# Kohn, Swift & Graf, P.C.

1600 Market Street, Suite 2500
Philadelphia, Pennsylvania 19103-7225

JOSEPH C. KOHN
ROBERT A. SWIFT
ROBERT J. LaROCCA
DOUGLAS A. ABRAHAMS *
WILLIAM E. HOESE
STEVEN M. STEINGARD *
STEPHEN H. SCHWARTZ †
CRAIG W. HILLWIG
BARBARA L. GIBSON †
NEIL L. GLAZER †
ZAHRA R. DEAN ⌘
AARTHI MANOHAR
ELIAS A. KOHN

HAROLD E. KOHN
1914-1999
BAYARD M. GRAF
1926-2015

OF COUNSEL
GEORGE W. CRONER
LISA PALFY KOHN

(215) 238-1700
Telecopier (215) 238-1968
FIRM E-MAIL: info@kohnswift.com
Web Site: www.kohnswift.com

Email: nglazer@kohnswift.com

† ALSO ADMITTED IN NEW YORK
* ALSO ADMITTED IN NEW JERSEY
⌘ ONLY ADMITTED IN NEW YORK

November 12, 2021

**Via Electronic Filing**

Honorable Eric R. Komitee
United States District Court
  Eastern District of New York
225 Cadman Plaza East
Courtroom: 6G North
Brooklyn, New York 11201

    Re:    **Edmondson, et al. v Raniere, et al.**

Dear Judge Komitee:

    The Court has directed the parties to submit letters setting forth their positions on issues raised at the status conference. For the reasons discussed below, Plaintiffs do not believe that the action should be divided, Defendants dropped, or claims severed. Plaintiffs are prepared to move forward with the current Complaint and are ready to respond to the motions to dismiss outlined by Defendants Clare and Sara Bronfman.[1] Therefore, Plaintiffs respectfully request that the Court consider a schedule for the proposed motions to dismiss at the next status conference scheduled for November 30. Plaintiffs present herein a summary statement of the case.

## DEFENDANTS ARE JOINTLY AND SEVERALLY LIABLE

    Since the early-to-mid-2000s, Clare Bronfman and Sara Bronfman agreed with Keith Raniere, Nancy Salzman and others to jointly pursue a common purpose through unlawful means, operating largely through NXIVM-related entities. The common purpose was to enhance Raniere's stature and provide him with everything he desired, while obtaining for themselves financial rewards, free labor, enhanced stature, and power and control over a growing community. This joint effort (referred to herein as the "NXIVM Venture") was, among other things, a conspiracy to operate or participate in a racketeering enterprise and to engage in human trafficking

---

[1] Three other Defendants have now appeared pro se and have indicated their intent to join in the motions to dismiss that will be filed by Clare Bronfman and Sara Bronfman, and that they may raise additional issues in their motions.

crimes, and the methods it employed were highly destructive. It succeeded. It was continuous over two decades, spanned North America and beyond, and through the unlawful and tortious acts set forth in the Complaint, caused members of the NXIVM community numerous economic and personal injuries. None of these harmful acts were distinct; each was connected to, arose out of and/or was necessary to the operation of the NXIVM Venture, and are thus part of this single case. To divide this case into siloed claims on separate tracks with separate discovery would be inefficient and would unduly restrict the Plaintiffs from being able to prove their claims.

The Complaint alleges that Clare Bronfman and Sara Bronfman conspired to participate in, and participated in, a racketeering enterprise – the NXIVM Venture – in which they each agreed to commit and committed at least two RICO predicate acts. The Complaint asserts claims against Clare Bronfman and Sara Bronfman under 18 U.S.C. § 1595(a), pursuant to which they are liable for acts in violation of enumerated Chapter 77 offenses, attempting and/or conspiring to commit such acts, and for having benefitted from their participation in a venture – the NXIVM Venture – that they knew, recklessly disregarded or should have known was committing Chapter 77 offenses. The Complaint alleges that Clare Bronfman and Sara Bronfman aided and abetted or acted in concert with others to engage in acts – the system and methods of the NXIVM Venture – that are negligent per se under New York law. The Complaint describes what the NXIVM Venture was, how it did what it did, how it injured the Plaintiffs, and each Defendant's role in this extraordinarily harmful venture. There is no room in a seven-page summary of the case to take on each point of law raised by Defendants, but Plaintiffs strongly disagree with Defendants' characterizations and mischaracterizations of the governing laws and are prepared to address each point of law in opposition to Defendants' motions to dismiss.[2]

