1          UNITED STATES DISTRICT COURT

2        EASTERN DISTRICT OF NEW YORK (BROOKLYN)

3    SARAH EDMONDSON, et al,
                                    Case No. 1:20-cv-00485-EK-CLP
4            Plaintiffs,

5    v.                             Brooklyn, New York
                                    February 1, 2023
6    KEITH RANIERE, et al,          2:34 p.m.

7            Defendants.

8
                      TRANSCRIPT OF HEARING
9          BEFORE THE HONORABLE ERIC R. KOMITEE
            UNITED STATES DISTRICT COURT JUDGE
10
     APPEARANCES:
11   For the Plaintiff:          Aitan D. Goelman, Esq.
                                 Bryan M Reines, Esq.
12                               Zuckerman Spaeder LLP
                                 1800 M Street, NW
13                               Suite 1000
                                 Washington, DC 20036-5802
14
                                 William E. Hoese, Esq.
15                               Aarthi Manohar, Esq.
                                 Zahra Dean, Esq.
16                               Craig W. Hillwig, Esq.
                                 Kohn, Swift & Graf, P.C.
17                               1600 Market Street
                                 Suite 2500
18                               Philadelphia, PA 19103-7225

19   For the Defendant:         Ronald S. Sullivan, Esq.
     (Clare Bronfman)           Ronald Sullivan Law, PLLC
20                              1300 I Street NW
                                Suite 400 E
21                              Washington, DC 20005

22                              Craig C. Martin, Esq.
     (Clare Bronfman)           Willkie Farr & Gallagher, LLP
23                              300 N. LaSalle Dr.
                                Ste 50th Floor
24                              Chicago, IL 60654

25

```
 1    APPEARANCES (continued):

 2    For the Defendant:              James D Wareham, Esq.
      (Sara Bronfman)                Fried, Frank, Harris, Shriver
 3                                    & Jacobson, LLP
                                      801 17th Street, NW
 4                                    Washington, DC 20006

 5    For the Defendant:              Anne Aufhauser, Esq.
      (Sara Bronfman)                Robin Henry, Esq.
 6                                    Fried, Frank, Harris, Shriver &
                                      Jacobson, LLP
 7                                    One New York Plaza
                                      New York, NY 10004
 8
      For the Defendant:              Brandon Porter, Pro Se
 9                                    P.O. Box 1102
                                      500 W. Hickman Rd.
10                                    Waukee, IA 40263

11    For the Defendant:              Danielle Roberts, Pro Se
                                      4120 S. Lake Drive
12                                    Unit #463
                                      St. Francis, WI 53235
13
      For the Defendant:              Nicole Clyne, Pro Se
14                                    1072 Bedford Avenue, #87
                                      Brooklyn, NY 11216
15
      Clerk:                          Unknown
16
      Court Recorder:                 Electronic Sound Recording
17
      Transcription Service:          Chris Hwang
18                                    Abba Reporting
                                      PO Box 223282
19                                    Chantilly, Virginia  20153
                                      (518) 302-6772
20

21

22

23    Proceedings recorded by electronic sound recording;
      transcript produced by transcription service.
24

25
```

1          (Call to order at 2:34 p.m.)

2               THE COURT:  Please be seated.

3               THE CLERK:  Civil cause for oral argument, Edmondson,

4     et al versus Raniere, et al. docket number 20 civil 485.

5               Would you all please state your appearances for the

6     record, starting with the Plaintiff?

7               MR. GOELMAN:  Aitan Goelman, Zuckerman Spaeder, good

8     afternoon, Your Honor.

9               THE COURT:  Good afternoon.

10              MR. HOESE:  William Hoese, H-O-E-S-E for the

11     Plaintiffs, good afternoon, Your Honor.

12              THE CLERK:  I'll remind you all to speak into the

13     microphones.

14              MR. HOESE:  I'm sorry, I apologize.  (Indiscernible.)

15              MS. MANOHAR:  Good afternoon, Aarthi Manohar for the

16     Plaintiffs, Kohn, Swift & Graf.

17              MS. DEAN:  Good afternoon, Zahra Dean for the

18     Plaintiffs also from the Kohn, Swift & Graf.

19              THE COURT:  You got to find the microphones where you

20     can.

21              MR. HILLWIG:  Craig Hillwig, Kohn, Swift & Graf also

22     for Plaintiffs.

23              MR. REINES:  Bryan Reines for Plaintiffs.

24              THE COURT:  And for the Defendants?

25              MR. SULLIVAN:  Ronald Sullivan on behalf of Clare

1    Bronfman.

2            MR. MARTIN:  And Craig Martin, Willkie Farr &

3    Gallagher on behalf of Clare Bronfman as well.

4            MR. WAREHAM:  Good afternoon, Your Honor, James

5    Wareham, Fried Frank, along with my colleague Ann A. and my

6    partner Robin Henry at the end on behalf of Sara Bronfman.

7            MR. PORTER:  Branden Porter representing myself.

8            MS. ROBERTS:  Good afternoon, Your Honor, Danielle

9    Roberts representing myself.

10           MS. CLYNE:  And Nicole Clyne representing myself.

11           THE COURT:  All right, good afternoon, everyone.

12   Thank you all for being here.

13           Mr. Goelman, are you leading the case or are you here

14   all alone and I just didn't make the connection?

15           MR. GOELMAN:  This is my first appearance at a

16   hearing, but we've been working with Mr. Glazer at Kohn Swift.

17           THE CLERK:  Microphone, Mr. Goelman.

18           MR. GOELMAN:  Sorry.  This is my first appearance in

19   person, but we've been involved since before the complaint was

20   filed, Your Honor.

21           THE COURT:  Okay.  And you filed an appearance in the

22   case?

23           MR. GOELMAN:  Yes, Your Honor.

24           THE COURT:  All right.  So we got a lot of motions to

25   dismiss by a lot of Defendants dealing with a lot of claims

1    brought by a lot of Plaintiffs.

2            I would like to wrap up here by 5:00, which is two

3    and a half hours of which we're going to use about 7 minutes.

4    I assume we'll take a 10-minute break somewhere along the way.

5            By my calculations, that leaves us roughly 10 minutes

6    or so to discuss each of the 14 counts in the complaint.  And

7    that's then is both sides total per count.

8            So I think, you know, we'll spend more time on RICO,

9    RICO conspiracy, and the RICO predicates, which obviously have

10   some overlap between and amongst themselves and maybe less time

11   on some of the latter counts.

12           But I'm going to ask in the first instance that we

13   talk about the RICO claims.  Even though it's the Defendant's

14   motions that we're here to argue, I think it actually makes

15   more sense to start with the Plaintiffs and argue why the

16   motion to dismiss a given claim should be denied, why in other

17   words, the allegations are sufficient to make out enough

18   factual content on each element of each claim.  And then, we

19   can hear from the Defendants essentially in rebuttal.

20           So why don't we kick off with the RICO claim?  I

21   don't know who's -- Mr. Goelman arguing.  And I'd like to go

22   Defendant by Defendant.

23           MR. GOELMAN:  Would the Court prefer me to stay at

24   table or go the lectern?

25           THE COURT:  Either is fine with me as long as you're

1    near enough to a microphone that the sound engineer is picking

2    you up.

3              MR. GOELMAN:  Okay.

4              THE COURT:  So starting with the claim for RICO as

5    against Ms. Clare Bronfman?

6              MR. GOELMAN:  Your Honor, I'll start -- is this

7    picking me up?  Yeah.

8              THE COURT:  That is, you're on.

9              MR. GOELMAN:  I want to start by talking by the

10   question of the existence of an enterprise and what the

11   enterprise is.

12             And all of the Defendants say that there's no

13   enterprise here.  And I want to just kind of talk about why

14   this case is right in the wheelhouse of what a RICO case should

15   be as opposed to a lot of other civil RICO cases that get

16   filed.

17             As the Court knows, RICO was passed to combat

18   organized crime.  And it had been very difficult for the

19   government to combat organized crime because those acts were --

20   took so long, were so disparate, and witnesses had a way of

21   disappearing or being afraid to testify.

22             So Congress passes RICO.  It's initially used to

23   combat the mob.  And then, it starts being used for another

24   context.

25             When I was at AUSA, I was in a unit called the

1   Violent Gangs Unit.  So we used to take street gangs, drug

2   gangs that charged other drug dealers rents in the projects and

3   charge them with RICO.

4          And sometimes gang members would get to court and

5   they would for the first time learn that they were in a gang

6   that was called by a particular name.

7          Because a lot of times these gangs didn't have names.

8   It didn't have a hierarchy.  They were an affiliation in fact,

9   but they were looser than you might think.

10          And that was a issue that they raised and an issue

11  that the 2nd Circuit has repeatedly rejected when affirming

12  those convictions.

13          This is different, Your Honor.  This is NXIVM.  You

14  know, for years, decades, the Mafia argued that there's no such

15  thing as the Mafia.

16          You can't argue that there's no such thing as NXIVM.

17  People in the NXIVM community, and it was a community, it was a

18  distorted, warped community built on lies that did terrible

19  things to its members, but it was a community.  They called

20  themselves NXIVMs or Espions (phonetic).

21          THE COURT:  Yeah, I don't think we have any real

22  dispute that there were entities here that there were

23  associations both in fact and in law.

24          We might debate, I suppose, whether you're calling

25  the enterprise was actually more than one enterprise, but

1    that's why my inclination was to start with the predicate acts

2    and go Defendant by Defendant, because my sense is that's more

3    likely to be where the rubber meets the road here in terms of

4    the motions to dismiss.

5           MR. GOELMAN:  Okay, and I'm happy to address why this

6    is one enterprise and not many enterprise.  If the Court wants

7    to hear that, but if you want to start with predicates, that's

8    -- whatever the Court prefers.

9           THE COURT:  Why don't -- I think we'll be better able

10   to get to the specifics if we go Defendant by Defendant, and

11   get your view on whether the complaint adequately alleges the

12   requisite predicate acts.

13          MR. GOELMAN:  Okay.

14          THE COURT:  And if you'd start with -- just because

15   that's the order that my notes here go in Ms. Clare Bronfman.

16          MR. GOELMAN:  Okay.

17          THE COURT:  You can take it from there.

18          MR. GOELMAN:  I will start with Ms. Clare Bronfman.

19   And I want to begin with a response to what Ms. Clare Bronfman,

20   Ms. Sara Bronfman, and some of the other Defendants alleged in

21   their reply briefs.

22          And what they said is you're only going after the

23   Bronfmans because they're rich.  They had nothing to do with

24   the really bad stuff here.  And this is a shameless, I can't

25   tell you how many times that word appeared, shameless cash grab

1    for a will -- a windfall for greedy plaintiffs and their

2    lawyers.

3              That's not true, Your Honor.  But it is true that the

4    wealth of the Bronfmans is very relevant here.  Without

5    Bronfman money, there's no NXIVM headquarters or operation

6    center.  There's no houses in Clifton Park, New York.  There's

7    no team of lawyers and private investigators intimidating

8    critics and apostates.  There's no stream of foreign nationals

9    to abuse.  There are no pseudoscientific experiments.  There's

10   no visit by the Dalai Lama.  And short, there's no NXIVM or a

11   greatly reduced NXIVM.

12             And I want to begin in terms of Ms. Clare Bronfman by

13   talking about what Judge Garaufis found when he sentenced her.

14   And in their reply briefs, Ms. Clare Bronfman's lawyers say

15   it's improper to cite the criminal case.

16             That's not right.  It's entirely proper to cite the

17   criminal case.  And there are different parts of the criminal

18   case that will play different roles in this case, should it

19   proceed to trial.

20             So, for example, Clare Bronfman pleaded guilty to two

21   counts.  She took an oath to tell the truth and stood in a

22   courthouse in a room in this courthouse and admitted to what

23   she had done.  That clearly is admissible and it probably

24   has -- it probably is preclusive as well.

25             THE COURT:  We can talk about that right there.

1   There may be some collateral estoppel effect to the guilty

2   pleas.  Surely there is some collateral estoppel effect.

3        But a lot of what you cite in the briefs is Judge

4   Garaufis' characterization of the evidence he saw at trial

5   perhaps.

6        You know, your motion doesn't always make clear the

7   extent to which he's basing his observations on trial evidence

8   versus the PSR versus some other source.

9        And I don't know that you take any position on

10  whether those kind of observations have any preclusive affect

11  at all.

12       And if not, then we probably shouldn't be talking

13  about them at this stage, right, because on a motion to

14  dismiss, we're testing the legal sufficiency of the complaint.

15  We're limited to the factual allegations that fall within the

16  four corners of the complaint except to which -- except to the

17  extent to which there are matters of which the Court can take

18  judicial notice.

19       And I can take judicial notice that Judge Garaufis

20  said something at sentencing because there's a transcript, but

21  I don't think I -- on the basis can take that for the truth of

22  the matter asserted unless there's some collateral estoppel or

23  other legally preclusive effect, but tell me if I have that

24  wrong?

25            MR. GOELMAN:  I think you do have that somewhat

1    wrong, Your Honor.

2             THE COURT:  Please.

3             MR. GOELMAN:  You know, Judge Garaufis sat through

4    the trial.  He considered all the evidence in the pre-sentence

5    reports.

6             And then, he made findings by a preponderance of the

7    evidence, which is greater than what the Court has to find here

8    to find plausibility about Clare Bronfman's role in NXIVM.

9             And there is -- and we don't need to decide whether

10   or not those findings are admissible at trial.  There's law

11   about that and we think we have good case.

12            There's even law about sentencing findings being

13   preclusive, but that is something that is not -- is not joined

14   right now.

15            You don't have to decide whether or not it's

16   preclusive or whether or not the evidence is admitted at trial,

17   but there's nothing that precludes the Court from evaluating

18   and weighing Judge Garaufis' findings and deciding whether or

19   not this complaint is plausible.

20            And the complaint itself --

21            THE COURT:  Does that depend on -- so not every word

22   that a judge says in the course of imposing sentence is a

23   finding of fact, right?

24            The judge may be making findings of fact, but usually

25   when that's the case, there will be some statement to that

1    effect, but I'm not sure that I saw those in your brief.

2           And you know, are you arguing -- you're not arguing

3    that every word a judge says at sentencing becomes evidence or

4    factual allegation even on the basis of which we can test the

5    sufficiency of the complaint here, right?  You're making some

6    more limited argument, but I'm just not sure I understand what

7    it is.

8           MR. GOELMAN:  I am not arguing that every word that a

9    judge says at sentencing is admissible.  I am arguing that in

10   order to sentence Clare Bronfman the way he did, Judge Garaufis

11   made particular findings by a preponderance of the evidence.

12          Those findings were challenged by Clare Bronfman in

13   her appeal to the 2nd Circuit and the 2nd Circuit affirmed and

14   said Judge Garaufis was well within his discretion to make

15   those findings based on record.

16          If Judge Garaufis decided to sentence somebody to

17   three times the top of a Sentencing Guidelines range, he --

18          THE COURT:  Well, let me -- so the conspiracy -- the

19   two most interesting predicate acts as to Clare Bronfman to me

20   are the forced labor predicate and the conspiracy to conceal

21   and harbor illegal aliens predicate or predicates.

22          The latter was the subject of her guilty plea, right?

23   And I think I agree with you that there's some preclusive

24   effect from that, but talk about the forced labor predicate.

25          What -- you know, start with your complaint, and

1    then, and tell me exactly what the complaint says about Clare

2    Bronfman's liability for forced labor.  And then to the extent

3    you're relying not only on things in the complaint, but also

4    things from the record at sentencing.  We can talk about that

5    in succession.

6         MR. GOELMAN:  Okay.  Your Honor, before I turn to the

7    forced labor, I just want to follow up on the immigration fraud

8    because that is a predicate act and it's a predicate act that

9    Clare Bronfman pleaded guilty to.  And when she pleaded guilty,

10   she took an oath and said that she had done that for financial

11   gain.

12        Now that particular Plaintiff -- I mean, that

13   particular victim, Jane Doe 12, is not a Plaintiff of ours.

14   But several other Plaintiffs are and several other victims are

15   Plaintiffs.

16        And just because the Jane Doe 12 is not a Plaintiff

17   doesn't mean that that cannot count as one of the two predicate

18   acts.

19        And the complaint alleges at least four different

20   people who Clare Bronfman committed immigration fraud with

21   respect to.

22        So right there, there's more than enough predicate

23   acts for Clare Bronfman before you even get to the forced

24   labor.

25        THE COURT:  Okay, and you're not -- and just make it

1   explicit for me when you say there's more than enough, are you

2   talking about the factual allegations alleged in writing in the

3   complaint or are you also trying to leverage some preclusive

4   effect associated with the guilty plea as well?

5           MR. GOELMAN:  Your Honor, the guilty plea and Judge

6   Garaufis' findings, they're all part of the four corners of the

7   complaint.  We cite them all in the complaint.  They're all

8   being --

9           THE COURT:  All right, so just point me there.  I've

10  got the complaint with me.  And for the sake of everybody

11  working off the same paragraph numbers, I'm working off the

12  First Amended Complaint because I think that's what the briefs

13  do as well.

14          MR. MARTIN:  Your Honor, do you have this as docket -

15  - document 64?

16          THE COURT:  Yes.

17          MR. MARTIN:  Okay, thank you.

18          THE COURT:  So let me tee this up for you even a

19  little bit more perhaps.  The elements of a claim for forced

20  labor are that a Defendant knowingly obtained the labor or

21  services of another by means of a series of bad ways of doing

22  that, force or physical restraint, but I think the one you

23  probably are relying on as to Clare Bronfman is the threat of

24  serious harm.  And I'm interested in what the complaint says by

25  way of alleging that element.

1    MR. GOELMAN:  Just one moment.  The paragraphs that I

2    had been planning to direct the Court to are the ones about

3    Clare Bronfman's guilty plea and it's in fact.  So let me --

4    Court's indulgence.

5    THE COURT:  Yeah, I mean, I see, so for example, I

6    think, one of the Plaintiffs as to who you allege false labor -

7    - forced labor against Clare Bronfman is Camila.  And that is

8    in the First Amended Complaint, paragraph 87 or thereabouts.

9    Or anywhere else you want to point me, but my question is --

10    MR. GOELMAN:  Your question is how is it --

11    THE COURT:  Where is the threat of serious harm

12    alleged in the complaint?

13    MR. GOELMAN:  Clare Bronfman told Camila -- well,

14    first, she advised Camila not to return to Mexico to renew her

15    visitor visa.

16    Okay, once that happened, Camila was effectively a

17    prisoner.  And Clare Bronfman and others told Camila that she

18    would be deported, that she would be in trouble, that she would

19    be -- when in 2017, Clare Bronfman threatened that Camila Would

20    be arrested.  She told that the FBI was after her.

21    THE COURT:  This is before the work happens or after?

22    MR. GOELMAN:  Camila's affiliation with NXIVM

23    continued after 2017.  And --

24    THE COURT:  Including what you're saying is the

25    forced labor?

1          MR. GOELMAN:  I'm not sure it's -- I'm not sure if

2    the labor continued after that or not.

3          THE COURT:  Well, the labor has to be induced by the

4    threat.  So a threat that happens after the labor has completed

5    wouldn't work, would it?

6          MR. GOELMAN:  No, Your Honor.

7          THE COURT:  Okay, so just so I understand, the -- as

8    to Camila, the threat of serious harm that induces her labor is

9    what?  Is advising her to stop returning to Mexico?

10         That -- I think I need a case citation for the

11   proposition that giving somebody bad advice about immigration

12   law, if that's what that is, constitutes a threat of serious

13   harm.

