UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------x

SARAH EDMONDSON, TONI NATALIE,
JESSICA JOAN SALAZAR, SOUKIANA
MEHDAOUI, NICOLE, DANIELA, et al.,        **MEMORANDUM & ORDER**
                                          20-CV-485 (EK)(CLP)
                Plaintiffs,


                -against-

KEITH RANIERE, CLARE BRONFMAN, SARA
BRONFMAN, ALLISON MACK, KATHY
RUSSELL, et al.,

                Defendants.

------------------------------------x
ERIC KOMITEE, United States District Judge:

I.   Background.......................................... 6
  A.  NXIVM's Founding & Growth ............................ 7
  B.  NXIVM's Leadership .................................. 8
  C.  Criminal Prosecutions .............................. 10
II.  Legal Standard...................................... 11
III. Discussion ......................................... 11
  A.  RICO (Count I) ..................................... 11
    1.  The Alleged RICO Enterprise ...................... 12
    2.  Effect on Interstate or Foreign Commerce ......... 14
    3.  Pattern of Racketeering Activity ................. 15
      a.  Clare Bronfman's Alleged Predicate Acts ......... 16
        i.  Immigration Fraud ............................. 16
        ii.  Witness Tampering ............................ 28
        iii. Forced Labor, Sex Trafficking, and Human
             Trafficking ................................. 34
        iv.  Mail and Wire Fraud .......................... 35
        v.  State Law Extortion ........................... 41
      b.  Sara Bronfman's Alleged Predicate Acts .......... 46
        i.  Immigration Fraud ............................. 46

      ii.   Witness Tampering ................................ 47

      iii.  Forced Labor, Sex Trafficking, and Human
            Trafficking .................................... 48

      iv.   Mail and Wire Fraud ............................. 48

  4.  RICO Standing ....................................... 49

      i.    Clare Bronfman .................................. 51

      ii.   Sara Bronfman ................................... 55

B.   RICO Conspiracy (Count II) ............................ 55

  1.  Clare Bronfman ....................................... 57

  2.  Sara Bronfman ........................................ 58

  3.  Brandon Porter ....................................... 59

  4.  Danielle Roberts ..................................... 60

C.   Human Trafficking Under the TVPRA (Count III) ......... 62

  1.  The Alleged Venture .................................. 63

  2.  Count 3(A): Sex Trafficking and Attempted Sex
      Trafficking .......................................... 64

      i.    Clare Bronfman .................................. 67

      ii.   Danielle Roberts ............................... 72

  3.  Count 3(B): Conspiracy to Commit Sex Trafficking ...... 74

      i.    Clare Bronfman .................................. 75

      ii.   Danielle Roberts ............................... 76

  4.  Count 3(C): Forced Labor and Human Trafficking, and
      Attempted Forced Labor and Human Trafficking .......... 77

      i.    Clare Bronfman .................................. 79

      ii.   Sara Bronfman ................................... 86

      iii.  Brandon Porter ................................. 87

      iv.   Danielle Roberts ............................... 89

  5.  Count 3(D): Conspiracy to Commit Forced Labor and  Human
      Trafficking .......................................... 90

  6.  Count 3(E): Document Confiscation in Furtherance of
      Trafficking or Forced Labor ......................... 92

  7.  Count 3(F): Conspiracy to Engage in Unlawful Conduct with
      Respect to Documents in Furtherance of Trafficking or
      Forced Labor ........................................ 94

F.   Malicious Prosecution & Abuse of Process (Count IV) .... 94

  2.  Abuse of Process ..................................... 96

E.   Battery (Count V) ..................................... 98

H.    Gross Negligence and Recklessness (Count VII) .......... 99
    1.    Brandon Porter ...................................... 100
    2.    Clare and Sara Bronfman ............................ 102
IV.  Conclusion............................................. 102

This case concerns an Albany, New York-based organization that billed itself as an educational enterprise. Founded by Keith Raniere, who touted himself as a scientist, philosopher, and humanitarian, the organization — named NXIVM — offered courses ostensibly designed to help people reach their full "human potential" by overcoming psychological and emotional pitfalls. Many of its members paid thousands of dollars to attend self-help workshops.

Some women in the NXIVM community also became involved in a group called "DOS" — an acronym for "Dominus Obsequious Sororium," which the complaint in this case translates from Latin as "lord (or master) of the obedient female companions." DOS was also led by Raniere, with "first-line masters" below him and "slaves" at the bottom. When recruiting new members, masters advertised that DOS was a women-only group — a private sorority — and concealed Raniere's role as its leader. To join DOS, recruits had to provide "collateral," which ranged from sexually explicit photographs to letters containing damaging accusations (whether true or false) about family members and friends. New members also received a brand, applied with an electrocautery device, as part of their initiation. They allege that the brand contained Raniere's initials, though they did not know that prior to initiation and branding. Ultimately, DOS members began to leave the organization and speak out.

In July of 2018, a grand jury sitting in this District indicted Raniere and many of the other defendants to this suit, alleging that they comprised a racketeering enterprise in connection with NXIVM (including DOS and other affiliated entities).  Following the indictment, each of Raniere's co-defendants — but not Raniere himself — pleaded guilty.  After a six-week trial in 2019, a jury convicted Raniere on numerous counts, including racketeering and racketeering conspiracy under the Racketeer Influenced and Corrupt Organizations Act ("RICO").

Seventy plaintiffs — all former members of NXIVM (several of whom were also part of DOS) — now seek civil damages for injuries that they allegedly sustained in connection with the affairs of NXIVM.  They assert claims against Raniere, Clare Bronfman, Sara Bronfman, Allison Mack, Brandon Porter, Danielle Roberts, Kathy Russell, and several corporate entities: NXIVM Corporation, Executive Success Programs, Inc. ("ESP"); Ethical Science Foundation ("ESF"); and First Principles, Inc. (collectively, the "Entity Defendants").[1]  The plaintiffs' claims come in two broad categories of misconduct — sex trafficking and forced labor, on the one hand, and consumer fraud, on the other.

---

[1] In earlier iterations of the complaint, the plaintiffs also asserted claims against other individuals including Lauren and Nancy Salzman, but they later dismissed those claims.  Nicki Clyne is the only individual named in the third amended complaint who has been voluntarily dismissed subsequent to the most recent amendment.  Notice of Voluntary Dismissal, ECF No. 233.

All plaintiffs assert claims for substantive and
conspiracy violations of RICO, which authorizes private civil
actions to recoup economic injuries sustained by victims of
criminal racketeering activity, against Raniere, Clare, Sara,
Mack, Russell, and the Entity Defendants.[2]  Nearly twenty
plaintiffs also assert claims under the Trafficking Victims
Protection Reauthorization Act ("TVPRA") against Raniere, Clare,
Sara Bronfman, Mack, Roberts, and Russell.  Further, several
plaintiffs assert New York state-law claims including battery,
malicious prosecution, and negligence.

Four individual defendants — Clare, Sara, Porter, and
Roberts — now move to dismiss the claims against them.
Meanwhile, Raniere, Mack, Russell, and the Entity Defendants,
have failed to appear.  For the reasons set out below, Porter's
motion to dismiss is granted in full, while Clare's, Sara's and
Roberts's motions are granted in part and denied in part.

## I.  Background

Except as noted, the following facts (and those laid
out above) are taken from the third amended complaint (the
"complaint" or "Compl."), ECF No. 215.  When considering a
motion to dismiss, courts "must take the facts alleged in the
complaint as true."  *In re NYSE Specialists Sec. Litig.*,

---

[2] To avoid confusion, this order refers to Clare and Sara Bronfman by
their first names.

503 F.3d 89, 91 (2d Cir. 2007).[3]  In addition, the Court takes

judicial notice of certain filings in the criminal case — *United

States v. Raniere, et al.*, No. 18-CR-204 (NGG) (E.D.N.Y.).  *See

Kramer v. Time Warner Inc.*, 937 F.2d 767, 774 (2d Cir. 1991).

## A.   NXIVM's Founding & Growth

In 1998, Keith Raniere and Nancy Salzman founded the

NXIVM organization in Albany, New York.  Compl. ¶¶ 1, 24.  NXIVM

sold a self-help curriculum called "Rational Inquiry," which was

"a synthesis of psychotherapy and the teachings, methods, and

practices of the human potential movement."  *Id.* ¶ 25.  Those

who enrolled in NXIVM's courses were encouraged to sell the

program (books and classes setting out NXIVM's core tenets) and

recruit new members.  *Id.* ¶ 24.  The curriculum encouraged new

members "to completely immerse themselves in the NXIVM system

and move to Albany."  *Id.* ¶ 27.  More than 16,000 individuals

enrolled in NXIVM's courses, *id.* ¶ 40; hundreds of them also

---

[3] The second amended complaint, which was more than 200 pages and 830
paragraphs, provided virtually no indication of which facts were proffered in
support of which causes of action, and asserted several claims "against All
Defendants on behalf of all [seventy-six] Plaintiffs" with no specific
allegations as to each defendant's role.  *See, e.g.*, Second Am. Compl. ¶ 790,
ECF No. 159 ("The Individual Defendants participated in the scheme or
artifice to defraud knowingly, willfully, and with the specific intent to
deceive and/or defraud Plaintiffs into paying for NXIVM programs.").  During
oral argument in February of 2023, the Court invited the plaintiffs to
streamline the complaint, following which they submitted a third amended
complaint comprising 111 pages and 332 numbered paragraphs (substantially
shorter, but still sprawling).  Though marginally more manageable than its
predecessor, the new complaint still required the Court to engage in
painstaking efforts to identify the facts alleged in support of each claim,
often hundreds of paragraphs apart from each other.

moved to Albany to live among fellow "Nxians," as members called themselves. *Id.* ¶ 27.

Over time, NXVIM grew into a multi-pronged umbrella organization. It contained several legal entities, including the NXIVM Corporation, the various Entity Defendants, *see supra*, and Rainbow Cultural Garden ("RCG"), purportedly a childcare program. *Id.* ¶¶ 2, 15, 30. It was also comprised of several internally named organizations and groups with no separate legal status; these included DOS as well as "exo / eso" (a "bodywork program marketed to athletes, fitness enthusiasts, and yoga practitioners") and "Ultima" (which subsumed other groups including "The Knife," a "purported news outlet"). *Id.* ¶¶ 2, 93, 94, 102.

## B. NXIVM's Leadership

Raniere and Nancy Salzman worked closely with a group of individuals — referred to in the complaint as Raniere's "inner circle" — to manage NXIVM's affairs. *Id.* ¶ 3. In addition to Nancy Salzman, the inner circle consisted of Clare Bronfman, Sara Bronfman, Nicki Clyne, Allison Mack, Kathy Russell, and Lauren Salzman (Nancy's daughter). *Id.*

Sara joined NXIVM in 2001 and later served on its Executive Board. *Id.* ¶¶ 28, 30. She also served as Senior Executive of Executive Success Programs, head of RCG, and co-founded the Ethical Science Foundation ("ESF"). *Id.* ¶ 30.

Further, she founded NXIVM's so-called "VIP Programs," which recruited powerful and prominent individuals, including the Dalai Lama, to appear at NXIVM events. *Id.* ¶¶ 30, 33. For a time, she detailed her extensive involvement in NXIVM's affairs on her personal blog. *See id.* ¶ 30 (quoting www.sarabronfman.com).

At Sara's urging, her sister Clare joined NXIVM in 2004. *Id.* ¶ 29. Clare, too, eventually became a member of NXIVM's Executive Board. She also served as Vice President of Operations and Board Member of Executive Success Programs, and as Trustee and Chief Operating Officer of the Ethical Science Foundation, which she co-founded. *Id.* ¶ 31. Clare "directed and ran virtually every aspect of the NXIVM operation, including overseeing its financial, legal, administrative, and accounting operations." *Id.* While serving in these leadership roles, she maintained a "close relationship" with Raniere. *Id.* ¶ 34.

Together, Clare and Sara Bronfman provided NXIVM and its related entities with more than $100 million in funding. *Id.* The complaint characterizes them as "Raniere's primary backers and funders and his most trusted advisors and confidants." *Id.* ¶ 36.

Allison Mack was a senior leader of DOS, serving as a so-called "first-line master." *Id.* ¶ 12. As set forth in more detail below, she is alleged to have extorted several plaintiffs

and to have participated in sex trafficking and forced-labor violations.

Finally, Kathy Russell served as NXIVM's bookkeeper for more than a decade. *Id.* ¶ 14. She "worked directly with Raniere and other NXIVM leaders." *Id.* She is alleged to have aided and abetted immigration fraud, *id.* ¶ 229, and to have committed forced labor, sex trafficking, and human trafficking, *id.* ¶ 266, and visa fraud. *Id.* ¶ 228.

## C.  Criminal Prosecutions

Following the 2018 indictment, each of Raniere's co-defendants entered guilty pleas, as discussed above. Clare pleaded guilty to identity theft and immigration fraud conspiracy. She was sentenced to eighty-one months' incarceration. *See* Judgment as to Clare, *United States v. Raniere*, No. 18-CR-204 (NGG), ECF No. 946 (E.D.N.Y. Oct. 7, 2020). Mack pleaded guilty to racketeering and racketeering conspiracy. She received a thirty-six-month sentence. *See* Judgment as to Allison Mack, *United States v. Raniere*, *id.*, ECF No. 1086 (E.D.N.Y. July 28, 2021). Finally, Russell pleaded guilty to visa fraud and received two years' probation. *See* Judgment as to Kathy Russell, *id.*, ECF No. 1153 (E.D.N.Y. Nov. 5, 2021). Sara Bronfman was not charged.

Raniere himself was convicted after trial on all counts on which he was indicted, including racketeering and

racketeering conspiracy, forced labor conspiracy, wire fraud conspiracy, sex trafficking conspiracy, sex trafficking, and attempted sex trafficking. He was sentenced to 120 years in prison. *See* Judgment as to Keith Raniere, *United States v. Raniere*, No. 18-CR-204 (NGG), ECF No. 969 (E.D.N.Y. 2020).

## II. Legal Standard

On a motion to dismiss under Rule 12(b)(6), "the court's task is to assess the legal feasibility of the complaint." *Lynch v. City of New York*, 952 F.3d 67, 75 (2d Cir. 2020).[4] To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to "state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). Courts "are not bound to accept as true a legal conclusion couched as a factual allegation," and "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id.*

## III. Discussion

### A. RICO (Count I)

All plaintiffs assert civil claims under the RICO statute, 18 U.S.C. § 1964(c), against Raniere, Clare, Sara, Mack, Russell, and the Entity Defendants. To prevail on a civil RICO claim, "plaintiffs must show (1) a substantive RICO

---

[4] Unless otherwise noted, when quoting judicial decisions this order accepts all alterations and omits all citations, footnotes, and internal quotation marks.

violation under 18 U.S.C. § 1962, (2) injury to the plaintiff's business or property, and (3) that such injury was by reason of the substantive RICO violation." *Sykes v. Mel S. Harris & Assocs. LLC*, 780 F.3d 70, 83 (2d Cir. 2015).

To establish that first element — the substantive RICO violation — under Section 1962(c), as the plaintiffs attempt to do here, the complaint "must allege the existence of seven constituent elements: (1) that the defendant (2) through the commission of two or more acts (3) constituting a pattern (4) of racketeering activity (5) directly or indirectly invests in, or maintains an interest in, or participates in (6) an enterprise (7) the activities of which affect interstate or foreign commerce." *Moss v. Morgan Stanley Inc.*, 719 F.2d 5, 17 (2d Cir. 1983). A plaintiff must establish each of these elements "as to each individual defendant." *DeFalco v. Bernas*, 244 F.3d 286, 306 (2d Cir. 2001).

1. The Alleged RICO Enterprise

A RICO "enterprise" under 18 U.S.C. § 1961 can be "any union or group of individuals associated in fact although not a legal entity." The plaintiffs assert that Raniere and his so-called "inner circle" operated such an "association-in-fact" RICO enterprise in conducting the affairs of NXIVM. *See* Compl. ¶¶ 198-99. Per the Supreme Court, "an association-in-fact enterprise is simply a continuing unit that functions with a

common purpose." *Boyle v. United States*, 556 U.S. 938, 948 (2009).

