**FILED**
**Jan 10, 2025, 1:18 PM**
**in the Clerk's Office**
**U.S. District Court,**
**EDNY, Brooklyn**
**Pro Se Office via**
**Electronic Submission**

**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**

_____

SARAH EDMONDSON, *et al.*　　　　　*

　　　　*

　　　　*

　　　　Plaintiffs,　　　　*

　　　　*　　1:20 - cv - 00485-EK-CLP

　　v.　　　　*

　　　　*

Keith Raniere, *et al.*　　　　*

　　　　*

　　　　Defendants.　　　*

_____*


**DEFENDANT DANIELLE ROBERTS' REPLY IN SUPPORT OF HER MOTION TO DISMISS COUNT V: BATTERY AND MOTION FOR JUDICIAL NOTICE PURUSANT TO 201(c)(2).**


**INTRODUCTION**

　　　　The Plaintiffs claim the Defendant's motion to dismiss is procedurally and substantively deficient is baseless. The Plaintiffs' opposition to the motion to dismiss the battery claim is without merit and must be rejected by the Court. The alleged incidents constituting Count V: Battery occurred up to June 2017, when the last of the four Plaintiffs alleging battery received her brand. This means that at the **latest,** the claim for battery had to be brought by June, 2018 to withstand a statute of limitations argument, which was not the case, as this suit was filed approximately a year and half after that. As such, the claim must be dismissed with prejudice. Further Defendant's motion should not only be granted, but Defendant should be permitted leave to amend her complaint with additional information for her counterclaims, or permitted to sever those claims and proceed as a Plaintiff based on those claims under a separate docket number before your honor once her motion is granted and she is no longer a Defendant in this matter.

**RELEVANT STATEMENT OF FACTS**

Defendant incorporates by reference all facts from her previously filed motion for sake of brevity. The last of the four Plaintiffs alleging battery received her brand on June, 2017 while the others were completed prior to this date; Plaintiff Edmondson in May 2017 and Plaintiffs Nicole and India in January of 2017 and finally Plaintiff Paloma in June 2017. Further, Plaintiffs went to the state authorities regarding their alleged battery and the authorities determined not to move forward with the complaint because they determined that the branding was consensual.

Then, a New York Times article was published internationally on October 17, 2017 alleging that the meaning of the brand was deceptive and that the branding "was criminal." This story was shared on thousands of different websites, magazines, and newspapers. There was no legal basis for this false claim, and it was contradicted by the previous findings by the police that there was no crime that occurred.

After the New York Times article, Federal and State agencies started investigations into the article's claims, yet no battery indictments were made against any of the criminal defendants or Roberts. However, the damage was done and the federal investigations commenced. The first indictments against Raniere and Mack were made on April 19th 2018 and did NOT include any battery charges related to the branding. In each case, there was no charge of battery. The remaining co-defendants were indicted on 7/23/2018. A superseding indictment was unsealed on July 24th 2018 (13 months AFTER the last branding and past the statute of limitations for battery and 18 months BEFORE this civil claim was made). The superseding indictment included all of the criminal trial defendants. This indictment did NOT include battery.

Edmonson and others brought their battery complaint to police in 2017. This is revealed in the October 17, 2017 New York Times article, "Inside a Secretive Group Where Women Are Branded" by Barry Meier. *"In July, Ms. Edmondson filed a complaint with the New York State Department of Health against Danielle Roberts, a licensed osteopath and follower of Mr. Raniere, who performed the branding, according to Ms. Edmondson and another woman. In a letter, the agency said it would not look into Dr. Roberts because she was not acting as Ms. Edmondson's doctor when the branding is said to have happened." "Separately, a state police investigator told Ms. Edmondson and two other women that officials would not pursue their criminal complaint against NXIVM because **their actions had been consensual**, a text message shows." (Emphasis added).* This shows that Edmonson and two other women tried to bring criminal charges related to the branding before Oct 2017, but this was rejected "because their actions had been consensual." Consensual physical acts are NOT battery, so no criminal action was taken against Roberts.

As such, the Plaintiffs had opportunity to bring a civil battery complaint after the State Police decided that the branding was consensual. They did not. The Federal Prosecutors did not take up their battery complaint. NY CPLR 215(8) does not apply to the battery complaint because 1) battery was never addressed in the criminal courts, 2) Defendant was never a Defendant in the criminal courts.

This initial civil complaint was entered in January of 2020, which was over a year and half after June, 2018, it's deadline. The proposed *Third* Amended Complaint was posted on April 3, 2023, which was now **almost five years** since June, 2018, and six years since the actual branding took place. This included serious Allegations - Count I: RICO, Count II: RICO

Conspiracy, Counts III A: Sex trafficking and attempted sex trafficking, B: Conspiracy to sex trafficking, C: Human trafficking and forced labor or attempted human trafficking and forced labor, D: Conspiracy to human trafficking and forced labor - for which there was no basis against Defendant. These counts were inadequate despite three amendments (*see* Dkt. 211 & 230). Count I: RICO was removed by Plaintiffs' counsel at the Status Conference on November 30th, 2021 because the only possible predicate act that was directly attributed to Roberts was Count V, Battery. Counts II-IV were found to have no basis on September 27, 2024 in The Court's Memorandum & Order (Dkt. 240) and were also dismissed.

Count V: Battery is now the only remaining count alleged against the Defendant in the Third Amended Complaint as of today. There has been no factual basis stated for a tolling of the relevant statute of limitations. Further, without possible connection to the now dismissed RICO charges, it became clear that the battery charge was time-barred.

## LEGAL ARGUMENT

### I.     Judicial Notice Must Be Taken Pursuant To 201(c)(2).

I humbly request that the court take Judicial Notice of the Judicial Notice rule 201(c)(2), which states, that the court "*must take judicial notice if a party requests it and the court is supplied with the necessary information*". Further, I am moving this court pursuant to 201(e) and (f) as well. 201(e) which states, "*(e) Opportunity to Be Heard. On timely request, a party is entitled to be heard on the propriety of taking judicial notice and the nature of the fact to be noticed. If the court takes judicial notice before notifying a party, the party, on request, is still entitled to be heard.*" Finally, as stated in the rule in 201(f), in relevant part in a civil proceeding "*the court **must** instruct the [fact finder] to accept the noticed fact as conclusive.*"

The facts I am asking the court take Judicial Notice of is "*New Evidence of Alleged FBI Malfeasance Emerges in Sex Cult Founder's Case*" Published Dec 23, 2024 at 5:00 AM EST <https://www.newsweek.com/fbi-nxivm-crime-sex-cult-keith-raniere-2004375> (Accessed last 1/9/2024). I am asking the court to take Judicial notice of the totality of the article itself, as well as the specific quotes:

> '"The search of 8 Hale (a property where Raniere had resided) was deliberately and fraudulently staged and that search scene collection photographs were also deliberately staged," wrote Mark Daniel Bowling, a former FBI agent and former agent for the Department of Energy's Office of Inspector General, one of the experts hired by Raniere's legal team.
>
> "Further, I agree that at least four of the nine search team members were complicit in this fraudulent conduct, with two of them as key orchestrators," he added. "During my nearly 20 years in the FBI, I have never seen a search executed with this level of corrupt and illegal behavior," added Bowling referring to the search on March 27, 2018.
>
> ...
>
> However, the experts now hired by the defense say in a report that the photo metadata had been changed to make it appear that Camila was under 18 when the pictures were taken, while Raniere's lawyers say she was a legal adult when a relationship began.
>
> ...
>
> ... It appears to me that the FBI has altered the images, or they have changed the evidence to fit their narrative."
>
> Sturgis worked as a digital forensic expert for law enforcement for 10 years and was trained by the U.S. Secret Service at the National Computer Forensic Institute. He said he was limited in his assessment because he didn't have access to the original evidence, but he knows the agents who drafted the defense's reports personally and by reputation and he believes them.
>
> Sturgis said he was surprised that the judge didn't give more credence to the report by the former FBI agents as part of the motion for a new trial and alongside the new search findings, in the motion to vacate the original sentence.
>
> ...
>
> on September 19, 2019, an FBI examiner took the camera card out of evidence control for "review" before CART had processed the evidence, according to court documents. This is a major violation of chain-of-custody standards, Kiper said.
>
> On the same day the camera card was accessed without a write-blocker, which meant it could have been manipulated, the experts said.'

These quotes show that 1) there may have been serious problems with the underlying evidence from the first case and 2) would go towards a RICO counterclaim for not only Defendant Roberts, but likely numerous other Defendants as well. Without the initial evidence in the criminal case, it is unlikely this civil case would have been initiated at all, and if that evidence was modified, then it brings into question the entire enterprise of the Criminal and Civil cases.

## II.        This Motion To Dismiss Must Be Granted Based on 12(c) or 12(b)(6)

The Plaintiffs' procedural objections are misplaced and must be disregarded. They are the last grasps from attorneys who realize their entire set of claims against Defendant Roberts were baseless, and this is all they have left, against a pro se Defendant who they have done nothing but bully, harass, demean, not to mention rely on Defamatory and false statements for their claims which the court correctly deemed to have no merit and dismissed all but one. It is now time for the court to complete justice in this matter, and dismiss with prejudice the final claim of Battery as well.

Per 12(h),  Defendant Roberts has preserved her defense of the statute of limitations against Count V with every single attempt to amend the complaint and subsequent response, as it was included in her response, as required by 12(h)(1)(a): "A party waives any defense listed in Rule 12(b)(2)–(5) by: (A) omitting it from a motion in the circumstances described in Rule 12(g)(2)". Defendant Roberts has **not** done that, and as such, preserved the defense. As such, she has preserved her right to file this successive and timely Motion to dismiss based upon this time-

bar[1]. Additionally, Federal Rule of Civil Procedure 8(c) states that a party must affirmatively state any affirmative defense, including statute of limitations, in responding to a pleading. Patel v. Contemporary Classics of Beverly Hills, 259 F.3d 123, 126 (2d Cir. 2001): The Second Circuit Court of Appeals held that "the statute of limitations is an affirmative defense that must be pleaded and proved by the defendant" Fed. R. Civ. P. 12(h): This rule implies that certain defenses, including the statute of limitations, are preserved if raised in a responsive pleading (such as an Answer) or a motion made before pleading. By including the statute of limitations defense in the answer to the Third Amended Complaint, the Defendant has properly preserved this defense, countering potential arguments of waiver. This motion to dismiss is timely as it was filed shortly after answer the complaint and before any significant litigation has occurred on the merits. Even if it had not been preserved, which it was, the court could also interpret the rule pursuant to 12(b)(6) as discussed below.

The argument that the motion is barred as a successive motion under Rule 12(g)(2) fails because there is a Rule 12(h)(2) exception: While Rule 12(g)(2) generally bars successive motions, Rule 12(h)(2) provides an exception for failure to state a claim defenses. The statute of limitations defense falls under the exception, as it asserts that the Plaintiffs' have failed to state a claim upon which relief can be granted. The statute of limitations defense was not clearly available when the first motion (or the third motion) was filed due the nature of the facts being presented in the various amended complaints. While the battery allegation was cast in the light of a state charge, no other possible predicate acts named Roberts directly harming a Plaintiff. The

---

[1] *"THIRD DEFENSE: The complaint should be dismissed because of expiration of the statute of limitations. The statute of limitations for Battery in NYS is 1 year from the date of the incident. The last brand was given in March of 2017 and the first complaint was filed January, 28th of 2020."* [Dct. 244] Answer to the Summary Action

battery charge was apparently alleged as part of the RICO enterprise endeavor. The structure of the numerous complaints made it difficult for this Defendant to know what was being alleged to be connected to whom, what, and when. Now that the RICO related charges are dropped, it is clear that the one-year statute of limitation applies in this situation. Even if the statute of limitations defense was available when the TAC was filed, courts have discretion to consider successive motions to prevent manifest injustice, which would occur if a clearly time-barred claim were allowed to proceed. As such, this motion should be treated as either a 12(b)(6) motion to dismiss or if need be, a Rule 12(c) motion for judgement on the pleadings. While legally, the motion can be granted on 12(b)(6) grounds alone, it is clear why the court may treat this as a Rule 12(c) motion instead.

