**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**

| | |
|---|---|
| SARAH EDMONDSON, *et al.*      * | |
|      * | |
| Plaintiffs,      * | NOTICE OF MOTION TO STRIKE |
| v.      * | ALLEGATIONS OF THE COMPLAINT |
|      * | OR TO COMPEL DISCOVERY |
| Keith Raniere, *et al*      * | |
|      * | Case N. 1:20 - cv - 00485-EK-CLP |
| Defendants.      * | |
|      * | |

**PLEASE TAKE NOTICE,** that the Defendant, Danielle Roberts, DO, MS, Pro Se, will move

before The United States District Court for the Eastern District of New York, on October 13,

2025 or at any other time that The Court schedules for an order striking the allegations of the

complaint and dismissing it or alternatively compelling discovery requested by Defendant from

Plaintiffs that the Plaintiffs have not complied with. The motion is brought on the strength of the

certification of the Defendant with exhibits thereto and the letter brief supporting the application.


Dated: October 13, 2025

*/s/ Danielle Roberts*

Danielle Roberts, D.O., M.S. *Pro Se*
244 York Street, Apt. 1
Jersey City, NJ 07302
Phone: (516) 480-1700
Email: Danielle@drdanielleroberts.com

**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**

_____

SARAH EDMONDSON, *et al.*                    *
                                             *
             Plaintiffs,                     *       CERTIFICATION – AFFIRMATION
        v.                                   *              OF SERVICE
                                             *
Keith Raniere, *et al*                       *       Case N. 1:20 - cv - 00485-EK-CLP
                                             *
             Defendants.                     *
                                             *
_____

I certify and affirm under penalty of perjury that I have served on October 13th, 2025, the within

notice of motion and supporting documents upon the Plaintiff's attorney:

Robert A. Swift
William E. Hoese
Zahra R. Dean
Elias Kohn
KOHN, SWIFT & GRAF, P.C.
1600 Market Street, Suite 2500
Philadelphia, PA 19103
(215) 238-1700
whoese@kohnswift.com
rswift@kohnswift.com
zdean@kohnswift.com

Adam M. Prom
DICELLO LEVITT LLP
10 North Dearborn Street, Sixth Floor
Chicago, IL 60602
(312) 214-7900
aprom@dicellolevitt.com

Greg G. Gutzler
Emma Bruder
DICELLO LEVITT LLP
485 Lexington Avenue, 10th Floor
New York, NY 10017
(646) 933-1000
ggutzler@dicellolevitt.com
ebruder@dicellolevitt.com

Agnieszka M. Fryszman
Brendan R. Schneiderman
COHEN MILSTEIN SELLERS
& TOLL PLLC
1100 New York Ave. NW, Suite 800
Washington, DC 20005
(202) 408-4600
afryszman@cohenmilstein.com
bschneiderman@cohenmilstein.com

Manuel John Dominguez
COHEN MILSTEIN SELLERS
& TOLL PLLC
11780 U.S. Highway One, Suite N500
Palm Beach Gardens, FL 33408
(561) 515-1400
jdominguez@cohenmilstein.com

Attorneys for Plaintiffs

Dated: October 13, 2025

*/s/ Danielle Roberts*

Danielle Roberts, D.O., M.S. *Pro Se*
244 York Street, Apt. 1
Jersey City, NJ 07302
Phone: (516) 480-1700
Email: Danielle@drdanielleroberts.com

| | |
|---|---|
| SARAH EDMONDSON, *et al.* | * |
| | * |
| Plaintiffs, | * THE CERTIFICATION – AFFIRMATION OF |
| | * DANIELLE ROBERTS IN SUPPPORT OF |
| | * THE MOTION TO COMPEL DISCOVERY |
| | * AND STRIKE ALLEGATIONS |
| v. | * OF THE COMPLAINT |
| | * 1:20 - cv - 00485-EK-CLP |
| Keith Raniere, *et al.* | * |
| | * |
| Defendants. | * |
| | * |

## <u>Certification - Affirmation</u>

I, Danielle Roberts, Pro Se Defendant, hereby certify and affirm under penalty of perjury as follows:

1. I make this certification - affirmation in support of my motion to compel or strike the allegations of the complaint for failure of the Plaintiffs to comply with discovery obligations.

2. I am fully familiar with the facts stated herein.

3. On May 22nd, 2025 I served a request for production of documents to the Plaintiffs' attorneys **(Exhibit 1).** Their answers to this request simply were objections in which the majority of them were about the request being overly broad. The court can examine the document of answers. Each request the document demanded to be produced was specifically circumscribed either in the request itself or in the follow up requests. For example; the documents requested in Request No. 1 circumscribed all of those that were related to the battery claim (and the counterclaims) and that the Plaintiffs possesses, have access to or control of, that show proof of the alleged intentional touching or application

of force, if it was harmful or offensive, and of lack of consent. Clearly, this is a request for all of the documentation in the possession of Plaintiffs for these elements of their claim. The same is valid for all other requests either referring to a stated time period or to a specific aspect of the case (see **Exhibit 2** - the response to Exhibit 1 by the Plaintiffs).

4. On July 8th 2025 I served a second request for production of documents to the Plaintiffs' attorneys **(Exhibit 3).** The answers to this request were also simply objections, similar to the answers to my previous request **(Exhibit 4).** In my letter from last week (October 5th, 2025 (**Exhibit 5**)) to Plaintiffs' attorney, which I also filed in the electronic docket with Attention: Magistrate Judge Pollak, I gave 5 days for them to comply with the discovery requests. I stated in that letter that the response of the Plaintiffs, although not in compliance with the Plaintiffs obligations, shows that Exhibit 4 in fact constituted a request for answers to interrogatories accompanied with requests for documents for the same interrogatories that were asked. The reason why I said that in the letter is because the Plaintiffs' attorneys were aware that that was the aim since they objected that the requests were not for production of documents, but rather interrogatories each followed by a request for the documents related to that interrogatory. They realized that because I am a layperson, I considered both interrogatories and notice to produce documents to be all "discovery," and subject to the same obligations for the party to whom they were propounded to comply and provide answers and documents, whether served separately or in the same request document.

5. In addition, in both Exhibit 2 and 4 the plaintiffs stated that they were seeking to meet with me to discuss the details of the scope of the documents to be produced but did not

answer any of the questions requested. For example; in Exhibit 2, Request No. 5 on page 8 the Plaintiff's state "Subject to and without waiving the foregoing objections, Plaintiffs state that they will meet and confer with Defendant regarding the scope of a reasonable search for responsive discovery material in their possession, custody, or control regarding sub parts a, b, d, e, f, and m." Similarly, in Exhibit 4 the Plaintiff's answer to Request No. 2 on page 3 states, "Subject to and without waiving the foregoing objections, Plaintiffs state that they will meet and confer with Defendant regarding the scope of a reasonable search for responsive, non-privileged discovery material in their possession, custody, or control." As a consequence of that the Plaintiffs' attorneys sent me on Aug 11, 2025 an email note asking me if Wednesday was a good day to meet and confer **(see Exhibit 6).** The Court should notice that I have complied with the Plaintiffs interrogatory requests as shown in **Exhibit 7.** The Court can also see that I have complied with the Discovery requests that were addressed to me (regarding the only charge left in the complaint addressed to me and barring the charges in the complaint that were not against me or that were previously dismissed **(Exhibit 8)).**

6. Similarly, I have also provided the answer to the video request as part of the document requests.

7. The Plaintiffs have not complied with their discovery obligations, except by objections that are simply an evasion of those obligations, and then proposed a meet and confer with the intention of delay and resistance to compliance. They have not answered any specific interrogatory in a manner that would be providing the requested information of them, and not a single document from document production. Their answers to my discovery requests acknowledge that my request for document production was in fact a request for

answer to interrogatories accompanied by request for document production for those particular interrogatories, and yet they failed to answer. (**Exhibit 2 and Exhibit 4** provide copies of the non-compliant answers of the Plaintiffs to my requests).

8. As a consequence of the above, the Plaintiffs proposed conferencing on the limits and extent of the production of documents and answer to interrogatories for which they have objected (as I have stated above to The Court, they are not valid objections, but just delay and refusal for non-compliance - **see Exhibit 9**). I have complied with every aspect stated in these attached letters. The Plaintiffs have not replied to the requests for discovery of the Defendant irrergardless of their recognition that they were interrogatories named, "Request for Production of Documents" (due to my lack of knowledge of the language of designation). They have also not complied to the requests in these letters.

9. The Defendant has complied with all of the discovery request of the Plaintiffs, but the Plaintiffs have failed to answer  interrogatories by providing the answer to interrogatories not just objections, and providing the documents that were requested. The Court can see that the conduct of the Plaintiffs is contumacious. They have refused to answer specifically the questions propounded to them, and have not provided one single document requested to be produced despite a first warning August 18th (Exhibit 9a) of 10 days to comply (now over 56 days old) and another recent notice October 5th (Exhibit 5) of 5 days to comply. We are asking The Court to strike the allegations of the complaint, or at a minimum to compel them to answer the interrogatories and fully produce the documents requested.

10. I bring to the attention of The Court that these delays have been prejudicial to the Defendant because there was a motion to dismiss the only charge left against me (filed in violation of the statute of limitation for Battery and therefore barred by it) that The Court

denied, but kept alive the Defense providing the opportunity to be presented after discovery that would potentially show that there was no basis for any tolling of the statute of limitations. This delay keeps alive a case by prolonging the time for the Defendant filing, as part of a motion for summary judgment, the dismissal of the charge of Battery that the finalization of discovery would make the Defendant entitled to file.

I certify and affirm under penalty of perjury that the foregoing statements made by me are true, I am aware that if any of the foregoing statements made by me are willfully false, I am subject to punishment.

Dated: October 13, 2025

Respectfully Submitted,

**_/s/ Danielle Roberts_**

Danielle Roberts, D.O., M.S. *Pro Se*
244 York Street, Apt. 1
Jersey City, NJ 07302
Phone: (516) 480-1700
Email: Danielle@drdanielleroberts.com

# EXHIBIT 1

## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF NEW YORK

| | |
|---|---|
| SARAH EDMONDSON, *et al.* * | |
| * | |
| * | |
| Plaintiffs, * | |
| * | 1:20 - cv - 00485-EK-CLP |
| v. * | |
| * | |
| Keith Raniere, *et al.* * | |
| * | |
| Defendants. * | |
| * | |

May 1, 2025

      TO:

      Robert A. Swift
      William E. Hoese
      Zahra R. Dean
      Elias Kohn
      KOHN, SWIFT & GRAF, P.C.
      1600 Market Street, Suite 2500
      Philadelphia, PA 19103
      (215) 238-1700
      rswift@kohnswift.com
      whoese@kohnswift.com
      zdean@kohnswift.com

      ekohn@kohnswift.com


## FIRST SET OF REQUESTS FOR PRODUCTION OF DOCUMENTS TO PLAINTIFFS

      Defendant Danielle Roberts requests pursuant to Federal Rules of Civil Procedure 26 and

34 and Local Civil Rules 26.2, 26.3 and 26.4 of the United States District Court for the Eastern

Districts of New York, that Plaintiffs, in the above captioned action produce the following

Documents to Defendant via email ONLY at danielle@drdanielleroberts.com, within thirty (30)

days following the receipt of service of these Requests for Production of Documents ("Requests").

## DEFINITIONS

1.      The Uniform Definitions in Discovery Requests set forth in Local Civil Rule 26.3 and the rules of construction set forth therein and in the Federal Rules of Civil Procedure are all incorporated herein by reference as if separately set forth in each and every Request.

2.      The "Action" refers to the particular action in which these Requests have been served, i.e., the action within which the party responding to these Requests has been named as a Defendant.

3.      "And" and "or" mean and/or and should be construed accordingly.

4. "Communication" means the transmission of information, in the form of facts, ideas, inquiries, or otherwise.

5. "Document" has the broadest possible meaning, including paper Documents and electronic files and data, including without limitation communications in any form including emails, text messages, messages using any other messaging app, calendars, phone logs, notes and recordings of meetings and phone calls.

6. "You," or "Your" means the specific Plaintiff identified in the question, or any Plaintiff who is answering these documents.

7. "Defendants" means all currently and formerly named Defendants in this Action.

8. "DOS" means the organization within NXIVM generally referred to as "DOS", also sometimes referred to as "the Vow".

9. "DOS member" means any individual associated with NXIVM who was recruited to join DOS (also known as "The Vow").

10. "DOS Plaintiffs" means Plaintiffs Sarah Edmonson, Jessica Joan Salazar, India Oxenberg, Soukiana Mehdaoui, Rachel Widjaja, Nicole Isbell, Valerie Heckel, Allison Warnyca, Paloma Pena, Erika Weissenborn, Kristin Taravella, Veronica Jaspeado, Charlotte Giroux (the "DOS Plaintiffs") and Camila Fernandez.

11. "Identify" when referring to a Document means, unless otherwise specified, to give, to the extent known, the (a) type of Document; (b) general subject matter; (c) date of the

Document; and (d) author(s), addressee(s), and recipient(s).

12. "Individual Defendant" means any non-entity who was ever named as a Defendant in the Action, whether or not the person is named as a Defendant in the Third Amended Complaint.

13. "NXIVM" means NXIVM, Executive Success Programs ("ESP") and affiliated companies, including: Ethical Science Foundation ("ESF"), Ethical Humanitarian Foundation, Rainbow Cultural Garden ("RCG"), Jness, Society of Protectors ("SOP"), and NXIVM's VIP Program.

15. "Person" or "persons" means any natural person or any business, legal or governmental entity, or association.

16. "Plaintiffs" means Sarah Edmondson, Jessica Joan Salazar, Soukiana Mehdaoui, Nicole Isbell, Daniela Fernandes, Camila Fernandes, India Oxenberg, Bonnie Piesse, Tabitha Chapman, Ashley Mclean, Mark Vicente, Anthony Ames, Veronica Jaspeado, Paloma Pena, Charlotte Giroux, Rachel Behl/Widjaja, Valerie Heckel, Adrienne Stiles, Jennifer Sinclair/Kobelt, Margot Leviton, Isabella Constantino, Caryssa Cottrell, Deanne Brunelle, Karla Diaz Cano, Pamela Cooley, Rosalyn Cua, Brieanna Fiander, Shayna Holmes, Polly Green, Andrea Hammond, Yan Huang, Sara Lim, Ariella Menashy, Maja Miljkovic, Michelle Neal, Susan Pratt, Alison Rood, Katie Shaw Kristin, Hannah Vanderheyden, Juliana Vicente, Susan Patricia Vieta, Susan Wysocki, Stephanie Fair-Layman, Gabrielle Gendron, Sarah Wall, Scott Starr, Philip Akka, Alejandro Balassa, Madeline Carrier, Rod Christiansen, Owen Giroux, Jeffrey Golfman, Ashley Harvey, Rees Alan Haynes, Nils Macquarrie, Anthony Madani, Chad Williams, Christopher Black, Robert Gray, Ken Kozak, Allison Warnycam, Erika Weissenborn, Elham Menhaji, Kayla Grosse and Lindsay MacInnis.

17. "Referring to" means concerning, relating to, describing, evidencing, or constituting and is used synonymously with those terms.

**INSTRUCTIONS**

1. The Documents to be produced in response to these Requests are all responsive Documents within Your possession, custody or control, including Documents that You have the

practical ability to obtain, including but not limited to, Documents that are within the possession, custody or control of any of Your agents, attorneys, administrators, executors, family members and any and all such other persons and entities that represent You or are subject to Your control.

2.      Electronically Stored Information ("ESI") shall be produced pursuant to the Joint Stipulated Order Regarding Discovery of Electronically Stored Information or any other ESI order entered on the Court's docket or as agreed to by the parties.

3.      With respect to each Document withheld on a claim of privilege, provide a statement setting forth the information required by Local Civil Rule 26.2.

4.      Each Request shall be construed as required under Local Civil Rule 26.4.

5.      If any Documents within the scope of the Requests have been lost, destroyed, transferred to others not subject to Your control, or otherwise disposed of, or if any Documents responsive to the Requests exist but are not available, furnish a list identifying each such Document and setting forth the following information with respect to each such Document: its date, author(s), sender(s), addressee(s), and recipient(s), and the subject matter of the Document. In each instance, explain the circumstances surrounding each disposition or why such Document is unavailable, including the person(s) responsible for authorizing the disposition and the date of disposition.

6.      Please produce the Documents either as they are kept in the usual course of business or organize and label them to correspond to the categories in these Requests.

7.      If You have no Documents responsive to a particular Request, so state.

8.      Unless otherwise indicated, the time period covered by these Requests encompasses, for the individual responding, the period from when they first became involved in the matters specific to this complaint to the present.

**DOCUMENTS TO BE PRODUCED:**

1. In regards to the Battery claim that you have filed against me, Communications between medical board and authorities, phone records, produce all documents, including police reports, emails and texts, written letters, journal entry, podcast or video recordings, Facebook pages, signal, whats app, telegram, protonmail, all email addresses, group chats, recorded voice conversations (HBO), voice notes, zoom recordings, snapchat, tiktok, photos, videos recorded communications or anything else (from now on known as Proofs) that allege supports your claim for battery and specifically:

   a. Proofs regarding the alleged intentional touching or application of force;

   b. Proofs regarding the alleged touching that shows that it was either harmful or offensive to a reasonable person in the plaintiff's circumstances; and

   c. Proofs regarding the Lack of consent to the touching.

2. In regards to the Battery claim that you have filed against me, produce all Proofs as far back as you have available when you first contemplated bring the battery charge against me.

3. If any such Proofs were deleted, please give a detailed list of those deleted Proofs, and why they were deleted. Further, please state what actions taken, if any were done to recover those Proofs in light of the ongoing litigation.

4. For any such Proofs where a Phone was used, please state the Phone company you used for such Proofs.

5. In regards to consent for the alleged battery, please produce all Proofs showing:

   a. You did not consent to get a brand;
   b. You needed to know the meaning prior to getting the brand;
   c. Any "Master slave communications";

d. All communication that showed you either enjoyed their experience and wanted to share it or communications showing you did not enjoy it;

e. If applicable, the date you found out the brand was KR's initials and how you found out;

f. People you tried to enroll, conversations with those people and specifically who you tried to enroll after you found out the brand was KR's initials;

g. All Proofs in your possession showing the activities and conversations that show the lifestyle that was occurring in ESP and DOS was one you wanted and wanted to share it with others;

h. All Proofs that show you trusted the system – things that show how "weird" their lifestyle was and how you liked doing it – all the things that you were doing, and this was just one of them;

i. Proofs that show you knew DOS was about complete obedience and either objected at any time, or enjoyed it;

j. Proofs that you had Informed consent and that you were informed of what the life was;

k. Proofs of when you learned that you were, in fact, a "victim" of this lifestyle, and who, or how you learned it;

l. Proofs you agreed to an alternative lifestyle and liked and enjoyed that until it became inconvenient and proofs as to how you were inconvenienced or damages by the lifestyle;

m. Any proofs that the alleged act of the battery was part of the practice of medicine or a medical procedure;

n. Any proofs that you have or made for tributes or "thank yous" or anything you created that shows your appreciation of Keith;

o. Produce your "Vow" and "creedos" from DOS; and

p. Any Communications between you and any other members of DOS.

6. In regards to harm for the alleged battery, please produce all Proofs showing:

a. Proofs that you sought medical advice after the alleged battery occurred;

b. Proofs of you Enrolling of others after the alleged battery occurred;

c. Proofs of any threats you received if you didn't comply with anything while participating in the lifestyle;

d. Proofs of Any Collaterals or alleged Blackmail that were released against you or anyone else;

e. Any communications you have between yourself and Lauren Salzman;

f. Any communications you have between yourself and Alex Betancourt;

g. Any communications you have between yourself and anyone who is or was a party in this matter related to this matter;

h. Any Proofs related to any videos of any alleged battery of any of the alleged parties;

i. Any therapy records in your possession where you spoke about the alleged battery and it's alleged psychological damage;

j. Any Medical records for bodily harm that you can produce after the alleged battery;

    k.  Communications of progress on any assignments with a master/instructor/teacher and slave/instructed/student and reports on successes/failures with those assignments;

    l.  Proofs of any receipts from plastic surgery procedure to counter the alleged battery and have it removed that you got restitution for  and what specifically the money was used for;

7. Any proofs or Affidavits from people in Sarah Edmonson's circle;
8. Any proofs or letters stating anyone explained the risks of the alleged battery;
9. Any proofs anyone told you to see their doctor for follow up if needed;
10. Any proofs you left during part of the alleged battery, what you left to do and that you came back afterwards to have it completed?
11. Any proofs of Finances from your bank records to show you were paid and by who.
12. Copies of any bank records, books and records from any of the entities involved that you have copied or that are in your possession.
13. All proofs of earnings and money you received that you made from books, podcasts, HBO, interviews, Megan Kelly, Dr. Oz, travel paid, etc. from talking about the facts involved in this matter.
14. All proofs of Subscribers before and after you came out about the facts involved in this matter.
15. All Proofs of Contracts with HBO
16. All proof of Communications between HBO and the FBI, prosecutors and Moira Penza.
17. All proofs of if the government or you sold footage to HBO, or "leak footage" to HBO – how did HBO get the footage
18. All communications between yourself, any other parties and HBO.
19. All requests that came into HBO for images or anything else.
20. Any receipts you have from HBO regarding anything you gave to them.
21. All proofs you have regarding conversations with therapists about the facts involved in this matter.
22. All communications between you and your psychotherapist and you and that non licensed therapist woman.
23. All awards and speaking invitations you received for speaking about the facts involved in this matter.
24. All proofs of additional Notoriety or appearances, exposure, contacts etc.: TED talk appearances, articles, photoshoots, jobs (ex: ambassador for denim jeans), voice over work, etc. you gained from this matter.
25. All proofs of communications between you and any other parties in this matter.
26. All proofs of communications between you and the FBI or Moira Penza.
27. All proofs of Any communications between plaintiffs and Frank Parlato
28. All proofs of Any Plaintiffs who started with their therapist after speaking to Neil Glazer
29. All proof from the "Therapy island retreat" for any plaintiffs/victims
30. All communications around the time of leaving ESP, bringing complaint to OPMC, the police, and negative responses from the authorities.
31. All communications with NY Times and Barry Meier and the primary team and Parloto
32. All Communications between Cuomo and the medical commissioner
33. All Communications between the FBI and the administrative court (OPMC)
34. All Communications with any parties regarding: readiness drills

35. All tribute videos in your possession (to Keith Raniere, to ESP, NXVIM, other programs under NXVIM or Ultima umbrellas).
36. All communications with news media and Frank Parloto and Rob Gavin and HBO directors
37. All Non-Disclosure Agreements Mark Vincent issued (and those collected) to share information with anyone he was de-enrolling from NXVIM, Ultima or DOS.
38. All proofs you have meetings, zoom meetings, conference calls of you working with other Plaintiffs, or Cult deprogrammers, media, etc. that were recorded by HBO as well as all raw footage or any other ESI you have in your possession.
39. All proofs you have meetings, zoom meetings, conference calls of you working with other Plaintiffs, or Cult deprogrammers, media, etc. that were recorded by you or anyone you were within the meeting or any other ESI you have in your possession.
40. All intro/enrollment videos for ESP and any other intro/enrollment videos.
41. All videos used related to Auditions/resumes/demos or any other purpose to get hired or for any other purpose that references any facts from the complaint.
42. All Photos from their Photo libraries from 2016 through 2018 in their possession including ESI that illustrates your lifestyle during this time.
43. All Scripts written by any of the other Plaintiffs created for how you would incriminate any of the other parties or set them up and any conversations recorded during this script writing.
44. Your search history from all research engine searches about or relating to cults, taking down organizations, how to dismantle a community or any other search regarding harming NXIVM or any other parties in this matter.
45. All proofs with any Public Relations people, media coaching meetings, etc. in regards to how to best position yourself in regards to the facts from the complaint.
46. All proofs referring to how to respond to reports, coverage, or criticisms of NXIVM in news media, blogs and other public outlets, including but not limited to general instructions, plans, or guidelines, crafting of specific statements, records of statements made to public outlets, and discussions regarding statements made to public outlets.
47. Any proofs of any email address/accounts or identities (real, fake or anonymous) you or any plaintiff you were in contact with created during 2017 - 2025 to communicate publicly or comment publicly about NXVIM, branding or anything related to this matter – Ex: A Count Dracula email address, anonymous accounts used to comment on podcasts, blogs, FR, NYTs, Twitter/X, Reddit, etc.
48. Any proofs you have between India and any of her family members, including step-family regarding the issues in this complaint.
49. Any proofs you have about sex groups in India's mom's house, and any proofs you have regarding any bodily fluids she wore around her neck or elsewhere on her body.
50. Any proofs with Media Moguls, Catherine Oxenberg, politicians, royalty, producers, and anyone media related regarding the issues in this complaint.
51. Please provide any proofs regarding India's inheritance/banking records because Catherine claimed India burned through her entire inheritance doing ESP classes.
52. Please provide any proofs of Catherine's foundations accounting books including the books themselves.
53. Please provide any proofs of Mark Vincent's and Bonnie Piesse's taxes and books including the books themselves.

54. All proofs with the Mexican media outlet (Noticieros Televisa) that released Sarah's branding video or Communications between you and Alex Betancourt, Lauren Salzman and Alex Betancourt, and Alex Betancourt and the Mexican media outlet that released the video.
55. All proofs between Lauren Salzman and Charmel Bowden and Audrey and Charmel about branding. Any proof of threat of collateral release to Charmel Bowden
56. Any proofs with AnaGabriela Montemayor about branding. Any proofs about her choice not to get a brand. Any proofs of threats of collateral release or collateral release for her choice.
57. Any proofs with Sylvie Lloyd about the branding.
58. Any proofs of AnaGabriela Montemayor not doing the assignments from her Master and not receiving any consequences or threats of collateral release.
59. All proofs between Lauren Salzman and Sarah E about the branding, when either was told about any meanings or inclusion of Keith Raniere's initials.
60. Your applications and invitation to fill out the applications for the Ultima development groups you applied to.
61. Any feedback surveys of any NXVIM or Ultima related Courses you took.
62. Your Coach applications.
63. All Proofs from/to Bonnie Piesse regarding a black sash promotion in ESP, and your enlightenment experience.
64. All Proofs from/to Bonnie Piesse with any plaintiffs or coaches regarding your enlightenment experience.
65. All Proofs from/to Bonnie Piesse to anyone regarding mediation with Allison Mack.
66. All Proofs with your family, parents, siblings about these matters (NXVIM, DOS, ESP, Ultima related companies).
67. All Job applications and accepts of jobs after the 2017 campaign to attack NXIVM.
68. All Proofs from or to NXIVM-affiliated individuals referring to the retention of legal counsel to represent You or any other NXIVM-affiliated individuals or entities in legal proceedings, or make complaints to law enforcement or regulators about people on behalf of NXIVM-affiliated individuals or entities that are not protected by attorney/client privilege, including, but not limited to, any communications you had with your current representation not protected and any communications you have with anyone who is not currently representing you.

/s/ Danielle Roberts____
 Danielle Roberts

244 York Street, Apt 1
Jersey City, NJ 07302
danielle@drdanielleroberts.com
516.480.1700

## CERTIFICATION

I hereby certify that the copies of the reports annexed hereto rendered by proposed expert witnesses are exact copies of the entire report or reports rendered by them; that the existence of other reports of said experts, either written or oral, are unknown to me, and if such become later known or available, I shall serve them promptly on the propounding party.

By:_____(sign and print name)
Print:

Dated:_____, 202____

## INDIVIDUAL CERTIFICATION

I certify that the foregoing statements made by me are true.  I am aware that if any of the foregoing statements made by me are willfully false, I am subject to punishment for contempt of Court.

_____(sign and print name)
Print:

Dated: _____, 202____

EXHIBIT 2

# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF NEW YORK

|  |  |  |
|---|---|---|
| | : | |
| SARAH EDMONDSON, et al., | : | |
| | : | |
| Plaintiffs, | : | |
| | : | CIVIL ACTION NO. 20-CV-485 (EK) (CLP) |
| v. | : | |
| | : | PLAINTIFFS' RESPONSES AND |
| KEITH RANIERE, et al., | : | OBJECTIONS TO DEFENDANT DANIELLE |
| | : | ROBERTS FIRST SET OF DEMANDS FOR |
| Defendants. | : | PRODUCTION |

Plaintiffs who are asserting a battery claim hereby provide the following responses and objections to Defendant Danielle Roberts' ("Defendant Roberts") First Set of Requests for Production ("RFPs" or "Requests") by Plaintiffs.

## GENERAL OBJECTIONS

The following General Objections form a part of, and are hereby incorporated into, the response to each and every Request as set forth below. Nothing in Plaintiffs' Specific Objections and Responses should be construed as a waiver of these General Objections, all of which are expressly preserved.

1.     Plaintiffs object to the Definitions, Instructions, and Requests to the extent they seek to impose burdens or obligations beyond what is required by the Federal Rules of Civil Procedure, the Local Rules of the Eastern District of New York, any applicable Court Orders, or other governing law (collectively, the "Applicable Rules"). Plaintiffs will construe the Definitions and Requests consistent with the Applicable Rules.

2.     Plaintiffs object to these Requests to the extent they attempt or purport to seek Documents and/or information protected by the attorney-client privilege, the work-product

doctrine, or any other applicable privilege held by Plaintiffs. Any inadvertent disclosure of such information shall not constitute a waiver of any such privilege or of any ground for objecting to the discovery or admissibility of such materials, their subject matter, or the information contained therein, nor shall such disclosure constitute a waiver of Plaintiffs' rights to object to the use of such information during this or any other proceeding.

3.      Plaintiffs object to these Requests to the extent that they suggest Plaintiffs are obligated to provide information that is not in the possession, custody, or control of Plaintiffs, which is not known by Plaintiffs, or that can be more conveniently obtained from another source.

4.      Plaintiffs object to these Requests to the extent they are premature by seeking information that has yet to be determined, as discovery in this litigation is ongoing. The requested information will be provided in accordance with the Court's Scheduling Order and all other Applicable Rules.

5.      Plaintiffs reserve the right to amend, supplement, or revise their objections and responses as discovery progresses. No statement herein shall be deemed a waiver of any argument, objection, or claim that may later arise in this matter, including at trial.

## FIRST SET OF REQUESTS FOR PRODUCTION OF DOCUMENTS

### Request No. 1:

In regards to the Battery claim that you have filed against me, Communications between medical board and authorities, phone records, produce all documents, including police reports, emails and texts, written letters, journal entry, podcast or video recordings, Facebook pages, signal, whats app, telegram, protonmail, all email addresses, group chats, recorded voice conversations (HBO), voice notes, zoom recordings, snapchat, tiktok, photos, videos recorded communications or anything else (from now on known as Proofs) that allege supports your claim for battery and specifically:
   a.      Proofs regarding the alleged intentional touching or application of force;
   b.      Proofs regarding the alleged touching that shows that it was either harmful or offensive to a reasonable person in the plaintiff's circumstances; and
   c.      Proofs regarding the Lack of consent to the touching

## Response to Request No. 1:

Plaintiffs object to this Request as overbroad, unduly burdensome, and not proportional to the needs of the case under Rule 26(b)(1) of the Federal Rules of Civil Procedure to the extent it seeks "all documents" in any form or from any platform, without reasonable limitations as to time, subject matter, or connection to the allegations in the Third Amended Complaint.

Plaintiffs further object to this Request to the extent it seeks information protected by the attorney-client privilege, work-product doctrine, or any other applicable privilege or protection.

Plaintiffs also object to this Request as vague and ambiguous with respect to the undefined term "Proofs," which improperly attempts to define every conceivable form of electronic or recorded communication as a discoverable category, regardless of relevance, format, or context.

Plaintiffs are responding to these document requests using the definition of documents in the Federal Rules of Civil Procedure. Subject to and without waiving the foregoing objections, Plaintiffs state that they will meet and confer with Defendants regarding the scope of a reasonable search for responsive discovery material in their possession, custody, or control.

## Request No. 2:

In regards to the Battery claim that you have filed against me, produce all Proofs as far back as you have available when you first contemplated bring the battery charge against me.

## Response to Request No. 2:

Plaintiffs object to this Request as overbroad, unduly burdensome, and not proportional to the needs of the case under Rule 26(b)(1) of the Federal Rules of Civil Procedure to the extent it seeks "all documents" in any form or from any platform, without reasonable limitations as to time, subject matter, or connection to the allegations in the Third Amended Complaint.

Plaintiffs further object to this Request to the extent it seeks information protected by the attorney-client privilege, work-product doctrine, or any other applicable privilege or protection.

Plaintiffs also object to this Request as vague and ambiguous with respect to the undefined term "Proofs," which improperly attempts to define every conceivable form of electronic or recorded communication as a discoverable category, regardless of relevance, format, or context. Plaintiffs are responding to these document requests using the definition of documents in the Federal Rules of Civil Procedure.

Plaintiffs also object to this Request as vague and speculative to the extent it seeks documents based on when a Plaintiff "first contemplated" asserting a claim for battery, which is neither reasonably defined nor susceptible to a reliable or objective search.

Plaintiffs will not produce documents in response to this Request.

**Request No. 3:**

If any such Proofs were deleted, please give a detailed list of those deleted Proofs, and why they were deleted. Further, please state what actions taken, if any were done to recover those Proofs in light of the ongoing litigation.

**Response to Request No. 3:**

Plaintiffs object to this Request as overbroad, unduly burdensome, and not proportional to the needs of the case under Rule 26(b)(1) of the Federal Rules of Civil Procedure to the extent it seeks "a detailed list" of any and all deleted documents or communications without reasonable limitations as to time, subject matter, or connection to the allegations in the Third Amended Complaint.

Plaintiffs further object to this Request to the extent it seeks information protected by the attorney-client privilege, work-product doctrine, or any other applicable privilege or protection.

Plaintiffs also object to this Request as vague and ambiguous with respect to the undefined term "Proofs," which improperly attempts to define every conceivable form of electronic or recorded communication as a discoverable category, regardless of relevance, format, or context.

Plaintiffs are responding to these document requests using the definition of documents in the Federal Rules of Civil Procedure.

Plaintiffs also object to this Request as vague and speculative to the extent it seeks an accounting of deletions without identifying a relevant time period or triggering event for preservation, and to the extent it demands speculative or retrospective reconstruction of materials not presently in Plaintiffs' possession, custody, or control.

Plaintiffs also object to this Request on the ground that it is, in substance, an interrogatory improperly styled as a request for production. The Request seeks narrative information regarding deletions, reasons for deletions, and subsequent actions taken—none of which seek the production of documents, and all of which are more appropriately addressed, if at all, through a properly served interrogatory under Rule 33.

Plaintiffs will not produce documents in response to this Request.

**Request No. 4:**

For any such Proofs where a Phone was used, please state the Phone company you used for such Proofs.

**Response to Request No. 4:**

Plaintiffs object to this Request as overbroad, unduly burdensome, and not proportional to the needs of the case under Rule 26(b)(1) of the Federal Rules of Civil Procedure to the extent it seeks identification of "the Phone company" used for any document or communication, without reasonable limitations as to time, subject matter, or connection to the allegations in the Third Amended Complaint.

Plaintiffs further object to this Request to the extent it seeks information protected by the attorney-client privilege, work-product doctrine, or any other applicable privilege or protection.

Plaintiffs also object to this Request as vague and ambiguous with respect to the undefined term "Proofs," which improperly attempts to define every conceivable form of electronic or recorded communication as a discoverable category, regardless of relevance, format, or context. Plaintiffs are responding to these document requests using the definition of documents in the Federal Rules of Civil Procedure.

Plaintiffs also object to this Request as vague and speculative to the extent it seeks information about the service providers for unspecified communications or devices, potentially dating back many years, and not reasonably subject to identification through a document search.

Plaintiffs also object to this Request on the ground that it is, in substance, an interrogatory improperly styled as a request for production. The Request seeks narrative information regarding phone service providers used in connection with unspecified communications, which is more appropriately addressed, if at all, through a properly served interrogatory under Rule 33.

Plaintiffs will not produce documents in response to this Request.

**Request No. 5:**

In regards to consent for the alleged battery, please produce all Proofs showing:
  a.    You did not consent to get a brand;
  b.    You needed to know the meaning prior to getting the brand;
  c.    Any "Master slave communications"
  d.    All communication that showed you either enjoyed their experience and wanted to share it or communications showing you did not enjoy it;
  e.    If applicable, the date you found out the brand was KR's initials and how you found out;
  f.    People you tried to enroll, conversations with those people and specifically who you tried to enroll after you found out the brand was KR's initials;
  g.    All Proofs in your possession showing the activities and conversations that show the lifestyle that was occurring in ESP and DOS was one you wanted and wanted to share it with others;
  h.    All Proofs that show you trusted the system – things that show how "weird" their lifestyle was and how you liked doing it – all the things that you were doing, and this was just one of them;
  i.    Proofs that show you knew DOS was about complete obedience and either objected at any time, or enjoyed it;

j.     Proofs that you had Informed consent and that you were informed of what the life was;

k.     Proofs of when you learned that you were, in fact, a "victim" of this lifestyle, and who, or how you learned it;

l.     Proofs you agreed to an alternative lifestyle and liked and enjoyed that until it became inconvenient and proofs as to how you were inconvenienced or damages by the lifestyle;

m.     Any proofs that the alleged act of the battery was part of the practice of medicine or a medical procedure;

n.     Any proofs that you have or made for tributes or "thank yous" or anything you created that shows your appreciation of Keith;

o.     Produce your "Vow" and "creedos" from DOS; and

p.     Any Communications between you and any other members of DOS.

## Response to Request No. 5:

Plaintiffs object to this Request as overbroad, unduly burdensome, and not proportional to the needs of the case under Rule 26(b)(1) of the Federal Rules of Civil Procedure. The Request improperly combines numerous distinct categories of documents and communications—ranging from expressions of personal enjoyment or gratitude to allegations about the practice of medicine—without reasonable limitations as to time, subject matter, or connection to the claims for battery asserted in the Third Amended Complaint.

Plaintiffs further object to this Request to the extent it seeks information protected by the attorney-client privilege, work-product doctrine, or any other applicable privilege or protection.

Plaintiffs also object to this Request as vague and ambiguous with respect to the undefined term "Proofs," which improperly attempts to define every conceivable form of communication, document, image, or expression as a discoverable category, regardless of relevance, format, or context. Plaintiffs are responding to these document requests using the definition of documents in the Federal Rules of Civil Procedure.

Plaintiffs also object to this Request to the extent it is argumentative and assumes disputed facts—including with respect to Plaintiffs' states of mind, motivations, understandings, and injuries—rather than seeking relevant documents tied to specific claims or defenses.

Subject to and without waiving the foregoing objections, Plaintiffs state that they will meet and confer with Defendant regarding the scope of a reasonable search for responsive discovery material in their possession, custody, or control regarding sub parts a, b, d, e, f, and m.

**Request No. 6:**

In regards to harm for the alleged battery, please produce all Proofs showing:
a. Proofs that you sought medical advice after the alleged battery occurred;
b. Proofs of you Enrolling of others after the alleged battery occurred;
c. Proofs of any threats you received if you didn't comply with anything while participating in the lifestyle;
d. Proofs of Any Collaterals or alleged Blackmail that were released against you or anyone else;
e. Any communications you have between yourself and Lauren Salzman;
f. Any communications you have between yourself and Alex Betancourt;
g. Any communications you have between yourself and anyone who is or was a party in this matter related to this matter;
h. Any Proofs related to any videos of any alleged battery of any of the alleged parties;
i. Any therapy records in your possession where you spoke about the alleged battery and it's alleged psychological damage;
j. Any Medical records for bodily harm that you can produce after the alleged battery;
k. Communications of progress on any assignments with a master/instructor/teacher and slave/instructed/student and reports on successes/failures with those assignments;
l. Proofs of any receipts from plastic surgery procedure to counter the alleged battery and have it removed that you got restitution for and what specifically the money was used for;

**Response to Request No. 6**:

Plaintiffs object to this Request as overbroad, unduly burdensome, and not proportional to the needs of the case under Rule 26(b)(1) of the Federal Rules of Civil Procedure. The Request improperly aggregates numerous distinct categories of information—including medical records, therapy notes, receipts, and various forms of communication—without reasonable limitations as

to time, subject matter, or connection to the battery claims asserted in the Third Amended Complaint.

Plaintiffs further object to this Request to the extent it seeks information protected by the attorney-client privilege, work-product doctrine, physician-patient privilege, psychotherapist-patient privilege, HIPAA, or any other applicable privilege or protection. Plaintiffs also object to this Request to the extent it seeks sensitive medical or psychological information without adequate privacy safeguards or a showing of particularized relevance.

Plaintiffs also object to this Request as vague and ambiguous with respect to the undefined term "Proofs," which improperly attempts to define every conceivable form of communication, document, recording, or personal record as a discoverable category, regardless of relevance, format, or context. Plaintiffs are responding to these document requests using the definition of documents in the Federal Rules of Civil Procedure.

Plaintiffs also object to this Request as vague, speculative, and argumentative to the extent it assumes disputed facts or demands information that is neither clearly defined nor reasonably susceptible to document-based discovery.

Plaintiffs object that this Request is premature to the extent it seeks the production of executed HIPAA authorizations at this stage because the scope of relevant medical discovery has not yet been determined, and no Applicable Rule currently compels Plaintiffs to provide unrestricted authorizations in the absence of specific, substantiated relevance.

Subject to and without waiving the foregoing objections, Plaintiffs state that they will meet and confer with Defendants regarding the scope of a reasonable search for responsive discovery material in their possession, custody, or control regarding subparts a, h, i, j, and l.

**Request No. 7:**

Any proofs or Affidavits from people in Sarah Edmonson's circle;

**Response to Request No. 7:**

Plaintiffs object to this Request as overbroad, unduly burdensome, and not proportional to the needs of the case under Rule 26(b)(1) of the Federal Rules of Civil Procedure to the extent it seeks "any proofs or Affidavits" from "people in Sarah Edmonson's circle," without reasonable limitations as to time, subject matter, or connection to the claims or defenses in this case.

Plaintiffs further object to this Request as vague and ambiguous with respect to the undefined terms "Proofs" and "Sarah Edmonson's circle," which are not reasonably clear in scope or meaning and render the Request unworkable as drafted. Plaintiffs are responding to these document requests using the definition of documents in the Federal Rules of Civil Procedure.

Plaintiffs also object to this Request to the extent it seeks documents from individuals who are not parties to this action and whose documents are therefore not within the possession, custody, or control of Plaintiffs within the meaning of Rule 34.

Plaintiffs further object to this Request to the extent it seeks information protected by the attorney-client privilege, work-product doctrine, or any other applicable privilege or protection.

Plaintiffs will not produce documents in response to this Request.

**Request No. 8:**

Any proofs or letters stating anyone explained the risks of the alleged battery;

**Response to Request No. 8:**

Plaintiffs object to this Request as overbroad, unduly burdensome, and not proportional to the needs of the case under Rule 26(b)(1) of the Federal Rules of Civil Procedure to the extent it

seeks "any proofs or letters" without reasonable limitations as to time, subject matter, or connection to the battery claims asserted in the Third Amended Complaint.

Plaintiffs further object to this Request as vague and ambiguous with respect to the undefined term "Proofs," which improperly attempts to define every conceivable form of communication or documentation as a discoverable category, regardless of relevance, format, or context.

Plaintiffs also object to this Request as vague and speculative to the extent it assumes the existence of documents in which someone explained the risks of the alleged battery or presumes disputed facts regarding Plaintiffs' knowledge or consent.

Plaintiffs further object to this Request to the extent it seeks information protected by the attorney-client privilege, work-product doctrine, or any other applicable privilege or protection.

Subject to and without waiving the foregoing objections, Plaintiffs state that they will meet and confer with Defendant regarding the scope of a reasonable search for responsive discovery material in their possession, custody, or control.

**Request No. 9:**

Any proofs anyone told you to see their doctor for follow up if needed;

**Response to Request No. 9:**

Plaintiffs object to this Request as overbroad, unduly burdensome, and not proportional to the needs of the case under Rule 26(b)(1) of the Federal Rules of Civil Procedure to the extent it seeks "any proofs" without reasonable limitations as to time, subject matter, or connection to the battery claims asserted in the Third Amended Complaint.

Plaintiffs further object to this Request as vague and ambiguous with respect to the undefined term "Proofs," which improperly attempts to define every conceivable form of

communication or documentation as a discoverable category, regardless of relevance, format, or context. Plaintiffs are responding to these document requests using the definition of documents in the Federal Rules of Civil Procedure.

Plaintiffs also object to this Request as vague and speculative to the extent it assumes that any such recommendation occurred or that it would have been documented in a form subject to discovery.

Subject to and without waiving the foregoing objections, Plaintiffs state that they will meet and confer with Defendant regarding the scope of a reasonable search for responsive discovery material in their possession, custody, or control.

**Request No. 10:**

Any proofs you left during part of the alleged battery, what you left to do and that you came back afterwards to have it completed?

**Response to Request No. 10:**

Plaintiffs object to this Request as overbroad, unduly burdensome, and not proportional to the needs of the case under Rule 26(b)(1) of the Federal Rules of Civil Procedure to the extent it seeks "any proofs" without reasonable limitations as to time, subject matter, or connection to the battery claims asserted in the Third Amended Complaint.

Plaintiffs further object to this Request as vague and ambiguous with respect to the undefined term "Proofs," which improperly attempts to define every conceivable form of communication or documentation as a discoverable category, regardless of relevance, format, or context.

Plaintiffs also object to this Request as vague, speculative, and argumentative to the extent it assumes disputed facts about the circumstances of the alleged battery, including whether any Plaintiff "left" or "came back" to "have it completed."

Plaintiffs further object to this Request to the extent it seeks information protected by the attorney-client privilege, work-product doctrine, or any other applicable privilege or protection.

Subject to and without waiving the foregoing objections, Plaintiffs state that they will meet and confer with Defendant regarding the scope of a reasonable search for responsive discovery material in their possession, custody, or control.

**Request No. 11:**

Any proofs of Finances from your bank records to show you were paid and by who.

**Response to Request No. 11:**

Plaintiffs object to this Request as overbroad, unduly burdensome, and not proportional to the needs of the case under Rule 26(b)(1) of the Federal Rules of Civil Procedure to the extent it seeks "any proofs of Finances from your bank records" without reasonable limitations as to time, subject matter, or connection to the claims or defenses in this case.

Plaintiffs further object to this Request as vague and ambiguous with respect to the undefined terms "Proofs" and "Finances," which are not reasonably clear in scope or meaning and render the Request unworkable as drafted. Plaintiffs are responding to these document requests using the definition of documents in the Federal Rules of Civil Procedure.

Plaintiffs also object to this Request to the extent it seeks irrelevant and highly personal financial information without any particularized showing of relevance or necessity, and without adequate safeguards for privacy or confidentiality.

Plaintiffs further object to this Request to the extent it seeks information protected by the attorney-client privilege, work-product doctrine, or any other applicable privilege or protection. Plaintiffs will not produce documents in response to this Request.

**Request No. 12:**

Copies of any bank records, books and records from any of the entities involved that you have copied or that are in your possession.

**Response to Request No. 12:**

Plaintiffs object to this Request as overbroad, unduly burdensome, and not proportional to the needs of the case under Rule 26(b)(1) of the Federal Rules of Civil Procedure to the extent it seeks "any bank records, books and records" from "any of the entities involved," without identifying the entities with specificity or limiting the Request to documents relevant to the claims or defenses in this action.

Plaintiffs further object to this Request as vague and ambiguous, particularly with respect to the terms "entities involved" and "books and records," which are not reasonably clear in scope or meaning and render the Request unworkable as drafted.

Plaintiffs also object to this Request to the extent it seeks documents containing sensitive personal or financial information without any particularized showing of relevance or necessity, and without adequate safeguards for privacy or confidentiality.

Plaintiffs further object to this Request to the extent it seeks information protected by the attorney-client privilege, work-product doctrine, or any other applicable privilege or protection.

Plaintiffs will not produce documents in response to this Request.

**Request No. 13:**

All proofs of earnings and money you received that you made from books, podcasts, HBO, interviews, Megan Kelly, Dr. Oz, travel paid, etc. from talking about the facts involved in this matter.

**Response to Request No. 13:**

Plaintiffs object to this Request as overbroad, unduly burdensome, and not proportional to the needs of the case under Rule 26(b)(1) of the Federal Rules of Civil Procedure to the extent it

seeks "all proofs of earnings and money" from an open-ended list of platforms, appearances, or opportunities, without reasonable limitations as to time, subject matter, or relevance to any claim or defense in this case.

Plaintiffs further object to this Request as vague and ambiguous with respect to the undefined term "Proofs," which improperly attempts to define every conceivable form of financial or communicative record as a discoverable category, regardless of relevance, format, or context.

Plaintiffs also object to this Request to the extent it seeks information about income, honoraria, or appearance-related compensation without any particularized showing of relevance, and without adequate safeguards for the privacy and confidentiality of financial and contractual information.

Plaintiffs further object to this Request to the extent it seeks information protected by the attorney-client privilege, work-product doctrine, or any other applicable privilege or protection.

Plaintiffs will not produce documents in response to this Request.

**Request No. 14:**

All proofs of Subscribers before and after you came out about the facts involved in this matter.

**Response to Request No. 14:**

Plaintiffs object to this Request as overbroad, unduly burdensome, and not proportional to the needs of the case under Rule 26(b)(1) of the Federal Rules of Civil Procedure to the extent it seeks "all proofs" of Subscribers before and after public disclosure, without reasonable limitations as to platform, time period, or connection to the claims or defenses in this case.

Plaintiffs further object to this Request as vague and ambiguous with respect to the undefined terms "Proofs," "Subscribers," and "came out about the facts involved in this matter," which are not reasonably clear in scope or meaning and render the Request unworkable as drafted.

Plaintiffs also object to this Request to the extent it seeks irrelevant and speculative data about changes in social media or platform metrics, which are not tied to any claim or element of damages in this case, and for which no particularized showing of relevance has been made.

Plaintiffs further object to this Request to the extent it seeks information protected by the attorney-client privilege, work-product doctrine, or any other applicable privilege or protection.

Plaintiffs will not produce documents in response to this Request.

**Request No. 15:**

All Proofs of Contracts with HBO

**Response to Request No. 15:**

Plaintiffs object to this Request as overbroad, unduly burdensome, and not proportional to the needs of the case under Rule 26(b)(1) of the Federal Rules of Civil Procedure to the extent it seeks "all Proofs of Contracts" with HBO without reasonable limitations as to time, subject matter, or connection to any claim or defense in this case.

Plaintiffs further object to this Request as vague and ambiguous with respect to the undefined term "Proofs," which improperly attempts to define every conceivable form of documentation as a discoverable category, regardless of relevance, format, or context.

Plaintiffs also object to this Request to the extent it seeks information about third-party contractual arrangements that are not relevant to any claim or defense in this matter, and that may contain sensitive or confidential business terms not subject to discovery in the absence of a specific, particularized showing of relevance.

Plaintiffs further object to this Request to the extent it seeks information protected by the attorney-client privilege, work-product doctrine, or any other applicable privilege or protection.

Plaintiffs will not produce documents in response to this Request.

**Request No. 16:**

All proof of Communications between HBO and the FBI, prosecutors and Moira Penza.

**Response to Request No. 16:**

Plaintiffs object to this Request as overbroad, unduly burdensome, and not proportional to the needs of the case under Rule 26(b)(1) of the Federal Rules of Civil Procedure to the extent it seeks "all proof of communications" between HBO and third parties, including government entities, without any limitation as to time, subject matter, or relevance to the claims or defenses in this case.

Plaintiffs further object to this Request as vague and ambiguous with respect to the undefined term "proof," which improperly attempts to define every conceivable form of communication or document as a discoverable category, regardless of format or context.

Plaintiffs also object to this Request to the extent it seeks documents not within their possession, custody, or control, including communications between third parties such as HBO and government agencies.

Plaintiffs further object to this Request to the extent it seeks information protected by the attorney-client privilege, work-product doctrine, law enforcement privilege, or any other applicable privilege or protection.

Plaintiffs will not produce documents in response to this Request.

**Request No. 17:**

All proofs of if the government or you sold footage to HBO, or "leak footage" to HBO –
how did HBO get the footage,

**Response to Request No. 17:**

Plaintiffs object to this Request as overbroad, unduly burdensome, and not proportional to the needs of the case under Rule 26(b)(1) of the Federal Rules of Civil Procedure to the extent it

seeks "all proofs" without reasonable limitations as to time, subject matter, or connection to the claims or defenses in this case.

Plaintiffs further object to this Request as vague and ambiguous with respect to the undefined term "proofs," which improperly attempts to define every conceivable form of communication, document, or media record as a discoverable category, regardless of format or context. Plaintiffs are responding to these document requests using the definition of documents in the Federal Rules of Civil Procedure.

Plaintiffs also object to this Request as vague, speculative, and argumentative to the extent it assumes the existence of disputed facts regarding whether footage was "sold" or "leaked" to HBO, or by whom, and further demands a narrative explanation under the guise of a document request.

Plaintiffs further object to this Request to the extent it seeks information not within Plaintiffs' possession, custody, or control, including communications or transactions that may have occurred between HBO and third parties such as the government.

Plaintiffs also object to this Request on the ground that it is, in substance, an interrogatory improperly styled as a request for production. The demand for an explanation of "how HBO got the footage" seeks narrative information more appropriately addressed, if at all, through a properly served interrogatory under Rule 33.

Plaintiffs will not produce documents in response to this Request.

**Request No. 18:**

All communications between yourself, any other parties and HBO.

**Response to Request No. 18:**

Plaintiffs object to this Request as overbroad, unduly burdensome, and not proportional to the needs of the case under Rule 26(b)(1) of the Federal Rules of Civil Procedure to the extent it seeks "all communications" with HBO and "any other parties," without any limitation as to time, subject matter, or connection to the claims or defenses in this action.

Plaintiffs further object to this Request as vague and ambiguous with respect to the scope of "any other parties," which is undefined and renders the Request unworkable as drafted.

Plaintiffs also object to this Request to the extent it seeks information protected by the attorney-client privilege, work-product doctrine, or any other applicable privilege or protection, and to the extent it seeks confidential or proprietary materials belonging to third parties.

Plaintiffs will not produce documents in response to this Request.

**Request No. 19:**

All requests that came into HBO for images or anything else.

**Response to Request No. 19:**

Plaintiffs object to this Request as overbroad, unduly burdensome, and not proportional to the needs of the case under Rule 26(b)(1) of the Federal Rules of Civil Procedure to the extent it seeks "all requests" made to HBO for "images or anything else," without any limitation as to time, subject matter, or relevance to the claims or defenses in this action.

Plaintiffs further object to this Request as vague and ambiguous with respect to the terms "requests" and "anything else," which are undefined, overly broad, and render the Request unworkable as drafted.

Plaintiffs also object to this Request to the extent it seeks information not within their possession, custody, or control, including internal records of a third party (HBO), and communications to which Plaintiffs were neither party nor recipient.

Plaintiffs further object to this Request to the extent it seeks information protected by the attorney-client privilege, work-product doctrine, or any other applicable privilege or protection.

Plaintiffs will not produce documents in response to this request.

**Request No. 20:**

Any receipts you have from HBO regarding anything you gave to them.

**Response to Request No. 20:**

Plaintiffs object to this Request as overbroad, unduly burdensome, and not proportional to the needs of the case under Rule 26(b)(1) of the Federal Rules of Civil Procedure to the extent it seeks "any receipts" without reasonable limitations as to time, subject matter, or connection to the claims or defenses in this case.

Plaintiffs also object to this Request to the extent it seeks information protected by the attorney-client privilege, work-product doctrine, or any other applicable privilege or protection, or to the extent it seeks records of third-party transactions not within Plaintiffs' possession, custody, or control.

Plaintiffs further object to this Request as vague and ambiguous with respect to the phrase "anything you gave to them," which is undefined and renders the Request unworkable as drafted.

 Plaintiffs will not produce documents in response to this Request.

**Request No. 21:**

All proofs you have regarding conversations with therapists about the facts involved in this matter.

**Response to Request No. 21:**

Plaintiffs object to this Request as overbroad, unduly burdensome, and not proportional to the needs of the case under Rule 26(b)(1) of the Federal Rules of Civil Procedure to the extent it

seeks "all proofs" without reasonable limitations as to time, subject matter, or connection to the claims or defenses in this case.

Plaintiffs further object to this Request as vague and ambiguous with respect to the undefined term "proofs," which is overly broad and renders the Request unworkable as drafted. Plaintiffs are responding to these document requests using the definition of documents in the Federal Rules of Civil Procedure.

Plaintiffs also object to this Request to the extent it seeks information protected by the psychotherapist-patient privilege, physician-patient privilege, and any other applicable privacy protections, including those under HIPAA. Plaintiffs further object to the extent it seeks sensitive mental health information without any particularized showing of relevance or appropriate protective measures.

Subject to and without waiving the foregoing objections, Plaintiffs state that they will meet and confer with Defendant regarding the scope of a reasonable search for any non-privileged, responsive discovery material in their possession, custody, or control.

**Request No. 22:**

All communications between you and your psychotherapist and you and that non licensed therapist woman.

**Response to Request No. 22:**

Plaintiffs object to this Request as overbroad, unduly burdensome, and not proportional to the needs of the case under Rule 26(b)(1) of the Federal Rules of Civil Procedure to the extent it seeks "all communications" without reasonable limitations as to time, subject matter, or relevance to the claims or defenses in this case.

Plaintiffs further object to this Request as vague and ambiguous with respect to the undefined phrase "that non licensed therapist woman," which is not reasonably clear in scope or meaning and renders the Request unworkable as drafted.

Plaintiffs also object to this Request to the extent it seeks information protected by the psychotherapist-patient privilege, physician-patient privilege, and any other applicable privacy protections, including those under HIPAA. Plaintiffs further object to the extent it seeks sensitive mental health communications without any particularized showing of relevance or appropriate protective measures.

Subject to and without waiving the foregoing objections, Plaintiffs state that they will meet and confer with Defendant regarding the scope of a reasonable search for any non-privileged, responsive discovery material in their possession, custody, or control.

**Request No. 23:**

All awards and speaking invitations you received for speaking about the facts involved in this matter.

**Response to Request No. 23:**

Plaintiffs object to this Request as overbroad, unduly burdensome, and not proportional to the needs of the case under Rule 26(b)(1) of the Federal Rules of Civil Procedure to the extent it seeks "all awards and speaking invitations" without reasonable limitations as to time, subject matter, or connection to the claims or defenses in this action.

Plaintiffs further object to this Request as vague and ambiguous with respect to the phrase "the facts involved in this matter," which is undefined and renders the Request unworkable as drafted.

Plaintiffs also object to this Request to the extent it seeks speculative or irrelevant information regarding professional or public appearances, absent a particularized showing of relevance to any claim or defense.

Plaintiffs further object to this Request to the extent it seeks information protected by the attorney-client privilege, work-product doctrine, or any other applicable privilege or protection.

Plaintiffs will not produce documents in response to this Request.

**Request No. 24:**

All proofs of additional Notoriety or appearances, exposure, contacts etc.: TED talk appearances, articles, photoshoots, jobs (ex: ambassador for denim jeans), voice over work, etc. you gained from this matter.

**Response to Request No. 24:**

Plaintiffs object to this Request as overbroad, unduly burdensome, and not proportional to the needs of the case under Rule 26(b)(1) of the Federal Rules of Civil Procedure to the extent it seeks "all proofs" without reasonable limitations as to time, subject matter, or connection to the claims or defenses in this case.

Plaintiffs further object to this Request as vague and ambiguous with respect to the terms "proofs," "notoriety," "exposure," and "gained from this matter," which are undefined, speculative, and render the Request unworkable as drafted.

Plaintiffs also object to this Request to the extent it seeks irrelevant and speculative information about Plaintiffs' public profiles, professional opportunities, or post-litigation appearances, absent a particularized showing of relevance to any claim or defense.

Plaintiffs further object to this Request to the extent it seeks information protected by the attorney-client privilege, work-product doctrine, or any other applicable privilege or protection.

Plaintiffs will not produce documents in response to this Request.

**Request No. 25:**

All proofs of communications between you and any other parties in this matter.

**Response to Request No. 25:**

Plaintiffs object to this Request as overbroad, unduly burdensome, and not proportional to the needs of the case under Rule 26(b)(1) of the Federal Rules of Civil Procedure to the extent it seeks "all proofs of communications" without reasonable limitations as to time, subject matter, or connection to the claims or defenses in this action.

Plaintiffs further object to this Request as vague and ambiguous with respect to the undefined term "proofs," which improperly attempts to define every conceivable form of communication or document as a discoverable category, regardless of relevance, format, or context. Plaintiffs are responding to these document requests using the definition of documents in the Federal Rules of Civil Procedure.

Plaintiffs further object to this Request to the extent it seeks information protected by the attorney-client privilege, work-product doctrine, or any other applicable privilege or protection.

Plaintiffs will not produce documents in response to this Request.

**Request No. 26:**

All proofs of communications between you and the FBI or Moira Penza.

**Response to Request No. 26:**

Plaintiffs object to this Request as overbroad, unduly burdensome, and not proportional to the needs of the case under Rule 26(b)(1) of the Federal Rules of Civil Procedure to the extent it seeks "all proofs of communications" without reasonable limitations as to time, subject matter, or connection to the claims or defenses in this action.

Plaintiffs further object to this Request as vague and ambiguous with respect to the undefined term "proofs," which improperly attempts to define every conceivable form of communication or document as a discoverable category, regardless of relevance, format, or context.

Plaintiffs further object to this Request to the extent it seeks information protected by the attorney-client privilege, work-product doctrine, or any other applicable privilege or protection.

Plaintiffs will not produce documents in response to this Request.

**Request No. 27:**

All proofs of Any communications between plaintiffs and Frank Parlato.

**Response to Request No. 27:**

Plaintiffs object to this Request as overbroad, unduly burdensome, and not proportional to the needs of the case under Rule 26(b)(1) of the Federal Rules of Civil Procedure to the extent it seeks "all proofs of communications" without reasonable limitations as to time, subject matter, or connection to the claims or defenses in this action.

Plaintiffs further object to this Request as vague and ambiguous with respect to the undefined term "proofs," which improperly attempts to define every conceivable form of communication or document as a discoverable category, regardless of relevance, format, or context. Plaintiffs are responding to these document requests using the definition of documents in the Federal Rules of Civil Procedure.

Plaintiffs further object to this Request to the extent it seeks information protected by the attorney-client privilege, work-product doctrine, or any other applicable privilege or protection.

Plaintiffs will not produce documents in response to this Request.

**Request No. 28:**

All proofs of Any Plaintiffs who started with their therapist after speaking to Neil Glazer.

**Response to Request No. 28:**

Plaintiffs object to this Request as overbroad, unduly burdensome, and not proportional to the needs of the case under Rule 26(b)(1) of the Federal Rules of Civil Procedure to the extent it seeks "all proofs" without reasonable limitations as to time, subject matter, or connection to the claims or defenses in this case.

Plaintiffs further object to this Request as vague and ambiguous with respect to the undefined term "proofs," which improperly attempts to define every conceivable form of documentation or communication as a discoverable category, regardless of relevance, format, or context. Plaintiffs are responding to these document requests using the definition of documents in the Federal Rules of Civil Procedure.

Plaintiffs also object to this Request as vague, speculative, and argumentative to the extent it assumes disputed facts or requires the reconstruction of events and motivations that are not reasonably subject to document-based discovery.

Plaintiffs further object to this Request to the extent it seeks information protected by the psychotherapist-patient privilege, attorney-client privilege, work-product doctrine, or any other applicable privilege or protection, including those related to the privacy of mental health treatment decisions.

Plaintiffs will not produce documents in response to this Request.

**Request No. 29:**

All proof from the "Therapy island retreat" for any plaintiffs/victims.

**Response to Request No. 29:**

Plaintiffs object to this Request as overbroad, unduly burdensome, and not proportional to the needs of the case under Rule 26(b)(1) of the Federal Rules of Civil Procedure to the extent it seeks "all proofs" without reasonable limitations as to time, subject matter, or connection to the claims or defenses in this case.

Plaintiffs further object to this Request as vague and ambiguous with respect to the term "proof" and the phrase "Therapy island retreat," both of which are undefined and render the Request unworkable as drafted.

Plaintiffs further object to this Request to the extent it seeks information protected by the psychotherapist-patient privilege, attorney-client privilege, work-product doctrine, or any other applicable privilege or protection.

Plaintiffs will not produce documents in response to this Request.

**Request No. 30:**

All communications around the time of leaving ESP, bringing complaint to OPMC, the police, and negative responses from the authorities.

**Response to Request No. 30:**

Plaintiffs object to this Request as overbroad, unduly burdensome, and not proportional to the needs of the case under Rule 26(b)(1) of the Federal Rules of Civil Procedure to the extent it seeks "all communications" without reasonable limitations as to time, subject matter, or connection to the claims or defenses in this action.

Plaintiffs further object to this Request as vague and ambiguous with respect to the terms "around the time of leaving ESP," "bringing complaint," and "negative responses from the authorities," which are not defined and render the Request unworkable as drafted.

Plaintiffs also object to this Request to the extent it seeks information protected by the attorney-client privilege, work-product doctrine, law enforcement privilege, or any other applicable privilege or protection.

Subject to and without waiving the foregoing objections, Plaintiffs state that they will meet and confer with Defendant regarding the scope of a reasonable search for responsive discovery material in their possession, custody, or control.

**Request No. 31:**

All communications with NY Times and Barry Meier and the primary team and Parloto.

**Response to Request No. 31:**

Plaintiffs object to this Request as overbroad, unduly burdensome, and not proportional to the needs of the case under Rule 26(b)(1) of the Federal Rules of Civil Procedure to the extent it seeks "all communications" with multiple individuals and entities without reasonable limitations as to time, subject matter, or connection to the claims or defenses in this action.

Plaintiffs further object to this Request as vague and ambiguous with respect to the terms "primary team" and "Parloto," which are undefined and render the Request unworkable as drafted.

Plaintiffs also object to this Request to the extent it seeks information protected by the attorney-client privilege, work-product doctrine, journalist-source privilege, or any other applicable privilege or protection.

Subject to and without waiving the foregoing objections, Plaintiffs state that they will meet and confer with Defendant regarding the scope of a reasonable search for responsive discovery material in their possession, custody, or control.

**Request No. 32:**

All Communications between Cuomo and the medical commissioner.

**Response to Request No. 32:**

Plaintiffs object to this Request as overbroad, unduly burdensome, and not proportional to the needs of the case under Rule 26(b)(1) of the Federal Rules of Civil Procedure to the extent it seeks "all communications" between third-party government entities without reasonable limitations as to time, subject matter, or relevance to the claims or defenses in this action.

Plaintiffs further object to this Request as vague and ambiguous with respect to the identity of "the medical commissioner," which is undefined and renders the Request unworkable as drafted.

Plaintiffs also object to this Request to the extent it seeks documents not within Plaintiffs' possession, custody, or control, including communications between third parties such as public officials or government agencies.

Plaintiffs will not produce documents in response to this Request.

**Request No. 33:**

All Communications between the FBI and the administrative court (OPMC).

**Response to Request No. 33:**

Plaintiffs object to this Request as overbroad, unduly burdensome, and not proportional to the needs of the case under Rule 26(b)(1) of the Federal Rules of Civil Procedure to the extent it seeks "all communications" between third-party government entities without reasonable limitations as to time, subject matter, or relevance to the claims or defenses in this action.

Plaintiffs further object to this Request as vague and ambiguous with respect to the term "administrative court (OPMC)," which conflates distinct entities and renders the Request unworkable as drafted.

Plaintiffs also object to this Request to the extent it seeks documents not within Plaintiffs'
possession, custody, or control, including communications solely between third parties such as the
FBI and OPMC.

Subject to and without waiving the foregoing objections, Plaintiffs state that they are not
in possession, custody, or control of any communications responsive to this Request and will not
be producing responsive documents.

**Request No. 34:**

All Communications with any parties regarding: readiness drills.

**Response to Request No. 34:**

Plaintiffs object to this Request as overbroad, unduly burdensome, and not proportional to
the needs of the case under Rule 26(b)(1) of the Federal Rules of Civil Procedure to the extent it
seeks "all communications" without reasonable limitations as to time, subject matter, or
connection to the claims or defenses in this action.

Plaintiffs further object to this Request as vague and ambiguous with respect to the term
"readiness drills," which is undefined and renders the Request unworkable as drafted.

Plaintiffs also object to this Request as vague and ambiguous with respect to the term "any
parties," which lacks reasonable specificity.

Plaintiffs further object to this Request to the extent it seeks information protected by the
attorney-client privilege, work-product doctrine, or any other applicable privilege or protection.

 Plaintiffs will not produce documents in response to this Request.

**Request No. 35:**

All tribute videos in your possession (to Keith Raniere, to ESP, NXVIM, other programs
under NXVIM or Ultima umbrellas).

**Response to Request No. 35:**

Plaintiffs object to this Request as overbroad, unduly burdensome, and not proportional to the needs of the case under Rule 26(b)(1) of the Federal Rules of Civil Procedure to the extent it seeks "all tribute videos" without reasonable limitations as to time, subject matter, or relevance to the claims or defenses in this action.

Plaintiffs further object to this Request to the extent it seeks information protected by the attorney-client privilege, work-product doctrine, or any other applicable privilege or protection.

Plaintiffs will not produce documents in response to this Request.

**Request No. 36:**

All communications with news media and Frank Parloto and Rob Gavin and HBO directors.

**Response to Request No. 36:**

Plaintiffs object to this Request as overbroad, unduly burdensome, and not proportional to the needs of the case under Rule 26(b)(1) of the Federal Rules of Civil Procedure to the extent it seeks "all communications" without limitation as to time, subject matter, or relevance to the claims or defenses in this action.

Plaintiffs further object to this Request as vague and ambiguous with respect to the undefined term "HBO directors," which renders the Request unworkable as drafted.

Subject to and without waiving the foregoing objections, Plaintiffs state that they will meet and confer with Defendant regarding the scope of a reasonable search for responsive discovery material in their possession, custody, or control.

Plaintiffs also object to this Request to the extent it seeks information protected by the attorney-client privilege, work-product doctrine, or any applicable journalist-source privilege or related protections.

Plaintiffs will not produce documents in response to this Request.

**Request No. 37:**

All Non-Disclosure Agreements Mark Vincent issued (and those collected) to share information with anyone he was de-enrolling from NXVIM, Ultima or DOS.

**Response to Request No. 37:**

Plaintiffs object to this Request as overbroad, unduly burdensome, and not proportional to the needs of the case under Rule 26(b)(1) of the Federal Rules of Civil Procedure to the extent it seeks "all Non-Disclosure Agreements" without reasonable limitations as to time, subject matter, or connection to the claims or defenses in this action.

Plaintiffs also object to this Request to the extent it seeks confidential or third-party agreements unrelated to the Plaintiffs' claims or the conduct alleged in the Third Amended Complaint.

Plaintiffs further object to this Request to the extent it seeks information protected by the attorney-client privilege, work-product doctrine, or any other applicable privilege or protection.

Plaintiffs will not produce documents in response to this Request.

**Request No. 38:**

All proofs you have meetings, zoom meetings, conference calls of you working with other Plaintiffs, or Cult deprogrammers, media, etc. that were recorded by HBO as well as all raw footage or any other ESI you have in your possession.

**Response to Request No. 38:**

Plaintiffs object to this Request as overbroad, unduly burdensome, and not proportional to the needs of the case under Rule 26(b)(1) of the Federal Rules of Civil Procedure to the extent it seeks "all proofs" and "any other ESI" without reasonable limitations as to time, subject matter, or connection to the claims or defenses in this action.

Plaintiffs further object to this Request as vague and ambiguous with respect to the terms "proofs," "cult deprogrammers," "media," and "ESI," which are undefined and render the Request unworkable as drafted.

Plaintiffs also object to this Request to the extent it seeks documents or raw footage recorded by or in the possession of third parties, including HBO, which are not within Plaintiffs' possession, custody, or control.

Plaintiffs further object to this Request to the extent it seeks information protected by the attorney-client privilege, work-product doctrine, or any other applicable privilege or protection, and to the extent it seeks sensitive or private communications not relevant to the issues in dispute.

Plaintiffs will not produce documents in response to this Request.

**Request No. 39:**

All proofs you have meetings, zoom meetings, conference calls of you working with other Plaintiffs, or Cult deprogrammers, media, etc. that were recorded by you or anyone you were within the meeting or any other ESI you have in your possession.

**Response to Request No. 39:**

Plaintiffs object to this Request as overbroad, unduly burdensome, and not proportional to the needs of the case under Rule 26(b)(1) of the Federal Rules of Civil Procedure to the extent it seeks "all proofs" and "any other ESI" without reasonable limitations as to time, subject matter, or connection to the claims or defenses in this action.

Plaintiffs further object to this Request as vague and ambiguous with respect to the terms "proofs," "cult deprogrammers," "media," and "ESI," which are undefined and render the Request unworkable as drafted.

Plaintiffs also object to this Request as vague and speculative to the extent it assumes that meetings or calls were recorded by Plaintiffs or others and that such recordings exist or are within their possession, custody, or control.

Plaintiffs further object to this Request to the extent it seeks information protected by the attorney-client privilege, work-product doctrine, common interest doctrine, or any other applicable privilege or protection.

Plaintiffs will not produce documents in response to this Request.

**Request No. 40:**

All intro/enrollment videos for ESP and any other intro/enrollment videos.

**Response to Request No. 40:**

Plaintiffs object to this Request as overbroad, unduly burdensome, and not proportional to the needs of the case under Rule 26(b)(1) of the Federal Rules of Civil Procedure to the extent it seeks "all intro/enrollment videos" without reasonable limitations as to time, subject matter, or relevance to the claims or defenses in this action.

Plaintiffs further object to this Request as vague and ambiguous with respect to the scope of "any other intro/enrollment videos," which is undefined and renders the Request unworkable as drafted.

Plaintiffs also object to this Request to the extent it seeks materials that may not be within Plaintiffs' possession, custody, or control, and to the extent it seeks information protected by the attorney-client privilege, work-product doctrine, or any other applicable privilege or protection.

Plaintiffs will not produce documents in response to this Request.

**Request No. 41:**

All videos used related to Auditions/resumes/demos or any other purpose to get hired or for any other purpose that references any facts from the complaint.

**Response to Request No. 41:**

Plaintiffs object to this Request as overbroad, unduly burdensome, and not proportional to the needs of the case under Rule 26(b)(1) of the Federal Rules of Civil Procedure to the extent it seeks "all videos" used for employment-related purposes without reasonable limitations as to time, subject matter, or connection to the claims or defenses in this action.

Plaintiffs further object to this Request as vague and ambiguous with respect to the phrases "any other purpose," "to get hired," and "references any facts from the complaint," which are undefined and speculative, and render the Request unworkable as drafted.

Plaintiffs also object to this Request to the extent it seeks irrelevant personal or professional materials unrelated to the claims at issue, and to the extent it seeks information protected by the attorney-client privilege, work-product doctrine, or any other applicable privilege or protection.

Plaintiffs will not produce documents in response to this Request.

**Request No. 42:**

All Photos from their Photo libraries from 2016 through 2018 in their possession including ESI that illustrates your lifestyle during this time.

**Response to Request No. 42:**

Plaintiffs object to this Request as overbroad, unduly burdensome, and not proportional to the needs of the case under Rule 26(b)(1) of the Federal Rules of Civil Procedure to the extent it seeks "all photos" and "ESI that illustrates your lifestyle" without any reasonable limitations as to subject matter or connection to the claims or defenses in this action.

Plaintiffs further object to this Request as vague and ambiguous with respect to the phrase "illustrates your lifestyle," which is subjective, undefined, and renders the Request unworkable as drafted.

Plaintiffs also object to this Request to the extent it seeks information protected by the attorney-client privilege, work-product doctrine, or any other applicable privilege or protection.

Plaintiffs will not produce documents in response to this request.

**Request No. 43:**

All Scripts written by any of the other Plaintiffs created for how you would incriminate any of the other parties or set them up and any conversations recorded during this script writing.

**Response to Request No. 43:**

Plaintiffs object to this Request as overbroad, unduly burdensome, and not proportional to the needs of the case under Rule 26(b)(1) of the Federal Rules of Civil Procedure. The Request is also vague, speculative, and argumentative to the extent it assumes facts not in evidence—namely, that Plaintiffs engaged in coordinated efforts to "incriminate" or "set up" other parties—and improperly seeks discovery based on a false factual premise.

Plaintiffs further object to this Request as vague and ambiguous with respect to the terms "scripts," "set them up," and "script writing," which are undefined and render the Request unworkable as drafted.

Plaintiffs also object to this Request to the extent it seeks information protected by the attorney-client privilege, work-product doctrine, joint prosecution privilege, or any other applicable privilege or protection.

Plaintiffs will not produce documents in response to this Request.

**Request No. 44:**

Your search history from all research engine searches about or relating to cults, taking down organizations, how to dismantle a community or any other search regarding harming NXIVM or any other parties in this matter.

**Response to Request No. 44:**

Plaintiffs object to this Request as overbroad, unduly burdensome, and not proportional to the needs of the case under Rule 26(b)(1) of the Federal Rules of Civil Procedure. The Request seeks personal internet search history across all platforms without any reasonable limitations as to time, subject matter, or connection to the claims or defenses in this action.

Plaintiffs further object to this Request as vague and ambiguous with respect to the undefined terms "taking down organizations," "dismantle a community," and "any other search regarding harming NXIVM," which are speculative and render the Request unworkable as drafted.

Plaintiffs also object to this Request as invasive and irrelevant, and to the extent it seeks information protected by the attorney-client privilege, work-product doctrine, or any other applicable privilege or protection.

Plaintiffs will not produce documents in response to this Request.

**Request No. 45:**

All proofs with any Public Relations people, media coaching meetings, etc. in regards to how to best position yourself in regards to the facts from the complaint.

**Response to Request No. 45:**

Plaintiffs object to this Request as overbroad, unduly burdensome, and not proportional to the needs of the case under Rule 26(b)(1) of the Federal Rules of Civil Procedure to the extent it seeks "all proofs" without reasonable limitations as to time, subject matter, or connection to the claims or defenses in this case.

Plaintiffs further object to this Request as vague and ambiguous with respect to the undefined term "proofs," which renders the Request unworkable as drafted.

Plaintiffs also object to this Request to the extent it seeks information protected by the attorney-client privilege, work-product doctrine, common interest doctrine, or any other applicable privilege or protection.

Plaintiffs will not produce documents in response to this Request.

**Request No. 46:**

All proofs referring to how to respond to reports, coverage, or criticisms of NXIVM in news media, blogs and other public outlets, including but not limited to general instructions, plans, or guidelines, crafting of specific statements, records of statements made to public outlets, and discussions regarding statements made to public outlets.

**Response to Request No. 46:**

Plaintiffs object to this Request as overbroad, unduly burdensome, and not proportional to the needs of the case under Rule 26(b)(1) of the Federal Rules of Civil Procedure to the extent it seeks "all proofs" without reasonable limitations as to time, subject matter, or connection to the claims or defenses in this case.

Plaintiffs further object to this Request as vague and ambiguous with respect to the undefined term "proofs," which renders the Request unworkable as drafted.

Plaintiffs also object to this Request to the extent it seeks information protected by the attorney-client privilege, work-product doctrine, common interest doctrine, or any other applicable privilege or protection.

Plaintiffs will not produce documents in response to this Request.

**Request No. 47:**

Any proofs of any email address/accounts or identities (real, fake or anonymous) you or any plaintiff you were in contact with created during 2017 - 2025 to communicate publicly or comment publicly about NXVIM, branding or anything related to this matter – Ex: A Count Dracula email address, anonymous accounts used to comment on podcasts, blogs, FR, NYTs, Twitter/X, Reddit, etc.

**<u>Response to Request No. 47:</u>**

Plaintiffs object to this Request as overbroad, unduly burdensome, and not proportional to the needs of the case under Rule 26(b)(1) of the Federal Rules of Civil Procedure to the extent it seeks "all proofs" without reasonable limitations as to time, subject matter, or connection to the claims or defenses in this case.

Plaintiffs further object to this Request as vague and ambiguous with respect to the undefined term "proofs," as well as to the phrase "any plaintiff you were in contact with," which is speculative and renders the Request unworkable as drafted.

Plaintiffs also object to this Request as vague and speculative to the extent it seeks the identification of anonymous or pseudonymous accounts and communications that may not be tied to any Plaintiff or within their possession, custody, or control.

Plaintiffs also object to this Request on the ground that it is, in substance, an interrogatory improperly styled as a request for production. The Request seeks narrative information regarding deletions, reasons for deletions, and subsequent actions taken—none of which seek the production of documents, and all of which are more appropriately addressed, if at all, through a properly served interrogatory under Rule 33.

Plaintiffs further object to this Request to the extent it seeks information protected by the attorney-client privilege, work-product doctrine, or any other applicable privilege or protection.

Subject to and without waiving the foregoing objections, Plaintiffs state that they will meet and confer with Defendant regarding the scope of a reasonable search for responsive materials in their possession, custody, or control.

**Request No. 48:**

Any proofs you have between India and any of her family members, including step-family regarding the issues in this complaint.

**Response to Request No. 48:**

Plaintiffs object to this Request as overbroad, unduly burdensome, and not proportional to the needs of the case under Rule 26(b)(1) of the Federal Rules of Civil Procedure to the extent it seeks "all proofs" without reasonable limitations as to time, subject matter, or connection to the claims or defenses in this case.

Plaintiffs further object to this Request as vague and ambiguous with respect to the undefined term "proofs," which renders the Request unworkable as drafted.

Plaintiffs also object to this Request to the extent it seeks documents involving non-parties, including India Oxenberg and her family members, which are not within Plaintiffs' possession, custody, or control or are not relevant to the claims or defenses in this action.

Plaintiffs will not produce documents in response to this Request.

**Request No. 49:**

Any proofs you have about sex groups in India's mom's house, and any proofs you have regarding any bodily fluids she wore around her neck or elsewhere on her body.

**Response to Request No. 49:**

Plaintiffs object to this Request as overbroad, unduly burdensome, and not proportional to the needs of the case under Rule 26(b)(1) of the Federal Rules of Civil Procedure to the extent it seeks "all proofs" without reasonable limitations as to time, subject matter, or connection to the claims or defenses in this case.

Plaintiffs also object to this Request as vague and ambiguous with respect to the term "proofs," which is undefined and renders the Request unworkable as drafted, and further that the Request is speculative, assuming facts not in evidence.

Plaintiffs also object to this Request to the extent it seeks documents involving non-parties, including India Oxenberg and her family members, which are not within Plaintiffs' possession, custody, or control or are not relevant to the claims or defenses in this action.

Plaintiffs will not produce documents in response to this Request.

**Request No. 50:**

Any proofs with Media Moguls, Catherine Oxenberg, politicians, royalty, producers, and anyone media related regarding the issues in this complaint.

**Response to Request No. 50:**

Plaintiffs object to this Request as overbroad, unduly burdensome, and not proportional to the needs of the case under Rule 26(b)(1) of the Federal Rules of Civil Procedure to the extent it seeks "all proofs" without reasonable limitations as to time, subject matter, or connection to the claims or defenses in this case.

Plaintiffs further object to this Request as vague and ambiguous with respect to the terms "proofs," "media moguls," "media related," and "royalty," which are undefined and render the Request unworkable as drafted.

Plaintiffs also object to this Request to the extent it seeks documents involving non-parties, including Catherine Oxenberg, politicians, and others, which are not within Plaintiffs' possession, custody, or control or are not relevant to the claims or defenses in this action.

 Plaintiffs will not produce documents in response to this Request.

**Request No. 51:**

Please provide any proofs regarding India's inheritance/banking records because Catherine claimed India burned through her entire inheritance doing ESP classes.

**Response to Request No. 51:**

Plaintiffs object to this Request as overbroad, unduly burdensome, and not proportional to the needs of the case under Rule 26(b)(1) of the Federal Rules of Civil Procedure to the extent it seeks "all proofs" without reasonable limitations as to time, subject matter, or connection to the claims or defenses in this case.

Plaintiffs further object to this Request as vague and ambiguous with respect to the term "proofs," which is undefined and renders the Request unworkable as drafted.

Plaintiffs also object to this Request to the extent it seeks financial or personal records of non-parties, including India Oxenberg, which are not within Plaintiffs' possession, custody, or control or are not relevant to the claims or defenses in this action.

Plaintiffs will not produce documents in response to this Request.

**Request No. 52:**

Please provide any proofs of Catherine's foundations accounting books including the books themselves.

**Response to Request No. 52:**

Plaintiffs object to this Request as overbroad, unduly burdensome, and not proportional to the needs of the case under Rule 26(b)(1) of the Federal Rules of Civil Procedure to the extent it seeks "all proofs" without reasonable limitations as to time, subject matter, or connection to the claims or defenses in this case.

Plaintiffs further object to this Request as vague and ambiguous with respect to the term "proofs," which is undefined and renders the Request unworkable as drafted.

Plaintiffs also object to this Request to the extent it seeks financial or business records of non-parties, including Catherine Oxenberg or any foundation affiliated with her, that are not within Plaintiffs' possession, custody, or control or are not relevant to the claims or defenses in this action.

Plaintiffs will not produce documents in response to this Request.

**Request No. 53:**

Please provide any proofs of Mark Vincent's and Bonnie Piesse's taxes and books including the books themselves.

**Response to Request No. 53:**

Plaintiffs object to this Request as overbroad, unduly burdensome, and not proportional to the needs of the case under Rule 26(b)(1) of the Federal Rules of Civil Procedure to the extent it seeks "all proofs" without reasonable limitations as to time, subject matter, or connection to the claims or defenses in this case.

Plaintiffs further object to this Request as vague and ambiguous with respect to the term "proofs," which is undefined and renders the Request unworkable as drafted.

Plaintiffs also object to this Request to the extent it seeks highly sensitive personal or financial information, including tax records, without any particularized showing of relevance, and to the extent it seeks documents not within Plaintiffs' possession, custody, or control.

Plaintiffs will not produce documents in response to this Request.

**Request No. 54:**

All proofs with the Mexican media outlet (Noticieros Televisa) that released Sarah's branding video or Communications between you and Alex Betancourt, Lauren Salzman and Alex Betancourt, and Alex Betancourt and the Mexican media outlet that released the video.

**Response to Request No. 54:**

Plaintiffs object to this Request as overbroad, unduly burdensome, and not proportional to the needs of the case under Rule 26(b)(1) of the Federal Rules of Civil Procedure to the extent it

seeks "all proofs" without reasonable limitations as to time, subject matter, or connection to the claims or defenses in this case.

Plaintiffs further object to this Request as vague and ambiguous with respect to the term "proofs," which is undefined and renders the Request unworkable as drafted.

Plaintiffs also object to this Request to the extent it seeks documents not within Plaintiffs' possession, custody, or control, including communications to which Plaintiffs were not party.

Plaintiffs further object to this Request to the extent it seeks information protected by the attorney-client privilege, work-product doctrine, or any other applicable privilege or protection.

Subject to and without waiving the foregoing objections, Plaintiffs state that they will meet and confer with Defendant regarding the scope of a reasonable search for responsive discovery material in their possession, custody, or control.

**Request No. 55:**

All proofs between Lauren Salzman and Charmel Bowden and Audrey and Charmel about branding. Any proof of threat of collateral release to Charmel Bowden.

**Response to Request No. 55:**

Plaintiffs object to this Request as overbroad, unduly burdensome, and not proportional to the needs of the case under Rule 26(b)(1) of the Federal Rules of Civil Procedure to the extent it seeks "all proofs" without reasonable limitations as to time, subject matter, or connection to the claims or defenses in this case.

Plaintiffs further object to this Request as vague and ambiguous with respect to the term "proofs," which is undefined and renders the Request unworkable as drafted.

Plaintiffs also object to this Request to the extent it seeks documents not within Plaintiffs' possession, custody, or control.

Plaintiffs further object to this Request to the extent it seeks information protected by the attorney-client privilege, work-product doctrine, or any other applicable privilege or protection.

Plaintiffs will not produce documents in response to this Request.

**Request No. 56:**

Any proofs with AnaGabriela Montemayor about branding. Any proofs about her choice not to get a brand. Any proofs of threats of collateral release or collateral release for her choice.

**Response to Request No. 56:**

Plaintiffs object to this Request as overbroad, unduly burdensome, and not proportional to the needs of the case under Rule 26(b)(1) of the Federal Rules of Civil Procedure to the extent it seeks "all proofs" without reasonable limitations as to time, subject matter, or connection to the claims or defenses in this case.

Plaintiffs further object to this Request as vague and ambiguous with respect to the term "proofs," which is undefined and renders the Request unworkable as drafted.

Plaintiffs also object to this Request to the extent it seeks documents involving non-parties, including AnaGabriela Montemayor, that are not within Plaintiffs' possession, custody, or control or are not relevant to the claims or defenses in this action. Plaintiffs further object to this Request to the extent it seeks sensitive or private material concerning third-party individuals without a particularized showing of relevance.

Plaintiffs will not produce documents in response to this Request.

**Request No. 57:**

Any proofs with Sylvie Lloyd about the branding.

**Response to Request No. 57:**

Plaintiffs object to this Request as overbroad, unduly burdensome, and not proportional to the needs of the case under Rule 26(b)(1) of the Federal Rules of Civil Procedure to the extent it seeks "all proofs" without reasonable limitations as to time, subject matter, or connection to the claims or defenses in this case.

Plaintiffs further object to this Request as vague and ambiguous with respect to the term "proofs," which is undefined and renders the Request unworkable as drafted.

Plaintiffs also object to this Request to the extent it seeks documents involving non-parties, including Sylvie Lloyd, which are not within Plaintiffs' possession, custody, or control or are not relevant to the claims or defenses in this action.

Plaintiffs will not produce documents in response to this Request.

**Request No. 58:**

Any proofs of AnaGabriela Montemayor not doing the assignments from her Master and not receiving any consequences or threats of collateral release.

**Response to Request No. 58:**

Plaintiffs object to this Request as overbroad, unduly burdensome, and not proportional to the needs of the case under Rule 26(b)(1) of the Federal Rules of Civil Procedure to the extent it seeks "all proofs" without reasonable limitations as to time, subject matter, or connection to the claims or defenses in this case.

Plaintiffs further object to this Request as vague and ambiguous with respect to the term "proofs," which is undefined and renders the Request unworkable as drafted.

Plaintiffs also object to this Request to the extent it seeks documents involving non-parties, including AnaGabriela Montemayor, that are not within Plaintiffs' possession, custody, or control or are not relevant to the claims or defenses in this action.

Plaintiffs will not produce documents in response to this Request.

**Request No. 59:**

All proofs between Lauren Salzman and Sarah E about the branding, when either was told about any meanings or inclusion of Keith Raniere's initials

**Response to Request No. 59:**

Plaintiffs object to this Request as overbroad, unduly burdensome, and not proportional to the needs of the case under Rule 26(b)(1) of the Federal Rules of Civil Procedure to the extent it seeks "all proofs" without reasonable limitations as to time, subject matter, or connection to the claims or defenses in this case.

Plaintiffs further object to this Request as vague and ambiguous with respect to the terms "proofs" and "the branding," which are undefined and render the Request unworkable as drafted.

Plaintiffs also object to this Request to the extent it seeks information protected by the attorney-client privilege, work-product doctrine, or any other applicable privilege or protection.

Subject to and without waiving the foregoing objections, Plaintiffs state that they will meet and confer with Defendant regarding the scope of a reasonable search for responsive materials in their possession, custody, or control.

**Request No. 60:**

Your applications and invitation to fill out the applications for the Ultima development groups you applied to.

**Response to Request No. 60:**

Plaintiffs object to this Request as overbroad, unduly burdensome, and not proportional to the needs of the case under Rule 26(b)(1) of the Federal Rules of Civil Procedure. Plaintiffs further object to this Request as vague and ambiguous with respect to the term "Ultima development groups," which is undefined and renders the Request unworkable as drafted.

Plaintiffs will not produce documents in response to this Request.

**Request No. 61:**

Any feedback surveys of any NXVIM or Ultima related Courses you took.

**Response to Request No. 61:**

Plaintiffs object to this Request as overbroad, unduly burdensome, and not proportional to the needs of the case under Rule 26(b)(1) of the Federal Rules of Civil Procedure. Plaintiffs further object to this Request as vague and ambiguous with respect to the terms "feedback surveys" and "Ultima related Courses," which are undefined and render the Request unworkable as drafted.

Plaintiffs will not produce documents in response to this Request

**Request No. 62:**

Your Coach applications

**Response to Request No. 62:**

Plaintiffs object to this Request as overbroad, unduly burdensome, and not proportional to the needs of the case under Rule 26(b)(1) of the Federal Rules of Civil Procedure. Plaintiffs further object to this Request as vague and ambiguous with respect to the term "Coach applications," which is undefined and renders the Request unworkable as drafted.

Plaintiffs will not produce documents in response to this Request.

**Request No. 63:**

All Proofs from/to Bonnie Piesse regarding a black sash promotion in ESP, and your enlightenment experience.

**Response to Request No. 63:**

Plaintiffs object to this Request as overbroad, unduly burdensome, and not proportional to the needs of the case under Rule 26(b)(1) of the Federal Rules of Civil Procedure to the extent it seeks "all proofs" without reasonable limitations as to time, subject matter, or connection to the claims or defenses in this case.

Plaintiffs further object to this Request as vague and ambiguous with respect to the term "proofs," which is undefined and renders the Request unworkable as drafted.

Plaintiffs will not produce documents in response to this Request.

**Request No. 64:**

All Proofs from/to Bonnie Piesse with any plaintiffs or coaches regarding your enlightenment experience.

**Response to Request No. 64:**

Plaintiffs object to this Request as overbroad, unduly burdensome, and not proportional to the needs of the case under Rule 26(b)(1) of the Federal Rules of Civil Procedure to the extent it seeks "all proofs" without reasonable limitations as to time, subject matter, or connection to the claims or defenses in this case.

Plaintiffs further object to this Request as vague and ambiguous with respect to the term "proofs," which is undefined and renders the Request unworkable as drafted.

Plaintiffs will not produce documents in response to this Request.

**Request No. 65:**

All Proofs from/to Bonnie Piesse to anyone regarding mediation with Allison Mack.

**Response to Request No. 65:**

Plaintiffs object to this Request as overbroad, unduly burdensome, and not proportional to the needs of the case under Rule 26(b)(1) of the Federal Rules of Civil Procedure to the extent it seeks "all proofs" without reasonable limitations as to time, subject matter, or connection to the claims or defenses in this case.

Plaintiffs further object to this Request as vague and ambiguous with respect to the term "proofs," which is undefined and renders the Request unworkable as drafted.

Plaintiffs also object to this Request to the extent it seeks documents protected by the attorney-client privilege, work-product doctrine, or any other applicable privilege or protection.

Plaintiffs will not produce documents in response to this Request.

**Request No. 66:**

All Proofs with your family, parents, siblings about these matters (NXVIM, DOS, ESP, Ultima related companies).

**Response to Request No. 66:**

Plaintiffs object to this Request as overbroad, unduly burdensome, and not proportional to the needs of the case under Rule 26(b)(1) of the Federal Rules of Civil Procedure to the extent it seeks "all proofs" without reasonable limitations as to time, subject matter, or connection to the claims or defenses in this case.

Plaintiffs further object to this Request as vague and ambiguous with respect to the term "proofs," and as intrusive into private family communications without a particularized showing of relevance.

Plaintiffs will not produce documents in response to this Request.

**Request No. 67:**

All Job applications and accepts of jobs after the 2017 campaign to attack NXIVM.

**Response to Request No. 67:**

Plaintiffs object to this Request as overbroad, unduly burdensome, and not proportional

to the needs of the case under Rule 26(b)(1) of the Federal Rules of Civil Procedure. Plaintiffs

further object to this Request as vague and argumentative to the extent it presumes the existence

of a "campaign to attack NXIVM," and to the extent it seeks irrelevant employment history

without any showing of relevance to the claims or defenses in this action.

Plaintiffs will not produce documents in response to this Request.

**Request No. 68:**

All Proofs from or to NXIVM-affiliated individuals referring to the retention of legal counsel to represent You or any other NXIVM-affiliated individuals or entities in legal proceedings, or make complaints to law enforcement or regulators about people on behalf of NXIVM-affiliated individuals or entities that are not protected by attorney/client privilege, including, but not limited to, any communications you had with your current representation not protected and any communications you have with anyone who is not currently representing you.

**Response to Request No. 68:**

Plaintiffs object to this Request as overbroad, unduly burdensome, and not proportional to

the needs of the case under Rule 26(b)(1) of the Federal Rules of Civil Procedure to the extent it

seeks "all proofs" without reasonable limitations as to time, subject matter, or connection to the

claims or defenses in this case.

Plaintiffs further object to this Request as vague and ambiguous with respect to the term

"proofs," which is undefined and renders the Request unworkable as drafted.

Plaintiffs will not produce documents in response to this Request.

Dated: August 6, 2025

/s/ Robert A. Swift
Robert A. Swift
William E. Hoese
Zahra R. Dean
KOHN, SWIFT & GRAF, P.C.
1600 Market Street, Suite 2500
Philadelphia, PA 19103
(215) 238-1700
rswift@kohnswift.com
whoese@kohnswift.com
zdean@kohnswift.com

Adam M. Prom
DICELLO LEVITT LLP
10 North Dearborn
Chicago, IL 60602
(312) 214-7900
aprom@dicellolevitt.com

Greg G. Gutzler
Emma Bruder
DICELLO LEVITT LLP
485 Lexington Avenue, 10th Floor
New York, NY 10017
(646) 933-1000
gutzler@dicellolevitt.com
ebruder@dicellolevitt.com

Agnieszka M. Fryszman
Brendan R. Schneiderman
COHEN MILSTEIN SELLERS
    & TOLL PLLC
1100 New York Ave. NW, Suite 800
Washington, DC 20005
(202) 408-4600
afryszman@cohenmilstein.com
bschneiderman@cohenmilstein.com

Manuel John Dominguez
COHEN MILSTEIN SELLERS
    & TOLL PLLC
11780 U.S. Highway One, Suite N500
Palm Beach Gardens, FL 33408
(561) 515-1400
jdominguez@cohenmilstein.com

*Attorneys for Plaintiffs*

52

<u>**CERTIFICATE OF SERVICE**</u>

I hereby certify that on August 6, 2025, I served the foregoing via electronic mail on the following:

Robin A. Henry
Anne S. Aufhauser
FRIED, FRANK, HARRIS, SHRIVER
   & JACOBSON LLP
One New York Plaza
New York, NY 10004
(212) 859-8000
robin.henry@friedfrank.com
anne.aufhauser@friedfrank.com

*Attorneys for Sara Bronfman*

Aaron M. Goldsmith
225 Broadway, Suite 715
New York, NY 10007
(914) 588-2679
aarongoldsmithlaw@gmail.com

*Attorney for Keith Raniere and Clare Bronfman*

Danielle Roberts
575 Easton Ave, Apt. 18
Somerset, NJ 08873
(516) 480-1700

*Pro Se Defendant*

Dated: August 6, 2025         */s/ Robert A. Swift*
                                   Robert A. Swift

EXHIBIT 3

| | |
|---|---|
| SARAH EDMONDSON, *et al.* | * |
| | * |
| | * |
| Plaintiffs, | * |
| | *     1:20 - cv - 00485-EK-CLP |
| v. | * |
| | * |
| Keith Raniere, *et al.* | * |
| | * |
| Defendants. | * |
| | * |

July 8, 2025


    TO:

    Robert A. Swift
    William E. Hoese
    Zahra R. Dean
    Elias Kohn
    KOHN, SWIFT & GRAF, P.C.
    1600 Market Street, Suite 2500
    Philadelphia, PA 19103
    (215) 238-1700
    rswift@kohnswift.com
    whoese@kohnswift.com
    zdean@kohnswift.com

    ekohn@kohnswift.com


### SECOND SET OF REQUESTS FOR PRODUCTION OF DOCUMENTS TO PLAINTIFFS[1]

    Defendant Danielle Roberts requests pursuant to Federal Rules of Civil Procedure 26 and

34 and Local Civil Rules 26.2, 26.3 and 26.4 of the United States District Court for the Eastern

Districts of New York, that Plaintiffs, in the above captioned action produce the following

---

[1] This does not toll or stop your requirement to properly answer my prior discovery. These are additional questions to those previously sent. You have not properly responded to **any** prior discovery, and if that continues, I will file a motion to compel that discovery, and if it comes to it, this discovery as well.

Documents to Defendant via email ONLY at danielle@drdanielleroberts.com, within thirty (30) days following the receipt of service of these Requests for Production of Documents ("Requests").

**DEFINITIONS**

1.      The Uniform Definitions in Discovery Requests set forth in Local Civil Rule 26.3 and the rules of construction set forth therein and in the Federal Rules of Civil Procedure are all incorporated herein by reference as if separately set forth in each and every Request.

2.      The "Action" refers to the particular action in which these Requests have been served, i.e., the action within which the party responding to these Requests has been named as a Defendant.

3.      "And" and "or" mean and/or and should be construed accordingly.

4. "Communication" means the transmission of information, in the form of facts, ideas, inquiries, or otherwise.

5. "Document" has the broadest possible meaning, including paper Documents and electronic files and data, including without limitation communications in any form including emails, text messages, messages using any other messaging app, calendars, phone logs, notes and recordings of meetings and phone calls.

6. "You," or "Your" means the specific Plaintiff identified in the question, or any Plaintiff who is answering these documents.

7. "Defendants" means all currently and formerly named Defendants in this Action.

8. "DOS" means the organization within NXIVM generally referred to as "DOS", also sometimes referred to as "the Vow".

9. "DOS member" means any individual associated with NXIVM who was recruited to join DOS (also known as "The Vow").

10. "DOS Plaintiffs" means Plaintiffs Sarah Edmonson, Jessica Joan Salazar, India Oxenberg, Soukiana Mehdaoui, Rachel Widjaja, Nicole Isbell, Valerie Heckel, Allison Warnyca, Paloma Pena, Erika Weissenborn, Kristin Taravella, Veronica Jaspeado, Charlotte Giroux (the

"DOS Plaintiffs") and Camila Fernandez.

11. "Identify" when referring to a Document means, unless otherwise specified, to give, to the extent known, the (a) type of Document; (b) general subject matter; (c) date of the Document; and (d) author(s), addressee(s), and recipient(s).

12. "Individual Defendant" means any non-entity who was ever named as a Defendant in the Action, whether or not the person is named as a Defendant in the Third Amended Complaint.

13. "NXIVM" means NXIVM, Executive Success Programs ("ESP") and affiliated companies, including: Ethical Science Foundation ("ESF"), Ethical Humanitarian Foundation, Rainbow Cultural Garden ("RCG"), Jness, Society of Protectors ("SOP"), and NXIVM's VIP Program.

15. "Person" or "persons" means any natural person or any business, legal or governmental entity, or association.

16. "Plaintiffs" means Sarah Edmondson, Jessica Joan Salazar, Soukiana Mehdaoui, Nicole Isbell, Daniela Fernandes, Camila Fernandes, India Oxenberg, Bonnie Piesse, Tabitha Chapman, Ashley Mclean, Mark Vicente, Anthony Ames, Veronica Jaspeado, Paloma Pena, Charlotte Giroux, Rachel Behl/Widjaja, Valerie Heckel, Adrienne Stiles, Jennifer Sinclair/Kobelt, Margot Leviton, Isabella Constantino, Caryssa Cottrell, Deanne Brunelle, Karla Diaz Cano, Pamela Cooley, Rosalyn Cua, Brieanna Fiander, Shayna Holmes, Polly Green, Andrea Hammond, Yan Huang, Sara Lim, Ariella Menashy, Maja Miljkovic, Michelle Neal, Susan Pratt, Alison Rood, Katie Shaw Kristin, Hannah Vanderheyden, Juliana Vicente, Susan Patricia Vieta, Susan Wysocki, Stephanie Fair-Layman, Gabrielle Gendron, Sarah Wall, Scott Starr, Philip Akka, Alejandro Balassa, Madeline Carrier, Rod Christiansen, Owen Giroux, Jeffrey Golfman, Ashley Harvey, Rees Alan Haynes, Nils Macquarrie, Anthony Madani, Chad Williams, Christopher Black, Robert Gray, Ken Kozak, Allison Warnycam, Erika Weissenborn, Elham Menhaji, Kayla Grosse and Lindsay MacInnis.

17. "Referring to" means concerning, relating to, describing, evidencing, or constituting and is used synonymously with those terms.

## INSTRUCTIONS

1.      The Documents to be produced in response to these Requests are all responsive Documents within Your possession, custody or control, including Documents that You have the practical ability to obtain, including but not limited to, Documents that are within the possession, custody or control of any of Your agents, attorneys, administrators, executors, family members and any and all such other persons and entities that represent You or are subject to Your control.

2.      Electronically Stored Information ("ESI") shall be produced pursuant to the Joint Stipulated Order Regarding Discovery of Electronically Stored Information or any other ESI order entered on the Court's docket or as agreed to by the parties.

3.      With respect to each Document withheld on a claim of privilege, provide a statement setting forth the information required by Local Civil Rule 26.2.

4.      Each Request shall be construed as required under Local Civil Rule 26.4.

5.      If any Documents within the scope of the Requests have been lost, destroyed, transferred to others not subject to Your control, or otherwise disposed of, or if any Documents responsive to the Requests exist but are not available, furnish a list identifying each such Document and setting forth the following information with respect to each such Document: its date, author(s), sender(s), addressee(s), and recipient(s), and the subject matter of the Document. In each instance, explain the circumstances surrounding each disposition or why such Document is unavailable, including the person(s) responsible for authorizing the disposition and the date of disposition.

6.      Please produce the Documents either as they are kept in the usual course of business or organize and label them to correspond to the categories in these Requests.

7.      If You have no Documents responsive to a particular Request, so state.

8.      Unless otherwise indicated, the time period covered by these Requests encompasses, for the individual responding, the period from when they first became involved in the matters specific to this complaint to the present.

**DOCUMENTS TO BE PRODUCED:**

1.  Please present all evidence that defendant was personally directly or indirectly responsible for the delay in you bringing the specific charge of battery against her.

2.  Please present all evidence as to the reason you waited until you did for when you filed the battery charge against defendant, if any such evidence exists.

    Please present all documentation that backs up your answer.

3.  Did you believe that filing the battery charge against her when you did was within the one year statute of limitations? If so why?

    Please present all documentation that backs up your answer.

4.  If you knew it was beyond the statute of limitations, why did you file it anyway?Please present all documentation that backs up your answer.

5.  Were you aware that defendant had not been charged criminally with anything?

    Please present all documentation that backs up your answer.

6.  Is it your contention that the statute of limitations in regards to the battery charge was somehow tolled?

    Please present all documentation that backs up your answer.

7.  Once the attempts to file charges in July 2017 for battery that allegedly took place on the date of 3/9/2017 with the police department were dropped, please tell me why you failed to file civil charges before the statute of limitations passed.

    Please present all documentation that backs up your answer.

8.  In regards to the Battery claim that you have filed against me, Communications between medical board and authorities, phone records, produce all documents, including police reports, emails and texts, written letters, journal entry, podcast or video recordings,

Facebook pages, signal, whats app, telegram, protonmail, all email addresses, group chats, recorded voice conversations (HBO), voice notes, zoom recordings, snapchat, tiktok, photos, videos recorded communications or anything else (from now on known as Proofs) that allege supports your claim for battery and specifically:

    a. Proofs regarding the alleged intentional touching or application of force;

    b. Proofs regarding the alleged touching that shows that it was either harmful or offensive to a reasonable person in the plaintiff's circumstances; and

    c. Proofs regarding the Lack of consent to the touching.

9. In regards to the Battery claim that you have filed against me, produce all Proofs as far back as you have available when you first contemplated bring the battery charge against me.

10. If any such Proofs were deleted, please give a detailed list of those deleted Proofs, and why they were deleted. Further, please state what actions taken, if any were done to recover those Proofs in light of the ongoing litigation.

11. For any such Proofs where a Phone was used, please state the Phone company you used for such Proofs.

12. In regards to consent for the alleged battery, please produce all Proofs showing:

    a. You did not consent to get a brand;
    b. You needed to know the meaning prior to getting the brand;
    c. Any "Master slave communications";
    d. All communication that showed you either enjoyed their experience and wanted to share it or communications showing you did not enjoy it;
    e. If applicable, the date you found out the brand was KR's initials and how you found out;
    f. People you tried to enroll, conversations with those people and specifically who you tried to enroll after you found out the brand was KR's initials;
    g. All Proofs in your possession showing the activities and conversations that show the lifestyle that was occurring in ESP and DOS was one you wanted and wanted to share it with others;

h. All Proofs that show you trusted the system – things that show how "weird" their lifestyle was and how you liked doing it – all the things that you were doing, and this was just one of them;

i. Proofs that show you knew DOS was about complete obedience and either objected at any time, or enjoyed it;

j. Proofs that you had Informed consent and that you were informed of what the life was;

k. Proofs of when you learned that you were, in fact, a "victim" of this lifestyle, and who, or how you learned it;

l. Proofs you agreed to an alternative lifestyle and liked and enjoyed that until it became inconvenient and proofs as to how you were inconvenienced or damages by the lifestyle;

m. Any proofs that the alleged act of the battery was part of the practice of medicine or a medical procedure;

n. Any proofs that you have or made for tributes or "thank yous" or anything you created that shows your appreciation of Keith;

o. Produce your "Vow" and "creedos" from DOS; and

p. Any Communications between you and any other members of DOS.

13. In regards to harm for the alleged battery, please produce all Proofs showing:

a. Proofs that you sought medical advice after the alleged battery occurred;

b. Proofs of you Enrolling of others after the alleged battery occurred;

c. Proofs of any threats you received if you didn't comply with anything while participating in the lifestyle;

d. Proofs of Any Collaterals or alleged Blackmail that were released against you or anyone else;

e. Any communications you have between yourself and Lauren Salzman;

f. Any communications you have between yourself and Alex Betancourt;

g. Any communications you have between yourself and anyone who is or was a party in this matter related to this matter;

h. Any Proofs related to any videos of any alleged battery of any of the alleged parties;

i. Any therapy records in your possession where you spoke about the alleged battery and it's alleged psychological damage;

j. Any Medical records for bodily harm that you can produce after the alleged battery;

k. Communications of progress on any assignments with a master/instructor/teacher and slave/instructed/student and reports on successes/failures with those assignments;

l. Proofs of any receipts from plastic surgery procedure to counter the alleged battery and have it removed that you got restitution for and what specifically the money was used for;

14. Any proofs or letters stating anyone explained the risks of the alleged battery;

15. Any proofs anyone told you to see their doctor for follow up if needed;

16. Any proofs you left during part of the alleged battery, and what you left to do and that you came back afterwards to have it completed?

_/s/ Danielle Roberts____
Danielle Roberts

## CERTIFICATION

I hereby certify that the copies of the reports annexed hereto rendered by proposed expert witnesses are exact copies of the entire report or reports rendered by them; that the existence of other reports of said experts, either written or oral, are unknown to me, and if such become later known or available, I shall serve them promptly on the propounding party.

By:_____(sign and print name)
Print:

Dated:_____, 202____

## INDIVIDUAL CERTIFICATION

I certify that the foregoing statements made by me are true.  I am aware that if any of the foregoing statements made by me are willfully false, I am subject to punishment for contempt of Court.

_____(sign and print name)
Print:

Dated: _____, 202____

EXHIBIT 4

# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF NEW YORK

| | |
|---|---|
| SARAH EDMONDSON, et al., :<br><br>Plaintiffs, :<br><br>v. :<br><br>KEITH RANIERE, et al., :<br><br>Defendants. : | CIVIL ACTION NO. 20-CV-485 (EK) (CLP)<br><br>PLAINTIFFS' RESPONSES AND OBJECTIONS TO DEFENDANT DANIELLE ROBERTS' SECOND SET OF DEMANDS FOR PRODUCTION |

Plaintiffs who are asserting a battery claim hereby provide the following responses and objections to Defendant Danielle Roberts' ("Defendant Roberts") Second Set of Requests for Production ("RFPs" or "Requests") by Plaintiffs.

## GENERAL OBJECTIONS

The following General Objections form a part of, and are hereby incorporated into, the response to each and every Request as set forth below. Nothing in Plaintiffs' Specific Objections and Responses should be construed as a waiver of these General Objections, all of which are expressly preserved.

1.      Plaintiffs object to the Definitions, Instructions, and Requests to the extent they seek to impose burdens or obligations beyond what is required by the Federal Rules of Civil Procedure, the Local Rules of the Eastern District of New York, any applicable Court Orders, or other governing law (collectively, the "Applicable Rules"). Plaintiffs will construe the Definitions and Requests consistent with the Applicable Rules.

2.      Plaintiffs object to these Requests to the extent they attempt or purport to seek Documents and/or information protected by the attorney-client privilege, the work-product

doctrine, or any other applicable privilege held by Plaintiffs. Any inadvertent disclosure of such information shall not constitute a waiver of any such privilege or of any ground for objecting to the discovery or admissibility of such materials, their subject matter, or the information contained therein, nor shall such disclosure constitute a waiver of Plaintiffs' rights to object to the use of such information during this or any other proceeding.

3.    Plaintiffs object to these Requests to the extent that they suggest Plaintiffs are obligated to provide information that is not in the possession, custody, or control of Plaintiffs, which is not known by Plaintiffs, or that can be more conveniently obtained from another source.

4.    Plaintiffs object to these Requests to the extent they are premature by seeking information that has yet to be determined, as discovery in this litigation is ongoing. The requested information will be provided in accordance with the Court's Scheduling Order and all other Applicable Rules.

5.    Plaintiffs reserve the right to amend, supplement, or revise their objections and responses as discovery progresses. No statement herein shall be deemed a waiver of any argument, objection, or claim that may later arise in this matter, including at trial.

## SECOND SET OF REQUESTS FOR PRODUCTION OF DOCUMENTS

### Request No. 1:

Please present all evidence that defendant was personally directly or indirectly responsible for the delay in you bringing the specific charge of battery against her.

### Response to Request No. 1:

Plaintiffs object to this Request as overbroad, unduly burdensome, and not proportional to the needs of the case under Rule 26(b)(1) of the Federal Rules of Civil Procedure to the extent it seeks "all evidence" without reasonable limitations as to time, subject matter, or connection to the battery claim asserted in the Third Amended Complaint.

Plaintiffs further object to this Request as vague and ambiguous with respect to the terms, "evidence" and "delay," which are not defined and render the Request unworkable as drafted.

Plaintiffs also object to this Request to the extent it seeks information protected by the attorney-client privilege, work-product doctrine, or any other applicable privilege or protection.

Plaintiffs will not produce documents in response to this request.

**Request No. 2:**

Please present all evidence as to the reason you waited until you did for when you filed the battery charge against defendant, if any such evidence exists. Please present all documentation that backs up your answer.

**Response to Request No. 2:**

Plaintiffs object to this Request as overbroad, unduly burdensome, and not proportional to the needs of the case under Rule 26(b)(1) of the Federal Rules of Civil Procedure to the extent it seeks "all evidence" or "all documentation" without reasonable limitations as to time, subject matter, or connection to the battery claim asserted in the Third Amended Complaint.

Plaintiffs also object to this Request to the extent it seeks information protected by the attorney-client privilege, work-product doctrine, or any other applicable privilege or protection.

Subject to and without waiving the foregoing objections, Plaintiffs state that they will meet and confer with Defendant regarding the scope of a reasonable search for responsive, non-privileged discovery material in their possession, custody, or control.

**Request No. 3:**

Did you believe that filing the battery charge against her when you did was within the one year statute of limitations? If so why? Please present all documentation that backs up your answer.

**Response to Request No. 3:**

Plaintiffs object to this Request on the ground that it is, in substance, an interrogatory improperly styled as a request for production. The Request seeks narrative information regarding

Plaintiffs' beliefs, reasoning, and legal interpretations, rather than requesting specific documents for production as contemplated by Rule 34.

Plaintiffs object to this Request as overbroad, unduly burdensome, and not proportional to the needs of the case under Rule 26(b)(1) of the Federal Rules of Civil Procedure to the extent it seeks "all documentation" without reasonable limitations as to time, subject matter, or connection to the battery claim asserted in the Third Amended Complaint.

Plaintiffs further object to this Request to the extent it seeks information protected by the attorney-client privilege, work-product doctrine, or any other applicable privilege or protection.

Plaintiffs will not produce documents in response to this Request.

**Request No. 4:**

If you knew it was beyond the statute of limitations, why did you file it anyway? Please present all documentation that backs up your answer.

**Response to Request No. 4:**

Plaintiffs object to this Request on the ground that it is, in substance, an interrogatory improperly styled as a request for production. The Request seeks narrative information regarding Plaintiffs' beliefs, reasoning, and legal interpretations, rather than requesting specific documents for production as contemplated by Rule 34.

Plaintiffs further object to this Request as overbroad, unduly burdensome, and not proportional to the needs of the case under Rule 26(b)(1) of the Federal Rules of Civil Procedure to the extent it seeks "all documentation" without reasonable limitations as to time, subject matter, or connection to the battery claim asserted in the Third Amended Complaint.

Plaintiffs also object to this Request to the extent it seeks information protected by the attorney-client privilege, work-product doctrine, or any other applicable privilege or protection.

Plaintiffs will not produce documents in response to this Request.

**Request No. 5:**

Were you aware that defendant had not been charged criminally with anything? Please present all documentation that backs up your answer.

**Response to Request No. 5:**

Plaintiffs object to this Request on the ground that it is, in substance, an interrogatory improperly styled as a request for production. The Request seeks narrative information regarding Plaintiffs' beliefs, reasoning, and legal interpretations, rather than requesting specific documents for production as contemplated by Rule 34.

Plaintiffs further object to this Request as overbroad, unduly burdensome, and not proportional to the needs of the case under Rule 26(b)(1) of the Federal Rules of Civil Procedure to the extent it seeks "all documentation" without reasonable limitations as to time, subject matter, or connection to the battery claim asserted in the Third Amended Complaint.

Plaintiffs also object to this Request to the extent it seeks information protected by the attorney-client privilege, work-product doctrine, or any other applicable privilege or protection.

Plaintiffs will not produce documents in response to this Request.

**Request No. 6:**

Is it your contention that the statute of limitations in regards to the battery charge was somehow tolled? Please present all documentation that backs up your answer.

**Response to Request No. 6:**

Plaintiffs object to this Request on the ground that it is, in substance, an interrogatory improperly styled as a request for production. The Request seeks narrative information regarding Plaintiffs' beliefs, reasoning, and legal interpretations, rather than requesting specific documents for production as contemplated by Rule 34.

Plaintiffs further object to this Request as overbroad, unduly burdensome, and not proportional to the needs of the case under Rule 26(b)(1) of the Federal Rules of Civil Procedure to the extent it seeks "all documentation" without reasonable limitations as to time, subject matter, or connection to the battery claim asserted in the Third Amended Complaint.

Plaintiffs also object to this Request to the extent it seeks information protected by the attorney-client privilege, work-product doctrine, or any other applicable privilege or protection.

Plaintiffs will not produce documents in response to this Request.

**Request No. 7:**

Once the attempts to file charges in July 2017 for battery that allegedly took place on the date of 3/9/2017 with the police department were dropped, please tell me why you failed to file civil charges before the statute of limitations passed. Please present all documentation that backs up your answer.

**Response to Request No. 7:**

Plaintiffs object to this Request on the ground that it is, in substance, an interrogatory improperly styled as a request for production. The Request seeks narrative information regarding Plaintiffs' beliefs, reasoning, and legal interpretations, rather than requesting specific documents for production as contemplated by Rule 34.

Plaintiffs further object to this Request as overbroad, unduly burdensome, and not proportional to the needs of the case under Rule 26(b)(1) of the Federal Rules of Civil Procedure to the extent it seeks "all documentation" without reasonable limitations as to time, subject matter, or connection to the battery claim asserted in the Third Amended Complaint.

Plaintiffs also object to this Request to the extent it seeks information protected by the attorney-client privilege, work-product doctrine, or any other applicable privilege or protection.

Plaintiffs will not produce documents in response to this Request.

**Request No. 8:**

In regards to the Battery claim that you have filed against me, Communications between medical board and authorities, phone records, produce all documents, including police reports, emails and texts, written letters, journal entry, podcast or video recordings, Facebook pages, signal, whats app, telegram, protonmail, all email addresses, group chats, recorded voice conversations (HBO), voice notes, zoom recordings, snapchat, tiktok, photos, videos recorded communications or anything else (from now on known as Proofs) that allege supports your claim for battery and specifically:

    a. Proofs regarding the alleged intentional touching or application of force;
    b. Proofs regarding the alleged touching that shows that it was either harmful or offensive to a reasonable person in the plaintiff's circumstances; and
    c. Proofs regarding the Lack of consent to the touching.

**Response to Request No. 8:**

      Plaintiffs object to this Request as duplicative of Defendant's Request No. 1 in her First Set of Requests for Production of Documents. Plaintiffs defer to their objections and responses, served on August 6, 2025, to that request.

**Request No. 9:**

In regards to the Battery claim that you have filed against me, produce all Proofs as far back as you have available when you first contemplated bring the battery charge against me.

**Response to Request No. 9:**

      Plaintiffs object to this Request as duplicative of Defendant's Request No. 2 in her First Set of Requests for Production of Documents. Plaintiffs defer to their objections and responses, served on August 6, 2025, to that request.

**Request No. 10:**

If any such Proofs were deleted, please give a detailed list of those deleted Proofs, and why they were deleted. Further, please state what actions taken, if any were done to recover those Proofs in light of the ongoing litigation.

**Response to Request No. 10:**

Plaintiffs object to this Request as duplicative of Defendant's Request No. 3 in her First Set of Requests for Production of Documents. Plaintiffs defer to their objections and responses, served on August 6, 2025, to that request.

**Request No. 11:**

For any such Proofs where a Phone was used, please state the Phone company you used for such Proofs.

**Response to Request No. 11:**

Plaintiffs object to this Request as duplicative of Defendant's Request No. 4 in her First Set of Requests for Production of Documents. Plaintiffs defer to their objections and responses, served on August 6, 2025, to that request.

Plaintiffs object to this Request as overbroad, unduly burdensome, and not proportional to the needs of the case under Rule 26(b)(1) of the Federal Rules of Civil Procedure to the extent it seeks information about any and all phone companies used for any communication or document, without reasonable limitations as to time, subject matter, or connection to the battery claim asserted in the Third Amended Complaint.

Plaintiffs also object to this Request as vague and speculative to the extent it seeks identification of service providers used in connection with unspecified communications, potentially dating back many years, and not reasonably susceptible to identification through a document search.

Plaintiffs further object to this Request to the extent it seeks information protected by the attorney-client privilege, work-product doctrine, or any other applicable privilege or protection.

Plaintiffs will not produce documents in response to this Request.

**Request No. 12:**

In regards to consent for the alleged battery, please produce all Proofs showing:

a. You did not consent to get a brand;
b. You needed to know the meaning prior to getting the brand;
c. Any "Master slave communications";
d. All communication that showed you either enjoyed their experience and wanted to share it or communications showing you did not enjoy it;
e. If applicable, the date you found out the brand was KR's initials and how you found out;
f. People you tried to enroll, conversations with those people and specifically who you tried to enroll after you found out the brand was KR's initials;
g. All Proofs in your possession showing the activities and conversations that show the lifestyle that was occurring in ESP and DOS was one you wanted and wanted to share it with others
h. All Proofs that show you trusted the system – things that show how "weird" their lifestyle was and how you liked doing it – all the things that you were doing, and this was just one of them;
i. Proofs that show you knew DOS was about complete obedience and either objected at any time, or enjoyed it;
j. Proofs that you had Informed consent and that you were informed of what the life was;
k. Proofs of when you learned that you were, in fact, a "victim" of this lifestyle, and who, or how you learned it;
l. Proofs you agreed to an alternative lifestyle and liked and enjoyed that until it became inconvenient and proofs as to how you were inconvenienced or damages by the lifestyle;
m. Any proofs that the alleged act of the battery was part of the practice of medicine or a medical procedure;
n. Any proofs that you have or made for tributes or "thank yous" or anything you created that shows your appreciation of Keith;
o. Produce your "Vow" and "creedos" from DOS; and
p. Any Communications between you and any other members of DOS.

**Response to Request No. 12:**

Plaintiffs object to this Request as duplicative of Defendant's Request No. 5 in her First Set of Requests for Production of Documents. Plaintiffs defer to their objections and responses, served on August 6, 2025, to that request.

**Request No. 13:**

In regards to harm for the alleged battery, please produce all Proofs showing:

a. Proofs that you sought medical advice after the alleged battery occurred;
b. Proofs of you Enrolling of others after the alleged battery occurred;
c. Proofs of any threats you received if you didn't comply with anything while participating in the lifestyle;

d.  Proofs of Any Collaterals or alleged Blackmail that were released against you or anyone else;
e.  Any communications you have between yourself and Lauren Salzman;
f.  Any communications you have between yourself and Alex Betancourt;
g.  Any communications you have between yourself and anyone who is or was a party in this matter related to this matter;
h.  Any Proofs related to any videos of any alleged battery of any of the alleged parties;
i.  Any therapy records in your possession where you spoke about the alleged battery and it's alleged psychological damage;
j.  Any Medical records for bodily harm that you can produce after the alleged battery;
k.  Communications of progress on any assignments with a master/instructor/teacher and slave/instructed/student and reports on successes/failures with those assignments;
l.  Proofs of any receipts from plastic surgery procedure to counter the alleged battery and have it removed that you got restitution for and what specifically the money was used for;

**Response to Request No. 13:**

Plaintiffs object to this Request as duplicative of Defendant's Request No. 6 in her First Set of Requests for Production of Documents. Plaintiffs defer to their objections and responses, served on August 6, 2025, to that request.

**Request No. 14:**

Any proofs or letters stating anyone explained the risks of the alleged battery;

**Response to Request No. 14:**

Plaintiffs object to this Request as duplicative of Defendant's Request No. 8 in her First Set of Requests for Production of Documents. Plaintiffs defer to their objections and responses, served on August 6, 2025, to that request.

**Request No. 15:**

Any proofs anyone told you to see their doctor for follow up if needed;

**Response to Request No. 15:**

Plaintiffs object to this Request as duplicative of Defendant's Request No. 9 in her First Set of Requests for Production of Documents. Plaintiffs defer to their objections and responses, served on August 6, 2025, to that request.

**Request No. 16:**

Any proofs you left during part of the alleged battery, and what you left to do and that you came back afterwards to have it completed?

**Response to Request No. 16:**

Plaintiffs object to this Request as duplicative of Defendant's Request No. 10 in her First Set of Requests for Production of Documents. Plaintiffs defer to their objections and responses, served on August 6, 2025, to that request.

Dated: August 8, 2025

/s/ Robert A. Swift
Robert A. Swift
William E. Hoese
Zahra R. Dean
KOHN, SWIFT & GRAF, P.C.
1600 Market Street, Suite 2500
Philadelphia, PA 19103
(215) 238-1700
rswift@kohnswift.com
whoese@kohnswift.com
zdean@kohnswift.com

Adam M. Prom
DICELLO LEVITT LLP
10 North Dearborn
Chicago, IL 60602
(312) 214-7900
aprom@dicellolevitt.com

Greg G. Gutzler
Emma Bruder
DICELLO LEVITT LLP
485 Lexington Avenue, 10th Floor
New York, NY 10017
(646) 933-1000
gutzler@dicellolevitt.com
ebruder@dicellolevitt.com

Agnieszka M. Fryszman
Brendan R. Schneiderman
COHEN MILSTEIN SELLERS
    & TOLL PLLC
1100 New York Ave. NW, Suite 800
Washington, DC 20005
(202) 408-4600
afryszman@cohenmilstein.com
bschneiderman@cohenmilstein.com

Manuel John Dominguez
COHEN MILSTEIN SELLERS
    & TOLL PLLC
11780 U.S. Highway One, Suite N500
Palm Beach Gardens, FL 33408
(561) 515-1400
jdominguez@cohenmilstein.com

*Attorneys for Plaintiffs*

<u>**CERTIFICATE OF SERVICE**</u>

I hereby certify that on August 8, 2025, I served the foregoing via electronic mail on the

following:

Robin A. Henry
Anne S. Aufhauser
FRIED, FRANK, HARRIS, SHRIVER
   & JACOBSON LLP
One New York Plaza
New York, NY 10004
(212) 859-8000
robin.henry@friedfrank.com
anne.aufhauser@friedfrank.com

*Attorneys for Sara Bronfman*

Aaron M. Goldsmith
225 Broadway, Suite 715
New York, NY 10007
(914) 588-2679
aarongoldsmithlaw@gmail.com

*Attorney for Keith Raniere and Clare
Bronfman*

Danielle Roberts
575 Easton Ave, Apt. 18
Somerset, NJ 08873
(516) 480-1700

*Pro Se Defendant*

Dated: August 8, 2025          *<u>/s/ Robert A. Swift</u>*
                                     Robert A. Swift

EXHIBIT 5

Danielle Roberts, Pro Se
244 York St. Apt 1
Jersey City, NJ 07302
(516) 480.1700
Sender email: danielle@drdanielleroberts.com

Attention: Magistrate Judge Pollak

October 5th, 2025

Via Email to: zdean@kohnswift.com

Attorneys of Kohn, Swift & Graft, P.C
1600 Market Street, Suite 2500
Philadelphia, Pennsylvania 19103-7225
(215) 238 – 1700

Re: *Edmondson et al. v. Raniere et al.*, C.A. No. 20-cv-00485

## NOTICE OF FAILURE TO RESPONSE TO DISCOVERY

Dear Ms. Dean,

Your answer to my discovery request are deficient and in fact they are not answers, but mainly objections and an effort to avoid compliance with the discovery obligation of the Plaintiffs. In addition, you use the fact that I am not an attorney as a method to avoid the obligation to provide discovery. Your answer showed that you were aware that one of the documents that I prepared and titled SECOND SET OF REQUESTS FOR PRODUCTION OF DOCUMENTS TO PLAINTIFFS[1] was in fact a request for both interrogatories and documents in which I asked the question and immediately asked for the production of documents related to the interrogatory thereafter. Instead you construed it not as a request for production, but as a request to answer interrogatories and more importantly never answered the interrogatories. Instead you raised a

number of objections that are only applicable if the aim of the request was document production ONLY. Under the rules and practice that I have learned researching and questioning attorneys, I can make requests to answer interrogatories and request all documents related to those questions. I am giving you 5 days to fully answer what was stated in my Second request for document production which in fact should have been titled REQUEST FOR ANSWER TO INTERROGATORIES in which I request also the production of documents related to each interrogatory. Failure to provide answers and documents within 5 days of the receipt of this letter will result in my filing a motion to strike the allegations of the complaint and/or compel answer to the questions.

Be guided accordingly,

Danielle Roberts, DO, MS

# EXHIBIT 6

**From:** Dr. Danielle Roberts danielle@drdanielleroberts.com 📎
**Subject:** Re: Roberts Resp. and Obj. to Plaintiff's First Set of Reqs. for Prod.
**Date:** August 13, 2025 at 7:56 PM
**To:** Zahra R. Dean zdean@kohnswift.com
**Cc:** Brendan Schneiderman bschneiderman@cohenmilstein.com, Mary Brown mabrown@cohenmilstein.com, Robert A. Swift rswift@kohnswift.com, William E. Hoese whoese@kohnswift.com, Greg Gutzler ggutzler@dicellolevitt.com, Adam Prom aprom@dicellolevitt.com, Emma Bruder ebruder@dicellolevitt.com, Manuel John Dominguez jdominguez@cohenmilstein.com, afryszman@cohenmilstein.com, Henry, Robin robin.henry@friedfrank.com, Aufhauser, Anne anne.aufhauser@friedfrank.com, Leavy, Danielle danielle.leavy@friedfrank.com, Aaron Goldsmith aarongoldsmithlaw@gmail.com
**Bcc:** Josh Thomas JoshuaLThomas@gmail.com

Counsel,

I'll be working at both of those times. Please see the letter attached.

**Danielle Roberts, DO, MS**

On Wed, Aug 13, 2025 at 10:26 AM Zahra R. Dean <zdean@kohnswift.com> wrote:

Ms. Roberts,

Are you available tomorrow, Thursday at 10:00 am EST for a meet and confer?

Best,

Zahra

---

**From:** Zahra R. Dean
**Sent:** Monday, August 11, 2025 1:51 PM
**To:** Dr. Danielle Roberts <danielle@drdanielleroberts.com>; Brendan Schneiderman <bschneiderman@cohenmilstein.com>; Mary Brown <mabrown@cohenmilstein.com>; Robert A. Swift <rswift@kohnswift.com>; William E. Hoese <whoese@kohnswift.com>; Greg Gutzler <ggutzler@dicellolevitt.com>; Adam Prom <aprom@dicellolevitt.com>; Emma Bruder <ebruder@dicellolevitt.com>; Manuel John Dominguez <jdominguez@cohenmilstein.com>; afryszman@cohenmilstein.com
**Cc:** Henry, Robin <robin.henry@friedfrank.com>; Aufhauser, Anne <anne.aufhauser@friedfrank.com>; Leavy, Danielle <danielle.leavy@friedfrank.com>; Aaron Goldsmith <aarongoldsmithlaw@gmail.com>
**Subject:** RE: Roberts Resp. and Obj. to Plaintiff's First Set of Reqs. for Prod.

Ms. Roberts,

Does Wednesday at 1:30 pm work for a meet and confer?

Best,

Zahra

---

**From:** Dr. Danielle Roberts <danielle@drdanielleroberts.com>
**Sent:** Wednesday, August 6, 2025 6:14 PM
**To:** Brendan Schneiderman <bschneiderman@cohenmilstein.com>; Mary Brown <mabrown@cohenmilstein.com>; Robert A. Swift <rswift@kohnswift.com>; William E. Hoese <whoese@kohnswift.com>; Greg Gutzler <ggutzler@dicellolevitt.com>; Adam Prom <aprom@dicellolevitt.com>; Emma Bruder <ebruder@dicellolevitt.com>; Manuel

John Dominguez <[jdominguez@cohenmilstein.com](mailto:jdominguez@cohenmilstein.com)>; [afryszman@cohenmilstein.com](mailto:afryszman@cohenmilstein.com);
Zahra R. Dean <[zdean@kohnswift.com](mailto:zdean@kohnswift.com)>
**Cc:** Henry, Robin <[robin.henry@friedfrank.com](mailto:robin.henry@friedfrank.com)>; Aufhauser, Anne
<[anne.aufhauser@friedfrank.com](mailto:anne.aufhauser@friedfrank.com)>; Leavy, Danielle <[danielle.leavy@friedfrank.com](mailto:danielle.leavy@friedfrank.com)>;
Aaron Goldsmith <[aarongoldsmithlaw@gmail.com](mailto:aarongoldsmithlaw@gmail.com)>
**Subject:** Roberts Resp. and Obj. to Plaintiff's First Set of Reqs. for Prod.

This email originated from outside of the organization. Do not click links or open attachments unless you recognize the sender and know the content is safe.

Counsel,

Here are my first set of responses to your first set of requests. There are additional videos of a sensitive nature that would require secure sending. How would you like those sent?

**Danielle Roberts, DO, MS**

**\*\*\*Privilege and Confidentiality Notice\*\*\***

**The information contained in this e-mail message is attorney-client privileged and/or confidential information intended for the use of the named recipient only. You are hereby notified that any dissemination, distribution, or copying of this communication is prohibited. If you have received this communication in error, please immediately notify the sender by replying to this electronic e-mail or call us at 215-238-1700.**
**Thank you.**



Roberts confer
letter 0...25.pdf

# EXHIBIT 7

**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**

---

|  |  |
|---|---|
| SARAH EDMONDSON, *et al.* | * |
|  | * |
|  | * |
| Plaintiffs, | * |
|  | * |
| v. | * |
|  | * |
| Keith Raniere, *et al.* | * |
|  | * |
| Defendants. | * |
|  | * |

1:20 - cv - 00485-EK-CLP

---

**ANSWER TO PLAINTIFFS' FIRST SET OF INTERROGATORIES TO DEFENDANTS**

1. List each telephone number (including "smartphone," "cellular", and "landline") used by You, and the carrier associated with each such number, to communicate anything concerning, referring, or relating to any Plaintiff, NXIVM, or DOS.

    **516.480.1700 - Verizon a few years ago, now Optimum**

2. List each email address You have used to communicate about any Plaintiff, NXIVM, or DOS, including other people's email addresses You used.

    **Danielle@drdanielleroberts.com, danielle@danielleroberts.com, drdanielledo@gmail.com, hello@thedossierproject.com, photonfamentum@protonmail.com, Danielle@exoeso.com (not accessible), I do not recall if I had or the name of my nxvim email if one existed.**

3. List each social media platform, networking website, messaging app, or online forum you have established, used, or maintained that contained or communicated anything concerning, referring, or relating to any Plaintiff, NXIVM, or DOS, and for each, state the (a) the platform or application name; (b) the associated username(s); (c) the date the account was created, and (d) if applicable, the date it was closed.

    **Telegram:**
    **(b) the associated username(s); Danielle Roberts**
    **(c) the date the account was created - application download date is unavailable. I believe it was in 2013, verified by email notification**

    **WhatsApp:**
    **(b) the associated username(s); Danielle Roberts**

**(c) the date the account was created - application download date is unavailable. I believe it was in 2013, verified by email notification**

**Instagram:**
**Danielle Roberts @drdanielleroberts: Created August 2016**
**The Dossier Project @thedossierproject: Created June 2020**

**Facebook:**
**Danielle Roberts: Creation date unavailable. Still active.**
**DrDanielleRoberts: Created March 27, 2012**

**Twitter/X:**
**(b) the associated username(s): Dr. Danielle Roberts @DrDanielleDR**
**(c) the date the account was created: September 2020**

**YouTube:**
**Dr. Danielle Roberts @dr.danielleroberts4335**
**created: Joined Dec 9, 2021**

**The Dossier Project @DossierProject**
**Created: Joined Mar 27, 2023**

**Websites:**
**https://www.thedossierproject.love/ Reestablished Summer 2023**
**https://www.drdanielleroberts.com/ Created 2022**

4. List all electronic devices You owned, possessed, or used to communicate anything concerning, referring, or relating to any Plaintiff, NXIVM, or DOS, including, but not limited to, smartphones, cellular phones, lap or desktop computers, tablets, and any other device connected to the internet, and for each device, identify the make, model, operating system, and unique identifiers (e.g., IMEI, MEID, or IMSI), if applicable.

**iPhone: 13 Pro iOS 18.6.2 IMEI 35 385166 071731 4**
**MacBook Pro macOS Monterey Version 12.7.6**

5. State whether You deleted or removed any e-mails, text messages, or other electronic content or communications concerning, referring, or relating to any Plaintiff, NXIVM, or DOS from any of the electronic devices, addresses, platforms, websites, apps, forums, or accounts You identified above in responses to Interrogatories 1-4. If the answer is yes, for each deleted item, describe the content, the date it was deleted, and the reason for its deletion.

**To my recollection I have not deleted any content.**

6. List each title, role, and function (whether formal or informal) You had or preformed with respect to NXIVM and DOS and the time period You had each title, role, and function, name everyone You reported to with respect to Your title(s), role(s) and function(s), identify everyone who worked with or for You or reported to You in connection with Your title(s), role(s), and function(s), and describe all monetary and non-monetary benefits You received on account of Your title(s), role(s), and function(s).

### Slave
a. **everyone You reported to: Allison Mack, Keith Raniere**
b. **identify everyone who worked with - India Oxenberg, Michele Hatchette, Nicole Isbel**
c. **reported to You: none**
d. **all monetary and non-monetary benefits You received: No monetary benefit. I received coaching from Ms. Mack and Mr. Raniere. Support and inspiration from my circle, and networking connections from DOS.**

### Branding Artist
a. **everyone You reported to: Allison Mack**
b. **worked with: Allison Mack, Professional Branding Artist, Steve Haworth**
c. **all monetary and non-monetary benefits You received: No monetary benefit – the satisfaction of knowing I was doing something to help us women learn how to more meaningfully honor our commitments, build deeper relationships and comradery with each other, and witness the bravery we exhibited to do so.**

### Coach in ESP
a. **everyone You reported to: Michelle Salzman**
b. **identify everyone who worked with or for You or reported to You: I had 1 or 2 Coachees for a very short period of time. I don't remember their names now.**
c. **all monetary and non-monetary benefits You received: No monetary benefit. I received coaching in entrepreneurship. I learned more about people and the curriculum by guiding others through the it.**

### SOP team leader
a. **everyone You reported to: Ms. Sally Brink**
b. **or reported to You: Susan Wysocki, Stephanie Fair-Layman, Esther Carlson, Megan Mills-Hoffman, Julia Darmon, Allison Mack**
c. **all monetary and non-monetary benefits You received: No monetary benefit. I received training and experience leading and following (a great leader can do both).**

### SOP team member:
a. **Reporting to Nicole Clyne and Linda Chung at different times**
b. **Was teammates with Michele Hatchette, Nicole Clyne, Micaela Zahner, to the best of my recollection**

     **c. No monetary benefit. I received training and experience leading and following (a great leader can do both).**

DEFENDANT DANIELLE ROBERTS reserves the right to supplement and/or amend these responses up to and including the time of trial.

    Dated: October 6, 2025
       New York, NY

I affirm under penalty of perjury that the foregoing statements made by me are true, I am aware that if any of the foregoing statements made by me are willfully false I am subject to punishment.

_____

/s/ Danielle Roberts, Pro Se

# EXHIBIT 8

---

|  |  |
|---|---|
| SARAH EDMONDSON, *et al.* | * |
|  | * |
|  | * |
| Plaintiffs, | * |
|  | *     1:20 - cv - 00485-EK-CLP |
| v. | * |
|  | * |
| Keith Raniere, *et al.* | * |
|  | * |
| Defendants. | * |
|  | * |

---

August 6, 2025

     TO:

     Robert A. Swift
     William E. Hoese
     Zahra R. Dean
     Elias Kohn
     KOHN, SWIFT & GRAF, P.C.
     1600 Market Street, Suite 2500
     Philadelphia, PA 19103
     (215) 238-1700
     rswift@kohnswift.com
     whoese@kohnswift.com
     zdean@kohnswift.com

     ekohn@kohnswift.com

## GENERAL OBJECTIONS

The following General Objections form a part of, and are hereby incorporated into, the response to each and every Request as set forth below. Nothing in Defendant's Specific Objections and Responses should be construed as a waiver of these General Objections, all of which are expressly preserved.

1. Defendant objects to the Definitions, Instructions, and Requests to the extent they seek to impose burdens or obligations beyond what is required by the Federal Rules of Civil Procedure, the Local Rules of the Eastern District of New York, any applicable Court Orders, or other governing law (collectively, the "Applicable Rules"). Defendant will construe the Definitions and Requests consistent with the Applicable Rules.

2. Defendant objects to these Requests to the extent they attempt or purport to seek Documents and/or information protected by the attorney-client privilege, the work-product doctrine, or any other applicable privilege held by Defendant. Any inadvertent disclosure of such information shall not constitute a waiver of any such privilege or of any ground for objecting to the discovery or admissibility of such materials, their subject matter, or the information obtained therein, nor shall such disclosure constitute a waiver of Defendant's rights to objects to the use of such information during this or any other proceeding.

3. Defendant objects to the Definitions of "You," "Yours," and "Defendant" as overly broad and unduly burdensome to the extent it purports to require these individuals to provide information that is not in their possession, custody, or control, that is not known by Defendant, or that can be more conveniently obtained from another source.

4. Defendant objects to these Requests to the extent that they suggest Defendant are obligated to provide information that is not in the possession, custody, or control of Defendant, that is not known by Defendant, or that can be more conveniently obtained from another source.

5. Defendant objects to these Requests to the extent they are premature by seeking information that has yet to be determined, as discovery in this litigation is ongoing. The requested information will be provided in accordance with the Court's Scheduling Order and all other Applicable Rules.

6. Defendant reserves the right to amend, supplement, or revise their objections and responses as discovery progresses. No statement herein shall be deemed a waiver of any argument, objection, or claim that may later arise in this matter, including at trial.

## RESPONSES TO REQUESTS FOR PRODUCTION OF DOCUMENTS FROM PLAINTIFFS

1. Defendant objects to this Request as overbroad, unduly burdensome, and seeking irrelevant documents not proportional to the needs of the case under Rule 26(b)(1) of the Federal Rules of Civil Procedure ("Rule 26(b)(1)") to the extent it seeks documents without limitation as to subject matter or connection to the allegations in the Third Amended Complaint, specifically the battery charge which is the only relevant charge left against Defendant. Defendant object that this Request is, and no Applicable Rule currently compels Plaintiffs to provide this information in the absence of specific, substantiated relevance. Subject to and without waiving the foregoing objections, Defendant states that she will meet and confer with Plaintiffs regarding the scope of a reasonable search for responsive discovery material in their possession, custody, or control.

2. Please see the documents in my possession, including telegrams and all other proofs responsive to this question at bates stamps numbered 231-236. Defendant reserves the right to supplement this answer at a later time.

3. Defendant objects to this Request as overbroad, unduly burdensome, and seeking irrelevant documents not proportional to the needs of the case under Rule 26(b)(1) of the Federal Rules of Civil Procedure ("Rule 26(b)(1)") to the extent it seeks documents without limitation as to subject matter or connection to the allegations in the Third

Amended Complaint, specifically the battery charge which is the only relevant charge left against Defendant. Defendant object that this Request is, and no Applicable Rule currently compels Plaintiffs to provide this information in the absence of specific, substantiated relevance. Subject to and without waiving the foregoing objections, Defendant states that she will meet and confer with Plaintiffs regarding the scope of a reasonable search for responsive discovery material in their possession, custody, or control.

4. The alleged "tool(s), instrument(s), or device(s)" are not currently in my possession. Defendant reserves the right to supplement this answer at a later time.

5. Please see the video, which will be sent separately via our vendor due to the nature of the video, of Sarah Edmondson getting branded. Defendant reserves the right to supplement this answer at a later time.

6. Please see all Documents regarding elements and Chakras referring to the brand at bates stamp number starting at 87, 91, 166, and 167. Defendant reserves the right to supplement this answer at a later time.

7. Please see all Document regarding elements and Chakras referring to the brand at bates stamp number starting at 87, 91, 166, and 167. Defendant reserves the right to supplement this answer at a later time.

8. Objection, assumes facts not in evidence – "collateral" is undefined and irrelevant to the battery charge. Defendant objects to this Request as overbroad, unduly burdensome, and seeking irrelevant documents not proportional to the needs of the case under Rule 26(b)(1) of the Federal Rules of Civil Procedure ("Rule 26(b)(1)") to the extent it seeks documents  without limitation as to subject matter or connection to the allegations in the

Third Amended Complaint, specifically the battery charge which is the only relevant charge left against Defendant. Defendant object that this Request is, and no Applicable Rule currently compels Plaintiffs to provide this information in the absence of specific, substantiated relevance. Subject to and without waiving the foregoing objections, Defendant states that she will meet and confer with Plaintiffs regarding the scope of a reasonable search for responsive discovery material in their possession, custody, or control.

9. Objection, assumes facts not in evidence – "collateral" is undefined and irrelevant to the battery charge. Defendant objects to this Request as overbroad, unduly burdensome, and seeking irrelevant documents not proportional to the needs of the case under Rule 26(b)(1) of the Federal Rules of Civil Procedure ("Rule 26(b)(1)") to the extent it seeks documents  without limitation as to subject matter or connection to the allegations in the Third Amended Complaint, specifically the battery charge which is the only relevant charge left against Defendant. Defendant object that this Request is, and no Applicable Rule currently compels Plaintiffs to provide this information in the absence of specific, substantiated relevance. Subject to and without waiving the foregoing objections, Defendant states that she will meet and confer with Plaintiffs regarding the scope of a reasonable search for responsive discovery material in their possession, custody, or control.

10. Objection, assumes facts not in evidence – "collateral" is undefined and irrelevant to the battery charge. Defendant objects to this Request as overbroad, unduly burdensome, and seeking irrelevant documents not proportional to the needs of the case under Rule 26(b)(1) of the Federal Rules of Civil Procedure ("Rule 26(b)(1)") to the extent it seeks

documents without limitation as to subject matter or connection to the allegations in the Third Amended Complaint, specifically the battery charge which is the only relevant charge left against Defendant. Defendant object that this Request is, and no Applicable Rule currently compels Plaintiffs to provide this information in the absence of specific, substantiated relevance. Subject to and without waiving the foregoing objections, Defendant states that she will meet and confer with Plaintiffs regarding the scope of a reasonable search for responsive discovery material in their possession, custody, or control.

11. Objection, assumes facts not in evidence – "collateral" is undefined and irrelevant to the battery charge. Defendant objects to this Request as overbroad, unduly burdensome, and seeking irrelevant documents not proportional to the needs of the case under Rule 26(b)(1) of the Federal Rules of Civil Procedure ("Rule 26(b)(1)") to the extent it seeks documents without limitation as to subject matter or connection to the allegations in the Third Amended Complaint, specifically the battery charge which is the only relevant charge left against Defendant. Defendant object that this Request is, and no Applicable Rule currently compels Plaintiffs to provide this information in the absence of specific, substantiated relevance. Subject to and without waiving the foregoing objections, Defendant states that she will meet and confer with Plaintiffs regarding the scope of a reasonable search for responsive discovery material in their possession, custody, or control.

12. Defendant objects to this Request as overbroad, unduly burdensome, and seeking irrelevant documents not proportional to the needs of the case under Rule 26(b)(1) of the Federal Rules of Civil Procedure ("Rule 26(b)(1)") to the extent it seeks documents

without limitation as to subject matter or connection to the allegations in the Third Amended Complaint, specifically the battery charge which is the only relevant charge left against Defendant. Defendant object that this Request is, and no Applicable Rule currently compels Plaintiffs to provide this information in the absence of specific, substantiated relevance. Subject to and without waiving the foregoing objections, Defendant states that she will meet and confer with Plaintiffs regarding the scope of a reasonable search for responsive discovery material in their possession, custody, or control.

13. Objection as the request is irrelevant to the battery charge. Defendant objects to this Request as overbroad, unduly burdensome, and seeking irrelevant documents not proportional to the needs of the case under Rule 26(b)(1) of the Federal Rules of Civil Procedure ("Rule 26(b)(1)") to the extent it seeks documents  without limitation as to subject matter or connection to the allegations in the Third Amended Complaint, specifically the battery charge which is the only relevant charge left against Defendant. Defendant object that this Request is, and no Applicable Rule currently compels Plaintiffs to provide this information in the absence of specific, substantiated relevance. Subject to and without waiving the foregoing objections, Defendant states that she will meet and confer with Plaintiffs regarding the scope of a reasonable search for responsive discovery material in their possession, custody, or control.

14. Objection as the request is irrelevant to the battery charge. Defendant objects to this Request as overbroad, unduly burdensome, and seeking irrelevant documents not proportional to the needs of the case under Rule 26(b)(1) of the Federal Rules of Civil Procedure ("Rule 26(b)(1)") to the extent it seeks documents  without limitation as to

subject matter or connection to the allegations in the Third Amended Complaint, specifically the battery charge which is the only relevant charge left against Defendant. Defendant object that this Request is, and no Applicable Rule currently compels Plaintiffs to provide this information in the absence of specific, substantiated relevance. Subject to and without waiving the foregoing objections, Defendant states that she will meet and confer with Plaintiffs regarding the scope of a reasonable search for responsive discovery material in their possession, custody, or control.

15. Objection as the request is irrelevant to the battery charge. Defendant objects to this Request as overbroad, unduly burdensome, and seeking irrelevant documents not proportional to the needs of the case under Rule 26(b)(1) of the Federal Rules of Civil Procedure ("Rule 26(b)(1)") to the extent it seeks documents without limitation as to subject matter or connection to the allegations in the Third Amended Complaint, specifically the battery charge which is the only relevant charge left against Defendant. Defendant object that this Request is, and no Applicable Rule currently compels Plaintiffs to provide this information in the absence of specific, substantiated relevance. Subject to and without waiving the foregoing objections, Defendant states that she will meet and confer with Plaintiffs regarding the scope of a reasonable search for responsive discovery material in their possession, custody, or control.

16. Objection as the request is irrelevant to the battery charge. Defendant objects to this Request as overbroad, unduly burdensome, and seeking irrelevant documents not proportional to the needs of the case under Rule 26(b)(1) of the Federal Rules of Civil Procedure ("Rule 26(b)(1)") to the extent it seeks documents without limitation as to subject matter or connection to the allegations in the Third Amended Complaint,

specifically the battery charge which is the only relevant charge left against Defendant. Defendant object that this Request is, and no Applicable Rule currently compels Plaintiffs to provide this information in the absence of specific, substantiated relevance. Subject to and without waiving the foregoing objections, Defendant states that she will meet and confer with Plaintiffs regarding the scope of a reasonable search for responsive discovery material in their possession, custody, or control.

17. Objection as the request is irrelevant to the battery charge. Defendant objects to this Request as overbroad, unduly burdensome, and seeking irrelevant documents not proportional to the needs of the case under Rule 26(b)(1) of the Federal Rules of Civil Procedure ("Rule 26(b)(1)") to the extent it seeks documents  without limitation as to subject matter or connection to the allegations in the Third Amended Complaint, specifically the battery charge which is the only relevant charge left against Defendant. Defendant object that this Request is, and no Applicable Rule currently compels Plaintiffs to provide this information in the absence of specific, substantiated relevance. Subject to and without waiving the foregoing objections, Defendant states that she will meet and confer with Plaintiffs regarding the scope of a reasonable search for responsive discovery material in their possession, custody, or control.

18. Objection as the request is irrelevant to the battery charge. Defendant objects to this Request as overbroad, unduly burdensome, and seeking irrelevant documents not proportional to the needs of the case under Rule 26(b)(1) of the Federal Rules of Civil Procedure ("Rule 26(b)(1)") to the extent it seeks documents  without limitation as to subject matter or connection to the allegations in the Third Amended Complaint, specifically the battery charge which is the only relevant charge left against Defendant.

Defendant object that this Request is, and no Applicable Rule currently compels Plaintiffs to provide this information in the absence of specific, substantiated relevance. Subject to and without waiving the foregoing objections, Defendant states that she will meet and confer with Plaintiffs regarding the scope of a reasonable search for responsive discovery material in their possession, custody, or control.

19. Objection as the request is irrelevant to the battery charge. Defendant objects to this Request as overbroad, unduly burdensome, and seeking irrelevant documents not proportional to the needs of the case under Rule 26(b)(1) of the Federal Rules of Civil Procedure ("Rule 26(b)(1)") to the extent it seeks documents without limitation as to subject matter or connection to the allegations in the Third Amended Complaint, specifically the battery charge which is the only relevant charge left against Defendant. Defendant object that this Request is, and no Applicable Rule currently compels Plaintiffs to provide this information in the absence of specific, substantiated relevance. Subject to and without waiving the foregoing objections, Defendant states that she will meet and confer with Plaintiffs regarding the scope of a reasonable search for responsive discovery material in their possession, custody, or control.

20. Objection as "the stripe path" is not defined for these questions. Defendant objects to this Request as overbroad, unduly burdensome, and seeking irrelevant documents not proportional to the needs of the case under Rule 26(b)(1) of the Federal Rules of Civil Procedure ("Rule 26(b)(1)") to the extent it seeks documents without limitation as to subject matter or connection to the allegations in the Third Amended Complaint, specifically the battery charge which is the only relevant charge left against Defendant. Defendant object that this Request is, and no Applicable Rule currently compels

Plaintiffs to provide this information in the absence of specific, substantiated relevance. Subject to and without waiving the foregoing objections, Defendant states that she will meet and confer with Plaintiffs regarding the scope of a reasonable search for responsive discovery material in their possession, custody, or control.

21. Objection as "value exchanges" is not defined for these questions. Defendant objects to this Request as overbroad, unduly burdensome, and seeking irrelevant documents not proportional to the needs of the case under Rule 26(b)(1) of the Federal Rules of Civil Procedure ("Rule 26(b)(1)") to the extent it seeks documents without limitation as to subject matter or connection to the allegations in the Third Amended Complaint, specifically the battery charge which is the only relevant charge left against Defendant. Defendant object that this Request is, and no Applicable Rule currently compels Plaintiffs to provide this information in the absence of specific, substantiated relevance. Subject to and without waiving the foregoing objections, Defendant states that she will meet and confer with Plaintiffs regarding the scope of a reasonable search for responsive discovery material in their possession, custody, or control.

22. Defendant objects to this Request as overbroad, unduly burdensome, and seeking irrelevant documents not proportional to the needs of the case under Rule 26(b)(1) of the Federal Rules of Civil Procedure ("Rule 26(b)(1)") to the extent it seeks documents without limitation as to subject matter or connection to the allegations in the Third Amended Complaint, specifically the battery charge which is the only relevant charge left against Defendant. Defendant object that this Request is, and no Applicable Rule currently compels Plaintiffs to provide this information in the absence of specific, substantiated relevance. Subject to and without waiving the foregoing objections,

Defendant states that she will meet and confer with Plaintiffs regarding the scope of a reasonable search for responsive discovery material in their possession, custody, or control.

23. Defendant objects to this Request as overbroad, unduly burdensome, and seeking irrelevant documents not proportional to the needs of the case under Rule 26(b)(1) of the Federal Rules of Civil Procedure ("Rule 26(b)(1)") to the extent it seeks documents without limitation as to subject matter or connection to the allegations in the Third Amended Complaint, specifically the battery charge which is the only relevant charge left against Defendant. Defendant object that this Request is, and no Applicable Rule currently compels Plaintiffs to provide this information in the absence of specific, substantiated relevance. Subject to and without waiving the foregoing objections, Defendant states that she will meet and confer with Plaintiffs regarding the scope of a reasonable search for responsive discovery material in their possession, custody, or control.

24. Defendant objects to this Request as overbroad, unduly burdensome, and seeking irrelevant documents not proportional to the needs of the case under Rule 26(b)(1) of the Federal Rules of Civil Procedure ("Rule 26(b)(1)") to the extent it seeks documents without limitation as to subject matter or connection to the allegations in the Third Amended Complaint, specifically the battery charge which is the only relevant charge left against Defendant. Defendant object that this Request is, and no Applicable Rule currently compels Plaintiffs to provide this information in the absence of specific, substantiated relevance. Subject to and without waiving the foregoing objections, Defendant states that she will meet and confer with Plaintiffs regarding the scope of a

reasonable search for responsive discovery material in their possession, custody, or control.

25. Defendant objects to this Request as overbroad, unduly burdensome, and seeking irrelevant documents not proportional to the needs of the case under Rule 26(b)(1) of the Federal Rules of Civil Procedure ("Rule 26(b)(1)") to the extent it seeks documents without limitation as to subject matter or connection to the allegations in the Third Amended Complaint, specifically the battery charge which is the only relevant charge left against Defendant. Defendant object that this Request is, and no Applicable Rule currently compels Plaintiffs to provide this information in the absence of specific, substantiated relevance. Subject to and without waiving the foregoing objections, Defendant states that she will meet and confer with Plaintiffs regarding the scope of a reasonable search for responsive discovery material in their possession, custody, or control.

26. Please see all documents about my loss of license at bates stamp number 2, 87, 99, 102, 159, 168, 185, 247, 300, 331, and all attachments from 333 onwards. Defendant reserves the right to supplement this answer at a later time.

27. To my knowledge, there are no such documents in my possession or that I know exist as of this time.

28. See all documents attached and produced bates stamped from 1 through to the end, all were al least briefly reviewed in preparation for these responses.


 /s/ Danielle Roberts____
  Danielle Roberts

|  |  |
|---|---|
| SARAH EDMONDSON, *et al.* | * |
|  | * |
|  | * |
| Plaintiffs, | * |
|  | * |
| v. | * |
|  | * |
| Keith Raniere, *et al.* | * |
|  | * |
| Defendants. | * |
|  | * |

1:20 - cv - 00485-EK-CLP

July 26, 2025

TO:

Robert A. Swift
William E. Hoese
Zahra R. Dean
Elias Kohn
KOHN, SWIFT & GRAF, P.C.
1600 Market Street, Suite 2500
Philadelphia, PA 19103
(215) 238-1700
rswift@kohnswift.com
whoese@kohnswift.com
zdean@kohnswift.com

ekohn@kohnswift.com

## GENERAL OBJECTIONS

The following General Objections form a part of, and are hereby incorporated into, the

response to each and every Interrogatory Request as set forth below. Nothing in Defendant's

Specific Objections and Responses should be construed as a waiver of these General Objections,

all of which are expressly preserved.

1. Defendant objects to the Definitions, Instructions, and Requests to the extent they seek to impose burdens or obligations beyond what is required by the Federal Rules of Civil Procedure, the Local Rules of the Eastern District of New York, any applicable Court Orders, or other governing law (collectively, the "Applicable Rules"). Defendant will construe the Definitions and Requests consistent with the Applicable Rules.

2. Defendant objects to these Requests to the extent they attempt or purport to seek Documents and/or information protected by the attorney-client privilege, the work-product doctrine, or any other applicable privilege held by Defendant. Any inadvertent disclosure of such information shall not constitute a waiver of any such privilege or of any ground for objecting to the discovery or admissibility of such materials, their subject matter, or the information obtained therein, nor shall such disclosure constitute a waiver of Defendant's rights to objects to the use of such information during this or any other proceeding.

3. Defendant objects to the Definitions of "You," "Yours," and "Defendant" as overly broad and unduly burdensome to the extent it purports to require these individuals to provide information that is not in their possession, custody, or control, that is not known by Defendant, or that can be more conveniently obtained from another source.

4. Defendant objects to these Requests to the extent that they suggest Defendant are obligated to provide information that is not in the possession, custody, or control of Defendant, that is not known by Defendant, or that can be more conveniently obtained from another source.

5. Defendant objects to these Requests to the extent they are premature by seeking information that has yet to be determined, as discovery in this litigation is ongoing. The requested information will be provided in accordance with the Court's Scheduling Order and all other Applicable Rules.

Defendant reserves the right to amend, supplement, or revise their objections and responses as discovery progresses. No statement herein shall be deemed a waiver of any argument, objection, or claim that may later arise in this matter, including at trial.

## RESPONSES TO FIRST SET OF INTERROGATORIES

1. Objection as the request is irrelevant to the battery charge. Defendant objects to this Request as overbroad, unduly burdensome, and seeking irrelevant documents not proportional to the needs of the case under Rule 26(b)(1) of the Federal Rules of Civil Procedure ("Rule 26(b)(1)") to the extent it seeks documents without limitation as to subject matter or connection to the allegations in the Third Amended Complaint, specifically the battery charge which is the only relevant charge left against Defendant. Defendant object that this Request is, and no Applicable Rule currently compels Plaintiffs to provide this information in the absence of specific, substantiated relevance. Subject to and without waiving the foregoing objections, Defendant states that she will meet and confer with Plaintiffs regarding the scope of a reasonable search for responsive discovery material in their possession, custody, or control.

2. Objection as the request is irrelevant to the battery charge. Defendant objects to this Request as overbroad, unduly burdensome, and seeking irrelevant documents not proportional to the needs of the case under Rule 26(b)(1) of the Federal Rules of Civil Procedure ("Rule 26(b)(1)") to the extent it seeks documents without limitation as to subject matter or connection to the allegations in the Third Amended Complaint, specifically the battery charge which is the only relevant charge left against Defendant. Defendant object that this Request is, and no Applicable Rule currently compels Plaintiffs to provide this information in the absence of specific, substantiated relevance.

Subject to and without waiving the foregoing objections, Defendant states that she will meet and confer with Plaintiffs regarding the scope of a reasonable search for responsive discovery material in their possession, custody, or control.

3. Objection as the request is irrelevant to the battery charge. Defendant objects to this Request as overbroad, unduly burdensome, and seeking irrelevant documents not proportional to the needs of the case under Rule 26(b)(1) of the Federal Rules of Civil Procedure ("Rule 26(b)(1)") to the extent it seeks documents without limitation as to subject matter or connection to the allegations in the Third Amended Complaint, specifically the battery charge which is the only relevant charge left against Defendant. Defendant object that this Request is, and no Applicable Rule currently compels Plaintiffs to provide this information in the absence of specific, substantiated relevance. Subject to and without waiving the foregoing objections, Defendant states that she will meet and confer with Plaintiffs regarding the scope of a reasonable search for responsive discovery material in their possession, custody, or control.

4. Objection, assumes facts not in evidence – "collateral" is undefined and irrelevant to the battery charge. Defendant objects to this Request as overbroad, unduly burdensome, and seeking irrelevant documents not proportional to the needs of the case under Rule 26(b)(1) of the Federal Rules of Civil Procedure ("Rule 26(b)(1)") to the extent it seeks documents without limitation as to subject matter or connection to the allegations in the Third Amended Complaint, specifically the battery charge which is the only relevant charge left against Defendant. Defendant object that this Request is, and no Applicable Rule currently compels Plaintiffs to provide this information in the absence of specific, substantiated relevance. Subject to and without waiving the foregoing objections,

Defendant states that she will meet and confer with Plaintiffs regarding the scope of a reasonable search for responsive discovery material in their possession, custody, or control.

5. Objection, assumes facts not in evidence – "collateral" is undefined and irrelevant to the battery charge. Defendant objects to this Request as overbroad, unduly burdensome, and seeking irrelevant documents not proportional to the needs of the case under Rule 26(b)(1) of the Federal Rules of Civil Procedure ("Rule 26(b)(1)") to the extent it seeks documents without limitation as to subject matter or connection to the allegations in the Third Amended Complaint, specifically the battery charge which is the only relevant charge left against Defendant. Defendant object that this Request is, and no Applicable Rule currently compels Plaintiffs to provide this information in the absence of specific, substantiated relevance. Subject to and without waiving the foregoing objections, Defendant states that she will meet and confer with Plaintiffs regarding the scope of a reasonable search for responsive discovery material in their possession, custody, or control.

6. Objection as the request is irrelevant to the battery charge. Defendant objects to this Request as overbroad, unduly burdensome, and seeking irrelevant documents not proportional to the needs of the case under Rule 26(b)(1) of the Federal Rules of Civil Procedure ("Rule 26(b)(1)") to the extent it seeks documents without limitation as to subject matter or connection to the allegations in the Third Amended Complaint, specifically the battery charge which is the only relevant charge left against Defendant. Defendant object that this Request is, and no Applicable Rule currently compels Plaintiffs to provide this information in the absence of specific, substantiated relevance.

Subject to and without waiving the foregoing objections, Defendant states that she will meet and confer with Plaintiffs regarding the scope of a reasonable search for responsive discovery material in their possession, custody, or control.

7. I first learned that all DOS members would be receiving a brand when Allison Mack invited me to join DOS in February of 2016. She first let me know there was a women's group that formed to help each other grow. It was for women who were serious about their growth. If I wanted to know more about it I would need to provide collateral. I did give collateral. In our second conversation after I submitted my collateral, Allison shared the 4 components of DOS that I would be committing to if I decided to join: 1. A lifetime vow of obedience, 2. A master : slave relationship, 3. Wearing a piece of jewelry to symbolize the commitment, 4. A brand as part of initiation at some point in the future. I understood the brand was to be a symbol of our commitment and solidarity.

There were no further branding conversations until about 9 months later, in or around Nov/Dec 2016 when Allison asked me if I would be interested in learning the branding and tattooing techniques for the initiation process for the women. She called me while I was in her apartment in Knox Woods. She explained that the women that started the group had their brands done by a male branding artist. They wanted it to be a more intimate and meaningful process for the rest of us. As such, going forward they wanted  a woman who was part of DOS to learn how to do it. She was also asking other women and figuring out who might want to learn and then teach this branding process.

Our next conversation was in Allison's car. It was about why she thought I would be a good fit to be able to help and support the other women through this process. I shared some concerns I had about breaching the body//skin and the effects it could have on the

body and about the ink from the tattooing process (I was a purist largely when it came to wellness). She shared that the brand is a permanent symbol of our commitment. That many women tend to back pedal or forget their commitment when things get hard or scary, and that the brand was meant to help remind women of their commitment to themselves and each other when things got challenging. She shared that I had a proven track record of sticking to my commitments and seeing them through even when it gets hard or scary (medical school, exo|eso). She thought that I would be a good support for the women for that reason. I also had done art in the past and had good fine motor skills and had some experience with electrocautery.

For these reasons, I considered helping with the process. I understood the depth and scope of the issues that were caused by women breaking their promises and their word; the harms on relationships, our culture and society, but mostly the harms on their personal lives and their personal opinion of themselves. For these reasons I felt the benefits outweighed the risks.

Lastly, Allison shared a little bit about how special and meaningful the first line women wanted this experience to be for the women in DOS, and how it could be crafted to help us surrender, and experience choosing love, and solidarity over pain or fear. How it would help create a group where only women who were truly committed to their goals, each other and love, would participate and how we as women can experience the comradery that men experience by creating this commitment for ourselves. She also spoke about how I had a good relationship with physical pain and that this would be supportive. She shared the symbol itself had a few different meanings including; Greek letters that symbolized the sorority meaning, the 7 chakras, the 5 elements and her and

Keith's initials as a tribute to them for starting this organization. She reiterated that this was all confidential information and all the other women would be informed by their Masters, and that I was not to speak about it otherwise (as per usual with DOS details).

I let her know I was considering it, but I wouldn't do anything on any other woman until I experienced it myself.

We had another one or two brief conversations regarding my choice to do the brands, how long I would do it for before teaching others, and logistics before we decided this was a good fit.

I reserve my right to add to this answer.

8. Objection as the request is irrelevant to the battery charge. Defendant objects to this Request as overbroad, unduly burdensome, and seeking irrelevant documents not proportional to the needs of the case under Rule 26(b)(1) of the Federal Rules of Civil Procedure ("Rule 26(b)(1)") to the extent it seeks documents without limitation as to subject matter or connection to the allegations in the Third Amended Complaint, specifically the battery charge which is the only relevant charge left against Defendant. Defendant object that this Request is, and no Applicable Rule currently compels Plaintiffs to provide this information in the absence of specific, substantiated relevance. Subject to and without waiving the foregoing objections, Defendant states that she will meet and confer with Plaintiffs regarding the scope of a reasonable search for responsive discovery material in their possession, custody, or control.

9. See response in 7, incorporated here.

10. Objection as the request is irrelevant to the battery charge. Defendant objects to this Request as overbroad, unduly burdensome, and seeking irrelevant documents not

proportional to the needs of the case under Rule 26(b)(1) of the Federal Rules of Civil

Procedure ("Rule 26(b)(1)") to the extent it seeks documents without limitation as to

subject matter or connection to the allegations in the Third Amended Complaint,

specifically the battery charge which is the only relevant charge left against Defendant.

Defendant object that this Request is, and no Applicable Rule currently compels

Plaintiffs to provide this information in the absence of specific, substantiated relevance.

Subject to and without waiving the foregoing objections, Defendant states that she will

meet and confer with Plaintiffs regarding the scope of a reasonable search for responsive

discovery material in their possession, custody, or control.

11. The DOS women were brought into the room blindfolded and led by their Masters. Once

they entered the room, they removed their blindfolds. Often, women were very happy to

see me because we knew each other. Typically, they were nervous and excited about the

process. Next they removed all their clothing as directed by their Masters. I then

explained the process I would guide them through from start to finish and explain a bit

about what they could expect during and after the experience. There were never any

objections, or expressions to me that any women didn't want to do this, wanted to leave

or that this wasn't completely consensual. There weren't even body language cues that I

picked up on to indicate unwillingness. I perceived excitement, nervousness, joking and

laughing (as per the transcript, audio and video provided). First, each recipient would first

find a spot that would work best on her body to place the stencil under their bikini line. I

would then apply the stencil, and make adjustments for them as they desired. Once all

stencils were placed satisfactorily, the first woman would be ready to begin. The first line

women had intentionally crafted a manuscript for the process to turn this into a ritual with

depth and meaning. The Master would start by reading to their Slave and then the Slave read back to their Master in response. There was an introduction and then the woman got on the massage table and was supported by her sisters to secure her body for her own safety so that she wouldn't jump or move inadvertently and cause injury or mess-ups to their brands. There was typically 1 woman at her legs, one at each arm, one with her by her head and one taking video footage. From my understanding this was set up to inspire courage, trust and support. Before each line on the design was completed there was a statement that was read by the Master describing its meaning. I would start each woman with a "light touch" from the cautery for 1 second so that they had an idea of the sensation to come, and could mentally prepare. I would then count to 3 or 5 seconds when I delivered each line depending on the length of the line and the pain tolerance of the member. Some were more pain tolerant than others and I was in tune with and accommodated that. There was only 1 woman that had a pronounced reaction to the pain and took more support and coaching to help her through. There were requests to take a breather here and there, but no requests to stop or abandon the process, even for the woman who had a greater reaction to the experience. There were 7 lines total, which typically took a total of less than two minutes pen to skin time. After the brand was complete each woman was typically emotional, triumphant and verbally expressed their gratitude to their Master, me and their sisters. The brand was cleaned with normal saline and covered with a clear bandage. When everyone was finished in the group (between 3-5 women), I verbally gave basic care instructions and typically gave them some rose ointment as a gift. Each woman was to take a picture each day to document the progression of their healing and maturation process for the manual that would be created

for the future generations of DOS women, so that they would better know what to expect, and for sentimental purposes. They would send those pictures to their Masters and their Masters to me. The women would then reapply their blindfolds and all leave together with their Masters. This was done to keep the home they were in anonymous.

I was not aware of a specific purpose for the filming other than for a record for the women, and their masters - this wasn't collateral from my experience and my own personal branding process was not filed as collateral in my collateral log.

I reserve my right to add to this answer.

12. Who:

    1. Allison's Circle (which I was a part of) – in Allison's home

        a. India Oxenberg

        b. Nicole Isbel

        c. MH

    2. Lauren Salzman – In Allison's home

    3. Lauren's Circle – In Allison's home

        a. AC

        b. Sarah Edmondson

        c. CG

        d. JG

        e. AM

    4. Rosa Laura's Circle – In Allison's home

        a. AD

        b. AR

c. NH

    d. PA

5. Daniela Padilla's Circle – In Allison's home

    a. CB

    b. MR

    c. LE

6. Jimena's Circle  - In the DOS sorority house

    a. Paloma Pena

    b. M

I reserve my right to add to this list.

How: See answers to #9 as well as:

I bought the electrocautery machine on-line from Medtronic with Allision's credit card. I had training using a cautery in residency, not for creating scars but treating conditions while minimizing scaring. I learned from Steve Hayworth, the leading branding artist in the nation, who was the first to use electrocautery for branding in order to minimize risks of infection, make the art more precise, and reduce healing times significantly. He guided me and shared his process over the phone and email. I learned in person from a branding artist in Brooklyn. I practiced on fruit skin and pig knuckles as instructed by Steve Hayworth before doing it live. I reserve my right to add to this answer.

13. I had no communication with any DOS members before their branding process except my circle of 4 women. We had discussed it several times in person and worked out logistics for me to get my brand in BK and for them to come with me. The discussions were

usually us asking Allison regarding any concerns we had. She shared what she learned from Steve Hayworth in learning how to do it and having her own done. She addressed our concerns. There was no talk of collateral.

The other circles I helped with their brands had no communication with me before their brands. See answer to #11 regarding what I spoke to them about in the initiation and "Brands care instructions" for an approximation of what I explained to them in person about their healing process. They were guided to share photos with their Masters for each day after the process for 30 days and to address any signs of infection or issue should they arise with their doctors or urgent care. There were no issues/infections.

I spoke to the women in my circle about their brands, how they liked them, how they were healing and so forth and shared my own experience with them. There were very few other women who messaged me or that I spoke with about their brands after the process. A few sent me a picture so I could see how they were looking or to ask if it looked normal or consistent with what it should look like. Sarah Edmondson messaged me about three months after receiving the brand (and after breaking her vow) and unusually addressed me as Dr. Roberts which she had never done before as I have never acted as her doctor and we had always previously interacted as friendly acquaintances. Days later she filed a complaint against me with the Office of Professional Medical Conduct.

I never discussed anything about collateral with anyone outside of my circle. I spoke to the women in my circle about ideas about what I or they could submit, what the experience was like for us, etc.

I reserve my right to add to this answer.

14. Objection as the request is irrelevant to the battery charge. Defendant objects to this Request as overbroad, unduly burdensome, and seeking irrelevant documents not proportional to the needs of the case under Rule 26(b)(1) of the Federal Rules of Civil Procedure ("Rule 26(b)(1)") to the extent it seeks documents without limitation as to subject matter or connection to the allegations in the Third Amended Complaint, specifically the battery charge which is the only relevant charge left against Defendant. Defendant object that this Request is, and no Applicable Rule currently compels Plaintiffs to provide this information in the absence of specific, substantiated relevance. Subject to and without waiving the foregoing objections, Defendant states that she will meet and confer with Plaintiffs regarding the scope of a reasonable search for responsive discovery material in their possession, custody, or control.

15. Objection as the request is irrelevant to the battery charge. Defendant objects to this Request as overbroad, unduly burdensome, and seeking irrelevant documents not proportional to the needs of the case under Rule 26(b)(1) of the Federal Rules of Civil Procedure ("Rule 26(b)(1)") to the extent it seeks documents without limitation as to subject matter or connection to the allegations in the Third Amended Complaint, specifically the battery charge which is the only relevant charge left against Defendant. Defendant object that this Request is, and no Applicable Rule currently compels Plaintiffs to provide this information in the absence of specific, substantiated relevance. Subject to and without waiving the foregoing objections, Defendant states that she will meet and confer with Plaintiffs regarding the scope of a reasonable search for responsive discovery material in their possession, custody, or control.

16. Objection as the request is irrelevant to the battery charge. Defendant objects to this Request as overbroad, unduly burdensome, and seeking irrelevant documents not proportional to the needs of the case under Rule 26(b)(1) of the Federal Rules of Civil Procedure ("Rule 26(b)(1)") to the extent it seeks documents without limitation as to subject matter or connection to the allegations in the Third Amended Complaint, specifically the battery charge which is the only relevant charge left against Defendant. Defendant object that this Request is, and no Applicable Rule currently compels Plaintiffs to provide this information in the absence of specific, substantiated relevance. Subject to and without waiving the foregoing objections, Defendant states that she will meet and confer with Plaintiffs regarding the scope of a reasonable search for responsive discovery material in their possession, custody, or control.

17. Objection, assumes facts not in evidence – "collateral" is undefined and irrelevant to the battery charge. Defendant objects to this Request as overbroad, unduly burdensome, and seeking irrelevant documents not proportional to the needs of the case under Rule 26(b)(1) of the Federal Rules of Civil Procedure ("Rule 26(b)(1)") to the extent it seeks documents without limitation as to subject matter or connection to the allegations in the Third Amended Complaint, specifically the battery charge which is the only relevant charge left against Defendant. Defendant object that this Request is, and no Applicable Rule currently compels Plaintiffs to provide this information in the absence of specific, substantiated relevance. Subject to and without waiving the foregoing objections, Defendant states that she will meet and confer with Plaintiffs regarding the scope of a reasonable search for responsive discovery material in their possession, custody, or control.

18. Objection as the request is irrelevant to the battery charge. Defendant objects to this Request as overbroad, unduly burdensome, and seeking irrelevant documents not proportional to the needs of the case under Rule 26(b)(1) of the Federal Rules of Civil Procedure ("Rule 26(b)(1)") to the extent it seeks documents without limitation as to subject matter or connection to the allegations in the Third Amended Complaint, specifically the battery charge which is the only relevant charge left against Defendant. Defendant object that this Request is, and no Applicable Rule currently compels Plaintiffs to provide this information in the absence of specific, substantiated relevance. Subject to and without waiving the foregoing objections, Defendant states that she will meet and confer with Plaintiffs regarding the scope of a reasonable search for responsive discovery material in their possession, custody, or control.

19. Objection as the request is irrelevant to the battery charge. Defendant objects to this Request as overbroad, unduly burdensome, and seeking irrelevant documents not proportional to the needs of the case under Rule 26(b)(1) of the Federal Rules of Civil Procedure ("Rule 26(b)(1)") to the extent it seeks documents without limitation as to subject matter or connection to the allegations in the Third Amended Complaint, specifically the battery charge which is the only relevant charge left against Defendant. Defendant object that this Request is, and no Applicable Rule currently compels Plaintiffs to provide this information in the absence of specific, substantiated relevance. Subject to and without waiving the foregoing objections, Defendant states that she will meet and confer with Plaintiffs regarding the scope of a reasonable search for responsive discovery material in their possession, custody, or control.

20. Make Justice Blind: https://makejusticeblind.com/ Is a website that was developed out of An important need. Our voices were being silenced in the media and this was a way to illustrate the FBI malfeasance, evidence tampering and corruption that is occurring the Raniere case. It shows hard indisputable evidence (now corroborated by 8 experts including - digital forensic expert, Dr. Rick Kiper, that taught the FBI digital forensic team before he retired, and an independent expert hired by Newsweek). There are also very influential advocates including Judges, Attorney's and the like.

21. The Dossier Project: https://www.thedossierproject.love/. Is a group of women that came together about 5 years ago in May of 2020 as the wreckage from 2017's public campaign started to settle. Most of the community was terrified to talk to each other before that because of FBI threats and investigations. We re-found each other, and began talking. As we did, we started to realize a lot of us had very positive experiences and lies were being told publicly into a well-crafted defamation narrative. We were appalled, shocked, and devastated. We found solace in coming together to support each other and what we experienced to be true. This gave us the strength to speak out and to try to set the record straight since we were being silenced publicly. We created videos and articles detailing our personal accounts and experiences in DOS and laid out evidence contrary to the public narrative. Unfortunately, much of this was withdrawn by Nicki Clyne in March of 2023 when she had a change of heart, decided to leave the Dossier Project, and deny us access to our content. We are currently working to rebuild.

 /s/ Danielle Roberts____
  Danielle Roberts

## INDIVIDUAL CERTIFICATION

I certify that the foregoing statements made by me are true. I am aware that if any of the foregoing statements made by me are willfully false, I am subject to punishment for contempt of Court.

_____(sign and print name)

Print:

Dated: ___September 22___, 202_5_

**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**

---

SARAH EDMONDSON, *et al.*

   Plaintiffs,

  v.

Keith Raniere, *et al.*

   Defendants.

---

\*
\*
\*
\*
\*  1:20 - cv - 00485-EK-CLP
\*
\*
\*
\*
\*
\*

TABLE OF CONTENTS FOR DOCUMENTS

Roberts 2 –  IN THE MATTER OF DISCIPLINARY PROCEEDINGS COMPLAINT

Roberts 87 –  Letter enclosing amended complaint

Roberts 87 –  Coach Summy Brand Schedule

Roberts 91 –  Emails about the brand history

Roberts 93 –  Lauren Salzman log

Roberts 95 –  **BASIC NON-DISCLOSURE (NDA) AGREEMENT**

Roberts 99 –  Notice of disciplinary proceedings

Roberts 102 – Determination and order from disciplinary board

Roberts 159 – Summary of revocation of license

Roberts 163 – Text messages with Sarah Edmonson

Roberts 166 – definitions of key terms

Roberts 167 – messages with India Oxenberg

Roberts 168 – "Petitioner's Brief in reply to the Brief For Respondent AG."

Roberts 185 – Brief for Respondent AG

Roberts 230 – Text messages with Sarah Edmonson

Roberts 231 – Conversation With Allison Mack

Roberts 237 – Conversation With Kieth Raneire

Roberts 239 – Transcript of Video Conversation with Sarah Edmonson

Roberts 247 – Amended Complaint

Roberts 300 – Determination and order

Roberts 331 – Proof of license

Roberts 332 – Letter to Sarah Edmonson stating issues are not Doctor-Patient related

Roberts 333 – Attachments

Roberts 334 – Attachment 1 – Letter from OPMC to Ms. Edmondson, dated July 11, 2017.

Roberts 336 – Attachment 2 – OPMC Statement of Charges, dated November 17, 2017.

Roberts 407 – Attachment 3 – Email from OPMC Prosecutor Conklin, dated December 1,2017

Roberts 409 – Attachment 4 – OPMC Subpoena for Allison Mack, dated January 18, 2018

Roberts 413 – Attachment 5 – Declaration of Danielle Roberts, dated June 15, 2022

Roberts 419 – Attachment 6 – Letter on behalf of Allison Mack to OPMC, dated February 2, 2018

Roberts 422 – Attachment 7 – OPMC Interview Offer, dated February 5, 2018

Roberts 426 – Attachment 8 – Email from OPMC Prosecutor Conklin, dated June 27, 2019

Roberts 429 –  Attachment 9 – Emails from OPMC Prosecutor Conklin from October 2019

Roberts 436 – Respondent's Memorandum To The Hearing Committee

Roberts 463 – Complaint submitted on July 7, 2017

Roberts 465 – **BRIEF AND SPECIAL APPENDIX FOR DEFENDANT-APPELLANT**

**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**

_____

SARAH EDMONDSON, *et al.*

            Plaintiffs,

      v.

Keith Raniere, *et al.*

            Defendants.

_____

\*
\*
\*
\*
\*
\*
\*
\*
\*
\*

1:20 - cv - 00485-EK-CLP

August 6, 2025

        ALL DOCUMENTS RESPONSIVE TO REQUESTS FOR DOCUMENTS

STATE OF WISCONSIN
BEFORE THE MEDICAL EXAMINING BOARD

| | | |
|---|---|---|
| IN THE MATTER OF DISCIPLINARY | : | |
| PROCEEDINGS AGAINST | : | |
| | : | COMPLAINT |
| DANIELLE D. ROBERTS, D.O., | : | |
| RESPONDENT. | : | |

Division of Legal Services and Compliance Case No. 18 MED 161

Colleen L. Meloy, an attorney for the State of Wisconsin, Department of Safety and Professional Services (Department) Division of Legal Services and Compliance (Division) Post Office Box 7190, Madison, Wisconsin 53707-7190, upon information and belief, alleges that:

1.     Danielle D. Roberts, D.O., (Respondent) is licensed in the state of Wisconsin to practice medicine and surgery, having license number 60617-21, first issued on April 25, 2013, and expired on October 31, 2017.

2.     Pursuant to Wis. Stat. § 440.08(3), Respondent has the right to renew her license upon payment of a fee until October 31, 2022.

3.     Respondent's most recent address on file with the Department is 215 Castle Avenue, Westbury, New York 11590.

4.     Respondent is also licensed to practice medicine in New York, having New York medical license number 255075, first granted on October 5, 2009 and registered through August 31, 2023.

5.     On May 2, 2018, Division Case No. 18 MED 161 was opened to investigate allegations that Respondent used a cauterizing iron to deliberately create scar tissue of the initials "K.R." on multiple female members of the sex cult, NXIVM, led by Keith Raniere, as described by various media outlets, including a newspaper article dated April 30, 2018.

6.     On March 5, 2020, the New York State Department of Health, State Board for Professional Medical Conduct (New York Board) filed a Notice of Hearing and Statement of Charges against Respondent (New York Charges). *See New York Charges attached hereto as Exhibit A and incorporated by reference herein.*

7.     The New York Charges alleged the following facts, *intra alia*:

a.     On March 9, 2017, Respondent used a cauterizing pen as part of a medical procedure to scar the skin by branding female patients A-E, with the initials KR or AM in the pelvis region leaving a permanent scar and deviated from acceptable medical standards as follows:

i. without using appropriate infection control procedures and sterile technique;

ii. without the use of local or general anesthesia;

iii. with the assistance of non-medically trained personnel that physically restrained each patient;

iv. while both the patient and the non-medically trained personnel were naked contrary to any known medical protocol;

v. failed to provide appropriate wound care during and after the medical procedure;

vi. failed to provide appropriate follow-up care to each patient;

vii. failed to obtain informed consent from each patient; and

viii. failed to keep appropriate medical records for each patient.

b. Between January 2017 and December 2017, Respondent used a cauterizing pen as part of a medical procedure to scar the skin by branding female patients F-M, with the initials KR or AM in the pelvis region leaving a permanent scar and deviated from acceptable medical standards as set forth in subparagraph a, i-vii.

c. Between June 2016 and August 2016, Respondent failed to report a communicable disease outbreak at a conference held in Silver Bay, New York, which involved approximately 438 individuals, including 76 children.

8.    The New York Charges alleged counts one through forty-seven of professional misconduct against Respondent including, *intra alia*:

a. willfully abusing patients (charges 1-6);

b. engaging in conduct in the practice of medicine which evidences moral unfitness to practice medicine (charges 7-12);

c. failing to use scientifically accepted barrier precautions and infection control practices as established by the New York State Department of Health (charges 13-18);

d. practicing the profession fraudulently or beyond its authorized scope (charge 19);

e. practicing the profession with negligence, gross negligence, incompetence and/or gross incompetence (charges 20-33);

f. failing to file a public health report required by law (charge 34);

g. willfully or grossly negligently failing to comply with substantial provisions of federal, state, or local laws, rules, or regulations governing the practice of medicine (charge 35);

h. performing professional services which have not been authorized by the patient (charges 36-41); and

i. failing to maintain patient healthcare records (charges 42-47).

9. A full recitation of the facts alleged and charges set forth in the New York Charges are attached hereto as Exhibit A and incorporated by reference herein.

10. On April 27, 2020, the New York Board filed an Amended Statement of Charges against Respondent (New York Amended Charges).[1] *See New York Amended Charges attached hereto as Exhibit B and incorporated by reference herein.*

11. On September 27, 2021, the New York Board issued a Determination and Order which revoked Respondent's license to practice medicine in the State of New York after a determination that the forty-seven specified counts of professional misconduct set forth in the New York Charges were sustained. *See New York Determination and Order attached hereto as Exhibit C and incorporated by reference herein.*

12. Respondent engaged in unprofessional conduct pursuant to Wis. Admin. Code § Med 10.03(2)(b) by departing from or failing to conform to the standard of minimally competent medical practice which creates an unacceptable risk of harm to a patient or the public whether or not the act or omission resulted in actual harm to any person.

13. Respondent engaged in unprofessional conduct pursuant to Wis. Admin. Code § Med 10.03(2)(j) by performing an act constituting the practice of medicine and surgery without required informed consent under s. 448.30, Wis. Stats.

14. Respondent engaged in unprofessional conduct pursuant to Wis. Admin. Code § Med 10.03(3)(c) by having any credential pertaining to the practice of medicine and surgery or any act constituting the practice of medicine and surgery become subject to adverse determination by any agency of this or another state, or by any federal agency or authority.

15. As a result of the above conduct, Respondent is subject to discipline pursuant to Wis. Stat. § 448.02(3).

The Division of Legal Services and Compliance requests that the Board hear evidence relevant to the matters alleged in this complaint, determine and impose the discipline warranted, and assess the costs against Respondent Danielle D. Roberts, D.O.

Dated the 6th of October, 2021

_____
Colleen L. Meloy, Prosecuting Attorney
State Bar Number 1029855
Department of Safety and Professional Services
Division of Legal Services and Compliance

---

[1] The New York Amended Charges removed patients H-M.

P.O. Box 7190
Madison, WI 53707-7190
(608) 261-8779
Colleen.Meloy@wisconsin.gov

These charges are only allegations which

may be contested by the licensee in an

Administrative hearing.

Exhibit A 001

NEW YORK STATE          DEPARTMENT OF HEALTH
STATE BOARD FOR PROFESSIONAL MEDICAL CONDUCT

| | |
|---|---|
| **IN THE MATTER**<br>**OF**<br>**DANIELLE ROBERTS, D.O.** | NOTICE<br>OF<br>HEARING |

TO:   DANIELLE ROBERTS, D.O.

█████████████████████████

PLEASE TAKE NOTICE:

A hearing will be held pursuant to the provisions of N.Y. Pub. Health Law §230 and N.Y. State Admin. Proc. Act §§301-307 and 401. The hearing will be conducted before a committee on professional conduct of the State Board for Professional Medical Conduct on May 4, 2020 at 10:00 a.m., at the Offices of the New York State Department of Health, 90 Church State Street, 4th floor, New York, New York 10007, and at such other adjourned dates, times and places as the committee may direct.

At the hearing, evidence will be received concerning the allegations set forth in the Statement of Charges, which is attached. A stenographic record of the hearing will be made and the witnesses at the hearing will be sworn and examined. You shall appear in person at the hearing and may be represented by counsel who shall be an attorney admitted to practice in New York state. You have the right to produce witnesses and evidence on your behalf, to issue or have subpoenas issued on your behalf in order to require the production of witnesses and documents, and you may cross-examine witnesses and examine evidence produced against you. A summary of the Department of Health Hearing Rules is enclosed.

YOU ARE HEREBY ADVISED THAT THE ATTACHED CHARGES WILL BE MADE PUBLIC FIVE BUSINESS DAYS AFTER THEY ARE SERVED.

Department attorney: Initial here ███████

The hearing will proceed whether or not you appear at the hearing. Please note that requests for adjournments must be made in writing and by telephone to the New York State Department of Health, Division of Legal Affairs, Bureau of Adjudication, Riverview Center,150 Broadway - Suite 510, Albany, NY 12204-2719, ATTENTION: HON. JAMES HORAN, DIRECTOR, BUREAU OF ADJUDICATION, (henceforth "Bureau of Adjudication"), (Telephone: (518-402-0748), upon notice to the attorney for the Department of Health whose name appears below, and at least five days prior to the scheduled hearing date. Adjournment requests are not routinely granted as scheduled dates are considered dates certain. Claims of court engagement will require detailed Affidavits of Actual Engagement. Claims of illness will require medical documentation.

Pursuant to the provisions of N.Y. Pub. Health Law §230(10)(c), you shall file a written answer to each of the charges and allegations in the Statement of Charges not less than ten days prior to the date of the hearing. Any charge or allegation not so answered shall be deemed admitted. You may wish to seek the advice of counsel prior to filing such answer. The answer shall be filed with the Bureau of Adjudication, at the address indicated above, and a copy shall be forwarded to the attorney for the Department of Health whose name appears below. Pursuant to §301(5) of the State Administrative Procedure Act, the Department, upon reasonable notice, will provide at no charge a qualified interpreter of the deaf to interpret the proceedings to, and the testimony of, any deaf person. Pursuant to the

Exhibit A 003

terms of N.Y. State Admin. Proc. Act §401 and 10 N.Y.C.R.R. §51.8(b), the Petitioner hereby demands disclosure of the evidence that the Respondent intends to introduce at the hearing, including the names of witnesses, a list of and copies of documentary evidence and a description of physical or other evidence which cannot be photocopied.

At the conclusion of the hearing, the committee shall make findings of fact, conclusions concerning the charges sustained or dismissed, and in the event any of the charges are sustained, a determination of the penalty to be imposed or appropriate action to be taken. Such determination may be reviewed by the Administrative Review Board for Professional Medical Conduct.

THESE PROCEEDINGS MAY RESULT IN A DETERMINATION THAT YOUR LICENSE TO PRACTICE MEDICINE IN NEW YORK STATE BE REVOKED OR SUSPENDED, AND/OR THAT YOU BE FINED OR SUBJECT TO OTHER SANCTIONS SET OUT IN NEW YORK PUBLIC HEALTH LAW §§230-a. YOU ARE URGED TO OBTAIN AN ATTORNEY TO REPRESENT YOU IN THIS MATTER.

DATE: March 5, 2020

Albany, New York

Timothy A. Mahar, Esq.
Deputy Counsel
Bureau of Professional Medical Conduct

Inquiries should be directed to:
Jeffrey J. Conklin, Esq., Associate Counsel
Bureau of Professional Medical Conduct
Empire State Plaza
Corning Tower, Room 2517
Albany, New York 12237

Exhibit A 004

NEW YORK STATE        DEPARTMENT OF HEALTH
STATE BOARD FOR PROFESSIONAL MEDICAL CONDUCT

| | |
|---|---|
| **IN THE MATTER** **OF** **DANIELLE ROBERTS, D.O.** | STATEMENT OF CHARGES |

DANIELLE ROBERTS, D.O., the Respondent, was authorized to practice medicine in New York State on or about October 5, 2009, by the issuance of license number 255075 by the New York State Education Department.

## FACTUAL ALLEGATIONS

A.    On or about March 9, 2017, the Respondent used a cauterizing pen as part of a medical procedure to scar the skin by branding Patient A, a female patient, hereinafter identified in the attached Appendix "A", with the initials KR/AM, and/or KR, in the pelvis region, thereby leaving a permanent scar. Respondent's conduct deviated from accepted standards of care as follows:

1. Respondent performed the medical procedure upon Patient A in an other than appropriately sterile environment, and/or without appropriate infection control, and/or without the use of sterile technique, including the surgical field, surgical procedure room, multiple use of a cautery pen tip and electrical grounding pad, and documented electrical testing and maintenance upkeep of the cautery device.

2. Respondent performed the medical procedure without the use of a local anesthetic or general anesthesia, thereby causing Patient A to suffer pain for no legitimate medical purpose.

1

Exhibit A 005

3. Respondent performed the medical procedure upon Patient A with non-medically trained personnel present, who were not wearing personal protective equipment.

4. Respondent performed the medical procedure upon Patient A with the assistance of non-medically trained personnel who physically restrained said patient.

5. Respondent failed to cease performing the medical procedure despite the fact that Patient A was suffering pain without medical justification.

6. Respondent, during the course of the medical procedure, willfully physically abused Patient A.

7. Respondent performed the medical procedure upon Patient A at the time when said patient was naked and while being held down by other individuals, who were also naked, contrary to any appropriate medical protocol or need.

8. Respondent inappropriately performed the medical procedure upon Patient A while an individual who was also naked utilized a cell phone to video said medical procedure.

9. Respondent failed to provide appropriate wound care for Patient A at the time of the medical procedure, and thereafter.

10. Respondent failed to provide appropriate follow-up medical care and treatment for Patient A's wound, and/or failed to refer Patient A to another medical provider for such post-medical procedure wound care.

11. Respondent inappropriately advised, or caused another individual to advise, Patient A to take photographs of the wound caused by the medical procedure on a daily basis for one month and once a week for another month, and to thereafter send such photographs to an individual who shared all or some of said photographs with the Respondent.

12. Respondent failed to provide appropriate medical care and treatment for Patient A, including obtaining information regarding said patient's medical history and current medications.

2

Exhibit A 006

13. Respondent failed to prepare and/or maintain appropriate medical records for the patient which accurately reflected the evaluation and treatment of Patient A.

14. Respondent fraudulently failed to disclose to Patient A that the initials KR/AM and/or KR said Respondent branded into the pelvis region of Patient A represented the initials of Keith Ranieri and/or Allison Mack.

15. Respondent performed the medical procedure upon Patient A without having obtained the adequate informed consent of Patient A.


B. On or about March 9, 2017, the Respondent used a cauterizing pen as part of a medical procedure to scar the skin by branding Patient B, a female patient, hereinafter identified in the attached Appendix "A", with the initials KR/AM, and/or KR, in the pelvis region, thereby leaving a permanent scar. Respondent's conduct deviated from accepted standards of care as follows:

1. Respondent performed the medical procedure upon Patient B in an other than appropriately sterile environment, and/or without appropriate infection control and/or, without the use of sterile technique, including the surgical field, surgical procedure room, multiple use of a cautery pen tip and electrical ground pad, and documented electrical testing and maintenance upkeep of the cautery device.

2. Respondent, while performing the medical procedure without the use of a local anesthetic or general anesthesia, thereby causing Patient B to suffer pain for no legitimate medical purpose.

3. Respondent performed the medical procedure upon Patient B with non-medically trained personnel present, who were not wearing personal protective equipment.

4. Respondent performed the medical procedure upon Patient B with the assistance of non-medically trained personnel who physically restrained said patient.

3

Exhibit A 007

5. Respondent failed to cease performing the medical procedure despite the fact that Patient B was suffering pain without medical justification.

6. Respondent, during the course of the medical procedure, willfully and physically abused Patient B.

7. Respondent performed the medical procedure upon Patient B at the time when said patient was naked and while being held down by other individuals, who were also naked, contrary to any appropriate medical protocol or need.

8. Respondent inappropriately performed the medical procedure upon Patient B while an individual who was also naked utilized a cell phone to video said medical procedure.

9. Respondent failed to provide appropriate wound care for Patient B at the time of the medical procedure, and thereafter.

10. Respondent failed to provide appropriate follow-up medical care and treatment for Patient B's wound, and/or failed to refer Patient B to another medical provider for such post-medical procedure wound care.

11. Respondent inappropriately advised, or caused another individual to advise Patient B to take photographs of the wound caused by the medical procedure on a daily basis for one month and once a week for another month, and to thereafter send such photographs to an individual who shared all or some of said photographs with Respondent.

12. Respondent failed to provide appropriate medical care and treatment for Patient B, including obtaining information regarding said patient's medical history and current medications.

13. Respondent failed to prepare and/or maintain appropriate medical records for the patient which accurately reflected the evaluation and treatment of Patient B.

14. Respondent fraudulently failed to disclose to Patient B that the initials KR/AM and/or KR said Respondent branded into the pelvis region of Patient B represented the initials of Keith Ranieri and/or Allison Mack.

4

15. Respondent performed the medical procedure upon Patient B without having obtained the adequate informed consent of Patient B.

C. On or about March 9, 2017, the Respondent used a cauterizing pen as part of a medical procedure to scar the skin by branding Patient C, a female patient, hereinafter identified in the attached Appendix "A", with the initials KR/AM, and/or KR, in the pelvis region, thereby leaving a permanent scar. Respondent's conduct deviated from accepted standards of care as follows:

1. Respondent performed the medical procedure upon Patient C in an other than appropriately sterile environment, and/or without appropriate infection control, and/or without the use of sterile technique, including the surgical field, surgical procedure room, multiple use of a cautery pen tip and electrical grounding pad, and documented electrical testing and maintenance upkeep of the cautery device.

2. Respondent, while performing the medical procedure without the use of a local anesthetic or general anesthesia, thereby causing Patient C to suffer pain for no legitimate medical purpose.

3. Respondent performed the medical procedure upon Patient C with non-medically trained personnel present, who were not wearing personal protective equipment.

4. Respondent performed the medical procedure upon Patient C with the assistance of non-medically trained personnel who physically restrained said patient.

5. Respondent failed to cease performing the medical procedure despite the fact that Patient C was suffering pain without medical justification.

6. Respondent, during the course of the medical procedure, willfully physically abused Patient C.

5

Exhibit A 009

7. Respondent performed the medical procedure upon Patient C at the time when said patient was naked and while being held down by other individuals, who were also naked, contrary to any appropriate medical protocol or need.

8. Respondent inappropriately performed the medical procedure upon Patient C while an individual who was also naked utilized a cell phone to video said medical procedure.

9. Respondent failed to provide appropriate wound care for Patient C at the time of the medical procedure, and thereafter.

10. Respondent failed to provide appropriate follow-up medical care and treatment for Patient C's wound, and/or failed to refer Patient C to another medical provider for such post-medical procedure wound care.

11. Respondent inappropriately advised, or caused another individual to advise, Patient C to take photographs of the wound caused by the medical procedure on a daily basis for one month and once a week for another month, and to thereafter send such photographs to an individual who shared all or some of said photographs with Respondent.

12. Respondent failed to provide appropriate medical care and treatment for Patient C, including obtaining information regarding said patient's medical history and current medications.

13. Respondent failed to prepare and/or maintain appropriate medical records for the patient which accurately reflected the evaluation and treatment of Patient C.

14. Respondent fraudulently failed to disclose to Patient C that the initials KR/AM and/or KR said Respondent branded into the pelvis region of Patient C represented the initials of Keith Ranieri and/or Allison Mack.

15. Respondent performed the medical procedure upon Patient C without having obtained the adequate informed consent of Patient C.

6

Exhibit A 010

D.  On or about March 9, 2017, the Respondent used a cauterizing pen as part of a medical procedure to scar the skin by branding Patient D, a female patient, hereinafter identified in the attached Appendix "A", with the initials KR/AM, and/or KR, in the pelvis region, thereby leaving a permanent scar. Respondent's conduct deviated from accepted standards of care as follows:

1.  Respondent performed the medical procedure upon Patient D in an other than appropriately sterile environment, and/or without appropriate infection control, and/or without the use of sterile technique, including the surgical field, surgical procedure room, multiple use of a cautery pen tip and electrical grounding pad, and documented electrical testing and maintenance upkeep of the cautery device.

2.  Respondent, while performing the medical procedure without the use of a local anesthetic or general anesthesia, thereby causing Patient D to suffer pain for no legitimate medical purpose.

3.  Respondent performed the medical procedure upon Patient D with non-medically trained personnel present, who were not wearing personal protective equipment.

4.  Respondent performed the medical procedure upon Patient D with the assistance of non-medically trained personnel who physically restrained said patient.

5.  Respondent failed to cease performing the medical procedure despite the fact that patient D was suffering pain without medical justification.

6.  Respondent, during the course of the medical procedure, willfully physically abused Patient D.

7.  Respondent performed the medical procedure upon Patient D at the time when said patient was naked and while being held down by other individuals, who were also naked, contrary to any appropriate medical protocol or need.

7

Exhibit A 011

8. Respondent inappropriately performed the medical procedure upon Patient D while an individual who was also naked utilized a cell phone to video said medical procedure.

9. Respondent failed to provide appropriate wound care for Patient D at the time of the medical procedure, and thereafter.

10. Respondent failed to provide appropriate follow-up medical care and treatment for Patient D's wound, and/or failed to refer Patient D to another medical provider for such post-medical procedure wound care.

11. Respondent inappropriately advised, or caused another individual to advise Patient D to take photographs of the wound caused by the medical procedure on a daily basis for one month and once a week for another month, and to thereafter send such photographs to an individual who shared all or some of said photographs with Respondent.

12. Respondent failed to provide appropriate medical care and treatment for Patient D, including obtaining information regarding said patient medical history and current medications.

13. Respondent failed to prepare and/or maintain appropriate medical records for the patient which accurately reflected the evaluation and treatment of Patient D.

14. Respondent fraudulently failed to disclose to Patient D that the initials KR/AM and/or KR said Respondent branded into the pelvis region of Patient D represented the initials of Keith Ranieri and/or Allison Mack.

15. Respondent performed the medical procedure upon Patient D without having obtained the adequate informed consent of Patient D.


E.  On or about March 9, 2017, the Respondent used a cauterizing pen as part of a medical procedure to scar the skin by branding Patient E, a female patient, hereinafter identified in the attached Appendix "A", with the initials KR/AM, and/or

8

Exhibit A 012

KR, in the pelvis region, thereby leaving a permanent scar. Respondent's conduct deviated from accepted standards of care as follows:

1.     Respondent performed the medical procedure upon Patient E in an other than appropriately sterile environment, and/or without appropriate infection control, and/or without the use of sterile technique, including the surgical field, surgical procedure room, multiple use of a cautery tip pen and electrical grounding pad, and documented electrical testing and maintenance upkeep of the cautery device.

2.     Respondent performed the medical procedure without the use of a local anesthetic or general anesthesia, thereby causing Patient E to suffer pain for no legitimate medical purpose.

3.     Respondent performed the medical procedure upon Patient E with non-medically trained personnel present, who were not wearing personal protective equipment.

4.     Respondent performed the medical procedure upon Patient E with the assistance of non-medically trained personnel who physically restrained said patient.

5.     Respondent failed to cease performing the medical procedure despite the fact that Patient E was suffering pain without medical justification.

6.     Respondent, during the course of the medical procedure, willfully physically abused Patient E.

7.     Respondent performed the medical procedure upon Patient E at the time when said patient was naked and while being held down by other individuals, who were also naked, contrary to any appropriate medical protocol or need.

8.     Respondent inappropriately performed the medical procedure upon Patient E while an individual who was also naked utilized a cell phone to video said medical procedure.

9.     Respondent failed to provide appropriate wound care for Patient E at the time of the medical procedure, and thereafter.

9

Exhibit A 013

10. Respondent failed to provide appropriate follow-up medical care and treatment for Patient E's wound, and/or failed to refer Patient E to another medical provider for such post-medical procedure wound care.

11. Respondent inappropriately advised, or caused another individual to advise, Patient E to take photographs of the wound caused by the medical procedure on a daily basis for one month and once a week for another month, and to thereafter send such photographs to an individual who shared all or some of said photographs with Respondent.

12. Respondent failed to provide appropriate medical care and treatment for the Patient E, including obtaining information regarding said patient's medical history and current medications.

13. Respondent failed to prepare and/or maintain appropriate medical records for the patient which accurately reflected the evaluation and treatment of Patient E.

14. Respondent fraudulently failed to disclose to Patient E that the initials KR/AM and/or KR said Respondent branded into the pelvis region of Patient E represented the initials of Keith Ranieri and/or Allison Mack.

15. Respondent performed the medical procedure upon Patient E without having obtained the adequate informed consent of Patient E.


F.  During the period from on or about January 2017 through December 2017, the Respondent used a cauterizing pen as part of medical procedures to permanently scar the skin by branding one or more of the following: Patient F through Patient M, inclusive, female patients, hereinafter identified in the attached Appendix "A", with the initials KR/AM, and/or KR, in their pelvis regions. Respondent's conduct deviated from accepted standards of care as follows:

1.  Respondent performed the medical procedures upon one or more of the following: Patient F through Patient M, inclusive, in an other than appropriately

10

Exhibit A 014

sterile environment, and/or without appropriate infection control, and/or without the use of sterile technique, including the surgical field, surgical procedure room, multiple use of a cautery pen tip and electrical grounding pad, and documented electrical testing and maintenance upkeep of the cautery device.

2. Respondent performed the medical procedures without the use of a local anesthetic or general anesthesia, thereby causing one or more of the following: Patient F though Patient M, inclusive, to suffer pain for no legitimate medical purpose.

3. Respondent performed the medical procedures upon one or more of the following: Patient F through Patient M, inclusive, with non-medically trained personnel present, who were not wearing personal protective equipment.

4. Respondent performing the medical procedures upon one or more of the following: Patient F through Patient M, inclusive, with the assistance of non-medically trained personnel who physically restrained said patients.

5. Respondent failed to cease performing the medical procedures despite the fact that one or more of the following: Patient F through Patient M, inclusive, were suffering pain without medical justification.

6. Respondent, during the course of the medical procedures willfully physically abused one or more of the following: Patient F through Patient M, inclusive.

7. Respondent inappropriately performed the medical procedures upon one or more of the following: Patient F through Patient M, inclusive, while an individual utilized a cell phone to video said medical procedures.

8. Respondent failed to provide appropriate wound care for one or more of the following: Patient F through Patient M, inclusive, at the time of the medical procedures, and thereafter.

9. Respondent failed to provide appropriate follow-up medical care and treatment for one or more of the following: Patient F through Patient M,

11

Exhibit A 015

inclusive, and/or failed to refer the patients to other medical providers for such post-medical procedures wound care.

10. Respondent inappropriately advised, or caused another individual to advise, one or more of the following: Patient F through Patient M, inclusive, to take photographs of the wounds caused by the medical procedures on a daily basis for one month and once a week for another month, and to thereafter send such photographs to an individual who shared all or some of said photographs with Respondent.

11. Respondent failed to provide appropriate medical care and treatment for one or more of the following: Patient F through Patient M, inclusive, including obtaining information regarding said patients' medical histories and current medications.

12. Respondent failed to prepare and/or maintain appropriate medical records for the patients which accurately reflected the evaluation and treatment of one or more of the following: Patient F through Patient M, inclusive.

13. Respondent performed the medical procedures upon one or more of the following: Patient F through Patient M, inclusive, without having obtained the adequate informed consents of Patient F through Patient M, inclusive.


G. During the time from on or about June 2016 through August 2016, NXIVM and/or the Executive Success Program (ESP) conducted a conference and/or meeting at the Silver Bay Conference and Family Retreat Center (Conference Center), located in Silver Bay, New York. The Respondent and approximately 438 other individuals attended the conference, including approximately 76 children. During the course of the conference, hundreds of the attendees became severely ill with an undetermined communicable disease. The individuals who became ill suffered inter alia, flu-like symptoms, severe vomiting and diarrhea. The Respondent had knowledge of the fact that many individuals at the conference had become ill. The Respondent knew

12

Exhibit A 016

or should have known that the illness suffered by the attendees at the conference was a communicable disease, outbreak of a communicable disease, and/or an unusual disease or outbreak. Respondent's conduct deviated from accepted standards of care as follows:

1. Respondent failed to report a disease outbreak or unusual disease to the State Department of Health as required by Title 10 N,Y.C.R.R. Section 2.1(c).

2. Respondent failed to report the suspected or confirmed case of communicable disease, outbreak of communicable disease, and/or the unusual disease or outbreak to the city, county, or district health officer as required by Title 10 N.Y.C.R.R. Sections 2.10 and 2.1(b) and (c).

3. Respondent failed to report by telephone, facsimile, or other electronic communication, or in person the illness of the attendees at the conference suspected or confirmed to have been caused due to the consumption of spoiled or poisonous food to the city, county, or district health officer, in violation of Title 10 N.Y.C.R.R. Section 2.15.

4. Upon being made aware of the fact that attendees at the conference might have been suffering from a communicable disease, the Respondent failed to cause such individuals to be isolated in an appropriate environment, pending official action by the health officer, in violation of Title 10 N.Y.C.R.R. Section 2.27.

13

Exhibit A 017

## SPECIFICATIONS OF CHARGES

### FIRST THROUGH SIXTH SPECIFICATIONS
### WILLFULLY ABUSING A PATIENT

Respondent is charged with committing professional misconduct as defined by New York Education Law §6530(31) by willfully abusing a patient as alleged in the facts of one or more of the following:

1. The facts in paragraphs A and A.2, A and A.4, A and A.5, A and A.6, and/or A and A.8.

2. The facts in paragraphs B and B.2, B and B.4, B and B.5, B and B.6, and/or B and B.8.

3. The facts in paragraphs C and C.2, C and C.4, C and C.5, C and C.6, and/or, C and C.8.

4. The facts in paragraphs D and D.2, D and D.4, D and D.5, D and D.6, and/or, D and D.8.

5. The facts in paragraphs E and E.2, E and E.4, E and E.5, E and E.6, and/or, E and E.8.

6. The facts in paragraphs F and F.2, F and F.4, F and F.5, F and F.6, and/or F and F.8.

14

Exhibit A 018

## SEVENTH THROUGH
## TWELFTH SPECIFICATIONS

### CONDUCT IN THE PRACTICE OF MEDICINE
### WHICH EVIDENCES MORAL UNFITNESS

Respondent is charged with committing professional misconduct as defined by New York Education Law §6530(20) by engaging in conduct in the practice of medicine which evidences moral unfitness to practice medicine as alleged in the facts of one or more of the following:

7.  The facts in paragraphs A and A.2, A and A.4, A and A.5, A and A.6, and/or A and A.8.

8.  The facts in paragraphs B and B.2, B and B.4, B and B.5, B and B.6, and/or B and B.8.

9.  The facts in paragraphs C and C.2, C and C.4, C and C.5, C and C.6, and/or C and C.8.

10. The facts in paragraphs D and D.2, D and D.4, D and D.5, D and D.6, and/or D and D.8.

11. The facts in paragraphs E and E.2, E and E.4, E and E.5, E and E.6, and/or E and E.8.

12. The facts in paragraphs F and F.2, F and F.4, F and F.5, F and F.6, and/or F and F.8.

15

Exhibit A 019

## THIRTEENTH THROUGH EIGHTEENTH SPECIFICATIONS

### FAILING TO USE APPROPRIATE STERILE ENVIRONMENT AND/OR WITHOUT APPROPRIATE INFECTION CONTROL AND/OR WITHOUT THE USE OF STERILE TECHNIQUE

Respondent is charged with committing professional misconduct as defined by New York Education Law §6530(47) by failing to use scientifically accepted barrier precautions and infection control practices as established by the department of health as alleged in the facts of one or more of the following:

13. The facts in paragraphs A and A.1, A and A.3, A and A.4, and/or A and A.7.

14. The facts in paragraphs B and B.1, B and B.3, B and B.4, and/or B and B.7.

15. The facts in paragraphs C and C.1, C and C.3, C and C.4, and/or C and C.7.

16. The facts in paragraphs D and D.1, D and D.3, D and D.4, and/or D and D.7.

17. The facts in paragraphs E and E.1, E and E.3, E and E.4, and/or E and E.7.

18. The facts in paragraphs F and F.1, F and F.3, F and F.4, and/or F and F.7.


### NINTEENTH SPECIFICATION

### PRACTICING THE PROFESSION FRAUDULENTLY OR BEYOND ITS SCOPE

Respondent is charged with committing professional misconduct as defined by New York Education Law §6530(2) by practicing the profession fraudulently or beyond its authorized scope as alleged in the facts of one or more of the following:

19. The facts in paragraphs A and A.2, A and A.3, A and A.8 and/or A and A.14; B and B.2, B and B.3, B and B.8, and/or B and B.14; C and C.2, C and C.3, C and C.8, and/or C and C.14; D and D.2, D and D.3, D and D.8, and/or D and D.14; E

16

Exhibit A 020

and E.2, E and E.3, E and E.8, and/or E and E. 14; F and F.2, F and F.3, and/or F and F.7.

## TWENTIETH THROUGH TWENTY-FIFTH SPECIFICATIONS
## PRACTICING THE PROFESSION WITH GROSS NEGLIGENCE

Respondent is charged with committing professional misconduct as defined by New York Education Law §6530(4) by practicing the profession with gross negligence as alleged in the facts of one or more of the following:

20. The facts in paragraphs A and A.1, A and A.2, A and A.3, A and A.4, A and A.5, A and A.6, A and A.7, A and A.8, A and A.9, A and A.10, A and A.11, A and A.12, A and A.13, A and A.14, and/or A and A.15.

21. The facts in paragraphs B and B.1, B and B.2, B and B.3, B and B.4, B and B.5, B and B.6, B and B.7, B and B.8, B and B.9, B and B.10, B and B.11, B and B.12, B and B.13, B and B.14, and/or B and B.15.

22. The facts in paragraphs C and C.1, C and C.2, C and C.3, C and C.4, C and C.5, C and C.6, C and C.7, C and C.8, C and C.9, C and C.10, C and C.11, C and C.12, C and C.13, C and C.14, and/or C and C.15.

23. The facts in paragraphs D and D.1, D and D.2, D and D.3, D and D.4, D and D.5, D and D.6, D and D.7, D and D.8, D and D.9, D and D.10, D and D.11, D and D.12, D and D.13, D and D.14, and/or D and D.15.

17

Exhibit A 021

24. The facts in paragraphs E and E.1, E and E.2, E and E.3, E and E.4, E and E.5, E and E.6, E and E.7, E and E.8, E and E.9, E and E.10, E and E.11, E and E.12, E and E.13, E and E.14, and/or E and E.15.

25. The facts in paragraphs F and F.1, F and F.2, F and F.3, F and F.4, F and F.5, F and F.6, F and F.7, F and F.8, F and F.9, F and F.10, F and F.11, F and F.12, and/or F and F.13.

## TWENTY-SIXTH SPECIFICATION

## PRACTICING THE PROFESSION WITH NEGLIGENCE
## ON MORE THAN ONE OCCASION

Respondent is charged with committing professional misconduct as defined by New York Education Law §6530(3) by practicing the profession with negligence on more than one occasion as alleged in the facts of the following:

26. The facts in paragraphs A and A.1, A and A.2, A and A.3, A and A.4, A and A.5, A and A.6, A and A.7, A and A.8, A and A.9, A and A.10, A and A.11, A and A.12, A and A.13, and/or A and A.15; and/or B and B.1, B and B.2, B and B.3, B and B.4, B and B.5, B and B.6, B and B.7, B and B.8, B and B.9, B and B.10, B and B.11, B and B.12, B and B.13, and/or B and B.15; and/or C and C.1, C and C.2, C and C.3, C and C.4, C and C.5, C and C.6, C and C.7, C and C.8, C and C.9, C and C.10, C and C.11, C and C.12, C and C.13, and/or C and C.15; and/or D and D.1, D and D.2, D and D.3, D and D.4, D and D.5, D and D.6, D and D.7, D and D.8, D and D.9, D and D.10, D and D.11, D and D.12, D and D.13, and/or D

18

Exhibit A 022

and D.15; and/or E and E.1, E and E.2, E and E.3, E and E.4, E and E.5, E and E.6, E and E.7, E and E.8, E and E.9, E and E.10, E and E.11, E and E.12, E and E.13, and/or E and E.15; and/or F and F.1, F and F.2, F and F.3, F and F.4, F and F.5, F and F.6, F and F.7, F and F.8, F and F.9, F and F.10, F and F.11, F and F.12, and/or F and F.13; and/or G and G.1, G and G.2, G and G.3, and/or G and G.4.

## TWENTY-SEVENTH THROUGH THIRTY-SECOND SPECIFICATIONS
## PRACTICING THE PROFESSION WITH GROSS INCOMPETENCE

Respondent is charged with committing professional misconduct as defined by New York Education Law §6530(6) by practicing the profession with gross incompetence as alleged in the facts of one or more of the following:

27. The facts in paragraphs A and A.1, A and A.2, A and A.3, A and A.4, A and A.5, A and A.6, A and A.7, A and A.8, A and A.9, A and A.10, A and A.11, A and A.12, A and A.13, and/or A and A.15.

28. The facts in paragraphs B and B.1, B and B.2, B and B.3, B and B.4, B and B.5, B and B.6, B and B.7, B and B.8, B and B.9, B and B.10, B and B.11, B and B.12, B and B.13, and/or A and A.15.

29. The facts in paragraphs C and C.1, C and C.2, C and C.3, C and C.4, C and C.5, C and C.6, C and C.7, C and C.8, C and C.9, C and C.10, C and C.11, C and C.12, C and C.13, and/or C and C.15.

19

Exhibit A 023

30. The facts in paragraphs D and D.1, D and D.2, D and D.3, D and D.4, D and D.5, D and D.6, D and D.7, D and D.8, D and D.9, D and D.10, D and D.11, D and D.12, D and D.13, and/or D and D.15.

31. The facts in paragraphs E and E.1, E and E.2, E and E.3, E and E.4, E and E.5, E and E.6, E and E.7, E and E.8, E and E.9, E and E.10, E and E.11, E and E.12, E and E.13, and/or E and E.15.

32. The facts in paragraphs F and F.1, F and F.2, F and F.3, F and F.4, F and F.5, F and F.6, F and F.7, F and F.8, F and F.9, F and F.10, F and F.11, F and F.12, and/or F and F.13.

## THIRTY-THIRD SPECIFICATION

### PRACTICNG THE PROFESSION WITH INCOMPETENCE ON MORE THAN ONE OCCASION

Respondent is charged with committing professional misconduct as defined by New York Education Law §6530(5) by practicing the profession with incompetence on more than one occasion as alleged in the facts of the following:

33. The facts in paragraphs A and A.1, A and A.2, A and A.3, A and A.4, A and A.5, A and A.6, A and A.7, A and A.8, A and A.9, A and A.10, A and A.11, A and A.12, A and A.13, and/or A and A.15; and/or B and B.1, B and B.2, B and B.3, B and B.4, B and B.5, B and B.6, B and B.7, B and B.8, B and B.9, B and B.10, B and B.11, B and B.12, B and B.13, and/or B and B.15; and/or C and C.1, C and C.2, C and C.3, C and C.4, C and C.5, C and C.6, C and C.7, C and C.8, C and C.9,

20

C and C.10, C and C.11, C and C.12, C and C.13, and/or C and C.15; and/or D and D.1, D and D.2, D and D.3, D and D.4, D and D.5, D and D.6, D and D.7, D and D.8, D and D.9, D and D.10, D and D.11, D and D.12, D and D.13, and/or D and D.15; and/or E and E.1, E and E.2, E and E.3, E and E.4, E and E.5, E and E.6, E and E.7, E and E.8, E and E.9, E and E.10, E and E.11, E and E.12, E and E.13, and/or E and E.15; and/or F and F.1, F and F.2, F and F.3, F and F.4, F and F.5, F and F.6, F and F.7, F and F.8, F and F.9, F and F.10, F and F.11, F and F.12, and/or F and F.13; and/or G and G.1, G and G.2, G and G.3, and/or G and G.4.

## THIRTY-FOURTH SPECIFICATION
## WILLFULLY FAILING TO FILE A REPORT REQUIRED BY LAW

Respondent is charged with committing professional misconduct as defined by New York Education Law §6530(21) by willfully failing to file a report required by law or by the Department of Health, or the Education Department as alleged in the facts of one or more of the following:

34. The facts in paragraphs G and G.1, G and G.2, G and G.3 and/or G. and G.4.

21

Exhibit A 025

## THIRTY-FIFTH SPECIFICATION

### WILLFULLY OR GROSSLY FAILING TO COMPLY WITH FEDERAL, STATE, OR LOCAL LAWS RULES OR REGULATIONS GOVERNING THE PRACTICE OF MEDICINE

Respondent is charged with committing professional misconduct as defined by New York Education Law §6530(16) by willfully or grossly negligently failing to comply with substantial provisions of federal, state, or local laws, rules, or regulations governing the practice of medicine as alleged in the facts of one or more of the following:

35. The facts in paragraphs G and G.1, G and G.2, G and G.3 and/or G and G.4.


## THIRTY-SIXTH THROUGH FORTY-FIRST SPECIFICATIONS

### PERFORMING PROFESSIONAL SERVICES WHICH HAVE NOT BEEN AUTHORIZED BY THE PATIENT

Respondent is charged with committing professional misconduct as defined by New York Education Law §6530(26) by performing professional services which have not been authorized by the patient as alleged in the facts of one or more of the following:

36. The facts in paragraphs A and A.14, and/or A and A.15.

37. The facts in paragraphs B and B.14, and/or B and B.15.

38. The facts in paragraphs C and C.14, and/or C and C.15.

39. The facts in paragraphs D and D.14, and/or D and D.15.

40. The facts in paragraphs E and E.14, and/or E and E.15.

41. The facts in paragraphs F and F.14, and/or F and F.15.

22

Exhibit A 026

## FORTY-SECOND THROUGH FORTY-SEVENTH SPECIFICATIONS

### FAILING TO MAINTAIN RECORDS

Respondent is charged with committing professional misconduct as defined by New York Education Law §6530(32) by failing to maintain a record for each patient which accurately reflects the evaluation and treatment of the patient as alleged in the facts of the following:

42. The facts in paragraphs A and A.13.

43. The facts in paragraphs B and B.13.

44. The facts in paragraphs C and C.13.

45. The facts in paragraphs D and D.13.

46. The facts in paragraphs E and E.13.

47. The facts in paragraphs F and F.12.

DATE: March 5 , 2020
Albany, New York

TIMOTHY J. MAHAR, ESQ.
Deputy Counsel
Bureau of Professional Medical Conduct

23

Exhibit A 027

NEW YORK STATE       DEPARTMENT OF HEALTH
STATE BOARD FOR PROFESSIONAL MEDICAL CONDUCT

| | |
|---|---|
| **IN THE MATTER**<br><br>**OF**<br><br>**DANIELLE ROBERTS, D.O.** | AMENDED<br><br>STATEMENT<br><br>OF CHARGES |

DANIELLE ROBERTS, D.O., the Respondent, was authorized to practice medicine in New York State on or about October 5, 2009, by the issuance of license number 255075 by the New York State Education Department.

## FACTUAL ALLEGATIONS

A.    On or about March 9, 2017, the Respondent used a cauterizing pen as part of a medical procedure to scar the skin by branding Patient A, a female patient, hereinafter identified in the attached Appendix "A", with the initials KR and/or KAR, in the pelvis region, thereby leaving a permanent scar. Respondent's conduct deviated from accepted standards of care as follows:

1.  Respondent performed the medical procedure upon Patient A in an other than appropriately sterile environment, and/or without appropriate infection control, and/or without the use of sterile technique, including the surgical field, surgical procedure room, multiple use of a cautery pen tip and electrical grounding pad, and documented electrical testing and maintenance upkeep of the cautery device.

2.  Respondent performed the medical procedure without the use of a local anesthetic or general anesthesia, thereby causing Patient A to suffer pain for no legitimate medical purpose.

1



EXHIBIT
tabbies
1a

Exhibit B  001

3. Respondent performed the medical procedure upon Patient A with non-medically trained personnel present, who were not wearing personal protective equipment.

4. Respondent performed the medical procedure upon Patient A with the assistance of non-medically trained personnel who physically restrained said patient.

5. Respondent failed to cease performing the medical procedure despite the fact that Patient A was suffering pain without medical justification.

6. Respondent, during the course of the medical procedure, willfully physically abused Patient A.

7. Respondent performed the medical procedure upon Patient A at the time when said patient was naked and while being held down by other individuals, who were also naked, contrary to any appropriate medical protocol or need.

8. Respondent inappropriately performed the medical procedure upon Patient A while an individual who was also naked utilized a cell phone to video said medical procedure.

9. Respondent failed to provide appropriate wound care for Patient A at the time of the medical procedure, and thereafter.

10. Respondent failed to provide appropriate follow-up medical care and treatment for Patient A's wound, and/or failed to refer Patient A to another medical provider for such post-medical procedure wound care.

11. Respondent inappropriately advised, or caused another individual to advise, Patient A to take photographs of the wound caused by the medical procedure on a daily basis for one month and once a week for another month, and to thereafter send such photographs to an individual who shared all or some of said photographs with the Respondent.

12. Respondent failed to provide appropriate medical care and treatment for Patient A, including obtaining information regarding said patient's medical history and current medications.

2

Exhibit B    002

13. Respondent failed to prepare and/or maintain appropriate medical records for the patient which accurately reflected the evaluation and treatment of Patient A.

14. Respondent fraudulently failed to disclose to Patient A that the initials KR and/or KAR said Respondent branded into the pelvis region of Patient A represented the initials of Keith Alan Ranieri..

15. Respondent performed the medical procedure upon Patient A without having obtained the adequate informed consent of Patient A.


B. On or about March 9, 2017, the Respondent used a cauterizing pen as part of a medical procedure to scar the skin by branding Patient B, a female patient, hereinafter identified in the attached Appendix "A", with the initials KR and/or KAR, in the pelvis region, thereby leaving a permanent scar. Respondent's conduct deviated from accepted standards of care as follows:

1. Respondent performed the medical procedure upon Patient B in an other than appropriately sterile environment, and/or without appropriate infection control and/or, without the use of sterile technique, including the surgical field, surgical procedure room, multiple use of a cautery pen tip and electrical ground pad, and documented electrical testing and maintenance upkeep of the cautery device.

2. Respondent, while performing the medical procedure without the use of a local anesthetic or general anesthesia, thereby causing Patient B to suffer pain for no legitimate medical purpose.

3. Respondent performed the medical procedure upon Patient B with non-medically trained personnel present, who were not wearing personal protective equipment.

4. Respondent performed the medical procedure upon Patient B with the assistance of non-medically trained personnel who physically restrained said patient.

3

5.     Respondent failed to cease performing the medical procedure despite the fact that Patient B was suffering pain without medical justification.

6.     Respondent, during the course of the medical procedure, willfully and physically abused Patient B.

7.     Respondent performed the medical procedure upon Patient B at the time when said patient was naked and while being held down by other individuals, who were also naked, contrary to any appropriate medical protocol or need.

8.     Respondent inappropriately performed the medical procedure upon Patient B while an individual who was also naked utilized a cell phone to video said medical procedure.

9.     Respondent failed to provide appropriate wound care for Patient B at the time of the medical procedure, and thereafter.

10.     Respondent failed to provide appropriate follow-up medical care and treatment for Patient B's wound, and/or failed to refer Patient B to another medical provider for such post-medical procedure wound care.

11.     Respondent inappropriately advised, or caused another individual to advise Patient B to take photographs of the wound caused by the medical procedure on a daily basis for one month and once a week for another month, and to thereafter send such photographs to an individual who shared all or some of said photographs with Respondent.

12.     Respondent failed to provide appropriate medical care and treatment for Patient B, including obtaining information regarding said patient's medical history and current medications.

13.     Respondent failed to prepare and/or maintain appropriate medical records for the patient which accurately reflected the evaluation and treatment of Patient B.

14.     Respondent fraudulently failed to disclose to Patient B that the initials KR and/or KAR said Respondent branded into the pelvis region of Patient B represented the initials of Keith Alan Ranieri.

4

15.    Respondent performed the medical procedure upon Patient B without having obtained the adequate informed consent of Patient B.

C.    On or about March 9, 2017, the Respondent used a cauterizing pen as part of a medical procedure to scar the skin by branding Patient C, a female patient, hereinafter identified in the attached Appendix "A", with the initials KR and/or KAR, in the pelvis region, thereby leaving a permanent scar.   Respondent's conduct deviated from accepted standards of care as follows:

1.    Respondent performed the medical procedure upon Patient C in an other than appropriately sterile environment, and/or without appropriate infection control, and/or without the use of sterile technique, including the surgical field, surgical procedure room, multiple use of a cautery pen tip and electrical grounding pad, and documented electrical testing and maintenance upkeep of the cautery device.

2.    Respondent, while performing the medical procedure without the use of a local anesthetic or general anesthesia, thereby causing Patient C to suffer pain for no legitimate medical purpose.

3.    Respondent performed the medical procedure upon Patient C with non-medically trained personnel present, who were not wearing personal protective equipment.

4.    Respondent performed the medical procedure upon Patient C with the assistance of non-medically trained personnel who physically restrained said patient.

5.    Respondent failed to cease performing the medical procedure despite the fact that Patient C was suffering pain without medical justification.

6.    Respondent, during the course of the medical procedure, willfully physically abused Patient C.

5

7. Respondent performed the medical procedure upon Patient C at the time when said patient was naked and while being held down by other individuals, who were also naked, contrary to any appropriate medical protocol or need.

8. Respondent inappropriately performed the medical procedure upon Patient C while an individual who was also naked utilized a cell phone to video said medical procedure.

9. Respondent failed to provide appropriate wound care for Patient C at the time of the medical procedure, and thereafter.

10. Respondent failed to provide appropriate follow-up medical care and treatment for Patient C's wound, and/or failed to refer Patient C to another medical provider for such post-medical procedure wound care.

11. Respondent inappropriately advised, or caused another individual to advise, Patient C to take photographs of the wound caused by the medical procedure on a daily basis for one month and once a week for another month, and to thereafter send such photographs to an individual who shared all or some of said photographs with Respondent.

12. Respondent failed to provide appropriate medical care and treatment for Patient C, including obtaining information regarding said patient's medical history and current medications.

13. Respondent failed to prepare and/or maintain appropriate medical records for the patient which accurately reflected the evaluation and treatment of Patient C.

14. Respondent fraudulently failed to disclose to Patient C that the initials KR and/or KAR said Respondent branded into the pelvis region of Patient C represented the initials of Keith Alan Ranieri.

15. Respondent performed the medical procedure upon Patient C without having obtained the adequate informed consent of Patient C.

6

D.    On or about March 9, 2017, the Respondent used a cauterizing pen as part of a medical procedure to scar the skin by branding Patient D, a female patient, hereinafter identified in the attached Appendix "A", with the initials KR and/or KAR, in the pelvis region, thereby leaving a permanent scar. Respondent's conduct deviated from accepted standards of care as follows:

1. Respondent performed the medical procedure upon Patient D in an other than appropriately sterile environment, and/or without appropriate infection control, and/or without the use of sterile technique, including the surgical field, surgical procedure room, multiple use of a cautery pen tip and electrical grounding pad, and documented electrical testing and maintenance upkeep of the cautery device.

2. Respondent, while performing the medical procedure without the use of a local anesthetic or general anesthesia, thereby causing Patient D to suffer pain for no legitimate medical purpose.

3. Respondent performed the medical procedure upon Patient D with non-medically trained personnel present, who were not wearing personal protective equipment.

4. Respondent performed the medical procedure upon Patient D with the assistance of non-medically trained personnel who physically restrained said patient.

5. Respondent failed to cease performing the medical procedure despite the fact that patient D was suffering pain without medical justification.

6. Respondent, during the course of the medical procedure, willfully physically abused Patient D.

7. Respondent performed the medical procedure upon Patient D at the time when said patient was naked and while being held down by other individuals, who were also naked, contrary to any appropriate medical protocol or need.

7

Exhibit B   007

8. Respondent inappropriately performed the medical procedure upon Patient D while an individual who was also naked utilized a cell phone to video said medical procedure.

9. Respondent failed to provide appropriate wound care for Patient D at the time of the medical procedure, and thereafter.

10. Respondent failed to provide appropriate follow-up medical care and treatment for Patient D's wound, and/or failed to refer Patient D to another medical provider for such post-medical procedure wound care.

11. Respondent inappropriately advised, or caused another individual to advise Patient D to take photographs of the wound caused by the medical procedure on a daily basis for one month and once a week for another month, and to thereafter send such photographs to an individual who shared all or some of said photographs with Respondent.

12. Respondent failed to provide appropriate medical care and treatment for Patient D, including obtaining information regarding said patient medical history and current medications.

13. Respondent failed to prepare and/or maintain appropriate medical records for the patient which accurately reflected the evaluation and treatment of Patient D.

14. Respondent fraudulently failed to disclose to Patient D that the initials KR and/or KAR said Respondent branded into the pelvis region of Patient D represented the initials of Keith Alan Ranieri.

15. Respondent performed the medical procedure upon Patient D without having obtained the adequate informed consent of Patient D.

E. On or about March 9, 2017, the Respondent used a cauterizing pen as part of a medical procedure to scar the skin by branding Patient E, a female patient, hereinafter identified in the attached Appendix "A", with the initials KR and/or KAR,

8

Exhibit B    008

in the pelvis region, thereby leaving a permanent scar. Respondent's conduct deviated from accepted standards of care as follows:

1. Respondent performed the medical procedure upon Patient E in an other than appropriately sterile environment, and/or without appropriate infection control, and/or without the use of sterile technique, including the surgical field, surgical procedure room, multiple use of a cautery tip pen and electrical grounding pad, and documented electrical testing and maintenance upkeep of the cautery device.

2. Respondent performed the medical procedure without the use of a local anesthetic or general anesthesia, thereby causing Patient E to suffer pain for no legitimate medical purpose.

3. Respondent performed the medical procedure upon Patient E with non-medically trained personnel present, who were not wearing personal protective equipment.

4. Respondent performed the medical procedure upon Patient E with the assistance of non-medically trained personnel who physically restrained said patient.

5. Respondent failed to cease performing the medical procedure despite the fact that Patient E was suffering pain without medical justification.

6. Respondent, during the course of the medical procedure, willfully physically abused Patient E.

7. Respondent performed the medical procedure upon Patient E at the time when said patient was naked and while being held down by other individuals, ~~who were also naked~~, contrary to any appropriate medical protocol or need.

8. Respondent inappropriately performed the medical procedure upon Patient E while an individual who was also naked utilized a cell phone to video said medical procedure.

9. Respondent failed to provide appropriate wound care for Patient E at the time of the medical procedure, and thereafter.

9

Exhibit B    009

10. Respondent failed to provide appropriate follow-up medical care and treatment for Patient E's wound, and/or failed to refer Patient E to another medical provider for such post-medical procedure wound care.

11. Respondent inappropriately advised, or caused another individual to advise, Patient E to take photographs of the wound caused by the medical procedure on a daily basis for one month and once a week for another month, and to thereafter send such photographs to an individual who shared all or some of said photographs with Respondent.

12. Respondent failed to provide appropriate medical care and treatment for the Patient E, including obtaining information regarding said patient's medical history and current medications.

13. Respondent failed to prepare and/or maintain appropriate medical records for the patient which accurately reflected the evaluation and treatment of Patient E.

14. Respondent fraudulently failed to disclose to Patient E that the initials KR and/or KAR said Respondent branded into the pelvis region of Patient E represented the initials of Keith Alan Ranieri.

15. Respondent performed the medical procedure upon Patient E without having obtained the adequate informed consent of Patient E.

F. During the period from on or about January 2017 through December 2017, the Respondent used a cauterizing pen as part of medical procedures to permanently scar the skin by branding one or more of the following: Patients F and G, female patients, hereinafter identified in the attached Appendix "A", with the initials KR and/or KAR, in their pelvis regions. Respondent's conduct deviated from accepted standards of care as follows:

1. Respondent performed the medical procedures upon one or more of the following: Patients F and G in an other than appropriately sterile environment,

10

Exhibit B  010

and/or without appropriate infection control, and/or without the use of sterile technique, including the surgical field, surgical procedure room, multiple use of a cautery pen tip and electrical grounding pad, and documented electrical testing and maintenance upkeep of the cautery device.

2. Respondent performed the medical procedures without the use of a local anesthetic or general anesthesia, thereby causing one or more of the following: Patients F and G to suffer pain for no legitimate medical purpose.

3. Respondent performed the medical procedures upon one or more of the following: Patients F and G with non-medically trained personnel present, who were not wearing personal protective equipment.

4. Respondent performing the medical procedures upon one or more of the following: Patients F and G with the assistance of non-medically trained personnel who physically restrained said patients.

5. Respondent failed to cease performing the medical procedures despite the fact that one or more of the following: Patients F and G were suffering pain without medical justification.

6. Respondent, during the course of the medical procedures willfully physically abused one or more of the following: Patients F and G.

7. Respondent inappropriately performed the medical procedures upon one or more of the following: Patients F and G while an individual utilized a cell phone to video said medical procedures.

8. Respondent failed to provide appropriate wound care for one or more of the following: Patients F and G at the time of the medical procedures, and thereafter.

9. Respondent failed to provide appropriate follow-up medical care and treatment for one or more of the following: Patients F and G, and/or failed to refer the patients to other medical providers for such post-medical procedures wound care.

11

Exhibit B   011

10. Respondent inappropriately advised, or caused another individual to advise, one or more of the following: Patients F and G to take photographs of the wounds caused by the medical procedures on a daily basis for one month and once a week for another month, and to thereafter send such photographs to an individual who shared all or some of said photographs with Respondent.

11. Respondent failed to provide appropriate medical care and treatment for one or more of the following: Patients F and G, including obtaining information regarding said patients' medical histories and current medications.

12. Respondent failed to prepare and/or maintain appropriate medical records for the patients which accurately reflected the evaluation and treatment of one or more of the following: Patients F and G.

13. Respondent performed the medical procedures upon one or more of the following: Patients F and G without having obtained the adequate informed consents of said Patients F and G.

G. During the time from on or about June 2016 through August 2016, NXIVM and/or the Executive Success Program (ESP) conducted a conference and/or meeting at the Silver Bay Conference and Family Retreat Center (Conference Center), located in Silver Bay, New York. The Respondent and approximately 438 other individuals attended the conference, including approximately 76 children. During the course of the conference, hundreds of the attendees became severely ill with an undetermined communicable disease. The individuals who became ill suffered inter alia, flu-like symptoms, severe vomiting and diarrhea. The Respondent had knowledge of the fact that many individuals at the conference had become ill. The Respondent knew or should have known that the illness suffered by the attendees at the conference was a communicable disease, outbreak of a communicable disease, and/or an unusual disease or outbreak. Respondent's conduct deviated from accepted standards of care as follows:

12

1. Respondent failed to report a disease outbreak or unusual disease to the State Department of Health as required by Title 10 N,Y.C.R.R. Section 2.1(c).

2. Respondent failed to report the suspected or confirmed case of communicable disease, outbreak of communicable disease, and/or the unusual disease or outbreak to the city, county, or district health officer as required by Title 10 N.Y.C.R.R. Sections 2.10 and 2.1(b) and (c).

3. Respondent failed to report by telephone, facsimile, or other electronic communication, or in person the illness of the attendees at the conference suspected or confirmed to have been caused due to the consumption of spoiled or poisonous food to the city, county, or district health officer, in violation of Title 10 N.Y.C.R.R. Section 2.15.

4. Upon being made aware of the fact that attendees at the conference might have been suffering from a communicable disease, the Respondent failed to cause such individuals to be isolated in an appropriate environment, pending official action by the health officer, in violation of Title 10 N.Y.C.R.R. Section 2.27.

13

## SPECIFICATIONS OF CHARGES

## FIRST THROUGH SIXTH SPECIFICATIONS
### WILLFULLY ABUSING A PATIENT

Respondent is charged with committing professional misconduct as defined by New York Education Law §6530(31) by willfully abusing a patient as alleged in the facts of one or more of the following:

1. The facts in paragraphs A and A.2, A and A.4, A and A.5, A and A.6, and/or A and A.8.

2. The facts in paragraphs B and B.2, B and B.4, B and B.5, B and B.6, and/or B and B.8.

3. The facts in paragraphs C and C.2, C and C.4, C and C.5, C and C.6, and/or, C and C.8.

4. The facts in paragraphs D and D.2, D and D.4, D and D.5, D and D.6, and/or, D and D.8.

5. The facts in paragraphs E and E.2, E and E.4, E and E.5, E and E.6, and/or, E and E.8.

6. The facts in paragraphs F and F.2, F and F.4, F and F.5, F and F.6, and/or F and F.8.

14

Exhibit B  014

## SEVENTH THROUGH
## TWELFTH SPECIFICATIONS

## CONDUCT IN THE PRACTICE OF MEDICINE
## WHICH EVIDENCES MORAL UNFITNESS

Respondent is charged with committing professional misconduct as defined by New York Education Law §6530(20) by engaging in conduct in the practice of medicine which evidences moral unfitness to practice medicine as alleged in the facts of one or more of the following:

7. The facts in paragraphs A and A.2, A and A.4, A and A.5, A and A.6, and/or A and A.8.

8. The facts in paragraphs B and B.2, B and B.4, B and B.5, B and B.6, and/or B and B.8.

9. The facts in paragraphs C and C.2, C and C.4, C and C.5, C and C.6, and/or C and C.8.

10. The facts in paragraphs D and D.2, D and D.4, D and D.5, D and D.6, and/or D and D.8.

11. The facts in paragraphs E and E.2, E and E.4, E and E.5, E and E.6, and/or E and E.8.

12. The facts in paragraphs F and F.2, F and F.4, F and F.5, F and F.6, and/or F and F.8.

15

Exhibit B   015

## THIRTEENTH THROUGH EIGHTEENTH SPECIFICATIONS

## FAILING TO USE APPROPRIATE STERILE ENVIRONMENT AND/OR WITHOUT APPROPRIATE INFECTION CONTROL AND/OR WITHOUT THE USE OF STERILE TECHNIQUE

Respondent is charged with committing professional misconduct as defined by New York Education Law §6530(47) by failing to use scientifically accepted barrier precautions and infection control practices as established by the department of health as alleged in the facts of one or more of the following:

13. The facts in paragraphs A and A.1, A and A.3, A and A.4, and/or A and A.7.

14. The facts in paragraphs B and B.1, B and B.3, B and B.4, and/or B and B.7.

15. The facts in paragraphs C and C.1, C and C.3, C and C.4, and/or C and C.7.

16. The facts in paragraphs D and D.1, D and D.3, D and D.4, and/or D and D.7.

17. The facts in paragraphs E and E.1, E and E.3, E and E.4, and/or E and E.7.

18. The facts in paragraphs F and F.1, F and F.3, F and F.4, and/or F and F.7.

## NINTEENTH SPECIFICATION

## PRACTICING THE PROFESSION FRAUDULENTLY OR BEYOND ITS SCOPE

Respondent is charged with committing professional misconduct as defined by New York Education Law §6530(2) by practicing the profession fraudulently or beyond its authorized scope as alleged in the facts of one or more of the following:

19. The facts in paragraphs A and A.2, A and A.3, A and A.8 and/or A and A.14; B and B.2, B and B.3, B and B.8, and/or B and B.14; C and C.2, C and C.3, C and C.8, and/or C and C.14; D and D.2, D and D.3, D and D.8, and/or D and D.14; E

16

Exhibit B   016

and E.2, E and E.3, E and E.8, and/or E and E. 14; F and F.2, F and F.3, and/or F and F.7.

## TWENTIETH THROUGH TWENTY-FIFTH SPECIFICATIONS
## PRACTICING THE PROFESSION WITH GROSS NEGLIGENCE

Respondent is charged with committing professional misconduct as defined by New York Education Law §6530(4) by practicing the profession with gross negligence as alleged in the facts of one or more of the following:

20. The facts in paragraphs A and A.1, A and A.2, A and A.3, A and A.4, A and A.5, A and A.6, A and A.7, A and A.8, A and A.9, A and A.10, A and A.11, A and A.12, A and A.13, A and A.14, and/or A and A.15.

21. The facts in paragraphs B and B.1, B and B.2, B and B.3, B and B.4, B and B.5, B and B.6, B and B.7, B and B.8, B and B.9, B and B.10, B and B.11, B and B.12, B and B.13, B and B.14, and/or B and B.15.

22. The facts in paragraphs C and C.1, C and C.2, C and C.3, C and C.4, C and C.5, C and C.6, C and C.7, C and C.8, C and C.9, C and C.10, C and C.11, C and C.12, C and C.13, C and C.14, and/or C and C.15.

23. The facts in paragraphs D and D.1, D and D.2, D and D.3, D and D.4, D and D.5, D and D.6, D and D.7, D and D.8, D and D.9, D and D.10, D and D.11, D and D.12, D and D.13, D and D.14, and/or D and D.15.

17

Exhibit B   017

24. The facts in paragraphs E and E.1, E and E.2, E and E.3, E and E.4, E and E.5, E and E.6, E and E.7, E and E.8, E and E.9, E and E.10, E and E.11, E and E.12, E and E.13, E and E.14, and/or E and E.15.

25. The facts in paragraphs F and F.1, F and F.2, F and F.3, F and F.4, F and F.5, F and F.6, F and F.7, F and F.8, F and F.9, F and F.10, F and F.11, F and F.12, and/or F and F.13.

## TWENTY-SIXTH SPECIFICATION

## PRACTICING THE PROFESSION WITH NEGLIGENCE ON MORE THAN ONE OCCASION

Respondent is charged with committing professional misconduct as defined by New York Education Law §6530(3) by practicing the profession with negligence on more than one occasion as alleged in the facts of the following:

26. The facts in paragraphs A and A.1, A and A.2, A and A.3, A and A.4, A and A.5, A and A.6, A and A.7, A and A.8, A and A.9, A and A.10, A and A.11, A and A.12, A and A.13, and/or A and A.15; and/or B and B.1, B and B.2, B and B.3, B and B.4, B and B.5, B and B.6, B and B.7, B and B.8, B and B.9, B and B.10, B and B.11, B and B.12, B and B.13, and/or B and B.15; and/or C and C.1, C and C.2, C and C.3, C and C.4, C and C.5, C and C.6, C and C.7, C and C.8, C and C.9, C and C.10, C and C.11, C and C.12, C and C.13, and/or C and C.15; and/or D and D.1, D and D.2, D and D.3, D and D.4, D and D.5, D and D.6, D and D.7, D and D.8, D and D.9, D and D.10, D and D.11, D and D.12, D and D.13, and/or D

18

Exhibit B   018

and D.15; and/or E and E.1, E and E.2, E and E.3, E and E.4, E and E.5, E and E.6, E and E.7, E and E.8, E and E.9, E and E.10, E and E.11, E and E.12, E and E.13, and/or E and E.15; and/or F and F.1, F and F.2, F and F.3, F and F.4, F and F.5, F and F.6, F and F.7, F and F.8, F and F.9, F and F.10, F and F.11, F and F.12, and/or F and F.13; and/or G and G.1, G and G.2, G and G.3, and/or G and G.4.

## TWENTY-SEVENTH THROUGH THIRTY-SECOND SPECIFICATIONS
## PRACTICING THE PROFESSION WITH GROSS INCOMPETENCE

Respondent is charged with committing professional misconduct as defined by New York Education Law §6530(6) by practicing the profession with gross incompetence as alleged in the facts of one or more of the following:

27.    The facts in paragraphs A and A.1, A and A.2, A and A.3, A and A.4, A and A.5, A and A.6, A and A.7, A and A.8, A and A.9, A and A.10, A and A.11, A and A.12, A and A.13, and/or A and A.15.

28.    The facts in paragraphs B and B.1, B and B.2, B and B.3, B and B.4, B and B.5, B and B.6, B and B.7, B and B.8, B and B.9, B and B.10, B and B.11, B and B.12, B and B.13, and/or A and A.15.

29.    The facts in paragraphs C and C.1, C and C.2, C and C.3, C and C.4, C and C.5, C and C.6, C and C.7, C and C.8, C and C.9, C and C.10, C and C.11, C and C.12, C and C.13, and/or C and C.15.

19

Exhibit B   019

30. The facts in paragraphs D and D.1, D and D.2, D and D.3, D and D.4, D and D.5, D and D.6, D and D.7, D and D.8, D and D.9, D and D.10, D and D.11, D and D.12, D and D.13, and/or D and D.15.

31. The facts in paragraphs E and E.1, E and E.2, E and E.3, E and E.4, E and E.5, E and E.6, E and E.7, E and E.8, E and E.9, E and E.10, E and E.11, E and E.12, E and E.13, and/or E and E.15.

32. The facts in paragraphs F and F.1, F and F.2, F and F.3, F and F.4, F and F.5, F and F.6, F and F.7, F and F.8, F and F.9, F and F.10, F and F.11, F and F.12, and/or F and F.13.

## THIRTY-THIRD SPECIFICATION

## PRACTICNG THE PROFESSION WITH INCOMPETENCE ON MORE THAN ONE OCCASION

Respondent is charged with committing professional misconduct as defined by New York Education Law §6530(5) by practicing the profession with incompetence on more than one occasion as alleged in the facts of the following:

33. The facts in paragraphs A and A.1, A and A.2, A and A.3, A and A.4, A and A.5, A and A.6, A and A.7, A and A.8, A and A.9, A and A.10, A and A.11, A and A.12, A and A.13, and/or A and A.15; and/or B and B.1, B and B.2, B and B.3, B and B.4, B and B.5, B and B.6, B and B.7, B and B.8, B and B.9, B and B.10, B and B.11, B and B.12, B and B.13, and/or B and B.15; and/or C and C.1, C and C.2, C and C.3, C and C.4, C and C.5, C and C.6, C and C.7, C and C.8, C and C.9,

20

Exhibit B   020

C and C.10, C and C.11, C and C.12, C and C.13, and/or C and C.15; and/or D and D.1, D and D.2, D and D.3, D and D.4, D and D.5, D and D.6, D and D.7, D and D.8, D and D.9, D and D.10, D and D.11, D and D.12, D and D.13, and/or D and D.15; and/or E and E.1, E and E.2, E and E.3, E and E.4, E and E.5, E and E.6, E and E.7, E and E.8, E and E.9, E and E.10, E and E.11, E and E.12, E and E.13, and/or E and E.15; and/or F and F.1, F and F.2, F and F.3, F and F.4, F and F.5, F and F.6, F and F.7, F and F.8, F and F.9, F and F.10, F and F.11, F and F.12, and/or F and F.13; and/or G and G.1, G and G.2, G and G.3, and/or G and G.4.

## THIRTY-FOURTH SPECIFICATION

## WILLFULLY FAILING TO FILE A REPORT REQUIRED BY LAW

Respondent is charged with committing professional misconduct as defined by New York Education Law §6530(21) by willfully failing to file a report required by law or by the Department of Health, or the Education Department as alleged in the facts of one or more of the following:

34. The facts in paragraphs G and G.1, G and G.2, G and G.3 and/or G. and G.4.

21

Exhibit B   021

## THIRTY-FIFTH SPECIFICATION

## WILLFULLY OR GROSSLY FAILING TO COMPLY WITH
## FEDERAL, STATE, OR LOCAL LAWS RULES OR
## REGULATIONS GOVERNING THE PRACTICE OF MEDICINE

Respondent is charged with committing professional misconduct as defined by New York Education Law §6530(16) by willfully or grossly negligently failing to comply with substantial provisions of federal, state, or local laws, rules, or regulations governing the practice of medicine as alleged in the facts of one or more of the following:

35. The facts in paragraphs G and G.1, G and G.2, G and G.3 and/or G and G.4.


## THIRTY-SIXTH THROUGH
## FORTY-FIRST SPECIFICATIONS

## PERFORMING PROFESSIONAL SERVICES WHICH
## HAVE NOT BEEN AUTHORIZED BY THE PATIENT

Respondent is charged with committing professional misconduct as defined by New York Education Law §6530(26) by performing professional services which have not been authorized by the patient as alleged in the facts of one or more of the following:

36. The facts in paragraphs A and A.14, and/or A and A.15.

37. The facts in paragraphs B and B.14, and/or B and B.15.

38. The facts in paragraphs C and C.14, and/or C and C.15.

39. The facts in paragraphs D and D.14, and/or D and D.15.

40. The facts in paragraphs E and E.14, and/or E and E.15.

41. The facts in paragraphs F and F.14, and/or F and F.15.

22

Exhibit B   022

## FORTY-SECOND THROUGH FORTY-SEVENTH SPECIFICATIONS

## FAILING TO MAINTAIN RECORDS

Respondent is charged with committing professional misconduct as defined by New York Education Law §6530(32) by failing to maintain a record for each patient which accurately reflects the evaluation and treatment of the patient as alleged in the facts of the following:

42. The facts in paragraphs A and A.13.

43. The facts in paragraphs B and B.13.

44. The facts in paragraphs C and C.13.

45. The facts in paragraphs D and D.13.

46. The facts in paragraphs E and E.13.

47. The facts in paragraphs F and F.12.

DATE: April 27, 2020
Albany, New York

TIMOTHY J. MAHAR, ESQ.
Deputy Counsel
Bureau of Professional Medical Conduct

23

STATE OF NEW YORK : DEPARTMENT OF HEALTH
STATE BOARD FOR PROFESSIONAL MEDICAL CONDUCT
-------------------------------------------------------------------------------x
                                      :

**IN THE MATTER**           :       **DETERMINATION**

**OF**                     :          **AND**

**DANIELLE ROBERTS, D.O.**     :       **ORDER**

                                        :
-------------------------------------------------------------------------------x

      A Notice of Hearing and Statement of Charges dated March 5, 2020, and Amended Statement of Charges dated April 27, 2020, were duly served pursuant to § 230(10)(d)(i) of the Public Health Law (PHL) upon Danielle Roberts, D.O. (Respondent). (Exhibits 1, 1a; Appendix I.) Steven Lapidus, M.D., Chair, Ramanathan Raju, M.D., and Joan Martinez McNicholas, duly designated members of the State Board for Professional Medical Conduct, served as the Hearing Committee, and Dawn MacKillop-Soller, served as the Administrative Law Judge. PHL § 230(10)(e). The Department of Health, Bureau of Professional Medical Conduct (Department), appeared by Jeffrey J. Conklin, Esq. The Respondent appeared and was represented by Anthony Z. Scher, Esq.

      The Hearing Committee voted 3-0 to sustain 45 specifications among ten definitions of misconduct set forth in the Education Law: willfully abusing a patient §6530(31); conduct in the practice of medicine which evidences moral unfitness §6530(20); failing to use appropriate infection control practices §6530(47); practicing the profession of medicine fraudulently §6530(2); practicing the profession with gross negligence §6530(4); practicing the profession with negligence on more than one occasion §6530(3); practicing the profession with gross incompetence §6530(6); practicing the profession with incompetence on more than one occasion §6530(5); performing professional services which have not been authorized by the patient §6530(26); and failing to maintain a record for each patient which accurately reflects the evaluation and treatment of the patient § 6530(32). The Hearing Committee also voted 2-1 to sustain two

Exhibit C  001

additional specifications of misconduct: willfully failing to file a report required by law §6530(21) and willfully or grossly negligently failing to comply with substantial provisions of federal, state, or local laws, rules, or regulations governing the practice of medicine §6530(16).

The Hearing Committee unanimously determined to impose the penalty of revocation of the Respondent's medical license pursuant to PHL § 230-a(4).

## Hearing Record

| | |
|---|---|
| Pre-Hearing Conference: | May 28, 2020 |
| Hearing Dates: | June 2, July 1 & 6, August 12 & 14, September 9, October 21, November 3, December 2 & 15, 2020. January 8, February 19, March 2, 2021. |
| Witnesses for Petitioner: | Vasco Bilbao (Transcript, p. 61-189.) Danielle Roberts, D.O. (Transcript, p. 199-440, 514-757.) Ariella Cepelinski (Transcript, p. 443-490.) Michael Menashy (Transcript, p. 492-511.) S.E. (Transcript, p. 769-942.) Robert T. Grant, M.D. (Transcript, p. 1056-1238.) Bruce F. Farber, M.D. (Transcript, p. 955-1045.) |
| Petitioner's Exhibits: | 1, 1a, 2a, 2b, 3, 4, 6, 8d, 9, 14a, 15a, 16, 17, 35, 38, 45, 47-49 |
| Witnesses for Respondent: | Danielle Roberts, D.O. (Transcript, p. 1247-1461, 2106-2150.) David Mayer, M.D. (Transcript, p. 1469-1594.) M.H. (Transcript, p. 1594-1666.) Jane Doe 1 (Transcript, p. 1675-1720.) Jane Doe 2 (Transcript, p. 1726-1755.) Steve Arthur Haworth (Transcript, p. 1758-1840, 2094-2097.) E. Carlson (Transcript, p. 1845-1855.) R. Wolle (Transcript, p. 1856-1867.) Jane Doe 3 (Transcript, p. 1878-1930.) Jane Doe 4 (Transcript, p. 1934-1993.) Jane Doe 5 (Transcript, p. 1996-2092.) |
| Respondent's Exhibit: | A |
| ALJ Exhibit: | I |
| Written Submissions received: | June 2, 2021 |
| Deliberations held: | June 29, July 20, 2021 |

Exhibit C 002

## **Findings of Fact**

The Hearing Committee unanimously makes the following findings of fact:

1.  Respondent Danielle Roberts, D.O., was authorized to practice medicine in New York State on October 5, 2009, by the issuance of license number 255075. (Exhibit 3.)

2.  The Respondent's background includes board certification and completion of a residency in family practice in 2011 followed by working as a physician and medical director between 2011 and 2013 at a large family practice caring for patients of all ages and with various conditions. From 2013 to 2018, she worked as a hospitalist at St. Peter's Hospital in Albany providing medical care to hospital patients from admission to discharge. Her background also includes seven years of locum tenens work at a hospital in Wisconsin and one year at a large integrative medical practice in Manhattan. (Exhibit 38; Transcript, p. 202, 206-207, 1249-1250, 1424-1425.)

3.  In 2013, the Respondent joined NXIVM, a personal development organization founded by Keith Raniere, also known as Vanguard. NXIVM is the parent company to several umbrella organizations, including ESP (Executive Success Programs), SOP (Society of Protectors), Ninth Media, DOS (dominus obsequious sororium, master/slave, master allegiance sisterhood), and Exo/Eso (fitness/exercise program), with multiple center locations in New York, California, Canada, and Mexico. (Exhibit 49; Transcript, p. 65, 184, 186-187, 224, 1255-1256, 1261, 1728.)

4.  In 2016, the Respondent joined DOS, a secret women's group developed by eight "1st line" or original members in collaboration with Keith Raniere. The claimed purpose of DOS was to empower women to build character, strength, and discipline by overcoming fears and pain to experience growth. The Respondent's involvement in DOS was "2nd line member" behind the "1st line" members. (Exhibits 14a, 49; Transcript, p. 234, 246, 252-253, 411-412, 526, 785, 1426, 1938, 2003.)

Exhibit C  003

5.      Membership in DOS required a lifetime commitment or "vow of obedience" between master and slave, the exchange of collateral, a necklace or collar worn 24 hours every day to symbolize obedience and commitment, and a brand placed by an electrocautery device to the pelvic region as part of a branding ceremony. The vow required slaves to strictly follow their masters' orders and keep DOS completely secret. The goal of the branding was to overcome pain and create solidarity. (Exhibit 14a; Transcript, p. 240-243, 255-256, 358-359, 1265, 1268, 1730, 1747-1750, 1888, 1938-1939.)

6.      The brandings of the women, including S.E., A.M., J.G., C.G., A.C., and L.S., occurred only after they committed to join DOS and submitted multiple forms of acceptable collateral. Acceptable collateral included titles to houses and cars, investment and bank accounts, businesses, nude photographs, incriminating letters and/or written confessions detailing sexual deviance, illicit drug use, extramarital affairs, and/or embarrassing family matters. The collateral coerced the women into keeping DOS secret and maintaining their commitment and was subject to public release if the women breached these requirements. (Exhibit 14a; Transcript, p. 243-246, 358-359, 781, 783, 796, 815, 859, 894, 1730, 1747-1748, 1967, 1969, 2054-2055.)

7.      An electrocautery device generates electrical energy that is converted to heat for cutting through skin or solid organs, dissection, separating planes between tissues, hemostasis to stop or seal off bleeding blood vessels or lymphatics during procedures, and for electrocautery branding to place a scar on the body. While an electrocautery device can be used as a scalpel, it is not intended to be used directly on the skin surface because it can cause significantly more skin damage extending beyond the tip or point of contact. (Transcript, p. 1072, 1074, 1224, 1541.)

8.      A smoke evacuator must be used with an electrocautery device to remove dangerous particulate matter such as viruses, infectious diseases, blood cells, and other antigens released from the

Exhibit C  004

device upon contact with skin and tissue and prevent them from being absorbed or inhaled. (Transcript, p. 1074, 1082.)

9. Electrocautery branding is a form of body modification in which an electrical arch on the electrocautery device vaporizes the skin and leaves behind undamaged skin and tissue but not a 2nd degree burn. (Transcript, p. 1787-1788.)

10. Prior to performing the branding procedures on the women, including S.E., A.M., J.G., C.G., A.C., and L.S., the Respondent was required, under acceptable standards of medical conduct that apply to physicians, to complete training in the use of an electrocautery device. The training involves: (1) regulating the settings considering skin anatomy for the appropriate amount of energy transmitted through the tip; (2) grounding the device; (3) using personal protection equipment; and (4) safely operating and maintaining the device, including the use of a smoke evacuator. The Respondent never completed such training. (Transcript, p. 1070-1079, 1082-1087, 1125-1126, 1322-1325, 1327-1328.)

11. Beginning in January of 2017 and continuing through March of 2017, the Respondent used a Medline Valley Lab Surgistat electrocautery device and a stencil to brand "KAR," the initials of Keith Raniere, into the pelvic regions of 17 women, including S.E., A.M., J.G., C.G., A.C., and L.S., most of whom were nude. The brandings were done without anesthesia to intentionally cause them pain. (Exhibits 8D, 45, 47; Transcript, p. 313, 339, 416, 524, 584-585, 635-640, 692, 1331-1332, 1353, 2107-2108.)

12. The branding procedures occurred in a small room of a house and took between 20 and 45 minutes to complete. They were videotaped with a cell phone while a group of women used their bare hands and/or naked bodies to hold down the woman branded to keep her still and supine on the massage table. (Exhibit 8D; Transcript, p. 308, 313-314, 330, 524, 636, 804, 821, 827, 1333-1334, 1377, 1416, 1421.)

Exhibit C 005

13.     The Respondent's conduct in performing the brandings on S.E., A.M., J.G., C.G., A.C., L.S. and the other women constituted the practice of medicine by a physician. The Respondent relied on her medical training, education, and background when she performed the procedures to alter the skin and physical condition of their pelvic regions. (Transcript, p. 1110, 1115-1116, 1129, 1176.)

14.     The brandings performed by the Respondent while licensed as a physician were medical procedures in which standards of medical practice apply. (Transcript, p. 1097, 1109, 1112, 1129, 1163.)

15.     An electrocautery device must be properly grounded to ensure the safe return of the electrical energy from the person treated with the electrocautery device back to the grounding pad, which is affixed to that person. This process involves ensuring the operator and participants are properly insulated to prevent a burn by wearing gloves to avoid serving as the ground themselves. The women participants were not wearing gloves. (Transcript, p. 342, 638, 696, 1074, 1079-1080, 1082, 1154.)

16.     Physicians using an electrocautery device to perform procedures must adhere to infection control standards applicable to physicians performing invasive procedures on the human body. They must maintain a sterile field and sterile environment by: (1) applying draping around the surgical site and as a barrier to block off unsterile areas; (2) using an antibacterial cleaning solution to clean the room, surfaces, table, and equipment between cases and terminally at the end of the day; and (3) requiring all participants wear personal protection equipment, including sterile gloves, masks, and eye shields. The purpose in these requirements is to prevent infection. The Respondent followed none of these infection control procedures. (Exhibit 8D; Transcript, p. 341-342, 522, 536, 638, 1097-1098, 1100-1105, 1125, 1130, 1160-1161.)

17.     Physicians using electrocautery devices must also adhere to operational standards by performing and documenting routine testing and service of the electrocautery device and confirming sufficient electrical output in the room where the device is used. The purpose in these rules is to prevent a surgical or electrical fire during a procedure. (Transcript, p. 1071, 1097-1098, 1100.)

Exhibit C   006

18.     The Respondent's failures to maintain proper infection control standards and operational procedures while using an electrocautery device that inflicted 2nd degree burns on the women were severe deviations from the standard of care. (Transcript, p. 1124-1125, 1132.)

19.     In using an electrocautery device to perform the brandings without anesthesia, the Respondent caused the women, including S.E., A.M., J.G., C.G., A.C., and L.S., significant physical pain, 2nd degree burns, and abnormal permanent and/or raised keloid and hypertrophic scarring, and placed them at risk for harm, including deeper 3rd and 4th degree burns and psychological trauma like post-traumatic stress disorder (PTSD) or anxiety. (Exhibits 14a, 45, 47; Transcript, p. 579, 1079-1090, 1124-1130, 1133-1146, 1154, 1209, 1377, 1403, 1421.)

20.     In subjecting the women to significant pain from the electrocautery device, the Respondent was required to administer them, or at the very least offer, anesthesia, such as a local anesthetic, to alleviate the pain. The Respondent had no legitimate medical reason, such as an allergy or an emergency, for neither providing the women anesthesia nor presenting them with this treatment option. (Transcript, p. 339, 635, 1073, 1086.)

21.     The Respondent's failure to administer or advise and offer anesthesia to the women was a severe deviation from the standard of care. Physicians are ethically prohibited from causing patients such extreme harm on purpose. (Transcript, p. 1073, 1124-1125, 1131-1132, 1210-1211.)

22.     The Respondent never informed the women she branded that the brand was KAR to represent Keith Raniere's initials or that it would measure approximately two inches by two inches. The brand was intentionally placed upside down and backwards on most of the women to conceal Keith Raniere's initials. S.E., A.M., J.G., C.G., A.C. and others had falsely been told by their masters that the brand represented "a symbol of the sorority," "a line of the sun and the earth and certain elements," an "abstract symbol," "chakras," and/or "four elements," and that the size would be "little," "small," and/or

Exhibit C  007

"dime sized." Only L.S., as a "1st line" member, knew prior to her branding that the brand represented Keith Raniere's initials. (Exhibit 14a; Transcript, p. 351, 541-542, 787, 797-802, 904, 1355, 1450, 1685-1686, 1739, 1882, 1939, 1941-1942.)

23.     Prior to performing the branding procedures on the women, the Respondent was required to obtain their voluntary, verbal and/or written informed consent that reflected a discussion of the psychological and physical risks, benefits, and alternatives to the procedure, including the option not to proceed; the pain involved and the option of anesthesia; details of the brand symbol; and consideration of the individual's psychological and medical histories, comorbidities, and medications. The purpose of obtaining informed consent is to confirm the women have a complete understanding of the procedure and to avoid complications. The Respondent did not obtain such consent from any of the women. (Transcript, p. 435-437, 538-540, 1098, 1124-1125, 1164-1168, 1178-1182, 1985.)

24.     The Respondent's infliction of the branding procedures on the women without obtaining their voluntary verbal and/or written informed consent was a severe deviation from the standard of care. Informed consent must be voluntary and not in connection with coercion under the threat of disclosure of personal and potentially damaging or destructive collateral. (Transcript, p. 1098, 1124-1125, 1132, 1178-1183.)

25.     Physicians are obligated to provide proper care of 2nd degree burn wounds that includes application of antibacterial ointment and treatment plans that include follow-up physician monitoring. Providing this care is critical to ensure proper wound healing and to prevent infection. The Respondent failed to provide this care. (Transcript, p. 542-545, 624-625, 1164, 1166-1167, 1171, 1349, 2114.)

26.     The Respondent's failure to provide proper treatment and follow-up care of the 2nd degree burn wounds was a severe deviation from the standard of care. (Transcript, p. 1093-1096, 1123-1124, 1128, 1164, 1166-1167, 1171, 1174.)

Exhibit C  008

27.     Following completion of the branding procedures, the Respondent instructed the women to submit photos of their brands to their masters every day for 30 days and then one time per week. The Respondent evaluated and kept the photos but never made them part of a medical record because she never prepared or maintained such records for the women. (Transcript, p. 377, 379, 540, 543, 547-549, 556.)

28.     Physicians performing medical procedures involving the infliction of wounds are required to prepare, maintain, and document medical records that include photographs of the wound and details of the procedure, the equipment used, physical evaluations, diagnosis, treatment plans, and post-procedure instructions. The Respondent severely deviated from the standard of care by failing to prepare and maintain medical records to apprise outside providers of the treatment provided. (Transcript, p. 1173-1174.)

29.     In 2016, the Respondent participated in a ten-day annual NXIVM corporate retreat known as "Vanguard week" at the Silver Bay YMCA Family and Retreat Center, located in Silver Bay, New York. The purpose of the event was to celebrate the birthday of Keith Raniere. The attendees included more than 400 NXIVM members. (Exhibit 17; Transcript, p. 80, 90-93, 451-452, 456, 478, 496, 708, 710.)

30.     During the event and while attending it, the Respondent became aware of a gastrointestinal illness affecting many of the attendees. Among the attendees were children, a woman with end-stage cancer, and a pregnant woman. The symptoms of the illness included diarrhea, nausea, vomiting, dehydration, and fatigue. This illness placed the attendees and the public at risk for harm, including gastrointestinal morbidity and dehydration, which is a particular concern for people with comorbidities like cancer. (Transcript, p. 84-85, 454, 455, 485, 498-499, 505, 714-715.)

31.     This illness constituted a disease outbreak because it involved a large group of people who developed similar symptoms while attending the same event in a confined environment. Physicians are required under Department of Health regulations to report a communicable disease or any disease outbreak

Exhibit C  009

or unusual disease to public health officials. 10 NYCRR 2.10. The Respondent failed to take any steps to comply with these requirements. (Transcript, p. 972, 991.)

32. The Respondent's failure to report the infectious disease outbreak was a violation of public health regulations and a significant deviation from the standard of care for a physician. (Transcript, p. 991.)

## Factual Allegations

By email correspondence dated March 1, 2021, the Petitioner withdrew factual allegations G.3 and G.4. (ALJ I.) The Hearing Committee sustained all the remaining Factual Allegations in the Statement of Charges.

The Hearing Committee <u>sustained</u>, by unanimous vote (3-0):

Factual Allegations A.1, A.2, A.3, A.4, A.5, A.6, A.7, A.8, A.9, A.10, A.11, A.12, A.13, A.14, A.15, B.1, B.2, B.3, B.4, B.5, B.6, B.7, B.8, B.9, B.10, B.11, B.12, B.13, B.14, B.15, C.1, C.2, C.3, C.4, C.5, C.6, C.7, C.8, C.9, C.10, C.11, C.12, C.13, C.14, C.15, D.1, D.2, D.3, D.4, D.5, D.6, D.7, D.8, D.9, D.10, D.11, D.12, D.13, D.14, D.15, E.1, E.2, E.3, E.4, E.5, E.6, E.7, E.8, E.9, E.10, E.11, E.12, E.13, E.14, E.15, F.1, F.2, F.3, F.4, F.5, F.6, F.7, F.8, F.9, F.10, F.11, F.12, F.13.

The Hearing Committee <u>sustained</u>, by majority vote (2-1):

Factual Allegations G.1, G.2.

## Evaluation of the Respondent's Testimony

The Respondent testified on her own behalf and as a witness for the Petitioner. Although considered incidental by the Hearing Committee in deciding central issues in this case, the Hearing Committee believes it is worth noting the Respondent's evasiveness, defiance, and inconsistencies on various points. For instance, she refused to disclose: (1) the circumstances of her becoming involved in NXIVM (Transcript, p. 218); (2) the initials of the women she branded (Transcript, p. 315-316); (3) the whereabouts of the branding videos and whether she maintained them (Transcript, p. 328, 331); (4) how it was determined the brandings would be videotaped (Transcript, p. 331); (5) who was present when she branded L.S. (Transcript, p. 333); (6) the roles of the women in the room with L.S. during the branding

Exhibit C 010

(Transcript, p. 336); (7) whether L.S. was clothed during the branding (Transcript, p. 335); (8) what the brand represented (Transcript, p. 351); and (9) whether L.S.'s limbs were held down when she was branded (Transcript, p. 337). Despite being directed to answer these questions when they were asked, the Respondent never did. She also initially refused to disclose whether she was branded with Keith Raniere's initials (Transcript, p. 518-519) but then finally admitted — consistent with the other evidence — that she was branded and that the brand was KAR to represent his initials. (Exhibits 14a and 49; Transcript, p. 1312, 1352-1352, 1388, 1391-1393, 1396.)

Further inconsistencies include her initial testimony that she was unaware of the details of the electrocautery device she used, stating it was "purchased by the friend that invited me" (Transcript, p. 266, 269), and her later testimony that she purchased it, identifying the model and manufacturer. (Transcript, p. 2108.) She also initially testified that DOS was "a completely separate organization" from NXIVM and Keith Raniere was not its "leader" (Transcript, p. 253) and that L.S., a 1st line member, had "no master" (Transcript, p. 381), but then later admitted that Keith Raniere was the "grandmaster" to the 1st line members (Transcript, p. 1387), who were his "slaves." (Transcript, p. 1389.)

The Hearing Committee finds these factors significantly diminished the Respondent's credibility and evaluated her testimony accordingly.

### The Practice of Medicine

The Hearing Committee was not persuaded by the Respondent's arguments that the Board lacks subject matter jurisdiction to bring charges against her because she "was not engaged in the practice of medicine" and that branding "is not a medical procedure." (Respondent's brief, p. 2.) The Hearing Committee finds the Petitioner correctly argues the Respondent "performed medical procedures when she branded the DOS women" and that "the brandings fell within the definition as to what constitutes the

Exhibit C 011

practice of medicine" and agrees with its reliance on Courts having a long-standing history of interpreting Educ. Law §6521 broadly to support these positions. (Petitioner's brief, p. 12-13.)

The practice of the profession of medicine is defined as "diagnosing, treating, operating or prescribing for any human disease, pain, injury, deformity or physical condition." Educ. Law § 6521. Whether conduct constitutes the practice of medicine is a determination to be made by the Hearing Committee based on the facts presented. Addei v. State Board for Professional Medical Conduct, 278 AD2d 551, 552 (3d Dept. 2000); See also Educ. Law §6504. This determination must be based solely on the facts "and not upon the name of the procedure, its origins or legislative lack of clairvoyance." People v. Amber, 76 Misc. 2d 267, 273 (Sup. Ct. Queens Co. 1973).

The reported decisions relied on by the Petitioner that the Hearing Committee finds convincing on this point include People v. Amber, supra at 273, in which the Court described its interpretation of Educ. Law §6521 as "a statute intended to regulate, limit or control the diagnosis and treatment of ailments must be read broadly to include the gamut of those known, whether or not recognized and even those not yet conjured." (Petitioner's brief, p. 12-13.) See also, People v. Mastromarino, 148 Misc. 454, 455 (Sup. Ct. Kings Co. 1933); People v. Rubin, 103 Misc.2d 227, 234 (N.Y. City Crim. Ct. Queens Co. 1979). The Respondent acknowledges that while branding "arguably involves operating," the operations were not "for a human disease, pain, injury, deformity or physical condition," and so did not fit the statute because the women were "perfectly healthy and normal in all respects" when they received the brands. (Respondent's brief, p. 3-4.)

The Respondent relies on Matter of Gross v. Ambach, 71 NY2d 859, 861 (1988), in which the Court of Appeals determined autopsies constitute the practice of medicine because they are "the ultimate diagnostic procedure" to diagnose the cause and manner of death. (Respondent's brief, p. 3-4.) The Hearing Committee finds the only similarity to be drawn between the two cases is that the statute somehow

Exhibit C 012

does not fit. There because autopsies are not practicing medicine since medicine can only be practiced on "living" patients and here because the women were "normal and healthy" when they were branded. Gross, supra at 861. In any event, the Hearing Committee, like the Court of Appeals in Gross, declines to limit the statue in that regard. Id. (Respondent's brief, p. 4.) The Hearing Committee rejects the Respondent's claim that it is "blatantly obvious" that the Respondent's "operating" on the women was not for "a human disease, pain, injury, deformity or physical condition" to meet the criteria under the statute. (Respondent's brief, page 3.) To the contrary, it is glaringly obvious to the Hearing Committee that she was operating on the women to alter the skin, appearance, and physical condition of their pelvic regions regardless of whether they were "normal and healthy." (Transcript, p. 1110-1111, 1116.)

The Petitioner presented as a witness plastic surgeon Robert T. Grant, M.D. While Dr. Grant lacks branding experience, the Hearing Committee noted his expertise and credibility on the main issues in this case were established by his decades of experience as a board-certified specialist in general and plastic surgeries performing cosmetic procedures, such as body piercings and nipple and areola tattooing to complete a breast reconstruction, and as Chief of Plastic Surgery at NewYork-Presbyterian Hospital, program director for the residents training program, and Professor of Surgery at Columbia University. (Exhibit 4; 1060-1066, 1185-1186.)

The Respondent presented as a witness general surgeon David Mayer, M.D. The Hearing Committee noted Dr. Mayer's extensive and diverse background as a practicing healthcare attorney and board-certified surgeon with 40 years of experience, including current privileges at three ambulatory facilities, teaching at three medical colleges, and prior Chair of Surgery at Syosset Hospital, where he performed thousands of surgeries, directed a laparoscopic fellowship program, and trained residents. (Transcript, p. 1469-1471, 1505.) Despite his considerable medical and legal experience, the Hearing

Exhibit C  013

Committee was not persuaded by his professional opinions on the issue of the practice of medicine due to contradictions in his testimony.

For instance, Dr. Mayer insisted the Respondent was a branding technician able to "put aside her white coat" as a physician when she performed the brandings, yet he described himself as "always a physician" who doesn't "stop being a physician…at different times." (Transcript, p. 1569, 1579-1580.) His position that she was acting as a branding technician was also inconsistent with his testimony that "you never forget your training and education" (Transcript, p. 1566-1567.) Another example is his testimony that physicians should not cause extreme pain while also refusing to discuss the "ethics" of the Respondent causing the women such pain and insistence that her osteopathic oath to do no harm and prevent pain did not apply. (Transcript, p. 1528, 1531.) The Hearing Committee considered such inconsistencies, noted his long-standing history of providing expert witness services in hundreds of civil cases to law firms and other private companies, and evaluated his testimony accordingly. (Transcript, p. 1499.)

While the Hearing Committee was not persuaded by Dr. Grant's professional opinion that the Respondent was practicing medicine because she addressed "psychic pain" the women were experiencing, it did agree with his testimony that the brandings are the practice of medicine under Educ. Law §6521 because they were "surgical," involving "violating the epidermis and getting into the deeper layers of skin," and performed to "alter the skin" or physical condition of the women. (Transcript, p. 1110-1111, 1114, 1116.) The Respondent attempted to contrast branding with plastic surgery such as a rhinoplasty on a "successful face model" on the grounds that branding does not treat "a physical condition" the patient seeks to change (brief, p. 12), but the Hearing Committee finds this comparison frustrates her cause. Just as a rhinoplasty to change the appearance of a nose alters the physical condition of the face, the Hearing

Exhibit C 014

Committee finds the Respondent's branding to inflict a permanent and very visible scar alters the skin, appearance, and physical condition of the pelvic region.

Dr. Grant took the position that while brandings and other similar cosmetic procedures such as body piercing and tattooing can be performed by non-physicians, they constitute medical procedures when physicians perform them. (Transcript, p. 1108-1109, 1196-1197.) The Hearing Committee agrees with this view and rejects the Respondent's arguments against it. On the one hand, the Respondent claims that branding "is a form of commercial body art in the same manner as are tattooing and body piercing." (Respondent's brief, p. 8.) To that end, she argues that "aesthetic or ritual branding is outside the jurisdiction of the State Board for Professional Medical Conduct as branding is not regulated at all in New York." (Respondent's brief, p. 9.) On the other hand, the Respondent goes on to <u>distinguish</u> these activities on the basis that tattooing and body piercing require a license to perform, whereas branding does not. PHL §461. In doing so, she overlooks the exception to the tattoo and body piercing licensing requirement for physicians that is expressly stated in the statute. PHL §462. The Hearing Committee believes the Legislature specifically carved out that exception precisely because when a doctor and not a technician performs tattooing or body piercing, it is presumed that appropriate medical standards will apply. Consistent with this was Dr. Grant's testimony that he was unable to "imagine the scenario" involving a licensed physician performing these brandings acting as only a "technician." (Transcript, p. 1218.)

The Respondent's arguments that tattooing and body piercing are regulated — whereas branding is not — were deemed inconsequential to the Hearing Committee. The Committee's view is simple — all these activities are practicing medicine and become medical procedures when performed by a physician. Contrary to Dr. Mayer's testimony that the Respondent could obtain "a separate license as a tattoo artist or body piercer" and "not use" her medical license (Transcript, p. 1549), the Hearing Committee believes that as a physician, the Respondent cannot unilaterally pick and choose when the standards of medical

Exhibit C 015

practice apply. (Transcript, p. 1107-1109, 1200, 1549.) Dr. Grant confirmed this when he testified: "given the privilege of being a physician that comes with responsibilities. You can't decide when you are going to enjoy the privileges, but not have the responsibilities." (Transcript, p. 1112.) The Hearing Committee considers the Respondent's attempt to use a double standard, compartmentalizing her life by ostensibly branding the women as a technician and not a doctor, an irresponsible attempt to cast aside her privileged status as a licensed physician with specialized knowledge.

The Hearing Committee was guided in reaching its determination by reported court decisions relying on various factors and circumstances in recognizing when activities performed by physicians fall within the definition of the practice of medicine. In Y.Y.B. ex rel. Barukh v. Rachminov, the court found that "while a circumcision performed by a physician would be the practice of medicine, a circumcision performed as a religious ritual by a qualified person (a 'mohel' in this case) does not constitute the practice of the profession of medicine within the meaning of the Education Law." Y.Y.B. ex rel. Barukh v. Rachminov, 11 N.Y.S.3d 808, 1059 (Sup. Ct. Queens Co. 2015); See also Zakhartchenko v. Weinberger, 605 N.Y.S.2d 205, 206 (Sup. Ct. Kings Co. 1993.) In relying on this same reasoning, the Court in Zakhartchenko applied negligence principles to a hospital where a circumcision performed by a Rabbi involved the hospital's trained medical staff. Zakhartchenko, supra at 413. The Petitioner also cites Zakhartchenko in its brief (p. 18) to correctly summarize the principle from these cases applicable to this matter: "Therefore, while the acts performed by a non-physician are not subject to the jurisdiction of the Board of Professional Medical Conduct, the brandings/medical procedures performed by Dr. Roberts on 17 DOS women are." The Hearing Committee follows the view of these reported cases that different standards apply when physicians perform procedures.

The Respondent claims that "several possible people were considered" to perform the brandings and that "(c)learly, the intent was not to select a physician but to pick amongst friends" (brief, p. 8), but

Exhibit C 016

the Hearing Committee finds it more likely the Respondent was chosen based on her background, training, and knowledge as a physician. The Respondent acknowledged relying on her medical background in everything she does. (Transcript, p. 263, 423, 430-431, 488, 521, 547, 552-553, 1440-1442, 2134.) The evidence also confirms she was the only physician approached by the 1st line members to perform the brandings, her status as a physician was well-known in the NXIVM community, and she was the one chosen to do them. (Transcript, p. 182-183, 352, 797, 1853, 1950.) Her experience as a physician was obviously relevant to what they were seeking in a person to do the job, which Jane Doe 5 described as someone who was "willing," "calm," not "squeamish," and had "a steady hand" and "attention to detail." (Transcript, p. 2020-2021.) Jane Doe 4 also expressed how she hoped "someone skilled enough" would be chosen for the job and the relief she felt — consistent with S.E.'s testimony — knowing her branding would be done by the Respondent, who she knew was a doctor. (Transcript, p. 796, 1951, 1942-1943, 1975.)

### Standards of Medical Practice

The Hearing Committee concluded the Respondent's lack of training in the use of an electrocautery device contributed to her improper technique in performing the branding procedures and exacerbated the harm to these women. The Hearing Committee was skeptical of Dr. Mayer's assertion that the Respondent took "great care to get special training in branding" (Transcript, p. 1476) because the evidence established she was woefully unskilled in performing the procedures. According to Dr. Grant, proper training in the safe and proper use of an electrocautery device includes attending "a series of didactic lectures" and using the device for a period of time "under direct observation of a mentor or preceptor," steps the Respondent never undertook. (Transcript, p. 517, 562-563, 1070-1071, 1327-1328, 1765, 1784.) The Hearing Committee finds her preparations for the brandings, which included undergoing branding herself by branding artist Brian Decker in Brooklyn, practicing on fruit and pigs' knuckles, and a few

Exhibit C 017

communications by email and telephone with Mr. Decker and body modification artist Steve Arthur Haworth, fell short of demonstrating serious and proper training in using an electrocautery device. (Transcript, p. 273-274, 280-284.)

The Respondent presented body modification artist Steve Arthur Haworth as a witness to discuss her branding technique. The Hearing Committee was not convinced by Mr. Haworth's opinion that the Respondent used appropriate technique when she performed the brandings. (Transcript, p. 1779.) Mr. Haworth testified that in his almost 30 years of performing electrocautery brandings, he has never caused a 2nd degree burn. (Transcript, p. 1827.) He described such a burn as "significantly more painful" than a brand (Transcript, p. 1788), with a greater risk of infection. (Transcript, p. 1795.) Mr. Haworth's description of an electrocautery brand as "not a second-degree burn" and "more like a scrape" that heals "very quickly" (Transcript, p. 1763, 1789-1790, 1796) was contrary to all the evidence in this case. The Respondent's brandings resulted in 2nd degree burns, as was established by the brand photos (Exhibits 45 and 47), the branding video (Exhibit 8D), and the testimony of Dr. Mayer (Transcript, p. 1510-1511), Dr. Grant (Transcript, p. 1085), and the Respondent herself. (Transcript, p. 1377, 1420-1421.) The Hearing Committee attributed Mr. Haworth's seeming unawareness that the Respondent's brandings caused 2nd degree burns to his lack of a medical degree and his failure to review the brand wound photos showing the depth of the wounds or the testimony of the physician witnesses. (Exhibits 8D, 45, 47; Transcript, p. 1791-1792.)

The Respondent's poor technique was obvious to the Hearing Committee on S.E.'s branding video, which showed sparks and fire from the electrocautery device as she moved it across the skin to create the brand's "seven lines" and "touchups" (Exhibit 8D; Transcript, p. 366-367) and her multiple starts and stops, which Mr. Haworth commented on as "different" from his technique. (Transcript, p. 1778.) The Hearing Committee also recognized the Respondent's failure to mention the energy settings or the types

Exhibit C 018

of tips she used, which suggested her unfamiliarity with how the device works, specifically that the electrical current from the device and the time in which it is applied directly affects the outcome. (Transcript, p. 283, 1224.) She also expressed no awareness of the danger in using an electrocautery device directly on the skin surface to make an incision because it can cause a more significant injury than intended, such as the abnormal scarring and deep 2nd degree burns that occurred in this case and the risk of deeper 3rd and 4th degree burns. (Transcript, p. 1215, 1224, 1510, 1581.) For these reasons, the Hearing Committee believes her lack of training in controlling the electrocautery device to predict the outcome meant she never understood that the time in which she applied the tremendous amount of electrical energy from the device caused the women substantial injuries, pain, and trauma. (Exhibits 14a, 45, 47; Transcript, p. 1085-1087, 1128.)

Dr. Grant described the Respondent's branding of these women as "excruciatingly" and "incredibly painful" for which she never even offered them a choice of anesthesia. (Transcript, p. 1086, 1162-1163.) In response to the pain, the evidence showed A.M. and S.E. cried and J.G. screamed and squealed, flipped off the table, and bit down on a towel. (Exhibit 14a; Transcript, p. 807, 819, 579, 689, 819, 846, 1404.) S.E. described her pain from the branding as "an acute fire in the most sensitive part of my body." (Transcript, p. 827.) L.S. described her experience of the branding as "incredibly painful." (Exhibit 14a.) While the evidence established the women desired pain as part of the branding process (Respondent's brief, p. 18), the Hearing Committee agreed with Dr. Grant that absent a legitimate medical reason, such as an allergy or an emergency, the Respondent was obligated to at least attempt to alleviate such pain, such as by administering a local anesthetic in the area where the cautery was applied. (Transcript, p. 1073, 1124, 1210-1211.)

This was necessary, Dr. Grant explained, because the level of pain the women endured was so intense that it risked causing the woman cauterized even deeper burns from not being able to remain still

Exhibit C 019

during the procedure. Dr. Mayer also acknowledged this risk, as well as the risk of physical injuries to the women participants holding her down as she violently reacts to the electrocautery device. (Transcript, p. 1082-1083, 1087-1090, 1510.) Dr. Grant emphasized it is "unethical" for physicians to intentionally cause patients such harm because doing so violates "our ethical background in training and responsibility." (Transcript, p. 1116, 1228.)

The Respondent's lack of training was also established by her failure to prevent other risks of harm from occurring. She risked burns to the other women participants because they were not properly grounded by wearing gloves for insulation, instead using their bare skin to hold down the woman cauterized. Another risk was that the women could inhale or absorb harmful pathogens, such as viruses and infectious diseases, due to the failure to use a smoke evacuator to remove the debris plume released from the electrocautery device. She also risked burn wound infections by not maintaining a sterile field because she never properly cleaned the room, applied sterile draping, or required the women to wear personal protective equipment such as masks, sterile gloves, and eye protection. (Transcript, p. 1074, 1082, 1097-1098, 1104-1105, 1130.) The Hearing Committee disagreed with Dr. Mayer's opinion that these risks were "low," especially because the Respondent made no effort to mitigate them. (Transcript, p. 334-335, 532, 562, 1584.) Dr. Grant deemed the Respondent's failure to complete these steps serious deviations from the standard of care. (Transcript, p. 1124-1125, 1132.)

The Hearing Committee unanimously voted that the Respondent's conduct constituted professional misconduct as defined in Educ. Law §6530(4), practicing the profession with gross negligence on a particular occasion, professional misconduct as defined in Educ. Law §6530(6), practicing the profession with gross incompetence, and professional misconduct as defined in Educ. Law 6530(5), practicing the profession with incompetence on more than one occasion.

Exhibit C  020

Gross negligence involves a significant deviation from acceptable medical standards that creates the risk of grave consequence to the patient. Such conduct may result in a single act of negligence in egregious proportions or multiple acts of negligence that cumulatively are egregious. Post v. N.Y.S. Dept. of Health, 245 A.D.2d 985, 986 (3d Dept. 1997.) Gross incompetence involves an unmitigated lack of the skill or knowledge necessary to perform an act undertaken by the licensee in the practice of medicine. This conduct may consist of a single act of incompetence of egregious proportions or multiple acts of incompetence that cumulatively amount to egregious conduct. Post, 245 A.D.2d at 986; Minielly v. Commissioner of Health, 222 A.D.2d 750, 752 (3d Dept. 1995). Incompetence includes a lack of the requisite knowledge or skill in the practice of the profession but does not require a showing of an act or omission constituting a breach of the duty of due care. Dhabuwala v. State Bd. For Professional Med. Conduct, 225 AD2d 209, 213 (3d Dept. 1996).

The Respondent deviated from the standard of care and demonstrated a lack of skill and knowledge to practice the profession of medicine. She dangerously operated the electrocautery device to perform the branding procedures without anesthesia or adhering to infection control standards, which subjected the women to extreme pain, deep 2nd degree burn wounds, and abnormal scarring, and risked them further 3rd and 4th degree burn wounds, infection, and other harm.

The Hearing Committee also voted 3-0 that the Respondent's conduct constituted professional misconduct as defined under Education Law §6530(47), failing to use appropriate infection control practices. The Respondent's failure to follow any infection control procedures risked the women burn wound infections and other harmful outcomes, representing to the Hearing Committee her disregard for their health and safety.

Informed consent requires a verbal or written discussion to evaluate risks so the patient can "prudently decide whether or not" to proceed with the procedure. (Transcript, p. 1098, 1178-1180.) It must

Exhibit C  021

include a discussion of the psychological and physical risks, benefits, and alternatives to the procedure, including the option not to proceed, considering medical histories, comorbidities, and medications. (Transcript, p. 1124, 1179-1180.) The Respondent admits she never obtained such consent, which Dr. Grant deemed a serious deviation from the standard of care. (Respondent's brief, p. 8; Transcript, p. 436, 538-540, 1180.)

In failing to take medical histories and perform physical examinations, the Respondent risked missing a diagnosis or condition such as diabetes or connective tissue disorder, or a blood thinner medication like aspirin, that could affect clotting or wound healing. She also risked missing a cardiac condition that could trigger an arrythmia or pre-existing PTSD or anxiety that could become exacerbated by direct exposure to blood and trauma. (Transcript, p. 544-544, 1094-1095, 1171, 1418.) Other risks included burn wound infections and poor healing because she never provided treatment plans that included application of antibiotic ointment and follow-up physician monitoring. (Transcript, p. 377, 547, 556, 1362, 1168, 1171-1172.) In failing to document medical records, including the brand wound photos she collected and kept, she also risked depriving outside providers of important information about the procedures and the reason why they were performed. (Transcript, p. 1175.)

The Respondent, as a physician, was obligated to complete such tasks. The Hearing Committee believes she should have known to do so, especially considering her experience as a hospitalist following protocols that involve reading charts, assessing medications and medical histories to determine comorbidities, and treating patients with various injuries, including burn wounds. (Transcript, p. 206-207, 209, 291.) Although Mr. Haworth testified that his brandings never involve completing these steps, the Hearing Committee noted that he is not a doctor. The medical standards that apply to physicians with specialized medical training and knowledge performing these procedures do not also apply to branding technicians. (Transcript, p. 1770-1771.)

Exhibit C  022

The Hearing Committee unanimously determined that the Respondent's conduct constituted professional misconduct as defined in Educ. Law §6530(32), failing to maintain records for each patient that "accurately reflect the evaluation and treatment of the patient." Physicians are required to maintain such records that include every interaction with the patient and, in cases such as this, photos of the injury. Mucciolo v. Fernandez, 195 A.D.2d 623, 625 (3d Dept. 1993).

Negligence means the "failure to exercise the care that would be exercised by a reasonably prudent licensee under the circumstances." Bogdan v. State Bd. For Professional Med. Conduct, 195 A.D.2d 86, 88 (3d Dept. 1993). The Department is not required to prove harm to a patient. Youssef v. State Bd. For Professional Med. Conduct, 89 A.D.3d 824, 825 (3d Dept. 2004). Negligence can also be sustained when there is a relationship between inadequate medical records and patient treatment. Matter of Patin v. State Bd. For Professional Med. Conduct, 77 A.D.3d 1211, 1214 (3d Dept. 2010). The Hearing Committee sustains the negligence charge on both grounds. The Respondent failed to exercise the required level of care when she failed to take even the most basic steps to protect these women, such as by assessing medical and psychiatric histories, providing follow-up care considering the deeply traumatizing nature of the branding procedures, or assessing cross reactions, such as a medication that could worsen a preexisting psychiatric problem or a heart defect that could create a fatal condition. Her failure to maintain any medical records prevented subsequent providers from understanding the cause of the injuries and the reasons for them, which could adversely impact their future treatment decisions. As a physician, the Respondent was required to consider these matters before performing operations on the women that physically and permanently altered their bodies.

Of particular concern to the Hearing Committee in the circumstances here was that informed consent must be voluntary and not due to coercion (Transcript, p. 1182) and involves providing details of the procedure, all of which were missing in this case. The Respondent concedes she never obtained

Exhibit C  023

"formal written" informed consent but claims the branding video of S.E. shows she gave "verbal" consent, which the Hearing Committee finds misleading at best. (Respondent's brief, p. 8, 17.) The Respondent denies the women were coerced, yet the brandings were performed upon women who had submitted collateral that would result in damaging and embarrassing consequences if released to the public. (Respondent's brief, p. 19; Exhibit 14a; Transcript, p. 388, 390, 424, 426, 530, 783-784, 1182, 1957.) S.E. described the involuntariness of the branding process in the pressure she felt to move forward with the procedure because of the collateral, which she characterized as a "gun" to her head. (Transcript, p. 802.) This is the very definition of coercion.

The collateral included titles to cars and houses, letters about illicit drug use and sexual deviance, and nude photos, some of which showed explicit images of genitalia. (Exhibit 14a; Transcript, p. 802, 857, 1353, 1941-1942, 1686, 1738, 1884.) Even Dr. Mayer acknowledged the women could view the collateral as coercive (Transcript, p. 1537), describing it as "a factor to consider in the voluntariness of their actions." (Transcript, p. 1528.) Dr. Grant confirmed that under these circumstances, there can be no informed consent. (Transcript, p. 1182.) The Hearing Committee was not persuaded by the Respondent's comparison of the branding process to the brandings in the "African American fraternity known as the Omegas" (Respondent's brief, p. 18-19) because while the fraternity members experience painful brands to symbolize their "bond" and "life-long membership in the fraternity," they are not coerced into being branded by having to submit potentially harmful collateral. (Respondent's brief, p. 18-19.)

Particularly troubling to the Hearing Committee was the evidence establishing the women were purposefully not told what symbol would be branded onto their bodies. (Exhibit 14a; Transcript, p. 798, 802, 1182, 1660, 1685, 1884, 1941.) S.E. confirmed this when she testified "(a)t no point did anyone say these are Keith's initials. It was only revealed to me later." (Transcript, p. 798.) The Respondent, however, did know that the symbol was KAR to represent Keith Raniere's initials. (Transcript, p. 1387-1388, 1353,

Exhibit C  024

1355, 1392, 1394.) She claims she did not disclose it to the women because it wasn't her "business" or "responsibility" and doing so would have breached her "lifetime vow of obedience" to DOS. (Transcript, p. 541, 1353-1355.) The Hearing Committee rejects these excuses and finds that regardless of her commitment to DOS, she had a duty as a physician to disclose what she was doing in the same way a plastic surgeon would be required to describe the pigment, shape, and appearance of a nipple for a nipple areola tattooing procedure. (Transcript, p. 1107.) The Hearing Committee agrees with Dr. Grant that the Respondent's failure to disclose the brand symbol to the women deviated from the standard of care. (Transcript, p. 1178, 1182.)

The Hearing Committee unanimously determined that the Respondent's conduct constituted professional misconduct as defined in Educ. Law §6530(2), practicing the profession fraudulently. Fraudulent practice requires "proof of either an intentional misrepresentation or concealment of a known fact" and "intent or knowledge" can be inferred. Patin, supra at 1214. The Hearing Committee finds the Respondent's admission that she knew what the brand symbol was and her decision not to disclose it represents an intentional concealment of a known fact. The Respondent violated an important aspect of informed consent by branding the women without making them fully aware of what the brand symbol was or what it represented.

The Hearing Committee unanimously determined that this conduct also constitutes professional misconduct as defined in Educ. Law §6530(20), moral unfitness to practice medicine; professional misconduct as defined in Educ. Law 6530(31), willfully harassing, abusing, or intimidating a patient; and professional misconduct as defined in Educ. Law §6530(26), performing professional services which have not been duly authorized by the patient. Moral unfitness is conduct that "violat[es] the trust the public bestows on the medical profession and/or violate[es] the medical profession's moral standards." Such conduct is suggestive of, or would tend to prove, moral unfitness. Patin, supra at 1215 citing Matter of

Exhibit C 025

Prado v. Novello, 301 A.D.2d 692, 694 (3d Dept. 2003). The Respondent's medically reckless performance of the brandings caused the women significant harm without apprising them of the brand symbol. Physicians are strictly prohibited from going above and beyond what the patient expects when performing a medical procedure.

## Vanguard Week

The Petitioner also charges the Respondent with failing to report a communicable disease, an unusual outbreak, or a disease outbreak involving a gastrointestinal illness during the annual NXIVM retreat at the Silver Bay YMCA, as required under the New York State Sanitary Code. (Petitioner's brief, p. 72-73.) The Respondent admits she did not report the outbreak of the gastrointestinal illness during the event to public health officials but claims she was not required to because she was on vacation and since "garden variety" stomach viruses, which are "unpleasant but not lethal," are not "communicable" or "unusual" to meet the mandatory reporting requirements under the regulation. (Respondent's brief, p. 21-22; Transcript, p. 733, 1294.) Physicians are required to report a "communicable disease" or "(a)ny disease outbreak or unusual disease" to public health officials. 10 NYCRR 2.10(a)-(c). An outbreak is defined as "an increased incidence of disease above its expected or baseline level" 10 NYCRR 2.2(d).

In support of its charges, the Petitioner presented as a witness infectious disease specialist Bruce Frederick Farber, M.D., whose testimony the Respondent failed to refute. The Hearing Committee noted Dr. Farber's impressive background includes 30 years of experience as an infectious disease specialist, including head of infectious disease for Northwell Health and in charge of the infectious disease programs at North Shore University Hospital and LIJ Medical Center. (Exhibit 6; Transcript, p. 959.) The majority of the Hearing Committee agreed with his professional opinion that the Respondent's duty as a physician to report this illness applied to her even if she was on vacation. (Transcript, p. 993, 995.) The Committee decided 2-1 that while the illness fails to meet the criteria under the regulation as "communicable" or

Exhibit C 026

"unknown" — presumably because it was never reported or investigated — it did constitute a "disease outbreak" that the Respondent as a physician was required to report regardless of whether or not she was on vacation. 10 NYCRR 2.1(c); 10 NYCRR 2.2. (Transcript, p. 993, 995, 998-999.) Dr. Farber made clear that her failure to fulfill this duty was a significant deviation from the standard of care. (Transcript, p. 991, 994.)

The evidence established this "obvious" illness affected a large group of people among the more than 400 attendees in a confined location, all of whom had similar symptoms. (Transcript, p. 990-991, 993, 999.) This is the precise definition of a "disease outbreak." 10 NYCRR 2.1(c), 10 NYCRR 2.2(d). The majority of the Hearing Committee agreed with Dr. Farber that the Respondent's failure to report it was especially egregious because it subjected the elderly and other vulnerable individuals, such as those with conditions or diseases like cancer, renal failure, and pregnancy, to potentially dangerous consequences like dehydration requiring hospitalization. (Transcript, p. 974-975.) The majority of the Hearing Committee also agreed with his opinion that based on her hospitalist experience that required her to complete an infection control course covering this subject, the Respondent should have known to report the illness. (Transcript, p. 972-973, 979.) Dr. Farber emphasized the importance in following this rule to "shut down" and properly "clean" the facility to prevent the illness from contaminating others and to determine its etiology. (Transcript, p. 980, 984.)

The Hearing Committee voted 2-1 that the Respondent's failure to report a disease outbreak constituted professional misconduct as defined in Educ. Law § 6530(21), a willful failure to file a report required by law; professional misconduct as defined in Educ. Law § 6530(16), a willful or grossly negligent failure to comply with substantial provisions of state laws governing the practice of medicine; professional misconduct as defined in Educ. Law § 6530(3), practicing the profession with negligence on

Exhibit C 027

more than one occasion; and professional misconduct as defined in Educ. Law § 6530(5), practicing the profession with incompetence on more than one occasion.

## Penalty

In considering the full spectrum of penalties under PHL § 230-a, including revocation, suspension, probation, censure and reprimand and the imposition of civil penalties, the Hearing Committee unanimously determined, by vote of 3-0, that the penalty of revocation of the Respondent's medical license is appropriate. The Hearing Committee determined that the Respondent engaged in 12 forms of professional misconduct, all of which it addressed in this hearing decision and sustained. The Respondent says she joined NXIVM with a goal to "enrich (her) skills as a doctor." (Transcript, p. 219.) The evidence shows, however, that she deliberately chose to adhere to her DOS "vows of obedience" instead of providing the women she branded with "all the things that a physician does" because to do so would have resulted in "breaking (her) vow" and "went quite the counter to what the whole purpose was." (Transcript, p. 1442-1443.) In other words, when faced with any conflict between NXIVM and her responsibilities as a physician, she chose NXIVM. For these reasons, the Hearing Committee believes she abdicated her values as a physician and failed her profession, herself, and everyone else involved.

The Hearing Committee recognizes the Respondent's tremendous future potential as a physician who excelled in every undertaking from becoming a skilled gymnast to graduating college with honors and earning dual degrees — osteopathic medicine and a master's in clinical nutrition — and then as an entrepreneur building a family medical practice and developing Exo/Eso, the physical fitness company within NXIVM she co-developed with Keith Raniere. (Transcript, p. 1255-1256.) The Hearing Committee is deeply troubled, however, by her unwillingness to admit regrets. (Transcript, p. 228, 1248-1249, 1252, 1255-1256, 1259, 1412, 1445, 1455-1456.) Instead of holding herself accountable for harming S.E., for example, she accused S.E. of victimizing herself. (Transcript, p. 1412-1413.) The only sadness she

Exhibit C  028

expressed was that the branding "was twisted into something it wasn't" and that "it has been used to scare people." (Transcript, p. 1455-1456.) The Respondent denies being brainwashed, yet she expressed no real remorse, which represented to the Hearing Committee her distorted reality and the very real concern that others remain vulnerable to her future brandings. (Transcript, p. 1453, 1719, 1753.)

The Hearing Committee is hopeful that the Respondent will regard the volume of sustained charges in this hearing decision as an opportunity to reflect on her poor choices and reeducate herself professionally and personally.

## **Order**

Based·upon the foregoing, IT IS HEREBY ORDERED THAT:

1. The first through forty-seventh specifications of professional misconduct set forth in the Statement of Charges are <u>Sustained</u>.

2. The Respondent's license to practice medicine in the State of New York is hereby <u>Revoked</u> under PHL § 230-a(4).

3. This Determination and Order shall be effective upon service on the Respondent in compliance with PHL § 230(10)(h).

DATED: Albany, New York
    September 27, 2021

           Steven Lapidus, M.D., Chairperson

           Ramanathan Raju, M.D.
           Joan Martinez McNicholas

Exhibit C  030

TO:    Jeffrey J. Conklin, Associate Counsel
New York State Department of Health
Division of Legal Affairs
Corning Tower Building, Room 2517
Empire State Plaza
Albany, New York  12237

Anthony Z. Scher, Esq.
800 Westchester Avenue
Suite N-641
Rye Brook, New York, 10573

Exhibit C  031

Wisconsin Department of Safety and Professional Services
Division of Legal Services and Compliance
4822 Madison Yards Way
PO Box 7190
Madison WI 53707-7190
**RETURN SERVICE REQUESTED**



Phone: 608-266-2112
Web: http://dsps.wi.gov
Email: dsps@wisconsin.gov

**Tony Evers, Governor**
**Dawn B. Crim, Secretary**

November 19, 2021


DIVISION OF HEARING AND APPEALS
ATTN: KRISTIN P. FREDRICK, ALJ
4822 MADISON YARDS WAY, 5TH FLOOR NORTH
MADISON, WI 53705


      Re:  DHA Case No. SPS-21-0080 and DLSC Case No. 18 MED 161 Danielle D. Roberts, D.O.

Dear Administrative Law Judge Frederick,

Enclosed please find for filing in the above matter the Division's Amended Complaint.

The Division hereby amends its Complaint in this matter to plead only a violation of Wis. Admin. Code Med §10.03(3)(c) based solely on the New York Determination and Order. Pursuant to the scheduling order, the Division will move for summary judgment on the basis that there is no genuine issue of fact or law that the New York Determination and Order constitutes an adverse action by the New York Board against Respondent's license to practice medicine in that state. The Division does not object if Respondent wishes to stand by her original answer in this matter.

By filing this Amended Complaint, the Division does not concede the other violations pled in its original Complaint. However, the Division believes this matter may be resolved on summary judgment and subsequent discipline by the Board, without the need for additional discovery by either party. Since all involved share an interest in avoiding unnecessary litigation time and expense, the Division requests that its motion for summary judgment be decided prior to the current witness and exhibit deadlines. In the alternative, the Division asks that those deadlines be held in abeyance until after the motion is decided, to be reset at that time, as needed.

Sincerely,

Colleen L. Meloy, Attorney
Division of Legal Services and Compliance
Direct Dial: 608-261-8779  Fax:  608-266-2264
colleen.meloy@wisconsin.gov


Enclosure

**Coach summit Brands:**
**16 total**

**Summit schedule:**
Thurs: Albany coaches hosting
Friday: FoF formal night
Sat: Follies

**Need 4 nights:**

**Option 1:**
Day 0: Wed: practice during volley

Day 1: Thursday
      6-9pm – Lola Circle 1: 3 – arriving wed, leaving sunday am.
      9-12pm – Nik – 3; arriving wed night 940, leaving Sunday 4pm

Day 2: Friday (formal night) – ends 9 or 10pm
      8-10pm - India: 2
      10pm-1am – Lola Circle 2: 3

Day 3: Sat (follies) ends 9-10pm
      9-10 – Dani – 1
      10-12am – Ale - 2

Day 4: Sunday
      5-6 – Lauren – 1
      6-8 – Jimena – 2


*Michele and Sylvie's circles are not being branded per Michele.

**Option 2:**
Day 0: Wed: practice during volley

Day 1: Thursday (Can change order of these)
      6-8pm - India: 2
      8-9 – Dani – 1
      9-12pm – Nik – 3; arriving wed night 940, leaving Sunday 4pm

Day 2: Friday (formal night)
      9pm-12 – Lola Circle 1: 3 – arriving wed, leaving sunday am.

Day 3: Sat (follies)

9pm-12am – Lola Circle 2: 3

Day 4: Sunday - Lola:
      6-7 – Lauren – 1
      7-9 – Jimena – 2
      9-11pm – Ale – 2


"Hello Masters;

Congratulations on this important milestone in your circles' growth!

I've noticed a few things that seems to help the process to run smoothly. This may help as you prepare your Circle for this special event.

I've noticed if they try to control the process, controlling when the cautery starts and stops, it takes away from their experience and slows the process down. I've also noticed if they can be fully present, without distractions of phone, meetings etc., they can be more present with the pain and less reactive to it. This may better support them in their process of experiencing a Self beyond the pain of their body and decrease yelling or reactions to the pain.

Bringing a bathing suit bottom or pair of panties that most nearly reflects the cut of their bathing suit also helps us find proper placement quickly.

The process takes about 1 hour per woman from stencil to clean up. Please do your best to come on time so that we finish before the next amazing group of woman come.

I will go over all care of the Brand as a group briefly before we end.  But here are some helpful tips:

1. Each new Brand will be covered with a tegaderm (clear adhesive bandage). This should be kept on overnight.
2. Remove the first tegaderm the next morning. Shower as usual. You may wash with soap and water.
3. Pat dry.  Use may use a little Neosporin, or coconut oil in the "groves" of the brand (just where the skin has been burnt).  Take care not to get it on healthy skin as the new bandage won't stick if you do.
4. Place a new tegaderm over the brand.
5. Wash and change the bandage once a day for a week.  Then you can stop covering the brand and use coconut or sesame oil as needed for cracking or drying.
6. I recommend boy shorts as panties for at least a week or cloths that prevent rubbing against the brand.
7. It may bleed a little the first day or so. This is normal.
8. Enjoy it!

 Gmail

**Dr. Danielle Roberts <danielle@drdanielleroberts.com>**

---

## Fwd: further explanation
1 message

**Sahajo Haertel** <sahajoh@gmail.com>                                                        Mon, Feb 3, 2025 at 7:58 PM
To: danielle@drdanielleroberts.com

---------- Forwarded message ---------
From: **nicki clyne** <nclyne@gmail.com>
Date: Fri, Aug 27, 2021 at 12:38 PM
Subject: Fwd: further explanation
To: Sahajo Haertel <sahajoh@gmail.com>

The attachments show for me - let me know if this works.

> Begin forwarded message:
>
> **From:** nicki clyne <nclyne@gmail.com>
> **Subject: further explanation**
> **Date:** February 13, 2018 at 12:46:29 AM EST
> **To:** vanessagri@mac.com
>
> Hi Vanessa,
>
> How are you? I'm sorry for the delay, I've been traveling. I'm attaching an explanation of the brand symbol. It started with the Bar Alpha Mu design, and found ways the shapes contained within were also meaningful. At some point we discovered the KR resemblance when flipped and straightened, and we liked that too. I'm attaching drawings for your eyes only just in case the lines weren't clear.
>
> I've also continued to contemplate your questions. Though I'm sure I could talk ad nauseam about any of them, the only one I'm not sure I sufficiently answered was why the opposition may be making the claims they are, the way they are.
>
> I think it's important to note that the most vocal detractors were enthusiastic supporters of NXIVM and its tools for upwards of 13 years. They lived successful, happy, privileged lives. The idea that there was abuse during any of this time—without anyone's knowledge of it—is incredibly hard for me to believe. From what I could see, and I believe this can be verified through independent psychological surveys, they were healthy, productive and psychologically stable; I watched them continuously use NXIVM's tools to achieve their goals and enrich their lives.
>
> The only way I can explain the "trauma" that is being described, or even PTSD, is that something changed or occurred after they left. I think the cognitive dissonance theory helps explain the magnitude and direction of their motivation. (https://en.wikipedia.org/wiki/Cognitive_dissonance) Trauma can happen at any time. In this case, it either happened during their stay, or after they left. I believe, especially considering the above, the trauma was because they left, and their behavior around leaving. This involved lying to, and proactively hurting long-time friends. I have been hurt greatly by Sarah Edmondson's actions. She is a person I thought was a dear friend, the person who brought me into NXIVM, and a person who left and did not even contact me. If I thought one of my friends (even an acquaintance) I had personally enrolled in something might be in a bad situation, I would at least reach out to them to make sure they were ok. This has me questioning her intent. Seeing the benefits she has derived from her version of the circumstance only fortifies my sadness and skepticism.
>
> Without the cognitive dissonance they just would have left and gone on to live happy lives in another direction, as so many people have. To instead focus your energy on destroying the reputations, relationships and livelihoods of people who were once your friends is very confusing behavior from people who once stood for humanitarianism, ethics and personal growth. Not to mention that they are using the situation and media attention for personal gain. So, I find their behavior strange and their motives suspicious; the narrative they are creating is worlds apart from my own experience. I see people take ESP trainings and become better friends, parents, artists, entrepreneurs. I see the people who left choosing to publicly shame those who decide to stay and using the spotlight to boost their own public image. Regardless of anything, I don't agree with using the media to "enact justice." I also would be very curious to know what specifically the trauma is that they experienced, and when it occurred. Speaking for myself, nothing has changed. I still strive to uphold the same values I always have, and I feel more certain than ever of the necessity for a more critically thinking, honorable society. I hope this helps bring some clarity to the situation, or at least another way of understanding the conflict.
>
> Let me know if you have any other questions. I hope this finds you well, and I wish you the best with the rest of the piece!
>
> Sincerely,
> Nicki

---

**4 attachments**



**B1.jpeg**
24K



**B2.jpeg**
31K

**B3.jpeg**
29K

**Symbology Notes.docx**
14K

Roberts - 92

https //mail google com/mail/u/2/?ik  0daf88b0d5&view  pt&search  all&permthid  thread f 1823086438557843811&simpl  msg f 1823086438557843811

2/2

Danielle Roberts, [28.01.17 18:18]
Lauren Salzman log:

These two were day 1 (12-18 hours after)

Then these two were this morning, day 2

And then lastly, tonight (so now we are almost 48 full hours later)

Day 3

Day 4.

5

Day 6

Day 7

Danielle Roberts:
You can let it air. It may scab and the scabbing may cause uneven healing.
But you can put oil (sesame, coconut, etc.) To keep moist and keep Tegaderm off

Lauren Salzman:
Should I keep it covered with like a non stick gauze or something?

I stopped using the tegaderm after the second day and used polysporine.

No, I used polysporine and the plastic. I'm sorry I thought tegaderm was the salve you gave me.
I used polysporine and the tegaderm.

I used gauze one day but the tape didn't hold as well.

Day 8.

Day 9.

Day 11

Yesterday I wore gauze with no ointment all day (and accidentally left the ointment home). The gauze stuck to the wound and it was very painful most of the day. I had to peel it off a couple times. When I got home I put neosporine and techaderm for the night and it feels better this morning.

It had scabbed on most of the outer sections all around but the middle is where it was still a biz oozy and got all stuck to the gauze.

Day 12

Danielle Roberts:
Day 13

Lauren Salzman:
Day 14

Day 15

Day 16

Day 17

I sent a second one bc you always see it just after the shower when it has been wet for a bit. It is a little dryer than it appears initially.

Danielle Roberts:
Day 18?

# BASIC NON-DISCLOSURE (NDA) AGREEMENT

This Nondisclosure Agreement (the "Agreement") is entered into by and between  _____
with its principal offices at 7 Generals Way Clifton Park NY , ("Disclosing Party") and --------------------
("Receiving Party") for the purpose of preventing the unauthorized disclosure of Confidential
Information as defined below. The parties agree to enter into a confidential relationship with respect
to the disclosure of certain proprietary and confidential information ("Confidential
Information/Design").

1.  **Definition of Confidential Information.** For purposes of this Agreement, "Confidential
Information" shall include all information or material that has or could have commercial value or other
utility in the business in which Disclosing Party is engaged. If Confidential Information is in written
form, the Disclosing Party shall label or stamp the materials with the word "Confidential" or some
similar warning. If Confidential Information is transmitted orally, the Disclosing Party shall promptly
provide a writing indicating that such oral communication constituted Confidential Information.

2.  **Exclusions from Confidential Information.** Receiving Party's obligations under this Agreement
do not extend to information that is: (a) publicly known at the time of disclosure or subsequently
becomes publicly known through no fault of the Receiving Party; (b) discovered or created by the
Receiving Party before disclosure by Disclosing Party; (c) learned by the Receiving Party through
legitimate means other than from the Disclosing Party or Disclosing Party's representatives; or (d) is
disclosed by Receiving Party with Disclosing Party's prior written approval.

3.  **Obligations of Receiving Party.** Receiving Party shall hold and maintain the Confidential
Information in strictest confidence for the sole and exclusive benefit of the Disclosing Party. Receiving
Party shall carefully restrict access to Confidential Information to employees, contractors and third
parties as is reasonably required and shall require those persons to sign nondisclosure restrictions at
least as protective as those in this Agreement. Receiving Party shall not, without prior written
approval of Disclosing Party, use for Receiving Party's own benefit, publish, copy, or otherwise disclose
to others, or permit the use by others for their benefit or to the detriment of Disclosing Party, any
Confidential Information. Receiving Party shall return to Disclosing Party any and all records, notes,
and other written, printed, or tangible materials in its possession pertaining to Confidential
Information immediately if Disclosing Party requests it in writing.

Download more templates from FPPT.com

4.   **Time Periods.** The nondisclosure provisions of this Agreement shall survive the termination of 99 Years, this Agreement and Receiving Party's duty to hold Confidential Information in confidence shall remain in effect until the Confidential Information no longer qualifies as a trade secret or until Disclosing Party sends Receiving Party written notice releasing Receiving Party from this Agreement, whichever occurs first.

5.   **Relationships.** Nothing contained in this Agreement shall be deemed to constitute either party a partner, joint venturer or employee of the other party for any purpose.

6.   **Severability.** If a court finds any provision of this Agreement invalid or unenforceable, the remainder of this Agreement shall be interpreted so as best to affect the intent of the parties.

7.   **Integration.** This Agreement expresses the complete understanding of the parties with respect to the subject matter and supersedes all prior proposals, agreements, representations and understandings. This Agreement may not be amended except in a writing signed by both parties.

8.   **Waiver.** The failure to exercise any right provided in this Agreement shall not be a waiver of prior or subsequent rights.

This Agreement and each party's obligations shall be binding on the representatives, assigns and successors of such party. Each party has signed this Agreement through its authorized representative.

_____ (Signature)

 (Printed Name)

Date: Jan/3/2017

_____ (Signature)

 (Printed Name)

Date: Jan/3/2017

Download more templates from FPPT.com

# BASIC NON-DISCLOSURE (NDA) AGREEMENT

This Nondisclosure Agreement (the "Agreement") is entered into by and between Danielle Roberts with its principal offices at 7 Generals Way Clifton Park NY , ("Disclosing Party") and Brian Decker, Pure Body Arts, located at 271 Manhattan Ave.  Brooklyn, NY ("Receiving Party") for the purpose of preventing the unauthorized disclosure of Confidential Information as defined below. The parties agree to enter into a confidential relationship with respect to the disclosure of certain proprietary and confidential information ("Confidential Information/Design").

1.  **Definition of Confidential Information.** For purposes of this Agreement, "Confidential Information" shall include all information or material that has or could have commercial value or other utility in the business in which Disclosing Party is engaged. If Confidential Information is in written form, the Disclosing Party shall label or stamp the materials with the word "Confidential" or some similar warning. If Confidential Information is transmitted orally, the Disclosing Party shall promptly provide a writing indicating that such oral communication constituted Confidential Information.

2.  **Exclusions from Confidential Information.** Receiving Party's obligations under this Agreement do not extend to information that is: (a) publicly known at the time of disclosure or subsequently becomes publicly known through no fault of the Receiving Party; (b) discovered or created by the Receiving Party before disclosure by Disclosing Party; (c) learned by the Receiving Party through legitimate means other than from the Disclosing Party or Disclosing Party's representatives; or (d) is disclosed by Receiving Party with Disclosing Party's prior written approval.

3.  **Obligations of Receiving Party.** Receiving Party shall hold and maintain the Confidential Information in strictest confidence for the sole and exclusive benefit of the Disclosing Party. Receiving Party shall carefully restrict access to Confidential Information to employees, contractors and third parties as is reasonably required and shall require those persons to sign nondisclosure restrictions at least as protective as those in this Agreement. Receiving Party shall not, without prior written approval of Disclosing Party, use for Receiving Party's own benefit, publish, copy, or otherwise disclose to others, or permit the use by others for their benefit or to the detriment of Disclosing Party, any Confidential Information. Receiving Party shall return to Disclosing Party any and all records, notes, and other written, printed, or tangible materials in its possession pertaining to Confidential Information immediately if Disclosing Party requests it in writing.

Download more templates from FPPT.com

4.   **Time Periods.** The nondisclosure provisions of this Agreement shall survive the termination of 99 Years, this Agreement and Receiving Party's duty to hold Confidential Information in confidence shall remain in effect until the Confidential Information no longer qualifies as a trade secret or until Disclosing Party sends Receiving Party written notice releasing Receiving Party from this Agreement, whichever occurs first.

5.   **Relationships.** Nothing contained in this Agreement shall be deemed to constitute either party a partner, joint venturer or employee of the other party for any purpose.

6.   **Severability.** If a court finds any provision of this Agreement invalid or unenforceable, the remainder of this Agreement shall be interpreted so as best to affect the intent of the parties.

7.   **Integration.** This Agreement expresses the complete understanding of the parties with respect to the subject matter and supersedes all prior proposals, agreements, representations and understandings. This Agreement may not be amended except in a writing signed by both parties.

8.   **Waiver.** The failure to exercise any right provided in this Agreement shall not be a waiver of prior or subsequent rights.

This Agreement and each party's obligations shall be binding on the representatives, assigns and successors of such party. Each party has signed this Agreement through its authorized representative.

_____ (Signature)

Danielle Roberts   (Printed Name)

Date: Jan/3/2017

_____ (Signature)

Brian Decker   (Printed Name)

Date: Jan/3/2017

Download more templates from FPPT.com

STATE OF WISCONSIN
BEFORE THE MEDICAL EXAMINING BOARD

---

| | | |
|---|---|---|
| IN THE MATTER OF | : | |
| DISCIPLINARY PROCEEDINGS AGAINST | : | |
| | : | NOTICE OF HEARING |
| DANIELLE D. ROBERTS, D.O., | : | |
| RESPONDENT. | : | |

---

Division of Legal Services and Compliance Case No. 18 MED 161

TO:    Danielle D. Roberts, D.O.
       215 Castle Ave.
       Westbury, NY 11590

PLEASE TAKE NOTICE that disciplinary proceedings have been commenced against you before the Wisconsin Medical Examining Board (Board).  The Complaint, which is attached to this Notice, states the nature and basis of the proceeding.  This proceeding may result in disciplinary action taken against you by the Board.  This proceeding is a class 2 proceeding as defined in Wis. Stat. § 227.01(3)(b).

Within 20 days from the date of service of the Complaint, you must file a written Answer to the allegations of the Complaint.  You may have an attorney help or represent you.  The Answer shall follow the general rules of pleading contained in Wis. Admin. Code § SPS 2.09 and shall be filed as required by Wis. Admin. Code § SPS 2.08(2).  If you do not provide a proper Answer within 20 days, you will be found to be in default and a default judgment may be entered against you on the basis of the Complaint and other evidence.  In addition, the Board may take disciplinary action against you and impose the costs of the investigation, prosecution and decision of this matter upon you without further notice or hearing.

The original of your Answer should be filed with the Division of Hearings and Appeals, who has been designated to preside over this matter pursuant to Wis. Admin. Code § SPS 2.10, at the address listed below:

**Division of Hearings and Appeals**
**4822 Madison Yards Way**
**Post Office Box 7875**
**Madison, WI  53707-7875**
**Telephone (608) 266-7709**

An Administrative Law Judge designated to preside over the matter will be assigned, and you will be notified of the assignment.

You should also file a copy of your Answer with the prosecuting attorney, who is:

**Colleen L. Meloy**
**Department of Safety and Professional Services**
**Division of Legal Services and Compliance**
**Post Office Box 7190**
**Madison, WI 53707-7190**
**Telephone (608) 261-8779**
**Fax (608) 266-2264**

A prehearing conference or a hearing on the matters contained in the Complaint will be held on a date and time to be determined in the future by the Division of Hearings and Appeals.

The legal authority and procedures under which the hearing is to be held are set forth in Wis. Stat. § 227.44, 448.02(3), and Wis. Admin. Code ch. SPS 2.

If you do not appear for the prehearing or the hearing when it is scheduled, you will be found to be in default, and a default judgment may be entered against you on the basis of the Complaint and other evidence. The Board may then take disciplinary action against you and impose the costs of the investigation, prosecution and decision of this matter upon you without further notice or hearing.

If you choose to be represented by an attorney in this proceeding, the attorney, after he or she has been retained by you, is requested to promptly file a Notice of Appearance with the Division of Hearings and Appeals and the prosecuting attorney.

A copy of the Complaint and of this Notice has been sent to the Division of Hearings and Appeals. They will be contacting you in the near future to schedule a prehearing conference or hearing regarding this matter.

Dated 6th of October, 2021.

Colleen L. Meloy, Prosecuting Attorney
State Bar Number 1029855
Department of Safety and Professional Services
Division of Legal Services and Compliance
P.O. Box 7190
Madison, WI 53707-7190
(608) 261-8779
Colleen.Meloy@wisconsin.gov

cc:    Shelly Wang Bandago by scan
Mary Kay Avellino by scan
Donna Fitzgerald by scan
<u>opmcfinalactions@health.ny.gov</u> by scan
Mr. Weintraub by scan
Mr. Conklin by scan
Mr. Dawson
SAPA File
BOA by scan



**KATHY HOCHUL**
Governor

**HOWARD A. ZUCKER, M.D., J.D.**
Commissioner

**KRISTIN M. PROUD**
Acting Executive Deputy Commissioner

September 29, 2021

**CERTIFIED MAIL - RETURN RECEIPT REQUESTED**

Jeffrey J. Conklin, Esq.
NYS Department of Health
Corning Tower Room 2517
Empire State Plaza
Albany, New York 12237

Anthony Z. Scher, Esq.
800 Westchester Avenue
Suite N-641
Rye Brook, New York 10573

**RE: In the Matter of Danielle Roberts, DO**

Dear Parties:

Enclosed please find the Determination and Order (No. 21-206) of the Hearing Committee in the above referenced matter. This Determination and Order shall be deemed effective upon the receipt or seven (7) days after mailing by certified mail as per the provisions of §230, subdivision 10, paragraph (h) of the New York State Public Health Law.

Five days after receipt of this Order, you will be required to deliver to the Board of Professional Medical Conduct your license to practice medicine together with the registration certificate. Delivery shall be by either certified mail or in person to:

Office of Professional Medical Conduct
New York State Department of Health
Office of Professional Medical Conduct
Riverview Center
150 Broadway - Suite 355
Albany, New York 12204

If your license or registration certificate is lost, misplaced or its whereabouts is otherwise unknown, you shall submit an affidavit to that effect. If subsequently you locate the requested items, they must then be delivered to the Office of Professional Medical Conduct in the manner noted above.

As prescribed by the New York State Public Health Law §230, subdivision 10, paragraph (i), (McKinney Supp. 2015) and §230-c subdivisions 1 through 5, (McKinney Supp. 2015), "the determination of a committee on professional medical conduct may be reviewed by the Administrative Review Board for professional medical conduct." Either the licensee or the Department may seek a review of a committee determination.

Request for review of the Committee's determination by the Administrative Review Board stays penalties other than suspension or revocation until final determination by that Board. Summary orders are not stayed by Administrative Review Board reviews.

All notices of review must be served, by certified mail, upon the Administrative Review Board and the adverse party within fourteen (14) days of service and receipt of the enclosed Determination and Order.

The notice of review served on the Administrative Review Board should be forwarded to:

Jean T. Carney, Administrative Law Judge
New York State Department of Health
Bureau of Adjudication
Riverview Center
150 Broadway – Suite 510
Albany, New York 12204

The parties shall have 30 days from the notice of appeal in which to file their briefs to the Administrative Review Board. Six copies of all papers must also be sent to the attention of Ms. Carney at the above address and one copy to the other party. The stipulated record in this matter shall consist of the official hearing transcript(s) and all documents in evidence.

Parties will be notified by mail of the Administrative Review Board's Determination and Order.

Sincerely,

James F. Horan
Chief Administrative Law Judge
Bureau of Adjudication

JFH: nm
Enclosure

STATE OF NEW YORK : DEPARTMENT OF HEALTH
STATE BOARD FOR PROFESSIONAL MEDICAL CONDUCT

------------------------------------------------------------------------x

|  |  |  |
|---|---|---|
| **IN THE MATTER** | : | **DETERMINATION** |
| **OF** | : | **AND** |
| **DANIELLE ROBERTS, D.O.** | : | **ORDER** |

------------------------------------------------------------------------x

A Notice of Hearing and Statement of Charges dated March 5, 2020, and Amended Statement of Charges dated April 27, 2020, were duly served pursuant to § 230(10)(d)(i) of the Public Health Law (PHL) upon Danielle Roberts, D.O. (Respondent). (Exhibits 1, 1a; Appendix I.) Steven Lapidus, M.D., Chair, Ramanathan Raju, M.D., and Joan Martinez McNicholas, duly designated members of the State Board for Professional Medical Conduct, served as the Hearing Committee, and Dawn MacKillop-Soller, served as the Administrative Law Judge. PHL § 230(10)(e). The Department of Health, Bureau of Professional Medical Conduct (Department), appeared by Jeffrey J. Conklin, Esq. The Respondent appeared and was represented by Anthony Z. Scher, Esq.

The Hearing Committee voted 3-0 to sustain 45 specifications among ten definitions of misconduct set forth in the Education Law: willfully abusing a patient §6530(31); conduct in the practice of medicine which evidences moral unfitness §6530(20); failing to use appropriate infection control practices §6530(47); practicing the profession of medicine fraudulently §6530(2); practicing the profession with gross negligence §6530(4); practicing the profession with negligence on more than one occasion §6530(3); practicing the profession with gross incompetence §6530(6); practicing the profession with incompetence on more than one occasion §6530(5); performing professional services which have not been authorized by the patient §6530(26); and failing to maintain a record for each patient which accurately reflects the evaluation and treatment of the patient § 6530(32). The Hearing Committee also voted 2-1 to sustain two

additional specifications of misconduct: willfully failing to file a report required by law §6530(21) and willfully or grossly negligently failing to comply with substantial provisions of federal, state, or local laws, rules, or regulations governing the practice of medicine §6530(16).

The Hearing Committee unanimously determined to impose the penalty of revocation of the Respondent's medical license pursuant to PHL § 230-a(4).

**<u>Hearing Record</u>**

| | |
|---|---|
| Pre-Hearing Conference: | May 28, 2020 |
| Hearing Dates: | June 2, July 1 & 6, August 12 & 14, September 9, October 21, November 3, December 2 & 15, 2020. January 8, February 19, March 2, 2021. |
| Witnesses for Petitioner: | Vasco Bilbao (Transcript, p. 61-189.) Danielle Roberts, D.O. (Transcript, p. 199-440, 514-757.) Ariella Cepelinski (Transcript, p. 443-490.) Michael Menashy (Transcript, p. 492-511.) S.E. (Transcript, p. 769-942.) Robert T. Grant, M.D. (Transcript, p. 1056-1238.) Bruce F. Farber, M.D. (Transcript, p. 955-1045.) |
| Petitioner's Exhibits: | 1, 1a, 2a, 2b, 3, 4, 6, 8d, 9, 14a, 15a, 16, 17, 35, 38, 45, 47-49 |
| Witnesses for Respondent: | Danielle Roberts, D.O. (Transcript, p. 1247-1461, 2106-2150.) David Mayer, M.D. (Transcript, p. 1469-1594.) M.H. (Transcript, p. 1594-1666.) Jane Doe 1 (Transcript, p. 1675-1720.) Jane Doe 2 (Transcript, p. 1726-1755.) Steve Arthur Haworth (Transcript, p. 1758-1840, 2094-2097.) E. Carlson (Transcript, p. 1845-1855.) R. Wolle (Transcript, p. 1856-1867.) Jane Doe 3 (Transcript, p. 1878-1930.) Jane Doe 4 (Transcript, p. 1934-1993.) Jane Doe 5 (Transcript, p. 1996-2092.) |
| Respondent's Exhibit: | A |
| ALJ Exhibit: | I |
| Written Submissions received: | June 2, 2021 |
| Deliberations held: | June 29, July 20, 2021 |

## **Findings of Fact**

The Hearing Committee unanimously makes the following findings of fact:

1.      Respondent Danielle Roberts, D.O., was authorized to practice medicine in New York State on October 5, 2009, by the issuance of license number 255075. (Exhibit 3.)

2.      The Respondent's background includes board certification and completion of a residency in family practice in 2011 followed by working as a physician and medical director between 2011 and 2013 at a large family practice caring for patients of all ages and with various conditions. From 2013 to 2018, she worked as a hospitalist at St. Peter's Hospital in Albany providing medical care to hospital patients from admission to discharge. Her background also includes seven years of locum tenens work at a hospital in Wisconsin and one year at a large integrative medical practice in Manhattan. (Exhibit 38; Transcript, p. 202, 206-207, 1249-1250, 1424-1425.)

3.      In 2013, the Respondent joined NXIVM, a personal development organization founded by Keith Raniere, also known as Vanguard. NXIVM is the parent company to several umbrella organizations, including ESP (Executive Success Programs), SOP (Society of Protectors), Ninth Media, DOS (dominus obsequious sororium, master/slave, master allegiance sisterhood), and Exo/Eso (fitness/exercise program), with multiple center locations in New York, California, Canada, and Mexico. (Exhibit 49; Transcript, p. 65, 184, 186-187, 224, 1255-1256, 1261, 1728.)

4.      In 2016, the Respondent joined DOS, a secret women's group developed by eight "1st line" or original members in collaboration with Keith Raniere. The claimed purpose of DOS was to empower women to build character, strength, and discipline by overcoming fears and pain to experience growth. The Respondent's involvement in DOS was "2nd line member" behind the "1st line" members. (Exhibits 14a, 49; Transcript, p. 234, 246, 252-253, 411-412, 526, 785, 1426, 1938, 2003.)

5.     Membership in DOS required a lifetime commitment or "vow of obedience" between master and slave, the exchange of collateral, a necklace or collar worn 24 hours every day to symbolize obedience and commitment, and a brand placed by an electrocautery device to the pelvic region as part of a branding ceremony. The vow required slaves to strictly follow their masters' orders and keep DOS completely secret. The goal of the branding was to overcome pain and create solidarity. (Exhibit 14a; Transcript, p. 240-243, 255-256, 358-359, 1265, 1268, 1730, 1747-1750, 1888, 1938-1939.)

6.     The brandings of the women, including S.E., A.M., J.G., C.G., A.C., and L.S., occurred only after they committed to join DOS and submitted multiple forms of acceptable collateral. Acceptable collateral included titles to houses and cars, investment and bank accounts, businesses, nude photographs, incriminating letters and/or written confessions detailing sexual deviance, illicit drug use, extramarital affairs, and/or embarrassing family matters. The collateral coerced the women into keeping DOS secret and maintaining their commitment and was subject to public release if the women breached these requirements. (Exhibit 14a; Transcript, p. 243-246, 358-359, 781, 783, 796, 815, 859, 894, 1730, 1747-1748, 1967, 1969, 2054-2055.)

7.     An electrocautery device generates electrical energy that is converted to heat for cutting through skin or solid organs, dissection, separating planes between tissues, hemostasis to stop or seal off bleeding blood vessels or lymphatics during procedures, and for electrocautery branding to place a scar on the body. While an electrocautery device can be used as a scalpel, it is not intended to be used directly on the skin surface because it can cause significantly more skin damage extending beyond the tip or point of contact. (Transcript, p. 1072, 1074, 1224, 1541.)

8.     A smoke evacuator must be used with an electrocautery device to remove dangerous particulate matter such as viruses, infectious diseases, blood cells, and other antigens released from the

device upon contact with skin and tissue and prevent them from being absorbed or inhaled. (Transcript, p. 1074, 1082.)

9. Electrocautery branding is a form of body modification in which an electrical arch on the electrocautery device vaporizes the skin and leaves behind undamaged skin and tissue but not a 2nd degree burn. (Transcript, p. 1787-1788.)

10. Prior to performing the branding procedures on the women, including S.E., A.M., J.G., C.G., A.C., and L.S., the Respondent was required, under acceptable standards of medical conduct that apply to physicians, to complete training in the use of an electrocautery device. The training involves: (1) regulating the settings considering skin anatomy for the appropriate amount of energy transmitted through the tip; (2) grounding the device; (3) using personal protection equipment; and (4) safely operating and maintaining the device, including the use of a smoke evacuator. The Respondent never completed such training. (Transcript, p. 1070-1079, 1082-1087, 1125-1126, 1322-1325, 1327-1328.)

11. Beginning in January of 2017 and continuing through March of 2017, the Respondent used a Medline Valley Lab Surgistat electrocautery device and a stencil to brand "KAR," the initials of Keith Raniere, into the pelvic regions of 17 women, including S.E., A.M., J.G., C.G., A.C., and L.S., most of whom were nude. The brandings were done without anesthesia to intentionally cause them pain. (Exhibits 8D, 45, 47; Transcript, p. 313, 339, 416, 524, 584-585, 635-640, 692, 1331-1332, 1353, 2107-2108.)

12. The branding procedures occurred in a small room of a house and took between 20 and 45 minutes to complete. They were videotaped with a cell phone while a group of women used their bare hands and/or naked bodies to hold down the woman branded to keep her still and supine on the massage table. (Exhibit 8D; Transcript, p. 308, 313-314, 330, 524, 636, 804, 821, 827, 1333-1334, 1377, 1416, 1421.)

13.     The Respondent's conduct in performing the brandings on S.E., A.M., J.G., C.G., A.C., L.S. and the other women constituted the practice of medicine by a physician. The Respondent relied on her medical training, education, and background when she performed the procedures to alter the skin and physical condition of their pelvic regions. (Transcript, p. 1110, 1115-1116, 1129, 1176.)

14.     The brandings performed by the Respondent while licensed as a physician were medical procedures in which standards of medical practice apply. (Transcript, p. 1097, 1109, 1112, 1129, 1163.)

15.     An electrocautery device must be properly grounded to ensure the safe return of the electrical energy from the person treated with the electrocautery device back to the grounding pad, which is affixed to that person. This process involves ensuring the operator and participants are properly insulated to prevent a burn by wearing gloves to avoid serving as the ground themselves. The women participants were not wearing gloves. (Transcript, p. 342, 638, 696, 1074, 1079-1080, 1082, 1154.)

16.     Physicians using an electrocautery device to perform procedures must adhere to infection control standards applicable to physicians performing invasive procedures on the human body. They must maintain a sterile field and sterile environment by: (1) applying draping around the surgical site and as a barrier to block off unsterile areas; (2) using an antibacterial cleaning solution to clean the room, surfaces, table, and equipment between cases and terminally at the end of the day; and (3) requiring all participants wear personal protection equipment, including sterile gloves, masks, and eye shields. The purpose in these requirements is to prevent infection. The Respondent followed none of these infection control procedures. (Exhibit 8D; Transcript, p. 341-342, 522, 536, 638, 1097-1098, 1100-1105, 1125, 1130, 1160-1161.)

17.     Physicians using electrocautery devices must also adhere to operational standards by performing and documenting routine testing and service of the electrocautery device and confirming sufficient electrical output in the room where the device is used. The purpose in these rules is to prevent a surgical or electrical fire during a procedure. (Transcript, p. 1071, 1097-1098, 1100.)

18.     The Respondent's failures to maintain proper infection control standards and operational procedures while using an electrocautery device that inflicted 2nd degree burns on the women were severe deviations from the standard of care. (Transcript, p. 1124-1125, 1132.)

19.     In using an electrocautery device to perform the brandings without anesthesia, the Respondent caused the women, including S.E., A.M., J.G., C.G., A.C., and L.S., significant physical pain, 2nd degree burns, and abnormal permanent and/or raised keloid and hypertrophic scarring, and placed them at risk for harm, including deeper 3rd and 4th degree burns and psychological trauma like post-traumatic stress disorder (PTSD) or anxiety. (Exhibits 14a, 45, 47; Transcript, p. 579, 1079-1090, 1124-1130, 1133-1146, 1154, 1209, 1377, 1403, 1421.)

20.     In subjecting the women to significant pain from the electrocautery device, the Respondent was required to administer them, or at the very least offer, anesthesia, such as a local anesthetic, to alleviate the pain. The Respondent had no legitimate medical reason, such as an allergy or an emergency, for neither providing the women anesthesia nor presenting them with this treatment option. (Transcript, p. 339, 635, 1073, 1086.)

21.     The Respondent's failure to administer or advise and offer anesthesia to the women was a severe deviation from the standard of care. Physicians are ethically prohibited from causing patients such extreme harm on purpose. (Transcript, p. 1073, 1124-1125, 1131-1132, 1210-1211.)

22.     The Respondent never informed the women she branded that the brand was KAR to represent Keith Raniere's initials or that it would measure approximately two inches by two inches. The brand was intentionally placed upside down and backwards on most of the women to conceal Keith Raniere's initials. S.E., A.M., J.G., C.G., A.C. and others had falsely been told by their masters that the brand represented "a symbol of the sorority," "a line of the sun and the earth and certain elements," an "abstract symbol," "chakras," and/or "four elements," and that the size would be "little," "small," and/or

"dime sized." Only L.S., as a "1st line" member, knew prior to her branding that the brand represented Keith Raniere's initials. (Exhibit 14a; Transcript, p. 351, 541-542, 787, 797-802, 904, 1355, 1450, 1685-1686, 1739, 1882, 1939, 1941-1942.)

23.     Prior to performing the branding procedures on the women, the Respondent was required to obtain their voluntary, verbal and/or written informed consent that reflected a discussion of the psychological and physical risks, benefits, and alternatives to the procedure, including the option not to proceed; the pain involved and the option of anesthesia; details of the brand symbol; and consideration of the individual's psychological and medical histories, comorbidities, and medications. The purpose of obtaining informed consent is to confirm the women have a complete understanding of the procedure and to avoid complications. The Respondent did not obtain such consent from any of the women. (Transcript, p. 435-437, 538-540, 1098, 1124-1125, 1164-1168, 1178-1182, 1985.)

24.     The Respondent's infliction of the branding procedures on the women without obtaining their voluntary verbal and/or written informed consent was a severe deviation from the standard of care. Informed consent must be voluntary and not in connection with coercion under the threat of disclosure of personal and potentially damaging or destructive collateral. (Transcript, p. 1098, 1124-1125, 1132, 1178-1183.)

25.     Physicians are obligated to provide proper care of 2nd degree burn wounds that includes application of antibacterial ointment and treatment plans that include follow-up physician monitoring. Providing this care is critical to ensure proper wound healing and to prevent infection. The Respondent failed to provide this care. (Transcript, p. 542-545, 624-625, 1164, 1166-1167, 1171, 1349, 2114.)

26.     The Respondent's failure to provide proper treatment and follow-up care of the 2nd degree burn wounds was a severe deviation from the standard of care. (Transcript, p. 1093-1096, 1123-1124, 1128, 1164, 1166-1167, 1171, 1174.)

27.     Following completion of the branding procedures, the Respondent instructed the women to submit photos of their brands to their masters every day for 30 days and then one time per week. The Respondent evaluated and kept the photos but never made them part of a medical record because she never prepared or maintained such records for the women. (Transcript, p. 377, 379, 540, 543, 547-549, 556.)

28.     Physicians performing medical procedures involving the infliction of wounds are required to prepare, maintain, and document medical records that include photographs of the wound and details of the procedure, the equipment used, physical evaluations, diagnosis, treatment plans, and post-procedure instructions. The Respondent severely deviated from the standard of care by failing to prepare and maintain medical records to apprise outside providers of the treatment provided. (Transcript, p. 1173-1174.)

29.     In 2016, the Respondent participated in a ten-day annual NXIVM corporate retreat known as "Vanguard week" at the Silver Bay YMCA Family and Retreat Center, located in Silver Bay, New York. The purpose of the event was to celebrate the birthday of Keith Raniere. The attendees included more than 400 NXIVM members. (Exhibit 17; Transcript, p. 80, 90-93, 451-452, 456, 478, 496, 708, 710.)

30.     During the event and while attending it, the Respondent became aware of a gastrointestinal illness affecting many of the attendees. Among the attendees were children, a woman with end-stage cancer, and a pregnant woman. The symptoms of the illness included diarrhea, nausea, vomiting, dehydration, and fatigue. This illness placed the attendees and the public at risk for harm, including gastrointestinal morbidity and dehydration, which is a particular concern for people with comorbidities like cancer. (Transcript, p. 84-85, 454, 455, 485, 498-499, 505, 714-715.)

31.     This illness constituted a disease outbreak because it involved a large group of people who developed similar symptoms while attending the same event in a confined environment. Physicians are required under Department of Health regulations to report a communicable disease or any disease outbreak

or unusual disease to public health officials. 10 NYCRR 2.10. The Respondent failed to take any steps to comply with these requirements. (Transcript, p. 972, 991.)

32.     The Respondent's failure to report the infectious disease outbreak was a violation of public health regulations and a significant deviation from the standard of care for a physician. (Transcript, p. 991.)

**Factual Allegations**

By email correspondence dated March 1, 2021, the Petitioner withdrew factual allegations G.3 and G.4. (ALJ I.) The Hearing Committee sustained all the remaining Factual Allegations in the Statement of Charges.

The Hearing Committee <u>sustained</u>, by unanimous vote (3-0):

Factual Allegations A.1, A.2, A.3, A.4, A.5, A.6, A.7, A.8, A.9, A.10, A.11, A.12, A.13, A.14, A.15, B.1, B.2, B.3, B.4, B.5, B.6, B.7, B.8, B.9, B.10, B.11, B.12, B.13, B.14, B.15, C.1, C.2, C.3, C.4, C.5, C.6, C.7, C.8, C.9, C.10, C.11, C.12, C.13, C.14, C.15, D.1, D.2, D.3, D.4, D.5, D.6, D.7, D.8, D.9, D.10, D.11, D.12, D.13, D.14, D.15, E.1, E.2, E.3, E.4, E.5, E.6, E.7, E.8, E.9, E.10, E.11, E.12, E.13, E.14, E.15, F.1, F.2, F.3, F.4, F.5, F.6, F.7, F.8, F.9, F.10, F.11, F.12, F.13.

The Hearing Committee <u>sustained</u>, by majority vote (2-1):

Factual Allegations G.1, G.2.

**Evaluation of the Respondent's Testimony**

The Respondent testified on her own behalf and as a witness for the Petitioner. Although considered incidental by the Hearing Committee in deciding central issues in this case, the Hearing Committee believes it is worth noting the Respondent's evasiveness, defiance, and inconsistencies on various points. For instance, she refused to disclose: (1) the circumstances of her becoming involved in NXIVM (Transcript, p. 218); (2) the initials of the women she branded (Transcript, p. 315-316); (3) the whereabouts of the branding videos and whether she maintained them (Transcript, p. 328, 331); (4) how it was determined the brandings would be videotaped (Transcript, p. 331); (5) who was present when she branded L.S. (Transcript, p. 333); (6) the roles of the women in the room with L.S. during the branding

(Transcript, p. 336); (7) whether L.S. was clothed during the branding (Transcript, p. 335); (8) what the brand represented (Transcript, p. 351); and (9) whether L.S.'s limbs were held down when she was branded (Transcript, p. 337). Despite being directed to answer these questions when they were asked, the Respondent never did. She also initially refused to disclose whether she was branded with Keith Raniere's initials (Transcript, p. 518-519) but then finally admitted — consistent with the other evidence — that she was branded and that the brand was KAR to represent his initials. (Exhibits 14a and 49; Transcript, p. 1312, 1352-1352, 1388, 1391-1393, 1396.)

Further inconsistencies include her initial testimony that she was unaware of the details of the electrocautery device she used, stating it was "purchased by the friend that invited me" (Transcript, p. 266, 269), and her later testimony that she purchased it, identifying the model and manufacturer. (Transcript, p. 2108.) She also initially testified that DOS was "a completely separate organization" from NXIVM and Keith Raniere was not its "leader" (Transcript, p. 253) and that L.S., a 1st line member, had "no master" (Transcript, p. 381), but then later admitted that Keith Raniere was the "grandmaster" to the 1st line members (Transcript, p. 1387), who were his "slaves." (Transcript, p. 1389.)

The Hearing Committee finds these factors significantly diminished the Respondent's credibility and evaluated her testimony accordingly.

### The Practice of Medicine

The Hearing Committee was not persuaded by the Respondent's arguments that the Board lacks subject matter jurisdiction to bring charges against her because she "was not engaged in the practice of medicine" and that branding "is not a medical procedure." (Respondent's brief, p. 2.) The Hearing Committee finds the Petitioner correctly argues the Respondent "performed medical procedures when she branded the DOS women" and that "the brandings fell within the definition as to what constitutes the

practice of medicine" and agrees with its reliance on Courts having a long-standing history of interpreting Educ. Law §6521 broadly to support these positions. (Petitioner's brief, p. 12-13.)

The practice of the profession of medicine is defined as "diagnosing, treating, operating or prescribing for any human disease, pain, injury, deformity or physical condition." Educ. Law § 6521. Whether conduct constitutes the practice of medicine is a determination to be made by the Hearing Committee based on the facts presented. Addei v. State Board for Professional Medical Conduct, 278 AD2d 551, 552 (3d Dept. 2000); *See also* Educ. Law §6504. This determination must be based solely on the facts "and not upon the name of the procedure, its origins or legislative lack of clairvoyance." People v. Amber, 76 Misc. 2d 267, 273 (Sup. Ct. Queens Co. 1973).

The reported decisions relied on by the Petitioner that the Hearing Committee finds convincing on this point include People v. Amber, *supra* at 273, in which the Court described its interpretation of Educ. Law §6521 as "a statute intended to regulate, limit or control the diagnosis and treatment of ailments must be read broadly to include the gamut of those known, whether or not recognized and even those not yet conjured." (Petitioner's brief, p. 12-13.) *See also*, People v. Mastromarino, 148 Misc. 454, 455 (Sup. Ct. Kings Co. 1933); People v. Rubin, 103 Misc.2d 227, 234 (N.Y. City Crim. Ct. Queens Co. 1979). The Respondent acknowledges that while branding "arguably involves operating," the operations were not "for a human disease, pain, injury, deformity or physical condition," and so did not fit the statute because the women were "perfectly healthy and normal in all respects" when they received the brands. (Respondent's brief, p. 3-4.)

The Respondent relies on Matter of Gross v. Ambach, 71 NY2d 859, 861 (1988), in which the Court of Appeals determined autopsies constitute the practice of medicine because they are "the ultimate diagnostic procedure" to diagnose the cause and manner of death. (Respondent's brief, p. 3-4.) The Hearing Committee finds the only similarity to be drawn between the two cases is that the statute somehow

does not fit. There because autopsies are not practicing medicine since medicine can only be practiced on "living" patients and here because the women were "normal and healthy" when they were branded. Gross, supra at 861. In any event, the Hearing Committee, like the Court of Appeals in Gross, declines to limit the statue in that regard. Id. (Respondent's brief, p. 4.) The Hearing Committee rejects the Respondent's claim that it is "blatantly obvious" that the Respondent's "operating" on the women was not for "a human disease, pain, injury, deformity or physical condition" to meet the criteria under the statute. (Respondent's brief, page 3.) To the contrary, it is glaringly obvious to the Hearing Committee that she was operating on the women to alter the skin, appearance, and physical condition of their pelvic regions regardless of whether they were "normal and healthy." (Transcript, p. 1110-1111, 1116.)

The Petitioner presented as a witness plastic surgeon Robert T. Grant, M.D. While Dr. Grant lacks branding experience, the Hearing Committee noted his expertise and credibility on the main issues in this case were established by his decades of experience as a board-certified specialist in general and plastic surgeries performing cosmetic procedures, such as body piercings and nipple and areola tattooing to complete a breast reconstruction, and as Chief of Plastic Surgery at NewYork-Presbyterian Hospital, program director for the residents training program, and Professor of Surgery at Columbia University. (Exhibit 4; 1060-1066, 1185-1186.)

The Respondent presented as a witness general surgeon David Mayer, M.D. The Hearing Committee noted Dr. Mayer's extensive and diverse background as a practicing healthcare attorney and board-certified surgeon with 40 years of experience, including current privileges at three ambulatory facilities, teaching at three medical colleges, and prior Chair of Surgery at Syosset Hospital, where he performed thousands of surgeries, directed a laparoscopic fellowship program, and trained residents. (Transcript, p. 1469-1471, 1505.) Despite his considerable medical and legal experience, the Hearing

Committee was not persuaded by his professional opinions on the issue of the practice of medicine due to contradictions in his testimony.

For instance, Dr. Mayer insisted the Respondent was a branding technician able to "put aside her white coat" as a physician when she performed the brandings, yet he described himself as "always a physician" who doesn't "stop being a physician…at different times." (Transcript, p. 1569, 1579-1580.) His position that she was acting as a branding technician was also inconsistent with his testimony that "you never forget your training and education" (Transcript, p. 1566-1567.) Another example is his testimony that physicians should not cause extreme pain while also refusing to discuss the "ethics" of the Respondent causing the women such pain and insistence that her osteopathic oath to do no harm and prevent pain did not apply. (Transcript, p. 1528, 1531.) The Hearing Committee considered such inconsistencies, noted his long-standing history of providing expert witness services in hundreds of civil cases to law firms and other private companies, and evaluated his testimony accordingly. (Transcript, p. 1499.)

While the Hearing Committee was not persuaded by Dr. Grant's professional opinion that the Respondent was practicing medicine because she addressed "psychic pain" the women were experiencing, it did agree with his testimony that the brandings are the practice of medicine under Educ. Law §6521 because they were "surgical," involving "violating the epidermis and getting into the deeper layers of skin," and performed to "alter the skin" or physical condition of the women. (Transcript, p. 1110-1111, 1114, 1116.) The Respondent attempted to contrast branding with plastic surgery such as a rhinoplasty on a "successful face model" on the grounds that branding does not treat "a physical condition" the patient seeks to change (brief, p. 12), but the Hearing Committee finds this comparison frustrates her cause. Just as a rhinoplasty to change the appearance of a nose alters the physical condition of the face, the Hearing

Committee finds the Respondent's branding to inflict a permanent and very visible scar alters the skin, appearance, and physical condition of the pelvic region.

Dr. Grant took the position that while brandings and other similar cosmetic procedures such as body piercing and tattooing can be performed by non-physicians, they constitute medical procedures when physicians perform them. (Transcript, p. 1108-1109, 1196-1197.) The Hearing Committee agrees with this view and rejects the Respondent's arguments against it. On the one hand, the Respondent claims that branding "is a form of commercial body art in the same manner as are tattooing and body piercing." (Respondent's brief, p. 8.) To that end, she argues that "aesthetic or ritual branding is outside the jurisdiction of the State Board for Professional Medical Conduct as branding is not regulated at all in New York." (Respondent's brief, p. 9.) On the other hand, the Respondent goes on to <u>distinguish</u> these activities on the basis that tattooing and body piercing require a license to perform, whereas branding does not. PHL §461. In doing so, she overlooks the exception to the tattoo and body piercing licensing requirement for physicians that is expressly stated in the statute. PHL §462. The Hearing Committee believes the Legislature specifically carved out that exception precisely because when a doctor and not a technician performs tattooing or body piercing, it is presumed that appropriate medical standards will apply. Consistent with this was Dr. Grant's testimony that he was unable to "imagine the scenario" involving a licensed physician performing these brandings acting as only a "technician." (Transcript, p. 1218.)

The Respondent's arguments that tattooing and body piercing are regulated — whereas branding is not — were deemed inconsequential to the Hearing Committee. The Committee's view is simple — all these activities are practicing medicine and become medical procedures when performed by a physician. Contrary to Dr. Mayer's testimony that the Respondent could obtain "a separate license as a tattoo artist or body piercer" and "not use" her medical license (Transcript, p. 1549), the Hearing Committee believes that as a physician, the Respondent cannot unilaterally pick and choose when the standards of medical

practice apply. (Transcript, p. 1107-1109, 1200, 1549.) Dr. Grant confirmed this when he testified: "given the privilege of being a physician that comes with responsibilities. You can't decide when you are going to enjoy the privileges, but not have the responsibilities." (Transcript, p. 1112.) The Hearing Committee considers the Respondent's attempt to use a double standard, compartmentalizing her life by ostensibly branding the women as a technician and not a doctor, an irresponsible attempt to cast aside her privileged status as a licensed physician with specialized knowledge.

The Hearing Committee was guided in reaching its determination by reported court decisions relying on various factors and circumstances in recognizing when activities performed by physicians fall within the definition of the practice of medicine. In Y.Y.B. ex rel. Barukh v. Rachminov, the court found that "while a circumcision performed by a physician would be the practice of medicine, a circumcision performed as a religious ritual by a qualified person (a 'mohel' in this case) does not constitute the practice of the profession of medicine within the meaning of the Education Law." Y.Y.B. ex rel. Barukh v. Rachminov, 11 N.Y.S.3d 808, 1059 (Sup. Ct. Queens Co. 2015); See also Zakhartchenko v. Weinberger, 605 N.Y.S.2d 205, 206 (Sup. Ct. Kings Co. 1993.) In relying on this same reasoning, the Court in Zakhartchenko applied negligence principles to a hospital where a circumcision performed by a Rabbi involved the hospital's trained medical staff. Zakhartchenko, supra at 413. The Petitioner also cites Zakhartchenko in its brief (p. 18) to correctly summarize the principle from these cases applicable to this matter: "Therefore, while the acts performed by a non-physician are not subject to the jurisdiction of the Board of Professional Medical Conduct, the brandings/medical procedures performed by Dr. Roberts on 17 DOS women are." The Hearing Committee follows the view of these reported cases that different standards apply when physicians perform procedures.

The Respondent claims that "several possible people were considered" to perform the brandings and that "(c)learly, the intent was not to select a physician but to pick amongst friends" (brief, p. 8), but

the Hearing Committee finds it more likely the Respondent was chosen based on her background, training, and knowledge as a physician. The Respondent acknowledged relying on her medical background in everything she does. (Transcript, p. 263, 423, 430-431, 488, 521, 547, 552-553, 1440-1442, 2134.) The evidence also confirms she was the only physician approached by the 1st line members to perform the brandings, her status as a physician was well-known in the NXIVM community, and she was the one chosen to do them. (Transcript, p. 182-183, 352, 797, 1853, 1950.) Her experience as a physician was obviously relevant to what they were seeking in a person to do the job, which Jane Doe 5 described as someone who was "willing," "calm," not "squeamish," and had "a steady hand" and "attention to detail." (Transcript, p. 2020-2021.) Jane Doe 4 also expressed how she hoped "someone skilled enough" would be chosen for the job and the relief she felt — consistent with S.E.'s testimony — knowing her branding would be done by the Respondent, who she knew was a doctor. (Transcript, p. 796, 1951, 1942-1943, 1975.)

### Standards of Medical Practice

The Hearing Committee concluded the Respondent's lack of training in the use of an electrocautery device contributed to her improper technique in performing the branding procedures and exacerbated the harm to these women. The Hearing Committee was skeptical of Dr. Mayer's assertion that the Respondent took "great care to get special training in branding" (Transcript, p. 1476) because the evidence established she was woefully unskilled in performing the procedures. According to Dr. Grant, proper training in the safe and proper use of an electrocautery device includes attending "a series of didactic lectures" and using the device for a period of time "under direct observation of a mentor or preceptor," steps the Respondent never undertook. (Transcript, p. 517, 562-563, 1070-1071, 1327-1328, 1765, 1784.) The Hearing Committee finds her preparations for the brandings, which included undergoing branding herself by branding artist Brian Decker in Brooklyn, practicing on fruit and pigs' knuckles, and a few

communications by email and telephone with Mr. Decker and body modification artist Steve Arthur Haworth, fell short of demonstrating serious and proper training in using an electrocautery device. (Transcript, p. 273-274, 280-284.)

The Respondent presented body modification artist Steve Arthur Haworth as a witness to discuss her branding technique. The Hearing Committee was not convinced by Mr. Haworth's opinion that the Respondent used appropriate technique when she performed the brandings. (Transcript, p. 1779.) Mr. Haworth testified that in his almost 30 years of performing electrocautery brandings, he has never caused a 2nd degree burn. (Transcript, p. 1827.) He described such a burn as "significantly more painful" than a brand (Transcript, p. 1788), with a greater risk of infection. (Transcript, p. 1795.) Mr. Haworth's description of an electrocautery brand as "not a second-degree burn" and "more like a scrape" that heals "very quickly" (Transcript, p. 1763, 1789-1790, 1796) was contrary to all the evidence in this case. The Respondent's brandings resulted in 2nd degree burns, as was established by the brand photos (Exhibits 45 and 47), the branding video (Exhibit 8D), and the testimony of Dr. Mayer (Transcript, p. 1510-1511), Dr. Grant (Transcript, p. 1085), and the Respondent herself. (Transcript, p. 1377, 1420-1421.) The Hearing Committee attributed Mr. Haworth's seeming unawareness that the Respondent's brandings caused 2nd degree burns to his lack of a medical degree and his failure to review the brand wound photos showing the depth of the wounds or the testimony of the physician witnesses. (Exhibits 8D, 45, 47; Transcript, p. 1791-1792.)

The Respondent's poor technique was obvious to the Hearing Committee on S.E.'s branding video, which showed sparks and fire from the electrocautery device as she moved it across the skin to create the brand's "seven lines" and "touchups" (Exhibit 8D; Transcript, p. 366-367) and her multiple starts and stops, which Mr. Haworth commented on as "different" from his technique. (Transcript, p. 1778.) The Hearing Committee also recognized the Respondent's failure to mention the energy settings or the types

of tips she used, which suggested her unfamiliarity with how the device works, specifically that the electrical current from the device and the time in which it is applied directly affects the outcome. (Transcript, p. 283, 1224.) She also expressed no awareness of the danger in using an electrocautery device directly on the skin surface to make an incision because it can cause a more significant injury than intended, such as the abnormal scarring and deep 2nd degree burns that occurred in this case and the risk of deeper 3rd and 4th degree burns. (Transcript, p. 1215, 1224, 1510, 1581.) For these reasons, the Hearing Committee believes her lack of training in controlling the electrocautery device to predict the outcome meant she never understood that the time in which she applied the tremendous amount of electrical energy from the device caused the women substantial injuries, pain, and trauma. (Exhibits 14a, 45, 47; Transcript, p. 1085-1087, 1128.)

Dr. Grant described the Respondent's branding of these women as "excruciatingly" and "incredibly painful" for which she never even offered them a choice of anesthesia. (Transcript, p. 1086, 1162-1163.) In response to the pain, the evidence showed A.M. and S.E. cried and J.G. screamed and squealed, flipped off the table, and bit down on a towel. (Exhibit 14a; Transcript, p. 807, 819, 579, 689, 819, 846, 1404.) S.E. described her pain from the branding as "an acute fire in the most sensitive part of my body." (Transcript, p. 827.) L.S. described her experience of the branding as "incredibly painful." (Exhibit 14a.) While the evidence established the women desired pain as part of the branding process (Respondent's brief, p. 18), the Hearing Committee agreed with Dr. Grant that absent a legitimate medical reason, such as an allergy or an emergency, the Respondent was obligated to at least attempt to alleviate such pain, such as by administering a local anesthetic in the area where the cautery was applied. (Transcript, p. 1073, 1124, 1210-1211.)

This was necessary, Dr. Grant explained, because the level of pain the women endured was so intense that it risked causing the woman cauterized even deeper burns from not being able to remain still

during the procedure. Dr. Mayer also acknowledged this risk, as well as the risk of physical injuries to the women participants holding her down as she violently reacts to the electrocautery device. (Transcript, p. 1082-1083, 1087-1090, 1510.) Dr. Grant emphasized it is "unethical" for physicians to intentionally cause patients such harm because doing so violates "our ethical background in training and responsibility." (Transcript, p. 1116, 1228.)

The Respondent's lack of training was also established by her failure to prevent other risks of harm from occurring. She risked burns to the other women participants because they were not properly grounded by wearing gloves for insulation, instead using their bare skin to hold down the woman cauterized. Another risk was that the women could inhale or absorb harmful pathogens, such as viruses and infectious diseases, due to the failure to use a smoke evacuator to remove the debris plume released from the electrocautery device. She also risked burn wound infections by not maintaining a sterile field because she never properly cleaned the room, applied sterile draping, or required the women to wear personal protective equipment such as masks, sterile gloves, and eye protection. (Transcript, p. 1074, 1082, 1097-1098, 1104-1105, 1130.) The Hearing Committee disagreed with Dr. Mayer's opinion that these risks were "low," especially because the Respondent made no effort to mitigate them. (Transcript, p. 334-335, 532, 562, 1584.) Dr. Grant deemed the Respondent's failure to complete these steps serious deviations from the standard of care. (Transcript, p. 1124-1125, 1132.)

The Hearing Committee unanimously voted that the Respondent's conduct constituted professional misconduct as defined in Educ. Law §6530(4), practicing the profession with gross negligence on a particular occasion, professional misconduct as defined in Educ. Law §6530(6), practicing the profession with gross incompetence, and professional misconduct as defined in Educ. Law 6530(5), practicing the profession with incompetence on more than one occasion.

Gross negligence involves a significant deviation from acceptable medical standards that creates the risk of grave consequence to the patient. Such conduct may result in a single act of negligence in egregious proportions or multiple acts of negligence that cumulatively are egregious. Post v. N.Y.S. Dept. of Health, 245 A.D.2d 985, 986 (3d Dept. 1997.) Gross incompetence involves an unmitigated lack of the skill or knowledge necessary to perform an act undertaken by the licensee in the practice of medicine. This conduct may consist of a single act of incompetence of egregious proportions or multiple acts of incompetence that cumulatively amount to egregious conduct. Post, 245 A.D.2d at 986; Minielly v. Commissioner of Health, 222 A.D.2d 750, 752 (3d Dept. 1995). Incompetence includes a lack of the requisite knowledge or skill in the practice of the profession but does not require a showing of an act or omission constituting a breach of the duty of due care. Dhabuwala v. State Bd. For Professional Med. Conduct, 225 AD2d 209, 213 (3d Dept. 1996).

The Respondent deviated from the standard of care and demonstrated a lack of skill and knowledge to practice the profession of medicine. She dangerously operated the electrocautery device to perform the branding procedures without anesthesia or adhering to infection control standards, which subjected the women to extreme pain, deep 2nd degree burn wounds, and abnormal scarring, and risked them further 3rd and 4th degree burn wounds, infection, and other harm.

The Hearing Committee also voted 3-0 that the Respondent's conduct constituted professional misconduct as defined under Education Law §6530(47), failing to use appropriate infection control practices. The Respondent's failure to follow any infection control procedures risked the women burn wound infections and other harmful outcomes, representing to the Hearing Committee her disregard for their health and safety.

Informed consent requires a verbal or written discussion to evaluate risks so the patient can "prudently decide whether or not" to proceed with the procedure. (Transcript, p. 1098, 1178-1180.) It must

include a discussion of the psychological and physical risks, benefits, and alternatives to the procedure, including the option not to proceed, considering medical histories, comorbidities, and medications. (Transcript, p. 1124, 1179-1180.) The Respondent admits she never obtained such consent, which Dr. Grant deemed a serious deviation from the standard of care. (Respondent's brief, p. 8; Transcript, p. 436, 538-540, 1180.)

In failing to take medical histories and perform physical examinations, the Respondent risked missing a diagnosis or condition such as diabetes or connective tissue disorder, or a blood thinner medication like aspirin, that could affect clotting or wound healing. She also risked missing a cardiac condition that could trigger an arrythmia or pre-existing PTSD or anxiety that could become exacerbated by direct exposure to blood and trauma. (Transcript, p. 544-544, 1094-1095, 1171, 1418.) Other risks included burn wound infections and poor healing because she never provided treatment plans that included application of antibiotic ointment and follow-up physician monitoring. (Transcript, p. 377, 547, 556, 1362, 1168, 1171-1172.) In failing to document medical records, including the brand wound photos she collected and kept, she also risked depriving outside providers of important information about the procedures and the reason why they were performed. (Transcript, p. 1175.)

The Respondent, as a physician, was obligated to complete such tasks. The Hearing Committee believes she should have known to do so, especially considering her experience as a hospitalist following protocols that involve reading charts, assessing medications and medical histories to determine comorbidities, and treating patients with various injuries, including burn wounds. (Transcript, p. 206-207, 209, 291.) Although Mr. Haworth testified that his brandings never involve completing these steps, the Hearing Committee noted that he is not a doctor. The medical standards that apply to physicians with specialized medical training and knowledge performing these procedures do not also apply to branding technicians. (Transcript, p. 1770-1771.)

The Hearing Committee unanimously determined that the Respondent's conduct constituted professional misconduct as defined in Educ. Law §6530(32), failing to maintain records for each patient that "accurately reflect the evaluation and treatment of the patient." Physicians are required to maintain such records that include every interaction with the patient and, in cases such as this, photos of the injury. Mucciolo v. Fernandez, 195 A.D.2d 623, 625 (3d Dept. 1993).

Negligence means the "failure to exercise the care that would be exercised by a reasonably prudent licensee under the circumstances." Bogdan v. State Bd. For Professional Med. Conduct, 195 A.D.2d 86, 88 (3d Dept. 1993). The Department is not required to prove harm to a patient. Youssef v. State Bd. For Professional Med. Conduct, 89 A.D.3d 824, 825 (3d Dept. 2004). Negligence can also be sustained when there is a relationship between inadequate medical records and patient treatment. Matter of Patin v. State Bd. For Professional Med. Conduct, 77 A.D.3d 1211, 1214 (3d Dept. 2010). The Hearing Committee sustains the negligence charge on both grounds. The Respondent failed to exercise the required level of care when she failed to take even the most basic steps to protect these women, such as by assessing medical and psychiatric histories, providing follow-up care considering the deeply traumatizing nature of the branding procedures, or assessing cross reactions, such as a medication that could worsen a preexisting psychiatric problem or a heart defect that could create a fatal condition. Her failure to maintain any medical records prevented subsequent providers from understanding the cause of the injuries and the reasons for them, which could adversely impact their future treatment decisions. As a physician, the Respondent was required to consider these matters before performing operations on the women that physically and permanently altered their bodies.

Of particular concern to the Hearing Committee in the circumstances here was that informed consent must be voluntary and not due to coercion (Transcript, p. 1182) and involves providing details of the procedure, all of which were missing in this case. The Respondent concedes she never obtained

"formal written" informed consent but claims the branding video of S.E. shows she gave "verbal" consent, which the Hearing Committee finds misleading at best. (Respondent's brief, p. 8, 17.) The Respondent denies the women were coerced, yet the brandings were performed upon women who had submitted collateral that would result in damaging and embarrassing consequences if released to the public. (Respondent's brief, p. 19; Exhibit 14a; Transcript, p. 388, 390, 424, 426, 530, 783-784, 1182, 1957.) S.E. described the involuntariness of the branding process in the pressure she felt to move forward with the procedure because of the collateral, which she characterized as a "gun" to her head. (Transcript, p. 802.) This is the very definition of coercion.

The collateral included titles to cars and houses, letters about illicit drug use and sexual deviance, and nude photos, some of which showed explicit images of genitalia. (Exhibit 14a; Transcript, p. 802, 857, 1353, 1941-1942, 1686, 1738, 1884.) Even Dr. Mayer acknowledged the women could view the collateral as coercive (Transcript, p. 1537), describing it as "a factor to consider in the voluntariness of their actions." (Transcript, p. 1528.) Dr. Grant confirmed that under these circumstances, there can be no informed consent. (Transcript, p. 1182.) The Hearing Committee was not persuaded by the Respondent's comparison of the branding process to the brandings in the "African American fraternity known as the Omegas" (Respondent's brief, p. 18-19) because while the fraternity members experience painful brands to symbolize their "bond" and "life-long membership in the fraternity," they are not coerced into being branded by having to submit potentially harmful collateral. (Respondent's brief, p. 18-19.)

Particularly troubling to the Hearing Committee was the evidence establishing the women were purposefully not told what symbol would be branded onto their bodies. (Exhibit 14a; Transcript, p. 798, 802, 1182, 1660, 1685, 1884, 1941.) S.E. confirmed this when she testified "(a)t no point did anyone say these are Keith's initials. It was only revealed to me later." (Transcript, p. 798.) The Respondent, however, did know that the symbol was KAR to represent Keith Raniere's initials. (Transcript, p. 1387-1388, 1353,

1355, 1392, 1394.) She claims she did not disclose it to the women because it wasn't her "business" or "responsibility" and doing so would have breached her "lifetime vow of obedience" to DOS. (Transcript, p. 541, 1353-1355.) The Hearing Committee rejects these excuses and finds that regardless of her commitment to DOS, she had a duty as a physician to disclose what she was doing in the same way a plastic surgeon would be required to describe the pigment, shape, and appearance of a nipple for a nipple areola tattooing procedure. (Transcript, p. 1107.) The Hearing Committee agrees with Dr. Grant that the Respondent's failure to disclose the brand symbol to the women deviated from the standard of care. (Transcript, p. 1178, 1182.)

The Hearing Committee unanimously determined that the Respondent's conduct constituted professional misconduct as defined in Educ. Law §6530(2), practicing the profession fraudulently. Fraudulent practice requires "proof of either an intentional misrepresentation or concealment of a known fact" and "intent or knowledge" can be inferred. Patin, *supra* at 1214. The Hearing Committee finds the Respondent's admission that she knew what the brand symbol was and her decision not to disclose it represents an intentional concealment of a known fact. The Respondent violated an important aspect of informed consent by branding the women without making them fully aware of what the brand symbol was or what it represented.

The Hearing Committee unanimously determined that this conduct also constitutes professional misconduct as defined in Educ. Law §6530(20), moral unfitness to practice medicine; professional misconduct as defined in Educ. Law 6530(31), willfully harassing, abusing, or intimidating a patient; and professional misconduct as defined in Educ. Law §6530(26), performing professional services which have not been duly authorized by the patient. Moral unfitness is conduct that "violat[es] the trust the public bestows on the medical profession and/or violate[es] the medical profession's moral standards." Such conduct is suggestive of, or would tend to prove, moral unfitness. Patin, *supra* at 1215 *citing* Matter of

Prado v. Novello, 301 A.D.2d 692, 694 (3d Dept. 2003). The Respondent's medically reckless performance of the brandings caused the women significant harm without apprising them of the brand symbol. Physicians are strictly prohibited from going above and beyond what the patient expects when performing a medical procedure.

### Vanguard Week

The Petitioner also charges the Respondent with failing to report a communicable disease, an unusual outbreak, or a disease outbreak involving a gastrointestinal illness during the annual NXIVM retreat at the Silver Bay YMCA, as required under the New York State Sanitary Code. (Petitioner's brief, p. 72-73.) The Respondent admits she did not report the outbreak of the gastrointestinal illness during the event to public health officials but claims she was not required to because she was on vacation and since "garden variety" stomach viruses, which are "unpleasant but not lethal," are not "communicable" or "unusual" to meet the mandatory reporting requirements under the regulation. (Respondent's brief, p. 21-22; Transcript, p. 733, 1294.) Physicians are required to report a "communicable disease" or "(a)ny disease outbreak or unusual disease" to public health officials. 10 NYCRR 2.10(a)-(c). An outbreak is defined as "an increased incidence of disease above its expected or baseline level" 10 NYCRR 2.2(d).

In support of its charges, the Petitioner presented as a witness infectious disease specialist Bruce Frederick Farber, M.D., whose testimony the Respondent failed to refute. The Hearing Committee noted Dr. Farber's impressive background includes 30 years of experience as an infectious disease specialist, including head of infectious disease for Northwell Health and in charge of the infectious disease programs at North Shore University Hospital and LIJ Medical Center. (Exhibit 6; Transcript, p. 959.) The majority of the Hearing Committee agreed with his professional opinion that the Respondent's duty as a physician to report this illness applied to her even if she was on vacation. (Transcript, p. 993, 995.) The Committee decided 2-1 that while the illness fails to meet the criteria under the regulation as "communicable" or

"unknown" — presumably because it was never reported or investigated — it did constitute a "disease outbreak" that the Respondent as a physician was required to report regardless of whether or not she was on vacation. 10 NYCRR 2.1(c); 10 NYCRR 2.2. (Transcript, p. 993, 995, 998-999.) Dr. Farber made clear that her failure to fulfill this duty was a significant deviation from the standard of care. (Transcript, p. 991, 994.)

The evidence established this "obvious" illness affected a large group of people among the more than 400 attendees in a confined location, all of whom had similar symptoms. (Transcript, p. 990-991, 993, 999.) This is the precise definition of a "disease outbreak." 10 NYCRR 2.1(c), 10 NYCRR 2.2(d). The majority of the Hearing Committee agreed with Dr. Farber that the Respondent's failure to report it was especially egregious because it subjected the elderly and other vulnerable individuals, such as those with conditions or diseases like cancer, renal failure, and pregnancy, to potentially dangerous consequences like dehydration requiring hospitalization. (Transcript, p. 974-975.) The majority of the Hearing Committee also agreed with his opinion that based on her hospitalist experience that required her to complete an infection control course covering this subject, the Respondent should have known to report the illness. (Transcript, p. 972-973, 979.) Dr. Farber emphasized the importance in following this rule to "shut down" and properly "clean" the facility to prevent the illness from contaminating others and to determine its etiology. (Transcript, p. 980, 984.)

The Hearing Committee voted 2-1 that the Respondent's failure to report a disease outbreak constituted professional misconduct as defined in Educ. Law § 6530(21), a willful failure to file a report required by law; professional misconduct as defined in Educ. Law § 6530(16), a willful or grossly negligent failure to comply with substantial provisions of state laws governing the practice of medicine; professional misconduct as defined in Educ. Law § 6530(3), practicing the profession with negligence on

more than one occasion; and professional misconduct as defined in Educ. Law § 6530(5), practicing the profession with incompetence on more than one occasion.

## Penalty

In considering the full spectrum of penalties under PHL § 230-a, including revocation, suspension, probation, censure and reprimand and the imposition of civil penalties, the Hearing Committee unanimously determined, by vote of 3-0, that the penalty of revocation of the Respondent's medical license is appropriate. The Hearing Committee determined that the Respondent engaged in 12 forms of professional misconduct, all of which it addressed in this hearing decision and sustained. The Respondent says she joined NXIVM with a goal to "enrich (her) skills as a doctor." (Transcript, p. 219.) The evidence shows, however, that she deliberately chose to adhere to her DOS "vows of obedience" instead of providing the women she branded with "all the things that a physician does" because to do so would have resulted in "breaking (her) vow" and "went quite the counter to what the whole purpose was." (Transcript, p. 1442-1443.) In other words, when faced with any conflict between NXIVM and her responsibilities as a physician, she chose NXIVM. For these reasons, the Hearing Committee believes she abdicated her values as a physician and failed her profession, herself, and everyone else involved.

The Hearing Committee recognizes the Respondent's tremendous future potential as a physician who excelled in every undertaking from becoming a skilled gymnast to graduating college with honors and earning dual degrees — osteopathic medicine and a master's in clinical nutrition — and then as an entrepreneur building a family medical practice and developing Exo/Eso, the physical fitness company within NXIVM she co-developed with Keith Raniere. (Transcript, p. 1255-1256.) The Hearing Committee is deeply troubled, however, by her unwillingness to admit regrets. (Transcript, p. 228, 1248-1249, 1252, 1255-1256, 1259, 1412, 1445, 1455-1456.) Instead of holding herself accountable for harming S.E., for example, she accused S.E. of victimizing herself. (Transcript, p. 1412-1413.) The only sadness she

expressed was that the branding "was twisted into something it wasn't" and that "it has been used to scare people." (Transcript, p. 1455-1456.) The Respondent denies being brainwashed, yet she expressed no real remorse, which represented to the Hearing Committee her distorted reality and the very real concern that others remain vulnerable to her future brandings. (Transcript, p. 1453, 1719, 1753.)

The Hearing Committee is hopeful that the Respondent will regard the volume of sustained charges in this hearing decision as an opportunity to reflect on her poor choices and reeducate herself professionally and personally.

## <u>Order</u>

Based·upon the foregoing, IT IS HEREBY ORDERED THAT:

1.  The first through forty-seventh specifications of professional misconduct set forth in the Statement of Charges are <u>Sustained</u>.

2.  The Respondent's license to practice medicine in the State of New York is hereby <u>Revoked</u> under PHL § 230-a(4).

3.  This Determination and Order shall be effective upon service on the Respondent in compliance with PHL § 230(10)(h).

DATED:    Albany, New York
           September 27, 2021


_(signature)_ Steven Lapidus, M.D., Chairperson

Ramanathan Raju, M.D.
Joan Martinez McNicholas

TO: Jeffrey J. Conklin, Associate Counsel
New York State Department of Health
Division of Legal Affairs
Corning Tower Building, Room 2517
Empire State Plaza
Albany, New York  12237

Anthony Z. Scher, Esq.
800 Westchester Avenue
Suite N-641
Rye Brook, New York, 10573

APPENDIX I

NEW YORK STATE       DEPARTMENT OF HEALTH
STATE BOARD FOR PROFESSIONAL MEDICAL CONDUCT

| IN THE MATTER | AMENDED |
|---|---|
| OF | STATEMENT |
| DANIELLE ROBERTS, D.O. | OF CHARGES |

DANIELLE ROBERTS, D.O., the Respondent, was authorized to practice medicine in New York State on or about October 5, 2009, by the issuance of license number 255075 by the New York State Education Department.

## FACTUAL ALLEGATIONS

A.      On or about March 9, 2017, the Respondent used a cauterizing pen as part of a medical procedure to scar the skin by branding Patient A, a female patient, hereinafter identified in the attached Appendix "A", with the initials KR and/or KAR, in the pelvis region, thereby leaving a permanent scar. Respondent's conduct deviated from accepted standards of care as follows:

     1. Respondent performed the medical procedure upon Patient A in an other than appropriately sterile environment, and/or without appropriate infection control, and/or without the use of sterile technique, including the surgical field, surgical procedure room, multiple use of a cautery pen tip and electrical grounding pad, and documented electrical testing and maintenance upkeep of the cautery device.

     2. Respondent performed the medical procedure without the use of a local anesthetic or general anesthesia, thereby causing Patient A to suffer pain for no legitimate medical purpose.

1



3. Respondent performed the medical procedure upon Patient A with non-medically trained personnel present, who were not wearing personal protective equipment.

4. Respondent performed the medical procedure upon Patient A with the assistance of non-medically trained personnel who physically restrained said patient.

5. Respondent failed to cease performing the medical procedure despite the fact that Patient A was suffering pain without medical justification.

6. Respondent, during the course of the medical procedure, willfully physically abused Patient A.

7. Respondent performed the medical procedure upon Patient A at the time when said patient was naked and while being held down by other individuals, who were also naked, contrary to any appropriate medical protocol or need.

8. Respondent inappropriately performed the medical procedure upon Patient A while an individual who was also naked utilized a cell phone to video said medical procedure.

9. Respondent failed to provide appropriate wound care for Patient A at the time of the medical procedure, and thereafter.

10. Respondent failed to provide appropriate follow-up medical care and treatment for Patient A's wound, and/or failed to refer Patient A to another medical provider for such post-medical procedure wound care.

11. Respondent inappropriately advised, or caused another individual to advise, Patient A to take photographs of the wound caused by the medical procedure on a daily basis for one month and once a week for another month, and to thereafter send such photographs to an individual who shared all or some of said photographs with the Respondent.

12. Respondent failed to provide appropriate medical care and treatment for Patient A, including obtaining information regarding said patient's medical history and current medications.

2

13. Respondent failed to prepare and/or maintain appropriate medical records for the patient which accurately reflected the evaluation and treatment of Patient A.

14. Respondent fraudulently failed to disclose to Patient A that the initials KR and/or KAR said Respondent branded into the pelvis region of Patient A represented the initials of Keith Alan Ranieri..

15. Respondent performed the medical procedure upon Patient A without having obtained the adequate informed consent of Patient A.


B. On or about March 9, 2017, the Respondent used a cauterizing pen as part of a medical procedure to scar the skin by branding Patient B, a female patient, hereinafter identified in the attached Appendix "A", with the initials KR and/or KAR, in the pelvis region, thereby leaving a permanent scar. Respondent's conduct deviated from accepted standards of care as follows:

1. Respondent performed the medical procedure upon Patient B in an other than appropriately sterile environment, and/or without appropriate infection control and/or, without the use of sterile technique, including the surgical field, surgical procedure room, multiple use of a cautery pen tip and electrical ground pad, and documented electrical testing and maintenance upkeep of the cautery device.

2. Respondent, while performing the medical procedure without the use of a local anesthetic or general anesthesia, thereby causing Patient B to suffer pain for no legitimate medical purpose.

3. Respondent performed the medical procedure upon Patient B with non-medically trained personnel present, who were not wearing personal protective equipment.

4. Respondent performed the medical procedure upon Patient B with the assistance of non-medically trained personnel who physically restrained said patient.

3

5. Respondent failed to cease performing the medical procedure despite the fact that Patient B was suffering pain without medical justification.

6. Respondent, during the course of the medical procedure, willfully and physically abused Patient B.

7. Respondent performed the medical procedure upon Patient B at the time when said patient was naked and while being held down by other individuals, who were also naked, contrary to any appropriate medical protocol or need.

8. Respondent inappropriately performed the medical procedure upon Patient B while an individual who was also naked utilized a cell phone to video said medical procedure.

9. Respondent failed to provide appropriate wound care for Patient B at the time of the medical procedure, and thereafter.

10. Respondent failed to provide appropriate follow-up medical care and treatment for Patient B's wound, and/or failed to refer Patient B to another medical provider for such post-medical procedure wound care.

11. Respondent inappropriately advised, or caused another individual to advise Patient B to take photographs of the wound caused by the medical procedure on a daily basis for one month and once a week for another month, and to thereafter send such photographs to an individual who shared all or some of said photographs with Respondent.

12. Respondent failed to provide appropriate medical care and treatment for Patient B, including obtaining information regarding said patient's medical history and current medications.

13. Respondent failed to prepare and/or maintain appropriate medical records for the patient which accurately reflected the evaluation and treatment of Patient B.

14. Respondent fraudulently failed to disclose to Patient B that the initials KR and/or KAR said Respondent branded into the pelvis region of Patient B represented the initials of Keith Alan Ranieri.

4

15. Respondent performed the medical procedure upon Patient B without having obtained the adequate informed consent of Patient B.

C. On or about March 9, 2017, the Respondent used a cauterizing pen as part of a medical procedure to scar the skin by branding Patient C, a female patient, hereinafter identified in the attached Appendix "A", with the initials KR and/or KAR, in the pelvis region, thereby leaving a permanent scar. Respondent's conduct deviated from accepted standards of care as follows:

1. Respondent performed the medical procedure upon Patient C in an other than appropriately sterile environment, and/or without appropriate infection control, and/or without the use of sterile technique, including the surgical field, surgical procedure room, multiple use of a cautery pen tip and electrical grounding pad, and documented electrical testing and maintenance upkeep of the cautery device.

2. Respondent, while performing the medical procedure without the use of a local anesthetic or general anesthesia, thereby causing Patient C to suffer pain for no legitimate medical purpose.

3. Respondent performed the medical procedure upon Patient C with non-medically trained personnel present, who were not wearing personal protective equipment.

4. Respondent performed the medical procedure upon Patient C with the assistance of non-medically trained personnel who physically restrained said patient.

5. Respondent failed to cease performing the medical procedure despite the fact that Patient C was suffering pain without medical justification.

6. Respondent, during the course of the medical procedure, willfully physically abused Patient C.

5

7. Respondent performed the medical procedure upon Patient C at the time when said patient was naked and while being held down by other individuals, who were also naked, contrary to any appropriate medical protocol or need.

8. Respondent inappropriately performed the medical procedure upon Patient C while an individual who was also naked utilized a cell phone to video said medical procedure.

9. Respondent failed to provide appropriate wound care for Patient C at the time of the medical procedure, and thereafter.

10. Respondent failed to provide appropriate follow-up medical care and treatment for Patient C's wound, and/or failed to refer Patient C to another medical provider for such post-medical procedure wound care.

11. Respondent inappropriately advised, or caused another individual to advise, Patient C to take photographs of the wound caused by the medical procedure on a daily basis for one month and once a week for another month, and to thereafter send such photographs to an individual who shared all or some of said photographs with Respondent.

12. Respondent failed to provide appropriate medical care and treatment for Patient C, including obtaining information regarding said patient's medical history and current medications.

13. Respondent failed to prepare and/or maintain appropriate medical records for the patient which accurately reflected the evaluation and treatment of Patient C.

14. Respondent fraudulently failed to disclose to Patient C that the initials KR and/or KAR said Respondent branded into the pelvis region of Patient C represented the initials of Keith Alan Ranieri.

15. Respondent performed the medical procedure upon Patient C without having obtained the adequate informed consent of Patient C.

6

D.  On or about March 9, 2017, the Respondent used a cauterizing pen as part of a medical procedure to scar the skin by branding Patient D, a female patient, hereinafter identified in the attached Appendix "A", with the initials KR and/or KAR, in the pelvis region, thereby leaving a permanent scar.  Respondent's conduct deviated from accepted standards of care as follows:

1.  Respondent performed the medical procedure upon Patient D in an other than appropriately sterile environment, and/or without appropriate infection control, and/or without the use of sterile technique, including the surgical field, surgical procedure room, multiple use of a cautery pen tip and electrical grounding pad, and documented electrical testing and maintenance upkeep of the cautery device.

2.  Respondent, while performing the medical procedure without the use of a local anesthetic or general anesthesia, thereby causing Patient D to suffer pain for no legitimate medical purpose.

3.  Respondent performed the medical procedure upon Patient D with non-medically trained personnel present, who were not wearing personal protective equipment.

4.  Respondent performed the medical procedure upon Patient D with the assistance of non-medically trained personnel who physically restrained said patient.

5.  Respondent failed to cease performing the medical procedure despite the fact that patient D was suffering pain without medical justification.

6.  Respondent, during the course of the medical procedure, willfully physically abused Patient D.

7.  Respondent performed the medical procedure upon Patient D at the time when said patient was naked and while being held down by other individuals, who were also naked, contrary to any appropriate medical protocol or need.

7

8. Respondent inappropriately performed the medical procedure upon Patient D while an individual who was also naked utilized a cell phone to video said medical procedure.

9. Respondent failed to provide appropriate wound care for Patient D at the time of the medical procedure, and thereafter.

10. Respondent failed to provide appropriate follow-up medical care and treatment for Patient D's wound, and/or failed to refer Patient D to another medical provider for such post-medical procedure wound care.

11. Respondent inappropriately advised, or caused another individual to advise Patient D to take photographs of the wound caused by the medical procedure on a daily basis for one month and once a week for another month, and to thereafter send such photographs to an individual who shared all or some of said photographs with Respondent.

12. Respondent failed to provide appropriate medical care and treatment for Patient D, including obtaining information regarding said patient medical history and current medications.

13. Respondent failed to prepare and/or maintain appropriate medical records for the patient which accurately reflected the evaluation and treatment of Patient D.

14. Respondent fraudulently failed to disclose to Patient D that the initials KR and/or KAR said Respondent branded into the pelvis region of Patient D represented the initials of Keith Alan Ranieri.

15. Respondent performed the medical procedure upon Patient D without having obtained the adequate informed consent of Patient D.


E. On or about March 9, 2017, the Respondent used a cauterizing pen as part of a medical procedure to scar the skin by branding Patient E, a female patient, hereinafter identified in the attached Appendix "A", with the initials KR and/or KAR,

8

in the pelvis region, thereby leaving a permanent scar. Respondent's conduct deviated from accepted standards of care as follows:

1. Respondent performed the medical procedure upon Patient E in an other than appropriately sterile environment, and/or without appropriate infection control, and/or without the use of sterile technique, including the surgical field, surgical procedure room, multiple use of a cautery tip pen and electrical grounding pad, and documented electrical testing and maintenance upkeep of the cautery device.

2. Respondent performed the medical procedure without the use of a local anesthetic or general anesthesia, thereby causing Patient E to suffer pain for no legitimate medical purpose.

3. Respondent performed the medical procedure upon Patient E with non-medically trained personnel present, who were not wearing personal protective equipment.

4. Respondent performed the medical procedure upon Patient E with the assistance of non-medically trained personnel who physically restrained said patient.

5. Respondent failed to cease performing the medical procedure despite the fact that Patient E was suffering pain without medical justification.

6. Respondent, during the course of the medical procedure, willfully physically abused Patient E.

7. Respondent performed the medical procedure upon Patient E at the time when said patient was naked and while being held down by other individuals, ~~who were also naked~~, contrary to any appropriate medical protocol or need.

8. Respondent inappropriately performed the medical procedure upon Patient E while an individual who was also naked utilized a cell phone to video said medical procedure.

9. Respondent failed to provide appropriate wound care for Patient E at the time of the medical procedure, and thereafter.

9

10. Respondent failed to provide appropriate follow-up medical care and treatment for Patient E's wound, and/or failed to refer Patient E to another medical provider for such post-medical procedure wound care.

11. Respondent inappropriately advised, or caused another individual to advise, Patient E to take photographs of the wound caused by the medical procedure on a daily basis for one month and once a week for another month, and to thereafter send such photographs to an individual who shared all or some of said photographs with Respondent.

12. Respondent failed to provide appropriate medical care and treatment for the Patient E, including obtaining information regarding said patient's medical history and current medications.

13. Respondent failed to prepare and/or maintain appropriate medical records for the patient which accurately reflected the evaluation and treatment of Patient E.

14. Respondent fraudulently failed to disclose to Patient E that the initials KR and/or KAR said Respondent branded into the pelvis region of Patient E represented the initials of Keith Alan Ranieri.

15. Respondent performed the medical procedure upon Patient E without having obtained the adequate informed consent of Patient E.


F. During the period from on or about January 2017 through December 2017, the Respondent used a cauterizing pen as part of medical procedures to permanently scar the skin by branding one or more of the following: Patients F and G, female patients, hereinafter identified in the attached Appendix "A", with the initials KR and/or KAR, in their pelvis regions. Respondent's conduct deviated from accepted standards of care as follows:

1. Respondent performed the medical procedures upon one or more of the following: Patients F and G in an other than appropriately sterile environment,

10

and/or without appropriate infection control, and/or without the use of sterile technique, including the surgical field, surgical procedure room, multiple use of a cautery pen tip and electrical grounding pad, and documented electrical testing and maintenance upkeep of the cautery device.

2. Respondent performed the medical procedures without the use of a local anesthetic or general anesthesia, thereby causing one or more of the following: Patients F and G to suffer pain for no legitimate medical purpose.

3. Respondent performed the medical procedures upon one or more of the following: Patients F and G with non-medically trained personnel present, who were not wearing personal protective equipment.

4. Respondent performing the medical procedures upon one or more of the following: Patients F and G with the assistance of non-medically trained personnel who physically restrained said patients.

5. Respondent failed to cease performing the medical procedures despite the fact that one or more of the following: Patients F and G were suffering pain without medical justification.

6. Respondent, during the course of the medical procedures willfully physically abused one or more of the following: Patients F and G.

7. Respondent inappropriately performed the medical procedures upon one or more of the following: Patients F and G while an individual utilized a cell phone to video said medical procedures.

8. Respondent failed to provide appropriate wound care for one or more of the following: Patients F and G at the time of the medical procedures, and thereafter.

9. Respondent failed to provide appropriate follow-up medical care and treatment for one or more of the following: Patients F and G, and/or failed to refer the patients to other medical providers for such post-medical procedures wound care.

11

10. Respondent inappropriately advised, or caused another individual to advise, one or more of the following: Patients F and G to take photographs of the wounds caused by the medical procedures on a daily basis for one month and once a week for another month, and to thereafter send such photographs to an individual who shared all or some of said photographs with Respondent.

11. Respondent failed to provide appropriate medical care and treatment for one or more of the following: Patients F and G, including obtaining information regarding said patients' medical histories and current medications.

12. Respondent failed to prepare and/or maintain appropriate medical records for the patients which accurately reflected the evaluation and treatment of one or more of the following: Patients F and G.

13. Respondent performed the medical procedures upon one or more of the following: Patients F and G without having obtained the adequate informed consents of said Patients F and G.

G. During the time from on or about June 2016 through August 2016, NXIVM and/or the Executive Success Program (ESP) conducted a conference and/or meeting at the Silver Bay Conference and Family Retreat Center (Conference Center), located in Silver Bay, New York. The Respondent and approximately 438 other individuals attended the conference, including approximately 76 children. During the course of the conference, hundreds of the attendees became severely ill with an undetermined communicable disease. The individuals who became ill suffered inter alia, flu-like symptoms, severe vomiting and diarrhea. The Respondent had knowledge of the fact that many individuals at the conference had become ill. The Respondent knew or should have known that the illness suffered by the attendees at the conference was a communicable disease, outbreak of a communicable disease, and/or an unusual disease or outbreak. Respondent's conduct deviated from accepted standards of care as follows:

12

1. Respondent failed to report a disease outbreak or unusual disease to the State Department of Health as required by Title 10 N,Y.C.R.R. Section 2.1(c).

2. Respondent failed to report the suspected or confirmed case of communicable disease, outbreak of communicable disease, and/or the unusual disease or outbreak to the city, county, or district health officer as required by Title 10 N.Y.C.R.R. Sections 2.10 and 2.1(b) and (c).

3. Respondent failed to report by telephone, facsimile, or other electronic communication, or in person the illness of the attendees at the conference suspected or confirmed to have been caused due to the consumption of spoiled or poisonous food to the city, county, or district health officer, in violation of Title 10 N.Y.C.R.R. Section 2.15.

4. Upon being made aware of the fact that attendees at the conference might have been suffering from a communicable disease, the Respondent failed to cause such individuals to be isolated in an appropriate environment, pending official action by the health officer, in violation of Title 10 N.Y.C.R.R. Section 2.27.

13

## SPECIFICATIONS OF CHARGES

## FIRST THROUGH SIXTH SPECIFICATIONS
## WILLFULLY ABUSING A PATIENT

Respondent is charged with committing professional misconduct as defined by New York Education Law §6530(31) by willfully abusing a patient as alleged in the facts of one or more of the following:

1. The facts in paragraphs A and A.2, A and A.4, A and A.5, A and A.6, and/or A and A.8.

2. The facts in paragraphs B and B.2, B and B.4, B and B.5, B and B.6, and/or B and B.8.

3. The facts in paragraphs C and C.2, C and C.4, C and C.5, C and C.6, and/or, C and C.8.

4. The facts in paragraphs D and D.2, D and D.4, D and D.5, D and D.6, and/or, D and D.8.

5. The facts in paragraphs E and E.2, E and E.4, E and E.5, E and E.6, and/or, E and E.8.

6. The facts in paragraphs F and F.2, F and F.4, F and F.5, F and F.6, and/or F and F.8.

14

**SEVENTH THROUGH**
**TWELFTH SPECIFICATIONS**

**CONDUCT IN THE PRACTICE OF MEDICINE**
**WHICH EVIDENCES MORAL UNFITNESS**

Respondent is charged with committing professional misconduct as defined by New York Education Law §6530(20) by engaging in conduct in the practice of medicine which evidences moral unfitness to practice medicine as alleged in the facts of one or more of the following:

7. The facts in paragraphs A and A.2, A and A.4, A and A.5, A and A.6, and/or A and A.8.

8. The facts in paragraphs B and B.2, B and B.4, B and B.5, B and B.6, and/or B and B.8.

9. The facts in paragraphs C and C.2, C and C.4, C and C.5, C and C.6, and/or C and C.8.

10. The facts in paragraphs D and D.2, D and D.4, D and D.5, D and D.6, and/or D and D.8.

11. The facts in paragraphs E and E.2, E and E.4, E and E.5, E and E.6, and/or E and E.8.

12. The facts in paragraphs F and F.2, F and F.4, F and F.5, F and F.6, and/or F and F.8.

15

## THIRTEENTH THROUGH EIGHTEENTH SPECIFICATIONS

## FAILING TO USE APPROPRIATE STERILE ENVIRONMENT
## AND/OR WITHOUT APPROPRIATE INFECTION CONTROL
## AND/OR WITHOUT THE USE OF STERILE TECHNIQUE

Respondent is charged with committing professional misconduct as defined by New York Education Law §6530(47) by failing to use scientifically accepted barrier precautions and infection control practices as established by the department of health as alleged in the facts of one or more of the following:

13. The facts in paragraphs A and A.1, A and A.3, A and A.4, and/or A and A.7.

14. The facts in paragraphs B and B.1, B and B.3, B and B.4, and/or B and B.7.

15. The facts in paragraphs C and C.1, C and C.3, C and C.4, and/or C and C.7.

16. The facts in paragraphs D and D.1, D and D.3, D and D.4, and/or D and D.7.

17. The facts in paragraphs E and E.1, E and E.3, E and E.4, and/or E and E.7.

18. The facts in paragraphs F and F.1, F and F.3, F and F.4, and/or F and F.7.

## NINTEENTH SPECIFICATION

## PRACTICING THE PROFESSION FRAUDULENTLY OR BEYOND ITS SCOPE

Respondent is charged with committing professional misconduct as defined by New York Education Law §6530(2) by practicing the profession fraudulently or beyond its authorized scope as alleged in the facts of one or more of the following:

19. The facts in paragraphs A and A.2, A and A.3, A and A.8 and/or A and A.14; B and B.2, B and B.3, B and B.8, and/or B and B.14; C and C.2, C and C.3, C and C.8, and/or C and C.14; D and D.2, D and D.3, D and D.8, and/or D and D.14; E

16

and E.2, E and E.3, E and E.8, and/or E and E. 14; F and F.2, F and F.3, and/or F and F.7.

## TWENTIETH THROUGH TWENTY-FIFTH SPECIFICATIONS
## PRACTICING THE PROFESSION WITH GROSS NEGLIGENCE

Respondent is charged with committing professional misconduct as defined by New York Education Law §6530(4) by practicing the profession with gross negligence as alleged in the facts of one or more of the following:

20. The facts in paragraphs A and A.1, A and A.2, A and A.3, A and A.4, A and A.5, A and A.6, A and A.7, A and A.8, A and A.9, A and A.10, A and A.11, A and A.12, A and A.13, A and A.14, and/or A and A.15.

21. The facts in paragraphs B and B.1, B and B.2, B and B.3, B and B.4, B and B.5, B and B.6, B and B.7, B and B.8, B and B.9, B and B.10, B and B.11, B and B.12, B and B.13, B and B.14, and/or B and B.15.

22. The facts in paragraphs C and C.1, C and C.2, C and C.3, C and C.4, C and C.5, C and C.6, C and C.7, C and C.8, C and C.9, C and C.10, C and C.11, C and C.12, C and C.13, C and C.14, and/or C and C.15.

23. The facts in paragraphs D and D.1, D and D.2, D and D.3, D and D.4, D and D.5, D and D.6, D and D.7, D and D.8, D and D.9, D and D.10, D and D.11, D and D.12, D and D.13, D and D.14, and/or D and D.15.

17

24. The facts in paragraphs E and E.1, E and E.2, E and E.3, E and E.4, E and E.5, E and E.6, E and E.7, E and E.8, E and E.9, E and E.10, E and E.11, E and E.12, E and E.13, E and E.14, and/or E and E.15.

25. The facts in paragraphs F and F.1, F and F.2, F and F.3, F and F.4, F and F.5, F and F.6, F and F.7, F and F.8, F and F.9, F and F.10, F and F.11, F and F.12, and/or F and F.13.


## TWENTY-SIXTH SPECIFICATION

## PRACTICING THE PROFESSION WITH NEGLIGENCE
## ON MORE THAN ONE OCCASION

Respondent is charged with committing professional misconduct as defined by New York Education Law §6530(3) by practicing the profession with negligence on more than one occasion as alleged in the facts of the following:

26. The facts in paragraphs A and A.1, A and A.2, A and A.3, A and A.4, A and A.5, A and A.6, A and A.7, A and A.8, A and A.9, A and A.10, A and A.11, A and A.12, A and A.13, and/or A and A.15; and/or B and B.1, B and B.2, B and B.3, B and B.4, B and B.5, B and B.6, B and B.7, B and B.8, B and B.9, B and B.10, B and B.11, B and B.12, B and B.13, and/or B and B.15; and/or C and C.1, C and C.2, C and C.3, C and C.4, C and C.5, C and C.6, C and C.7, C and C.8, C and C.9, C and C.10, C and C.11, C and C.12, C and C.13, and/or C and C.15; and/or D and D.1, D and D.2, D and D.3, D and D.4, D and D.5, D and D.6, D and D.7, D and D.8, D and D.9, D and D.10, D and D.11, D and D.12, D and D.13, and/or D

18

and D.15; and/or E and E.1, E and E.2, E and E.3, E and E.4, E and E.5, E and E.6, E and E.7, E and E.8, E and E.9, E and E.10, E and E.11, E and E.12, E and E.13, and/or E and E.15; and/or F and F.1, F and F.2, F and F.3, F and F.4, F and F.5, F and F.6, F and F.7, F and F.8, F and F.9, F and F.10, F and F.11, F and F.12, and/or F and F.13; and/or G and G.1, G and G.2, G and G.3, and/or G and G.4.

## TWENTY-SEVENTH THROUGH THIRTY-SECOND SPECIFICATIONS
## PRACTICING THE PROFESSION WITH GROSS INCOMPETENCE

Respondent is charged with committing professional misconduct as defined by New York Education Law §6530(6) by practicing the profession with gross incompetence as alleged in the facts of one or more of the following:

27. The facts in paragraphs A and A.1, A and A.2, A and A.3, A and A.4, A and A.5, A and A.6, A and A.7, A and A.8, A and A.9, A and A.10, A and A.11, A and A.12, A and A.13, and/or A and A.15.

28. The facts in paragraphs B and B.1, B and B.2, B and B.3, B and B.4, B and B.5, B and B.6, B and B.7, B and B.8, B and B.9, B and B.10, B and B.11, B and B.12, B and B.13, and/or A and A.15.

29. The facts in paragraphs C and C.1, C and C.2, C and C.3, C and C.4, C and C.5, C and C.6, C and C.7, C and C.8, C and C.9, C and C.10, C and C.11, C and C.12, C and C.13, and/or C and C.15.

19

30. The facts in paragraphs D and D.1, D and D.2, D and D.3, D and D.4, D and D.5, D and D.6, D and D.7, D and D.8, D and D.9, D and D.10, D and D.11, D and D.12, D and D.13, and/or D and D.15.

31. The facts in paragraphs E and E.1, E and E.2, E and E.3, E and E.4, E and E.5, E and E.6, E and E.7, E and E.8, E and E.9, E and E.10, E and E.11, E and E.12, E and E.13, and/or E and E.15.

32. The facts in paragraphs F and F.1, F and F.2, F and F.3, F and F.4, F and F.5, F and F.6, F and F.7, F and F.8, F and F.9, F and F.10, F and F.11, F and F.12, and/or F and F.13.

## THIRTY-THIRD SPECIFICATION

### PRACTICNG THE PROFESSION WITH INCOMPETENCE
### ON MORE THAN ONE OCCASION

Respondent is charged with committing professional misconduct as defined by New York Education Law §6530(5) by practicing the profession with incompetence on more than one occasion as alleged in the facts of the following:

33. The facts in paragraphs A and A.1, A and A.2, A and A.3, A and A.4, A and A.5, A and A.6, A and A.7, A and A.8, A and A.9, A and A.10, A and A.11, A and A.12, A and A.13, and/or A and A.15; and/or B and B.1, B and B.2, B and B.3, B and B.4, B and B.5, B and B.6, B and B.7, B and B.8, B and B.9, B and B.10, B and B.11, B and B.12, B and B.13, and/or B and B.15; and/or C and C.1, C and C.2, C and C.3, C and C.4, C and C.5, C and C.6, C and C.7, C and C.8, C and C.9,

20

C and C.10, C and C.11, C and C.12, C and C.13, and/or C and C.15; and/or D and D.1, D and D.2, D and D.3, D and D.4, D and D.5, D and D.6, D and D.7, D and D.8, D and D.9, D and D.10, D and D.11, D and D.12, D and D.13, and/or D and D.15; and/or E and E.1, E and E.2, E and E.3, E and E.4, E and E.5, E and E.6, E and E.7, E and E.8, E and E.9, E and E.10, E and E.11, E and E.12, E and E.13, and/or E and E.15; and/or F and F.1, F and F.2, F and F.3, F and F.4, F and F.5, F and F.6, F and F.7, F and F.8, F and F.9, F and F.10, F and F.11, F and F.12, and/or F and F.13; and/or G and G.1, G and G.2, G and G.3, and/or G and G.4.

## THIRTY-FOURTH SPECIFICATION

## WILLFULLY FAILING TO FILE A REPORT REQUIRED BY LAW

Respondent is charged with committing professional misconduct as defined by New York Education Law §6530(21) by willfully failing to file a report required by law or by the Department of Health, or the Education Department as alleged in the facts of one or more of the following:

34. The facts in paragraphs G and G.1, G and G.2, G and G.3 and/or G. and G.4.

21

## THIRTY-FIFTH SPECIFICATION

## WILLFULLY OR GROSSLY FAILING TO COMPLY WITH FEDERAL, STATE, OR LOCAL LAWS RULES OR REGULATIONS GOVERNING THE PRACTICE OF MEDICINE

Respondent is charged with committing professional misconduct as defined by New York Education Law §6530(16) by willfully or grossly negligently failing to comply with substantial provisions of federal, state, or local laws, rules, or regulations governing the practice of medicine as alleged in the facts of one or more of the following:

35. The facts in paragraphs G and G.1, G and G.2, G and G.3 and/or G and G.4.

## THIRTY-SIXTH THROUGH FORTY-FIRST SPECIFICATIONS

## PERFORMING PROFESSIONAL SERVICES WHICH HAVE NOT BEEN AUTHORIZED BY THE PATIENT

Respondent is charged with committing professional misconduct as defined by New York Education Law §6530(26) by performing professional services which have not been authorized by the patient as alleged in the facts of one or more of the following:

36. The facts in paragraphs A and A.14, and/or A and A.15.

37. The facts in paragraphs B and B.14, and/or B and B.15.

38. The facts in paragraphs C and C.14, and/or C and C.15.

39. The facts in paragraphs D and D.14, and/or D and D.15.

40. The facts in paragraphs E and E.14, and/or E and E.15.

41. The facts in paragraphs F and F.14, and/or F and F.15.

22

## FORTY-SECOND THROUGH FORTY-SEVENTH SPECIFICATIONS

## FAILING TO MAINTAIN RECORDS

Respondent is charged with committing professional misconduct as defined by New York Education Law §6530(32) by failing to maintain a record for each patient which accurately reflects the evaluation and treatment of the patient as alleged in the facts of the following:

42. The facts in paragraphs A and A.13.

43. The facts in paragraphs B and B.13.

44. The facts in paragraphs C and C.13.

45. The facts in paragraphs D and D.13.

46. The facts in paragraphs E and E.13.

47. The facts in paragraphs F and F.12.

DATE: April 27, 2020
Albany, New York

TIMOTHY J. MAHAR, ESQ.
Deputy Counsel
Bureau of Professional Medical Conduct

23

HIGHLLIGHTED PORTION WAS NOT MADE PUBLIC YET
SAVED FOR BEST TIME

The Office of Professional Medical Conduct decided to revoke my license to practice medicine on September 29th, 2021. They released a 58 page 'Determination and Order' (link) to validate their decision.

There have been many articles in the media written about the decision. To date, only one journalist has reached out to me for comment and decided to focus on smut rather than the loss of my license. In the interest of a more important conversation I am making the following statement:

**The lies and fear campaign of one woman:**
In June of 2017 Sarah Edmondson called friends, clients and even the families of friends to say "Something so terrible is happening [I can't say what], but it's so bad you have to get out". She gave no facts and provided no issues, only fear. Eventually, she spread rumors of 'human branding' within the organization, Sarah and others de-enrolled 140+ clients of NXIVM, causing an estimated $1.4 million in damages, according to a then-member of the NXIVM executive board. For this, she was facing possible fraud charges.

July 7th 2017, perhaps to take the heat off of herself, she brought her complaint to the OPMC claiming her consensual receipt of a brand was gross medical misconduct. After her request was denied, the actress turned to her resources in the media.

On October 17, 2017, a New York Times published an article, entitled 'Inside a Secretive Group Where Women Are Branded', she claimed her participation [in the initiation] was non-consensual, that she "thought it [the brand] was going to be a small tattoo", that "for hours muffled screams... filled the room", that she "wept the whole time". She told ABC news "it was worse than childbirth...Imagine a hot laser, dragged across your flesh for 30 minutes without anesthetic." She claimed "she dissociated out of her body (Scared and HBO's 'the Vow'). All of the above are lies, and I have the video to prove it. She knew about the brand before she joined, it was protocol (p. 1718, Trial Transcript). I was invited the same way. She didn't scream once. She breathed deeply for what was less than two mins of pen to skin time. She made fart jokes and bragged about "being a badass...getting a brand after her hallmark audition the day before". She cried (what appeared to be) genuine tears of gratitude at the end as she thanked Ms. Lauren Salzman for inviting her. She emphasized "how important all of this is" and she thanked me and said it looked great. (link to transcript of audio)

Below are excerpts of never-before-released audio from Sarah's branding ceremony [listen to full audio]. They show that Sarah was cheerful, laughed, made jokes, and even expressed gratitude for being invited to DOS:

Sarah: I feel like I might fart though actually… sorry
*(Everyone laughs and someone responds "that's ok")*

Lauren: You're doing great. Fucking awesome!
Sarah: Thank you
Another sorority sister: Warrior Bitches!
Sarah: Thank you for choosing me

*(Lauren kisses Sarah on her cheek)*
Sarah: … this means a lot
*(Lauren strokes Sarah face)*
Sarah: Thank you… I love you.
Lauren: I love you
*(Lauren kisses Sarah again on the cheek and strokes her own hair and returns her hand to Sarah heart)*

Sarah: … It's so funny, I was auditioning for a fucking hallmark movie yesterday. *(women laughing)* … Bridal Bootcamp *(the title said in a humorous, mocking way)* … *(she shakes her head from side to side)* fuck… *(she laughs)*
Another sorority sister: Bridal Bootcamp *(laughs)*
Sarah: … thank you … warrior bootcamp, bitches!" *(laughter)*

Based on the video, the ceremony was full of meaning and also fun, and a celebration of something Sarah had chosen. Yet the story she told in the New York Times was quite the opposite.

…And yet each media outlet bought her crafted story and supported this grown woman's (39 at the time) sob story without thorough fact checking or even questioning her.

**Political and Media Involvement:**
In 2017 NY Gov. Andrew Cuomo decided to "influence" the medical commissioner to prosecute this matter after the OPMC had rendered a written decision to the contrary. When Sarah Edmondson brought her claims to the OPMC in 2017, they issued a written statement concluding that "[T]he issues you [Ms. Edmondson] describe did not occur within the doctor-patient relationship… The issues you describe are not medical conduct… and no further action will be taken." They also encouraged her to take this matter to the criminal authorities if she felt this act was violent or criminal in nature. When she did, this claim was also denied (link).

Instead of stopping this ridiculous allegation there, the Governor and the OPMC buckled under the pressure of the media. As a result, my license has been under investigation for the past 4 years for actions that have nothing to do with the practice of medicine.

**Not the Practice of Medicine:**
The art of branding is done all over the county by non-medical tattoo artists and fraternity members in tattoo parlors. There are no licenses required to practice branding in the state of NY. Therefore, I was not leaning on my medical license for scope. There was no patient-physician relationship. It was unknown to the women who would be helping them with their brands until they arrived. There were no monies exchanged, or insurances billed. In fact, billing codes for

branding don't even exist. It is not taught in medical school and there are no courses or fellowships that so much as mention it. I was taught by the nation's leading body modification artist – not a doctor. But, perhaps most importantly, it does not meet the medical-legal definition for the practice of medicine as clearly outlined in [Section 6251, NY Education Law](#) entitled "Definition of Practice of Medicine":

*"The practice of the profession of medicine is defined as diagnosing, treating, operating or prescribing for any human disease, pain, injury, deformity or physical condition."*

Can someone please tell me what disease, pain, injury, deformity or condition I was treating?

My hard-earned medical license was taken away for actions taken between consenting adults outside the practice of medicine. I have never so much as had one complaint from an actual patient of mine.

**The OPMC:**
Three board members were chosen (by a board that hires/fires them, who are hired/fired by the Medical Commissioner, who is now hired/fired by the Governor [Cuomo]) to evaluate the legitimacy of my case and determine my competence. It is not their job to protect consenting adults from the consequences of their decisions as in the case of Sarah Edmonson. It is, however, their job to distinguish medical practice from personal endeavor. Unless, of course, we want government agencies to dictate to us what we can and can not do in our personal lives, just as our parents did when we were 15.

They were way outside their scope.

The board's lack of judgement, discernment and morality are a matter of great concern for me (and should be for all of us). If boards, political offices and news outlets are run by individuals who have not exercised and refined these skills then we run the risk of accepting oppression and coercion under the guise of security and protection.

**The Consequences:**
Nowhere was it proven that I hurt a single patient, or was grossly neglectful, or gave a patient bad medical treatment, or even misdiagnosed someone. This is the realm where a doctor should be evaluated. Not their belief system, their religion, or their non-medical life. I was stripped of my hard-earned medical license, not because of my failures as a doctor (as I have never, in my entire career, received one malpractice complaint from a single patient or colleague), but because of my personal beliefs and activities outside the practice of medicine. It took merely one former friend (not a patient, not a colleague) complaining, retroactively, about something she not only consented to, but celebrated at the time, to destroy fifteen years of my hard work and ten additional years of dedicated and faithful service.

The ruling in my case ultimately says that physicians must live their lives, both personal and professional, in a way that the OPMC approves of. Frighteningly, it requires a retroactive evaluation by the OPMC to determine that a physician's personal conduct violated their unspecified and undisclosed code. This historic decision grants power to administrative

occupational boards to peer into a physician's personal life and revoke their license(s) for consensual actions taken in "privacy". If this is allowed, even once, by any of us... kiss your civil liberties goodbye.
-
The OPMC released a 58 page justification for their decision. I will address the issues in this justification one by one in coming statements. For now, I'm continuing to evaluate what it means about the rights of all medical practitioners, and all of us as humans, that this was allowed in the United States.

I was stripped of my medical license as a result of a fear campaign incited by one woman willing to lie, the careless and fervent appetite of our culture for gossip, the lack of integrity and rigor of our media to fact check, and the moral weakness of our political leaders and elected court officials.

I will appeal this decision, not just for me, but for all of us.
Please contact me if you'd like to help.

danielle@drdanielleroberts.com
www.drdanielleroberts.com

Danielle Roberts, [06.03.17 22:06]
Ms Edmonson,
We are looking for Ms Obrien. Do you know where she may be?

Sarah Edmonson, [06.03.17 22:06]
She is with me!

Sarah Edmonson, [06.03.17 22:07]
Texting you now.

Danielle Roberts, [06.03.17 22:07]
Thank you!

Sarah Edmonson, [06.03.17 22:07]


Sarah Edmonson, [04.06.17 08:27]
Thanks for your note

Sarah Edmonson, [04.06.17 08:27]
I've been meaning to write

Sarah Edmonson, [04.06.17 08:27]
My brand isn't Healing well

Sarah Edmonson, [04.06.17 08:28]
One line is super thick and painful. And raised. The rest are fine.

Sarah Edmonson, [04.06.17 08:28]
Is that normal?

Sarah Edmonson, [04.06.17 08:28]
What helps? Coconut oil? Vitamin e?

Danielle Roberts, [04.06.17 11:11]
Yes some skin heals that way. You can use coconut oil or lavender

Danielle Roberts, [04.06.17 11:11]
Lets just be mindful of using the b word

Sarah Edmonson, [04.06.17 11:15]
Copy

Danielle Roberts, [04.06.17 13:37]

Sorry for the short answer. We were exploring in groups.
How are you?! Hows your grandpa?!

We miss you?

Danielle Roberts, [04.06.17 13:37]
We miss you.  (Not ?)

Sarah Edmonson, [04.06.17 13:50]
Thanks    He has stomach cancer

Danielle Roberts, [04.06.17 15:54]
Iye. Im so sorry. How is he doing?

Sarah Edmonson, [04.06.17 16:31]
Weak but happy to have his family

Danielle Roberts, [04.06.17 22:07]


Danielle Roberts, [04.06.17 22:07]
How are you doing?

Sarah Edmonson, [04.06.17 22:07]
Rough. U?

Danielle Roberts, [04.06.17 22:09]
A bit of a rollercoaster in coach summit.

You need anything love. I know those situations can wear on you?

Sarah Edmonson, [04.06.17 22:11]
Tell me

Sarah Edmonson, [04.06.17 22:13]
In need some vitamin e oil. Lol

Danielle Roberts, [04.06.17 22:14]
Tell you?

Danielle Roberts, [04.06.17 22:15]
Not sure what you meant by that

Danielle Roberts, [04.06.17 22:15]

Where are you? Im Vancouver?

Sarah Edmonson, [04.06.17 22:26]
U said it was a roller coaster

Danielle Roberts, [04.06.17 22:31]
Ah yes. Building a conscience is painful

Primary meaning:

**Bar** - The horizontal axis represents the path from birth to death, beginning to end, and linear time — life to death, and the dual nature of human existence evidenced by our symmetrical shapes: left and right, male and female, good and evil.

**Alpha** - The letter A (alpha) means the "primary force." In English, the noun is used as a synonym for "beginning." It is derived from the Phoenician and Hebrew letter aleph, an ox or a leader.

**Mu** - According to the Greek Alphabet Code, M (mu) is the "visible nature." From Greek alphabet oracle: *"It is necessary to labor {Mokhtheô}, but the change will be admirable."* (Through toil and distress a change will be made for the better. Hard work will result in a good return.)

Additional meanings:

The design incorporates the Four Elements; a line symbolizing the horizon represents Air, an open triangle symbolizing a mountain, Earth; an angled line symbolizing a wave, Water; and finally, the brand is sealed with Fire. The brand has 7 lines, signifying the 7 Chakras. Triangles represent the desire to rise up as a strong and solid force in harmony and balance with the world around us. Straight lines indicate an unwavering moral code.

In summary:

We started with Alpha because it's the beginning and Mu due to the visible nature of women and progression towards a positive outcome. We added the line to represent the journey, and which also made it 7 lines to reflect the chakras. It's meant to represent our ascension to our ideal selves... committing to grow and uphold our essential nature, to build our capacities to fully express this nature and actualize our individual and shared purposes, in full balance and harmony within ourselves, others and the natural world.

The experience itself harks to traditional rites of passage, where the experience of challenge and pain facilitates an awakening and transition into a state of full responsibility. In addition, the bonding experience that occurs is akin to teams/groups that go through shared hardships or obstacles, creates an experience of deep vulnerability and connection.



**Danielle Roberts**  08:35

Here

Have you shared to TBD story with anyone? Particularly the part  08:35
that I choose to brand them because I waned then to have someone
safe to go to? (Speaking with Nik and evaluating a few things)

Nicki  08:35

**India Oxenberg**  08:36

I chose to brand who? Are you referring to me or yourself

**Danielle Roberts**  08:37

Me... did you include in your story to your fam that I branded you?

**India Oxenberg**



No. I didn't include you in any of the story  08:42

**Danielle Roberts**  08:43

Gotcha! Thanks for the info

## PRELIMINARY STATEMENT

Petitioner submits this Brief in reply to the Brief For Respondent. The Brief submitted on behalf of respondent, The New York State Board for Professional Medical Conduct (the "State Board"), constitutes an effort to distract from the fundamental issue in this case – whether the State Board improperly exercised jurisdiction over petitioner. This effort to prejudice the case against petitioner occurred during the administrative hearing and has continued in this Court. Even in the Preliminary Statement contained in respondent's Brief, the organization that petitioner joined is referred to as a "cult." Whether the women who agreed to join DOS and who voluntarily agreed to receive a brand as part of the initiation ceremony were involved in a "cult" is utterly irrelevant to the misconduct charges brought and sustained against petitioner and to her defense that she was not involved in the practice of medicine when she agreed to serve as a branding technician for the initiation ceremony. Respondent's Brief is also prejudicial when it asserts in Point number 3 of its Questions Presented that "investigators initially decided not to pursue petitioner's actions and instead referred a complaint to law enforcement." In fact, as the letter which was not admitted into evidence by the complaint was rejected by the OPMC because the actions by petitioner that were complained of did not occur within a doctor-patient relationship and did not

constitute professional misconduct under Section 6530 of the Education Law (RR 3527-3530). It was suggested to the complainant that she could file a complaint with law enforcement. This was not a statement involving dual jurisdiction, both administrative and criminal, where the Office of Professional Medical Conduct ("OPMC") was exercising discretion by referring the matter to law enforcement. By stating the fact that the actions complained of did not fall within a doctor-patient relationship, OPMC was stating that it lacked jurisdiction because the allegations did not occur in the practice of medicine.

Consistent with OPMC's letter rejecting the allegations set forth in the Complaint, petitioner has asserted in her main Brief that all of the women who received a brand had agreed to receive a brand before learning that petitioner would be serving as the branding technician (RR   ). None of the women, including the complainant who was the only woman who testified against petitioner, had any idea that petitioner or any other physician would be performing the task (RR   ). Despite this, respondent's Brief states the opposite at page 6 thereof, claiming that "the women knew that she was a doctor" thus implying reliance on this knowledge. The evidence, however, was clear and unrefuted by several women who received a brand that they didn't know that a physician would be performing the branding and they did not consider themselves to be patients of petitioner (RR   ).

Respondent's Brief continues its effort to distract from the real issue by referring to the assertions by S.E. that she was misled (by others, not petitioner) about whether she would be receiving a tattoo rather than a brand; that she was misled about the nature of the brand and its alleged meaning; the amount of pain that she would feel when the brand was being applied; the fact that she was not offered anesthesia; or that the table was not disinfected between brandings. While her testimony was largely discredited, it was utterly irrelevant. It served only one purpose during the hearing and is again serving the same purpose in respondent's Brief – to prejudice the hearing committee and now this Court against petitioner. The claims by S.E., which were set forth in her Complaint that was rejected by the OPMC as noted above, are not relevant to whether petitioner was engaged in the practice of medicine and thus subject to the jurisdiction of the State Board. Nor does the testimony of Bilbao and Cepelinski cited in respondent's Brief about alleged pressure brought to convince women to undergo the branding and keep it a secret have anything to do with the fundamental issue (indeed, the only issue) in this case. (screen for other distractions)

**THE EXPERT TESTIMONY DID NOT ESTABLISH
THAT PETITIONER WAS ENGAGED IN THE
PRACTICE OF MEDICINE WHEN SHE PROVIDED A BRAND
TO SEVERAL WOMEN**

It has been asserted in respondent's Brief that the expert testimony at the hearing below supported the hearing committee's determination that petitioner was engaged in the practice of medicine which justified its assertion of disciplinary jurisdiction. Testifying as an expert on behalf of OPMC was Robert Grant, MD, a plastic surgeon. But Dr. Grant was unable to explain how providing a brand fell within the statutory definition of the practice of medicine. As noted in our main Brief, the practice of medicine is defined in Section 6521 of the Education Law as "diagnosing, treating operating or prescribing for any human disease. Pain, injury, deformity or physical condition," In an effort to fit branding into this definition, Dr. Grant asserted that branding is analogous to cosmetic surgery in that cosmetic surgery is universally considered the practice of medicine and that this is so because cosmetic surgery treats a patient's "psychic pain" (RR    ). [need to address what the reply brief says about grants testimony and the substantiation of the brand beign the practice of medicine "because he says it was" He continued this bizarre analogy by claiming completely without evidence that persons who want to be branded are also experiencing "psychic pain." Apparently, his argument is that since petitioner was treating "pain" she was engaged in the practice of medicine within the statutory definition set forth in Section 6521 of the Education Law. Aside from the obvious facial absurdity and lack of evidence for this position, the fact is that cosmetic surgery is the practice of medicine not because

the surgeon is treating "psychic pain" but rather because the surgeon is treating a physical condition that the patient wants addressed. The condition, for example, could be a nose that is perceived by the patient to be too large, too small or too crooked. But persons who agree to be branded for ceremonial purposes have no physical condition that is being addressed by the branding technician.

Respondent's Brief fails to even mention the underlying basis for Dr. Grant's position undoubtedly because it is too absurd to even defend. perfect

Respondent's Brief also cites the testimony of petitioner's expert as if his testimony supported the hearing committee's determination that petitioner was engaged in the practice of medicine when she provided a brand at the request of several women. Dr. David Mayer testified as an expert on behalf of petitioner. Dr. Mayer is a highly experienced surgeon who has served as a chairman of surgery in the Northwell Health System with supervisory responsibility for over 250 surgeons (including plastic surgeons); he has taught medical students and residents at New York Medical College, Hofstra Medical School and the State University of New York at Stony Brook; and he is also a licensed attorney having graduated *summa cum laude* from the Hofstra University School of Law (RR   ). Contrary to the misleading references in respondent's Brief, Dr. Mayer testified

In my expert opinion to a reasonable degree
of medical certainty, [petitioner] was not

engaged in the practice of medicine when she
performed the branding procedure. In fact, she
was acting as a branding technician or a scarification
artist rather than a physician (RR 1473).

In attempting to respond to petitioner's argument that branding is not the

practice of medicine, respondent's Brief cites *People v. Amber, 76 Misc. 2d 267,*

*273 (Sup. Ct Queens 1973)* which concluded that acupuncture is within the practice

of medicine and *People v. Rubin, 113 Misc. 2d 117, 119 (App. Term 2d Dept.*

*1981*) finding hair implantation to be a medical practice. But both cases actually

support petitioner's position that branding is not the practice of medicine as

defined by Section 6521 of the Education Law. *People v. Amber, supra,* delved

into the history of acupuncture and concluded that it is a form of treatment

intended to relieve the patient of pain or other physical trouble and therefore falls

within the practice of medicine as defined in the Education Law. Id. At 273. The

Court cited the New York Court of Appeals' decision in *People v. Cole, 219 NY 98*

*(1916)* which, in interpreting the precursor to Education Law Section 6521,

concluded that the language of the statute was intended to regulate activities

relieve or cure disease or infirmity. *People v. Rubin, supra*, also supports

petitioner's position. In that case, the question was whether hair implantation

constitutes the practice of medicine within the definition of Section 6521. Therein,

the Court referred to the fact that the defendants were treating the condition of

baldness (alopecia – makes it very medical – even has a specific medical word, lol). Since this was a physical condition, its treatment fell within Section 6521.

Respondent's Brief continues its misleading arguments and citations by arguing at page 22 thereof that it was rational for the hearing committee to find that petitioner operated for a physical condition because she caused second degree burns and created permanent scars on her subjects. While there was substantial testimony at the hearing refuting that the "burns" caused by petitioner were real second degree burns in the way that phrase is commonly used medically (RR    ), the fact is that this is irrelevant to the issue just as it is irrelevant that the branding procedure was painful. The undisputed fact is that the women who agreed to be branded and for whom petitioner provided a brand, had no disease when they came to be branded; they had no pain when they came to be branded; they had no injury when they came to be branded; they had no deformity when they came to be branded; and they had no physical condition that they wanted addressed when they came to be branded. Great and emphatic (suggest changing "be branded" in all of these statements to "to receive a brand") Respondent's Brief cites the hearing committee's analogy of branding to rhinoplasty based on the assumption that rhinoplasty changes the appearance of the nose and branding causes a permanent scar on the skin. But this analogy, of course, misperceives the statutory definition of the practice of medicine. A rhinoplasty addresses a pre-existing condition – a

nose that is perceived by the patient to be too large, too small or too crooked. But the women who wanted to receive a brand for ceremonial purposes and as a symbol of their commitment to the organization they wanted to join had no pre-existing physical condition that was being diagnosed, treated, operated on or prescribed for by petitioner. Respondent's Brief argues at page 23 that petitioner's assertion that the women were all healthy is beside the point because cosmetic surgery often seeks to alter or enhance  a normal patient's appearance. To the contrary, that the women who wanted to be branded were all healthy and had no physical condition that they wanted addressed is not beside the point, it is precisely the point. As noted above, cosmetic surgery patients have a physical condition that they want addressed – the same is not true for branding. The fact that the ceremonial or symbolic brand alters the skin by placing a scar on the skin does not render this non-medical activity into the practice of medicine as defined in the Education Law which, in every instance, refers to a pre-existing condition. (excpect for ear piercing – Grant brought this up, and it is mentioned in the reply brief. Does this argument leave us open to the criticism here? Ear Piercing is however taught to plastic surgeons as mentioned by Dr. Grant I believe)

Respondent's Brief next cites *Y.Y.B. v. Rachminov, 48 Misc. 3d 1055 (Sup. Ct. Queens (2015)* which addresses a circumcision by a religious official and argues that this case somehow supports the proposition that the brandings

performed by petitioner fall within the statutory practice of medicine set forth in Education Law Section 6521. A circumcision performed by a physician is clearly the practice of medicine. It is an operative procedure that treats a physical condition that the patient's parents want addressed. (good) The fact that an unlicensed religious official is permitted to perform the procedure does not alter a physician's obligation to perform this medical procedure in accordance with accepted standards of medical practice. This leaves me wide open to their argument that because I;m a physician I need to up hold the standards of medicine while doent this procedure. Thus, *Rachminov* and similar cases do not stand for the proposition that when a physician is performing a private, non-medical procedure, she must nevertheless observe the same standards as if the procedure were a medical procedure. (how – I don't follow here. Because this is a physical condition, yes – but the physicians need to uphold medical standards when doing it perhaps better refuted or bolsetered IF the unlicenced religious official also need to uphold the standards of medical care in this procedure? – supports that it's medical in nature then and even an unlicensed practictioner needs to uphold that standard. Another thought is that there is training for physicians in this realm, training, courses, ICD-9 codes – this is clearly a medical procedure – not the same with branding.)

Respondent's Brief misperceives the argument raised in petitioner's main Brief that branding is not regulated by New York as are tattooing and body piercing. The point is that physicians who perform tattooing and body piercing are exempt from licensure under Article 4A of the Public Health Law. Thus, when performing these procedures (tattooing and body piercing)

, even if for a non-medical purpose (and not part of medical practice) the State Board could reasonably exercise jurisdiction because the medical license would be legally required to exempt the physician from licensure under Article 4A. The same is not true for branding which is not regulated. No license is legally required and thus cannot serve as a predicate for the exercise of disciplinary jurisdiction.

The balance of the arguments raised in respondent's Brief contain similar logical errors. Respondent's Brief argues that petitioner did not meet accepted medical standards and that this renders her conduct within the jurisdiction of the State Board. But a physician is not obligated to meet accepted medical standards when engaged in an activity that does not constitute the practice of medicine. Before the State Board can discipline a physician for deviating from accepted standards of practice, the Board must first determine that the physician was engaged in the practice of medicine such that medical standards apply (perfect). As noted in petitioner's main Brief, the hearing committee's determination that

petitioner was engaged in the practice of medicine was based on the erroneous concept that physicians are always engaged in the practice of medicine because they possess unique training and knowledge not enjoyed by the general public. When engaged in a private, non-medical activity, a physician need only comply with the standards applicable to the activity. (perfect) (because we say so, or because it's true provable by simple logic – doctors can never divorce themselves from their education, you can't unknow something once you know it, but that doesn't mean you play the role of a doctor or uphold the specific standards of medicine in every role you play in life. You don't do medical histories on your aerobics students as an instructor, provide a full physical exam to a waxing client as an esthetician, or obtain informed consent detailing possible risk of anaphylaxis from your clients before serving a meal as a chef? does it need a metaphor or example – aerobics instructor, massage therapist, or does that weaken it?). In the case of branding, petitioner was only obligated to meet branding standards. She did so and there was no evidence to the contrary. OPMC didn't even attempt to prove to the contrary. (nice) OPMC's expert had no experience with branding and conceded that he was unaware of any medical education or training that addresses the subject (RR   ). (use this more if possible – that there is no medical training or courses or ICD-9 codes) But even if OPMC had proven that petitioner violated accepted branding standards, this still would not subject her to jurisdiction of the

State Board which is charged with enforcing the misconduct laws applicable to the practice of medicine. (very good)

Finally, respondent's Brief argues at page 29 that a patient consent to or even insistence upon certain medical treatment does not relieve a physician from the obligation of treating the patient with the usual standards of care. Petitioner agrees. But the women who received a brand were not "patients" and they didn't perceive themselves as patients (   ). There was no "treatment" rendered to them and petitioner did not depart from accepted standards of medical practice based on her "philosophy" or "religion." She served as a branding technician /artist and met standards commonly applicable to branding – there was no requirement that to meet or apply medical standards because she was not engaged in the practice of medicine. All of the cases cited in respondent's Brief concerning moral unfitness in the practice of medicine are inapposite because the conduct addressed in each of the cited cases was part and parcel of medical practice. The opposite is true here. As noted in petitioner's main Brief, the activity engaged in by petitioner (though not immoral in any way), is irrelevant because it ~~did not fall within~~ did not meet the statutory definition of medical practice; the conduct did not involve patients; the conduct did not occur in a hospital or medical facility and no compensation was received or billed for. (ICD10- codes don't even exist for branding).

**RESPONDENT'S BRIEF FAILS TO JUSTIFY THE EXCLUSION OF THE**

## OPMC LETTER WHICH REJECTED
## THE COMPLAINT OF S.E.

Initially it should be noted that there is nothing in the excluded letter that suggests that an OPMC "investigator" declined to pursue the complaint filed by S.E. (RR   ). The Complaint was rejected by OPMC's Central Intake Unit whose obvious job is to sift through complaints and weed out those that do not fall within OPMC's jurisdiction. (nice) Moreover, the Complaint was not merely "not pursued" by OPMC as alleged in respondent's Brief, It was expressly rejected on the ground that the allegations set forth in the Complaint "did not occur within the doctor-patient relationship…" and "[t]he issues you describe are not medical misconduct as defined in New York State Education Law Section 6530." (very nice) A review of the allegations in the Complaint reveals that they are identical to the testimony provided at the hearing by S.E. (RR 3529-3530). Contrary to the argument raised in respondent's Brief, petitioner does not argue that the letter is dispositive or that an estoppel should bind the hearing committee. Petitioner argues that the hearing committee should have been permitted to see the letter which is 100 percent consistent with petitioner's defense that the allegations against her did not occur within a doctor-patient relationship and do not constitute misconduct under the Education Law Section 6530. It was prejudicial error to exclude the letter, especially on the ground that it was irrelevant. It couldn't have been more

relevant and had the hearing committee been permitted to see the letter it would

likely have effected its decision. (begs the question is why be so prejudicial?)

## PETITIONER WAS NOT OBLIGATED
## TO REPORT THE OUTBREAK OF A MILD,
## SELF-LIMITING VIRUS

It is asserted at page 34 of respondent's Brief that the gastrointestinal

symptoms suffered by a number of attendees at the corporate retreat known as

Vanguard Week falls "squarely within state reporting requirements." This

statement is absolutely not true. Indeed, it is stated in respondent's Brief that

physicians have a duty to report every case of a "communicable disease," "any

unusual disease" and "any unusual disease outbreak." But the regulation in

question, 10 NYCRR Section 2.1 *et. seq.* defines "communicable disease" as any

disease listed in the regulation. There was agreement at the hearing that the disease

outbreak in question was, in all likelihood, a noro virus which is a garden variety

stomach virus – unpleasant, but not lethal which usually takes two or three days to

recover from (RR   ). There was no dispute that the virus was not on the list of

communicable diseases set forth in the regulation (10 NYCRR Section 2.1).

Obviously, if this stomach virus was not a communicable disease it could hardly be

considered a communicable disease outbreak. Moreover, there was agreement at

the hearing below that the virus that broke out was not an "unusual" disease. As

such, it could not be considered an unusual disease outbreak. All that is left of the

reporting requirement is an ambiguous reference in Section 2.1c to the reporting of any disease outbreak. But, as noted in petitioner's main Brief, this reporting requirement is limited by 10 NYCRR Section 2.1b which, in turn, refers to 10 NYCRR Section 2.10 which addresses only communicable diseases and unusual diseases. This makes the reporting requirement far less than clear. Further, no one who contracted the disease was hospitalized and each person recovered completely in a few days as is common with a routine stomach virus.

Respondent's Brief mischaracterizes the expert testimony of Dr. Farber who testified on behalf of OPMC. Dr. Farber admitted that the stomach virus in question was a routine, non-lethal, garden variety type virus (RR720). While he thought it should have been reported, he was unable to say how the "failure" to report this routine virus violated 10 NYCRR Section 2. And while he stated his belief that the virus should have been reported, he did not know of even one instance during his long and distinguished career (of 40 years) where a report was made under similar circumstances (RR   ). Clearly, this is not the widely practiced "standard of care" it's purported to be in the hearing or the reply. Furthermore it's clear, there was no intentional or grossly negligent failure by petitioner to comply with the regulation allegedly violated. Indeed, petitioner had no mandatory reporting requirement at all. And Dr. Farber's admission that he had

never heard of anyone making a report under the attendant circumstances leaves the hearing record devoid of evidence to support a negligence finding.

## CONCLUSION

When OPMC's Intake Unit received the allegations against petitioner, it correctly concluded that, even if true, the allegations did not occur in the context of a doctor-patient relationship (and were not the practice of medicine). For reasons that are unclear, but which likely relate to the high visibility and high profile nature of this case, the allegations against petitioner were resurrected and were then kept from the hearing committee by the Health Department's administrative law judge who ruled that this important letter was irrelevant. This, and many other misleading statements and prejudicial actions (just a portion of which were pointed out in this reply) [tie it back to the preliminary statement] severely prejudiced petitioner. The letter, specifically, was directly relevant to the most important issue in the case – whether petitioner was engaged in medical practice when she provided a brand to women who requested that this be done as part of their initiation ceremony. Petitioner engaged in a purely private, non-medical procedure that was clearly outside of medical practice. The determination by the hearing committee constitutes the improper exercise over this private, non-medical activity in which no one was hurt. That the hearing committee may have believed that

petitioner exercised bad judgment in agreeing to act as a branding technician is of no moment. This does not confer jurisdiction where none exists. This is an infringement on the rights of citizens and doctors a like to decide how they would like to live their lives outside of medicine that is meaningful to them. Allowing a determination like this to stand is a dangerous precedent to set for all doctors and state-licensed professionals. The Determination and Order issued by the hearing committee should be vacated and annulled.

SUPREME COURT OF THE STATE OF NEW YORK
APPELLATE DIVISION: THIRD DEPARTMENT

-------------------------------------------------------------------------x

In The Matter of DANIELLE ROBERTS, D.O.,

Petitioner,

For a Judgment and Order Pursuant to Article 78    Case No.:
of the Civil Practice Law and Rules,                        534554

- against -

THE NEW YORK STATE BOARD FOR
PROFESSIONAL MEDICAL CONDUCT,

Respondent.

-------------------------------------------------------------------------x

## BRIEF FOR RESPONDENT

LETITIA JAMES
Attorney General of the
State of New York
**Attorney for Respondent**
28 Liberty Street
New York, New York 10005
(212) 416-8590

VICTOR PALADINO
Senior Assistant Solicitor General

JAMES M. HERSHLER
Assistant Attorney General
  of Counsel

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES......................................................................iii

PRELIMINARY STATEMENT................................................................1

QUESTIONS PRESENTED....................................................................2

STATEMENT OF THE CASE ................................................................3

A.  The Professional Misconduct Charges .................................................3

B.  The Disciplinary Hearing ...................................................................4

    1.  The Branding Procedures.................................................................4

        *a.* Petitioner ...................................................................................4

        *b.* Other NXIVM and DOS Members .............................................7

        *c.* Expert Witnesses ...................................................................10

    2.  Vanguard Week ...........................................................................14

C.  The Hearing Committee's Determination...........................................16

    1. The Committee Determined That Petitioner's
    Brandings Constituted Medical Practice .....................................16

    2. The Committee Found That Petitioner's Brandings
    Violated Numerous Medical Standards........................................17

    3. The Vanguard Week Outbreak ....................................................19

    4. The Penalty.................................................................................20

i

ARGUMENT ....................................................................... 20

THE COMMITTEE'S DETERMINATION THAT
PETITIONER ENGAGED IN NUMEROUS ACTS OF
PROFESSIONAL MISCONDUCT IS RATIONALLY
SUPPORTED BY THE RECORD ................................................. 20

    A. Petitioner's Branding Procedures Were A Medical Practice
       Within The Committee's Jurisdiction ................................ 20

    B. Petitioner's Repeated Violations Of Medical Standards
       Constituted Professional Misconduct ................................ 27

    C. The Exclusion Of A Letter By Investigators Initially
       Declining To Pursue A Complaint Against Petitioner
       Did Not Deprive Her Of A Fair Hearing By The
       Committee ............................................................. 30

    D. Petitioner Committed Further Misconduct By Failing
       To Report A Large-scale Outbreak Of A Serious Illness ..... 34

CONCLUSION ..................................................................... 38

# TABLE OF AUTHORITIES

CASES                                                        **Page(s)**

*Matter of Adei v. State Bd. For Professional Med. Conduct,*
278 A.D.2d 551 (3d Dep't 2000) ........................................................ 21

*Matter of Anghel v. Daines,*
86 A.D.3d 869 (3d Dep't 2011) ............................................... 24, 27, 37

*Matter of Binenfeld v. New York State Department of Health,*
226 A.D.2d 935 (3d Dep't 1996) ........................................................ 32

*Matter of Charles A. Field Delivery Service, Inc.,*
66 N.Y.2d 516 (1985) ............................................................. 33

*Matter of Conteh v. Daines,*
52 A.D.3d 994 (3d Dep't 2008) ........................................................ 30

*Matter of Elcor Health Services, Inc. v. Novello,*
100 N.Y.2d 273 (2003) ............................................................. 36

*Matter of Gross v. Ambach,*
71 N.Y.2d 859 (1988) ............................................................. 25

*Matter of McBarnette v. Sobol,*
83 N.Y.2d 333 (1994) ............................................................. 31

*Matter of Pardo v. Novello,*
2 A.D.3d 991 (3d Dep't 2003) ............................................................. 24

*Matter of Smith v. New York State Dept. of Health,*
66 A.D.3d 1144 (3d Dep't 2009) ............................................... 29-30, 33

*Matter of Sundaram v. Novello,*
53 A.D.3d 804 (3d Dept. 2008) ............................................... 30, 32

*Metzler v. New York State Bd. for Professional Medical Conduct,*
203 A.D.2d 617 (3d Dep't 1994) ........................................................ 29

*Patin v. State Bd. for Professional Medical Conduct*,
 77 A.D.3d 1211 (3d Dep't 2010) ........................................ 24, 27, 29, 33

*People v. Amber*,
 76 Misc. 2d 267 (Sup. Ct. Queens 1973) ...................................... 21, 25

*People v. Rubin*,
 113 Misc.2d 117 (App. Term 2d Dep't 1981) ..................... 21-22, 25, 28

*Tsirelman v. Daines*,
 61 A.D.3d 1128 (3d Dep't 2009) ................................................ 21, 32-33

*Y.Y.B. v. Rachminov*,
 48 Misc. 3d 1055 (Sup. Ct. Queens 2015) ........................................... 25

## STATE STATUTES

Education Law
 § 6521 ........................................................................... 16, 21-22, 25
 §§ 6530 (2), (3), (4), (5), (6), (20), (26), (31), (32) and (47) .................... 4

Public Health Law
 § 230-c(5) ................................................................................................ 1
 § 230(10)(g) ........................................................................................... 31

## STATE REGULATIONS

10 N.Y.C.R.R.
 § 2.1(a) ................................................................................................ 35
 § 2.1(b) ................................................................................................ 35
 § 2.1(c) .......................................................................................... 19, 35
 § 2.2(d) .......................................................................................... 19, 35
 § 2.10 ................................................................................................... 34

## PRELIMINARY STATEMENT

In this proceeding under Public Health Law § 230-c(5), petitioner Danielle Roberts, a physician, challenges a disciplinary order issued by a Hearing Committee of the New York State Board for Professional Medical Conduct (the "Committee") that revoked petitioner's medical license. Revocation was based on the Committee's finding that petitioner used an electrocautery device to brand seven women on their pelvic areas during their initiation into a cult, causing them to suffer second degree burns and creating permanent scars. The Committee found that petitioner's actions fell within its disciplinary jurisdiction and that she committed professional misconduct by failing to obtain informed consent for the procedures, failing to offer the women anesthesia for the intense pain that they suffered, and otherwise failing to abide by accepted medical standards in performing the medical procedures. It determined that petitioner committed further professional misconduct when, in violation of Health Department regulations, she failed to report a serious disease outbreak at a widely attended event, thereby endangering vulnerable children and elderly participants.

1

The Committee's decision is fully supported by the record and should be confirmed.

## QUESTIONS PRESENTED

1.  Does the record support the Committee's determination that petitioner engaged in the practice of medicine when she used an electrocautery device to brand seven women's pelvic areas, causing them to suffer painful second degree burns and creating permanent scars?

2.  Does the record support the Committee's further determination that petitioner committed professional misconduct by performing the scarring procedures without receiving proper training on the device she used and without taking medical histories, conducting physical examinations, obtaining informed consent, offering anesthesia, using appropriate infection control measures, providing adequate follow-up care or keeping medical records?

3.  Was petitioner deprived of a fair hearing because the administrative law judge did not admit into evidence a letter in which investigators initially decided not to pursue petitioner's actions and instead referred a complainant to law enforcement?

2

4.    Did the Committee correctly determine that petitioner committed further professional misconduct by willfully failing to report to public health authorities a serious disease outbreak occurring at an event that was attended by over 400 persons, including children and other vulnerable individuals?

## STATEMENT OF THE CASE

### A.    The Professional Misconduct Charges

By Amended Statement of Charges, dated April 27, 2020, the New York State Health Department's Bureau of Professional Medical Conduct ("Bureau") charged petitioner with committing professional misconduct when using a cauterizing device to brand seven female patients (A – G) on their pelvic regions, thereby creating permanent scars with the initials "KR" and/or "KAR" (Record [R]43-65).   The Bureau alleged that petitioner deviated from accepted standards of care by, *inter alia*, concealing the brands' meaning and failing to obtain the women's informed consent for their procedures, not taking medical histories or performing physical examinations, failing to offer anesthesia, not using appropriate infection controls or personal protective equipment, failing to provide adequate follow-up care and

3

failing to keep medical records (R43-54). She was charged with, *inter alia*, gross negligence and incompetence, negligence and incompetence on more than one occasion, patient abuse, moral unfitness to practice, fraudulent medical practice, performing services unauthorized by patients and failing to keep medical records, in violation of Education Law §§ 6530 (2), (3), (4), (5), (6), (20), (26), (31), (32) and (47) (R56-65).

The Bureau further charged petitioner with willfully and recklessly failing to report to public health authorities a serious disease outbreak that occurred at an event held in Silver Bay, New York during the summer of 2016 where hundreds of the attendees became severely ill (R54-55, 61, 63-64).

## B.   The Disciplinary Hearing

Petitioner's disciplinary hearing was held on 13 dates from June 2020 to March 2021 during which the three-member Committee heard testimony from 18 witnesses. A summary of the key evidence follows:

### 1.   The Branding Procedures

#### *a.*   Petitioner

Petitioner testified that she was a member of NXIVM, a personal development organization founded by Keith Raniere, and in 2016 she

4

joined a secret women's society known as DOS ("dominant over submissive") that was organized with Raniere's assistance (R962-963, 974, 980-985, 2271-2272). She testified that new DOS enrollees were required to commit to master-slave relationships with their teachers or mentors, submit "collateral" and get branded in their pelvic areas (R967-974, 985-987, 1040-1042, 1117-1118, 1276-1277).

At the request of DOS, petitioner branded 17 women for their initiations (including the 7 patients alleged in the charges) by using an electrocautery device (R991-994, 1042, 1277). The same symbol was used on all of the women, who had no choice about its content (R1160-1164, 1434). Petitioner did not tell them that the brand represented Keith Raniere's initials because that information was given to her in confidence by the society's leaders (R2197-2200, 2232-2233, 2237-2239).

Petitioner testified that the brandings involved a "very systematic" process in which the women were nude, they were held down and pain was an "integral part" (R1117-1118, 1406-1410, 1158-1160, 1272, 1279, 2261). The procedures were intensely painful, causing one or more of the women to scream and move despite being restrained, and they resulted in second degree burns and hypertropic

5

scars (R1325, 1454-1456, 2222, 2248-2249, 2266, 3065). Petitioner did not tell the women how painful it would be, nor did she offer them anesthesia because that was "completely counterintuitive to what they were trying to accomplish" through the experience (R1274, 1320-1321).

Petitioner received only minimal training on the electrocautery device that she used for the brandings (R1005-1016). She did not take medical histories, there was little protective equipment and medical records were not kept (R1070-1072, 1121, 1272, 1285-1288). Nor did she use sterile techniques or recommend prompt follow-up care or painkillers, terming the brandings a "very low risk, noninvasive procedure" that did not require "treatment of a second-degree burn" (R1185-1186, 1292-1293).

Petitioner did not dispute testimony by respondent's expert on the treatment standards for second degree burns (R2265-2267), but said they did not apply because she performed the brandings "as a technician," not a doctor (R1269-1270, 1407, 1411). However, many of the women knew that she was a doctor (R1080-1081, 1407, 1436-1437, 1521-1522), she reviewed photos of the brands and gave instructions on healing (R1103-1107, 1290-1292, 2209). Petitioner conceded that there

6

is an overlap between the skills of a doctor and a branding technician (R3076-3080) and that she could not ignore her medical knowledge when doing the procedures (R1179, 1269, 1295, 1300, 1305).

Petitioner expressed no regrets about her actions and stated that "I loved what we were doing in DOS. I feel very sad that it was twisted into something that it wasn't [and] used to scare people" (R2300-2301). She denied harming the women that she branded, claiming "[e]verybody is willing of their own free will to victimize themselves" and that "[w]e are all indoctrinated . . . in our society" (R2257, 2298).

### b. Other NXIVM and DOS Members

S.E. testified that when recruited by DOS, she was told that her experience would be self-empowering and life changing (R1571-1573). But she first had to submit "collateral" including a nude photograph of herself and a letter admitting to sexual deviance, affairs and drug use (R1565-1571). She said the collateral exerted an "incredible amount of pressure" on her, like a "gun to my head" (R1587-1588, 1592, 1680).

S.E. testified that women at her initiation ceremony knew that petitioner was a doctor and she was comforted when realizing that petitioner would do her procedure (R1581-1583). However, she did not

7

know in advance that she would receive a brand, rather than a tattoo, or that it represented Keith Raniere's initials, and she would not have gone through with the procedure if she knew this (R1579-1584, 1690-1692, 1725-1727). She did not learn the brand's meaning until weeks later and felt defrauded by petitioner (R1626-1630, 1649-1650, 1693).

S.E. suffered "extreme pain" during her branding, describing it as an "acute fire in the most sensitive part of my body" (R1613). She could smell her burning flesh (R1614). She saw brandings of other DOS women where one screamed in pain and flipped off the table and another repeatedly asked to stop her procedure (R1593, 1607-1608).

S.E. further testified that petitioner did not offer anesthesia, the table was not disinfected between brandings, the women were all held down and their procedures were filmed (R1589-1593, 1602, 1607, 1635-video). Petitioner then provided instructions on changing bandages, applying Neosporin and submitting photos of the wounds (R 1598-1600). For any subsequent problems, S.E. was told to see petitioner and no one else, including S.E.'s own doctor (R1697-1698). Her brand did not heal well and she needed to apply ointments and creams for years before having plastic surgery to remove it (R1617-1621). S.E.'s branding video

8

was eventually released to the public after she broke her secrecy vow (R231, 1643-45, 2974-2975).

Vasco Bilbao, a former member of NXIVM, testified that S.E. said she had been deceived and was intensely pressured to go through with her branding (R814-818, 823-825, 849-852). Ariella Cepelinski, also a former NXIVM member, interviewed many women including S.E. who described their DOS experiences as "horrible," the ultimate intention appearing to be to "create an army of obedient women" (R1209-1214, 1218-1223, 1226).

Various members of DOS confirmed that Keith Raniere was the "grand master" or "architect" of the organization (R154, 2921-2923, 2960-2961, 2991), and though ostensibly intended for women's empowerment its enrollees had to submit to lifetime master-slave relationships (R194, 2471-2474, 2594, 2645, 2821-2822). The collateral was meant to ensure the group's secrecy and consisted of items such as the deed to a house or car, nude pictures (R163, 170, 177, 2642-2643), compromising letters to family or friends (R2593-2594, 2886, 2888), and other damaging information (R186, 2820-2821).

9

The DOS members confirmed that new enrollees were purposely not told that the brand symbol concealed Keith Raniere's initials (R167, 196, 203, 213, 228, 2490-2491, 2581-2882, 2800-2804, 2859-2861). They also confirmed that petitioner was known to be a doctor (R888-890, 895-896, 2480-2481, 2869-2870), and said that she was chosen to do the brandings as a skilled person with "a steady hand," "attention to detail," and a "very calm, caring demeanor" who was not "squeamish" (R2861-2862, 2894-2895, 2939).

### c.  Expert Witnesses

Respondent's expert, Dr. Robert Grant, board-certified in general and plastic surgery, regularly uses an electrocautery device as a scalpel and to seal bleeding vessels (R1878-1879, 1889-1897). He testified that using the device requires medical training, including operating under supervision (R1889-1890, 1897, 1903), and described necessary precautions such as testing, electrical grounding, sterility, anesthesia, protective equipment and smoke evacuation and general requirements for taking histories, creating plans of care, obtaining informed consent, providing follow up care and keeping medical records (R1892-1893, 1890-1928, 1944-1945, 1948, 1971-1973, 1982-1998).

Dr. Grant testified that all of these standards applied to petitioner's brandings because, like other cosmetic surgeries, they were painful, invasive medical procedures that reached and altered the deeper layers of skin (R1929, 1932-1935, 1948, 1994-1995). He further stated that reconstructive surgery is necessary to remove a brand, unlike a tattoo (R2051-2052).

After reviewing testimony by petitioner and other witnesses and video and photographic evidence of the brandings, Dr. Grant concluded that petitioner had not followed medical standards of care (R1888-1889, 1914-1915, 1943-1951, 1979-1993). He testified that her deviations were severe because, *inter alia*, her lack of training, the invasiveness of the procedures and the absence of consent discussions, medical histories, proper follow up care and record keeping presented serious risks to the women (R1943-1944, 1951, 1982, 1992-2000, 2053). He saw no legitimate medical purpose for her use of electrocautery on their skin without offering them anesthesia and said that her procedures caused excruciating pain, deep burns and abnormal scarring (R1892, 1904-1905, 1956-1965, 1981-1982, 2029-2030, 2034, 2043).

11

Dr. Grant further testified that medical standards apply to a doctor even if a layperson can perform the same procedure (R1994-1996, 1927-1928, 1932). He explained that doctors cannot enjoy the privileges that are unique to their profession without bearing the responsibilities (R1930-1932, 2046-2047), and while non-physicians can do minimally invasive procedures like body piercing, medical standards apply to physicians who perform them (R1926-1928).

Testifying for petitioner, Dr. David Mayer said that he received medical training on an electrocautery device and uses it for surgery (R2412). He nevertheless claimed that petitioner was not practicing medicine when branding because she could "put aside her white coat" and act "outside the profession of medicine," and was not addressing an abnormal condition like an "oversized nose" (R2441-2444). He said that her non-compliance with medical standards showed that the brandings were not within the practice of medicine (R2355-2357, 2459-2460).

However, Dr. Mayer tacitly admitted that medical practice can extend beyond treating abnormal conditions, such as performing a breast augmentation (R2444). He further conceded that one does not "stop being a physician . . . at different times" and that petitioner used

12

her medical knowledge when evaluating photos of the brands (R2438, 2451-2452). Nor did he dispute that the DOS women had second degree burns, or deny the medical treatment standards enunciated by Dr. Grant (R2382-2384, 2390). He admitted that anesthesia should be offered for painful procedures in medical practice, and that the women's collateral was possibly coercive (R2400, 2445-2446, 2409). Dr. Mayer said that he was "not here to justify" petitioner's actions because they were outside the practice of medicine (R2403-2405). He believed that her deception about the brand's meaning was "more in line of a criminal battery charge" (R2392-2393).

Steve Haworth, also a witness for petitioner, has done many electrocautery brandings and purportedly invented the technique (R2657, 2659). He said that second degree burns are far more painful and damaging than his brandings, which are "more like a scrape" (R2683-2685, 2723). He gave petitioner information on his methods by email and telephone, but never met her (R2661-2663, 3015). Haworth approved of her technique as shown in the video of S.E.'s branding, but could not explain her infliction of second degree burns and said that her

13

practice differed from his due to more frequent "starting and stopping" common for inexperienced branders (R2674-2675, 2702).

## 2. Vanguard Week

In August 2016, petitioner attended Vanguard Week, a celebration of the birthday of Keith Raniere, NXIVM's founder (R1477-1483). She taught fitness classes at the event and described it as a "working vacation" (R2122-2124). Petitioner became aware of the outbreak of an illness causing nausea, diarrhea, vomiting and fatigue, and admits that shutting down and disinfecting the facility was a potential response to prevent spread of the illness (R1484-1485, 1490-1491). But she did not report the outbreak, claiming that it was not her duty because she was not there as a physician (R1495-1498, 1503).

However, E. Carlson, who also attended Vanguard Week, testified that petitioner was seen as a "huge resource" by NXIVM for her expertise in physical health and "a doctor in our community that you could go to" (R2747, 2749). Carlson said that petitioner held exercise classes at the event "to improve . . . body mechanics and get healthier" (R2749-2750).

14

Other NXIVM members who attended testified that people came to the ten-day event from all over the world with their families, including pregnant women and young children (R787-789, 893-894, 1199-1200, 1244-1248). The outbreak spread rapidly and many, if not most, of the 400 attendees became ill with intense nausea, diarrhea and vomiting during the event (R879-882, 1201-1208, 1231-1233).

Bruce F. Farber, M.D., board certified in internal medicine and infectious disease (R1762), testified that "any outbreak of infectious disease needs to be reported to the health department," whether or not a doctor is caring for patients (R1782-1784, 1800-1802). The goal is "to end it as soon as possible and prevent further spread," and that "if there is any question, you report it" (R1787, 1841).

Dr. Farber testified that noroviruses commonly cause outbreaks, are "extraordinarily unpleasant" and are dangerous for vulnerable people due to dehydration (R1779-1780). He has reported many such incidents and stated that, because Vanguard Week was a very large outbreak of a serious disease in a confined facility, petitioner should have known that medical standards required her to report it based on her training and experience (R1776-1777, 1784, 1789-1798). He found

15

her lapse to be significant because the facility needed to be closed immediately and decontaminated (R1785, 1795-1799, 1803-1804, 1836).

## C. The Hearing Committee's Determination

On September 27, 2021, the Committee issued a Determination and Order that sustained the charges against petitioner and revoked her medical license (R 3472-3501).

### 1. The Committee Determined That Petitioner's Brandings Constituted Medical Practice

The Committee rejected petitioner's claim that she did not engage in medical practice when branding the women (R3482). It observed that Education Law § 6521, which defines the practice of medicine, is interpreted broadly by the courts (R3483). It credited Dr. Grant's testimony that the brandings were "surgical" in nature and found it "glaringly obvious" that petitioner "was operating on the women to alter the skin, appearance, and physical condition of their pelvic regions," within the statute's meaning (R3484).

The Committee further determined that it had jurisdiction over petitioner's conduct notwithstanding the lack of specific branding regulations. It noted that doctors are exempted from tattooing and body piercing regulations because "it is presumed that appropriate

16

medical standards will apply" to their conduct, and that such activities
are medical procedures when performed by doctors (R3486).

The Committee was not persuaded by petitioner's claim that she
could "compartmentalize" her life, cast aside "her privileged status as a
licensed physician with specialized knowledge" and brand the women as
a technician (R3487). It found her testimony evasive and contradictory,
diminishing her credibility (R3481-3482) (*e.g.* R1044-1046, 1049, 1059-
1066, 1079). It noted that she admittedly relied on her medical
background "in everything she does" and that her status as a doctor was
well known in the NXIVM community (R3488).

## 2. The Committee Found That Petitioner's Brandings Violated Numerous Medical Standards

The Committee determined that petitioner violated many
professional standards when performing the branding procedures. It
found that she lacked "serious and proper training in using an
electrocautery device," noting testimony by her witness that he never
causes second degree burns whereas visual evidence and witness
testimony showed that she caused intensely painful second degree
burns (R3489). The Committee found that her "poor technique was
obvious" from the video of S.E.'s branding, "which showed sparks and

17

fire from the electrocautery device as she moved it across the skin"
(R3489). It concluded that she lacked an understanding of how the
device worked, the dangers in using it directly on the skin and the
substantial pain and trauma that she caused (R3490).

The Committee credited Dr. Grant's opinion that "it is unethical
for physicians to intentionally cause patients such harm" and that
petitioner's severe deviations from medical standards "risked causing
the women cauterized even deeper burns from not being able to remain
still during the procedure," wound infections and psychological trauma
(R3490-3492). It concluded that her failure to take medical histories,
perform physical examinations and keep medical records created
additional dangers, and that she should have known to discuss the
risks, benefits and alternatives to the branding procedure with the
women in order to obtain their informed consent (R3493-3494).

The Committee was particularly concerned about the coercive
material submitted by the women and petitioner's failure to inform
them of the brand's meaning (R3494-3495). It found that her "medically
reckless" procedures violated the strict prohibition against doctors
"going above and beyond what the patient expects," constituting fraud,

18

performing unauthorized services, moral unfitness to practice and patient abuse (R3496-3497).

### 3.    The Vanguard Week Outbreak

The Committee held that petitioner committed further misconduct by her willful and negligent failure to comply with state requirements to report to public health authorities the widespread disease outbreak that occurred during Vanguard Week (R3498).

The Committee found that the definition of a "disease outbreak" which must be reported under 10 NYCRR §§ 2.1(c) and 2.2(d) was met because numerous attendees at the event, held in a confined location, suffered similar gastrointestinal symptoms (R3498). It credited Dr. Farber's testimony that petitioner should have known it was her duty to report the outbreak from her medical training and experience, even if on vacation (R3497-3498). It considered her failure to be "especially egregious" because of the potentially dangerous consequences for sick, elderly and other vulnerable people and the need to close the facility to prevent further spread of the disease (R3498).

19

### 4. The Penalty

The Committee found that petitioner's many acts of professional misconduct in this case showed that she abdicated her responsibilities as a physician (R3499). It was deeply concerned by her lack of remorse and observed that "instead of holding herself accountable for harming" S.E., who was severely traumatized by the branding, she accused S.E. of "victimizing herself" (R3499). The Committee determined that license revocation was necessary because petitioner's "distorted reality" presented the risk that others would be vulnerable to similar misconduct if she were to continue practicing (R3500).

This proceeding ensued.

## ARGUMENT

## THE COMMITTEE'S DETERMINATION THAT PETITIONER ENGAGED IN NUMEROUS ACTS OF PROFESSIONAL MISCONDUCT IS RATIONALLY SUPPORTED BY THE RECORD

### A. Petitioner's Branding Procedures Were A Medical Practice Within The Committee's Jurisdiction.

There is no merit to petitioner's argument that her brandings were a non-medical practice that was beyond the Committee's disciplinary authority. Quite the contrary, the record amply supports

20

the Committee's finding that her performance of these procedures was subject to numerous medical standards.

Judicial review of the Committee's determination "is limited to whether it is supported by substantial evidence." *Tsirelman v. Daines*, 61 A.D.3d 1128, 1129 (3d Dep't 2009). Of particular relevance here, the question of "[w]hether the alleged misconduct actually occurred within the practice of medicine is a factual determination to be made by the [Hearing] Committee which will not be disturbed if it has a rational basis." *Matter of Adei v. State Bd. For Professional Med. Conduct*, 278 A.D.2d 551, 552 (3d Dep't 2000).

Education Law § 6521 defines the practice of medicine as "diagnosing, treating, operating or prescribing for any human disease, pain, injury, deformity or physical condition." As the Committee observed, this law has been broadly interpreted by courts and the determination of whether conduct falls within it must be based on the facts presented "and not upon the name of the procedure, its origins or legislative lack of clairvoyance." (R3483) (quoting *People v. Amber*, 76 Misc. 2d 267, 273 (Sup. Ct. Queens 1973) (finding acupuncture within the practice of medicine); *see also People v. Rubin*, 113 Misc.2d 117, 119

21

(App. Term 2d Dep't 1981) (finding hair implantation to be a medical practice).

The evidence in this case showed that petitioner's branding procedures were excruciatingly painful and resulted in permanent and abnormal scars that would require sophisticated plastic surgery to repair (R129-151, 564-599, 1593, 1607-1608, 1613, 2051-2052). The Committee rationally credited Dr. Grant's expert testimony that petitioner's invasive procedures, which caused second degree burns and reached the deeper layers of skin, constituted "operating" within the meaning of medical practice (R3484-3485). *Cf. Rubin*, 113 Misc.2d at 119 (hair implantation is the practice of medicine because, *inter alia*, it involves "violation of the scalp by a foreign object" and "potential or actual complications resulting from such procedure").

Petitioner even concedes that her electrocautery procedures "arguably" could be considered "operating" within Educ. L. § 6521, but nonetheless claims there is no evidence that she addressed a "physical condition" (Br. at 10). However, it was rational for the committee to find that petitioner "operat[ed]" "for" a "physical condition" when she caused second degree burns and created permanent scars on her

22

subjects. The Committee found that "just as rhinoplasty to change the appearance of a nose alters the physical condition of the face [the petitioner's] branding to inflict a permanent and very visible scar alters the skin, appearance, and physical condition of the pelvic region" (R3485-3486). Her claim that the women were healthy (Br. at 10) is beside the point - - cosmetic plastic surgery is often performed to alter or enhance a normal patient's appearance (R1926-1927, 2444).

Petitioner's further claim that she could simply cast aside her physician's role when branding the women (Br. at 14-15) is likewise difficult to reconcile with the painful, violative nature of the procedures. The Committee was not required to accept this excuse, especially when she lacked credibility and admittedly relied on her medical background "in everything that she does" (R3488). Record evidence showed that petitioner's status as a doctor was well known, she was chosen to perform the brandings for her specialized skills and DOS enrollees were relieved knowing that it was her doing their procedures (R3488). Indeed, her expert conceded that doctors cannot simply forget their training, while declining to defend her ethics (R2438, 2451).

23

The Committee rationally credited Dr. Grant's testimony that a doctor can never simply cast aside professional responsibilities and deem herself to be a mere "technician" when performing a medical procedure (R3487). It agreed with his firm statement that "given the privilege of being a physician comes with responsibilities. You can't decide when you are going to enjoy the privileges, but not have the responsibilities" (R3487). Moreover, to the extent his testimony conflicted with the views of petitioner's expert, the Committee carefully explained why it found Dr. Grant more convincing (R3484-3486). Making these credibility determinations and weighing the evidence are the Committee's sole province. *Matter of Anghel v. Daines*, 86 A.D.3d 869, 872 (3d Dep't 2011); *Patin v. State Bd. for Professional Medical Conduct*, 77 A.D.3d 1211, 1214 (3d Dep't 2010) (rejecting doctor's excuses for not taking patient histories or performing physical examinations after finding him "evasive on questioning"); *Cf. Matter of Pardo v. Novello*, 2 A.D.3d 991, 992 (3d Dep't 2003) (finding ample basis for misconduct findings despite expert witness's "guarded testimony" supporting physician's "marginal or outright lacking" conduct).

24

Petitioner fails to address, much less distinguish, the cases relied on by the Committee which hold that while a procedure such as circumcision is not a medical practice when done by a religious official, it is when performed by a physician (R3487). *See, e.g. Y.Y.B. v. Rachminov*, 48 Misc. 3d 1055, 1059 (Sup. Ct. Queens 2015). Nor can she reasonably deny the Committee's common sense rationale, based on those cases, that while a layperson may perform a given procedure, when doctors undertake such treatment they are bound by the established standards of their profession (R3486).

Equally unavailing is petitioner's reliance on the lack of branding regulations in New York (Br. at 16-17). The State is not required to enact specific rules for every single procedure that a doctor may perform in governing the vast field of medical practice. *Cf. Matter of Gross v. Ambach*, 71 N.Y.2d 859, 861 (1988) (finding autopsies constitute medical practice despite the lack of an explicit statutory reference); *People v. Amber*, 76 Misc. 2d at 273 (Legislature was not required to envision accupuncture when enacting Educ. L. 6521); *Rubin*, 113 Misc.2d at 119 (*accord*). As the Committee aptly reasoned, it is presumed that accepted standards will apply to a given medical

25

procedure performed by a physician even in the absence of specific regulations (R3486).

Similarly, the fact that laypersons can purchase electrocautery devices and do brandings does not obviate a physician's duty of care (Br. at 3). Anyone can also buy and use tweezers, bandages, a stethoscope, a blood pressure kit, over the counter pills, etc. However, when removing splinters, dressing wounds, checking heart rates, taking blood pressures and recommending medications, physicians are held to higher standards by virtue of their training and license to practice medicine.

As a final matter, petitioner asserts that the Committee's decision implies that doctors will not be able to hold exercise classes or chaperone elementary school students without performing EKG tests, doing physical examinations and taking medical histories (Br. at 18). But she cites no authority that accepted practice standards reasonably contemplate those extreme measures. Nor would routine, non-medical activities be comparable to the type of invasive, traumatizing procedures seen in this case that "physically and permanently altered [women's] bodies" (R3494).

26

## B. Petitioner's Repeated Violations Of Medical Standards Constituted Professional Misconduct.

In its exhaustive determination, the Committee cited abundant evidence that petitioner violated numerous medical standards of care applicable to her branding procedures and that her misconduct reached egregious levels due to the risks involved.

The Committee relied on voluminous testimony by Dr. Grant, petitioner and her own expert witness, the accounts of various NXIVM and DOS members, scar photos and a video recording of a branding by petitioner. This evidence demonstrated petitioner's severe medical lapses, including negligent and incompetent use of the electrocautery device, failing to take medical histories and perform physical examinations, failing to obtain informed consent, ignoring infection controls, neglecting adequate follow up care and keeping no medical records (R3474-3481, 3488-3497). While petitioner disputes the evidence, the "assessment and resolution of conflicting evidence and witness credibility are within the exclusive province of the Hearing Committee." *Patin*, 77 A.D.3d at 1214-15 (confirming findings of negligence, incompetence and fraud based on, *inter alia*, a physician's own admissions and lack of credibility) (citations omitted); *Anghel*, 86

27

A.D.3d at 872, 875 (deferring to hearing committee's resolution of conflicting expert testimony).

Rather than defending her practices, petitioner largely rests on her contention that they were simply outside the Committee's jurisdiction for lack of a "nexus" to the practice of medicine (Br. at 14). But her case is not comparable to situations where doctors committed acts that were extraneous to the practice of medicine, such as making unwarranted sexual advances to co-workers (Br. at 12-13). Here, petitioner's misconduct arose directly from her use of an electrical surgical instrument to cause second degree burns and create permanent, abnormal scars. *Cf. Rubin*, 113 Misc.2d at 119. Petitioner's claim that her very failure to abide by accepted standards of care when performing the brandings proves that her acts were unregulated (Br. at 6, 15) cannot be right. Her position, if accepted, would incentivize other doctors to forgo medical standards in order to avoid disciplinary review, an unacceptable result.

Equally flawed is petitioner's claim that the "usual indicia of medical practice" were absent because "branding was simply part of a ritual" for which critical items such as medical histories, physical

28

examinations and anesthesia for pain were irrelevant (Br. at 14-15). To the contrary, this Court has held that "[t]here are no different standards for licensed physicians based on their philosophy, religion or personal approach to their calling," and that "[i]t is well settled that a patient's consent to or even insistence upon a certain treatment does not relieve a physician from the obligation of treating a patient with the usual standard of care." *Metzler v. New York State Bd. for Professional Medical Conduct*, 203 A.D.2d 617, 619 (3d Dep't 1994) (confirming license revocation for homeopathic physician who did not recognize the necessity for physical examinations and laboratory testing).

Ample evidence in the record supported the Committee's determination that petitioner's many deviations from practice standards reached egregious levels. It found that she chose her allegiance to the NXIVM and DOS organizations over her profound responsibilities as a physician (R3499), to the point of concealing the meaning of the symbols that she painfully emblazoned on the women in this case. Her conduct showed a "deliberate deceit which violates the trust the public bestows on the medical profession." *Patin*, 77 A.D.3d at 1215. *Cf. Matter of Smith v. New York State Dept. of Health*, 66 A.D.3d

29

1144, 1148 (3d Dep't 2009) (confirming misconduct findings against plastic surgeon who conducted false evaluation for a breast augmentation); *Matter of Conteh v. Daines*, 52 A.D.3d 994, 996 (3d Dep't 2008) (confirming fraud and moral unfitness charges against doctor for prescribing controlled substances without sound medical reasons).

**C.    The Exclusion Of A Letter By Investigators Initially Declining To Pursue A Complaint Against Petitioner Did Not Deprive Her Of A Fair Hearing By The Committee.**

Petitioner further claims that the Committee's determination should be annulled because the administrative law judge excluded from evidence a letter in which the Office of Professional Medical Conduct (OPMC) initially declined to pursue S.E.'s complaint (Br. at 20-22). This contention too is meritless.

It is well-established that the petitioners in these proceedings are "not entitled to the same due process rights afforded to criminal defendants" and that the Committee "is not bound by traditional rules of evidence." *Smith*, 66 A.D.3d at 1147. Thus, in order to warrant annulment, "an erroneous evidentiary ruling must infect the entire proceeding with unfairness." *Matter of Sundaram v. Novello*, 53 A.D.3d 804, 806 (3d Dept. 2008) (citations omitted). That is hardly the case

30

here since the letter in question was irrelevant and its exclusion did not deprive petitioner of a fair hearing on the charges.

The essential point overlooked by petitioner is that while the OPMC conducts investigations, it does not decide disciplinary cases. She fails to suggest how the OPMC's opinion regarding a misconduct complaint constituted evidence when the Committee has sole authority to make findings of fact and conclusions of law in professional misconduct cases. *See* PHL 230(10)(g). The excluded letter did not contain any *factual* material relevant to the charges of professional misconduct, but rather stated an investigator's legal conclusion that was not binding on the Committee. Moreover, while the OPMC initially directed the complainant to law enforcement authorities (R3527), it ultimately brought a misconduct investigation against petitioner after she was not criminally charged.

This case is unlike *Matter of McBarnette v. Sobol*, 83 N.Y.2d 333 (1994) (Br. at 21), where a physician wanted to introduce a complaint made against him to cross-examine the patient. Here, the petitioner had no similar purpose but instead wanted the OPMC's letter in evidence so that the Committee could "see what allegations had been

31

rejected" (Br. at 22). However, that would have invited pointless speculation since the OPMC does not rule on misconduct charges, and the disciplinary case the Bureau brought against petitioner years later involved many more women that she branded, photographic and video evidence of her procedures and lengthy testimony by both sides. The essential point is that petitioner had ample opportunity to defend the case at her hearing, including presenting testimony by her expert on whether she had engaged in medical practice. *Cf. Sundaram*, 53 A.D.3d at 807 (exclusion of medical texts at physician misconduct hearing was non-prejudicial because both sides presented experts on the relevant issues); *Tsirelman*, 61 A.D.3d at 1131 (rejecting evidentiary claim where the excluded records were redundant and irrelevant).

Petitioner's argument boils down to an estoppel theory that would bind the respondent to a preliminary decision made by its investigators. But estoppel is generally unavailable to prevent an agency from enforcing its administrative duties. *Matter of Binenfeld v. New York State Department of Health*, 226 A.D.2d 935, 936 (3d Dep't 1996) ("[i]n all but rare cases, estoppel cannot be invoked against a governmental agency to prevent it from discharging its statutory duties"). Nor is this

32

a situation where administrative *stare decisis* would apply, because the Committee made no prior determination that could be binding on it. *Cf. Matter of Charles A. Field Delivery Service, Inc.*, 66 N.Y.2d 516, 517 (1985) ("A decision of an administrative agency which neither adheres to its own prior precedent nor indicates its reason for reaching a different result on essentially the same facts is arbitrary and capricious").

The exclusion of OPMC's letter hardly tainted the entire proceeding or deprived petitioner of the opportunity to fully defend the charges. Consequently, she does not approach the high threshold for setting aside a disciplinary determination based on evidentiary error. *Tsirelman*, 61 A.D.3d at 1130 (petitioner must show that an evidentiary error "infected the entire proceeding with unfairness"); *Smith*, 66 A.D.3d at 1147 (finding no merit to physician's claim that he was substantially prejudiced by reference in the prosecutor's opening statement to a charge that was later withdrawn).

33

## D. Petitioner Committed Further Misconduct By Failing To Report A Large-scale Outbreak Of A Serious Illness.

Petitioner also challenges the Committee's determination that she committed further misconduct by failing to report to public authorities the widespread disease outbreak at Vanguard Week. Her argument, however, relies on an unduly restrictive interpretation of state reporting requirements, while ignoring unrebutted evidence by respondent's expert that she violated medical standards by failing to report the outbreak of a highly infectious and potentially dangerous illness (Br. at 22-27).

The evidence in this case showed that many of the over 400 Vanguard Week attendees became acutely ill with similar gastrointestinal symptoms in a short period of time, falling squarely within state reporting requirements (R3498). In relevant part, these regulations provide that "it shall be the duty of every physician to report" to local public health authorities every case of a "communicable disease," any "outbreak of communicable disease," "any unusual disease" and any "unusual disease outbreak" (10 N.Y.C.R.R. § 2.10). They further require that all such reports be immediately forwarded to

34

the State Department of Health (10 N.Y.C.R.R. § 2.1 (b)), and that any "disease outbreak" or "unusual disease" shall *also* be reported to the State Department of Health. 10 N.Y.C.R.R. § 2.1(c).

Contrary to petitioner's analysis (Br. at 25), these regulations are not limited to the communicable diseases listed in 10 N.Y.C.R.R. § 2.1(a) or "unusual diseases." Petitioner misreads the requirement that doctors must also report "any disease outbreak" to the Department of Health (Br. at 25). *See* 10 N.Y.C.R.R. §§ 2.1(c). Because section 2.1(b) already requires "communicable" and "unusual" disease reports to be forwarded immediately to the State Health Department, section 2.1(c)'s requirement that "any disease outbreak" be reported is meaningless if limited to those illnesses.

Further, the Committee's straightforward view of this regulation (R3497-3498) does not extend to routine or seasonal colds, strep throats and the like, as petitioner contends (Br. at 25). The regulations define an "outbreak" as "an increased incidence of a disease above its expected or baseline level," providing indicative factors such as the "size and type of population exposed" and "time and place of occurrence," precluding an unnecessarily wide reach. *See* 10 N.Y.C.R.R. § 2.2(d).

35

Petitioner's reading of the regulatory scheme, on the other hand, would eliminate the reporting requirement precisely when it is critical, namely, when a large event attended by people from various locations, including children and other vulnerable individuals, is struck by a rapidly spreading disease (R787-788, 893-894, 1199-1200, 1794-1795). Even if her narrow view of a doctor's reporting duties made sense, the Committee's rational interpretation of its own agency's regulation should be deferred to "in the absence of weighty reasons." *Matter of Elcor Health Services, Inc. v. Novello*, 100 N.Y.2d 273, 280 (2003) ("That the Department's interpretation might not be the most natural reading of the regulation, or that the regulation could be interpreted in another way, does not make the interpretation irrational").

For similar reasons, petitioner's claim that the Committee's determination lacked evidentiary support (Br. at 26-27) is meritless. Contrary to her contentions, Dr. Farber did not view the Vanguard Week outbreak as a "routine," "garden variety" illness limited to a small community function, but testified that it was "very unusual" and "one of the largest" disease outbreaks he has seen in New York (R1795, 1820, 1836). He has reported many outbreaks of norovirus, the likely

36

infectious agent, and gave unrefuted testimony that medical standards required a doctor to report it to the Health Department so that the facility would be closed to prevent further spread of the highly contagious disease (R1784-1789, 1796-1798). He firmly stated that physicians have this duty whether or not they are taking care of patients, "morally, ethically and legally" (R1776-1777, 1783-1784).

The Committee was not compelled to accept petitioner's excuses for failing to comply with a critical infection control requirement. The evidence showed that she knew about the outbreak, that her status as a physician was well known in the NXIVM sphere, and that she even engaged in health-related activities at the Vanguard Week event (R1484-1485, 2747-2750). Moreover, the fast-spreading illness was a potentially serious health threat for attendees and anyone else infected who had co-morbidities (R1779-1780). Consequently, there was ample support for the Committee's determination that petitioner's failure to report the outbreak was egregious and constituted professional misconduct (R3498-3499). *Cf. Anghel,* 86 A.D.3d at 872 (finding substantial evidence that physician willfully failed to comply with laws

37

regulating medical practice after inferring his knowledge of laboratory certification requirements from the record facts).

## CONCLUSION

The Committee's determination should be confirmed and the petition should be dismissed.

Dated: New York, New York
       November 22, 2022

                              LETITIA JAMES
                              Attorney General of the
                              State of New York
                              **Attorney for Respondent**
                              By:

                              James M. Hershler
                              Assistant Attorney General
                              28 Liberty Street
                              New York, New York 10005
                              (212) 416-8590

VICTOR PALADINO
Senior Assistant Solicitor General

JAMES M. HERSHLER
Assistant Attorney General
    of Counsel

38

## CERTIFICATE OF COMPLIANCE
## PURSUANT TO 22 NYCRR § 1250.8(j)

The foregoing brief was prepared on a computer. A proportionally spaced typeface was used, as follows:

Name of typeface: Century Schoolbook
Point size: 14
Line spacing: Double

The total number of words in the brief, inclusive of point headings and footnotes and exclusive of signature blocks and pages including the table of contents, table of citations, proof of service, certificate of compliance, or any authorized addendum containing statutes, rules, regulations, etc., is 7325.

**AFFIRMATION OF SERVICE**

James M. Hershler, an attorney duly admitted to practice before the Courts of this State, declares and affirms under the penalties of perjury that the following is true and correct:

On November 22, 2022, I served the following document:

- BRIEF FOR RESPONDENT

upon counsel for the petitioner in this proceeding:

Anthony Z. Scher, Esq.
800 Westchester Avenue
Suite N-641
Rye Brook, New York 10573

by depositing a true copy of the same enclosed in a postage prepaid Fedex Overnight Mailing envelope directed to said attorney at the above address in an official Fedex depository located in New York, NY.  Additionally, I emailed a copy of said document to petitioner's counsel on this date to woodscher@aol.com .

Dated: New York, NY
     November 22, 2022

_____
James M. Hershler

Please delete this here  11:14 PM

It looks great though.  Any concerns?
11:15 PM

Ops sorry!!  11:24 PM

Just wasn't sure about the white
11:25 PM

JUNE 29, 2017

Hey Danielle. Sally passed on what you said about me. Would you like to speak to me directly?  11:52 AM

JULY 3, 2017

I guess not. So much for honour.
10:46 AM

TODAY

Hi Dr Roberts! So, my scar is really not healing well. Any medical tips?
2:45 AM

Type a message

Roberts - 230

Allison Mack:
Hey love!

Hows it looking for branding??

Danielle Roberts:
Still waiting for the machine.... 😔

I was just thing about this last night. I'm going to track it today

I want to practice a bit Bellmore I touch another human 😱

*I want to practice a bit before I touch another human

Hi M...

How are you?

I have a big fear coming up around the branding... I'd lie to EM it with Dani ASAP...

Does she know about that?

I'd love to talk to you about it too. It has to do with my attachment to having a man female relationship in the future... I think the same thing that came up during our friendship breakfast.

I have an EM with Crystal today. I'm excited to work that.

Let me know if you can talk soon. Xoxo I'm sad I missed our time together

Allison Mack:

Yes you can speak to dani amiga. She knows.

And yes we can talk. Whats your scheudle?

Roberts - 232



OK good news...
so I have the machine!

Bad news...

There's no workable attachments for the branding instruments...

These don't fit...

There is a number on the side.. I will call and trouble shoot.. I'm going to need to find the hand held part of the tool and order it...

Then I'll be able to practice 😋


Update...
The machine that Steve recommended and I ordered apparently is ancient.  It didn't come with the pencils and needle tips I need to start... I found some leads as to where I can order them and left messages...

Medtronic (a manufacturuer) closed after Thursday. I was hoping to get the parts from the rep but no such luck. She doesn't have them.
They are closed until Jan 2nd.

I have the product numbers and will do some more searching. I'm so sorry for the delay.

I hope your having a beautiful Christmas Eve ❤️🎄🌨️🌲



Allison Mack:
So whe

Danielle Roberts, [01.01.17 23:06]
n will branding happen?

Danielle Roberts:
I'll let you know an estimate shortly

If I can't find another store to order parts from then the earliest I'll be able to order them from Medtronic is January 2nd. That's when they reopen. If that's the case I'll overnight them and practice in the next few days. It's possible we could do it before coach Summit at the latest after pennies Memorial.

Roberts - 234

If I can find another company then I'll have them ship the parts right away and we can do it next week

Danielle Roberts:
Hmmm. I didn't know about it

I'll talk to them...and coordinate the ==brand==ing equipment I may be able to have it sent by tomorrow

Allison Mack:
Beautiful. The plan for nyc just happened

Wouod be good fornyou to be there

Danielle Roberts:
Coordinating now

Allison Mack:
Ok love

Danielle Roberts:
I'll let you know by this evening...😘

Allison Mack:
We may be able to ==brand== in nyc??

Danielle Roberts:
I have no practice yet... I'd want to make sure I have a few grapefruits and maybe a flank steak under my belt before I touch my sisters.. 🐵

But I'll try

Allison Mack:
Hahaha... we could do Saturday... or Sunday?? If you get the parts by tomorrow??



Branding update?

Danielle Roberts:
Driving in the snow in... Write you soon

M*

Branding: I sent the reciept. It will be shipped today that was the soonest I could get it. I will be here likely tues... I will practice and likely do the day before coach summit starts

Roberts - 236



**Danielle**                                                                                    9:10:18 AM

Someone has also called another hospital to tell them I am
having inappropriate relationships with my patients.



**Danielle**                                                                                    10:48:58 AM

From Barry Meier NYT this morning:

"Dear Dr. Roberts. As I believe you are aware I have reached out
to you numerous times in connection with an article in The New
York Times about Nxivm and branding. I anticipate that this
article with refer to a complaint filed with the NYS Dept of
Health that alleges you performed branding. As I stated be fore
I am eager for your comment. This article is likely to appear
shortly. Kindly contact me by 5PM today Tuesday October 17.
Thank you."


It was texted wjile I was driving and my autoreply texted back.


"[Auto-Reply]  I'm driving right now – I'll get back to you later."

It was the times union that called St. Peter's hospital with a            10:57:55 AM
"patient" of mine that has a brand on their "vagina"

**Keith Raneire**                                                                                12:17:45 PM

KR

**Keith Raneire**      12:17:45 PM

I am so sorry about all this honey... I'll be back late tonight... If someone was branded on their vagina it was not you... but even if it were I guess women just can't make those decisions for themselves...

**Danielle**      12:26:14 PM

Yeah... vagina... hip area same thing

**Keith Raneire**      12:27:28 PM

Up to the collar bone I think... it's been a long time since I studied anatomy, I'm rusty

**Danielle**      12:28:52 PM

Ha yeah! I think you go up to the collar bone through the vagina

SE recites the initial statement expressing she wants to be branded. There is a secret dialog exchange and then SE gets on the table. For the rest of the transcript, every time it says "dialog exchange," assume it's a secret of the sisterhood.

The women position themselves around her and voices can be heard.

Woman A, as she positions herself to hold SE's leg says, "so tell me how this feels…"
SE states, "I need more…"

Woman A "on the other leg?"

SE, moving her arms to indicate that they are movable "… on my elbow"
Woman B moves to support the elbows, gains visual agreement on what is needed – removes support to wait for the process to begin.

Woman A "is this ok, the way I'm sitting now?"
SE: "yeah"

SE, closing her eyes, starts doing deep yoga breathing (she had told us it was yoga breathing)
There's a bunch of talking… Woman D (the individual who will be applying the brand) is getting the equipment ready, etc. SE continues to breathe deeply.

Woman B, "do you have to do personality studies in the morning?" (we were to start jness the next morning and we were assessing what time we needed to arrive)
It's not quite clear what is said, but SE smiles in response

Woman A "… again and again and again…" (joking about how many times we have filled out the paperwork for the study) Everyone laughs

SE: "I am apt to show off my body" (joking about a question on the paperwork) Everyone laughs and SE has a big smile on her face

Woman C (who is sitting above SE holding her hands) leans down and says something unclear to SE. SE responds, "sure"
SE says something unclear back to Woman C, Woman C responds "Ok, you tell me when."

SE: "I feel like I might fart though actually… sorry" Everyone laughs and someone responds "that's ok"

Someone jokes, "you won't be able to smell it over the smell of burning skin"

SE: "are we doing a new needle?"
Woman D responds: "Yes"
SE: "What happened?"

A few of the women respond "dropped it"

SE: "Oh… thank you"

Woman E exclaims: "drop that shit like Drake… drop it like it's hot!"

Woman A laughs

SE starts rapping though it's hard to make out the words clearly

Woman D is ready to start.  She stands and says "ready?"

All the women get into position to help offer moral support and physical support so there are no involuntary movements that could disturb the line work.

SE takes a deep breath.

Woman D: "We'll just do a touch first so you know what it feels like."

Woman D: "ready, touch." It's brief, you can hear the sound of the tool touching the skin.

SE's face can be seen.  Her facial expression does not change with the test.

Following the test, SE inhales and exhales, yoga breathing.

Woman D: "Ok… we'll do a three count at first… ready? Here we go… one, two, three, nice job." (as she counts she is moving the branding tool, which looks like a pen across the stencil, about a 1/3 of the way across the top line of the design.)

Woman B: "You're doing so good Sarah"

SE can be heard breathing deeply in and out

Woman D: "k, three count again… inhale, and… here we go… one, two, three" (she finished the rest of the line)

Woman B: "fucking awesome!"

SE: sighs gently as she exhales

Woman D: "two little touch ups, ok? … Ready, here we go" does one touch up "one more… umm, one, maybe two more, ready, here we go…"

SE: hums as she exhales in a yoga breath

Woman D: "Ready? Here we go."

SE: hums in exhale

Woman D: "one more. Ready?"

SE: hums again in exhale

Camera moves to her face. She takes a deep breath in and out. At this point there is emotion.

Woman B: "That was awesome!"

Woman A: "One shot baby!"

SE:  "We did it!" there is a positive/soft tone in her voice – she takes a deep breath in and sighs as she lets it out.

Woman E: "Fucking warrior!"

The women are talking about how much time has elapsed since the start.  SE's process was moving quicker than the two before her.  It's been about 2 minutes, but the actual branding was approximately less than 10 seconds.

Woman E: "Gonna break some records!"
Woman C says something that's unclear but I think it was about SE's breathing
Someone else says something like  "always helpful"
SE affirms: "and birth" (referencing that she had used the same breathing process during her labor for child birth) 4:26:730

Dialog exchange that's part of the ceremony – the women have all stepped back to give themselves and SE a break.  In the dialog exchange, SE asks that one of the lines be repeated and it is.

When the dialog is done we resume positions.
SE mentions "I need someone to hold here" again referring to her elbows… it wasn't really needed and woman B rests her hand on SE's heart.

SE is holding woman C's hands.  There is a reassuring squeeze of the hands between them.

SE: "which line is next?"

Woman D: "I'm gonna show you where we're at"
SE: "ok"

Woman B: "the inside one, inside triangle"

Woman D: "Ok, so just a touch… ready, touch… ok, good… ready, breathe in… ready, one, two, three…"

Woman B: "that was awesome!"
SE deep inhale and yoga exhale with a sigh

Woman B: "more than half way"
Woman D: "ready? Here we go… one, two, three"
Woman B: "done"

Woman D: "gonna go over that one a little bit… ready? Here we go… one… one more little touch, ready?"
SE nods that she is ready, deep inhale and exhale
Woman D: "here we go… k, hold on one sec… I'm gonna leave it, I'm gonna compare it to the other side… no electricity… (she goes over the line just with the needle, this can't be felt)… ok"

Someone says "nice job" 6:17:623
Dialog exchange

SE becomes emotional
Woman B: "You're doing great.  Fucking awesome!"
SE: "Thank you"
Woman E whispers: "Warrior Bitches!"
SE: "Thank you for choosing me"

Woman B kisses SE on her cheek
SE: says something that's not audible and then, "this means a lot…"
Woman B strokes SE's face
SE: "thank you… I love you."
Woman B: "I love you" kisses her again on the cheek and strokes her hair, returns her hand to
SE's heart
SE: "k… (a moment elapses) … it's so funny, I was auditioning for a fucking hallmark movie
yesterday." Everyone laughs "… Bridal Bootcamp… (the title said in a humorous mocking way)
SE shakes her head from side to side and says "… fuck…" and laughs

Woman C repeats the title and laughs
SE is making jokes, but it's hard to hear what she says "… (something) on my fucking life… oh,
yeah, so good, thank you… warrior bootcamp, bitches!"
Woman C is laughing

Woman D: "ok, here we go…"
SE closes her eyes and breathes deeply in and out
Woman D: "ok, just a touch at first… ready, touch.  I'm gonna go right up that line… ready, here
we go, one, two, three…"
SE takes several deep breaths in and out
Woman D: "ready?  Here we go… one, two, three…"
SE exhales loudly… then says "sorry" (I think it was to woman C for squeezing her hands tightly)

Woman B brushes SE's chest lightly to help her clear the state

Woman D: "ready? Here we go… one, two…"
SE winces
Woman D: "just some touch ups"
SE takes a deep breath in and out
Woman D: "Ok, ready? Here we go… one, two, three"

SE: calmly "That was the worst one"
Woman D: "one more touch up"
SE breathes in and out

Woman D does a few quick touches
SE: "touch ups are always the worst"
Woman B: agreeing "they *are* the worst"
Woman D: "no electricity"
Woman B: "looks good!"
Someone else: "looks great!"
Someone else says: "three quarters done"
Woman B: "Even more because you have all the big lines done"

SE emotes: "this is so important…"
Woman B kisses her head and puts her hand on SE's heart, sits next to her
9:54:691

Dialog exchange

Woman D: "ok, small touch first… ready, touch…"
SE: yoga breath out with hum
Woman D: "ready, here we go… one, two, three"
Woman B: "that's the whole line"
SE: exhales with sound
Woman D: "little touch.  Ready, here we go…" two touches "no electricity…"
SE: deep breathing
Woman D: "that's good"
Woman B: "awesome"
SE: "ok"

Women talking, it's unclear what's being said, something about tiny lines
Woman B: "you have three lines left"
SE: "ok… little ones?
Woman B: "Yeah, one the same as the one you just did and then two little little"
11:00

Dialog exchange

SE is smiling during this and nodding her head in agreement
SE: "I got your back!"
Woman B: "I got yours" and they laugh
SE: "you got my whole body right now" continuing to laugh

Woman D: "ok, Sarah, touch…"
SE inhales
Woman D: "ready? Here we go…" one touch
SE inhales and exhales
Woman D: "ok, here we go…" touch for like two counts

Woman D: taking a second to adjust to position of her hand "sorry just trying to figure out where to anchor…"
SE: "my hip bones are bony"
Woman C: "your what?"
SE: "my hip bones are bony"
Woman B: "funny angle"
SE: "yeah… (imitating her husband) want me to flex, does that help?" laughs and everyone laughs.. making more flexing faces like her husband does
Woman B: in a low voice but continuing the joke "I'm stronger…" (something SE's husband shouts when he leaves the gym)
SE: in a soft humorous voice "Troy (her son) goes, I gotta go to the gym and get stronger and muscles like daddy!"
Woman B: "aww…"
Laughing…
Someone says "that's sweet…"

Woman D: "ok, ready?"
SE: "mmm hmm"
Woman D: "here we go… ready? Here we go, one, two, three"
SE yoga breathing, exhaling with a low rumble
Woman D: "ok, gonna go over that one…"
SE deep exhale
Woman D: "ready, here we go, one, two, three"
SE: "that was way worse, is it done?"
Woman D: "two touch ups"
SE: "ok"
Woman D: "here we go… one more touch up… ready, here we go… just elec, uh, just <u>no</u> electricity."
Woman B: "Looks really good.  Just have two dinky ones."
SE: laughing "dinky… I love the word dinky!"
13:19:336

Dialog exchange

Woman D: "touch first… k, ready? Here we go, one, two…. I'm gonna go over that one one more time.  Ready, here we go, one, two"
SE breathing as woman D goes over it with no electricity
Woman D: "little touch… here we go" (quick touch) "no electricity… ok"

Woman B: "last line…"
14:32:749

Dialog exchange

Woman B: "last one…"

SE: big smile to woman B, "how am I doing?"

Woman B: "Awesome! Fucking inspiring!"

SE is beaming

Woman D: "ok, ready?  Ok, here we go…"

Woman B: "that was awesome!"

Woman D: "hang in there, just little touch ups now"

SE exhales

Woman D: "ready, here we go… ok, I'm just gonna open this side a little bit.  It's gonna be the one towards the inside, ok?"

Woman B: preparing SE "this ones gonna hurt" and something else inaudible

Woman D: "ready? Here we go…"

SE winces

Woman D: "Nice… Almost there…"

SE: breathes in and out, calmly says "just finish it…"

Woman D: "ok, I think we're good."

SE puts her hands in namaste, first to her forehead and then to her heart

Releases a bit of emotion

15:31:244

Woman B sits next to SE and stokes her hair and the side of her face during the last dialog exchange

When it is complete SE laughs and emotes

Woman B kisses her on the cheek twice and they embrace for some time

Woman B: still in the embrace "you did awesome!"

SE: emoting "this is such an honor thank you…"

Woman B kisses her again twice

SE: "thank you for helping me push!"

Woman B kisses her again: "You did so good.  I'm so proud of you!"

SE: "thank you." (she says something else that's hard to hear… something "to control it" she may have been referring to her emotional release at the end, it's not clear)

Woman B: "That was really, really awesome! You did fucking awesome!"

Video ends

STATE OF WISCONSIN
BEFORE THE MEDICAL EXAMINING BOARD

---

IN THE MATTER OF DISCIPLINARY    :
PROCEEDINGS AGAINST              :
                                      :      AMENDED COMPLAINT
DANIELLE D. ROBERTS, D.O.,      :
      RESPONDENT.              :

---

Division of Legal Services and Compliance Case No. 18 MED 161

Colleen L. Meloy, an attorney for the State of Wisconsin, Department of Safety and Professional Services (Department) Division of Legal Services and Compliance (Division) Post Office Box 7190, Madison, Wisconsin 53707-7190, upon information and belief, alleges that:

1.     Danielle D. Roberts, D.O., (Respondent) is licensed in the state of Wisconsin to practice medicine and surgery, having license number 60617-21, first issued on April 25, 2013, and expired on October 31, 2017.

2.     Pursuant to Wis. Stat. § 440.08(3), Respondent has the right to seek renewal of her license upon payment of a fee until October 31, 2022.

3.     Respondent's most recent address on file with the Department is 215 Castle Avenue, Westbury, New York 11590.[1]

4.     Respondent is also licensed to practice medicine in New York, having New York medical license number 255075, first granted on October 5, 2009 and which was revoked on September 27, 2021.

5.     On May 2, 2018, Division Case No. 18 MED 161 was opened to investigate allegations that Respondent used a cauterizing iron to deliberately create scar tissue of the initials "K.R." on multiple female members of the sex cult, NXIVM, led by Keith Raniere, as described by various media outlets, including a newspaper article dated April 30, 2018.

6.     On March 5, 2020, the New York State Department of Health, State Board for Professional Medical Conduct (New York Board) filed a Notice of Hearing and Statement of Charges against Respondent (New York Charges). *See New York Charges attached hereto as Exhibit A and incorporated by reference herein.*

7.     The New York Charges alleged the following facts, *intra alia*:

---

[1] In Respondent's Answer to the Complaint, she stated that her current mailing address is 4120 S. Lake Dr., Unit 463, St. Francis, WI 53235.

a.  On March 9, 2017, Respondent used a cauterizing pen as part of a medical procedure to scar the skin by branding female patients A-E, with the initials KR or AM in the pelvis region leaving a permanent scar and deviated from acceptable medical standards as follows:

    i. without using appropriate infection control procedures and sterile technique;

    ii. without the use of local or general anesthesia;

    iii. with the assistance of non-medically trained personnel that physically restrained each patient;

    iv. while both the patient and the non-medically trained personnel were naked contrary to any known medical protocol;

    v. failed to provide appropriate wound care during and after the medical procedure;

    vi. failed to provide appropriate follow-up care to each patient;

    vii. failed to obtain informed consent from each patient; and

    viii. failed to keep appropriate medical records for each patient.

b. Between January 2017 and December 2017, Respondent used a cauterizing pen as part of a medical procedure to scar the skin by branding female patients F-M, with the initials KR or AM in the pelvis region leaving a permanent scar and deviated from acceptable medical standards as set forth in subparagraph a, i-vii.

c. Between June 2016 and August 2016, Respondent failed to report a communicable disease outbreak at a conference held in Silver Bay, New York, which involved approximately 438 individuals, including 76 children.

8.    The New York Charges alleged counts one through forty-seven of professional misconduct against Respondent including, *intra alia*:

a. willfully abusing patients (charges 1-6);

b. engaging in conduct in the practice of medicine which evidences moral unfitness to practice medicine (charges 7-12);

c. failing to use scientifically accepted barrier precautions and infection control practices as established by the New York State Department of Health (charges 13-18);

d. practicing the profession fraudulently or beyond its authorized scope (charge 19);

e. practicing the profession with negligence, gross negligence, incompetence and/or gross incompetence (charges 20-33);

f. failing to file a public health report required by law (charge 34);

g.   willfully or grossly negligently failing to comply with substantial provisions of federal, state, or local laws, rules, or regulations governing the practice of medicine (charge 35);

h.   performing professional services which have not been authorized by the patient (charges 36-41); and

i.   failing to maintain patient healthcare records (charges 42-47).

9.      A full recitation of the facts alleged and charges set forth in the New York Charges are attached hereto as Exhibit A and incorporated by reference herein.

10.     On April 27, 2020, the New York Board filed an Amended Statement of Charges against Respondent (New York Amended Charges).[2] *See New York Amended Charges attached hereto as Exhibit B and incorporated by reference herein.*

11.     On September 27, 2021, the New York Board issued a Determination and Order which revoked Respondent's license to practice medicine in the State of New York after a determination that the forty-seven specified counts of professional misconduct set forth in the New York Charges were sustained. *See New York Determination and Order attached hereto as Exhibit C and incorporated by reference herein.*

12.     Respondent engaged in unprofessional conduct pursuant to Wis. Admin. Code § Med 10.03(3)(c) by having any credential pertaining to the practice of medicine and surgery or any act constituting the practice of medicine and surgery become subject to adverse determination by any agency of this or another state, or by any federal agency or authority.

13.     As a result of the above conduct, Respondent is subject to discipline pursuant to Wis. Stat. § 448.02(3).

The Division of Legal Services and Compliance requests that the Board hear evidence relevant to the matters alleged in this complaint, determine and impose the discipline warranted, and assess the costs against Respondent Danielle D. Roberts, D.O.

Dated this 19th of November, 2021

_____

Colleen L. Meloy, Prosecuting Attorney
State Bar Number 1029855
Department of Safety and Professional Services
Division of Legal Services and Compliance
P.O. Box 7190
Madison, WI 53707-7190
(608) 261-8779
Colleen.Meloy@wisconsin.gov

---

[2] The New York Amended Charges removed patients H-M.

These charges are only allegations which

may be contested by the licensee in an

Administrative hearing.

Exhibit A 001

NEW YORK STATE        DEPARTMENT OF HEALTH
STATE BOARD FOR PROFESSIONAL MEDICAL CONDUCT

| IN THE MATTER | NOTICE |
| :---: | :---: |
| OF | OF |
| **DANIELLE ROBERTS, D.O.** | HEARING |

TO:    DANIELLE ROBERTS, D.O.

██████████████████

PLEASE TAKE NOTICE:

     A hearing will be held pursuant to the provisions of N.Y. Pub. Health Law §230 and

N.Y. State Admin. Proc. Act §§301-307 and 401. The hearing will be conducted before a

committee on professional conduct of the State Board for Professional Medical Conduct on

May 4, 2020 at 10:00 a.m., at the Offices of the New York State Department of Health, 90

Church State Street, 4th floor, New York, New York 10007, and at such other adjourned

dates, times and places as the committee may direct.

     At the hearing, evidence will be received concerning the allegations set forth in the

Statement of Charges, which is attached. A stenographic record of the hearing will be made

and the witnesses at the hearing will be sworn and examined. You shall appear in person at

the hearing and may be represented by counsel who shall be an attorney admitted to practice

in New York state. You have the right to produce witnesses and evidence on your behalf, to

issue or have subpoenas issued on your behalf in order to require the production of witnesses

and documents, and you may cross-examine witnesses and examine evidence produced

against you. A summary of the Department of Health Hearing Rules is enclosed.

YOU ARE HEREBY ADVISED THAT THE ATTACHED CHARGES WILL BE MADE PUBLIC FIVE BUSINESS DAYS AFTER THEY ARE SERVED.

Department attorney: Initial here ███████

The hearing will proceed whether or not you appear at the hearing. Please note that requests for adjournments must be made in writing and by telephone to the New York State Department of Health, Division of Legal Affairs, Bureau of Adjudication, Riverview Center,150 Broadway - Suite 510, Albany, NY 12204-2719, ATTENTION: HON. JAMES HORAN, DIRECTOR, BUREAU OF ADJUDICATION, (henceforth "Bureau of Adjudication"), (Telephone: (518-402-0748), upon notice to the attorney for the Department of Health whose name appears below, and at least five days prior to the scheduled hearing date. Adjournment requests are not routinely granted as scheduled dates are considered dates certain. Claims of court engagement will require detailed Affidavits of Actual Engagement. Claims of illness will require medical documentation.

Pursuant to the provisions of N.Y. Pub. Health Law §230(10)(c), you shall file a written answer to each of the charges and allegations in the Statement of Charges not less than ten days prior to the date of the hearing. Any charge or allegation not so answered shall be deemed admitted. You may wish to seek the advice of counsel prior to filing such answer. The answer shall be filed with the Bureau of Adjudication, at the address indicated above, and a copy shall be forwarded to the attorney for the Department of Health whose name appears below. Pursuant to §301(5) of the State Administrative Procedure Act, the Department, upon reasonable notice, will provide at no charge a qualified interpreter of the deaf to interpret the proceedings to, and the testimony of, any deaf person. Pursuant to the

Exhibit A 003

terms of N.Y. State Admin. Proc. Act §401 and 10 N.Y.C.R.R. §51.8(b), the Petitioner hereby demands disclosure of the evidence that the Respondent intends to introduce at the hearing, including the names of witnesses, a list of and copies of documentary evidence and a description of physical or other evidence which cannot be photocopied.

At the conclusion of the hearing, the committee shall make findings of fact, conclusions concerning the charges sustained or dismissed, and in the event any of the charges are sustained, a determination of the penalty to be imposed or appropriate action to be taken. Such determination may be reviewed by the Administrative Review Board for Professional Medical Conduct.

> THESE PROCEEDINGS MAY RESULT IN A DETERMINATION THAT YOUR LICENSE TO PRACTICE MEDICINE IN NEW YORK STATE BE REVOKED OR SUSPENDED, AND/OR THAT YOU BE FINED OR SUBJECT TO OTHER SANCTIONS SET OUT IN NEW YORK PUBLIC HEALTH LAW §§230-a. YOU ARE URGED TO OBTAIN AN ATTORNEY TO REPRESENT YOU IN THIS MATTER.

DATE: March 5, 2020

Albany, New York

Timothy A. Mahar, Esq.
Deputy Counsel
Bureau of Professional Medical Conduct

Inquiries should be directed to:
Jeffrey J. Conklin, Esq., Associate Counsel
Bureau of Professional Medical Conduct
Empire State Plaza
Corning Tower, Room 2517
Albany, New York 12237

NEW YORK STATE          DEPARTMENT OF HEALTH
STATE BOARD FOR PROFESSIONAL MEDICAL CONDUCT

| | |
|---|---|
| **IN THE MATTER**<br><br>**OF**<br><br>**DANIELLE ROBERTS, D.O.** | STATEMENT<br><br>OF<br><br>CHARGES |

DANIELLE ROBERTS, D.O., the Respondent, was authorized to practice medicine in New York State on or about October 5, 2009, by the issuance of license number 255075 by the New York State Education Department.

## FACTUAL ALLEGATIONS

A.  On or about March 9, 2017, the Respondent used a cauterizing pen as part of a medical procedure to scar the skin by branding Patient A, a female patient, hereinafter identified in the attached Appendix "A", with the initials KR/AM, and/or KR, in the pelvis region, thereby leaving a permanent scar. Respondent's conduct deviated from accepted standards of care as follows:

1.  Respondent performed the medical procedure upon Patient A in an other than appropriately sterile environment, and/or without appropriate infection control, and/or without the use of sterile technique, including the surgical field, surgical procedure room, multiple use of a cautery pen tip and electrical grounding pad, and documented electrical testing and maintenance upkeep of the cautery device.

2.  Respondent performed the medical procedure without the use of a local anesthetic or general anesthesia, thereby causing Patient A to suffer pain for no legitimate medical purpose.

1

Exhibit A 005

3. Respondent performed the medical procedure upon Patient A with non-medically trained personnel present, who were not wearing personal protective equipment.

4. Respondent performed the medical procedure upon Patient A with the assistance of non-medically trained personnel who physically restrained said patient.

5. Respondent failed to cease performing the medical procedure despite the fact that Patient A was suffering pain without medical justification.

6. Respondent, during the course of the medical procedure, willfully physically abused Patient A.

7. Respondent performed the medical procedure upon Patient A at the time when said patient was naked and while being held down by other individuals, who were also naked, contrary to any appropriate medical protocol or need.

8. Respondent inappropriately performed the medical procedure upon Patient A while an individual who was also naked utilized a cell phone to video said medical procedure.

9. Respondent failed to provide appropriate wound care for Patient A at the time of the medical procedure, and thereafter.

10. Respondent failed to provide appropriate follow-up medical care and treatment for Patient A's wound, and/or failed to refer Patient A to another medical provider for such post-medical procedure wound care.

11. Respondent inappropriately advised, or caused another individual to advise, Patient A to take photographs of the wound caused by the medical procedure on a daily basis for one month and once a week for another month, and to thereafter send such photographs to an individual who shared all or some of said photographs with the Respondent.

12. Respondent failed to provide appropriate medical care and treatment for Patient A, including obtaining information regarding said patient's medical history and current medications.

2

Exhibit A 006

13. Respondent failed to prepare and/or maintain appropriate medical records for the patient which accurately reflected the evaluation and treatment of Patient A.

14. Respondent fraudulently failed to disclose to Patient A that the initials KR/AM and/or KR said Respondent branded into the pelvis region of Patient A represented the initials of Keith Ranieri and/or Allison Mack.

15. Respondent performed the medical procedure upon Patient A without having obtained the adequate informed consent of Patient A.

B. On or about March 9, 2017, the Respondent used a cauterizing pen as part of a medical procedure to scar the skin by branding Patient B, a female patient, hereinafter identified in the attached Appendix "A", with the initials KR/AM, and/or KR, in the pelvis region, thereby leaving a permanent scar. Respondent's conduct deviated from accepted standards of care as follows:

1. Respondent performed the medical procedure upon Patient B in an other than appropriately sterile environment, and/or without appropriate infection control and/or, without the use of sterile technique, including the surgical field, surgical procedure room, multiple use of a cautery pen tip and electrical ground pad, and documented electrical testing and maintenance upkeep of the cautery device.

2. Respondent, while performing the medical procedure without the use of a local anesthetic or general anesthesia, thereby causing Patient B to suffer pain for no legitimate medical purpose.

3. Respondent performed the medical procedure upon Patient B with non-medically trained personnel present, who were not wearing personal protective equipment.

4. Respondent performed the medical procedure upon Patient B with the assistance of non-medically trained personnel who physically restrained said patient.

3

Exhibit A 007

5. Respondent failed to cease performing the medical procedure despite the fact that Patient B was suffering pain without medical justification.

6. Respondent, during the course of the medical procedure, willfully and physically abused Patient B.

7. Respondent performed the medical procedure upon Patient B at the time when said patient was naked and while being held down by other individuals, who were also naked, contrary to any appropriate medical protocol or need.

8. Respondent inappropriately performed the medical procedure upon Patient B while an individual who was also naked utilized a cell phone to video said medical procedure.

9. Respondent failed to provide appropriate wound care for Patient B at the time of the medical procedure, and thereafter.

10. Respondent failed to provide appropriate follow-up medical care and treatment for Patient B's wound, and/or failed to refer Patient B to another medical provider for such post-medical procedure wound care.

11. Respondent inappropriately advised, or caused another individual to advise Patient B to take photographs of the wound caused by the medical procedure on a daily basis for one month and once a week for another month, and to thereafter send such photographs to an individual who shared all or some of said photographs with Respondent.

12. Respondent failed to provide appropriate medical care and treatment for Patient B, including obtaining information regarding said patient's medical history and current medications.

13. Respondent failed to prepare and/or maintain appropriate medical records for the patient which accurately reflected the evaluation and treatment of Patient B.

14. Respondent fraudulently failed to disclose to Patient B that the initials KR/AM and/or KR said Respondent branded into the pelvis region of Patient B represented the initials of Keith Ranieri and/or Allison Mack.

4

Exhibit A 008

15. Respondent performed the medical procedure upon Patient B without having obtained the adequate informed consent of Patient B.

C. On or about March 9, 2017, the Respondent used a cauterizing pen as part of a medical procedure to scar the skin by branding Patient C, a female patient, hereinafter identified in the attached Appendix "A", with the initials KR/AM, and/or KR, in the pelvis region, thereby leaving a permanent scar. Respondent's conduct deviated from accepted standards of care as follows:

1. Respondent performed the medical procedure upon Patient C in an other than appropriately sterile environment, and/or without appropriate infection control, and/or without the use of sterile technique, including the surgical field, surgical procedure room, multiple use of a cautery pen tip and electrical grounding pad, and documented electrical testing and maintenance upkeep of the cautery device.

2. Respondent, while performing the medical procedure without the use of a local anesthetic or general anesthesia, thereby causing Patient C to suffer pain for no legitimate medical purpose.

3. Respondent performed the medical procedure upon Patient C with non-medically trained personnel present, who were not wearing personal protective equipment.

4. Respondent performed the medical procedure upon Patient C with the assistance of non-medically trained personnel who physically restrained said patient.

5. Respondent failed to cease performing the medical procedure despite the fact that Patient C was suffering pain without medical justification.

6. Respondent, during the course of the medical procedure, willfully physically abused Patient C.

5

Exhibit A 009

7.  Respondent performed the medical procedure upon Patient C at the time when said patient was naked and while being held down by other individuals, who were also naked, contrary to any appropriate medical protocol or need.

8.  Respondent inappropriately performed the medical procedure upon Patient C while an individual who was also naked utilized a cell phone to video said medical procedure.

9.  Respondent failed to provide appropriate wound care for Patient C at the time of the medical procedure, and thereafter.

10. Respondent failed to provide appropriate follow-up medical care and treatment for Patient C's wound, and/or failed to refer Patient C to another medical provider for such post-medical procedure wound care.

11. Respondent inappropriately advised, or caused another individual to advise, Patient C to take photographs of the wound caused by the medical procedure on a daily basis for one month and once a week for another month, and to thereafter send such photographs to an individual who shared all or some of said photographs with Respondent.

12. Respondent failed to provide appropriate medical care and treatment for Patient C, including obtaining information regarding said patient's medical history and current medications.

13. Respondent failed to prepare and/or maintain appropriate medical records for the patient which accurately reflected the evaluation and treatment of Patient C.

14. Respondent fraudulently failed to disclose to Patient C that the initials KR/AM and/or KR said Respondent branded into the pelvis region of Patient C represented the initials of Keith Ranieri and/or Allison Mack.

15. Respondent performed the medical procedure upon Patient C without having obtained the adequate informed consent of Patient C.

6

Exhibit A 010

D.    On or about March 9, 2017, the Respondent used a cauterizing pen as part of a medical procedure to scar the skin by branding Patient D, a female patient, hereinafter identified in the attached Appendix "A", with the initials KR/AM, and/or KR, in the pelvis region, thereby leaving a permanent scar. Respondent's conduct deviated from accepted standards of care as follows:

    1.    Respondent performed the medical procedure upon Patient D in an other than appropriately sterile environment, and/or without appropriate infection control, and/or without the use of sterile technique, including the surgical field, surgical procedure room, multiple use of a cautery pen tip and electrical grounding pad, and documented electrical testing and maintenance upkeep of the cautery device.

    2.    Respondent, while performing the medical procedure without the use of a local anesthetic or general anesthesia, thereby causing Patient D to suffer pain for no legitimate medical purpose.

    3.    Respondent performed the medical procedure upon Patient D with non-medically trained personnel present, who were not wearing personal protective equipment.

    4.    Respondent performed the medical procedure upon Patient D with the assistance of non-medically trained personnel who physically restrained said patient.

    5.    Respondent failed to cease performing the medical procedure despite the fact that patient D was suffering pain without medical justification.

    6.    Respondent, during the course of the medical procedure, willfully physically abused Patient D.

    7.    Respondent performed the medical procedure upon Patient D at the time when said patient was naked and while being held down by other individuals, who were also naked, contrary to any appropriate medical protocol or need.

7

Exhibit A 011

8. Respondent inappropriately performed the medical procedure upon Patient D while an individual who was also naked utilized a cell phone to video said medical procedure.

9. Respondent failed to provide appropriate wound care for Patient D at the time of the medical procedure, and thereafter.

10. Respondent failed to provide appropriate follow-up medical care and treatment for Patient D's wound, and/or failed to refer Patient D to another medical provider for such post-medical procedure wound care.

11. Respondent inappropriately advised, or caused another individual to advise Patient D to take photographs of the wound caused by the medical procedure on a daily basis for one month and once a week for another month, and to thereafter send such photographs to an individual who shared all or some of said photographs with Respondent.

12. Respondent failed to provide appropriate medical care and treatment for Patient D, including obtaining information regarding said patient medical history and current medications.

13. Respondent failed to prepare and/or maintain appropriate medical records for the patient which accurately reflected the evaluation and treatment of Patient D.

14. Respondent fraudulently failed to disclose to Patient D that the initials KR/AM and/or KR said Respondent branded into the pelvis region of Patient D represented the initials of Keith Ranieri and/or Allison Mack.

15. Respondent performed the medical procedure upon Patient D without having obtained the adequate informed consent of Patient D.


E. On or about March 9, 2017, the Respondent used a cauterizing pen as part of a medical procedure to scar the skin by branding Patient E, a female patient, hereinafter identified in the attached Appendix "A", with the initials KR/AM, and/or

8

Exhibit A 012

KR, in the pelvis region, thereby leaving a permanent scar. Respondent's conduct deviated from accepted standards of care as follows:

1.    Respondent performed the medical procedure upon Patient E in an other than appropriately sterile environment, and/or without appropriate infection control, and/or without the use of sterile technique, including the surgical field, surgical procedure room, multiple use of a cautery tip pen and electrical grounding pad, and documented electrical testing and maintenance upkeep of the cautery device.

2.    Respondent performed the medical procedure without the use of a local anesthetic or general anesthesia, thereby causing Patient E to suffer pain for no legitimate medical purpose.

3.    Respondent performed the medical procedure upon Patient E with non-medically trained personnel present, who were not wearing personal protective equipment.

4.    Respondent performed the medical procedure upon Patient E with the assistance of non-medically trained personnel who physically restrained said patient.

5.    Respondent failed to cease performing the medical procedure despite the fact that Patient E was suffering pain without medical justification.

6.    Respondent, during the course of the medical procedure, willfully physically abused Patient E.

7.    Respondent performed the medical procedure upon Patient E at the time when said patient was naked and while being held down by other individuals, who were also naked, contrary to any appropriate medical protocol or need.

8.    Respondent inappropriately performed the medical procedure upon Patient E while an individual who was also naked utilized a cell phone to video said medical procedure.

9.    Respondent failed to provide appropriate wound care for Patient E at the time of the medical procedure, and thereafter.

9

Exhibit A 013

10. Respondent failed to provide appropriate follow-up medical care and treatment for Patient E's wound, and/or failed to refer Patient E to another medical provider for such post-medical procedure wound care.

11. Respondent inappropriately advised, or caused another individual to advise, Patient E to take photographs of the wound caused by the medical procedure on a daily basis for one month and once a week for another month, and to thereafter send such photographs to an individual who shared all or some of said photographs with Respondent.

12. Respondent failed to provide appropriate medical care and treatment for the Patient E, including obtaining information regarding said patient's medical history and current medications.

13. Respondent failed to prepare and/or maintain appropriate medical records for the patient which accurately reflected the evaluation and treatment of Patient E.

14. Respondent fraudulently failed to disclose to Patient E that the initials KR/AM and/or KR said Respondent branded into the pelvis region of Patient E represented the initials of Keith Ranieri and/or Allison Mack.

15. Respondent performed the medical procedure upon Patient E without having obtained the adequate informed consent of Patient E.


F. During the period from on or about January 2017 through December 2017, the Respondent used a cauterizing pen as part of medical procedures to permanently scar the skin by branding one or more of the following: Patient F through Patient M, inclusive, female patients, hereinafter identified in the attached Appendix "A", with the initials KR/AM, and/or KR, in their pelvis regions. Respondent's conduct deviated from accepted standards of care as follows:

1. Respondent performed the medical procedures upon one or more of the following: Patient F through Patient M, inclusive, in an other than appropriately

10

Exhibit A 014

sterile environment, and/or without appropriate infection control, and/or without the use of sterile technique, including the surgical field, surgical procedure room, multiple use of a cautery pen tip and electrical grounding pad, and documented electrical testing and maintenance upkeep of the cautery device.

2. Respondent performed the medical procedures without the use of a local anesthetic or general anesthesia, thereby causing one or more of the following: Patient F though Patient M, inclusive, to suffer pain for no legitimate medical purpose.

3. Respondent performed the medical procedures upon one or more of the following: Patient F through Patient M, inclusive, with non-medically trained personnel present, who were not wearing personal protective equipment.

4. Respondent performing the medical procedures upon one or more of the following: Patient F through Patient M, inclusive, with the assistance of non-medically trained personnel who physically restrained said patients.

5. Respondent failed to cease performing the medical procedures despite the fact that one or more of the following: Patient F through Patient M, inclusive, were suffering pain without medical justification.

6. Respondent, during the course of the medical procedures willfully physically abused one or more of the following: Patient F through Patient M, inclusive.

7. Respondent inappropriately performed the medical procedures upon one or more of the following: Patient F through Patient M, inclusive, while an individual utilized a cell phone to video said medical procedures.

8. Respondent failed to provide appropriate wound care for one or more of the following: Patient F through Patient M, inclusive, at the time of the medical procedures, and thereafter.

9. Respondent failed to provide appropriate follow-up medical care and treatment for one or more of the following: Patient F through Patient M,

11

Exhibit A 015

inclusive, and/or failed to refer the patients to other medical providers for such post-medical procedures wound care.

10. Respondent inappropriately advised, or caused another individual to advise, one or more of the following: Patient F through Patient M, inclusive, to take photographs of the wounds caused by the medical procedures on a daily basis for one month and once a week for another month, and to thereafter send such photographs to an individual who shared all or some of said photographs with Respondent.

11. Respondent failed to provide appropriate medical care and treatment for one or more of the following: Patient F through Patient M, inclusive, including obtaining information regarding said patients' medical histories and current medications.

12. Respondent failed to prepare and/or maintain appropriate medical records for the patients which accurately reflected the evaluation and treatment of one or more of the following: Patient F through Patient M, inclusive.

13. Respondent performed the medical procedures upon one or more of the following: Patient F through Patient M, inclusive, without having obtained the adequate informed consents of Patient F through Patient M, inclusive.


G. During the time from on or about June 2016 through August 2016, NXIVM and/or the Executive Success Program (ESP) conducted a conference and/or meeting at the Silver Bay Conference and Family Retreat Center (Conference Center), located in Silver Bay, New York. The Respondent and approximately 438 other individuals attended the conference, including approximately 76 children. During the course of the conference, hundreds of the attendees became severely ill with an undetermined communicable disease. The individuals who became ill suffered inter alia, flu-like symptoms, severe vomiting and diarrhea. The Respondent had knowledge of the fact that many individuals at the conference had become ill. The Respondent knew

12

Exhibit A 016

or should have known that the illness suffered by the attendees at the conference was a communicable disease, outbreak of a communicable disease, and/or an unusual disease or outbreak. Respondent's conduct deviated from accepted standards of care as follows:

1. Respondent failed to report a disease outbreak or unusual disease to the State Department of Health as required by Title 10 N,Y.C.R.R. Section 2.1(c).

2. Respondent failed to report the suspected or confirmed case of communicable disease, outbreak of communicable disease, and/or the unusual disease or outbreak to the city, county, or district health officer as required by Title 10 N.Y.C.R.R. Sections 2.10 and 2.1(b) and (c).

3. Respondent failed to report by telephone, facsimile, or other electronic communication, or in person the illness of the attendees at the conference suspected or confirmed to have been caused due to the consumption of spoiled or poisonous food to the city, county, or district health officer, in violation of Title 10 N.Y.C.R.R. Section 2.15.

4. Upon being made aware of the fact that attendees at the conference might have been suffering from a communicable disease, the Respondent failed to cause such individuals to be isolated in an appropriate environment, pending official action by the health officer, in violation of Title 10 N.Y.C.R.R. Section 2.27.

13

Exhibit A 017

# SPECIFICATIONS OF CHARGES

## FIRST THROUGH SIXTH SPECIFICATIONS
## WILLFULLY ABUSING A PATIENT

Respondent is charged with committing professional misconduct as defined by New York Education Law §6530(31) by willfully abusing a patient as alleged in the facts of one or more of the following:

1. The facts in paragraphs A and A.2, A and A.4, A and A.5, A and A.6, and/or A and A.8.

2. The facts in paragraphs B and B.2, B and B.4, B and B.5, B and B.6, and/or B and B.8.

3. The facts in paragraphs C and C.2, C and C.4, C and C.5, C and C.6, and/or, C and C.8.

4. The facts in paragraphs D and D.2, D and D.4, D and D.5, D and D.6, and/or, D and D.8.

5. The facts in paragraphs E and E.2, E and E.4, E and E.5, E and E.6, and/or, E and E.8.

6. The facts in paragraphs F and F.2, F and F.4, F and F.5, F and F.6, and/or F and F.8.

14

Exhibit A 018

## SEVENTH THROUGH
## TWELFTH SPECIFICATIONS

### CONDUCT IN THE PRACTICE OF MEDICINE
### WHICH EVIDENCES MORAL UNFITNESS

Respondent is charged with committing professional misconduct as defined by New York Education Law §6530(20) by engaging in conduct in the practice of medicine which evidences moral unfitness to practice medicine as alleged in the facts of one or more of the following:

7. The facts in paragraphs A and A.2, A and A.4, A and A.5, A and A.6, and/or A and A.8.

8. The facts in paragraphs B and B.2, B and B.4, B and B.5, B and B.6, and/or B and B.8.

9. The facts in paragraphs C and C.2, C and C.4, C and C.5, C and C.6, and/or C and C.8.

10. The facts in paragraphs D and D.2, D and D.4, D and D.5, D and D.6, and/or D and D.8.

11. The facts in paragraphs E and E.2, E and E.4, E and E.5, E and E.6, and/or E and E.8.

12. The facts in paragraphs F and F.2, F and F.4, F and F.5, F and F.6, and/or F and F.8.

15

Exhibit A 019

## THIRTEENTH THROUGH EIGHTEENTH SPECIFICATIONS

## FAILING TO USE APPROPRIATE STERILE ENVIRONMENT
## AND/OR WITHOUT APPROPRIATE INFECTION CONTROL
## AND/OR WITHOUT THE USE OF STERILE TECHNIQUE

Respondent is charged with committing professional misconduct as defined by New York Education Law §6530(47) by failing to use scientifically accepted barrier precautions and infection control practices as established by the department of health as alleged in the facts of one or more of the following:

13. The facts in paragraphs A and A.1, A and A.3, A and A.4, and/or A and A.7.

14. The facts in paragraphs B and B.1, B and B.3, B and B.4, and/or B and B.7.

15. The facts in paragraphs C and C.1, C and C.3, C and C.4, and/or C and C.7.

16. The facts in paragraphs D and D.1, D and D.3, D and D.4, and/or D and D.7.

17. The facts in paragraphs E and E.1, E and E.3, E and E.4, and/or E and E.7.

18. The facts in paragraphs F and F.1, F and F.3, F and F.4, and/or F and F.7.

## NINTEENTH SPECIFICATION

## PRACTICING THE PROFESSION FRAUDULENTLY OR BEYOND ITS SCOPE

Respondent is charged with committing professional misconduct as defined by New York Education Law §6530(2) by practicing the profession fraudulently or beyond its authorized scope as alleged in the facts of one or more of the following:

19. The facts in paragraphs A and A.2, A and A.3, A and A.8 and/or A and A.14; B and B.2, B and B.3, B and B.8, and/or B and B.14; C and C.2, C and C.3, C and C.8, and/or C and C.14; D and D.2, D and D.3, D and D.8, and/or D and D.14; E

16

Exhibit A 020

and E.2, E and E.3, E and E.8, and/or E and E. 14; F and F.2, F and F.3, and/or F and F.7.

## TWENTIETH THROUGH TWENTY-FIFTH SPECIFICATIONS
## PRACTICING THE PROFESSION WITH GROSS NEGLIGENCE

Respondent is charged with committing professional misconduct as defined by New York Education Law §6530(4) by practicing the profession with gross negligence as alleged in the facts of one or more of the following:

20. The facts in paragraphs A and A.1, A and A.2, A and A.3, A and A.4, A and A.5, A and A.6, A and A.7, A and A.8, A and A.9, A and A.10, A and A.11, A and A.12, A and A.13, A and A.14, and/or A and A.15.

21. The facts in paragraphs B and B.1, B and B.2, B and B.3, B and B.4, B and B.5, B and B.6, B and B.7, B and B.8, B and B.9, B and B.10, B and B.11, B and B.12, B and B.13, B and B.14, and/or B and B.15.

22. The facts in paragraphs C and C.1, C and C.2, C and C.3, C and C.4, C and C.5, C and C.6, C and C.7, C and C.8, C and C.9, C and C.10, C and C.11, C and C.12, C and C.13, C and C.14, and/or C and C.15.

23. The facts in paragraphs D and D.1, D and D.2, D and D.3, D and D.4, D and D.5, D and D.6, D and D.7, D and D.8, D and D.9, D and D.10, D and D.11, D and D.12, D and D.13, D and D.14, and/or D and D.15.

17

Exhibit A 021

24. The facts in paragraphs E and E.1, E and E.2, E and E.3, E and E.4, E and E.5, E and E.6, E and E.7, E and E.8, E and E.9, E and E.10, E and E.11, E and E.12, E and E.13, E and E.14, and/or E and E.15.

25. The facts in paragraphs F and F.1, F and F.2, F and F.3, F and F.4, F and F.5, F and F.6, F and F.7, F and F.8, F and F.9, F and F.10, F and F.11, F and F.12, and/or F and F.13.

## TWENTY-SIXTH SPECIFICATION

## PRACTICING THE PROFESSION WITH NEGLIGENCE
## ON MORE THAN ONE OCCASION

Respondent is charged with committing professional misconduct as defined by New York Education Law §6530(3) by practicing the profession with negligence on more than one occasion as alleged in the facts of the following:

26. The facts in paragraphs A and A.1, A and A.2, A and A.3, A and A.4, A and A.5, A and A.6, A and A.7, A and A.8, A and A.9, A and A.10, A and A.11, A and A.12, A and A.13, and/or A and A.15; and/or B and B.1, B and B.2, B and B.3, B and B.4, B and B.5, B and B.6, B and B.7, B and B.8, B and B.9, B and B.10, B and B.11, B and B.12, B and B.13, and/or B and B.15; and/or C and C.1, C and C.2, C and C.3, C and C.4, C and C.5, C and C.6, C and C.7, C and C.8, C and C.9, C and C.10, C and C.11, C and C.12, C and C.13, and/or C and C.15; and/or D and D.1, D and D.2, D and D.3, D and D.4, D and D.5, D and D.6, D and D.7, D and D.8, D and D.9, D and D.10, D and D.11, D and D.12, D and D.13, and/or D

18

Exhibit A 022

and D.15; and/or E and E.1, E and E.2, E and E.3, E and E.4, E and E.5, E and E.6, E and E.7, E and E.8, E and E.9, E and E.10, E and E.11, E and E.12, E and E.13, and/or E and E.15; and/or F and F.1, F and F.2, F and F.3, F and F.4, F and F.5, F and F.6, F and F.7, F and F.8, F and F.9, F and F.10, F and F.11, F and F.12, and/or F and F.13; and/or G and G.1, G and G.2, G and G.3, and/or G and G.4.

## TWENTY-SEVENTH THROUGH THIRTY-SECOND SPECIFICATIONS
## PRACTICING THE PROFESSION WITH GROSS INCOMPETENCE

Respondent is charged with committing professional misconduct as defined by New York Education Law §6530(6) by practicing the profession with gross incompetence as alleged in the facts of one or more of the following:

27. The facts in paragraphs A and A.1, A and A.2, A and A.3, A and A.4, A and A.5, A and A.6, A and A.7, A and A.8, A and A.9, A and A.10, A and A.11, A and A.12, A and A.13, and/or A and A.15.

28. The facts in paragraphs B and B.1, B and B.2, B and B.3, B and B.4, B and B.5, B and B.6, B and B.7, B and B.8, B and B.9, B and B.10, B and B.11, B and B.12, B and B.13, and/or A and A.15.

29. The facts in paragraphs C and C.1, C and C.2, C and C.3, C and C.4, C and C.5, C and C.6, C and C.7, C and C.8, C and C.9, C and C.10, C and C.11, C and C.12, C and C.13, and/or C and C.15.

19

Exhibit A 023

30. The facts in paragraphs D and D.1, D and D.2, D and D.3, D and D.4, D and D.5, D and D.6, D and D.7, D and D.8, D and D.9, D and D.10, D and D.11, D and D.12, D and D.13, and/or D and D.15.

31. The facts in paragraphs E and E.1, E and E.2, E and E.3, E and E.4, E and E.5, E and E.6, E and E.7, E and E.8, E and E.9, E and E.10, E and E.11, E and E.12, E and E.13, and/or E and E.15.

32. The facts in paragraphs F and F.1, F and F.2, F and F.3, F and F.4, F and F.5, F and F.6, F and F.7, F and F.8, F and F.9, F and F.10, F and F.11, F and F.12, and/or F and F.13.

## THIRTY-THIRD SPECIFICATION

### PRACTICNG THE PROFESSION WITH INCOMPETENCE ON MORE THAN ONE OCCASION

Respondent is charged with committing professional misconduct as defined by New York Education Law §6530(5) by practicing the profession with incompetence on more than one occasion as alleged in the facts of the following:

33. The facts in paragraphs A and A.1, A and A.2, A and A.3, A and A.4, A and A.5, A and A.6, A and A.7, A and A.8, A and A.9, A and A.10, A and A.11, A and A.12, A and A.13, and/or A and A.15; and/or B and B.1, B and B.2, B and B.3, B and B.4, B and B.5, B and B.6, B and B.7, B and B.8, B and B.9, B and B.10, B and B.11, B and B.12, B and B.13, and/or B and B.15; and/or C and C.1, C and C.2, C and C.3, C and C.4, C and C.5, C and C.6, C and C.7, C and C.8, C and C.9,

20

Exhibit A 024

C and C.10, C and C.11, C and C.12, C and C.13, and/or C and C.15; and/or D and D.1, D and D.2, D and D.3, D and D.4, D and D.5, D and D.6, D and D.7, D and D.8, D and D.9, D and D.10, D and D.11, D and D.12, D and D.13, and/or D and D.15; and/or E and E.1, E and E.2, E and E.3, E and E.4, E and E.5, E and E.6, E and E.7, E and E.8, E and E.9, E and E.10, E and E.11, E and E.12, E and E.13, and/or E and E.15; and/or F and F.1, F and F.2, F and F.3, F and F.4, F and F.5, F and F.6, F and F.7, F and F.8, F and F.9, F and F.10, F and F.11, F and F.12, and/or F and F.13; and/or G and G.1, G and G.2, G and G.3, and/or G and G.4.

## THIRTY-FOURTH SPECIFICATION

## WILLFULLY FAILING TO FILE A REPORT REQUIRED BY LAW

Respondent is charged with committing professional misconduct as defined by New York Education Law §6530(21) by willfully failing to file a report required by law or by the Department of Health, or the Education Department as alleged in the facts of one or more of the following:

34. The facts in paragraphs G and G.1, G and G.2, G and G.3 and/or G. and G.4.

21

Exhibit A 025

## THIRTY-FIFTH SPECIFICATION

## WILLFULLY OR GROSSLY FAILING TO COMPLY WITH FEDERAL, STATE, OR LOCAL LAWS RULES OR REGULATIONS GOVERNING THE PRACTICE OF MEDICINE

Respondent is charged with committing professional misconduct as defined by New York Education Law §6530(16) by willfully or grossly negligently failing to comply with substantial provisions of federal, state, or local laws, rules, or regulations governing the practice of medicine as alleged in the facts of one or more of the following:

35. The facts in paragraphs G and G.1, G and G.2, G and G.3 and/or G and G.4.

## THIRTY-SIXTH THROUGH FORTY-FIRST SPECIFICATIONS

## PERFORMING PROFESSIONAL SERVICES WHICH HAVE NOT BEEN AUTHORIZED BY THE PATIENT

Respondent is charged with committing professional misconduct as defined by New York Education Law §6530(26) by performing professional services which have not been authorized by the patient as alleged in the facts of one or more of the following:

36. The facts in paragraphs A and A.14, and/or A and A.15.

37. The facts in paragraphs B and B.14, and/or B and B.15.

38. The facts in paragraphs C and C.14, and/or C and C.15.

39. The facts in paragraphs D and D.14, and/or D and D.15.

40. The facts in paragraphs E and E.14, and/or E and E.15.

41. The facts in paragraphs F and F.14, and/or F and F.15.

22

Exhibit A 026

## FORTY-SECOND THROUGH FORTY-SEVENTH SPECIFICATIONS

## FAILING TO MAINTAIN RECORDS

Respondent is charged with committing professional misconduct as defined by New York Education Law §6530(32) by failing to maintain a record for each patient which accurately reflects the evaluation and treatment of the patient as alleged in the facts of the following:

42. The facts in paragraphs A and A.13.

43. The facts in paragraphs B and B.13.

44. The facts in paragraphs C and C.13.

45. The facts in paragraphs D and D.13.

46. The facts in paragraphs E and E.13.

47. The facts in paragraphs F and F.12.

DATE: March 5 , 2020
Albany, New York

TIMOTHY J. MAHAR, ESQ.
Deputy Counsel
Bureau of Professional Medical Conduct

23

Exhibit A 027

NEW YORK STATE        DEPARTMENT OF HEALTH
STATE BOARD FOR PROFESSIONAL MEDICAL CONDUCT

<table>
<tr><td><strong>IN THE MATTER</strong><br><br><strong>OF</strong><br><br><strong>DANIELLE ROBERTS, D.O.</strong></td><td>AMENDED<br><br>STATEMENT<br><br>OF CHARGES</td></tr>
</table>

DANIELLE ROBERTS, D.O., the Respondent, was authorized to practice medicine in New York State on or about October 5, 2009, by the issuance of license number 255075 by the New York State Education Department.

### FACTUAL ALLEGATIONS

A.    On or about March 9, 2017, the Respondent used a cauterizing pen as part of a medical procedure to scar the skin by branding Patient A, a female patient, hereinafter identified in the attached Appendix "A", with the initials KR and/or KAR, in the pelvis region, thereby leaving a permanent scar.  Respondent's conduct deviated from accepted standards of care as follows:

1.  Respondent performed the medical procedure upon Patient A in an other than appropriately sterile environment, and/or without appropriate infection control, and/or without the use of sterile technique, including the surgical field, surgical procedure room, multiple use of a cautery pen tip and electrical grounding pad, and documented electrical testing and maintenance upkeep of the cautery device.

2.  Respondent performed the medical procedure without the use of a local anesthetic or general anesthesia, thereby causing Patient A to suffer pain for no legitimate medical purpose.

1



3. Respondent performed the medical procedure upon Patient A with non-medically trained personnel present, who were not wearing personal protective equipment.

4. Respondent performed the medical procedure upon Patient A with the assistance of non-medically trained personnel who physically restrained said patient.

5. Respondent failed to cease performing the medical procedure despite the fact that Patient A was suffering pain without medical justification.

6. Respondent, during the course of the medical procedure, willfully physically abused Patient A.

7. Respondent performed the medical procedure upon Patient A at the time when said patient was naked and while being held down by other individuals, who were also naked, contrary to any appropriate medical protocol or need.

8. Respondent inappropriately performed the medical procedure upon Patient A while an individual who was also naked utilized a cell phone to video said medical procedure.

9. Respondent failed to provide appropriate wound care for Patient A at the time of the medical procedure, and thereafter.

10. Respondent failed to provide appropriate follow-up medical care and treatment for Patient A's wound, and/or failed to refer Patient A to another medical provider for such post-medical procedure wound care.

11. Respondent inappropriately advised, or caused another individual to advise, Patient A to take photographs of the wound caused by the medical procedure on a daily basis for one month and once a week for another month, and to thereafter send such photographs to an individual who shared all or some of said photographs with the Respondent.

12. Respondent failed to provide appropriate medical care and treatment for Patient A, including obtaining information regarding said patient's medical history and current medications.

2

Exhibit B   002

13. Respondent failed to prepare and/or maintain appropriate medical records for the patient which accurately reflected the evaluation and treatment of Patient A.

14. Respondent fraudulently failed to disclose to Patient A that the initials KR and/or KAR said Respondent branded into the pelvis region of Patient A represented the initials of Keith Alan Ranieri..

15. Respondent performed the medical procedure upon Patient A without having obtained the adequate informed consent of Patient A.


B. On or about March 9, 2017, the Respondent used a cauterizing pen as part of a medical procedure to scar the skin by branding Patient B, a female patient, hereinafter identified in the attached Appendix "A", with the initials KR and/or KAR, in the pelvis region, thereby leaving a permanent scar. Respondent's conduct deviated from accepted standards of care as follows:

1. Respondent performed the medical procedure upon Patient B in an other than appropriately sterile environment, and/or without appropriate infection control and/or, without the use of sterile technique, including the surgical field, surgical procedure room, multiple use of a cautery pen tip and electrical ground pad, and documented electrical testing and maintenance upkeep of the cautery device.

2. Respondent, while performing the medical procedure without the use of a local anesthetic or general anesthesia, thereby causing Patient B to suffer pain for no legitimate medical purpose.

3. Respondent performed the medical procedure upon Patient B with non-medically trained personnel present, who were not wearing personal protective equipment.

4. Respondent performed the medical procedure upon Patient B with the assistance of non-medically trained personnel who physically restrained said patient.

3

Exhibit B  003

5. Respondent failed to cease performing the medical procedure despite the fact that Patient B was suffering pain without medical justification.

6. Respondent, during the course of the medical procedure, willfully and physically abused Patient B.

7. Respondent performed the medical procedure upon Patient B at the time when said patient was naked and while being held down by other individuals, who were also naked, contrary to any appropriate medical protocol or need.

8. Respondent inappropriately performed the medical procedure upon Patient B while an individual who was also naked utilized a cell phone to video said medical procedure.

9. Respondent failed to provide appropriate wound care for Patient B at the time of the medical procedure, and thereafter.

10. Respondent failed to provide appropriate follow-up medical care and treatment for Patient B's wound, and/or failed to refer Patient B to another medical provider for such post-medical procedure wound care.

11. Respondent inappropriately advised, or caused another individual to advise Patient B to take photographs of the wound caused by the medical procedure on a daily basis for one month and once a week for another month, and to thereafter send such photographs to an individual who shared all or some of said photographs with Respondent.

12. Respondent failed to provide appropriate medical care and treatment for Patient B, including obtaining information regarding said patient's medical history and current medications.

13. Respondent failed to prepare and/or maintain appropriate medical records for the patient which accurately reflected the evaluation and treatment of Patient B.

14. Respondent fraudulently failed to disclose to Patient B that the initials KR and/or KAR said Respondent branded into the pelvis region of Patient B represented the initials of Keith Alan Ranieri.

4

15. Respondent performed the medical procedure upon Patient B without having obtained the adequate informed consent of Patient B.

C. On or about March 9, 2017, the Respondent used a cauterizing pen as part of a medical procedure to scar the skin by branding Patient C, a female patient, hereinafter identified in the attached Appendix "A", with the initials KR and/or KAR, in the pelvis region, thereby leaving a permanent scar. Respondent's conduct deviated from accepted standards of care as follows:

1. Respondent performed the medical procedure upon Patient C in an other than appropriately sterile environment, and/or without appropriate infection control, and/or without the use of sterile technique, including the surgical field, surgical procedure room, multiple use of a cautery pen tip and electrical grounding pad, and documented electrical testing and maintenance upkeep of the cautery device.

2. Respondent, while performing the medical procedure without the use of a local anesthetic or general anesthesia, thereby causing Patient C to suffer pain for no legitimate medical purpose.

3. Respondent performed the medical procedure upon Patient C with non-medically trained personnel present, who were not wearing personal protective equipment.

4. Respondent performed the medical procedure upon Patient C with the assistance of non-medically trained personnel who physically restrained said patient.

5. Respondent failed to cease performing the medical procedure despite the fact that Patient C was suffering pain without medical justification.

6. Respondent, during the course of the medical procedure, willfully physically abused Patient C.

5

7. Respondent performed the medical procedure upon Patient C at the time when said patient was naked and while being held down by other individuals, who were also naked, contrary to any appropriate medical protocol or need.

8. Respondent inappropriately performed the medical procedure upon Patient C while an individual who was also naked utilized a cell phone to video said medical procedure.

9. Respondent failed to provide appropriate wound care for Patient C at the time of the medical procedure, and thereafter.

10. Respondent failed to provide appropriate follow-up medical care and treatment for Patient C's wound, and/or failed to refer Patient C to another medical provider for such post-medical procedure wound care.

11. Respondent inappropriately advised, or caused another individual to advise, Patient C to take photographs of the wound caused by the medical procedure on a daily basis for one month and once a week for another month, and to thereafter send such photographs to an individual who shared all or some of said photographs with Respondent.

12. Respondent failed to provide appropriate medical care and treatment for Patient C, including obtaining information regarding said patient's medical history and current medications.

13. Respondent failed to prepare and/or maintain appropriate medical records for the patient which accurately reflected the evaluation and treatment of Patient C.

14. Respondent fraudulently failed to disclose to Patient C that the initials KR and/or KAR said Respondent branded into the pelvis region of Patient C represented the initials of Keith Alan Ranieri.

15. Respondent performed the medical procedure upon Patient C without having obtained the adequate informed consent of Patient C.

6

Exhibit B   006

D.    On or about March 9, 2017, the Respondent used a cauterizing pen as part of a medical procedure to scar the skin by branding Patient D, a female patient, hereinafter identified in the attached Appendix "A", with the initials KR and/or KAR, in the pelvis region, thereby leaving a permanent scar. Respondent's conduct deviated from accepted standards of care as follows:

1.    Respondent performed the medical procedure upon Patient D in an other than appropriately sterile environment, and/or without appropriate infection control, and/or without the use of sterile technique, including the surgical field, surgical procedure room, multiple use of a cautery pen tip and electrical grounding pad, and documented electrical testing and maintenance upkeep of the cautery device.

2.    Respondent, while performing the medical procedure without the use of a local anesthetic or general anesthesia, thereby causing Patient D to suffer pain for no legitimate medical purpose.

3.    Respondent performed the medical procedure upon Patient D with non-medically trained personnel present, who were not wearing personal protective equipment.

4.    Respondent performed the medical procedure upon Patient D with the assistance of non-medically trained personnel who physically restrained said patient.

5.    Respondent failed to cease performing the medical procedure despite the fact that patient D was suffering pain without medical justification.

6.    Respondent, during the course of the medical procedure, willfully physically abused Patient D.

7.    Respondent performed the medical procedure upon Patient D at the time when said patient was naked and while being held down by other individuals, who were also naked, contrary to any appropriate medical protocol or need.

7

Exhibit B   007

8. Respondent inappropriately performed the medical procedure upon Patient D while an individual who was also naked utilized a cell phone to video said medical procedure.

9. Respondent failed to provide appropriate wound care for Patient D at the time of the medical procedure, and thereafter.

10. Respondent failed to provide appropriate follow-up medical care and treatment for Patient D's wound, and/or failed to refer Patient D to another medical provider for such post-medical procedure wound care.

11. Respondent inappropriately advised, or caused another individual to advise Patient D to take photographs of the wound caused by the medical procedure on a daily basis for one month and once a week for another month, and to thereafter send such photographs to an individual who shared all or some of said photographs with Respondent.

12. Respondent failed to provide appropriate medical care and treatment for Patient D, including obtaining information regarding said patient medical history and current medications.

13. Respondent failed to prepare and/or maintain appropriate medical records for the patient which accurately reflected the evaluation and treatment of Patient D.

14. Respondent fraudulently failed to disclose to Patient D that the initials KR and/or KAR said Respondent branded into the pelvis region of Patient D represented the initials of Keith Alan Ranieri.

15. Respondent performed the medical procedure upon Patient D without having obtained the adequate informed consent of Patient D.

E. On or about March 9, 2017, the Respondent used a cauterizing pen as part of a medical procedure to scar the skin by branding Patient E, a female patient, hereinafter identified in the attached Appendix "A", with the initials KR and/or KAR,

8

in the pelvis region, thereby leaving a permanent scar. Respondent's conduct deviated from accepted standards of care as follows:

1. Respondent performed the medical procedure upon Patient E in an other than appropriately sterile environment, and/or without appropriate infection control, and/or without the use of sterile technique, including the surgical field, surgical procedure room, multiple use of a cautery tip pen and electrical grounding pad, and documented electrical testing and maintenance upkeep of the cautery device.

2. Respondent performed the medical procedure without the use of a local anesthetic or general anesthesia, thereby causing Patient E to suffer pain for no legitimate medical purpose.

3. Respondent performed the medical procedure upon Patient E with non-medically trained personnel present, who were not wearing personal protective equipment.

4. Respondent performed the medical procedure upon Patient E with the assistance of non-medically trained personnel who physically restrained said patient.

5. Respondent failed to cease performing the medical procedure despite the fact that Patient E was suffering pain without medical justification.

6. Respondent, during the course of the medical procedure, willfully physically abused Patient E.

7. Respondent performed the medical procedure upon Patient E at the time when said patient was naked and while being held down by other individuals, who were also naked, contrary to any appropriate medical protocol or need.

8. Respondent inappropriately performed the medical procedure upon Patient E while an individual who was also naked utilized a cell phone to video said medical procedure.

9. Respondent failed to provide appropriate wound care for Patient E at the time of the medical procedure, and thereafter.

9

Exhibit B   009

10. Respondent failed to provide appropriate follow-up medical care and treatment for Patient E's wound, and/or failed to refer Patient E to another medical provider for such post-medical procedure wound care.

11. Respondent inappropriately advised, or caused another individual to advise, Patient E to take photographs of the wound caused by the medical procedure on a daily basis for one month and once a week for another month, and to thereafter send such photographs to an individual who shared all or some of said photographs with Respondent.

12. Respondent failed to provide appropriate medical care and treatment for the Patient E, including obtaining information regarding said patient's medical history and current medications.

13. Respondent failed to prepare and/or maintain appropriate medical records for the patient which accurately reflected the evaluation and treatment of Patient E.

14. Respondent fraudulently failed to disclose to Patient E that the initials KR and/or KAR said Respondent branded into the pelvis region of Patient E represented the initials of Keith Alan Ranieri.

15. Respondent performed the medical procedure upon Patient E without having obtained the adequate informed consent of Patient E.

F. During the period from on or about January 2017 through December 2017, the Respondent used a cauterizing pen as part of medical procedures to permanently scar the skin by branding one or more of the following: Patients F and G, female patients, hereinafter identified in the attached Appendix "A", with the initials KR and/or KAR, in their pelvis regions. Respondent's conduct deviated from accepted standards of care as follows:

1. Respondent performed the medical procedures upon one or more of the following: Patients F and G in an other than appropriately sterile environment,

10

Exhibit B  010

and/or without appropriate infection control, and/or without the use of sterile technique, including the surgical field, surgical procedure room, multiple use of a cautery pen tip and electrical grounding pad, and documented electrical testing and maintenance upkeep of the cautery device.

2. Respondent performed the medical procedures without the use of a local anesthetic or general anesthesia, thereby causing one or more of the following: Patients F and G to suffer pain for no legitimate medical purpose.

3. Respondent performed the medical procedures upon one or more of the following: Patients F and G with non-medically trained personnel present, who were not wearing personal protective equipment.

4. Respondent performing the medical procedures upon one or more of the following: Patients F and G with the assistance of non-medically trained personnel who physically restrained said patients.

5. Respondent failed to cease performing the medical procedures despite the fact that one or more of the following: Patients F and G were suffering pain without medical justification.

6. Respondent, during the course of the medical procedures willfully physically abused one or more of the following: Patients F and G.

7. Respondent inappropriately performed the medical procedures upon one or more of the following: Patients F and G while an individual utilized a cell phone to video said medical procedures.

8. Respondent failed to provide appropriate wound care for one or more of the following: Patients F and G at the time of the medical procedures, and thereafter.

9. Respondent failed to provide appropriate follow-up medical care and treatment for one or more of the following: Patients F and G, and/or failed to refer the patients to other medical providers for such post-medical procedures wound care.

11

Exhibit B   011

10. Respondent inappropriately advised, or caused another individual to advise, one or more of the following: Patients F and G to take photographs of the wounds caused by the medical procedures on a daily basis for one month and once a week for another month, and to thereafter send such photographs to an individual who shared all or some of said photographs with Respondent.

11. Respondent failed to provide appropriate medical care and treatment for one or more of the following: Patients F and G, including obtaining information regarding said patients' medical histories and current medications.

12. Respondent failed to prepare and/or maintain appropriate medical records for the patients which accurately reflected the evaluation and treatment of one or more of the following: Patients F and G.

13. Respondent performed the medical procedures upon one or more of the following: Patients F and G without having obtained the adequate informed consents of said Patients F and G.

G. During the time from on or about June 2016 through August 2016, NXIVM and/or the Executive Success Program (ESP) conducted a conference and/or meeting at the Silver Bay Conference and Family Retreat Center (Conference Center), located in Silver Bay, New York. The Respondent and approximately 438 other individuals attended the conference, including approximately 76 children. During the course of the conference, hundreds of the attendees became severely ill with an undetermined communicable disease. The individuals who became ill suffered inter alia, flu-like symptoms, severe vomiting and diarrhea. The Respondent had knowledge of the fact that many individuals at the conference had become ill. The Respondent knew or should have known that the illness suffered by the attendees at the conference was a communicable disease, outbreak of a communicable disease, and/or an unusual disease or outbreak. Respondent's conduct deviated from accepted standards of care as follows:

12

Exhibit B 012

1. Respondent failed to report a disease outbreak or unusual disease to the State Department of Health as required by Title 10 N,Y.C.R.R. Section 2.1(c).

2. Respondent failed to report the suspected or confirmed case of communicable disease, outbreak of communicable disease, and/or the unusual disease or outbreak to the city, county, or district health officer as required by Title 10 N.Y.C.R.R. Sections 2.10 and 2.1(b) and (c).

3. Respondent failed to report by telephone, facsimile, or other electronic communication, or in person the illness of the attendees at the conference suspected or confirmed to have been caused due to the consumption of spoiled or poisonous food to the city, county, or district health officer, in violation of Title 10 N.Y.C.R.R. Section 2.15.

4. Upon being made aware of the fact that attendees at the conference might have been suffering from a communicable disease, the Respondent failed to cause such individuals to be isolated in an appropriate environment, pending official action by the health officer, in violation of Title 10 N.Y.C.R.R. Section 2.27.

Roberts - 289

## SPECIFICATIONS OF CHARGES

### FIRST THROUGH SIXTH SPECIFICATIONS
### WILLFULLY ABUSING A PATIENT

Respondent is charged with committing professional misconduct as defined by New York Education Law §6530(31) by willfully abusing a patient as alleged in the facts of one or more of the following:

1. The facts in paragraphs A and A.2, A and A.4, A and A.5, A and A.6, and/or A and A.8.

2. The facts in paragraphs B and B.2, B and B.4, B and B.5, B and B.6, and/or B and B.8.

3. The facts in paragraphs C and C.2, C and C.4, C and C.5, C and C.6, and/or, C and C.8.

4. The facts in paragraphs D and D.2, D and D.4, D and D.5, D and D.6, and/or, D and D.8.

5. The facts in paragraphs E and E.2, E and E.4, E and E.5, E and E.6, and/or, E and E.8.

6. The facts in paragraphs F and F.2, F and F.4, F and F.5, F and F.6, and/or F and F.8.

14

Exhibit B  014

## SEVENTH THROUGH
## TWELFTH SPECIFICATIONS

## CONDUCT IN THE PRACTICE OF MEDICINE
## WHICH EVIDENCES MORAL UNFITNESS

Respondent is charged with committing professional misconduct as defined by New York Education Law §6530(20) by engaging in conduct in the practice of medicine which evidences moral unfitness to practice medicine as alleged in the facts of one or more of the following:

7. The facts in paragraphs A and A.2, A and A.4, A and A.5, A and A.6, and/or A and A.8.

8. The facts in paragraphs B and B.2, B and B.4, B and B.5, B and B.6, and/or B and B.8.

9. The facts in paragraphs C and C.2, C and C.4, C and C.5, C and C.6, and/or C and C.8.

10. The facts in paragraphs D and D.2, D and D.4, D and D.5, D and D.6, and/or D and D.8.

11. The facts in paragraphs E and E.2, E and E.4, E and E.5, E and E.6, and/or E and E.8.

12. The facts in paragraphs F and F.2, F and F.4, F and F.5, F and F.6, and/or F and F.8.

15

Exhibit B   015

## THIRTEENTH THROUGH EIGHTEENTH SPECIFICATIONS

## FAILING TO USE APPROPRIATE STERILE ENVIRONMENT
## AND/OR WITHOUT APPROPRIATE INFECTION CONTROL
## AND/OR WITHOUT THE USE OF STERILE TECHNIQUE

Respondent is charged with committing professional misconduct as defined by New York Education Law §6530(47) by failing to use scientifically accepted barrier precautions and infection control practices as established by the department of health as alleged in the facts of one or more of the following:

13. The facts in paragraphs A and A.1, A and A.3, A and A.4, and/or A and A.7.

14. The facts in paragraphs B and B.1, B and B.3, B and B.4, and/or B and B.7.

15. The facts in paragraphs C and C.1, C and C.3, C and C.4, and/or C and C.7.

16. The facts in paragraphs D and D.1, D and D.3, D and D.4, and/or D and D.7.

17. The facts in paragraphs E and E.1, E and E.3, E and E.4, and/or E and E.7.

18. The facts in paragraphs F and F.1, F and F.3, F and F.4, and/or F and F.7.


## NINTEENTH SPECIFICATION

## PRACTICING THE PROFESSION FRAUDULENTLY OR BEYOND ITS SCOPE

Respondent is charged with committing professional misconduct as defined by New York Education Law §6530(2) by practicing the profession fraudulently or beyond its authorized scope as alleged in the facts of one or more of the following:

19. The facts in paragraphs A and A.2, A and A.3, A and A.8 and/or A and A.14; B and B.2, B and B.3, B and B.8, and/or B and B.14; C and C.2, C and C.3, C and C.8, and/or C and C.14; D and D.2, D and D.3, D and D.8, and/or D and D.14; E

16

Exhibit B  016

and E.2, E and E.3, E and E.8, and/or E and E. 14; F and F.2, F and F.3, and/or F and F.7.

## TWENTIETH THROUGH TWENTY-FIFTH SPECIFICATIONS
## PRACTICING THE PROFESSION WITH GROSS NEGLIGENCE

Respondent is charged with committing professional misconduct as defined by New York Education Law §6530(4) by practicing the profession with gross negligence as alleged in the facts of one or more of the following:

20. The facts in paragraphs A and A.1, A and A.2, A and A.3, A and A.4, A and A.5, A and A.6, A and A.7, A and A.8, A and A.9, A and A.10, A and A.11, A and A.12, A and A.13, A and A.14, and/or A and A.15.

21. The facts in paragraphs B and B.1, B and B.2, B and B.3, B and B.4, B and B.5, B and B.6, B and B.7, B and B.8, B and B.9, B and B.10, B and B.11, B and B.12, B and B.13, B and B.14, and/or B and B.15.

22. The facts in paragraphs C and C.1, C and C.2, C and C.3, C and C.4, C and C.5, C and C.6, C and C.7, C and C.8, C and C.9, C and C.10, C and C.11, C and C.12, C and C.13, C and C.14, and/or C and C.15.

23. The facts in paragraphs D and D.1, D and D.2, D and D.3, D and D.4, D and D.5, D and D.6, D and D.7, D and D.8, D and D.9, D and D.10, D and D.11, D and D.12, D and D.13, D and D.14, and/or D and D.15.

17

Exhibit B   017

24. The facts in paragraphs E and E.1, E and E.2, E and E.3, E and E.4, E and E.5, E and E.6, E and E.7, E and E.8, E and E.9, E and E.10, E and E.11, E and E.12, E and E.13, E and E.14, and/or E and E.15.

25. The facts in paragraphs F and F.1, F and F.2, F and F.3, F and F.4, F and F.5, F and F.6, F and F.7, F and F.8, F and F.9, F and F.10, F and F.11, F and F.12, and/or F and F.13.

## TWENTY-SIXTH SPECIFICATION

## PRACTICING THE PROFESSION WITH NEGLIGENCE
## ON MORE THAN ONE OCCASION

Respondent is charged with committing professional misconduct as defined by New York Education Law §6530(3) by practicing the profession with negligence on more than one occasion as alleged in the facts of the following:

26. The facts in paragraphs A and A.1, A and A.2, A and A.3, A and A.4, A and A.5, A and A.6, A and A.7, A and A.8, A and A.9, A and A.10, A and A.11, A and A.12, A and A.13, and/or A and A.15; and/or B and B.1, B and B.2, B and B.3, B and B.4, B and B.5, B and B.6, B and B.7, B and B.8, B and B.9, B and B.10, B and B.11, B and B.12, B and B.13, and/or B and B.15; and/or C and C.1, C and C.2, C and C.3, C and C.4, C and C.5, C and C.6, C and C.7, C and C.8, C and C.9, C and C.10, C and C.11, C and C.12, C and C.13, and/or C and C.15; and/or D and D.1, D and D.2, D and D.3, D and D.4, D and D.5, D and D.6, D and D.7, D and D.8, D and D.9, D and D.10, D and D.11, D and D.12, D and D.13, and/or D

18

Exhibit B   018

and D.15; and/or E and E.1, E and E.2, E and E.3, E and E.4, E and E.5, E and E.6, E and E.7, E and E.8, E and E.9, E and E.10, E and E.11, E and E.12, E and E.13, and/or E and E.15; and/or F and F.1, F and F.2, F and F.3, F and F.4, F and F.5, F and F.6, F and F.7, F and F.8, F and F.9, F and F.10, F and F.11, F and F.12, and/or F and F.13; and/or G and G.1, G and G.2, G and G.3, and/or G and G.4.

## TWENTY-SEVENTH THROUGH THIRTY-SECOND SPECIFICATIONS
## PRACTICING THE PROFESSION WITH GROSS INCOMPETENCE

Respondent is charged with committing professional misconduct as defined by New York Education Law §6530(6) by practicing the profession with gross incompetence as alleged in the facts of one or more of the following:

27.   The facts in paragraphs A and A.1, A and A.2, A and A.3, A and A.4, A and A.5, A and A.6, A and A.7, A and A.8, A and A.9, A and A.10, A and A.11, A and A.12, A and A.13, and/or A and A.15.

28.   The facts in paragraphs B and B.1, B and B.2, B and B.3, B and B.4, B and B.5, B and B.6, B and B.7, B and B.8, B and B.9, B and B.10, B and B.11, B and B.12, B and B.13, and/or A and A.15.

29.   The facts in paragraphs C and C.1, C and C.2, C and C.3, C and C.4, C and C.5, C and C.6, C and C.7, C and C.8, C and C.9, C and C.10, C and C.11, C and C.12, C and C.13, and/or C and C.15.

19

Exhibit B   019

30. The facts in paragraphs D and D.1, D and D.2, D and D.3, D and D.4, D and D.5, D and D.6, D and D.7, D and D.8, D and D.9, D and D.10, D and D.11, D and D.12, D and D.13, and/or D and D.15.

31. The facts in paragraphs E and E.1, E and E.2, E and E.3, E and E.4, E and E.5, E and E.6, E and E.7, E and E.8, E and E.9, E and E.10, E and E.11, E and E.12, E and E.13, and/or E and E.15.

32. The facts in paragraphs F and F.1, F and F.2, F and F.3, F and F.4, F and F.5, F and F.6, F and F.7, F and F.8, F and F.9, F and F.10, F and F.11, F and F.12, and/or F and F.13.

## THIRTY-THIRD SPECIFICATION

## PRACTICNG THE PROFESSION WITH INCOMPETENCE ON MORE THAN ONE OCCASION

Respondent is charged with committing professional misconduct as defined by New York Education Law §6530(5) by practicing the profession with incompetence on more than one occasion as alleged in the facts of the following:

33. The facts in paragraphs A and A.1, A and A.2, A and A.3, A and A.4, A and A.5, A and A.6, A and A.7, A and A.8, A and A.9, A and A.10, A and A.11, A and A.12, A and A.13, and/or A and A.15; and/or B and B.1, B and B.2, B and B.3, B and B.4, B and B.5, B and B.6, B and B.7, B and B.8, B and B.9, B and B.10, B and B.11, B and B.12, B and B.13, and/or B and B.15; and/or C and C.1, C and C.2, C and C.3, C and C.4, C and C.5, C and C.6, C and C.7, C and C.8, C and C.9,

20

Exhibit B   020

C and C.10, C and C.11, C and C.12, C and C.13, and/or C and C.15; and/or D and D.1, D and D.2, D and D.3, D and D.4, D and D.5, D and D.6, D and D.7, D and D.8, D and D.9, D and D.10, D and D.11, D and D.12, D and D.13, and/or D and D.15; and/or E and E.1, E and E.2, E and E.3, E and E.4, E and E.5, E and E.6, E and E.7, E and E.8, E and E.9, E and E.10, E and E.11, E and E.12, E and E.13, and/or E and E.15; and/or F and F.1, F and F.2, F and F.3, F and F.4, F and F.5, F and F.6, F and F.7, F and F.8, F and F.9, F and F.10, F and F.11, F and F.12, and/or F and F.13; and/or G and G.1, G and G.2, G and G.3, and/or G and G.4.

## THIRTY-FOURTH SPECIFICATION

## WILLFULLY FAILING TO FILE A REPORT REQUIRED BY LAW

Respondent is charged with committing professional misconduct as defined by New York Education Law §6530(21) by willfully failing to file a report required by law or by the Department of Health, or the Education Department as alleged in the facts of one or more of the following:

34. The facts in paragraphs G and G.1, G and G.2, G and G.3 and/or G. and G.4.

21

Exhibit B   021

### THIRTY-FIFTH SPECIFICATION

### WILLFULLY OR GROSSLY FAILING TO COMPLY WITH
### FEDERAL, STATE, OR LOCAL LAWS RULES OR
### REGULATIONS GOVERNING THE PRACTICE OF MEDICINE

Respondent is charged with committing professional misconduct as defined by New York Education Law §6530(16) by willfully or grossly negligently failing to comply with substantial provisions of federal, state, or local laws, rules, or regulations governing the practice of medicine as alleged in the facts of one or more of the following:

35. The facts in paragraphs G and G.1, G and G.2, G and G.3 and/or G and G.4.

### THIRTY-SIXTH THROUGH
### FORTY-FIRST SPECIFICATIONS

### PERFORMING PROFESSIONAL SERVICES WHICH
### HAVE NOT BEEN AUTHORIZED BY THE PATIENT

Respondent is charged with committing professional misconduct as defined by New York Education Law §6530(26) by performing professional services which have not been authorized by the patient as alleged in the facts of one or more of the following:

36. The facts in paragraphs A and A.14, and/or A and A.15.

37. The facts in paragraphs B and B.14, and/or B and B.15.

38. The facts in paragraphs C and C.14, and/or C and C.15.

39. The facts in paragraphs D and D.14, and/or D and D.15.

40. The facts in paragraphs E and E.14, and/or E and E.15.

41. The facts in paragraphs F and F.14, and/or F and F.15.

22

Exhibit B   022

## FORTY-SECOND THROUGH FORTY-SEVENTH SPECIFICATIONS

## FAILING TO MAINTAIN RECORDS

Respondent is charged with committing professional misconduct as defined by New York Education Law §6530(32) by failing to maintain a record for each patient which accurately reflects the evaluation and treatment of the patient as alleged in the facts of the following:

42. The facts in paragraphs A and A.13.

43. The facts in paragraphs B and B.13.

44. The facts in paragraphs C and C.13.

45. The facts in paragraphs D and D.13.

46. The facts in paragraphs E and E.13.

47. The facts in paragraphs F and F.12.

DATE: April 27, 2020
     Albany, New York

TIMOTHY J. MAHAR, ESQ.
Deputy Counsel
Bureau of Professional Medical Conduct

23

STATE OF NEW YORK : DEPARTMENT OF HEALTH
STATE BOARD FOR PROFESSIONAL MEDICAL CONDUCT
-------------------------------------------------------------------------------x
                                          :

**IN THE MATTER**             :       **DETERMINATION**

**OF**                      :            **AND**

**DANIELLE ROBERTS, D.O.**     :         **ORDER**
                                            :
-------------------------------------------------------------------------------x

       A Notice of Hearing and Statement of Charges dated March 5, 2020, and Amended Statement of Charges dated April 27, 2020, were duly served pursuant to § 230(10)(d)(i) of the Public Health Law (PHL) upon Danielle Roberts, D.O. (Respondent). (Exhibits 1, 1a; Appendix I.) Steven Lapidus, M.D., Chair, Ramanathan Raju, M.D., and Joan Martinez McNicholas, duly designated members of the State Board for Professional Medical Conduct, served as the Hearing Committee, and Dawn MacKillop-Soller, served as the Administrative Law Judge. PHL § 230(10)(e). The Department of Health, Bureau of Professional Medical Conduct (Department), appeared by Jeffrey J. Conklin, Esq. The Respondent appeared and was represented by Anthony Z. Scher, Esq.

       The Hearing Committee voted 3-0 to sustain 45 specifications among ten definitions of misconduct set forth in the Education Law: willfully abusing a patient §6530(31); conduct in the practice of medicine which evidences moral unfitness §6530(20); failing to use appropriate infection control practices §6530(47); practicing the profession of medicine fraudulently §6530(2); practicing the profession with gross negligence §6530(4); practicing the profession with negligence on more than one occasion §6530(3); practicing the profession with gross incompetence §6530(6); practicing the profession with incompetence on more than one occasion §6530(5); performing professional services which have not been authorized by the patient §6530(26); and failing to maintain a record for each patient which accurately reflects the evaluation and treatment of the patient § 6530(32). The Hearing Committee also voted 2-1 to sustain two

additional specifications of misconduct: willfully failing to file a report required by law §6530(21) and willfully or grossly negligently failing to comply with substantial provisions of federal, state, or local laws, rules, or regulations governing the practice of medicine §6530(16).

The Hearing Committee unanimously determined to impose the penalty of revocation of the Respondent's medical license pursuant to PHL § 230-a(4).

## **Hearing Record**

| | |
|---|---|
| Pre-Hearing Conference: | May 28, 2020 |
| Hearing Dates: | June 2, July 1 & 6, August 12 & 14, September 9, October 21, November 3, December 2 & 15, 2020. January 8, February 19, March 2, 2021. |
| Witnesses for Petitioner: | Vasco Bilbao (Transcript, p. 61-189.) Danielle Roberts, D.O. (Transcript, p. 199-440, 514-757.) Ariella Cepelinski (Transcript, p. 443-490.) Michael Menashy (Transcript, p. 492-511.) S.E. (Transcript, p. 769-942.) Robert T. Grant, M.D. (Transcript, p. 1056-1238.) Bruce F. Farber, M.D. (Transcript, p. 955-1045.) |
| Petitioner's Exhibits: | 1, 1a, 2a, 2b, 3, 4, 6, 8d, 9, 14a, 15a, 16, 17, 35, 38, 45, 47-49 |
| Witnesses for Respondent: | Danielle Roberts, D.O. (Transcript, p. 1247-1461, 2106-2150.) David Mayer, M.D. (Transcript, p. 1469-1594.) M.H. (Transcript, p. 1594-1666.) Jane Doe 1 (Transcript, p. 1675-1720.) Jane Doe 2 (Transcript, p. 1726-1755.) Steve Arthur Haworth (Transcript, p. 1758-1840, 2094-2097.) E. Carlson (Transcript, p. 1845-1855.) R. Wolle (Transcript, p. 1856-1867.) Jane Doe 3 (Transcript, p. 1878-1930.) Jane Doe 4 (Transcript, p. 1934-1993.) Jane Doe 5 (Transcript, p. 1996-2092.) |
| Respondent's Exhibit: | A |
| ALJ Exhibit: | I |
| Written Submissions received: | June 2, 2021 |
| Deliberations held: | June 29, July 20, 2021 |

Exhibit C  002

## **Findings of Fact**

The Hearing Committee unanimously makes the following findings of fact:

1.     Respondent Danielle Roberts, D.O., was authorized to practice medicine in New York State on October 5, 2009, by the issuance of license number 255075. (Exhibit 3.)

2.     The Respondent's background includes board certification and completion of a residency in family practice in 2011 followed by working as a physician and medical director between 2011 and 2013 at a large family practice caring for patients of all ages and with various conditions. From 2013 to 2018, she worked as a hospitalist at St. Peter's Hospital in Albany providing medical care to hospital patients from admission to discharge. Her background also includes seven years of locum tenens work at a hospital in Wisconsin and one year at a large integrative medical practice in Manhattan. (Exhibit 38; Transcript, p. 202, 206-207, 1249-1250, 1424-1425.)

3.     In 2013, the Respondent joined NXIVM, a personal development organization founded by Keith Raniere, also known as Vanguard. NXIVM is the parent company to several umbrella organizations, including ESP (Executive Success Programs), SOP (Society of Protectors), Ninth Media, DOS (dominus obsequious sororium, master/slave, master allegiance sisterhood), and Exo/Eso (fitness/exercise program), with multiple center locations in New York, California, Canada, and Mexico. (Exhibit 49; Transcript, p. 65, 184, 186-187, 224, 1255-1256, 1261, 1728.)

4.     In 2016, the Respondent joined DOS, a secret women's group developed by eight "1st line" or original members in collaboration with Keith Raniere. The claimed purpose of DOS was to empower women to build character, strength, and discipline by overcoming fears and pain to experience growth. The Respondent's involvement in DOS was "2nd line member" behind the "1st line" members. (Exhibits 14a, 49; Transcript, p. 234, 246, 252-253, 411-412, 526, 785, 1426, 1938, 2003.)

Exhibit C  003

5.     Membership in DOS required a lifetime commitment or "vow of obedience" between master and slave, the exchange of collateral, a necklace or collar worn 24 hours every day to symbolize obedience and commitment, and a brand placed by an electrocautery device to the pelvic region as part of a branding ceremony. The vow required slaves to strictly follow their masters' orders and keep DOS completely secret. The goal of the branding was to overcome pain and create solidarity. (Exhibit 14a; Transcript, p. 240-243, 255-256, 358-359, 1265, 1268, 1730, 1747-1750, 1888, 1938-1939.)

6.     The brandings of the women, including S.E., A.M., J.G., C.G., A.C., and L.S., occurred only after they committed to join DOS and submitted multiple forms of acceptable collateral. Acceptable collateral included titles to houses and cars, investment and bank accounts, businesses, nude photographs, incriminating letters and/or written confessions detailing sexual deviance, illicit drug use, extramarital affairs, and/or embarrassing family matters. The collateral coerced the women into keeping DOS secret and maintaining their commitment and was subject to public release if the women breached these requirements. (Exhibit 14a; Transcript, p. 243-246, 358-359, 781, 783, 796, 815, 859, 894, 1730, 1747-1748, 1967, 1969, 2054-2055.)

7.     An electrocautery device generates electrical energy that is converted to heat for cutting through skin or solid organs, dissection, separating planes between tissues, hemostasis to stop or seal off bleeding blood vessels or lymphatics during procedures, and for electrocautery branding to place a scar on the body. While an electrocautery device can be used as a scalpel, it is not intended to be used directly on the skin surface because it can cause significantly more skin damage extending beyond the tip or point of contact. (Transcript, p. 1072, 1074, 1224, 1541.)

8.     A smoke evacuator must be used with an electrocautery device to remove dangerous particulate matter such as viruses, infectious diseases, blood cells, and other antigens released from the

Exhibit C  004

device upon contact with skin and tissue and prevent them from being absorbed or inhaled. (Transcript, p. 1074, 1082.)

9. Electrocautery branding is a form of body modification in which an electrical arch on the electrocautery device vaporizes the skin and leaves behind undamaged skin and tissue but not a 2nd degree burn. (Transcript, p. 1787-1788.)

10. Prior to performing the branding procedures on the women, including S.E., A.M., J.G., C.G., A.C., and L.S., the Respondent was required, under acceptable standards of medical conduct that apply to physicians, to complete training in the use of an electrocautery device. The training involves: (1) regulating the settings considering skin anatomy for the appropriate amount of energy transmitted through the tip; (2) grounding the device; (3) using personal protection equipment; and (4) safely operating and maintaining the device, including the use of a smoke evacuator. The Respondent never completed such training. (Transcript, p. 1070-1079, 1082-1087, 1125-1126, 1322-1325, 1327-1328.)

11. Beginning in January of 2017 and continuing through March of 2017, the Respondent used a Medline Valley Lab Surgistat electrocautery device and a stencil to brand "KAR," the initials of Keith Raniere, into the pelvic regions of 17 women, including S.E., A.M., J.G., C.G., A.C., and L.S., most of whom were nude. The brandings were done without anesthesia to intentionally cause them pain. (Exhibits 8D, 45, 47; Transcript, p. 313, 339, 416, 524, 584-585, 635-640, 692, 1331-1332, 1353, 2107-2108.)

12. The branding procedures occurred in a small room of a house and took between 20 and 45 minutes to complete. They were videotaped with a cell phone while a group of women used their bare hands and/or naked bodies to hold down the woman branded to keep her still and supine on the massage table. (Exhibit 8D; Transcript, p. 308, 313-314, 330, 524, 636, 804, 821, 827, 1333-1334, 1377, 1416, 1421.)

Exhibit C 005

13. The Respondent's conduct in performing the brandings on S.E., A.M., J.G., C.G., A.C., L.S. and the other women constituted the practice of medicine by a physician. The Respondent relied on her medical training, education, and background when she performed the procedures to alter the skin and physical condition of their pelvic regions. (Transcript, p. 1110, 1115-1116, 1129, 1176.)

14. The brandings performed by the Respondent while licensed as a physician were medical procedures in which standards of medical practice apply. (Transcript, p. 1097, 1109, 1112, 1129, 1163.)

15. An electrocautery device must be properly grounded to ensure the safe return of the electrical energy from the person treated with the electrocautery device back to the grounding pad, which is affixed to that person. This process involves ensuring the operator and participants are properly insulated to prevent a burn by wearing gloves to avoid serving as the ground themselves. The women participants were not wearing gloves. (Transcript, p. 342, 638, 696, 1074, 1079-1080, 1082, 1154.)

16. Physicians using an electrocautery device to perform procedures must adhere to infection control standards applicable to physicians performing invasive procedures on the human body. They must maintain a sterile field and sterile environment by: (1) applying draping around the surgical site and as a barrier to block off unsterile areas; (2) using an antibacterial cleaning solution to clean the room, surfaces, table, and equipment between cases and terminally at the end of the day; and (3) requiring all participants wear personal protection equipment, including sterile gloves, masks, and eye shields. The purpose in these requirements is to prevent infection. The Respondent followed none of these infection control procedures. (Exhibit 8D; Transcript, p. 341-342, 522, 536, 638, 1097-1098, 1100-1105, 1125, 1130, 1160-1161.)

17. Physicians using electrocautery devices must also adhere to operational standards by performing and documenting routine testing and service of the electrocautery device and confirming sufficient electrical output in the room where the device is used. The purpose in these rules is to prevent a surgical or electrical fire during a procedure. (Transcript, p. 1071, 1097-1098, 1100.)

Exhibit C 006

18.     The Respondent's failures to maintain proper infection control standards and operational procedures while using an electrocautery device that inflicted 2nd degree burns on the women were severe deviations from the standard of care. (Transcript, p. 1124-1125, 1132.)

19.     In using an electrocautery device to perform the brandings without anesthesia, the Respondent caused the women, including S.E., A.M., J.G., C.G., A.C., and L.S., significant physical pain, 2nd degree burns, and abnormal permanent and/or raised keloid and hypertrophic scarring, and placed them at risk for harm, including deeper 3rd and 4th degree burns and psychological trauma like post-traumatic stress disorder (PTSD) or anxiety. (Exhibits 14a, 45, 47; Transcript, p. 579, 1079-1090, 1124-1130, 1133-1146, 1154, 1209, 1377, 1403, 1421.)

20.     In subjecting the women to significant pain from the electrocautery device, the Respondent was required to administer them, or at the very least offer, anesthesia, such as a local anesthetic, to alleviate the pain. The Respondent had no legitimate medical reason, such as an allergy or an emergency, for neither providing the women anesthesia nor presenting them with this treatment option. (Transcript, p. 339, 635, 1073, 1086.)

21.     The Respondent's failure to administer or advise and offer anesthesia to the women was a severe deviation from the standard of care. Physicians are ethically prohibited from causing patients such extreme harm on purpose. (Transcript, p. 1073, 1124-1125, 1131-1132, 1210-1211.)

22.     The Respondent never informed the women she branded that the brand was KAR to represent Keith Raniere's initials or that it would measure approximately two inches by two inches. The brand was intentionally placed upside down and backwards on most of the women to conceal Keith Raniere's initials. S.E., A.M., J.G., C.G., A.C. and others had falsely been told by their masters that the brand represented "a symbol of the sorority," "a line of the sun and the earth and certain elements," an "abstract symbol," "chakras," and/or "four elements," and that the size would be "little," "small," and/or

Exhibit C  007

"dime sized." Only L.S., as a "1st line" member, knew prior to her branding that the brand represented Keith Raniere's initials. (Exhibit 14a; Transcript, p. 351, 541-542, 787, 797-802, 904, 1355, 1450, 1685-1686, 1739, 1882, 1939, 1941-1942.)

23.     Prior to performing the branding procedures on the women, the Respondent was required to obtain their voluntary, verbal and/or written informed consent that reflected a discussion of the psychological and physical risks, benefits, and alternatives to the procedure, including the option not to proceed; the pain involved and the option of anesthesia; details of the brand symbol; and consideration of the individual's psychological and medical histories, comorbidities, and medications. The purpose of obtaining informed consent is to confirm the women have a complete understanding of the procedure and to avoid complications. The Respondent did not obtain such consent from any of the women. (Transcript, p. 435-437, 538-540, 1098, 1124-1125, 1164-1168, 1178-1182, 1985.)

24.     The Respondent's infliction of the branding procedures on the women without obtaining their voluntary verbal and/or written informed consent was a severe deviation from the standard of care. Informed consent must be voluntary and not in connection with coercion under the threat of disclosure of personal and potentially damaging or destructive collateral. (Transcript, p. 1098, 1124-1125, 1132, 1178-1183.)

25.     Physicians are obligated to provide proper care of 2nd degree burn wounds that includes application of antibacterial ointment and treatment plans that include follow-up physician monitoring. Providing this care is critical to ensure proper wound healing and to prevent infection. The Respondent failed to provide this care. (Transcript, p. 542-545, 624-625, 1164, 1166-1167, 1171, 1349, 2114.)

26.     The Respondent's failure to provide proper treatment and follow-up care of the 2nd degree burn wounds was a severe deviation from the standard of care. (Transcript, p. 1093-1096, 1123-1124, 1128, 1164, 1166-1167, 1171, 1174.)

Exhibit C  008

27.     Following completion of the branding procedures, the Respondent instructed the women to submit photos of their brands to their masters every day for 30 days and then one time per week. The Respondent evaluated and kept the photos but never made them part of a medical record because she never prepared or maintained such records for the women. (Transcript, p. 377, 379, 540, 543, 547-549, 556.)

28.     Physicians performing medical procedures involving the infliction of wounds are required to prepare, maintain, and document medical records that include photographs of the wound and details of the procedure, the equipment used, physical evaluations, diagnosis, treatment plans, and post-procedure instructions. The Respondent severely deviated from the standard of care by failing to prepare and maintain medical records to apprise outside providers of the treatment provided. (Transcript, p. 1173-1174.)

29.     In 2016, the Respondent participated in a ten-day annual NXIVM corporate retreat known as "Vanguard week" at the Silver Bay YMCA Family and Retreat Center, located in Silver Bay, New York. The purpose of the event was to celebrate the birthday of Keith Raniere. The attendees included more than 400 NXIVM members. (Exhibit 17; Transcript, p. 80, 90-93, 451-452, 456, 478, 496, 708, 710.)

30.     During the event and while attending it, the Respondent became aware of a gastrointestinal illness affecting many of the attendees. Among the attendees were children, a woman with end-stage cancer, and a pregnant woman. The symptoms of the illness included diarrhea, nausea, vomiting, dehydration, and fatigue. This illness placed the attendees and the public at risk for harm, including gastrointestinal morbidity and dehydration, which is a particular concern for people with comorbidities like cancer. (Transcript, p. 84-85, 454, 455, 485, 498-499, 505, 714-715.)

31.     This illness constituted a disease outbreak because it involved a large group of people who developed similar symptoms while attending the same event in a confined environment. Physicians are required under Department of Health regulations to report a communicable disease or any disease outbreak

Exhibit C  009

or unusual disease to public health officials. 10 NYCRR 2.10. The Respondent failed to take any steps to comply with these requirements. (Transcript, p. 972, 991.)

32.    The Respondent's failure to report the infectious disease outbreak was a violation of public health regulations and a significant deviation from the standard of care for a physician. (Transcript, p. 991.)

## Factual Allegations

By email correspondence dated March 1, 2021, the Petitioner withdrew factual allegations G.3 and G.4. (ALJ I.) The Hearing Committee sustained all the remaining Factual Allegations in the Statement of Charges.

The Hearing Committee <u>sustained</u>, by unanimous vote (3-0):

Factual Allegations A.1, A.2, A.3, A.4, A.5, A.6, A.7, A.8, A.9, A.10, A.11, A.12, A.13, A.14, A.15, B.1, B.2, B.3, B.4, B.5, B.6, B.7, B.8, B.9, B.10, B.11, B.12, B.13, B.14, B.15, C.1, C.2, C.3, C.4, C.5, C.6, C.7, C.8, C.9, C.10, C.11, C.12, C.13, C.14, C.15, D.1, D.2, D.3, D.4, D.5, D.6, D.7, D.8, D.9, D.10, D.11, D.12, D.13, D.14, D.15, E.1, E.2, E.3, E.4, E.5, E.6, E.7, E.8, E.9, E.10, E.11, E.12, E.13, E.14, E.15, F.1, F.2, F.3, F.4, F.5, F.6, F.7, F.8, F.9, F.10, F.11, F.12, F.13.

The Hearing Committee <u>sustained</u>, by majority vote (2-1):

Factual Allegations G.1, G.2.

## Evaluation of the Respondent's Testimony

The Respondent testified on her own behalf and as a witness for the Petitioner. Although considered incidental by the Hearing Committee in deciding central issues in this case, the Hearing Committee believes it is worth noting the Respondent's evasiveness, defiance, and inconsistencies on various points. For instance, she refused to disclose: (1) the circumstances of her becoming involved in NXIVM (Transcript, p. 218); (2) the initials of the women she branded (Transcript, p. 315-316); (3) the whereabouts of the branding videos and whether she maintained them (Transcript, p. 328, 331); (4) how it was determined the brandings would be videotaped (Transcript, p. 331); (5) who was present when she branded L.S. (Transcript, p. 333); (6) the roles of the women in the room with L.S. during the branding

Exhibit C  010

(Transcript, p. 336); (7) whether L.S. was clothed during the branding (Transcript, p. 335); (8) what the brand represented (Transcript, p. 351); and (9) whether L.S.'s limbs were held down when she was branded (Transcript, p. 337). Despite being directed to answer these questions when they were asked, the Respondent never did. She also initially refused to disclose whether she was branded with Keith Raniere's initials (Transcript, p. 518-519) but then finally admitted — consistent with the other evidence — that she was branded and that the brand was KAR to represent his initials. (Exhibits 14a and 49; Transcript, p. 1312, 1352-1352, 1388, 1391-1393, 1396.)

Further inconsistencies include her initial testimony that she was unaware of the details of the electrocautery device she used, stating it was "purchased by the friend that invited me" (Transcript, p. 266, 269), and her later testimony that she purchased it, identifying the model and manufacturer. (Transcript, p. 2108.) She also initially testified that DOS was "a completely separate organization" from NXIVM and Keith Raniere was not its "leader" (Transcript, p. 253) and that L.S., a 1st line member, had "no master" (Transcript, p. 381), but then later admitted that Keith Raniere was the "grandmaster" to the 1st line members (Transcript, p. 1387), who were his "slaves." (Transcript, p. 1389.)

The Hearing Committee finds these factors significantly diminished the Respondent's credibility and evaluated her testimony accordingly.

## The Practice of Medicine

The Hearing Committee was not persuaded by the Respondent's arguments that the Board lacks subject matter jurisdiction to bring charges against her because she "was not engaged in the practice of medicine" and that branding "is not a medical procedure." (Respondent's brief, p. 2.) The Hearing Committee finds the Petitioner correctly argues the Respondent "performed medical procedures when she branded the DOS women" and that "the brandings fell within the definition as to what constitutes the

Exhibit C 011

practice of medicine" and agrees with its reliance on Courts having a long-standing history of interpreting Educ. Law §6521 broadly to support these positions. (Petitioner's brief, p. 12-13.)

The practice of the profession of medicine is defined as "diagnosing, treating, operating or prescribing for any human disease, pain, injury, deformity or physical condition." Educ. Law § 6521. Whether conduct constitutes the practice of medicine is a determination to be made by the Hearing Committee based on the facts presented. Addei v. State Board for Professional Medical Conduct, 278 AD2d 551, 552 (3d Dept. 2000); See also Educ. Law §6504. This determination must be based solely on the facts "and not upon the name of the procedure, its origins or legislative lack of clairvoyance." People v. Amber, 76 Misc. 2d 267, 273 (Sup. Ct. Queens Co. 1973).

The reported decisions relied on by the Petitioner that the Hearing Committee finds convincing on this point include People v. Amber, *supra* at 273, in which the Court described its interpretation of Educ. Law §6521 as "a statute intended to regulate, limit or control the diagnosis and treatment of ailments must be read broadly to include the gamut of those known, whether or not recognized and even those not yet conjured." (Petitioner's brief, p. 12-13.) See also, People v. Mastromarino, 148 Misc. 454, 455 (Sup. Ct. Kings Co. 1933); People v. Rubin, 103 Misc.2d 227, 234 (N.Y. City Crim. Ct. Queens Co. 1979). The Respondent acknowledges that while branding "arguably involves operating," the operations were not "for a human disease, pain, injury, deformity or physical condition," and so did not fit the statute because the women were "perfectly healthy and normal in all respects" when they received the brands. (Respondent's brief, p. 3-4.)

The Respondent relies on Matter of Gross v. Ambach, 71 NY2d 859, 861 (1988), in which the Court of Appeals determined autopsies constitute the practice of medicine because they are "the ultimate diagnostic procedure" to diagnose the cause and manner of death. (Respondent's brief, p. 3-4.) The Hearing Committee finds the only similarity to be drawn between the two cases is that the statute somehow

Exhibit C  012

does not fit. There because autopsies are not practicing medicine since medicine can only be practiced on "living" patients and here because the women were "normal and healthy" when they were branded. <u>Gross, supra</u> at 861. In any event, the Hearing Committee, like the Court of Appeals in <u>Gross</u>, declines to limit the statue in that regard. *Id.* (Respondent's brief, p. 4.) The Hearing Committee rejects the Respondent's claim that it is "blatantly obvious" that the Respondent's "operating" on the women was not for "a human disease, pain, injury, deformity or physical condition" to meet the criteria under the statute. (Respondent's brief, page 3.) To the contrary, it is glaringly obvious to the Hearing Committee that she was operating on the women to alter the skin, appearance, and physical condition of their pelvic regions regardless of whether they were "normal and healthy." (Transcript, p. 1110-1111, 1116.)

The Petitioner presented as a witness plastic surgeon Robert T. Grant, M.D. While Dr. Grant lacks branding experience, the Hearing Committee noted his expertise and credibility on the main issues in this case were established by his decades of experience as a board-certified specialist in general and plastic surgeries performing cosmetic procedures, such as body piercings and nipple and areola tattooing to complete a breast reconstruction, and as Chief of Plastic Surgery at NewYork-Presbyterian Hospital, program director for the residents training program, and Professor of Surgery at Columbia University. (Exhibit 4; 1060-1066, 1185-1186.)

The Respondent presented as a witness general surgeon David Mayer, M.D. The Hearing Committee noted Dr. Mayer's extensive and diverse background as a practicing healthcare attorney and board-certified surgeon with 40 years of experience, including current privileges at three ambulatory facilities, teaching at three medical colleges, and prior Chair of Surgery at Syosset Hospital, where he performed thousands of surgeries, directed a laparoscopic fellowship program, and trained residents. (Transcript, p. 1469-1471, 1505.) Despite his considerable medical and legal experience, the Hearing

Exhibit C 013

Committee was not persuaded by his professional opinions on the issue of the practice of medicine due to contradictions in his testimony.

For instance, Dr. Mayer insisted the Respondent was a branding technician able to "put aside her white coat" as a physician when she performed the brandings, yet he described himself as "always a physician" who doesn't "stop being a physician…at different times." (Transcript, p. 1569, 1579-1580.) His position that she was acting as a branding technician was also inconsistent with his testimony that "you never forget your training and education" (Transcript, p. 1566-1567.) Another example is his testimony that physicians should not cause extreme pain while also refusing to discuss the "ethics" of the Respondent causing the women such pain and insistence that her osteopathic oath to do no harm and prevent pain did not apply. (Transcript, p. 1528, 1531.) The Hearing Committee considered such inconsistencies, noted his long-standing history of providing expert witness services in hundreds of civil cases to law firms and other private companies, and evaluated his testimony accordingly. (Transcript, p. 1499.)

While the Hearing Committee was not persuaded by Dr. Grant's professional opinion that the Respondent was practicing medicine because she addressed "psychic pain" the women were experiencing, it did agree with his testimony that the brandings are the practice of medicine under Educ. Law §6521 because they were "surgical," involving "violating the epidermis and getting into the deeper layers of skin," and performed to "alter the skin" or physical condition of the women. (Transcript, p. 1110-1111, 1114, 1116.) The Respondent attempted to contrast branding with plastic surgery such as a rhinoplasty on a "successful face model" on the grounds that branding does not treat "a physical condition" the patient seeks to change (brief, p. 12), but the Hearing Committee finds this comparison frustrates her cause. Just as a rhinoplasty to change the appearance of a nose alters the physical condition of the face, the Hearing

Exhibit C  014

Committee finds the Respondent's branding to inflict a permanent and very visible scar alters the skin, appearance, and physical condition of the pelvic region.

Dr. Grant took the position that while brandings and other similar cosmetic procedures such as body piercing and tattooing can be performed by non-physicians, they constitute medical procedures when physicians perform them. (Transcript, p. 1108-1109, 1196-1197.) The Hearing Committee agrees with this view and rejects the Respondent's arguments against it. On the one hand, the Respondent claims that branding "is a form of commercial body art in the same manner as are tattooing and body piercing." (Respondent's brief, p. 8.) To that end, she argues that "aesthetic or ritual branding is outside the jurisdiction of the State Board for Professional Medical Conduct as branding is not regulated at all in New York." (Respondent's brief, p. 9.) On the other hand, the Respondent goes on to <u>distinguish</u> these activities on the basis that tattooing and body piercing require a license to perform, whereas branding does not. PHL §461. In doing so, she overlooks the exception to the tattoo and body piercing licensing requirement for physicians that is expressly stated in the statute. PHL §462. The Hearing Committee believes the Legislature specifically carved out that exception precisely because when a doctor and not a technician performs tattooing or body piercing, it is presumed that appropriate medical standards will apply. Consistent with this was Dr. Grant's testimony that he was unable to "imagine the scenario" involving a licensed physician performing these brandings acting as only a "technician." (Transcript, p. 1218.)

The Respondent's arguments that tattooing and body piercing are regulated — whereas branding is not — were deemed inconsequential to the Hearing Committee. The Committee's view is simple — all these activities are practicing medicine and become medical procedures when performed by a physician. Contrary to Dr. Mayer's testimony that the Respondent could obtain "a separate license as a tattoo artist or body piercer" and "not use" her medical license (Transcript, p. 1549), the Hearing Committee believes that as a physician, the Respondent cannot unilaterally pick and choose when the standards of medical

15

Exhibit C 015

practice apply. (Transcript, p. 1107-1109, 1200, 1549.) Dr. Grant confirmed this when he testified: "given the privilege of being a physician that comes with responsibilities. You can't decide when you are going to enjoy the privileges, but not have the responsibilities." (Transcript, p. 1112.) The Hearing Committee considers the Respondent's attempt to use a double standard, compartmentalizing her life by ostensibly branding the women as a technician and not a doctor, an irresponsible attempt to cast aside her privileged status as a licensed physician with specialized knowledge.

The Hearing Committee was guided in reaching its determination by reported court decisions relying on various factors and circumstances in recognizing when activities performed by physicians fall within the definition of the practice of medicine. In Y.Y.B. ex rel. Barukh v. Rachminov, the court found that "while a circumcision performed by a physician would be the practice of medicine, a circumcision performed as a religious ritual by a qualified person (a 'mohel' in this case) does not constitute the practice of the profession of medicine within the meaning of the Education Law." Y.Y.B. ex rel. Barukh v. Rachminov, 11 N.Y.S.3d 808, 1059 (Sup. Ct. Queens Co. 2015); See also Zakhartchenko v. Weinberger, 605 N.Y.S.2d 205, 206 (Sup. Ct. Kings Co. 1993.) In relying on this same reasoning, the Court in Zakhartchenko applied negligence principles to a hospital where a circumcision performed by a Rabbi involved the hospital's trained medical staff. Zakhartchenko, supra at 413. The Petitioner also cites Zakhartchenko in its brief (p. 18) to correctly summarize the principle from these cases applicable to this matter: "Therefore, while the acts performed by a non-physician are not subject to the jurisdiction of the Board of Professional Medical Conduct, the brandings/medical procedures performed by Dr. Roberts on 17 DOS women are." The Hearing Committee follows the view of these reported cases that different standards apply when physicians perform procedures.

The Respondent claims that "several possible people were considered" to perform the brandings and that "(c)learly, the intent was not to select a physician but to pick amongst friends" (brief, p. 8), but

Exhibit C 016

the Hearing Committee finds it more likely the Respondent was chosen based on her background, training, and knowledge as a physician. The Respondent acknowledged relying on her medical background in everything she does. (Transcript, p. 263, 423, 430-431, 488, 521, 547, 552-553, 1440-1442, 2134.) The evidence also confirms she was the only physician approached by the 1st line members to perform the brandings, her status as a physician was well-known in the NXIVM community, and she was the one chosen to do them. (Transcript, p. 182-183, 352, 797, 1853, 1950.) Her experience as a physician was obviously relevant to what they were seeking in a person to do the job, which Jane Doe 5 described as someone who was "willing," "calm," not "squeamish," and had "a steady hand" and "attention to detail." (Transcript, p. 2020-2021.) Jane Doe 4 also expressed how she hoped "someone skilled enough" would be chosen for the job and the relief she felt — consistent with S.E.'s testimony — knowing her branding would be done by the Respondent, who she knew was a doctor. (Transcript, p. 796, 1951, 1942-1943, 1975.)

### Standards of Medical Practice

The Hearing Committee concluded the Respondent's lack of training in the use of an electrocautery device contributed to her improper technique in performing the branding procedures and exacerbated the harm to these women. The Hearing Committee was skeptical of Dr. Mayer's assertion that the Respondent took "great care to get special training in branding" (Transcript, p. 1476) because the evidence established she was woefully unskilled in performing the procedures. According to Dr. Grant, proper training in the safe and proper use of an electrocautery device includes attending "a series of didactic lectures" and using the device for a period of time "under direct observation of a mentor or preceptor," steps the Respondent never undertook. (Transcript, p. 517, 562-563, 1070-1071, 1327-1328, 1765, 1784.) The Hearing Committee finds her preparations for the brandings, which included undergoing branding herself by branding artist Brian Decker in Brooklyn, practicing on fruit and pigs' knuckles, and a few

Exhibit C 017

communications by email and telephone with Mr. Decker and body modification artist Steve Arthur Haworth, fell short of demonstrating serious and proper training in using an electrocautery device. (Transcript, p. 273-274, 280-284.)

The Respondent presented body modification artist Steve Arthur Haworth as a witness to discuss her branding technique. The Hearing Committee was not convinced by Mr. Haworth's opinion that the Respondent used appropriate technique when she performed the brandings. (Transcript, p. 1779.) Mr. Haworth testified that in his almost 30 years of performing electrocautery brandings, he has never caused a 2nd degree burn. (Transcript, p. 1827.) He described such a burn as "significantly more painful" than a brand (Transcript, p. 1788), with a greater risk of infection. (Transcript, p. 1795.) Mr. Haworth's description of an electrocautery brand as "not a second-degree burn" and "more like a scrape" that heals "very quickly" (Transcript, p. 1763, 1789-1790, 1796) was contrary to all the evidence in this case. The Respondent's brandings resulted in 2nd degree burns, as was established by the brand photos (Exhibits 45 and 47), the branding video (Exhibit 8D), and the testimony of Dr. Mayer (Transcript, p. 1510-1511), Dr. Grant (Transcript, p. 1085), and the Respondent herself. (Transcript, p. 1377, 1420-1421.) The Hearing Committee attributed Mr. Haworth's seeming unawareness that the Respondent's brandings caused 2nd degree burns to his lack of a medical degree and his failure to review the brand wound photos showing the depth of the wounds or the testimony of the physician witnesses. (Exhibits 8D, 45, 47; Transcript, p. 1791-1792.)

The Respondent's poor technique was obvious to the Hearing Committee on S.E.'s branding video, which showed sparks and fire from the electrocautery device as she moved it across the skin to create the brand's "seven lines" and "touchups" (Exhibit 8D; Transcript, p. 366-367) and her multiple starts and stops, which Mr. Haworth commented on as "different" from his technique. (Transcript, p. 1778.) The Hearing Committee also recognized the Respondent's failure to mention the energy settings or the types

Exhibit C 018

of tips she used, which suggested her unfamiliarity with how the device works, specifically that the electrical current from the device and the time in which it is applied directly affects the outcome. (Transcript, p. 283, 1224.) She also expressed no awareness of the danger in using an electrocautery device directly on the skin surface to make an incision because it can cause a more significant injury than intended, such as the abnormal scarring and deep 2nd degree burns that occurred in this case and the risk of deeper 3rd and 4th degree burns. (Transcript, p. 1215, 1224, 1510, 1581.) For these reasons, the Hearing Committee believes her lack of training in controlling the electrocautery device to predict the outcome meant she never understood that the time in which she applied the tremendous amount of electrical energy from the device caused the women substantial injuries, pain, and trauma. (Exhibits 14a, 45, 47; Transcript, p. 1085-1087, 1128.)

Dr. Grant described the Respondent's branding of these women as "excruciatingly" and "incredibly painful" for which she never even offered them a choice of anesthesia. (Transcript, p. 1086, 1162-1163.) In response to the pain, the evidence showed A.M. and S.E. cried and J.G. screamed and squealed, flipped off the table, and bit down on a towel. (Exhibit 14a; Transcript, p. 807, 819, 579, 689, 819, 846, 1404.) S.E. described her pain from the branding as "an acute fire in the most sensitive part of my body." (Transcript, p. 827.) L.S. described her experience of the branding as "incredibly painful." (Exhibit 14a.) While the evidence established the women desired pain as part of the branding process (Respondent's brief, p. 18), the Hearing Committee agreed with Dr. Grant that absent a legitimate medical reason, such as an allergy or an emergency, the Respondent was obligated to at least attempt to alleviate such pain, such as by administering a local anesthetic in the area where the cautery was applied. (Transcript, p. 1073, 1124, 1210-1211.)

This was necessary, Dr. Grant explained, because the level of pain the women endured was so intense that it risked causing the woman cauterized even deeper burns from not being able to remain still

Exhibit C 019

during the procedure. Dr. Mayer also acknowledged this risk, as well as the risk of physical injuries to the women participants holding her down as she violently reacts to the electrocautery device. (Transcript, p. 1082-1083, 1087-1090, 1510.) Dr. Grant emphasized it is "unethical" for physicians to intentionally cause patients such harm because doing so violates "our ethical background in training and responsibility." (Transcript, p. 1116, 1228.)

The Respondent's lack of training was also established by her failure to prevent other risks of harm from occurring. She risked burns to the other women participants because they were not properly grounded by wearing gloves for insulation, instead using their bare skin to hold down the woman cauterized. Another risk was that the women could inhale or absorb harmful pathogens, such as viruses and infectious diseases, due to the failure to use a smoke evacuator to remove the debris plume released from the electrocautery device. She also risked burn wound infections by not maintaining a sterile field because she never properly cleaned the room, applied sterile draping, or required the women to wear personal protective equipment such as masks, sterile gloves, and eye protection. (Transcript, p. 1074, 1082, 1097-1098, 1104-1105, 1130.) The Hearing Committee disagreed with Dr. Mayer's opinion that these risks were "low," especially because the Respondent made no effort to mitigate them. (Transcript, p. 334-335, 532, 562, 1584.) Dr. Grant deemed the Respondent's failure to complete these steps serious deviations from the standard of care. (Transcript, p. 1124-1125, 1132.)

The Hearing Committee unanimously voted that the Respondent's conduct constituted professional misconduct as defined in Educ. Law §6530(4), practicing the profession with gross negligence on a particular occasion, professional misconduct as defined in Educ. Law §6530(6), practicing the profession with gross incompetence, and professional misconduct as defined in Educ. Law 6530(5), practicing the profession with incompetence on more than one occasion.

Exhibit C 020

Gross negligence involves a significant deviation from acceptable medical standards that creates the risk of grave consequence to the patient. Such conduct may result in a single act of negligence in egregious proportions or multiple acts of negligence that cumulatively are egregious. Post v. N.Y.S. Dept. of Health, 245 A.D.2d 985, 986 (3d Dept. 1997.) Gross incompetence involves an unmitigated lack of the skill or knowledge necessary to perform an act undertaken by the licensee in the practice of medicine. This conduct may consist of a single act of incompetence of egregious proportions or multiple acts of incompetence that cumulatively amount to egregious conduct. Post, 245 A.D.2d at 986; Minielly v. Commissioner of Health, 222 A.D.2d 750, 752 (3d Dept. 1995). Incompetence includes a lack of the requisite knowledge or skill in the practice of the profession but does not require a showing of an act or omission constituting a breach of the duty of due care. Dhabuwala v. State Bd. For Professional Med. Conduct, 225 AD2d 209, 213 (3d Dept. 1996).

The Respondent deviated from the standard of care and demonstrated a lack of skill and knowledge to practice the profession of medicine. She dangerously operated the electrocautery device to perform the branding procedures without anesthesia or adhering to infection control standards, which subjected the women to extreme pain, deep 2nd degree burn wounds, and abnormal scarring, and risked them further 3rd and 4th degree burn wounds, infection, and other harm.

The Hearing Committee also voted 3-0 that the Respondent's conduct constituted professional misconduct as defined under Education Law §6530(47), failing to use appropriate infection control practices. The Respondent's failure to follow any infection control procedures risked the women burn wound infections and other harmful outcomes, representing to the Hearing Committee her disregard for their health and safety.

Informed consent requires a verbal or written discussion to evaluate risks so the patient can "prudently decide whether or not" to proceed with the procedure. (Transcript, p. 1098, 1178-1180.) It must

Exhibit C 021

include a discussion of the psychological and physical risks, benefits, and alternatives to the procedure, including the option not to proceed, considering medical histories, comorbidities, and medications. (Transcript, p. 1124, 1179-1180.) The Respondent admits she never obtained such consent, which Dr. Grant deemed a serious deviation from the standard of care. (Respondent's brief, p. 8; Transcript, p. 436, 538-540, 1180.)

In failing to take medical histories and perform physical examinations, the Respondent risked missing a diagnosis or condition such as diabetes or connective tissue disorder, or a blood thinner medication like aspirin, that could affect clotting or wound healing. She also risked missing a cardiac condition that could trigger an arrythmia or pre-existing PTSD or anxiety that could become exacerbated by direct exposure to blood and trauma. (Transcript, p. 544-544, 1094-1095, 1171, 1418.) Other risks included burn wound infections and poor healing because she never provided treatment plans that included application of antibiotic ointment and follow-up physician monitoring. (Transcript, p. 377, 547, 556, 1362, 1168, 1171-1172.) In failing to document medical records, including the brand wound photos she collected and kept, she also risked depriving outside providers of important information about the procedures and the reason why they were performed. (Transcript, p. 1175.)

The Respondent, as a physician, was obligated to complete such tasks. The Hearing Committee believes she should have known to do so, especially considering her experience as a hospitalist following protocols that involve reading charts, assessing medications and medical histories to determine comorbidities, and treating patients with various injuries, including burn wounds. (Transcript, p. 206-207, 209, 291.) Although Mr. Haworth testified that his brandings never involve completing these steps, the Hearing Committee noted that he is not a doctor. The medical standards that apply to physicians with specialized medical training and knowledge performing these procedures do not also apply to branding technicians. (Transcript, p. 1770-1771.)

Exhibit C  022

The Hearing Committee unanimously determined that the Respondent's conduct constituted professional misconduct as defined in Educ. Law §6530(32), failing to maintain records for each patient that "accurately reflect the evaluation and treatment of the patient." Physicians are required to maintain such records that include every interaction with the patient and, in cases such as this, photos of the injury. Mucciolo v. Fernandez, 195 A.D.2d 623, 625 (3d Dept. 1993).

Negligence means the "failure to exercise the care that would be exercised by a reasonably prudent licensee under the circumstances." Bogdan v. State Bd. For Professional Med. Conduct, 195 A.D.2d 86, 88 (3d Dept. 1993). The Department is not required to prove harm to a patient. Youssef v. State Bd. For Professional Med. Conduct, 89 A.D.3d 824, 825 (3d Dept. 2004). Negligence can also be sustained when there is a relationship between inadequate medical records and patient treatment. Matter of Patin v. State Bd. For Professional Med. Conduct, 77 A.D.3d 1211, 1214 (3d Dept. 2010). The Hearing Committee sustains the negligence charge on both grounds. The Respondent failed to exercise the required level of care when she failed to take even the most basic steps to protect these women, such as by assessing medical and psychiatric histories, providing follow-up care considering the deeply traumatizing nature of the branding procedures, or assessing cross reactions, such as a medication that could worsen a preexisting psychiatric problem or a heart defect that could create a fatal condition. Her failure to maintain any medical records prevented subsequent providers from understanding the cause of the injuries and the reasons for them, which could adversely impact their future treatment decisions. As a physician, the Respondent was required to consider these matters before performing operations on the women that physically and permanently altered their bodies.

Of particular concern to the Hearing Committee in the circumstances here was that informed consent must be voluntary and not due to coercion (Transcript, p. 1182) and involves providing details of the procedure, all of which were missing in this case. The Respondent concedes she never obtained

Exhibit C  023

"formal written" informed consent but claims the branding video of S.E. shows she gave "verbal" consent, which the Hearing Committee finds misleading at best. (Respondent's brief, p. 8, 17.) The Respondent denies the women were coerced, yet the brandings were performed upon women who had submitted collateral that would result in damaging and embarrassing consequences if released to the public. (Respondent's brief, p. 19; Exhibit 14a; Transcript, p. 388, 390, 424, 426, 530, 783-784, 1182, 1957.) S.E. described the involuntariness of the branding process in the pressure she felt to move forward with the procedure because of the collateral, which she characterized as a "gun" to her head. (Transcript, p. 802.) This is the very definition of coercion.

The collateral included titles to cars and houses, letters about illicit drug use and sexual deviance, and nude photos, some of which showed explicit images of genitalia. (Exhibit 14a; Transcript, p. 802, 857, 1353, 1941-1942, 1686, 1738, 1884.) Even Dr. Mayer acknowledged the women could view the collateral as coercive (Transcript, p. 1537), describing it as "a factor to consider in the voluntariness of their actions." (Transcript, p. 1528.) Dr. Grant confirmed that under these circumstances, there can be no informed consent. (Transcript, p. 1182.) The Hearing Committee was not persuaded by the Respondent's comparison of the branding process to the brandings in the "African American fraternity known as the Omegas" (Respondent's brief, p. 18-19) because while the fraternity members experience painful brands to symbolize their "bond" and "life-long membership in the fraternity," they are not coerced into being branded by having to submit potentially harmful collateral. (Respondent's brief, p. 18-19.)

Particularly troubling to the Hearing Committee was the evidence establishing the women were purposefully not told what symbol would be branded onto their bodies. (Exhibit 14a; Transcript, p. 798, 802, 1182, 1660, 1685, 1884, 1941.) S.E. confirmed this when she testified "(a)t no point did anyone say these are Keith's initials. It was only revealed to me later." (Transcript, p. 798.) The Respondent, however, did know that the symbol was KAR to represent Keith Raniere's initials. (Transcript, p. 1387-1388, 1353,

Exhibit C   024

1355, 1392, 1394.) She claims she did not disclose it to the women because it wasn't her "business" or "responsibility" and doing so would have breached her "lifetime vow of obedience" to DOS. (Transcript, p. 541, 1353-1355.) The Hearing Committee rejects these excuses and finds that regardless of her commitment to DOS, she had a duty as a physician to disclose what she was doing in the same way a plastic surgeon would be required to describe the pigment, shape, and appearance of a nipple for a nipple areola tattooing procedure. (Transcript, p. 1107.) The Hearing Committee agrees with Dr. Grant that the Respondent's failure to disclose the brand symbol to the women deviated from the standard of care. (Transcript, p. 1178, 1182.)

The Hearing Committee unanimously determined that the Respondent's conduct constituted professional misconduct as defined in Educ. Law §6530(2), practicing the profession fraudulently. Fraudulent practice requires "proof of either an intentional misrepresentation or concealment of a known fact" and "intent or knowledge" can be inferred. Patin, supra at 1214. The Hearing Committee finds the Respondent's admission that she knew what the brand symbol was and her decision not to disclose it represents an intentional concealment of a known fact. The Respondent violated an important aspect of informed consent by branding the women without making them fully aware of what the brand symbol was or what it represented.

The Hearing Committee unanimously determined that this conduct also constitutes professional misconduct as defined in Educ. Law §6530(20), moral unfitness to practice medicine; professional misconduct as defined in Educ. Law 6530(31), willfully harassing, abusing, or intimidating a patient; and professional misconduct as defined in Educ. Law §6530(26), performing professional services which have not been duly authorized by the patient. Moral unfitness is conduct that "violat[es] the trust the public bestows on the medical profession and/or violate[es] the medical profession's moral standards." Such conduct is suggestive of, or would tend to prove, moral unfitness. Patin, supra at 1215 citing Matter of

Exhibit C  025

*Prado v. Novello*, 301 A.D.2d 692, 694 (3d Dept. 2003). The Respondent's medically reckless performance of the brandings caused the women significant harm without apprising them of the brand symbol. Physicians are strictly prohibited from going above and beyond what the patient expects when performing a medical procedure.

## Vanguard Week

The Petitioner also charges the Respondent with failing to report a communicable disease, an unusual outbreak, or a disease outbreak involving a gastrointestinal illness during the annual NXIVM retreat at the Silver Bay YMCA, as required under the New York State Sanitary Code. (Petitioner's brief, p. 72-73.) The Respondent admits she did not report the outbreak of the gastrointestinal illness during the event to public health officials but claims she was not required to because she was on vacation and since "garden variety" stomach viruses, which are "unpleasant but not lethal," are not "communicable" or "unusual" to meet the mandatory reporting requirements under the regulation. (Respondent's brief, p. 21-22; Transcript, p. 733, 1294.) Physicians are required to report a "communicable disease" or "(a)ny disease outbreak or unusual disease" to public health officials. 10 NYCRR 2.10(a)-(c). An outbreak is defined as "an increased incidence of disease above its expected or baseline level" 10 NYCRR 2.2(d).

In support of its charges, the Petitioner presented as a witness infectious disease specialist Bruce Frederick Farber, M.D., whose testimony the Respondent failed to refute. The Hearing Committee noted Dr. Farber's impressive background includes 30 years of experience as an infectious disease specialist, including head of infectious disease for Northwell Health and in charge of the infectious disease programs at North Shore University Hospital and LIJ Medical Center. (Exhibit 6; Transcript, p. 959.) The majority of the Hearing Committee agreed with his professional opinion that the Respondent's duty as a physician to report this illness applied to her even if she was on vacation. (Transcript, p. 993, 995.) The Committee decided 2-1 that while the illness fails to meet the criteria under the regulation as "communicable" or

Exhibit C 026

"unknown" — presumably because it was never reported or investigated — it did constitute a "disease outbreak" that the Respondent as a physician was required to report regardless of whether or not she was on vacation. 10 NYCRR 2.1(c); 10 NYCRR 2.2. (Transcript, p. 993, 995, 998-999.) Dr. Farber made clear that her failure to fulfill this duty was a significant deviation from the standard of care. (Transcript, p. 991, 994.)

The evidence established this "obvious" illness affected a large group of people among the more than 400 attendees in a confined location, all of whom had similar symptoms. (Transcript, p. 990-991, 993, 999.) This is the precise definition of a "disease outbreak." 10 NYCRR 2.1(c), 10 NYCRR 2.2(d). The majority of the Hearing Committee agreed with Dr. Farber that the Respondent's failure to report it was especially egregious because it subjected the elderly and other vulnerable individuals, such as those with conditions or diseases like cancer, renal failure, and pregnancy, to potentially dangerous consequences like dehydration requiring hospitalization. (Transcript, p. 974-975.) The majority of the Hearing Committee also agreed with his opinion that based on her hospitalist experience that required her to complete an infection control course covering this subject, the Respondent should have known to report the illness. (Transcript, p. 972-973, 979.) Dr. Farber emphasized the importance in following this rule to "shut down" and properly "clean" the facility to prevent the illness from contaminating others and to determine its etiology. (Transcript, p. 980, 984.)

The Hearing Committee voted 2-1 that the Respondent's failure to report a disease outbreak constituted professional misconduct as defined in Educ. Law § 6530(21), a willful failure to file a report required by law; professional misconduct as defined in Educ. Law § 6530(16), a willful or grossly negligent failure to comply with substantial provisions of state laws governing the practice of medicine; professional misconduct as defined in Educ. Law § 6530(3), practicing the profession with negligence on

Exhibit C  027

more than one occasion; and professional misconduct as defined in Educ. Law § 6530(5), practicing the profession with incompetence on more than one occasion.

## Penalty

In considering the full spectrum of penalties under PHL § 230-a, including revocation, suspension, probation, censure and reprimand and the imposition of civil penalties, the Hearing Committee unanimously determined, by vote of 3-0, that the penalty of revocation of the Respondent's medical license is appropriate. The Hearing Committee determined that the Respondent engaged in 12 forms of professional misconduct, all of which it addressed in this hearing decision and sustained. The Respondent says she joined NXIVM with a goal to "enrich (her) skills as a doctor." (Transcript, p. 219.) The evidence shows, however, that she deliberately chose to adhere to her DOS "vows of obedience" instead of providing the women she branded with "all the things that a physician does" because to do so would have resulted in "breaking (her) vow" and "went quite the counter to what the whole purpose was." (Transcript, p. 1442-1443.) In other words, when faced with any conflict between NXIVM and her responsibilities as a physician, she chose NXIVM. For these reasons, the Hearing Committee believes she abdicated her values as a physician and failed her profession, herself, and everyone else involved.

The Hearing Committee recognizes the Respondent's tremendous future potential as a physician who excelled in every undertaking from becoming a skilled gymnast to graduating college with honors and earning dual degrees — osteopathic medicine and a master's in clinical nutrition — and then as an entrepreneur building a family medical practice and developing Exo/Eso, the physical fitness company within NXIVM she co-developed with Keith Raniere. (Transcript, p. 1255-1256.) The Hearing Committee is deeply troubled, however, by her unwillingness to admit regrets. (Transcript, p. 228, 1248-1249, 1252, 1255-1256, 1259, 1412, 1445, 1455-1456.) Instead of holding herself accountable for harming S.E., for example, she accused S.E. of victimizing herself. (Transcript, p. 1412-1413.) The only sadness she

Exhibit C  028

expressed was that the branding "was twisted into something it wasn't" and that "it has been used to scare people." (Transcript, p. 1455-1456.) The Respondent denies being brainwashed, yet she expressed no real remorse, which represented to the Hearing Committee her distorted reality and the very real concern that others remain vulnerable to her future brandings. (Transcript, p. 1453, 1719, 1753.)

The Hearing Committee is hopeful that the Respondent will regard the volume of sustained charges in this hearing decision as an opportunity to reflect on her poor choices and reeducate herself professionally and personally.

Exhibit C  029

## <u>Order</u>

Based upon the foregoing, IT IS HEREBY ORDERED THAT:

1.       The first through forty-seventh specifications of professional misconduct set forth in the Statement of Charges are <u>Sustained</u>.

2.       The Respondent's license to practice medicine in the State of New York is hereby <u>Revoked</u> under PHL § 230-a(4).

3.       This Determination and Order shall be effective upon service on the Respondent in compliance with PHL § 230(10)(h).

DATED:       Albany, New York
             September 27, 2021


Steven Lapidus, M.D., Chairperson

Ramanathan Raju, M.D.
Joan Martinez McNicholas

Exhibit C  030

TO:    Jeffrey J. Conklin, Associate Counsel
New York State Department of Health
Division of Legal Affairs
Corning Tower Building, Room 2517
Empire State Plaza
Albany, New York  12237

Anthony Z. Scher, Esq.
800 Westchester Avenue
Suite N-641
Rye Brook, New York, 10573

Exhibit C  031



Congratulations! Below are your electronic wallet cards to use as proof of your license. You can also print your license at any time by visiting www.colorado.gov/dora/DPO_Print_License and following the instructions listed.

If you would like a more durable wallet card option, you can order one for a fee by visiting www.nasbastore.org and selecting the "Colorado License Cards" link on the left hand side of the page. If you prefer, you can also contact NASBA by phone at 1-888-925-5237 or by email at nasbastore@nasba.org.

Should you have questions about your credential, or need other information please contact our Customer Service Team at 303-894-7800 or dora_registrations@state.co.us.

| Colorado Department of Regulatory Agencies |
| Division of Professions and Occupations |

Colorado Medical Board

**Danielle D Roberts**

Physician                    Doctor of Osteopathic Medicine

DR.0059333                              09/19/2017
**Number**                              **Issue Date**
Active                                  04/30/2019
**Credential Status**                   **Expire Date**
Verify this credential at: www.colorado.gov/dora/dpo

Division Director  Ronne Hines    Credential Holder Signature

| Colorado Department of Regulatory Agencies |
| Division of Professions and Occupations |

Colorado Medical Board

**Danielle D Roberts**

Physician                    Doctor of Osteopathic Medicine

DR.0059333                              09/19/2017
**Number**                              **Issue Date**
Active                                  04/30/2019
**Credential Status**                   **Expire Date**
Verify this credential at: www.colorado.gov/dora/dpo

Division Director  Ronne Hines    Credential Holder Signature





**Department of Health**

ANDREW M. CUOMO
Governor

HOWARD A. ZUCKER, M.D., J.D.
Commissioner

SALLY DRESLIN, M.S., R.N.
Executive Deputy Commissioner

July 11, 2017

OPMC # 17-07-4422

Dear Ms. Edmondson:

In accordance with New York State Public Health Law Section 230, the Office of Professional Medical Conduct (OPMC) has reviewed your July 7, 2017 correspondence regarding Danielle Roberts, DO. This office is responsible for investigating allegations of professional misconduct by physicians, physician assistants and special assistants. We assessed the allegations you raised and the physician's actions in the context of New York State Education Law Section 6530 that defines the parameters of medical misconduct.

The issues you describe did not occur within the doctor-patient relationship and should be reported to law enforcement in the area where the incident occurred. The issues you describe are not medical misconduct as defined in New York State Education Law Section 6530. The information that you have supplied will be retained in our confidential files and no further action will be taken.

If you have further questions regarding the processing of your complaint, or this letter, you may contact this office at 1-800-663-6114. Thank you for bringing this matter to our attention.

Sincerely,

R. Soulier
Central Intake Unit
Office of Professional Medical Conduct

# ATTACHMENTS

# Attachment 1

Letter from OPMC to Ms. Edmondson, dated July 11, 2017.



**NEW YORK STATE OF OPPORTUNITY.**

# Department of Health

**ANDREW M. CUOMO**
Governor

**HOWARD A. ZUCKER, M.D., J.D.**
Commissioner

**SALLY DRESLIN, M.S., R.N.**
Executive Deputy Commissioner

July 11, 2017

OPMC # 17-07-4422

Dear Ms. Edmondson:

In accordance with New York State Public Health Law Section 230, the Office of Professional Medical Conduct (OPMC) has reviewed your July 7, 2017 correspondence regarding Danielle Roberts, DO. This office is responsible for investigating allegations of professional misconduct by physicians, physician assistants and special assistants. We assessed the allegations you raised and the physician's actions in the context of New York State Education Law Section 6530 that defines the parameters of medical misconduct.

The issues you describe did not occur within the doctor-patient relationship and should be reported to law enforcement in the area where the incident occurred. The issues you describe are not medical misconduct as defined in New York State Education Law Section 6530. The information that you have supplied will be retained in our confidential files and no further action will be taken.

If you have further questions regarding the processing of your complaint, or this letter, you may contact this office at 1-800-663-6114. Thank you for bringing this matter to our attention.

Sincerely,

R. Soulier

R. Soulier
Central Intake Unit
Office of Professional Medical Conduct

Empire State Plaza, Corning Tower, Albany, NY 12237 | health.ny.gov

# Attachment 2

OPMC Statement of Charges, dated November 17, 2017.

NEW YORK STATE          DEPARTMENT OF HEALTH
STATE BOARD FOR PROFESSIONAL MEDICAL CONDUCT

| | |
|---|---|
| **IN THE MATTER**<br><br>**OF**<br><br>**DANIELLE ROBERTS, D.O.** | STATEMENT<br><br>OF<br><br>CHARGES |

DANIELLE ROBERTS, D.O., the Respondent, was authorized to practice medicine in New York State on or about October 5, 2009, by the issuance of license number 255075 by the New York State Education Department.

## FACTUAL ALLEGATIONS

A.  On or about March, 2017, the Respondent intentionally used a cauterizing iron as part of a branding procedure and/or rite to permanently alter and/or disfigure the skin by branding Patient A, a female patient, hereinafter identified in the attached Appendix "A", with the initials KR/AM in the pelvis region, thereby leaving a permanent scar.

    1.  Respondent performed the branding procedure and/or rite in an other than appropriately sterile environment and/or without appropriate infection control.

    2.  Respondent, while performing the branding procedure and/or rite, caused the patient to suffer excruciating pain for no known medical purpose.

    3.  The patient requested on multiple occasions that Respondent cease performing the branding procedure and/or rite, which said Respondent failed to do.

1

4.    Respondent failed to cease performing the branding procedure and/or rite despite the fact that the patient screamed on multiple occasions because of the excruciating pain she was experiencing.

5.    Respondent, during the course of the branding procedure and/or rite, tortured and physically abused the patient.

6.    Respondent performed the branding procedure and/or rite upon the patient at the time the patient was naked and while being held down by three other individuals, who were also naked, contrary to any appropriate medical protocol or need.

7.    Respondent knowingly performed a branding procedure and/or rite upon the patient when Respondent knew, or should have known, that the patient believed that she was only having a tattoo applied to her pelvic region.

8.    Respondent inappropriately performed the branding procedure and/or rite upon the patient while an individual who was also naked utilized a cell phone to video said branding procedure and/or rite without the consent of the patient.

9.    Respondent failed to provide appropriate wound care for the patient at the time of the branding procedure and/or rite and thereafter.

10.    Respondent failed to refer the patient to a specialist after the branding procedure and/or rite to provide appropriate wound care.

11.    Respondent inappropriately advised the patient to take photos of the wound caused by the branding procedure and/or rite on a daily basis for one month and once a week for another month, and to thereafter send such photographs to an individual known as "Lauren Salzman".

12.    Respondent failed to provide appropriate medical care and treatment for the patient.

13.    Respondent failed to prepare and/or maintain appropriate medical records for the patient which accurately reflected the evaluation and treatment of the patient.

2

B. On or about March, 2017, the Respondent intentionally used a cauterizing iron as part of a branding procedure and/or rite to permanently alter and/or disfigure the skin by branding Patient B, a female patient, hereinafter identified in the attached Appendix "A", with the initials KR/AM in the pelvis region, thereby leaving a permanent scar.

1. Respondent performed the branding procedure and/or rite in an other than appropriately sterile environment and/or without appropriate infection control.

2. Respondent, while performing the branding procedure and/or rite, caused the patient to suffer excruciating pain for no known medical purpose.

3. The patient requested on multiple occasions that Respondent cease performing the branding procedure and/or rite, which said Respondent failed to do.

4. Respondent failed to cease performing the branding procedure and/or rite despite the fact that the patient screamed on multiple occasions because of the excruciating pain she was experiencing.

5. Respondent, during the course of the branding procedure and/or rite, tortured and physically abused the patient.

6. Respondent performed the branding procedure and/or rite upon the patient at the time the patient was naked and while being held down by three other individuals, who were also naked, contrary to any appropriate medical protocol or need.

7. Respondent knowingly performed a branding procedure and/or rite upon the patient when Respondent knew, or should have known, that the patient believed that she was only having a tattoo applied to her pelvic region.

8. Respondent inappropriately performed the branding procedure and/or rite upon the patient while an individual who was also naked utilized a cell phone to video said branding procedure and/or rite without the consent of the patient.

9. Respondent failed to provide appropriate wound care for the patient at the time of the branding procedure and/or rite and thereafter.

3

10. Respondent failed to refer the patient to a specialist after the branding procedure and/or rite to provide appropriate wound care.

11. Respondent inappropriately advised the patient to take photos of the wound caused by the branding procedure and/or rite on a daily basis for one month and once a week for another month, and to thereafter send such photographs to an individual known as "Lauren Salzman".

12. Respondent failed to provide appropriate medical care and treatment for the patient.

13. Respondent failed to prepare and/or maintain appropriate medical records for the patient which accurately reflected the evaluation and treatment of the patient.


C. On or about March, 2017, the Respondent intentionally used a cauterizing iron as part of a branding procedure and/or rite to permanently alter and/or disfigure the skin by branding Patient C, a female patient, hereinafter identified in the attached Appendix "A", with the initials KR/AM in the pelvis region, thereby leaving a permanent scar.

1. Respondent performed the branding procedure and/or rite in an other than appropriately sterile environment and/or without appropriate infection control.

2. Respondent, while performing the branding procedure and/or rite, caused the patient to suffer excruciating pain for no known medical purpose.

3. The patient requested on multiple occasions that Respondent cease performing the branding procedure and/or rite, which said Respondent failed to do.

4. Respondent failed to cease performing the branding procedure and/or rite despite the fact that the patient screamed on multiple occasions because of the excruciating pain she was experiencing.

4

5. Respondent, during the course of the branding procedure and/or rite, tortured and physically abused the patient.

6. Respondent performed the branding procedure and/or rite upon the patient at the time the patient was naked and while being held down by three other individuals, who were also naked, contrary to any appropriate medical protocol or need.

7. Respondent knowingly performed a branding procedure and/or rite upon the patient when Respondent knew, or should have known, that the patient believed that she was only having a tattoo applied to her pelvic region.

8. Respondent inappropriately performed the branding procedure and/or rite upon the patient while an individual who was also naked utilized a cell phone to video said branding procedure and/or rite without the consent of the patient.

9. Respondent failed to provide appropriate wound care for the patient at the time of the branding procedure and/or rite and thereafter.

10. Respondent failed to refer the patient to a specialist after the branding procedure and/or rite to provide appropriate wound care.

11. Respondent inappropriately advised the patient to take photos of the wound caused by the branding procedure and/or rite on a daily basis for one month and once a week for another month, and to thereafter send such photographs to an individual known as "Lauren Salzman".

12. Respondent failed to provide appropriate medical care and treatment for the patient.

13. Respondent failed to prepare and/or maintain appropriate medical records for the patient which accurately reflected the evaluation and treatment of the patient.

5

D. On or about March, 2017, the Respondent intentionally used a cauterizing iron as part of a branding procedure and/or rite to permanently alter and/or disfigure the skin by branding Patient D, a female patient, hereinafter identified in the attached Appendix "A", with the initials KR/AM in the pelvis region, thereby leaving a permanent scar.

    1. Respondent performed the branding procedure and/or rite in an other than appropriately sterile environment and/or without appropriate infection control.

    2. Respondent, while performing the branding procedure and/or rite, caused the patient to suffer excruciating pain for no known medical purpose.

    3. The patient requested on multiple occasions that Respondent cease performing the branding procedure and/or rite, which said Respondent failed to do.

    4. Respondent failed to cease performing the branding procedure and/or rite despite the fact that the patient screamed on multiple occasions because of the excruciating pain she was experiencing.

    5. Respondent, during the course of the branding procedure and/or rite, tortured and physically abused the patient.

    6. Respondent performed the branding procedure and/or rite upon the patient at the time the patient was naked and while being held down by three other individuals, who were also naked, contrary to any appropriate medical protocol or need.

    7. Respondent knowingly performed a branding procedure and/or rite upon the patient when Respondent knew, or should have known, that the patient believed that she was only having a tattoo applied to her pelvic region.

    8. Respondent inappropriately performed the branding procedure and/or rite upon the patient while an individual who was also naked utilized a cell phone to video said branding procedure and/or rite without the consent of the patient.

    9. Respondent failed to provide appropriate wound care for the patient at the time of the branding procedure and/or rite and thereafter.

6

10. Respondent failed to refer the patient to a specialist after the branding procedure and/or rite to provide appropriate wound care.

11. Respondent inappropriately advised the patient to take photos of the wound caused by the branding procedure and/or rite on a daily basis for one month and once a week for another month, and to thereafter send such photographs to an individual known as "Lauren Salzman".

12. Respondent failed to provide appropriate medical care and treatment for the patient.

13. Respondent failed to prepare and/or maintain appropriate medical records for the patient which accurately reflected the evaluation and treatment of the patient.


E. On or about March, 2017, the Respondent intentionally used a cauterizing iron as part of a branding procedure and/or rite to permanently alter and/or disfigure the skin by branding Patient E, a female patient, hereinafter identified in the attached Appendix "A", with the initials KR/AM in the pelvis region, thereby leaving a permanent scar.

1. Respondent performed the branding procedure and/or rite in an other than appropriately sterile environment and/or without appropriate infection control.

2. Respondent, while performing the branding procedure and/or rite, caused the patient to suffer excruciating pain for no known medical purpose.

3. The patient requested on multiple occasions that Respondent cease performing the branding procedure and/or rite, which said Respondent failed to do.

4. Respondent failed to cease performing the branding procedure and/or rite despite the fact that the patient screamed on multiple occasions because of the excruciating pain she was experiencing.

7

5. Respondent, during the course of the branding procedure and/or rite, tortured and physically abused the patient.

6. Respondent performed the branding procedure and/or rite upon the patient at the time the patient was naked and while being held down by three other individuals, who were also naked, contrary to any appropriate medical protocol or need.

7. Respondent knowingly performed a branding procedure and/or rite upon the patient when Respondent knew, or should have known, that the patient believed that she was only having a tattoo applied to her pelvic region.

8. Respondent inappropriately performed the branding procedure and/or rite upon the patient while an individual who was also naked utilized a cell phone to video said branding procedure and/or rite without the consent of the patient.

9. Respondent failed to provide appropriate wound care for the patient at the time of the branding procedure and/or rite and thereafter.

10. Respondent failed to refer the patient to a specialist after the branding procedure and/or rite to provide appropriate wound care.

11. Respondent inappropriately advised the patient to take photos of the wound caused by the branding procedure and/or rite on a daily basis for one month and once a week for another month, and to thereafter send such photographs to an individual known as "Lauren Salzman".

12. Respondent failed to provide appropriate medical care and treatment for the patient.

13. Respondent failed to prepare and/or maintain appropriate medical records for the patient which accurately reflected the evaluation and treatment of the patient.

8

F. On or about March, 2017, the Respondent intentionally used a cauterizing iron as part of a branding procedure and/or rite to permanently alter and/or disfigure the skin by branding Patient F, a female patient, hereinafter identified in the attached Appendix "A", with the initials KR/AM in the pelvis region, thereby leaving a permanent scar.

1. Respondent performed the branding procedure and/or rite in an other than appropriately sterile environment and/or without appropriate infection control.

2. Respondent, while performing the branding procedure and/or rite, caused the patient to suffer excruciating pain for no known medical purpose.

3. The patient requested on multiple occasions that Respondent cease performing the branding procedure and/or rite, which said Respondent failed to do.

4. Respondent failed to cease performing the branding procedure and/or rite despite the fact that the patient screamed on multiple occasions because of the excruciating pain she was experiencing.

5. Respondent, during the course of the branding procedure and/or rite, tortured and physically abused the patient.

6. Respondent performed the branding procedure and/or rite upon the patient at the time the patient was naked and while being held down by three other individuals, who were also naked, contrary to any appropriate medical protocol or need.

7. Respondent knowingly performed a branding procedure and/or rite upon the patient when Respondent knew, or should have known, that the patient believed that she was only having a tattoo applied to her pelvic region.

8. Respondent inappropriately performed the branding procedure and/or rite upon the patient while an individual who was also naked utilized a cell phone to video said branding procedure and/or rite without the consent of the patient.

9. Respondent failed to provide appropriate wound care for the patient at the time of the branding procedure and/or rite and thereafter.

9

10. Respondent failed to refer the patient to a specialist after the branding procedure and/or rite to provide appropriate wound care.

11. Respondent inappropriately advised the patient to take photos of the wound caused by the branding procedure and/or rite on a daily basis for one month and once a week for another month, and to thereafter send such photographs to an individual known as "Lauren Salzman".

12. Respondent failed to provide appropriate medical care and treatment for the patient.

13. Respondent failed to prepare and/or maintain appropriate medical records for the patient which accurately reflected the evaluation and treatment of the patient.

G. On or about March, 2017, the Respondent intentionally used a cauterizing iron as part of a branding procedure and/or rite to permanently alter and/or disfigure the skin by branding Patient G, a female patient, hereinafter identified in the attached Appendix "A", with the initials KR/AM in the pelvis region, thereby leaving a permanent scar.

1. Respondent performed the branding procedure and/or rite in an other than appropriately sterile environment and/or without appropriate infection control.

2. Respondent, while performing the branding procedure and/or rite, caused the patient to suffer excruciating pain for no known medical purpose.

3. The patient requested on multiple occasions that Respondent cease performing the branding procedure and/or rite, which said Respondent failed to do.

4. Respondent failed to cease performing the branding procedure and/or rite despite the fact that the patient screamed on multiple occasions because of the excruciating pain she was experiencing.

10

5. Respondent, during the course of the branding procedure and/or rite, tortured and physically abused the patient.

6. Respondent performed the branding procedure and/or rite upon the patient at the time the patient was naked and while being held down by three other individuals, who were also naked, contrary to any appropriate medical protocol or need.

7. Respondent knowingly performed a branding procedure and/or rite upon the patient when Respondent knew, or should have known, that the patient believed that she was only having a tattoo applied to her pelvic region.

8. Respondent inappropriately performed the branding procedure and/or rite upon the patient while an individual who was also naked utilized a cell phone to video said branding procedure and/or rite without the consent of the patient.

9. Respondent failed to provide appropriate wound care for the patient at the time of the branding procedure and/or rite and thereafter.

10. Respondent failed to refer the patient to a specialist after the branding procedure and/or rite to provide appropriate wound care.

11. Respondent inappropriately advised the patient to take photos of the wound caused by the branding procedure and/or rite on a daily basis for one month and once a week for another month, and to thereafter send such photographs to an individual known as "Lauren Salzman".

12. Respondent failed to provide appropriate medical care and treatment for the patient.

13. Respondent failed to prepare and/or maintain appropriate medical records for the patient which accurately reflected the evaluation and treatment of the patient.

11

H. On or about March, 2017, the Respondent intentionally used a cauterizing iron as part of a branding procedure and/or rite to permanently alter and/or disfigure the skin by branding Patient H, a female patient, hereinafter identified in the attached Appendix "A", with the initials KR/AM in the pelvis region, thereby leaving a permanent scar.

    1. Respondent performed the branding procedure and/or rite in an other than appropriately sterile environment and/or without appropriate infection control.

    2. Respondent, while performing the branding procedure and/or rite, caused the patient to suffer excruciating pain for no known medical purpose.

    3. The patient requested on multiple occasions that Respondent cease performing the branding procedure and/or rite, which said Respondent failed to do.

    4. Respondent failed to cease performing the branding procedure and/or rite despite the fact that the patient screamed on multiple occasions because of the excruciating pain she was experiencing.

    5. Respondent, during the course of the branding procedure and/or rite, tortured and physically abused the patient.

    6. Respondent performed the branding procedure and/or rite upon the patient at the time the patient was naked and while being held down by three other individuals, who were also naked, contrary to any appropriate medical protocol or need.

    7. Respondent knowingly performed a branding procedure and/or rite upon the patient when Respondent knew, or should have known, that the patient believed that she was only having a tattoo applied to her pelvic region.

    8. Respondent inappropriately performed the branding procedure and/or rite upon the patient while an individual who was also naked utilized a cell phone to video said branding procedure and/or rite without the consent of the patient.

    9. Respondent failed to provide appropriate wound care for the patient at the time of the branding procedure and/or rite and thereafter.

12

10. Respondent failed to refer the patient to a specialist after the branding procedure and/or rite to provide appropriate wound care.

11. Respondent inappropriately advised the patient to take photos of the wound caused by the branding procedure and/or rite on a daily basis for one month and once a week for another month, and to thereafter send such photographs to an individual known as "Lauren Salzman".

12. Respondent failed to provide appropriate medical care and treatment for the patient.

13. Respondent failed to prepare and/or maintain appropriate medical records for the patient which accurately reflected the evaluation and treatment of the patient.

I. On or about March, 2017, the Respondent intentionally used a cauterizing iron as part of a branding procedure and/or rite to permanently alter and/or disfigure the skin by branding Patient I, a female patient, hereinafter identified in the attached Appendix "A", with the initials KR/AM in the pelvis region, thereby leaving a permanent scar.

1. Respondent performed the branding procedure and/or rite in an other than appropriately sterile environment and/or without appropriate infection control.

2. Respondent, while performing the branding procedure and/or rite, caused the patient to suffer excruciating pain for no known medical purpose.

3. The patient requested on multiple occasions that Respondent cease performing the branding procedure and/or rite, which said Respondent failed to do.

4. Respondent failed to cease performing the branding procedure and/or rite despite the fact that the patient screamed on multiple occasions because of the excruciating pain she was experiencing.

13

5.     Respondent, during the course of the branding procedure and/or rite, tortured and physically abused the patient.

6.     Respondent performed the branding procedure and/or rite upon the patient at the time the patient was naked and while being held down by three other individuals, who were also naked, contrary to any appropriate medical protocol or need.

7.     Respondent knowingly performed a branding procedure and/or rite upon the patient when Respondent knew, or should have known, that the patient believed that she was only having a tattoo applied to her pelvic region.

8.     Respondent inappropriately performed the branding procedure and/or rite upon the patient while an individual who was also naked utilized a cell phone to video said branding procedure and/or rite without the consent of the patient.

9.     Respondent failed to provide appropriate wound care for the patient at the time of the branding procedure and/or rite and thereafter.

10.     Respondent failed to refer the patient to a specialist after the branding procedure and/or rite to provide appropriate wound care.

11.     Respondent inappropriately advised the patient to take photos of the wound caused by the branding procedure and/or rite on a daily basis for one month and once a week for another month, and to thereafter send such photographs to an individual known as "Lauren Salzman".

12.     Respondent failed to provide appropriate medical care and treatment for the patient.

13.     Respondent failed to prepare and/or maintain appropriate medical records for the patient which accurately reflected the evaluation and treatment of the patient.

14

J.  On or about March, 2017, the Respondent intentionally used a cauterizing iron as part of a branding procedure and/or rite to permanently alter and/or disfigure the skin by branding Patient J, a female patient, hereinafter identified in the attached Appendix "A", with the initials KR/AM in the pelvis region, thereby leaving a permanent scar.

1.  Respondent performed the branding procedure and/or rite in an other than appropriately sterile environment and/or without appropriate infection control.

2.  Respondent, while performing the branding procedure and/or rite, caused the patient to suffer excruciating pain for no known medical purpose.

3.  The patient requested on multiple occasions that Respondent cease performing the branding procedure and/or rite, which said Respondent failed to do.

4.  Respondent failed to cease performing the branding procedure and/or rite despite the fact that the patient screamed on multiple occasions because of the excruciating pain she was experiencing.

5.  Respondent, during the course of the branding procedure and/or rite, tortured and physically abused the patient.

6.  Respondent performed the branding procedure and/or rite upon the patient at the time the patient was naked and while being held down by three other individuals, who were also naked, contrary to any appropriate medical protocol or need.

7.  Respondent knowingly performed a branding procedure and/or rite upon the patient when Respondent knew, or should have known, that the patient believed that she was only having a tattoo applied to her pelvic region.

8.  Respondent inappropriately performed the branding procedure and/or rite upon the patient while an individual who was also naked utilized a cell phone to video said branding procedure and/or rite without the consent of the patient.

9.  Respondent failed to provide appropriate wound care for the patient at the time of the branding procedure and/or rite and thereafter.

15

10. Respondent failed to refer the patient to a specialist after the branding procedure and/or rite to provide appropriate wound care.

11. Respondent inappropriately advised the patient to take photos of the wound caused by the branding procedure and/or rite on a daily basis for one month and once a week for another month, and to thereafter send such photographs to an individual known as "Lauren Salzman".

12. Respondent failed to provide appropriate medical care and treatment for the patient.

13. Respondent failed to prepare and/or maintain appropriate medical records for the patient which accurately reflected the evaluation and treatment of the patient.

K. On or about March, 2017, the Respondent intentionally used a cauterizing iron as part of a branding procedure and/or rite to permanently alter and/or disfigure the skin by branding Patient K, a female patient, hereinafter identified in the attached Appendix "A", with the initials KR/AM in the pelvis region, thereby leaving a permanent scar.

1. Respondent performed the branding procedure and/or rite in an other than appropriately sterile environment and/or without appropriate infection control.

2. Respondent, while performing the branding procedure and/or rite, caused the patient to suffer excruciating pain for no known medical purpose.

3. The patient requested on multiple occasions that Respondent cease performing the branding procedure and/or rite, which said Respondent failed to do.

4. Respondent failed to cease performing the branding procedure and/or rite despite the fact that the patient screamed on multiple occasions because of the excruciating pain she was experiencing.

16

5. Respondent, during the course of the branding procedure and/or rite, tortured and physically abused the patient.

6. Respondent performed the branding procedure and/or rite upon the patient at the time the patient was naked and while being held down by three other individuals, who were also naked, contrary to any appropriate medical protocol or need.

7. Respondent knowingly performed a branding procedure and/or rite upon the patient when Respondent knew, or should have known, that the patient believed that she was only having a tattoo applied to her pelvic region.

8. Respondent inappropriately performed the branding procedure and/or rite upon the patient while an individual who was also naked utilized a cell phone to video said branding procedure and/or rite without the consent of the patient.

9. Respondent failed to provide appropriate wound care for the patient at the time of the branding procedure and/or rite and thereafter.

10. Respondent failed to refer the patient to a specialist after the branding procedure and/or rite to provide appropriate wound care.

11. Respondent inappropriately advised the patient to take photos of the wound caused by the branding procedure and/or rite on a daily basis for one month and once a week for another month, and to thereafter send such photographs to an individual known as "Lauren Salzman".

12. Respondent failed to provide appropriate medical care and treatment for the patient.

13. Respondent failed to prepare and/or maintain appropriate medical records for the patient which accurately reflected the evaluation and treatment of the patient.

17

L.    On or about March, 2017, the Respondent intentionally used a cauterizing iron as part of a branding procedure and/or rite to permanently alter and/or disfigure the skin by branding Patient L, a female patient, hereinafter identified in the attached Appendix "A", with the initials KR/AM in the pelvis region, thereby leaving a permanent scar.

1.    Respondent performed the branding procedure and/or rite in an other than appropriately sterile environment and/or without appropriate infection control.

2.    Respondent, while performing the branding procedure and/or rite, caused the patient to suffer excruciating pain for no known medical purpose.

3.    The patient requested on multiple occasions that Respondent cease performing the branding procedure and/or rite, which said Respondent failed to do.

4.    Respondent failed to cease performing the branding procedure and/or rite despite the fact that the patient screamed on multiple occasions because of the excruciating pain she was experiencing.

5.    Respondent, during the course of the branding procedure and/or rite, tortured and physically abused the patient.

6.    Respondent performed the branding procedure and/or rite upon the patient at the time the patient was naked and while being held down by three other individuals, who were also naked, contrary to any appropriate medical protocol or need.

7.    Respondent knowingly performed a branding procedure and/or rite upon the patient when Respondent knew, or should have known, that the patient believed that she was only having a tattoo applied to her pelvic region.

8.    Respondent inappropriately performed the branding procedure and/or rite upon the patient while an individual who was also naked utilized a cell phone to video said branding procedure and/or rite without the consent of the patient.

9.    Respondent failed to provide appropriate wound care for the patient at the time of the branding procedure and/or rite and thereafter.

18

10. Respondent failed to refer the patient to a specialist after the branding procedure and/or rite to provide appropriate wound care.

11. Respondent inappropriately advised the patient to take photos of the wound caused by the branding procedure and/or rite on a daily basis for one month and once a week for another month, and to thereafter send such photographs to an individual known as "Lauren Salzman".

12. Respondent failed to provide appropriate medical care and treatment for the patient.

13. Respondent failed to prepare and/or maintain appropriate medical records for the patient which accurately reflected the evaluation and treatment of the patient.

M. On or about March, 2017, the Respondent intentionally used a cauterizing iron as part of a branding procedure and/or rite to permanently alter and/or disfigure the skin by branding Patient M, a female patient, hereinafter identified in the attached Appendix "A", with the initials KR/AM in the pelvis region, thereby leaving a permanent scar.

1. Respondent performed the branding procedure and/or rite in an other than appropriately sterile environment and/or without appropriate infection control.

2. Respondent, while performing the branding procedure and/or rite, caused the patient to suffer excruciating pain for no known medical purpose.

3. The patient requested on multiple occasions that Respondent cease performing the branding procedure and/or rite, which said Respondent failed to do.

4. Respondent failed to cease performing the branding procedure and/or rite despite the fact that the patient screamed on multiple occasions because of the excruciating pain she was experiencing.

19

5. Respondent, during the course of the branding procedure and/or rite, tortured and physically abused the patient.

6. Respondent performed the branding procedure and/or rite upon the patient at the time the patient was naked and while being held down by three other individuals, who were also naked, contrary to any appropriate medical protocol or need.

7. Respondent knowingly performed a branding procedure and/or rite upon the patient when Respondent knew, or should have known, that the patient believed that she was only having a tattoo applied to her pelvic region.

8. Respondent inappropriately performed the branding procedure and/or rite upon the patient while an individual who was also naked utilized a cell phone to video said branding procedure and/or rite without the consent of the patient.

9. Respondent failed to provide appropriate wound care for the patient at the time of the branding procedure and/or rite and thereafter.

10. Respondent failed to refer the patient to a specialist after the branding procedure and/or rite to provide appropriate wound care.

11. Respondent inappropriately advised the patient to take photos of the wound caused by the branding procedure and/or rite on a daily basis for one month and once a week for another month, and to thereafter send such photographs to an individual known as "Lauren Salzman".

12. Respondent failed to provide appropriate medical care and treatment for the patient.

13. Respondent failed to prepare and/or maintain appropriate medical records for the patient which accurately reflected the evaluation and treatment of the patient.

20

N. On or about March, 2017, the Respondent intentionally used a cauterizing iron as part of a branding procedure and/or rite to permanently alter and/or disfigure the skin by branding Patient N, a female patient, hereinafter identified in the attached Appendix "A", with the initials KR/AM in the pelvis region, thereby leaving a permanent scar.

1. Respondent performed the branding procedure and/or rite in an other than appropriately sterile environment and/or without appropriate infection control.

2. Respondent, while performing the branding procedure and/or rite, caused the patient to suffer excruciating pain for no known medical purpose.

3. The patient requested on multiple occasions that Respondent cease performing the branding procedure and/or rite, which said Respondent failed to do.

4. Respondent failed to cease performing the branding procedure and/or rite despite the fact that the patient screamed on multiple occasions because of the excruciating pain she was experiencing.

5. Respondent, during the course of the branding procedure and/or rite, tortured and physically abused the patient.

6. Respondent performed the branding procedure and/or rite upon the patient at the time the patient was naked and while being held down by three other individuals, who were also naked, contrary to any appropriate medical protocol or need.

7. Respondent knowingly performed a branding procedure and/or rite upon the patient when Respondent knew, or should have known, that the patient believed that she was only having a tattoo applied to her pelvic region.

8. Respondent inappropriately performed the branding procedure and/or rite upon the patient while an individual who was also naked utilized a cell phone to video said branding procedure and/or rite without the consent of the patient.

9. Respondent failed to provide appropriate wound care for the patient at the time of the branding procedure and/or rite and thereafter.

21

10. Respondent failed to refer the patient to a specialist after the branding procedure and/or rite to provide appropriate wound care.

11. Respondent inappropriately advised the patient to take photos of the wound caused by the branding procedure and/or rite on a daily basis for one month and once a week for another month, and to thereafter send such photographs to an individual known as "Lauren Salzman".

12. Respondent failed to provide appropriate medical care and treatment for the patient.

13. Respondent failed to prepare and/or maintain appropriate medical records for the patient which accurately reflected the evaluation and treatment of the patient.


O. On or about March, 2017, the Respondent intentionally used a cauterizing iron as part of a branding procedure and/or rite to permanently alter and/or disfigure the skin by branding Patient O, a female patient, hereinafter identified in the attached Appendix "A", with the initials KR/AM in the pelvis region, thereby leaving a permanent scar.

1. Respondent performed the branding procedure and/or rite in an other than appropriately sterile environment and/or without appropriate infection control.

2. Respondent, while performing the branding procedure and/or rite, caused the patient to suffer excruciating pain for no known medical purpose.

3. The patient requested on multiple occasions that Respondent cease performing the branding procedure and/or rite, which said Respondent failed to do.

4. Respondent failed to cease performing the branding procedure and/or rite despite the fact that the patient screamed on multiple occasions because of the excruciating pain she was experiencing.

22

5. Respondent, during the course of the branding procedure and/or rite, tortured and physically abused the patient.

6. Respondent performed the branding procedure and/or rite upon the patient at the time the patient was naked and while being held down by three other individuals, who were also naked, contrary to any appropriate medical protocol or need.

7. Respondent knowingly performed a branding procedure and/or rite upon the patient when Respondent knew, or should have known, that the patient believed that she was only having a tattoo applied to her pelvic region.

8. Respondent inappropriately performed the branding procedure and/or rite upon the patient while an individual who was also naked utilized a cell phone to video said branding procedure and/or rite without the consent of the patient.

9. Respondent failed to provide appropriate wound care for the patient at the time of the branding procedure and/or rite and thereafter.

10. Respondent failed to refer the patient to a specialist after the branding procedure and/or rite to provide appropriate wound care.

11. Respondent inappropriately advised the patient to take photos of the wound caused by the branding procedure and/or rite on a daily basis for one month and once a week for another month, and to thereafter send such photographs to an individual known as "Lauren Salzman".

12. Respondent failed to provide appropriate medical care and treatment for the patient.

13. Respondent failed to prepare and/or maintain appropriate medical records for the patient which accurately reflected the evaluation and treatment of the patient.

23

P.  On or about March, 2017, the Respondent intentionally used a cauterizing iron as part of a branding procedure and/or rite to permanently alter and/or disfigure the skin by branding Patient P, a female patient, hereinafter identified in the attached Appendix "A", with the initials KR/AM in the pelvis region, thereby leaving a permanent scar.

1.  Respondent performed the branding procedure and/or rite in an other than appropriately sterile environment and/or without appropriate infection control.

2.  Respondent, while performing the branding procedure and/or rite, caused the patient to suffer excruciating pain for no known medical purpose.

3.  The patient requested on multiple occasions that Respondent cease performing the branding procedure and/or rite, which said Respondent failed to do.

4.  Respondent failed to cease performing the branding procedure and/or rite despite the fact that the patient screamed on multiple occasions because of the excruciating pain she was experiencing.

5.  Respondent, during the course of the branding procedure and/or rite, tortured and physically abused the patient.

6.  Respondent performed the branding procedure and/or rite upon the patient at the time the patient was naked and while being held down by three other individuals, who were also naked, contrary to any appropriate medical protocol or need.

7.  Respondent knowingly performed a branding procedure and/or rite upon the patient when Respondent knew, or should have known, that the patient believed that she was only having a tattoo applied to her pelvic region.

8.  Respondent inappropriately performed the branding procedure and/or rite upon the patient while an individual who was also naked utilized a cell phone to video said branding procedure and/or rite without the consent of the patient.

9.  Respondent failed to provide appropriate wound care for the patient at the time of the branding procedure and/or rite and thereafter.

24

10. Respondent failed to refer the patient to a specialist after the branding procedure and/or rite to provide appropriate wound care.

11. Respondent inappropriately advised the patient to take photos of the wound caused by the branding procedure and/or rite on a daily basis for one month and once a week for another month, and to thereafter send such photographs to an individual known as "Lauren Salzman".

12. Respondent failed to provide appropriate medical care and treatment for the patient.

13. Respondent failed to prepare and/or maintain appropriate medical records for the patient which accurately reflected the evaluation and treatment of the patient.


Q. On or about March, 2017, the Respondent intentionally used a cauterizing iron as part of a branding procedure and/or rite to permanently alter and/or disfigure the skin by branding Patient Q, a female patient, hereinafter identified in the attached Appendix "A", with the initials KR/AM in the pelvis region, thereby leaving a permanent scar.

1. Respondent performed the branding procedure and/or rite in an other than appropriately sterile environment and/or without appropriate infection control.

2. Respondent, while performing the branding procedure and/or rite, caused the patient to suffer excruciating pain for no known medical purpose.

3. The patient requested on multiple occasions that Respondent cease performing the branding procedure and/or rite, which said Respondent failed to do.

4. Respondent failed to cease performing the branding procedure and/or rite despite the fact that the patient screamed on multiple occasions because of the excruciating pain she was experiencing.

25

5. Respondent, during the course of the branding procedure and/or rite, tortured and physically abused the patient.

6. Respondent performed the branding procedure and/or rite upon the patient at the time the patient was naked and while being held down by three other individuals, who were also naked, contrary to any appropriate medical protocol or need.

7. Respondent knowingly performed a branding procedure and/or rite upon the patient when Respondent knew, or should have known, that the patient believed that she was only having a tattoo applied to her pelvic region.

8. Respondent inappropriately performed the branding procedure and/or rite upon the patient while an individual who was also naked utilized a cell phone to video said branding procedure and/or rite without the consent of the patient.

9. Respondent failed to provide appropriate wound care for the patient at the time of the branding procedure and/or rite and thereafter.

10. Respondent failed to refer the patient to a specialist after the branding procedure and/or rite to provide appropriate wound care.

11. Respondent inappropriately advised the patient to take photos of the wound caused by the branding procedure and/or rite on a daily basis for one month and once a week for another month, and to thereafter send such photographs to an individual known as "Lauren Salzman".

12. Respondent failed to provide appropriate medical care and treatment for the patient.

13. Respondent failed to prepare and/or maintain appropriate medical records for the patient which accurately reflected the evaluation and treatment of the patient.

26

R. On or about March, 2017, the Respondent intentionally used a cauterizing iron as part of a branding procedure and/or rite to permanently alter and/or disfigure the skin by branding Patient R, a female patient, hereinafter identified in the attached Appendix "A", with the initials KR/AM in the pelvis region, thereby leaving a permanent scar.

1. Respondent performed the branding procedure and/or rite in an other than appropriately sterile environment and/or without appropriate infection control.

2. Respondent, while performing the branding procedure and/or rite, caused the patient to suffer excruciating pain for no known medical purpose.

3. The patient requested on multiple occasions that Respondent cease performing the branding procedure and/or rite, which said Respondent failed to do.

4. Respondent failed to cease performing the branding procedure and/or rite despite the fact that the patient screamed on multiple occasions because of the excruciating pain she was experiencing.

5. Respondent, during the course of the branding procedure and/or rite, tortured and physically abused the patient.

6. Respondent performed the branding procedure and/or rite upon the patient at the time the patient was naked and while being held down by three other individuals, who were also naked, contrary to any appropriate medical protocol or need.

7. Respondent knowingly performed a branding procedure and/or rite upon the patient when Respondent knew, or should have known, that the patient believed that she was only having a tattoo applied to her pelvic region.

8. Respondent inappropriately performed the branding procedure and/or rite upon the patient while an individual who was also naked utilized a cell phone to video said branding procedure and/or rite without the consent of the patient.

9. Respondent failed to provide appropriate wound care for the patient at the time of the branding procedure and/or rite and thereafter.

27

10. Respondent failed to refer the patient to a specialist after the branding procedure and/or rite to provide appropriate wound care.

11. Respondent inappropriately advised the patient to take photos of the wound caused by the branding procedure and/or rite on a daily basis for one month and once a week for another month, and to thereafter send such photographs to an individual known as "Lauren Salzman".

12. Respondent failed to provide appropriate medical care and treatment for the patient.

13. Respondent failed to prepare and/or maintain appropriate medical records for the patient which accurately reflected the evaluation and treatment of the patient.

S. On or about March, 2017, the Respondent intentionally used a cauterizing iron as part of a branding procedure and/or rite to permanently alter and/or disfigure the skin by branding Patient S, a female patient, hereinafter identified in the attached Appendix "A", with the initials KR/AM in the pelvis region, thereby leaving a permanent scar.

1. Respondent performed the branding procedure and/or rite in an other than appropriately sterile environment and/or without appropriate infection control.

2. Respondent, while performing the branding procedure and/or rite, caused the patient to suffer excruciating pain for no known medical purpose.

3. The patient requested on multiple occasions that Respondent cease performing the branding procedure and/or rite, which said Respondent failed to do.

4. Respondent failed to cease performing the branding procedure and/or rite despite the fact that the patient screamed on multiple occasions because of the excruciating pain she was experiencing.

28

5.  Respondent, during the course of the branding procedure and/or rite, tortured and physically abused the patient.

6.  Respondent performed the branding procedure and/or rite upon the patient at the time the patient was naked and while being held down by three other individuals, who were also naked, contrary to any appropriate medical protocol or need.

7.  Respondent knowingly performed a branding procedure and/or rite upon the patient when Respondent knew, or should have known, that the patient believed that she was only having a tattoo applied to her pelvic region.

8.  Respondent inappropriately performed the branding procedure and/or rite upon the patient while an individual who was also naked utilized a cell phone to video said branding procedure and/or rite without the consent of the patient.

9.  Respondent failed to provide appropriate wound care for the patient at the time of the branding procedure and/or rite and thereafter.

10. Respondent failed to refer the patient to a specialist after the branding procedure and/or rite to provide appropriate wound care.

11. Respondent inappropriately advised the patient to take photos of the wound caused by the branding procedure and/or rite on a daily basis for one month and once a week for another month, and to thereafter send such photographs to an individual known as "Lauren Salzman".

12. Respondent failed to provide appropriate medical care and treatment for the patient.

13. Respondent failed to prepare and/or maintain appropriate medical records for the patient which accurately reflected the evaluation and treatment of the patient.

29

T.  On or about March, 2017, the Respondent intentionally used a cauterizing iron as part of a branding procedure and/or rite to permanently alter and/or disfigure the skin by branding Patient T, a female patient, hereinafter identified in the attached Appendix "A", with the initials KR/AM in the pelvis region, thereby leaving a permanent scar.

1.  Respondent performed the branding procedure and/or rite in an other than appropriately sterile environment and/or without appropriate infection control.

2.  Respondent, while performing the branding procedure and/or rite, caused the patient to suffer excruciating pain for no known medical purpose.

3.  The patient requested on multiple occasions that Respondent cease performing the branding procedure and/or rite, which said Respondent failed to do.

4.  Respondent failed to cease performing the branding procedure and/or rite despite the fact that the patient screamed on multiple occasions because of the excruciating pain she was experiencing.

5.  Respondent, during the course of the branding procedure and/or rite, tortured and physically abused the patient.

6.  Respondent performed the branding procedure and/or rite upon the patient at the time the patient was naked and while being held down by three other individuals, who were also naked, contrary to any appropriate medical protocol or need.

7.  Respondent knowingly performed a branding procedure and/or rite upon the patient when Respondent knew, or should have known, that the patient believed that she was only having a tattoo applied to her pelvic region.

8.  Respondent inappropriately performed the branding procedure and/or rite upon the patient while an individual who was also naked utilized a cell phone to video said branding procedure and/or rite without the consent of the patient.

9.  Respondent failed to provide appropriate wound care for the patient at the time of the branding procedure and/or rite and thereafter.

30

10. Respondent failed to refer the patient to a specialist after the branding procedure and/or rite to provide appropriate wound care.

11. Respondent inappropriately advised the patient to take photos of the wound caused by the branding procedure and/or rite on a daily basis for one month and once a week for another month, and to thereafter send such photographs to an individual known as "Lauren Salzman".

12. Respondent failed to provide appropriate medical care and treatment for the patient.

13. Respondent failed to prepare and/or maintain appropriate medical records for the patient which accurately reflected the evaluation and treatment of the patient.

U. On or about March, 2017, the Respondent intentionally used a cauterizing iron as part of a branding procedure and/or rite to permanently alter and/or disfigure the skin by branding Patient U, a female patient, hereinafter identified in the attached Appendix "A", with the initials KR/AM in the pelvis region, thereby leaving a permanent scar.

1. Respondent performed the branding procedure and/or rite in an other than appropriately sterile environment and/or without appropriate infection control.

2. Respondent, while performing the branding procedure and/or rite, caused the patient to suffer excruciating pain for no known medical purpose.

3. The patient requested on multiple occasions that Respondent cease performing the branding procedure and/or rite, which said Respondent failed to do.

4. Respondent failed to cease performing the branding procedure and/or rite despite the fact that the patient screamed on multiple occasions because of the excruciating pain she was experiencing.

31

5. Respondent, during the course of the branding procedure and/or rite, tortured and physically abused the patient.

6. Respondent performed the branding procedure and/or rite upon the patient at the time the patient was naked and while being held down by three other individuals, who were also naked, contrary to any appropriate medical protocol or need.

7. Respondent knowingly performed a branding procedure and/or rite upon the patient when Respondent knew, or should have known, that the patient believed that she was only having a tattoo applied to her pelvic region.

8. Respondent inappropriately performed the branding procedure and/or rite upon the patient while an individual who was also naked utilized a cell phone to video said branding procedure and/or rite without the consent of the patient.

9. Respondent failed to provide appropriate wound care for the patient at the time of the branding procedure and/or rite and thereafter.

10. Respondent failed to refer the patient to a specialist after the branding procedure and/or rite to provide appropriate wound care.

11. Respondent inappropriately advised the patient to take photos of the wound caused by the branding procedure and/or rite on a daily basis for one month and once a week for another month, and to thereafter send such photographs to an individual known as "Lauren Salzman".

12. Respondent failed to provide appropriate medical care and treatment for the patient.

13. Respondent failed to prepare and/or maintain appropriate medical records for the patient which accurately reflected the evaluation and treatment of the patient.

32

V. On or about March, 2017, the Respondent intentionally used a cauterizing iron as part of a branding procedure and/or rite to permanently alter and/or disfigure the skin by branding Patient V, a female patient, hereinafter identified in the attached Appendix "A", with the initials KR/AM in the pelvis region, thereby leaving a permanent scar.

1. Respondent performed the branding procedure and/or rite in an other than appropriately sterile environment and/or without appropriate infection control.

2. Respondent, while performing the branding procedure and/or rite, caused the patient to suffer excruciating pain for no known medical purpose.

3. The patient requested on multiple occasions that Respondent cease performing the branding procedure and/or rite, which said Respondent failed to do.

4. Respondent failed to cease performing the branding procedure and/or rite despite the fact that the patient screamed on multiple occasions because of the excruciating pain she was experiencing.

5. Respondent, during the course of the branding procedure and/or rite, tortured and physically abused the patient.

6. Respondent performed the branding procedure and/or rite upon the patient at the time the patient was naked and while being held down by three other individuals, who were also naked, contrary to any appropriate medical protocol or need.

7. Respondent knowingly performed a branding procedure and/or rite upon the patient when Respondent knew, or should have known, that the patient believed that she was only having a tattoo applied to her pelvic region.

8. Respondent inappropriately performed the branding procedure and/or rite upon the patient while an individual who was also naked utilized a cell phone to video said branding procedure and/or rite without the consent of the patient.

9. Respondent failed to provide appropriate wound care for the patient at the time of the branding procedure and/or rite and thereafter.

33

10. Respondent failed to refer the patient to a specialist after the branding procedure and/or rite to provide appropriate wound care.

11. Respondent inappropriately advised the patient to take photos of the wound caused by the branding procedure and/or rite on a daily basis for one month and once a week for another month, and to thereafter send such photographs to an individual known as "Lauren Salzman".

12. Respondent failed to provide appropriate medical care and treatment for the patient.

13. Respondent failed to prepare and/or maintain appropriate medical records for the patient which accurately reflected the evaluation and treatment of the patient.

W. On or about March, 2017, the Respondent intentionally used a cauterizing iron as part of a branding procedure and/or rite to permanently alter and/or disfigure the skin by branding Patient W, a female patient, hereinafter identified in the attached Appendix "A", with the initials KR/AM in the pelvis region, thereby leaving a permanent scar.

1. Respondent performed the branding procedure and/or rite in an other than appropriately sterile environment and/or without appropriate infection control.

2. Respondent, while performing the branding procedure and/or rite, caused the patient to suffer excruciating pain for no known medical purpose.

3. The patient requested on multiple occasions that Respondent cease performing the branding procedure and/or rite, which said Respondent failed to do.

4. Respondent failed to cease performing the branding procedure and/or rite despite the fact that the patient screamed on multiple occasions because of the excruciating pain she was experiencing.

34

5. Respondent, during the course of the branding procedure and/or rite, tortured and physically abused the patient.

6. Respondent performed the branding procedure and/or rite upon the patient at the time the patient was naked and while being held down by three other individuals, who were also naked, contrary to any appropriate medical protocol or need.

7. Respondent knowingly performed a branding procedure and/or rite upon the patient when Respondent knew, or should have known, that the patient believed that she was only having a tattoo applied to her pelvic region.

8. Respondent inappropriately performed the branding procedure and/or rite upon the patient while an individual who was also naked utilized a cell phone to video said branding procedure and/or rite without the consent of the patient.

9. Respondent failed to provide appropriate wound care for the patient at the time of the branding procedure and/or rite and thereafter.

10. Respondent failed to refer the patient to a specialist after the branding procedure and/or rite to provide appropriate wound care.

11. Respondent inappropriately advised the patient to take photos of the wound caused by the branding procedure and/or rite on a daily basis for one month and once a week for another month, and to thereafter send such photographs to an individual known as "Lauren Salzman".

12. Respondent failed to provide appropriate medical care and treatment for the patient.

13. Respondent failed to prepare and/or maintain appropriate medical records for the patient which accurately reflected the evaluation and treatment of the patient.

35

X.  In on or about 2014, the Respondent provided medical care and treatment to Patient X, as identified in the Appendix. The Respondent's medical care of Patient X deviated from accepted standards of care as follows:

1. Respondent failed to prepare and/or maintain appropriate records which accurately reflected the evaluation and treatment of Patient X.

Y.  In on or about 2016, the Respondent provided medical care and treatment to Patient Y, as identified in the Appendix. The Respondent's medical care of Patient Y deviated from accepted standards of care as follows:

1. Respondent failed to prepare and/or maintain appropriate records which accurately reflected the evaluation and treatment of Patient Y.

Z.  During the time from on or about June 2016 through August 2016, NXIVM and/or the Executive Success Program (ESP) conducted a conference and/or meeting at the Silver Bay Conference and Family Retreat Center (Conference Center), located in Silver Bay, New York. The Respondent and approximately 300 to 400 other individuals attended the conference, including 50 to 60 children. During the course of the conference, hundreds of the attendees became severely ill with an undetermined communicable disease. The individuals who became ill suffered inter alia, flu-like symptoms, severe vomiting and diarrhea. The Respondent had knowledge of the fact that many individuals at the conference had become ill. The Respondent knew or should have known that the illness suffered by the attendees at the conference was a communicable disease, outbreak of a communicable disease, and/or an unusual disease or outbreak.

1. Respondent failed to report the suspected or confirmed case of communicable disease, outbreak of communicable disease, and/or the unusual disease or

36

outbreak to the city, county, or district health officer as required by Title 10 N.Y.C.R.R. Section 2.10.

2. Respondent failed to report by telephone, facsimile, or other electronic communication, or in person the illness of the attendees at the conference suspected or confirmed to have been caused due to the consumption of spoiled or poisonous food to the city, county, or district health officer, in violation of Title 10 N.Y.C.R.R. Section 2.15.

3. Upon being made aware of the fact that attendees at the conference might have been suffering from a communicable disease, the Respondent failed to cause such individuals to be isolated in an appropriate environment, pending official action by the health officer, in violation of Title 10 N.Y.C.R.R. Section 2.27.

37

# SPECIFICATIONS OF CHARGES
## FIRST THROUGH TWENTY-THIRD SPECIFICATIONS
## WILLFULLY ABUSING A PATIENT

Respondent is charged with committing professional misconduct as defined by New York Education Law §6530(31) by willfully abusing a patient as alleged in the facts of:

1. The facts in paragraphs A and A.1, A and A.2, A and A.3, A and A.4, A and A.5, A and A.6, A and A.7, A and A.8, A and A.9, A and A.10, A and A.11, A and A.12, and/or A and A.13.

2. The facts in paragraphs B and B.1, B and B.2, B and B.3, B and B.4, B and B.5, B and B.6, B and B.7, B and B.8, B and B.9, B and B.10, B and B.11, B and B.12, and/or B and B.13.

3. The facts in paragraphs C and C.1, C and C.2, C and C.3, C and C.4, C and C.5, C and C.6, C and C.7, C and C.8, C and C.9, C and C.10, C and C.11, C and C.12, and/or C and C.13.

4. The facts in paragraphs D and D.1, D and D.2, D and D.3, D and D.4, D and D.5, D and D.6, D and D.7, D and D.8, D and D.9, D and D.10, D and D.11, D and D.12, and/or D and D.13.

5. The facts in paragraphs E and E.1, E and E.2, E and E.3, E and E.4, E and E.5, E and E.6, E and E.7, E and E.8, E and E.9, E and E.10, E and E.11, E and E.12, and/or E and E.13.

38

6. The facts in paragraphs F and F.1, F and F.2, F and F.3, F and F.4, F and F.5, F and F.6, F and F.7, F and F.8, F and F.9, F and F.10, F and F.11, F and F.12, and/or F and F.13.

7. The facts in paragraphs G and G.1, G and G.2, G and G.3, G and G.4, G and G.5, G and G.6, G and G.7, G and G.8. G and G.9, G and G.10, G and G.11, G and G.12, and/or G and G.13.

8. The facts in paragraphs H and H.1, H and H.2, H and H.3, H and H.4, H and H.5, H and H.6, H and H.7, H and H.8, H and H.9, H and H.10, H and H.11, H and H.12, and/or H and H.13.

9. The facts in paragraphs I and I.1, I and I.2, I and I.3, I and I.4, I and I.5, I and I.6, I and I.7, I and I.8, I and I.9, I and I.10, I and I.11, I and I.12, and/or I and I.13.

10. The facts in paragraphs J and J.1, J and J.2, J and J.3, J and J.4, J and J.5, J and J.6, J and J.7, J and J.8, J and J.9, J and J.10, J and J.11, J and J.12, and/or J and J.13.

11. The facts in paragraphs K and K.1, K and K.2, K and K.3, K and K.4, K and K.5, K and K.6, K and K.7, K and K.8, K and K.9, K and K.10, K and K.11, K and K.12, and/or K and K.13.

12. The facts in paragraphs L and L.1, L and L.2, L and L.3, L and L.4, L and L.5, L and L.6, L and L.7, L and L.8, L and L.9, L and L.10, L and L.11, L and L.12, and/or L and L.13.

39

13. The facts in paragraphs M and M.1, M and M.2, M and M.3, M and M.4, M and M.5, M and M.6, M and M.7, M and M.8, M and M.9, M and M.10, M and M.11, M and M.12, and/or M and M.13.

14. The facts in paragraphs N and N.1, N and N.2, N and N.3, N and N.4, N and N.5, N and N.6, N and N.7, N and N.8, N and N.9, N and N.10, N and N.11, N and N.11, N and N.12, and/or N and N.13.

15. The facts in paragraphs O and O.1, O and O.2, O and O.3, O and O.4, O and O.5, O and O.6, O and O.7, O and O.8, O and O.9, O and O.10, O and O.11, O and O.12, and/or O and O.13.

16. The facts in paragraphs P and P.1, P and P.2, P and P.3, P and P.4, P and P.5, P and P.6, P and P.7, P and P.8, P and P.9, P and P.10, P and P.11, P and P.12, and/or P and P.13.

17. The facts in paragraphs Q and Q.1, Q and Q.2, Q and Q.3, Q and Q.4, Q and Q.5, Q and Q.6, Q and Q.7, Q and Q.8, Q and Q.9, Q and Q.10, Q and Q.11, Q and Q.12, and/or Q and Q.13.

18. The facts in paragraphs R and R.1, R and R.2, R and R.3, R and R.4, R and R.5, R and R. 6, R and R.7, R and R.8, R and R.9, R and R.10, R and R.11, R and R.12, and/or R and R.13.

19. The facts in paragraphs S and S.1, S and S.2, S and S.3, S and S.4, S and S.5, S and S.6, S and S.7, S and S.8, S and S.9, S and S.10, S and S.11, S and S.12, and/or S and S.13.

40

20. The facts in paragraphs T and T.1, T and T.2, T and T.3, T and T.4, T and T.5, T and T.6, T and T.7, T and T.8, T and T.9, T and T.10, T and T.11, T and T.12, and/or T and T.13.

21. The facts in paragraphs U and U.1, U and U.2, U and U.3, U and U.4, U and U.5, U and U.6, U and U.7, U and U.8, U and U.9, U and U.10, U and U.11, U and U.12, and/or U and U.13.

22. The facts in paragraphs V and V.1, V and V.2, V and V.3, V and V.4, V and V.5, V and V.6, V and V.7, V and V.8, V and V.9, V and V.10, V and V.11, V and V.12, and/or V and V.13.

23. The facts in paragraphs W and W.1, W and W.2, W and W.3, W and W.4, W and W.5, W and W. 6, W and W.7, W and W.8, W and W.9, W and W.10, W and W.11, W and W.12, and/or W and W.13.

## TWENTY-FOURTH THROUGH
## FORTY-SIXTH SPECIFICATIONS

### CONDUCT IN THE PRACTICE OF MEDICINE
### WHICH EVIDENCES MORAL UNFITNESS

Respondent is charged with committing professional misconduct as defined by New York Education Law §6530(20)

24. The facts in paragraphs A and A.1, A and A.2, A and A.3, A and A.4, A and A.5, A and A.6, A and A.7, A and A.8, A and A.9, A and A.10, A and A.11, A and A.12, and/or A and A.13.

41

25. The facts in paragraphs B and B.1, B and B.2, B and B.3, B and B.4, B and B.5, B and B.6, B and B.7, B and B.8, B and B.9, B and B.10, B and B.11, B and B.12, and/or B and B.13.

26. The facts in paragraphs C and C.1, C and C.2, C and C.3, C and C.4, C and C.5, C and C.6, C and C.7, C and C.8, C and C.9, C and C.10, C and C.11, C and C.12, and/or C and C.13.

27. The facts in paragraphs D and D.1, D and D.2, D and D.3, D and D.4, D and D.5, D and D.6, D and D.7, D and D.8, D and D.9, D and D.10, D and D.11, D and D.12, and/or D and D.13.

28. The facts in paragraphs E and E.1, E and E.2, E and E.3, E and E.4, E and E.5, E and E.6, E and E.7, E and E.8, E and E.9, E and E.10, E and E.11, E and E.12, and/or E and E.13.

29. The facts in paragraphs F and F.1, F and F.2, F and F.3, F and F.4, F and F.5, F and F.6, F and F.7, F and F.8, F and F.9, F and F.10, F and F.11, F and F.12, and/or F and F.13.

30. The facts in paragraphs G and G.1, G and G.2, G and G.3, G and G.4, G and G.5, G and G.6, G and G.7, G and G.8. G and G.9, G and G.10, G and G.11, G and G.12, and/or G and G.13.

31. The facts in paragraphs H and H.1, H and H.2, H and H.3, H and H.4, H and H.5, H and H.6, H and H.7, H and H.8, H and H.9, H and H.10, H and H.11, H and H.12, and/or H and H.13.

42

32. The facts in paragraphs I and I.1, I and I.2, I and I.3, I and I.4, I and I.5, I and I.6, I and I.7, I and I.8, I and I.9, I and I.10, I and I.11, I and I.12, and/or I and I.13.

33. The facts in paragraphs J and J.1, J and J.2, J and J.3, J and J.4, J and J.5, J and J.6, J and J.7, J and J.8, J and J.9, J and J.10, J and J.11, J and J.12, and/or J and J.13.

34. The facts in paragraphs K and K.1, K and K.2, K and K.3, K and K.4, K and K.5, K and K.6, K and K.7, K and K.8, K and K.9, K and K.10, K and K.11, K and K.12, and/or K and K.13.

35. The facts in paragraphs L and L.1, L and L.2, L and L.3, L and L.4, L and L.5, L and L.6, L and L.7, L and L.8, L and L.9, L and L.10, L and L.11, L and L.12, and/or L and L.13.

36. The facts in paragraphs M and M.1, M and M.2, M and M.3, M and M.4, M and M.5, M and M.6, M and M.7, M and M.8, M and M.9, M and M.10, M and M.11, M and M.12, and/or M and M.13.

37. The facts in paragraphs N and N.1, N and N.2, N and N.3, N and N.4, N and N.5, N and N.6, N and N.7, N and N.8, N and N.9, N and N.10, N and N.11, N and N.11, N and N.12, and/or N and N.13.

38. The facts in paragraphs O and O.1, O and O.2, O and O.3, O and O.4, O and O.5, O and O.6, O and O.7, O and O.8, O and O.9, O and O.10, O and O.11, O and O.12, and/or O and O.13.

Roberts - 379

39. The facts in paragraphs P and P.1, P and P.2, P and P.3, P and P.4, P and P.5, P and P.6, P and P.7, P and P.8, P and P.9, P and P.10, P and P.11, P and P.12, and/or P and P.13.

40. The facts in paragraphs Q and Q.1, Q and Q.2, Q and Q.3, Q and Q.4, Q and Q.5, Q and Q.6, Q and Q.7, Q and Q.8, Q and Q.9, Q and Q.10, Q and Q.11, Q and Q.12, and/or Q and Q.13.

41. The facts in paragraphs R and R.1, R and R.2, R and R.3, R and R.4, R and R.5, R and R. 6, R and R.7, R and R.8, R and R.9, R and R.10, R and R.11, R and R.12, and/or R and R.13.

42. The facts in paragraphs S and S.1, S and S.2, S and S.3, S and S.4, S and S.5, S and S.6, S and S.7, S and S.8, S and S.9, S and S.10, S and S.11, S and S.12, and/or S and S.13.

43. The facts in paragraphs T and T.1, T and T.2, T and T.3, T and T.4, T and T.5, T and T.6, T and T.7, T and T.8, T and T.9, T and T.10, T and T.11, T and T.12, and/or T and T.13.

44. The facts in paragraphs U and U.1, U and U.2, U and U.3, U and U.4, U and U.5, U and U.6, U and U.7, U and U.8, U and U.9, U and U.10, U and U.11, U and U.12, and/or U and U.13.

45. The facts in paragraphs V and V.1, V and V.2, V and V.3, V and V.4, V and V.5, V and V.6, V and V.7, V and V.8, V and V.9, V and V.10, V and V.11, V and V.12, and/or V and V.13.

44

Roberts - 380

46. The facts in paragraphs W and W.1, W and W.2, W and W.3, W and W.4, W and W.5, W and W. 6, W and W.7, W and W.8, W and W.9, W and W.10, W and W.11, W and W.12, and/or W and W.13.

## FORTY-SEVENTH THROUGH SIXTY-NINTH SPECIFICATIONS

## FAILING TO USE SCIENTIFICALLY ACCEPTED
## INFECTION CONTROL PRACTICES

Respondent is charged with committing professional misconduct as defined by New York Education Law §6530(47)

47. The facts in paragraphs A and A.1, A and A.8, A and A.9, A and A.10, and/or A and A.11.

48. The facts in paragraphs B and B.1, B and B.8, B and B.9, B and B.10, and/or B and B.11.

49. The facts in paragraphs C and C.1, C and C.8, C and C.9, C and C.10, and/or C and C.11.

50. The facts in paragraphs D and D.1, D and D.8, D and D.9, D and D.10, and/or D and D.11.

51. The facts in paragraphs E and E.1, E and E.8, E and E.9, E and E.10, and/or E and E.11.

52. The facts in paragraphs F and F.1, F and F.8, F and F.9, F and F.10, and/or F and F.11.

45

53. The facts in paragraphs G and G.1, G and G.8, G and G.9, G and G.10, and/or G and G.11.

54. The facts in paragraphs H and H.1, H and H.8, H and H.9, H and H.10, and/or H and H.11.

55. The facts in paragraphs I and I.1, I and I.8, I and I.9, I and I.10, and/or I and I.11.

56. The facts in paragraphs J and J.1, J and J.8, I and J.9, J and J.10, and/or J and J.11.

57. The facts in paragraphs K and K.1, K and K.8, K and K.9, K and K.10, and/or K and K.11.

58. The facts in paragraphs L and L.1, L and L.8, L and L.9, L and L.10, and/or L and L.11.

59. The facts in paragraphs M and M.1, M and M.8, M and M.9, M and M.10, and/or M and M.11.

60. The facts in paragraphs N and N.1, N and N.8, N and N.9, N and N.10, and/or N and N.11.

61. The facts in paragraphs O and O.1, O and O.8, O and O.9, O and O.10, and/or O and O.11.

62. The facts in paragraphs P and P.1, P and P.8, P and P.9, P and P.10, and/or P and P.11.

63. The facts in paragraphs Q and Q.1, Q and Q.8, Q and Q.9, Q and Q.10, and/or Q and Q.11.

46

64. The facts in paragraphs R and R.1, R and R.8, R and R.9, R and R.10, and/or R and R. 11.

65. The facts in paragraphs S and S.1, S and S.8, S and S.9, S and S.10, and/or S and S.11.

66. The facts in paragraphs T and T.1, T and T.8, T and T.9, T and T.10, and/or T and T.11.

67. The facts in paragraphs U and U.1, U and U.8, U and U.9, U and U.10, and/or U and U.11.

68. The facts in paragraphs V and V.1, V and V.8, V and V.9, V and V.10, and/or V and V.11.

69. The facts in paragraphs W and W.1, W and W.8, W and W.9, W and W.10, and/or W and W.11.

## SEVENTIETH THROUGH NINETY-SECOND SPECIFICATIONS

## PRACTICING THE PROFESSION FRAUDULENTLY OR BEYOND ITS SCOPE

Respondent is charged with committing professional misconduct as defined by New York Education Law §6530(2)

70. The facts in paragraphs A and A.2, A and A.3, A and A.4, and/or A and A.7.

71. The facts in paragraphs B and B.2, B and B.3, B and B.4, and/or B and B.7.

72. The facts in paragraphs C and C.2, C and C.3, C and C.4, and/or C and C.7.

73. The facts in paragraphs D and D.2, D and D.3, D and D.4, and/or D and D.7.

47

74. The facts in paragraphs E and E.2, E and E.3, E and E.4, and/or E and E.7.

75. The facts in paragraphs F and F.2, F and F.3, F and F.4, and/or F and F.7.

76. The facts in paragraphs G and G.2, G and G.3, G and G.4, and/or G and G.7.

77. The facts in paragraphs H and H.2, H and H.3, H and H.4, and/or H and H.7.

78. The facts in paragraphs I and I.2, I and I.3, I and I.4, and/or I and I.7.

79. The facts in paragraphs J and J.2, J and J.3, J and J.4, and/or J and J.7.

80. The facts in paragraphs K and K.2, K and K.3, K and K.4, and/or K and K.7.

81. The facts in paragraphs L and L.2, L and L.3, L and L.4, and/or L and L.7.

82. The facts in paragraphs M and M.2, M and M.3, M and M.4, and/or M and M.7.

83. The facts in paragraphs N and N.2, N and N.3, N and N.4, and/or N and N.7.

84. The facts in paragraphs O and O.2, O and O.3, O and O.4, and/or O and O.7.

85. The facts in paragraphs P and P.2, P and P.3, P and P.4, and/or P and P.7.

86. The facts in paragraphs Q and Q.2, Q and Q.3, Q and Q.4, and/or Q and Q.7.

87. The facts in paragraphs R and R.2, R and R.3, R and R.4, and/or R and R.7.

88. The facts in paragraphs S and S.2, S and S.3, S and S.4, and/or S and S.7.

89. The facts in paragraphs T and T.2, T and T.3, T and T.4, and/or T and T.7.

90. The facts in paragraphs U and U.2, U and U.3, U and U.4, and/or U and U.7.

91. The facts in paragraphs V and V.2, V and V.3, V and V.4, and/or V and V.7.

92. The facts in paragraphs W and W.2, W and W.3, W and W.4, and/or W and W.7.

Roberts - 384

## NINETY-THIRD THROUGH ONE HUNDRED FIFTEENTH SPECIFICATIONS

## PRACTICING THE PROFESSION WITH GROSS NEGLIGENCE

Respondent is charged with committing professional misconduct as defined by New York Education Law §6530(4)

93. The facts in paragraphs A and A.1, A and A.2, A and A.3, A and A.4, A and A.5, A and A.6, A and A.7, A and A.8, A and A.9, A and A.10, A and A.11, A and A.12, and/or A and A.13.

94. The facts in paragraphs B and B.1, B and B.2, B and B.3, B and B.4, B and B.5, B and B.6, B and B.7, B and B.8, B and B.9, B and B.10, B and B.11, B and B.12, and/or B and B.13.

95. The facts in paragraphs C and C.1, C and C.2, C and C.3, C and C.4, C and C.5, C and C.6, C and C.7, C and C.8, C and C.9, C and C.10, C and C.11, C and C.12, and/or C and C.13.

96. The facts in paragraphs D and D.1, D and D.2, D and D.3, D and D.4, D and D.5, D and D.6, D and D.7, D and D.8, D and D.9, D and D.10, D and D.11, D and D.12, and/or D and D.13.

97. The facts in paragraphs E and E.1, E and E.2, E and E.3, E and E.4, E and E.5, E and E.6, E and E.7, E and E.8, E and E.9, E and E.10, E and E.11, E and E.12, and/or E and E.13.

98. The facts in paragraphs F and F.1, F and F.2, F and F.3, F and F.4, F and F.5, F and F.6, F and F.7, F and F.8, F and F.9, F and F.10, F and F.11, F and F.12, and/or F and F.13.

49

99. The facts in paragraphs G and G.1, G and G.2, G and G.3, G and G.4, G and G.5, G and G.6, G and G.7, G and G.8. G and G.9, G and G.10, G and G.11, G and G.12, and/or G and G.13.

100. The facts in paragraphs H and H.1, H and H.2, H and H.3, H and H.4, H and H.5, H and H.6, H and H.7, H and H.8, H and H.9, H and H.10, H and H.11, H and H.12, and/or H and H.13.

101. The facts in paragraphs I and I.1, I and I.2, I and I.3, I and I.4, I and I.5, I and I.6, I and I.7, I and I.8, I and I.9, I and I.10, I and I.11, I and I.12, and/or I and I.13.

102. The facts in paragraphs J and J.1, J and J.2, J and J.3, J and J.4, J and J.5, J and J.6, J and J.7, J and J.8, J and J.9, J and J.10, J and J.11, J and J.12, and/or J and J.13.

103. The facts in paragraphs K and K.1, K and K.2, K and K.3, K and K.4, K and K.5, K and K.6, K and K.7, K and K.8, K and K.9, K and K.10, K and K.11, K and K.12, and/or K and K.13.

104. The facts in paragraphs L and L.1, L and L.2, L and L.3, L and L.4, L and L.5, L and L.6, L and L.7, L and L.8, L and L.9, L and L.10, L and L.11, L and L.12, and/or L and L.13.

105. The facts in paragraphs M and M.1, M and M.2, M and M.3, M and M.4, M and M.5, M and M.6, M and M.7, M and M.8, M and M.9, M and M.10, M and M.11, M and M.12, and/or M and M.13.

Roberts - 386

106. The facts in paragraphs N and N.1, N and N.2, N and N.3, N and N.4, N and N.5, N and N.6, N and N.7, N and N.8, N and N.9, N and N.10, N and N.11, N and N.11, N and N.12, and/or N and N.13.

107. The facts in paragraphs O and O.1, O and O.2, O and O.3, O and O.4, O and O.5, O and O.6, O and O.7, O and O.8, O and O.9, O and O.10, O and O.11, O and O.12, and/or O and O.13.

108. The facts in paragraphs P and P.1, P and P.2, P and P.3, P and P.4, P and P.5, P and P.6, P and P.7, P and P.8, P and P.9, P and P.10, P and P.11, P and P.12, and/or P and P.13.

109. The facts in paragraphs Q and Q.1, Q and Q.2, Q and Q.3, Q and Q.4, Q and Q.5, Q and Q.6, Q and Q.7, Q and Q.8, Q and Q.9, Q and Q.10, Q and Q.11, Q and Q.12, and/or Q and Q.13.

110. The facts in paragraphs R and R.1, R and R.2, R and R.3, R and R.4, R and R.5, R and R. 6, R and R.7, R and R.8, R and R.9, R and R.10, R and R.11, R and R.12, and/or R and R.13.

111. The facts in paragraphs S and S.1, S and S.2, S and S.3, S and S.4, S and S.5, S and S.6, S and S.7, S and S.8, S and S.9, S and S.10, S and S.11, S and S.12, and/or S and S.13.

112. The facts in paragraphs T and T.1, T and T.2, T and T.3, T and T.4, T and T.5, T and T.6, T and T.7, T and T.8, T and T.9, T and T.10, T and T.11, T and T.12, and/or T and T.13.

51

113. The facts in paragraphs U and U.1, U and U.2, U and U.3, U and U.4, U and U.5, U and U.6, U and U.7, U and U.8, U and U.9, U and U.10, U and U.11, U and U.12, and/or U and U.13.

114. The facts in paragraphs V and V.1, V and V.2, V and V.3, V and V.4, V and V.5, V and V.6, V and V.7, V and V.8, V and V.9, V and V.10, V and V.11, V and V.12, and/or V and V.13.

115. The facts in paragraphs W and W.1, W and W.2, W and W.3, W and W.4, W and W.5, W and W. 6, W and W.7, W and W.8, W and W.9, W and W.10, W and W.11, W and W.12, and/or W and W.13.


## ONE HUNDRED SIXTEENTH THROUGH ONE HUNDRED THIRTY-NINTH

## SPECIFICATIONS

## PRACTICING THE PROFESSION WITH NEGLIGENCE
## ON MORE THAN ONE OCCASION

Respondent is charged with committing professional misconduct as defined by New York Education Law §6530(3)

116. The facts in paragraphs A and A.1, A and A.2, A and A.3, A and A.4, A and A.5, A and A.6, A and A.7, A and A.8, A and A.9, A and A.10, A and A.11, A and A.12, and/or A and A.13.

117. The facts in paragraphs B and B.1, B and B.2, B and B.3, B and B.4, B and B.5, B and B.6, B and B.7, B and B.8, B and B.9, B and B.10, B and B.11, B.12, and/or B and B.13.

52

118. The facts in paragraphs C and C.1, C and C.2, C and C.3, C and C.4, C and C.5, C and C.6, C and C.7, C and C.8, C and C.9, C and C.10, C and C.11, C and C.12, and/or C and C.13.

119. The facts in paragraphs D and D.1, D and D.2, D and D.3, D and D.4, D and D.5, D and D.6, D and D.7, D and D.8, D and D.9, D and D.10, D and D.11, D and D.12, and/or D and D.13.

120. The facts in paragraphs E and E.1, E and E.2, E and E.3, E and E.4, E and E.5, E and E.6, E and E.7, E and E.8, E and E.9, E and E.10, E and E.11, E and E.12, and/or E and E.13.

121. The facts in paragraphs F and F.1, F and F.2, F and F.3, F and F.4, F and F.5, F and F.6, F and F.7, F and F.8, F and F.9, F and F.10, F and F.11, F and F.12, and/or F and F.13.

122. The facts in paragraphs G and G.1, G and G.2, G and G.3, G and G.4, G and G.5, G and G.6, G and G.7, G and G.8. G and G.9, G and G.10, G and G.11, G and G.12, and/or G and G.13.

123. The facts in paragraphs H and H.1, H and H.2, H and H.3, H and H.4, H and H.5, H and H.6, H and H.7, H and H.8, H and H.9, H and H.10, H and H.11, H and H.12, and/or H and H.13.

124. The facts in paragraphs I and I.1, I and I.2, I and I.3, I and I.4, I and I.5, I and I.6, I and I.7, I and I.8, I and I.9, I and I.10, I and I.11, I and I.12, and/or I and I.13.

Roberts - 389

125. The facts in paragraphs J and J.1, J and J.2, J and J.3, J and J.4, J and J.5, J and J.6, J and J.7, J and J.8, J and J.9, J and J.10, J and J.11, J and J.12, and/or J and J.13.

126. The facts in paragraphs K and K.1, K and K.2, K and K.3, K and K.4, K and K.5, K and K.6, K and K.7, K and K.8, K and K.9, K and K.10, K and K.11, K and K.12, and/or K and K.13.

127. The facts in paragraphs L and L.1, L and L.2, L and L.3, L and L.4, L and L.5, L and L.6, L and L.7, L and L.8, L and L.9, L and L.10, L and L.11, L and L.12, and/or L and L.13.

128. The facts in paragraphs M and M.1, M and M.2, M and M.3, M and M.4, M and M.5, M and M.6, M and M.7, M and M.8, M and M.9, M and M.10, M and M.11, M and M.12, and/or M and M.13.

129. The facts in paragraphs N and N.1, N and N.2, N and N.3, N and N.4, N and N.5, N and N.6, N and N.7, N and N.8, N and N.9, N and N.10, N and N.11, N and N.11, N and N.12, and/or N and N.13.

130. The facts in paragraphs O and O.1, O and O.2, O and O.3, O and O.4, O and O.5, O and O.6, O and O.7, O and O.8, O and O.9, O and O.10, O and O.11, O and O.12, and/or O and O.13.

131. The facts in paragraphs P and P.1, P and P.2, P and P.3, P and P.4, P and P.5, P and P.6, P and P.7, P and P.8, P and P.9, P and P.10, P and P.11, P and P.12, and/or P and P.13.

54

132. The facts in paragraphs Q and Q.1, Q and Q.2, Q and Q.3, Q and Q.4, Q and Q.5, Q and Q.6, Q and Q.7, Q and Q.8, Q and Q.9, Q and Q.10, Q and Q.11, Q and Q.12, and/or Q and Q.13.

133. The facts in paragraphs R and R.1, R and R.2, R and R.3, R and R.4, R and R.5, R and R. 6, R and R.7, R and R.8, R and R.9, R and R.10, R and R.11, R and R.12, and/or R and R.13.

134. The facts in paragraphs S and S.1, S and S.2, S and S.3, S and S.4, S and S.5, S and S.6, S and S.7, S and S.8, S and S.9, S and S.10, S and S.11, S and S.12, and/or S and S.13.

135. The facts in paragraphs T and T.1, T and T.2, T and T.3, T and T.4, T and T.5, T and T.6, T and T.7, T and T.8, T and T.9, T and T.10, T and T.11, T and T.12, and/or T and T.13.

136. The facts in paragraphs U and U.1, U and U.2, U and U.3, U and U.4, U and U.5, U and U.6, U and U.7, U and U.8, U and U.9, U and U.10, U and U.11, U and U.12, and/or U and U.13.

137. The facts in paragraphs V and V.1, V and V.2, V and V.3, V and V.4, V and V.5, V and V.6, V and V.7, V and V.8, V and V.9, V and V.10, V and V.11, V and V.12, and/or V and V.13.

138. The facts in paragraphs W and W.1, W and W.2, W and W.3, W and W.4, W and W.5, W and W. 6, W and W.7, W and W.8, W and W.9, W and W.10, W and W.11, W and W.12, and/or W and W.13.

139. The facts in paragraphs X and X.1 and/or Y and Y.1.

55

## ONE HUNDRED FORTIETH THROUGH ONE HUNDRED SIXTIETH SPECIFICATIONS

## PRACTICING THE PROFESSION WITH GROSS INCOMPETENCE

Respondent is charged with committing professional misconduct as defined by New York Education Law §6530(6)

140. The facts in paragraphs A and A.1, A and A.2, A and A.3, A and A.4, A and A.5, A and A.6, A and A.7, A and A.8, A and A.9, A and A.10, A and A.11, A and A.12, and/or A and A.13.

141. The facts in paragraphs B and B.1, B and B.2, B and B.3, B and B.4, B and B.5, B and B.6, B and B.7, B and B.8, B and B.9, B and B.10, B and B.11, B and B.12, and/or B and B.13.

142. The facts in paragraphs C and C.1, C and C.2, C and C.3, C and C.4, C and C.5, C and C.6, C and C.7, C and C.8, C and C.9, C and C.10, C and C.11, C and C.12, and/or C and C.13.

143. The facts in paragraphs D and D.1, D and D.2, D and D.3, D and D.4, D and D.5, D and D.6, D and D.7, D and D.8, D and D.9, D and D.10, D and D.11, D and D.12, and/or D and D.13.

144. The facts in paragraphs E and E.1, E and E.2, E and E.3, E and E.4, E and E.5, E and E.6, E and E.7, E and E.8, E and E.9, E and E.10, E and E.11, E and E.12, and/or E and E.13.

145. The facts in paragraphs F and F.1, F and F.2, F and F.3, F and F.4, F and F.5, F and F.6, F and F.7, F and F.8, F and F.9, F and F.10, F and F.11, F and F.12, and/or F and F.13.

56

Roberts - 392

146. The facts in paragraphs G and G.1, G and G.2, G and G.3, G and G.4, G and G.5, G and G.6, G and G.7, G and G.8. G and G.9, G and G.10, G and G.11, G and G.12, and/or G and G.13.

147. The facts in paragraphs H and H.1, H and H.2, H and H.3, H and H.4, H and H.5, H and H.6, H and H.7, H and H.8, H and H.9, H and H.10, H and H.11, H and H.12, and/or H and H.13.

148. The facts in paragraphs I and I.1, I and I.2, I and I.3, I and I.4, I and I.5, I and I.6, I and I.7, I and I.8, I and I.9, I and I.10, I and I.11, I and I.12, and/or I and I.13.

149. The facts in paragraphs J and J.1, J and J.2, J and J.3, J and J.4, J and J.5, J and J.6, J and J.7, J and J.8, J and J.9, J and J.10, J and J.11, J and J.12, and/or J and J.13.

150. The facts in paragraphs K and K.1, K and K.2, K and K.3, K and K.4, K and K.5, K and K.6, K and K.7, K and K.8, K and K.9, K and K.10, K and K.11, K and K.12, and/or K and K.13.

151. The facts in paragraphs L and L.1, L and L.2, L and L.3, L and L.4, L and L.5, L and L.6, L and L.7, L and L.8, L and L.9, L and L.10, L and L.11, L and L.12, and/or L and L.13.

152. The facts in paragraphs M and M.1, M and M.2, M and M.3, M and M.4, M and M.5, M and M.6, M and M.7, M and M.8, M and M.9, M and M.10, M and M.11, M and M.12, and/or M and M.13.

57

153. The facts in paragraphs N and N.1, N and N.2, N and N.3, N and N.4, N and N.5, N and N.6, N and N.7, N and N.8, N and N.9, N and N.10, N and N.11, N and N.11, N and N.12, and/or N and N.13.

154. The facts in paragraphs O and O.1, O and O.2, O and O.3, O and O.4, O and O.5, O and O.6, O and O.7, O and O.8, O and O.9, O and O.10, O and O.11, O and O.12, and/or O and O.13.

155. The facts in paragraphs P and P.1, P and P.2, P and P.3, P and P.4, P and P.5, P and P.6, P and P.7, P and P.8, P and P.9, P and P.10, P and P.11, P and P.12, and/or P and P.13.

156. The facts in paragraphs Q and Q.1, Q and Q.2, Q and Q.3, Q and Q.4, Q and Q.5, Q and Q.6, Q and Q.7, Q and Q.8, Q and Q.9, Q and Q.10, Q and Q.11, Q and Q.12, and/or Q and Q.13.

157. The facts in paragraphs R and R.1, R and R.2, R and R.3, R and R.4, R and R.5, R and R. 6, R and R.7, R and R.8, R and R.9, R and R.10, R and R.11, R and R.12, and/or R and R.13.

158. The facts in paragraphs S and S.1, S and S.2, S and S.3, S and S.4, S and S.5, S and S.6, S and S.7, S and S.8, S and S.9, S and S.10, S and S.11, S and S.12, and/or S and S.13.

159. The facts in paragraphs T and T.1, T and T.2, T and T.3, T and T.4, T and T.5, T and T.6, T and T.7, T and T.8, T and T.9, T and T.10, T and T.11, T and T.12, and/or T and T.13.

58

Roberts - 394

160. The facts in paragraphs U and U.1, U and U.2, U and U.3, U and U.4, U and U.5, U and U.6, U and U.7, U and U.8, U and U.9, U and U.10, U and U.11, U and U.12, and/or U and U.13.

161. The facts in paragraphs V and V.1, V and V.2, V and V.3, V and V.4, V and V.5, V and V.6, V and V.7, V and V.8, V and V.9, V and V.10, V and V.11, V and V.12, and/or V and V.13.

162. The facts in paragraphs W and W.1, W and W.2, W and W.3, W and W.4, W and W.5, W and W. 6, W and W.7, W and W.8, W and W.9, W and W.10, W and W.11, W and W.12, and/or W and W.13.

## ONE HUNDRED SIXTY-THIRD THROUGH

## ONE HUNDRED EIGHTY-SIXTH SPECIFICATIONS

### PRACTICNG THE PROFESSION WITH INCOMPETENCE
### ON MORE THAN ONE OCCASION

Respondent is charged with committing professional misconduct as defined by New York Education Law §6530(5)

163. The facts in paragraphs A and A.1, A and A.2, A and A.3, A and A.4, A and A.5, A and A.6, A and A.7, A and A.8, A and A.9, A and A.10, A and A.11, A and A.12, and/or A and A.13.

164. The facts in paragraphs B and B.1, B and B.2, B and B.3, B and B.4, B and B.5, B and B.6, B and B.7, B and B.8, B and B.9, B and B.10, B and B.11, B.12, and/or B and B.13.

59

165. The facts in paragraphs C and C.1, C and C.2, C and C.3, C and C.4, C and C.5, C and C.6, C and C.7, C and C.8, C and C.9, C and C.10, C and C.11, C and C.12, and/or C and C.13.

166. The facts in paragraphs D and D.1, D and D.2, D and D.3, D and D.4, D and D.5, D and D.6, D and D.7, D and D.8, D and D.9, D and D.10, D and D.11, D and D.12, and/or D and D.13.

167. The facts in paragraphs E and E.1, E and E.2, E and E.3, E and E.4, E and E.5, E and E.6, E and E.7, E and E.8, E and E.9, E and E.10, E and E.11, E and E.12, and/or E and E.13.

168. The facts in paragraphs F and F.1, F and F.2, F and F.3, F and F.4, F and F.5, F and F.6, F and F.7, F and F.8, F and F.9, F and F.10, F and F.11, F and F.12, and/or F and F.13.

169. The facts in paragraphs G and G.1, G and G.2, G and G.3, G and G.4, G and G.5, G and G.6, G and G.7, G and G.8. G and G.9, G and G.10, G and G.11, G and G.12, and/or G and G.13.

170. The facts in paragraphs H and H.1, H and H.2, H and H.3, H and H.4, H and H.5, H and H.6, H and H.7, H and H.8, H and H.9, H and H.10, H and H.11, H and H.12, and/or H and H.13.

171. The facts in paragraphs I and I.1, I and I.2, I and I.3, I and I.4, I and I.5, I and I.6, I and I.7, I and I.8, I and I.9, I and I.10, I and I.11, I and I.12, and/or I and I.13.

Roberts - 396

172. The facts in paragraphs J and J.1, J and J.2, J and J.3, J and J.4, J and J.5, J and J.6, J and J.7, J and J.8, J and J.9, J and J.10, J and J.11, J and J.12, and/or J and J.13.

173. The facts in paragraphs K and K.1, K and K.2, K and K.3, K and K.4, K and K.5, K and K.6, K and K.7, K and K.8, K and K.9, K and K.10, K and K.11, K and K.12, and/or K and K.13.

174. The facts in paragraphs L and L.1, L and L.2, L and L.3, L and L.4, L and L.5, L and L.6, L and L.7, L and L.8, L and L.9, L and L.10, L and L.11, L and L.12, and/or L and L.13.

175. The facts in paragraphs M and M.1, M and M.2, M and M.3, M and M.4, M and M.5, M and M.6, M and M.7, M and M.8, M and M.9, M and M.10, M and M.11, M and M.12, and/or M and M.13.

176. The facts in paragraphs N and N.1, N and N.2, N and N.3, N and N.4, N and N.5, N and N.6, N and N.7, N and N.8, N and N.9, N and N.10, N and N.11, N and N.11, N and N.12, and/or N and N.13.

177. The facts in paragraphs O and O.1, O and O.2, O and O.3, O and O.4, O and O.5, O and O.6, O and O.7, O and O.8, O and O.9, O and O.10, O and O.11, O and O.12, and/or O and O.13.

178. The facts in paragraphs P and P.1, P and P.2, P and P.3, P and P.4, P and P.5, P and P.6, P and P.7, P and P.8, P and P.9, P and P.10, P and P.11, P and P.12, and/or P and P.13.

Roberts - 397

179. The facts in paragraphs Q and Q.1, Q and Q.2, Q and Q.3, Q and Q.4, Q and Q.5, Q and Q.6, Q and Q.7, Q and Q.8, Q and Q.9, Q and Q.10, Q and Q.11, Q and Q.12, and/or Q and Q.13.

180. The facts in paragraphs R and R.1, R and R.2, R and R.3, R and R.4, R and R.5, R and R. 6, R and R.7, R and R.8, R and R.9, R and R.10, R and R.11, R and R.12, and/or R and R.13.

181. The facts in paragraphs S and S.1, S and S.2, S and S.3, S and S.4, S and S.5, S and S.6, S and S.7, S and S.8, S and S.9, S and S.10, S and S.11, S and S.12, and/or S and S.13.

182. The facts in paragraphs T and T.1, T and T.2, T and T.3, T and T.4, T and T.5, T and T.6, T and T.7, T and T.8, T and T.9, T and T.10, T and T.11, T and T.12, and/or T and T.13.

183. The facts in paragraphs U and U.1, U and U.2, U and U.3, U and U.4, U and U.5, U and U.6, U and U.7, U and U.8, U and U.9, U and U.10, U and U.11, U and U.12, and/or U and U.13.

184. The facts in paragraphs V and V.1, V and V.2, V and V.3, V and V.4, V and V.5, V and V.6, V and V.7, V and V.8, V and V.9, V and V.10, V and V.11, V and V.12, and/or V and V.13.

185. The facts in paragraphs W and W.1, W and W.2, W and W.3, W and W.4, W and W.5, W and W. 6, W and W.7, W and W.8, W and W.9, W and W.10, W and W.11, W and W.12, and/or W and W.13.

186. The facts in paragraphs X and X.1, and/or Y and Y.1.

Roberts - 398

## ONE HUNDRED EIGHTY-SEVENTH THROUGH
## TWO HUNDRED NINTH SPECIFICATIONS

## EXERCISING UNDUE INFLUENCE ON A PATIENT

Respondent is charged with committing professional misconduct as defined by New York Education Law §6530(17)

187. The facts in paragraphs A and A.5, A and A.6, and/or A and A.7.

188. The facts in paragraphs B and B.5, B and B. 6, and/or B and B.7.

189. The facts in paragraphs C and C.5, C and C.6, and/or C and C.7.

190. The facts in paragraphs D and D.5, D and D.6, and/or D and D.7.

191. The facts in paragraphs E and E.5, E and E.6, and/or E and E.7.

192. The facts in paragraphs F and F.5, F and F.6, and/or F and F.7.

193. The facts in paragraphs G and G.5, G and G.6, and/or G and G.7.

194. The facts in paragraphs H and H.5, H and H.6, and/or H and H.7.

195. The facts in paragraphs I and I.5, I and I.6, and/or I and I.7.

196. The facts in paragraphs J and J.5, J and J.6, and/or J and J.7.

197. The facts in paragraphs K and K.5, K and K.6, and/or K and K.7.

198. The facts in paragraphs L and L.5, L and L.6, and/or L and L.7.

199. The facts in paragraphs M and M.5, M and M.6, and/or M and M.7.

200. The facts in paragraphs N and N.5, N and N.6, and/or N and N.7.

201. The facts in paragraphs O and O.5, O and O.6, and/or O and O.7.

202. The facts in paragraphs P and P.5, P and P.6, and/or P and P.7.

63

203. The facts in paragraphs Q and Q.5, Q and Q.6, and/or Q and Q.7.

204. The facts in paragraphs R and R.5, R and R.6, and/or R and R.7.

205. The facts in paragraphs S and S.5, S and S.6, and/or S and S.7.

206. The facts in paragraphs T and T.5, T and T.6, and/or T and T.7.

207. The facts in paragraphs U and U.5, U and U.6, and/or U and U.7.

208. The facts in paragraphs V and V.5, V and V.6, and/or V and V.7.

209. The facts in paragraphs W and W.5, W and W.6, and/or W and W.7.

## TWO HUNDRED TENTH SPECIFICATION

## WILLFULLY FAILING TO FILE A REPORT REQUIRED BY LAW

Respondent is charged with committing professional misconduct as defined by New York Education Law §6530(21)

210. The facts in paragraphs Z and Z.1, and/or Z and Z.2.

64

## TWO HUNDRED ELEVENTH SPECIFICATION

## WILLFULLY OR GROSSLY FAILING TO COMPLY WITH
## FEDERAL, STATE, OR LOCAL LAWS RULES OR
## REGULATIONS GOVERNING THE PRACTICE OF MEDICINE

Respondent is charged with committing professional misconduct as defined by New York Education Law §6530(16)

211.   The facts in paragraphs Z and Z.1, Z and Z.2, and/or Z and Z.3.


## TWO HUNDRED TWELFTH THROUGH
## TWO HUNDRED THIRTY-FOURTH SPECIFICATIONS

## PERFORMING PROFESSIONAL SERVICES WHICH
## HAVE NOT BEEN AUTHORIZED BY THE PATIENT

Respondent is charged with committing professional misconduct as defined by New York Education Law §6530(26)

212.   The facts in paragraphs A and A.3, and/or A and A.7.

213.   The facts in paragraphs B and B.3, and/or B and B.7.

214.   The facts in paragraphs C and C.3, and/or C and C.7.

215.   The facts in paragraphs D and D.3, and/or D and D.7.

216.   The facts in paragraphs E and E.3, and/or E and E.7.

217.   The facts in paragraphs F and F.3, and/or F and F.7.

218.   The facts in paragraphs G and G.3, and/or G and G.7.

219.   The facts in paragraphs H and H.3, and/or H and H.7.

220.   The facts in paragraphs I and I.3, and/or I and I.7.

221.   The facts in paragraphs J and J.3, and/or J and J.7.

65

222. The facts in paragraphs K and K.3, and/or K and K.7.

223. The facts in paragraphs L and L.3, and/or L and L.7.

224. The facts in paragraphs M and M.3, and/or M and M.7.

225. The facts in paragraphs N and N.3, and/or N and N.7.

226. The facts in paragraphs O and O.3, and/or O and O.7.

227. The facts in paragraphs P and P.3, and/or P and P.7.

228. The facts in paragraphs Q and Q.3, and/or Q and Q.7

229. The facts in paragraphs R and R.3, and/or R and R.7.

230. The facts in paragraphs S and S.3, and/or S and S.7.

231. The facts in paragraphs T and T.3, and/or T and T.7.

232. The facts in paragraphs U and U.3, and/or U and U.7.

233. The facts in paragraphs V and V.3, and/or V and V.7.

234. The facts in paragraphs W and W.3, and/or W and W.7.

## TWO HUNDRED THIRTY-FIFTH THROUGH
## TWO HUNDRED FIFTY-EIGHTH SPECIFICATIONS

## FAILING TO MAINTAIN RECORDS

Respondent is charged with committing professional misconduct as defined by New York Education Law §6530(32)

235. The facts in paragraphs A and A.13.

236. The facts in paragraphs B and B.13.

66

237. The facts in paragraphs C and C.13.

238. The facts in paragraphs D and D.13.

239. The facts in paragraphs E and E.13.

240. The facts in paragraphs F and F.13.

241. The facts in paragraphs G and G.13.

242. The facts in paragraphs H and H.13.

243. The facts in paragraphs I and I.13.

244. The facts in paragraphs J and J.13.

245. The facts in paragraphs K and K.13.

246. The facts in paragraphs L and L.13.

247. The facts in paragraphs M and M.13.

248. The facts in paragraphs N and N.13.

249. The facts in paragraphs O and O.13.

250. The facts in paragraphs P and P.13.

251. The facts in paragraphs Q and Q.13.

252. The facts in paragraphs R and R.13.

253. The facts in paragraphs S and S.13.

254. The facts in paragraphs T and T.13.

255. The facts in paragraphs U and U.13.

256. The facts in paragraphs V and V.13.

257. The facts in paragraphs W and W.13.

258. The facts in paragraphs X and X.1, and/or Y and Y.1.

67

DATE: November     , 2017
      Albany, New York

_____
MICHAEL A. HISER, ESQ.
Deputy Counsel
Bureau of Professional Medical Conduct

68

## APPENDIX "A"

Patient A            Sarah Edmondson;

Patient B            Amanda Canning;

Patient C            Lauren Salzman;

Patient D            Livia Cohen;

Patient E            Allison Mack;

Patient F            Alicia Novak;

Patient G            Melissa Demmers;

Patient H            Maggie Dou;

Patient I            India Oxenberg;

Patient J            Soukaina Mehdaoui;

Patient K            Michelle Salzman;

Patient L            Audrey McIntyre;

Patient M            Nicki Klein;

Patient N            Sylvie Lloyd;

Patient O            Pam Aristikitis;

Patient P            Nancy Salzman;

Patient Q            Ana-Lea Holland;

Patient R            Sahjo Haertel;

Patient S            Rosa Laura Junco;

Patient T            Jimena Garza;

69

| | |
|---|---|
| Patient U | Corolla Garza; |
| Patient V | Nicole Isbal; |
| Patient W | Angelica Hinjos; |
| Patient X | Barbara Jeske; and |
| Patient Y | Pam Cafritz |

70

# Attachment 3

Email from OPMC Prosecutor Conklin, dated December 1,2017

Michael: Our investigation has continued, which has resulted in new evidence and confirmation of the charges of professional misconduct against ████████ and Dr. Roberts. With the possibility of separate criminal investigations ongoing, please let me know whether your clients have reconsidered the offers of the voluntary Surrenders with the modest Statements of Charges. If they are willing to voluntarily surrender their licenses, we will seek authority for you to speak to individuals involved with the parallel criminal investigations.

   If you are inclined to discuss these matters, you can call me at (518) 473-4219 (direct line) or (518) 275-1178 (cell). I also have access to my work e-mail at all times.


Jeffrey J. Conklin

Associate Counsel

Bureau of Professional Medical Conduct

Division of Legal Affairs

New York State Department of Health

Room 2516, Corning Tower

Empire State Plaza

Albany, New York 12237

(518) 473-4219

Jeffrey.conklin@health.ny.gov

# Attachment 4

OPMC Subpoena for Allison Mack, dated January 18, 2018

NEW YORK STATE                 DEPARTMENT OF HEALTH

| IN THE MATTER | SUBPOENA AD TESTIFICANDUM AND DUCES TECUM |

IN THE MATTER

OF

AL-17-07-4422A

SUBPOENA
AD
TESTIFICANDUM
AND
DUCES TECUM

THE PEOPLE OF THE STATE OF NEW YORK

TO:  Allison Mack
     127 Grenadier Court
     Clifton Park, New York 12065-6583

PURSUANT TO THE AUTHORITY OF N.Y. Pub. Health Law § 230(10)(a), the State Board for Professional Medical Conduct (the Board) is conducting an investigation of possible professional misconduct within the meaning of N.Y. Educ. Law §§ 6530 and 6531 by an individual licensed to practice medicine in the State of New York.

The Board is required to conduct this investigation by N.Y. Pub. Health Law § 230(10)(a).

PURSUANT TO N.Y. Pub. Health Law § 230(11)(a), all complaints of possible professional misconduct received by the Board must remain and are kept confidential.

PURSUANT TO THE AUTHORITY OF N.Y. Pub. Health Law §§ 230(10)(k) and (l), on November 1, 2017, a committee on professional conduct (the Committee) reviewed the complaint and investigatory materials in connection with the above-captioned matter. The committee determined that the complaint is authentic and that there is sufficient substance to warrant investigation into the professional conduct of the physician named therein. The Committee, having concluded that the preliminary investigation justifies the issuance of subpoenas in furtherance of the investigation, specifically authorized the issuance of subpoenas in this matter. The instant subpoena requires the production of documents necessary to the proper investigation of the possible professional misconduct.

1

YOU ARE HEREBY COMMANDED to appear and be examined before the designee(s) of the Director of the Office of Professional Medical Conduct, pursuing an investigation on the authority of the State Board for Professional Medical Conduct, New York State Department of Health, pursuant to Pub. Health Law §§230(10)(a)(i), Empire State Plaza, Corning Tower, Room 2512, Albany, New York 12237, on February 14, 2018, at 10:00 a.m., or at such other adjourned date, time or place as may be directed.

Failure to comply with this Subpoena Ad Testificandum may subject you to such penalties as are provided by the laws of the State of New York.

YOU ARE HEREBY FURTHER COMMANDED to produce before the Office of Professional Medical Conduct at New York State Department of Health, Empire State Plaza, Corning Tower, Room 2512, Albany, New York 12237, on or before the 14th day of February, or at such other adjourned dates, times and places as may be scheduled, the following documents now in your possession or under your control:

1) Any and all records, written communications (whether by text messaging or other text or messenger apps, e-mails, social media posts, or correspondence) photographs, movies, videos, and cellphone videos regarding marks (symbols, initials or other letters) made by use of a cauterizing pen (or other medical device) upon you by Danielle Roberts, D.O.

2) Any and all records, written communications (whether by text messaging or other text or messenger apps, e-mails, social media posts, or correspondence) photographs, movies, videos, and cellphone videos regarding the disinfectants, bandages, masks and gloves utilized at the times marks (symbols, initials or other letters) were made by use of a cauterizing pen (or other medical device) upon you by Danielle Roberts, D.O.

2

3) Any and all records, written communications (whether by text messaging or other text or messenger apps, e-mails, social media posts, or correspondence) photographs, movies, videos, and cellphone videos regarding the instructions for wound care given to you at the time marks (symbols, initials, or other letters) were made by use of a cauterizing pen (or other medical device) upon you by Danielle Roberts, D.O., including, but not limited to, the type of bandages to be applied, the frequency when bandages should be changed, the application of Neosporin, ointments, coconut oil, and/or lavender to the wounds, and the frequency of said applications, and taking photographs of the wounds, and the frequency of said photographs.

OR

4) Legible photocopies of the material described in paragraphs (1), (2) and (3), above, certified to be true and complete copies thereof.

AND UPON YOUR FAILURE to produce as required above, you may be held subject to such penalties as are provided by the laws of the State of New York.

WITNESS, Robert Catalano, M.D., Executive Secretary
State Board for Professional Medical Conduct

DATED: January 18, 2018
Albany, New York

Robert Catalano, M.D., Executive Secretary
State Board for Professional Medical Conduct

By: _Jeffrey Conkl_
JEFFREY J. CONKLIN, ESQ.
Associate Counsel, BPMC

Inquiries to:

Jeffrey J. Conklin, Esq.
Associate Counsel
Bureau of Professional Medical Conduct
(518) 473-4219

3

Roberts - 412

# Attachment 5

Declaration of Danielle Roberts, dated June 15, 2022

# Declaration of Danielle Roberts

1. My name is Danielle Roberts, DO, MS.
2. I currently reside in St. Francis, Wisconsin.
3. I graduated from Binghamton University Cum Laude in 2003 with a degree in Psychobiology. I completed a dual degree as a Doctor of Osteopathic Medicine with a Masters in Clinical Nutrition in 2008. I completed my Family Practice Residency in 2011. Since, I have served our communities as a hospitalist in 4 different hospitals from 2012-2017, as a Medical Director of an Integrative Medical Practice from 2011-2013, and as an entrepreneur creating and developing 4 different movement and wellness systems and certifications for prevention from 2013-2018, one of which was implemented in 3 countries.
4. I was a second-line member of DOS and was invited by Allison Mack.
5. I served as the primary branding artist for those who got a brand.
6. I have key information I could have offered to the defense counsel in Keith Raniere's case to dispel much of the testimony that was given at trial about how DOS worked, its procedures and practices, the branding process, and my experiences in DOS with Allison Mack, and India and Nicole who were in my circle.
7. I could have given direct testimony that would have challenged Nicole's narrative in general, and specifically about her spending a few hours transcribing videos with me, for Pamela Cafritz's memorial service, which the Government argued was "forced labor."
8. As a second-line member of DOS, I directly experienced the processes and protocols being developed and implemented by the first line.
9. My testimony would have attested to the rigorous and thoughtful enrollment process each woman would have undergone who decided to join, and the conditions surrounding the collateral.
10. This would have clearly illustrated that the collateral was used as a tool to back our promises to ourselves, like surety, not as a tool of fear, force, or blackmail as was alleged by the Government and by Nicole.
11. I believe much of my testimony would have helped to dispel, if not completely dismantle, the Government's theory of sex trafficking and forced labor. I was similarly situated to Nicole, both of us being in the same circle of DOS.
12. In addition, I have been a close friend and business partner of Mr. Raniere.
13. I had known him for approximately six years at the time of the trial.
14. I had worked very closely with him for four years building our company exo|eso, and I worked very closely with him and his closest chosen family in caring for Ms. Pamela Cafritz in her two-year struggle with metastatic renal cancer before she passed away in 2016.
15. I cared for Ms. Cafritz in their home and, at the end, around the clock.

16. As such a close friend, I could have offered essential and reliable testimony as to the consistency of Mr. Raniere's character and conduct.

17. I believe my testimony would have strongly contradicted the handful of Government witnesses' narrative of Mr. Raniere's alleged sinister intent.

18. Instead of being afforded an uninfluenced right to testify under oath as to the nature and purpose of DOS and my experience, I was threatened and intimidated into silence by the actions of U.S. Governmental agencies, including the EDNY, which I will describe below, and significant media pressure.

19. In and around Oct. 2017, the time when Mr. Raniere and five others were being indicted, the New York Times published an article that criticized NYS Governor, Andrew Cuomo, for choosing not to investigate my medical license.

20. In the summer of 2017, the Office of Professional Medical Conduct (OPMC), part of the NYS Health Department, had already issued a written decision, in response to a complaint from Ms. Sarah Edmondson, stating that my actions as a branding artist for DOS was NOT the practice of medicine.

21. Two days after the New York Times article, the OPMC, in contravention of their prior decision, launched an investigation into my private and professional life.

22. This decision (to act outside of their jurisdiction) cost me my contract as a hospitalist at Columbia St. Mary's Hospital (which I had served loyally for 5 years) and every other job I tried to pursue over the next 2 years in the medical field. This was the beginning of dismantling my reputation, credibility, and financial stability.

23. The OPMC threatened me with a salacious, highly exaggerated statement of charges to subpoena information from me, and other women (not related to the practice of medicine and quite possibly to try to collect further information in relation to Mr. Raniere's criminal case).

24. These initial allegations are very different from the allegations the Health Dept. finally published against me about three years later. The Health Dept. continually found ways to try to intimidate me to surrender my license, including highlighting their right to use any information I may state as testimony to defend my medical license and livelihood, as grounds for criminal charges. Clearly discouraging me from testifying in any way in relation to the federal case.

25. OPMC prosecutor, Jeffery Conklin indicated that any testimony I gave in my medical hearing could be used to support a criminal indictment, thus inextricably linking the federal case and my medical hearing. Therefore, any evidence uncovered or testimony given by me (or others) in my hearing could have been used in the federal case to challenge the prosecutors narrative.

26. The women that were subpoenaed through my case, also pleaded the 5th amendment for fear of prosecutorial retaliation, reputational damage, and financial consequence.

27. Seeing I was not amendable to surrendering my license (and that I would likely testify at my own hearing), my hearing was held in abeyance for approximately 2 years, until September 2019, when the federal trial was complete (June 2019) and convictions made.

28. It is precatory that the OPMC present a case to the state board no more than 90 days after an initial interview is offered to a physician/defendant. It was 2 years before the OPMC moved my hearing forward. In order to justify their delay, and divergence from their standard, they offered another "initial" interview so that the hearing would be within the "90 day window". This was a severe deviation from the standard, during which I was unable to work, and timed exactly with the progression of the criminal trial.

29. The consequences of these unjustified tactics and actions led to the loss of my livelihood.

30. I had to sell my home and most of my possessions and eventually had to change careers to support myself and pay legal fees.

31. In addition to the significant intimidation and financial duress I was placed under, the Federal Government invaded and threatened our community, followed us in our cars, sat outside our homes in their vehicles, and raided Ms. Salzman's home just a few blocks from my home.

32. As a gesture of cooperation, NXIVM had closed their offices and I was sufficiently intimidated that I closed my company, exo|eso™ as well.

33. I sought legal representation and was represented by attorney Michael Kelton, Esq. of Abrams Fensterman, LLP for my matters with the OPMC and attorney Daniel Stein, Esq. of Mayer Brown, LLP for any matters pertaining to possible criminal charges. In April 2018, the prosecutor's in Mr. Raniere's case informed Mr. Stein that they wanted to speak with me.

34. Mr. Stein offered that I comply, if they offered me protection from prosecution.

35. Then-Assistant US Attorney Moira Kim Penza, the lead prosecutor, granted limited immunity. The limited protections of the proffer agreement stated that the proffer agreement did not constitute a cooperation agreement. Should there be any criminal exposure for me discovered in the course of the interview, that my participation in the proffer and continued cooperation would be helpful in resolving such issues.

36. However, Ms. Penza stated that she was not making any promises to resolve any matter in any particular fashion.

37. It became clear to me that if I was of help to the prosecution, it would be beneficial to me.

38. There were many moments over the course of the two, full eight-hour-long proffer sessions that Ms. Penza seemed very fixed in her viewpoints about NXIVM and DOS; especially pertaining to my experience and perspectives regarding the collateral I voluntarily gave in exchange for mentorship (however unconventional), and the incorporation of Mr. Raniere's initials into the meanings of the brand.

39. When I shared my viewpoints, based on my personal experiences, she often seemed to get visibly upset and perseverated on those specific points and others that offered a different motivation other than coercion.

40. I recall one instance in particular where, for around fifteen minutes, she argued with me about my experience of collateral. I explained that collateral was a tool I chose to use to build self-trust and self-reliance, to back my promises and that it was not, nor was it intended to be, a tool of coercion or extortion. My attorney eventually needed to step in to point out her behavior and redirect her.

41. She displayed the same behavior when discussing the intent and meaning behind what I was told the incorporation of Mr. Raniere's initials meant in the symbol that was created by the 1st line members. She again was insistent the meaning was related to control, possession, and coercion, when that was not my opinion at all.

42. By the end of the interview on May 11, 2018, it became clear to me that Ms. Penza had solely two possible viewpoints: 1) I was a co-conspirator of a massive criminal enterprise, or 2) I was a victim of the situation that had been brainwashed and couldn't think for myself.

43. It did not seem to me that she was open to the possibility, which I believe to be the truth, that this group of people, including Keith Raniere, was innocent and well-intended, even if some mistakes were made.

44. Consistent with my observation, at the end of the first interview she offered me victim support services so that I could be properly treated for the abuse that she decreed that I had undergone, even though I did not, and do not feel, I was abused nor can I measure objectively any destruction of my life or life's work by the practices I engaged in in DOS. In fact, I experienced quite the opposite and I conveyed that in my proffer interviews.

45. Ms. Penza's comments to me at the end of the first interview indicated to me that she had dismissed my testimony, my positive experience, and rendered me incompetent in her mind in order to maintain her theory of the case and the foundation she needed to "win."

46. At the end of the second interview, she threatened to subpoena me to testify in the trial against Mr. Raniere. I made it clear I was not interested in helping her.

47. I also knew that if I were to testify in support of the defense, Mr. Raniere, she may change her mind about me, if it served her, and I could then become a co-conspirator in her assessment, open to indictment, even though I had done nothing wrong or criminal.

48. Based on my initial direct experiences with Ms. Penza, she seemed disinterested in the truth and unwilling to examine any contrary perspective to one of abuse and coercion.

49. I was effectively intimidated from giving crucial testimony to the case.

50. Ms. Penza did not choose to call me to testify.

51. The actions of Ms. Penza were the straw that broke the camel's back and successfully intimidated me from testifying in the criminal proceedings.

52. I declare under penalty of perjury of the laws of the United States of America that the foregoing is true and correct, and of my own personal knowledge, except as to those matters stated upon information and belief. As to those matters, I believe them to be true.

Executed on June 15, 2022 at St. Francis, Wisconsin.



Danielle Roberts

Jaclene Elyse Dobbins-Baptiste

NOTARY PUBLIC
STATE OF NEVADA

Appt. No. 21-1883-01

Expires December 12, 2025

Notarized online using audio-video communication

State of Nevada

County of Clark

Signed and sworn to (or affirmed) before me

on 06/14/2022 by Danielle Roberts.

# Attachment 6

Letter on behalf of Allison Mack to OPMC, dated February 2, 2018

# ABRAMS A F FENSTERMAN

Abrams, Fensterman, Fensterman, Eisman, Formato, Ferrara, Wolf & Carone, LLP

Attorneys at Law
www.abramslaw.com

1 MetroTech Center
Suite 1701
Brooklyn, New York 11201
Phone: (718) 215-5300
Fax: (718) 215-5304
Fax Not For Legal Service

FIRM OFFICES
———
Lake Success
New York
Rochester

February 2, 2018

**VIA EMAIL AND FIRST-CLASS MAIL**
Jeffrey Conklin, Esq.
New York State Department of Health
Office of Professional Medical Conduct
Riverview Center
150 Broadway, Suite 355
Albany, New York 12204-2719

Re: OPMC # AL-17-07-4422A

Dear Mr. Conklin:

As you know, this office has been retained by Allison Mack in connection with the Administrative Subpoena ad Testificandum and Duces Tecum ("the Administrative Subpoena") issue to her by BPMC.

Ms. Mack is neither a licensee of the state of New York, nor a holder of a limited permit, medical resident, physician, physician assistant's or specialist's assistant subject to the jurisdiction of the Department of Health. As such the Department of Health has no jurisdiction over Ms. Mack, nor any legal authority to compel her to respond to the Administrative Subpoena. *See* N.Y. Public Health Law §230 generally, and §230(7)(a).

It is Ms. Mack's position that, inasmuch as she is not subject to the jurisdiction of the Department of Health, the Administrative Subpoena provides no legal compulsion to require her to provide the materials and testimony requested therein. As such, she will not comply with the Administrative Subpoena.

Further, it is Ms. Mack's position that the Administrative Subpoena is based upon nothing more than an unsubstantiated fishing expedition infringing upon her constitutionally protected personal affiliations and lifestyle choices, and does not satisfy the threshold requirement of a good faith basis by which to compel her response.

In responding to the Administrative Subpoena in the manner set forth herein, Ms. Mack

neither admits nor denies that she has any of the requested items or materials in her possession or under her control, or that she possesses any relevant and material information in connection with BPMC's purported investigation.

Ms. Mack recognizes that BPMC may seek legal redress in the appropriate forum. Should such action be taken, demand is made on behalf of Ms. Mack, that the undersigned be given reasonable advance notice of such action and an opportunity to be heard in connection therewith.

Very truly yours,

Michael S. Kelton

cc: Allison Mack

# Attachment 7

OPMC Interview Offer, dated February 5, 2018



**Department of Health**

ANDREW M. CUOMO
Governor

HOWARD A. ZUCKER, M.D., J.D.
Commissioner

SALLY DRESLIN, M.S., R.N.
Executive Deputy Commissioner

February 5, 2018

**CERTIFIED MAIL - RETURN RECEIPT REQUESTED**

**PERSONAL AND CONFIDENTIAL**

Danielle Roberts, DO
c/o Michael S. Kelton
Abrams Fensterman
1 MetroTech Center Suite 1701
Brooklyn, New York 11201

RE: OPMC# AL-17-07-4422A

Dear Dr. Roberts:

The Office of Professional Medical Conduct (OPMC) within the New York State Department of Health is authorized to investigate instances or complaints of suspected professional misconduct. OPMC is currently investigating your medical conduct.

Public Health Law Section 230(10)(a)(iii) provides that in all matters referred to an investigation committee of the Board for Professional Medical Conduct, the licensee shall have an opportunity to be interviewed by OPMC in order to provide an explanation of the issues under investigation and to submit written comments or expert opinions to OPMC. You may have legal counsel present during this interview. A copy of the report of interview from OPMC will be provided to you within 30 days of the conclusion of your interview. You may have a stenographer present to transcribe the interview (at your own expense). You must provide a copy of the transcribed interview to this office within 30 days of the conclusion of the interview. After review of the transcript, if there are no inconsistencies, a Memorandum of Investigation will be provided to you within 15 days. Please see the enclosed Information for Licensees as well as information regarding infection control practices.

The matters under investigation are listed below. The questions that will be presented to you during the interview will, for the most part, address these matters. However, the discussion may, if appropriate, cover other areas relevant to the evaluation, diagnosis, treatment, and follow-up provided to the specified individuals during the specified timeframes, as well as other professional conduct, including, but not limited to, medical procedures performed on the individuals, and the circumstances before, during and after such medical procedures.

The issues under investigation are:

- Whether you used a cauterizing pen, or other medical device, to burn letters, initials, symbols or other marks upon the bodies of Sarah Edmondson, Audrey

McIntyre, India Oxenberg, Pamela Arstikaitis, Rosa Laura Junco, Allison Mack, Lauren Salzman, Sylvie Lloyd, Sahajo Haertel, and Nicole Clyne, and/or other individuals, during the period of 2009 to the present.

- Whether before, during and after the times when you used a cauterizing pen or other medical device to burn letters, initials, symbols or other marks upon the bodies of the above referenced individuals, you performed such procedures in an appropriate sterile environment, administered anesthesia, used proper equipment, and took necessary infection control steps.
- Whether you permitted multiple women in a state of nakedness to hold down the limbs of the above referenced individuals (who were also naked) in an unsterile environment, without administering anesthesia, without using proper equipment and taking necessary infection control steps while using a cauterizing pen or other medical device to burn letters, initials, symbols or other marks upon the bodies of such individuals.
- Whether you provided medical care and treatment to the above referenced individuals, and/or advised such individuals as to wound care.
- Whether you maintained medical records for each of the above referenced individuals.
- Whether videos were taken of the above referenced individuals at the time you used a cauterizing pen, or other medical device, to burn letters, initials, symbols, and/or other marks upon their bodies.
- The circumstances under which you used a cauterizing pen, or other medical device, to burn letters, initials, symbols, and/or other marks upon the bodies of the above referenced individuals.
- Whether you failed to report a virus outbreak during a retreat held at the Silver Bay YMCA in August and September 2016 to public authorities.
- Whether your physician profile, which was last updated on January 13, 2010, is presently current and compliant with law.

Please note that New York State Public Health Law (NYSPHL) Section 2995 mandates that physicians actively registered to practice medicine in New York State complete a Physician Profile Survey which they are required to update within six months prior to the expiration of each biennial registration period, as a condition of registration renewal. Your profile has *not* been updated as required. You must update your physician profile prior to this interview. The updates can be made on line through your Health Commerce System (HCS) account or by requesting a survey via telephone at 1-888-338-6998. Failure to update your profile as required may result in disciplinary action.

You may provide written comment and/or expert opinion that is directly relevant to the issues identified in this letter or during the interview. In addition, you are directed to provide the following identifying information, which may be provided in the form of a curriculum vitae: full name, date of birth, place of birth, residence address/phone number, office address/phone number, all states where currently or previously licensed, medical school/year graduated, residency location(s)/dates, internship location(s)/dates, current practice type and specialty, current hospital/health maintenance organization affiliations, and past hospital affiliations. Please also provide a list of all professional corporations/businesses in which you are an owner or partner, and a list of all private corporations by which you are employed.

Please telephone me at 518-408-5431 no later than February 26, 2018 to either schedule this interview or decline this opportunity for an interview. This interview must be scheduled no

sooner than 20 days from receipt of this letter, (unless you wish to waive this 20 day period), and no later than March 12, 2018. A declination must be followed up in writing to me at **New York State Department of Health, Office of Professional Medical Conduct, Riverview Center, 150 Broadway, Suite 355, Menands, New York 12204**. Failure to contact this office to schedule an interview or failure to show for the interview on the scheduled date will be considered a declination of your opportunity for an interview. If you or your attorney wish to discuss this matter further, please contact me at your earliest convenience. Thank you.

Sincerely,

Jason Warn
Supervising Medical Conduct Investigator
Office of Professional Medical Conduct


Enclosures

# Attachment 8

Email from OPMC Prosecutor Conklin, dated June 27, 2019



**From:** Conklin, Jeffrey J (HEALTH) <jeffrey.conklin@health.ny.gov>
**Sent:** Thursday, June 27, 2019 9:06 AM
**To:** Michael Kelton XXXXXXXXXXXXX
**Subject:** Matter of Roberts


Michael: As you may recall, we discussed negotiated resolutions of the Porter and Roberts matters back in 2017. With regard to Dr. Porter, the penalty included, among other parameters,  a two year suspension dated from October of 2017. Had that offer been accepted, Dr. Porter would be in a position to resume his medical career in 4 months. Of course, we do  not have an Order and Decision in the case.

   Before completing our investigation and initiating a hearing in the Roberts case, this e-mail is to inquire whether Dr. Roberts is inclined to consider a resolution short of a permanent surrender. I do not have the authority to accept any such offer, but would

discuss the same with my superiors. If Dr. Roberts does not intend to conduct negotiations under any circumstances, please advise.

I hope you are enjoying the summer.

Jeffrey J. Conklin

Associate Counsel

Bureau of Professional Medical Conduct

Division of Legal Affairs

New York State Department of Health

Room 2516, Corning Tower

Empire State Plaza

Albany, New York 12237

(518) 473-4219

Jeffrey.conklin@health.ny.gov





# Attachment 9

Emails from OPMC Prosecutor Conklin from October 2019

Michael: This e-mail is to follow-up on our recent communications regarding the Roberts matter. If at any time in the future your firm is no longer representing Dr. Roberts, please advise. As you know, Dr. Roberts sent a letter which indicated that she would be unable to afford the services of an attorney.

The investigation by OPMC continues. At the time this case is submitted to an Investigation Committee, and if it is voted to hearing, I will advise you immediately. If that occurs, of course, Dr. Roberts will be offered an opportunity to be interviewed.

I would ask that you bring to the attention of Dr. Roberts Public Health Law Section 230 (9-a). Pursuant to this provision, "At any time, if the board or professional medical conduct or the office of professional medical conduct determines that there is a reasonable belief that an act or omission that constitutes a crime under the law of the state of New York, or any other state, or the United States has been committed by the licensee, the board for professional medical conduct shall notify the appropriate law enforcement official or authority."

Thank you.


Jeffrey J. Conklin

Associate Counsel

Bureau of Professional Medical Conduct

Division of Legal Affairs

On Oct 24, 2019, at 12:18 PM, Conklin, Jeffrey J (HEALTH) <jeffrey.conklin@health.ny.gov> wrote:

Michael: Over the course of time, I have advised you of the offer of a license surrender, with a modest Statement of Charges (alleging negligence on more than one occasion regarding the use of a medical device - cautery pen).

I have met with 2 expert witnesses, who are expected to be called as witnesses at the professional misconduct hearing. Additionally, I am in receipt of devastating evidence against Dr. Roberts (through investigation, interviews of witnesses, and evidence from the AUSA involved in the criminal prosecution of Keith Ranieri and other NXIVM semembers.

Based upon the foregoing, the Statement of Charges will include many more Specifications than the draft previously forwarded to you.

If Dr. Roberts had accepted the settlement offer from October of 2017, she would be able to practice medicine at this time. Again, I am reiterating the opportunity for Dr. Roberts to surrender her license, with the less serious allegations. In 3 years, Dr. Roberts can reapply for restoration of her medical license. If this case is voted to hearing, and the testimony and other evidence goes as expected, the Department will seek revocation of Dr. Roberts' license. Additionally, by reason of the egregious nature of her professional misconduct, we will request the imposition of the maximum monetary fines. In the event a Hearing Committee sustains the charges of professional misconduct and revokes Dr. Roberts' medical license, the chances of restoration in the future would be greatly diminished.

I urge Dr. Roberts in the strongest possible terms to accept the offer to resolve this matter.

Please forward this e-mail to Dr. Roberts. Thank you.

Roberts - 431

Sent from my iPhone

**Timeline & Records of New York State OPMC's Prosecution of Danielle Roberts**

In July 2017, Sarah Edmondson ("Edmondson"), a former member DOS[1], filed a complaint with the Office of Professional Medical Conduct ("OPMC") after receiving a brand from Danielle Roberts ("Danielle"). Danielle, a physician, was a DOS member. The brand was done with an electrocautery pen, similar to tattooing as they both involve the use of heat to alter tissue.

The OPMC dismissed the complaint, stating that the cauterization, branding, "did not occur within the doctor-patient relationship" and "[is] not medical misconduct [by Danielle]" but "should be reported to law enforcement."[2]

Notably, Lauren Salzman, a cooperating witness for the government, who recruited Edmondson into DOS, testified in the trial of Keith Raniere that prospective DOS members were informed beforehand that joining would involve receiving a brand.[3]

On October 17, 2017, a *New York Times* article[4] revealed DOS' existence, while focusing on Edmondson's claims about forcibly receiving a brand—claims that are demonstrably false.[5]

The article criticized the OPMC for not taking action and cited a text message where a state police investigator told Edmondson and 2 other women that their criminal complaint would not be pursued because the "actions had been **consensual**."

Two days later, the *New York Times* followed up, quoting Richard Azzopardi, spokesperson for then Governor Andrew Cuomo, "[o]fficials in New York State plan to review why regulators and others did not act."[6]

Shortly after the *New York Times* articles, the OPMC reversed its dismissal. On or about November 17, 2017, Danielle received an unsigned, undated 70-page Statement of Charges from the Bureau of Professional Medical Conduct ("BPMC") by its Deputy Counsel .[7]

---

[1] In 2015, Keith Raniere co-founded a private women's self-empowerment group, a non-collegiate sorority, called DOS.

[2] *See* Attachment 1, Letter from OPMC to Ms. Edmondson, dated July 11, 2017.

[3] *See* Trial T. (5/20/19) at 1602:9-1603:17.

[4] *See* Barry Meier, Inside a Secretive Group Where Women Are Branded, *N.Y. Times*, October 17, 2017, https://www.nytimes.com/2017/10/17/nyregion/nxivm-women-branded-albany.html.

[5] *See* Dr. Danielle Roberts' Statement in Response to the Revocation of Her Medical License, https://www.drdanielleroberts.com/sovereignty/dr-danielle-roberts-statement-in-response-to-the-revocation-of-her-medical-license; *see* also Trial T. (5/20/19) at 1749:1-15 (Lauren Salzman describing the conditions of Ms. Edmondson's branding ceremony).

[6] *See* Complaints About Branding Inside Secretive Group Are Under Review, *N.Y. Times* (Oct. 19, 2017), https://www.nytimes.com/2017/10/19/nyregion/complaints-by-ex-nxivm-members.html.

[7] *See* Attachment 2, OPMC Statement of Charges.

1

The Statement of Charges alleged medical misconduct toward 25 individuals, including 2 who had passed away from natural causes long before these allegations were compiled. It also contained other demonstrably false claims, including:

- It claims Danielle gave a brand to Nancy Salzman, the 60+ year-old president of NXIVM, who, in fact, never received a brand.
- The statement accuses Danielle of giving brands to 12 specific women, none of whom received a brand.
- It claims Edmondson repeatedly "requested on multiple occasions that [Danielle] cease performing the branding procedure."[8] Video evidence from Edmondson's own branding session, which she consented to be filmed, shows no such requests to stop.[9]
- It claims "Edmondson believed that she was only having a tattoo applied to her pelvic region."[10] However, evidence confirms that Edmondson was fully aware and informed she would receive a brand, not a tattoo. She had been told about the brand in advance of joining DOS and even filmed the process of other DOS members receiving a brand before receiving her own.[11]

On December 1, 2017, Associate Counsel Jeffrey J. Conklin ("Associate Counsel Conklin") reminded Danielle, through counsel, about "the possibility of separate criminal investigations ongoing" and inquired as to whether Roberts would voluntarily surrender her license.[12]

On January 18, 2018, Associate Counsel Conklin subpoenaed 7 women[13], including DOS members India Oxenberg ("Oxenberg") and Allison Mack ("Mack"), (*I took out alleging bc the subpoena doesn't spell it out directly*) inferring they were victims of medical misconduct by Roberts. Mack was charged by the EDNY months later, and Oxenberg was designated as an "unindicted co-conspirator."

---

[8] *Id.* at 1 ¶ A(3).

[9] *See* GX 441_SE Video_v1, presented in In re Danielle Roberts, D.O., N.Y. Dep't of Health, State Bd. for Prof'l Med. Conduct.

[10] *See* OPMC Statement of Charges at 2 at ¶ A(7).

[11] *See* Trial T. (5/20/19) at 1747:11-20 (Lauren Salzman stating, "I think it was Sarah [Edmondson]" who filmed the first branding ceremony, prior to Edmondson's own).

[12] *See* Attachment 3, Email from Associate Counsel Conklin, dated December 1, 2017

[13] *See*, e.g., Attachment 4, BPMC Subpoena for Allison Mack

2

Danielle herself was a potential key defense witness. She was positioned within DOS under Mack and alongside the EDNY's primary alleged victim at that time. Roberts' experience and evidence directly contradicts the government's narrative of coercion, central to their case.[14]

The subpoenas "commanded" the women to appear at the OPMC office on February 14, 2018, and to bring emails, texts, photos, videos, and any other evidence relating to the cauterizing pen. These women contested the subpoenas[15]. Some had not received a brand at all, others received a brand from a tattoo artist, not Danielle, and all who received a brand had consented.

On February 5, 2018, Associate Counsel Conklin invited Roberts to provide information at an OPMC interview.[16] Danielle declined this "offer."

Under NY State Public Health Law Section 230(10)(iii), the Bureau of Professional Medical Conduct had **90 days** from the date of the interview offer to bring charges against Danielle, but failed to do so.

From March 2018 to June 2019, as the Eastern District pursued its criminal case against Keith Raniere, Allison Mack, and others, there was no further action from BPMC.

However, a week after Raniere's guilty verdict on June 27, 2019 and **507 days** after the February 2018 offer letter, Associate Counsel Conklin contacted Roberts' lawyer again, suggesting that Danielle might want to "consider a resolution short of a permanent surrender."[17]

By this time, approximately 450 days had passed since the interview offer, yet Associate Counsel Conklin had still not brought any charges, despite the legal requirement to do so within 90 days. During this time, Danielle was unable to secure medical employment after being terminated from her prior job or get malpractice insurance in New York due to the pending investigation.

Subsequently, Associate Counsel Conklin pressed Danielle to surrender her license, threatening her with license revocation, "the imposition of maximum monetary fines", the potential for "separate criminal investigations", and the possibility of "notifying appropriate law enforcement official or authority."[18]

---

[14] *See* Attachment 5, Declaration of Danielle Roberts, dated June 15, 2022, which was included in a Rule 33 motion for a new trial, dated June 21, 2022, in *US v. Keith Raniere* (EDNY), 18-cr-204, Doc. 1178.

[15] *See*, e.g., Attachment 6, Letter on behalf of Allison Mack to OPMC, dated February 2, 2018

[16] *See* Attachment 7, OPMC Interview Offer, dated February 5, 2018.

[17] *See* Attachment 8, Email from OPMC Prosecutor Conklin, dated June 27, 2019.

[18] *See* Attachment 9, Emails from OPMC Prosecutor Conklin from October 2019

On September 30, 2021, after a trial, the the New York Department of Health revoked Danielle's license. 2 years later, in 2023, the NYS Supreme Court denied her appeal, and the NYS Court of Appeals declined to review the case.

This timeline of actions can only demonstrate how the OPMC, influenced by media pressure in concert with New York State and DOJ influence, was improperly weaponized to support the federal prosecution of Mr. Raniere.

**NEW YORK STATE                DEPARTMENT OF HEALTH**

**STATE BOARD FOR PROFESSIONAL MEDICAL CONDUCT**

------------------------------------------------------------------------------X

<em>IN THE MATTER</em>

<em>OF</em>

<em>DANIELLE ROBERTS, D.O.</em>

------------------------------------------------------------------------------X

# RESPONDENT'S MEMORANDUM TO THE
# HEARING COMMITTEE

## Preliminary Statement

Respondent, Danielle Roberts, D.O., submits this Memorandum to the Hearing Committee in support of her position that the charges against her constitute an improper attempt by the Office of Professional Medical Conduct ("OPMC") to exercise jurisdiction over the purely private, non-medical conduct of a physician in violation of the New York Education Law and the New York Public Health Law. This effort is not only dangerous for physicians but also is a gross misuse of resources as it places the State Board for Professional Medical Conduct in a position where it is being called upon to utilize its limited resources to pursue a purely political attack on perfectly legal and private activities. Moreover, the Courts have made it clear that the State Board, like all administrative agencies, is a creature of statute and, as such, has only the jurisdiction granted to it by the Legislature. *New York State Association of Nurse Anesthetists v. Novello, 189 Misc. 2d 564 (Sup. Ct. Albany Co. 2001) aff'd 301 AD2d 895 rev. on other grounds*

1

*2 NY 3d 2007 (2004).* The jurisdiction granted to the Board does not extend to the regulation of physicians in their private lives and to activities not considered the practice of medicine.   As we show below, the evidence adduced at the hearing demonstrates that branding is not a medical procedure and that Dr. Roberts was not engaged in the practice of medicine when she gave a brand to several women who sought out and consented to this activity for their own reasons.

## STATEMENT OF THE CASE

In an Amended Statement of Charges, OPMC asserted that Dr. Roberts committed professional misconduct by giving a brand to a number of women identified in the charges. (Exhibit 1) (Citations herein are to exhibits in evidence and to pages in the transcript.)  The women are referred to in the charges as "Patients A-G".  We decline to refer to the women who received a brand as "patients" because the evidence was quite clear, indeed overwhelming, that none of the women were patients of Dr. Roberts and did not see Dr. Roberts in her capacity as a physician.

OPMC was quite aware of this fundamental defect and fatal flaw in the legal validity of its charges. That is why the branding procedure is delineated as a "medical procedure" 55 times in the Amended Statement of Charges. Apparently, OPMC hopes that if you repeat a falsehood often enough, people (such as a Hearing Committee) will begin to believe it, a tactic sometimes employed by politicians.  A review of the relevant provision of the New York Education Law, however, makes it indisputable that the branding performed by Dr. Roberts was not a medical procedure.  Section 6521 of the Education Law is entitled "Definition of Practice of Medicine"

2

and provides that "The practice of the profession of medicine is defined as diagnosing, treating, operating or prescribing for any human disease, pain, injury, deformity or physical condition." There can be no doubt that this provision is applicable. A number of years ago, OPMC charged Elliot Gross, MD, with professional misconduct relating to several autopsies that he performed in the course of his position and professional duties as the Chief Medical Examiner for New York City. During the administrative proceeding before the State Board for Professional Medical Conduct a motion was made to dismiss the charges as lacking in jurisdiction. The argument in favor of dismissal was that forensic autopsies, which involve cadavers rather than live patients, do not fall within Section 6521 of the Education Law and thus are not the practice of medicine. This legal issue ultimately worked its way to the courts and the Appellate Division held that the State Board did have jurisdiction to hear and decide the charges against Dr. Gross but the Court's reasoning is especially pertinent to Dr. Roberts' case. The Court recognized the applicability of Education Law Section 6521 but noted that an autopsy is the "ultimate diagnosis" and, as such, falls within the statutory definition of medical practice. *Matter of Gross v. Ambach, 126 A.D. 2d 21 (Third Dept. 1987) aff'd 71 N.Y.2d 859 (1988)*. Thus, it is clear that Section 6521 must be considered in the determination as to whether branding is a medical procedure that is within the practice of medicine as defined by the New York Education Law. Accordingly, an analysis of Section 6521 and the pertinent facts is in order. Section 6521 contains a two-pronged test. First, the activity must involve "diagnosing, treating, operating or prescribing." While branding does not involve diagnosing, treating or prescribing, it arguably involves "operating." But this is only the first prong of the test. The "operating" must be for a human disease, pain, injury, deformity or physical condition. It should be blatantly obvious that none of these criteria are implicated.

3

The women who received a brand were perfectly normal and healthy in all respects and OPMC presented no evidence to the contrary. No evidence was offered by OPMC that the women who received a brand had any "disease, pain, injury, deformity or physical condition." Since this second prong of Section 6521 was not met or satisfied, it is evident that branding is not a medical procedure and does not fall within the statutory definition of the practice of medicine. The fact that branding may have some risks associated with it is utterly irrelevant. Many procedures and activities people choose to engage in on a regular basis carry associated risks (electrolysis, massage, fitness and yoga classes) but they are not considered medical practice just because a physician may administer or lead them.

To further illuminate the distinction between activities and contexts that carry risk with them but are outside the context of medical practice and the jurisdiction of the State Board, consider: there are many processes and activities people do every day that have risks associated but are not considered the practice of medicine – some even arguably closer to "treating a condition" than giving a brand could ever be. Take teaching an aerobics class; because the instructor is a physician would she be required to take a medical history on every person that gets on a spin bike in her aerobics class? Of course not; that would not be appropriate for the activity being engaged in. There are other responsibilities and standards that have been created for aerobics instructors to uphold that are appropriate for this activity and those who choose to participate have a responsibility to check with their physician or determine on their own whether they are fit for this activity. Though this activity could possibly treat a condition (diabetes, heart disease, musculoskeletal imbalances), it is not considered the practice of medicine and a physician who leads the activity would not be expected to treat it like a medical practice just

4

because he or she has a medical license. The physician would be expected to adhere to the standards associated with the activity – not the more rigorous standards of medical practice.

Branding is no exception. It is an unregulated activity which people choose to engage in at their local tattoo shop, fraternity, sorority or home. The branding technician/artist and the participant have responsibilities to keep each other safe during the process, and there are accepted standards and practices that apply – but these are not medical standards; they are branding standards. That the branding technician/artist is a physician does not alter the applicable standards.

The fact that branding is not a medical procedure under the applicable law and relevant facts, does not, however, automatically preclude the Board's jurisdiction. If this activity was performed in the course of Dr. Roberts' medical practice or it otherwise implicated her medical license, the Board could still reasonably exercise jurisdiction. For example, if a gynecologist performing a pelvic examination sexually touches a patient purely for his sexual gratification, everyone would agree that this conduct (the improper touching) would not be considered a medical practice or procedure. But everyone would also agree that the conduct represents "conduct in the practice of the profession which evidences moral unfitness to practice medicine" in violation of Section 6530 (20) of the Education Law. Thus, for the State Board's jurisdiction to be properly invoked, the conduct must fall within the definition of the practice of medicine (under Education Law Section 6521) or, at least, the conduct must have occurred in the environment and context of medical practice. The same analysis applies to all of OPMC's charges against Dr. Roberts relating to the branding process.

Dr. Roberts was charged with practicing the profession of medicine with gross negligence and gross incompetence and practicing the profession of medicine with negligence

5

and incompetence on more than one occasion based on the facts and circumstances surrounding the branding process. To establish these charges, OPMC was required to prove that not only was Dr. Roberts grossly negligent, grossly incompetent, and negligent and/or incompetent but also that her conduct occurred in the practice of medicine. She was also charged with engaging in conduct in the practice of medicine which evidences moral unfitness to practice medicine. The law is well-settled that the issue of whether conduct occurs in the practice of medicine is a factual determination to be made by a hearing committee based on all of the pertinent facts. With that in mind, we set forth below how the evidence adduced at the hearing demonstrates that Danielle was engaged in conduct that was clearly outside the practice of medicine and in no way implicated her medical license. Throughout this Memorandum, respondent is sometimes referred to as "Danielle" where the context indicates that she was not performing a medical procedure, was not engaged in the practice of medicine and was not regarded by others as their physician.

First and foremost is the fact that the women receiving a brand did not perceive that Danielle was functioning as a physician when she gave them a brand. Several women who received a brand from Danielle testified on her behalf. Each testified that she did not consider Danielle to be her physician. (1887, 1943, 1950-1951). Similarly, Dr. Roberts testified that she perceived herself to be acting as a branding technician rather than a physician and she did not consider the women to whom she gave brands to be her patients (750, 1337).

The women who received brands and who testified on behalf of Dr. Roberts were Jane Doe 3, Jane Doe 4 and Jane Doe 5. They testified that when they agreed to join DOS they were told that receiving a brand would be part of their initiation ceremony (1881-1882, 1939, 2013-2015). Not one of them testified that they were advised that they would be getting a tattoo rather than a brand. (1882, 1939, 2014-2015). Each of these women testified that when they agreed to

6

receive a brand they had no idea that a physician would be doing the branding and they were not relying on or contemplating that a physician would be doing the branding (1883, 1939-1940, 1943). The only person who gave slightly different testimony was prosecution witness S.E. According to S.E., she was told that a small tattoo would be required and that she didn't know it would be a brand until much later on - the night the branding took place (793). S.E. further testified that she didn't want to receive a brand but she felt comforted by the fact that it would be done by a physician (796). It seems unlikely that all of the other women who received a brand knew from the outset that a brand would be required and only S.E. was told that it would be a small tattoo. It was apparent from her testimony that S.E. became angry at DOS and everyone involved with DOS including Danielle and was trying her best to incriminate Dr. Roberts. SE is the woman seen receiving a brand on the video in evidence (Exhibit 8C). She was confronted on cross-examination with information that she provided to an OPMC investigator which clearly is inconsistent with what can be plainly seen on the video (884-895). In an apparent effort to "reconcile" her prior statements with the video, S.E. claimed that the OPMC investigator got everything she told him wrong (884-895). A far more likely explanation is that when S.E. realized that what she told the investigator was inconsistent with the video, she had to assert that the investigator's summary was inaccurate. But even if S.E.'s testimony was truthful it still would not establish that a physician/patient relationship existed between her and Danielle on the day she received her brand. It takes more than S.E. stating that she was "comforted" that a physician would be doing the branding to establish a physician/patient relationship. Numerous other factors demonstrate that the branding did not take place in the context of a physician/patient relationship and that Danielle was acting as a branding technician/artist in a private capacity that was not part of medical practice. We set forth below some of these factors.

7

The branding was performed in a private home rather than in a hospital, medical facility or physician's office (1336-1337, 1886). The branding was not paid for (1338, 1886). No medications were prescribed. No scripts at all were written (1352). None of the formalities normally associated with medical practice were observed. No formal written informed consent was obtained (although verbal consent was documented as can be seen from the video in evidence). No history was taken and no physical examination was performed. No medical records were maintained. No insurance information was obtained. Insurance billing codes for branding don't exist. The women who received a brand did not know who would be performing the branding (1943). The women of DOS who received a brand initially (before Danielle became involved) received their brands from a branding artist (1315, 1323, 2019). When they decided that future branding should be done in a more intimate setting, they considered several possible people to perform the task (2019-2021). Only one of the candidates was a physician – Danielle. Clearly, the intent was not to select a physician but to pick amongst friends (1314).

Danielle agreed to the request that she perform the branding, but only after she received a brand herself and only after she satisfied herself that she could perform this task safely and competently (1322, 1327-1331). It was necessary for her to research the subject and talk to branding artists because branding is not taught in medical school; there are no residencies in branding (1327-1331, 1784) and there was no way to learn about branding through traditional medical avenues. Branding is not a medical practice or procedure; it is a form of commercial body art in the same manner as are tattooing and body piercing. Thus, Danielle's knowledge about branding was not derived from her medical education, training or experience (1784).

.

8

A number of states regulate branding under the rubric of commercial body art. For example, Arkansas, Idaho, Louisiana and Michigan, among many others, regulate branding as a form of commercial body art. It is noteworthy that some of the states that regulate branding distinguish between branding performed for aesthetic or ritual purposes and branding performed incidental to medical practice. See, for example, Michigan Body Art Facilities Act 210 PA 375 Section 3.1.9 which specifically distinguishes branding for aesthetic purposes from branding which the State Board determines to be medical in nature. It is only medical branding that falls within the jurisdiction of the medical board. In New York, it is even more clear that aesthetic or ritual branding is outside the jurisdiction of the State Board for Professional Medical Conduct as branding is not regulated at all in New York. Pursuant to Article 4-A of the New York Public Health Law, tattooing and body piercing (but not branding) are regulated activities that require a license issued by the Department of Health. The only exemption is for physicians. Thus, a physician who performs tattooing or body piercing who does not possess a license issued pursuant to Article 4A necessarily relies upon his or her medical license for the legal authority to perform that activity. But this is not true for branding. Therefore, when a physician performs branding his or her medical license is not implicated because the physician does not need to rely upon a statutory exemption (as would be true for tattooing and body piercing) because branding is not regulated at all.

OPMC attempted to argue that Dr. Roberts was engaged in medical practice when she performed the branding because she used an electrocautery which is a "medical" device sometimes used by physicians in the course of medical practice (1070-1071). But anyone can legally purchase an electrocautery – no medical license is required for such a purchase (1329,

9

1768).  This is unlike an X-ray machine.  Such machines can only be purchased by a hospital, medical facility or appropriately licensed person.

Moreover, an electrocautery was purchased by Danielle solely for the purpose of performing the branding that she was asked to do.  Steve Haworth testified as a fact/expert witness on behalf of Dr. Roberts.  He explained that he was the first person to utilize an electrocautery for the purpose of branding to replace strike branding with hot metal which was commonly used before he brought the electrocautery into vogue (1760-1761).  Danielle purchased the same device used by Mr. Haworth (2124).  It should thus be clear that Danielle's use of an electrocautery in no way implicated her medical license, medical education, medical training or medical experience and the device was only used for this single, non-medical purpose, i.e. branding.

OPMC's other arguments that Dr. Roberts was engaged in medical practice when she performed the branding (and thus subject to the jurisdiction of the State Board) are equally unavailing.  OPMC pointed out that Dr. Roberts utilized bandages; she kept the brands clean; she wore gloves and the "patients" were placed on an "examining" table.  All of these and other similar points are common to any branding procedure and in no way transform branding into an aspect of medical practice. OPMC also attempted to prove that Dr. Roberts was engaged in medical practice by offering the expert testimony of Dr. Robert Grant. But the expert testimony provided by Dr. Grant was not persuasive.

Dr. Grant conceded that there are no medical programs that involve branding. (1185). He further admitted that he has no experience whatsoever with branding (1185-11186).  The primary argument advanced by Dr. Grant was utterly without merit. He attempted to argue that branding is analogous to cosmetic surgery.  It was Dr. Grant's position that cosmetic surgery is universally

10

recognized as the practice of medicine. From this basic truism, he next argued that cosmetic surgery falls within the definition of the practice of medicine set forth in Section 6521 of the Education Law. He reasoned that cosmetic surgeons treat "psychic pain" that the patient has from having a part of their body that displeases them and results in a type of emotional pain that he labeled "psychic pain" (1191-1192). Since Section 6521 includes the treatment of pain as part of the definition of the practice of medicine, he argued that cosmetic surgery is therefore the practice of medicine. From this, Dr. Grant argued that branding is also medical practice because it too treats a type of psychic pain. He did not make clear, however, the basis for his position that persons receiving a brand are experiencing "psychic pain." In any event, his argument is so preposterous and without merit that ordinarily we would not even dignify it with a response. But the stakes in this case are too high to leave this absurd argument unchallenged.

Dr. Grant cited no authority whatsoever for his claim that all cosmetic surgery patients, are experiencing what he referred to as "psychic pain." Moreover, if he really believed that all of his cosmetic surgery patients are being treated for psychic pain, then it would be incumbent on him to arrange for every patient to undergo a psychiatric evaluation before having cosmetic surgery. He provided no such testimony and we seriously doubt that all of his cosmetic surgery patients are required to undergo a psychiatric evaluation before he operates on them. Furthermore, a simple hypothetical should suffice to show the lack of merit to Dr. Grant's argument.

Hypothesize a successful face model who is extremely happy with her appearance. She nevertheless is advised by her agent that she can earn substantially more money for each photo shoot if she has cosmetic surgery on her nose making it slightly smaller; she agrees to this for the financial reward despite being perfectly content with her appearance and having absolutely no "psychic pain" whatsoever with the way she looks. According to Dr. Grant's argument, the

11

cosmetic surgeon who performs the requested procedure would not be practicing medicine since in our hypothetical situation there is no psychic pain being treated. But common-sense dictates that this hypothetical rhinoplasty is clearly the practice of medicine. The reason that it is the practice of medicine is the same reason that all cosmetic surgery is considered the practice of medicine. Cosmetic surgeons operate on or treat a "physical condition" that the patient wants to have addressed. The physical condition could be a nose that the patient wants changed or wrinkles that he or she wants removed or a plethora of other physical conditions. Since treating or operating on a "physical condition" falls within Section 6521, cosmetic surgery constitutes the practice of medicine. While we do not doubt that in some instances patients undergoing cosmetic surgery will obtain some emotional or psychic benefit, this does not mean that this constitutes the basis for deeming cosmetic surgery as the practice of medicine.

Indeed, Dr. Grant's argument is so lacking in a rational basis, that one can only conclude that he was not acting as a non-partisan expert, but rather was creating an argument in an attempt to achieve a desired result – in other words, the end justifies the means. It is also the case that while Dr. Grant is a highly experienced and respected plastic surgeon, neither his testimony nor his *curriculum vitae* demonstrates any legal training or background. This is especially important in this case which did not present clinical issues in plastic surgery but rather involved a somewhat complex application of the facts to the applicable law. The credentials of defense expert David Mayer, M.D., were, however, particularly pertinent to the expert testimony that he provided.

Dr. Mayer graduated from Cornell Medical College (1st in his class). He performed a five-year residency in general surgery at New York Hospital-Weil Cornell Medical Center which he completed in 1978 (1469-1470). He has been certified by the American Board of Surgery

12

since 1979 (1470).  Following his residency, Dr. Mayer practiced as a busy general and vascular surgeon in the Northwell Health System.  He served as Chairman of Surgery at Syosset Hospital where he had supervisory responsibility for 250 surgeons including various specialties such as general surgery, plastic surgery, orthopedic surgery, etc., as well as running an advanced laparoscopic, minimally invasive fellowship program (1471).  He teaches medical students and residents at New York Medical College, Hofstra Medical School and the State University of New York at Stonybrook (1470-1474).  Dr. Mayer has published extensively – over 50 peer reviewed articles and three book chapters in the field of surgery (1971-1972).  He has also lectured widely in the United States and internationally (1472).  In addition, Dr. Mayer is a licensed attorney having graduated *summa cum laude* from the Hofstra University School of Law in 2010, and he has an expertise in Health Law (1472).  Clearly, he brings to his testimony a rather unique dual perspective.

In preparation for his testimony, Dr. Mayer reviewed the relevant hearing transcripts including the testimony of Dr. Grant, Dr. Roberts and S.E. (1972).  He also reviewed the video of Danielle performing the branding of S.E., as well as the relevant provision of the New York Education Law (1473).  As he testified:

> In my expert opinion and testimony to a reasonable degree of medical certainty, Dr. Roberts was not engaged in the practice of medicine when she performed the branding procedure.  In fact, she was acting as a branding tech or a scarification artist rather than a physician or osteopathic physician. (1473)

Dr. Mayer explained that his opinion was based on his training and experience both as a physician and attorney and on the application of the pertinent facts to the applicable law (1474). He emphasized the fact that the women who received brands had no prior knowledge that a

physician would be doing the branding and that therefore the confidential relationship of trust that is crucial to the doctor/patient relationship didn't exist (1475-1476). He disagreed with Dr. Grant's analysis and Dr. Grant's analogy of branding to cosmetic surgery. He explained that cosmetic surgeons treat a patient's perceived physical condition – not "psychic pain" as asserted by Dr. Grant (1480-1481).

OPMC was well aware of the weakness of its argument as to branding being a medical procedure. In an effort to circumvent this fatal flaw in the charges, OPMC attempted to argue that even if the branding itself is not the practice of medicine, the "follow-up" care or alleged lack of such care by Dr. Roberts constituted the practice of medicine, thus subjecting her to the jurisdiction of the State Board. But this argument fails as well.

Although there is always a theoretical risk of harm following the creation of the brand/scar, Danielle did not provide medical follow-up care. The risks from the branding process are exceedingly small and the women were told to follow-up with their own physician if any medical issues arose (418-419, 436-437, 1352, 1370). OPMC argued through the testimony of its expert, Dr. Grant, that Dr. Roberts acted irresponsibly and negligently because she created a second degree burn with the electrocautery which required medical attention which she did not provide. But branding expert, Steve Haworth, explained that the electrocautery doesn't cause a true second degree burn because it only vaporizes the layers of skin it directly touches and leaves intact the surrounding cells and blood supply, thus being categorized as a second degree burn only because it removes two layers of skin (1787-1789). However, the wound it creates carries significantly less infection risk and heals much more quickly than typical second degree burns caused by scalding water or by strike branding with a hot iron (1787-1789); – which medical professionals typically encounter and are trained to manage. The exaggeration of the "risks"

14

associated with electrocautery branding was compounded by OPMC's placing in evidence (over objection) of numerous photos of the branding scar in the healing process (Exhibit 47). The photos of the brands offered by OPMC were significantly enlarged, backlighted and reddened to create the impression that the scar that was created was extensive and constituted a significant risk to the women who received the brands (1357-1358).

The only post-branding instructions that Danielle gave related to the aesthetics of the brand (668, 1349-1350, 1979). Obviously, she advised the women to keep the scar clean with a clear plastic bandage (534-535, 1349-1350), but this was no more than any branding technician/artist does. Dr. Mayer pointed out that there are many personal services such as tattooing, piercing, waxing, facials, electrolysis, perms and eyelash extensions where it is well-settled that they are not the practice of medicine. He explained that it is routine for those providing such services to give aftercare instructions that are considered general care rather than medical in nature (1483). He testified that the fact that Dr. Roberts provided routine instructions for aesthetic purposes was not an indicia of medical practice (1483). The women who received the brand all understood that they should follow-up with their primary care doctor or go to an emergency room should any complications develop (1352, 1370, 1893). This was understood because they were all aware that Danielle was not functioning as their physician (1943, 1959). The only exception to this was the testimony of prosecution witness S.E. But it was obvious that S.E. provided false, biased testimony. This can be seen from her earlier text messages to Dr. Roberts where she referred to Dr. Roberts as "Danielle." (669). Later, when she was trying to incriminate Danielle, her texts sought "medical" advice and referred to Danielle as "Dr. Roberts." (Exhibit 35; 669).

It should be noted that we are not making the argument that merely because unlicensed persons can legally perform a task that it cannot be the practice of medicine. This is a "straw

15

man" argument raised by OPMC in its oral closing. By way of illustration, the definition of the licensed profession of public accountancy does not include the preparation of tax returns. See, Education Law Section 7401. This permits companies such as H&R Block to prepare tax returns without employing CPAs. Yet it is common knowledge that many people elect to use a CPA for the preparation of their tax returns. When a CPA incorporates the preparation of tax returns into his or her accounting practice and clients go to the CPA for that purpose, it is clear that the CPA is subject to the jurisdiction of the State Board for Public Accountancy if he or she were to act fraudulently, negligently or immorally. It would not be a valid jurisdictional defense that anyone, including unlicensed persons, can legally prepare a tax return. But that is very different from the situation involved in this case. In the former case, the preparation of tax returns is incorporated into the CPA's accounting practice and the clients who seek out that service do so precisely because they want a CPA to take responsibility for their tax returns. It would thus be incorrect to assert that a CPA who acts unprofessionally with respect to the preparation of tax returns can do so with impunity because he or she is not engaged in the practice of his or her profession. And we make no such argument here. We do not argue that because anyone can perform branding that, therefore, Danielle was not engaged in the practice of medicine.

Danielle was not engaged in the practice of medicine for the reasons referred to above. She did not incorporate branding into her general practice of medicine and the women did not come to her because she was a physician and they all had agreed to the branding before even knowing that DOS had recruited her to perform the branding. Thus, OPMC's strawman argument fails.

OPMC's remaining arguments (and charges) also have no merit. OPMC alleged that Dr. Roberts committed professional misconduct because she "failed to meet the accepted standards

16

of medical practice related to the "medical procedure" that she performed.  Thus, OPMC alleged that Dr. Roberts practiced medicine negligently and incompetently because she did not take a medical history and did not perform a physical examination prior to giving the women the brands that they requested; she did not obtain a formal written consent and she did not offer the women anesthesia to mitigate or eliminate the pain associated with the branding.  Finally, OPMC alleged that Dr. Roberts failed to maintain a medical record reflecting her evaluation and treatment of the women who received the brands.  Paradoxically, that Danielle didn't do these things is actually consistent with her not being engaged in the practice of medicine.  As Dr. Mayer testified "the things that she didn't do are understandably disturbing to OPMC when OPMC reviews a case. But, in this case, they support the proposition that she did not engage in the practice of medicine, and therefore, wouldn't need to do the indicia of medical practices and documentations that medical practice would normally require." (1483-1484).  Although Dr. Grant testified that Dr. Roberts deviated from the accepted standards of practice by not performing a history and physical and by not obtaining informed consent, etc., he admitted on cross-examination that his testimony was premised on the idea that Dr. Roberts was engaging in medical practice when she performed the branding and that this triggered the standards of medical practice that she was obligated to comply with (1198-1199).  Inconsistently and even bizarrely, Dr. Grant insisted that these medical standards would still apply even if the Hearing Committee were to conclude that branding is not a medical procedure; that the women who were branded were not patients of Dr. Roberts; and that Dr. Roberts was not engaged in the practice of medicine (1199).

Of particular concern to OPMC was the fact that Dr. Roberts had no "medical justification" for not offering anesthesia to the women who received the brands to eliminate or

17

mitigate the pain associated with the branding.  But this concern misperceives the purpose of the branding and the concept of the shared experience that was intended to create a bond among the women that they had all persevered through a difficult and painful experience (411-412, 748, 1325-1326, 2023-2025).  Even prosecution witness S.E. conceded this. Several witnesses testified that receiving anesthesia during the branding process would have defeated one of the primary purposes of the branding (411-412, 1325-1326, 1888, 1947-1948, 2023-2025).

There was testimony during the hearing about the African American fraternity known as the Omegas and that many prominent African-Americans including former basketball player, Michael Jordan, are members of this prestigious college fraternity (415, 663, 748, 753). Many of the Omegas choose to be branded with the Greek letters symbolizing their life-long membership in the fraternity.  The brand is accomplished by the use of a hot iron on the exposed flesh. Presumably, this is quite painful.  Imagine if it were ascertained that one of the Omegas so branded was given anesthesia to eliminate the pain.  That fraternity brother would not have the respect of those who endured the branding and accepted the pain as a symbol of their commitment.  Instead of being a bonding experience, it would be divisive.  The branding experience involving the DOS women was similar. It was intended to be a shared bonding experience, not a shared medical experience. The idea was not merely to obtain the final result of having a brand but also to persevere through the difficult branding process (411-412, 748, 1325-1326, 2023-2025). The way the women saw themselves can be gleaned from Shakespeare's *Henry V*, Act 4 Scene 3.  Before the vastly outnumbered English fight the French at Agincourt in 1415, King Henry addresses his troops:

We few, we happy few, we band of brothers;
For he to-day that sheds his blood with me shall be my brother;
Be he ne'er so vile, this day shall gentle his conditions:
And gentlemen in England now a-bed shall think themselves accursed
They were not here, and hold their manhoods cheap whiles any speaks
That fought with us Saint Crispin's day.

This is the bond that the branded DOS women desired to emulate. They viewed their membership in a secret society as empowering and a show of strength and commitment. They wanted to be a "band of sisters." That bond would be defeated if they were offered anesthesia and some accepted. By regarding the branding as a medical procedure and part of medical practice, Dr. Grant not only failed to correctly interpret Section 6521 of the Education Law, he also failed to understand the initiation bonding ritual that the DOS women wanted and accepted.

OPMC also spent a substantial amount of time delving into the "collateral" provided by the women who were branded. OPMC argued that this constituted coercion and that accordingly, the women were not able to and did not give true consent to the branding. This is blatantly untrue, (as Danielle herself went through the very same process all the women who chose to join DOS went through) and many women testified to the absurdity of this assertion. Moreover, OPMC again fails to understand the illogic of its position. Consent in this forum is only an issue if Danielle was performing a medical procedure and/or was engaged in the practice of medicine. Since it has been shown by clear and convincing evidence that branding is not a medical procedure and that Danielle was not engaged in the practice of medicine, there is no issue of consent that can legally be heard in the misconduct forum. Certainly, whether the DOS women who were branded gave their consent or were coerced is extremely important. This issue, however, would have been adjudicated elsewhere if true. But the fact is there was no coercion as Danielle and several other witnesses testified (530, 1265-1266, 1397, 1925-1929). If there was

19

coercion, it might constitute immoral conduct, but it would not be "conduct in the practice of medicine which evidences moral unfitness to practice medicine." – the requirement of Section 6530 (20) of the Education Law. The Hearing Committee should take note of the fact that New York only regulates the moral conduct of physicians when they are engaged in the practice of their profession. This is not true for all States. Some States regulate and sanction any conduct by a physician perceived to be immoral. New York has chosen not to follow those States. Indeed, almost all of New York Education Law Section 6530, where misconduct is defined, is limited to acts committed in the course of practicing the profession. The only exceptions are for criminal convictions and drug and alcohol dependency. See, Education Law Sections 6530 (8) and 6530 (9).

By referring to and citing this fact, we do not mean to imply that Danielle engaged in immoral behavior in any way. Rather, this is a response to OPMC's effort to taint Dr. Roberts by improper allegations of guilt by association. That is why counsel for OPMC repeatedly referred to NXIVM, Keith Raniere and DOS. He claimed that this was for the purpose of context. In reality, OPMC's purpose was an attempt to tarnish Dr. Roberts in the eyes of the Hearing Committee based on her purely private, non-medical conduct. As we have shown, Danielle's conduct was, at all times, moral and compassionate. But regardless, it is only her conduct while practicing her profession that is within the purview and jurisdiction of the State Board.

It is critical for the Hearing Committee to understand that Dr. Roberts is a highly moral person and did not engage in immoral conduct in the practice of medicine or outside the practice of medicine. Witnesses testified to her exemplary character. She was described as "exceptionally honest," "caring, compassionate" and "loyal, faithful and full of integrity" (1852, 1863, 1866). We urge the Hearing Committee to review the video in evidence (Exhibit 8C). It can readily be

20

seen that Danielle was supportive and compassionate.  The women were laughing and joking as they shared the experience. There was absolutely nothing resembling coercion or immorality. The Hearing Committee should also consider Dr. Roberts' demeanor as she was testifying. By carefully declining to answer specific questions that did not pertain to the charges but only sought information about her private life, she stood for the right of physicians to have private lives outside of their agreed upon professional commitments, and revealed where those rights were being violated to serve a political agenda. She upheld the honorable foundation and principles the Board was founded on. She stood to safeguard the privacy of non-relevant parties and the sanctity of the commitments she gave when she joined DOS. She did this even when declining to answer might have placed her in legal peril depending on the rulings made by ALJ MacKillop-Soller. This was courageous and benefits us all.

**The Charges Relating to "Vanguard" Week**

Dr. Roberts was also charged with practicing the profession of medicine with negligence and incompetence because she didn't report the outbreak of a norovirus while on vacation at a corporate retreat in Upstate New York. And she was charged with willfully failing to file a report required by law (Education Law Section 6530 (21)) and willfully (or grossly negligently) failing to comply with a substantial provision of Health Department regulation 10 NYCRR Section 2.1 et. seq. – a regulation mandating that physicians report certain infectious disease situations to the Department of Health. See, Education Sectio 6530 (16). We address first the alleged reporting requirement of 10 NYCRR Section 2.1.

Section 2.1 does not require the filing of a report as asserted by OPMC. This regulation, which most physicians are not familiar with, is concerned primarily with "communicable"

diseases. But it is clear from Section 2.1 that the term "communicable disease" is not used in its usual sense and is limited to those diseases specified in Section 2.1. The evidence adduced at the hearing showed that the disease entity that occurred during "Vanguard" week attended by Dr. Roberts and others in 2016 was a norovirus or something very similar thereto (1000). Noroviruses are not included on the list of communicable diseases in Section 2.1 (1300). As such, there was no mandatory reporting requirement. OPMC correctly points out that Section 2.1 also requires the reporting of "unusual" diseases. The evidence was clear, however, that the disease that occurred during Vanguard week 2016 was not "unusual" (1015-1016, 1302). In fact, OPMC's expert conceded that it was a very common, self-limiting disease that was unpleasant but not lethal (1001-1002). It was a garden variety stomach virus, sometimes referred to informally as a stomach bug or 24-hour virus (720). Clearly, this virus was not reportable as an "unusual" disease. *A priori* it was not reportable as an unusual disease outbreak. Next, OPMC asserted that the norovirus had to be reported as a disease outbreak under Section 2.1(c). This subsection states that "any disease outbreak or unusual disease shall also be reported to the State Department of Health as provided in subdivision (b) of the section." But subdivision (b) refers, in turn, to Section 2.10. Title 10 NYCRR Section 2.10 states:

> It shall be the duty of every physician to report
> to the city, county or district health officer, within
> whose jurisdiction such patient resides, the full name,
> age and address of every person with a suspected
> or confirmed case of a communicable disease, any
> outbreak of communicable disease, any unusual disease
> or unusual disease outbreak and as otherwise authorized
> in section 2.1 of this Part, together with the name of the
> disease if known, and any additional information requested
> by the health officer….

22

Two things are clear from the above quoted language – first, Section 2.10 refers to reporting about "patients," not persons who are known to the physician only as fellow vacationers. This makes Section 2.1 inapplicable to what occurred during Vanguard week. Second, Section 2.10 refers to "communicable diseases, outbreaks of communicable diseases, unusual diseases and unusual disease outbreaks – none of which occurred during Vanguard week if the definitions contained in Section 2.1 are applied as they must be. Apparently, OPMC is attempting to hang its hat on the language in Section 2.10 that refers to "as otherwise authorized in section 2.1 of this Part." But a review of Section 2.1 reveals that there are no other reports mandated or authorized. As can be seen from the foregoing, Dr. Roberts did not violate 10 NYCRR Section 2.1 et. seq. As can also be seen, this regulation is difficult to parse and requires jumping from subdivision to subdivision and the application of technical definitions. This is a challenging task even for lawyers trained in statutory and regulatory interpretation. Even if the Hearing Committee were to disagree with the analysis and interpretation set forth above, the evidence in this case did not demonstrate a "willful" failure to file a report required by law and, just as clearly, the evidence did not establish that Dr. Roberts "willfully or grossly negligently" failed to comply with Title 10 NYCRR Section 2.1 et. seq.

Nor is there any merit to OPMC's charges that, irrespective of Section 2.1 of Title 10, Dr. Roberts practiced the profession of medicine negligently and incompetently by not notifying the Department of Health about the norovirus that occurred during Vanguard week. In an effort to prove that Dr. Roberts departed from accepted standards of practice by not reporting the cases of norovirus (or similar disease) that occurred, OPMC offered the testimony of Dr. Bruce Farber. While we do not question Dr. Farber's credentials as an infectious disease expert, his testimony fell well short of establishing a departure by Dr. Roberts from accepted standards of practice. In

23

fact, Dr. Farber's testimony established the opposite – that there was no departure from accepted standards by Dr. Roberts.

Dr. Farber testified on direct examination that the disease entity that occurred during Vanguard week was probably a norovirus (1000). On cross-examination, he acknowledged that a norovirus is not an unusual virus and that it is a self-limiting virus which, in most cases, resolves in two or three days (1001-1002). He also admitted that the symptoms, while unpleasant, are rarely lethal (1002). Dr. Farber testified that every New York physician is required to take an infection control course every four years and that he co-authored one such course (1004-1005). Implied in this testimony is that his course and courses like it inform physicians of their reporting obligations and define standard practice in this area. But Dr. Farber admitted that the course he co-authored says nothing about a physician's reporting obligations while on vacation. Curiously, OPMC did not offer in evidence the documents pertaining to the infection control course co-authored by Dr. Farber (1005). The Hearing Committee can be confident that if the infection control course co-authored by Dr. Farber contained any language supporting OPMC's position, the course documents would have been offered in evidence. OPMC, did, however, offer the documents pertaining to an infection control course given at St. Peter's Hospital (1005). That course and the documents related thereto do not refer to any obligation to report a disease such as a norovirus, especially while on vacation and where the disease does not relate to any of a physician's own patients. Moreover, Dr. Farber was unable to identify any textbook that refers to a physician's reporting obligations while on vacation. Nor could he identify any teaching that takes place during a physician's post-graduate training years or scholarly literature that refers to and defines a physician's obligations under such circumstances (1006-1008). His "explanation" was that he hadn't done a literature search in preparation for his testimony (1009). His position

24

that standard accepted practice requires the reporting of an outbreak of a relatively benign disease such as a norovirus in non-patients while on vacation was completely undermined through questioning by Dr. Raju of the Hearing Committee. Dr. Raju asked Dr. Farber whether in his 40 years of practice he had ever heard of a family practice physician attending a community event reporting an incident such as occurred at Vanguard week (1043-1044). Dr. Farber candidly admitted that he could not recall a single such instance (1044). Given this testimony, it should be clear that there was no valid expert testimony supporting OPMC's negligence and incompetence charges.

# CONCLUSION

This case was brought improperly from the outset. OPMC's "case" against Dr. Roberts constitutes a misuse of government resources to prosecute the purely private behavior of a physician. New York's misconduct definitions, which are found in Section 6530 of the Education Law, limit actionable misconduct to conduct that occurs in the practice of medicine. Thus, the Education Law refers to "practicing the profession" with negligence or incompetence (Sections 6530 (2) and (5)) and "conduct in the practice of medicine" which evidences moral unfitness to practice medicine (Section 6530 (20)). One can't help but think that OPMC prosecuted Dr. Roberts because of her connection to an organization that was and is politically unpopular – in other words, guilt by association. This is contrary to everything this country stands for.  This case also represents an abuse of the State Board. We believe that members of the Board did not volunteer their time to police the private behavior of their colleagues resulting in no harm. Furthermore, allowing or legitimizing charges like the ones brought against Dr.

25

Roberts, would condone the government's peering into the private lives of physicians – a scary proposition indeed.

Dr. Roberts has had her career destroyed despite the fact that not a single allegation has been made by an actual patient or colleague against her clinical abilities or integrity as a physician. In fact, during her testimony, she declined to identify the non-medical field in which she is now working for fear that OPMC would further destroy her ability to make a living. Despite tremendous social, legal and financial obstacles, Dr. Roberts has continued to stand for our rights, find other ways to make a living for herself and those she cares for, start new businesses that will help keep people healthy in the face of COVID, and even pursue ways to volunteer her skills during this critical time that we face. She is an unrelenting force for good. The Hearing Committee can and should end this ordeal and allow Dr. Roberts to return to what she earned with years of study and work and what she loves most, the practice of medicine.

Respectfully submitted

Anthony Z. Scher, Esq.

Rye Brook, NY
May 31, 2021

Attorney for Respondent
800 Westchester Avenue
Suite N-641
Rye Brook, NY 10573
(914) 328-5600

`

26

27

## COMPLAINT

I WAS INVITED TO BE A PART OF WHAT I THOUGHT WAS A SORORITY, AN INTERNATIONAL WOMEN'S GROUP. THE FIRST STEP WAS GIVING NUDE PHOTOS AS "COLLATERAL," AKA BLACKMAIL, TO ENSURE SECRECY. THE SECOND STEP WAS HAZING: GETTING A SMALL TATTOO, THAT I WAS TOLD WOULD BE 1 INCH BY 1 INCH. ON THE NIGHT OF MARCH 9, I WAS BLINDFOLDED IN CLIFTON PARK AND TAKEN TO AN UNKNOWN ADDRESS IN KNOX WOODS WITH FOUR OF MY OTHER "SISTERS" - OTHER RECRUITS IN THIS SORORITY. WE WERE TOLD TO REMOVE OUR BLINDFOLDS, GET UNDRESSED HEAD TO TOE, AND WERE HELD DOWN BY FIVE WOMEN WHILE DOCTOR ROBERTS PERFORMED WHAT I THOUGHT WAS GOING TO BE A TATTOO. THE WOUND ENDED UP BEING A 2 INCH BY 2 INCH THIRD DEGREE BURN, MADE WITH A CAUTERIZING IRON ON THE PUBIC AREA, AN INCH LEFT OF MY VAGINA. THE ENTIRE PROCEDURE TOOK 30 MINUTES AND WAS FILMED, TO BE USED AS MORE COLLATERAL FOR BLACKMAIL.

I WAS INITIALLY TOLD THAT THE MARK WAS A LATIN SYMBOL FOR THE ELEMENTS, SIMILAR TO THE GREEK LETTERS IN A SORORITY. A FEW WEEKS LATER, I FOUND OUT THIS WAS ALL A LIE. THIS WAS NOT A WOMEN'S GROUP, BUT A CULT STARTED BY KEITH RANIERE OF NXIVM, AND THE BRAND WAS ACTUALLY HIS INITIALS, "KR," COMBINED WITH THE INITIALS OF ANOTHER WOMAN, ALLISON MACK ("AM"), WHO STARTED THIS WITH HIM. A PHOTO OF THE BURN IS ATTACHED.

I THINK IT'S IMPORTANT THIS GETS ADDRESSED RIGHT AWAY. DR. ROBERTS IS PERFORMING THIS "SECRET RITUAL" TO UP TO SIX WOMEN AT A TIME UNDER FALSE PRETENSES. THEY ARE BEING LIED TO, AND THIS HAS TO STOP.

THE ENTIRE ORDEAL HAS BEEN VERY TRAUMATIC FOR ME, AND MY DOCTOR HAS DIAGNOSED ME WITH POST-TRAUMATIC STRESS DISORDER WITH INSTRUCTIONS TO SEE A PSYCHOLOGIST.

I HAVE ATTACHED A COPY OF DR. ROBERTS'S MEDICAL LICENSE, AVAILABLE TO VIEW ONLINE.

PUBLIC LINKS TO MORE INFORMATION:
https://frankreport.com/2017/06/05/part-1-branded-slaves-and-master-raniere-sources-human-branding-part-of-raniere-inspired-womens-group
https://frankreport.com/2017/06/07/part-2branded-slaves-and-master-raniere-more-details-of-secretive-master-slave-branding-group-revealed
More information about the activity can be found on this site.

http://www.vanityfair.com/culture/2010/11/pronfman-201011

③

# 3530

https://www.forbes.com/forbes/2003/1013/088.html

FINALLY, I WOULD LIKE TO REMAIN ANONYMOUS, AS THE
ORGANIZATION IS INCREDIBLY LETIGIOUS AND DESTRUCTIVE, AND
THREATENS TO FRAME AND/OR SUE ANYONE WHO WILL SPEAK OF THIS
IN PUBLIC.



JULY 7, 2017

# 24-778-CR(L)
## 24-1285-CR(CON), 24-1317-CR(CON)

IN THE

# United States Court of Appeals

### FOR THE SECOND CIRCUIT

▶▶ ◀◀

UNITED STATES OF AMERICA,

*Appellee,*

*v.*

ALLISON MACK, CLARE BRONFMAN, KATHY RUSSELL,
LAUREN SALZMAN, NANCY SALZMAN, AKA PERFECT,

*Defendants,*

KEITH RANIERE, AKA VANGUARD,

*Defendant-Appellant.*

*On Appeal from the United States District Court
for the Eastern District of New York*

## BRIEF AND SPECIAL APPENDIX
## FOR DEFENDANT-APPELLANT

DEBORAH J. BLUM, ESQ.
*Attorney for Defendant-Appellant*
225 Broadway, Suite 715
New York, New York 10007
646-535-2586


(212) 719-0990
appeals@phpny.com

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ......................................................................................vi

PRELIMINARY STATEMENT ................................................................................1

STATEMENT OF JURISDICTION ..........................................................................4

ISSUES PRESENTED FOR REVIEW .....................................................................5

STANDARD OF REVIEW .......................................................................................9

STATEMENT OF CASE .........................................................................................10

    1.  Before Trial ..............................................................................................10

    2.  At Trial ....................................................................................................12

    3.  Post-Trial Discoveries of Digital Evidence Falsification .........................16

    4.  Government's Consolidated Opposition ...................................................18

    5.  Defense's Reply to the Rule 33 ...............................................................19

    6.  The Court's Denials ................................................................................20

SUMMARY OF THE ARGUMENT .......................................................................20

    I.  Denial of the Rule 33 ...............................................................................20

    II.  Denial of the Motions to Compel .............................................................22

    III.  Denial of Recusal .....................................................................................23

ARGUMENT ...................................................................................................24

I.    WHETHER THE DISTRICT COURT ABUSED ITS
DISCRETION IN DENYING THE RULE 33 BY
SUBSTANTIALLY RELYING UPON AND CREDITING
NEW GOVERNMENT EVIDENCE, CREATED POST-
TRIAL, FROM INDIVIDUALS WHO WERE NEVER
SUBJECT TO CROSS-EXAMINATION, VIOLATING
MR. RANIERE'S SIXTH AMENDMENT RIGHT OF
CONFRONTATION ................................................................................24

    A.  Applicable Law .................................................................................24

    B.  Analysis ...........................................................................................25

II.   THE DISTRICT COURT ABUSED ITS DISCRETION IN
CREDITING LOVEALL'S REPORT TO DENY THE
RULE 33 ................................................................................................28

    A.  Loveall's Report Was Based Upon Secret Evidence,
Violating Mr. Raniere's Fifth Amendment Right to Due
Process ............................................................................................28

        1.  Applicable Law .........................................................................28

        2.  Analysis ....................................................................................29

    B.  Loveall's Report Failed to Meet the Admissibility
Standards of FRE 702 and *Daubert* .................................................30

        1.  Applicable Law .........................................................................30

        2.  Analysis ....................................................................................31

    C.  Loveall's Report Failed to Meet the Statutory
Requirements of 28 U.S.C. § 1746 ....................................................31

        1.  Applicable Law .........................................................................31

        2.  Analysis ....................................................................................32

Roberts - 467

    D.  Loveall's Report Failed to Refute the 7 Digital
        Forensics Experts' Findings ............................................................. 32

    E.  Loveall's Report Contained Indisputable Errors .............................. 35

III.  THE DISTRICT COURT ABUSED ITS DISCRETION IN
     FINDING THAT "AMPLE TRIAL EVIDENCE" IN
     CONJUNCTION WITH THE LOVEALL REPORT AND
     CAMILA'S DECLARATION, OUTWEIGHED THE
     MATERIALITY OF THE 7 DIGITAL FORENSICS
     EXPERTS' FINDINGS ............................................................................ 36

IV.  THE DISTRICT COURT ABUSED ITS DISCRETION IN
     IGNORING THAT THE SECOND FORENSIC IMAGE
     MEETS THE STANDARD FOR BOTH A
     *BRADY/GIGLIO* VIOLATION <u>AND</u> "NEWLY
     DISCOVERED EVIDENCE" .................................................................. 38

    A.  The Court Abused Its Discretion By Not Applying the
        *Brady* Rule 33 Standard ..................................................................... 38

    B.  Applicable Law ................................................................................... 38

    C.  Analysis .............................................................................................. 40

V.  THE DISTRICT COURT ABUSED ITS DISCRETION IN
    FAILING TO FIND THAT THE SECRET FBI
    PHOTOGRAPH TECHNICIAN MEETS THE
    STANDARD FOR BOTH A *BRADY/GIGLIO*
    VIOLATION <u>AND</u> "NEWLY DISCOVERED
    EVIDENCE" ........................................................................................... 44

VI.  THE DISTRICT COURT ABUSED ITS DISCRETION IN
     FAILING TO FIND THAT THE PROOF OF
     GOVERNMENT INVOLVEMENT IN FALSIFYING
     MATERIAL EVIDENCE CATEGORICALLY
     CONSTITUTES "NEWLY DISCOVERED EVIDENCE"
     AND A *BRADY/GIGLIO* VIOLATION ............................................... 47

Roberts - 468

VII. THE EVIDENCE OF SYSTEMATIC AND
INTENTIONAL GOVERNMENT MALFEASANCE
MEETS THE STANDARD FOR DISMISSAL AND
ALSO CAUSED STRUCTURAL ERROR ...........................................48

    A. Applicable Law ...................................................................48

        1. Standard for Dismissal ...............................................48

        2. Standard for Structural Error .......................................49

    B. Analysis ...............................................................................50

VIII. THE DISTRICT COURT ABUSED ITS DISCRETION IN
DENYING THE MOTIONS TO COMPEL ...........................................52

    A. Applicable Law ...................................................................52

    B. Analysis ...............................................................................52

IX. THE DISTRICT COURT ABUSED ITS DISCRETION IN
DENYING THE MOTION FOR JUDICIAL RECUSAL .....................54

    A. Applicable Law ...................................................................54

    B. Analysis ...............................................................................55

        1. The Court Abused Its Discretion in Misapplying
*Liteky* to Comments Made During the Trial ..............................55

        2. The Court's Termination of Cross-Examination
Demonstrates the Appearance of "Deep-Seated
Favoritism" Towards the Government and "Deep-
Seated Antagonism" Towards Mr. Raniere ...............................56

        3. The Court's Comments and Actions at the
Restitution Hearing Further Demonstrate the
Appearance of "Deep-Seated Antagonism"
Towards Mr. Raniere, Requiring Recusal ..................................60

Roberts - 469

CONCLUSION ..................................................................................62

    REASONS TO GRANT, VACATE, AND REMAND....................................62

PRINTING SPECIFICATIONS STATEMENT......................................................63

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*Alcorta v. State of Texas,*
  355 U.S. 28 (1957) ........................................................................40

*Amorgianos v. National R.R. Passenger Corp.*
  303 F.3d 256 (2d Cir. 2002) ..........................................................30

*Anderson v. United States,*
  417 U.S. 211 (1974) ......................................................................21

*Arizona v. Fulminante,*
  499 U.S. 279 (1991) ................................................................49, 51

*Banks v. Dretke*
  540 U.S. 668 (2004) ..........................................................39, 43, 45

*Bonds v. Cox,*
  20 F.3d 697 (6th Cir. 1995)............................................................32

*Boucher v. U.S. Suzuki Motor Corp.,*
  73 F.3d 18 (2d Cir. 1996)...............................................................30

*Brady v. United States,*
  397 U.S. 742 (1970) ................................................................passim

*Bullcoming v. New Mexico,*
  564 U.S. 647 (2011) ............................................................3, 25, 27

*Crawford v. Washington,*
  541 U.S. 36 (2004) ........................................................................24

*Daubert v. Merrell Dow Pharmaceuticals, Inc.,*
  509 U.S. 579 (1993) ................................................................passim

*Dilonez v. Fox Linen Serv. Inc.,*
  35 F. Supp. 3d 247 (E.D.N.Y. 2014)..............................................31

*Flovac, Inc. v. Airvac, Inc.*,
   817 F.3d 849 (1st Cir. 2016) ................................................................32

*Giglio v. United States*,
   405 US 150 (1972) ......................................................................*passim*

*Harris v. Nelson*,
   394 U.S. 286 (1969) ..........................................................................22

*In re Drexel Burnham Lambert Inc.*,
   861 F.2d 1307 (2d Cir. 1988) ............................................................55

*In re United States v. Coppa (In re United States)*,
   267 F.3d 132 (2d Cir. 2001) ..............................................................43

*ISC Holding AG v. Nobel Biocare Fin. AG*,
   688 F.3d 98 (2d Cir. 2012) ................................................................55

*Kyles v. Whitley*,
   514 U.S. 419 (1995) .....................................................................39, 40

*Leka v. Portuondo*,
   257 F.3d 89 (2d Cir. 2001) ................................................................39

*Liteky* v. *United States*,
   510 U.S. 540 (1994) ....................................................8, 23, 54, 55

*Melendez-Diaz v. Massachusetts*,
   557 U.S. 305 (2009) ..........................................................................24

*Mendez v. MCSS Rest. Corp.*,
   564 F. Supp. 3d 195 (E.D.N.Y. 2021)...............................................31

*Napue v. Illinois*,
   360 US 264 (1959) ............................................................................48

*Paucar v. Garland*
   84 F.4th 71 (2d Cir. 2023)...................................................................9

*Perkins v. Teele*,
   No. 3:15-CV-01137 (JCH), 2018 U.S. Dist. LEXIS 122117,
   2018 WL 3541864 (D. Conn. July 23, 2018).....................................32

Roberts - 472

*Poventud v. City of New York*,
  750 F.3d 121 (2d Cir. 2014) ................................................................40

*Reynolds v. Sealift, Inc.*,
  311 Fed.Appx. 422 (2d Cir. 2009) ......................................................31

*Rose v. Clark*,
  478 U.S. 570 (1986) .....................................................................49, 51

*Smith v. Arizona*,
  144 S. Ct. ..........................................................................3, 21, 25, 27

*Smith v. Arizona*,
  602 U.S. ___ ...........................................................................................25

*Strickler v. Greene*,
  527 U.S. 263 (1999) ...........................................................................39

*U.S. v. Abuhamra*,
  389 F.3d 309 (2d Cir. 2004) ...................................................28, 29, 30

*U.S. v. Autuori*
  212 F.3d 105 (2d Cir. 2000) ................................................................27

*United States v. Agurs*,
  427 U.S. 97 (1976) ...........................................................39, 42, 46, 48

*United States v. Alston*,
  899 F.3d 135 (2d Cir. 2018) ................................................................47

*United States v. Amico*,
  486 F.3d 764 (2d Cir. 2007) ....................................................54, 55, 58

*United States v. Armstrong*,
  517 U.S. 456 (1996) ...........................................................................48

*United States v. Bagley*,
  473 U.S. 667 (1985) ...........................................................................38

*United States v. Boles*,
  914 F.3d 95 (2d Cir. 2019) ...................................................................9

*United States* v. *Carlton*,
534 F.3d 97 (2d Cir. 2008)......................................................55, 59, 62

*United States v. Chemical Foundation*,
272 U.S. 1 (1926) ............................................................................48

*United States v. Christi*,
682 F.3d 138 (1st Cir. 2012) ...........................................................49

*United States v. Davis*,
836 F. App'x 754 (11th Cir. 2020) ..................................................53

*United States v. Fields*
592 F.2d 638 (2d Cir. 1978)......................................................49, 52

*United States v. Forbes*,
790 F.3d 403 (2d Cir. 2015)......................................................38, 43

*United States v. Halloran*,
821 F.3d 321 (2d Cir. 2016)..............................................................40

*United States v. Hicks*,
2024 U.S. Dist. LEXIS 7877 (W.D.N.Y 1.16.24)............................32

*United States v. Jackson*,
345 F.3d 59 (2d Cir. 2003)................................................................39

*United States v. Johnson*,
2024 U.S. App. LEXIS 22691 (2d Cir. 2024)............................25, 49

*United States v. Keith Raniere, et. al*,
1:18-cr-00204 (EDNY) ....................................................................10

*United States v. Madori*,
419 F.3d 159 (2d Cir. 2005)..............................................................10

*United States v. Mangano*,
2022 U.S. Dist. LEXIS 3048 (EDNY Jan. 6, 2022)....................48, 52

*United States v. Middlemiss*,
217 F.3d 112 (2d Cir. 2000)..............................................................25

*United States v. Morell,*
  524 F.2d 550 (2d Cir. 1975) .................................................42

*United States v. Purcell,*
  967 F. 3d 159 (2d Cir. 2020) .................................................9

*United States v. Sanchez,*
  813 F. Supp. 241 (S.D.N.Y. 1993) ...................................42

*United States v. Sessa,*
  711 F.3d 316 (2d Cir. 2013), *cert, denied,* — U.S. —,
  134 S.Ct. 353 (2013) ...........................................................9

*United States v. Thomas,*
  981 F.Supp. 2d 229 (SDNY 10.30.13) .............................40

*United States v. Wallach,*
  935 F.2d 445 (2d Cir. 1991) .............................................48

*United States v. Walters,*
  910 F.3d 11 (2d Cir. 2018) ...............................................10

*United States v. Wedd,*
  993 F.3d 104 (2d Cir. 2021) ...............................................9

*United States v. Williams,*
  2017 U.S. Dist. LEXIS 135235 (S.D.N.Y. 2017) ............52

*United States v. Wolfson,*
  413 F.2d 804 (2d Cir. 1969) .......................................22, 52

*Williams v. Keisler,*
  No. 07 CV 503 (ARR), 2007 U.S. Dist. LEXIS 117028
  (E.D.N.Y. Oct. 30, 2007) .................................................31

*Zervos v. Verizon N.Y., Inc.,*
  252 F.3d 163 (2d Cir.2001) ................................................9

**Statutes**

18 U.S.C. § 3231 ....................................................................4

18 U.S. § 3500 ...............................................................*passim*

28 U.S.C. § 445(a) .................................................................4, 24, 54, 59

28 U.S.C. § 455 ...............................................................................8, 62

28 U.S.C. § 1291 .................................................................................4

28 U.S.C. § 1746 .........................................................................*passim*

**Rules**

Federal Rules of Criminal Procedure Rule 16..................................*passim*

Federal Rules of Civil Procedure Rule 33.........................................*passim*

Federal Rules of Evidence 702.........................................................*passim*

Federal Rules of Evidence 702(b) .........................................................30

**Constitutional Provisions**

Fifth Amendment to the U.S. Constitution..........................................5, 28

Sixth Amendment to the U.S. Constitution .....................................3, 5, 24

**Other Authorities**

Dang, Quynh, *Secure Hash Standard (SHS)*, FIPS PUB 180-4, Nat'l
   Inst. of Standards & Tech. (2015) ....................................................53

New York Post .....................................................................................61

Noah Goldberg (@Noah__Goldberg)**,** *X (formerly Twitter)*
   (May 6, 2022, 10:14 AM)).
   https://x.com/Noah__Goldberg/status/1522580665899925509..................61, 62

Vanity Fair...........................................................................................61

## PRELIMINARY STATEMENT

Defendant-Appellant's (hereinafter referred to as "Mr. Raniere") Rule 33 is

based upon the post-trial findings of seven (7) independent digital forensics

experts, **including four (4) former FBI examiners**, who discovered that material

evidence was extensively falsified, with government involvement in the fraudulent

conduct:

> "[A] camera card ... and a hard drive were deliberately and
> extensively manipulated… 168 photos, including the alleged
> contraband, were planted on the hard drive... Given admitted
> government misconduct, including violating evidence protocols,
> providing evidence to unidentified and unauthorized personnel, and
> altering the original camera card, **the involvement of government
> personnel in this evidentiary fraud is inescapable – an
> unprecedented finding in our combined 150+ years of forensic
> experience.**" (A1698 ¶¶ 1-2, A1700 ¶ 8, A1703 ¶ 16) (emphasis
> added).

The camera's memory card and hard drive were the core evidence of the alleged

child pornography and sexual exploitation predicate acts, which the government

said was "at the heart of our racketeering conspiracy." (A217:14-16).

Mr. Raniere met the Rule 33 threshold for *Brady* violations and "newly

discovered evidence". The government actively concealed:

> (1) the existence and use of a second forensic image[1] of the memory card,
> secretly created during trial, which was never disclosed, despite repeated
> requests and the prosecution's assurances of full compliance with their
> statutory disclosure requirements;

---

[1] A forensic image is an exact replica of the contents of the device. (A310:7-A311:3).

(2) the intentional mishandling of the unpreserved memory card by a secret FBI photograph technician, in violation of FBI and DOJ regulations, deliberately omitted from the chain of custody, and only revealed **4 years after trial**; and

(3) falsification of the digital evidence and government involvement in this fraudulent conduct.

Some of this fraudulent conduct took place during the trial, after the government sought and obtained a prohibition against "presenting evidence or arguments concerning … alleged government misconduct in … this prosecution." (A272).

There is a high likelihood that Judge Garaufis created new precedent by crediting new government evidence and having it serve as two-thirds (⅔) of his basis for denial of the Rule 33. The evidence relied upon by the government was created post-trial solely to oppose the Rule 33 and related Motions to Compel and consisted of a report from the government's post-conviction forensic expert, FBI Senior Computer Scientist David Loveall II, and a declaration from Camila, the alleged subject of the purported underage photos. Neither testified nor were subject to cross-examination of confrontation **at any time**. The Court's reliance on this new government evidence, without a hearing, violated the fundamental constitutional protections afforded to defendants in our justice system.

Relying on Camila's hearsay declaration, which is partly contradicted by her unsworn statement at Mr. Raniere's sentencing, without her being subject to

cross examination, violates Mr. Raniere's Sixth Amendment Right of Confrontation.

Another clear abuse of the Court's discretion is its reliance on Loveall's forensic report due to its many fatal flaws. It was based on material evidence that the government and Court have refused to disclose to the defense, rendering his report a product of 'secret evidence'. Not only was Loveall never subjected to cross-examination in any capacity, but his report relied on the analysis of another FBI examiner who did not testify at all, violating the Confrontation protections established by *Smith v. Arizona* and *Bullcoming v. New Mexico*. Loveall's rebuttals did not cite to data, violating the requirements of Federal Rule of Evidence 702 and *Daubert*, and was undated, violating the requirements of 28 U.S.C. §1746.

Allowing these decisions to stand will permit the government to create new evidence and theory whole-cloth in post-conviction litigation and deprive a defendant of their rights under the Confrontation Clause and other constitutional protections.

Judge Garaufis's decision makes the unacceptable acceptable by allowing systematic, intentional government malfeasance relating to the digital evidence, involving at least eight (8) identified FBI/DOJ personnel.

Respectfully, Judge Garaufis was not the right justice to preside over these determinations. The Court erred in failing to recuse itself pursuant to 28 U.S.C. §

455(a), despite clear evidence of the appearance of "deep-seated antagonism" against Mr. Raniere and "deep-seated favoritism" towards the prosecution.

## STATEMENT OF JURISDICTION

This is a consolidated appeal from three (3) final Orders that dispose of Mr. Raniere's current claims. The District Court had subject matter jurisdiction over these actions pursuant to 18 U.S.C. § 3231 and Rule 33 of the Federal Rules of Criminal Procedure. This Court has jurisdiction over this consolidated appeal pursuant to 28 U.S.C. § 1291.

Mr. Raniere filed a timely Notice of Appeal (Doc. 1240) dated March 21, 2024 with respect to the March 7, 2024 Order (SPA12-19) denying (1) the Motion for Reconsideration (A1692-1696) of the Court's November 6, 2023 Memorandum and Order (A1680-1691) denying his first Motion to Compel Production of Evidence, and (2) a separate Motion to Compel Production of Evidence, dated December 21, 2023 (A1747-1759).

Mr. Raniere filed a timely Notice of Appeal (A1842) dated May 7, 2024 in respect to the April 29, 2024 Order (SPA20-30) denying the Rule 33, supplemental Rule 33 focusing on the *Brady* violations, and *pro se* Rule 33 (A767-808; A1197-1210; A1211-1231).

Mr. Raniere filed a timely Notice of Appeal (A1843) dated May 10, 2024 in respect to the April 26, 2023 Order (SPA1-11) denying the Motion for Judicial Disqualification pursuant to 28 U.S.C. § 445(a) (A1159-1191).

On June 13, 2024, the Second Circuit consolidated these appeals. (2nd Circuit, *US v. Raniere*, 24-1285, DktEntry 32.1)

The original deadline for the consolidated appeals was August 21, 2024. (*Id.*) However, on consent, the Second Circuit granted two motions for extension of time and set a new deadline of October 28, 2024. (2nd Circuit, *US v. Raniere*, 24-1285, DktEntry 35.1, DktEntry 37.1).

## ISSUES PRESENTED FOR REVIEW

1. Whether the District Court's substantial reliance on and crediting of new government evidence, created post-trial, from Camila and FBI Senior Computer Scientist David Loveall II, who never testified and were never subject to cross-examination, to deny the Rule 33, without a hearing, violated Mr. Raniere's Sixth Amendment right to confront witnesses?

2. Whether the District Court's crediting of Loveall's forensic report (hereinafter referred to as "Loveall Report") in denying the Rule 33:

   a. Violated Mr. Raniere's Fifth Amendment right to Due Process by allowing Loveall to rely on secret evidence, including an undisclosed

second forensic copy of the camera's memory card, which was never made available to the defense, despite repeated requests and the prosecution's assurances of full compliance with their statutory disclosure requirements?

b. Abused its discretion, due to the Loveall Report's failure to meet the admissibility standards of FRE 702 and *Daubert*?

c. Abused its discretion, due to the Loveall Report lacking a date, in violation of the requirements of 28 U.S.C. § 1746?

d. Abused its discretion, due to the Loveall Report's failure to address at least 12 key defense findings, its agreement with one of the defense's key findings, its decision not to contest another, and its blatant errors?

3. Whether the District Court abused its discretion in finding that "ample [non-digital] trial evidence", in conjunction with the post-trial Loveall Report and post-trial Camila declaration, outweighed the materiality of the 7 digital forensic experts' findings, to deny the Rule 33?

4. Whether the District Court abused its discretion in ignoring that the non-disclosure and concealment of the **second** forensic image of the memory

card constitutes both a *Brady/Giglio* violation and "newly discovered evidence" under Rule 33?

5. Whether the District Court abused its discretion in ignoring that an FBI photograph technician conducted an unauthorized access of the unpreserved memory card, deliberately omitted from the chain of custody, and revealed by the government after trial in their Consolidated Opposition, constitutes both a *Brady/Giglio* violation and "newly discovered evidence" under Rule 33?

6. Whether the District Court abused its discretion in ignoring that the 7 digital forensics experts' discovery of proof of government involvement in falsifying material evidence categorically constitutes "newly discovered evidence" under Rule 33 and a *Brady/Giglio* violation?

7. Whether the evidence of systematic and intentional government malfeasance meets the standard for dismissal of the indictment, or, separately, a reversal of the conviction due to structural error?

8. Whether the District Court abused its discretion in denying Mr. Raniere's Motions to Compel exculpatory evidence, for use in his Rule 33 Reply?

9. Whether the District Court abused its discretion in denying the Motion for Recusal, pursuant to 28 U.S.C. § 455, by:

   a. Erroneously applying the standard set forth in *Liteky* for post-trial judicial comments to comments made during trial?

   b. Failing to acknowledge that its comments both in the presence and absence of the jury evinced a "deep-seated antagonism" against Mr. Raniere?

   c. Failing to acknowledge that its reason for terminating cross-examination of a key government cooperating witness was to prevent the jury from hearing testimony favorable to the defense?

   d. Failing to acknowledge that its post-trial comments during a restitution hearing evinced "deep-seated antagonism" towards Mr. Raniere?

All should be answered in the affirmative.

8

## STANDARD OF REVIEW

The Second Circuit reviews a District Court's denial of a Rule 33, a Motion to Compel, and a Motion for Judicial Disqualification for abuse of discretion. *See United States v. Sessa,* 711 F.3d 316, 321 (2d Cir. 2013), *cert, denied,* —— U.S. —— ——, 134 S.Ct. 353 (2013); *United States v. Boles*, 914 F.3d 95, 109 (2d Cir. 2019); *United States v. Wedd*, 993 F.3d 104, 114 (2d Cir. 2021).

"A district court 'abuses' or 'exceeds' the discretion accorded to it when (1) its decision rests on an error of law (such as application of the wrong legal principle) or a clearly erroneous factual finding, or (2) its decision—though not necessarily the product of a legal error or a clearly erroneous factual finding— cannot be located within the range of permissible decisions." *Zervos v. Verizon N.Y., Inc.,* 252 F.3d 163, 169 (2d Cir.2001) (footnotes omitted).

Issues 1, 2(a), 3, 4, 5, 6, 7, 8, and 9(a) are presented for *de novo* review. Issues 2(b) - (d) and 9(b) - (d) are presented for abuse of discretion review.

As to an error of law, the Second Circuit "review[s] constitutional claims and questions of law *de novo*." *Paucar v. Garland* 84 F.4th 71, 80 (2d Cir. 2023).

This Court reviews challenges to the sufficiency of the evidence underlying criminal convictions *de novo*. *United States v. Purcell*, 967 F. 3d 159, 185 (2d Cir. 2020).

Materiality in the context of an alleged *Brady* violation presents a mixed question of law and fact and is reviewed *de novo* by this Court. See *United States v. Madori*, 419 F.3d 159, 169 (2d Cir. 2005) (citations omitted).

This Court reviews the denial of a motion to dismiss an indictment on grounds of government misconduct *de novo*. *See United States v. Walters,* 910 F.3d 11, 22 (2d Cir. 2018).

## STATEMENT OF CASE

This is a consolidated appeal from post-conviction Memorandum & Orders by The Hon. Judge Nicholas G. Garaufis, USDJ (hereinafter referred to as "Judge Garaufis" and "the Court") in *United States v. Keith Raniere, et. al,* 1:18-cr-00204, (EDNY) in which he denied without a hearing Mr. Raniere's First and Second Motion to Compel Production of Evidence and Motion for Reconsideration (hereinafter jointly referred to as "Motions to Compel") (SPA12-19), Final Rule 33 Motion for a New Trial and its Supplement (hereinafter referred to as "Rule 33") (SPA20-30), and Motion for Recusal (SPA1-11).

### 1. Before Trial

On February 21, 2019, nine (9) weeks before the trial was set to begin, FBI agents made an 'accidental' discovery on a seized Western Digital hard drive (hereinafter referred to as the "hard drive") of alleged child pornography involving a single subject, Camila. (SPA22). The files were outside the date range authorized

by the search warrant. This accidental discovery transformed a case about adult conduct into one centering on child exploitation. It led to a second superseding indictment on March 13, 2019, adding two (2) predicate acts of sexual exploitation, for alleged production of the photos, and one predicate act of possession of the photos on the hard drive (hereinafter referred to as "child predicate acts"). (A192-193). The prosecution stated that these charges were "at the heart of our racketeering conspiracy." (A217:14-16).

Pre-trial, the defense requested inspection of all digital evidence which supported these predicate acts (A243:10-15, A265 ¶ 4, A419:5-9). The hard drive was the only piece of digital evidence the prosecution disclosed it would rely on to support the child predicate acts. (Doc. 362, A220-230; A232-264). On April 4, 2019, the prosecution pressed the defense to declare it would be ready for trial. The defense stated that it would be ready, noting that the prosecution had been "accommodating and responsive", as they had made *the hard drive* available to the defense for its expert to analyze (A243:6-A244:2).

However, on April 24, 2019, during the third day of jury selection, the prosecution disclosed a forensic report about a different piece of digital evidence, *a camera's memory card*, by CART Examiner Stephen Flatley (hereinafter referred to as "Flatley"). (A776, 1089). This was the first indication of the government's reliance on the camera's memory card.

## 2. At Trial

On May 4, 2019, three (3) days prior to opening statements, the Court issued its ruling on the motions *in limine*, ordering, "Raniere is prohibited from presenting evidence or arguments concerning… **alleged government misconduct** in … this prosecution". (A272). (emphasis added).

At trial, the child pornography and sexual exploitation predicate acts centered on the digital evidence: a Canon camera (hereinafter referred to as the "camera"), its memory card, and the hard drive, all seized from 8 Hale Drive, a townhouse Mr. Raniere used. (A774). The government's theory at trial was that Mr. Raniere took illicit photographs of a singular underage subject on two (2) dates in 2005[2] with the camera, which stored photographs on its memory card, and the photographs were backed up to the hard drive, where the FBI reported discovering them. (A525:9-A529:24).

Camila, the subject of the alleged underage photographs, did not testify at trial. The photographs were not obviously contraband but were argued to be such,

---

[2] The prosecution had an ever-shifting number of alleged illicit photographs. Before trial, it was "approximately 15" photos. (A226). During trial, it was "18 or so images". (A391:7-9). After trial, it was "at least nine". (A1573).

based upon allegedly being taken in 2005, when she would have been fifteen (15), using the camera[3]. (A528:22-A529:24; A530:17-23).[4]

The 2005 timing was derived from information in the photographs, called EXIF metadata, which is generated by a camera on capture. (A346:18-A347:20). FBI Senior Forensic Examiner Brian Booth (hereinafter referred to as "Booth"), who analyzed the hard drive, testified that EXIF metadata is difficult to modify and "purposely designed" to be that way. Booth affirmed it is the "best evidence" of when the photographs were taken and that the EXIF metadata dates indicated the photos were taken in 2005. (A349:12-4; A359:3-11; A404:7-11). In summation, lead prosecutor AUSA Moira Kim Penza (hereinafter referred to as "AUSA Penza") reiterated this by stating:

> [T]he photographs were taken in 2005 because that's what the data shows… Booth testified that **the most reliable metadata that the FBI could obtain from the images on the Western digital hard drive, said that they were taken… on November 2, 2005 … [and] November 24, 2005.**[5]

---

[3] That specific camera was necessary to establish an element of production. Neither of the witnesses who were photographed, **as adults**, by Mr. Raniere identified the camera as the one used to photograph them. Camila did not identify that camera in her post-trial declaration.

[4] Camila's sister Daniela testified that Camila underwent an appendectomy in 2007, and was asked, "[I]f you saw an image of Camila where there is no scar on her abdomen, would you know how old she was?" to which Daniela answered, "She would be 16 years or younger." (A295:11-20; A298:24-A299:3) According to the testimony of Special Agent Michael Weniger, no appendectomy scar was visible in the photographs. (A516:6-A517:8). There are photographs of Camila as an adult where sometimes the scar is not visible, as presented in Mr. Raniere's *pro se* Rule 33. (A1335 ¶ 6).

[5] It should be noted that Camila, in her post-trial declaration, claimed that there was only one (1) single photo session in 2005, "no more than 2-3 months after September 18, 2005." (A1592 ¶ 8).

(A529:16-24) (emphasis added).

The defense discovered post-trial that Flatley, who did not testify in this case, testified in a prior case that **metadata creation dates are unreliable and easily altered**. (A1512-1520, 1826).

Five (5) weeks into the six (6) week trial and prior to testimony about the digital evidence, Flatley, who examined the camera and memory card, was suddenly sent to Ghana. Flatley created a forensic image of the memory card before trial, and Booth was substituted as a trial witness to testify about the forensic analysis of the camera and its memory card. (A510:1-16). At trial, the prosecution introduced a "Replacement" report from Booth regarding the memory card. Booth's report, disclosed two (2) days before the close of testimony, showed that the memory card contained photo files that corroborated the 2005 dates of the purported contraband and linked the photographs to the camera tied to Mr. Raniere. (A1006-1007, A1029-1033; A530:17-A531:1).

The prosecution elicited testimony supporting that the camera, containing the memory card, was properly handled in accordance with FBI protocol. Special Agent Christopher Mills (hereinafter referred to as "Mills") testified that FBI protocol, which requires the involvement of the Computer Analysis Response Team (hereinafter referred to as "CART") to review original digital evidence, was

adhered to with the handling of the camera. (A304:8-18)[6]. Four (4) years after trial, the prosecution's footnote revealed that the protocol was **not** followed for the camera and its memory card, as it was accessed outside of CART. (A1579 at n.6).

Booth, a CART member, explained that CART's role is to "protect and process" digital evidence; this involves creating a "forensic image," which is an extraction of the device's data. (A308:2-8; A310:3-A311:2). Booth testified that CART protocol allows for **only one (1) forensic image per device** and that all evidence review and analysis is conducted based on that image. (A311:21-A312:19. The prosecution did not disclose that Booth's "Replacement" report was derived from **a second forensic image**, which he created, a violation of FBI protocol, the existence of which was discovered by the defense post-trial. (A1006-1007, 1038-1039).

During cross-examination of Booth regarding his examination of the camera and memory card, Assistant U.S. Attorney Tanya Hajjar (hereinafter referred to as "AUSA Hajjar") requested a sidebar and represented that Booth did not create any forensic images. (A414:3-A416:4). During it, AUSA Hajjar admitted that they had not disclosed the CART examination notes. In response, the defense reiterated its

---

[6] Three (3) days after Mills' testimony, and the day before the close of testimony, Booth confirmed that an access without a write blocker occurred prior to delivery to CART.

request for all Rule 16 and 3500 materials. (A417:17-24; A417:25-4895:3; A418:16-22).

### 3. Post-Trial Discoveries of Digital Evidence Falsification

Mr. Raniere, in weighing his right to exercise his post-conviction challenges, retained Dr. James Richard Kiper, Ph.D. (hereinafter referred to as "Dr. Kiper"), a retired FBI Special Agent, Forensic Examiner, and "a trainer of forensic examiners, and a trainer of other trainers of forensic examiners," to analyze the digital evidence. (A1003). Based on his specialized knowledge of FBI procedure, Dr. Kiper deduced from details in Booth's report and notes that Booth's report was based on a **second** forensic image of the memory card, which Booth had created on June 11, 2019, violating the very protocol Booth testified to. Dr. Kiper also noted that creating a second forensic image is **strictly prohibited by the FBI**. (A1038).

Dr. Kiper uncovered that Booth's report contained thirty-seven (37) photo files not listed in Flatley's report and that the metadata of several of these photo files had been intentionally manipulated. (A1004-1005). He concluded that there was a "high likelihood" that **all 37 photo files were planted on the memory card in FBI custody**, between the creation of the first and second forensic images. (A1036-1037).

Notably, Dr. Kiper, during his 20 years in the FBI, "never observed or claimed that an FBI employee tampered with evidence, digital or otherwise." (A1003).

Dr. Kiper determined that the alleged contraband, as well as the other photos on the hard drive, had been manually planted there, and that timestamps and folder names had been intentionally manipulated, "happen[ing] to align with the government's narrative." (*Id.*). All of Dr. Kiper's technical findings and conclusions of digital evidence falsification were independently verified and agreed with by six (6) additional forensic experts, including three (3) fellow former FBI CART examiners. (A1074-1087, A1097-1104, A1371-1556).

On March 16, 2022, prior to filing the Rule 33, Mr. Raniere, through counsel, requested the second forensic image from the prosecution. (A1143-1154). On March 18, 2022, AUSA Hajjar responded that the prosecution had "fully complied" with its obligations under *Brady*, Rule 16, and 3500. (*Id.*) Prior to trial, the prosecution made multiple representations about their compliance. (A1749-1752; A1780-1782).

On May 3, 2022, Mr. Raniere filed the Rule 33. (A767-808). Thereafter, with the Court's permission, Mr. Raniere filed a supplemental Rule 33, which focused on *Brady* violations. (A1197-1210). On June 21, 2022, Mr. Raniere filed a

*pro se* Rule 33. (A1211-1231). On April 14, 2023, Mr. Raniere filed a Motion to

Compel, seeking access to the second forensic image. (A1358-1556).

### 4. Government's Consolidated Opposition

The government submitted a Consolidated Opposition to Mr. Raniere's Rule

33 and Motion to Compel, denying that evidence manipulation occurred. (A1568-

1589).

To support its contentions, the prosecution submitted a forensic report from

Loveall, who was not involved in the investigation or prosecution of Mr. Raniere.

(A1618-1625). Loveall was given access to the second forensic image, and his

report, which was undated in violation of 28 U.S.C. 1746, was created solely for

the purpose of opposing the Rule 33 (A1618, A1621-1622 ¶ 9).

In his report, Loveall included rebuttals to five (5) of the seven (7) technical

findings by Dr. Kiper. (A1619 ¶ 5, A1619-1620 ¶ 6, A1620-1621 ¶ 7, A1621 ¶ 8,

A1621-A1622 ¶ 9, A1622 ¶¶ 11-12, A1622-1623 ¶ 13, A1623 ¶¶ 14-15, A1623-

1624 ¶17, A1624-1625 ¶18). Of the remaining two (2) findings, he chose not to

contest one (1) finding (A1623 ¶ 16), and agreed with the other, that the memory

card was accessed on September 19, 2018[7] without a 'write blocker,' a tool meant

---

[7] The defense was aware of this improper September 19, 2018 access at trial. (A492:6-A496:12).
Dr. Kiper included this fact as one of several findings which supported his conclusion of
intentional evidence manipulation. (A1007-1008).

to prevent alterations to the digital evidence. (A1622 ¶ 10). The Loveall Report

only addressed a subset of Dr. Kiper's findings and did not address the 6 other

digital forensics experts' reports.

Over 4 years after trial, the prosecution disclosed for the first time, in two

parts,[8] that an unidentified FBI "photograph technician" was the individual who

improperly accessed the camera's memory card on September 19, 2018, which was

before it was delivered to CART for processing, violating FBI protocol. (A1579 at

n.6). No such person was listed on the chain of custody or previously disclosed.

(A1233-A1235).

The prosecution also included a post-trial declaration from Camila. (A1591-

1593). In it, Camila asserted that she was 15 in the photos and that they were taken

by Mr. Raniere. (*Id*). Prior to the creation of this declaration, Camila was awarded

$507,997.45 in restitution. (A1821).

### 5. Defense's Reply to the Rule 33

In its Reply, the defense included a joint report from the 7 digital forensics

experts which provided refutations for each of Loveall's rebuttals, identified errors

in his report, and included additional findings of data falsification on the memory

---

[8] In their Consolidated Opposition, the prosecution disclosed the existence of the "photograph technician." (A1579 at n.6). Five (5) months later, in their Opposition to the Second Motion to Compel, the prosecution identified the same individual as an **FBI** photograph technician. (Doc. 1231 at 1).

card, such as the planting of photo files and manual editing of timestamps, which were uncovered during the process of responding to Loveall. (A1698-1727). This report was also included in the Motion for Reconsideration. (A1694).

### 6. The Court's Denials

First, the Court denied the Motion for Recusal. (SPA1-11). The Court then denied, without a hearing, the Motion to Compel, its subsequent Motion for Reconsideration, and a Second Motion to Compel seeking information about the newly disclosed FBI photograph technician. (A1680-1691, SPA12-19). It credited the Loveall Report's rebuttals as more "plausible" than Dr. Kiper's findings, relied on Camila's post-trial declaration, and pointed to the so-called 'ample trial evidence' supporting the jury verdict. Thereafter, in denying the Rule 33 without a hearing, the Court reiterated this reasoning and found no newly discovered evidence or *Brady* violations. (A1840).

## SUMMARY OF THE ARGUMENT

### I. Denial of the Rule 33

The Court's finding that "Mr. Raniere seeks to have a new trial to challenge evidence … that he had the opportunity to challenge, and did in fact challenge during his trial" is patently wrong. (SPA27-28). Mr. Raniere is not seeking a second bite at the apple. There are clear *Brady/Giglio* violations and "newly discovered evidence" which the Court abused its discretion in not crediting: 1) the

second forensic image of the memory card, 2) the secret FBI photograph

technician, and 3) the 7 digital forensics experts' proof of government involvement

in the falsification of the digital evidence used to introduce and support the child

predicate acts. Each of these were actively concealed by the government.

The Court's conclusion that the defense's evidence would not "likely lead to

an acquittal" is flawed. It failed to apply the *Brady* standard for Rule 33 review, a

less strict standard, despite the defense identifying *Brady* violations.

The Court erroneously credited new government evidence, created post-trial,

serving as its primary basis for the Rule 33 denial. Put simply, Judge Garaufis'

reliance upon Camila's declaration and the Loveall Report violates the

Confrontation Clause. Neither testified before the jury and were never subject to

cross examination yet the Court credited their testimonial statements as proof of

the truth of the matters they asserted. *See Smith v. Arizona*, 144 S. Ct. 1785, 1792

(2024) (quoting *Anderson v. United States*, 417 U.S. 211, 219 (1974)). The Loveall

Report does not comply with *Daubert*, FRE 702, and 28 U.S.C. § 1746.

The government should not be permitted to claim that there is no "newly

discovered evidence" when they indisputably created new evidence post-trial and

disclosed previously concealed information to the defense for the first time, and

then used it to oppose Mr. Raniere's Rule 33 and Motions to Compel.

Finally, the Court fails to recognize that the 7 digital forensics experts'
conclusion that the hard drive and camera's memory card were falsified is fatal to
the child predicate acts, independent of any so-called other 'ample trial evidence.'
The Court's refusal to order a hearing, despite the unanimous determination by **4
former members of the FBI digital forensics unit** regarding unprecedented
government malfeasance, and the Court's reliance on new unscrutinized evidence
created post-trial by the prosecution shocks the conscience.

## II. Denial of the Motions to Compel

A District Court has broad discretion to fashion discovery mechanisms
suitable to the case before it. According to the Supreme Court, "where specific
allegations before the court show reason to believe that the petitioner may... be
able to demonstrate that he is" entitled to a new trial, "it is the duty of the court to
provide the necessary facilities and procedures for an adequate inquiry." *Harris v.
Nelson,* 394 U.S. 286, 299 (1969); *see also United States v. Wolfson*, 413 F.2d 804,
808 (2d Cir. 1969) (in dictum, suggesting that *Harris* applies to Rule 33 motions).

The Court erroneously concluded there was no "reasonable probability" that
testing the requested evidence, including the 2 forensic images of the memory
card, would prove Mr. Raniere's innocence. However, this conclusion is based on
the same three (3) flawed factors: 1) the Loveall Report, 2) Camila's post-trial
declaration, and 3) 'ample trial evidence.' Permitting the defense to test the

forensic images would further prove digital falsification. It would also confirm

whether 37 specific photo files are present only on the second forensic image,

which Dr. Kiper concluded a high likelihood of. If true, this would prove they were

planted on the memory card in FBI custody during the months between the

creation of the 2 forensic images. This finding would entitle Mr. Raniere to a new

trial, if not a dismissal.

Finally, the Court failed to recognize that Loveall used both the concealed

second forensic image and the first forensic image[9] to make new, material claims

opposing the Rule 33. The defense needed access to both forensic images to

competently respond to these claims. In a circular way, the Court used the Loveall

Report to deny the defense access to evidence needed to challenge it, and then

relied on that report to deny the Rule 33.

## III.    Denial of Recusal

The District Court abused its discretion in denying Mr. Raniere's motion for

recusal by misapplying the standard in *Liteky v. United States*. The Court

incorrectly relied on *Liteky* to justify its denial; as *Liteky* stands for the proposition

that recusal is not warranted where "upon completion of the evidence, [a Judge is]

exceedingly ill disposed towards the defendant". However, the comments in

question occurred early in the trial, during ongoing evidence, before a

---

[9] The first forensic image was first known to the defense on the third day of jury selection.

determination of guilt. Judge Garaufis's comments revealed that the Court's termination of cross-examination of a key government witness was based upon preconceived notions of Mr. Raniere's guilt and an effort to protect the government's case; demonstrating "deep-seated favoritism" towards the prosecution. Further, the Court's exchange with defense counsel during the restitution hearing highlighted its "deep-seated antagonism" incompatible with judicial impartiality. These incidents show bias, warranting recusal pursuant to 28 U.S.C. § 455(a) to ensure a fair evaluation of Mr. Raniere's post-conviction motions.

## ARGUMENT

I. **Whether the District Court Abused Its Discretion in Denying the Rule 33 by Substantially Relying Upon and Crediting New Government Evidence, Created Post-Trial, from Individuals Who Were Never Subject to Cross-Examination, Violating Mr. Raniere's Sixth Amendment Right of Confrontation**

### A. Applicable Law

Under *Crawford v. Washington,* 541 U.S. 36 (2004), a witness's testimony against a defendant is inadmissible unless the witness appears at trial or, if the witness is unavailable, the defendant had a prior opportunity for cross-examination. This principle was further extended in *Melendez-Diaz v. Massachusetts*, 557 U.S. 305 (2009), where the Court held that affidavits reporting the results of forensic analysis are testimonial, requiring the analyst who prepared

the report to testify in person. *See also Bullcoming v. New Mexico*, 564 U.S. 647 (2011.

In *Smith v. Arizona*, 602 U.S. ___; 144 S. Ct. 1785, 1791 (2024), The Supreme Court held that "a prosecutor cannot introduce an absent laboratory analyst's testimonial out-of-court statements to prove the results of forensic testing", thereby implicating the Confrontation Clause. *See also United States v. Johnson*, 2024 U.S. App. LEXIS 22691, at *34 (2d Cir. 2024).

Pursuant to this Court's precedent, a district court faced with a Rule 33 motion must be careful to consider any reliable **trial evidence**[10] as a whole, rather than on a piecemeal basis. *See, e.g.*, *United States v. Middlemiss*, 217 F.3d 112, 117 (2d Cir. 2000) (emphasis added). An analysis of trial evidence is a required aspect of the analysis, not post-trial evidence created by the government, which forms ⅔ of Judge Garaufis' basis for his denial of the Rule 33 and related Motions to Compel. (SPA15, SPA29).

### B. Analysis

Defendants have fewer rights in post-conviction proceedings, given the existence of evidence previously subjected to an adversarial process. **Here, Mr.**

---

[10] If this Court finds a structural error occurred, or that an evidentiary hearing is necessary to make this determination, as discussed in Section VII, the trial evidence cannot be considered "reliable."

**Raniere's case is unique because the Court relied on, and credited, new government evidence, created post-trial.** Since the government's newly created evidence was never subject to an adversarial process, nor presented for the jury's scrutiny, the Court should not have made a credibility determination.

The Court credited the post-trial declaration of Camila, despite its hearsay, for the truth of her assertion that she was 15 years old in the photographs. Yet while the Court acknowledged that Camila never testified at trial[11] (SPA24), it went on to fully credit the declaration as one-third (⅓) of its reasons for denial. Moreover, in assessing the declaration's credibility, the Court failed to discuss the fact that Camila had previously been awarded $507,997.45 in restitution, a material factor potentially impacting her motives. (A1821).

The Court also failed to consider critical inconsistencies in her declaration, raised in the Rule 33 Reply. (A1821-1822). In it, Camila claims there was only a single photo session in 2005 and claims certainty of the timing because "it was the only time he took photographs of me like that." (A1592 ¶ 8, A1593 ¶ 10). Yet, this is contradicted by her statement at sentencing, when she alleged multiple photo sessions at age 15. (Sentencing Hearing T. (10/27/20) at 21: 7-13). The

---

[11] Neil Glazer, a civil attorney who represented Daniela, Camila's sister, and other testifying government fact witnesses, wrote in a pre-trial email, "Cami has been interviewed... the fact is they don't need her testimony to prosecute and convict Raniere... Moira [AUSA Penza] told me, and this is a quote, '**we have all the evidence we need.**'" (A1330) (emphasis added).

government's theory, presented at trial and based on the EXIF dates, claimed **2** photo sessions on precise dates in 2005, further casting doubt on the veracity of Camila's declaration.

The Court relied on the Loveall Report for the truth of whether digital evidence falsification occurred. The Loveall Report relied on Flatley's analysis, specifically the settings[12] he used to generate his report, to make material assertions. (A1621-1622 ¶ 9). Neither Flatley nor Loveall testified in the case, and Loveall had no involvement in the prosecution of Mr. Raniere. (A1618 ¶ 2). **This set of circumstances is the exact harm sought to be prevented** under *Bullcoming v. New Mexico*, and *Smith v. Arizona*, which require that the analyst responsible for the original analysis testify in court.

If this had occurred during trial, not taking testimony from Camila, Loveall, or Flatley would be a clear violation of the Confrontation Clause. By crediting the truthfulness of this new government evidence, the Court usurped the jury's role in assessing witness credibility. As noted in *U.S. v. Autuori*, 212 F.3d 105, 120 (2d Cir. 2000): "the court may weigh the evidence and credibility of witnesses... At the same time, the court may not wholly usurp the jury's role. It is only where exceptional circumstances can be demonstrated that the trial judge may intrude

---

[12] The defense was not provided these settings; they are not a part of Flatley's report.

upon the jury function of credibility assessment." No such exceptional circumstances exist here.

Respectfully, the Confrontation Clause protections must apply here given that the government introduced unconfronted post-trial evidence from new witnesses, effectively presenting a different case than at trial and bolstering it. The Court used this new **post-trial** government evidence to justify why the defense's newly discovered evidence would not have changed the **trial** outcome. This logical fallacy created by the Court's erroneous Rule 33 analysis is precisely why this Court must intervene.

## II. The District Court Abused Its Discretion in Crediting Loveall to Deny the Rule 33

### A. Loveall's Report Was Based Upon Secret Evidence, Violating Mr. Raniere's Fifth Amendment Due Process Rights

#### 1. Applicable Law

The practice of the government utilizing undisclosed evidence is a violation of due process. In *U.S. v. Abuhamra*, this Court held that the district court's reliance on *ex parte* information provided by the government, during a post-conviction bail hearing, which was not disclosed to the defense, violated due process. *U.S. v. Abuhamra*, 389 F.3d 309, 322 (2d Cir. 2004). The *Abuhamra* Court also opined:

> "Although a defendant who has been found guilty at trial retains only a modest conditional expectation of continued liberty…

neither the defendant nor the public would be well served by having determinations that so immediately affect even this reduced interest routinely made in closed proceedings or on secret evidence." *Id. at* 324.

### 2. Analysis

Loveall used both images in his analysis and made material assertions about them. (A1621-1622 ¶ 9). The government has refused defense access to these same materials.[13] To verify or challenge Loveall's critical claim that the 2 forensic images are "identical"[14] and thus 37 photo files were not planted in FBI custody, the defense must have access to both forensic images. Additionally, Loveall relied on Flatley's report settings, which are not listed in his report, to assert that the 37 photo files on the second forensic image do not appear in Flatley's report of the first forensic image due to different settings.

The only time the Court addressed Mr. Raniere's reliance on *Abuhamra* was in denying the Second Motion to Compel, opining "*Abuhamra* is thus inapplicable to this case where the court did not rely on arguments presented *ex parte* or *in camera* and does not concern access to information relevant to a party's bail application." (SPA16). However, the Court relied on secret evidence to adjudicate the Rule 33, violating due process. The Rule 33 and *Abuhamra* both deal with

---

[13] The defense was aware of the **first** forensic image at trial.

[14] The literal interpretation of Loveall's assertion is that the forensic image of the **camera** is identical to the forensic image of the **memory card**, which is false and impossible, as discussed in Section II(E)

secret evidence within a post-conviction proceeding. Yet in the Rule 33, the liberty interest impacted is greater, as is the level of secrecy. *Abuhamra* dealt with a defendant's post-conviction bail hearing while awaiting sentencing, whereas a Rule 33 entails the possibility of a new trial. While *Abuhamra* dealt with *ex parte* evidence, the Rule 33 deals with secret evidence.

This Court must avoid a ruling that makes it acceptable for district courts to rely on secret government evidence to deny a Rule 33.

### B. Loveall's Report Failed to Meet the Admissibility Standards of FRE 702 and *Daubert*

#### 1. Applicable Law

Under *Daubert*, the judge must ensure that an expert's testimony rests on a reliable foundation and is relevant. *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 580 (1993). It is an abuse of discretion to admit expert testimony based on speculative assumptions. *Boucher v. U.S. Suzuki Motor Corp.*, 73 F.3d 18, 22 (2d Cir. 1996). "[W]hen an expert opinion is based on data, a methodology, or studies that are simply inadequate to support the conclusions reached, *Daubert* and Rule 702 mandate [its] exclusion". *Amorgianos v. National R.R. Passenger Corp.* 303 F.3d 256, 266 (2d Cir. 2002). Expert testimony must be "based on sufficient facts or data." FRE 702(b).

## 2. Analysis

Loveall's rebuttals of Dr. Kiper's technical findings are speculative and

outright lack data. (A1619 ¶ 5, A1619-1620 ¶ 6, A1620-1621 ¶ 7, A1621 ¶ 8,

A1621-A1622 ¶ 9, A1622 ¶¶ 11-12, A1622-1623 ¶ 13, A1623 ¶¶ 14-15, A1623-

1624 ¶17, A1624-1625 ¶18, A1699 ¶ 4(d); A1824). Loveall's conclusions rest on

conjecture, unverified assertions and are unsupported by sufficient facts or data. As

such, the Loveall Report fails to meet the reliability and evidentiary requirements

set forth in *Daubert* and FRE 702. This Court must avoid a ruling that violates this

Supreme Court precedent and the FRE.

### C. Loveall's Report Failed to Meet the Statutory Requirements of 28 U.S.C. § 1746

#### 1. Applicable Law

Under 28 U.S.C. § 1746, an unsworn declaration must be "dated" to be

valid. Failure to date an unsworn declaration is "technical noncompliance." *Dilonez

v. Fox Linen Serv. Inc.*, 35 F. Supp. 3d 247, 253 (E.D.N.Y. 2014). This Court has

upheld exclusion of undated affidavits. *See Reynolds v. Sealift, Inc.*, 311 Fed.Appx.

422, 425 (2d Cir. 2009). The District Courts of the Second Circuit, including The

Eastern District of New York:

> "have routinely exercised their discretion against admitting
> undated, unsworn declarations into evidence. See, e.g., *Mendez v.
> MCSS Rest. Corp*., 564 F. Supp. 3d 195, 209 (E.D.N.Y. 2021)
> (declining to accept plaintiff's undated, unsworn declaration);
> *Williams v. Keisler*, … 2007 U.S. Dist. LEXIS 117028 at *4

(E.D.N.Y. Oct. 30, 2007) ("The document is not actually an affidavit, since it is unsworn, and is not admissible as an unsworn declaration because it is undated."); *Perkins v. Teele*, ... 2018 U.S. Dist. LEXIS 122117 ... at *2 n.3 (D. Conn. July 23, 2018) (disregarding an undated, unsworn declaration)". *United States v. Hicks*, 2024 U.S. Dist. LEXIS 7877, at *10 - 12 (W.D.N.Y 1.16.24).

Other Circuits have also deemed undated declarations inadmissible. *See, e.g., Flovac, Inc. v. Airvac, Inc.*, 817 F.3d 849, 854 n.2 (1st Cir. 2016); *Bonds v. Cox*, 20 F.3d 697, 702 (6th Cir. 1995).

## 2. Analysis

The Loveall Report is undated, making it inadmissible, technically non-compliant, and invalid. (A1618, A1825). The Court abused its discretion in crediting and relying upon it.

### D. Loveall's Report Failed to Refute the 7 Digital Forensics Experts' Findings

The Court's claim that "Loveall's explanations... thoroughly refute Kiper's key findings" is incorrect. (SPA29, citing to A1682-1683). Of Dr. Kiper's 7 technical findings, Loveall only provided speculative rebuttals to five (5) of them; the 7 digital forensics experts refuted these 5 in their joint response. (A1619 ¶ 5, A1619-1620 ¶ 6, A1620-1621 ¶ 7, A1621 ¶ 8, A1621-A1622 ¶ 9, A1622 ¶¶ 11-12, A1622-1623 ¶ 13, A1623 ¶¶ 14-15, A1623-1624 ¶17, A1624-1625 ¶18, A1699 - A1703). The prosecution and Loveall had the opportunity to contest at least **12** other significant defense findings and failed to do so. In their Opposition to the

Rule 33, they opposed only Dr. Kiper's findings, in part, and none of the other

experts' findings. In their Opposition to the Motion for Reconsideration, they

failed to contest the 7 digital forensic experts' joint report. Thus, and as

summarized below, the Loveall Report was hardly a "thorough refutation":

| Defense Finding | Loveall / Government's Response |
|---|---|
| Mills committed perjury by testifying that the camera was handled in compliance with FBI protocol. (A1206). | **Uncontested.** |
| Booth committed perjury regarding the reliability of EXIF metadata and that receiving unsealed evidence is not extraordinary. (A1037-1039). | **Uncontested.** |
| SAs Lever and Maegan Rees each reviewed the unpreserved camera and memory card, for a total of 24 days, before it had been sent to CART, violating FBI procedure. (A1035-1036). | **Uncontested.** |
| The USAO was provided the original, unpreserved memory card, which is prohibited by FBI protocol. (A1383). | **Uncontested.** |
| An unauthorized forensic exam was done on the unpreserved memory card on 9/19/18, 5 months before it was delivered to CART. (A1383). | **Uncontested.** |
| Booth created a second forensic image of the memory card, in violation of FBI procedure. (A1006-1007, A1038-1039). | **Uncontested.** |

| | |
|---|---|
| Booth's receipt of the memory card from Mills in an unsealed bag violated FBI procedure. (A1034). | **Uncontested.** |
| Photos 81-100 on the memory card were planted by a computer with manually edited creation dates, falsely supporting the 2005 timeframe. (A1703 ¶ 15(a), A1707-1709). | **Uncontested.** This was submitted in the Motion for Reconsideration and the government did not address it in their Opposition.[15] |
| Photos 224-243 on the memory card were planted by a computer with manually edited creation dates, falsely supporting the 2005 timeframe. (A1703 ¶ 15(b), A1709-1711). | **Uncontested.** This was submitted in the Motion for Reconsideration and the government did not address it in their Opposition.[16] |
| A computer was used to manually edit the last accessed dates of Photos 21-42, falsely supporting the 2005 timeframe. (A1703 ¶ 15(c), A1711-1713). | **Uncontested.** This was submitted in the Motion for Reconsideration and the government did not address it in their Opposition.[17] |
| A computer was used to manually edit the last accessed dates of Photos 193-199, falsely supporting the 2005 timeframe. (A1703 ¶ 15(d), Bates 17-18). | **Uncontested.** This was submitted in the Motion for Reconsideration and the government did not address it in their Opposition.[18] |
| Folder names on the hard drive were intentionally manipulated, falsely supporting the 2005 timeframe. (A1009-1010, 1378-1379). | **Loveall responded but did not contest**. (A1623 ¶ 16). |
| The 168 photos, including the alleged contraband, were **manually planted on the hard drive** and disguised to appear as if they were automatically backed up by a computer in 2009. (A1011-1012, | Rebutted defense's finding without proof and their rebuttal is demonstrably false. (A1623-1624 ¶ 17, A1624-1624 ¶18, A1700 ¶ 8). |

---

[15] This defense finding was also included in the Reply to the Rule 33, not in the original findings Loveall reviewed.

[16] *See* footnote 14.

[17] *See* footnote 14.

[18] *See* footnote 14.

| A1379, A1448-1451). | |
|---|---|
| Photos 93-97 on the memory card had their metadata intentionally manipulated. (A1004-1005, A1437-1439). | Rebutted defense's finding without proof and their rebuttal is demonstrably false. (A1619 ¶ 5, A1619-1620 ¶ 6, A1620-1621 ¶ 7, A1621 ¶ 8, A1702 ¶ 14). |
| 37 photo files, with "high likelihood", were planted on the memory card in FBI custody, between 4/11/19 and 6/11/19. (A1036-1037). | Rebutted defense's finding without proof and is unverifiable by the defense without access to the forensic images. (A1621-1622 ¶ 9, A1702 at n.1). |
| Timestamps of at least 12 photos on the hard drive were intentionally manipulated to falsely support the 2005 timeframe. (A1008-1009; A1378-1379). | Rebutted defense's finding without proof and their rebuttal is demonstrably false. (A1622 ¶¶ 11-12, A1622-A1623 ¶ 13, A1623 ¶¶ 14-15, A1701 ¶¶ 9-10). |
| Memory card altered on 9/19/18 in FBI custody. (A1007-1008). | **Agreed.** (A1622 ¶ 10). |

The Court's denial renders the above uncontested findings of government misconduct and data falsification as acceptable.

### E. Loveall's Report Contained Indisputable Errors

The Court ignored false assertions made by Loveall that undermine the credibility of his report. For example, Loveall wrote:

> "The fact that additional files appeared in one report [of the memory card] is a result of the use of different settings. I have examined the disk images [forensic copies] created of 1B15 and 1B15a and determined that they are identical." (A1621-1622 ¶ 9).

To a layperson, this statement appears as though Loveall is confirming that the 2 forensic images of the memory card are "identical." However, he is actually stating

that a forensic image of the *camera* (1B15) is identical to a forensic image of the *memory card* (1B15a). This is technically impossible and false, as they are 2 distinct devices. (A1699 ¶ 4(b), A1702 ¶ 12).

Additionally, in opposing Dr. Kiper's finding that the photos were planted on the hard drive, Loveall wrote, "I procured a Dell Dimension 8300-20090330, the same [computer] model identified in the folder name, to test Kiper's claim." (A1623-1624 ¶ 17). "Dell Dimension 8300-20090330" is not a computer model. (A1699 ¶ 4(a), A1825). The Court failed to address these blatant falsehoods in the Loveall Report, which were pointed out in the defense submissions, before concluding that Loveall's explanation "offers a far more plausible and convincing explanation" of the discrepancies in the digital data. (SPA29).

**III.    The District Court Abused Its Discretion in Finding that "Ample Trial Evidence" in Conjunction with the Loveall Report and Camila's Declaration, Outweighed the Materiality of the 7 Digital Forensics Experts' Findings.**

Judge Garaufis cited three (3) incorrect reasons (SPA29) to deny the Rule 33. ⅔ of them, Loveall Report's and Camila's declaration[19], should not have been credited, *supra*. The third, "ample evidence [non-digital evidence] presented at

---

[19] Camila's declaration does not negate the 7 digital forensics experts' findings showing data falsification and government malfeasance.

trial," including "the photos themselves", cannot be credited as a reason for a

denial given that:

- The "photos themselves" are not proof of guilt, contrary to the Court's opinion (A1681); they are not obviously contraband. It is their alleged 2005 dating, derived from EXIF metadata[20] that makes them appear illegal.

- The government's other so-called "ample" trial evidence was debunked point by point by Mr. Raniere (A1743-1745). For example, the Court cites "communications from Mr. Raniere referencing the photos [from 2005]." However, the referenced text exchange (A1587) is from 2014, when Camila was 24, and simply mentions pictures "from way back" without reference to any specific time frame, age or other incriminating information. The Court's determination that these messages refer to the photos in question is baseless. (A626).

- **Falsification of the hard drive and camera's memory card is a standalone issue that, if credited, is fatal to the child pornography and sexual exploitation predicate acts, regardless of other trial evidence. The devices formed the basis of these acts and should not have been admitted. The Court failed to recognize this.** Further, government involvement in falsification of evidence is a due process violation requiring relief, independent of the question of guilt or innocence.

---

[20] To this end, the Court incorrectly concluded, "Booth acknowledged before the jury that the metadata was not reliable as to when the photos were taken." In this comment, the Court cites to Booth's testimony about one type of metadata, **file creation dates**, being unreliable, but ignored his testimony that **EXIF metadata** was reliable. (A501:13-A502:17). EXIF data is what the government used to establish the alleged 2005 timeframe.

IV.    **The District Court Abused Its Discretion in Ignoring that the Second Forensic Image Meets the Standard for Both a *Brady/Giglio* Violation and "Newly Discovered Evidence".**

      A. **The Court Abused Its Discretion by Not Applying the *Brady* Rule 33 Standard**

The Court committed an error of law by applying the wrong standard to review the Rule 33, which is presented to this Court for *de novo* review. It used the *Forbes* standard, which Judge Garaufis enunciated in his denial:

> "Relief under Rule 33 based on newly discovered evidence may be granted only upon a showing that '(1) the evidence was newly discovered after trial; (2) facts are alleged from which the court can infer due diligence on the part of the movant to obtain the evidence; (3) the evidence is material; (4) the evidence is not merely cumulative or impeaching; and (5) the evidence would likely result in an acquittal.' *United States v. Forbes,* 790 F.3d 403, 406-07 (2d Cir. 2015)." (SPA25).

The *Forbes* standard requires that newly discovered evidence "would likely result in an acquittal." However, Mr. Raniere claims *Brady* violations, requiring a less strict standard of review: "a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." *United States v. Bagley*, 473 U.S. 667, 682 (1985) (A1817-1818).

      B. **Applicable Law**

There are three (3) components of a *Brady* violation: "[1] The evidence at issue must be favorable to the accused, either because it is exculpatory, or because it is impeaching; [2] that evidence must have been suppressed by the State, either

willfully or inadvertently; and [3] prejudice must have ensued." *United States v. Jackson*, 345 F.3d 59, 71 (2d Cir. 2003) (alterations in original) (quoting *Strickler v. Greene*, 527 U.S. 263, 281-82 (1999)).

As to prong one, the "prosecutor has a duty to learn of any favorable evidence known to the others acting on the government's behalf in the case, including [law enforcement]." *Kyles v. Whitley*, 514 U.S. 419, 437 (1995). (Petitioner's conviction was reversed and remanded for a new trial ordered due to the prosecution's failure to disclose material evidence favorable to the accused).

As to prong two, *Brady* material that is not "disclos[ed] in sufficient time to afford the defense an opportunity for use" may be deemed suppressed within the meaning of the *Brady* doctrine. *Leka v. Portuondo,* 257 F.3d 89, 103 (2d Cir. 2001). In *Banks,* The Supreme Court opined:

> "Our decisions lend no support to the notion that defendants must scavenge for hints of undisclosed *Brady* material when the prosecution represents that all such material has been disclosed. … A rule thus declaring "prosecutor may hide, defendant must seek," is not tenable in a system constitutionally bound to accord defendants due process." *Banks v. Dretke*, 540 U.S. 668, 694-96 (2004).

The Supreme Court in *Agurs*, held that "[w]hen the prosecutor receives a specific and relevant request, the failure to make any response is seldom, if ever, excusable." *United States v. Agurs*, 427 U.S. 97, 106 (1976). The deliberate suppression by the government of evidence favorable to a defendant would

constitute a denial of due process. *Alcorta v. State of Texas*, 355 U.S. 28, 78

(1957).

As to prong three, whether prejudice ensued, the materiality analysis "turns

on the cumulative effect of all . . . evidence suppressed by the government." *Kyles*,

514 U.S. at 421. As reiterated in *United States v. Thomas*, 981 F.Supp. 2d 229, 242

(SDNY 10.30.13):

> "*Brady* does not require a "strong" or "overwhelming" probability
> of a **different outcome**, only a "**reasonable probability**" that the
> Government's suppression affected the outcome of the case ... The
> question is not whether the defendant would more likely than not
> have received a different verdict with the evidence, but whether in
> its absence he received a fair trial, understood as a trial resulting in
> a verdict worthy of confidence. *Kyles*, 514 U.S. at 434 (internal
> citations omitted)."

The "remedy for a *Brady* violation is vacatur of the judgment of conviction

and a new trial in which the defendant now has the *Brady* material available to

her." *United States v. Halloran*, 821 F.3d 321, 342 n.14 (2d Cir. 2016) (quoting

*Poventud v. City of New York*, 750 F.3d 121, 133 (2d Cir. 2014) (en banc)).

### C. Analysis

The Court erroneously opined:

"[Mr. Raniere's] **defense was also aware of [the memory card]
during trial** ... [yet uses it] to argue that the evidence now in focus
is both "newly discovered" and the "key evidence" that would prove
his innocence. But the Defendant provides no persuasive argument
that he could not have discovered this evidence with diligence."
(SPA28) (emphasis added).

40

**The Court fundamentally misconstrues the issue**. The defense's argument is not about the memory card itself but the data extracted from it — specifically, the *second* forensic image. At trial, the defense was aware of the first forensic image only. The defense had no knowledge that Booth created a second forensic image and that his testimony and analysis was based on it.

Dr. Kiper's post-trial analysis revealed that Booth created this second forensic image **3 days before the close of testimony**. (A1006). At trial, the government actively concealed the existence of this second forensic image. On direct examination, AUSA Hajjar elicited testimony from Booth describing the FBI protocol of only creating 1 forensic image of the original digital evidence. (A311:21-A312:19). Booth omitted that he violated this protocol by creating a second image. Further, during cross-examination of Booth, regarding the notes of his examination of the camera and memory card, AUSA Hajjar requested a sidebar. During it, **she told the Court that Booth did not create any forensic images**, stating, "[Booth] testified yesterday he received the forensic image from Ms. Donnelly … **he never said I was the one who imaged the devices.**" (A414:3-A416:4) (emphasis added).

In fact, Booth deceptively concealed that he created a second forensic image, as further highlighted in his Administrative Note entry on June 7, 2019, in the CART Examination Notes. In it, he states, "Request was made by SA Lever of

item 1B15 [the camera, containing the memory card] to be processed in lieu of ITS/SFE Steven Flatleys availability as he would be overseas during trial. This exam would be utilized in trial. **SSA Trenton Schmatz concurred and authorized to process the item.**" (emphasis added). (A930). However, Booth omits that his "processing" would entail creating a second forensic image, which he knew was prohibited and that Schmatz could not authorize; re-imaging can only be authorized by the Assistant Director of the FBI Operational Technology Division. (A1038-1039).

Despite repeated defense requests under Rule 16 and 3500 for all digital evidence, including during that sidebar and before trial (A416:9-11; A417:25-A418:7; A418:16-22; A419:5-9), the prosecution never disclosed the existence of the second forensic image. This failure to comply with the defense's request, given the prosecution's statutory disclosure requirement, "is seldom, if ever, excusable." *Agurs*, 427 U.S. at 106.

For *Brady* purposes, the prosecution is imputed with knowledge of the second forensic image, as it was created by Booth, a testifying witness and "arm of the prosecution." *United States v. Morell*, 524 F.2d 550, 555 (2d Cir. 1975); see also *United States v. Sanchez*, 813 F. Supp. 241, 247 (S.D.N.Y. 2.10.93). The Court must avoid a ruling that allows the prosecution to "hide" material evidence that the prosecution is obligated to disclose, such as the second forensic image,

which they secretly used at trial, and then shift the burden to the defense to "seek" it. *See Banks*, 540 U.S. at 694-96, As such, the second forensic image of the camera's memory card is "suppressed" under *Brady*.

There is a "reasonable probability that the government's suppression" of the second forensic image "affected the outcome of the case," establishing a *Brady/Giglio* violation. *In re United States v. Coppa (In re United States)*, 267 F.3d 132, 134 (2d Cir. 2001). Had the second forensic image been disclosed, it would have had a material impact on the outcome of the case. Defense counsel would have had it analyzed by a forensic expert. This should have revealed that the camera's memory card had been extensively falsified and led to an application for suppression of the camera and its memory card. Without them, the prosecution is unable to link the production of the photos to Mr. Raniere, a required element of the sexual exploitation acts. (A530:17-A531:1).

For Rule 33 purposes, the second forensic image constitutes "newly discovered evidence". Before and during trial, defense counsel diligently sought all relevant scientific evidence relating to these charges, "from which the court can infer due diligence." *Forbes,* 790 F.3d at 406-07. Given the government's intentional concealment of the second forensic image, there was no way for the defense, through due diligence, to have discovered it. Given the fatal impact of the

newly discovered evidence, an acquittal on the child predicate acts would have

been likely, meeting the threshold for Rule 33 relief.

**V.    The District Court Abused Its Discretion in Failing to Find that the Secret FBI Photograph Technician Meets the Standard for Both a *Brady/Giglio* Violation and "Newly Discovered Evidence".**

The Court failed to acknowledge the prosecution's disclosure in their

Consolidated Opposition:

> "This [September 19, 2018] access [without a write blocker] was not the result of law enforcement "tampering,"... [H]aving no reason to believe that the metadata of the contents of the Canon EOS 20D camera card had any evidentiary value, law enforcement agents directed that a photograph technician copy the photographs from the camera card in order to provide the photographs more expeditiously to defense counsel." (A1579 at n.6)

This disclosure, **made in a footnote 4 years after trial,** is clearly "newly

discovered evidence," as was argued by the defense in its Rule 33 Reply. (A1810,

1814, 1816).

It revealed intentional government misconduct with respect to the camera

and memory card and its unauthorized access on September 19, 2018[21] as analyzed

in a joint report from the 4 former FBI examiners, submitted in the Reply to the

Second Motion to Compel (A1771-A1776):

- The prosecution directed this operation, as they disclosed in the footnote that its purpose was for discovery production, "to provide the photographs … to defense counsel", which is under the prosecution's purview, and their

---

[21] At trial, the defense was solely aware of the fact that the memory card was accessed without a write blocker on September 19, 2018.

paralegal was involved in creating the report from the technician's access (A1383).

- The prosecution, in directing this operation, intentionally circumvented CART, which is prohibited, whether or not the evidence is believed to have value. (A1774 ¶ 14)

- The prosecution knowingly concealed it until 4 years after trial.

- The FBI technician and Lever, who provided the access, **deliberately concealed** this operation from the chain of custody. (A1773 ¶ 11; Chain of Custody at A1233-A1235).

- The FBI technician knowingly violated protocol by accessing the original, unpreserved memory card and used "an unknown forensic tool" on it, constituting "an unauthorized forensic examination" and altered the memory card (A1773 ¶ 11, A1774 ¶ 17).

- The intentional misconduct by Lever and the FBI technician could have led to termination, lacked a legitimate explanation, and is **unprecedented in their combined 55 years of FBI service**. (A1773 ¶ 11, A1774 ¶ 14, A1776 ¶ 21).

This Court must avoid a ruling that makes such secret manipulation of

evidence acceptable.

The onus is not on the defense to "scavenge" for an unauthorized operation

that was intentionally concealed from the chain of custody, and for which no *Brady*

notice was ever provided. *See Banks,* 540 U.S. at 694-96. During cross-

examination, the prosecution's disclosure requirement was prompted when the

defense questioned Booth about the improper access without a write blocker

(A496:19-25), as the defense repeatedly requested all materials relating to the

45

digital evidence. The prosecution's failure to respond to a specific request and prompt, such as this one, is "seldom, if ever, excusable." *Agurs*, 427 U.S. at 106.

The prosecution's knowing concealment of the FBI technician's involvement demonstrates that this information was clearly suppressed under *Brady*. Their footnote disclosure, on July 21, 2023, is particularly egregious because the prosecution previously made an affirmative representation of full compliance with *Brady*, Rule 16, and 3500 on March 18, 2022. (A1154).

The secret FBI photograph technician also constitutes "newly discovered evidence" under Rule 33, as no amount of due diligence on the part of the defense could have exposed an individual not listed on the chain of custody. To date, the prosecution and Court have denied the defense access to the FBI technician's identity and records relating to their access. (A1762-1763, SPA15-19).

The week before and after the prosecution directed this operation, six (6) months after seizure and before the camera and its memory card were sent to CART, AUSAs Penza and Hajjar repeatedly and falsely assured the Court that all devices had been processed by CART **"[w]ithin days"** of seizure. (See, e.g., A88 ¶ 1; A112:25-A113:12; Doc. 143 at 1¶ 2 (9/24/18)).

This prosecution's lack of required *Brady/Giglio* notice, regarding the secret FBI photograph technician, deprived the defense from impeaching Mills and

Booth[22] about this concealed and intentional malfeasance, and using it to seek

suppression of the camera and memory card.[23]

**VI.    The District Court Abused Its Discretion in Failing to Find that the Proof of Government Involvement in Falsifying Material Evidence Categorically Constitutes "Newly Discovered Evidence" and a *Brady/Giglio* Violation.**

In its denial of the Rule 33, the Court ignored that the 7 digital forensics

experts' discovery of government involvement in facilitating and concealing the

falsification of key evidence is **categorically** newly discovered and suppressed

under *Brady*. They concluded that "**the involvement of government personnel in**

**this evidentiary fraud is inescapable**". (A1703 ¶ 16) (emphasis added). The

government "may not knowingly use false evidence, including false testimony, to

obtain a tainted conviction." *United States v. Alston*, 899 F.3d 135, 145 (2d Cir.

2018) (citations omitted).

Our legal system operates on a presumption of good faith by the

government. "The presumption of regularity supports the official acts of public

officers and, in the absence of clear evidence to the contrary, courts presume that

---

[22] The Court's opinion that "Mr. Raniere's counsel cross-examined … Booth extensively about the photographic evidence, the … hard drive, the camera card, … the related metadata, and the chain of custody of the digital evidence" (SPA23-24) is undermined by the fact that the defense was deprived of the ability to do a complete cross-examination, as the secret FBI photograph technician and the second forensic image were concealed and "suppressed".

[23] To seek suppression, defense counsel would need to challenge the Court's prohibition on presenting evidence or argument concerning government misconduct. (A272).

they have properly discharged their official duties." *United States v. Chemical Foundation*, 272 U.S. 1, 14-15 (1926); *see also United States v. Armstrong*, 517 U.S. 456, 464 (1996).

This Court must avoid a ruling that undermines this presumption of regularity. Therefore, it must find the 7 digital forensic experts' findings of fraudulent government conduct, uncovered after trial, to be both "suppressed" under *Brady* and constitute "newly discovered evidence" under Rule 33, and/or order a hearing.

Additionally, the uncontested, material perjury by Mills and Booth about the integrity and authenticity of the digital evidence, as listed in the table in Section II(D), independently warrant reversal of the conviction. *See Giglio v. United States*, 405 US 150, 153 (1972); *Napue v. Illinois*, 360 US 264, 269 (1959); *United States v. Wallach*, 935 F.2d 445 (2d Cir. 1991); *Agurs*, 427 U.S. at 103.

## VII.  The Evidence of Systematic and Intentional Government Malfeasance Meets the Standard for Dismissal and Also Caused Structural Error

### A. Applicable Law

#### 1. Standard for Dismissal

Dismissal is generally appropriate only when the prosecution engages in "'egregious and deliberate' misconduct or act[s] flagrantly, willfully, and in bad faith.'" *United States v. Mangano*, 2022 U.S. Dist. LEXIS 3048, at *7 (E.D.N.Y. Jan. 6, 2022) (citations omitted).

"It is only in the rare case, where it is impossible to restore a criminal defendant to the position that he would have occupied vis-a-vis the prosecutor, that the indictment may be dismissed… We have approved this extreme sanction only when the pattern of misconduct is widespread or continuous." *United States v. Fields* 592 F.2d 638, 648 (2d Cir. 1978) (citations omitted).

## 2. Standard for Structural Error

In *Arizona v. Fulminante*, The Supreme Court recognized that there are "structural defects in the constitution of the trial mechanism … [which] defy analysis by harmless error standards." *Arizona v. Fulminante*, 499 U.S. 279, 280 (1991). Such structural defects require automatic reversal without any need to demonstrate prejudice. *Johnson*, 2024 U.S. App. LEXIS at *18. In addition to being per se reversible, these structural types of errors need not be preserved by objection and thus may be raised for the first time on appeal. See *United States v. Christi*, 682 F.3d 138 (1st Cir. 2012).

Structural errors share in common that they undermine a criminal trial such that it "cannot reliably serve its function as a vehicle for determination of guilt or innocence." *Rose v. Clark*, 478 U.S. 570, 577-78 (1986). As such, as a result of structural error, the question of guilt or innocence cannot be determined.

## B. Analysis

While the class of structural errors is extremely limited, the systematic and pervasive **intentional** government malfeasance in Mr. Raniere's case qualifies.[24] This misconduct involved at least eight (8) identified FBI and DOJ personnel and spanned multiple departments, involving CART, non-CART FBI employees, and the prosecutors, who knew or should have known. A subset of these findings is summarized below:

### CART:

- Booth committed perjury about the reliability of EXIF metadata and that unsealed evidence is not extraordinary in FBI evidence handling. (A1037-1039).

- Booth knowingly violated FBI protocol by creating a second forensic image, and intentionally concealed it. (A1006-1007, A1038-1039).

- Schmatz knowingly violated FBI protocol by approving Booth's creation of the second forensic image, as he lacked the authority to approve this action. (*Id.*).

### Non-CART FBI employees:

- Rees, Lever and an FBI photograph technician knowingly violated FBI protocol by reviewing the unpreserved camera and memory card. (A1035-1036, A1773 ¶ 11).

- Lever and the FBI photograph technician knowingly violated FBI protocol by concealing the technician's access from the chain of custody. (A1773 ¶ 11; Chain of Custody at A1233-A1235).

- Mills committed perjury about proper CART handling of the camera, despite

---

[24] Mr. Raniere preserved this argument in his Rule 33 Reply. (A1823; *Id.* at n.1).

signing the chain of custody prior to his testimony; the chain of custody
showed unauthorized non-CART handling of the camera. (A1206, A1235).

**Prosecution:**

- AUSAs Hajjar and Penza intentionally circumvented CART for the
  unpreserved camera and memory card and concealed the FBI photograph
  technician's access until 4+ years after trial. (A1774 ¶ 14; A1579 at n.6).

- AUSAs Hajjar and Penza made false assertions to the Court about proper
  CART handling of all digital evidence and full compliance of their statutory
  disclosure obligations. (A1749-1752; A1780-1782).

- AUSA Hajjar should have known she was eliciting Mills' false testimony
  about the proper CART handling of the camera, as the prosecution had
  directed the unauthorized handling of the camera outside of CART.

- AUSA Hajjar misrepresented that Booth did "not create any forensic
  images", which she should have known was false. (A414:3-A416:4)

The above subset of findings demonstrates widespread and coordinated

malfeasance that affected the integrity of evidence handling, evidence processing,

evidence disclosure, witness handling, and the presentation of the case at trial. Its

impact is not isolatable and constitutes a structural error, which fundamentally

undermined the trial's "framework" (*Arizona,* 499 U.S.at 310) such that the trial

could not "reliably serve its function as a vehicle for determination of guilt or

innocence." *Rose*, 478 U.S. at 577-78.

Respectfully, this Court must find this to be a structural error or remand the

case for an evidentiary hearing to fully develop the record, to avoid a ruling that

makes the above, largely uncontested government malfeasance to be within

tolerance.

The above also demonstrates "widespread", "continuous", and "egregious and deliberate" misconduct by the government such that dismissal is warranted. *Mangano*, 2022 U.S. Dist. LEXIS at *7; *Fields* 592 F.2d at 648.

## VIII. The District Court Abused Its Discretion in Denying the Motions to Compel

### A. Applicable Law

In opining on a defendant's post-trial motion for discovery, this Court has held:

> "In some instances when possible exculpatory evidence not known by a defendant to exist at the time of trial is later shown to have then been in the Government's hands and the information necessary to develop fully the exculpatory nature of the evidence must be obtained from government sources it might be improper for a district judge to deny a motion for discovery when coupled with a timely motion for a new trial." *United States v. Wolfson*, 413 F.2d 804, 808 (2d Cir. 1969).

"In certain circumstances, some discovery may be appropriate as part of the post-trial factual development." *United States v. Williams*, 2017 U.S. Dist. LEXIS 135235, at *5 (S.D.N.Y. 2017).

### B. Analysis

Its denial of the Motions to Compel (SPA12-19), the Court made multiple factual and legal errors warranting reversal and the requested disclosure:

- The Court abused its discretion in not finding that the second forensic image was "suppressed" under *Brady* and "newly discovered evidence" under Rule 33. (A1689-1690).

- The Court abused its discretion in concluding that testing the 2 forensic images would not raise a "reasonable probability" of Mr. Raniere's innocence, instead erroneously relying on unconfronted newly created government evidence and so-called "ample" trial evidence. (A1689).

- The District Court made a clear error in concluding that digital evidence is "wholly different from DNA evidence, which has been shown capable of conclusively demonstrating a petitioner's innocence." (A1685). For instance, comparing the 2 forensic images' "hash values" is more accurate than DNA testing[25] and could, with virtually 100% accuracy, verify or disprove Loveall's claim about the 37 photo files not being planted while in FBI custody.

- The District Court misapplied the standard of fundamental fairness when it dismissed the defense's request as a "fishing expedition" and cited to *United States v. Davis*, 836 F. App'x 754, 758 (11th Cir. 2020) and its holding that

---

[25] The National Institute of Standards and Technology describes SHA-256, a hash algorithm, which creates hash values, as offering exceptionally strong "collision resistance," meaning it is "computationally infeasible" for two different files to produce the same hash value. The chance of such a collision is approximately **1 in $2^{256}$**, which is infinitesimal. See Quynh Dang, *Secure Hash Standard (SHS)*, FIPS PUB 180-4, Nat'l Inst. of Standards & Tech. (2015).

"[a] blanket assertion of fabricated evidence not substantiated by any

credible source is not enough to warrant a new trial or even an evidentiary

hearing." However, the defense did not make a "blank assertion"; it made

precise scientific assertions about the planting of specific photos and

manipulation of specific timestamps. These assertions were unanimously

substantiated by highly credible sources, the 7 digital forensics experts,

including 4 former FBI examiners.

## IX. The District Court Abused Its Discretion in Denying the Motion for Judicial Recusal

### A. Applicable Law

In evaluating the appropriateness of recusal, courts consider the statutory

requirement that a Judge "shall disqualify himself in any proceeding in which his

impartiality might reasonably be questioned." 28 U.S.C. § 455(a). This provision is

to "be evaluated on an objective basis, so that what matters is not the reality of bias

or prejudice but its appearance." *Liteky* v. *United States,* 510 U.S. 540, 548 (1994)

3; *United States v. Amico,* 486 F.3d 764, 775 (2d Cir. 2007) ("[T]his test deals

exclusively with appearances. Its purpose is the protection of the public's

confidence in the impartiality of the judiciary.").

To constitute a basis for recusal due to bias stemming from judicial sources,

"opinions formed by the judge on the basis of facts introduced or events occurring

in the course of the current [or] prior proceedings" would have to demonstrate "a

deep-seated favoritism or antagonism that would make fair judgment impossible."
*Liteky*, 510 U.S. at 555.

The operative question is whether "an objective, disinterested observer fully
informed of the underlying facts, [would] entertain significant doubt that justice
would be done absent recusal." *United States* v. *Carlton,* 534 F.3d 97, 100 (2d Cir.
2008) (alterations in original); *ISC Holding AG v. Nobel Biocare Fin. AG,* 688
F.3d 98, 107 (2d Cir. 2012); *see also In re Drexel Burnham Lambert Inc.,* 861 F.2d
1307, 1313 (2d Cir. 1988); *Amico,* 486 F.3d at 775.

## B. Analysis

### 1. The Court Abused Its Discretion in Misapplying *Liteky* to Comments Made During the Trial

In denying recusal, Judge Garaufis cited primarily to *Liteky* to justify his
position:

> "Alleged bias may not warrant recusal where 'upon completion of
> the evidence, [a Judge is] exceedingly ill disposed towards the
> defendant, who has been shown to be a thoroughly reprehensible
> person' throughout the trial. *Liteky*, 510 U.S. at 550-51." (SPA4).

The Court's citation to *Liteky* ignores that it refers to a judge's conduct

"upon **completion** of the evidence." The Court repeats this error in opining:

> Even if the court's comments at time [after the termination of
> Lauren Salzman's cross-examination] evinced … some sort of
> distaste for the defendant, no reasonable observer would, **after
> witnessing the trial …** earnestly believe that the distaste was the
> result of some sort of extrajudicial bias or deep-seated antagonism.
> (SPA8) (emphasis added).

55

Here, the Court's comments relating to his termination of the cross-examination of Lauren Salzman (hereinafter referred to as "Ms. Salzman") took place during the first half of the trial, ten (10) days into the twenty-three (23) days of testimony, prior to any determination of guilt.

### 2. The Court's Termination of Cross-Examination Demonstrates the Appearance of "Deep-Seated Favoritism" Towards the Government and "Deep-Seated Antagonism" Towards Mr. Raniere

During cross-examination of Ms. Salzman, defense counsel asked a critical question, "What was your intention when you were in DOS?" (A284:7). The case involved charges that related to alleged activities involving DOS. The crux of the government's theory regarding DOS was that the actions of Mr. Raniere and some of his co-defendants, including Ms. Salzman, were **intended to harm**, a necessary element of these charges.[26] Ms. Salzman was critical to their case, as she was the sole testifying cooperating witness and a founding member of DOS. Ms. Salzman then gave an answer that tended to invalidate her extortion plea, showing a lack of required intent to harm:

> "My intention was to prove to Keith that I was not so far below the ethical standard that he holds that I was -- I don't even know how far below I am. I was trying to prove my self-worth, and salvage

---

[26] The indictment alleged that the actions of Mr. Raniere involved "instilling in them [DOS members] fear" and the threats of actions "calculated to harm." (A198 ¶ 34).

> this string of a hope of what I thought my relationship might someday be, and I put it above everything else; I put it above my friends, and I put it above other people, helping them in their best interest. That's what I did when I was in DOS." (A284:9-16).

In the presence of the jury, the Court abruptly terminated cross-examination. The Court then twice offered the prosecution to reexamine the witness, which they declined. (A284:23-A285:4). The Court later conceded that defense counsel was not harassing the witness. (A288:2-10).

The Court's decision that the defense could not continue questioning but the prosecution could itself shows the appearance of "deep-seated favoritism" towards the prosecution. After dismissing the jury, the Court gave its first justification for terminating cross-examination:

> **I am not going to have someone have a nervous breakdown** on the witness stand in front of -- excuse me, this is not DOS. This is not the allegations… I think it's absolutely necessary that there be a certain level of consideration for someone's condition. And that's really what this was… **I had a crisis here. And not in my courtroom.** (A286:24-A287:8). (emphasis added).

In its denial of the Motion for Recusal, the Court reiterated that its rationale was "to avoid needless harassment and attend to the witness's wellbeing." (SPA7).

However, if the Court thought that Ms. Salzman was having a "nervous breakdown", it could have done any number of things, including: offering her a recess, giving the defense a limiting instruction, or dismissing her entirely without asking for redirect. The Court took the only option that is antithetical to its stated

concern; immediately inviting the prosecution to subject Ms. Salzman to more

questioning, asking **not once but twice** if the government wanted to question her

on redirect. This refutes that it intervened out of concern for the witness's well-

being.

The Court also provided a second justification, accusing the defense of

asking an improper question:

> I have to sentence this defendant and **what you did was, basically,
> ask her to make legal judgments** about whether what she did in
> pleading guilty was farcical that she took somebody else's advice,
> some lawyer, so she could get out from under a trial… **When I tried
> to cut off the line of questioning**, you just went right back to the line
> of questioning. (A288:11-A289:3) (emphasis added).

However, this justification is disproven by the fact that the Court allowed defense

counsel's question, over the prosecution's objection. (A284:4-8).

By process of elimination, this reveals that the Court's termination of cross-

examination was not due any impropriety with the question, nor the witness'

emotional state, but **the content of her answer**.

The Court's decision to intervene reveals its intent was to prevent the jury

from hearing testimony that was favorable to the defense; not an "ordinary effort at

courtroom administration" as it claimed. (Doc. 1194 at 7). A judge should not be

partial to the government's case. The Court's intervention, in front of the jury,

demonstrates "[a]n appearance of partiality … that made it inappropriate for him to

continue to preside." *Amico*, 486 F.3d at 767.

The Court also demonstrated "deep-seated antagonism" towards Mr. Raniere by its comment, "I am not going to have someone have a nervous breakdown on the witness stand in front of -- excuse me, **this is not DOS.**" (A286:24-A287:1) (emphasis added). "[T]his is not DOS" indicated a pre-judgment that Mr. Raniere's role in DOS was intended to harm. This was a central question being litigated in the trial. The Court taking a critical action during the trial based on a predetermination of the defendant's guilt, before any jury verdict, is textbook bias and evidences "significant doubt that justice would be done absent recusal." *Carlton,* 534 F.3d at 100.

The Court's final justification is equivalent to an admission of bias:

> "I may not get everything right up here, but I will tell you, **as a human being, it was the right decision**. Alright? And **before I'm a judge, I'm a human being.**" (A289:4-6) (emphasis added).

What distinguishes the role of a judge from humans generally is their required impartiality. Yet the Court's comment logically equates to: **this is something that a human generally would do, but that a judge would not**. The Court's decision to vacate this role clearly demonstrates that his "impartiality might reasonably be questioned," meeting the statutory standard of 28 U.S.C. § 455(a).

The Court acknowledged that its termination of cross-examination potentially implicated appellate ruling, stating, "So, you have your record, and if

there is a conviction, you can appeal my decision to the Second Circuit, okay?"

(A287:9-11).

### 3. The Court's Comments and Actions at the Restitution Hearing Further Demonstrate the Appearance of "Deep-Seated Antagonism" Towards Mr. Raniere, Requiring Recusal

The Court's "deep-seated antagonism" towards Mr. Raniere was also

expressed through direct statements made to defense counsel[27] during the

restitution hearing. In answering the Court, Mr. Raniere stated that he was not

aware of who the restitution victims were. (A549:3-8). A contentious exchange

between the Court and defense counsel then ensued about whether the proceeding

would be delayed to allow Mr. Raniere to confer with counsel. This led to the

Court bringing up that counsel had requested a one-hour postponement of the

hearing to attend the funeral and shiva of counsel's mentor, who had just passed

away due to pancreatic cancer. This culminated in the following exchange:

> Mr. Fernich: There is absolutely nothing dilatory about my request.
>
> The Court: Excuse me.
>
> Mr. Fernich: I wanted the day off to go to Joel Winograd's funeral, who died of pancreatic cancer on Sunday morning.
>
> The Court: **Give him this to go cry on. He's not a member of your family, sir.**
> …

---

[27] Mr. Raniere retained separate defense counsel to handle the restitution hearing.

The Court: **Be seated or I'll have you arrested.**

(A576:23-A578:12) (emphasis added).

This colloquy made its way to *Vanity Fair*, as cited to in the Motion

for Recusal. It provided additional context surrounding this exchange:

> "According to the *New York Post* ... during the hearing, [after the
> above exchange] Garaufis and Fernich **spent half an hour staring
> at each other in silence** as the rest of the courtroom looked on...
> When Fernich said during the hearing that Garaufis lacked "human
> decency," the judge, according to the tabloid, **grabbed a box of
> tissues,** told a court clerk, "Give him this to go cry," and threatened
> to have Fernich arrested unless he sat down. (A1177 at n.5).
> (emphasis added).

Mocking a person's grief over the death of their mentor, is one most would find

inappropriate to express. It is expected that a Senior District Court Judge would not

say such a thought aloud. There is no way to determine that the bias inherent in this

comment was against defense counsel, and not Mr. Raniere, who would be

impacted negatively regardless.

In response to the Motion for Recusal being filed, Noah Goldberg, a

journalist and "an objective, disinterested observer" present at the restitution

hearing, tweeted: "Keith Raniere's lawyer asked for the judge in the case to recuse

himself for being biased, citing **one of the most bizarre moments in court I've

ever seen** in which a lawyer was told by the judge to go cry about a funeral for a

colleague who had just died of pancreatic cancer." (Noah Goldberg

(@Noah__Goldberg)**,** *X (formerly Twitter)* (May 6, 2022, 10:14 AM)). (emphasis

added). https://x.com/Noah__Goldberg/status/1522580665899925509). *See also Carlton,* 534 F.3d at 100.

## CONCLUSION

## REASONS TO GRANT, VACATE, AND REMAND

For the foregoing reasons, Defendant-Appellant, Mr. Raniere, respectfully submits that: 1) the Order denying the motion for a new trial, the Rule 33, should be reversed and the case remanded for either a new trial or an evidentiary hearing; 2) the Order denying the Motions to Compel should be reversed and remanded, ordering the production of the 2 forensics images to the defense; and 3) the Order denying the Motion for Recusal under 28 U.S.C. § 455 should be reversed and remanded.

Dated:    New York, New York
          October 28, 2024

                    Respectfully submitted,

                    \s\ Deborah J. Blum
By:   Deborah J. Blum
      DEBORAH J. BLUM, ESQ.
      Attorney for Defendant-Appellant
      225 Broadway, Suite 715
      New York, New York 10007
      646-535-2586

## CERTIFICATE OF COMPLIANCE WITH FRAP 32(A)

1.     This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because this brief contains 13,962 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii).

2.     This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using Microsoft Word in Times New Roman, 14 point font.

Dated:    New York, New York
          October 28, 2024

                Respectfully submitted,

                *Deborah J Blum*

        By:    Deborah J. Blum
              DEBORAH J. BLUM, ESQ.
              Attorney for Defendant-Appellant
              225 Broadway, Suite 715
              New York, New York 10007
              646-535-2586

# SPECIAL APPENDIX

**Table of Contents**

**Page**

Memorandum and Order of the Honorable Nicholas G. Garaufis,
dated April 26, 2023 (Docket No. 1194).......................................  SPA1

Memorandum and Order of the Honorable Nicholas G. Garaufis,
dated March 6, 2024 (Docket No. 1238) ..................................  SPA12

Memorandum and Order of the Honorable Nicholas G. Garaufis,
dated April 29, 2024 (Docket No. 1256) ..................................  SPA20

**SPA1**

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
UNITED STATES,

          -against-

KEITH RANIERE, et al.,

                   Defendant.

**MEMORANDUM & ORDER**
**18-CR-204 (NGG) (VMS)**

NICHOLAS G. GARAUFIS, United States District Judge.

Pending before the court is a Motion for Recusal and Judicial Disqualification of this court, filed by Defendant Raniere on May 6, 2022. (Mot. for Recusal (Dkts. 1170-71).) Defendant Raniere seeks recusal pursuant to both 28 U.S.C. § 455(a) and 28 U.S.C. § 455(b)(1). For the reasons set forth below, this motion for recusal is DENIED.

## I.  BACKGROUND

### A.  Factual History

The court assumes familiarity with the underlying facts of the case, *United States v. Raniere*, et al., and summarizes briefly below only those facts relevant to the instant motion.

In May and June 2019, this court held a several week jury trial regarding the criminal charges brought against Defendant Keith Raniere. That trial included testimony from a plethora of witnesses. (*See generally* Dkts. 634, 636, 638, 654, 658, 660, 661, 662, 670, 672, 674, 676, 678, 680, 687, 695, 697, 699, 704, 706, 711, 713, 723.) One such witness, Lauren Salzman, played an important role at trial as a cooperating witness. (*See generally* Dkts. 670, 672.) An exchange between the court and an attorney for the defense that took place during the cross-examination of Ms. Salzman, on the 10th out of 23 days of testimony, is among the incidents in dispute on this motion. (Mem. In Support (the "Mot.") (Dkt. 1171) at 2-7); (May 22, 2019 Trial Tr. (Dkt. 958)

1

at 2265-70.) After the trial was completed, the court undertook typical post-trial duties such as presiding over restitution hearings and sentencing the various defendants who had pleaded guilty or been convicted at trial. Two such hearings are at issue in this motion. First, on July 20, 2021, a hearing was held for the purposes of determining the amount of restitution owed by Defendant Raniere. (Mot. at 7-16; Restitution Hearing Tr. (Dkt._1193).) Second, on September 30, 2020, a hearing was held for the purposes of sentencing Defendant Clare Bronfman. (Mot. at 17-18; Bronfman Sent. Tr. (Dkt. 964).)

### B.  Procedural History

Defendant Raniere filed the instant Recusal Motion on May 6, 2022. (Mot.) On May 9, 2022, the Court acknowledged receipt of the motion and stated that it would defer consideration of the motion until the Second Circuit resolved the appeal of the judgment of conviction, which was at the time *sub judice* after oral argument. (May 9, 2022 Text Order.) On January 3, 2023, two mandates issued from the Second Circuit, affirming the district court's judgments in full. (Dkts. 1183-84.)[1] Shortly thereafter, Defendant filed with the Second Circuit a petition for a writ of mandamus, seeking relief consistent with this Motion. (*See* Dkt. 1185.) On March 20, 2023, a mandate issued from the Second Circuit, denying that petition on the basis that "Petitioner has not demonstrated that he lacks an adequate, alternative means of obtaining relief, that his right to the writ is clear and indisputable, and that granting the writ is appropriate under the circumstances." (*Id.*) The court now considers the Motion.

---

[1] On April 17, 2023, the Supreme Court denied Defendant Raniere's petition for a writ of certiorari. *See* Order List, Supreme Court of the United States at 3 (Apr. 17, 2023), https://www.supremecourt.gov/orders/courtorders/041723zor_4gdj.pdf.

2

## II. LEGAL STANDARD

Defendant Raniere moves for recusal under both 28 U.S.C. § 455(a) and 28 U.S.C. § 455(b)(1). These two statutory provisions are governed by similar but distinct legal standards.

### 1. 28 U.S.C. § 455(a)

In evaluating the appropriateness of recusal under § 455(a), courts consider the statutory requirement that a Judge "shall disqualify himself in any proceeding in which his impartiality might reasonably be questioned." 28 U.S.C. § 455(a).[2] This provision is to "be evaluated on an objective basis, so that what matters is not the reality of bias or prejudice but its appearance." *Liteky v. United States*, 510 U.S. 540, 548 (1994)[3]; *see also Amico*, 486 F.3d at 775 ("[T]his test deals exclusively with appearances. Its purpose is the protection of the public's confidence in the impartiality of the judiciary."). The operative question is whether "an objective, disinterested observer fully informed of the underlying facts, [would] entertain significant doubt that justice would be done absent recusal." *United States v. Carlton*, 534 F.3d 97, 100 (2d Cir. 2008) (alterations in original); *ISC Holding*, 688 F.3d at 107; *see also In re Drexel Burnham Lambert Inc.*, 861 F.2d 1307, 1313 (2d Cir. 1988); *Amico*, 486 F.3d at 775.

---

[2] *See, e.g., ISC Holding AG v. Nobel Biocare Fin. AG*, 688 F.3d 98, 107 (2d Cir. 2012) ("Recusal here is governed by 28 U.S.C. § 455(a), which states that '[a]ny . . . judge . . . of the United States shall disqualify himself in any proceeding in which his impartiality might reasonably be questioned.'") (alterations in original); *see also SEC v. Razmilovic*, 728 F.3d 71 (2d Cir. 2013), *as amended* 738 F.3d 14, 29 (2d Cir. 2013); *In re Int'l Bus. Machs. Corp.*, 45 F.3d 641, 643 (2d Cir. 1995); *United States v. Amico*, 486 F.3d 764, 775 (2d Cir. 2007); *United States v. Giordano*, 442 F.3d 30, 48 (2d Cir. 2006); *United States v. Basciano*, No. 03-CR-929 (NGG), 2008 WL 794945, at *10 (E.D.N.Y. Mar. 24, 2008).

[3] When quoting cases, and unless otherwise noted, all citations and quotation marks are omitted, and all alterations are adopted.

3

The *Liteky* court explained that the goal of a recusal analysis is to identify not just whether the judge in question holds a "favorable or unfavorable disposition or opinion," but whether such views are "wrongful or inappropriate." *Liteky*, 510 U.S. at 550. Moreover, the level of bias necessary to warrant recusal under §455(a) is higher if it is derived from a judicial—rather than extrajudicial—source. *Liteky*, 510 U.S. at 555 (stating that § 455(a) analyses rely on a highly "significant (and often determinative) extrajudicial source factor")

Alleged bias may not warrant recusal where "upon completion of the evidence, [a Judge is] exceedingly ill disposed towards the defendant, who has been shown to be a thoroughly reprehensible person" throughout the trial. *Liteky*, 510 U.S. at 550-51. This would likely not constitute recusable bias because the judge's "knowledge and the opinion it produced were properly and necessarily acquired in the course of the proceedings." *Id.* To constitute a basis for recusal due to bias stemming from judicial sources, "opinions formed by the judge on the basis of facts introduced or events occurring in the course of the current [or] prior proceedings" would have to demonstrate "a deep-seated favoritism or antagonism that would make fair judgment impossible." *Id.* at 555; *see also ISC Holding*, 688 F.3d at 107; *Razmilovic*, 738 F.3d at 29; *Basciano*, 2008 WL 794945, at *10. Even "a judge's comments during a proceeding that are 'critical or disapproving of, or even hostile to, counsel, the parties, or their cases, ordinarily do not support a bias or partiality challenge.'" *Carlton*, 534 F.3d at 100 (citing *Liteky*, 510 U.S. at 555); *see also Razmilovic*, 738 F.3d at 29.

By contrast, the "requirement of deep-seated antagonism does not apply" where "opinions are . . . 'derive[d] from a source outside judicial proceedings.'" *ISC Holding*, 688 F.3d at 107 (quoting *Liteky*, 510 U.S. at 551, 554) (differentiating bias derived from judicial versus extrajudicial sources).

4

**SPA5**

2. 28 U.S.C. § 455(b)(1)

§ 455(b)(1) requires a judge to recuse himself "where he has a personal bias or prejudice concerning a party[.]" 28 U.S.C. § 455(b)(1). *See, e.g., United States v. Osinowo*, No. 95-CR-1334, 1996 WL 20514, at *1 (2d Cir. 1996). Courts have emphasized that while motions brought under § 455(a) are evaluated pursuant to an objective standard, § 455(b)(1) "mandates recusal only where the court harbors *actual* prejudice or bias against a particular defendant." *Id.* (citing *Liteky*, 510 U.S. at 553) (emphasis added); *see also Pri-har v. United States*, 83 F. Supp. 2d 393, 397 (S.D.N.Y. 2000). As in a § 455(a) analysis, § 455(b)(1) typically requires an "extrajudicial" source factor. *Liteky*, 510 U.S. at 553 ("§ 455(b)(1) . . . contains the 'extrajudicial source' limitation[.]"); *see also Curley v. St. John's Univ.*, 7 F. Supp. 2d 359, 362 (S.D.N.Y. 1998); *Pri-har*, 83 F.Supp. at 397 (applying the logic of *Liteky* to § 455(b)(1) claims).

3. Recusal for the Purposes of Ruling on a Rule 33 Motion

Although much of the controlling case law cited was developed in the context of a party seeking a judge's recusal prior to the commencement of litigation or trial, the standards for recusal under § 455(a) and/or (b)(1) remain the same where the party moving for recusal has also moved (or is simultaneously moving) for a new trial under Fed. R. Crim. P. 33. *See United States v. Scaretta*, No. 97-CR-1089, 1997 WL 829256, at *4 (2d Cir. 1997); *Osinowo*, 1996 WL 20514, at *1; *United States v. Robinson*, No. 16-CR-545 (SJF) (AYS), 2021 WL 62076, at *25 (E.D.N.Y. Jan. 6, 2021); *Pri-har*, 83 F. Supp. at 394; *United States*

5

**SPA6**

*v. Agunbiade*, No. 90-CR-610(S)-02 (JRB), 1995 WL 351058, at *1 (E.D.N.Y. May 10, 1995).[4]

### III. LEGAL ANALYSIS

The court will now assess the Defendant's various arguments for recusal in turn. None of the cited-to examples of supposed bias reach the standards set forth by 28 U.S.C. §§ 455(a) or 455(b)(1).

#### A. Trial conduct

First, the Defendant argues that "the Court's comments and personal opinions expressed about Mr. Raniere, his Defense team, and his co-defendants, displayed a deep-seated, unequivocal hostility and personal bias against Mr. Raniere and his Defense team, making disqualification for all future proceedings, in this case, warranted and, indeed, mandatory." (Mot. at 21.)

With regard to the allegedly biased conduct during Ms. Salzman's testimony at trial, the Defendant exhibits a foundational misunderstanding of what constitutes personal, extra-judicial bias, rather than honestly held viewpoints gained throughout presiding over a trial. Here, there is no indication whatsoever that this

---

[4] In addition to filing a motion for a new trial pursuant to Rule 33, Defendant Raniere took the unusual step of filing a petition for a writ of mandamus at the Court of Appeals prior to decision on the Rule 33 motion. While such a step is typically not taken until *after* the district court decides the underlying recusal motion, the court is aware of two other cases in which parties attempted to do so prior to a district court ruling on the recusal. *Qualls v. United States*, No. 07-CR-14 (DLI), 2018 WL 1513625, at *1 (E.D.N.Y. Mar. 27, 2018); *Buhannic v. TradingScreen Inc.*, No. 19-CIV-10650 (ER), 2020 WL 4058949, at *4 (S.D.N.Y. July 20, 2020). In both instances, the appellate court denied the petition for a writ of mandamus, and the district court proceeded to evaluate the recusal motions under the same legal standards it would have used had no writ of mandamus been sought. *Qualls*, 2018 WL 1513625, at *1; *Buhannic*, 2020 WL 4058949, at *4.

6

court harbored any animosity or "personal bias" toward Defendant Raniere prior to the trial, during which many unsavory facts about Mr. Raniere were proven beyond a reasonable doubt.

The Defendant also fails to recognize the wide discretion granted to judges in the administration of a trial. "A judge's ordinary efforts at courtroom administration—even a stern and short-tempered judge's ordinary efforts at courtroom administration—remain immune." *Liteky*, 510 U.S. at 556; *see also Farr v. Greiner*, No. 01-CV-6921 (NG), 2007 WL 1094160, at *15 (E.D.N.Y. Apr. 10, 2007) (quoting *Gilliam v. Foster*, 75 F.3d 881, 900 (4th Cir.1996)) ("Generally, a trial judge possesses wide latitude to maintain control over the courtroom to ensure the integrity of the proceedings."). In particular, "[t]rial judges retain wide latitude to impose reasonable limits on cross-examination based on concerns about, among other things, harassment, prejudice, confusion of issues, the witness's safety, or interrogation that is repetitive or only marginally relevant." *Cordero v. Rivera*, 677 F. Supp. 2d 684, 699 (S.D.N.Y. 2009) (quoting *Delaware v. Fensterer*, 474 U.S. 15, 20 (1985)). Here, the court's choice to curtail cross-examination of a witness to avoid needless harassment and attend to the witness's wellbeing was well within the bounds of a trial judge's discretion. The court's behavior in furtherance of this legitimate goal, therefore, did not meet the extremely high standard for bias stemming from a judicial source—that of evincing "deep-seated . . . antagonism."[5] *Liteky*, 510 U.S. at 555. Thus, the court is not required to recuse itself under 455(b)(1)'s actual bias rule.

The standard under 455(a) is one of whether "an objective, disinterested observer fully informed of the underlying facts, [would] entertain significant doubt that justice would be done

---

[5] Moreover, the comparison to a World War-I era case in which a federal judge exhibited blatant xenophobia is an analogy that is, at best, inapt.

7

**SPA8**

absent recusal." *Carlton*, 534 F.3d at 100. Even if the court's comments at time evinced not just frustration and impatience, but some sort of distaste for the defendant, no reasonable observer would, after witnessing the trial over which the court was then presiding, earnestly believe that the distaste was the result of some sort of extrajudicial bias or deep-seated antagonism. This threshold has therefore also not been met.[6]

### B. Restitution Hearing Conduct

Second, the Defendant asserts that "Judge Garaufis displayed an unacceptable bias toward Mr. Raniere's Defense team by letting his frustration with the Defense's request for a delay" of the Restitution Hearing interfere with his duty to preside over the trial impartially. (Mot. at 24.) Here too, there is no evidence that the court harbored any bias with an extra-judicial source against Mr. Raniere. The restitution hearing in question happened *after* the trial took place. Moreover, any conduct evincing bias was allegedly aimed toward an attorney hired by Defendant Raniere after the conclusion of trial, and there is no evidence that any disagreement between the court and that counsel reflected a broader issue between the court and the defendant. Thus, the court exhibited no bias stemming from *either* an extrajudicial or judicial source toward the Defendant at this time, let alone the "deep seated . . . antagonism" required to mandate recusal under 28 U.S.C. 455(a). *Liteky*, 510 U.S. at 555. Finally, the fact that the allegedly biased conduct was directed only toward one of a series of lawyers representing the defendant, and never toward the defendant himself, weighs strongly against any finding that the

---

[6] The Defendant also raises the question of whether less extreme measures would have been possible. It is altogether possible that less extreme measures were available. However, that is not the standard to which this court must be held in considering a recusal motion.

8

district court "harbors actual prejudice or bias against a defendant," *Osinowo*, 100 F.3d at 2. This incident therefore also does not require recusal under 28 U.S.C. 455(b)(1).

### C. Sentencing Hearing Conduct

Third and finally, the Defendant argues that this court's choice to "tripl[e] the sentence of Ms. Bronfman, a first-time offender, because she refused to 'renounce' Mr. Raniere and the NXIVM organization," presents further evidence of this court's bias toward Defendant Raniere. (Mot. at 26.)

In determining the appropriate sentence for Defendant Bronfman, the court considered the required sentencing factors. 18 U.S.C. § 3553(a). These factors include the need for a sentence that reflects the seriousness of the offense, the need for a sentence that promotes respect for the law, and the goal of providing a just punishment. (*See* Bronfman Sent. Tr. at ECF 121); *see also* 18 U.S.C. § 3553(a)(2)(A). The court made no findings as to whether Defendant Bronfman had any real time knowledge of the extent of Defendant Raniere's criminal behavior. As part of its analysis of the sentencing factors, however, the court did take into consideration Defendant Bronfman's continued support for Defendant Raniere *after* learning the full extent of his criminal conduct. (*See* Bronfman Sent. Tr. at ECF 123 ("It does, however, concern me that she continues to stand by Raniere and believe in his work, even as he stands convicted of heinous conduct."); *see also* Mandate of USCA as to 20-5320-cr (Dkt. 118) ("Summary Order") at ECF 38 ("a full reading of the District Court's lengthy statement (which covers thirty pages of the transcript) shows that it was primarily concerned with Bronfman's actions *after* she found out about DOS in June 2017, including gher reinvigorated support of Raniere").) In doing so, the court displayed fidelity to its obligation to carefully weigh the sentencing factors and other relevant information, and therefore displayed no bias—extra-judicial or otherwise.

9

The court carefully articulated the ways in which Defendant Bronfman's actions in devotion to Defendant Raniere without regard to the seriousness of his crimes had reflected a sincere lack of respect of the law. The court also endeavored to consider how the sentence compared to sentences of other similarly situated defendants. But, as the court took great pains to describe, the circumstances of Ms. Bronfman's offenses, and in particular the relationship between her and Mr. Raniere, provided important context when considering the seriousness of her offenses, and set her conduct far apart from other otherwise similarly situated defendants. (Bronfman Sent. Tr. at ECF 124 ("[T]he context of Ms. Bronfman's criminal conduct places her in [an] all together different category from other defendants convicted of the same offenses; and, therefore, her circumstances defy easy comparison.").) Indeed, the court made clear that "the offenses of conviction . . . were more serious here than those crimes might ordinarily be under other circumstances." (Bronfman Sent. Tr. at ECF 121.) The Second Circuit, affirming this court in full, agreed wholeheartedly with this assessment, pointing out that her "conduct—before and after her indictment—readily distinguishe[d] her" from her co-defendants, and reiterating this court's assertion that the context for her criminal conduct set her far apart from other defendants convicted of the same offenses. (Summary Order at ECF 38.) In sentencing Ms. Bronfman accordingly, the court appropriately exercised its wide discretion in matters of sentencing. (*See id.*) ("[T]he District Court acted well within its discretion in arriving at its conclusion.")

To have considered Ms. Bronfman's relationship with Mr. Raniere in the process of doing so does not indicate impermissible bias—either of the objective sort required for recusal under 455(a) or of the actual sort required for recusal under 455(b)(1). 28 U.S.C. § 455(a)-(b)(1). Indeed, "[t]he Second Circuit has repeatedly held that a sentencing court is entitled to rely on

**SPA11**

information gleaned from a trial in which the person to be sentenced was neither a defendant nor represented by counsel." (Bronfman Sent. Tr. at ECF 100.) To the extent the court properly gleaned such information about that relationship from the lengthy trial and the surrounding proceedings, and weighed that evidence at sentencing, it was proper to do so.

## IV. CONCLUSION

For the foregoing reasons, Defendant Raniere's motion seeking for this court to recuse itself prior to consideration of Rule 33 motions in this action is DENIED.

SO ORDERED.


Dated:      Brooklyn, New York
            April 2$\underline{6}$, 2023

                                        s/Nicholas G. Garaufis

                                        NICHOLAS G. GARAUFIS
                                        United States District Judge

11

**SPA12**

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
UNITED STATES OF AMERICA,

                             **MEMORANDUM & ORDER**
                             **18-CR-204 (NGG)**

       -against-

KEITH RANIERE,

                 Defendant.

NICHOLAS G. GARAUFIS, United States District Judge.

Before the court are two motions filed by Defendant Keith Raniere: (1) his motion for reconsideration of the court's November 6, 2023, Memorandum and Order denying his motion to compel production of evidence, (*see* Mot. for Recons. (Dkt. 1225)), and (2) a separate motion to compel production of evidence. (*See* Post-Conviction Mot. to Compel dated December 21, 2023 ("Second MTC") (Dkt. 1230).) For the reasons set forth below, both motions are DENIED.

The court further sets April 22, 2024, as the final deadline for Defendant's submission of his Reply in support of his pending Rule 33 motion.

**I. BACKGROUND**

The court assumes familiarity with the background of this case. In brief, Mr. Raniere was convicted on June 19, 2019 on seven counts, including racketeering, racketeering conspiracy, wire fraud conspiracy, forced labor conspiracy, sex trafficking conspiracy, and two counts of sex trafficking. (*See* Jury Verdict (Dkt. 735).) On October 27, 2020, he was then sentenced to 120 years in the custody of the Federal Bureau of Prisons. (*See* October 27, 2020 Minute Entry (Dkt. 968).) Since his conviction, Mr. Raniere has filed three motions for a new trial pursuant to Fed. R. Crim.

1

P. 33. (*See, e.g.*, First Rule 33 Mot. (Dkt. 851); Second Rule 33 Mot. (Dkt. 956); Third Rule 33 Mot. (Dkts. 1169, 1176).) The court denied the first two of the these. (Mem. and Order dated July 17, 2020 (Dkt. 902) (denying first Rule 33 motion); Mem. and Order dated October 23, 2020 (Dkt. 963) (denying second Rule 33 motion).) His third remains pending.

Since filing his latest Rule 33 motion, Mr. Raniere has made two requests to the court to compel the Government to produce information relating to his child exploitation and child pornography predicate acts. (*See* Post-Conviction Mot. to Compel dated April 14, 2023 ("First MTC"); Second MTC.) On November 6, 2023, this court denied Mr. Raniere's first motion to compel the production of evidence. (*See* Mem. and Order dated November 6, 2023 (Dkt. 1224) (denying First MTC).) Mr. Raniere then moved for reconsideration of this denial two weeks later. (Mot. for Recons; *see also* Opp. to Mot. for Recons. (Dkt. 1229).) He then filed his second, separate request for the court to compel production of evidence on December 21, 2023. (Second MTC; *see also* Opp. to Second MTC (Dkt. 1231); Reply (Dkt. 1233); Supp. Reply (Dkt. 1235).)

The court considers the motion for reconsideration and the latest motion to compel in turn.

## II. MOTION FOR RECONSIDERATION

The standard courts apply when considering motions for reconsideration "is strict, and reconsideration will generally be denied unless the moving party can point to controlling decisions or data that the court overlooked—matters, in other words, that might reasonably be expected to alter the conclusion reached by the court." *Shrader v. CSX Transp., Inc.*, 70 F.3d 255, 257 (2d Cir. 1995). A motion for reconsideration "is not a vehicle for relitigating old issues, presenting the case under new theories, securing a rehearing on the merits, or otherwise taking

2

a second bite at the apple[.]" *Analytical Surveys, Inc. v. Tonga Partners, L.P.*, 684 F.3d 36, 52 (2d Cir. 2012). Courts in this Circuit have thus generally held that parties seeking reconsideration may not advance new facts not previously presented to the Court. *See In re Facebook, Inc., IPO Secs. & Derivative Litig.*, 43 F. Supp. 3d 369, 373 (S.D.N.Y. 2014) (noting that a "party seeking reconsideration" may not "advance new facts, issues, or arguments not previously presented to the Court.") (quoting *Schonberger v. Serchuk*, 742 F. Supp. 108, 119 (S.D.N.Y. 1990)); *United States v. Morillo-Vidal*, No. 10-CR-222 (RWS), 2011 WL 4072173, at *2 (S.D.N.Y. Sept. 13, 2011); *see also* Local Civil Rule 6.3 ("No affidavits shall be filed by any party unless directed by the Court.")

Mr. Raniere does not cite to any controlling law that the court overlooked. (*See generally* Mot. for Recons.) He asserts that the court overlooked two items that Defendant argues are "critical"—(1) that it was fundamentally unfair for the court to consider the Loveall Declaration and (2) that the Loveall Declaration was incorrect. (Mot. for Recons. at 1-2); *see also* Loveall Decl. (Dkt. 1213-3).) But neither of these arguments were overlooked or alter the conclusion reached by the court. The court, in denying the motion to compel evidence, found that Mr. Raniere did not have "(1) *Brady* rights to this information; (2) post-conviction due process rights to this information; and (3) the right to this information under principles of 'elemental fairness.'" (Mem. and Order dated November 6, 2023 at 5.) The Loveall Report was considered by the court in the latter "elemental fairness" analysis alongside the "ample evidence at trial" when finding that "even assuming" a standard premised on "elemental fairness" applied, Mr. Raniere could not meet this standard. (*Id.* at 8-10.) Specifically, the court found that:

> Mr. Loveall's report, refuting Kiper's key findings, offers a far more plausible and convincing explanation of any anomalies

3

**SPA15**

in the photos' metadata. Mr. Loveall's report is further supported by the ample evidence presented at trial and Camila's declaration that she is certain of the circumstances and timing of the photos. In sum, the evidence presented at trial, the Government's expert report, and Camila's declaration substantially outweigh the arguments raised in the Report and Mr. Raniere's motion. Mr. Raniere therefore does not raise a reasonable probability that testing the evidence would demonstrate he did not commit the offense. (*Id.* at 10.)

Mr. Raniere's arguments in the present motion questioning the veracity of the report are better characterized as attempts to relitigate old issues. *See Analytical Surveys, Inc.*, 684 F.3d at 52. The court therefore DENIES Defendant's motion for reconsideration.

### III. SECOND POST-CONVICTION MOTION TO COMPEL

This Second MTC has much in common with the first. Mr. Raniere again requests information that he argues will demonstrate that the Government fabricated evidence relating to his conviction of racketeering acts of child pornography and child exploitation. (*See generally* Second MTC.)[1] And he again argues that withholding this information violates his due process rights and principles of "elemental fairness." (*Id.* at 9-12).

The court thus incorporates its discussion concerning the relevant standards to Mr. Raniere's request to compel production of

---

[1] In his First MTC, "Mr. Raniere request[ed] (1) two forensic copies of the camera card and corresponding FTK log files; (2) a file listing of the Hard drive that contained the images of child pornography (the "Western Digital hard drive"); and (3) CART examination notes." (Memorandum and Order dated November 6, 2023 at 3 n.1.) In his Second MTC, Mr. Raniere requests: "all information pertaining to the unknown photograph technician who, prior to trial, and without authorization, changed and forensically manipulated an unpreserved, essential piece of evidence – the camera card." (Second MTC at 1; *see also* Second MTC, Ex. A (Requested Information Relating to the Photograph Technician) (Dkt. 1230-1).)

4

evidence from its November 6, 2023 order. (*See* Mem. & Order dated November 6, 2023 at 5-11.) In considering Defendant's present request under these standards, the court finds that Mr. Raniere does not have post-conviction due process right to the requested information and DENIES his motion.

Mr. Raniere again does not cite any law showing he has a right to the information requested. He primarily relies on *U.S. v. Abuhamra* 389 F.3d 309, 322. (2d Cir. 2004), for the contention that the Government must hand over this information. (*See* Second MTC at 9-10). In *Abuhamra*, the Second Circuit found that the respondent's right to a fair hearing was violated when the district court relied on information presented *ex parte* and *in camera* when denying respondent's bail application. *Id.* at 332-33. *Abuhamra* is thus inapplicable to this case where the court did not rely on arguments presented *ex parte* or *in camera* and does not concern access to information relevant to a party's bail application. This motion instead concerns a request for information relevant to Mr. Raniere's post-conviction motion for a new trial. His rights to this information therefore "must be analyzed in light of the fact that he has already been found guilty at a fair trial, and has only a limited interest in postconviction relief." *Dist. Attorney's Off. for Third Jud. Dist. v. Osborne,* 557 U.S. 52, 69 (2009).

And Mr. Raniere again does not demonstrate that "elemental fairness" should lead the court to compel the Government to grant him access to this information. Mr. Raniere's counsel had an opportunity to review and test the veracity of the photographic evidence prior to trial. (*See* Mem. and Order dated November 6, 2023 at 10-11.) The evidence requested would thus not support his Rule 33 motion because he cannot show that "'the evidence could not with due diligence have been discovered before or during trial.'" (*Id.* (quoting *United States v. Forbes,* 790 F.3d 403, 408-09 (2d Cir. 2015)). And Mr. Raniere is unable to

5

show that the evidence raises a reasonable probability as to his innocence in light of the substantial evidence supporting the relevant charges in addition to the photos, including:

> messages from [the victim] where she referenced her sexual relationship with Raniere beginning in 2005 when she was fifteen years old; communications from Mr. Raniere referencing the photos; testimony from [the victim's] sister that she was aware of the relationship prior to Fall 2006; a folder containing nude pictures of the other women with whom Mr. Raniere had a sexual relationship and in which the pictures of [the victim] were found; testimony that Mr. Raniere sought to take similar pictures of other women; [the victim's] medical records, which included statements indicating she was in a sexual relationship with the same partner since she was underage; and testimony from [the victim's] sister identifying her as the person in a sanitized version of the photos. (Id. at 2.)

The Government provided additional information rebutting the claims of fabrication including: a declaration from the victim verifying the photos and the Loveall report discussed above. (*Id.* at 4, 9-10.) Considered together, Mr. Raniere is unable to demonstrate a reasonable probability that he did not commit the offense.

The court therefore finds that "Mr. Raniere provides no legal support for his request, and even if applying his desired standard of 'fundamental fairness,' Mr. Raniere fails to show that access to this evidence violates fundamental fairness." (*Id.* at 11.)

## IV. RULE 33 MOTION

Mr. Raniere was convicted in June 2019 and his third Rule 33 motion for a new trial has been outstanding since May 2022. (*See* Third Rule 33 Mot.) The court has not ruled on this motion primarily due to his filing of separate motions that the court

6

**SPA18**

considered and decided. (*See e.g.,* Not. of Mot. for Recusal (Dkt. 1170); First MTC; Second MTC.) The court also granted multiple requests to extend the deadline for Mr. Raniere to file a reply in support of his third Rule 33 motion due to logistical challenges presented by Mr. Raniere's incarceration. (*See* Def. Mots. for Extension of Time to Reply (Dkts. 1217, 1220, 1221, 1222, 1226).)

This court granted the most recent extension of time to file a reply on November 28, 2023, at which time the court noted that it would update the deadline for the Reply when ruling on Mr. Raniere's motion for reconsideration. (See Min. Entry dated November 28, 2023.) The court now sets the deadline for April 22, 2024, approximately 45 days following the release of this order. The court will not grant an additional request for an extension beyond this date. Mr. Raniere has had ample time to consider and respond to the Government's response to Mr. Raniere's third Rule 33 motion and now has an additional 45 days to do so. Any potential prejudice in not granting an additional extension is outweighed by an interest in the finality of his conviction.

7

**SPA19**

### V.   CONCLUSION

For the reasons discussed herein, the court DENIES Mr. Raniere's motion for reconsideration and second post-conviction motion to compel. The court further sets a final deadline of April 22, 2024, for Mr. Raniere to file his reply in support of his pending third Rule 33 motion for a new trial.

SO ORDERED.

Dated:     Brooklyn, New York
           March 6, 2024

s/Nicholas G. Garaufis

NICHOLAS G. GARAUFIS
United States District Judge

8

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
UNITED STATES OF AMERICA,

-against-

KEITH RANIERE,

                    Defendant.

**MEMORANDUM & ORDER
18-CR-204 (NGG)**

NICHOLAS G. GARAUFIS, United States District Judge.

On June 19, 2019, Defendant Keith Raniere was convicted of racketeering, racketeering conspiracy, wire fraud conspiracy, forced labor conspiracy, sex trafficking conspiracy, and two counts of sex trafficking. (*See* Jury Verdict (Dkt. 735); Judgment (Dkt. 969) at 1-2.) Now before the court is Mr. Raniere's third motion for a new trial premised on what he argues is newly discovered evidence relating to two of the eleven predicate acts supporting his racketeering conviction. (*See* Not. of Mot. (Dkt. 1168); Mem. of Law in Support of Mot. for Rule 33 Relief ("Mot.") (Dkt. 1169); Suppl. to Mot. (Dkt. 1176); *see also* Mem. and Order dated July 17, 2020 (Dkt. 902) ("First Rule 33 M&O") (denying Defendant's first Rule 33 motion); Mem. and Order dated October 23, 2020 (Dkt. 963) ("Second Rule 33 M&O") (denying Defendant's second Rule 33 motion).)[1]

---

[1] In addition to this third Rule 33 motion, Mr. Raniere filed a *pro se* fourth new trial motion on June 21, 2022. (*See* Pro Se Mot. (Dkt. 1178).) This motion raises the same issues previously considered by this court when denying Mr. Raniere's first two motions for a new trial relating to allegations of Government intimidation or perjury by key witnesses, which this court has previously rejected as bases to grant a new trial, as well as issues raised in the present motion which the court considers herein. Mr. Raniere's *pro se* motion is therefore also DENIED. (*See generally* First Rule 33

1

For the reasons discussed herein, Mr. Raniere's motion for a new trial is DENIED.[2]

## I.  BACKGROUND

The court assumes familiarity with this case's background, which the court reviews only as relevant to the present motion.[3]

As the leader of NXIVM, Mr. Raniere engaged in criminal activities that led a jury to find him guilty of racketeering, racketeering conspiracy, forced labor conspiracy, wire fraud conspiracy, sex trafficking conspiracy, and two counts of sex trafficking. (*See* Judgment at 1-2; *see also* Sentencing Mem. (Dkt. 966) at 9-18 (describing underlying criminal activity).) Mr. Raniere's racketeering charge was predicated on eleven acts, including child exploitation and possession of child pornography. (*See* Jury Verdict at 2-3.) The jury found that the Government proved each of these eleven predicate acts beyond a reasonable doubt. (*Id.*)

The child pornography and child exploitation predicate acts are the focus of this motion. These acts were added in the second superseding indictment returned by the grand jury in March 2019. (*See* Second Superseding Indictment (Dkt. 430) ¶¶ 21-23);

---

M&O (discussing purported perjury); Second Rule 33 M&O (discussing purported Government intimidation).)

[2] On April 19, 2024, Mr. Raniere filed a habeas petition which discusses some of the same underlying facts reviewed in his Rule 33 motion, but in the context of constitutional ineffective assistance of counsel claims. (*See* Habeas Petition (Dkt. 1252) at 27-42.) Because the habeas petition considers separate claims, the court finds that it is proper to consider the outstanding Rule 33 motion and the habeas petition separately. This order thus RESERVES DECISION on the outstanding habeas petition pending additional briefing from the parties.

[3] Much of the underlying facts relevant to this motion were recently reviewed when denying Mr. Raniere's request to compel evidence. (*See* Mem. and Order dated Nov. 6, 2023 (Dkt. 1224) at 1-3.)

2

*see also, generally,* Superseding Indictment (Dkt. 50).) Specifi-
cally, they were added after the Government discovered
pornographic images depicting a minor in February 2019, while
reviewing a previously seized hard drive (the "Western Digital
hard drive"). (Gov Mem. of Law in Opposition to Rule 33 Mot.
("Opp.") (Dkt. 1213) at 4-5; *see also* Letter from Government
dated February 21, 2019 (Dkt. 362) (noting discovery of child
pornography images on the Western Digital hard drive).) The de-
fense moved to dismiss or sever the newly added predicate acts
(Defense Letter dated March 17, 2019 (Dkt. 436)), which this
court denied. (Mem. and Order dated April 29, 2019 (Dkt. 600)
at 31-32.)

The defense initially raised concerns about their ability to analyze
the evidence relating to the newly added predicate acts prior to
the start of the trial, which was then scheduled for April 29, 2019.
(*See, e.g.*, Defense Letter dated March 17, 2019 at 2; March 18,
2019 Status Conference Tr. (Dkt. 467) at 20:11-24 (noting that
jury selection was to begin on April 8, 2019, with the trial to
begin on April 29, 2019).) However, in a filing dated March 22,
2019, Mr. Raniere represented that he was ready for trial "even
though the government has superseded the indictment" and he
"request[ed] that the Court keep the dates for the current trial
schedule." (Defense Mem. dated March 22, 2019 (Dkt. 456-1) at
2-4.) Given the conflicting statements from Mr. Raniere's defense
team, the Government sought to ensure that he was ready to pro-
ceed, after noting numerous times that it would consent to the
trial's adjournment if necessary to allow his defense team time to
conduct a forensic examination of the photographs and the pho-
tographs' metadata. (*See, e.g.*, Gov. Mem. of Law dated March
29, 2019 (Dkt. 485) at 6-10.)

The issue of a potential delay in the trial was then discussed at a
status conference held on April 4, 2019, where the Government
raised the defense's prior statements that Raniere may not be

3

ready for trial following the recent filing of the Second Superseding Indictment. (April 4, 2019 Status Conference Tr. (Dkt. 510) at 11:14-17.) The court therefore asked Mr. Raniere's defense counsel whether they could make an "affirmative statement that based on what's in the second superseding indictment . . . that [Mr. Raniere] will still be ready to go to trial." (*Id.* at 14:20-25.) Mr. Raniere's counsel responded saying that he will "be ready to go to trial." (*Id.* at 15:1-5.) Mr. Raniere's counsel also noted that the Government had been "very responsive" and accommodating in allowing the defense's forensic expert to visit the FBI to examine the relevant evidence. (*Id.* at 12:10-13:2, 15:1-5.) The trial then began on May 7, 2019. (*See* Dkt. 631.)

At trial, the Government introduced the photographs of the victim and metadata to prove the child pornography and child exploitation predicate acts. (Opp. at 19.) Further evidence proving that the pictures were from 2005 when the victim was fifteen years old included messages from the victim where she referenced her sexual relationship with Raniere beginning in 2005; communications from Mr. Raniere referencing the photos; testimony from the victim's sister that she was aware of the relationship prior to Fall 2006; a folder containing nude pictures of the other women with whom Mr. Raniere had a sexual relationship and in which the pictures of the victim were found; testimony that Mr. Raniere sought to take similar pictures of other women; the victim's medical records, which included statements indicating she was in a sexual relationship with the same partner since she was underage; and testimony from the victim's sister identifying the victim as the person in a sanitized version of the photos. (*Id.* at 19-20 (citing trial exhibits and the trial transcript).)

Mr. Raniere's counsel cross-examined FBI Senior Forensic Examiner Booth extensively about the photographic evidence, the

4

Western Digital hard drive, the camera card ("CF card"), the related metadata, and the chain of custody of the digital evidence. (June 13, 2019 Trial Tr. (Dkt. 979) at 4898:1-4947:4, 4962:8-4975:4, 4986:19-4988:21.) During his testimony, Booth acknowledged before the jury that the metadata was not reliable as to when the photos were taken (*id.* at 4940:13-15), that metadata could be changed or altered (*id.* at 4987:21-4988:12), and that he was unaware of who accessed the camera card on September 19, 2018 while it was in the FBI's possession. (*Id.* at 4973:19-25.)

The victim depicted in these photographs did not testify at trial, but she submitted a sworn declaration in response to this motion. (*See* Camila Decl. (Dkt. 1213-1).) In the declaration, the victim affirms that she reviewed each of the photographs at issue and that she is certain both that she is the subject of each photo and that she was 15 years old when the photos were taken. (*Id.* ¶¶ 5, 8.) She also affirms that Mr. Raniere began sexually abusing her in 2005, when she was 15 years old. (Camila Decl. ¶ 5; *see also* Camila Impact Statement (Dkt. 965-1) at 1.)

Following his conviction in June 2019, Mr. Raniere has filed multiple motions for a new trial pursuant to Fed. R. Crim. P. 33. (*See* Mot.; First Rule 33 M&O; Second Rule 33 M&O.) His first two were denied in July and October 2020. (First Rule 33 M&O; Second Rule 33 M&O.) The present motion was filed in May 2022. (*See* Mot.) The Government responded to this motion in July 2023 and Mr. Raniere filed his Reply on April 17, 2024.[4]

---

[4] The delay in briefing of the present motion largely resulted from stays while the court considered separate motions filed by the Defendant or his appeals of separate motions. The court also granted numerous requests by the defense for extension of time to submit Mr. Raniere's Reply. (*See* Mem. and Order dated March 6, 2024 (Dkt. 1238) at 6-7 (reviewing the delay in briefing the present motion).)

5

## II. LEGAL STANDARD

Rule 33 endows district courts with the authority to order a new trial "if the interest of justice so requires." Fed. R. Crim. Pro. 33. District court have "broad discretion to grant a new trial," but should grant such motions "sparingly and in the most extraordinary circumstances, and only in order to avert a perceived miscarriage of justice." *United States v. Gramins*, 939 F.3d 429, 444 (2d Cir. 2019).[5] In considering Rule 33 motions, the focus is "whether letting a guilty verdict stand would be a *manifest injustice*." *Id.*

Relief under Rule 33 based on newly discovered evidence may be granted only upon a showing that "(1) the evidence was newly discovered after trial; (2) facts are alleged from which the court can infer due diligence on the part of the movant to obtain the evidence; (3) the evidence is material; (4) the evidence is not merely cumulative or impeaching; and (5) the evidence would likely result in an acquittal." *United States v. Forbes*, 790 F.3d 403, 406-07 (2d Cir. 2015). The Second Circuit has "long held that to constitute newly discovered evidence, not only must the defendant show that the evidence was discovered after trial, but he must also demonstrate that the evidence could not with due diligence have been discovered before or during trial." *Id.* at 408-09. The court in conducting this analysis considers the balance between "protecting the finality of judgments and the interests of justice [] inherent in the Rule 33 analysis." *Id.* at 408.

## III. DISCUSSION

Mr. Raniere fails to demonstrate that justice requires a new trial, and the court therefore denies his motion.

---

[5] When quoting case law, except as otherwise noted, all citations and internal quotation marks are omitted, and all alterations are adopted.

6

**SPA26**

The basis for the Defendant's motion are allegations that the Government manipulated and fabricated "all the key evidence" used to prove the child pornography and child exploitation predicate acts. (Mot. at 3.) In his Reply, Mr. Raniere clarifies that he does not allege that the photos themselves were falsified, but instead only that the "files, timestamps, folders and metadata" associated with the pictures were fabricated. (Reply (Dkt. 1253) at 16-17.) This purported clarification is surprising because in the very first sentence of Mr. Raniere's memorandum in support of the present motion filed in May 2022, he states that "the government manufactured child pornography and planted it on a computer hard drive to tie it to him." (Mot. at 3.) And subsequent filings did not contradict this statement but instead reinforced it through broad statements such as: "the child pornography evidence was fabricated." (First Post-Conviction Mot. to Compel (Dkt. 1192) at 3-4.) His Reply therefore directly contradicts his prior representations about the photographic evidence at issue. Nevertheless, in light of his Reply's purported clarification, the court considers the digital evidence's "files, timestamps, folders, and metadata." (Reply at 17.)

The Defendant argues that the FBI falsified metadata on the digital camera card ("CF card") and Western Digital hard drive to fit the Government's narrative that the photographs were taken in 2005 when the victim was fifteen years old. (*See, e.g.,* Mot. at 12-13.) He further alleges that he did not have time to thoroughly examine the metadata evidence (Reply at 2), and that the Government covered up this manipulation by soliciting false testimony during trial. (Mot. at 19-20.)

These allegations of data manipulation do not constitute newly discovered evidence under Rule 33, which requires the defendant to show that "the evidence was discovered after trial . . .[and]

7

**SPA27**

that the evidence could not with due diligence have been discovered before or during trial." *Forbes*, 790 F.3d at 409. They are also contrary to the record.

In the leadup to trial and during trial, Mr. Raniere was made aware of the metadata evidence soon after the Government discovered the photographs on the Western Digital hard drive. (*See* Letter from Government dated February 21, 2019.) His defense then had an opportunity to test and challenge this evidence prior to trial, including by hiring a forensic expert who visited the FBI to review this evidence. His defense then had an opportunity to cross-examine the FBI Agent called by the Government to discuss the photos and their metadata. In this cross-examination, the Agent testified to the metadata and its ability to be altered. (June 13, 2019 Trial Tr. at 4987:21-4988:20.) The jury considered this evidence alongside other evidence presented at trial and convicted Mr. Raniere of these charges.

Raniere argues that even if his defense team was aware of the evidence, a new trial is warranted because there was not sufficient time for his experts to analyze the metadata. (Reply at 10.) But this post-trial argument is in conflict with Mr. Raniere's trial counsel clearly stating multiple times after the photographs were discovered and the new charges were added to his Second Superseding Indictment that he was ready for trial. (*Cf.* April 4, 2019 Status Conference Tr. at 15:1-5; Defense Mem. dated March 22, 2019 at 2-4.) The Government offered to adjourn the trial date on consent specifically to allow the defense to have more time to examine the evidence connected to his child pornography and exploitation charges, which he rejected. (*See* Gov. Mem. of Law dated March 29, 2019 at 6-10; April 4, 2019 Status Conference Tr. at 15:1-5.)

Mr. Raniere ultimately seeks to have a new trial to challenge evidence that he previously stated he was ready to challenge, that

8

he had the opportunity to challenge, and that he did in fact challenge during his trial. The jury found him guilty of the predicate acts at issue so he now attempts to manufacture "new evidence" he argues would lead to his acquittal to receive a second bite at the apple. These are not extraordinary circumstances where a new trial is necessary to prevent a manifest injustice.

Mr. Raniere separately argues that it was "impossible" to discover certain evidence relating to the metadata, specifically, the camera card and details of the chain of custody of the metadata. (Reply at 9-10.) In doing so, he seeks to distinguish the metadata evidence his defense indisputably had the opportunity to review and challenge—*i.e.*, the evidence found on the Western Digital hard drive—from other evidence connected to the metadata. (*Id.*) His argument is that if given the opportunity to examine this other source of the metadata, it would reveal the "tampering" on which his motion relies. (*Id.*) This argument fails. Mr. Raniere seeks to circumvent his defense's ability to inspect and challenge the photographs' metadata by distinguishing the evidence his defense reviewed from other pieces of evidence such as the CF card—which, to be clear, his defense was also aware of during trial (*see, e.g.*, June 13, 2019 Trial Tr. 4901:1-25, 4902:11-25, 4906:10-4907:4)—to argue that the evidence now in focus is both "newly discovered" and the "key evidence" that would prove his innocence. But the Defendant provides no persuasive argument that he could not have discovered this evidence with diligence, *see Forbes*, 790 F.3d at 409, or that the evidence now in focus demonstrates manipulation or falsification of metadata that would support an acquittal. Ultimately, as with his prior unsuccessful motion for a new trial, Mr. Raniere "does not point to a single case in which a court has recognized the kind of evidence he cites as the basis for his motion as 'newly discovered evidence' under Rule 33." (Second Rule 33 M&O at 7.)

9

The motion also fails because Mr. Raniere cannot demonstrate that the purported newly discovered evidence would result in acquittal or otherwise demonstrate that a new trial is necessary to prevent a manifest injustice. *Forbes*, 790 F.3d at 411. Mr. Raniere's primary support for his argument that the metadata was falsified are proffered expert reports submitted alongside his motion. (Reply at 3-4; *see also* Kiper Report (Dkt. 1169-1) at ECF 195-264); *see also* Dkt. 1178-2.) In response to these reports, the Government submitted a Declaration by David Loveall II, a Senior Computer Scientist with the FBI. (Loveall Decl. (Dkt. 1213-3).) This court previously considered the Defendant's and Government's reports when denying Mr. Raniere's motions to compel evidence. (*See* Mem. and Order dated Nov. 6, 2023 (Dkt. 1224) at 3-4, 9-10; Mem. and Order dated March 6, 2024 (Dkt. 1238) at 3-4.) In doing so, the court found that the Loveall Declaration "offers a far more plausible and convincing explanation of any anomalies in the photos' metadata" than the reports submitted by the Defendant, especially when considered alongside the "ample evidence presented at trial," *see supra*, and the victim's affidavit affirming that she was fifteen in the photographs. (Mem. and Order dated Nov. 6, 2023 at 9-10; Mem. and Order dated March 6, 2024 at 3-4.).) Mr. Raniere disagrees with the court's prior findings in his Reply. (Reply at 18-21.) But he provides no reason for the court to reconsider its prior determination that the evidence presented at trial, the Loveall report, and the affidavit submitted by the victim verifying her identity and age in the photos provide a far more plausible explanation for the discrepancy in the metadata than the Defendant. The court is confident that the evidence demonstrates Mr. Raniere's guilt as to these charges.

In sum, the court finds that the evidence is not newly discovered under Rule 33 and that, even if it was considered newly discovered, it would not "likely result in an acquittal." *Forbes*, 790 F.3d at 407. Justice does not require a new trial and the court denies

10

Mr. Raniere's Rule 33 motion.[6] *See United States v. Snyder*, 740 F. App'x 727, 728 (2d Cir. 2018) (summary order) ("A district court ordinarily should not grant a new trial unless it is convinced that the jury has reached a seriously erroneous result or that the verdict is a miscarriage of justice.").

## IV. CONCLUSION

For the foregoing reasons, Defendant's Motion for a New Trial is DENIED and his request for an evidentiary hearing is DENIED as moot.

SO ORDERED.

Dated:      Brooklyn, New York
            April 27, 2024

                                    s/Nicholas G. Garaufis
                                    NICHOLAS G. GARAUFIS
                                    United States District Judge

---

[6] The court further finds that an evidentiary hearing is not necessary to decide the present motion. *See United States v. Ghavami*, 23 F. Supp. 3d 148, 157 (S.D.N.Y. 2014) ("Whether to hold an evidentiary hearing before deciding a motion for a new trial rests within the district court's discretion."); *see also United States v. Helmsley*, 985 F.2d 1202, 1209-10 (2d Cir. 1993) (district court may properly decline to hold hearing where "the moving papers themselves disclosed the inadequacies of the defendant['s] case").

11

# EXHIBIT 9

**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**

```
-------------------------------------------------------------x
                                            :
SARAH EDMONDSON, et al.,                    :
                                            :
                    Plaintiffs,             :
                                            :    No.: 1:20-cv-00485-(ERK)(CLP)
        v.                                  :
                                            :    [PROPOSED] DISCOVERY PLAN
                                            :
KEITH RANIERE, et al.,                      :
                                            :
                    Defendants.             :
-------------------------------------------------------------x
```

8/13/2025

**Re:  ONGOING DISCOVERY**

**To:    Zahra Dean**
**Kohn, Swift & Graf, P.C.**
**1600 Market Street**
**Suite 2500**
**Philadelphia, PA 19103**
**215-238-1700**
**Fax: 215-238-1968**
**Email: zdean@kohnswift.com**

Dear Ms. Dean,

I hope you are doing well. This is a letter confirming that due to my work schedule, I will not be able to do an "live" meet and confer. As such, I ask that for all discovery that you responded with the response of, or similar to: "Subject to and without waiving the foregoing objections, Plaintiffs state that they will meet and confer with Defendants regarding the scope of a reasonable search for responsive discovery material in their possession, custody, or control." Please simply send me all documents or responses you feel are responsive to those questions, specifically numbers 1, 5, 6, 8, 9,  10, 21, 22, 30, 31, 36, 47, 54, 59 within 10 days. Further, any outstanding

requests you have not responded to, please submit the responses within 10 days, to avoid the need for any motion practice regarding the discovery.

Additionally, as I previously stated there are videos of a sensitive nature that would require secure sending. How would you like those sent?

Finally, if you have any questions regarding the discovery I submitted, please let me know in writing, and I'll respond as quickly as possible.


Thank you,

____/s/ Danielle Roberts_____
Danielle Roberts


CC: All other interested parties via e-mail

KOHN, SWIFT & GRAF, P.C.

1600 MARKET STREET, SUITE 2500

PHILADELPHIA, PENNSYLVANIA 19103-7225

(215) 238-1700
TELECOPIER (215) 238-1968
FIRM E-MAIL: info@kohnswift.com
WEB SITE: www.kohnswift.com

JOSEPH C. KOHN
ROBERT A. SWIFT
ROBERT J. LAROCCA †
DOUGLAS A. ABRAHAMS
WILLIAM E. HOESE
ZAHRA R. DEAN ✛
AARTHI MANOHAR

† ALSO ADMITTED IN NEW YORK
✛ ONLY ADMITTED IN NEW YORK

HAROLD E. KOHN
1914-1999
BAYARD M. GRAF
1926-2015

OF COUNSEL
GEORGE W. CRONER
CARY FLEISHER
LISA PALFY KOHN

Sender's E-Mail:  zdean@kohnswift.com

August 18, 2025

The Honorable Cheryl Pollak
United States District Court
  for the Eastern District of New York
225 Cadman Plaza East
Brooklyn, NY 11201

Re:    *Edmondson et al. v. Raniere et al.*, C.A. No. 20-cv-00485

Dear Magistrate Judge Pollak:

The attorneys for Plaintiffs and defendants Sara Bronfman, Clare Bronfman, and Keith Raniere (collectively, the "Parties") have submitted a joint discovery letter to the Court. Further to your request that the Parties bring to your attention any present discovery disputes by today, Plaintiffs write separately to inform Your Honor about the status of discovery with respect to Ms. Roberts.

Plaintiffs have served document requests and interrogatories on Ms. Roberts, and Ms. Roberts has served document requests on Plaintiffs. On August 6, Plaintiffs and Ms. Roberts exchanged responses and objections, and on August 8, Plaintiffs responded and objected to another set of document requests served by Ms. Roberts. Plaintiffs are not yet required to respond to Ms. Roberts' counterclaim discovery.

On Monday, August 11, and Wednesday, August 13, Plaintiffs proposed dates and times for a live meet and confer with Ms. Roberts. Ms. Roberts informed Plaintiffs via letter on August 13 that she is not available to meet and confer due to her work schedule and that it could be done by letter. Plaintiffs sent Ms. Roberts a letter on August 15 containing their positions on discovery issues and offered to exchange proposed search terms, consistent with what the other parties are doing.

The Honorable Cheryl Pollak
August 18, 2025
Page 2

    With respect to Ms. Roberts' and Plaintiffs' document requests, Plaintiffs have proposed drafting e-discovery search terms and parameters to use to search for responsive documents to Plaintiffs' document requests and Ms. Roberts' first and second set of document requests. Once Plaintiffs and Ms. Roberts agree to the search terms, Plaintiffs will run those search terms against the requests they have agreed to respond to.

    Ms. Roberts has produced documents in response to some of Plaintiffs' requests. However, it is unclear to Plaintiffs to which requests the documents produced are responsive. Plaintiffs have requested that Ms. Roberts provide Plaintiffs with an index identifying each document and to which request the document is responsive.

    With respect to the Plaintiffs' interrogatories, Ms. Roberts has responded to interrogatories 7, 9, 11, 12, 13, 20 and 21, but the verification was not signed. Ms. Roberts has not responded to interrogatories 1, 2, 3, 4, 5, 6, 8, 10, 14, 15, 16, 17, 18, 19. Plaintiffs have told Ms. Roberts that they expect narrative responses to these interrogatories and a signed verification but do not have her final position on responding to these interrogatories. The unanswered interrogatories are set forth on Schedule A attached to this letter.

    Plaintiffs will continue their dialogue with Ms. Roberts regarding discovery.

                                        Respectfully submitted,

                                        *Zahra R. Dean*

                                        Zahra R. Dean

ZRD/yr

cc:    All counsel via ECF

## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF NEW YORK

```
----------------------------------------------------------------x
                                              :
SARAH EDMONDSON, et al.,                      :
                                              :
                    Plaintiffs,               :
                                              :   No.: 1:20-cv-00485-(ERK)(CLP)
            v.                                :
                                              :   [PROPOSED] DISCOVERY PLAN
                                              :
KEITH RANIERE, et al.,                        :
                                              :
                    Defendants.               :
----------------------------------------------------------------x
```

8/20/2025


**The Honorable Cheryl Pollak**
**United States District Court**
**for the Eastern District of New York**
**225 Cadman Plaza East**
**Brooklyn, NY 11201**

### LETTER REGARDING ONGOING DISCOVERY


Dear Magistrate Judge Pollak,

  I hope you are doing well. This is a letter responding to the letter dated August 18, 2025. In regards to the "counterclaim" discovery, I have not made any break between discovery requests being counterclaim discovery or discovery related to the primary claim in this matter. It is my contention that Plaintiff's demarcation between the two types of discovery is simply an excuse to try and delay responding to specific discovery requests. Further, Plaintiffs' counsel's responses are also severely deficient, including those discovery responses they intended to answer as they admitted I told them on August 15, 2025. Nonetheless, I will continue to work in good faith with them to try and get as much good faith responses that I can, and submit my own good faith answers.

As for the e-discovery search terms, I will admit to not being as informed as Plaintiffs' counsel on that matter, and will largely defer to the "search terms and parameters" they come up with, only adding in any I think that are crucial that might have been missed.

As for the document responses, they were sent bates stamped for all 571 pages, but I understand that Plaintiffs' counsel are requesting that 1) an index be made of the admittedly substantial document responses and 2) stating in each response to their questions the documents they are responsive to. This will be completed and sent to them as updated responses to their discovery requests no later than Monday, August 25, 2025 along with the remaining outstanding discovery. I also ask that Plaintiffs' counsel do the same for their responses, specifically those I have pointed out as deficient and state a date for when they expect to complete that work but also those they have already completed that have the same deficiencies.

As for the verification, I will sign that and send it back to them by Monday, August 25, 2025 as well, as this was simply an oversight. As for interrogatories 1, 2, 3, 4, 5, 6, 8, 10, 14, 15, 16, 17, 18, and 19, many were responded to with objections, but stating that after our meet and confer, I will respond further, if necessary to each of those answers. To the extent that any further responses are needed, particularly in light of the documents that have been produced, I will submit those by Monday, August 25, 2025, but still reserve the right to either maintain said objections, or submit further responses at a later date, if more information becomes available, especially if/when Plaintiffs' attorneys respond meaningfully to my discovery requests.

Thank you,

____/s/ Danielle Roberts_____
Danielle Roberts

CC: All other interested parties via e-filing

Danielle Roberts, DO, MS, Pro Se
244 York St. Apt.1
Jersey City, NJ 07302
Tel. (516) 480-1700
Email: Danielle@drdanielleroberts.com

Oct 13, 2025

Honorable Cheryl Pollak, U.S.D.C.J.
Attn: Eric R. Komitee, U.S.D.C.J.
United States District Court for the Eastern District of New York
United States Courthouse
225 Cadman Plaza E,
Brooklyn, NY 11201

Dear Judge Pollak,

Please accept this letter in lieu of a former brief or memorandum of law.

## STATEMENT OF FACT

Defendant incorporates as is stated herein at length the statements in the certification of the Defendant Danielle Roberts as the statement of fact for the purpose of this motion.

## STATEMENT OF PROCEDURAL HISTORY

Defendant incorporates as is stated herein at length the entries of the electronic docket of the case as the statement of procedural history.

## POINT ONE:
## THE MOTION TO COMPEL OR STRIKE SHOULD BE GRANTED BECAUSE THE PLAINTIFFS FAILED TO PROVIDE DISCOVERY WILLFULLY AND CONTUMACIOUSLY

An examination of the certification of Danielle Roberts, DO, MS, Defendant, with the supporting exhibit thereto supports the application made by the Defendant for

striking the allegations of the complaint and at a minimum to compel the discovery requested for which the Plaintiffs have not been compliant. At this time the Defendant is not asking for monetary sanctions, simply because being Pro Se she does not know if she has the right to ask for the time invested in bringing this motion that has been caused by the willful refusal to provide discovery and the evasive conduct seeking substitutes for the compliance that the rule requires that amounts to contumacious conduct or refusal.

Under FRCP 37 (37(b)(2)) the extreme sanction of striking is properly applied after showing noncompliance that was willful, contumacious or in bad faith rather than mere negligence. Courts may issue first an order compelling discovery, we are asking here this minimum from the present court, but we believe that the conduct of the Plaintiffs is such that it amounts to a willful violation that due to the exchanges between the parties the violation was contumacious. The Plaintiff has been warned by letter giving them 10 days to reply with the discovery requests and failed to respond to it with compliance. Lately, there has been a second letter giving them 5 days, the Plaintiff has refused to comply. We submit to the court that this is contumacious behavior. The rule applies to discovery in general and is applicable for example in Discovery for depositions, <u>Connell v. city of New York</u>, 230F, supp. 2nd 432 (S.D.N.Y 2002). This compelling and/or striking applies under R. 37 (a)(B)(iii) to failure to answer interrogatories and Ad Fortiori for answering requests for production of documents served. It also applies under R37 (a)(C)(4) to evasive incomplete disclosure answer or response and, although Defendant is not seeking monetary sanction, the rule provides for the payment of cost and attorney fees where the refusal is not substantively justified

or the award or payment would be unjust. The Defendant is only asking for the compelling, for failure to comply or alternatively, for the willfulness, for the remedy of striking the allegations since the Defendant is well aware under case law that the willfulness is only applicable under R33 to a party that did not raise an objection, and if they raised it failed to make a motion to sustain the objection, see Societe International v. Rogers, 357 US 197 Supreme Court (1958).

The Court examining the exhibits and the statement can see the play of evasiveness, incomplete answers or deliberate evasion, as well as willful refusal in which the Plaintiff used the limited knowledge of the Defendant as a Pro Se layperson to avoid fully disclosing and complying with discovery. The Court has the power to compel an answer that is adequate, Cone Mills Corp. v. Joseph Bon Croft and Sons Co., 33 F.R.D. 318 (D. Del. 1963). In the present case there is no substantial justification or harmlessness in the party who failed to comply, see Hunter v. City of New York, No. 12CV6139(MKB)(RML). United States District Court, E.D. New York. Doc. 146. The Court has only excused noncompliance where the nondisclosure has been harmless, without prejudice to the defendant and unintentional, that can be cured easily and inexpensively, see Lujan v. Cabana management Inc., 284 F.R.D. 50 (E.D.N.Y. 2012), and Hein v. CUPRUM, SA DE CV., 136 F. Supp. 2d 63 (N.D.N.Y 2001).

## CONCLUSION

The motion should be granted because as shown in the certificate of the Defendant the Plaintiffs have been evasive, and have not complied with the discovery requests even after exchange in respect to the discovery between the parties and even after two

letters from the Defendant demanding the discovery, allowing time for compliance and alerting that without compliance this motion would be filed. The Defendant has complied with all of her discovery obligations. The noncompliance by the Plaintiffs has caused harm in the form of significant additional time and resources the Defendant does not have, while trying to support herself on income severely impacted by the loss of career and reputation that the Plaintiffs have caused in the first place by the fabrication of these frivolous charges.

Dated: October 13th 2025

> Respectfully submitted,
>
> */s/ Danielle Roberts*
>
> Danielle Roberts, D.O., M.S. *Pro Se*
> 244 York Street, Apt. 1
> Jersey City, NJ 07302
> Phone: (516) 480-1700
> Email: Danielle@drdanielleroberts.com

**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**

SARAH EDMONDSON, *et al.*

      Plaintiffs,

    v.

Keith Raniere, *et al*

      Defendants.

ORDER

Case N. 1:20 - cv - 00485-EK-CLP

This matter having been brought to the attention of Court by way of motion to compel discovery or strike the allegations of the complaint by the Defendant, Danielle Roberts, DO, MS, Pro Se, and The Court having examined all documents submitted and argument advanced and for good cause,

**IT IS ORDERED,** this _____ of _____, 2025;

    ___ 1. The motion is granted and the Plaintiff is ordered to provide all discovery

requests be it answer to interrogatories or production of documents or both.

    ___ 2. The allegations in the complaint are hereby stricken and the complaint

dismissed.

**AND IT IS FURTHER ORDERED,** that a copy of this order be served upon the party's

attorney _____ of the entering of this order.

_____

United States District Court Judge