## BACKGROUND OF THE NXIVM VENTURE

This was an elaborate, destructive undertaking, relying on an unending series of express and implicit false promises, including not only that NXIVM offered a legitimate career path (Compl. ¶ 3), but also (among other things) that the "tech" could cure psychological, medical and psychiatric conditions (Compl. ¶¶ 7, 16, 589, 600), and that Raniere's teachings were endorsed by (among others) the Dalai Lama. (Compl. ¶ 702). NXIVM's methods involved relentless emotional

---

[2] For example, Defendant Clare Bronfman argues that practicing psychology without a license is not unlawful in New York State, citing *People v. Abrams*, 177 A.D.2d 633 (1991). This is incorrect. *Abrams* was based on an antiquated version of the statute governing the profession of psychology, which was superseded by amendments to Title VIII of New York Education Law enacted in 2002. These amendments not only expressly made the practice of psychology without a license unlawful, but also substantially expanded the scope of Title VIII to include persons practicing psychotherapy, psychoanalysis and mental or behavioral health counseling under a variety of rubrics. The legislative intent was "to protect the public from unprofessional, improper, unauthorized and unqualified practice of counseling and psychotherapy." 2002 Sess. Law News of N.Y. Ch. 676, § 7 (S. 7727) (McKinney's). Anyone who engages in any of these practices without first qualifying for and being granted a license – regardless of what label they use – is guilty of a felony, as is anyone who aids and abets such acts. N.Y. Educ. Law § 6512. This law is "extraordinarily expansive" and it "manifests a legislative intent to proscribe all aspects of the unlicensed practice of any regulated profession" *People v. Shnayder*, 11 Misc. 3d 1053(A) at *8 (N.Y. Supreme Court, Kings Cty., Feb. 10, 2006) (internal quotation marks and citation omitted). Plaintiffs contend that NXIVM's methods violated these laws, and that these violations constitute negligence per se.

and psychological manipulation designed to impart a belief that one's problems resulted from personal failings and failures that only NXIVM's system could resolve.

Raniere and Nancy Salzman launched NXIVM as a so-called umbrella company under which Executive Success Programs and other related entities operated. As the "conceptual founder," Raniere had a ten-percent interest in each of the entities that was not documented or disclosed, because he was promoted as an ascetic humanitarian who had no interest in material possessions or worldly pleasures. (Compl. ¶¶ 54, 595-596). This false image of Raniere was fundamental to the promotion of the NXIVM Venture, and it was carefully managed, his true character and predilections obscured from the view of prospective recruits and most members of the NXIVM community. He was "Vanguard," and a large, framed photograph of him hung in every NXIVM classroom. (Compl. ¶ 620). He was venerated at the start of every class, his words and teachings were to be unquestioningly accepted and followed and members were required to give him tribute. (Compl. ¶ 639).

Exploitation of humans – extraction of assets and labors by fraud, manipulation and coercion – was central to the NXIVM Venture, and its teachings and methods were crafted to achieve this objective. According to NXIVM teachings, the ultimate goal for members was to attain self-mastery and effect positive change in the world by living in accord with principles taught by NXIVM. (Compl. ¶ 638). Students were manipulated into taking a never-ending series of expensive curriculum that slowly and subtly displaced their values with a warped "ethics" that normalized antisocial and even unlawful behaviors. (Compl. ¶ 8). Paired with these teachings were "EM" sessions in which the values taught in the curriculum were applied to a person's internal life to identify personal "issues." An issue could be anything identified as holding a person back from advancement, including resistance to teachings, and students were obligated to work relentlessly on overcoming them. (Compl. ¶¶ 677-681). Failing to work issues was an "ethical breach," an offense against both a person and the community that could result in punitive consequences. NXIVM students were forbidden from sharing what they were learning or experiencing with family, friends, and other outsiders, depriving them of anyone who might express concerns or offer a different frame of reference. (Compl. ¶ 612). This devastating combination stripped individuals of their self-worth and disconnected them from self-protective emotional responses ("issues" to be overcome), rendering them vulnerable to systematically escalating and destructive manipulation.