14         MR. GOELMAN:  Camila, along with the other people who

15   were here illegally, other people who were lured here

16   illegally, were told that they could be deported because they

17   were --

18         THE COURT:  Right.

19         MR. GOELMAN:  -- no longer -- they were no longer

20   under the four corners of the -- their ability -- their

21   permission to enter the country.

22         THE COURT:  Right.  No, and we see the case law that

23   clearly establishes that threatening to have somebody deported

24   constitutes a threat of serious harm.

25         But tell me where that is then in the complaint that

1    Ms. Bronfman is herself threatening to cause deportation and,

2    you know, initiate a deportation raid investigation or

3    otherwise?

4            MR. GOELMAN:  I will direct the Court to paragraph

5    90.

6            THE COURT:  So Clare Bronfman, you allege, refused to

7    allow Camila to have any direct contact with Ms. Bronfman's

8    attorneys purportedly because they represent Bronfman and not

9    her.

10           MR. GOELMAN:  Right, told her that she needs to wait

11   no further instructions.

12           THE COURT:  Well, that -- you allege that Clare

13   Bronfman told her.  You said Camila once told.  And there's a

14   lot of passive voice in the complaint including there, right?

15           Camila was told that she might qualify under the

16   Dream Act, but that she waited to -- she needed to wait for

17   further instructions.  Am I supposed to infer that that's Ms.

18   Bronfman who is the speaker?

19           MR. GOELMAN:  Yes, Your Honor.  This is talking about

20   a conversation that Ms. Bronfman had with her lawyers, who she

21   retained and she turned around and relayed that or purportedly

22   relay that to Camila.

23           So I think that despite the use of the passive voice

24   there, it's pretty apparent who's being talked about.

25           THE COURT:  Well, the next one, it says Raniere and

1   Bronfman never intended to assist Camila.  And the prior

2   sentence talks about Bronfman, okay.

3           MR. GOELMAN:  Your Honor --

4           THE COURT:  Yeah.

5           MR. GOELMAN:  -- the --

6           THE COURT:  All right, but so fine, let's assume that

7   that's Clare Bronfman who is the speaker, even though that's

8   not make explicit.

9           The what is spoken is that Camila might qualify under

10  the Dream Act, but needed to wait for further instructions

11  because if she applied, it would risk exposing that she had

12  been in the country illegally.

13          I think we can assume that if that's true, that was

14  not the world's greatest legal advice being provided, but how

15  does say you need to wait for further instructions constitute a

16  threat of serious harm?

17          MR. GOELMAN:  Your Honor, it is part of the overall

18  context with which -- under which Camila was here.  And how

19  these women, and I'm using plural, but Camila's one of them,

20  are lured to the U.S., right, under false pretenses.

21          Once they no longer have their legal immigration

22  status, they have very little leverage.  They're working, doing

23  menial house work for Clare Bronfman and others.

24          And if they want to leave, if they want to babysit,

25  if they want to apply for citizenship under the Dream Act, they

1   are told that they can't.

2           And Ms. Bronfman, Your Honor, the complaint needs be

3   read as a whole.  And whether or not there are plausible

4   allegations to establish any particular element comes from the

5   complaint as a whole.

6           THE COURT:  I agree with that, but it seems at least

7   incumbent on you if you're saying, look, the way in which the

8   forced labor was induced here was through the threat of serious

9   harm, it seems like it's incumbent on you just to say what the

10  nature of the harm is and how Clare Bronfman induced it.

11          And you know, it's one thing to say that somebody's

12  living under the stress of, you know, non-legal status in the

13  country and all the anxiety that that brings with it.

14          It's another thing to say that a particular person

15  made threats in respect of that status.  And it's that last

16  logical inference that I'm having some trouble with.

17          So what is the harm?  And then, we can talk about how

18  it was induced.  The harm is deportation or is it something

19  else?

20          MR. GOELMAN:  That is the threatened harm,

21  deportation.

22          THE COURT:  Okay.

23          MR. GOELMAN:  There's also and it depends on the

24  particular Plaintiff.

25          THE COURT:  So how does Clare Bronfman threaten --

1    you allege Clare Bronfman threatened do to go the authorities

2    and have Camila deported.  And my question was like what's the

3    other allegation that fulfills that role here?

4              MR. GOELMAN:  Your Honor, Camila was told that she

5    had to keep working because if she didn't, she would be found

6    out, and she would be deported.  That's --

7              THE COURT:  That's something Clare Bronfman said?

8              MR. GOELMAN:  That is something that Clare Bronfman,

9    to my understanding, relayed to her from the immigration

10   lawyers.

11             And when I'm talking about the considering the

12   complaint as a whole, there is -- there are several paragraphs

13   which talk about Clare Bronfman and her role with respect to

14   lawyers and the campaign of legal terror against apostates.

15             But she also, Your Honor, and this is alleged in the

16   complaint, was the one who managed all the legal engagements.

17   60 lawyers over 30 firms.

18             So when the Court is considering legal advice on

19   immigration and how that was relayed or not relayed to the

20   Plaintiffs, I think it's a reasonable inference to conclude

21   that Ms. Bronfman was part of that.

22             With Court's indulgence, I just want to get this one

23   paragraph.  In paragraph 87, Your Honor, it says over the

24   course of many years, Defendant Clare Bronfman likewise

25   exploited Camila's vulnerabilities, including advising Camila

1    to stop returning to Mexico to renew her visitor visa with

2    false promises of assistance from Bronfman's immigration

3    lawyers.

4           Bronfman, Raniere, Nancy Salzman, and others knew

5    that Camila could be even more vulnerable if she lost her

6    immigration status.  And they took advantage of the

7    circumstances by among other things, paying her very low wages

8    and often refusing to compensate her at all.

9           THE COURT:  No, I get that.

10          MR. GOELMAN:  Telling her that she was -- since she

11   was in the country illegally, she had no right to be paid.  So

12   your question is where does the complaint say explicitly that

13   Clare Bronfman told her that she was at risk of being deported

14   if she stopped working for them?

15          THE COURT:  I don't think that would be enough even.

16   I'm not sure that would be true, but if the -- if what you're

17   saying is the serious harm that Ms. Bronfman threatened was

18   deportation, I think you have to show me where Ms. Bronfman

19   threatened deportation.

20          And query whether it would be enough that Ms.

21   Bronfman said if you stop working, you might be deported.  I'm

22   not even sure how that would work mechanically.

23          I mean, I think I have -- I think we both understand

24   what the argument is on this.  And if you want to transfer from

25   forced labor to the concealment and harboring of illegal aliens

1    for financial gain, then --

2            MR. GOELMAN:  Okay, well --

3            THE COURT: -- let me know where you see the elements

4    of that.

5            MR. GOELMAN:  Okay, well, I will begin with Clare

6    Bronfman's reply brief, which says that the only predicate act

7    that (indiscernible) establishing for Clare Bronfman is

8    harboring an alien.  And that's only predicate acts.

9            Clare Bronfman pleaded guilty to harboring an alien.

10   So I'm pretty sure that's more than come close to establishing,

11   that is establishing.  And the Court can read, her colloquy is

12   actually in the complaint where she says I did this for

13   financial gain.

14           THE COURT:  What was the financial gain?  That -- I

15   haven't read her allocution.

16           MR. GOELMAN:  She got free work at (indiscernible).

17           THE COURT:  Okay.  And tell me as a matter of law

18   what is the significance if anything of the fact that we're

19   talking about a different victim than the ones alleged here and

20   that the victim is not a Plaintiff in this case?

21           MR. GOELMAN:  That is not significant in terms of

22   establishing whether or not we have met the burden of

23   establishing that Clare Bronfman committed -- participated in

24   the RICO enterprise through a pattern of racketeering activity.

25   You still count that as one of the predicate acts.

1           And the fact, Your Honor, that she pleaded guilty and

2   admitted under oath that this was for her financial gain, I

3   understand that she only pleaded guilty to that one victim, and

4   the victim wasn't a Plaintiff, but there's several other

5   Plaintiffs who were also harbored illegally by Clare Bronfman.

6           And to believe that she --

7           THE COURT:  What does harboring mean in this context?

8           MR. GOELMAN:  I'm using it as shorthand for all of

9   the acts under 1324.  She lured people to this country, and

10  then, kept them basically imprisoned and confined to doing this

11  work that she had them do, and paid them either nothing or

12  minimal wages.

13          And threatened them with deportation if they -- or

14  just blew them off if they asked for better wages or wages at

15  all.

16          THE COURT:  So let's go Plaintiff by Plaintiff then.

17  The first one I'm looking at is Adrian.  What is the

18  concealment or harboring or you tell me what you think the

19  apposite verb is as to Adrian?

20          MR. GOELMAN:  I think that the allegation is that

21  Clare Bronfman lured Adrian to the U.S.  She was part of the

22  reason that he was brought here with the promise, which turned

23  out to be false, that he be able to be financially successful

24  in starting up a -- I believe it was a T-shirt business with

25  Ms. Bronfman, because here --

1           THE COURT:  But I -- is he still in Mexico City when

2      that inducement occurs or is he already here?

3           MR. GOELMAN:  I believe that the -- and the complaint

4      alleges that he came to the U.S. at the best of Clare Bronfman

5      after she made false promises to him.

6           THE COURT:  So I'm looking at paragraph 725.  In the

7      third sentence of that paragraph says eventually he complained

8      that he was unable to support himself and could not stay.  To

9      convince him otherwise, Raniere offered an opportunity to build

10     a company with Raniere as mentor, Clare Bronfman, and another

11     person own the equipment for this T-shirt manufacturing

12     operation.  And they offered Adrian a chance to get the company

13     up and running.

14          What are they doing by that conduct?  They're

15     harboring, they're concealing, they're luring?

16          MR. GOELMAN:  For that -- sorry, for that conduct,

17     they're harboring and concealing.  If he's already in the

18     country, they're not luring him into the United States.

19          THE COURT:  But how is giving somebody T-shirt

20     manufacturing equipment equal to harboring them or concealing

21     them?  I would have thought harboring or concealing means

22     putting up somebody up in a secret residence or something?  And

23     I guess this is a question of law, not a question of what are

24     the factual allegations.

25          MR. GOELMAN:  Well, in paragraph 726, Your Honor, it

1    says Defendants Raniere and Clare Bronfman and others pressured

2    Adrian into staying, persuading him that there's no need to

3    leave the U.S. and re-enter because their lawyers could take

4    sure of the issue.

5            He relied on these assurances and remained in the

6    U.S. working for Defendants even after losing his immigration

7    status.

8            You know, if you pressure someone into staying in the

9    U.S. illegally, and that forces them to basically be at your

10   beck and call and under your command, it may not be hiding them

11   in a cellar, but I don't that concealing has that limited a

12   meaning.

13           THE COURT:  So, in other words, he wants to go home

14   and they tell him don't do that.

15           MR. GOELMAN:  He wants to --

16           THE COURT:  And that --

17           MR. GOELMAN:  Look, Your Honor, he wants to go back

18   to Mexico and be in the U.S. legally.

19           THE COURT:  Oh, I -- yes, to renew his visa.  Okay.

20   What was, just by way of comparison, since I haven't read the

21   allocution on this point in front of Judge Garaufis, the

22   factual basis for the guilty plea?

23           MR. GOELMAN:  The one for the -- for Clare Bronfman,

24   you mean, Your Honor?

25           THE COURT:  Yeah, for the victim who's not a

1    Plaintiff here?

2              MR. GOELMAN:  For Jane Doe 12?

3              THE COURT:  Yes.

4              MR. GOELMAN:  It was that she -- I think it was that

5    she -- I can get you the exact words, but I think it was that

6    she lured her here and that she did it legally, and she knew

7    that it was legal, and she did it for her financial benefit.  I

8    think those are the elements.

9              THE COURT:  So, in other words, you're saying it was

10   roughly analogous to what was alleged as to these victims?

11             MR. GOELMAN:  I'm sorry, Your Honor, paragraph 852

12   contains Clare Bronfman's colloquy (indiscernible).

13             THE CLERK:  I'm losing you.  Please find a

14   microphone.

15             THE COURT:  Paragraph 852 you said?

16             MR. GOELMAN:  852, yes, Your Honor.

17             THE COURT:  Okay.  Substantially facilitated her to

18   live and work in our country in a way that would be undetected.

19   Okay, and which -- sorry, which subsection of 8 USC §1324 are

20   we talking about here?

21             MR. GOELMAN:  One moment, Your Honor.  Let me get the

22   statutory language.

23             THE COURT:  I think it's small Roman iii.  Whoever

24   knowing or reckless disregard of the fact that an alien has

25   come to, entered, or remains in the United States in violation

1    of law.  Then conceals, harbors, or shields from detection.  Or

2    shields from detection, okay.

3         And the allocution in paragraph 852 says that by

4    facilitating her living and working in the United States, that

5    was facilitating or protecting against detection.

6         But there has to be a RICO injury to switch gears to

7    another element of the RICO claim.  And who's the -- who's

8    injured by the violation of §1324?  Is it clear that the person

9    so harbored is the victim as opposed to the United States being

10   the injured party?

11        MR. GOELMAN:  Are you talking about under 1324 case

12   law who the victim is?  Are you talking about the allegations

13   of the complaint who was -- who suffered because of that?

14        THE COURT:  This is a legal question.  Yeah, so if

15   one of the elements of the RICO claim is that the Plaintiff

16   bringing that claim has to show that they were injured, Camila,

17   Adrian, these other people are Plaintiffs here.

18        What -- to the extent that they are harbored here or

19   that they're -- that they are shielded from the detection,

20   here, how are they injured by -- and I understand they're

21   injured by in other ways, right?  They're working for less than

22   minimum wage, but that may be a Fair Labor Standards Act injury

23   rather than an immigration law injury.

24        My question is isn't it the case, or tell me if it's

25   not the case, that the Plaintiffs say what the predicate act

1    has to be was this violation of the immigration law §1324, to

2    the extent they have to plead an injury, there has to be some

3    link between the predicate act and the injury.

4            So the injury can't be just failure to pay minimum

5    wage or otherwise I would have thought.  And therefore, it's

6    incumbent on you to demonstrate as a matter of law that the

7    person shielded from detection is somehow injured by that

8    conduct.  Is that not the right way of looking at it?

9            MR. GOELMAN:  I don't think so, Your Honor.  I think

10   that we have to show that Plaintiffs were injured by the

11   predicate act of somebody in the enterprise.

12           I don't think we have to show that to satisfy the two

13   predicate acts prong, the pattern prong, that there was any

14   injury for that.  I think all we have to do is fulfill the

15   elements of the crime, 1324, which Clare Bronfman pleaded

16   guilty to.

17           THE COURT:  Right, but again, it's in a RICO -- a

18   civil RICO violation are injury to the Plaintiff's business or

19   property.

20           MR. GOELMAN:  Uh-huh.

21           THE COURT:  So how is Adrian injured in this business

22   or property?  And does that -- does the 1324 violation have to

23   be the instrumentality by which that injury occurs?

24           MR. GOELMAN:  I don't believe that for purposes of

25   RICO that 1324 has to be the instrumentality.  But in any case,

1    Adrian, and Camila, and Lindsay MacInniss, they were injured by

2    the immigration fraud.

3          They were prevented from doing work that paid better.

4    They were prevented from changing jobs.  Camila was not allowed

5    to babysit.  Lindsay MacInniss was not allowed to be a yoga

6    instructor.  They were told this is your new life.  This is

7    your job.

8          And you know, your rewards will come down the line.

9    You'll get a ownership.  You'll get a better salary eventually.

10   Never intended to do and never have.

11         But without the hammer of them being in the country

12   illegally, and without the ability to get legal because of the

13   advice that Clare Bronfman purported relayed from her lawyers,

14   they're really at Ms. Bronfman's mercy.

15         THE COURT:  Okay, all right, can I hear from -- I

16   want to go claim by claim.  And I think it would be helpful for

17   me while all this is still fresh in memory to hear from Clare

18   Bronfman's attorney.  And then, we'll come back to the

19   Plaintiffs on the RICO claim.

20         MR. MARTIN:  So, Your Honor, Craig Martin.  The -- in

21   terms of -- and I'll stay here because there's smart people on

22   my right and left that may have something to add.

23         But in terms of the beginning, I just I'm not going

24   to go through these arguments, but you have a complaint 217

25   pages long, but you know from the briefs and you have a whole

1    bunch of Plaintiffs and a whole bunch of Defendants.  And you

2    have these group pleading allegations.  And we're entitled to

3    rely upon the complaint and the well -- the factual allegations

4    of the complaint.

5            So that's what we're dealing with here as opposed to

6    the narrative offered by Plaintiff's counsel that goes beyond

7    the words of the complaint.  So just to ground set.

8            And then, you know, and obviously, we have Rule 9(b)

9    issues and then we get to Rule 12(b)(6) issues.

10           I am mindful that it's 3:18 now.  And most of your

11   questions are --

12           THE COURT:  Yeah.

13           MR. MARTIN:  -- in regard to predicate acts are not

14   something that I am going to add a lot to because I think that

15   these issues are quite well briefed.

16           THE COURT:  Well, can you just tell me, so that

17   question I just posed --

18           MR. MARTIN:  Yeah.

19           THE COURT:  -- of does there need to be a particular

20   kind of linkage between the predicate act alleged by one of the

21   Plaintiffs and the injury suffered?

22           In other words, does Adrian for example need to

23   articulate that he is a victim of the 1324 immigration

24   violation?

25           MR. MARTIN:  And I think the --

1          THE COURT:  Or can he be victimized some more

2   general, more nebulous way by all this?

3          MR. MARTIN:  I don't think he can be victimized in a

4   general, nebulous way.

5          THE COURT:  What's the law on that?  Is there a case

6   that speaks to linkage?

7          MR. MARTIN:  Whether or not there's a 1324 case, I

8   have no idea.  We have to go look at that, but in terms of --

9          THE COURT:  Yeah, I think would be a RICO question.

10          MR. MARTIN:  Yeah.

11          THE COURT:  Whether yeah.

12          MR. MARTIN:  That's where I think the law is.  '

13          In terms of if you go back to our briefs and you look

14   at the elements of RICO, right?  And you see that there is an

15   enterprise and there's got to be a common purpose for an

16   enterprise.

17          And then, there's got -- as is pointed out more

18   thoroughly in Sara Bronfman's brief, there's got to be

19   causation.

20          And then, as is pointed out in all of the briefs,

21   RICO injury is different than just any injury.  It's got to be

22   injury to business or property.

23          So the way I would think about that question, Your

24   Honor, is that RICO requires you to connect the dots from the

25   common purpose of the enterprise through the predicate acts to

1  causation and to injury for business and property.

2          THE COURT:  That could be true.

3          MR. MARTIN:  That's --

4          THE COURT:  It makes intuitive sense to me, but it

5  also could not be true.  Like I could imagine the causation

6  rule being on the one hand, that it needs to be the particular,

7  you know, the conduct that makes up the predicate act is what

8  causes the injury.

9          Or it could be something broader that the person who

10 commits the predicate act needs to cause the injury or the RICO

11 enterprise needs to cause the injury, but there could be a

12 looser linkage between predicate act and injury perhaps.

13         MR. MARTIN:  I don't think so.  To -- but we may be

14 saying the same thing.

15         THE COURT:  I mean, my real question is do you think

16 this question was answered as well as it can be answered in

17 your briefs or do you think that I would benefit from short,

18 supplemental briefing on this question perhaps?

19         MR. MARTIN:  If you thought it was dispositive, I

20 would certainly be -- we'd be happy to submit an additional

21 brief with regard to that.

22         I don't -- I personally do not think the issue is

23 dispositive.