The alleged enterprise must therefore have "at least three structural features: a purpose, relationships among those associated with the enterprise, and longevity sufficient to permit these associates to pursue the enterprise's purpose." *Id.* at 946. But it "need not have a hierarchical structure or a chain of command," and "[m]embers of the group need not have fixed roles." *Id.* at 948. Nor must it have "regular meetings, dues, established rules and regulations, disciplinary procedures, or induction or initiation ceremonies." *Id.*[5]

The complaint adequately alleges that Raniere and his so-called inner circle — also referred to as "NXIVM's leadership" — operated as an association-in-fact. First, the plaintiffs have adequately alleged that this group — comprising the individual defendants and Lauren and Nancy Salzman — maintained relationships with one another, as *Boyle* requires. The complaint recites that these individuals "knew each other personally and were intimately involved in all aspects of" the enterprise, *id.* ¶ 3, and it identifies the roles that each served therein. *See, e.g.*, *id.* ¶¶ 10-14, 30-31, 168. Second,

---

[5] As the Supreme Court noted in *Boyle*, the RICO statute is, by its own terms, to be "liberally construed to effectuate its remedial purposes." 556 U.S. at 944 (citing the Organized Crime Control Act of 1970, Pub. L. No. 91-452, § 904(a), 84 Stat. 941, 947 (1970)).

the complaint sufficiently alleges a number of common purposes among NXIVM's senior leadership.[6]  These purposes include: "to enrich Raniere and themselves with money and social power by expanding and strengthening the NXIVM community 'to, among other things, sell curricul[a], cultivate a pool of foreign laborers to support the Enterprise, and groom women for sexual conduct with and for Raniere."  *Id.* ¶ 199.  At this stage, those purposes (and the complaint's factual content pled in support) suffice for this element.[7]  Finally, the plaintiffs have adequately alleged that the enterprise existed for a sufficient duration.  Specifically, they allege that the enterprise operated from its founding in 1998 to approximately 2017, when it "began to collapse."  *Id.* ¶¶ 2, 6, 199.[8]

  2.  Effect on Interstate or Foreign Commerce

    The complaint also adequately alleges that the enterprise engaged in, or that its activities affected, interstate or foreign commerce.  "[C]onduct having even a *de*

_____

[6] RICO does not require this shared purpose to be an "economic motive." *National Organization for Women, Inc. v. Scheidler*, 510 U.S. 249, 252 (1994) (permitting civil RICO claims aimed at an enterprise whose "aim [was] to shut down [abortion] clinics and persuade women not to have abortions").

[7] *See, e.g., United States v. Raniere*, 2022 WL 17544087, *4 (2d Cir. Dec. 9, 2022) (summary order) (holding that Raniere's "'inner circle' was an enterprise for the purposes of the RICO statute" and that it had a common purpose that included recruiting victims into DOS and thereby garnering for its members "increased power and status within the Enterprise").

[8] It is not required that all members of a RICO enterprise became members at its inception; they can join the enterprise alone the way. *United States v. Gershman*, 31 F.4th 80, 98-99 (2d Cir. 2022) (a RICO "enterprise may continue to exist even though it undergoes changes in membership" and it "therefore does not matter" that a key member of an enterprise joined "after other members had already begun associating with each other").

*minimis* effect on interstate commerce suffices" to satisfy this element.  *United States v. Mejia*, 545 F.3d 179, 203 (2d Cir. 2008).  The plaintiffs allege that "[t]he Enterprise engaged in, and conducted activities which affected, interstate and foreign commerce, including operating NXIVM and [Rainbow Cultural Garden] centers in several states across the country, Canada, and Mexico, as well as enticing American recruits and foreigners to travel across state and international borders to New York." Compl. ¶ 200.  Considering these allegations, and the allegations regarding the sale of NXIVM's curriculum, *see id.* ¶¶ 4, 26, the complaint adequately pleads this element.

   3.   Pattern of Racketeering Activity

        To satisfy the pleading requirement that a defendant engaged in a "pattern of racketeering activity," a plaintiff must allege that each defendant "personally committed" two or more predicate acts of "racketeering activity."  *McLaughlin v. Anderson*, 962 F.2d 187, 192 (2d Cir. 1992); *see also* 18 U.S.C. § 1961(5).  The RICO statute "broadly define[s]" racketeering activity to encompass a variety of state and federal offenses, including mail and wire fraud and extortion.  *DeFalco v. Bernas*, 244 F.3d 286, 306, 308 (2d Cir. 2001).  The predicate acts "must be related to each other ('horizontal' relatedness), and they must be related to the enterprise ('vertical' relatedness)." *United States v. Daidone*, 471 F.3d 371, 375 (2d Cir. 2006).  Yet

"proof of these separate elements need not be distinct and independent, as long as the proof offered is sufficient to satisfy both elements." *Id.* at 376. Such proof may include that the predicate acts shared "common goals" and "common victims," and involved "participants from the same pool of associates (who are members and associates of the enterprise)." *Id.*

As set forth below, the complaint adequately alleges that both Clare and Sara committed two predicate acts.

    a. Clare Bronfman's Alleged Predicate Acts

The plaintiffs allege that Clare committed predicate acts in five categories: (1) immigration fraud; (2) witness tampering; (3) forced labor, sex trafficking, and human trafficking; (4) mail and wire fraud; and (5) extortion under New York law. The plaintiffs have adequately alleged that Clare committed one act of immigration fraud and one act of mail and wire fraud. They have failed, however, to plead the other alleged predicates sufficiently.

        i. Immigration Fraud

The plaintiffs contend that Clare committed several violations of 8 U.S.C. § 1324(a)(1)(A)(iii)-(v) to obtain financial gain in connection with plaintiffs Lindsay MacInnis,

Adrian, Camila, Daniela, and Maja Miljkovich. Compl. ¶¶ 205-06.[9]
Under Section 1324(a)(1)(A)(iii), it is a crime to conceal,
harbor, or shield from detection an alien, "knowing or in
reckless disregard of the fact that [such] alien has come to,
entered, or remains in the United States in violation of law."
The Second Circuit has held that to constitute "harboring" under
Section 1324, "a defendant's action must be intended (1)
substantially to facilitate an illegal alien's remaining in the
United States" — e.g., by providing "shelter, money, or other
material comfort" — and "(2) to prevent the alien's detection by
immigration authorities." *United States v. George*, 779 F.3d
113, 118 (2d Cir. 2015).

Section 1324(a)(1)(A)(iv), for its part, establishes
criminal liability for any person who "encourages or induces an
alien to come to, enter, or reside in the United States, knowing
or in reckless disregard of the fact that such coming to, entry,
or residence is or will be in violation of law." In rejecting a
First Amendment overbreadth challenge to this provision, the
Supreme Court read "encourages or induces" in the phrase's
"specialized, criminal-law sense — that is, as incorporating
common-law liability for solicitation and facilitation." *United*

---

[9] Several plaintiffs, including Adrian, Camila, and Daniela, are
identified only by their first names for the reasons set forth in this
Court's order of February 11, 2022. *See* Prelim. Order of Protection, ECF No.
141.

*States v. Hansen*, 599 U.S. 762, 774 (2023). "Criminal solicitation is the intentional encouragement of an unlawful act," and "[f]acilitation — also called aiding and abetting — is the provision of assistance to a wrongdoer with the intent to further an offense's commission." *Id.* at 771. But neither solicitation nor facilitation "require[] lending physical aid; for both, words may be enough," so long as they are driven by the "intent to bring about a particular unlawful act." *Id.*

A violation of either subsection qualifies as a RICO predicate if the offense "was committed for the purpose of financial gain." 18 U.S.C. § 1961(1)(F). In the context of Section 1324 itself, which establishes higher penalties for violations "done for the purpose of commercial advantage or financial gain," *id.* § 1324(a)(1)(B)(i), the Second Circuit has suggested that the phrase "financial gain" should be given its ordinary meaning. *See United States v. Kim*, 193 F.3d 567, 576–77 (2d Cir. 1999) ("The phrases 'commercial advantage' and 'financial gain' are not defined in the statute or the Application Notes, but their meanings are hardly arcane."). While the Circuit did not further define financial gain — perhaps believing it self-explanatory — it discussed the "usual meaning" of the words "commercial" ("relating to commerce" or "having profit as the primary aim") and "advantage" ("a benefit, profit, or gain of any kind"). *Id.* at 577 (quoting *Webster's*

*Third New International Dictionary*, 456 (1976)).  The court

later explained — again with respect to Section 1324 — that no

*actual* gain or advantage need be obtained; the statute "merely

requires that the defendant acted for the purpose of financial

gain."  *United States v. Kim*, 435 F.3d 182, 185 (2d Cir. 2006).

While it is a close call, the complaint adequately

alleges that Clare committed such offenses with respect to one

of the five plaintiffs: Adrian.  It fails to plead sufficient

facts to suggest Section 1324 violations involving the other

four: Lindsay MacInnis,[10] Maja Miljkovic, Camila, and Daniela.[11]

*Adrian.*  First, the plaintiffs adequately allege that

Clare solicited Adrian to continue residing in the United States

"with the intent to further" his illegal residence, *Hansen*, 599

U.S. at 771, in violation of Section 1324(a)(1)(A)(iv).  They

further allege that Clare did so for the purpose of financial

gain.

According to the complaint, Adrian was a "foreign

national who lived and worked in the NXIVM community."  Compl.

¶ 68.  The complaint indicates that Adrian had a valid visa for

---

[10] Clare Bronfman's supplemental memorandum in support of her motion to dismiss spells Lindsay's last name "MakInnis."  Clare's Supp. Mem. at 16, ECF No. 226.  This order adopts the spelling used by the plaintiffs throughout their complaint, "MacInnis."  *E.g.*, Compl. ¶ 57.

[11] Clare Bronfman pled guilty to one count of conspiracy to violate Section 1324 with respect to a "Jane Doe 12," whose name was not revealed publicly.  Case No. 18-CR-204, ECF No. 936 at 2 (E.D.N.Y. 2020).  The complaint in this case does not purport to identify Jane Doe 12.

legal residence in the United States, although it does not specify when that visa took effect. *See id.* ¶¶ 68-69. Initially, Adrian performed manual labor for Clare in her barn, for which he was "rarely compensated." *Id.* ¶ 68. Eventually, he "complained that he was unable to support himself" and that he therefore "planned to leave NXIVM and return to Mexico." *Id.*

When Raniere heard that Adrian planned to return to Mexico because he "was unable to support himself," he "told Adrian that Adrian could build a company" with him and Clare. *Id.* Adrian accepted the offer, working "tirelessly" to build a profitable company, including by investing his own money into it. *Id.* When Adrian's visa was expiring, he informed Raniere and Clare "that he was returning to Mexico, to wait the requisite period, and apply to renew his visa." *Id.* ¶ 69. They "persuaded him not to leave the U.S. because their lawyers could resolve the immigration issue." *Id.* Relying on that assurance, Adrian continued to reside in the United States and to work on the t-shirt business without pay. *Id.* ¶¶ 68-69. But the assurance never bore fruit, and Adrian eventually "los[t] his lawful immigration status." *Id.* When the Albany Times Union published articles about NXIVM, Clare — worried about the negative press — "told Adrian to go into hiding so that he would not be discovered by reporters or immigration authorities." *Id.* ¶ 70.

The complaint does not provide further detail on what, precisely, Clare actually said about going "into hiding."  At the pleading stage, however, this claim is sufficiently well-defined to proceed.  *See generally Woodhull Freedom Found. v. United States*, 72 F.4th 1286, 1301 & n.5 (D.C. Cir. 2023) (citing Model Penal Code § 5.02(1)).

*Lindsay MacInnis.*  The complaint alleges that Clare also induced MacInnis — a Canadian national — to come to the United States, and then encouraged her to remain here, despite knowing that such residence would be unlawful.  This predicate act is inadequately pleaded because the complaint does not assert plausibly (or at all, really) that MacInnis's residence was or would be unlawful.

The complaint alleges that "Raniere and Clare lured" MacInnis to the United States by "assuring her that she would receive gainful employment in the NXIVM community."  *Id.* ¶ 76.  The complaint acknowledges that MacInnis entered the United States with a valid visa.  *Id.*  To facilitate MacInnis's residence in the United States, "Clare sent letters to immigration authorities on NXIVM's behalf representing that Linday [] would work for NXIVM as [a] 'business consultant[]' and would be given a salary satisfying the requirements for a visa."  *Id.*  But when MacInnis arrived and began work "as Clare's 'personal assistant' she was not paid what she had been

promised or a salary sufficient to satisfy the requirements of her visa." *Id.* Clare told her that to make more money "she needed to take more curriculum." *Id.* For a time, "Lindsay was forced to comply with Clare's demands because of her immigration status." *Id.* Eventually, in response to the lack of pay, "Lindsay fled to Canada." *Id.* ¶ 77.

These allegations fail to address a crucial element of Section 1324 — that MacInnis's residence in the United States be "in violation of law." 8 U.S.C. § 1324(a)(1)(A). Nor, consequently, does the complaint allege that Clare knew, or acted in reckless disregard of the fact that, MacInnis would be residing in the country illegally. *Id.* Instead, plaintiffs suggest (obliquely) that Clare resorted to fraud to obtain *continued* lawful immigration status for MacInnis.[12] But the complaint does not explain when or how MacInnis's residence in the United States would have been unlawful — the plaintiffs do not allege, for example, that MacInnis's work visa had expired or become invalid, or that Clare told her to stay on even after it did.[13] Compl. ¶ 77. In the absence such allegations, the

---

[12] Such an act might constitute visa fraud under 18 U.S.C. § 1546, but while the complaint alleges that Kathy Russell committed visa fraud as one of her predicate acts, *see* Compl. ¶ 226, it fails to make such an allegation against Clare, *see id.* ¶¶ 203-212.

[13] A visa holder in H1-B status may lose that status if they are *terminated* from a job, but only after a grace period. Plaintiffs do not allege that MacInnis lost her job — only that it did not meet her compensation expectations. The complaint does not allege any specific immigration implications of these allegations. Indeed, the complaint does not say what type of work visa MacInnis held.

complaint fails to adequately allege of violation of Section 1324 as to MacInnis.

*Maja Miljkovic.* The allegation that Clare harbored Maja Miljkovic in violation of Section 1324(a)(1)(A)(iii) for the purpose of financial gain is likewise inadequately pleaded.

"Maja entered the U.S. on a visitor visa" and joined the NXIVM community. Compl. ¶ 78. Although "Raniere and Clare told her that she would create and own a NXIVM company from which she would earn income . . . she was never compensated for her work" for the "Knife of Aristotle," a "purported news outlet" under the NXIVM umbrella. *Id.* ¶¶ 79, 102. The complaint does not expand on Miljkovic's role at the Knife of Aristotle, whether her promised ownership stake ever came into fruition, or her precise employment relationship with the company, other than to say that she was "recruited to develop" it and that she was never paid for doing so. *Id.* ¶ 79.[14] Instead, "to cover her living expenses and because Maja was unable to work anywhere else because of her visa status," Bronfman "paid Maja to work as a waitress at a cafe" that Bronfman owned; the pay was "meager." *Id.*

---

[14] People who "own" companies, as Miljkovic was allegedly promised she would, typically expect to earn money through the company's profits, rather than a fixed income. This basic tenet is at odds (or at least in tension) with the complaint's bare assertion that Clare's promise of income was false *when made*.

According to the complaint, when Miljkovic eventually announced that she was "leaving the NXIVM community" to "return[] to Canada," "Raniere and Clare then pressured Maja to marry Marc Elliot so Maja could remain in the U.S. and Maja agreed." *Id.* But the complaint proffers no details on how Clare "pressured" her. It merely alleges that Raniere (not Bronfman) "told [Miljkovic] that many people in the NXIVM community had entered into sham marriages" in order to stay in the United States. *Id.*

Allegations of sham marriage can be sufficient to state a claim for harboring. The Second Circuit has held that the "arrangement of sham marriage ceremonies to United States citizens for the purpose of enabling the aliens to claim citizenship" sufficed (with other evidence) to prove "harboring" under Section 1324. *United States v. Lopez*, 521 F.2d 437, 441 (2d Cir. 1975); *see also Hansen*, 599 U.S. at 782 (identifying "arranging fraudulent marriages" as an example of the statute's "plainly legitimate sweep").

Here, however, the complaint sets forth insufficient factual content to support the inference that Miljkovic's marriage was a sham and that Clare knew as much. The vague allegation that Raniere and Bronfman "pressured" Miljkovic to marry Marc Elliot does not suffice. *Cf., e.g.*, *Kassner v. 2nd Avenue Delicatessen Inc.*, 496 F.3d 229, 241 (2d Cir. 2007) (in

employment case, allegation "that defendants pressured plaintiffs to retire" was insufficient to state a claim absent "specific facts as to what was done to pressure [plaintiffs] to retire"). Absent plausible factual content, this predicate act allegation cannot suffice.

*Camila.* The complaint also charges Clare with two immigration predicates relating to Camila: first, that Clare concealed or harbored Camila in violation of Section 1324(a)(1)(A)(iv); and second, and that she aided and abetted an "encouragement" or "inducement" violation of Section 1324(a)(1)(A)(iii), or conspired with others to commit that offense. Compl. ¶¶ 206-07. These allegations, too, however, are inadequately pleaded.

At some time, "Raniere informed Camila that she no longer needed to return to Mexico to renew her visa because Clare Bronfman's immigration lawyers had a better way for her to remain in the U.S. Camila followed that advice and overstayed her visa, losing her lawful immigration status." *Id.* at ¶ 72. Further, the plaintiffs allege that Camila "repeatedly asked members of the Inner Circle about her status, but they did nothing but string her along, assuring her that Clare Bronfman was handling it." *Id.* "Clare knew of Camila's immigration status," they submit, because "she had orchestrated immigration fraud for NXIVM, including as to Adrian (Camila's brother);

members of the Inner Circle and the legal team were aware of Camila's immigration status; and Clare was personally familiar with Camila, who worked for RCG." *Id.* The complaint alleges that Clare (along with Sara Bronfman) "operated and financed RCG," "which was used as a vehicle . . . to fraudulently obtain foreign labor." *Id.* ¶ 215.