Pursuant to N.Y. C.P.L.R. § 215(3) (2025) states, in relevant part: *Actions to be commenced within one year: ... an action to recover damages for ... battery ..."* In this case, that means the **Civil** action would have had to commence by June, 2018. Plaintiffs have given no basis whatsoever for a tolling of that statute in the matter, even after three bites at the apple to do so. Even if this were a criminal count, which it is not, the statute would have expired after two years, so by June, 2019.

"*Upon a motion for a judgment as a matter of law, the trial court's function is not to weigh the evidence, but rather, in taking the case from the jury, to determine, that by no rational process could the trier of the facts base a finding in favor of the defendant upon the evidence presented*" *Laurie Marie M. v. Jeffrey TM,* 159 A.D.2d 52 (1990)*; Citing Blum v Fresh Grown Preserve Corp.,* 292 N.Y. 241, 245; *see*, *Lipsius v White*, 91 AD2d 271, 276-277)" (*Dooley v Skodnek*, 138 AD2d 102, 104). In this case, the evidence is clear on its face; no matter what the

Plaintiffs attempt to claim, there is no basis to proceed on this claim as it was submitted too late, and on the statute of limitations alone, this must be dismissed with prejudice.

The Plaintiffs' argue: "*the pleadings in this case have not closed: When a defendant files counterclaims—as Roberts has done here—the pleadings are not closed until the plaintiff answers those counterclaims.*" The fact that not all Defendants have answered does not preclude this treatment, as this motion pertains solely to the battery claim against the Defendant. Resolving the statute of limitation issue early based on merits, through this motion, serves judicial economy by potentially eliminating a time-barred claim before expending resources related to discovery and trial. This is substantiated by a consolidated reading of FRCP 41(a) and (b): which state in pertinent part: "(b) *If the plaintiff fails to prosecute or to comply with these rules or a court order, a defendant may move to dismiss the action or any claim against it.*" and "(a) … *the action may be dismissed over the defendant's objection only if the counterclaim can remain pending for independent adjudication.*" Read together, they show that a case can be involuntarily dismissed, as I am motioning for here, and that even if dismissed, the counterclaim can proceed independently. I certainly will not object to the court granting my motion for dismissal, as my counterclaims will certainly be able to stand on their own, independent from the Plaintiff's sole remaining claim and will still have Jurisdiction under 28 U.S.C. § 1331 and 28 U.S.C. § 1367. In fact, my counterclaims will be bolstered once the claim is dismissed, since I intend on pursuing a malicious prosecution claim and similar claims regarding the false nature of Plaintiff's claims in this matter. In fact, given the sole remaining claim is for battery, it is unclear if this court can even retain jurisdiction over that claim, given it does not appear jurisdiction would survive for the sole remaining claim against defendant under either 28 U.S.C. § 1331 or

28 U.S.C. § 1332, since 28 U.S.C. § 1367 is not available for a single claim, when there are no

other "federal" claims remaining against a defendant.

The Plaintiffs' claim the statute of limitations clock would begin not at the time of the

incident, but rather after *the termination of the related criminal proceedings* to sue under New

York Civil Practice Law & Rules ("N.Y. C.P.L.R.") § 215(8) which states,

> *"Whenever it is shown that **a criminal action against the same defendant** has been commenced with respect to the event or occurrence from which a claim governed by this section arises, the plaintiff shall have at least one year from the termination of the criminal action as defined in section 1.20 of the criminal procedure law in which to commence the civil action, notwithstanding that the time in which to commence such action has already expired or has less than a year remaining."* Emphasis added.

Plaintiffs argue "*some courts have recognized, Section 215(8) extends the statute of

limitations for claims against a defendant (like Roberts) who was not a defendant in the related

criminal proceeding when other defendants in the civil action (like Raniere and Clare Bronfman)

were defendants in the related criminal proceeding.*" However, the argument does not apply in

this case because not only was the Defendant not a part of the criminal case, but battery was

never a part of the indictment at all. There is no parallel between the criminal trial and this civil

complaint. Plaintiff cites no basis that NYCPLR 215(8) applies here to extend the statute of

limitations for a claim that wasn't even part of the criminal trial because no case exists. As

previously stated, it is the last grasp by attorneys who realized they pursued claims that were

completely baseless, and they are trying to avoid liability for those actions. As such, the statute

of limitations period began to run at the time that the alleged criminal activity took place, and as

previously stated, we are well beyond the one year statute for the civil claim. *See the*

*Precedential Decision of Stephens v. Clash, No. 14-3337 (3rd Circuit) (Opinion Filed: August 5,*

*2015) (Analysis of an in-depth discussion and comparison of New York's tolling regarding a*

*battery claim, showing clearly how the tolling did not apply in that case, just as it does not apply in this one).*

The Plaintiffs cannot establish fraudulent concealment to toll the statute because they were aware of the physical act constituting the alleged battery. Any alleged misrepresentation about the meaning of the brand does not conceal the existence of a battery claim, and any alleged misrepresentation was made public by October 2017. The Plaintiffs argue: "*It [equitable tolling] requires the plaintiff to ultimately prove "affirmative misconduct by the defendant," such as deception, misrepresentations, or fraud that "kept [the plaintiff] from timely bringing suit.*" Equitable tolling allows a plaintiff to avoid a statute of limitations bar if (i) she has "pursu[ed] [her] rights diligently", and (ii) "some extraordinary circumstance stood in [her] way." That is not the case here.

The Plaintiffs do no allege any deception by the Defendant barring them from knowing they may have been deceived about the meaning of the brand by her or other Defendants. The narrative that they were deceived about the meaning of the brand was all public knowledge by Oct 2017, none of which the Defendant interfered with. Instead the Plaintiffs point out that the Defendant "Roberts knew the brand represented Raniere's initials" per the New York Health Department's Office of Processional Medical Conduct ("OPMC"). However, they wrongfully conclude that this means the Defendant intentionally concealed information from the Plaintiffs that would preclude them from bringing a battery charge. The alleged narrative that the brand was a symbol of sexual slavery administered under force by means of collateral by the Defendant was established in Oct 2017. The Plaintiffs equitable tolling argument fails here. The defendant did not interfere with this knowledge or deceive the plaintiffs in any way to preclude them from

getting this information. They had ample time to bring a civil battery claim, just as they did a criminal battery claim, which they tried to do and failed at because the brand was deemed obviously consensual.

The Plaintiffs argue "Plaintiffs Nicole, Sarah Edmondson, India Oxenberg, and Paloma Pena each participated in the criminal restitution process, and as part of the Criminal Action the Court (J. Garaufis) found that each was a "crime victim." This conclusion may be true (just or not), but they were not victims of Defendant Roberts or Battery. This does not warrant tolling of the statue as explained previously that N.Y. C.P.L.R. §215(8) does not apply here because it only extends the statute of limitation for victims of crimes, not for civil claims that were, at most tangentially related to criminal proceedings. The Defendant was not charged nor convicted in the related criminal case, and Battery was not a criminal charge at all.

In Zola v. Gordon, 685 F. Supp. 354 (S.D.N.Y. 1998), the court held that the statute of limitation may be tolled where the defendant's fraudulent conduct prevents the plaintiff from timely filling. Clearly in this case, if there were any deception that actually occurred, that story was presented to the world in public reports by October 2017, more than 2 years before the complaint was filed. But, more importantly, Plaintiff Edmondson and others' petitioned the New York State Police to get a battery criminal charge against Roberts before the New York Times article. They were clearly unhappy with their brands at this point, however the State determined that the brands were obviously consensually acquired. Additionally, it is the Plaintiffs' responsibility to perform a "reasonable inquiry[2]," *Wende C. v. United Methodist Church*, 4

---

[2] Also stated in Defendants' MOTION TO DISMISS COUNT V: BATTERY, Dkt. 246, pg. 4

N.Y.3d 293 (2005). In this case, Plaintiffs' would have to make a highly dubious claim that information was "deceptively withheld from them" until one year before issuing the first complaint, even in the face of Plaintiff Edmondson's branding story (receiving a brand with Keith Raniere's initials) getting broadcast in thousands of different websites, magazines, and newspapers in October of 2017.

It must be noted that there is the potential that Plaintiffs' tried to heal their delay in bringing this claim by extending the statute of limitations and claiming (inadequate and now defunct) RICO charges against Defendant Roberts. If so, this was an egregious attempt to circumvent the statute of limitations. They cannot be rewarded for such behavior and the battery claim must be dismissed with prejudice.

Further, the claim can be dismissed on 12(b)(6) grounds as well. To have a claim for battery there must be "*A valid claim for battery exists where a person intentionally touches another **without that person's consent**"* Wende C. v. United Methodist Church*, 4 N.Y.3d 293 (2005). Further, "[t]o recover damages for battery, a plaintiff must prove that there was bodily contact, made with intent, and offensive in nature" Cotter v. Summit Security Services, Inc., 14 A.D.3d 475 (2005) (*Citing Cotter v Summit Sec. Servs., Inc.,* 14 AD3d 475, 475 [2005]; *see Thaw v North Shore Univ. Hosp.,* 129 AD3d 937, 938-939 [2015]). Even taking all of the established facts in the **best** possible light for the Plaintiffs, there is no evidence that the "branding" was ever without that person's consent. They could have left at any time, stopped at any time, and chose not to move forward with anything that occurred in the Complaint at any time. Instead, all actions taken were voluntary at the time they were taken, and it is only now they are retroactively attempting to claim any fault with the actions at all. However, a review of

their now thrice amended facts will show that they cannot show any action was taken without their consent, and as such, the battery claim fails pursuant to 12(b)(6) as well as well 12(c).

Further, if there is a concern regarding the counterclaims, Defendant posits a straightforward solution for this court, assuming this motion is granted and there are no longer any claims against Defendant Roberts; sever the counterclaims, assign them their own docket number, and let them proceed separately on the merits pursuant to FRCP 21 which states in pertinent part, … "*On motion or on its own, the court may at any time, on just terms, add or drop a party. The court may also sever any claim against a party.*".

In this case, assuming the motion to dismiss is granted, and there no claims against Defendant, it would make the most sense to sever defendant from this matter, and permit her to proceed in a separate action to pursue her own counterclaims against the relevant parties, while maintaining the same judge to support judicial economy of time and resources. Based on a substantial amount of review and preparation for the counterclaims, they would include some parties that are part of this matter, but also some parties that are not yet part of this matter and would have to be joined. The claims would include, but not be limited to, Defamation, Malicious Prosecution and RICO, both of which have taken a substantial time to establish as a pro se, but there are likely other claims as well, based on the substantial research done already into these claims. As such, I ask that assuming the motion to dismiss Count V is granted, that my counterclaims be severed, and I be granted time to amend them, and then re-serve the relevant parties to those counterclaims.

## CONCLUSION

The battery claim is clearly time-barred on the face of the complaint and even if it were not, the numerous complaints still failed to state a claim for it. The Plaintiffs' procedural and

substantive arguments fail to overcome this fundamental defect. Therefore, the Court should grant the motion to dismiss the battery claim with prejudice.

Dated: This 10th Day of January, 2025

Defendant *Pro Se*
Respectfully submitted,

/s/ Danielle Roberts

Danielle Roberts
575 Easton Ave Apt. 18 S
Somerset, NJ 08873
516.480.1700

FILED
IN CLERK'S OFFICE
U.S. DISTRICT COURT E.D.N.Y.