Early on, students were informed that if they committed to advancement within NXIVM by working their way up the "stripe path," they would not only alleviate their problems, but they could join the community and eventually earn a substantial living. (Compl. ¶ 3). However, first they were required to take courses, recruit others, and become "coaches," which required the provision of labor and services without compensation. (Compl. ¶¶ 632-634). As a member became increasingly immersed in the NXIVM community, they were encouraged to relocate to the Albany, NY area where the NXIVM Venture was based (Compl. ¶ 697), and over time many became financially dependent on the NXIVM Venture and its participants, put to work in severely underpaid and even unpaid jobs, which was justified as the way for an impoverished community member to continue to take the expensive courses they were pressured and manipulated to believe

they had to take. This unpaid work was sometimes referred to as a "value exchange." (Compl. ¶¶ 12, 642-643).

An ethical breach could result in not being paid or not being paid fully for one's labor. (Compl. ¶ 763). Many were told that their fear of being broke, going into debt or even having to file for bankruptcy was an issue that had to be overcome. (Compl. ¶ 691). This had a chilling effect on people standing up for themselves and increased vulnerability to the Venture's coercive pressure.

As they were pulled in deeper and became integrated into the NXIVM community, members were pressured to cut off outside friendships and family contacts or, at minimum, refuse to discuss anything related to NXIVM with them. (Compl. ¶ 612). These members were rendered financially and emotionally dependent on Defendants and the NXIVM Venture, and they no longer even saw a way out. This was extremely traumatizing, and it was all by design, the organized effort by Raniere and other participants in the NXIVM Venture, Clare and Sara Bronfman chief among them. Participants benefitted financially, they received free or extremely low-cost labor, they gained in stature in the growing community, and they expected greater stature, pleasures and material benefits as that community expanded around the world.

## DEFENDANTS CANNOT HAVE IT BOTH WAYS

Defendants' arguments are inconsistent. On the one hand, they argue that the Complaint alleges too much, is too sweeping, tries to lay the blame for everything at their feet; and on the other hand, they assert that it does not allege enough for them to understand the claims against them. They understand perfectly well what Plaintiffs' claims are, they have the short and plain set of allegations necessary to understand what they are accused of doing and what roles they both agreed to play and played in the NXIVM Venture. Their liability does not turn on being directly connected to (or even knowing about) each unlawful or harmful act. Nor do they have to have known each participant's specific role in the venture or the particular acts each would commit in furtherance of that undertaking.[3] They agreed to participate, and did participate, in a joint venture that, through the commission of numerous unlawful and tortious acts harmed numerous individuals, including Plaintiffs. They did so with the expectation of deriving benefits from this venture, which they did. And they knew, recklessly disregarded or should have known the NXIVM Venture was systematically engaging in acts of human trafficking that left members of the NXIVM community devastated.

The fact that the Complaint alleges many facts and legal claims is reflective of the scope of the NXIVM Venture. The Defendants in this action are not a random set of unrelated people who did unrelated things. The individual Defendants named in the Complaint lived, met, and worked out of a few residences and commercial buildings in Clifton Park, New York. Nor were the companies they set up and ran separate entities with their own independent boards of directors, managers, operations, and finances. Few, if any, formalities were followed, moneys were

---

[3] *See Salinas v. United States*, 522 U.S. 52 (1997) (explaining the broad scope of the RICO conspiracy statute § 1962(d) and that "[i]f conspirators have a plan which calls for some conspirators to perpetrate the crime and others to provide support, the supporters are as guilty as the perpetrators." *Id.* at 64.

commingled, the companies were rife with self-dealing – they were mere instrumentalities used to serve Defendants' needs in furthering the common purpose of the NXIVM Venture. (Compl. ¶ 615).