24         THE COURT:  Okay.

25         MR. MARTIN:  -- because I don't think you have -- I

1   don't for all the -- for all of the reasons that were embedded

2   in the question that you just asked, I was looking at my notes

3   and going to the very same paragraphs because I do not see as

4   is implied by your questions the predicate acts being

5   sufficient with regard to Ms. Bronfman.

6               THE COURT:  Well, why -- I mean, the -- what I just

7   heard from Mr. Goelman is that your client entered a plea of

8   guilty before Judge Garaufis on this exact crime, albeit as to

9   a different person.

10              And the allegations in the complaint here are

11  substantially identical, even though they relate to different

12  people.

13              If it's enough to make the criminal violation for

14  Judge Garaufis, why isn't it by definition enough to make out -

15  - to survive a 12(b)(6) motion on the predicate act question?

16              MR. MARTIN:  Well, the -- in terms of the predicate

17  for that question, with regard to her plea, her plea is to a

18  particular person, who is not a plaintiff in this case and

19  doesn't qualify as a predicate act in this case.

20              THE COURT:  Well, I understand that.

21              MR. MARTIN:  In terms --

22              THE COURT:  I understand that, but --

23              MR. MARTIN:  In terms of --

24              THE COURT:  -- what's the conduct to which he

25  allocutes she says here's what I did that, you know, you go in

1    to plead guilty, the judge says all right, I can't just let you

2    plead guilty because you want to plead guilty.  I need to

3    establish a factual basis to believe you actually are guilty.

4    So tell me in your own words what you did that makes you guilty

5    of this immigration crime?

6            And she says I facilitated this person's ability to

7    live and work in our country in a way that would be undetected.

8            And Judge Garaufis says, okay, that's -- that

9    suffices to make it a violation of §1324.  That factual

10   statement of facilitated someone's ability to live in a -- live

11   and work in our country in a way that's undetected, I'm not

12   seeing a categorical difference between that and what's alleged

13   in the complaint.  Yes, as to different people, but same

14   factual substance.  No?

15           MR. MARTIN:  Yeah, I don't think so.  When you look

16   at the three people that there's allegations about, which are

17   Camila, Adrian, and Daniela, I don't think that that matches up

18   to what she was pleading to in the criminal case.

19           And in terms of, you know, I would suggest to the

20   Court that there's a reason that Ms. Bronfman pled to one and

21   not the others.

22           And Mr. Sullivan, who was her -- at the -- at that

23   hearing can probably explain that, but I do not think that the

24   allegations with regard to Camila that you were just walking

25   through, or Adrian, or Daniela match that particular issue in

1     the same way.

2            And in fact, if you look at it, as best I can tell,

3     there's a conversation that goes on in those allegations in

4     which Ms. Bronfman allegedly says that I'm not going to give

5     you access to my lawyer.  That's as best I can tell in terms of

6     the whole of that paragraph.

7            But as you parse the paragraph, it does not say --

8            THE COURT:  Well, then why isn't saying I'll help you

9     support yourself, I'll give you access to this (indiscernible)

10    T-shirt company and its equipment.  And you can keep a share of

11    the profits.  Why isn't that substantially the same as alleging

12    that I substantially facilitated her ability to live and work

13    in our country in a way that would be undetected?

14           MR. MARTIN:  I don't know what undetected means in

15    the portion that we're quoting from the sentencing hearing.

16           THE COURT:  From the guilty plea hearing.

17           MR. MARTIN:  Yeah, but I do know from the guilty

18    plea.  But I do know with regard to there's a huge difference

19    between giving somebody the opportunity to participate in a T-

20    shirt company and harboring or concealing or shielding from

21    detection.

22           In fact, that seems exactly the opposite to me in the

23    sense that if you're going to work at a T-shirt company, you're

24    going to be out there working.  That's not concealing or

25    harboring or shielding from detection.

1          THE COURT:  And maybe, I mean, I don't know.  This is

2      a legal question.  Maybe if you say to somebody you can work

3      indoors and print T-shirts and make money, they're less likely

4      to be detected by the immigration authorities than they're --

5      than if they're out on the street begging for money.  I don't

6      know.

7          But Judge Garaufis said that that was sufficient to

8      establish your client's guilt.  And it almost feels to me like

9      you're saying there actually was not a legally sufficient basis

10     on which to accept the plea.

11         And you may be right or wrong about that, but we

12     should be looking at the cases on what the word shielding from

13     detection means and doesn't mean.

14         MR. MARTIN:  Well, I -- all get to look at cases and

15     we're happy to do that if you'd like us to, but when you look

16     the allegations, in order to square up the allegations to

17     shielding from detection, there's nothing in the allegations

18     that is talking about shielding from detection.

19         In terms of there's no -- you know, for example, I

20     could envision a set of facts that somebody could plead in

21     which there was shielding from detection, but that's not this.

22     That's not the facts here.

23         There's no -- for just to take Your Honor's

24     hypothetical, there no allegation that this person was put in a

25     basement, they were printing T-shirts, they were not allowed to

1    leave the basement.  They had to put the T-shirts on a dumb

2    waiter to go upstairs for somebody else to sell.

3              THE COURT:  Yeah, but there's no way factual

4    statement about any of that stuff in the plea allocution

5    either.

6              And we have a determination that that was legally

7    sufficient to make out a §1324 violation, yes, albeit as to

8    other people.

9              MR. MARTIN:  Right, but that's -- look, the

10   statements at the plea hearing are just a statement of

11   alternate fact, Your Honor, as opposed to an application of

12   fact of law --

13             THE COURT:  Right.

14             MR. MARTIN:  -- I do respectfully submit.

15             The -- happy to talk more.

16             THE COURT:  I think it would be helpful for people to

17   really bear down on the legal question of whether giving

18   someone a job and promising them a share -- it's not a job,

19   it's an equity stake in this T-shirt venture and promising them

20   a share in the profits, suffices to establish concealment,

21   harboring, or shielding from detection.

22             Unless you're telling me that you think that issue is

23   fully briefed already and I just am not seeing it proper, but

24   that think might be where the rubber meets the road here.  And

25   I'm --

1        MR. MARTIN:  If that's where Your Honor thinks the

2    rubber meets the road, we'd be happy to do that.  So in terms

3    of there, I can guarantee you that we have not exhausted the

4    analysis of that particular conduct that you just made.

5        THE COURT:  Okay, my law clerk's going to keep a

6    running list of what we may be following up on as we go forward

7    here.

8        Okay, all right, so back to I don't think I need to

9    hear from Defense counsel on the forced labor question.  I feel

10   like Mr. Goelman and I crystallized the issues there.

11       Do you want to take up the question of whether the

12   predicate acts have been adequately alleged as to Sara

13   Bronfman?

14       MR. GOELMAN:  Yes, Your Honor.

15       MR. MARTIN:  Your Honor, before we go there, let me -

16   - Mr. Wareham just so that I have it for you and your law

17   clerk, Mr. Wareham just handed me their brief at docket entry

18   169-1.

19       And on page 15, I'll just read it so that you and

20   your clerk have it, RICO requires that each Plaintiff alleged

21   injury, quote, in his business or property by the conduct

22   constituting the violation citing the Geiss case, G-E-I-S-S.

23       THE COURT:  Right.

24       MR. MARTIN:  383 F.Supp at 3d and citing one other

25   case from the Southern District of New York.

1          THE COURT:  So that's kind of the secondary.  The

2     first question is do we have a 1324 violation?

3          MR. MARTIN:  Right.

4          THE COURT:  And the second is does that violation

5     give rise to an injury on Adrian's part or these other alleged

6     victims?  Or is it instead that the victim of the immigration

7     fraud is the United States government?

8          And I -- as I said sit here, I don't know the answer

9     to either of those questions.

10          MR. MARTIN:  Right, and I think that that goes to the

11     causation question in which I basically postulate that you have

12     go through common purpose all the way to --

13          THE COURT:  Yes.

14          MR. MARTIN:  -- injury to property.

15          THE COURT:  Right, right, so that's the linkage

16     question that we were talking, yeah, okay.

17          MR. MARTIN:  So if you're making a list and you want

18     us to look at that even more than Geiss case, we'd be happy to.

19          THE COURT:  Well, I want to -- I think the Defendants

20     or sorry the Plaintiffs had disagreed.  They're saying it

21     does -- the injury does not meet the necessarily flow from the

22     predicate act specifically, but rather from the conduct of the

23     enterprise more broadly.  I hope I'm not mischaracterizing

24     their argument.

25          But Mr. Goelman, let me turn the floor back to you to

1    respond to any of that and also to turn to the predicate acts

2    alleged as against Sara Bronfman.

3            MR. GOELMAN:  Your Honor, I think I'm going to stay

4    here for this one since --

5            THE COURT:  Yeah.

6            MR. GOELMAN:  -- I don't like to keep walking back

7    and forth.  First, I agree with the Court that it's a question

8    of RICO law as not -- and not 1324 as to whether or not the

9    injury has to be done to that -- to someone's who a Plaintiff

10   in order for it to count as a predicate act.  And I think that

11   the law is pretty clear that it doesn't.  And we cited to a

12   case.

13           THE COURT:  Not to count as a predicate act, but to

14   count as injury.

15           THE COURT:  Okay, well, as long as a Plaintiff is

16   injured by some predicate act, I think that we are -- I thought

17   that we were talking about whether or not the complaint

18   established a pattern of racketeering by Ms. Clare Bronfman and

19   that the pattern has to be established by two predicate acts

20   within 10 years.

21           THE COURT:  Right.

22           MR. GOELMAN:  So that's what I thought the Court was

23   questioning whether or not something could count as a predicate

24   act if it was a different Plaintiff, I mean, a different victim

25   if it wasn't a Plaintiff, right?

1          THE COURT:  Well, let me --

2          MR. GOELMAN:  Jane Doe.

3          THE COURT:  Oh, I see what you're saying.

4          MR. GOELMAN:  Jane Doe 12 is the one that Ms. Clare

5    Bronfman pled guilty to harboring.

6          THE COURT:  And that's the alleged predicate act?

7          MR. GOELMAN:  That is one of many predicate acts that

8    is alleged in the complaint.

9          THE COURT:  Okay, so take that as a given that a

10   predicate act is any predicate act you commit on behalf of the

11   enterprise irrespective of whether the victim is a Plaintiff or

12   not a Plaintiff in the civil RICO case.  That's one predicate

13   act.

14          You still need a second one.  And I had two questions

15   in that regard.  One is who's the other victim of those or

16   who -- as to who else has Clare Bronfman concealed, harbored,

17   or shielded from detection, and how?

18          And when we talked about Adrian and whether he

19   qualifies or not, I think I still have a legal question about

20   whether giving somebody a job, knowing that they're in the

21   country illegally, constitutes a federal crime of shielding

22   somebody from detection.

23          If it is, I think a lot of businesses across the

24   country might have criminal problems they're not currently

25   anticipating.

1          Or is something more than just giving somebody a job

2     required?  And maybe you say that something more is required,

3     but you've alleged the something more, so you're okay.

4          But then a secondary question was, okay, let's say

5     there was a predicate act committed as to Adrian, Adrian also

6     has to show injury.  That's one of the elements of his civil

7     RICO claim.

8          And my question was does his injury have to emanate

9     from the predicate act specifically?  And if that's the case,

10    how is he injured by being harbored?  Or we just heard from

11    Defense counsel that that sounds more like a benefit than an

12    injury.

13         MR. GOELMAN:  Let me try to take those in turn.

14    First, in terms of the law, there's a case called Terminate in

15    the 2nd Circuit 1994, 28 F.3d 1335, that we believe addresses

16    the question of whether or not you can count as a predicate act

17    an act that was done to somebody who is not a plaintiff.  And

18    the answer there we believe is yes.

19         With respect to Ms. Bronfman and the difference

20    between what she pleaded guilty to and what happened not just

21    to Adrian, but also to Lindsay, and also to Camila, there's

22    really not any principle difference.

23         And I understand the Court's point that there could

24    be thousands of employers breaking the immigration laws every

25    day in this country.  And you're right, there could be and

1    there probably are.  And you see when, you know, these

2    factories are raided, what happens to the employers.

3            You know, when you talk about concealment, Your

4    Honor, it's not just that he wasn't out there begging on the

5    street or whatever else the Court postulated.

6            I mean, it's a whole scheme to hide his presence

7    here, right?  He doesn't -- he's not given a W-2.  There are

8    allegations in here about the books that were cooked and how

9    the books were cooked in order to deceive immigration

10   authorities.

11           And it's not just I'll give you a job.  It's also

12   don't go to the authorities.  Don't get legal.  Don't go back

13   to Mexico and apply for a visa.  I mean, that is actively

14   concealing the detection of somebody who's here illegally.

15           THE COURT:  Okay.  Okay, should we shift gears to

16   Sarah?

17           MR. GOELMAN:  Sure, Your Honor, but I don't want to

18   leave the Court with the impression that we think that these

19   four immigration-related offenses are the only available

20   predicates against Ms. Clare Bronfman.

21           THE COURT:  Oh, I accept that.  There's also forced

22   labor.  I think you also vaguely allege that Clare Bronfman is

23   somehow complicit in the predicate acts of mail and wire fraud,

24   but that, you know, we've heard about group pleading issues.

25           And that's pled in a group pleading sort of way,

 1   isn't it?  There's no specific allegation or set of allegations

 2   against Clare Bronfman that would cause mail or wire fraud, is

 3   there?

 4           MR. GOELMAN:  Well, there are.  And you know, the

 5   reason it was pled as to all Defendants is that all Defendants

 6   actually were defrauding members of NXIVM.

 7           THE COURT:  Okay, so that you have the 9(b) issue,

 8   right?  You got to plead Clare Bronfman's responsibility for

 9   mail and wire fraud or mail or wire fraud with particularity.

10   What is pled?  Point me to the complaint where we see what

11   Clare Bronfman is doing that would satisfy that standard?

12           MR. GOELMAN:  And that goes back, Your Honor, to the

13   description of Clare Bronfman.  And there's you know, a bunch

14   of paragraphs in here describing her role in the enterprise.

15           And you know, we talk about all the different

16   positions she held, right, on the executive board, founder of

17   ESF, part of the inner circle.

18           THE COURT:  Actually, you have a background in

19   enforcement.  I think you and I may have crossed paths at some

20   point when I was a securities fraud prosecutor and maybe you

21   were at the CFTC.

22           MR. GOELMAN:  Yeah.

23           THE COURT:  Were you?

24           MR. GOELMAN:  I was, yeah.

25           THE COURT:  Okay.  Companies commit securities fraud

1    all the time.  And they have boards of directors who oversee

2    everything happening at the company.  And it doesn't mean that

3    every member of the board of directors is criminally liable for

4    securities fraud, right?

5            You can't -- I don't think you're going to say just

6    because she held positions of authority, that ergo if there was

7    a fraud committed some where the organization, she's

8    automatically responsible, right?

9            So that's why I come back to the question of where

10   does the complaint speak with particularity to Clare Bronfman's

11   knowledge in and participation of -- sorry, knowledge of and

12   participation in mail or wire fraud other than just by

13   reference to her high ranking position?

14           MR. GOELMAN:  Your Honor, I understand your point

15   about people who are on board of directors.  And I think you're

16   right about criminal liability.

17           I do think that there are directors who are sued by

18   the SEC or CFDC or sued civilly that have, you know, far less

19   involvement in the actual crime or actual violation than Ms.

20   Clare Bronfman did here.  And the --

21           THE COURT:  But you have to have some involvement and

22   you have to have knowledge.  And I'm just -- I -- I'm perfectly

23   happy to be correct if I'm wrong here.

24           But where I sit now, I think there's literally

25   nothing alleged about her specific participation or knowledge.

1                MR. GOELMAN:  All right, Your Honor, if you turn

2      to --

3           (Counsel confer)

4                THE COURT:  I was looking for -- thank you.

5                MR. GOELMAN:  Your Honor, the reason that I bring up

6      Clare Bronfman's title is because it is not just a title.  It

7      is also a position that confers authority.

8                And there are allegations in here and I will try to

9      get you a paragraph number, that talk about how she was

10     Raniere's right hand man in developing the curriculum.

11               And the curriculum was based on lies.  It was

12     designed to and did entice people to pay a lot of money for

13     basically garbage.

14               And if somebody is on the executive board and in

15     charge of finance and in charge of legal I don't think you can

16     say that there's no allegation at all that she had, you know,

17     any idea about the multi-level marketing scheme.

18               THE COURT:  But tell me, let's look at some

19     paragraphs in the complaint, so we can have this conversation

20     by reference to the specifics.

21               MR. GOELMAN:  Okay.

22               THE COURT:  Well, if I matriculated into college on

23     the basis of representations on their website that I'm going to

24     get a world class education and have all kinds of job

25     prospects, and then, it turns out that my professors were all

 1      terrible and I don't get a job, like I don't -- that's not

 2      enough to allege fraud with particularity.

 3              MR. GOELMAN:  No, but --

 4              THE COURT:  Now there's got to be some concrete

 5      misrepresentation or omission of some -- you know.  And so

 6      that's why I say like let's get a paragraph number and look at

 7      the same thing.

 8              MR. GOELMAN:  Okay, and my colleagues are looking for

 9      it.  And I will point the Court to it, but in terms of your

10      college analogy, Your Honor, if the -- you're right that

11      there's not just because you're an employee of the college on

12      the board of directors necessarily, culpability and liability

13      for every lie or misrepresentation that's told.

14              But here, we're talking about a much smaller

15      organization --

16              THE COURT:  What's the lie?

17              MR. GOELMAN:  That this rational inquiry is this

18      patented wonderful --

19              THE COURT:  There's a patent pending.  And I don't

20      think you allege there was no patent application pending.

21      Maybe there wasn't, but in order for the first patent pending

22      to be a misrepresentation, I would think you'd have to allege

23      that there's no patent pending.

24              MR. GOELMAN:  I think that -- I'm not sure, but I

25      believe that there were misrepresentations about whether the

1    technology was patented, whether the patent was pending.

2            There were definitely misrepresentations about how

3    this could change your life.  And there's basically repackaged

4    cognitive therapy.  And it was sold to these people as this

5    brain child of the smartest man in the world.

6            THE COURT:  And you say he's not actually the

7    smartest person in the world?  I'm just kidding.

8            But people make, you know, there are psychotherapists

9    up and down the West side of Manhattan making grandiose claims

10   about how psychotherapy can change a person's life.  And some

11   people surely come out of therapy believing that it has not

12   lived up to those aspirations.

13           And so, again, I say let's look at the particular

14   passage in the 200-plus page complaint where we say here are

15   the misrepresentations that we're going to tag Clare Bronfman

16   with responsibility for.

17           MR. GOELMAN:  Okay, if the Court goes to paragraphs

18   593 and following, it talks about the misrepresentations, talks

19   about why Rational Inquiry was not eligible for patent

20   protection.

21           THE COURT:  Okay.  But there was a -- and then, you

22   say -- so paragraph 593 actually refers to a bogus patent

23   application.

24           So I think the natural understanding of that is they

25   actually did have a patent application pending, but you allege

1    that that patent application was destined to fail.

2              MR. GOELMAN:  As all of them beforehand, yes.

3              THE COURT:  All of NXIVM's applications?

4              MR. GOELMAN:  All of Raniere's patent applications,

5    yes.

6              THE COURT:  Okay.

7              MR. GOELMAN:  And then, Your Honor, the following

8    paragraphs talk about some of the other lies that Raniere is

9    the world's smartest person with an IQ Of 240.

10             THE COURT:  I mean, how would somebody -- is that

11   actionable as mail or wire fraud that somebody says I'm the

12   smartest person in the world?  Like there's no basis on which

13   somebody to credibly make that claim --

14             MR. GOELMAN:  Oh.

15             THE COURT:  -- unless they knew all 7 or 8 billion

16   people and had them all IQ tested.  Like nobody could be

17   injured by that claim, it seems to me.