These conclusory allegations fail to raise a plausible inference that Clare encouraged or induced Camila to reside in the United States despite knowing that such residence would be unlawful (or that she aided and abetted, or conspired with, others to do so). While the complaint alleges that Clare knew Camila, it proffers no facts that would satisfy the *actus reus* element of these violations — that is, it does not say that Clare did anything at all in respect of these allegations.

The allegation that *other individuals* told Camila that Clare was "handling" the issue of her immigration status does support an inference of Clare's action (or agreement to act). Moreover, the complaint suggests a fairly strained basis for inferring Clare's knowledge of Camila's immigration status: because she knew Camila, and had "orchestrated" Camila's *brother's* immigration fraud. These allegations, taken together, are insufficient to support the plausible inference that Clare committed, aided and abetted, or conspired to commit a violation of Section 1324 in Camila's case. *See United States v. Pipola*,

83 F.3d 556, 562 (2d Cir. 1996) (aiding and abetting requires "the specific intent of advancing the commission of the underlying crime"); *United States v. Mahaffy*, 693 F.3d 113, 123 (2d Cir. 2012) (conspiracy requires showing, among other things, that the defendant "knowingly engaged in the conspiracy with the specific intent to commit the offenses that were the objects of the conspiracy").

*Daniela.* Finally, the complaint asserts that Clare committed a direct violation of Section 1324(a)(1)(A)(iv) with respect to plaintiff Daniela — and that she aided and abetted, and conspired with, Raniere, Sara Bronfman, and Russell to violate Section 1324(a)(1)(A)(iii) in Daniela's case. Compl. ¶¶ 206-07. The complaint proffers no facts to support these claims. While it alleges that at some point, "Daniela asked Raniere for help from Clare's attorneys regarding her immigration status; she was ignored," *id.* ¶ 75, that allegation provides no basis to conclude that Clare herself knew that Daniela was residing in the United States illegally.

The complaint also alleges — again without factual support — that Clare served as Raniere's "agent" in the confiscation of Daniela's immigration papers (specifically, "her passport and other documents that proved her identity and country of origin"), *see id.* ¶¶ 75, 293-94, as discussed in Section III.C.6, *infra*. But the plaintiffs set forth no facts

about Bronfman's alleged role in, or even knowledge of, that document confiscation. Nor do they make any non-conclusory allegations suggesting that Clare knew about Daniela's unlawful status. In fact, the complaint specifically alleges that Raniere alone confiscated Daniela's documents: "Raniere confined her to a room and confiscated her passport and other documents that proved her identity and country of origin." *Id.* ¶ 75. The allegation that Clare was Raniere's "agent" in this regard is a legal conclusion. *See Ashcroft*, 556 U.S. at 678 ("[W]e must take all the factual allegations in the complaint as true, [but] we are not bound to accept as true a legal conclusion couched as a factual allegation."). In any event, principals are responsible for the acts of their agents, but the reverse is not also true.

Accordingly, the complaint fails to raise a plausible inference that Clare committed, aided and abetted, or conspired to commit a violation of Section 1324 with respect to Daniela.

### ii. Witness Tampering

The plaintiffs also allege that Clare committed witness tampering, in violation of 18 U.S.C. § 1512(b), with respect to Jessica Salazar, Soukiana Medhaoui, Sarah Edmondson, and Camila. Section 1512(b) makes criminally liable any person who:

> knowingly uses intimidation, threatens, or corruptly
> persuades another person, or attempts to do so, or
> engages in misleading conduct toward another person,
> with intent to: (1) influence, delay, or prevent the
> testimony of any person in an official proceeding; (2)
> cause or induce any person to (A) withhold testimony,
> or withhold a record, document, or other object, from
> an official proceeding; . . . or (3) hinder, delay, or
> prevent the communication to a law enforcement officer
> . . . of information relating to the commission or
> possible commission of a Federal offense.

*Id.* An act of persuasion is "corrupt[]" when it is "motivated by an improper purpose" — that is, when it is done in furtherance of some "constitutionally unprotected and purportedly illicit activity," such as "preventing through violence [a person's] cooperation with law enforcement." *United States v. Veliz*, 800 F.3d 63, 70 (2d Cir. 2015). However, neither "threats of future litigation, [n]or the initiation of actual litigation, constitute witness tampering." *G-I Holdings, Inc. v. Baron & Budd*, 179 F. Supp. 2d 233, 266 (2d Cir. 2001).

    *Jessica Salazar & Soukiana Medhaoui.* The plaintiffs allege that "Clare . . . retained two attorneys" who "sent letters — written by Raniere and Clare and transposed on law firm letterhead — to victim-witnesses, threatening them with legal action and arrest on criminal charges if they did not remain silent about DOS and NXIVM." Compl. ¶ 171. Further, they allege that "[m]etadata recovered by the government established that at least one of the threatening, extortive letters sent to a DOS victim came from a document created by

Clare," and that "[a]mong the recipients of these threatening letters were Plaintiffs Salazar and Medhaoui." *Id.* ¶ 173.

One such threatening letter allegedly suggested, albeit confusingly, that it came from a prosecutor. The letter was written on a law firm's letterhead — that of "Olmeda Gaxiola & Abogados, S.C." — but also described the writer as the "chief attorney of a criminal investigation in Mexico." *United States v. Raniere*, Case No. 18-CR-204 (NGG), ECF No. 922-1, at 4. It stated that the addressees — including Salazar and Medhaoui, Compl. ¶ 173 — were "currently connected to several criminal investigations involving fraud, coercion, extortion, harassment," and a slew of other crimes. *United States v. Raniere*, Case No. 18-CR-204 (NGG), ECF No. 922-1, at 4.

The complaint does not adequately allege a violation of Section 1512(b) by Clare against either Salazar or Medhaoui because it fails to allege the "official proceeding" element of subsections (b)(1) and (b)(2). To violate Section 1512(b), the defendant must "have in contemplation [some] particular official proceeding" towards which the obstructive act is directed, even if that particular proceeding is not yet pending. *Arthur Andersen LLP v. United States*, 544 U.S. 696, 708 (2005). In the *Andersen* case, the Supreme Court held that jury instructions on the "corruptly persuades" element of Section 1512 must "convey the requisite consciousness of wrongdoing." *Id.* The section

cannot apply to "someone who persuades others to shred documents under a document retention policy when he does not have in contemplation any *particular* official proceeding in which those documents might be material." *Id*. at 707-8 (emphasis added).[15]

Neither the complaint nor the letter itself identify any particular official proceeding as to which Clare was attempting to hinder Salazar's or Medhaoui's participation. The complaint does not, for example, allege that she was attempting to prevent their testimony before the grand jury that ultimately returned an indictment against her, or even that she was attempting to prevent their cooperation with an ongoing or foreseeable law enforcement investigation.

The "criminal investigation" referred to in the Abogados' letter does not qualify. For starters, the complaint does not allege that any such investigation actually existed. Moreover, the definition of "official proceeding" under Section 1512 is not limitless. An "official proceeding" is "a proceeding before a judge or court of the United States" (including non-Article III courts), "a Federal grand jury," "a proceeding before the Congress, a proceeding before a Federal Government agency which is authorized by law," or proceedings "involving the business of insurance." 18 U.S.C. § 1515(a)(1);

_____

[15] Plaintiffs do not invoke 18 U.S.C. § 1512(c) in support of this claim.

*see also United States v. Ermoian*, 752 F.3d 1165, 1170 (9th Cir. 2013) (holding that "a criminal investigation is not an 'official proceeding' under the obstruction of justice statute," as the term "connotes some type of formal hearing"). Foreign proceedings do not qualify, either. *El Omari v. Buchanan*, No. 22-55, 2022 WL 4454536, at *1-2 (2d Cir. 2022) ("For purposes of this statute, an 'official proceeding' is defined to include only specified domestic proceedings.").

Indeed, the letter at issue is primarily directed at minimizing media exposure, rather than witness testimony. It "strongly suggest[s] that [the recipients] cease and desist, undo, reverse, cancel, and retract, participation in all past, present, and future, conversation, conference calls, meetings, news media, social media, blogs, or websites." *United States v. Raniere*, Case No. 18-CR-204 (NGG), ECF No. 922-1, at 4. It recommends that "[y]our best course of action is to minimize your exposure." *Id*. But rather recommending the same course of action as to any law enforcement inquiry, the letter advises recipients to "fully cooperat[e] with the criminal investigations." *Id*.

*Sarah Edmondson.* The complaint also fails to adequately allege that Clare committed witness tampering with respect to Sarah Edmondson. The plaintiffs allege the same facts that Judge Garaufis found at Clare's sentencing — that

Clare "pursu[ed] false criminal charges against Plaintiffs Edmondson and Kobelt in Vancouver" "in response to the forthcoming New York Times exposé" of NXIVM.  Compl. ¶ 175.

Section 1515's definition of "official proceeding" refers only to proceedings in the United States; Canadian proceedings do not suffice.  *See* 18 U.S.C. § 1515(a)(1)(A) (referring to proceedings before courts "of the United States"). But in any event, as with Salazar and Medhaoui above, the complaint alleges no nexus between Clare's false complaint and "any particular proceeding," let alone a domestic one.  *Arthur Andersen*, 544 U.S. at 707.

*Camila.*  The complaint alleges that when the FBI contacted Camila in March 2019, Camila reached out to "an associate of Clare Bronfman who told her not to speak with the FBI."  Compl. ¶ 179.  It alleges that "Clare Bronfman arranged for Camila to hire an attorney" from a list provided, who would be paid by Clare.  *Id*.  Once hired, that attorney "instructed Camila not to speak to the FBI or a victim specialist."  *Id*. When Camila told the attorney that she wanted to speak with the FBI, the attorney initially responded that "she (the attorney) would confer with prosecutors and ascertain whether they viewed Camila as a perpetrator or a victim."  *Id*.  But the attorney never actually contacted the FBI, and later told Camila that she

would not do so "because the FBI would use its resources to locate Camila and charge her with crimes." *Id.*

Here, too, the complaint fails to allege the foreseeability of any "official proceeding," invoking instead only the prospect of Camila "speak[ing] to the FBI." Again, however, "a criminal investigation is not an 'official proceeding' under the obstruction of justice statute" because the term specifically "connotes some type of formal hearing." *Ermoian*, 752 F.3d at 1170; *see Fischer v. United States*, 144 S.Ct. 2176, 2200 (2024) (Barrett, J., dissenting) (citing appellate decisions to this effect). And beyond that, the plaintiffs fail to allege that Clare *herself* engaged in obstructive conduct, or even that she directed the attorney she allegedly paid for to do so. The complaint thus fails to state a claim under Section 1512(b) as to Camila.

### iii. Forced Labor, Sex Trafficking, and Human Trafficking

The plaintiffs have not adequately alleged that Clare has committed any forced labor, sex trafficking, or human trafficking offense. This is true for the reasons set forth in Section III.C.1, *infra* — generally, that they insufficiently allege Clare's actual knowledge of Raniere's conduct. Therefore, those alleged offenses cannot serve as a predicate act for purposes of this RICO claim.

iv.  Mail and Wire Fraud

For their next predicate acts, the plaintiffs allege that "Clare committed directly, aided and abetted the commission of, and conspired to commit multiple acts of mail and wire fraud in violation of 18 U.S.C. §§ 1341, 1343." Compl. ¶ 210.  These allegations relate primarily to the sale of NXIVM courses.

"The elements of mail or wire fraud are (i) a scheme to defraud (ii) to get money or property (iii) furthered by the use of interstate mail or wires." *Williams v. Affinion Grp., LLC*, 889 F.3d 116, 124 (2d Cir. 2018).  "A scheme to defraud is a plan to deprive a person of something of value by trick, deceit, chicane or overreaching," and requires "a material misrepresentation" made by the defendant. *Id.*[16]  A misrepresentation is material if it is "likely to be deemed significant to a reasonable person considering whether to enter into the transaction" — that is, if it misstates the "economic value" of the bargain. *Moore v. PaineWebber, Inc.*, 189 F.3d 165, 170 (2d Cir. 1999).

Pursuant to Federal Rule of Civil Procedure 9(b), a plaintiff must plead each element of fraud "with particularity" — that is, "detail the specific statements that are false or

---

[16] "[T]he mail or wire communications themselves need not contain a false statement," but such a statement must be "part of the defendants' scheme to [de]fraud." *Id.* at 125.  In effect, there must be "an underlying 'scheme to defraud' animated by a material misrepresentation," and identifying that misrepresentation is a core element of the claim. *Id.*

fraudulent, identify the speaker, state when and where the statements were made, and explain why the statements were fraudulent." *Williams*, 889 F.3d at 124.[17]  In *Moore*, the Second Circuit held that the plaintiff met the particularity requirement with "a chart listing twelve different mailings said to contain fraudulent representations, along with the dates of these mailings and cross-references to the paragraphs in the complaint in which the mailings [were] further discussed."  189 F.3d at 173.  Where, on the other hand, a complaint failed to include "statements setting forth the content, date, or place of any alleged misrepresentations, and the identity of the persons making them," a court in this district held that it failed to meet Rule 9(b)'s particularity requirement.  *Colony at Holbrook, Inc. v. Strata G.C., Inc.*, 928 F. Supp. 1224, 1232 (E.D.N.Y. 1996); *see also Flexborrow LLC v. TD Auto Finance LLC*, 255 F. Supp. 3d 406, 422 (E.D.N.Y. 2017).

Certain of the plaintiffs' allegations satisfy this rigorous standard, and thus the plaintiffs can proceed (at this stage) on their assertion that Clare committed a predicate act of mail and wire fraud.  However, as discussed below in the

---

[17] This requirement applies to theories of both direct liability and aiding and abetting.  *See Morrow v. Black*, 742 F. Supp. 1199, 1204 (E.D.N.Y. 1990) (holding that "the complaint will need to meet the standards of Rule 9(b) with regard to the circumstances of the predicate acts of fraud whether or not they were committed with the aid and abetment of other defendants who did not personally commit the act").

standalone RICO standing section, *infra* Section III.A.4, each plaintiff has not adequately pled (as they must) a clear and definite injury to business or property, proximately caused by this fraud.

## I.   Actionable Allegations of Fraud

The complaint alleges a straightforward consumer fraud in the sale of NXIVM's educational program.  Plaintiffs — all seventy of them — allege that "NXIVM materials continuously made several false and materially misleading assertions of fact." Compl. ¶ 211.  These alleged misrepresentations related primarily to the manner in which participants could obtain *promotion* through the NXIVM curriculum and ultimately *complete* it.  NXIVM represented, among other things, that "promotion in the NXIVM community depended on completing NXIVM courses."  *Id.* This was false, plaintiffs allege:  "In fact recruiting (which generated revenue) rather than completing the [stated curriculum] actually drove an enrollee's advancement in the NXIVM system."  *Id.* ¶ 42.  The plaintiffs attribute responsibility for those misrepresentations to Clare because she was a "leader[] and chief financier[] of NXIVM," which conveyed "influence and control over the content of NXIVM's doctrines, curricula, sales materials, and practices."  *Id.* ¶ 38.

As to completion, "NXIVM materials" stated that "NXIVM's curriculum could be completed by the taking of

37

courses." *Id.* ¶ 211. In truth, NXIVM is alleged to have run a Hotel California of personal improvement: a "never-ending program" that "trapped" participants in a "circle of indebtedness and [uncompensated] labor." *Id.* ¶ 57. In the end, because new courses were "continuously added," "no enrollee ever did, or could, complete the NXIVM program." *Id.* ¶ 40.

The complaint does not tell us precisely when or where each of these claims appeared. Still, the complaint's allegations are specific enough — and plausible enough — to allege a scheme to defraud at this stage. In the end, the plaintiffs plausibly allege that the NXIVM curriculum was a "pyramid scheme," *id.* ¶ 4 — a well-established type of fraud in which upfront payments are demanded of enrollees, goal posts are regularly moved, and (among other things) promised rewards turn out to be conditioned on recruiting other participants into the program. *See, e.g.*, *United States v. Gold Unlimited, Inc.*, 177 F.3d 472, 478-79, 481 (6th Cir. 1999) (describing the mechanics of pyramid schemes). And the plaintiffs need not allege that Clare "actually mailed [or wired] . . . anything" herself." *Pereira v. United States*, 347 U.S. 1, 8 (1954). Allegations that she "controlled" the enterprise and "caused false statements to be made in the name of" NXIVM is sufficient. *4K&D Corp. v. Concierge Auctions, LLC*, 2 F. Supp. 3d 525, 538-39 (S.D.N.Y. 2014). Accordingly, the plaintiffs may proceed to

assert mail and wire fraud as a predicate act in service of their RICO claim against Clare.