★ JUL 23 2018 ★

BROOKLYN OFFICE

MKM:MKP/TH/KKO
F. #2017R01840

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - X

UNITED STATES OF AMERICA

   - against -

KEITH RANIERE,
      also known as "Vanguard,"
CLARE BRONFMAN,
ALLISON MACK,
KATHY RUSSELL,
LAUREN SALZMAN and
NANCY SALZMAN,
      also known as "Prefect,"

                Defendants.

- - - - - - - - - - - - - - - - - - - - - - - - - - X

SUPERSEDING
INDICTMENT

Cr. No. 18-204 (NGG) (S-1)
(T. 18, U.S.C., §§ 981(a)(1)(C),
982(a)(2)(B), 982(b)(1), 1028(b)(5),
1028(f), 1349, 1591(a)(1), 1591(a)(2),
1591(b)(1), 1594(a), 1594(c), 1594(d),
1962(d), 1963, 2 and 3551 et seq.; T.
21, U.S.C., § 853(p); T. 28, U.S.C.,
§ 2461(c))

THE GRAND JURY CHARGES:

<u>INTRODUCTION</u>

       At all times relevant to this Superseding Indictment (the "Indictment"), unless otherwise indicated:

<u>The Enterprise</u>

       1.    The defendant KEITH RANIERE, also known as "Vanguard," was the founder of several pyramid-structured organizations ("the Pyramid Organizations"), including, but not limited to, (1) Nxivm, Executive Success Programs, Inc., Ultima and other related entities (collectively, "Nxivm"); and (2) an organization referred to as "DOS," the "Vow" and "the sorority" (collectively, "DOS"). In leading the Pyramid Organizations, RANIERE relied on certain individuals, sometimes referred to as his "inner circle," who

were accorded special positions of trust and privilege with RANIERE and who carried out his directives.

2.      Members of RANIERE's inner circle also held high positions in one or more of the Pyramid Organizations, including serving as executives, directors and officers of Nxivm.   Members of RANIERE's inner circle also, at times, served as "first-line masters" directly under RANIERE, meaning that they comprised the second-highest level within the DOS "pyramid" and that, other than RANIERE, they wielded the most power within DOS.

3.      RANIERE and his inner circle, including the defendants CLARE BRONFMAN, ALLISON MACK, KATHY RUSSELL, LAUREN SALZMAN and NANCY SALZMAN, also known as "Prefect," and others known and unknown, comprised an organized criminal enterprise (the "Enterprise").   The Enterprise, including its leadership, membership and associates, constituted an "enterprise" as defined in Title 18, United States Code, Section 1961(4), that is, a group of individuals associated in fact that was engaged in, and the activities of which affected, interstate and foreign commerce.   The Enterprise constituted an ongoing organization whose members functioned as a continuing unit for a common purpose of achieving the objectives of the Enterprise.

Purposes, Methods and Means of the Enterprise

4.      The principal purpose of the Enterprise was to obtain financial and personal benefits for the members of the Enterprise by promoting the defendant KEITH RANIERE, also known as "Vanguard," and by recruiting new members into the Pyramid Organizations.   By promoting RANIERE and recruiting others into the Pyramid Organizations, the members of the Enterprise expected to receive financial opportunities and increased power and status within the Enterprise.

5. The Enterprise operated within the Eastern District of New York, the Northern District of New York and elsewhere, including overseas.

6. Among the means and methods by which the defendants and their associates participated in the conduct of the affairs of the Enterprise were the following:

(a) Promoting, enhancing and protecting the Enterprise by committing, attempting and conspiring to commit crimes, including but not limited to identity theft, harboring of aliens for financial gain, extortion, forced labor, sex trafficking, money laundering, wire fraud and obstruction of justice;

(b) Demanding absolute commitment to RANIERE, including by exalting RANIERE's teachings and ideology, and not tolerating dissent;

(c) Inducing shame and guilt in order to influence and control members and associates of the Enterprise;

(d) Obtaining sensitive information about members and associates of the Enterprise in order to maintain control over them;

(e) Recruiting and grooming sexual partners for RANIERE;

(f) Using harassment, coercion and abusive litigation to intimidate and attack perceived enemies and critics of RANIERE; and

(g) Encouraging associates and others to take expensive Nxivm courses, and incur debt to do so, as a means of exerting control over them and to obtain financial benefits for the members of the Enterprise.

4

## The Defendants and Their Co-Conspirators

7.    The defendant KEITH RANIERE, also known as "Vanguard," founded and was the leader of Nxivm and DOS.   RANIERE was also the head of the Enterprise.

8.    The defendant CLARE BRONFMAN was a member of the Enterprise and a high-ranking member of Nxivm.   From at least in or about 2009 to 2018, BRONFMAN served on Nxivm's Executive Board.

9.    The defendant ALLISON MACK was a member of the Enterprise and a high-ranking member of Nxivm.   At various times relevant to the Indictment, MACK was also a first-line master in DOS.

10.    The defendant KATHY RUSSELL was a member of the Enterprise and a high-ranking member of Nxivm.   From at least in or about July 2002 to 2014, RUSSELL served as Nxivm's bookkeeper.

11.    The defendant LAUREN SALZMAN was a member of the Enterprise and a high-ranking member of Nxivm.   From at least in or about 2009 to 2018, LAUREN SALZMAN served on Nxivm's Executive Board.   At various times relevant to the Indictment, LAUREN SALZMAN was also a first-line master in DOS.

12.    The defendant NANCY SALZMAN, also known as "Prefect," was a member of the Enterprise and the President of Nxivm.   NANCY SALZMAN is LAUREN SALZMAN's mother.

13.    The defendants also acted in concert with other co-conspirators, both known and unknown, who were members and associates of the Enterprise, some of whose identities are known to the Grand Jury.

## COUNT ONE
### (Racketeering Conspiracy)

14.     The allegations contained in paragraphs one through 13 are realleged and incorporated as if fully set forth in this paragraph.

15.     In or about and between 2003 and March 2018, both dates being approximate and inclusive, within the Eastern District of New York and elsewhere, the defendants KEITH RANIERE, also known as "Vanguard," CLARE BRONFMAN, ALLISON MACK, KATHY RUSSELL, LAUREN SALZMAN and NANCY SALZMAN, also known as "Prefect," together with others, being persons employed by and associated with the Enterprise, an enterprise that engaged in, and the activities of which affected, interstate and foreign commerce, did knowingly and intentionally conspire to violate Title 18, United States Code, Section 1962(c), that is, to conduct and participate, directly and indirectly, in the conduct of the affairs of such enterprise through a pattern of racketeering activity, as that term is defined in Title 18, United States Code, Sections 1961(1) and 1961(5).

16.     The pattern of racketeering activity through which the defendants KEITH RANIERE, CLARE BRONFMAN, ALLISON MACK, KATHY RUSSELL, LAUREN SALZMAN and NANCY SALZMAN, together with others, agreed to conduct the affairs of the Enterprise consisted of the racketeering acts set forth in paragraphs 17 to 34 below, as Racketeering Acts One through Ten.  Each defendant agreed that a conspirator would commit at least two acts of racketeering in the conduct of the affairs of the Enterprise.

## RACKETEERING ACT ONE
(Conspiracy to Commit Identity Theft and to
Unlawfully Possess Identification of Jane Doe 1)

### A.    Conspiracy to Commit Identity Theft

17.    In or about 2004, within the Northern District of New York and elsewhere, the defendants KEITH RANIERE and KATHY RUSSELL, together with others, did knowingly and intentionally conspire to transfer, possess and use, without lawful authority and in and affecting interstate and foreign commerce, one or more means of identification of another person, to wit: Jane Doe 1, an individual whose identity is known to the Grand Jury, with the intent to commit, and to aid and abet, and in connection with, unlawful activity that constituted one or more violations of federal law, to wit: bringing in, transporting and harboring an alien, in violation of Title 8, United States Code, Section 1324(a)(1)(A), contrary to Title 18, United States Code, Section 1028(a)(7), all in violation of Title 18, United States Code, Section 1028(f).

### B.    Conspiracy to Unlawfully Possess Identification Document

18.    In or about December 2004, within the Northern District of New York and elsewhere, the defendants KEITH RANIERE and KATHY RUSSELL, together with others, did knowingly and intentionally conspire to possess a false identification document, to wit: a sheriff's identification card with the last name and date of birth of Jane Doe 1, with the intent that such document be used to defraud the United States, contrary to Title 18, United States Code, Section 1028(a)(4), in violation of Title 18, United States Code, Section 1028(f).

RACKETEERING ACT TWO
(Conspiracy to Commit Identity Theft)

A.    Conspiracy to Commit Identity Theft

19.    In or about and between August 2005 and November 2008, both dates

being approximate and inclusive, within the Northern District of New York and elsewhere,

the defendants KEITH RANIERE, CLARE BRONFMAN, KATHY RUSSELL and NANCY

SALZMAN, together with others, did knowingly and intentionally conspire to transfer,

possess and use, without lawful authority and in and affecting interstate and foreign

commerce, one or more means of identification of one or more other persons, with the intent

to commit, and to aid and abet, and in connection with, unlawful activity that constituted one

or more violations of federal law, to wit: (1) intercepting wire and electronic

communications, in violation of Title 18, United States Code, Section 2511; and (2)

unlawfully accessing wire and electronic communications, in violation of Title 18, United

States Code, Section 2701, contrary to Title 18, United States Code, Section 1028(a)(7), all

in violation of Title 18, United States Code, Section 1028(f).

B.    Identity Theft of John Doe 1

20.    In or about and between January 2006 and November 2008, both dates

being approximate and inclusive, within the Northern District of New York and elsewhere,

the defendants KEITH RANIERE and KATHY RUSSELL, together with others, did

knowingly and intentionally transfer, possess and use, without lawful authority and in and

affecting interstate commerce, one or more means of identification of another person, to wit:

John Doe 1, an individual whose identity is known to the Grand Jury, with the intent to

commit, and to aid and abet, and in connection with, unlawful activity that constituted one or

more violations of federal law, to wit: (1) intercepting wire and electronic communications, in violation of Title 18, United States Code, Section 2511; and (2) unlawfully accessing wire and electronic communications, in violation of Title 18, United States Code, Section 2701, all in violation of Title 18, United States Code, Sections 1028(a)(7) and 2.

C.    Identity Theft of John Doe 2

21.    In or about and between January 2006 and November 2008, both dates being approximate and inclusive, within the Northern District of New York and elsewhere, the defendants KEITH RANIERE and CLARE BRONFMAN, together with others, did knowingly and intentionally transfer, possess and use, without lawful authority and in and affecting interstate commerce, one or more means of identification of another person, to wit: John Doe 2, an individual whose identity is known to the Grand Jury, with the intent to commit, and to aid and abet, and in connection with, unlawful activity that constituted one or more violations of federal law, to wit: (1) intercepting wire and electronic communications, in violation of Title 18, United States Code, Section 2511; and (2) unlawfully accessing wire and electronic communications, in violation of Title 18, United States Code, Section 2701, all in violation of Title 18, United States Code, Sections 1028(a)(7) and 2.

RACKETEERING ACT THREE
(Conspiracy to Alter Records for Use in an Official Proceeding)

22.    In or about and between February 2008 and March 2018, both dates being approximate and inclusive, within the District of New Jersey and elsewhere, the defendants KEITH RANIERE and NANCY SALZMAN, together with others, did knowingly and intentionally conspire to corruptly alter, destroy, mutilate and conceal one or more records, documents and other objects, to wit: video recordings of NANCY SALZMAN,

with the intent to impair such objects' integrity and availability for use in an official proceeding, to wit: <u>NXIVM Corp., et al. v. Ross Institute, et al.</u>, 06 CV 1051 (D.N.J.), contrary to Title 18, United States Code, Section 1512(c)(1), all in violation of Title 18, United States Code, Section 1512(k).