## CLARE BRONFMAN AND SARA BRONFMAN WERE LEADERS OF THE NXIVM VENTURE

Soon after taking their first "intensives", the Bronfmans relocated to the Albany area. Raniere had two uses for women: as objects for sex, or as partners in his project to control a growing population of acolytes, from whom money, and labor could be extracted. Clare Bronfman and Sara Bronfman zealously pursued those latter roles in the NXIVM Venture. After taking a few courses, Raniere personally elevated each to the heights of power and authority within the NXIVM Venture and the expanding community it was building. Sara was appointed "Director of Humanities," and took a seat on the Executive Board. (Compl. ¶ 702). She and Clare Bronfman set up several non-profit entities to further the NXIVM Venture's purposes. Clare Bronfman headed NXIVM's "legal team," and was appointed to the Executive Board in 2009, serving as the conduit between the Board and Raniere, consolidating her power, effectively ousting Nancy Salzman and taking control of legal, administrative and financial operations for NXIVM, among other things. (Compl. ¶¶ 703-704). Clare Bronfman and Sara Bronfman were not unwitting donors to the NXIVM Venture; they both committed specific unlawful acts that furthered the Venture, including the following examples alleged in the complaint.

Clare Bronfman and Raniere brought together six women (including Plaintiffs Bonnie, Adrienne and Jane Doe 17) under the pretense of launching a company called exo/eso that would open centers around the world teaching a new form of bodywork. They subsequently used the power differential to groom these women for Raniere's "harem," applying many of the same methods that would be used on other women in DOS. The exo/eso women were falsely promised an ownership share and profits while, in reality, Clare Bronfman owned the company, and had no intention of affording these women a meaningful business and career opportunity, or even a living wage. (Compl. ¶¶ 751-765). After a launch event on her private island in Fiji, for which the women were compensated, that compensation dried up. They were required to provide exo/eso trainings to other NXIVM entities and prospective recruits for free. Clare Bronfman justified the lack of compensation with a reason based on NXIVM's central tenet: they weren't entitled to be paid because they were failing to adequately resolve their supposed issues. When the women complained, she brought in Defendant Lauren Salzman, NXIVM's director of education, to scold the women for having a sense of "entitlement," accuse them of "ethical breaches," and force them to retake NXIVM's "tribute" module of the curriculum, which taught that, before being entitled to compensation, they had to learn to willingly work for free. (Compl. ¶ 763). Years of destructive, misogynistic curriculum had stripped them of their self-esteem, they were physically and mentally exhausted, and they simply did not have the wherewithal to push back against two of the highest-ranking authorities in NXIVM. This was, among other things, forced labor and attempted sex trafficking per 18 U.S.C. § 1589 and 1591.

Jane Doe 17's experience with Clare Bronfman and exo/eso had another exploitative dimension: Clare Bronfman induced her to leave her home country and go to work within the

NXIVM community in Albany by false promises of a position and salary detailed in a letter submitted by Clare Bronfman to U.S. immigration authorities. Once Jane Doe 17 was in the U.S., however, Clare Bronfman and Raniere informed her that she would work directly with Raniere and Clare Bronfman in an underpaid job in exo/eso and a second underpaid job as Clare Bronfman's personal assistant. (Compl. ¶ 768). When she complained about her circumstances, she was reprimanded. After months of persistently reminding Clare Bronfman of the promised salary, Bronfman begrudgingly began to pay her monthly sums. Later, however, Bronfman told Jane Doe 17 that the payments were just a loan, and that now Jane Doe 17 was indebted to her personally and needed to pay or work off that debt. (Compl. ¶ 769). Recognizing that she had been brought into the U.S. under false pretenses and fearing legal trouble if she challenged Defendants, Jane Doe 17 returned to Canada, taking a job as a yoga instructor. But Clare Bronfman harassed Jane Doe 17, threatening her with legal action and insisting that she was obligated to return to the U.S. and go back to work for her to pay off her debt. (Compl. ¶¶ 770-774); *see also* Complaint ¶ 729 ("Raniere and Clare Bronfman lured unsuspecting women from other countries to enter the U.S. to work with them on developing exo/eso, including Jane Doe 17.")). This was, among other things, peonage under 18 U.S.C § 1581 and fraud in foreign labor contracting in violation of 18 U.S.C. § 1351(a).