18             MR. GOELMAN:  Your Honor, if I am somewhat lost and

19   looking for a religion or a philosophy to help me make sense of

20   my life, and you know, I walk by the Scientology store front,

21   and then I, you know, walk by the NXIVM or ESP store front and

22   they say here's this wonderful technology, patent pending, and

23   it's all come in from this smartest man in the world, Keith

24   Raniere, who is an ascetic.  He doesn't care at all about

25   worldly things.

1      And he's celibate.  And he has been inventing things

2  since he was, I don't know, 6.  Those are all lies.

3      Now, Your Honor, you may not fall for it.  You might

4  keep walking, but that -- those are statements that are

5  designed to induce someone to come in and give their credit

6  card and take a intensive however long course that cost them

7  thousands of dollars.  That's fraud.

8      THE COURT:  Okay, what's the best mail or wire fraud

9  case for the proposition that statements like I'm the smartest

10  person in the world and my program will change your life are

11  actionable bases for a mail or wire fraud prosecution?

12      MR. GOELMAN:  For securities fraud, Your Honor?  I

13  mean, you know, there's a line between puffery and, you know,

14  actionable, misleading, or false statements.  But I think if

15  you --

16      THE COURT:  Well, and also between statements of

17  opinion.  I mean, you know, this program will change your life,

18  that's not really falsifiable other than by reference to the

19  subjective experience of the person who feels their life was or

20  was not changed, right?  The initial presentation has to be

21  something that is susceptible to being proven true or false.

22      MR. GOELMAN:  Right.

23      THE COURT:  And --

24      MR. GOELMAN:  Sorry, go ahead.

25      THE COURT:  You know, you may be well be able to

1  prove at trial that Mr. Raniere was not the smartest person in

2  the world.  That seems eminently --

3       MR. GOELMAN:  Plausible.

4       THE COURT:  -- falsifiable maybe.  But claims about

5  the psychic effects in terms of self-esteem and well-being,

6  like that's why I asked.  Like have you seen a mail or wire

7  fraud case where that was the kind of subject matter of the

8  misrepresentations?

9       MR. GOELMAN:  Your Honor, I can get back to you about

10  the best mail or wire fraud cases we have.  You were a

11  securities prosecutor.  I think that the securities unit or the

12  SEC, if they had someone, and it's not just this is going to

13  change your life and we're awesome.

14       It's also based on Keith Raniere.  I mean, he's the

15  brand.  And he's the, you know, kind of god head figure and all

16  the qualities that he says he had weren't true.  I mean, they

17  are falsified.

18       He wasn't an ascetic.  He wasn't celibate.  He was

19  sleeping with 15 year olds.  And if that fact had been told to

20  the person walking down the street in, you know, whatever city,

21  I think that that would be pretty material.

22       THE COURT:  Okay.

23       MR. MARTIN:  Your Honor, oh.

24       MR. GOELMAN:  Sorry.

25       THE COURT:  I don't think I needed any rebuttal in

1    this.  And if you want to tell me what you want to say before

2    you say it, we can decide if we're going to shift gears here.

3              MR. MARTIN:  Tell me what you want to say?

4              THE COURT:  Just like are you responding to the

5    question of what constitutes mail or wire fraud or?

6              MR. MARTIN:  No, no.  I'm responding to the

7    paragraphs that he's pointing me to in the complaint with

8    regard to Ms. Bronfman are not paragraphs that are alleging

9    something that Ms. Bronfman did.

10             THE COURT:  Right, there's no statement that she knew

11   whether a patent application was pending --

12             MR. MARTIN:  Right.

13             THE COURT:  -- or not pending or whether previous

14   patent applications had been unsuccessful.  I understand that.

15             MR. GOELMAN:  Except that --

16             MR. MARTIN:  But it says leadership positions, the

17   Plaintiffs were in leadership positions.

18             THE COURT:  Yeah, I mean, this is why I started

19   with -- this is why I wanted to start with the forced labor and

20   alien harboring statutes because I think that's where the RICO

21   -- the predicate acts element of the RICO claim is going to

22   rise or fall, but we descended a bit into predicate acts beyond

23   those two.

24             Let's shift gears to Sara Bronfman.  And then, I want

25   to get into some of the other Defendants who are here as well.

1            MR. GOELMAN:  Okay.  And Your Honor, with respect to

2    Sara Bronfman, one of the predicate acts is witness tampering,

3    which is a 18 United States Code 1512.  It's one of the RICO

4    predicates.

5            THE COURT:  Right.

6            MR. GOELMAN:  And --

7            THE COURT:  Told somebody shortly before trial, this

8    is asking somebody to make themselves scarce in the lead up to

9    trial.

10           MR. GOELMAN:  Correct.

11           THE COURT:  Okay.

12           MR. GOELMAN:  But it's not just Sara Bronfman did

13   that.  The complaint also contains allegations that Clare

14   Bronfman did that.

15           THE COURT:  Can you just remind me what paragraph

16   we're talking about there?

17           MR. GOELMAN:  Sure.  While they're getting the cites

18   for the Court, this was with respect to Camila, who even after

19   2017 when Raniere was arrested -- well, actually 2017 Ms. Clare

20   Bronfman and Raniere were down in Mexico.

21           And Camila, who was a potential witness to child sex

22   abuse and child pornography against Raniere, was hidden away by

23   others, primarily Clare Bronfman being -- by being told that

24   the FBI was after her.  And she was hidden in an apartment.

25   And I will get the Court the citations for that.

1          THE COURT:  Let's switch gears to -- so I'll make a

2     note that you want us to look more closely at the witness

3     tampering predicate act as to Clare.

4          MR. GOELMAN:  Okay, Sara, so what Ms. Sara Bronfman

5     says in her motion to dismiss is that the First Amended

6     Complaint's low in intent to plead substantial assistance as to

7     Sara Bronfman as it's vague allegation that Clare and Sara

8     Bronfman provided the funds for the rent of premises and the

9     purchases of the -- purchase of the equipment used in the

10    unauthorized human research through ESF substantially assisting

11    Porter.

12          I don't know how anyone can call that vague.  It says

13    how they assisted, what entity they used to funnel money, the

14    specific use of the money.

15          THE COURT:  Sorry, so which predicate act are we

16    talking about here?

17          MR. GOELMAN:  I'm not sure that the -- is the ESF?

18    Okay.  Your Honor, that actually doesn't have to do with the

19    RICO claim.

20          Adrian, the witness tampering with Adrian, Sara

21    Bronfman attempts to get him to go abroad so that he can't

22    testify in the criminal case.

23          I think that in the pleadings, Ms. Sara Bronfman

24    actually concedes that witness tampering is a plausible

25    predicate.  And you know, intimidation of witnesses is a

1   primary tool in the Mafia tool kit --

2           THE COURT:  Okay.

3           MR. GOELMAN:  -- which is why it's a predicate act as

4   an RICO.

5           THE COURT:  So where is the -- can you just point me

6   to the paragraph in the complaint you're talking about?

7           MR. GOELMAN:  About Adrian?

8           THE COURT:  About, yes.

9           MR. GOELMAN:  855, Your Honor.

10          THE COURT:  Okay.  Okay.  In the days leading up to

11  trial, Sara Bronfman and her husband attempted to obstruct by

12  employing false pretenses and promises of money to entice

13  Adrian to leave the United States and remain outside of it

14  through the criminal trial.

15          I understand the import of that reference to money.

16  And I think I probably agree with you that the specific

17  monetary amount needs to be stated, but what are the false

18  pretenses that you're referring to?

19          MR. GOELMAN:  That he should go to Europe so that he

20  can pursue this promising career opportunity.

21          THE COURT:  Is that alleged in there or are you just

22  saying false pretenses with no additional detail?

23          MR. GOELMAN:  I think it actually is alleged and it

24  might be during the -- in the part about Adrian.

25      (Counsel confer)

1            THE COURT:  You don't need to point me to a

2    paragraph, but so the false presence is that there's a

3    promising career opportunity awaiting him in Europe, assuming

4    he departs now and stays out of the United States for the

5    duration of the trial.  We'll look for that.

6            But that's one predicate act of witness tampering.

7    What's the second highest confidence predicate act that you

8    allege as to Sara Bronfman?

9            MR. GOELMAN:  Aiding and abetting, immigration fraud.

10   Founding an organization called ESF, which was supposedly to

11   sponsor foreign nationals for educational scholarships so they

12   could get visas to come to the United States.

13           And then, putting these people to work in the Rainbow

14   Cultural Garden, which Sara Bronfman founded and I believe ran.

15   And then, that caused them to lose their immigration status.

16   And I think if you go to the complaint at paragraph 705.

17           THE COURT:  So everybody who gives somebody who's in

18   the United States on a student visa a job, thus undermining

19   their student visa immigration status, you're saying is

20   committing this crime?

21           MR. GOELMAN:  I'm saying if you sponsor students to

22   come to the United States under the false pretense that they're

23   going to get a scholarship and they're going to be a student.

24           And what you really do is you put them to work and

25   pay them very little and are aided by the fact that they're

1    then illegally in the country, that that qualifies for 1324.

2    It is --

3              THE COURT:  Oh, I see.

4              MR. GOELMAN:  -- a violation of 1324 to encourage or

5    induce aliens to come to or reside in the United States with

6    knowledge or in reckless disregard of the fact that such coming

7    to residence would violate the law.

8              You have people come into the country under false

9    pretenses, that's against the law.

10             THE COURT:  Okay, but all this says, if I look at 705

11   and 706, is that Sara, together with others, established these

12   two nonprofits, but you don't say that she made any of the

13   false representations about student immigration status or even

14   that she knew about I don't think.

15             You're just saying the fact that an entity that she

16   started employed these people -- yeah, you get my question.

17             MR. GOELMAN:  Yeah, so she starts an entity, ESF,

18   says we're going to sponsor students to come in here on student

19   visas, right?

20             They get there and then a different entity, which she

21   also founded and controls, put them --

22             THE COURT:  Where does it say that she said that

23   we're going to sponsor people on student visas?

24             MR. GOELMAN:  It said that -- says paragraph 6, that

25   Defendants used ESF to sponsor foreign nationals for

1    educational scholarships, so they could get visas to come to

2    the United States.

3              THE COURT:  But does she know -- is -- yeah.  Oh, so

4    Defendants you're saying is defined to include every Defendant?

5              MR. GOELMAN:  No, I'm saying it is defined to include

6    the Defendants, who are referred to in the previous paragraph

7    who established the nonprofits.

8              THE COURT:  Is that right?  It's Defendants with a

9    capital "D", which I would have thought was a defined term

10   somewhere, although maybe not.  But Defendants with a capital

11   "D" is used throughout to mean everybody.

12             MR. GOELMAN:  Your Honor, I understand that, you

13   know, a title by itself may not mean that a person actually did

14   a particular action, but if you are the founder and operator of

15   a fraudulent foundation, I think that it's not too great a leap

16   to say that, you know, you knew or at least were willfully

17   blind in not knowing what the foundation was doing.

18             THE COURT:  That's like *respondeat superior* liability

19   though, no?  Just extrapolating --

20             MR. GOELMAN:  No, for *respondeat superior*, I think

21   the more is, you know, the whole company is liable because, you

22   know, the janitor somewhere bribed a foreign official.  And

23   under, you know, *respondeat superior* is strict liability for

24   the company.  I'm not talking about that.

25             I'm talking about Ms. Sara Bronfman who this -- this

1    was her organization.  And these are not, you know,

2    multinational companies.

3                THE COURT:  I mean, how big are they?  How many --

4    well, okay.  All right, let's move on.  Sticking with the RICO

5    claim from Sara Bronfman to next on my list is Ms. Clyne.  And

6    the two predicate acts I think we're looking at there are the

7    1591 claim, which is transporting or recruiting or enticing or

8    harboring a person under age 18, knowing that the person's

9    under the age 18 or that force, fraud, or coercion will be used

10   to this person and knowing or in reckless disregard of the fact

11   that this person will be engaged in a commercial sex act.

12               So as to Ms. Clyne in that first element of

13   transporting or recruiting or enticing or harboring, which of

14   those do you allege?

15               MR. WAREHAM:  Your Honor, just for a second, I just

16   want to make sure that I'm not trying to steal the sun from

17   this client, who I just met, but do you want us to address the

18   comments about Sara Bronfman?

19               THE COURT:  So, yeah, let's -- I'm sorry, let's a

20   take minute on that.  So going back to the predicate acts

21   alleged as to Sara Bronfman, the first one was witness

22   tampering, right?

23               MR. WAREHAM:  Correct.  So preparatory comment or

24   two.  Sara Bronfman left the United States in 2011.  Sara

25   Bronfman was never -- never mind a subject to a target in a

1    criminal act that kind of underlies this thing.  She was never

2    a witness.  She was interviewed --

3            THE COURT:  Did she speak to -- does the complaint

4    allege that she spoke to Adrian about leaving the country for

5    the duration of the criminal trial?

6            MR. WAREHAM:  Well, in a nutshell, the homeless

7    patrol case sets out the exact types of arguments, conclusory

8    arguments raised in complaint and says that falls short of the

9    pleading standard so --

10           THE COURT:  Can I just -- maybe I'll ask Mr. Goelman

11   this question when I should have before.  What's the paragraph

12   if you can put your finger on it that says what Sara Bronfman

13   did as to this witness tampering predicate?

14           MR. WAREHAM:  Of the big problems, Your Honor, is and

15   I've know Mr. Goelman a long time.  In reading all these

16   materials, he got itself confused between what's in the First

17   Amended Complaint and what's in the brief.  And there's new

18   stuff about France and this and that.

19           THE COURT:  Okay.

20           MR. WAREHAM:  It's in the brief.  It's not in the

21   First Amended Complaint.  So --

22           THE COURT:  Well, that's why I asked the question.

23           MR. WAREHAM:  Yeah, one of our problems throughout

24   not only --

25           THE COURT:  All right, so you're saying --

1          MR. WAREHAM:  Yeah.

2          THE COURT:  -- that as to witness tampering the --

3          MR. WAREHAM:  That's it.

4          THE COURT:  -- the allegations that they're invoking

5    are just not in the complaint?

6          MR. WAREHAM:  They're not in the complaint.  Any time

7    you need content.  And I think frankly need some dollar amount.

8          THE COURT:  Well, that -- forget about the specifics.

9    I'm asking whether there's even a general reference in the

10   complaint to Sara Bronfman's participation in this conversation

11   about --

12         MR. GOELMAN:  Paragraph 855, Your Honor.  Sara

13   Bronfman and her husband.

14         THE COURT:  Thank you.  Okay.  Oh, yeah, we just

15   looked at that.

16         MR. WAREHAM:  Yeah, which would under --

17         THE COURT:  All right, so what --

18         MR. WAREHAM:  -- homeless patrol go bye bye.

19         THE COURT:  Under what?

20         MR. WAREHAM:  A homeless patrol case addresses these

21   very same type of allegations and dismisses the allegation as a

22   predicate act.

23         THE COURT:  Really?

24         MR. WAREHAM:  Yes.  And --

25         THE COURT:  Saying for somebody -- I'll set you up in

1    a promising career opportunity in Europe if you leave the

2    country right now, knowing that that person is a likely witness

3    in a criminal trial that's set to begin imminently, that's --

4           MR. WAREHAM:  Well, that's a hypothetical not in the

5    complaint.  I'm just addressing 855, right?  So, you know, any

6    details --

7           THE COURT:  That's what 855 says.  And it says

8    homeless patrol doesn't sound like a criminal case to me.

9           MR. WAREHAM:  No, it's a RICO case, Your Honor.

10          THE COURT:  A RICO case where witness tampering is

11   the --

12          MR. WAREHAM:  Alleged predicate act, where conclusory

13   allegations very similar to what's in 855 are dismissed as a

14   predicate act.

15          THE COURT:  Okay.  Put aside that for a moment.  And

16   talk to me about the second predicate act that we spoke to Mr.

17   Goelman about, aiding and abetting immigration fraud through

18   the establishment of the two entities listed in whatever

19   paragraph that was.

20          MR. WAREHAM:  Yeah, that's kind of a subset of group

21   pleading and pleading by title, not by action.  We of course

22   scoured this complaint.  There's not a solitary allegation that

23   Sara took any action with respect to any alien.

24          None are identified in the amended complaint.  They

25   point to impermissible group pleading arguments, which the

1    Court identified to talk about Defendants.  You got to talk

2    about individual.  You know, one of the things that Court said

3    --

4                THE COURT:  I understand.

5                MR. WAREHAM:  You know, when you in November of '21

6    said to the counsel for the Plaintiffs, you may wish to re-

7    amend because now we're at the third bite of the apple.

8                THE COURT:  When was that?  That's on my list of

9    questions for later.  When was it that I extended that

10   invitation to amend?

11               MR. WAREHAM:  November 21st, 2021.  And you said --

12   30 of 2021.  And what you said very clearly was that the

13   Plaintiffs have to allege these acts specifically with respect

14   to every individual Defendant individually.

15               And you know, you were coming off the 2nd Circuit's

16   rejection of group pleading.  And of course, the group pleading

17   doesn't just go to the Defendant's group pleading.  Unusually

18   in this case, Plaintiff's group pleading is replete throughout

19   the First Amended Complaint.

20               THE COURT:  Right.

21               MR. WAREHAM:  We can't tell who was harmed when or

22   where by Sara Bronfman for any single count.  So if I had been

23   asked and you said Your Honor --

24               THE COURT:  I understand your group pleading

25   argument.

1          MR. WAREHAM:  Yeah.

2          THE COURT:  I would have delver into it deeper --

3          MR. WAREHAM:  Sure.

4          THE COURT:  -- at level of specificity if we can.

5          Okay, so I think I have at least clarity in my mind

6    if not in the courtroom in general on how to think about the

7    predicate acts alleged as to Sara Bronfman.

8          As to Nikki Clyne, the §1591 sex trafficking claim,

9    element 1, if I have this right, is that the person accused

10   knowingly transported or recruited or enticed or harbored.  I

11   take it the verb you say that's applicable here is recruited?

12         MS. MANOHAR:  Your Honor?

13         THE COURT:  Or enticed.

14         MS. MANOHAR:  Your Honor, this is argument.  I'm

15   prepared to speak to §1591 as a predicate act and waiver

16   (indiscernible) to the facts.

17         THE COURT:  Please.

18         MS. MANOHAR:  I believe the operative words here

19   would be recruits, entices, or maintains.  Several of the terms

20   in a TD hearing are undefined and they're meant to be construed

21   according to their plain meaning.

22         THE COURT:  Yeah, I think I understand how you say

23   the allegations establish recruitment and enticing.  I'm not

24   sure I know what maintains means, but we can put that aside for

25   now.

1          Why is this a commercial sex act for which somebody

2     is being recruited?

3          MS. MANOHAR:  The term urge commercial sex act means

4     any sex act (indiscernible) in which anything of value is given

5     to or received by any person.

6          The commercial sex act was a thing of value to Keith

7     Raniere.  And in fact, ultimately that the commercial sex act

8     was not completed for some of these Plaintiffs is material.

9          THE COURT:  Is the thing of value -- hold on.

10         MS. MANOHAR:  The thing of value is the sex act in

11    and of itself.

12         THE COURT:  But then every sex act is a commercial

13    sex act?

14         MS. MANOHAR:  No, in the context of this complaint,

15    in context of this case.  The NXIVM operation was a sex

16    trafficking pipeline.  It was designed and maintained in order

17    to funnel individuals (indiscernible) for further sexual

18    pleasure.  That is how it's a commercial sex act.