## II.   Other Allegations of Fraud

Notwithstanding the discussion above, the Court notes that several of the plaintiffs' allegations in support of their fraud claims would not be actionable on a standalone basis. This is true for a variety of reasons, as discussed below.  The Court takes this step in the interest of explaining the RICO standing analysis below, as well as providing guidance for the discovery process.

First, the complaint challenges Clare's statement (on her blog) that the Rational Inquiry method was "patent-pending."  Compl. ¶ 51.  Given that Raniere had by that time successfully *obtained* several patents,[18] plaintiffs have not adequately alleged that this statement is materially false, let alone that Clare knew as much.  *See Flexborrow LLC v. TD Auto Finance LLC*, 255 F. Supp. 3d 406, 420 (E.D.N.Y. 2017) (RICO plaintiff bears the burden of "explain[ing] why the statements were fraudulent").  The plaintiffs also see fraud in NXIVM's

---

[18] *See, e.g.*, U.S. Patent No. 9646311-B2 (issued May 9, 2017) ("Electronic course evaluation"); U.S. Patent No. 9421447-B2 (issued Aug. 23, 2016) ("Method and apparatus for improving performance"); U.S. Patent No. 9100904-B2 (issued Aug. 4, 2015) ("Data stream division to increase data transmission rates").  This court "may properly take judicial notice of official records of the United States Patent and Trademark Office." *Telebrands Corp. v. Del Labs, Inc.*, 719 F. Supp. 2d 283, 287 n.3 (S.D.N.Y. 2010).

claim that Raniere was "an ascetic who had eschewed possessions and wealth." *Id.* at ¶ 45. This assertion is conclusory, in that the complaint provides no contrary factual allegations concerning Raniere's actual possessions and wealth. But beyond that, the plaintiffs do not connect this allegation to the benefit of the bargain between NXIVM and the plaintiffs who enrolled in its curriculum. *See United States v. Regent Office Supply Co.*, 421 F.2d 1174, 1180 (2d Cir. 1970) (holding that fraudulent intent — a "critical element in a scheme to defraud" — requires "an attempt to deceive the[] prospective customers with respect to the bargain [the defendants] were offering").

Similarly, statements that Raniere was "a celibate," Compl. ¶ 45, have not been connected the economic value of the NXIVM curriculum. *Moore*, 189 F.3d at 170. Such statements thus would not plausibly be "deemed significant" to a reasonable person considering whether to purchase NXIVM course materials. *Id.* at 170; *see also United States v. Shellef*, 507 F.3d 82, 108 (2d Cir. 2007) (mail and wire fraud statutes reach "schemes that depend for their completion on a misrepresentation of an essential element of the bargain"). And finally, statements that Raniere was the "'world's smartest man' with an IQ of 240," *id.* at ¶ 45, are a classic example of "blustering" — a statement "upon which no reasonable buyer would be justified in relying." *United States v. Weaver*, No. 13-CR-120, 2016 WL 3906494, at *15

n.11 (E.D.N.Y. June 10, 2016); *cf. United States v. Litvak*, 808 F.3d 160, 175 (2d Cir. 2015) ("Where the misstatements are so obviously unimportant to a reasonable investor that reasonable minds could not differ on the question of their importance, we may find the misstatements immaterial as a matter of law.").

Whether these statements would be actionable on a standalone basis, however, is a different question from whether they have evidentiary relevance to the broader scheme alleged. That question is for another day.

### v. State Law Extortion

In the final predicate act asserted against Clare, the plaintiffs allege that Raniere and Allison Mack committed "state law extortion" against the twelve DOS plaintiffs to obtain uncompensated labor, and that Clare "aided and abetted or conspired" to commit that extortion. Compl. ¶ 213.[19]

The plaintiffs allege that Mack and Nikki Clyne (who is no longer a defendant in this case) recruited female NXIVM recruits to what they described as a "woman-centered" subgroup of NXIVM. *Id.* ¶ 111. To join DOS, the recruits had to provide "collateral" — some type of private material they would not want

---

[19] "[R]acketeering activity" is defined by statute to include "any act or threat involving" (among other things) "extortion . . . which is chargeable under State law and punishable by imprisonment for more than one year." 18 U.S.C. § 1961(1). As a result, "[s]tate law crimes such as extortion can constitute racketeering acts under RICO." *United States v. Ivezaj*, 568 F.3d 88, 91 n.2 (2d Cir. 2009).

released publicly.  *Id.* ¶ 112.  Mack and Clyne would then threaten to release that initial material if the recruits did not provide more collateral.  *Id.* ¶ 115.  "Once recruits were trapped by their collateral, their masters forced the recruits to perform labor for the masters and (secretly) Raniere, including but not limited to transcribing video and audio recordings."  *Id.*[20]

The complaint does not allege that Clare was a DOS "master" or that she participated directly in this scheme. Instead, it alleges that she "aided and abetted or conspired" to extort the plaintiffs, "as evidenced by all the facts and circumstances, including her longtime leadership roles in NXIVM and closeness with Defendant Raniere."  *Id.* ¶ 213.  Beyond guilt by association, the plaintiffs argue that Clare is liable for her efforts to cover up the extortion after the fact: she sent "threatening letters she drafted to attorneys she had hired to send to people trying to escape DOS after it came to light in order to intimidate them from disclosing what Raniere and other DOS masters had done to them."  *Id.*

_____

[20] Plaintiffs also allege that the various participants leveraged DOS members' collateral to extort sexual favors for Raniere.  Compl. ¶ 109.  But the RICO statute provides a private right of action only for a "person injured in his business or property" by the racketeering violation, 18 U.S.C. § 1964(c); personal injuries are not covered.  *Bascunan v. Elsaca*, 874 F.3d 806, 817 (2d Cir. 2017).

Assuming that aiding and abetting a state-law predicate act can itself constitute a predicate act,[21] the DOS plaintiffs have still failed to adequately allege Clare's involvement in the alleged extortion.  Under New York law, a person is liable as an aider and abettor "when, acting with the mental culpability required for the commission" of the criminal conduct, she "intentionally aids [a principal] to engage in such conduct."  N.Y. Penal Law § 20.00.  "An aider and abettor must share the intent or purpose of the principal actor, and there can be no partnership in an act where there is no community of purpose."  *People v. La Belle*, 18 N.Y.2d 405, 412 (1966).

This definition has been held to exclude a defendant whose only contribution to a crime comes in the effort to conceal it after the fact.  Evidence that a defendant "helped his brother to remove traces" of a murder, for example, was insufficient to support the defendant's conviction for aiding and abetting the brother's crime.  *Id.* at 413.  The evidence did not "exclude the hypothesis that he was unaware before the murder of his brother's intention to kill the girl."  *Id.*  Of course, such a defendant may be prosecuted for "acting as an accessory after the fact, now known as hindering prosecution."

---

[21] The Second Circuit said in *First Capital Asset Management, Inc. v. Satinwood*, 385 F.3d 159, 178 (2d Cir. 2004), that "one who assists in the fraud also conducts or participates in the affairs of the enterprise."  This statement is, of course, somewhat orthogonal to the question posed above. Regardless, the Court need not resolve this question.

*People v. Bacote*, 107 A.D.3d 641, 641 (1st Dep't 2013).  But

hindering a prosecution is a separate state offense, *see* N.Y.

Penal Law § 205.65, and is not a RICO predicate.  *See* 18 U.S.C.

§ 1961(1).

     The DOS plaintiffs may (or may not) have alleged facts

sufficient to establish that Clare hindered the investigation or

prosecution of extortionate conduct.  But they have not

adequately alleged that she aided and abetted Raniere, Mack or

others in the commission of that offense.  The complaint's only

nonconclusory allegation regarding Clare's involvement is that

she drafted threatening letters (sent by her attorneys) to the

plaintiffs "after [the extortion] came to light."  Compl. ¶ 213.

As in *La Belle*, this indicates nothing as to whether she was

aware of the extortion prior to or during its occurrence, or

that she shared a "community of purpose" with the principals.

In the absence of any factual allegations indicating that Clare

knew of, agreed to, or intentionally aided in the extortionate

conduct, the DOS plaintiffs have failed to adequately allege

this predicate act.

     As to the allegation that Clare entered into a

conspiracy to commit extortion in violation of Section 105 of

the New York Penal law, that fails because the plaintiffs fail

to allege any "overt act" Clare committed "in furtherance of the

conspiracy."  N.Y. Pen. Law § 105.20.  As with the aiding and

abetting theory, the letter Clare is alleged to have drafted comes too late to serve as the overt act. As with aiders and abettors, New York law provides "that the acts and statements" of a conspirator made "subsequent to" the "achievement of the common purpose" of the conspiracy "are not performed or made in the furtherance of said conspiracy," because the conspiracy has already ended. *People v. Wisan*, 505 N.Y.S.2d 361, 363 (N.Y. Sup. Ct. July 14, 1986) (citing cases); *but cf. People v. Ribowsky*, 77 N.Y.2d 284, 293 (1991) ("Acts of concealment occurring . . . in some cases, after the conspiratorial objective is achieved may constitute overt acts in furtherance of an *ongoing* conspiracy.") (emphasis added). Thus, acts "performed by the co-conspirators" *after* the extortion was already accomplished "are not overt acts performed *in furtherance of the conspiracy*" within the meaning of Section 105.20 of the Penal Law. *Id.* (emphasis added). The only non-conclusory act Clare is alleged to have performed is that she drafted threatening letters to the plaintiffs after they left NXIVM "to intimidate them from disclosing what Raniere and other DOS masters *had done* to them." Compl. ¶ 213 (emphasis added). Those acts occurred subsequent to the completion of the extortion, and are thus insufficient under New York law to support the plaintiffs' allegations.

b.   Sara Bronfman's Alleged Predicate Acts

The plaintiffs allege that Sara committed four types of predicate acts: (1) immigration fraud; (2) witness tampering; (3) forced labor, sex trafficking, and human trafficking; and (4) mail and wire fraud.  The complaint adequately alleges two of these: witness tampering (as to Adrian) and mail and wire fraud.  Thus the RICO claims against her will proceed.

i.   Immigration Fraud

Plaintiffs allege that "Sara Bronfman aided and abetted and conspired to commit the immigration fraud violations" committed by her sister Clare.  As noted above, five plaintiffs are alleged to have suffered injury from this conduct: Adrian, Lindsay MacInnis, Maja Miljkovic, Camila, and Daniela.  Compl. ¶ 232.  Sara is alleged to have furthered the immigration violations "by establishing, operating, and financing" an entity known as RCG.  *Id.* ¶ 215.

RCG "purported" to function as a "school and daycare for children" that would "improve child development and teach the children several languages."  *Id.* ¶ 59.  In reality, plaintiffs claim, it "was a front for a trafficking organization."  *Id.*  The "specialists" who staffed its (unlicensed) daycare centers were actually brought to the United States to provide "uncompensated or under-compensated labor, and to sexually gratify Raniere."  *Id.* ¶ 58.

46

Plaintiffs allege that Sara instructed Loretta Garza —
a Mexican national who, as the "titular head" of RCG, answered
directly to Sara and Raniere — "to maintain multiple sets of
accounting books to hide the existence of foreign nationals and
mask RCG's finances." *Id.* ¶¶ 60, 61. But of MacInnis, Camila,
Adrian, Daniela, and Miljkovic, the complaint alleges only that
Camila worked for RCG. *See id.* ¶ 278 (Camila's uncompensated
labor consisted of "babysitting and teaching in RCG").

And in respect of Camila, as discussed above, the
complaint does not adequately allege that Clare violated Section
1324. Thus, the plaintiffs' allegation that "Sara Bronfman
specifically intended to facilitate Clare's immigration fraud"
fails; the plaintiffs cannot establish aiding and abetting of an
underlying offense that is itself not plausibly alleged. *See
Pipola*, 83 F.3d at 562 (an aiding-and-abetting charge requires
proof that "the underlying crime was committed by someone other
than the defendant and that the defendant himself either acted
or failed to act with the specific intent of advancing the
commission of the underlying crime").

ii. Witness Tampering

The complaint does plausibly allege that Sara
committed witness tampering in violation of 18 U.S.C. § 1512(b)
with respect to Adrian. She "offered Adrian a substantial sum
of money" to travel to and remain in France "during Raniere's

47

trial," with the purpose of "render[ing] him unavailable" to testify in that proceeding.  Compl. ¶ 180.  The complaint plausibly suggests that Sara sought to persuade Adrian to leave the country with the intent, and the corrupt purpose, of preventing him from testifying in an official proceeding.  *See United States v. Gotti*, 459 F.3d 296, 343 (2d Cir. 2006) (affirming Section 1512(b) conviction over defendant's argument that he had "merely suggest[ed]" that a key witness invoke the Fifth Amendment).

### iii. Forced Labor, Sex Trafficking, and Human Trafficking

The plaintiffs have not adequately alleged that Sara has committed any forced labor, sex trafficking, or human trafficking offense.  This is for the same reason discussed above with respect to Clare — that they insufficiently allege Sara's actual knowledge of Raniere's conduct. *See infra* Section III.C.2.  Therefore, those alleged offenses cannot serve as a predicate act for purposes of this RICO claim.

### iv.  Mail and Wire Fraud

The complaint attributes the same mail and wire fraud to Sara as it does to Clare, on an identical theory: "[B]oth Clare and Sara Bronfman, as leaders and chief financiers of NXIVM, had knowledge of and influence and control over the content of NXIVM's doctrines, curricula, sales materials and

practices." Compl. ¶ 38. As discussed above, *see* Section III.A.3.a.iv, this allegation suffices (at this stage) to establish Sara's responsibility for the fraud scheme, and the complaint adequately alleges that predicate.

4. <u>RICO Standing</u>

Lastly, Section 1964 requires each plaintiff asserting a civil RICO claim to have suffered an "injur[y] in his business or property by reason of a violation of section 1962." 18 U.S.C. § 1964. This requirement is known as "RICO standing," and each plaintiff must establish it as to each defendant. *Denney v. Deutsche Bank AG*, 443 F.3d 253, 266 (2d Cir. 2006). RICO standing is not jurisdictional, but it is "a more rigorous matter than standing under Article III." *Id.* "A RICO plaintiff only has standing if, and can only recover to the extent that, he has been injured in his business or property by the conduct constituting the RICO violation, and only when his or her actual loss becomes clear and definite*." Id.*; *see also Brookhaven Town Conserv. Comm. v. Walsh*, 258 F. Supp. 3d 277, 284 (E.D.N.Y. 2017) (addressing RICO standing at the motion to dismiss stage as a pleading requirement).

RICO standing requires each plaintiff to demonstrate that the defendant's predicate act "not only was a 'but for' cause of his injury, but was the proximate cause as well." *Holmes v. Secs. Investor Protection Corp*., 503 U.S. 258, 268

(1992).  To satisfy the proximate cause requirement, each

plaintiff must allege "a direct relationship between the

plaintiff's injury and the defendant's injurious conduct."

*DeFalco v. Bernas*, 244 F.3d 286, 329 (2d Cir. 2001).  This

"directness" requirement is designed to mitigate "the difficulty

that can arise when a court attempts to ascertain the damages

caused by some remote action."  *Anza v. Ideal Steel Supply

Corp.*, 547 U.S. 451, 458 (2006).  "[T]he less direct the injury

is, the more difficult it becomes to ascertain the amount of a

plaintiff's damages attributable to the violation, as distinct

from other, independent factors."  *Holmes*, 503 U.S. at 269.

The seventy plaintiffs who assert civil RICO claims

against both Clare and Sara Bronfman attempt to meet this

standard, both in the body of the complaint, *see* Compl. ¶ 231,

and in "Schedule A" thereto, added at the Court's request, which

purports to set forth the "Injury Type" suffered by each

plaintiff.  Schedule A at 1, ECF No. 215-1.  As to both Clare

and Sara, those attempts are insufficient at this stage for the

reasons explained below.  The plaintiffs are directed to file a

revised Schedule A remedying those insufficiencies within 60

days of the date this order issues (if they can do so in good

faith).

i.   Clare Bronfman

As discussed above, the plaintiffs adequately allege that Clare committed two RICO predicate acts: mail and wire fraud,[22] and immigration fraud (in relation to Adrian), *supra* Section III.A.3.a.i.  But Adrian — the only plaintiff who could plausibly have been injured by the immigration offense — has failed to allege an injury proximately caused by that act.  And none of the plaintiffs have adequately alleged an injury proximately caused by the NXIVM curriculum scheme to defraud.

In *Anza*, the Supreme Court held that the plaintiff corporation had inadequately alleged injuries proximately caused by a Section 1962 violation.  547 U.S. at 451.  The plaintiff and defendant were competitors, and the plaintiff's theory was that the defendants harmed it by "defrauding the New York tax authority and using the proceeds from the fraud to offer lower prices designed to attract more customers."  *Id.* at 457-58.