<u>RACKETEERING ACT FOUR</u><br>(Conspiracy to Commit Identity Theft – Jane Doe 2)

23.    In or about November 2008, within the Northern District of New York and elsewhere, the defendant KEITH RANIERE, together with others, did knowingly and intentionally conspire to transfer, possess and use, without lawful authority and in and affecting interstate commerce, one or more means of identification of another person, to wit: Jane Doe 2, an individual whose identity is known to the Grand Jury, with the intent to commit, and to aid and abet, and in connection with, unlawful activity that constituted one or more violations of federal law, to wit: (1) intercepting wire and electronic communications, in violation of Title 18, United States Code, Section 2511; and (2) unlawfully accessing wire and electronic communications, in violation of Title 18, United States Code, Section 2701, contrary to Title 18, United States Code, Section 1028(a)(7), all in violation of Title 18, United States Code, Section 1028(f).

<u>RACKETEERING ACT FIVE</u><br>(Encouraging and Inducing Illegal Entry and Money Laundering – Jane Doe 3)

A.    <u>Encouraging and Inducing Illegal Entry</u>

24.    In or about March 2009, within the Northern District of New York and elsewhere, the defendant CLARE BRONFMAN, together with others, did knowingly and intentionally encourage and induce an alien, to wit: Jane Doe 3, an individual whose identity is known to the Grand Jury, to come to, enter and reside in the United States, knowing and in

reckless disregard of the fact that such coming to, entry and residence was and would be in violation of law, for the purpose of financial gain, in violation of Title 8, United States Code, Sections 1324(a)(1)(A)(iv), 1324(a)(1)(B)(i) and 1324(a)(1)(A)(v)(II).

B.    Money Laundering

25.    In or about March 2009, within the Northern District of New York and elsewhere, the defendant CLARE BRONFMAN, together with others, did knowingly and intentionally transport, transmit and transfer monetary instruments and funds, to wit: wire transfers, from one or more places in the United States to and through one or more places outside the United States and to one or more places in the United States from and through one or more places outside the United States, with the intent to promote the carrying on of specified unlawful activity, to wit: bringing in and harboring an alien for financial gain, in violation of Title 8, United States Code, Section 1324, all in violation of Title 18, United States Code, Sections 1956(a)(2)(A) and 2.

RACKETEERING ACT SIX
(Trafficking and Document Servitude – Jane Doe 4)

A.    Trafficking of Jane Doe 4 for Labor and Services

26.    In or about and between March 2010 and April 2012, within the Northern District of New York and elsewhere, the defendants KEITH RANIERE and LAUREN SALZMAN, together with others, did knowingly and intentionally recruit, harbor, transport, provide and obtain a person, to wit: Jane Doe 4, an individual whose identity is known to the Grand Jury, for labor and services in violation of Title 18, United States Code, Chapter 77, to wit: (1) document servitude, in violation of Title 18, United States Code,

Section 1592; and (2) forced labor, in violation of Title 18, United States Code, Section 1589, all in violation of Title 18, United States Code, Sections 1590 and 2.

B.      Document Servitude of Jane Doe 4

27.     In and about and between March 2010 and April 2012, both dates being approximate and inclusive, within the Northern District of New York and elsewhere, the defendants KEITH RANIERE and LAUREN SALZMAN, together with others, did knowingly and intentionally conceal, remove, confiscate and possess one or more immigration documents and actual government identification documents of a person, to wit: Jane Doe 4, in the course of, and with intent to commit, one or more violations of Title 18, United States Code, Sections 1589 and 1590, all in violation of Title 18, United States Code, Sections 1592 and 2.

RACKETEERING ACT SEVEN
(State Law Extortion)

28.     In or about and between September 2015 and June 2017, both dates being approximate and inclusive, within the Eastern District of New York and elsewhere, the defendants KEITH RANIERE, ALLISON MACK and LAUREN SALZMAN, together with others, did knowingly and intentionally steal property by extortion, in that RANIERE, MACK, LAUREN SALZMAN and others obtained property, to wit: personal property and other things of value, by compelling and inducing one or more persons, to wit: lower-ranking DOS members, to deliver such property by instilling in them a fear that, if the property were not so delivered, RANIERE, MACK, LAUREN SALZMAN and others would (1) expose a secret and publicize an asserted fact, whether true or false, tending to subject one or more persons to hatred, contempt and ridicule; and (2) perform an act which would not in itself

materially benefit RANIERE, MACK, LAUREN SALZMAN and others, but which was

calculated to harm one or more persons materially with respect to their health, safety,

business, calling, career, financial condition, reputation and personal relationships, in

violation of New York Penal Law Sections 155.30(6), 155.05(2)(e)(v), 155.05(2)(e)(ix) and

20.00.

## RACKETEERING ACT EIGHT
### (Sex Trafficking, Forced Labor and State Law Extortion – Jane Doe 5)

A.    Sex Trafficking of Jane Doe 5

      29.    In or about and between February 2016 and June 2017, both dates

being approximate and inclusive, within the Eastern District of New York and elsewhere, the

defendants KEITH RANIERE and ALLISON MACK, together with others, did knowingly

and intentionally recruit, entice, harbor, transport, provide, obtain, maintain, patronize and

solicit a person, to wit: Jane Doe 5, an individual whose identity is known to the Grand Jury,

in and affecting interstate and foreign commerce, and did benefit, financially and by

receiving anything of value, from participation in a venture that engaged in such acts,

knowing and in reckless disregard of the fact that means of force, threats of force, fraud and

coercion, and a combination of such means, would be used to cause Jane Doe 5 to engage in

one or more commercial sex acts, in violation of Title 18, United States Code, Sections

1591(a)(1), 1591(a)(2) and 2.

B.    Forced Labor of Jane Doe 5

      30.    In or about and between February 2016 and June 2017, both dates

being approximate and inclusive, within the Eastern District of New York and elsewhere, the

defendants KEITH RANIERE and ALLISON MACK, together with others, did knowingly

and intentionally provide and obtain the labor and services of a person, to wit: Jane Doe 5, by

means of (a) force, physical restraint and threats of physical restraint to her and one or more

other persons, (b) serious harm and threats of serious harm to her and one or more other

persons, (c) one or more schemes, plans and patterns intended to cause her to believe that, if

she did not perform such labor and services, she and one or more other persons would suffer

serious harm, and a combination of such means, in violation of Title 18, United States Code,

Sections 1589(a) and 2.

C.      State Law Extortion of Jane Doe 5

31.     In or about and between February 2016 and June 2017, both dates

being approximate and inclusive, within the Eastern District of New York and elsewhere, the

defendant ALLISON MACK, together with others, did knowingly and intentionally steal

property by extortion, in that MACK and others obtained property, to wit: credit card

authorizations, jewelry and sexually explicit photographs and videos, by compelling and

inducing Jane Doe 5 to deliver such property by instilling in her a fear that, if the property

were not so delivered, MACK and others would (1) expose a secret and publicize an asserted

fact, whether true or false, tending to subject one or more persons to hatred, contempt and

ridicule; and (2) perform an act which would not in itself materially benefit MACK, but

which was calculated to harm one or more persons materially with respect to their health,

safety, business, calling, career, financial condition, reputation and personal relationships, in

violation of New York Penal Law Sections 155.30(6), 155.05(2)(e)(v), 155.05(2)(e)(ix) and

20.00.

## RACKETEERING ACT NINE
### (Forced Labor and State Law Extortion – Jane Doe 6)

A.   Forced Labor of Jane Doe 6

32.     In or about and between February 2017 and June 2017, both dates being approximate and inclusive, within the Eastern District of New York and elsewhere, the defendant LAUREN SALZMAN, together with others, did knowingly and intentionally obtain the labor and services of a person, to wit: Jane Doe 6, an individual whose identity is known to the Grand Jury, by means of (a) force, physical restraint and threats of physical restraint to her and one or more other persons, (b) serious harm and threats of serious harm to her and one or more other persons, (c) one or more schemes, plans and patterns intended to cause her to believe that, if she did not perform such labor and services, she and one or more other persons would suffer serious harm, and a combination of such means, in violation of Title 18, United States Code, Sections 1589(a) and 2.

B.   State Law Extortion of Jane Doe 6

33.     In or about and between February 2017 and June 2017, both dates being approximate and inclusive, within the Eastern District of New York and elsewhere, the defendant LAUREN SALZMAN, together with others, did knowingly and intentionally steal property by extortion, in that LAUREN SALZMAN and others obtained property, to wit: bank account authorizations and sexually explicit photographs and videos, by compelling and inducing Jane Doe 6 to deliver such property by instilling in her a fear that, if the property were not so delivered, LAUREN SALZMAN and others would (1) expose a secret and publicize an asserted fact, whether true or false, tending to subject one or more persons to hatred, contempt and ridicule; and (2) perform an act which would not in itself materially

benefit LAUREN SALZMAN, but which was calculated to harm one or more persons materially with respect to their health, safety, business, calling, career, financial condition, reputation and personal relationships, in violation of New York Penal Law Sections 155.30(6), 155.05(2)(e)(v), 155.05(2)(e)(ix) and 20.00.

## RACKETEERING ACT TEN
(Conspiracy to Commit Identity Theft – Jane Doe 7)

34.     In or about and between November 2016 and March 2018, both dates being approximate and inclusive, within the Northern District of New York and elsewhere, the defendants KEITH RANIERE and CLARE BRONFMAN, together with others, did knowingly and intentionally conspire to transfer, possess and use, without lawful authority and in and affecting interstate and foreign commerce, one or more means of identification of another person, to wit: Jane Doe 7, an individual whose identity is known to the Grand Jury, with the intent to commit, and to aid and abet, and in connection with, unlawful activity that constituted one or more violations of federal law, to wit: tax evasion, in violation of Title 26, United States Code, Section 7201, contrary to Title 18, United States Code, Section 1028(a)(7), all in violation of Title 18, United States Code, Section 1028(f).

(Title 18, United States Code, Sections 1962(d), 1963 and 3551 et seq.)

## COUNT TWO
(Forced Labor Conspiracy)

35.     In or about and between September 2015 and June 2017, both dates being approximate and inclusive, within the Eastern District of New York and elsewhere, the defendants KEITH RANIERE, also known as "Vanguard," ALLISON MACK and LAUREN SALZMAN, together with others, did knowingly and intentionally conspire to provide and obtain the labor and services of one or more persons, to wit: lower-ranking DOS members,

by means of (a) force, physical restraint and threats of physical restraint to them and one or

more other persons, (b) serious harm and threats of serious harm to them and one or more

other persons, (c) one or more schemes, plans and patterns intended to cause them to believe

that, if they did not perform such labor and services, they and one or more other persons

would suffer serious harm, and a combination of such means, contrary to Title 18, United

States Code, Section 1589(a).

(Title 18, United States Code, Sections 1594(c) and 3551 <u>et</u> <u>seq</u>.)

<u>COUNT THREE</u><br>(Wire Fraud Conspiracy)

36.     In or about and between September 2015 and June 2017, both dates

being approximate and inclusive, within the Eastern District of New York and elsewhere, the

defendants KEITH RANIERE, also known as "Vanguard," ALLISON MACK and LAUREN

SALZMAN, together with others, did knowingly and intentionally conspire to devise a

scheme and artifice to defraud one or more persons, to wit: lower-ranking DOS members,

and to obtain money and property, including rights to assets, credit card authorizations and

sexually explicit photographs and videos, from them by means of materially false and

fraudulent pretenses, representations and promises, and for the purpose of executing such

scheme and artifice, to transmit and cause to be transmitted by means of wire communication

in interstate and foreign commerce writings, signs, signals, pictures and sounds, to wit:

electronic messages, telephone text messages and Telegram messages, contrary to Title 18,

United States Code, Section 1343.

(Title 18, United States Code, Sections 1349 and 3551 <u>et</u> <u>seq</u>.)