## THE BRONFMANS' DECEPTION AND INTIMIDATION TACTICS

Clare Bronfman and Sara Bronfman engineered an event featuring the Dalai Lama so the NXIVM Venture could falsely portray Raniere as a world-class ethicist, honored and endorsed by one of the world's greatest spiritual leaders. After some conniving and outright lies to the Dalai Lama to assure him that Raniere was the victim of a disinformation campaign by his enemies, Sara Bronfman donated one-million dollars to one of the Dalai Lama's charities in exchange for him appearing at their event, which was subsequently used to perpetuate a falsehood: that the Dalai Lama traveled to Albany to honor and endorse Raniere. (Compl. ¶ 702). He didn't. Clare and Sara Bronfman organized and financed this event to promote the falsehood to persuade people to ignore negative media reports and continue as members of, and join, the NXIVM community. This was, among other things, fraud in violation of 18 U.S.C. § 1343.

Led by Defendant Clare Bronfman and supported by Sara Bronfman, the NXIVM Venture's 'legal team' hired investigators to rummage through peoples' garbage, monitor their communications, and obtain their financial information. (Compl. ¶ 701). They paid one investigative firm approximately one million dollars to dig up financial information and "dirt" on a list of NXIVM enemies that included public officials and even the federal judges presiding over their various cases. (Compl. ¶ 701). These were disturbing attempts to obstruct justice, interfere with federal legal proceedings and corruptly influence government officials.

The NXIVM Venture abused the legal process to punish critics and perceived enemies. Directed by Clare Bronfman, the Venture reportedly hired 50-60 lawyers from 30 or more law firms to file lawsuits, interfere in bankruptcy proceedings and abuse the legal system, not for legitimate purposes, but to set examples to others of the consequences they might suffer if they spoke to anyone against NXIVM. (Compl. ¶¶ 36). Plaintiff Toni Natalie was persecuted in one case after another, civil and criminal. Not a single case or claim against her had the slightest merit,

but that was never the point, and some were supported by false statements and other wrongdoing by Clare Bronfman. (Comp. ¶¶ 741, 745-748). The Venture sued NXIVM critic Rick Ross, who posted truthful information about Raniere and NXIVM on his website, along with several other individuals. (Compl. ¶ 742). Defendant Nancy Salzman pleaded guilty to conspiring to operate or participate in a racketeering enterprise that, among other things, altered evidence in that federal proceeding. (Compl. ¶ 842). That conspiracy and enterprise is the NXIVM Venture and the legal team that altered that evidence was run by Clare Bronfman. Sara Bronfman contributed millions of dollars to these efforts, knowing that the purpose was to make examples of some to silence the rest.

The intimidation and retaliation against victims and witnesses continued even after the existence of DOS had been publicly exposed and several critics, including at least one outspoken DOS victim, Plaintiff Sarah Edmondson, were calling for law enforcement to investigate the NXIVM Venture. Multiple women, including several Plaintiffs, wrote letters to Clare Bronfman and other members of NXIVM's Executive Board, describing their collateral (compromising photographs and documents) and asking that it be returned or destroyed. Clare Bronfman, and the rest of the board, ignored their pleas. Instead, she flew to Vancouver, Canada and lodged a false criminal complaint against Ms. Edmondson. (Compl. ¶¶ 106, 837). Beginning in the late summer and fall of 2017, Clare Bronfman and Raniere authored several letters to former DOS members, including several Plaintiffs, threatening legal action and demanding silence about DOS, some backed by more false criminal complaints. (Compl. ¶ 749, 884). Shortly before Raniere's criminal trial, Sara Bronfman attempted by false pretenses to financially induce Plaintiff (and potentially key prosecution witness) Adrian to leave and remain out of the country for the duration of the trial. (Compl. ¶ 855). These were acts of attempted witness tampering and attempts to obstruct and interfere with enforcement of 18 U.S.C. §§ 1590 and 1591.

All these overt acts were taken by Clare and Sara Bronfman in furtherance of the NXIVM Venture. Clare and Sara Bronfman knowingly and willingly participated in the affairs of the Venture, not merely as generous donors or foot soldiers, but while occupying top rungs in the organization. Their proclamations of innocence and ignorance strain credulity, and the Complaint offers a wealth of factual allegation to support Plaintiffs' claims.

Respectfully Submitted,

Neil L. Glazer

NLG/csm

cc: All counsel via ECF

{00223533 }