19         THE COURT:  Even if no money ever changes hands, it's

20    the fact that the pipeline you're saying that makes this

21    commercial, that it's organized like a business?

22         MS. MANOHAR:  Commercial sex act is defined as

23    anything of value.  And the anything of value is not limited to

24    financial value.  It's limited to any benefit.

25         THE COURT:  It sounds to me like there might some

1  circularity in your definition of what makes a sex act

2  commercial if you're saying that the thing of value that's

3  exchanged for the sex is the sex.

4        But the 2nd Circuit I think spoke to this -- a

5  related question in the Raniere appeal, right?  And they say,

6  if I have this right, that the commercial requirement was

7  satisfied if the person recruiting enticing, et cetera, does it

8  in return for a quote unquote privileged position within an

9  organization.  Do you allege that in the complaint?

10        MS. MANOHAR:  Yes, we do.

11        THE COURT:  And I don't just mean that Ms. Clyne held

12  a privileged position, but that she received it as compensation

13  for the enticing and facilitating that we're talking about.

14        MS. MANOHAR:  Yes, we do.  I direct the Court to

15  paragraph 69 that the First Amended Complaint.  We allege that

16  Clyne worked directly with Raniere to create a run DOS.

17        Within the DOS structure, Clyne was the first line

18  master and Jane Doe 8 was a slave.  She was a member of the

19  inner circle.

20        Those were all --

21        THE COURT:  Yeah, but that doesn't rule out -- I

22  looked at this -- the only ones who are suggesting.  I don't

23  think that if it makes the enticing recruiter, et cetera, part

24  of the commercial transaction of sorts is that you get a

25  privileged position within the organization, does it matter the

1  order in which things happen?  Maybe not.

2           MS. MANOHAR:  I'm not sure I understand the question.

3  Well --

4           THE COURT:  You have to recruit the person or entice

5  them, while knowing or recklessly disregarding the fact that

6  the person you are recruiting or enticing will be engaged in a

7  commercial sex act.

8           I mean, it's obvious why you would know that is if

9  you're a recruiting someone to participate in sort of garden

10 variety prostitution, right?  The exchange of sex for money.

11 That's not exactly what we're dealing with here.

12          And so, my question is at the moment, according to

13 your allegations, which is all we're testing now, at the

14 moment, you allege Ms. Clyne to have recruited and/or enticed

15 the people below her in this organization.  Does she know that

16 they would be engaged in a commercial sex act?  And if so, how?

17          And you're saying she knows that it's all commercial

18 because she was given this privileged position with the

19 expectation that she would, well, you tell me before I try to

20 hypothesize your view?

21          MS. MANOHAR:  So as a general matter, DOS was

22 structured as a pyramid.  People at the top of the pyramid,

23 first line masters, were given these positions of power and

24 they were able to maintain their positions of power by

25 recruiting, enticing, maintaining, et cetera individuals below

1    them on the pyramid.

2            The specific benefits that they attained were slaves.

3    We define that specifically in the complaint.  Those slaves

4    provided them with labor services, menial tasks, around the

5    clock care, acts of service.  Those were the non-monetary

6    benefits of --

7            THE COURT:  Okay, so you're not really -- I haven't

8    dug out or had my clerks dig out this passage that the 2nd

9    Circuit wrote in upholding Mr. Raniere's criminal conviction.

10   You're not relying on that reasoning.

11           If I understand you correctly, and definitely correct

12   me if I'm wrong, the commerce here is that in exchange for

13   recruiting, enticing women to engage in these acts with

14   Raniere, you say that Ms. Clyne was compensated with free,

15   quote unquote, slave labor.  Is that makes this commercial?

16           MS. MANOHAR:  Correct, Your Honor.

17           THE COURT:  Okay.  So that's one predicate act.

18           The second predicate I have you alleging as against

19   Ms. Clyne is the forced labor count, which is 18 U.S. Code

20   §1589, obtaining or providing labor or services of another by

21   means of a threat of serious harm.

22           And I take it the threat of serious harm you allege

23   is the release or publication of what the complaint calls

24   collateral is that the threat we're talking about?

25           MS. MANOHAR:  That's correct, Your Honor.  But also,

1    the psychological and physical abuse that accompanied being a

2    slave to a first line master that included sleep deprivation,

3    starvation, around the clock back in call service, this was a

4    very --

5            THE COURT:  Does that work with the statute because I

6    thought the threat of serious harm as to be the thing by means

7    of which the victim is induced to provide this labor?

8            If it's just a consequence of the labor, that's not

9    the serious harm we're talking about.

10           MS. MANOHAR:  No, collateral would meet that

11   definition.  The sort of -- the general environment in which

12   the collateral was given was this abusive environment.  And

13   that's why I'm discussing the -- a motion for physical abuse as

14   well.  Even if it was -- it was occurring contemporaneous with

15   the given of collateral as well after the fact.

16           THE COURT:  Okay.  Can you just point me to the

17   places in the complaint where these allegations appear? So as

18   to --

19           MS. MANOHAR:  Yes, Your Honor.

20           THE COURT:  -- paragraph 168, where you talk about

21   the, quote unquote, master slave relationship?

22           MS. MANOHAR:  Yes, this paragraph.

23           THE COURT:  And her elevated position within the

24   organization is at paragraphs 25 and 69?

25           MS. MANOHAR:  Yes, correct, Your Honor.

1          THE COURT:  Okay.  And where do you allege I

2    understand there's a general allegation at paragraph 22 about

3    the release of collateral, but I don't know that that speaks to

4    Defendant Clyne's participation directly.  So where's the

5    allegation that Ms. Clyne herself threatened to release

6    collateral?

7          MS. MANOHAR:  Paragraph 168, Defendant Clyne told

8    Jane Doe 8 that she needed collateral in the form of nude

9    photographs to tell her about it.

10         Clyne also required Jane Doe 8 to provide here with

11   the email addresses of her colleagues at work as collateral and

12   then revealed that Jane Doe 8 had entered into a master slave

13   relationship.

14         THE COURT:  And then revealed, okay.  All right, and

15   Ms. Clyne, do you want it be heard on what just transpired?

16         MS. CLYNE:  Yes, I would love to.

17         THE COURT:  Please.

18         MS. CLYNE:  Thank you, Your Honor.  Well, I know this

19   isn't the time to rebut, you know, all the allegations, but

20   first of all, if what they're saying is true, generally

21   speaking, I should be a Plaintiff in this case because I'm no

22   different than other people who are, you know, being

23   represented by the attorneys over here in terms of any type of

24   authority or rank within the companies.

25              In terms of Jane Doe 8, that description of how it

1    happened is completely false.

2              THE COURT:  So.

3              MS. CLYNE:  It was a voluntary, you know, agreement.

4    Jane Doe 8 was never threatened.  And I think some facts should

5    be understood, which is the fact that she lived in a different

6    country the entire time.

7              And I received no uncompensated labor.  If there was

8    uncompensated labor performed, it was at the center at which

9    she was a coach, which was led by Sarah Edmondson, a fellow

10   Plaintiff.  So it just doesn't beg to reason.

11             I understand I'm not a lawyer.  I have no legal

12   precedent, but there's just no logic here --

13             THE COURT:  Yeah.

14             MS. CLYNE:  -- to what they're alleging.

15             THE COURT:  So you -- it seems like you do understand

16   at least a little bit about what differentiates a motion to

17   dismiss, which is what we're dealing with now, from a motion

18   say for summary judgment --

19             MS. CLYNE:  Sure.

20             THE COURT:  -- which we might deal with later or

21   ultimately a trial.

22             At the motion to dismiss stage, we accept the truth

23   or we treat as true everything that the complaint alleges.

24   We're not having a dispute about whether these facts are

25   correct or not correct.  We're just testing whether they're

1    legally adequate, assuming they're truth, to make out a claim

2    for RICO or whatever.

3            MS. CLYNE:  So they're alleging -- this is a question

4    because I don't totally understand, that I thought Jane Doe 8

5    was going to have some sort of sex.  Is that the allegation?

6    Because --

7            THE COURT:  Yeah, if --

8            MS. CLYNE:  -- my understanding is she's -- she was

9    and is married.  And --

10           THE COURT:  Well, let me just look at the --

11           MS. CLYNE:  -- it makes no sense to me.

12           THE COURT:  The elements of we're talking about a

13   statute here, the citation for which is 18 U.S. Code §1591.

14           MS. CLYNE:  Uh-huh.

15           THE COURT:  It's being referred to in the complaint

16   as the sex trafficking claim.

17           And as I understand it, the elements of that claim,

18   meaning the things somebody has to prove in order to prevail on

19   that claim are, one, that the Defendant on that claim knowingly

20   transported or recruited or enticed a person knowing or

21   recklessly disregarding the fact that that person was going to

22   be subject to force, fraud, or coercion.

23           MS. CLYNE:  But so what are the specifics in the

24   complaint?  I don't --

25           THE COURT:  And knowing that the person was going to

1    be engaged following that coercion in a commercial sex act.

2         And so, we just talked about certain paragraphs in

3    the complaint that allege that it was the job of people in this

4    D-O-S or I guess DOS organization to recruit people into it.

5         And in paragraph 168, they say and we have to treat

6    this as true for today's purposes, that you recruited Jane Doe

7    8 to participate in DOS, that you told her that to --

8         MS. CLYNE:  Like well what -- how does that prove or

9    create the foundation for sex trafficking?  That's what -- I

10   don't understand that.  I know they say it.  They say under

11   uncompensated labor, but I think you understand that the words

12   master and slave are not literal in this case.

13        It was a figure of speech that was used in a program

14   where there was no monetary exchange whatsoever.  And to be

15   quite honest, being in a position where you're mentoring

16   someone, it's -- there's a lot of labor on my part to help

17   people.

18        I was available to Jane Doe 8, 24/7 to help her with

19   her problems and she called me at all hours.

20        THE COURT:  So you're suggesting that --

21        MS. CLYNE:  So I --

22        THE COURT:  If I understand the legal argument that

23   you're making --

24        MS. CLYNE:  Okay, thank you.

25        THE COURT:  -- you're suggesting that there's

1   actually no allegation in the complaint that you --

2              MS. CLYNE:  That links sex trafficking or forced

3   labor to inviting someone into DOS, that they voluntary --

4              THE COURT:  Knowing with reckless disregard --

5              MS. CLYNE:  Right.

6              THE COURT:  -- of the fact that this person would be

7   engaged in a commercial sex act.

8              So I guess putting that question back then to

9   Plaintiff's counsel, where -- what paragraph in the complaint

10  makes that linkage that the recruitment enticement maintenance

11  whatever was with knowledge or reckless disregard that the

12  person being recruited would be engaged in a commercial sex

13  act?

14             MS. MANOHAR:  Your Honor, I'll get you the paragraphs

15  in a second, but I'd like to say the complaint is replete with

16  discussions of the manipulation and the extreme nature of DOS.

17             We also allege that Ms. Clyne was the person who

18  designed it with Mr. Raniere.  And we also allege that it was a

19  pipeline to funnel women directly to Mr. Raniere, so I'll get

20  you --

21             THE COURT:  And the reason you need to say not only

22  that that's what it was, but that at the time of she did the

23  recruiting or enticing or whatever, that Ms. Clyne knew or

24  recklessly disregarded the fact that this person would be

25  engaged -- not might be engaged, would be engaged a commercial

1    sex act.

2              MS. MANOHAR:  Your Honor, we allege that DOS was

3    created as a sex trafficking mechanism.  That's what it was.

4              THE COURT:  Which paragraph are we talking about

5    here?

6              MS. MANOHAR:  69's a paragraph that relates

7    specifically to Ms. Clyne.  I'll get you the paragraphs related

8    --

9              THE COURT:  You said 6 and 9?

10             MS. MANOHAR:  Paragraph 69.

11             THE COURT:  69.

12             MS. MANOHAR:  And I'll get you the paragraph related

13   to DOS in a second.

14             THE COURT:  Worked with Raniere to create environment

15   DOS.

16             MS. MANOHAR:  And then --

17             THE COURT:  Was a first line master and member of the

18   inner circle.  Continues to support Raniere and advocate for

19   him.

20             But it doesn't say -- it doesn't make that last step

21   in the linkage at least not in this paragraph that created and

22   ran DOS knowing or recklessly disregarding that the

23   participants would be engaged.

24             MS. MANOHAR:  We have those paragraphs beginning at

25   paragraph 788.  That's the --

1          THE COURT:  7 --

2          MS. MANOHAR:  -- long description of DOS.  And we

3   allege in this paragraph that DOS was created with this -- for

4   the express purpose of providing women to Raniere.

5          THE COURT:  So just because this paragraph is -- I

6   mean, because this complaint is so long, can you just point me

7   to the particular paragraph you're talking about?

8          MS. MANOHAR:  Yes, paragraph 793, 794, 795, 797.

9          THE COURT:  So look at 793.  You have a bunch of

10  people named there.  And it says all these people were first

11  line DOS masters, with their own pods, some of whom, and that's

12  the phrase that we get hung up on here, some of whom had been

13  coerced into recruiting their own slaves as well.

14          And so, it's the purpose generally was to provide a

15  good labor pool for Raniere and the first line masters, as well

16  to expand Raniere's supply of partners.

17          But isn't it incumbent on you to allege at least

18  somewhere this element of Ms. Clyne's knowledge or reckless

19  disregard that when she was recruiting people, Ms. Clyne knew

20  or recklessly disregarded that they were being recruited to

21  engage in commercial sex acts?

22          MS. MANOHAR:  Yes, Your Honor read in connection with

23  paragraph 69, we believe we plausibly allege the connection

24  between Ms. Clyne, DOS, and the state of mind requirement of

25  §1591.

1          THE COURT:  Could you be -- let's say I dismiss this

2     claim, but with leave to amend, so dismiss without prejudice.

3     Could you say more about how Ms. Clyne knew at the time she was

4     recruiting, enticing, et cetera the purpose for which she was

5     recruiting people, namely to engage in commercial sex acts?

6          MS. MANOHAR:  Yes, we could.

7          THE COURT:  So that's why -- yeah.

8          MS. MANOHAR:  I understand that.

9          MS. CLYNE:  I just want to add, too, that Camila was

10    a first line who's a Plaintiff, again, raising the issue of the

11    arbitrary nature --

12         THE COURT:  Well, but that --

13         MS. CLYNE:  -- between Plaintiff and Defendant.

14         THE COURT:  I hear what you're saying.  We see

15    unfortunately a lot of more classically commercial sex

16    trafficking cases in this district and elsewhere.  And it

17    happens all the time that people are both perpetrators of these

18    offenses and victims unfortunately.

19         And I understand the logical point you're making, but

20    I'm not sure if it's a matter of law --

21         MS. CLYNE:  Well, just to the point that they're

22    raising, that because I was part of DOS that that implies that

23    I had any knowledge of this fabricated sex trafficking

24    enterprise.

25         THE COURT:  Yeah.  Should §9 be applied to this

1    claim?  I'm getting a head shake of no from behind you.

2              MR. HOESE:  Excuse me, Your Honor.  9 --

3              THE CLERK:  I'm sorry, the microphone.

4              MR. HOESE:  I believe that 9 only applies to

5    allegations regarding fraud.

6              THE COURT:  Yes, and but the -- so the elements of

7    disclaim are the person is recruited, enticed, et cetera by

8    means of force, fraud, or coercion.

9              And I take it what you're telling me is that if

10   you're hanging your hat on the coercion option, then you don't

11   have a 9(b) issue because fraud's not implicated?

12             MR. HOESE:  Your Honor, William Hoese.

13             THE CLERK:  I'm not picking you up on the microphone.

14             MR. HOESE:  Okay.  Your Honor, William Hoese for the

15   Plaintiffs.  I believe that we also allege that fraud was used.

16             THE COURT:  Well, but then you have to articulate

17   that in particularity under Rule 9(b), wouldn't you?

18             MR. HOESE:  Well, perhaps, but I think we do within

19   this complaint.  And I also believe that all the allegations

20   regarding --

21             THE COURT:  You do with particularity as to this

22   client?  You didn't say a single word about what she said or a

23   conversation that she had or.  I mean, I --

24             MR. HOESE:  I don't -- well, I come from Pennsylvania

25   where fact pleading is the requirement for state complaints,

1    but I believe this complaint has given her reasonable notice of

2    the claim.  She's here defending herself, doing a very nice

3    job, but I think the complaint adequately alleges when you read

4    as Mr. Goelman said, all of the allegations in toto.

5          THE COURT:  So what I'm getting hung up on is it may

6    have been enough.  You know, assuming this not a 9(b) issue

7    that needs to be pleaded with particularity, it may have been

8    enough if you would have just said we allege that when Ms.

9    Clyne recruited Jane Doe 8 and others into this organization,

10   she did so knowing or in reckless disregard of the fact that

11   they were or would be engaged in commercial sex acts.

12         If you just -- I looked hard at the language of the

13   statute itself.  But as to Ms. Clyne, you don't even do that.

14   And I asked you or you just reminded maybe a year ago, maybe

15   more if you wanted to amend the complaint to increase the level

16   of specificity or particularity as to any of these things.  And

17   the answer I got was no.

18         And that begs a question, which we know as I look

19   through now then, is why is this matter of a law that any

20   dismissals should be without prejudice to amend instead of with

21   prejudice given the procedural history here?

22         MR. HOESE:  And Your Honor, I apologize for --

23         THE COURT:  And if you want to defend Mr. Goelman on

24   that, that's fine with me.

25         MR. HOESE:  No, it's fine.  I'm always prepared to

1    address that question.  I also want to say just that Mr. Glazer

2    apologizes for not being able to be here today.  I can't really

3    say anything more about it, but I just wanted to let the Court

4    know he wanted to be here so.

5              THE COURT:  Okay, I hope he's all right.

6              MR. HOESE:  Thank you.

7              THE COURT:  Mr. Goelman?

8              MR. GOELMAN:  Aitan Goelman for the Plaintiffs.  Your

9    Honor, I was not here at the hearing and I don't remember

10   playing a part in the exchange of letters, but I have read the

11   transcript of the hearing that you're talking about and seen

12   the letters.

13             And I understand that the argument is basically we

14   told you guys that these were defects in the complaint, you had

15   your chance, and now it's too late.

16             And I would just refer this Court to 2nd a Circuit

17   opinion.  It's Loreley Financing.  It's from 2015.  And 797

18   F.3d at 190.  It's the exact same fact pattern.  It was Judge

19   Sullivan in the district court before he was elevated to the

20   2nd Circuit.

21             And he did the exact same thing.  He had a pre-motion

22   hearing, which is fine.  He had them exchange letters, which is

23   fine.

24             And then, he basically offered the Plaintiffs a

25   Hobson's choice:  agree to cure deficiencies not yet fully

1    briefed and decided or forfeit the opportunity to re-plead.

2          And what the 2nd Circuit said is without the benefit

3    of a ruling, many a plaintiff will not see the necessity of

4    amendment or be in opposition or be able to weigh the

5    practicality and possible means of assuring specific

6    deficiencies.

7          So what the 2nd Circuit said is that, I mean, right

8    now, we're in Rule 15 world, right, not Rule 16.  So district

9    courts are instructed to grant leave to amend freely when

10   justice requires.

11         THE COURT:  Right, but there's still an assessment to

12   be made there as to the prejudice to the opposing party.  Like

13   this case has gone on a long time.  And otherwise, I'll read

14   the Loreley Financing case.

15         And I'm not saying there's a point of rule in this

16   courtroom or anywhere else that if you're offered an

17   opportunity to amend and you decline, that you forfeited

18   forever.