---

[22] This is one predicate act, rather than two, for purposes of the RICO statute because "it is not proper under RICO to charge two predicate acts where one action violates two statutes."  *Polycast Tech. Corp. v. Uniroyal, Inc.*, 728 F. Supp. 926, 945 (S.D.N.Y. 1989); *see United States v. Indelicato*, 865 F.2d 1370, 1383 (2d Cir. 1989) (*en banc*) (warning that the court would "disapprove any attempt by the government or a private plaintiff to go beyond Congress' intent and fragment an act that is plainly unitary into multiple acts in order to invoke RICO"); *see also United States v. Biaggi*, 909 F.2d 662, 685-86 (2d Cir. 1990) (bribery and accepting a gratuity, though two separate criminal offenses, constituted one predicate act because they were both based on the same conduct: a promise of future employment), *cert. denied*, 499 U.S. 904 (1991); *United States v. Kragness*, 830 F.2d 842 (8th Cir. 1987); *United States v. Walgren*, 885 F.2d 1417 (9th Cir. 1989).  The plaintiffs rely on the same act — distributing curricula and promotional materials — for the scheme to defraud as to both mail and wire fraud, which thus constitute a single predicate act.

This theory had two problems.  First, the "direct victim of this conduct was the State of New York, not Ideal." *Id.*  "The cause of Ideal's asserted harms [] is a set of actions (offering lower prices) entirely distinct from the alleged RICO violation (defrauding the State)." *Id.*  And second, "Ideal's lost sales could have resulted from factors other than petitioners' alleged acts of fraud," because "[b]usinesses lose and gain customers for many reasons, and it would require a complex assessment to establish what portion of Ideal's lost sales were the product of National's decreased prices." *Id.* at 459.

Adrian has not plausibly alleged that Clare's alleged immigration violations proximately caused an injury to his business or property.  The predicate violation he describes consists of Clare's having "encouraged" or "induced" him to stay in the United States (and to "go into hiding") after his visa expired, in violation of 8 U.S.C. § 1324(a).  Compl. ¶ 70.  But the "harmful" conduct he describes is different: he alleges that he was injured because he "invest[ed] his own money" (as well as his labor) in the t-shirt business Clare and Raniere promised to build with him, and he was never reimbursed.  Compl. ¶ 68; Schedule A at 1.  That financial injury does not map neatly onto Clare's immigration fraud.  The holdings of *Holmes* and *Anza*

dictate that Adrian's injuries do not establish RICO standing under Section 1964.[23]

Thus, Adrian — and the remaining sixty-nine plaintiffs — are left to rely on allegations that they were proximately harmed by the NXIVM curriculum fraud scheme.  As the Second Circuit has noted, RICO standing effectively injects a reliance element into mail and wire fraud predicates.  "That is because reliance will typically be a necessary step in the causal chain linking the defendant's alleged misrepresentation to the plaintiffs' injury: if the person who was allegedly deceived by the misrepresentation (plaintiff or not) would have acted in the same way regardless of the misrepresentation, then the misrepresentation cannot be a but-for, much less proximate, cause of the plaintiffs' injury."  *Sergeants Benevolent Ass'n Health & Welfare Fund v. Sanofi-Aventis U.S. LLP*, 806 F.3d 71, 87 (2d Cir. 2015).

---

[23] This is not fatal to Adrian's RICO claim against Clare, as he may still be able to allege standing as a victim of the mail and wire fraud scheme.  *See* Gregory P. Joseph, Civil RICO: A Definitive Guide, 75 (5th ed. 2018) ("[T]he [RICO] plaintiff need not suffer injury from each predicate act comprising the pattern.").  And the "pattern" may include one or more RICO predicates as to which *no plaintiff* has RICO standing.  *See H.J. Inc. v. Northwestern Bell Telephone Co.*, 492 U.S. 229, 242 (1989); *Moses v. Martin*, 360 F. Supp. 2d 533, 549 (S.D.N.Y. 2004) (a "plaintiff may allege predicate acts involving others to establish a pattern of racketeering activity"); *Empire Merchants, LLC v. Reliable Churchill, LLLP*, No. 16-CV-5226, 2017 WL 5559030, *6 (E.D.N.Y. March 16, 2017) ("The weight of authority suggests that a plaintiff need only show that *one* of defendants' predicate acts proximately caused its injury.").

The plaintiffs have not met that burden, nor have they alleged "clear and definite" injuries proximately caused by the curriculum-related fraud scheme. In Schedule A, many of the plaintiffs rely upon the same conclusory statement of harm: "Financial harm including, by paying tuition and membership fees for NXIVM courses, programs and groups." Schedule A at 3.[24]

This does not tell us that any plaintiff was victimized by the fraud scheme that is actually alleged: that they took *extra* courses, for example, beyond what they were led to believe would be required to complete the program in reliance upon the fraudulent statements. Each plaintiff bears the burden of alleging not only that they paid tuition and membership fees, but also that they did so *because* of the fraud (or would not have, apart from the fraud). *See Motorola Credit Corp. v. Uzan*, 322 F.3d 130, 135 (2d Cir. 2003) ("[A RICO] plaintiff must demonstrate . . . causation of the injury by the violation.").

Thus, each of the plaintiffs continuing to assert mail and wire fraud allegations against Clare must supplement his or her "Injury Type" information on Schedule A to describe fraud-induced injuries with the "clear and definite" allegations that RICO standing demands. These plaintiffs should take note first

---

[24] This is true, for example, of Deanne Brunelle, *id.* at 2, Madeline Carrier, *id.* at 3, Tabitha Chapman, *id.*, Owen Giroux, *id.* at 6, Polly Green, *id.* at 6, Rees Alan Haynes, *id.* at 7, Susan Pratt, *id.* at 14, Susan Patricia Vieta, *id.* at 16, and Susan Wysocki, *id.* at 17.

of the allegations that this order holds (above) are non-actionable under the mail and wire fraud statutes.  The revised Schedule A shall be filed within 60 days of the date this order issues.

### ii.  Sara Bronfman

As to Sara, too, the plaintiffs adequately allege two RICO predicate acts: mail and wire fraud, *see* Section III.A.3.b.iv, and witness tampering (in relation to Adrian), Section III.A.3.b.ii.  Adrian does not allege (at all, let alone plausibly) that he was injured in his business or property by the witness tampering — indeed, his allegations suggest a financial benefit: that Sara induced him to go to France "in exchange for substantial sums of money."  Compl. ¶ 214.  As to the curriculum fraud predicate (which is effectively identical as to both Sara and Clare), the plaintiffs' allegations of injury suffer from the same deficiencies described above.

## B.  RICO Conspiracy (Count II)

"[T]o state a RICO conspiracy, a plaintiff must allege the existence of an agreement to violate RICO's substantive provisions."  *Williams v. Affinion Grp., LLC*, 889 F.3d 116, 124 (2d Cir. 2018).  However, "[t]he RICO conspiracy statute [] broadened conspiracy coverage by omitting the requirement of an overt act."  *Salinas v. United States*, 522 U.S. 52, 64 (1997).  Rather, "the core of a RICO civil conspiracy is an agreement to

commit predicate acts," *Hecht v. Commerce Clearing House, Inc.*, 897 F.2d 21, 25 (2d Cir. 1990), which is to say that each defendant "knew about and agreed to facilitate" the pattern of racketeering activity." *Baisch v. Gallina*, 346 F.3d 366, 377 (2d Cir. 2003).

Nonetheless, "injury from an overt act is necessary and sufficient to establish civil *standing* for a RICO conspiracy violation." *Hecht*, 897 F.2d at 25. Accordingly, although the plaintiffs need not plead that each defendant committed an overt act in furtherance of the Section 1962 conspiracy, to recover under Section 1964(c) they still must each allege injury.

So, when the existence of a RICO enterprise has been established, the only question (prior to the standing analysis) is whether "the defendant knew of, and agreed to, the general criminal objective of a jointly undertaken scheme," i.e. the enterprise purpose. *United States v. Arlington*, 941 F.3d 24, 36-37 (2d Cir. 2019). Here, the RICO enterprise is alleged to have had effectively three intertwined purposes: to accumulate money and unpaid labor through NXIVM's fraudulent curriculum scheme, to "cultivate a pool of foreign laborers to support" NXIVM, and to "groom women for sexual conduct with and for Raniere." Compl. ¶ 199.

Perhaps because Raniere was in fact convicted of RICO and RICO conspiracy, the moving defendants focus their attention

on the question of whether the plaintiffs have adequately

alleged that each defendant agreed to join in a RICO conspiracy.

1. <u>Clare Bronfman</u>

The plaintiffs adequately allege that Clare agreed to

join the charged conspiracy.  The complaint alleges that she

manifested the requisite agreement by her actions — including,

among other things, "accumulating a suite of positions in the

Enterprise that allowed her *de facto* power to operate and

control various important aspects of the Enterprise,"

"encouraging a sham marriage to facilitate the violation of

immigration law," and "pressuring witnesses and victims to

retain counsel that she would pay for" so that she and NXIVM

could control them "to intimidate and silence victims of

Raniere's brutal campaign of sexual abuse and exploitation."

Compl. ¶ 240.  As discussed above, the complaint also adequately

alleges that Clare committed predicate acts of immigration fraud

and mail and wire fraud.

Considering the full set of allegations against her,

the plaintiffs raise a plausible inference that Clare agreed to

join a racketeering scheme with the intent that its overall

goals be effectuated, and that the scheme involved two or more

predicate acts.  *See New York Dist. Council of Carpenters*

*Pension Fund v. Forde*, 939 F. Supp. 2d 268, 282 (S.D.N.Y. 2013)

("[A] defendant's agreement to join a conspiracy can be inferred

from circumstantial evidence of the defendant's status in the enterprise or knowledge of the wrongdoing.").  While the complaint includes many conclusory allegations against Clare, it nonetheless pleads specific facts sufficient to support an inference of such agreement.  *See U.S. Fire Ins. Co. v. United Limousine Serv., Inc.*, 303 F. Supp. 2d 432, 454 (S.D.N.Y. 2004) (denying motion to dismiss RICO conspiracy claim where the complaint's "conclusory statements [were] buttressed by . . . more specific allegations"); *Bd. of Managers of Trump Tower at City Ctr. Condo. by Neiditch v. Palazzolo*, 346 F. Supp. 3d 432, 464 (S.D.N.Y. 2018) (same).  Accordingly, this claim survives (pending the submission of the revised Schedule A discussed above to establish RICO standing).

   2.  <u>Sara Bronfman</u>

        The complaint adequately alleges that Sara, too, manifested her agreement to join the conspiracy.  Like Clare, Sara "accumulate[ed] positions in the Enterprise that were accompanied by *de facto* power to operate and control" NXIVM. Compl. ¶ 241.  She "financed the Enterprise," and "purchas[ed] multiple properties used as NXIVM's headquarters" and offices. *Id.*  And after the scheme was revealed publicly, she obstructed prosecution of it by paying "Adrian to travel to France during Raniere's trial" rather than testifying.  *Id.*

As with Clare, the "circumstantial evidence of [Sara's] status in the enterprise" is sufficient at this stage to infer her "agreement to join [the] conspiracy." *New York Dist. Council of Carpenters Pension Fund*, 939 F. Supp. 2d at 282; *see also United States v. Teitler*, 802 F.2d 606, 614 (2d Cir. 1986) (jury could "reasonably infer" defendant's agreement to participate in RICO conspiracy from, among other things, his "status as a partner in the Teitler firm" and "testimony concerning [his] role in the firm").

Here, the complaint alleges that Sara obtained senior positions across the NXIVM entities because she was "funneling massive amounts of money into NXIVM." Compl. ¶ 30. She was a member of NXIVM's Executive Board, Senior Executive of ESP, Co-Founder of ESF, head of RCG, and Founder of NXIVM's VIP Programs. *Id.* Together with the allegations of her witness tampering and her knowing participation in RCG's endeavors, these allegations are sufficient to overcome the motion to dismiss the RICO conspiracy count against her (again, pending the revised Schedule A).

3. Brandon Porter

The plaintiffs also contend that Brandon Porter conspired to facilitate a racketeering scheme. His agreement to join the scheme is evidenced, the complaint alleges, by his having "conduct[ed] unauthorized human experiment[s]" —

"unscientific" treatments for Tourette's Syndrome and obsessive-compulsive disorder, Compl. ¶¶ 15, 84 — "to bolster NXIVM's scientific credibility and thereby increase its ability to amass recruits." *Id.* ¶ 246. The complaint also alleges that Porter was "acting as a paid agent or employee of ESF in connection with [that] experimentation." *Id.* Unlike Clare and Sara Bronfman, the complaint does not allege that Porter held a prominent role in NXIVM, obtained elevated status within the organization, or knew of the broader scheme at play. Porter's alleged role in the "human experiments," without more, is insufficient to show that he had knowledge of the curriculum fraud scheme or the scheme to extort unpaid labor, or that he participated in the overall scheme with the intent that its goals be effectuated. To infer agreement to join a RICO conspiracy, a defendant must at least "know the general nature of the enterprise" and "that the enterprise extends beyond his individual role." *United States v. Viola*, 35 F.3d 37, 44 (2d Cir. 1994). The plaintiffs' factual allegations do not support the plausible inference that Porter had such an awareness.

### 4. Danielle Roberts

Finally, the plaintiffs contend that Danielle Roberts is liable for RICO conspiracy. In a single paragraph, the complaint points to Roberts' role in "branding DOS victims' pubic regions without their informed consent" and her

"continuing [promotion of] DOS well-after the details of DOS-related crimes came to light" as evidence of her agreement to join the racketeering scheme.  Compl. ¶ 245.  The complaint also alleges that Roberts admitted to a New York State medical review board that she "purchased the electrocautery device, that she knew that the brand was KAR to represent Raniere's initials, and that Raniere was the grandmaster to the [DOS] members who were his slaves."  *Id*. ¶ 122.

Again, however, it is not sufficient to allege that Roberts committed some act that furthered the conspiracy. Plaintiffs must plausibly allege that she joined in the scheme "with the intent that its *overall goals* be effectuated."  *United States v. Zemlyansky*, 908 F.3d 1, 11 (2d Cir. 2018) (emphasis added).

Here again, the plaintiffs do not allege that Roberts knew of the curriculum fraud or any immigration-related violations.  And as discussed above, the civil RICO statute does not reach personal injuries — only injuries to business or property.  Thus, Roberts' discrete acts underlying a given medical procedure — no matter how medically unjustified — do not suffice.  As with Porter, the plaintiffs have failed to allege facts suggesting Roberts' knowledge of the "general nature of the enterprise" and "that the enterprise extend[ed] beyond [her]

individual role." *Viola*, 35 F.3d at 44.  The RICO conspiracy

claim against her is therefore dismissed.[25]

## C.    Human Trafficking Under the TVPRA (Count III)

Nineteen plaintiffs[26] also bring claims pursuant to the

Trafficking Victims Protection Reauthorization Act of 2008

("TVPRA") — specifically, 18 U.S.C. § 1595, which provides a

private civil action for victims.  Defendants Clare, Sara,

Porter, and Roberts move to dismiss these claims on the bases

that the complaint does not adequately allege their direct

violation of, participation in, knowledge of, or benefits

received from any Chapter 77 violation, as addressed further

below.

Plaintiffs can, as a general matter, assert a TVPRA

claim in two ways.  They can allege a "direct" claim — that is,

that a given defendant was the "perpetrator" of a violation of

any provision in Chapter 77 of Title 18, which covers sex

trafficking, forced labor, and human trafficking.  18 U.S.C.

§ 1595(a).  Or they can allege that a defendant satisfied the

---

[25] Moreover, the plaintiffs allege no specific facts regarding Roberts'
continued "promot[ion]" of DOS, and cite no law for the proposition that one
can agree to join a conspiracy by promoting (or defending) that organization
after its members are charged.

[26] All plaintiffs allege these Chapter 77 violations as RICO predicate
acts.  The plaintiffs who bring them as standalone claims are the "exo / eso
Plaintiffs," the "DOS plaintiffs," Daniela, Camila, and Adrian.  The thirteen
DOS Plaintiffs are Sarah Edmonson, Jessica Salazar, India Oxenberg, Soukiana
Mehdaoui, Rachel, Nicole, Valerie, Jane Doe 8, Paloma Pena, Jane Doe 9,
Kristin, Veronica Jaspeado, and Charlotte.  The three exo / eso Plaintiffs
are Lindsay MacInnis, Adrienne Stiles, and Bonnie Piese.  Compl. ¶¶ 257, 259.

three elements of a "beneficiary" claim — that (a) the defendant knowingly benefitted, or attempted or conspired to benefit, (b) from "participation in a venture," that (c) the defendant "knew or should have known has engaged in" a Chapter 77 violation. *Id.* A defendant accused of a beneficiary violation does not need to benefit financially — she can benefit either "financially *or* by receiving anything of value." *Id.* (emphasis added). Here, the various plaintiffs bring claims for both direct and beneficiary liability. On the beneficiary liability claims, the plaintiffs rely substantially on Raniere's convictions for forced labor conspiracy, sex trafficking conspiracy, sex trafficking, and attempted sex trafficking. *See* Judgment as to Keith Raniere, No. 18-CR-204, ECF No. 969 at 2.

As set forth below, while the complaint adequately pleads that NXIVM was a "venture" for purposes of the TVPRA, the plaintiffs have not sufficiently alleged that any moving defendant directly violated Chapter 77; they have, however, sufficiently alleged beneficiary liability for Clare and Sara as to certain claims.