## COUNT FOUR
### (Sex Trafficking Conspiracy)

37.    In or about and between February 2016 and June 2017, both dates

being approximate and inclusive, within the Eastern District of New York and elsewhere, the

defendants KEITH RANIERE, also known as "Vanguard," and ALLISON MACK, together

with others, did knowingly and intentionally conspire to recruit, entice, harbor, transport,

provide, obtain, maintain, patronize and solicit one or more persons, to wit: one or more

lower-ranking DOS members, in and affecting interstate and foreign commerce, and to

benefit, financially and by receiving anything of value, from participation in a venture that

engaged in such acts, knowing and in reckless disregard of the fact that means of force,

threats of force, fraud and coercion, and a combination of such means, would be used to

cause such persons to engage in one or more commercial sex acts, which offense was

effected by force, fraud, coercion and a combination of such means, contrary to Title 18,

United States Code, Sections 1591(a)(1) and 1591(a)(2).

(Title 18, United States Code, Sections 1594(c), 1591(b)(1) and 3551 et seq.)

## COUNT FIVE
### (Sex Trafficking – Jane Doe 5)

38.    In or about and between February 2016 and June 2017, both dates

being approximate and inclusive, within the Eastern District of New York and elsewhere, the

defendants KEITH RANIERE, also known as "Vanguard," and ALLISON MACK, together

with others, did knowingly and intentionally recruit, entice, harbor, transport, provide,

obtain, maintain, patronize and solicit a person, to wit: Jane Doe 5, in and affecting interstate

and foreign commerce, and did benefit, financially and by receiving anything of value, from

participation in a venture that engaged in such acts, knowing and in reckless disregard of the

fact that means of force, threats of force, fraud and coercion, and a combination of such means, would be used to cause Jane Doe 5 to engage in one or more commercial sex acts, which offense was effected by force, fraud, coercion and a combination of such means.

(Title 18, United States Code, Sections 1591(a)(1), 1591(a)(2), 1591(b)(1), 2 and 3551 et seq.)

## COUNT SIX
### (Attempted Sex Trafficking – Jane Doe 8)

39.    In or about and between February 2016 and June 2017, both dates being approximate and inclusive, within the Eastern District of New York and elsewhere, the defendants KEITH RANIERE, also known as "Vanguard," and ALLISON MACK, together with others, did knowingly and intentionally attempt to recruit, entice, harbor, transport, provide, obtain, maintain, patronize and solicit one or more persons, to wit: Jane Doe 8, an individual whose identity is known to the Grand Jury, in and affecting interstate and foreign commerce, and to benefit, financially and by receiving anything of value, from participation in a venture that engaged in such acts, knowing and in reckless disregard of the fact that means of force, threats of force, fraud and coercion, and a combination of such means, would be used to cause such person to engage in one or more commercial sex acts, which offense was effected by force, fraud, coercion and a combination of such means, in violation of Title 18, United States Code, Section 1591(a)(1) and 1591(a)(2).

(Title 18, United States Code, Sections 1594(a), 1591(b)(1), 2 and 3551 et seq.)

<u>COUNT SEVEN</u>
(Conspiracy to Commit Identity Theft – Jane Doe 7)

40.     In or about and between November 2016 and March 2018, both dates being approximate and inclusive, within the Northern District of New York, the defendants KEITH RANIERE, also known as "Vanguard," and CLARE BRONFMAN, together with others, did knowingly and intentionally conspire to transfer, possess and use, without lawful authority and in and affecting interstate and foreign commerce, one or more means of identification of another person, to wit: Jane Doe 7, with the intent to commit, and to aid and abet, and in connection with, unlawful activity that constituted one or more violations of federal law, to wit: tax evasion, in violation of Title 26, United States Code, Section 7201, contrary to Title 18, United States Code, Section 1028(a)(7).

(Title 18, United States Code, Sections 1028(f) and 3551 <u>et seq.</u>)

CRIMINAL FORFEITURE ALLEGATION
<u>AS TO COUNT ONE</u>

41.     The United States hereby gives notice to the defendants charged in Count One that, upon their conviction of such offense, the government will seek forfeiture in accordance with Title 18, United States Code, Section 1963(a), which requires any person convicted of such offense to forfeit: (a) any interest the person acquired or maintained in violation of Title 18, United States Code, Section 1962; (b) any interest in, security of, claim against, or property or contractual right of any kind affording a source of influence over any enterprise which the person has established, operated, controlled, conducted or participated in the conduct of, in violation of Title 18, United States Code, Section 1962; and (c) any property constituting, or derived from, any proceeds which the person obtained, directly or

indirectly, from racketeering activity in violation of Title 18, United States Code, Section

1962.

    42.  If any of the above-described forfeitable property, as a result of any act

or omission of the defendants:

        (a)  cannot be located upon the exercise of due diligence;

        (b)  has been transferred or sold to, or deposited with, a third party;

        (c)  has been placed beyond the jurisdiction of the court;

        (d)  has been substantially diminished in value; or

        (e)  has been commingled with other property which cannot be

divided without difficulty;

it is the intent of the United States, pursuant to Title 18, United States Code, Section

1963(m), to seek forfeiture of any other property of the defendants up to the value of the

forfeitable property described in this forfeiture allegation.

    (Title 18, United States Code, Section 1963)

CRIMINAL FORFEITURE ALLEGATION
AS TO COUNTS TWO, FOUR, FIVE AND SIX

    43.  The United States hereby gives notice to the defendants charged in

Counts Two, Four, Five and Six that, upon their conviction of any such offense, the

government will seek forfeiture in accordance with Title 18, United States Code, Section

1594(d), of (a) any property, real or personal, that was involved in, used, or intended to be

used to commit or to facilitate the commission of such offenses, and any property traceable

to such property; and (b) any property, real or personal, constituting, or derived from,

21

proceeds obtained directly or indirectly as a result of such offenses, or any property traceable to such property.

44.     If any of the above-described forfeitable property, as a result of any act or omission of the defendants:

(a)     cannot be located upon the exercise of due diligence;

(b)     has been transferred or sold to, or deposited with, a third party;

(c)     has been placed beyond the jurisdiction of the court;

(d)     has been substantially diminished in value; or

(e)     has been commingled with other property which cannot be divided without difficulty;

it is the intent of the United States, pursuant to Title 21, United States Code, Section 853(p), to seek forfeiture of any other property of the defendants up to the value of the forfeitable property described in this forfeiture allegation.

(Title 18, United States Code, Section 1594(d); Title 21, United States Code, Section 853(p))

## CRIMINAL FORFEITURE ALLEGATION
### AS TO COUNT THREE

45.     The United States hereby gives notice to the defendants charged in Count Three that, upon their conviction of such offense, the government will seek forfeiture in accordance with Title 18, United States Code, Section 981(a)(1)(C) and Title 28, United States Code, Section 2461(c), which require any person convicted of such offense to forfeit any property, real or personal, constituting, or derived from, proceeds obtained directly or indirectly as a result of such offense.

22

46.     If any of the above-described forfeitable property, as a result of any act or omission of the defendants:

        (a)     cannot be located upon the exercise of due diligence;

        (b)     has been transferred or sold to, or deposited with, a third party;

        (c)     has been placed beyond the jurisdiction of the court;

        (d)     has been substantially diminished in value; or

        (e)     has been commingled with other property which cannot be divided without difficulty;

it is the intent of the United States, pursuant to Title 21, United States Code, Section 853(p), to seek forfeiture of any other property of the defendants up to the value of the forfeitable property described in this forfeiture allegation.

(Title 18, United States Code, Section 981(a)(1)(C); Title 21, United States Code, Section 853(p); Title 28, United States Code, Section 2461(c))

### CRIMINAL FORFEITURE ALLEGATION
### AS TO COUNT SEVEN

47.     The United States hereby gives notice to the defendants charged in Count Seven that, upon their conviction of such offense, the government will seek forfeiture in accordance with: (a) Title 18, United States Code, Section 982(a)(2)(B), which requires any person convicted of such offense to forfeit any property constituting, or derived from, proceeds obtained directly or indirectly as a result of such offense; and (b) Title 18, United States Code, Section 1028(b)(5), which requires any person convicted of such offense to forfeit any personal property used or intended to be used to commit the offense.

23

48.     If any of the above-described forfeitable property, as a result of any act

or omission of the defendants:

          (a)     cannot be located upon the exercise of due diligence;

          (b)     has been transferred or sold to, or deposited with, a third party;

          (c)     has been placed beyond the jurisdiction of the court;

          (d)     has been substantially diminished in value; or

          (e)     has been commingled with other property which cannot be

divided without difficulty;

it is the intent of the United States, pursuant to Title 21, United States Code, Section 853(p),

as incorporated by Title 18, United States Code, Sections 982(b)(1), to seek forfeiture of any

other property of the defendants up to the value of the forfeitable property described in this

forfeiture allegation.

        (Title 18, United States Code, Sections 982(a)(2)(B), 982(b)(1) and

1028(b)(5); Title 21, United States Code, Section 853(p))

A TRUE BILL

FOREPERSON

RICHARD P. DONOGHUE
UNITED STATES ATTORNEY
EASTERN DISTRICT OF NEW YORK

F. # 2017R01840
FORM DBD-34
JUN. 85

No.   18-CR-204 (NGG) (S-1)

# UNITED STATES DISTRICT COURT

## EASTERN *District of* NEW YORK

### CRIMINAL DIVISION

THE UNITED STATES OF AMERICA

*vs.*

KEITH RANIERE, *also known as "Vanguard," et al.,*

Defendants.

## SUPERSEDING INDICTMENT

(T. 18, U.S.C., §§ 981(a)(1)(C), 982(a)(2)(B), 982(b)(1), 1028(b)(5), 1028(f), 1349, 1591(a)(1), 1591(a)(2), 1591(b)(1), 1594(a), 1594(c), 1594(d), 1962(d), 1963, 2 and 3551 et seq.; T. 21, U.S.C., § 853(p); T. 28, U.S.C., § 2461(c))

*A true bill.*

_____
                                                    *Foreperson*

*Filed in open court this* _____ *day,*

*of* _____ *A.D. 20* _____

_____
                                                          *Clerk*

*Bail, $* _____

*Moira Kim Penza/Tanya Hajjar, Assistant U.S. Attorneys (718) 254-7000*

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - X

UNITED STATES OF AMERICA

    - against -

Raniere, at al.,

                        Defendants.

- - - - - - - - - - - - - - - - - - - - - - - - - - X

**F I L E D**
IN CLERK'S OFFICE
U.S. DISTRICT COURT E.D.N.Y.

★    JUL 2 4 2018    ★

**BROOKLYN OFFICE**

UNSEALING ORDER

Docket No. _18-204 (NGG) (S-1)_

      Upon the application of RICHARD P. DONOGHUE, United States Attorney

for the Eastern District of New York, by Assistant United States Attorney Moira Kim Penza,

for an order unsealing the superseding indictment as to all defendants, i.e. Keith Raniere,

Clare Bronfman, Allison Mack, Kathy Russell, Lauren Salzman and Nancy Salzman.

      WHEREFORE, it is ordered that the superseding indictment be unsealed.

Dated:     Brooklyn, New York
          July 24, 2018

                                S/Viktor V. Pohorelsky
                    HONORABLE VIKTOR V. POHORELSKY
                    UNITED STATES MAGISTRATE JUDGE
                    EASTERN DISTRICT OF NEW YORK

Summary of the Technical Findings of Digital Falsification in *US v. Raniere*
November 27, 2024

By:
**Dr. James Richard Kiper, Ph.D.,** Retired FBI Special Agent and Forensic Examiner
**Stacy Eldridge,** Former FBI Senior Forensic Examiner
**Mark Bowling,** Retired OIG and FBI Special Agent and Forensic Examiner
**William Odom,** Former FBI Special Agent and Forensic Examiner
**Steven Abrams,** Digital Forensics Examiner
**Stephen Bunting**, Digital Forensics Examiner
**Wayne Norris**, Digital Forensics Examiner

---

### I.  Introduction

Our joint analysis revealed that a camera's memory card and a hard drive – key evidence of charges "at the heart" of the government's racketeering case – were extensively falsified.[1] This report reviews the 11 technical findings of digital falsification, examines their current status, and further details two of the findings regarding the memory card. As outlined, **none of these findings have been scientifically refuted.**

### II.  Case Background

The camera, its memory card, and the hard drive were pivotal to the government's case, forming the basis of the child pornography and sexual exploitation charges. The government alleged that the defendant used the camera to photograph a 15-year-old, saving the photos to its memory card before transferring them to an unlocated Dell computer and later backing them up to the hard drive. The Government claimed these photos were taken in 2005.