19         I'm saying that's one factor potentially that's

20   relevant in the mix.  Obviously, we should assess the extent to

21   which you were really on notice of the deficiencies at issue.

22   How many time has passed since?  How, you know, how -- what

23   affect on other dates in the case calendar and so forth?

24         I mean, we have a I think a pretty pronounced shotgun

25   pleading problem with this complaint.  And the Defendants have

1   been saying it for a long time, the more I read the complaint,

2   the more I come to the same conclusion, which is it's just, you

3   know, how many pages in total?

4           MR. GOELMAN:  Over 200.

5           THE COURT:  Over 200 pages.  And when I say tell me

6   what are the facts that give rise to a predicate acts, I'm told

7   you know, look at a couple of paragraphs that are hundreds of

8   pages away from each other, and by the way, you have to

9   interpret, you know, you have to assess that predicate act by

10  reference to the complaint as a whole and draw all kinds of

11  inferences that are not even explicitly articulated.

12          And I might be more inclined to grant leave to amend

13  if I thought that it would go a substantial part of the way

14  towards solving the shotgun pleading problem.  It's just going

15  to make the complaint longer and more confusing.  That might be

16  relevant to the analysis also not in a way that I think is

17  helpful to you.

18          Do you understand my question?  If -- it might

19  militate against a finding of prejudice to the Defendants if

20  you are saying at the same time you ask for leave to amend that

21  you're going to simplify and streamline the complaint and make

22  it a lot easier for everybody to understand what they're

23  accused of, you know, you've got all kinds of claims here that

24  you say every Plaintiff brings this claim against every

25  Defendant, and then, you also have a thing about, you know,

1    multiple Plaintiffs or multiple Defendants on that claim.

2            How would you feel about the idea of and I'm not

3    saying I'm going to grant this.  I'm just asking like is it

4    possible that the amended complaint would come in substantially

5    lighter and more focused than the complaint we have now?

6    Because the answer to that question I think might inform the

7    prejudice analysis you're anticipating me making.

8            MR. GOELMAN:  Your Honor, are you talking about

9    prejudice to the Defendants?

10           THE COURT:  Yes.

11           MR. GOELMAN:  Because under that paradigm, every

12   complaint filed is prejudicial to Defendants because they have

13   to defend against it.

14           THE COURT:  No, no, no.

15           MR. GOELMAN:  Right?

16           THE COURT:  I'm saying the Defendants have been

17   laboring for a year under the obligation to divine that they're

18   accuse of in a complaint that really doesn't make that clear.

19           And leave to amend it seems theoretically possible

20   could make that problem either better or worse.  And if there

21   was some concrete reason to believe that leave to amend would

22   help focus this case substantially and tell the Plaintiffs

23   exactly what they're accused of doing when, that might be

24   relevant to the analysis.  Does that make sense and sort

25   distinguish this case from every other case in the world?

1          MR. GOELMAN:  I understand what the Court means.  I'm

2     still not clear about the definition of prejudice that the

3     Court is using.

4          But I will say this.  We'll do what the Court wants.

5     If you tell us, if you dismiss it with leave to amend and, you

6     know, indicate what you think the deficiencies in the complaint

7     are, then we will attempt to write a complaint that cures those

8     deficiencies.

9          The pre-motion letters by the Defendants contained

10    allegations that the complaint was deficient in about 50

11    different ways.

12         Now maybe the Court agrees with 10 of those.  Maybe

13    the Court agrees with 5 of those.  I don't think the Court

14    agrees with all 50 of those.

15         So it's pretty impossible at that point as Plaintiffs

16    to go back and fix things when you're just being told to hold

17    the whole thing sucks.

18         And Your Honor, I would -- yeah, I do think it makes

19    sense to read the Loreley case because Judge Sullivan -- I

20    mean, it's literally word for word what he said.  He didn't say

21    I have a hard and fast rule that you get one shot and one shot

22    only.  And --

23         THE COURT:  Well, every case has to be judged on its

24    own merits.  And you know, the standard is the standard, right?

25    And maybe it applies exactly the same way in that case based on

1    all of the, you know, every other procedural posture maybe

2    applies differently, but I understand your point.

3          MR. GOELMAN:  Can I just add one thing Your Honor?

4    Because there is a -- if the Court find -- look, I think that

5    the main reasons to dismiss with prejudice according to 2nd

6    Circuit are futility and bad faith.

7          And if you find bad faith, then you find bad faith.

8    I don't think there's any evidence of that here.

9          If you find futility, you know, I don't think that

10   the challenge of writing more focused complaint means futility.

11         The one claim that would be futile is if the Court

12   agrees that because one or more Plaintiffs were also in NXIVM,

13   that inherently means they can't be a Plaintiff in an RICO

14   lawsuit.  And that is something that the Defendants have

15   argued.  I don't think it's the law.

16         THE COURT:  No, no.

17         MR. GOELMAN:  If it is the law, we can't -- that's a

18   futile.  We can't change that.

19         THE COURT:  No, it's futile -- so my individual rules

20   say that when someone wants leave to amend the complaint, they

21   need to submit a blackline that shows here are the changes he

22   proposed to make to the complaint.  And I just ask the question

23   of Ms. Dean -- no, sorry, Ms. --

24         MS. MANOHAR:  Manohar.

25         THE COURT:  Okay, people are moving out of order from

1    my little chart here.  Thank you.  I'm sorry.

2            The question I posed was could you just allege more

3    specifically or even more generally that Ms. Clyne knew when

4    she was recruiting, enticing, et cetera people to come to this

5    inner circle that they were -- that they would be engaged as a

6    result of that recruitment in commercial sex acts.

7            And the answer was yes.  Like we can judge futility

8    by the Plaintiffs submitting a proposed amended complaint and

9    taking a look at it and saying, okay, is this going to make a

10   difference or is this not going to make a difference?

11           And I think it may make sense to do that before I go

12   through the Herculean effort of weighing an earlier -- on a

13   motion to dismiss a complaint that spans more than 200 pages

14   and involves more than 70 Plaintiffs alleging, you know, 14

15   causes of action against however many Defendants we have here

16   in some cases where the only way I'm going to be able to

17   dismiss the count unless they give me Defendant is to read the

18   entire 211 pages to conclude that the count doesn't allege

19   anything as against that Defendant on that claim.

20           Why not -- why not ask you to move for a leave to

21   amend now and to attach a draft complaint to that motion, that

22   yeah, also attaches a blackline and allows me to tell the

23   extent to which amendment would be futile or not futile?

24           Would streamline the shotgun pleading problems I'm

25   talking about here or aggravate them and so forth.  Just as a

1    matter of order of operations.

2            MR. GOELMAN:  No, I understand.  And certainly, this

3    hearing and your comments about shotgun approach and your

4    comments about, you know, the different specificity you desire

5    is giving us an idea of what kind of blackline the Court would

6    be looking for.

7            If there's any further direction about what the Court

8    finds deficient in the complaint, I know you think it's too

9    long.  I know you think it's shotgun.

10           THE COURT:  And it just doesn't -- there are elements

11   and this -- for just -- got up a minute ago, and Ms. Clyne is a

12   perfect example that, you know within one of the elements of

13   the sex trafficking claim is that the person doing the

14   recruiting, enticing, et cetera knows or recklessly disregards

15   knowledge that the person they're recruiting will be engaged in

16   a commercial sex act.  Like the complaint doesn't say that.  I

17   asked is that something you could say and the answer was yes.

18           You don't need me.  Like you can go through as well

19   as I can and, you know, look for the elements of each cause of

20   action and say, okay, have we alleged all the elements?

21           So what, you know, what do you propose if anything

22   with respect to amendment on the bases we've talked about here

23   today?

24           And if you want to take that question away, might not

25   be a fair question to put someone on the spot and ask you to

1    answer now, but I would be interested to just in terms of

2    supplemental briefing questions to hear from the Plaintiffs

3    about what proposed amendments they would make.

4            MR. GOELMAN:  So the pleading would be, if the Court

5    decides to dismiss with leave to amend, this is what we planned

6    to do differently?

7            THE COURT:  I'm trying to think of the path forward

8    here.  I see that there's law in other circuits and there may

9    be in the 2nd Circuit as well.

10           So let me read you an 11th Circuit case that got some

11   notoriety.  You might have even seen this yourself.  It's an

12   11th Circuit case talking about an appellate -- well, 11th

13   Circuit speaking on appeal.

14           The amended complaint is an incomprehensible shotgun

15   pleading.  It employs a multitude of claims and incorporates by

16   reference all of its factual allegations into each claim,

17   making it nearly impossible for Defendants and the Court to

18   determine with certainty which factual allegations give rise to

19   which claims for relief.

20           At 28 pages long, so a 10th of what we're dealing

21   with here approximately and having incorporated all 123

22   paragraphs of allegations into 16 counts, it is neither short

23   nor plain.  So it's a real 8 issue.

24           Absent a dismissal in Defendants in framing their

25   answer would likely have responded in kind.  They say some

1    harsh stuff that I won't repeat here because I'm not sure it's

2    that fair under the circumstances.

3         But here's the reason why I raised this.  They

4    conclude by saying this is why we have condemned shotgun

5    pleadings time and time again.  And this is why we have

6    repeatedly held that a district court retains authority to

7    dismiss a shotgun pleading on that basis alone.

8         So what does that imply for the order of operations?

9    Maybe that the right thing is for me not to get deep into the

10   weeds of every element of every count that every Plaintiff is

11   bringing against every Defendant.

12        But instead, to you know, dismiss without prejudice,

13   yeah, so like this, you know, Count 20 or sorry Count 15 begins

14   with paragraph 994.  Plaintiff's re-allege and incorporate by

15   reference each of the foregoing paragraphs in this complaint.

16        All right, so Count 15, which may not be part of this

17   case anymore, I don't think it is, but you get the idea

18   re-alleges and incorporates 993 paragraphs into that particular

19   count.

20        Like I think we have at least the same number of

21   problems that the 28-page complaint raised in the 11th Circuit.

22   And I don't think it's an efficient use of judicial resources

23   if I don't say so myself for me to write as I say the full

24   merits order on a motion to dismiss, only then to start from

25   scratch.

1      And so, it may well be that the path forward is tell

2  me how you amend this complaint in response to that which

3  you've heard here today, that which you've read in the

4  Defendant's briefs.

5      And you know, if it seems like the Defendants will be

6  helped in their understanding of what they're being accused of,

7  rather than prejudiced, you know, maybe we'll all agree that

8  leave to amend should be freely granted under those

9  circumstances, but we would have to be solving problems like

10  the shotgun pleading problem that I just described.

11      MR. GOELMAN:  Well, Your Honor, in terms of we all

12  agree, I mean I don't think the Defendants would ever agree.  I

13  certainly wouldn't if I were defense counsel, but we can do

14  that.

15      Do you mean then we wouldn't -- we would not submit

16  the actual blackline of the complaint.  We just would describe

17  in our motion for leave what we intend to do.

18      THE COURT:  That wouldn't comply with my individual

19  rules, but it might be that this complaint is so long and the

20  changes you're contemplating are so substantial, that a

21  blackline would not be readable.

22      And so, you'd be asking for relief from that part of

23  my individual orders.  It is pretty common.  I'm the only judge

24  in the city who's saying, you know, do an actual blackline to

25  show what the changes would be.

1          The more detail, the better, because if we're judging

2    things like futility, prejudice, et cetera, you know, the devil

3    on those questions is in the details, right?

4          So I would leave it to your good discretion, I think,

5    to decide if okay, we got to, you know, draft a complaint and

6    then run a blackline.

7          Or is it better to have a narrative statement of here

8    is precisely that which we would seek to do in an amended

9    complaint, but that specific you know, count by count,

10   Defendant by Defendant.

11          MR. GOELMAN:  Uh-huh.

12          THE COURT:  Rather than general.

13          MR. GOELMAN:  Okay, thank you.

14          THE COURT:  Okay.  All right, so that I think brings

15   us to the end of the predicate act on the 1591 claim against

16   Ms. Clyne.

17          The first leading (indiscernible) against Ms. Clyne,

18   Ms. Manohar?

19          MR. HOESE:  Your Honor, excuse me, Your Honor.

20          THE CLERK:  Counsel --

21          MR. HOESE:  We have division of labor.

22          THE COURT:  Okay.

23          MR. HOESE:  And I'm -- if it's all right with the

24   Court I'm prepared to address forced labor.

25          THE COURT:  Please.

1          MR. HOESE:  Thank you, Your Honor.

2          THE COURT:  Mr. -- are you Mr. Dean?

3          MR. HOESE:  No.

4          THE COURT:  I'm sorry.

5          MR. HOESE:  William Hoese, Your Honor.

6          MR. GOELMAN:  This is Ms. Dean next to me, Your

7    Honor.

8          THE COURT:  Thank you.  I've solve the mystery of who

9    Ms. Dean is.  I'm sorry.  I have a map in front of me that says

10   which lawyer is sitting there and somebody moved around after

11   that map was created.  I don't know who that person was.

12         MR. HOESE:  Well, I don't want to point the fingers

13   at anybody, but it was me, Your Honor.

14         THE COURT:  I'm just kidding.

15         MR. HOESE:  As a predicate act, and there are really

16   two things here, Your Honor, in terms of forced labor, but as a

17   predicate act, let's take a look at the statute.

18         THE COURT:  Yeah, knowingly obtained or provided the

19   labor of services -- labor or services of another by means of

20   and I take the means you're going to invoke is the threat of

21   serious harm?

22         MR. HOESE:  That's correct, Your Honor.  And in this

23   case, with respect to the forced labor, the threat of serious

24   harm is what you mentioned earlier, which is the threat of

25   release of collateral.

1          And the complaint alleges that before people are

2    induced -- people were induced to become members of DOS, they

3    were asked to give collateral, which was financial credit card

4    authorizations.

5          THE COURT:  Right.

6          MR. HOESE:  You know, naked photographs, videos,

7    letters.

8          THE COURT:  So what -- I understand there's a threat

9    to release the collateral.

10         MR. HOESE:  Yes.

11         THE COURT:  And short of that is a threat of serious

12   harm.  The 2nd Circuit said so.  In Raniere, I think that's the

13   law of the case.  I don't think we're anybody's disputing that.

14         I think the question for me is the Defendants

15   threatened to release the collateral if what?  And where is

16   that in the complaint?

17         MR. HOESE:  Uh --

18         THE COURT:  Because I'm not sure they said if you

19   don't keep working for us for free, or below minimum wage,

20   whatever, then we're going to release the collateral or maybe

21   they did.  But my question is the threat to release the

22   collateral is predicated on what condition?

23         MR. HOESE:  My understanding was that --

24         THE COURT:  I don't want to hear your understanding,

25   I'm sorry.  I want the paragraph in the complaint.

1          MR. HOESE:  No, that's fair Your Honor.  In the

2    complaint, and we're going to give you the exact numbers

3    momentarily, it says that the collateral is given in order to

4    as a sign of loyalty to DOS and that the threat was that if you

5    were disloyal or disavowed your vow, that you would have

6    committed some kind of breach under NXIVM rules.

7          THE COURT:  If you disavowed your vow?

8          MR. HOESE:  Yes, well, it was also called a vow, Your

9    Honor.

10          THE COURT:  But what's the vow?  The vow is to

11    provide free labor?

12          MR. HOESE:  The vow was -- the vow was to submit to a

13    position as a slave to another woman in this organization and

14    essentially to be at their beck and call to do what they said

15    whenever they said it and not to disobey.  And if you

16    disobeyed, then the threat was, or excuse me, the stick was

17    that we would release this collateral.

18          Because if you think about it, Your Honor, why else

19    would you have someone write a letter saying I was abused, you

20    know, true or false, I was abused by someone in my family and

21    give that to somebody?

22          It's not the world I live in.  But the threat was

23    that again, if you were disloyal that this could be released.

24    And that's the serious harm.

25          THE COURT:  If you were disloyal.  So you're saying

1    that the collateral becomes both a source of the coercion for

2    the commercial sex act at the heart of Count 3(a) and it is

3    also the threat of serious harm that is used to procure the

4    labor or services that are the heart of Count 3(b)?

5              MR. HOESE:  I agree with that, Your Honor.

6              THE COURT:  Okay.

7              MR. HOESE:  There's a lot of overlap in the TVPRN

8    sections.

9              THE COURT:  Okay, but so the collateral is serving

10   two purposes at least there?

11             MR. HOESE:  Yes.

12             THE COURT:  And the (indiscernible) says in paragraph

13   159 that these -- those were required to sign a contract or

14   the --

15             MR. HOESE:  Yes, Your Honor.

16             THE COURT:  That's some of them at least --

17             MS. MANOHAR:  That's under Salzman.

18             THE COURT:  Oh, just one particular one?

19             MS. MANOHAR:  Yeah.

20             THE COURT:  Okay, that's what I was trying to

21   understand, like I think you probably do at the Rule 12 stage

22   have enough specifics here.  There certainly are more specifics

23   than in some of the other counts.

24             But where does it say that this collateral was used

25   specifically to extract labor and specifically to coerce people

1    into commercial sex acts?

2              MS. MANOHAR:  But --

3              THE COURT:  Because you've got two paragraphs in here

4    where people actually say I'm leaving.  Paragraph arguing 62 in

5    respect to Jane Doe 7 and paragraph 170 in respect to Jane Doe

6    8.

7              And do you allege as to both that the collateral is

8    in fact released for that violation of the vow?

9              MR. HOESE:  We don't, Your Honor.

10              THE COURT:  As to neither?

11              MR. HOESE:  As to neither.

12              THE COURT:  Okay.

13              MR. HOESE:  However, I'd hasten to add that there was

14    the threat of the release of the collateral, not the actual

15    release of the collateral after the fact.

16              THE COURT:  Okay, so then where is the threat

17    described in those specific terms as a threat designed to

18    coerce free labor or commercial sex acts?  I think it is in

19    here.  I think I'm just not seeing it right now.

20              MR. HOESE:  Ms. Manohar is assisting me.  Thank you.

21    Page 152 of the FAC, paragraph 782.

22              THE COURT:  You said 152 first?

23              MR. HOESE:  Page 152, yes, Your Honor.

24              THE COURT:  Page 152?

25              MR. HOESE:  Yeah, maybe I shouldn't have said that,

1    but --

2         THE COURT:  Yeah, do a paragraph number if you would.

3         MR. HOESE:  No, I was going to do that.

4         THE COURT:  Oh, I see.

5         MR. HOESE:  Paragraph 781.  And I could read it to

6    the Court because I think this applies to more than just Ms.

7    Clyne.

8         NXVIM used a concept known as collateral to enforce

9    with the creators of DOS some sort of ethical conduct.  Under

10   Raniere's teachings, a person who is honorable and they were

11   trying it uphold his word should be happy to collateralize his

12   word in a demonstration of good faith.  And this --

13        THE COURT:  There's a step in the logic that I think

14   you need to make, which is you're collateralizing your word and

15   part of your word was I'll work for free.  I'll engage in

16   commercial sex act.  Like where is the -- and again I think you

17   do make this connection, but I just I'm not seeing it right

18   now.

19        MR. HOESE:  I --

20        THE COURT:  Where is the allegation that that is part

21   of what we mean when we say quote unquote his word?

22        MR. HOESE:  Well, let me draw the Court's attention

23   to paragraph 787.  Most importantly, collateral was the key to

24   get admission into DOS.

25        Recruits were required to provide deeds to property

1    and confidential information about themselves, family members,

2    or employers who were encouraged to lie if the information

3    provided was not scandalous enough to merit Raniere's approval.

4    That's more towards the serious harm.  But --

5            THE COURT:  Is there anywhere in here where

6    it's -- where somebody's threatened, hey, if you stop working

7    for free, providing this quote unquote slave labor, we will

8    release or collateral such that we know that the collateral is

9    serving that purpose in the forced labor context?