### 1. The Alleged Venture

The TVPRA defines a "venture" as "any group of two or more individuals associated in fact, whether or not a legal entity." 18 U.S.C. § 1591(e)(6). The complaint alleges that "NXIVM was not only a RICO enterprise, but also a trafficking

'Venture' designed to groom and procure women for Defendant Raniere's sexual predation and to provide free labor and services to members of the Venture." Compl. ¶ 249. "All Individual Defendants," the plaintiffs assert, "participated in the Venture," which "was led by Defendant Raniere." *Id.* For the same reasons that the complaint adequately alleges that NXIVM's senior leadership was an association-in-fact enterprise, *see* Section III.A.1 above, it also sufficiently pleads that the group was a venture for purposes of the TVPRA.

   2.   Count 3(A): Sex Trafficking and Attempted Sex Trafficking

First, the complaint alleges direct TVPRA claims against Raniere, Clare, Roberts, Russell, and Mack. These claims are based on allegations that each of these defendants committed two Chapter 77 violations — both sex trafficking and attempted sex trafficking, in violation of 18 U.S.C. §§ 1591 and 1594(a), respectively. Compl. ¶ 250. Only Clare and Roberts have moved to dismiss these claims.

To plead a direct violation under Section 1591, the complaint must allege that the defendant:

(1) "in or affecting interstate or foreign commerce";

(2) recruited, enticed, harbored, transported, provided, obtained, or maintained by any means a person;

(3) "knowing, or in reckless disregard of the fact,
that means of force, threats of force, fraud, coercion
. . . or any combination of such means will be used";

(4) "to cause the person to engage in a commercial sex
act."

18 U.S.C. § 1591(a); *see also Noble v. Weinstein*, 335 F. Supp.

3d 504, 515 (S.D.N.Y. 2018).  The modifier "commercial" is

defined broadly to encompass more than the payment of money.[27]

In the alternative, the complaint asserts beneficiary

claims under Section 1591.  These claims require a given

plaintiff to establish that the defendant in question knowingly

*benefitted* from their participation in NXIVM's senior

leadership, knowing the organization to have "engaged" in a

violation of Section 1591 (or when they "should have" known as

much).  *See S.J. v. Choice Hotels Int'l, Inc.*, 473 F. Supp. 3d

147, 152-53 (E.D.N.Y. 2020).  Thus, a complaint adequately

pleaded a Section 1591 violation against a priest (Father

Carrier) who "ignored evidence" that Douglas Perlitz, the

founder of a school for poor children in Haiti, was sexually

abusing students.  The complaint alleged

that Father Carrier . . . was a frequent visitor to
PPT where he stayed in Perlitz's home, that he was in

---

[27] As the Second Circuit explained in rejecting Raniere's criminal
appeal, a "commercial sex act" is "any sex act, on account of which anything
of value is given to or received by person," where "value" refers to "a
subjective, rather than objective, concept."  *United States v. Raniere*, 55
F.4th 354, 362 (2d Cir. 2022).  As a result, "anything of value" has does not
require a "monetary or financial component," and a "commercial sex act" is
not just one conducted for profit, but rather for anything of subjective
value.  *Id.*  It is a deliberately "expansive understanding of the phrase."
*Id.* at 361.

Perlitz's bedroom when Perlitz showed a pornographic video to a PPT student, and that he shunned a Haitian administrator at PPT after she tried to stop Perlitz's sexual abuse of PPT students.

*Jean-Charles v. Perlitz*, 937 F. Supp. 2d 276, 280 (D. Conn. 2013). Carrier also "knew at least one PPT student was living at Perlitz's home." *Id.* at 288. These allegations rendered it plausible that Carrier's employer knew or "should have known" that the school was violating Section 1591. *Id.*

On the other hand, allegations that hotel franchisors "were generally aware that sex trafficking sometimes occurred on their franchisees' properties" were insufficient to state a claim for beneficiary liability absent knowledge (or at least constructive knowledge) of the particular trafficking scheme at issue. *Choice Hotels*, 473 F. Supp. 3d at 154 (describing those allegations as supporting only a "might have been able to guess" scienter standard); *see also Does 1-6 v. Reddit, Inc.*, 51 F.4th 1137, 1145 (9th Cir. 2022) ("Mere association with sex traffickers is insufficient absent some knowing participation in the form of assistance, support, or facilitation.").

For the reasons that follow, the complaint states a Section 1595 claim for beneficiary liability against Clare, but fails to state such a claim against Danielle Roberts.

i.    Clare Bronfman

The plaintiffs allege that Clare is liable for sex trafficking offenses against the "exo / eso Plaintiffs," the "DOS Plaintiffs," Daniela, and Camila.[28]

*exo / eso Plaintiffs.*  First, the complaint alleges that "Clare perpetrated sex trafficking offenses against the exo / eso Plaintiffs" — Lindsay MacInnis, Adrienne Stiles, and Bonnie Piese — by "recruit[ing] them to join" that group. Compl. ¶ 257.  Clare did so, Plaintiffs allege,

> knowing or in reckless disregard of the fact that she would use fraud (false promises of a job, salary, and career advancement) or threats of serious harm (psychological and verbal abuse and, at times, threats of deportation) to groom or procure these Plaintiffs for Defendant Raniere and cause them to engage in commercial sex acts with him.

*Id.*

This passage describes a direct claim rather than a beneficiary claim.  And on that claim, the complaint is razor-thin.  The conclusory statement quoted above merely recites the elements of the offense (excluding the interstate-commerce element); the complaint proffers no specific facts to establish those elements.  *See Iqbal*, 556 U.S. at 678

---

[28] The thirteen DOS Plaintiffs are Sarah Edmonson, Jessica Salazar, India Oxenberg, Soukiana Mehdaoui, Rachel, Nicole, Valerie, Jane Doe 8, Paloma Pena, Jane Doe 9, Kristin, Veronica Jaspeado, and Charlotte.  The three exo / eso Plaintiffs are Lindsay MacInnis, Adrienne Stiles, and Bonnie Piese.

("[A] formulaic recitation of the elements of a cause of action will not do.").[29]  At no point does the complaint directly link any specific false promise, or any specific threat of serious harm, made by Clare herself to any commercial sex act involving MacInnis, Stiles, or Piese.  Accordingly, the direct claim fails.

*DOS Plaintiffs.*  Next, the DOS plaintiffs sufficiently allege a beneficiary claim against Clare.  They allege that "she knowingly benefited by receiving things of value, including enhanced status, power, and prestige within NXIVM, from participation in the Venture, which she knew or should have known was sex trafficking the DOS Plaintiffs."  Compl. ¶ 259. This trafficking occurred when the DOS plaintiffs were recruited (by Raniere, Mack, and Clyne) for the purpose of engaging in a "commercial sex act."  *Id.* ¶ 253.  As described above, Mack and Clyne allegedly misrepresented the nature of DOS to induce these plaintiffs to provide "damaging collateral," and they and Raniere would then "threaten explicitly or impliedly to release that collateral" if the DOS plaintiffs did not "engage in commercial sex acts with [Raniere] and others."  *Id.*

---

[29] The complaint also alleges no facts to establish the interstate-commerce element with respect to Stiles and Piese.  Although the burden to plead this element is "minimal," *United States v. Celaj*, 649 F.3d 162, 168 (2d Cir. 2011), the complaint still must offer sufficient facts to meet that burden.  *See Noble v. Weinstein*, 335 F. Supp. 3d 504, 515 (S.D.N.Y. 2018) ("To state a claim under 18 U.S.C. § 1591," a plaintiff "must adequately plead," among other things, that the conduct implicated "interstate or foreign commerce.").

The plaintiffs adequately allege that Clare "should have known" about this coercive recruiting. Constructive knowledge is an intensely fact-based assessment, and obviously presents a meaningfully lower hurdle than a requirement to show actual knowledge. Given the absence of any factual record, the claim may proceed at this stage. Plaintiffs allege, among other things, that Raniere and the "DOS First Line Masters (including Mack and Clyne)" were jointly responsible for the coercive recruitment of DOS members, and Clare "was a member of the Inner Circle (which included Mack and Clyne)." *Id.* ¶ 259. Further, they contend that Clare's knowledge can be inferred from her "false campaigns against DOS defectors, who came to her for the release of their collateral," and her alleged disclosure to "a reporter that there was a video of Plaintiff Edmonson's [*sic*] branding, further demonstrates that she knew or should have known about the sex trafficking offenses within DOS when they occurred." *Id.* ¶ 259. At this stage, these allegations suffice to state a claim for beneficiary liability against Clare pursuant to Section 1595.

*Veronica Jaspeado.* Whereas the plaintiffs allege only beneficiary claims against Clare in connection with the other DOS Plaintiffs, they allege that Clare also attempted to traffic Veronica Jaspeado directly. Per the complaint, Clare personally "funneled Veronica Jaspeado . . . to DOS by encouraging her to

join exo / eso.  Although Clare's attempts were unsuccessful,

Veronica was later recruited into DOS by a First Line DOS

Master."  Compl. ¶ 162.  The complaint asserts that

> [b]ased on Bronfman's leadership of exo / eso, her
> interactions with Veronica, her proximity to Raniere,
> her defense of DOS, and attacks on DOS victims after
> DOS was made public . . . , it is reasonable to infer
> that when Clare attempted to recruit Veronica into exo
> / eso she intended for Veronica to engage in sex acts
> with Raniere and knew that she and members of the
> Inner Circle would use extortive means to procure
> uncompensated labor and commercial sex acts from her.

*Id.* ¶ 166.  These unsupported allegations, which sound in guilt

by association, are inadequate to raise a plausible inference

that Clare attempted to sex traffic Jaspeado.  *See, e.g.*, *United*

*States v. Zhong*, 26 F.4th 536, 558 (2d Cir. 2022) ("Evidence

that demonstrates only guilt by association is irrelevant to the

question of a defendant's actual guilt."); *De Sole v. Knoedler*

*Gallery, LLC*, 139 F. Supp. 3d 618, 657 (S.D.N.Y. 2015)

(rejecting plaintiffs' arguments as amounting "to nothing more

than guilt by association").  The complaint proffers no specific

facts describing how Clare supposedly "attempted to recruit

Veronica into exo / eso," let alone any facts evincing that she

intended to (or knew that others would) "use extortive means" to

compel Veronica to engage in anything, much less commercial sex

acts.  *See Twombly*, 550 U.S. at 555 ("Factual allegations must

be enough to raise a right to relief above the speculative

level.").  For these reasons, this claim must be dismissed.

*Camila & Daniela.*  Finally, the plaintiffs allege that Clare is liable as a beneficiary for the sex trafficking of both Camila and Daniela.  The complaint states that Clare "knowingly benefited by receiving things of value, including enhanced status, power, and prestige within NXIVM, from participation in the Venture, which she knew or should have known sex trafficked Camila and Daniela."  Compl. ¶ 260.  In particular, the plaintiffs allege, Raniere "recruited" and "harbored" Daniela and Camilla by promising them "a job, salary, education, and legal immigration status" should they "submit to Defendant Raniere's demands."  *Id.* ¶ 255-56.  The plaintiffs say that Clare knew or should have known that Raniere recruited and harbored Daniela and Camila "to engage in commercial sex acts with him."  *Id.* ¶ 260.  This knowledge (or constructive knowledge), the plaintiffs contend, is "evidenced by facts including her leadership roles and power within NXIVM, her familiarity with Raniere and NXIVM's operations and Camila and Daniela, and that she paid an attorney to direct Camila not to cooperate with an FBI investigation into NXIVM."  *Id.*

These allegations, taken as a whole, are sufficient to state a plausible claim for Section 1595 beneficiary liability against Clare based upon constructive knowledge of Raniere's activities and her role in NXIVM's operations.

ii.  Danielle Roberts

The plaintiffs allege that Danielle Roberts, too, is liable as a beneficiary for sex trafficking offenses against the DOS Plaintiffs.  The complaint asserts that Roberts "knowingly benefitted by receiving things of value, including enhanced status, power, and prestige within NXIVM from participation in the Venture, which she knew or should have known was engaged in sex trafficking offenses."  Compl. ¶ 265.  But unlike Clare, Roberts is alleged to have had a relatively narrow role at NXIVM.  The complaint alleges that Roberts had actual or constructive knowledge of Raniere's offenses based on the fact that she "brand[ed] DOS members with [Raniere's] initials — a mark of their sexual servitude and Defendant Raniere's predation."  *Id.*  "No DOS Slaves," the plaintiffs claim, "gave voluntary, informed consent before being branded," and none "could have consented under the circumstances because each slave was branded under threat of the release of their collateral or punishment."  *Id.* ¶ 124.

To be sure, these allegations could suggest that Roberts participated in unlawful conduct — specifically, as addressed below, the allegedly coercive branding of DOS members is sufficient to sustain the plaintiffs' battery claims against Roberts.  *See infra* Section III.E.  But the complaint alleges no facts to bridge the gap between Roberts' knowledge of this

malfeasance and an awareness (or even constructive awareness) that the threats to release any recruit's "collateral" were connected to a commercial sex act.

The conclusory allegation that the branding was "a mark" of the recipients' sexual servitude says nothing about whether Roberts knew as much. And while the absence of informed consent may speak to why Roberts forfeited her medical license, *see* Compl. ¶ 120, it does not suggest her knowledge of sexual assault. (The plaintiffs do not allege that Roberts knew that the defendants' receipt of collateral or their threats to release it were related to a commercial sex act.)

In this regard, the allegations here are even more limited than those held insufficient in other cases. In *Eckhart v. Fox News Network, LLC*, for example, the plaintiff alleged that Fox News knew or should have known that a former anchor at the network subjected her to commercial sex acts including sexual assault and rape. No. 20-CV-5593, 2021 WL 4124616, at *11 (S.D.N.Y. Sept. 9, 2021). Fox should have known as much, she claimed, because it was "well aware" of the anchor's "inappropriate sexual misconduct," knew of his extramarital affair, and knew that he had "completed a sex addiction rehabilitation program at its request." *Id.* The plaintiff also alleged that it was an "open secret" that the anchor was "a serial harasser." *Id.* These allegations were insufficient to

establish that the network knew or should have known of the sex trafficking at issue.  *Id.*  Here, too, the plaintiffs have not adequately alleged defendant Roberts' knowledge of the alleged trafficking scheme.

   3.   Count 3(B): Conspiracy to Commit Sex Trafficking

      Certain plaintiffs also bring Section 1595 claims based on the predicate act of conspiracy to commit sex trafficking in violation of 18 U.S.C. § 1594(c), which provides for criminal liability for anyone "conspir[ing] with another to violate Section 1591."  As noted above, Raniere was convicted of sex trafficking conspiracy in violation of Section 1591. Judgment of Keith Raniere, No. 18-CR-204, ECF No. 969 at 2. These claims amount to allegations that the defendants here joined Raniere's conspiracy.  The plaintiffs asserting these claims are the "exo / eso Plaintiffs," the "DOS Plaintiffs," Daniela, and Camila; they assert the claims against Raniere, Clare, Mack, Roberts, and Russell.  Clare and Roberts have moved to dismiss the claims against them; Clare's motion is denied, but Roberts's motion is granted.

      To state a conspiracy claim, the plaintiffs must plead that "two or more persons entered into a joint enterprise for an unlawful purpose, with awareness of its general nature and extent."  *United States v. Torres*, 604 F.3d 58, 65 (2d Cir. 2010).  "The knowledge of the parties is relevant to a

conspiracy charge to the same extent as it may be for conviction of the substantive offense." *Id.* In the context of a TVPRA claim based on conspiracy to commit sex trafficking, the plaintiffs must allege "an actual agreement to participate in a sex-trafficking venture." *Doe 1 v. Deutsche Bank A.G.*, 671 F. Supp. 3d 387, 412 (S.D.N.Y. 2023). JP Morgan and Deutsche Bank's agreement to provide banking services for Jeffrey Epstein and "affiliated entities," for example, was insufficient to support the further inference that they agreed "to participate in a sex-trafficking venture." *Id.* That was so despite the plaintiff's allegations that the banks "knew, or recklessly disregarded" that their banking services "would assist" the sex-trafficking venture because the plaintiffs had inadequately alleged the banks' *agreement* to participate in sex-trafficking. *Id.*

i. Clare Bronfman

The plaintiffs do not adequately allege that Clare agreed to participate in a sex trafficking conspiracy. The complaint asserts that she "created exo / eso with Raniere to obtain women for Defendant Raniere in furtherance of the Venture," which "evidence[s]" her "larger agreement" with the other individual defendants "to procure and groom the DOS Plaintiffs, the exo / eso Plaintiffs, Daniela, and Camila for commercial sex acts with Defendant Raniere." Compl. ¶ 267.