Notably, the photos were not argued to be visually obvious as contraband. The photographed subject did not testify. Their age of 15 was inferred from the photos' metadata (EXIF data)—information embedded in the files that indicate when the photo was taken, but is easily manipulated[2]. (Trial T. (6/12/19) at 4817:18-4818:20). The metadata indicated that a series of photos, including the alleged contraband, were taken by the camera in 2005.

It is vital to explain the notion of metadata.  Metadata is "data about data".  For example, the words of a book are its data, and the title page [including the data of publication] and the numbers at the bottom of each page are its metadata.  If the book is placed into a library, the date of publication is also found in the library's filing system.

---

[1] *See US v. Keith Raniere et al.*, EDNY, 18-cr-204, Doc. 1253-1, hereinafter referred to as "Joint Report"
[2] *See* Dr. Kiper's Report, Doc. 1169-1 at PageID #21389-21396

Unlike books, files cannot exist in isolation - they must be stored on a drive of some type. That is essentially like saying all books must be in a library, which is far-fetched for books, but the only possibility for data files.

If someone views a file in, for example, Windows Explorer, the file's observed date (be it created, accessed, or modified) is the date Windows reports from the file system, not the EXIF data for that file.

If someone views the same file in, for example, Adobe Bridge or "exiftool", the observed date (be it date/time original, create date, modify date, or others) is the date from the file's EXIF data, not the file system timestamps.

File system dates and EXIF dates are both forms of metadata and arise from different processes. They are also stored in different locations, the former in a file system component (the MFT in an NTFS format or in the directory entry in a FAT format) and the latter in the beginning of the file data itself. The correlations between these two types of dates - and in certain cases, the lack of correlations - are vital in this case.

While the memory card did not itself actually contain contraband, it included photo files that appeared to come from the same series that was located on the hard drive and were allegedly taken by the camera. Linking the photos on the hard drive to the camera was critical to the government's case, as it was used to tie the defendant to the photos' creation.[3]

## III.    Summary of Key Findings

- The alleged contraband and other photos on the hard drive were planted.[4]
- A report from the second forensic image of the memory card (a forensic image is an exact replica of the data) shows 37 additional photo files that were not in the report of the first forensic copy. Access to both forensic copies is needed to explain this critical discrepancy.[5] We identified 28 of the 37 additional photo files as being intentionally manipulated.[6]
- **(Uncontested by the government)** Dozens of photo files were planted on the memory card using a computer, and then their file system creation timestamps (indicating when they were added to the card) were each manually altered making it falsely appear as though the seized camera—not a computer—took and saved them in continuous batches in 2005, 2006, and 2007.[7]

---

[3] Trial T. (6/17/19) at 5372:17-5373:5
[4] *See* Joint Report, Technical Finding 7
[5] *See* Joint Report, Technical Finding 2
[6] *See* Joint Report, Technical Findings 8, 10, and 11, summarized in ¶ 15
[7] *See* Joint Report, Technical Findings 8 and 9

- **(Uncontested by the government)** Last accessed dates of dozens of photo files on the memory card were manually tampered with and set to dates in 2005[8].
- **(Uncontested by the government)** Folder names on the hard drive were altered, falsely suggesting the photos were downloaded on specific dates in 2005.[9]
- Timestamps of photo files on the hard drive were manually adjusted, "most plausibly … to mimic an automatic Daylight Savings Time change from 2005"[10], further falsely supporting the 2005 timeline.
- The EXIF timestamps of a non-contraband photo, within the same sequence as the alleged contraband, were deliberately altered, apparently to conceal that the file had been modified using Photoshop Adobe Elements.[11] However, a record of that alteration was left in the EXIF metadata, allowing us to discover it.

Additionally, the memory card was altered while in FBI custody before it was sent for forensic preservation —a fact admitted by the government during the trial. Over four years later, it was revealed that this alteration was caused by an unauthorized FBI photograph technician who was concealed from the chain of custody. Despite repeated requests, the government has refused to identify this individual.

The undersigned former FBI CART examiners previously concluded that these knowing violations of FBI protocol altogether are unprecedented in their combined 55 years of service to the FBI and lack any legitimate explanation.

## IV. Detailed Discussion of Findings and Their Status

After the trial, the government enlisted FBI Senior Computer Scientist David Loveall II to respond to Dr. Kiper's technical findings.

However, Loveall's responses addressed only Dr. Kiper's conclusions and ignored additional observations submitted by other forensic examiners. These observations were submitted in the motions to which the government was opposing, using Loveall's responses..

Furthermore, neither the government nor Loveall contested the numerous FBI protocol violations uncovered by Dr. Kiper and Ms. Eldridge in the handling of this digital evidence. A summary of these protocol violations is provided in the table below:

---

[8] *See* Joint Report, Appendix A, Technical Findings 10 and 11
[9] *See* Joint Report, Technical Finding 6; see also Dr. Kiper's Report, Doc. 1169-1 at PageID # 21357-21358
[10] *See* Joint Report ¶ 9
[11] *See* Joint Report, Technical Finding 5, addressed in ¶ 10

| Key <u>Uncontested</u> Process Findings | |
|---|---|
| Expert | Finding |
| Kiper | FBI Senior Forensic Examiner (SFE) Brian Booth, who testified about his analysis of the camera and memory card at trial, received this evidence **unsealed**, creating a broken chain of custody. (Doc. 1169-1 at PageID # 21382) |
| Kiper | Special Agents (SAs) Maegan Rees and Michael Lever each checked out from Evidence Control the camera, containing its unpreserved memory card, for review, without authorization, in violation of FBI protocol, with SA Rees holding it for 17 days and SA Lever for 7 days. (*Id.* at PageID #21383) |
| Kiper | SFE Booth knowingly gave false testimony, including the following points:<br>1.  Receiving unsealed evidence is not extraordinary: In Dr. Kiper's 20 years in the FBI, he never received unsealed evidence, except in exigent circumstances, which did not exist here. (*Id.* at Page ID # 21382, 21385)<br>2.  SFE Booth did not know who had the evidence prior to his examination, two days prior to his testimony. (*Id.* at Page ID # 21385).<br>3.  SFE Booth repeatedly represented EXIF data as reliable (*Id.*).<br>4.  SFE Booth minimized his knowledge about the previous memory card exam. (*Id.* at Page ID #21386). |
| Kiper | SFE Booth created a prohibited second forensic image of the memory card, in violation of FBI protocol, and Supervisory Special Agent Trenton Schmatz improperly approved it. (*Id.* at PageID #21386-21387). |
| Eldridge | The US Attorney's Office was provided the original, unpreserved memory card, which is prohibited by FBI protocol. (Doc. 1192 at PageID # 22022). |
| Eldridge | An unauthorized forensic exam was done on the unpreserved memory card in September 2018, outside of CART, which is prohibited by FBI policy. (Doc. 1192 at PageID # 22022). |

Finally, Loveall did not respond to additional technical findings by the undersigned, which the government had an opportunity to respond to, as these findings were included in the defense's motion for reconsideration to compel the two forensic copies of the memory card. These findings are discussed in greater detail herein.

1.  **The Alleged Contraband, and the Other Photos, Were <u>Planted</u> on the Hard Drive and Disguised as a Computer Backup (Contested)**

    a.  **Our Finding (Technical Finding #7)**

    The hard drive contained three folders, each appearing to result from an automatic backup on March 30, 2009. One folder, "BKP.DellDimension8300-20090330," was allegedly created by a Dell computer, which was not among the devices collected pursuant to the March

27, 2018 search warrant but claimed by the government to belong to the defendant. This folder's creation date, March 30, 2009, matched the folder name, supporting that an automatic backup occurred on that date. This folder contained the alleged contraband.

However, the files inside of the purported March 30, 2009 backup folder, including the alleged contraband, show a file creation date of July 26, 2003—six years before the backup and before the camera that supposedly created the photos existed. If the files were part of a genuine 2009 backup, their file creation dates would match the 2009 creation date of the folder.

**This mismatch is akin to finding a new sealed soda can labeled as Coca Cola but filled with lemonade.** Soda canning is a fully automated process where the contents (cola) and the container (label) are expected to match perfectly. Similarly, in this case, the folder and its contents are expected to align because computer backups automatically assign file creation timestamps (file system) to files during the backup process. Such a discrepancy, the contradictory 2009 and 2003 file system timestamps, demonstrates evidence falsification. This discrepancy proves that the files were not from an automatic computer backup[12] but could only have been **manually** placed in the folder later and "disguised as a computer backup." A normal user would not do this.

This evidence of these actions constitute planting of the photos, invalidating the folder as a legitimate backup. **This directly undermines the government's possession charge, which required the photos to be authentically on that hard drive.** (Doc. 430 at 9, "the defendant … did knowingly and intentionally possess … [contraband] contained in digital files stored on a Western Digital hard drive.").

*(The rest of this page intentionally left blank)*

---

[12] There are additional anomalies with the backup folder, noted in our original reports, e.g. *see* Dr. Kiper's Report, Doc. 1169-1 at PageID# 21359-21360.

***Diagram 1: Contradictory 2003 Dates in Alleged 2009 Backup Folder***[13]



### b.  Evaluation of Loveall's Rebuttal

The government's expert, Loveall, failed to address the central issue of the anomaly: how files with 2003 file creation dates could appear in a folder from an automatic backup with a file creation date of 2009. His response focuses only on explaining the 2003 dates but ignores the critical contradiction with the backup folder's 2009 date.

| Summary of Loveall's Response | Critique of Loveall's Response | What a Proper Response Should Look Like |
|---|---|---|
| Loveall claims that files dated 2003 could result from a clock reset on a "Dell Dimension 8300 with a bad battery." He tested a computer he referred to as "Dell Dimension 8300-20090330" and concluded the 2003 dates were consistent with such a clock reset. | **Ignores the Main Issue**: Loveall focuses on explaining 2003 file dates, but does not address how files with those dates could appear in a folder created in 2009.<br><br>**Blatant Error**: He claims to have tested a "Dell Dimension 8300-20090330," | A valid response would:<br><br>1. Use a Dell Dimension 8300 to replicate the setup.<br><br>2. Connect the same model of external hard drive used in the case, and formatted to a FAT-32 file system. |

---

[13] This diagram was originally included in the Joint Report, Pg. 3 as Diagram 2.

| (Doc. 1213-3, Loveall Report ¶¶ 17-18). | which is not a real computer model but a folder name.

**Does Not Test the Issue**: He did not test whether an automatic backup in 2009 could produce files dated 2003 while creating a folder dated 2009, which is the anomaly. | 3. Run automatic backup software consistent with what was available in 2009.

4. Reproduce the anomaly: files dated 2003 inside a folder created in 2009, through an automatic backup.

5. Document each step thoroughly, providing reproducible results and clear evidence. |

As shown above, Loveall's response was scientifically invalid - it was speculation. Therefore, our finding stands: the alleged contraband was falsely planted on the hard drive.

## 2. 37 Additional Photo Files In the Report of the Second Forensic Copy of the Memory Card, Raising the Question of Planting in FBI Custody (Contested)

### a. Our Finding (Technical Finding #2)

During the trial, on June 11, 2019, FBI examiner Brian Booth created a second forensic copy of the camera's memory card. FBI protocol allows only one forensic image to be created from the original device; any subsequent copies are to be made from that first forensic image.[14] This second copy was made months after the first one. To confirm that two copies are identical, hash values—a unique digital fingerprint—are used. However, the second copy was never produced, and hash values have not been provided to verify it matched the first. Production of hash values is so basic to computer forensics that most forensic software creates them automatically. **To not provide them is exceptional.**

The report from the second copy showed 37 more photo files than the first, all appearing in the same folders as the photo files from the report of the first copy.[15] This raises serious questions about when and how these files were added and whether this happened between the creation of the two forensic copies.