10           MR. HOESE:  That -- is there a specific allegation in

11   the complaint that one or more of the Defendants said exactly

12   those words that if you --

13           THE COURT:  Not exactly those words but --

14           MR. HOESE:  But if you breach your vow --

15           THE COURT:  Made that point in substance.

16           MR. HOESE:  -- we'll release the collateral.

17           THE COURT:  That if you'll either provide labor or

18   engage in the commercial sex acts that the collateral will be

19   released.

20           MR. HOESE:  We're working our way through.  And

21   regrettably, Your Honor, I haven't been able to find it yet,

22   but there are multiple paragraphs regarding DOS, the type of

23   information that was required.

24           And I also would like to mention that, and these are

25   paragraphs with respect to Ms. Clare Bronfman, that certain

1    Plaintiffs and others wrote to her and others explicitly

2    describing the collateral and beseeching her and others for its

3    return.

4              THE COURT:  I'm -- believe me, I'm not questioning

5    that this is extraordinarily sensitive and painful for anybody

6    who finds themselves in that position.

7              MR. HOESE:  I'm sorry --

8              THE COURT:  I just want to understand the extent to

9    which the linkage is made explicit or whether it remains

10   implicit that --

11             THE COURT:  I think it's --

12             THE COURT:  -- that the reason people provided the

13   labor they provided and the commercial sex acts alleged is that

14   that was caused in whole or in part by the collateral.

15             MR. HOESE:  I'll say this.  I think Ms. Manohar wants

16   to address one of your points, but I think its inferential in

17   terms of why would I write to one of the inner circle and

18   beseech them to return this material if I wasn't operating

19   under the belief that it was going to be released?  I mean,

20   if --

21             THE COURT:  I'm not questioning that they had a

22   legitimate concern that the collateral would be released, but

23   we're talking about -- let me give you the actual words here by

24   means of.

25             The person who's the subject of the first labor count

1    has to be providing their labor or services or has to be --

2    those that labor or those services have to be obtained by means

3    of the use of the threat of serious harm, right?

4           And so, I think the first by means there's a causal

5    linkage that you have to make.  And I think you do make it.

6    I'm just trying to understand if it's sort of an inference from

7    the totality of 950 paragraphs or if it says here somewhere

8    explicitly, you know, Victim X only did this work that was

9    referred to as slave labor because she had provided collateral

10   and was concerned about its release or Victim Y, who engaged in

11   what we're calling commercial sex acts in this case did so only

12   because or in part because she was concerned about the release

13   of the collateral.

14           MS. MANOHAR:  Your Honor, if I might interject, we do

15   have language in the complaint.

16           THE COURT:  I thought I read it.  Yeah.

17           MS. MANOHAR:  It describes as much.  I'd direct the

18   Court to paragraph 802, which states recruits have expressed

19   interest in joining DOS were again required to submit

20   collateral to become members.

21           Once they became members, the quote slaves were

22   routinely required to provide more collateral with the

23   understanding that if they ever attempted to leave --

24           THE COURT:  Thank you.  Yes.

25           MS. MANOHAR:  -- or failed to comply with the

1    expectations of them as slaves including the demands for more

2    collateral, the collateral already provided would be released.

3    The expectation of the slaves would that they would be

4    performing labor.

5              THE COURT:  Yes, and doing everything their masters

6    told them, correct.

7              MS. MANOHAR:  Correct.

8              THE COURT:  I think that's -- I think that's what was

9    I looking for.  Okay.

10             All right, Ms. Clyne, do you want to be heard on the

11   forced labor predicate act?

12             MS. CLYNE:  Yes, Your Honor.

13             THE COURT:  Just briefly.

14             MS. CLYNE:  Just quickly, 171 says as a result of

15   capital D Defendants criminal acts and misrepresentations and

16   omissions.  Jane Doe 8 was emotionally and financially harmed

17   and then same thing, 172, performed uncompensated labor working

18   for many hours without compensation for the benefit of the

19   Defendants.

20             Again, I'm not clear if that's supposed to be for me

21   or if the implication is that because she's in DOS, now she's

22   performing labor for Sarah Edmondson at the Vancouver Center.

23             THE COURT:  Sorry, tell me the two paragraph numbers

24   you --

25             MS. CLYNE:  171 and 172.

1          THE COURT:  Okay.

2          MS. CLYNE:  Because I was never involved in, you

3    know, her life in Vancouver.  So I'm not clear as to if that's

4    a general allegation or if I'm included.

5          THE COURT:  Okay.

6          MS. CLYNE:  Or if it's specific to me.

7          THE COURT:  Yeah, well, the Defendants are going to

8    put in a letter that tells me whether or not they wish to amend

9    the complaint to add additional specifics.  And that'll would

10   be something they'll tell us they do or do not want to clarify.

11         All right.  We are over the time that I had hoped to

12   conclude by.  I want to make sure every Defendant here has an

13   opportunity to be heard.

14         Is it Dr. Roberts, do you want to be heard next?

15         MS. ROBERTS:  Sure.

16         THE COURT:  Please.  And you can address any of the

17   claims against you that you wish.  I'm interested especially in

18   the battery claims and specifically the allegation in paragraph

19   68 that this branding was performed, quote, without informed

20   consent.

21         I don't know how way to read that to mean that there

22   was consent, but it wasn't informed, or that there was no

23   consent informed or otherwise.  But you'll tell me anything you

24   want to tell about the --

25         MS. ROBERTS:  Sure.

1          THE COURT:  -- complaint and why it should be

2    dismissed as to you.

3          MS. ROBERTS:  Sure.  I will address that.  I guess

4    the first point I wanted to make was just that I don't see any

5    connection between me and the RICO case at all.  I'll address

6    the battery separately from that, because that's the only place

7    they specifically mention my name.

8          But in terms of being a participant in any type of

9    RICO conspiracy, I mean, I clearly wasn't prosecuted, I wasn't

10   indicted, I wasn't tied to any type of RICO conspiracy at all

11   in this entire process by the FBI agents.

12         So most of the other predicate acts would have to be

13   based on that and there doesn't seem to be any plausible

14   connection there.

15         If we refer directly to the battery charges, in my

16   experience, the entire experience of the branding was

17   consensual.

18         The women that were brought into DOS chose to join

19   DOS, knowing that there would be an initiation process and that

20   they would receive a brand.

21         They had consented to that ahead of time.  They had

22   also consented to the fact that we would be given information

23   on as-needed basis.  And that would that essentially we weren't

24   entitled to any particular information.

25         Based on that, myself and the other --

1          THE COURT:  Well, what does informed consent for

2    something like that mean to you?  How should I read those words

3    in the complaint?

4          MS. ROBERTS:  Well, I think every single member that

5    was brought was informed in terms of before they ever joined

6    before they ever gave there first piece -- well, before they

7    ever decided to join DOS and gave collateral to join DOS,

8    including myself by the way, we were informed that we were

9    going to receive a brand.  So there was informed consent in

10   that process.

11         THE COURT:  Can I just ask the Plaintiffs whoever is

12   taking the lead on this count, you know, how should I read

13   that?

14         MS. MANOHAR:  So in terms of informed consent, so

15   with respect to the battery, the individuals who were branded

16   did not know ahead of time that they were going to be branded

17   before they were first invited to DOS.

18         They had no idea that the brand would be comprised of

19   Raniere's initials.  And at that point, they were already

20   collateralized.  So they didn't feel that they had the

21   opportunity.

22         In terms of informed consent, they didn't know that

23   they would have anesthesia.

24         THE COURT:  Okay.

25         MS. MANOHAR:  None of them were disclosed the fact

1    that this would be part of the process.  When they were first

2    invited to DOS, they were only told that they -- in order to

3    learn more about DOS, that they provide collateral.  Any

4    information that was provided to any of the women in DOS was

5    subsequent to them turning over the first form of collateral.

6            THE COURT:  Okay.  And is it self-evident under New

7    York law or clearly established I guess under New York law that

8    informed, you know, subjecting somebody to a procedure like

9    that this without informed consent constitutes battery as a

10   matter of common law?

11           MS. MANOHAR:  So the cases that we've cited talk

12   about the intentional wrongful physical contact without consent

13   or that the consent is -- it's, sorry, or that the intended

14   contact was itself offensive or without consent if they didn't

15   have consent as to what the brand was or that it was part of

16   Raniere's initials.

17           That cannot be informed consent.  Informed consent by

18   definition means it would have to have the information, which

19   they did not.

20           MS. ROBERT:  Can I address that, Your Honor?

21           THE COURT:  Let me just ask one follow up question of

22   Plaintiff's counsel.  Is it -- do you -- does the complaint

23   allege that the nature of this brand was misrepresenting or

24   just that it was not -- it doesn't allege that it was -- it

25   represented the five elements?

1          MS. MANOHAR:  Yes, we do allege that it was

2    misrepresented and it's also a question of the scope of the

3    alleged consent.

4          So they might have consented to receiving a brand,

5    but if they did not know what the brand was, that cannot be

6    informed consent.

7          THE COURT:  Okay, does the -- remind me, does the

8    complaint allege that it was Dr. Roberts herself who made the

9    misrepresentations about what this brand actually consisted of?

10         MS. MANOHAR:  I believe so, but I can check the

11   paragraph.

12         THE COURT:  I'm just trying to understand what is

13   alleged more generally and what's alleged as to Dr. Roberts

14   herself.

15         Yeah, it just says in paragraph 102 that Ms.

16   Edmondson was told, again passive voice, that this brand was a

17   symbol of the five elements, but in fact, it was Mr. Raniere's

18   initials.

19         Does it matter for the battery claim what Mr. -- that

20   Dr. Roberts is telling people that she shows that people are

21   being told by others?

22         MS. MANOHAR:  I think it does matter, but I think it

23   also matters that they were collateralized at that point and

24   therefore could not give informed consent.

25         THE COURT:  Do you allege specifically that Dr.

1    Roberts knew about the collateralization process?

2              MS. MANOHAR:  Dr. Roberts was herself in DOS and

3    verified, went through the same process, and was aware that

4    collateral was required before individuals could be provided

5    with any more information about DOS.

6              THE COURT:  Okay.  Is that alleged?  We've heard it

7    from both sides now, but I'm just not sure I remember reading

8    in the complaint that Dr. Roberts was herself an inductee.

9              MS. MANOHAR:  At paragraph 68, we have Roberts

10   continues to support Raniere and publicly promote DOS.

11             THE COURT:  But does that -- that's not exactly what

12   I was asking, right?  And that speaks to current time, not

13   pre-branding.

14             Right, she must know that the victims are not really

15   consenting or not validly consenting.  And it could be that she

16   knows that because she knows that they're essentially the

17   subject of the extortion scheme essentially through the

18   collateral, but I just -- I can't remember again where in the

19   complaint you see that.

20             MS. MANOHAR:  I can't point to paragraph at this

21   point.

22             THE COURT:  Okay.  Well, think about whether that is

23   something that needed to point me to later or perhaps make the

24   subject of an amendment if we were to go that route.

25             Okay, Dr. Roberts, back to you.  I'm sorry.

1    MS. ROBERTS:  Sure.  I mean, I think it would be also

2    important to clarify that, yes, I was brought in in the same

3    way that these women were.  So the women that are alleging that

4    I deceived them or withheld information --

5    THE COURT:  So just to remind you, we're stuck with

6    the four corners of the complaint here.

7    MS. ROBERTS:  Yes.

8    THE COURT:  And all we're testing is what it says in

9    here.  You want to probably address your arguments to that as

10   well.

11   MS. ROBERTS:  Uh-huh.  I guess what I need to know is

12   they're alleging that I knew some sort of information that

13   these other women didn't know and that I somehow didn't inform

14   them of that information.

15   THE COURT:  No, the allegation, as I understand it,

16   is well, maybe alleged as to you specifically in the complaint

17   right now it may not be, but assume that we were dealing with

18   an allegation that you knew when one or more of these that

19   would have been submitted to this process that they lacked the

20   freedom to say no.

21   And instead, that they were submitting because they

22   had given up this compromising material and feared that if they

23   didn't comply, it would be released.

24   And that you know as a doctor and just as a citizen

25   that whatever consent they're giving under those circumstances

1    is not really consent.

2            MS. ROBERTS:  Well, my experience in terms of that

3    was the exact opposite.  I was brought in.  I was introduced

4    and invited into an organization the same way that that were.

5            So I clearly knew I had a choice to say no.  I

6    clearly knew that my collateral wasn't going to -- I wasn't

7    going to be forced.

8            THE COURT:  Again, we're outside the four corners of

9    the complaint.  I understand what you're saying.

10           MS. ROBERTS:  To the relevance, I mean.

11           THE COURT:  Yeah, the question is what does the

12   complaint say about who knew what when and who had what free

13   choices to make when?  And you know, we'll test it by that

14   standard.

15           All right, Dr. Porter, let me give you 10 minutes

16   here as well.

17           MR. PORTER:  Okay, so I guess the way I would start

18   is with the first complaints that directly mention me.

19           THE COURT:  Tell me if you're in which count you're

20   talking about or which cause of action?

21           MR. PORTER:  Right, so there's -- it's number 8 like

22   the negligence and the human research.

23           THE COURT:  Yes.

24           MR. PORTER:  And then, also 10 with gross negligence

25   and recklessness.  Now this is probably something more about

1    the future in that like there's no dates given in these.

2            So in my response, these actions most likely are

3    outside of the -- I forget the word right now, statute of

4    limitations.

5            And I don't know, but I was included in all of these

6    RICO charges, including sex trafficking.

7            THE COURT:  Can I just -- I apologize when I keep

8    interrupting the Defendant --

9            MR. PORTER:  Right.

10           THE COURT:  -- so I invite to speak first to hear

11   from Plaintiffs.

12           MR. PORTER:  No, that's okay.

13           THE COURT:  But I think I can sharpen up --

14           MR. PORTER:  Yeah.

15           THE COURT:  -- one of my questions by speaking to

16   them for a minute and then giving you a chance to respond.

17           Negligence per se, one of the elements as Plaintiff's

18   counsel knows is that the --

19           MS. MANOHAR:  Your Honor, sorry, if I can interject.

20   I don't think that we've we dismissed that claim.  The only

21   claims were Defendant Porter specifically mentioned is a gross

22   negligence and recklessness claim.

23           THE COURT:  Okay, so not -- sorry not Count 8?

24           MS. MANOHAR:  Correct.

25           THE COURT:  Gross negligence is count -- claim 10.

1    Also a three-year statute of limitations.  Okay, so essentially

2    a medical malpractice claim, right?

3            And the allegations as to Defendant Porter are that

4    he conducted experiments on people within the NXIVM community

5    without voluntary, informed consent or professional oversight.

6            Can you get into more specifics about why informed

7    consent was lacking?

8            MS. MANOHAR:  So I think the focus for the negligence

9    and recklessness claims is that he breached his duty of care to

10   them as a medical doctor holding himself out as providing a

11   cure for OCD and Turret Syndrome.

12           THE COURT:  Which -- so I'm looking at paragraph 67.

13   Is there something else I should be looking at?  Because that

14   doesn't say.  Just says he conducted these experiments without

15   voluntary informed concept or professional oversight, which is

16   fairly conclusory.

17           MS. MANOHAR:  So with respect to Porter specific

18   conduct, I can point to paragraph 711.

19           THE COURT:  Okay, yeah, yeah.

20           MS. MANOHAR:  Subparagraph E through D, as well as

21   the specific date of allegations.

22           THE COURT:  So tell me how though -- this is

23   basically saying -- well, tell me how these paragraphs equate

24   to a lack of informed consent?

25           Is it your position that there just could be no

1    informed consent because this was just essentially junk science

2    or was there something, you know, more specific lacking in the

3    consent people may or may not have given to participate?

4         MS. MANOHAR:  So the participants were not aware that

5    they would be treated using untested, unauthorized, and

6    inherently risky psychotherapy and unscientific so-called

7    studies for the treatments of OCD and Turret Syndrome.

8         So in terms of legally informed consent, I think that

9    they were not aware of what the treatment of consist of.  But

10   moreover, going back to the fact that this --

11        THE COURT:  But why so I understand that different,

12   you know, the medical board has established that a doctor

13   should not be doing this in New York state, but we're dealing

14   with a common law negligence claim here.

15        Does -- so usually when the negligence emerges from

16   the omission to speak, it's because somebody has a duty to say

17   the thing that they're not saying maybe.

18        MS. MANOHAR:  Sorry, to clarify the negligence is not

19   in the omission to speak, but the negligence is in his breach

20   of duty to approach their care in the way that a reasonably

21   prudent and careful medical professional would have provided

22   under similar circumstances.

23        THE COURT:  Okay, so it's not to say I thought for a

24   minute you were saying he should have obtained informed consent

25   by telling people explicitly, by the way, one of our none of

1   what we're about to do here has been the subject of the

2   peer-reviewed research published in medical journals.

3           It's not that.  It's he just should not have been

4   doing, what is it?

5           MS. MANOHAR:  He should not have been doing that, but

6   in addition to the fact that he shouldn't have been treating

7   them using these risky psychotherapy methods.  He should have

8   being informed consent, which he did not do.

9           THE COURT:  Okay.  And the elements of a negligence

10  claim are duty, breach, causation, and damages.  And as to Jane

11  Doe 19, we learned that the experiment still haunts her today.

12          I think there are a -- is Jane Doe 19 the only

13  Plaintiff pursuing this claim?

14          MS. MANOHAR:  There are a few other participants.

15  Using their names, Plaintiffs are Margot, Isabella, and

16  Caryssa.  I believe their Jane Doe numbers are 19, 20, and 21.

17          THE COURT:  Okay, and is there harm or damages

18  alleged as to them?

19          MS. MANOHAR:  As for Jane Doe 20, I point you to

20  paragraph 246 and 247.

21          THE COURT:  246.  Hold on, one second.  Okay, so 245,

22  she gets treatment from Defendant Porter.

23          MS. MANOHAR:  Correct.

24          THE COURT:  And 246, we learn that she's in serious

25  psychiatric crisis.  Is it implicit there, obvious that the

1    psychiatric crisis is a function of then Dr. Porter's

2    treatment?

3              MS. MANOHAR:  Yes.

4              MR. PORTER:  That wasn't -- I mean, unless it says

5    that Nancy Salzman was doing this.

6              THE COURT:  Well, paragraph 245 says that if Raniere

7    approved, the treatment would be administered by Nancy Salzman

8    and Porter.  That's in the first sentence of 245.

9              MR. PORTER:  Okay.

10             MS. MANOHAR:  And the second sentence reads Raniere

11   subsequently approved this treatment after which Jane Doe 20

12   was subject the night before along EMs and (indiscernible)

13   questioning by Porter.

14             THE COURT:  Uh-huh.

15             MS. MANOHAR:  Who had also instructed her to seek

16   pain medications prescribed by a previous doctor.

17             THE COURT:  Okay.  You don't think, assuming we might

18   be amending the complaint, anyway you don't think it would

19   behoove you to say anything more about causation?

20             Like paragraph 246 begins with the word eventually.

21   It could begin with a phrase like as a result of these

22   experiments.

23             Again, you can tell me that you think it is all the

24   negligence cause of action requires, but I just put the

25   question to you.

1        MS. MANOHAR:  If given the opportunity to amend, we

2  could (indiscernible) mine is more specific.

3        THE COURT:  Okay.  All right, Dr. Porter, do you want

4  to -- do you want to go last word?

5        MR. PORTER:  I guess my last word has to do with the

6  RICO charges against me.  The -- where it was --

7        THE COURT:  The negligence is not a predicate act

8  for --

9        MR. PORTER:  No, no, no, I'm talking about the group

10  pleading that I was included in.