But this is a direct claim that Clare conspired to violate Section 1591, not a Section 1595 beneficiary claim. As such, the mens rea requirement is higher: the plaintiffs must allege that Clare actually knew about (and agreed to facilitate) Raniere's sex trafficking scheme — not that she merely should have known. *Compare* 18 U.S.C. § 1591 *with* 18 U.S.C. § 1595. The complaint proffers no facts to support its bare declaration that Clare created exo / eso "to obtain women for Raniere." And it provides no basis to infer that Clare actually knew Raniere was coercing plaintiffs to participate in commercial sex acts with him, let alone that she formed exo / eso for that purpose. Faced with the higher mental-state requirement in Section 1591, this claim fails.

ii. Danielle Roberts

The plaintiffs also fail to adequately allege that Danielle Roberts agreed to participate in a sex trafficking scheme in violation of Section 1591. The complaint asserts that "Roberts branded DOS victims at the instruction of Defendant Raniere in furtherance of the Venture," and that this alone shows that she joined the "larger agreement" to commit sex trafficking. Compl. ¶ 267. As noted above, Roberts's role in branding DOS members does not indicate that she had knowledge of a sex trafficking scheme that victimized those members, or that she specifically agreed to facilitate such a scheme. As in *Doe*

*1 v. Deutsche Bank A.G.*, Roberts' relatively narrow conduct is insufficient to show that she agreed with Raniere to "assist his sex-trafficking venture." 671 F. Supp. 3d at 412. This claim against her therefore fails.

> 4. Count 3(C): Forced Labor and Human Trafficking, and <u>Attempted Forced Labor and Human Trafficking</u>

The TVPRA targets trafficking for forced labor as well as commercial sex acts. Nineteen plaintiffs[30] bring TVPRA claims against Raniere, Clare, Sara Bronfman, Mack, Porter, Roberts, and Russell based on the predicate offenses of forced labor and human trafficking, in violation of 18 U.S.C. §§ 1589 and 1590, respectively, and attempted forced labor and human trafficking, in violation of 18 U.S.C. § 1594(a). Clare, Sara, Porter, and Roberts have moved to dismiss the claims against them.

Section 1589 reads as follows:

(a) Whoever knowingly provides or obtains the labor or services of a person by any one of, or by any combination of, the following means —

> (1) by means of force, threats of force, physical restraint, or threats of physical restraint to that person or another person;

> (2) by means of serious harm or threats of serious harm to that person or another person;

---

[30] The DOS plaintiffs, exo / eso plaintiffs, Daniella, Camila, and Adrian bring this claim against Raniere and Clare. Compl. at 95, 98. Camila alone brings this claim against Sara and Porter. *Id.* at 97, 102. Plaintiffs Nicole, Oxenberg, Mehdaoui, Salazar, Rachel, Valerie, and the DOS plaintiffs bring this claim against Mack. *Id.* at 100. The DOS plaintiffs bring this claim against Roberts. *Id.* at 101. And Camila and the DOS plaintiffs bring this claim against Russell. *Id.* at 102.

(3)  by means of the abuse or threatened abuse of
             law or legal process; or

        (4)  by means of any scheme, plan, or pattern
             intended to cause the person to believe
             that, if that person did not perform such
             labor or services, that person or another
             person would suffer serious harm or physical
             restraint,

    shall be punished as provided under subsection (d).

18 U.S.C. § 1589.

        A forced labor violation can, in turn, constitute an
element of a human trafficking violation under Section 1590.  A
human trafficking claim arises when a defendant "knowingly
recruits, harbors, transports, provides, or obtains by any
means, any person for labor or services," 18 U.S.C. § 1590(a),
"in violation of the statutes prohibiting, *inter alia*, forced
labor."  *Adia v. Grandeur Mgmt., Inc.*, 933 F.3d 89, 94 (2d Cir.
2019).  Thus, when a human trafficking claim is predicated on a
failed forced labor claim, the human trafficking claim will fail
as well.

        As set forth below, the plaintiffs do not adequately
plead a forced labor violation against Porter or Roberts;
however, some of the beneficiary claims against Clare and Sara
are adequately pled.

i.  Clare Bronfman

The plaintiffs assert TVPRA claims based on predicate acts of forced labor and human trafficking against Clare on behalf of the exo / eso Plaintiffs, the DOS Plaintiffs, Adrian, Camila, and Daniela.

*exo / eso Plaintiffs.*  The complaint first alleges that Clare is liable for forced labor and human trafficking violations against the exo / eso Plaintiffs.  The plaintiffs contend that she "provided and obtained" their "uncompensated labor and services (the establishment of a company, administrative and menial work, and personal assistant work) by means of serious harm (sleep deprivation, psychological, and verbal abuse) and in some cases by means of the abuse or threatened abuse of law or legal process (the threat of deportation)."  Compl. ¶ 280.  They also allege that "Raniere and Clare told [MacInnis, Piese, and Stiles] that that they would own and operate exo / eso and divide the profits generated by the company between themselves," but "ownership of exo / eso was not transferred to them, and they never received a share of the profits."  *Id.* ¶ 95.

The allegations concerning MacInnis do not make out a forced-labor claim against Clare.  The complaint alleges that "MacInnis participated in exo / eso only because of her compromised immigration status, orchestrated by Clare and

Raniere," and that "[a]s part of her participation in exo / eso, she performed uncompensated labor, namely participating in meetings with Raniere, creating the training for exo / eso, and teaching exo / eso classes, while Clare subjected her to emotional and verbal abuse." *Id.* ¶ 96.

These allegations fail to show that Clare obtained MacInnis's labor "by means of" (1) "force [or] threats of force, (2) "serious harm or threats of serious harm", (3) "abuse or threatened abuse" of the legal process, or (4) "any scheme . . . intended to cause [MacInnis] to believe that" someone would suffer serious harm or physical restraint if she did not perform such labor. 18 U.S.C. § 1589(a). The term "serious harm" in Section 1589(a)(2) means:

> any harm, whether physical or nonphysical, including psychological, financial, or reputational harm, that is sufficiently serious, under all the surrounding circumstances, to compel a reasonable person of the same background and in the same circumstances to perform or to continue performing labor or services in order to avoid incurring that harm.

18 U.S.C. § 1589(c)(2).

MacInnis makes her allegations under the umbrella of the "serious harm" prong of Section 1589, pointing both to "emotional and verbal abuse" and threats of deportation to fulfill the statute's requirements. Neither allegation suffices.

First, the non-specific allegation that Clare subjected MacInnis to "emotional and verbal abuse" is plainly insufficient to plead a threat of serious harm; indeed, it does not even suggest the making of a threat.

And second, while threats of deportation *can* constitute serious harm, *see Adia*, 933 F.3d at 93-94, the complaint does not allege sufficient facts to support MacInnis' claim that Clare made such threats here. *See* Compl. ¶ 257. Although the complaint states that Clare "intentionally compromised" MacInnis's immigration status by not paying her "a salary sufficient to satisfy the requirements of her visa," *id.* ¶ 76, it does not suggest that Clare threatened — explicitly or implicitly — to report MacInnis to immigration authorities if MacInnis failed to perform labor or services. Indeed, the only alleged threat of legal action — to enforce a "purported violation of a non-compete clause [MacInnis] had supposedly signed with NXIVM" — occurred *after* MacInnis had already "fled to Canada," her home country. *Id.* ¶¶ 76-77. MacInnis' forced labor claim therefore fails; as a result, so does her human trafficking claim.

Plaintiff Piese likewise fails to state a claim for forced labor or a human trafficking against Clare. The complaint alleges that "Piese was on call every hour of the day" while working for exo / eso, that she was "punished by Clare

when she was unavailable," and that she was "not paid for her first nine months of work for Ultima." *Id.* ¶ 97. The complaint says nothing about the nature of the alleged "punishment," and therefore insufficiently alleges serious harm or the threat thereof. As a result, Piese's forced labor claim fails, and her human trafficking claim necessarily falls with it.

Stiles' forced labor claim fails for similar reasons. The complaint alleges only that Stiles "reported directly to Clare," that her responsibilities "were so demanding that she quit her full-time job," and that she did not receive pay "for her first year of work." *Id.* ¶ 98. It does not allege that Clare threatened any serious harm or legal action against Stiles to procure her labor or services. For these reasons, Stiles' forced labor claim fails; her human trafficking claim necessarily fails with it.

*DOS Plaintiffs.* The plaintiffs assert that Clare is liable as a beneficiary for forced labor and human trafficking violations against the DOS Plaintiffs. These plaintiffs allege that "DOS First Line Masters and Defendant Raniere were forcing the DOS Plaintiffs to perform menial tasks, acts of care, and commercial sex acts." *Id.* ¶ 281. Elsewhere, the complaint explains that "DOS slaves" were forced to "review and edit NXIVM course materials and transcribe numerous video presentations featuring Raniere and other members of the Inner Circle." *Id.*

¶ 117.  The plaintiffs contend that Clare "knowingly benefited" from this labor "by receiving things of value, including enhanced status, power, and prestige within NXIVM, from participation in the Venture, which she knew or should have known was engaged in labor trafficking offenses."  *Id.* ¶ 281.

The plaintiffs submit that Clare had actual or constructive knowledge of their forced labor "because she was a member of the Inner Circle who was in close and constant contact with other members of the Inner Circle, including Defendants Mack and Clyne and Raniere."  *Id.*  Such knowledge is further "evidenced by the fact that she launched legal campaigns against DOS defectors who came to her for the return of their collateral."  *Id.*  At this stage, these allegations are sufficient to support the plaintiffs' claim for beneficiary liability against Clare for her participation in Raniere's forced labor and human trafficking scheme, given the reduced mental-state requirement.

*Adrian.*  Further, the plaintiffs assert that Clare directly perpetrated forced labor and human trafficking offenses against Adrian.  They contend that "[s]he obtained his uncompensated labor and services (the establishment of a t-shirt company) by means of the abuse or threatened abuse of law or legal process (threat of deportation)," and "did this by means of a scheme, pattern, or plan, which caused Adrian to believe he

would be deported to Mexico should he fail to obey her every command." *Id.* ¶ 282.

While the complaint recites the elements of a forced labor offense, it alleges no specific facts to suggest that Clare threatened to report Adrian to the immigration authorities (or caused him to believe that he would be deported) if he failed to perform labor or services. Although deportation is a serious harm, *see Adia*, 933 F.3d at 93-94, the defendant must have at least "intended to make [the plaintiff] believe that he would be deported if he stopped working" for her. *Anora v. Oasia Pro. Mgmt. Grp., Ltd.*, No. 19-CV-11732, 2021 WL 11114539, at *2 (S.D.N.Y. Aug. 31, 2021). Here, however, the complaint alleges only that "[a]fter the Albany Times Union published a series of articles about NXIVM, Clare and other members of NXIVM leadership told Adrian to go into hiding so that he would not be discovered by reporters or immigration authorities because it would reflect poorly on Raniere and the NXIVM community if he were caught." *Id.* ¶ 70. In other words, the plaintiffs suggest that Clare encouraged Adrian to *avoid* deportation because she worried that his removal would harm NXIVM.

The complaint also asserts that "Clare and Raniere knew Adrian did not have the immigration status necessary to operate the [t-shirt] company, and that he would be unable to demand compensation or seek other employment for fear of

retaliation and deportation or arrest." *Id.* ¶ 68. Critically, however, it does not allege that Clare ever invoked that sentiment to Adrian, explicitly *or implicitly*. Thus, the plaintiffs have failed to support the allegation that Clare used the threat of deportation to compel Adrian to work without pay. *See Anora*, 2021 WL 11114539, at *2 ("[t]ellingly, [the plaintiff] does not describe any conversation in which [the defendant] encouraged him to continue working" for his firm to avoid deportation).

  *Camila & Daniela.* Finally, the plaintiffs assert that Clare is liable as a beneficiary for forced labor and human trafficking offenses against Camila and Daniela. The complaint alleges that "she knowingly benefited by receiving things of value, including enhanced status, power, and prestige within NXIVM, from participation in the Venture, which she knew or should have known labor trafficked Camila and Daniela." Compl. ¶ 284. "She knew or should have known the Inner Circle and Defendant Raniere were forcing Plaintiffs Daniela and Camila to perform menial tasks, administrative work, and commercial sex acts," the plaintiffs contend, "because she was a member of the Inner Circle who conspired to commit forced labor offenses and because she was in close and constant contact with other members of the Inner Circle and Raniere." *Id.*

As with the DOS Plaintiffs, Camila and Daniela's claims that Clare should have known of Raniere's forced labor scheme are plausibly pleaded at this stage and may proceed.

ii.  Sara Bronfman

Camila asserts a TVPRA claim against Sara based on predicate acts of forced labor and human trafficking, again in violation of Section 1589 and Section 1590(a).  She alleges two bases for liability: direct and beneficiary.  First, the complaint alleges that Sara herself "provided and obtained Plaintiff Camila's uncompensated labor and services (babysitting and teaching in RCG, which Defendant Sara Bronfman created and funded) by means of a scheme, pattern, or plan, which caused Plaintiff Camila to believe she would be deported should she fail to continue providing her uncompensated labor and services."  Compl. ¶ 278.  Second, that Sara "knowingly benefited financially or by receiving things of value, including free labor, enhanced status, power, and prestige within NXIVM, from participation in the Venture, which she knew or should have known labor trafficked Camila."  *Id.* ¶ 279.  Camila asserts that Sara had actual or constructive knowledge that she was subjected to forced labor "because [Sara] was the creator and funder of RCG, where Camila worked, and a member of the Inner Circle, in close and constant contact with Defendant Raniere and other members of the Inner Circle."  *Id.*

The first basis for liability — that Sara herself committed forced labor and human trafficking violations as to Camila — fails because it is pled entirely on a conclusory basis. Although the complaint alleges that Camila was "caused," "by means of a scheme, pattern, or plan," to "believe she would be deported should she fail to continue" providing free labor, it fails to explain what that scheme entailed. The complaint does not, for example, allege that Sara actually threatened to have Camila deported if she refused to perform free labor. It also fails to explain with any specificity what labor Sara benefitted from obtaining.

The second, beneficiary basis for this claim is, however, plausibly alleged at this stage and may proceed. Camila has plausibly pleaded — albeit barely — facts supporting the inference that Sara should have known Camila was subjected to forced labor and human trafficking by others, and benefitted from her work for NXIVM.

### iii. Brandon Porter

Further, Camila alleges that Brandon Porter is liable under the TVPRA as a beneficiary for the alleged forced labor and human trafficking violations against her in violation of Sections 1589 and 1590(a). She asserts that Porter "knowingly benefited financially or by receiving things of value, including payment, enhanced status, power, and prestige, and free

babysitting services from participation in the Venture." *Id.* ¶ 290. She also contends that "[h]e knew or should have known that members of the Inner Circle and Defendant Raniere were forcing Plaintiff Camila to perform menial tasks, commercial sex acts, administrative work, and babysitting because Camila provided babysitting services to his family." *Id.* That "[h]e was in regular contact with Camila, Raniere, and members of the Inner Circle and performed unauthorized experiments on Camila," also evidences such knowledge, per the complaint. *Id.*

But the mere fact that Camila babysat for Porter's family does not suggest that Porter knew or should have known that Camila was subjected to force or the threat of force, as required by Section 1589. Moreover, although the complaint elsewhere alleges that Porter conducted "studies for the treatments of OCD and Tourette's," it only alleges that those studies were performed upon plaintiffs Leviton, Constantino, and Cottrell — not Camila. *Id.* ¶ 84. Those allegations are not obviously connected to Camila's provision of free babysitting services to Porter, another member of the close-knit NXIVM community. Without some facts connecting the allegations, neither the allegation that he conducted unauthorized studies on other plaintiffs nor that Camila babysat for him suggest that Porter had actual or constructive knowledge that Camila was a victim of forced labor and human trafficking offenses. Nor does

the mere fact that he had "regular contact with Camila, Raniere, and members of the Inner Circle" without some facts providing context for that "contact." *Id.* ¶ 290. Unlike Clare and Sara, for example, it is not alleged that Porter was the head of ESF, RCG, or some other NXIVM entity through which Raniere conducted his affairs. Accordingly, the forced labor and human trafficking claims against Porter fail.

iv. Danielle Roberts

Finally, the DOS Plaintiffs assert that Danielle Roberts is liable under the TVPRA as a beneficiary of the alleged forced labor and human trafficking violations against them. Again, the complaint alleges that "she knowingly benefited by receiving things of value, including enhanced status, power, and prestige in NXIVM from participation in the Venture, which she knew or should have known labor trafficked the DOS Plaintiffs." *Id.* ¶ 289. It further alleges that Roberts "knew or should have known that DOS First Line Masters and Defendant Raniere were forcing the DOS Plaintiffs to perform menial tasks, acts of care, and commercial sex acts because she was a DOS member who was specially deputized by Raniere to brand DOS members with Keith Raniere's initials — a mark of their servitude to DOS and Raniere." *Id.* As noted above, the complaint alleges that "[n]o DOS Slaves gave voluntary, informed consent before being branded," and that none "could have

consented under the circumstances because each slave was branded under threat of the release of their collateral or punishment." *Id.* ¶ 124.