Notably, of these 37 files, we determined that 28 were intentionally manipulated (see Technical Findings #8 and #11, discussed below)**. The government has withheld access to both the first and the second forensic copies of the camera card**, preventing further analysis.

---

[14] *See* Dr. Kiper's Report, Doc. 1169-1 at Page ID# 21386
[15] *See* Dr. Kiper's Report, Doc. 1169-1, PageID# 21354-21355

***Diagram 2: 37 Photo File Discrepancy Between the Reports of the Two Forensic Copies***



**b.  Evaluation of Loveall's Rebuttal**

Loveall's rebuttal contains critical errors, omissions, and unverified claims.

| Summary of Loveall's Response | Critique of Loveall's Response | What a Proper Response Should Look Like |
|---|---|---|
| Loveall stated, "The fact that additional files appeared in one report is a result of the use of different settings. I have examined the disk images created of **1B15** and **1B15a** and determined that they are identical." (Loveall Report ¶ 9) (emphasis added). | **What is a "Disk Image"?:** A "disk image" is another term for a forensic copy, which contains the data extracted from a device. This is not the same as an "image" meaning a digital photo of the device.<br><br>**Wrong Identifiers:** Loveall refers to 1B15 (camera) and 1B15a (memory card), but these are device identifiers, not the correct labels for the forensic copies (NYC024299.001 and NYC024299_1B15a.E01). | A valid response would:<br>1. Accurately reference the memory card forensic images (NYC024299.001 and NYC024299_1B15a.E01).<br><br>2. Verify data integrity by providing the hash values for both images, proving they are identical.<br><br>3. Provide a detailed explanation of the settings used for each report and demonstrate how they account for the 37 photo files appearing only on the report of the second forensic copy. |

**So What Is He Saying?**: The question was whether two forensic images of the same card are different. Loveall is answering a different question - one that was not asked. Loveall is literally claiming that the forensic copy of the camera (1B15) is "identical" to the forensic copy of the memory card (1B15a). This is impossible for two reasons:

- **Impossibility 1:** Cameras like 1B15 (Canon EOS 20D) do not have internal storage, so it is impossible to create a forensic copy of the camera itself.

- **Impossibility 2:** The camera and memory card are separate devices with different data. Their forensic copies would not be "identical," and this is not even the correct comparison. The proper comparison is between the two forensic copies of the memory card.

**Errors Might Not Be Obvious:** These errors and impossibilities in his statement might not be obvious to a non-technical audience, but fundamentally undermine Loveall's claims.

**Vague and Unsupported "Examination":** Loveall claims he "examined" the forensic copies, but provides no details on how he did this. He offers no hash values (unique digital fingerprints),

4. Fully document all steps taken, including screenshots or logs, to ensure transparency and reproducibility.



|  | needed to confirm the data's integrity. <u>This is a basic and required practice in digital forensics.</u>[16]<br><br>**Settings Claim Lacks Proof:** Loveall speculates, without evidence, that the discrepancies are to "settings" differences, but does not specify what settings were used or provide any actual evidence whatsoever to support this claim. |  |

Loveall's response is scientifically invalid. speculative, and unsupported. It fails to establish that the forensic copies are identical, leaving the question as to whether the 37 photo files were planted in FBI custody between the creation of the two forensic copies unanswered. This is a question that could easily be resolved if access to the second forensic copy were granted to the defense – access that was exclusively given to Loveall post-trial to form his report. Access to the two forensic images would also likely lead to additional proof of falsification, because having the full data allows for a more comprehensive analysis.

3. **Planting of Photo Files on the Memory Card and Manipulation of File System Timestamps, Using a Computer, Mimicking Real-Time Camera Capture (Uncontested)**

   a. **Background About the Camera and File System Timestamps**

   When this camera takes photos, it saves them to the memory card. At that point in time, for each photo, the camera generates several timestamps, including:

   - a **file creation timestamp in the card's File Allocation Table [FAT],** reflecting when the photo file was saved to the card, and
   - an **EXIF timestamp inside the file itself,** reflecting when the photo was captured

---

[16] Loveall's failure to perform a basic verification of the two forensic images by comparing hash values is problematic, given that it is a standard procedure in digital forensics, and that the hash values would have definitively confirmed his claim. Notably, the government has offered Loveall in another case as an expert in the exact topic of verification through hash values (See the government's notice of expert testimony in *USA v. Trump* (Southern District of Florida), 23-cr-80101, Doc. 257-6). The notice states that Loveall "has not testified as an expert in a trial or by deposition in the last four years" except for in this case. (*Id.* at 2).

To reiterate, the file creation time is saved to the memory card's **file system**, which is like a table of contents that keeps track of where and when files are saved on the card. The EXIF timestamp is saved inside the photo file, like a note written directly on the photo itself.

When photos are moved to a computer or backed up to a hard drive, the EXIF timestamp remains unchanged, but the file creation timestamps of the transferred photos, e.g. on the hard drive or computer, would have an updated file creation timestamp, reflecting the date and time of transfer. This is illustrated in the diagram below.

***Diagram 3: Illustrating the Automatic Behavior of File Creation (File System) and EXIF Timestamps Upon Transfer (<u>Hypothetical</u> Example)***

*Original Photo File on the Memory Card, taken at **01/01/2008 11:11:10 PM***

| File Name | File Creation Timestamp | EXIF Timestamp |
|---|---|---|
| IMG_300 | 01/01/2008 11:11:10 PM | 01/01/2008 11:11:10 PM |

*Photo File on the Computer, After Transfer from the Memory Card on: **6/6/2008 at 2:00:00 PM**.*

| File Name | File Creation Timestamp | EXIF Timestamp |
|---|---|---|
| IMG_300 | **6/6/2008 2:00:00 PM (changed)** | 01/01/2008 11:11:10 PM (unchanged) |

*Photo File on the Hard Drive, After Transfer from the Computer on: **10/10/2008 at 8:00:00 PM**.*

| File Name | File Creation Timestamp | EXIF Timestamp |
|---|---|---|
| IMG_300 | **10/10/2008 8:00:00 PM (changed again)** | 01/01/2008 11:11:10 PM (unchanged) |

**b. Summary of the Finding**

The range of photos on the hard drive, including the alleged contraband, have EXIF timestamps and other metadata that suggest they originated from the camera and memory card in 2005. For specific groups of photos, such as the twenty individual photos in the range IMG_0081 through IMG_0100[17] (Photo Files 81–100), there are corresponding file names on the memory card with matching timestamps from 2005, such as the **file creation timestamps** on the memory card matching the **EXIF timestamps** on the hard drive, indicating that these files were originally saved to the memory card in 2005 and later transferred to the hard drive.

---

[17] This camera automatically names files sequentially in the format "IMG_," followed by a number, where the number increases with each photo taken, e.g. IMG_0001, IMG_0002, ec.

These twenty photo files on the memory card, IMG_0081-0100, had been deleted but were partially recovered using forensic software. While no visual images for these files could be recovered, the file names and file system timestamps recovered suggested these were the original files that were later backed up to the hard drive. This apparent alignment between the hard drive and memory card supported the government's argument that the photos on the hard drive, including the alleged contraband, were all taken by the seized camera in 2005.

However, our analysis in Technical Finding #8 reveal **that the twenty individual files in the range IMG_0081 through IMG_0100 on the memory card were planted there using a computer**, and their file system timestamps were manipulated, making them falsely appear as if the camera placed them there in 2005. We determined that the only plausible explanation is that these files were retrofitted onto the memory card with manipulated timestamps to create the illusion that the camera saved them in real-time in 2005, supporting the government's narrative. As previously discussed, it is even possible these are not photo files but merely files renamed to look like photo files from the Canon camera.[18]

### c.   How We Determined the Files Were Planted

Testing by Stephen Bunting, one of the undersigned experts, on a Canon EOS 20D (with the same firmware, 2.0.2., as in this case) confirmed that these files could not have been written to the memory card by the camera itself. This camera has a specific way of saving files to certain locations based on available space, and the placement of IMG_0081-0100 and IMG_0224-0243 does not align with how the camera is capable of operating.[19] In other words, contrary to how it appears, **the camera did not place them on the memory card. They were added to the memory card using a computer.**

Further, based upon this conclusion, we determined that after planting the photos, someone "subsequently edited their creation dates" (Joint Report at ¶15(a)) because the file system creation timestamps for IMG_0081-0100 match their hard drive namesakes and the file system creation dates for IMG_0224-0243 match their EXIF creation timestamps on the camera card. Otherwise, these timestamps would have reflected the date and time of the planting event.

This process of timestamp manipulation is visually represented in the diagram below, for a **hypothetical** transfer date and time of 1/1/2019 at 12:00:00 PM, where the computer would automatically update the file creation timestamps to that date and time after the planting.

---

[18] *See* Dr. Kiper's Report, Doc. 1169-1 at PageID # 21355
[19] *See* Mr. Bunting's Report in Appendix B of the Joint Report.

*Diagram 4: Visual Representation of the Planting and Timestamp Manipulation*



Based on the same analysis, in Technical Finding #9, we determined that 17 files (IMG_0224-0243), dated beginning roughly three months after the photos on the hard drive but appearing to be part of the same overall series, were also planted on the memory card, and their timestamps were subsequently manipulated, making it falsely appear as though the camera saved them in real-time. This continuity further reinforced the government's alleged 2005 timeline.

### d.  Why This Matters

Using a computer to insert and precisely modify these photo files on the memory card is as unnatural as taking a car back to the assembly line for an oil change —something that, in our experience, no normal user would ever do.

**We determined that the only plausible explanation for these manipulations is to retrofit the memory card with planted files to support the narrative that the seized camera took the photos found on the hard drive in 2005.**

### e.  Status

Technical Findings #8 and #9 were included in the defense's Motion for Reconsideration (Doc. 1225), which the government opposed (Doc. 1229), but did not include a rebuttal from Loveall or any other expert. Therefore they are uncontested.

4.  **The Last Accessed Dates of 29 Photo Files on the Memory Card Were Intentionally Altered by a Computer (Uncontested)**

   a.  **Background**

Photos 21-42 are the earliest photos on the memory card and are significant because their numbering sequence precedes the first set of photos on the hard drive (43-58). This makes it look like the photos across devices are part of one continuous sequence: the camera saved them to the memory card, and later, some of them were transferred to the hard drive. In Technical Finding #10, we found that the "last accessed dates" of Photos 21-42 were tampered with.

A last accessed date records the most recent time a file was opened or interacted with. Stephen Bunting determined, through testing the same camera and firmware as in this case, that this particular camera does not update last accessed dates when photos are viewed on the camera itself; similarly, when the camera is connected to a computer via USB, the last accessed dates remain unchanged. These timestamps only change if the memory card is accessed directly through a computer's card reader or slot.

   b.  **The Anomaly**

In Technical Finding #10, we observed that most photos in the range 21-42 have a last accessed date of October 16, 2005, two days after their creation, but two photos—29 and 42—show an earlier last accessed date of October 14, 2005.

Since all the photos were stored in the same folder and were active (non-deleted) at the same time, any computer access should have updated the last accessed dates for all of them, not just all but two of them. This inconsistency cannot be explained by normal camera use or simply connecting the camera to the computer,  leading to the conclusion that someone directly accessed the memory card and manually altered the last accessed dates using a computer. This pattern of anomaly was also observed in Technical Finding #11, affecting photo files 193-199, in which we also concluded manual tampering of last accessed dates.

   c.  **Why This Matters**

In our experience, altering last accessed dates is highly unusual and not something a typical user would do, let alone on a camera memory card. Users might delete photos or transfer them, but not manipulate access dates. The selective modification of these timestamps constitutes intentional tampering. Notably, the last accessed dates on the memory card are in 2005 and roughly match the alleged photo capture time frame.