11        THE COURT:  That's what I'm -- I think we're saying

12  the same thing --

13        MR. PORTER:  Okay.  Right.

14        THE COURT:  -- in different ways.

15        MR. PORTER:  Right.  Yeah, so there's no predicate

16  acts against me that are where my name is associated with doing

17  anything directly with anyone.

18        THE COURT:  Can I just ask again sort of turning back

19  to Defense counsel I'm sorry, or Plaintiff's counsel, I'm

20  sorry, what are the predicate acts you claim as against

21  Defendant Porter?

22        MS. DEAN:  We're not claiming any predicate acts

23  against Mr. Porter.

24        THE COURT:  So you -- but didn't you dismiss the RICO

25  claim against him or are you asking to do that now?

1          MR. HOESE:  Your Honor, excuse me.  We allege that

2     Mr. Porter was part of the RICO enterprise and conspired to

3     violate RICO in which case he'd be liable for the predicate

4     injuries from any of the predicate acts and from the operation

5     enterprise that other Defendants, co-conspirators conducted.

6          THE COURT:  Okay, but then, if you're alleging that

7     so you're saying -- remind me where Count 1 is?

8          MR. GOELMAN:  Paragraph 59, Your Honor.

9          THE COURT:  Yeah.  So at least in the First Amended

10    Complaint Count 1 is alleged as against all individual

11    Defendants on behalf of all Plaintiffs.  Does that change in

12    the second amended complaint?

13         MR. HOESE:  No, Your Honor.

14         THE COURT:  Okay.  So are you asking them to dismiss

15    the -- Count 1 as to Defendant Porter?

16         MR. HOESE:  I apologize, Your Honor.  Count 1 is on

17    which page again?

18         THE COURT:  Page 175 of the First Amended Complaint.

19         MR. HOESE:  Thank you.  Since you asked the question

20    directly, I would say if there were an amended complaint, it's

21    very possible that this count would not be alleged against Dr.

22    Porter.

23         THE COURT:  But you are ready to proceed right now,

24    right?

25         MR. HOESE:  If there are no predicate acts alleged

1    against Dr. Porter, my understanding of RICO is that he could

2    not have violated 18 USC Section 1962(c) or 1964(c).

3              THE COURT:  Okay, so on that basis, you have no

4    objection to me now dismissing Count 1 as against Mr. Porter,

5    correct or incorrect?

6              MR. HOESE:  I will concede the dismissal of Count 1

7    as against Dr. Porter.

8              THE COURT:  Okay.  And okay, but not the RICO

9    conspiracy claim in Count 2?

10             MR. HOESE:  No, not at this time, Your Honor.

11             THE COURT:  Okay.  All right.  I think we will --

12             MR. HOESE:  Your Honor --

13             THE COURT:  Leave the substantive.  I'm sorry.

14             MS. ROBERTS:  I'm sorry, excuse me.

15             THE COURT:  Yeah.

16             MS. ROBERTS:  I think it wasn't clear about my

17   question either, which my first -- the first comment I made to

18   you was what are the predicate acts that they're --

19             THE COURT:  Thank you, yes.  Defense or Plaintiff's

20   counsel, does that -- what are we doing with respect to Count 1

21   as against Defendant Roberts?

22             MS. DEAN:  Your Honor, we're looking at predicate act

23   to her under §3951 of the TPRA sex trafficking.

24             THE COURT:  To -- as to the alleged two predicate

25   acts or no?

1          MR. HOESE:  Yes, Your Honor (indiscernible) two

2     predicate acts.

3          THE CLERK:  I can't here you, counsel.

4          THE COURT:  You're off the microphone.

5          MR. HOESE:  Yes, Your Honor, in order as we just

6     discussed to violate 1962(c) would be you'd have to have

7     committed two predicate acts.

8          THE COURT:  So do you oppose I guess my question is

9     the motion to dismiss Count 1 as against Defendant Roberts?

10          MR. HOESE:  Well, I would have to confer with my --

11          THE COURT:  Yeah, take a moment.

12          MR. HOESE:  -- co-counsel, but --

13          THE COURT:  Take a moment and then, I think we're

14     done with the substantive legal arguments here today, but I

15     just want to make sure we all understand the path forward in

16     terms of who's going to submit what when.

17          And so, happy to hear from maybe Defense counsel on

18     that subject first since Plaintiff's counsel is gathering their

19     thoughts on Count 1.

20          MR. MARTIN:  So Craig Martin.  I'll go first with

21     regard to Clare Bronfman.  The -- this goes to your order of

22     operation --

23          THE COURT:  If you have to name who your client is,

24     you don't have the excuse that people have moved from chair to

25     chair.  So you need to a better excuse than that.

1          MR. MARTIN:  I will come up with one.  I think this

2    question goes to your order of operations question, Your Honor.

3          THE COURT:  Yeah.

4          MR. MARTIN:  And I will give you our perspective on

5    it.

6          THE COURT:  Please.

7          MR. MARTIN:  The briefs first of all, I think as Your

8    Honor knows, there is a second amended complaint at docket

9    entry 159.

10         THE COURT:  I do.  I think of that as more

11   housekeeping and clean up than a substantive amendment, but

12   yes.

13         MR. MARTIN:  Right, just so that we got it clear in

14   the record, but there is one.  In terms of the preparing the

15   briefing in this case and preparing for argument in this case

16   is extraordinarily complicated, given the pleading that exists.

17         In terms of you'll notice that both Bronfman

18   Defendants and maybe everybody else started with Rule 8.

19         THE COURT:  No, I remember.  Believe me.

20         MR. MARTIN:  Yes, and the reason --

21         THE COURT:  And yeah.

22         MR. MARTIN:  And the reason I -- look, this complaint

23   is a mess under any reasonable definition in any court in the

24   country.

25         Our job quite honestly just to put this in context

1    our job and respectfully Your Honor's job is not to sit here

2    for three and a half hours and try to parse out what claims

3    Plaintiffs made against which Defendants.

4              THE COURT:  Right.

5              MR. MARTIN:  It should be dismissed under Rule 8.

6              THE COURT:  So even if, let just to be clear in case

7    I wasn't before, even if the Plaintiffs come back and say, yes,

8    judge, before you render a decision on any of these motions, we

9    would like leave to amend the complaint, I would give you of

10   course the opportunity to oppose such leave in writing.

11             And if it's appropriate that leave be denied

12   notwithstanding the 2nd Circuit's Loreley case and other

13   binding law, then you know, we'll proceed to decide the motions

14   as they have been rendered against the second amended

15   complaint.

16             But the order of operations question for me now

17   simply is should we take up that dispute about leave to amend

18   before I go through the process of what you're describing as

19   the painful process of sorting through every one of these

20   motions as against every one of these counts against every

21   Defendant, et cetera.  What's your view on that question?

22             MR. MARTIN:  To be clear, my view is that you should

23   dismiss the complaint under Rule 8.  It is an impermissible

24   pleading.  It --

25             UNIDENTIFIED SPEAKER:  Your Honor, it's an exquisite

1    --

2              THE COURT:  But -- can I just understand --

3              MR. WAREHAM:  -- manifestation of failure to

4    understand the essence of Rule 8.

5              THE COURT:  Hold on a second.  Counsel, understand.

6              MR. WAREHAM:  I understand he has his ruling.

7    There's case law on this.  That's what this is.

8              THE COURT:  Hold on a second.  I should dismiss the

9    complaint under Rule 8 without prejudice?

10             MR. MARTIN:  You should dismiss the complaint under

11   Rule 8.  If you want to entertain a motion for them to file an

12   amended complaint thereafter, let them file their motion, give

13   us the entire complaint.

14             It's hard for me to envision another 70 Plaintiff,

15   14, 15 count complaint against about 20 Defendants given what

16   I've given what we've seen here.  And in terms of --

17             THE COURT:  You're saying I should give them I should

18   dismiss the complaint under Rule 8 and not say whether the

19   dismissal's with or without prejudice?

20             MR. MARTIN:  Right.  And --

21             THE COURT:  And instead instruct the Plaintiffs to

22   seek leave not to amend at that point because there's no

23   complaint pending, but just submit another complaint?

24             MR. MARTIN:  Yes, and then if you grant them leave

25   under Rule 15, with the full complaint, and they can give us a

1     redline, too.

2              THE COURT:  And why is that -- what is the -- for

3     (indiscernible) the same debate over amendment.  What does the

4     interim dismissal under Rule 8 get you?  I don't understand --

5              MR. MARTIN:  Well.

6              THE COURT:  -- the pragmatic difference.  Either way,

7     if we're fighting (indiscernible) they should be allowed submit

8     a new complaint.

9              MR. MARTIN:  Well, I -- look, Your Honor, I've listen

10    to the Court.  What I think is the right result is to dismiss

11    the complaint with prejudice, period.

12             Three-year old complaint, they've pled, they've

13    amended, we've briefed.

14             THE COURT:  Is that the rule in the 2nd Circuit by

15    the way that -- I mean, I think if you say this rule flows from

16    Rule 8.

17             So it's the rule everywhere but has the 2nd Circuit

18    said things like we've repeatedly held that a district court

19    retains authority to dismiss a shotgun pleading on that basis

20    alone, i.e. on the basis that it's shotgun pleading?

21             MR. MARTIN:  Mr. Wareham is all geared up to tell you

22    about that.

23             MR. WAREHAM:  Well, certainly.

24             THE COURT:  What's the best 2nd Circuit case?

25             MR. WAREHAM:  2nd Circuit case, I get the

1    pronunciation wrong, that deals with the biggest problem here,

2    which is group pleading.  Okay, is Atatune (phonetic) cited in

3    our briefs.

4              THE COURT:  Yeah.

5              MR. WAREHAM:  And group pleading's not allowed in --

6              THE COURT:  What's the best 2nd Circuit case on

7    shotgun pleading?

8              MR. WAREHAM:  I'm not sure I understand the

9    difference between shotgun pleading and --

10             THE COURT:  Shotgun pleading to me is you're not

11   saying which factual allegations suffice to allege which causes

12   of action, right?

13             You're just throwing a whole bunch of spaghetti at

14   the wall, over hundreds of paragraphs, and then saying we

15   restate and incorporate by reference everything that you said

16   so far in every count that follows leaving it to me to go dig

17   through two other pages to figure out, okay, what the RICO

18   allegations against Defendant X or Defendant Y.

19             If you can find the 2nd Circuit case, the 11th

20   Circuit case I just read, I'd be interested to hear the name.

21             I am inclined to dismiss the complaint under Rule 8

22   at this point.  I don't think it's going to make much of a

23   practical difference in terms of how you go forward.

24             We're either going to -- it seems to be unfair to

25   dismiss the complaint on a procedural basis basically that it

1    doesn't comply with Rule 8 and not give another chance to the

2    Defendants to fix that problem.

3         But I want to be explicit if I haven't been already

4    that one basis for dismissing the complaint of course is the

5    Rule 8 shotgun pleading issue.

6         And you know if the new complaint doesn't really

7    solve that issue, then that might be a basis for denying leave

8    to amend that's futile because we're going to dismiss the new

9    complaint under Rule 8 the same way we would have the second

10   amended complaint.

11        I think what we're learning is it really is

12   incumbent -- it has to be incumbent on the Defendants -- I'm

13   sorry the Plaintiffs at this point to tell me exactly what the

14   amended complaint would say, which means to actually submit a

15   draft of the proposed amended complaint.

16        MR. WAREHAM:  And Your Honor, with respect to Sara

17   Bronfman, who departed the United States 12 years ago, the

18   complaint is so bad to us, that I would encourage the

19   Plaintiffs to when they get their rule book out and study Rule

20   8, is to go three more down and take a look at Rule 11, because

21   I don't see any possible way --

22        THE COURT:  Okay.

23        MR. WAREHAM:  -- given that the length of time and

24   their knowledge of the multiple pleadings and the arguments and

25   the unbelievable work that this Court has done.  I mean, I'm

1    just amazed at how much you've studied and gone through and

2    parsed and thought this through.

3              THE COURT:  Thank you.

4              MR. WAREHAM:  And here we are nowhere.  And it isn't

5    because of you.  So I would let them look to Rule 11, take a

6    sneak peek at that before we come back and waste the time and

7    money that they're wasting here.

8              THE COURT:  Okay, Mr. Goelman, do you want to be

9    heard on what I just suggested about actually needing to see a

10   draft of the amended complaint?

11             MR. GOELMAN:  We'll prepare one.

12             THE COURT:  Okay.  What's a reasonable time frame for

13   that?

14             MR:  60 days.

15             THE COURT:  Granted.  I don't think you need to write

16   anything then until you see the amended complaint.  The -- you

17   know, bite sized issue of laws that we're talking about having

18   supplemental pleading on was based on the assumption that we

19   were going to decide the motion as to the existing complaint.

20             You'll bear that in mind if it turns out that any of

21   that is relevant to whether leave to amend would be futile here

22   or not.

23             Anyone else -- outside from the 60 days right now,

24   well, let me set a second deadline.

25             So 60 days from now we'll get proposed amended

1    complaint and argument from, you know, a short brief.  So let's

2    say 15 pages or less from the Plaintiffs on why we leave to

3    amend should be granted.

4              And then, 30 days from then in response also 15 pages

5    or less.  And speak up now if the 15 pages or speak up later if

6    15 pages is not enough, but I'm going to try to keep this short

7    given we already know a lot about what's going on here today.

8              So 30 days after their 60-day deadline, a response

9    from the Defendants on whether leave to amend should be denied

10   and why.  Also, 15 single-spaced pages.

11             10 days after that, a reply brief 10 pages or less on

12   leave.  And if I grant leave, I'm not -- I don't think you all

13   need to go back to square one in terms of moving to dismiss.

14   You may just want to submit a short supplement to what you've

15   said already explaining why, you know, the changes don't change

16   the outcome.

17             But I will set that motion, you know, deadline for a

18   motion or an answer when I decide the question about leave to

19   amend.

20             MR. GOELMAN:  I know the last thing the Court wants

21   is more pages from us, but if we submit a 15-page motion for

22   leave and then, each of the 5 Defendants submits a 15-page

23   opposition, then I think we would need more than 10 pages to

24   respond to their 75.

25             THE COURT:  I was -- yeah, should be thinking more in

1   terms multiplication here.  I think we can do 75 pages from the

2   Defendants in opposing leave to amend.  Can you all divide and

3   conquer maybe in 10 pages each?  Of course.

4          All right, let's -- let me say 15 pages for the

5   opposition to leave to amend unless you decide the -- you're

6   not opposing for some reason.

7          And then, fully 20 pages in response in reply from

8   the Plaintiffs.  I doubt everybody's going to need all that.  I

9   think you're going to see a lot of the same arguments from

10  multiple Defendants and you don't have to reply them multiple

11  times.

12         Thank you all.  It's taken me a great deal of time to

13  get my head around this complaint and all the various

14  complicated legal issues we discussed here today.

15         I do just want to say to the Defendant especially

16  since we have some non-lawyer Defendants here and non

17  represented Defendants, don't read too much into my questioning

18  here about what may happen on the merits at the end of the day.

19  I'm putting the Plaintiffs through their paces as you can

20  pretty firmly on the notion of whether they've met every

21  element on every claim they've alleged as against every

22  Defendant.

23         The fact that I'm, you know, lobbing question after

24  question their way, that doesn't mean anything about which way

25  this case is likely to come out.

1          In the end, it just means I'm -- it's my obligation

2    to test at this stage the legal sufficiency of the allegations

3    in the complaint.

4          I want to do that assertively so that we get the

5    right answer, but it's hard to get claims dismissed at the

6    motion to dismiss stage before any evidence is adduced in

7    discovery.  And so, I'll just -- I'll live you all with that

8    caveat.

9          Anything else from the Plaintiff's side before we

10   adjourn?

11         MR. GOELMAN:  No, Your Honor.  Thank you.

12         MS. ROBERTS:  (Indiscernible.)

13         THE CLERK:  I can't hear you.

14         THE COURT:  Oh, yes, I was going to come back, thank

15   you for yes repeatedly reminding on this.  Where do we stand

16   with respect to Count 1 as against Ms. Roberts?

17         MR. GOELMAN:  You can also dismiss that, Your Honor.

18         THE COURT:  Okay.  All right, so we've made some

19   concrete head way here today at least in respect of two claims.

20         MS. ROBERTS:  Your Honor, the only other question in

21   terms of specifying would be I would need - in terms of

22   informed consent, I would need to know why I'm responsible for

23   needing informed consent and what that would include.  Like

24   what was I was responsible in informing them of in this

25   situation?

1          THE COURT:  Well, you'll see new or amended

2     allegations they come back with --

3          MS. ROBERTS:  Right.

4          THE COURT:  If any and if you don't think adequate to

5     inform you of what you're accused of, you'll tell me why.

6          MR. PORTER:  And so, does this mean that the other

7     RICO things like the sex trafficking and forced labor and

8     things like that were included in the group pleading, like

9     those are out also for me or is it different?

10          THE COURT:  I'm not 100 percent sure I understand

11     your question, so I'll just answer it with what I think will

12     get you to where you're heading.  So if you look at, you know,

13     the complaint --

14          MR. PORTER:  Right.

15          THE COURT:  -- sets out a bunch of factual

16     allegations and then at the end, it set forth what we call

17     cause of action.

18          MR. PORTER:  Right.

19          THE COURT:  -- right and they're numbered.  And the

20     first cause of action in Count 1 is a civil RICO violation.

21     And the complaint said that that Count 1 civil RICO violation

22     was being alleged as against all the individual Defendants.

23          MR. PORTER:  Right.

24          THE COURT:  That's no longer true now that we've had

25     a motion from the Plaintiffs granted by me to dismiss you and

1    Dr. Roberts from Count 1.

2              MR. PORTER:  Okay.

3              THE COURT:  Maybe you're asking me, okay, now when we

4    go back to the factual allegations before we get to the cause

5    of action at the end should I read the word Defendants to

6    include me, when it's talking about --

7              MR. PORTER:  Right.  The reason I ask is because when

8    I apply for a medical license in a state, it's a requirement

9    that I share this court case with them.

10             And when they read it, they see that I'm charged with

11   sex trafficking, forced labor, human trafficking.

12             THE COURT:  Yeah.

13             MR. PORTER:  It's absolutely impossible for me to --

14             THE COURT:  So we've heard a lot about group pleading

15   and why it's a problem because it's all -- which defendant,

16   what they did specifically.

17             And when we look at the proposed amended complaint,

18   maybe you'll see that instead of just saying the defendants did

19   X, it's more specific as to which defendants did which of X, Y,

20   and Z.  If not, you know, take a look at the rules of civil

21   procedure.  There are legal devices pursuant to which

22   defendant can move to strike material in the complaint.  That's

23   a pretty hard standard to satisfy, but you'll, you know, you'll

24   make whatever arguments you feel are appropriate.

25             Any other defendant with any questions or comments at

1    this point?

2              MR. MARTIN:  Goodnight, Your Honor.

3              THE COURT:  Thank you all.  This has been elucidating

4    for me.  And I appreciate the high quality of the argument all

5    around.

6              MR. GOELMAN:  Thank you, Your Honor.

7          (Proceedings concluded at 5:53 p.m.)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                              **CERTIFICATE**

2

3

4            I, Chris Hwang, court approved transcriber, certify

5    that the foregoing is a correct transcript from the official

6    electronic sound recording of the proceedings in the above-

7    entitled matter.

8

9

10

11

12

13    _____              February 2, 2023

14    Chris Hwang                       Date

15    Court Reporter

16

17

18

19

20

21

22

23

24

25