But just as the plaintiffs' allegation that Roberts branded DOS members is insufficient to show that she knew or even should have known that they were coerced for commercial sex acts, that allegation is also insufficient to show that Roberts should have known they were being coerced for free labor. The plaintiffs do not allege, for example, that the DOS Plaintiffs performed any free labor for Roberts, that Roberts ever witnessed the plaintiffs perform such labor for others, or that she was privy to information from which she could have inferred as much. The branding is undoubtedly salacious. But it does not support an inference of coercion to engage in forced labor. Accordingly, the forced labor and trafficking claims against Roberts must be dismissed.

5. Count 3(D): Conspiracy to Commit Forced Labor and <u>Human Trafficking</u>

The complaint also asserts claims for conspiracy to commit forced labor and conspiracy to commit human trafficking against Raniere, Clare, Sara Bronfman, Mack, Porter and Roberts, with regard to the DOS Plaintiffs, the exo / eso Plaintiffs, Adrian, Camila, and Daniela. These plaintiffs contend that the defendants' "agreement to perpetuate the forced labor crimes of

the Venture is evidenced by the facts alleged" throughout the

complaint, including:

> that the forced labor and human trafficking were
> committed as part of a single, cohesive scheme against
> similarly situated Plaintiffs (NXIVM recruits); that
> each of the DOS masters used the same methods to
> commit their violations; that there was a united
> attempt to cover up the Venture's forced labor crimes;
> and that all of the violations were committed at
> Raniere and his Inner Circle's direction.

*Id.* ¶ 292.  Again, there is no dispute that the NXIVM venture

engaged in a forced labor conspiracy, as Raniere was convicted

of participating in such a conspiracy.  Judgment of Keith

Raniere, No. 18-CR-204, ECF No. 969 at 2.  The issue is whether

the complaint adequately alleges that each defendant agreed to

join that conspiracy in direct violation of Section 1589.

Clare, Sara, Porter, and Roberts have moved to dismiss the

claims against them.  Those motions are granted.

      As discussed above, however, the plaintiffs fail to

state a *direct* claim for substantive violations of forced labor

and human trafficking against the moving defendants (Clare,

Sara, Porter, and Roberts) because they do not adequately allege

that any of those defendants had actual knowledge of such

violations.  The failure to plead such knowledge is likewise

fatal to the conspiracy claims.  *See Torres*, 604 F.3d at 65

("The knowledge of the parties is relevant to a conspiracy

charge to the same extent as it may be for conviction of the

substantive offense."). Furthermore, the complaint does not set forth allegations sufficient to support the additional inference that the moving defendants *agreed* to join a conspiracy to commit forced labor offenses, or a conspiracy to commit human trafficking offenses (even if they had knowledge of such offenses). *See Doe 1*, 671 F. Supp. 3d at 412. Accordingly, the conspiracy claims as to those defendants must be dismissed.

6. Count 3(E): Document Confiscation in Furtherance of Trafficking or Forced Labor

Daniela also alleges claims against Raniere and Clare based on the predicate act of unlawful conduct with respect to documents in furtherance of forced labor, in violation of 18 U.S.C. § 1592. That section creates liability for anyone who "confiscates" or "possesses" another person's passport or other immigration document in the course of, or with intent to violate, various provisions in Chapter 77, or

> to prevent or restrict or to attempt to prevent or restrict, without lawful authority, the person's liberty to move or travel, in order to maintain the labor or services of that person, when the person is or has been a victim of a severe form of trafficking in persons, as defined in section 103 of the Trafficking Victims Protection Act of 2000.

*Id.* § 1592(a)(3). In support of this allegation, the complaint recites that "Raniere ordered the confiscation" of "Daniela's government identification documents and/or immigration papers" "and ordered her confinement to a room for two years . . . with

the intention and purpose of forcing her to perform labor, including secretarial work like writing letters." Compl. ¶ 293. The plaintiffs allege that Clare benefited from that conduct "by receiving things of value, including enhanced status, power, and prestige within the NXIVM organization from participation in the Venture, which she knew or should have known was engaged in unlawful conduct with respect to Daniela's documents." *Id.* ¶ 294. They allege that Clare knew of the document confiscation "because she was Defendant Raniere's most trusted advisor, funder, the head of legal for NXIVM, and because she was a member of the Inner Circle who was in close and constant contact with other members of the Inner Circle and Raniere." *Id.*

Again, this bare (and generic) reference to Clare's relationship with Raniere does not plausibly suggest that Clare had actual knowledge of Raniere's actions in respect of Daniela's documents. The mere facts of her close relationship with Raniere and membership in his inner circle are insufficient to suggest that she knew that he confiscated Daniela's immigration papers; the plaintiffs rely exclusively on her close association with Raniere to import her knowledge. The complaint alleges no other facts to show that Clare had such knowledge — that she witnessed, was told of, or assented to Raniere's conduct. Accordingly, this claim must be dismissed as against Clare.

7. Count 3(F): Conspiracy to Engage in Unlawful Conduct with Respect to Documents in Furtherance of Trafficking or Forced Labor

Finally, Daniela alleges that Raniere and Clare conspired to commit an offense under 18 U.S.C. § 1592, in violation of Section 1594(b). This, too, is in relation to the confiscation of Daniela's immigration documents: the complaint states that "members of the Inner Circle, including Clare, at the direction of Raniere agreed and conspired to hold Plaintiff Daniela captive in a room and confiscate her identification papers." *Id.* ¶ 295.

Again, the allegations in support of Clare's knowledge are sparse. "Bronfman's knowledge and participation in this conspiracy," the plaintiffs submit, "is evidenced by the facts alleged herein, including her leadership role in NXIVM's immigration fraud schemes." *Id.* Because this allegation again relies primarily on a theory of guilty-by-association, it falls far short of raising a plausible inference that Clare entered an agreement with Raniere and others to confiscate Daniela's immigration papers for the purpose of obtaining forced labor from her. Thus, this claim as to Clare must be dismissed.

**F. Malicious Prosecution & Abuse of Process (Count IV)**

Toni Natalie asserts claims of malicious prosecution and abuse of process against Keith Raniere, Clare, and Sara

Bronfman.  For the following reasons, she has not adequately
alleged either claim against any defendant.

   1.   <u>Malicious Prosecution</u>

        Under New York law, to establish a malicious
prosecution claim, "a plaintiff must prove (1) the initiation or
continuation of a criminal proceeding against plaintiff;
(2) termination of the proceeding in plaintiff's favor; (3) lack
of probable cause for commencing the proceeding; and (4) actual
malice as a motivation for defendant's actions." *Manganiello v.
City of New York*, 612 F.3d 149, 161 (2d Cir. 2010).  A plaintiff
must also plead "special damages with specificity." *Coggins v.
Buonora*, 776 F.3d 108, 111 (2d Cir. 2015).  Special damages must
entail "some concrete harm that is considerably more cumbersome
than the physical, psychological or financial demands of
defending a lawsuit," *Engel v. CBS, Inc.*, 711 N.E.2d 626, 631
(N.Y. 1999), and must amount to a "specific and measurable
loss." *Freihofer v. Hearst Corp.*, 65 N.Y.2d 135, 143 (1985).

        At the outset, the complaint fails to establish a
central element of malicious prosecution: that a criminal
proceeding was initiated against the plaintiff.  *See, e.g.*,
*Thompson v. Clark*, 596 U.S. 36, 51 (2022) (Alito, J.,
dissenting) ("[A] malicious-prosecution claim obviously requires
a prosecution.") (collecting treatises).  Similarly, Natalie has
not alleged that such a proceeding was "terminated" in her

favor. *Manganiello*, 612 F.3d at 161; *see also Bailey v. City of New York*, 79 F. Supp. 3d 424, 447 (E.D.N.Y. 2015) ("A malicious prosecution claim does not accrue until *an underlying criminal proceeding* terminates in plaintiff's favor.") (emphasis added).

Natalie's malicious prosecution claims therefore fail. Although the complaint alleges that Clare "repeatedly filed baseless criminal complaints against Natalie," Compl. ¶ 185, it does not allege that a single criminal proceeding was initiated against her, much less one that terminated in Natalie's favor.[31] Moreover, she has identified no "specific and measurable loss" she suffered. *Freihofer*, 65 N.Y.2d at 143; *see TADCO Const. Corp. v. Dormitory Auth.*, 700 F. Supp. 2d 253, 274 (E.D.N.Y. 2010) (dismissing malicious prosecution and abuse of process claims because plaintiff omitted to "identify actual losses" in a specified dollar amount).

## 2. Abuse of Process

An abuse-of-process claim requires allegations that the defendant "(1) employ[ed] regularly issued legal process to compel performance or forbearance of some act (2) with intent to

---

[31] Even if the complaint did allege a specific criminal proceeding initiated against Natalie, it still fails to demonstrate a lack of probable cause for Clare's criminal complaints or that they were motivated by malice. *See Manganiello*, 612 F.3d at 163. Indeed, beyond asserting (conclusorily) that Clare's criminal complaints were "baseless," the complaint does not even identify the nature of the charges, making it impossible to assess the facts underlying Natalie's claim. *See* Compl. ¶ 185; *see Iqbal*, 556 U.S. at 678 ("Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice" to state a claim.).

do harm without excuse of justification, and (3) in order to obtain a collateral objective that is outside the legitimate ends of the process." *Savino v. City of New York*, 331 F.3d 63, 76 (2d Cir. 2003). As with a malicious prosecution claim, a plaintiff must also plead special damages — in a specific dollar amount, and resulting from the conduct alleged to constitute abuse of process. *See Coggins*, 776 F.3d at 111. Here, too, the complaint fails to plead special damages (in any amount) and must be dismissed for that independent reason. *See, e.g.*, *TADCO Const. Corp.*, 700 F. Supp. 2d at 274.

Even if the complaint had pleaded special damages, it would still be dismissed because it relies on conclusory assertions and lumps the defendants together in "group pleading." *See Monterey Bay Military Housing, LLC v. Ambac Assurance Corp.*, 531 F. Supp. 3d 673, 728 (S.D.N.Y. 2021) ("It is well-established in this Circuit that plaintiffs cannot simply lump defendants together for pleading purposes."). The plaintiffs allege that Raniere, Clare, and Sara Bronfman "inserted themselves into" Natalie's bankruptcy proceeding, "commencing a series of adverse proceedings, each of which was ultimately dismissed on the merits"; that "Raniere and Clare directed this abuse of the legal system"; and that "Clare and Sara Bronfman financed these efforts." Compl. ¶¶ 297, 299. These allegations, which treat the defendants as a trio (or

group them in pairs), are inadequate. *See, e.g.*, *Breton v. City of New York*, 404 F. Supp. 3d 799, 812 (S.D.N.Y. 2019) ("It is not sufficient for a plaintiff to lump the three defendants together without pleading facts demonstrating what each did that makes him liable for the plaintiff's claims.").

## E.    Battery (Count V)

Plaintiffs Sarah Edmondson, Nicole, Paloma Pena, and India Oxenberg assert battery claims against Danielle Roberts. New York defines battery as "an intentional wrongful physical contact with another person without consent." *Tardif v. City of New York*, 991 F.3d 394, 410 (2d Cir. 2021). The complaint alleges that Raniere "specially commissioned Roberts to burn his initials onto some DOS slaves' skin with a cauterizing instrument without informed consent or anesthesia, while the victims were held down." Compl. ¶ 119. Roberts branded these plaintiffs "as part of the DOS ritual." *Id.* ¶ 302. The plaintiffs contend that "[a]s a member of DOS, Roberts knew that DOS members were not told that they would be branded when they were recruited into DOS, that they were not told that the brand was Raniere's initials, and that all DOS members had provided collateral and therefore could not consent to the branding." *Id.* ¶ 122.

These allegations are sufficient at this stage. The complaint raises a plausible inference the plaintiffs underwent

the branding only involuntarily, as they faced the "threat of the release of their collateral." *Id.* ¶ 124. A lack of consent "can be established" by "actual or implied threats." *Giuffre v. Andrew*, 579 F. Supp. 3d 429, 455 (S.D.N.Y. 2022). Similarly, "consent [] obtained by fraud . . . is the equivalent of no consent at all." *In re Small Smiles Litig.*, 109 A.D.3d 1212, 1214 (4th Dep't 2013). In Raniere's appeal, the Second Circuit held that the threatened release of collateral — the same threat alleged here — constituted "coercion" for purposes of proving a violation of 18 U.S.C. § 1591. *Raniere*, 55 F.4th at 366.

Even if the plaintiffs have not alleged that Roberts understood the full structure of the "collateral" scheme, she did not need to know that these plaintiffs were extorted for sex to know that they had not freely consented to the branding. The allegations plausibly suggest that their consent was obtained by coercion. The allegations on this claim, too, may be relatively cursory, but they are sufficient at this stage to proceed.

## H.   Gross Negligence and Recklessness (Count VII)

Finally, three plaintiffs — Margot Leviton, Isabella Constantino, and Caryssa Cottrell — accuse Clare, Sara, Porter, and Raniere of gross negligence. These claims arise out of Porter's "treatment" of the plaintiffs for OCD and Tourette's. Compl. ¶¶ 311-312.

To state a claim for gross negligence, "a plaintiff must establish four elements: (1) the existence of a duty; (2) a breach of that duty; (3) injury as a result thereof; and (4) conduct that evinces a reckless disregard for the rights of others or smacks of intentional wrongdoing." *Schwartzco Enterprises LLC v. TMH Mgmt., LLC*, 60 F. Supp. 3d 331, 355 (E.D.N.Y. 2014).

As set forth below, the complaint fails to state such a claim against Porter, Clare, or Sara.

1. Brandon Porter

Leviton, Constantino, and Cottrell allege that Porter performed "untested, unauthorized, and inherently risky psychotherapy and so-called studies" on them, ostensibly to treat their obsessive-compulsive disorder and Tourette's Syndrome. Compl. ¶¶ 82, 84, 312. They assert that these treatments lacked any scientific basis and that Porter failed to obtain informed consent for any study. *Id.* ¶¶ 83, 84.

This conduct, the three plaintiffs contend, breached a duty that Porter owed each of them. "As a medical doctor, Porter had a duty to uphold the accepted standard of care in his treatment" of those individuals, and "Porter breached this duty by failing to provide a standard of care that a reasonably prudent and careful doctor would provide under similar circumstances, which caused [them] to suffer injury." *Id.* ¶

310.  Those injuries including "post-traumatic stress disorder,"
"physical pain," and "mental anguish."  *Id.* ¶ 309.

Under New York law, "medical doctors owe a duty of
care to their patients."  *Rivera v. New York City Health &
Hosps. Corp.*, 191 F. Supp. 2d 412, 418 (S.D.N.Y. 2002).  Thus,
to the extent that Porter was treating Leviton, Constantino, and
Cottrell in his capacity as a medical doctor, as the complaint
alleges, he owed them a duty of care.

But the complaint does not adequately allege that
Porter breached his duty of care, or that he acted with reckless
disregard for the rights of others.  Indeed, the complaint does
not say anything at all about what Porter's treatments and
studies actually entailed him doing, or how his conduct caused
those injuries.

Leviton alleges that Porter subjected her to nightly
four-hour "'EM' questioning sessions," Compl. ¶ 84, but it does
not describe what those sessions consisted of, how they involved
reckless conduct by Porter, or how they led to Leviton's alleged
injuries.  And the complaint proffers no specific facts about
Porter's alleged treatment of Constantino or Cottrell.  The bare
allegations that Porter's methods were "untested, unauthorized,
and inherently risky" and "lacked scientific basis and informed
consent," *id.*, are insufficient, without supporting factual
content.  *Iqbal*, 556 U.S. at 678.

## 2.   Clare and Sara Bronfman

Leviton, Constantino, and Cottrell allege that Clare and Sara "had a duty of care to supervise" Porter because they controlled the non-profit organization ESF, which employed Porter.  Compl. ¶¶ 82, 86, 311; *see Kazanoff v. United States*, 945 F.2d 32, 36 (2d Cir. 1991) (defendants may have a "duty to control the conduct of third persons so as to prevent them from harming others" in the context of a "special relationship"). Whether they had this duty or not, this claim fails against both Bronfmans for the same reason it fails with respect to Porter: the other elements of the gross-negligence claim are insufficiently alleged.  Accordingly, these claims are dismissed.

## IV.  Conclusion

For the foregoing reasons, all claims against Brandon Porter are dismissed with prejudice.  The RICO, RICO conspiracy, and the TVPRA beneficiary claims against Clare and Sara Bronfman survive their motions to dismiss, but all other claims against both Clare and Sara are dismissed with prejudice, given that the plaintiffs have had two opportunities to amend their complaint with the benefit of extensive briefing from the defendants on its deficiencies.  Finally, while the battery claim against Danielle Roberts is sufficiently supported to withstand dismissal, the remaining claims against her are dismissed with

prejudice.  The plaintiffs are directed to file a revised Schedule A within 60 days of the date this order issues.

A status conference on the remaining claims shall be held at 11:30 AM on November 7, 2024, in Courtroom 6G North.


SO ORDERED.

/s/ Eric Komitee
ERIC KOMITEE
United States District Judge


Dated:    September 27, 2024
          Brooklyn, New York