Docusign Envelope ID: DB9A6ACA-E545-47C9-AE8E-C2ADE4CC4904

### d. Status

These findings were also included in the defense's Motion for Reconsideration, which the government opposed, but did not include a rebuttal from Loveall or any other expert. Therefore they are uncontested.

## 5. Manipulation of Timestamps in Folder Names (Uncontested)

In Technical Finding #6, we determined that the names of folders on the hard drive, which correspond to specific dates and times and appeared to indicate when photos were downloaded in 2005, were manually manipulated. Loveall did not contest this finding. He simply stated, "it is of course possible to rename files and folders and any computer user may do so," failing to address the deliberate manipulation of folder names, which falsely suggested the photos were downloaded at the specific dates and times in 2005 indicated in the folder names. (Loveall Report at ¶ 16)

## 6. Manipulation of Last Modified Timestamps, Apparently to Simulate an Automatic Daylight Savings Time Adjustment in 2005 (Contested)

### a. Our Finding (Technical Finding #4)

We determined that a two-hour shift between the file system last modified timestamps and EXIF created timestamps was present in only 11 photos in a single folder and in no other photos on the hard drive. We determined that this is best explained by someone inadvertently overlooking this folder while doing the manipulation. Further, we found that this change "most plausibly happened because they were attempting to mimic an automatic Daylight Savings Time adjustment from 2005 but made errors in the process."[20] In our experience, a normal user would not make these changes, which falsely supported the alleged 2005 timeframe.

### b. Evaluation of Loveall's Rebuttal

Loveall's rebuttal is hypothetical, unsupported by evidence, and does not explain the observed two-hour discrepancy.

| Summary of Loveall's Response | Critique of Loveall's Response | What a Proper Response Should Look Like |
|---|---|---|
| Loveall claims the timestamp changes are likely due to:<br><br>- Manual or automatic changes to device clocks in 2005.<br>- A 2006 Windows update introducing dynamic Daylight | **No Evidence**: Loveall does not test or demonstrate any of his claims.<br><br>**The 2006 Update Does Not Apply**: This update does not retroactively affect existing | A valid response would:<br><br>1. Simulate a pre-2006 Windows environment with files matching the original (unshifted) timestamps. |

---

[20] *See* Joint Report ¶ 9.

| Savings Time (DST) time zones.<br><br>(Loveall Report at ¶¶ 11-14). | files. It only applies to files created afterward.<br><br>**Fails to Specifically Explain the Anomaly**: Loveall does not explain how such an update would account for the observed two-hour shift followed by exact alignment of last modified and EXIF timestamps. | 2. Apply the 2006 Windows update and document whether it reproduces the two-hour shift and timestamp alignment.<br><br>3. Provide detailed steps, including screenshots and system settings, to ensure transparency and reproducibility. |
| --- | --- | --- |

Loveall's response lacks scientific validity and fails to explain the timestamp anomalies. It is simply speculative. As such, our finding that these last modified timestamps were manually manipulated stands.

7.   **Manual Manipulation of Timestamp/Metadata of Photo 175 (Contested)**

a.   **Our Finding (Technical Finding #5)**

In Technical Finding #5, we determined that the metadata of Photo 175, located on both the camera card and on the hard drive, had been manually manipulated. In this instance, the manipulated metadata refers to the EXIF data, which is part of the photographic *content*. The identical *last modified* timestamps indicated the photo had not been modified during its copy from the camera card to the computer and then to the external hard drive  However, the EXIF data on the hard drive copy of Photo 175 indicated that it was modified by Photoshop Adobe Elements. Any change in a photograph's EXIF data will necessarily change its last modified timestamp, absent human intervention. Based on these facts, we determined that the *last modified* timestamps of the Photo 175 copies were artificially synchronized to be the same, even though the EXIF data on the hard drive copy indicates the file had been modified. This synchronization of timestamps suggests intentional tampering to conceal file manipulation.

b.   **Evaluation of Loveall's Rebuttal**

Loveall's rebuttal is unsupported. He claims Adobe Photoshop Elements could have altered metadata without updating the modification date but provides no evidence to substantiate this claim.

| Summary of Loveall's Response | Critique of Loveall's Response | What a Proper Response Should Look Like |
| --- | --- | --- |
| Loveall claims that in Adobe Photoshop Elements, selecting "Change to a | **No Evidence**: Loveall does not test or demonstrate this behavior or provide | A valid response would:<br><br>1. Conduct controlled tests |

| | | |
|---|---|---|
| specified date and time" and clicking 'OK' without entering a new date can alter some internal metadata without updating the *last modified* timestamp.<br><br>(Loveall Report at ¶ 15). | screenshots to support his claim.<br><br>**Inconsistency**: Loveall's explanation relies on intentional use of timestamp manipulation features, undermining his claim that no manual alteration occurred. | with Adobe Photoshop Elements to see if metadata can be altered without updating the *last modified* timestamp.<br><br>2. Document each step taken, such as using the "Change to a specified date and time" feature and clicking 'OK.'<br><br>3. Verify whether the observed timestamps match the results of these tests.<br><br>4. Provide reproducible evidence, like screenshots or logs, to support the findings. |

Loveall's rebuttal lacks scientific rigor, provides no proof, and inadvertently reinforces the finding of manual manipulation by suggesting intentional use of timestamp-altering software. Thus, our finding stands.

### 8. Manual Manipulation of Photo Files 93-97 on the Memory Card (Contested)

#### a. Our Finding

Technical Finding #1 identified that the photo files IMG_0093-97 on the memory card contained the thumbnails of photo files 180-183, which depicted a different subject. We determined that this anomaly indicated intentional manipulation of the files and their metadata.

Additionally, Technical Finding #8 conclusively shows that IMG_0093-97, as part of the range IMG_0081-100, were planted on the memory card using a computer, with timestamps intentionally altered to create the appearance of real-time camera use in 2005. **Thus, this finding is subsumed by and more fully explained by the deliberate planting and manipulation described in Technical Finding #8**.

#### b. Evaluation of Loveall's Rebuttal

Loveall's response relies on hypothetical scenarios, lacks supporting evidence, and does not align with the observed data or behavior of the memory card and camera.

| Summary of Loveall's Response | Critique of Loveall's Response | What a Proper Response Should Look Like |
|---|---|---|
| | | |

| | | |
|---|---|---|
| Loveall argues that the anomalies in IMG_0093-97—where thumbnails depict a different subject than the actual photos—can be explained by normal FAT file system behavior. Specifically, he claims:<br><br>- Older deleted files may be overwritten by newer ones, causing metadata misattribution, which would explain the mismatched thumbnails. (Loveall Report at ¶¶ 5-8.)<br><br>- This behavior is "particularly true" when a memory card is full. ((Loveall Report at ¶ 5). | **Unsupported Hypothesis:** Loveall provides no testing, demonstrations, or evidence to support his claims. He does not cite the actual data on reports or the memory card, despite having access to the memory card and the two forensic copies.<br><br>**Misleading Capacity Argument:** Loveall claims the issue is "particularly true" when the memory card is full, but testing shows the card never exceeded 6% of its capacity. The farthest-used photo location is only 120 MB into a 2 GB card.[21] His explanation is irrelevant to this case.<br><br>**Wrong File System Explanation:** Loveall's explanation applies to NTFS file systems, not FAT-16, which is used by this card. FAT-16 zeroes out all pointers except the first segment of a file upon deletion[22], making fragmented or partially recovered files impossible. Only contiguous files can be accurately recovered on FAT-16.<br><br>**Inaccurate Camera Behavior:** Loveall's description and diagrams of file overwriting do not match the Canon EOS 20D's cluster | A proper response would:<br><br>**1. Examine the Files**: Use forensic tools to inspect where the data from IMG_0093-97 and IMG_0180-183 are stored on the memory card. Check if parts of IMG_0180-183 are overlapping with or pointing to the same space on the memory card as IMG_0093-97.<br><br>**2. Simulate the Camera's Overwriting Behavior**: Use the same camera model (Canon EOS 20D) with matching settings and memory card type and try to reproduce a situation where thumbnails from a newer photo, like IMG_0180, accidentally end up in the file space of an older photo, like IMG_0093, as Loveall suggested.<br><br>**3. Recover Deleted Data**: Use forensic tools to recover deleted files and see if the recovered thumbnails are incorrectly matched with older files.<br><br>**4. Document Everything**: Provide clear records of all steps taken, including screenshots and logs, so that the process can be repeated by others to verify the |

---

[21] *See* Joint Report ¶ 14 and Booth's FTK Report, Government Exhibit 521A - Replacement.

[22] "The Starting Cluster is an unsigned integer representing the Logical Cluster Number in which the file starts. It is stored in two separate areas of the Directory Entry, as FAT was originally designed for small volume sizes." See *FAT File System Section*, 2021 IACIS Basic Computer Forensic Examiner Manual, at Bates No. 145; See also *Id* at Pg. 159.

| | writing behavior, as detailed in Stephen Bunting's previously submitted report.[23] | findings. |
|---|---|---|

## V.    Conclusion

The above findings constitute a clear and extensive pattern of data falsification on both the camera's memory card and hard drive, with the apparent intent of creating the impression that the photos on the hard drive, including the alleged contraband, **were taken in 2005** and **using that particular camera**, which was precisely the government's narrative.

Additionally, as shown above, Loveall's rebuttals to the select findings he addressed fail to scientifically refute any of them. His responses were speculative, unsupported by evidence, and in some cases demonstrably false.

Further, we previously found, and reaffirm our conclusion that:

"Given admitted government misconduct, including violating evidence protocols, providing evidence to unidentified and unauthorized personnel, and altering the original camera card, the involvement of government personnel in this evidentiary fraud is inescapable – an unprecedented finding in our combined 150+ years of forensic experience." (Joint Report ¶ 16).

Signature: _____
Executed on: 11/28/2024
Name: **Dr. James Richard Kiper, Ph.D.**
Background: Former FBI Special Agent, Computer Forensic Examiner, and Unit Chief at the FBI Academy, 20 years' service to the FBI

Signature: _____
Executed on: 11/28/2024
Name: **Stacy Eldridge**
Background: Former FBI Senior Forensic Examiner, 10 years' service to the FBI

---

[23] *See* Joint Report, Appendix B

19

Signature: *Mark Bowling*

Executed on: 11/28/2024

Name: **Mark Daniel Bowling**

Background: Retired FBI and OIG Special Agent and Forensic Examiner and Former FBI Assistant Special Agent in Charge, FBI Inspector in Place, and Cyber Program Manager, 20 years' service to the FBI

Signature: *William Odom*

Executed on: 11/28/2024

Name: **William Odom**

Background: Former FBI Special Agent and Forensic Examiner, Manager of the FBI Forensics Lab in Houston; 5 years' service to the FBI

Signature: *Steve M. Abrams*

Executed on: 11/28/2024

Name: **Steve Abrams, J.D., M.S.**

Background: 25+ years in digital forensics, worked 1,500+ cases, served 11 years as a South Carolina State Constable, for the US Secret Service.

Signature: *Stephen Bunting*

Executed on: 11/28/2024

Name: **Stephen Bunting**

Background: Former Captain of the University of Delaware Police, created the University of Delaware Police's digital forensics unit; trained hundreds of examiners and authored five textbooks in the field of digital forensics.

Signature: *Wayne Norris*

Executed on: 11/27/2024

Name: **Wayne Norris**

Background: 60+ years of software development experience across 35 operating systems, the government's lead software development expert witness in the landmark *Microsoft vs. Commissioner of Internal Revenue* case, 36+ years of computer forensic expert experience.