Direct Line: +1.516.480.1700
Email: Danielle@drdanielleroberts.com
November 4th, 2025

*** Filed ***
4:25 PM, 14 Nov, 2025
U.S.D.C., Eastern District of New York

The Honorable Cheryl Pollak
United States District Court
for the Eastern District of New York
225 Cadman Plaza East
Brooklyn, NY 11201

Re:     Edmondson et al. v. Raniere et al., C.A. No. 20-cv-00485 Dear Magistrate Judge Pollak:

Dear Magistrate Judge Pollak:

I write to follow-up on the conference held before Your Honor on October 14, 2025. There are three issues I would like to address with The Court; 1. The issue of ESI adherence and disproportionate e-discover demands creating undue time and financial burden on me as a Pro Se litigant, 2.  The Plaintiffs continued abuse of process in this case (adding additional undue burden on my limited time and resources, and The Courts), 3. Lastly, the issue of the parties recording our future meet and confers if any are needed.

**Issue 1:** The issue of ESI adherence and disproportionate e-discover demands creating undue time and financial burden on me as a Pro Se litigant.

During the October 14, 2025 conference, the parties discussed with the Court the issue of discovery delay by the Plaintiffs and issue of search terms. I have since met and conferred with the Plaintiffs as your Honor had requested. It is my understanding that the Plaintiffs position is that search terms are necessary to comply with ESI protocol through the discovery process. It is also my understanding that this is a very technical, and cumbersome process customarily undertaken by a discovery vendor that has developed these skills as a specialty, does this full time, and that these vendors cost upwards of $5000.00 to just get started. The vendor being utilized by the other Defendants required a retainer of $15,000. This is not realistic or feasible for me (see EXHIBIT 1 Financial Hardship Affidavit and EXHIBIT 2 The Accompanying Tax Returns).

Instead, we have agreed that I would provide a letter to Plaintiffs and the Court explaining: (a) my position on the search terms and ESI protocol. (b) why I am unable to hire a vendor to collect and produce documents with full metadata compliant with the ESI Protocol; (b) how I have been conducting searches thus far to respond to Plaintiffs' RFPs; and (c) how I propose to re-produce documents and produce additional documents going forward in a manner that is as compliant as reasonably possible with the ESI Protocol.

Your Honor, in light not only of the facts as they have developed in the exercise of discovery obligations, I want the Court to consider the protection under Rule 26(b)(1) and Rule 26(b)(2) for proportionality, and also under Rule 26(c) for protective orders that prevent the burden of expenses as the case law throughout the nation and in this circuit have sustained. These rule and the following cases prevent undue burden or expense, and allow for equity and justice. Haka v. Lincoln County, No. 15-cv-674 (W.D. Wis. 2007) – incremental approach and shared cost model to prevent disproportionate burdens. Uhlig LLC v. CoreLogic, Inc., No. 22-2416 (D.

Kan. 2023) – cost-shifting based on party resources and proportionality, even where data were accessible. Bilek v. Fed. Ins. Co., No. 19-cv-8389 (N.D. Ill. Nov 29, 2023) – Judge in an order on bifurcated discovery, applied Zubulake factors to limit discovery obligations relative to the party's ability to pay. Zubulake v. UBS Warburg LLC, 217 F.R.D. 309 (S.D.N.Y. 2003) – foundational precedent outlining criteria for cost-shifting in e-discovery.

In the present case, your Honor, the proportionality should be applied and I ask your protection especially when there is only one single cause of action remaining against me, since all of the others were brought frivolously and dismissed.

This is the process I have conducted thus far and suggest moving forward if Your Honor would be so gracious (I have attached the current ESI protocol agreed upon by Counsel for your reference – EXHIBIT 3):

1. I have conducted a thorough search of all devices in my possession, access or control (laptop, iPhone, hard drive, etc) as listed and defined in the discovery instructions at the top of our requests to each other. I have produced all "documents" as defined in these instructions as well and within the 30-day time periods requested.
2. In order to achieve this I have:
   a. Searched any words I could think of that would produce the documents they are requesting and/or would provide information as to the interrogatories they are asking pertaining to the remaining four Battery Plaintiffs left with a claim against me.
   b. In addition, I have used any key words contained in their requests, or any synonym that could yield results.
      i. After their second submission of the same requests, now with the search terms, I repeated my process. Their additional search terms did not yield any additional results. Illustrating that my process is thorough.
   c. On each device I have used the main spotlight search bar on my device to search the entire device for documents or folders that may contain pertinent documents.
   d. In addition, I have gone through any folder on my devices that may contain pertinent information that I am aware of.
   e. If there were documents that may contain key words or information related to the requests (ie: telegram conversations, emails, etc.) I have searched each individual document for those key terms or any additional common sense ones that would yield requested information.
   f. I then either provided the entire document, the entire document with redacted information, or a screen shot of the pertinent information from the document if providing the entire document was outside of the scope of the request as per the discovery instructions.
   g. I am not super technologically savvy. I am working on a MAC and have no training in metadata, file management, TIFF, Jif or the like. If the document was a word document I saved it as a PDF instead to prevent alteration. Pictures, video files, audio files or other document forms I have left in their original form.
   h. For the documents, I created a duplicate and compiled them into a single file with the assistance of a friend who knows how to use adobe so that I could organize and Bate stamp each item in one continuous document for the Plaintiffs.
   i. I created a corresponding table of contents for the Plaintiffs reference corresponding to their numerical requests.

     j.  For any audio files or Video files I have created a duplicate and complied those into a secure Drop Box folder that I plan to share securely with Ms. Dean and Mr. Hoese, (as well as Defendants Counsel) with Your Honor's permission.

         i.  Due to the very personal nature of this case I am requesting that documents, (audio, video and picture files) that should only be revealed to the court be sealed. For example, there are explicit and sensitive videos of Ms. Edmonson that I have waiting to send over to the Plaintiffs that I would request be sealed to protect her, as well as videos of myself or any others that may be produced upon further searches. I will update my index and indicate these documents clearly.

     k.  I have defined what is outside the scope of discovery and what is pointed to the last allegation remaining against me in my responses and objections to the Plaintiffs individual requests and I have done this twice since they Plaintiffs have submitted a second request with search terms two months after their first request was sent.

These are the items I am and have produced forthwith utilizing this process (see EXHIBITs 4-6 as listed directly below):

    EXHIBIT 4: ANSWER TO PLAINTIFFS' FIRST SET OF INTERROGATORIES TO ALL DEFENDANTS
    EXHIBIT 5: RESPONSES TO REQUESTS FOR PRODUCTION OF DOCUMENTS FROM PLAINTIFFS (Roberts Discovery Response 1 092225)
       a.  Roberts Table of contents
       b.  ROBERTS DOCUMENTS BATES STAMPED
    EXHIBIT 6: ANSWER TO PLAINTIFFS' SECOND, FIRST REQEUST FOR PRODCUTION OF DOCUMENTS

This process alone has been cumbersome and has taken all of my waking hours outside of work to achieve, as well as leaning on my friends for favors to help me with the technicalities. I have made every good faith effort to cooperate through manual, limited, or incremental review methods within my technical capabilities. I have done this timely and willingly. The Plaintiffs on the other had have continued to abuse their power in this legal process.

**Issue 2:** The Plaintiffs' continued abuse of process in this case by adding undue and disproportionate burden on me as a Pro Se litigant that does not have the same time, education, capacity, resources or funding.

Where we are: In the recent meet and confer the Plaintiffs insisted that we cannot move forward without search terms. I maintain my position that this is not necessary that my initial requests in my Second Set of Requests to the Plaintiffs for Discovery are specific and pointed to the commonsense requests I have made. My requested search terms are obvious and contained within the request (EXHIBIT 7). They can either produce the documents and answers requested regarding the one last claim that is in question against me and prove tolling, or not. However, I understand the state of New York requires licensed attorneys to adhere to ESI protocols. The Plaintiffs suggested search terms they could use to adhere to this protocol when answering my requests (EXHIBIT 8). I have provided additional search terms and narrowed my requests of them to requests only pointed to the ONE remaining claim against me. I submitted my first set of requests before I understood the nature of discovery and that it is pointed only at the ONE remaining allegation against me, Battery. My initial understanding of discovery was that I would

need to ask ALL possible questions necessary or I would lose the opportunity to bring them later. I have hence come to understand the pointed nature of the discovery at hand, and have focused my requests in my Second Set of requests. I have also, now, delineated between document request and interrogatories in response to a previous objection by the Plaintiffs (EXHIBIT 9). These are the only two requests (one for documents and one for interrogatories) the Plaintiffs are requested to answer at this point (EXHIBIT 9). These were sent to the Plaintiffs in an email correspondence on November 11th, 2025 (EXHIBIT 10).


**Record of abuses causing undue and disproportionate burden on myself and The Court:**

In a in a letter to The Court and The Plaintiffs, August 20th 2025 (over two months ago), I wrote:

"As for the e-discovery search terms, I will admit to not being as informed as Plaintiffs' counsel on that matter, and will largely defer to the "search terms and parameters" they come up with [for me], only adding in any I think that are crucial that might have been missed."

The Plaintiffs did not suggest any search terms for my requests of them. Two warning letters were issued for them to respond. No response – See Notice of Motion to Strike Allegations of the Complaint or Compel Discovery. Additionally, they didn't produce the search terms for their own requests of me until the day before the latest conference with Your Honor - two months after their initial request was sent and days after my Notice of Motion to Strike Allegations of the Complaint or Compel Discovery was submitted to the Court. The remaining claim against me was made well after the period of the statute of limitations. Thus, these delays appear to be solely for the purpose of keeping me in the discovery process (at great expense to me) so that they can gain information pertaining to the other Defendants and delay the inevitable dismissal of the last charge against me.

If their true concern was to comply with the ESI guidelines why would they wait until the day before the conference with you to provide search terms to me, and not choose to suggest any search terms to me as I had requested 2 months prior in my letter to them? The only reasonable explanation for the delay may have been to try to overcome my objections in my first response with better questions. Their additional search terms did nothing of the sort. (I have now answered both requests and their search terms have added nothing, nor cured any of my objections).

Additional examples of Evasive behavior: *Plaintiffs Response to My Second set of Requests, Request No. 1:*

Plaintiffs were the ones that brought the tolling issue to The Court in response to my motion to dismiss. My request No. 1 in my Second Set of document requests to you is clear, pointed and it is obvious what I am requesting in relation to the tolling issue they have brought. I am asking for the evidence (*documents) that would cause the statute of limitations to be tolled. They either have it, or not.

My Request: "Please present all evidence that the Defendant was personally directly or indirectly responsible for the delay in you bringing the specific allegation of Battery against her."

Plaintiffs object to this Request as vague and ambiguous with respect to the terms, "evidence" and "delay," which are not defined and render the Request unworkable as drafted.

   a. They had acknowledged in my Request 1 Response No. 1 that they would interpret my incorrect use of "proofs" as "documents" the term that has been defined in the discovery instructions. My use of "evidence" is a similar misuse. It is clear they understand what I am trying to convey as a layperson, but yet use the semantics to avoid answering the request.

   b. Additionally, the definition of "delay" is clear. Directly from Webster's dictionary it is defined: as a verb, to stop, detain, or hinder for a time, or to cause to be slower or to occur more slowly than normal – Again, they are the ones that brought the tolling issue to The Court's attention. It is obvious that I am seeking any documents that illustrate that I caused a delay in the Plaintiffs bringing the Battery allegation in relationship to the defined statute of limitations you are arguing.

They further object "to the extent it seeks "all evidence" without reasonable limitations as to time, subject matter, or connection to the Battery claim asserted in the Third Amended Complaint."

   a. We've covered the semantics of "all evidence" directly above.

   b.  It's also clear where I request to produce "all documents" that I am requesting all documents as defined in the instructions as "all documents within your possession, access or control." This is customary.

Additionally, there are clear and reasonable limitations as obviously defined by the subject matter they raised to The Court:

       b.   The "time" is clear as defined by the tolling of the statute of limitations they brought in relation to the Battery allegation they also brought.

       c.    "Subject matter" is equally clear and couldn't be more specific – is it directly stated in reference to the Battery allegation and its elements that they have brought.

       d.   I'm not even sure what they mean "or connection to the Battery claim" – my request specifically refers to Battery claim.

Ex 2: *Plaintiffs Response to My Second set of Requests, Request No. 3:*

My Request: "Did you believe that filing the Battery allegation against her when you did was within the one year statute of limitations? If so, why? Please present all documentation that backs up your answer."

Plaintiffs object to this Request "on the ground that it is, in substance, an interrogatory improperly styled as a request for production. The Request seeks narrative information regarding Plaintiffs' beliefs, reasoning, and legal interpretations, rather than requesting specific documents for production as contemplated by Rule 34."

Similar to how they handled my incorrect use of the word "proofs" above - It is clear they understand what I am trying to convey as a layperson, but yet use the semantics to avoid answering the request.

Your Honor, it has taken approximately 6 years for the Plaintiffs to try to gain standing. They don't have it and they won't have it. They brought outrageous RICO allegations of sex trafficking and forced labor against Dr. Porter. They were dismissed. They did the same with me. They were dismissed. They have tried to establish the same RICO standing for multiple other Plaintiffs and failed. They have tried to sneak additional "new schemes" in without seeking the Courts permission to amend the TAC for a Fourth time (Status conference Doc. 290 page 5-6: 10-3). Plaintiffs and their attorneys cannot win with the facts of this case, so they are trying to obscure the truth with tiresome games that steal time and effort from everyone that they roped into this scheme.

As mentioned in our latest conference Oct. 14th, all of the other allegations in this case have been dismissed against me and there is only a Battery allegation, for which I need that they comply with the discovery propounded by me so that I can move to dismiss by summary judgment and be free of this frivolous suit against me. The issue of proper tolling is the only issue precluding me from filing the summary judgement. (Decision of The Court - EXHIBIT 11). In our status conference on Oct 14th, Mr. Hoese alluded to a second undecided issue by the judge, but that issue can be addressed in my motion for summary judgement. There is no need to delay on that basis.

The matter of the first issue in the decision is resolved because of the plain language of the statute. The court did not decide the case and kept it not because of the interpretation of the rule N.Y. C.P.L.R.§ 215(8)(a), but because the plaintiffs raised the issue of equitable tolling. I need to resolve that issue promptly so that in a motion for summary judgment I can, in plain language address the other. Both issues; 1. The tolling, and 2. the meaning of the statue related to extending the statute for non-criminally-charged civil defendants. In addition, the issue of tolling may be resolved by plain evidence about when they knew that they had a claim of Battery back in July 11th 2017 and filed an incident report with the NYS police two and a half years before they brought the civil allegation, January 28th 2020 (EXHIBIT 12).

I am reasonably requesting the Plaintiffs present to me a final and straight forward response to my Amended Second Set of Document Requests (with search strings now added) and Supplemental Interrogatories in 30 days so that we can close discovery with respect to the one remaining allegation brought against me by four Plaintiffs in this action.

**Issue 3:** Lastly, the issue of the parties recording our future meet and confers. I would like them recorded and the Plaintiffs vehemently objected.

Lastly, there was a dispute at the last meet and confer about recording the meeting. All other court meetings are recorded. If these are honest good faith meetings I see no reason they can't be recorded. I don't trust the Plaintiffs or their attorney's. They have made up lies about me in order to destroy my reputation, credibility and career. They have essentially rendered me destitute, and continue to bring wrongful allegations against me and abuse the legal process to do so. I am now aware of what they are capable of and request the court allow me to defend myself with recording audio during our meetings so that the actual events can be referenced and transparency upheld.

**Summary of Requests:**

Accordingly, I respectfully request:

Request 1: Entry of a protective order, or direction from the Court, confirming that:

- The steps I have undertaken to date satisfy my reasonable e-discovery obligations;
- No further production or vendor engagement is required based solely on protocol formality;
- The Court's guidance will govern any remaining, clearly-articulated disputes over particular files or categories;
- Discovery on the single remaining allegation (Battery) should proceed to completion without further delay.

Request 2: The Court Compel a final and straight forward response from the Plaintiffs to my Amended Second Set of Document Requests (with search strings now added) and Supplemental Interrogatories in 30 days so that we can close discovery with respect to the 1 remaining allegation against me brought by 4 Plaintiffs in this action timely.

Request 3: We can record meet and confers moving forward if any additional meetings are required.

Please consider It has taken me 8 years to find a job that allows me to pay a meager rent for myself and live on my own since the Plaintiffs have created a salacious and defamatory campaign that ruined my reputation and led to the revocation of my medical license. I am impoverished, in crushing debt, and require my time to work so that I can make ends meet. Defending myself in this case is a further burden. I am at a considerable disadvantage in this process and the Plaintiffs are trying to use this because they are at great disadvantage in regard to truth and justice. I am simply asking them to provide the dates that their claims occurred, and any documents that would support tolling of the statute. It is a disproportionate and undue burden on me to employ specialists, or become a specialist to produce my electronic evidence. I share this not for pity, but for context, a bid for equity, and to implore you to move this along. I am 44 years old and would like to start a family with whatever I may cobble together from these ashes.

Thank you for the Court's attention to this matter, and for recognizing the inequities faced by pro se litigants under current discovery conditions.

Very truly yours,

/s/ Danielle D. Roberts
Danielle D. Roberts

cc: All Counsel

**EXHIBITS**

1. EXHIBIT 1: Financial Hardship Affidavit
2. EXHIBIT 2: The Accompanying Tax Returns
3. EXHIBIT 3: Current ESI protocol for counsel.
4. EXHIBIT 4: ANSWER TO PLAINTIFFS' FIRST SET OF INTERROGATORIES TO ALL DEFENDANTS
5. EXHIBIT 5: RESPONSES TO REQUESTS FOR PRODUCTION OF DOCUMENTS FROM PLAINTIFFS (Roberts Discovery Response 1 092225)
   a. Roberts Table of contents
   b. ROBERTS DOCUMENTS BATES STAMPED
6. EXHIBIT 6: ANSWER TO PLAINTIFFS' SECOND, FIRST REQEUST FOR PRODCUTION OF DOCUMENTS
7. EXHIBIT 7: My Original Second set of Requests
8. EXHIBIT 8: 2025.10.30 - Pls' Prop. Search Strings Responsive to Roberts' 1st and 2d Set of RFPs
9. EXHIBIT 9: Amended Second Set of Requests to Produce Documents (with search strings) and corresponding amended interrogatories
10. EXHIBIT 10: Email correspondence
11. EXHIBIT 11: The decision from the Court on the motion to dismiss the Battery allegation
12. EXHIBIT 12: SUBPONEA

# EXHIBIT 1

**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**

**SARAH EDMONDSON, et al.,**
Plaintiffs,
v.
**Danielle Roberts,**
Defendant.
Civil Action No. 20-CV-485

**AFFIDAVIT OF DANIELLE ROBERTS REGARDING FINANCIAL HARDSHIP AND INABILITY TO BEAR E-DISCOVERY COSTS**

I, Danielle Roberts, declare under penalty of perjury as follows:

1. I am the pro se defendant in the above-captioned matter. I submit this affidavit in support of my request for relief from the financial burden of professional e-discovery costs or requirements that exceed my means.
2. From 2014 to the present, my adjusted gross income as reported on federal tax returns has been as follows:
    - 2017: $79,545 *– year the Plaintiffs launched defamatory public campaign against me*
    - 2018: $8,032
    - 2019: $79,726 (*includes $73,559 capital gain from the sale of my home; actual employment income $5,135, the rest from selling my home to fund legal defenses*)
    - 2020: $9,503
    - 2021: $10,395
    - 2022: $5,380
    - 2023: $6,803
    - 2024: $4,232
3. As of September 2025, I owe $428,620 in federal student loans and, as of May 2025, $15,079.66 in private student loans, incurred during my medical education. I also owe $33,800 on an SBA business loan (as of August 11, 2025) and $10,871.62 in credit card debt.
4. In addition, I owe $76,550 to friends and family who have supported my legal defense and medical license fight.
5. As of this year, my total debt is $564,921.28. My annual income last year was $4,232. I have no significant assets—no home, no car, no savings of any kind.
6. I have no ability to pay for the retention of a professional e-discovery vendor or expert. All quotes I have received are far beyond my means (the vendor retained by other defendants required a $15,000 retainer and no less than $5000 for even basic e-discovery services, such as forensic device imaging or complex ESI exports. These costs vastly exceed my entire annual income and would create an impossible hardship.
7. I have acted in good faith and made every possible effort to conduct manual searches of all electronic devices, accounts, and documents in my possession, using all search terms

requested by Plaintiffs, and have produced every responsive document I could locate as permitted by my resources and technical ability.

8. I make this affidavit in support of my application for a protective order or other relief from any requirement to undertake or finance vendor-based e-discovery or produce documents in formats that would require technical services I cannot afford. Requiring such expenditures would be unjust, disproportional, and unattainable.

9. I declare under penalty of perjury that the foregoing is true and correct.

**Dated:** November 4th, 2025
**Location:** Jersey City, New Jersey

**/s/ Danielle Roberts**

Danielle Roberts

# EXHIBIT 2

Form **1040**

Department of the Treasury—Internal Revenue Service
**U.S. Individual Income Tax Return**

**2024**

OMB No. 1545-0074    IRS Use Only—Do not write or staple in this space.

For the year Jan. 1–Dec. 31, 2024, or other tax year beginning . . . . . . . . . . . . . . . , 2024, ending . . . . . . . . . . . . . . . , 20 . . . . .    See separate instructions.

| Your first name and middle initial | Last name | Your social security number |
|---|---|---|
| DANIELLE | ROBERTS | ✗✗✗✗✗✗ |
| If joint return, spouse's first name and middle initial | Last name | Spouse's social security number |

Home address (number and street). If you have a P.O box, see instructions.   Apt. no.
██████████

City, town, or post office. If you have a foreign address, also complete spaces below.   State   ZIP code
███    NJ   ✗✗✗✗

Foreign country name    Foreign province/state/county    Foreign postal code

**Presidential Election Campaign**
Check here if you, or your spouse if filing jointly, want $3 to go to this fund. Checking a box below will not change your tax or refund.
[X] You    [ ] Spouse

**Filing Status**
Check only one box.

[X] Single
[ ] Married filing jointly (even if only one had income)
[ ] Married filing separately (MFS)
[ ] Head of household (HOH)
[ ] Qualifying surviving spouse (QSS)

If you checked the MFS box, enter the name of your spouse. If you checked the HOH or QSS box, enter the child's name if the qualifying person is a child but not your dependent:

[ ] If treating a nonresident alien or dual-status alien spouse as a U.S. resident for the entire tax year, check the box and enter their name (see instructions and attach statement if required): . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

**Digital Assets**
At any time during 2024, did you: (a) receive (as a reward, award, or payment for property or services); or (b) sell, exchange, or otherwise dispose of a digital asset (or a financial interest in a digital asset)? (See instructions.) . . . . . . . . . [ ] Yes [X] No

**Standard Deduction**
Someone can claim: [ ] You as a dependent [ ] Your spouse as a dependent
[ ] Spouse itemizes on a separate return or you were a dual-status alien

**Age/Blindness**  You: [ ] Were born before January 2, 1960 [ ] Are blind   Spouse: [ ] Was born before January 2, 1960 [ ] Is blind

**Dependents** (see instructions):

| (1) First name    Last name | (2) Social security number | (3) Relationship to you | (4) Check the box if qualifies for (see instructions): |
| | | | Child tax credit | Credit for other dependents |
|---|---|---|---|---|
| | | | [ ] | [ ] |
| | | | [ ] | [ ] |
| | | | [ ] | [ ] |
| | | | [ ] | [ ] |

If more than four dependents, see instr. and check here [ ]

**Income**

Attach Form(s) W-2 here. Also attach Forms W-2G and 1099-R if tax was withheld.

If you did not get a Form W-2, see instructions.

| | | | |
|---|---|---|---|
| **1a** | Total amount from Form(s) W-2, box 1 (see instructions) . . . . . . . . . . . . . . . . . . | **1a** | |
| **b** | Household employee wages not reported on Form(s) W-2 . . . . . . . . . . . . . . . . | **1b** | |
| **c** | Tip income not reported on line 1a (see instructions) . . . . . . . . . . . . . . . . . . | **1c** | |
| **d** | Medicaid waiver payments not reported on Form(s) W-2 (see instructions) . . . . . . | **1d** | |
| **e** | Taxable dependent care benefits from Form 2441, line 26 . . . . . . . . . . . . . . | **1e** | |
| **f** | Employer-provided adoption benefits from Form 8839, line 29 . . . . . . . . . . . . | **1f** | |
| **g** | Wages from Form 8919, line 6 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | **1g** | |
| **h** | Other earned income (see instructions) . . . . . . . . . . . . . . . . . . . . . . . . | **1h** | |
| **i** | Nontaxable combat pay election (see instructions) . . . . . . . . . . . **1i** | | |
| **z** | Add lines 1a through 1h . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | **1z** | |

Attach Sch. B if required.

| | | | | | |
|---|---|---|---|---|---|
| **2a** | Tax-exempt interest | **2a** | **b** Taxable interest | **2b** | |
| **3a** | Qualified dividends | **3a** | **b** Ordinary dividends | **3b** | |
| **4a** | IRA distributions | **4a** | **b** Taxable amount | **4b** | |
| **5a** | Pensions and annuities | **5a** | **b** Taxable amount | **5b** | |
| **6a** | Soc. sec. ben. | **6a** | **b** Taxable amount | **6b** | |
| **c** | If you elect to use the lump-sum election method, check here (see instructions) . . . . . . . . . . | | [ ] | | |

**Standard Deduction for –**
• Single or Married filing separately, $14,600
• Married filing jointly or Qualifying surviving spouse, $29,200
• Head of household, $21,900
• If you checked any box under Standard Deduction, see instructions.

| | | | |
|---|---|---|---|
| **7** | Capital gain or (loss). Attach Schedule D if required. If not required, check here . . . . . . . . . . | **7** | |
| **8** | Additional income from Schedule 1, line 10 . . . . . . . . . . . . . . . . . . . . . . | **8** | |
| **9** | Add lines 1z, 2b, 3b, 4b, 5b, 6b, 7, and 8. This is your **total income** . . . . . . . . | **9** | 7,068 |
| **10** | Adjustments to income from Schedule 1, line 26 . . . . . . . . . . . . . . . . . . . | **10** | 2,836 |
| **11** | Subtract line 10 from line 9. This is your **adjusted gross income** . . . . . . . . . . | **11** | 4,232 |
| **12** | Standard deduction or itemized deductions (from Schedule A) . . . . . . . . . . . . | **12** | ✗✗✗ |
| **13** | Qualified business income deduction from Form 8995 or Form 8995-A . . . . . . . . | **13** | |
| **14** | Add lines 12 and 13 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | **14** | ✗✗✗ |
| **15** | Subtract line 14 from line 11. If zero or less, enter -0-. This is your **taxable income** . . | **15** | |

**For Disclosure, Privacy Act, and Paperwork Reduction Act Notice, see separate instructions.**

Form **1040** (2024)

DAA

Form 1040 (2024)    **DANIELLE  ROBERTS**                                           Page **2**

| | | | | |
|---|---|---|---|---|
| **Tax and Credits** | 16 | **Tax** (see instructions). Check if any from Form(s): **1** ☐ 8814  **2** ☐ 4972  **3** ☐ | 16 | 0 |
| | 17 | Amount from Schedule 2, line 3 | 17 | |
| | 18 | Add lines 16 and 17 | 18 | 0 |
| | 19 | Child tax credit or credit for other dependents from Schedule 8812 | 19 | |
| | 20 | Amount from Schedule 3, line 8 | 20 | |
| | 21 | Add lines 19 and 20 | 21 | |
| | 22 | Subtract line 21 from line 18. If zero or less, enter -0- | 22 | 0 |
| | 23 | Other taxes, including self-employment tax, from Schedule 2, line 21 | 23 | |
| | 24 | Add lines 22 and 23. This is your **total tax** | 24 | |
| **Payments** | 25 | Federal income tax withheld from: | | |
| | a | Form(s) W-2 | 25a | |
| | b | Form(s) 1099 | 25b | |
| | c | Other forms (see instructions) | 25c | |
| | d | Add lines 25a through 25c | 25d | |
| If you have a qualifying child, attach Sch. EIC. | 26 | 2024 estimated tax payments and amount applied from 2023 return | 26 | |
| | 27 | Earned income credit (EIC) | 27 | |
| | 28 | Additional child tax credit from Schedule 8812 | 28 | |
| | 29 | American opportunity credit from Form 8863, line 8 | 29 | |
| | 30 | Reserved for future use | 30 | |
| | 31 | Amount from Schedule 3, line 15 | 31 | |
| | 32 | Add lines 27, 28, 29, and 31. These are your **total other payments and refundable credits** | 32 | |
| | 33 | Add lines 25d, 26, and 32. These are your **total payments** | 33 | |
| **Refund** | 34 | If line 33 is more than line 24, subtract line 24 from line 33. This is the amount you **overpaid** | 34 | |
| | 35a | Amount of line 34 you want **refunded to you.** If Form 8888 is attached, check here ☐ | 35a | |
| Direct deposit? See instructions. | b | Routing number ____  c Type: ☐ Checking  ☐ Savings | | |
| | d | Account number | | |
| | 36 | Amount of line 34 you want **applied to your 2025 estimated tax** | 36 | |
| **Amount You Owe** | 37 | Subtract line 33 from line 24. This is the **amount you owe.** For details on how to pay, go to *www.irs.gov/Payments*  or see instructions | 37 | |
| | 38 | Estimated tax penalty (see instructions) | 38 | |

**Third Party Designee**  Do you want to allow another person to discuss this return with the IRS? See instructions ........... **X** **Yes.** Complete below. ☐ **No**

Designee's name ▉▉▉▉▉▉  Phone no. ▉▉▉▉▉▉  Personal identification number (PIN) ▉▉▉▉▉

**Sign Here**  Under penalties of perjury, I declare that I have examined this return and accompanying schedules and statements, and to the best of my knowledge and belief, they are true, correct, and complete. Declaration of preparer (other than taxpayer) is based on all information of which preparer has any knowledge.

Joint return? See instructions. Keep a copy for your records.

Your signature ____  Date ____  Your occupation **D.O.**  If the IRS sent you an Identity Protection PIN, enter it here (see instr.)

Spouse's signature. If a joint return, **both** must sign.  Date ____  Spouse's occupation ____  If the IRS sent your spouse an Identity Protection PIN, enter it here (see instr.)

Phone no. ▉▉▉▉  Email address ▉▉▉▉▉

| | | | | |
|---|---|---|---|---|
| **Paid Preparer Use Only** | Preparer's signature | Date 06/11/25 | PTIN ▉▉▉▉ | Check if: ☐ Self-employed |
| | Firm's name ▉▉▉▉▉ | | | Phone no. ▉▉▉▉ |
| | Firm's address ▉▉▉▉ | | | Firm's EIN ▉▉▉▉ |

Go to *www.irs.gov/Form1040*  for instructions and the latest information.                    Form **1040** (2024)

6/11    INT ▉    FTP ▉

DAA

Form **1040**

Department of the Treasury—Internal Revenue Service
**U.S. Individual Income Tax Return** **2023** OMB No. 1545-0074   IRS Use Only–Do not write or staple in this space.

For the year Jan. 1–Dec. 31, 2023, or other tax year beginning .................., 2023, ending .................., 20.....   See separate instructions.

| | | |
|---|---|---|
| Your first name and middle initial | Last name | Your social security number |
| DANIELLE | ROBERTS | ▓▓▓▓▓▓ |
| If joint return, spouse's first name and middle initial | Last name | Spouse's social security number |

Home address (number and street). If you have a P.O box, see instructions.    Apt. no.

City, town or post office. If you have a foreign address, also complete spaces below.   State **NJ**   ZIP code

Foreign country name     Foreign  province/state/county     Foreign postal code

**Presidential Election Campaign**
Check here if you, or your spouse if filing jointly, want $3 to go to this fund.Checking a box below will not change your tax or refund.   [X] You   [ ] Spouse

**Filing Status** [X] Single

Check only one box.

[ ] Married filing jointly (even if only one had income)

[ ] Married filing separately (MFS)

[ ] Head of household (HOH)

[ ] Qualifying surviving spouse (QSS)

If you checked the MFS box, enter the name of your spouse. If you checked the HOH or QSS box, enter the child's name if the qualifying person is a child but not your dependent: ..................

**Digital Assets** At any time during 2023, did you: (a) receive (as a reward, award, or payment for property or services); or (b) sell, exchange, or otherwise dispose of a digital asset (or a financial interest in a digital asset)? (See instructions.) ......... [ ] Yes [X] No

**Standard Deduction** Someone can claim: [ ] You as a dependent [ ] Your spouse as a dependent

[ ] Spouse itemizes on a separate return or you were a dual-status alien

**Age/Blindness** You: [ ] Were born before January 2, 1959 [ ] Are blind  Spouse: [ ] Was born before January 2, 1959 [ ] Is blind

**Dependents** (see instructions):

If more than four dependents, see instr. and check here [ ]

| (1) First name   Last name | (2) Social security number | (3) Relationship to you | (4) Check the box if qualifies for (see instructions): |
|---|---|---|---|
| | | | Child tax credit | Credit for other dependents |
| | | | [ ] | [ ] |
| | | | [ ] | [ ] |
| | | | [ ] | [ ] |
| | | | [ ] | [ ] |

**Income**

Attach Form(s) W-2 here. Also attach Forms W-2G and 1099-R if tax was withheld.

If you did not get a Form W-2, see instructions.

| | | |
|---|---|---|
| 1a | Total amount from Form(s) W-2, box 1 (see instructions) .................... | 1a ▓▓▓ |
| b | Household employee wages not reported on Form(s) W-2 | 1b |
| c | Tip income not reported on line 1a (see instructions) | 1c |
| d | Medicaid waiver payments not reported on Form(s) W-2 (see instructions) | 1d |
| e | Taxable dependent care benefits from Form 2441, line 26 | 1e |
| f | Employer-provided adoption benefits from Form 8839, line 29 | 1f |
| g | Wages from Form 8919, line 6 | 1g |
| h | Other earned income (see instructions) | 1h |
| i | Nontaxable combat pay election (see instructions) ........ 1i | |
| z | Add lines 1a through 1h | 1z |

Attach Sch. B if required.

| | | | | | |
|---|---|---|---|---|---|
| 2a | Tax-exempt interest | 2a | b Taxable interest | 2b | ▓▓ |
| 3a | Qualified dividends | 3a | b Ordinary  dividends | 3b | |
| 4a | IRA distributions | 4a | b Taxable amount | 4b | |
| 5a | Pensions and annuities | 5a | b Taxable amount | 5b | |
| 6a | Soc. sec. ben. | 6a | b Taxable amount | 6b | |

**Standard Deduction for –**
- Single or Married filing separately, $13,850
- Married filing jointly or Qualifying surviving spouse, $27,700
- Head of household, $20,800
- If you checked any box under Standard Deduction, see instructions.

| | | |
|---|---|---|
| c | If you elect to use the lump-sum election method, check here (see instructions) [ ] | |
| 7 | Capital gain or (loss). Attach Schedule D if required. If not required, check here [ ] | 7 |
| 8 | Other income from Schedule 1, line 10 | 8 ▓▓ |
| 9 | Add lines 1z, 2b, 3b, 4b, 5b, 6b, 7, and 8. This is your **total income** | 9  8,669 |
| 10 | Adjustments to income from Schedule 1, line 26 | 10  1,866 |
| 11 | Subtract line 10 from line 9. This is your **adjusted gross income** | 11  6,803 |
| 12 | **Standard deduction or itemized deductions** (from Schedule A) | 12 ▓▓ |
| 13 | Qualified business income deduction from Form 8995 or Form 8995-A | 13 |
| 14 | Add lines 12 and 13 | 14 ▓▓ |
| 15 | Subtract line 14 from line 11. If zero or less, enter -0-. This is your **taxable income** | 15 |

**For Disclosure, Privacy Act, and Paperwork Reduction Act Notice, see separate instructions.**

Form **1040** (2023)

DAA

Form 1040 (2023)  **DANIELLE ROBERTS** ✕✕✕✕✕ Page **2**

| | | | | | |
|---|---|---|---|---|---|
| **Tax and Credits** | **16** | **Tax** (see instructions). Check if any from Form(s):  **1** ☐ 8814  **2** ☐ ▮▮  **3** ☐ | | | **16** ▮ |
| | | | | | **17** |
| | | | | | **18** |
| | | | | | **19** |
| | | | | | **20** |
| | | | | | **21** |
| | | | | | **22** |
| | | | | | **23** |
| | | | | | **24** ▮ |
| **Payments** | **25** | Federal income tax withheld from: | | | |
| | **a** | Form(s) W-2 | **25a** ✕ | | |
| | **b** | Form(s) 1099 | **25b** | | |
| | **c** | Other forms (see instructions) | **25c** | | |
| | **d** | Add lines 25a through 25c | | | **25d** |
| If you have a qualifying child, attach Sch. EIC. | **26** | 2023 estimated tax payments and amount applied from 2022 return | **26** | | |
| | **27** | Earned income credit (EIC) | **27** ✕ | | |
| | **28** | Additional child tax credit from Schedule 8812 | **28** | | |
| | **29** | American opportunity credit from Form 8863, line 8 | **29** | | |
| | **30** | Reserved for future use | **30** | | |
| | **31** | Amount from Schedule 3, line 15 | **31** | | |
| | **32** | Add lines 27, 28, 29 and 31. These are your **total other payments and refundable credits** | | | **32** |
| | **33** | Add lines 25d, 26, and 32. These are your **total payments** | | | **33** |
| **Refund** | **34** | If line 33 is more than line 24, subtract line 24 from line 33. This is the amount you **overpaid** | | | **34** |
| | **35a** | Amount of line 34 you want **refunded to you.** If Form 8888 is attached, check here ☐ | | | **35a** |
| Direct deposit? See instructions. | **b** | Routing number | **c** Type: ☐ Checking ☐ Savings | | |
| | **d** | Account number | | | |
| | **36** | Amount of line 34 you want **applied to your 2024 estimated tax** | **36** | | |
| **Amount You Owe** | **37** | Subtract line 33 from line 24. This is the **amount you owe.** For details on how to pay, go to *www.irs.gov/Payments* or see instructions | | | **37** |
| | **38** | Estimated tax penalty (see instructions) | **38** | | |

| | | |
|---|---|---|
| **Third Party Designee** | Do you want to allow another person to discuss this return with the IRS? See instructions | ☒ **Yes.** Complete below. ☐ **No** |
| | Designee's name ▮▮▮ | Phone no. ▮▮▮ | Personal identification number (PIN) ▮▮▮ |

**Sign Here**

Under penalties of perjury, I declare that I have examined this return and accompanying schedules and statements, and to the best of my knowledge and belief, they are true, correct, and complete. Declaration of preparer (other than taxpayer) is based on all information of which preparer has any knowledge.

Joint return? See instructions. Keep a copy for your records.

| | | |
|---|---|---|
| Your signature | Date | Your occupation |
| | | **D.O.** |
| Spouse's signature. If a joint return, **both** must sign. | Date | Spouse's occupation |

If the IRS sent you an Identity Protection PIN, enter it here (see instr.)

If the IRS sent your spouse an Identity Protection PIN, enter it here (see instr.)

**Paid Preparer Use Only**

| | | |
|---|---|---|
| Preparer's signature ▮▮▮ | Date | PTIN ▮▮▮ | Check if: ☐ Self-employed |
| Firm's name ▮▮▮ | | **08/13/24** | | Phone no. ▮▮▮ |
| Firm's address ▮▮▮ | | Firm's EIN ▮▮▮ |

Go to *www.irs.gov/Form1040* for instructions and the latest information.

Form **1040** 2023

8/13  INT  ✕  FTP  ✕ TOT ✕✕

DAA

Form **1040**

Department of the Treasury—Internal Revenue Service

**U.S. Individual Income Tax Return**   **2022**   OMB No. 1545-0074   IRS Use Only—Do not write or staple in this space.

**Filing Status**
Check only one box.

[X] Single   [ ] Married filing jointly   [ ] Married filing separately (MFS)   [ ] Head of household (HOH)   [ ] Qualifying surviving spouse (QSS)

If you checked the MFS box, enter the name of your spouse. If you checked the HOH or QSS box, enter the child's name if the qualifying person is a child but not your dependent:

| Your first name and middle initial | Last name | Your social security number |
|---|---|---|
| DANIELLE | ROBERTS | XXXXXXX |

If joint return, spouse's first name and middle initial    Last name

Spouse's social security number

Home address (number and street). If you have a P.O box, see instructions.   Apt. no. [X]

**Presidential Election Campaign**
Check here if you, or your spouse if filing jointly, want $3 to go to this fund.Checking a box below will not change your tax or refund.

City, town or post office. If you have a foreign address, also complete spaces below.   State **WI**   ZIP code XXXXX

Foreign country name    Foreign province/state/county    Foreign postal code

[X] You   [ ] Spouse

**Digital Assets**
At any time during 2022, did you: (a) receive (as a reward, award, or payment for property or services); or (b) sell, exchange, gift, or otherwise dispose of a digital asset (or a financial interest in a digital asset)? (See instructions.) ..... [ ] Yes   [X] No

**Standard Deduction**
Someone can claim: [ ] You as a dependent   [ ] Your spouse as a dependent
[ ] Spouse itemizes on a separate return or you were a dual-status alien

**Age/Blindness**   You: [ ] Were born before January 2, 1958   [ ] Are blind   Spouse: [ ] Was born before January 2, 1958   [ ] Is blind

**Dependents** (see instructions):
If more than four dependents, see instr. and check here [ ]

| (1) First name    Last name | (2) Social security number | (3) Relationship to you | (4) Check the box if qualifies for (see instructions): |  |
|---|---|---|---|---|
|  |  |  | Child tax credit | Credit for other dependents |
|  |  |  | [ ] | [ ] |
|  |  |  | [ ] | [ ] |
|  |  |  | [ ] | [ ] |
|  |  |  | [ ] | [ ] |

**Income**

Attach Form(s) W-2 here. Also attach Forms W-2G and 1099-R if tax was withheld.

If you did not get a Form W-2, see instructions.

| | | |
|---|---|---|
| 1a | Total amount from Form(s) W-2, box 1 (see instructions) | 1a  XXX |
| b | Household employee wages not reported on Form(s) W-2 | 1b |
| c | Tip income not reported on line 1a (see instructions) | 1c |
| d | Medicaid waiver payments not reported on Form(s) W-2 (see instructions) | 1d |
| e | Taxable dependent care benefits from Form 2441, line 26 | 1e |
| f | Employer-provided adoption benefits from Form 8839, line 29 | 1f |
| g | Wages from Form 8919, line 6 | 1g |
| h | Other earned income (see instructions) | 1h |
| i | Nontaxable combat pay election (see instructions)  **1i** | |
| z | Add lines 1a through 1h | 1z |

Attach Sch. B if required.

| | | | | |
|---|---|---|---|---|
| 2a | Tax-exempt interest | **2a** | b Taxable interest | 2b |
| 3a | Qualified dividends | **3a** | b Ordinary dividends | 3b |
| 4a | IRA distributions | **4a** | b Taxable amount | 4b |
| 5a | Pensions and annuities | **5a** | b Taxable amount | 5b |
| 6a | Soc. sec. ben. | **6a** | b Taxable amount | 6b |
| c | If you elect to use the lump-sum election method, check here (see instructions) | | | [ ] |
| 7 | Capital gain or (loss). Attach Schedule D if required. If not required, check here | | ..... [ ] | 7 |

**Standard Deduction for –**
- Single or Married filing separately, $12,950
- Married filing jointly or Qualifying surviving spouse, $25,900
- Head of household, $19,400
- If you checked any box under Standard Deduction, see instructions.

| | | |
|---|---|---|
| 8 | Other income from Schedule 1, line 10 | 8 |
| 9 | Add lines 1z, 2b, 3b, 4b, 5b, 6b, 7, and 8. This is your **total income** | 9  5,760 |
| 10 | Adjustments to income from Schedule 1, line 26 | 10  380 |
| 11 | Subtract line 10 from line 9. This is your **adjusted gross income** | 11  5,380 |
| 12 | **Standard deduction or itemized deductions** (from Schedule A) | 12 |
| 13 | Qualified business income deduction from Form 8995 or Form 8995-A | 13 |
| 14 | Add lines 12 and 13 | 14  XXX |
| 15 | Subtract line 14 from line 11. If zero or less, enter -0-. This is your **taxable income** | 15 |

**For Disclosure, Privacy Act, and Paperwork Reduction Act Notice, see separate instructions.**

Form **1040** (2022)

DAA

Form 1040 (2022)    **DANIELLE ROBERTS**    Page **2**

| | | | | |
|---|---|---|---|---|
| **Tax and Credits** | 16 | **Tax** (see instructions). Check if any from Form(s): **1** ☐ 8814  **2** ☐ 4972 **3** ☐ | | 16 |
| | 17 | Amount from Schedule 2, line 3 | | 17 |
| | 18 | Add lines 16 and 17 | | 18 |
| | 19 | Child tax credit or credit for other dependents from Schedule 8812 | | 19 |
| | 20 | Amount from Schedule 3, line 8 | | 20 |
| | 21 | Add lines 19 and 20 | | 21 |
| | 22 | Subtract line 21 from line 18. If zero or less, enter -0- | | 22 |
| | 23 | Other taxes, including self-employment tax, from Schedule 2, line 21 | | 23 |
| | 24 | Add lines 22 and 23. This is your **total tax** | | 24 |
| **Payments** | 25 | Federal income tax withheld from: | | |
| | a | Form(s) W-2 | 25a | |
| | b | Form(s) 1099 | 25b | |
| | c | Other forms (see instructions) | 25c | |
| | d | Add lines 25a through 25c | | 25d |
| If you have a qualifying child, attach Sch. EIC. | 26 | 2022 estimated tax payments and amount applied from 2021 return | | 26 |
| | 27 | Earned income credit (EIC) | 27 | |
| | 28 | Additional child tax credit from Schedule 8812 | 28 | |
| | 29 | American opportunity credit from Form 8863, line 8 | 29 | |
| | 30 | Reserved for future use | 30 | |
| | 31 | Amount from Schedule 3, line 15 | 31 | |
| | 32 | Add lines 27, 28, 29 and 31. These are your **total other payments and refundable credits** | | 32 |
| | 33 | Add lines 25d, 26, and 32. These are your **total payments** | | 33 |
| **Refund** | 34 | If line 33 is more than line 24, subtract line 24 from line 33. This is the amount you **overpaid** | | 34 |
| | 35a | Amount of line 34 you want **refunded to you**. If Form 8888 is attached, check here | | 35a |
| Direct deposit? See instructions. | b | Routing number | c Type: ☐ Checking ☐ Savings | |
| | d | Account number | | |
| | 36 | Amount of line 34 you want **applied to your 2023 estimated tax** | 36 | |
| **Amount You Owe** | 37 | Subtract line 33 from line 24. This is the **amount you owe.** For details on how to pay, go to *www.irs.gov/Payments* or see instructions | | 37 |
| | 38 | Estimated tax penalty (see instructions) | 38 | |

| | | |
|---|---|---|
| **Third Party Designee** | Do you want to allow another person to discuss this return with the IRS? See instructions | ☒ **Yes.** Complete below.   ☐ **No** |
| | Designee's name | Phone no. |
| | | Personal identification number (PIN) |

**Sign Here**

Under penalties of perjury, I declare that I have examined this return and accompanying schedules and statements, and to the best of my knowledge and belief, they are true, correct, and complete. Declaration of preparer (other than taxpayer) is based on all information of which preparer has any knowledge.

Joint return? See instructions. Keep a copy for your records.

Your signature     Date     Your occupation
**D.O.**

If the IRS sent you an Identity Protection PIN, enter it here (see instr.)

Spouse's signature. If a joint return, **both** must sign.     Date     Spouse's occupation

If the IRS sent your spouse an Identity Protection PIN, enter it here (see instr.)

Phone no.     Email address

| | | | | | |
|---|---|---|---|---|---|
| **Paid Preparer Use Only** | Preparer's name | Preparer's signature | | Date 04/15/23 | PTIN |
| | | | | | Check if: ☐ Self-employed |
| | Firm's name | | | | Phone no. |
| | Firm's address | | | | Firm's EIN |

Go to *www.irs.gov/Form1040* for instructions and the latest information.     Form **1040** (2022)

DAA

Form **1040**

Department of the Treasury—Internal Revenue Service    (99)

**U.S. Individual Income Tax Return**    **2021**    OMB No. 1545-0074    IRS Use Only–Do not write or staple in this space.

**Filing Status**
Check only one box.

[X] Single  [ ] Married filing jointly  [ ] Married filing separately (MFS)  [ ] Head of household (HOH)  [ ] Qualifying widow(er) (QW)

If you checked the MFS box, enter the name of your spouse. If you checked the HOH or QW box, enter the child's name if the qualifying person is a child but not your dependent.

Your first name and middle initial: DANIELLE    Last name: ROBERTS

Your social security number: XXXXXXX

If joint return, spouse's first name and middle initial    Last name

Spouse's social security number

Home address (number and street). If you have a P.O box, see instructions.    Apt. no.

City, town or post office. If you have a foreign address, also complete spaces below.    State: WI    ZIP code

Foreign country name    Foreign province/state/county    Foreign postal code

**Presidential Election Campaign**
Check here if you, or your spouse if filing jointly, want $3 to go to this fund. Checking a box below will not change your tax or refund.  [ ] You  [ ] Spouse

At any time during 2021, did you receive, sell, exchange, or otherwise dispose of any financial interest in any virtual currency?  [X] You  [ ] Spouse  [ ] Yes  [X] No

**Standard Deduction**    Someone can claim:  [ ] You as a dependent  [ ] Your spouse as a dependent
[ ] Spouse itemizes on a separate return or you were a dual-status alien

**Age/Blindness**    You:  [ ] Were born before January 2, 1957  [ ] Are blind    Spouse:  [ ] Was born before January 2, 1957  [ ] Is blind

**Dependents** (see instructions):  (1) First name  Last name  (2) Social security number  (3) Relationship to you  (4) if qualifies for (see instructions): Child tax credit / Credit for other dependents

If more than four dependents, see instr. and check here [ ]

Attach Sch.B if required.

| | | | |
|---|---|---|---|
| 1 | Wages, salaries, tips, etc. Attach Form(s) W-2 | 1 | |
| 2a | Tax-exempt interest  2a | b Taxable interest  2b | |
| 3a | Qualified dividends  3a | b Ordinary dividends  3b | |
| 4a | IRA distributions  4a | b Taxable amount  4b | |
| 5a | Pensions and annuities  5a | b Taxable amount  5b | |
| 6a | Soc. sec. ben.  6a | b Taxable amount  6b | |
| 7 | Capital gain or (loss). Attach Schedule D if required. If not required, check here [ ] | 7 | |
| 8 | Other income from Schedule 1, line 10 | 8 | |
| 9 | Add lines 1, 2b, 3b, 4b, 5b, 6b, 7, and 8. This is your **total income** | 9 | 11,230 |
| 10 | Adjustments to income from Schedule 1, line 26 | 10 | 835 |
| 11 | Subtract line 10 from line 9. This is your **adjusted gross income** | 11 | 10,395 |
| 12a | **Standard deduction or itemized deductions** (from Schedule A)  12a | | |
| b | Charitable contributions if you take the standard deduction (see instructions)  12b | | |
| c | Add lines 12a and 12b | 12c | |
| 13 | Qualified business income deduction from Form 8995 or Form 8995-A | 13 | |
| 14 | Add lines 12c and 13 | 14 | |
| 15 | **Taxable income.** Subtract line 14 from line 11. If zero or less, enter -0- | 15 | |

Standard Deduction for –
• Single or Married filing separately, $12,550
• Married filing jointly or Qualifying widow(er), $25,100
• Head of household, $18,800
• If you checked any box under Standard Deduction, see instructions.

**For Disclosure, Privacy Act, and Paperwork Reduction Act Notice, see separate instructions.**    Form **1040** (2021)

DAA

Form 1040 (2021)    **DANIELLE  ROBERTS**                                                                 Page **2**

| | | | |
|---|---|---|---|
| **16** | **Tax** (see instructions). Check if any from Form(s): **1** ☐ 8814 **2** ☐ 4972 **3** ☐ | | **16** |
| **17** | Amount from Schedule 2, line 3 | | **17** |
| **18** | Add lines 16 and 17 | | **18** |
| **19** | Nonrefundable child tax credit or credit for other dependents from Schedule 8812 | | **19** |
| **20** | Amount from Schedule 3, line 8 | | **20** |
| **21** | Add lines 19 and 20 | | **21** |
| **22** | Subtract line 21 from line 18. If zero or less, enter -0- | | **22** |
| **23** | Other taxes, including self-employment tax, from Schedule 2, line 21 | | **23** |
| **24** | Add lines 22 and 23. This is your **total tax** | | **24** |
| **25** | Federal income tax withheld from: | | |
| **a** | Form(s) W-2 | **25a** | |
| **b** | Form(s) 1099 | **25b** | |
| **c** | Other forms (see instructions) | **25c** | |
| **d** | Add lines 25a through 25c | | **25d** |
| **26** | 2021 estimated tax payments and amount applied from 2020 return | | **26** |

If you have a qualifying child, attach Sch. EIC.

| | | | |
|---|---|---|---|
| **27a** | Earned income credit (EIC) | **27a** | |
| | Check here if you were born after January 1, 1998, and before January 2, 2004, and you satisfy all other requirements for taxpayers who are at least age 18, to claim the EIC. See instructions ☐ | | |
| **b** | Nontaxable combat pay election | **27b** | |
| **c** | Prior year (2019) earned income | **27c** | |
| **28** | Refundable child tax credit or additional child tax credit from Sch. 8812 | **28** | |
| **29** | American opportunity credit from Form 8863, line 8 | **29** | |
| **30** | Recovery rebate credit. See instructions | **30** | 0 |
| **31** | Amount from Schedule 3, line 15 | **31** | |
| **32** | Add lines 27a and 28 through 31. These are your **total other payments and refundable credits** | | **32** |
| **33** | Add lines 25d, 26, and 32. These are your **total payments** | | **33** |

**Refund**

| | | | |
|---|---|---|---|
| **34** | If line 33 is more than line 24, subtract line 24 from line 33. This is the amount you **overpaid** | | **34** |
| **35a** | Amount of line 34 you want **refunded to you.** If Form 8888 is attached, check here ☐ | | **35a** |

Direct deposit?
See instructions.

| | | | |
|---|---|---|---|
| **b** | Routing number | **c** Type: ☒ Checking ☐ Savings | |
| **d** | Account number | | |
| **36** | Amount of line 34 you want **applied to your 2022 estimated tax** | **36** | |

**Amount You Owe**

| | | | |
|---|---|---|---|
| **37** | **Amount you owe.** Subtract line 33 from line 24. For details on how to pay, see instructions | | **37** |
| **38** | Estimated tax penalty (see instructions) | **38** | |

**Third Party Designee**

Do you want to allow another person to discuss this return with the IRS? See instructions      ☒ **Yes.** Complete below.    ☐ **No**

| Designee's name | Phone no. | Personal identification number (PIN) |
|---|---|---|
| | | |

**Sign Here**

Under penalties of perjury, I declare that I have examined this return and accompanying schedules and statements, and to the best of my knowledge and belief, they are true, correct, and complete. Declaration of preparer (other than taxpayer) is based on all information of which preparer has any knowledge.

Joint return?
See instructions.
Keep a copy for your records.

| Your signature | Date | Your occupation | If the IRS sent you an Identity Protection PIN, enter it here (see instr.) |
|---|---|---|---|
| | | **D.O.** | |
| Spouse's signature. If a joint return, **both** must sign. | Date | Spouse's occupation | If the IRS sent your spouse an Identity Protection PIN, enter it here (see instr.) |

Phone no.                    Email address

**Paid Preparer Use Only**

| Preparer's name | Preparer's signature | Date | PTIN |
|---|---|---|---|
| | | 06/14/22 | |
| | | Phone no. | |
| | | Firm's EIN | |

Go to *www.irs.gov/Form1040* for instructions and the latest information.                    Form **1040** (2021)

Form **1040**

Department of the Treasury—Internal Revenue Service (99)
**U.S. Individual Income Tax Return**

**2020**    OMB No. 1545-0074    IRS Use Only–Do not write or staple in this space.

**Filing Status**
Check only one box.

[X] Single   [ ] Married filing jointly   [ ] Married filing separately (MFS)   [ ] Head of household (HOH)   [ ] Qualifying widow(er) (QW)

If you checked the MFS box, enter the name of your spouse. If you checked the HOH or QW box, enter the child's name if the qualifying person is a child but not your dependent.

Your first name and middle initial: **DANIELLE**    Last name: **ROBERTS**

**Your social security number** ▨▨▨

If joint return, spouse's first name and middle initial    Last name

**Spouse's social security number**

Home address (number and street). If you have a P.O box, see instructions. ▨▨▨    Apt. no.

City, town or post office .If you have a foreign address, also complete spaces below.    State **NY**    ZIP code ▨▨

Foreign country name    Foreign province/state/county    Foreign postal code

**Presidential Election Campaign**
Check here if you, or your spouse if filing jointly, want $3 to go to this fund.Checking a box below will not change your tax or refund.
[X] You    [ ] Spouse

At anytime during 2020, did you receive, sell, send, exchange, or otherwise acquire financial interest in any virtual currency?    [ ] Yes   [X] No

**Standard Deduction**

Someone can claim:   [ ] You as a dependent    [ ] Your spouse as a dependent
[ ] Spouse itemizes on a separate return or you were a dual-status alien

**Age/Blindness**   **You:** [ ] Were born before January 2, 1956   [ ] Are blind   **Spouse:** [ ] Was born before January 2, 1956   [ ] Is blind

**Dependents** (see instructions):

| (1) First name    Last name | (2) Social security number | (3) Relationship to you | (4) if qualifies for (see instructions): Child tax credit | Credit for other dependents |
|---|---|---|---|---|
| | | | [ ] | [ ] |
| | | | [ ] | [ ] |
| | | | [ ] | [ ] |
| | | | [ ] | [ ] |

If more than four dependents, see instructions and check **here** [ ]

Attach Sch.B if required.

| | | | |
|---|---|---|---|
| **1** | Wages, salaries, tips, etc. Attach Form(s) W-2 | | **1** |
| **2a** | Tax-exempt interest | **2a** | **b** Taxable interest | **2b** |
| **3a** | Qualified dividends | **3a** | **b** Ordinary dividends | **3b** |
| **4a** | IRA distributions | **4a** ▨▨ | **b** Taxable amount | **4b** |
| **5a** | Pensions and annuities | **5a** | **b** Taxable amount | **5b** |
| **6a** | Soc. sec. ben. | **6a** | **b** Taxable amount | **6b** |
| **7** | Capital gain or (loss). Attach Schedule D if required. If not required, check here [ ] | | **7** |
| **8** | Other income from Schedule 1, line 9 | | **8** |
| **9** | Add lines 1, 2b, 3b, 4b, 5b, 6b, 7, and 8. This is your **total income** | | **9** | 10,689 |

**Standard Deduction for –**
• Single or Married filing separately, $12,400
• Married filing jointly or Qualifying widow(er), $24,800
• Head of household, $18,650
• If you checked any box under *Standard Deduction,* see instructions.

| | | |
|---|---|---|
| **10** | Adjustments to income: | |
| **a** | From Schedule 1, line 22 | **10a** ▨ |
| **b** | Charitable contributions if you take the standard deduction.See instructions | **10b** |
| **c** | Add line 10a and 10b. These are your **total adjustments to income** | **10c** | 1,186 |
| **11** | Subtract line 10c from line 9. This is your **adjusted gross income** | **11** | 9,503 |
| **12** | **Standard deduction or itemized deductions** (from Schedule A) | **12** |
| **13** | Qualified business income deduction. Attach Form 8995 or Form 8995-A | **13** |
| **14** | Add lines 12 and 13 | **14** ▨ |
| **15** | **Taxable income**. Subtract line 14 from line 11. If zero or less, enter -0- | **15** |

**For Disclosure, Privacy Act, and Paperwork Reduction Act Notice, see separate instructions.**    Form **1040** (2020)

DAA

Form 1040 (2020)    **DANIELLE  ROBERTS**    Page 2

| 16 | **Tax** (see instructions). Check if any from Form(s): **1** ☐ 8814  **2** ☐ 4972 | | | |
| | ☐ **3** | | 16 | |
| 17 | Amount from Schedule 2, line 3 | | 17 | |
| 18 | Add lines 16 and 17 | | 18 | |
| 19 | Child tax credit or credit for other dependents | | 19 | |
| 20 | Amount from Schedule 3, line 7 | | 20 | |
| 21 | Add lines 19 and 20 | | 21 | |
| 22 | Subtract line 21 from line 18. If zero or less, enter -0- | | 22 | |
| 23 | Other taxes, including self-employment tax, from Schedule 2, line 10 | | 23 | |
| 24 | Add lines 22 and 23. This is your **total tax** | | 24 | |
| 25 | Federal income tax withheld from: | | | |
| a | Form(s) W-2 | 25a | | |
| b | Form(s) 1099 | 25b | | |
| c | Other forms (see instructions) | 25c | | |
| d | Add lines 25a through 25c | | 25d | |
| 26 | 2020 estimated tax payments and amount applied from 2019 return | | 26 | |

• If you have a qualifying child, attach Sch. EIC.

• If you have nontaxable combat pay, see instructions.

| 27 | Earned income credit (EIC) | 27 | | |
| 28 | Additional child tax credit. Attach Schedule 8812 | 28 | | |
| 29 | American opportunity credit from Form 8863, line 8 | 29 | | |
| 30 | Recovery rebate credit. See instructions | 30 | 0 | |
| 31 | Amount from Schedule 3, line 13 | 31 | | |
| 32 | Add lines 27 through 31. These are your **total other payments and refundable credits** | | 32 | |
| 33 | Add lines 25d, 26, and 32. These are your **total payments** | | 33 | |

**Refund**

Direct deposit?
See instructions

| 34 | If line 33 is more than line 24, subtract line 24 from line 33. This is the amount you **overpaid** | | 34 | |
| 35a | Amount of line 34 you want **refunded to you.** If Form 8888 is attached, check here ☐ | | 35a | |
| b | Routing number _____  c | Type: ☐ Checking  ☐ Savings | | |
| d | Account number | | | |
| 36 | Amount of line 34 you want **applied to your 2021 estimated tax** | 36 | | |

**Amount You Owe**

For details on how to pay, see instructions.

| 37 | Subtract line 33 from line 24. This is the **amount you owe now** | | 37 | |
| | **Note:** Schedule H and Schedule SE filers, line 37 may not represent all of the taxes you owe for 2020. See Schedule 3, line 12e, and its instructions for details. | | | |
| 38 | Estimated tax penalty (see instructions) | 38 | 23 | |

**Third Party Designee**

Do you want to allow another person to discuss this return with the IRS? See instructions

☒ **Yes.** Complete below.    ☐ **No**

| Designee's name | | Phone no. | | Personal identification number (PIN) | |

**Sign Here**

Joint return?
See instructions.
Keep a copy for your records.

Under penalties of perjury, I declare that I have examined this return and accompanying schedules and statements, and to the best of my knowledge and belief, they are true, correct, and complete. Declaration of preparer (other than taxpayer) is based on all information of which preparer has any knowledge.

| Your signature | Date | Your occupation **D.O.** | If the IRS sent you an Identity Protection PIN, enter it here (see inst.) |
| Spouse's signature. If a joint return, **both** must sign. | Date | Spouse's occupation | If the IRS sent your spouse an Identity Protection PIN, enter it here (see inst.) |

Phone no. _____    Email address _____

**Paid**

| Preparer's name | | Date | PTIN | Check if: ☐ Self-employed |
| | | 03/13/21 | | |
| | | | Phone no. | |
| | | | Firm's EIN | |

Form **1040** (2020)

DAA

| Form **1040** | Department of the Treasury—Internal Revenue Service (99)<br>**U.S. Individual Income Tax Return** | **2019** | OMB No. 1545-0074 | IRS Use Only–Do not write or staple in this space. |

**Filing Status**
Check only one box.

[X] Single   [ ] Married filing jointly   [ ] Married filing separately (MFS)   [ ] Head of household (HOH)   [ ] Qualifying widow(er) (QW)

If you checked the MFS box, enter the name of spouse. If you checked the HOH or QW box, enter the child's name if the qualifying person is a child but not your dependent.

Your first name and middle initial: **DANIELLE**   Last name: **ROBERTS**

Your social security number: ▨▨▨

If joint return, spouse's first name and middle initial / Last name

Spouse's social security number

Home address (number and street). If you have a P.O box, see instructions.   Apt. no.

City, town or post office, state, and ZIP code. If you have a foreign address, also complete spaces below (see instructions).

Foreign country name / Foreign province/state/county / Foreign postal code

**Presidential Election Campaign**
Check here if you, or your spouse if filing jointly, want $3 to go to this fund. Checking a box below will not change your tax or refund. [X] You [ ] Spouse

If more than four dependents, see instr. and [ ] here

**Standard Deduction**   Someone can claim: [ ] You as a dependent   [ ] Your spouse as a dependent
[ ] Spouse itemizes on a separate return or you were a dual-status alien

**Age/Blindness**   You: [ ] Were born before January 2, 1955   [ ] Are blind   **Spouse:** [ ] Was born before January 2, 1955   [ ] Is blind

**Dependents** (see instructions):
| (1) First name   Last name | (2) Social security number | (3) Relationship to you | (4) if qualifies for (see instructions): Child tax credit / Credit for other dependents |

Standard Deduction for –
• Single or Married filing separately, $12,200
• Married filing jointly or Qualifying widow(er), $24,400
• Head of household, $18,350
• If you checked any box under Standard Deduction, see instructions.

| 1 | Wages, salaries, tips, etc. Attach Form(s) W-2 | 1 | ▨ |
| 2a | Tax-exempt interest | 2a | | b | Taxable interest. Attach Sch. B if required | 2b | |
| 3a | Qualified dividends | 3a | | b | Ordinary divs. Att. Sch. B if req. | 3b | |
| 4a | IRA distributions | 4a | | b | Taxable amount | 4b | |
| c | Pensions and annuities | 4c | | d | Taxable amount | 4d | |
| 5a | Soc. sec. ben. | 5a | | b | Taxable amount | 5b | |
| 6 | Capital gain or (loss). Attach Schedule D if required. If not required, check here [ ] | 6 | 73,559 |
| 7a | Other income from Schedule 1, line 9 | 7a | 5,135 |
| b | Add lines 1, 2b, 3b, 4b, 4d, 5b, 6, and 7a. This is your **total income** | 7b | 79,726 |
| 8a | Adjustments to income from Schedule 1, line 22 | 8a | 0 |
| b | Subtract line 8a from line 7b. This is your **adjusted gross income** | 8b | 79,726 |
| 9 | **Standard deduction or itemized deductions** (from Schedule A) | 9 | ▨ |
| 10 | Qualified business income deduction. Attach Form 8995 or Form 8995-A | 10 | |
| 11a | Add lines 9 and 10 | 11a | ▨ |
| b | **Taxable income.** Subtract line 11a from line 8b. If zero or less, enter -0- | 11b | |

**For Disclosure, Privacy Act, and Paperwork Reduction Act Notice, see separate instructions.**   Form **1040** (2019)

DAA

Form 1040 (2019)  **DANIELLE  ROBERTS**                                                              Page **2**

| | | | |
|---|---|---|---|
| **12a** | **Tax** (see instr.) Check if any from Form(s): **1** ☐ 8814 **2** ☐ 4972 | | |
| | **3** ☐ | 12a | |
| **b** | Add Schedule 2, line 3, and line 12a and enter the total .................... | 12b | |
| **13a** | Child tax credit or credit for other dependents | 13a | |
| **b** | Add Schedule 3, line 7, and line 13a and enter the total .................... | 13b | |
| **14** | Subtract line 13b from line 12b. If zero or less, enter -0- | 14 | |
| **15** | Other taxes, including self-employment tax, from Schedule 2, line 10 | 15 | |
| **16** | Add lines 14 and 15. This is your **total tax** | 16 | |
| **17** | Federal income tax withheld from Forms W-2 and 1099 .................... | 17 | |
| **18** | Other payments and refundable credits | | |
| **a** | Earned income credit (EIC) ........................ | 18a | |
| **b** | Additional child tax credit. Attach Schedule 8812 .......... | 18b | |
| **c** | American opportunity credit from Form 8863, line 8 .......... | 18c | |
| **d** | Schedule 3, line 14 .......................... | 18d | |
| **e** | Add lines 18a through 18d. These are your **total other payments and refundable credits** | 18e | |
| **19** | Add lines 17 and 18e. These are your **total payments** | 19 | |

• If you have a qualifying child, attach Sch. EIC.

• If you have nontaxable combat pay, see instructions.

**Refund**

| | | | |
|---|---|---|---|
| **20** | If line 19 is more than line 16, subtract line 16 from line 19. This is the amount you **overpaid** | 20 | |
| **21a** | Amount of line 20 you want **refunded to you**. If Form 8888 is attached, check here ...... ☐ | 21a | |

Direct deposit? See instructions.

| | | | |
|---|---|---|---|
| **b** | Routing number | **c** Type: ☐ Checking ☐ Savings | |
| **d** | Account number | | |
| **22** | Amount of line 20 you want **applied to your 2020 estimated tax** ..... | 22 | |

**Amount You Owe**

| | | | |
|---|---|---|---|
| **23** | **Amount you owe.** Subtract line 19 from line 16. For details on how to pay, see instructions | 23 | |
| **24** | Estimated tax penalty (see instructions) .................... | 24 | |

**Third Party Designee**

(Other than paid preparer)

Do you want to allow another person (other than your paid preparer) to discuss this return with the IRS? See instructions.   ☐ **Yes. Complete below.**   ☐ **No**

Designee's name ___   Phone no. ___   Personal identification number (PIN)

**Sign Here**

Under penalties of perjury, I declare that I have examined this return and accompanying schedules and statements, and to the best of my knowledge and belief, they are true, correct, and complete. Declaration of preparer (other than taxpayer) is based on all information of which preparer has any knowledge.

Joint return? See instructions. Keep a copy for your records.

Your signature ___   Date ___   Your occupation  **D.O.**

If the IRS sent you an Identity Protection PIN, enter it here (see instr.)

Spouse's signature. If a joint return, **both** must sign.   Date ___   Spouse's occupation ___

If the IRS sent your spouse an Identity Protection PIN, enter it here (see instr.)

Phone no. ___   Email address ___

**Paid Preparer Use Only**

| | | |
|---|---|---|
| Preparer's name | Preparer's signature | PTIN ___   Check if: ☒ 3rd Party Designee |
| Firm's name | | Date **09/18/20** |
| Firm's address | | Phone no. |

Go to *www.irs.gov/Form1040* for instructions and the latest information.

**9/18   INT**   ☒   **FTP**

DAA

# 1040

Department of the Treasury—Internal Revenue Service (99)

**U.S. Individual Income Tax Return**

**2018**

OMB No. 1545-0074    IRS Use Only–Do not write or staple in this space.

Filing status: [X] Single  [ ] Married filing jointly  [ ] Married filing separately  [ ] Head of household  [ ] Qualifying widow(er)

| Your first name and initial | Last name | | Your social security number |
|---|---|---|---|
| DANIELLE | ROBERTS | | ▨▨▨▨▨▨ |

Your standard deduction: [ ] Someone can claim you as a dependent  [ ] You were born before January 2, 1954  [ ] You are blind

If joint return, spouse's first name and initial    Last name

**Spouse's social security number**

Spouse standard deduction: [ ] Someone can claim your spouse as a dependent  [ ] Spouse was born before January 2, 1954    [X] Full-year health care coverage or exempt (see instr.)

[ ] Spouse is blind  [ ] Spouse itemizes on a separate return or you were a dual-status alien

Home address (number and street). If you have a P.O. box, see instructions.    Apt. no.

▨▨▨▨▨▨

**Presidential Election Campaign**

(see instr.) [X] You    [ ] Spouse

City, town or post office, state, and ZIP code. If you have a foreign address, attach Schedule 6.

**PORT JEFF. STATION  NY 11776**

If more than four dependents, see instr. and [ ] here

| Dependents (see instructions): | | **(2)** Social security number | **(3)** Relationship to you | | **(4)** if qualifies for (see instr.) | |
|---|---|---|---|---|---|---|
| **(1)** First name | Last name | | | | Child tax credit | Credit for other dependents |
| | | | | | [ ] | [ ] |
| | | | | | [ ] | [ ] |
| | | | | | [ ] | [ ] |
| | | | | | [ ] | [ ] |

## Sign Here

Under penalties of perjury, I declare that I have examined this return and accompanying schedules and statements, and to the best of my knowledge and belief, they are true, correct, and complete. Declaration of preparer (other than taxpayer) is based on all information of which preparer has any knowledge.

Joint return?
See instructions.
Keep a copy for your records.

| Your signature | Date | Your occupation | If the IRS sent you an Identity Protection PIN, enter it here (see instr.) |
|---|---|---|---|
| | | **D.O.** | |
| Spouse's signature. If a joint return, **both** must sign. | Date | Spouse's occupation | If the IRS sent you an Identity Protection PIN, enter it here (see instr.) |

## Paid Preparer Use Only

| Preparer's name | Preparer's signature | PTIN | Check if: |
|---|---|---|---|
| | | ▨ | [X] 3rd Party Designee |
| Firm's name ▨ | | Firm's EIN ▨ | [ ] ▨ |
| Firm's address ▨ | ▨ | Phone no. ▨ | ▨ |

**For Disclosure, Privacy Act, and Paperwork Reduction Act Notice, see separate instructions.**

Form 1040 (2018)   **DANIELLE ROBERTS**   XXXXX   Page **2**

| | | | | | |
|---|---|---|---|---|---|
| **1** | Wages, salaries, tips, etc. Attach Form(s) W-2 | | | | **1** |
| **2a** | Tax-exempt interest | **2a** | **b** Taxable interest | | **2b** |
| **3a** | Qualified dividends | **3a** | **b** Ordinary dividends | | **3b** |
| **4a** | IRAs, pensions, and annuities | **4a** | **b** Taxable amount | | **4b** |
| **5a** | Social security benefits | **5a** | **b** Taxable amount | | **5b** |
| **6** | Total income. Add lines 1 through 5. Add any amount from Schedule 1, line 22 | | 8,032 | **6** | 8,032 |
| **7** | Adjusted gross income. If you have no adjustments to income, enter the amount from line 6; otherwise subtract Schedule 1, line 36, from line 6 | | | **7** | 8,032 |

Attach Form(s) W-2. Also attach Form(s) W-2G and 1099-R if tax was withheld.

**Standard Deduction for –**

• Single or married filing separately, $12,000

• Married filing jointly or Qualifying widow(er), $24,000

• Head of household, $18,000

• If you checked any box under Standard deduction, see instructions.

| | | | | |
|---|---|---|---|---|
| **8** | **Standard deduction or itemized deductions** (from Schedule A) | | **8** | ■ |
| **9** | Qualified business income deduction (see instructions) | | **9** | |
| **10** | Taxable income. Subtract lines 8 and 9 from line 7. If zero or less, enter -0- | | **10** | 0 |
| **11** | **a** Tax (see instr.)  0  (check if any from: **1** ☐ Form(s) 8814  **2** ☐ Form 4972 **3** ☐ ) | | | |
| | **b Add** any amount from Schedule 2 and check here ☐ | | **11** | 0 |
| **12** | **a** Child tax credit/credit for other dependents  **b Add** any amount from Schedule 3 and check here ☐ | | **12** | |
| **13** | Subtract line 12 from line 11. If zero or less, enter -0- | | **13** | 0 |
| **14** | Other taxes. Attach Schedule 4 | | **14** | |
| **15** | Total tax. Add lines 13 and 14 | | **15** | 0 |
| **16** | Federal income tax withheld from Forms W-2 and 1099 | | **16** | |
| **17** | Refundable credits: **a** EIC (see instr.)  **b** Sch 8812 **c** Form 8863 | | | |
| | **Add** any amount from Schedule 5 | | **17** | |
| **18** | Add lines 16 and 17. These are your total payments | | **18** | |

**Refund**

Direct deposit? See instructions.

| | | | |
|---|---|---|---|
| **19** | If line 18 is more than line 15, subtract line 15 from line 18. This is the amount you **overpaid** | **19** | |
| **20a** | Amount of line 19 you want **refunded to you.** If Form 8888 is attached, check here ☐ | **20a** | |
| **b** | Routing number  **c** Type: ☐ Checking ☐ Savings | | |
| **d** | Account number | | |
| **21** | Amount of line 19 you want **applied to your 2019 estimated tax**  **21** | | |

**Amount You Owe**

| | | | |
|---|---|---|---|
| **22** | **Amount you owe.** Subtract line 18 from line 15. For details on how to pay, see instructions | **22** | 0 |
| **23** | Estimated tax penalty (see instructions)  **23** | | |

Go to *www.irs.gov/Form1040* for instructions and the latest information.

Form **1040** (2018)

DAA

Form **1040** Department of the Treasury—Internal Revenue Service (99)
**U.S. Individual Income Tax Return** **2017** OMB No. 1545-0074 IRS Use Only–Do not write or staple in this space.

For the year Jan. 1–Dec. 31, 2017, or other tax year beginning , 2017, ending , 20 **See separate instructions.**

Your first name and initial: **DANIELLE**    Last name: **ROBERTS**

**Your social security number** ▮▮▮▮▮▮▮▮▮

If a joint return, spouse's first name and initial    Last name

**Spouse's social security number**

Home address (number and street). If you have a P.O. box, see instructions. ▮▮▮▮▮▮▮▮    Apt. no.

Make sure the SSN(s) above and on line 6c are correct.

City, town or post office, state, and ZIP code. If you have a foreign address, also complete spaces below (see instructions).
**CLIFTON PARK    NY    12065**

**Presidential Election Campaign**
Check here if you, or your spouse if filing jointly, want $3 to go to this fund. Checking a box below will not change your tax or refund. [X] You  [ ] Spouse

Foreign country name    Foreign province/state/county    Foreign postal code

**Filing Status**

Check only one box.

1 [X] Single
2 [ ] Married filing jointly (even if only one had income)
3 [ ] Married filing separately. Enter spouse's SSN above and full name here.
4 [ ] Head of household (with qualifying person). (See instructions.) If the qualifying person is a child but not your dependent, enter this child's name here.
5 [ ] Qualifying widow(er) (see instructions)

**Exemptions**

6a [X] **Yourself.** If someone can claim you as a dependent, **do not** check box 6a
b [ ] **Spouse** }
Boxes checked on 6a and 6b **1**

c **Dependents:**

| (1) First name  Last name | (2) Dependent's social security number | (3) Dependent's relationship to you | (4) if child under age 17 qual. for child tax credit (see instr.) |
|---|---|---|---|

No. of children on 6c who:
• lived with you
• did not live with you due to divorce or separation (see instructions)
Dependents on 6c not entered above

If more than four dependents, see instructions and check here ▶ [ ]

d Total number of exemptions claimed
Add numbers on lines above **1**

**Income**

Attach Form(s) W-2 here. Also attach Forms W-2G and 1099-R if tax was withheld.

If you did not get a W-2, see instructions.

| | | |
|---|---|---|
| 7 | Wages, salaries, tips, etc. Attach Form(s) W-2 | 7 |
| 8a | **Taxable** interest. Attach Schedule B if required | 8a |
| b | Tax-exempt interest. **Do not** include on line 8a | 8b |
| 9a | Ordinary dividends. Attach Schedule B if required | 9a |
| b | Qualified dividends | 9b |
| 10 | Taxable refunds, credits, or offsets of state and local income taxes | 10 |
| 11 | Alimony received | 11 |
| 12 | Business income or (loss). Attach Schedule C or C-EZ | 12 |
| 13 | Capital gain or (loss). Attach Schedule D if required. If not required, check here ▶ [ ] | 13 |
| 14 | Other gains or (losses). Attach Form 4797 | 14 |
| 15a | IRA distributions 15a | b Taxable amount | 15b |
| 16a | Pensions and annuities 16a | b Taxable amount | 16b |
| 17 | Rental real estate, royalties, partnerships, S corporations, trusts, etc. Attach Schedule E | 17 | 79,545 |
| 18 | Farm income or (loss). Attach Schedule F | 18 |
| 19 | Unemployment compensation | 19 |
| 20a | Social security benefits 20a | b Taxable amount | 20b |
| 21 | Other income. List type and amount | 21 |
| 22 | Combine the amounts in the far right column for lines 7 through 21. This is your **total income** ▶ | 22 | 79,545 |

**Adjusted Gross Income**

| | | |
|---|---|---|
| 23 | Educator expenses | 23 |
| 24 | Certain business expenses of reservists, performing artists, and fee-basis government officials. Attach Form 2106 or 2106-EZ | 24 |
| 25 | Health savings account deduction. Attach Form 8889 | 25 |
| 26 | Moving expenses. Attach Form 3903 | 26 |
| 27 | Deductible part of self-employment tax. Attach Schedule SE | 27 |
| 28 | Self-employed SEP, SIMPLE, and qualified plans | 28 |
| 29 | Self-employed health insurance deduction | 29 |
| 30 | Penalty on early withdrawal of savings | 30 |
| 31a | Alimony paid b Recipient's SSN | 31a |
| 32 | IRA deduction | 32 |
| 33 | Student loan interest deduction | 33 |
| 34 | Tuition and fees. Attach Form 8917 | 34 |
| 35 | Domestic production activities deduction. Attach Form 8903 | 35 |
| 36 | Add lines 23 through 35 | 36 |
| 37 | Subtract line 36 from line 22. This is your **adjusted gross income** ▶ | 37 | 79,545 |

**For Disclosure, Privacy Act, and Paperwork Reduction Act Notice, see separate instructions.**

DAA

Form **1040** (2017)

Form 1040 (2017) **DANIELLE ROBERTS**  Page 2

| | | | |
|---|---|---|---|
| 38 | Amount from line 37 (adjusted gross income) | 38 | 79,545 |

**Tax and Credits**

**Standard Deduction for—**
- People who check any box on line 39a or 39b **or** who can be claimed as a dependent, see instructions.
- All others:
Single or Married filing separately, $6,350
Married filing jointly or Qualifying widow(er), $12,700
Head of household, $9,350

39a Check if: ☐ **You** were born before January 2, 1953, ☐ Blind. ☐ **Spouse** was born before January 2, 1953, ☐ Blind. } Total boxes checked ▶ 39a
b If your spouse itemizes on a separate return or you were a dual-status alien, check here ▶ 39b ☐
40 **Itemized deductions** (from Schedule A) **or** your **standard deduction** (see left margin) ... 40
41 Subtract line 40 from line 38 ... 41
42 **Exemptions.** If line 38 is $156,900 or less, multiply $4,050 by the number on line 6d. Otherwise, see instructions ... 42
43 **Taxable income.** Subtract line 42 from line 41. If line 42 is more than line 41, enter -0- ... 43
44 **Tax** (see instr.). Check if any from: **a** ☐ Form 8814 **b** ☐ Form 4972 **c** ☐ ... 44
45 **Alternative minimum tax** (see instructions). Attach Form 6251 ... 45
46 Excess advance premium tax credit repayment. Attach Form 8962 ... 46
47 Add lines 44, 45, and 46 ... ▶ 47
48 Foreign tax credit. Attach Form 1116 if required ... 48
49 Credit for child and dependent care expenses. Attach Form 2441 ... 49
50 Education credits from Form 8863, line 19 ... 50
51 Retirement savings contributions credit. Attach Form 8880 ... 51
52 Child tax credit. Attach Schedule 8812, if required ... 52
53 Residential energy credits. Attach Form 5695 ... 53
54 Other credits from Form: **a** ☐ 3800 **b** ☐ 8801 **c** ☐ ... 54
55 Add lines 48 through 54. These are your **total credits** ... 55
56 Subtract line 55 from line 47. If line 55 is more than line 47, enter -0- ... 56
57 Self-employment tax. Attach Schedule SE ... 57

**Other Taxes**

58 Unreported social security and Medicare tax from Form: **a** ☐ 4137 **b** ☐ 8919 ... 58
59 Additional tax on IRAs, other qualified retirement plans, etc. Attach Form 5329 if required ... 59
60a Household employment taxes from Schedule H ... 60a
b First-time homebuyer credit repayment. Attach Form 5405 if required ... 60b
61 Health care: individual responsibility (see instructions) Full-year coverage ☒ ... 61
62 Taxes from: **a** ☐ Form 8959 **b** ☐ Form 8960 **c** ☐ Instructions; enter code(s) ... 62
63 Add lines 56 through 62. This is your **total tax** ... ▶ 63

**Payments**

If you have a qualifying child, attach Schedule EIC.

64 Federal income tax withheld from Forms W-2 and 1099 ... 64
65 2017 estimated tax payments and amount applied from 2016 return ... 65
66a **Earned income credit (EIC)** ... 66a
b Nontaxable combat pay election ... 66b
67 Additional child tax credit. Attach Schedule 8812 ... 67
68 American opportunity credit from Form 8863, line 8 ... 68
69 Net premium tax credit. Attach Form 8962 ... 69
70 Amount paid with request for extension to file ... 70
71 Excess social security and tier 1 RRTA tax withheld ... 71
72 Credit for federal tax on fuels. Attach Form 4136 ... 72
73 Credits from Form: **a** ☐ 2439 **b** Reserved **c** ☐ 8885 **d** ☐ ... 73
74 Add lines 64, 65, 66a, and 67 through 73. These are your **total payments** ... ▶ 74

**Refund**

Direct deposit? See instructions.

75 If line 74 is more than line 63, subtract line 63 from line 74. This is the amount you **overpaid** ... 75
76a Amount of line 75 you want **refunded to you.** If Form 8888 is attached, check here ... ▶ 76a
b Routing number ▶ **c** Type: ☐ Checking ☐ Savings
d Account number ▶
77 Amount of line 75 you want **applied to your 2018 estimated tax** ▶ 77

**Amount You Owe**

78 **Amount you owe.** Subtract line 74 from line 63. For details on how to pay, see instructions ... ▶ 78
79 Estimated tax penalty (see instructions) ... 79 205

**Third Party Designee**

Do you want to allow another person to discuss this return with the IRS (see instructions)? ☒ **Yes.** Complete. ☐ **No**
Designee's name ▶   Phone no. ▶   Personal identification number (PIN) ▶

**Sign Here**
Joint return? See instr. Keep a copy for your records.

Under penalties of perjury, I declare that I have examined this return and accompanying schedules and statements, and to the best of my knowledge and belief, they are true, correct, and accurately list all amounts and sources of income I received during the tax year. Declaration of preparer (other than taxpayer) is based on all information of which preparer has any knowledge.
Your signature   Date   Your occupation   **D.O.**   Daytime phone number
Spouse's signature. If a joint return, **both** must sign.   If the IRS sent you an Identity Protection PIN, enter it here (see inst.)

**Paid Preparer Use Only**

Print/Type preparer's name   Preparer's signature   Date 09/17/18   Check ☐ if self-employed   PTIN
Firm's name ▶   Firm's EIN ▶
Firm's address ▶   Phone no.

Go to www.irs.gov/Form1040 for instructions and the latest information.   Form **1040** (2017)
DAA   **10/15 INT**   **FTP**   **TOT**

# EXHIBIT 3

**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**

| | |
|---|---|
| SARAH EDMONDSON, et al., : | |
| : | |
| Plaintiffs, : | |
| : | CIVIL ACTION NO. 20-CV-485 |
| v. : | |
| : | |
| KEITH RANIERE, et al. : | |
| : | |
| Defendants. : | |

**[STIPULATED] ORDER RE: DISCOVERY OF ELECTRONICALLY STORED INFORMATION ("ESI")**

This Order Regarding the Production of Documents, Electronically Stored Information and Paper Documents ("ESI Protocol") shall govern the production of documents and electronically stored information ("ESI") by the parties and their counsel of record (collectively, the "Parties") in the above captioned litigation (the "Matter").

## I.    GENERAL PROVISIONS

### A.    General

Nothing in this Order is intended to be an exhaustive list of or limitation on the discovery obligations or rights of a Party requested to produce documents or ESI ("Producing Party") or a Party requesting documents or ESI ("Requesting Party"). Except as specifically set forth herein, this Order does not (a) alter or affect the applicable Federal Rules of Civil Procedure ("Rules"), or (b) address, limit, determine, or affect the relevance, discoverability, or admissibility as evidence of any document or ESI, regardless of whether the document or ESI is to be preserved, is preserved, or is produced. The purpose of this Order is to facilitate the exchange of ESI and hard-copy documents in an efficient manner and in accordance with the Rules. By stipulating to this Order

1

and agreeing to produce documents in a particular form or forms, no Party waives any objections to producing any particular document or category of documents on any grounds whatsoever.

The procedures and protocols outlined in this Order govern the production of documents and ESI by all Parties. The Parties will take reasonable steps to comply with this Order. The Parties agree to promptly alert all other Parties concerning any technical problems associated with complying with this Order and, to the extent that a Party believes that compliance with this Order imposes an undue burden disproportionate to the needs of the case, the Party claiming such a burden shall inform all other Parties in writing of the asserted burden, describing it (and any potential solutions) with specificity, and the Parties shall thereafter promptly meet and confer in an effort to resolve the issue. All productions made pursuant to this Order are subject to any confidentiality, preservation, protective, and/or privilege orders entered in the Matter.

**B.    Applicability**

The production specifications in this Order apply to documents that are produced in the first instance in the Matter. In the event of transfer to other courts, this Order will remain in effect in all respects, until adopted by the transferee court or replaced by a successor order. The terms and specifications of this Order shall only apply to productions made after the date of entry of this Order. Productions served in the Matter that were delivered before the date of entry of this Order are exempt from the terms of the Order, unless the Producing Party and Receiving Party otherwise agree in writing.

**C.    Deadlines**

References to schedules and deadlines in this ESI Protocol shall comply with F.R.C.P. 6 with respect to computing deadlines.

**D.    Definitions:**

2

1.      "Discovery Material" is defined as all information produced, given, or exchanged by and among all Parties, or received from non-Parties in the Litigation, including all deposition testimony, testimony given at hearings or other proceedings, interrogatory answers, documents and all other discovery materials, whether produced informally or in response to requests for discovery.

2.      "Party" means Plaintiffs and Defendants in this Litigation.

3.      "Requesting Party" means the Party requesting production of documents.

4.      "Producing Party" means the Party that may be producing documents in response to the request of Requesting Party.

### E.      Confidential Information

Nothing herein shall contradict the Parties' rights and obligations with respect to any information designated as confidential under a protective order entered by the Court.

### F.      Encryption

To maximize the security of information in transit, any media on which the documents are produced may be encrypted by the Producing Party. In such cases, the Producing Party shall transmit the encryption key or password to the Requesting Party, under separate cover, contemporaneously with sending the encrypted media.

### G.      Rolling Productions

Documents that have been identified by a party for production shall be produced at reasonably expedient intervals.

## II.    SCOPE OF DISCOVERY

### A.      Scope in General

Pursuant to Federal Rule of Civil Procedure 26(b)(1), the Parties may obtain discovery regarding any nonprivileged matter that is relevant to any party's claim or defense, subject to the provisions of this Section and Rule 26(b)(1).

**B.     Preservation**

Nothing in this Order shall alter the preservation duties imposed by the Federal Rules of Civil Procedure or applicable law. Should either Party seek specific relief from a preservation obligation, they shall provide the other Party a specific request. The request shall contain a description of the data at issue, the date range the data covers, the basis of the specific request, a description of other sources containing identical or substantially equivalent data, if known. The Party receiving the request shall exercise good faith in reviewing the request. If the Parties cannot agree, the issue may be presented to the Court.

**C.     Disclosure of Archival/Backup Copies**

If a Party learns that potentially relevant and non-duplicative documents or information have been destroyed per a document retention policy, but that an archival/backup location contains an archival/backup copy of such documents, the Party will disclose the existence of this archival/backup data, regardless of whether such a location has been declared or deemed inaccessible.

**D.     Documents Produced in Other Matters**

To the extent any Party is required or agrees to produce documents in the Matter that originally were collected or produced in other cases or government investigations, such documents shall be identified and produced to the extent possible in accordance with the production format described herein. Such documents will bear the original Bates numbers assigned to them in those other proceedings and the Bates stamp required in this Matter.

4

E.    **Third Party Subpoenas and the Processing of Non-Party Documents**

A Requesting Party issuing a non-party subpoena ("Issuing Party") shall include a copy of this Order with the subpoena and request that the non-party produce documents in accordance with the specifications of this Order relating to form of production. The Issuing Party is responsible for producing to all other Parties any productions obtained in the same form in which the document(s) was/were produced by the non-party. Such non-party productions should be served by the Issuing Party to all other Parties within fourteen (14) calendar days of the non-party's production to the Issuing Party.  If any such non-party productions are not Bates numbered by the non-party producer, prior to any Party reproducing the non-party documents, the Parties will meet and confer to agree upon a format for designating the documents with a unique Bates number prefix. For the avoidance of doubt, nothing in this Order is intended to or should be interpreted as narrowing, expanding, or otherwise affecting the rights of the Parties or non-parties to object to a subpoena.

III.    **GENERAL PRODUCTION FORMAT PROTOCOLS**

A.    **Appendices**

Appendix A and B contain the technical specifications for the production of documents. If there is any conflict between the body of this document and the Appendices, the text of the body of this document shall control.

B.    **Form of Production**

Productions should take the following file types and format.

1.    Emails shall be produced as TIFF files.

2.    All spreadsheet (e.g., Microsoft Excel, Corel Quattro, etc.) files shall be produced as native files with TIFF placeholder images.

3.      All PDF files shall be produced as TIFF files, except for files that contain comments and/or annotations and no redaction is applied, in which case the document shall be produced as a native file with a TIFF placeholder image

4.      All word processing (e.g., Microsoft Word) files shall be produced as TIFF files, except for files that contain comments, notes, revisions, track changes, and/or other hidden text and no redaction is applied, in which case the document shall be produced as a native file with a TIFF placeholder image.

5.      All presentation files (e.g., PowerPoint) shall be produced as TIFF files with speaker note view visible except for files that contain hidden slides, comments, and/or notes (including speaker's notes), and no redaction is applied, in which case the document shall be produced as a native file with a TIFF placeholder image.

6.      All media files, such as audio and video files, shall be produced as native files with TIFF placeholder images.

7.      The Parties will meet and confer on the production of other file types, including, but not limited to, CAD drawings, GIS data, materials and prototypes testing, data from messaging applications (e.g., Teams, Slack, Google Chat, et al.), CRM or ERP platforms, (SAP, Salesforce, et al.) etc., including with respect to non-standard metadata fields not already listed in Appendix B, below.

## C.    Text Files

Each ESI item produced under this ESI Protocol shall be accompanied by a text file as set forth below. All text files shall be provided as a single document-level text file for each item, not one text file per page. Each text file shall be named using the Bates number of the first page of the corresponding production item.

1.     **Extracted Text.** All email, unredacted ESI, and redacted spreadsheets produced as native files, should be provided with complete document-level extracted text files. Extracted text shall include all comments, revisions, track changes, speaker's notes, and text from documents with comments or track changes, and hidden worksheets, slides, columns, and rows. Text extracted from emails shall include all header information that would be visible if the email was viewed in Outlook including: (1) the individuals to whom the communication was directed ("To"), (2) the author of the email communication ("From"), (3) who was copied and blind copied on such email ("CC" and "BCC"), (4) the subject line of the email ("RE" or "Subject"), (5) the date and time of the email, and (6) the names of any attachments.

2.     **OCR.** In the event a document, other than spreadsheets (e.g., Excel files), contains text that is to be redacted, Optical Character Recognition ("OCR") text files should be provided for any unredacted portions of the documents. Document-level OCR text files shall also be provided for all hard-copy scanned documents. OCR software must be set to the highest quality setting for any previously unscanned paper documents, and reasonable quality control measures shall be used to ensure that the integrity of scanned copies of previously unscanned paper documents are preserved for OCR (e.g., pages are not angled or skewed, text is not blurred or obscured, etc.). Documents containing foreign language text must be OCR'd using the appropriate settings for that language, (e.g., OCR of Asian language documents must properly capture the relevant Asian characters). Settings such as "auto-deskewing" and "auto-rotation" must be turned on during the OCR process to maximize text recognition on any given page.

**D.     Redactions**

No redactions for relevance may be made within a produced document or ESI item. The Parties agree that, where ESI items need to be redacted, they shall be produced in TIFF format

with each redaction clearly indicated. Each redaction on a document shall be completed using white or colored boxes that contain the word "Redacted" at the point of each redaction on each page of the redacted document. The redacted image file should be produced along with OCR text of the redacted file. If metadata displayed in the imaged document was redacted, then that metadata should be excluded from the load file.

All metadata fields shall be provided, unless redaction of those fields is necessary to protect the asserted privilege. The Parties understand that for certain MS Excel documents or other file types or files, TIFF redactions may be impracticable. These documents may be redacted in native format so long as the original document is also preserved in an unredacted form. Any Native redactions must be made in a manner that clearly indicates that a redaction has occurred (e.g. replacing the contents of a spreadsheet cell with "[redacted]" or inserting an audible tone in place of any the redacted speech in a audio file).

### E.    Bates Numbering

All images must be assigned a Bates number that must: (1) be unique across the entire document production; (2) maintain a constant prefix across the entire production; (3) contain no special characters or embedded spaces, except hyphens or underscores; (4) be sequential within a given document; and (5) use a unique text prefix. To the extent reasonably practicable, the Bates number must also maintain consistent numbering across a family of documents. If a Bates number or set of Bates numbers is skipped in a production, the Producing Party will so note in a cover letter or production log accompanying the production. If a document is reproduced for any reason, it shall be reproduced under the same Bates number as the original production. If additional pages are needed beyond those allocated to it during the initial production, they shall be assigned additional number following a period (e.g., "ABC-000001.001")

### F.    Color

Documents containing color need not be produced in color. The Producing Party will promptly produce a color image of a document upon request if the original document contains color and the color conveys meaningful information.

### G.    Hard-Copy Documents

Collected and/or potentially responsive documents that exist in hard copy will be scanned to TIFF image format and produced in accordance with the specifications set forth in this Order. A Party's hard-copy documents that are not text-searchable shall be made searchable by OCR prior to production at that Party's cost. In scanning hard-copy documents, distinct documents should not be merged into a single record, and single documents should not be split into multiple records (i.e., paper documents should be logically unitized). In the case of an organized compilation of separate documents – for example, a binder containing several separate documents behind numbered tabs – the document behind each tab should be scanned separately, but the relationship among the documents in the compilation should be reflected in the proper coding of the beginning and ending document and attachment fields (i.e., the "BegBates," "EndBates," "BegAttach," and "EndAttach" fields). The Parties will make their best efforts to unitize the documents correctly. Within 14 calendar days (or as otherwise agreed) after notice from a Requesting Party that a document appears to have been unitized incorrectly, the Producing Party shall either explain why the unitization is correct or produce a correctly unitized replacement. If any original hard-copy document has any note or attachment affixed to it, the Producing Party shall scan and produce copies of the original hard-copy document along with all notes and attachments to it in the same manner as other documents. If any such note or attachment obscures any information on the original hard-copy document, the Producing Party shall also produce a copy of the original hard-

9

copy document without the note or attachment affixed in order to make the underlying information visible.

### H.    Family Relationships

Family relationships (e.g., the association between an attachment and its parent document, or between embedded documents, or linked internal or non-public documents and their parents) shall be preserved. A document and all other documents in its attachment range, emails with attachments, and files with extracted embedded OLE documents all constitute family groups. Attachments should be consecutively produced with their parent such that the Bates numbers for the attachment(s) is/are directly subsequent to the parent document.

### I.    Complete Family Groups/Relationships

If any member of a family group is produced, all members of that group must also be produced or else logged as privileged/work-product without breaking the grouping of these documents. To the extent members of a family are withheld, the Producing Party shall include a slipsheet reflecting each document within the group withheld and the basis for withholding those documents.

### J.    Hyperlinks

A Producing Party will use available technology to match hyperlinked documents, including those utilizing Google Workspace, Microsoft Office's "Share Documents Via Link" feature, or other document sharing platforms, with the email or parent document to which the documents were attached. Documents extracted from embedded files or hyperlinks shall be populated with the BEGATTACH and ENDATTACH metadata fields to show the family relationship. If documents cannot be extracted from links at the time of collection, the Parties agree to promptly meet and confer to discuss alternative methods of collection and production. Upon

request by the Receiving Party, the Producing Party will produce hyperlinked documents that were not automatically produced and that are within the Producing Party's possession, custody, or control and are hyperlinked within the Producing Party's production. A reasonable request for hyperlinks should include a list of hyperlinks and corresponding Bates numbers. The Parties acknowledge that the current version of the hyperlinked document may differ from the version of the document at the time the hyperlink was sent. The parties also acknowledge that the metadata for hyperlinked documents produced under this section may not reflect the metadata for those documents at the time the documents were hyperlinked. The Parties agree to meet and confer in good faith to resolve any disputes concerning the appropriateness of production of the requested documents.

## IV.    ESI METADATA FORMAT AND PROCESSING

### A.    System Files

ESI productions may be de-NISTed using the industry standard list of such files maintained in the National Software Reference Library by the National Institute of Standards & Technology as it exists at the time of de-NISTing. Other file types may be added to the list of excluded files by agreement of the Parties.

### B.    De-duplication

A Party is only required to produce a single copy of a responsive document. "Duplicate ESI" means files that are exact duplicates based on the files' MD5 hash, SHA-1 hash, email duplicate spare messages or SHA-256 hash values. The Parties shall make reasonable efforts to not produce Duplicate ESI. To the extent identical copies of documents appear in the files of multiple Custodians, the Producing Party shall attempt to produce only one such identical copy across all Custodians based on MD5 or SHA-1 hash values at the document level for file system

11

data or the email family level for emails. Entire document families may constitute Duplicate ESI. De-duplication shall not break apart families. When Duplicate ESI exists in the files of multiple custodians, the names of all custodians who were in possession of a document prior to de-duplication will be populated in the All Custodians field identified in Appendix B. Likewise, the File Path that would have been provided for each version of the document that was not produced due to de-duplication shall be populated in the All File Paths field.

### C.      Embedded Files

Embedded files, except for images embedded in emails, are to be produced with family relationships preserved. Embedded files should be assigned Bates numbers that directly follow the Bates numbers on the documents within which they are embedded and values in the "BegAttach" and "EndAttach" fields to indicate their family. Images embedded in emails shall not be separately produced in the first instance, but shall be produced upon reasonable request by the Receiving Party. A Producing Party is not required to review or produce extracted embedded OLE documents if the document they were extracted from will be produced in native format.

### D.      Zero-byte Files

The Parties may filter out stand-alone files identified as zero-bytes in size that do not contain responsive file links or file names.

### E.      Hidden Text

ESI items processed after the execution date of this ESI Protocol shall be processed, to the extent practicable, in a manner that preserves hidden columns or rows, hidden text, worksheets, speaker notes, tracked changes, and comments.

### F.      Compressed Files

Compression file types (i.e., .CAB, .GZ, .TAR, .Z, and .ZIP) shall be decompressed in a reiterative manner to ensure that a zip within a zip is decompressed into the lowest possible compression resulting in individual folders and/or files.

### G.    Password-Protected or Encrypted Files

A Producing Party shall promptly provide passwords to access any produced ESI items that are password protected upon request by a Receiving Party. If there are any issues that make it impracticable to provide such passwords, the Producing Party will provide information to allow the Receiving Party to assess such claims. The Parties shall meet and confer to resolve any disputes over passwords to encrypted or password-protected ESI items..

### H.    Disclosure of Enterprise Messaging

The Parties will disclose with their initial disclosures any use of enterprise messaging tools used in the ordinary course of business (e.g., Slack, MS Teams, Zoom, WhatsApp, Sametime, Skype, Telegram, etc.), including the type of subscription and retention settings in place. The Parties will meet and confer regarding issues relating to the parameters for an inclusive collection of such data, the format of the production, and other issues unique to this type of data.

### I.    Messages or Chats

The Parties agree that message, chat and collaboration software ESI (e.g., Microsoft Teams, OneDrive, Slack, Facebook Messenger, Signal, or WhatsApp) is discoverable subject to the considerations in FRCP 26(b). The Parties further agree that the most efficient and cost-effective methods for collecting and producing such ESI may depend on the specific collaboration software or text messaging platform in use. In the case of chat messages generated from the use of chat or messaging platforms, the parties agree that it is necessary to produce relevant messages with the context of prior-in-time and subsequent in-time chat messages. The Parties will meet and

13

confer to discuss the methods to collect message or chat ESI, and the Parties agree to meet and confer regarding the processing and production format for relevant communications in collaboration software prior to any production of chat messages.

## V.    SEARCH METHODOLOGY

### A.    Use of Search Methodologies

The Parties shall meet and confer regarding search methods, if any, used to identify responsive documents and ESI. The fact that a document or ESI is responsive to a search term or identified as responsive by any other technology used to identify potentially responsive documents and ESI shall not prevent any Party from withholding such file from production on the grounds that the file is protected from disclosure by applicable privilege or work-product protection.

The use of a search methodology does not relieve a party from its obligations under the Rules to produce responsive documents, and accordingly documents or ESI known to be responsive to a discovery request or otherwise subject to production or relevant to the claims or defenses shall be produced without regard to whether it was returned by any search methodology used in accordance with this Order or otherwise agreed upon by the parties unless there is a claim of privilege. Prior to a Party using a search methodology (if any) to identify documents for production, the search terms, keywords, date limitations, and custodians applied to the data searched will be disclosed by the Producing Party to the Requesting Party. Within fourteen (14) calendar days of such disclosure, the Parties must meet and confer regarding such terms, custodians, and date culling per paragraph V.A ("Search Terms") below.

Should a Party choose to use a search methodology, the party will specify what custodial and non-custodial sources that the search methodology will be run against. Documents which are reasonably believed to be responsive and for which text-based search technologies are fundamentally ineffective, such as images, spreadsheets, hard-copy documents, or certain foreign

14

language documents where the Parties do not have suitable search terms in such language, must
be reviewed without search methodologies that rely primarily on text.

At all meet and conferrals where the topic is the validity of search methodologies to identify
documents subject to production, the Producing Party shall be required to provide search terms hit
reports pursuant to paragraph V.B ("Hit Reports") below, or other data points available to provide
insight into the validity of the method used.

Should a Producing Party wish to use any method or methodology not specifically
addressed by this Order to exclude documents from any review or production, notice to the
Receiving Party must be made prior to the use of any such method or methodology.

### B.    Search Terms

Where the Parties agree that potentially responsive ESI shall be searched using search
terms, the Parties shall meet and confer to resolve disagreements over the search terms, their
efficacy, or their application. Specifically, the Parties will meet and confer to provide reasonable
assurances to the Requesting Party that the Producing Party's search terms and methodology used
to apply them are reasonably calculated to identify responsive documents and ESI. Prior to or
during such meet and conferral, the Producing Party shall provide all associated information
required by this Order.

If, after disclosure of the Producing Party's proposed search method, search parameters,
and search terms, and after a reasonable meet-and-confer process, a Requesting Party believes in
good faith that the Producing Party's proposals regarding search, retrieval, and production would
result in deficiencies in production, the Requesting Party may object to the proposal and make
requests for different or additional search methods, parameters, or search terms. Such requests
shall only be made after the Parties have met and conferred as to the alleged deficiencies identified
by the Requesting Party. If the issue is not resolved within fourteen (14) calendar days after the

15

objection, either Party may thereafter immediately submit the dispute to the Court or its designee for resolution.

### C.     Hit reports

A hit report shall contain, for each custodian or data source in the document collection where the terms were applied, or as otherwise agreed, the following with respect to each proposed or modified search term in the collection:

1.     The number of documents with hits for that term;

2.     The number of unique documents for that term and no other term; and

3.     The number of family members requiring review in connection with all documents with hits.

## VI.     PROPRIETARY SOFTWARE, SYSTEMS AND DATA STORAGE LOCATIONS

### A.     Software

To the extent that relevant ESI cannot be rendered or reviewed without the use of proprietary software (whether created by the Party or not), the Parties shall meet and confer to minimize any expense or burden associated with the production of such documents in an acceptable format, including issues as may arise with respect to obtaining access to any such software and operating manuals.

During meet and conferral, the Producing Party shall have available a subject matter or technical expert to address questions regarding the capabilities and potential production formats for information retrieved from any such proprietary software. If the Producing Party identifies relevant information contained exclusively in proprietary software, the Producing Party shall be required to propose a retrieval methodology and/or production format for such information in writing, and the Parties agree to meet and confer within fourteen (14) days of such written disclosure to discuss any necessary adjustments to the proposal. An acceptable form of production

could include the provision of direct or remote access to a computer that can run that software and which has access to the relevant data.

### B.     Electronic Data Storage

To the extent that relevant ESI is stored in large databases or file servers such as Network Attached Storage (NAS) or Storage Area Network (SAN), the Parties shall meet and confer to minimize any expense or burden associated with the production of such documents located in those locations.

During meet and conferral, the Producing Party shall have available a technical expert to address questions regarding these databases and potential production formats for information retrieved from them. If the Producing Party identifies relevant information in these databases, the Producing Party shall be required to propose a retrieval methodology and production format for such information in writing, and the Parties agree to meet and confer within fourteen (14) days of such written disclosure to discuss any necessary adjustments to the proposal.

### C.     Hard copy Document Storage

To the extent that relevant documents and evidence are stored in hard copies in a storage facility, the Parties shall meet and confer to minimize any expense or burden associated with the production of such documents stored in those locations.

Prior to any meet and confer regarding hard-copy document storage, the Producing Party shall provide to the Receiving Party either a table of contents or inventory listing what is stored in the physical storage location. If production or searching is not feasible, the Receiving Party shall be able to inspect the hard-copy records at the physical location in person.

### D.     ESI Located on Mobile Devices

To the extent that relevant ESI exists on mobile devices that is not duplicative of ESI that is more readily available elsewhere, the parties agree that such ESI is discoverable subject to the

17

considerations in FRCP 26(b). Such mobile device ESI will be collected using commercially available tools sufficient to capture all reasonably available relevant information and metadata. The parties anticipate that this may include non-standard metadata fields not listed in Appendix B, below.

## VII.    PRIVLEGE LOGS

### A.    Requirement and Timing

Any document falling within the scope of any request for production that is withheld or redacted on the basis of a claim of attorney-client privilege, work product doctrine, or any other claim of privilege from discovery (collectively referred to hereinafter as "privilege") is to be identified by the Producing Party in a privilege log; and if documents are produced on a rolling basis, the privilege log should be produced on a rolling basis as well, within 30 days after each rolling production. A final privilege log should be produced within 30 days of the completion of document production. Each entry on the privilege log shall include sufficient information for a party or the Court to determine whether the document is privileged.

### B.    Format

Privilege logs will be produced in an Excel format, or other agreed-upon format, which allows the Receiving Party to search and sort any and all columns and entries of the privilege log.

### C.    Fields

#### 1.    Metadata

A log of the documents withheld or redacted for privilege will be generated from the following corresponding metadata fields to the extent they exist as electronic metadata associated with the original electronically stored information:

- Author
- Subject
- Title

- Attachment Name
- File Name
- File Path(s)
- Last Saved/Edited By
- Custodian(s)
- Sender/From
- Recipient/To
- CC
- BCC
- Sent Date/Time
- Created Date/Time
- Date/Time Last Modified
- Family relationship (e.g., identifying parent emails and attachments)
- File Extension
- Attachment Count
- Hash Value
- Conversation ID or Thread ID

Parties may substitute an alternative description of the content within the identified metadata field(s) where the content of the metadata field reveals privileged information. The Producing Party shall identify each instance in which it has modified the content of the field and the basis for the modification.

2.    **Identifying Attorneys and Third Parties**. The privilege logs will clearly identify any attorneys on the privilege log using an asterisk or other agreed-upon method and any third party, along with the name of the third-party business, and the job title and/or role of the third-party identified in a log entry or entries. To the extent a document is included on the log where no attorney is listed as the author, sender or recipient, the description shall include sufficient information regarding which attorney(s) requested or were involved in the preparation of the document that is claimed to be privileged.

3.    **Other contents.** Parties will also include on the privilege log fields containing:

- a unique document ID or Bates number;

- the log production date[1];
- information sufficient to understand the family relationship of withheld or redacted documents;
- the privilege asserted (*e.g.*, attorney-client, work product); and
- a description of the nature of the withheld or redacted document or communication in a manner that, without revealing information claimed privileged, will enable a party to assess the privilege claim.

4.    **Treatment of Families.** Attachments to emails shall be logged as separate documents on the log, with family relationships identified.

If the document is the parent or child of a family of documents, some of which have been produced and others withheld, the log should identify the Bates numbers of the first document (i.e., the parent, or if the parent is withheld the first attachment) produced from the family in which the logged document was withheld.

**D.    Listservs**

To the extent that Listserv or group email addresses are identified on the privilege log, the Designating Party shall work in good faith to identify individuals and/or groups of individuals and/or groups of individuals who make up such Listserv or group email.

**E.    Hard Copy**

To the extent a Producing Party seeks to withhold or redact any hard-copy documents or documents lacking sufficient metadata, the Producing Party shall log – if known – the following information for such documents consistent the Rules:

- a statement of the ground(s) alleged for withholding all or part of such document;
- the date the document was prepared;
- the date the document was distributed;
- the identity of the document's author;
- the identity of all recipients of the document;
- an indication of all authors or recipients of the document who are attorneys;

---

[1] If the document is withheld in its entirety, the log production date field should reflect the date of the production from which it was withheld.

- an indication of all authors or recipients of the document who are third parties and the nature of each third-party relationship;
- a description of the nature of the withheld or redacted document in a manner that, without revealing information claimed privileged or protected, will enable a party to assess the privilege claim; and
- a unique document ID or Bates number.

**F.    Redactions**

Notwithstanding a claim of privilege, any document containing both privileged and non-privileged matter must be produced with the purportedly privileged portion redacted, with the redacted portion indicated on the document itself.

**G.    Communications following the Complaint**

Privilege log identification is not required for privileged communications exchanged after the filing of the Complaint between the Producing Party and its outside counsel.

**H.    No Categorical Logging**

Absent agreement in writing by the Parties, documents withheld or redacted on the basis of privilege may not be logged categorically. In other words, each description of the withheld or redacted document required in this section shall be created from an assessment of the individual document.

**O.**    When the deposition of a custodian is scheduled for a date following substantial completion of a production of their custodial file, the parties shall provide privilege logs involving documents from the deponent's custodial file no fewer than fourteen (14) days prior to the deposition, unless otherwise negotiated and agreed to between counsel.

## VII. CHALLENGING PRIVILEGE

Should a Receiving Party have a good-faith reason to believe a particular entry or portion of the entry log is not accurate or does not provide adequate information, the Receiving Party may

request additional information, which will be provided to the Receiving Party upon reasonable request within fourteen days (14) in a supplemental privilege log consistent with the Rules.

    **A.**    A Receiving Party may challenge a Producing Party's claims of privilege or work product protection at any time.

    B.    The Receiving Party shall set forth in writing their challenges and the Producing Party shall have fourteen (14) calendar days to respond. Failure to respond timely will be presumed to terminate the meet and confer process.

    C.    Within seven (7) calendar days of the Producing Party's response, the parties shall meet and confer to attempt to resolve the challenge.

    D.    Once a Receiving Party initiates a written challenge pursuant to paragraph A herein, the meet and confer process shall be presumed concluded no later than thirty (30) calendar days later, inclusive of the response times in paragraphs B and C.

    E.    If the Receiving Party lodges a challenge to a withheld or redacted document, the Parties agree to meet and confer regarding the claim of privilege pursuant to the guidelines herein. If, at the conclusion of the meet and confer process, the Parties are still not in agreement, they may bring the issue to the Court.

DATED THIS _____ Day of _____, 2025

_____
Honorable Eric R. Komitee
Chief Magistrate Cheryl L. Pollak
United States District Court
Eastern District of New York

WE SO MOVE

And agree to abide by the terms of this Order

| | |
|---|---|
| William E. Hoese | Ronald Sullivan |
| Robert A. Swift | M. Victoria Torres |
| Zahra R. Dean | RONALD SULLIVAN LAW PLLC |
| Elias Kohn | 1300 I Street NW, Suite 400E |
| KOHN, SWIFT & GRAF, P.C. | Washington, DC 20005 |
| 1600 Market Street, Suite 2500 | (202) 313-8313 |
| Philadelphia, PA 19103 | rsullivan@ronaldsullivanlaw.com |
| (215) 238-1700 | vtorres@ronaldsullivanlaw.com |
| whoese@kohnswift.com | |
| rswift@kohnswift.com | *Attorney for Clare Bronfman* |
| zdean@kohnswift.com | |

ekohn@kohnswift.com

*Attorneys for Plaintiffs*
Adam M. Prom
DICELLO LEVITT LLP
10 North Dearborn Street, Sixth Floor
Chicago, IL 60602
(312) 214-7900
aprom@dicellolevitt.com


*Attorney for Plaintiffs*




Greg G. Gutzler
Emma Bruder
DICELLO LEVITT LLP
485 Lexington Avenue, 10th Floor
New York, NY 10017
(646) 933-1000
ggutzler@dicellolevitt.com
ebruder@dicellolevitt.com

James D Wareham
Robin A. Henry
FRIED, FRANK, HARRIS, SHRIVER
  & JACOBSON LLP
801 17th Street, NW
Washington, DC 20006
(202) 639-7040
james.wareham@friedfrank.com
robin.henry@friedfrank.com

*Attorneys for Sara Bronfman*

Aaron M. Goldsmith
225 Broadway, Suite 715
New York, NY 10007
(914) 588-2679
aarongoldsmithlaw@gmail.com

*Attorney for Keith Raniere*


Danielle Roberts
575 Easton Ave, Apt. 18
Somerset, NJ 08873
(516) 480-1700

*Pro Se Defendant*

<u>**APPENDIX A**</u>

**TECHNICAL SPECIFICATIONS**
<u>**ANDREQUIRED METADATA FIELDS**</u>

**IMAGES:**

- o Produce documents as single page, black and white, Group IV, TIFF files.

- o Image Resolution 300 DPI.

- o File Naming Convention: Match Bates Number of the page.

- o Insert placeholder image for files produced in Native Format.

- o Original document orientation shall be retained.

**SPECIAL FILE TYPE INSTRUCTIONS:**

- o Certain documents shall be produced in Native Format as required by Section III of this Protocol.

**FULL TEXT EXTRACTION/OCR:**

- o Produce full extracted text for all file types (Redacted text will not be produced) including text of embedded content.

- o Produce OCR text for any hard-copy document.

- o Produce OCR text for any ESI where the source format was an image file (such as JPG, JPEG, GIF, BMP, PCX, PNG, TIF, TIFF etc.) where extracted text cannot be provided, using industry standard OCR technology (Redacted text will not be produced).

- o Produce OCR text for any redacted document.

- o Production format: Single text file for each document, not one text file per page.

- o File Naming Convention: Match BegBates Number.

**LOAD FILES**

**Data Load File**

- o The data load file should use standard Concordance delimiters:

- o Comma - ¶ (ASCII 20)

- o Quote - þ (ASCII 254)

- o Newline-® (ASCII174)

1

- o The first record should contain the field names in the order of the data

- o All date fields should be produced in mm/dd/yyyy format

- o Use carriage-return line-feed to indicate the start of the next record

- o Load files should not span across media (e.g., CDs, DVDs, Hard Drives, Etc.); a separate volume should be created for each piece of media delivered

- o The name of the data load file should mirror the name of the delivery volume, and should have a DAT extension (i.e., ABC00l.DAT)

- o The volume names should be consecutive (i.e., ABC00l, ABC002, et. seq.)

**Image Load File**

- o The name of the image load file should mirror the name of the delivery volume, and should have an .OPT extension (i.e., ABC001.OPT)

- o The volume names should be consecutive (i.e., ABC001, ABC002, et. seq.)

- o There should be one row in the Load File per TIFF image.

- o Every image in the delivery volume should be contained in the image load file.

- o The image key should be named the same as Bates Number of the page.

- o Load files should not span across media (e.g., CDs, DVDs, Hard Drives, Etc.), i.e., a separate volume should be created for each piece of media delivered.

- o The Opticon OPT image load file (.OPT) configuration shall be a page level comma delimited file containing seven fields per line: PageID, VolumeLabel, ImageFilePath, DocumentBreak, FolderBreak, BoxBreak, PageCount

2

**APPENDIX B**

**METADATA FIELDS**

| Field | Description | Email | Non- Email ESI | Hard Copy |
|---|---|---|---|---|
| Production Number Begin [ProdBeg] | Document Starting Bates # | x | x | x |
| Production Number End [ProdEnd] | Document Ending Bates # | x | x | x |
| Attachment Begin [ProdBegAttach] | Beginning Bates of attachment range | x | x | x |
| Attachment End [ProdEndAttach] | Ending Bates of attachment range | x | x | x |
| Custodian | Name of the custodian or repository name of the document produced - Last Name, First Name format | x | x | x |
| Source | This is the source from which non-custodial data was collected | x | x | x |
| All Custodians | Name(s) of the deduplicated custodians or repository name(s) of the document produced - Last Name, First Name format; semi-colon delimited | x | x | x |
| All Participants | Participants in lesser-included emails that otherwise would have been subject to review but are not by reason of email threading | x | | |
| File Name | File name of document (Original including Extension) | x | x | |
| File Extension | File extension of original document | x | x | |
| Email Outlook Type | Type of Outlook item (e.g., email, calendar item, note, task) | x | | |
| Page Count | For documents produced in TIFF form, number of pages in the document. For documents produced | x | x | x |

3

| Field | Description | Email | Non- Email ESI | Hard Copy |
|---|---|---|---|---|
| | in native, page count will be 1 (for placeholder). | | | |
| Document Title | Title field extracted from the Metadata of a non-Email document | | x | x |
| Author | Document author of a non-Email document. | | x | x |
| Email Subject | Subject of email | x | | |
| From | Email author | x | | |
| To | Email recipients | x | | |
| CC | Email copyees | x | | |
| BCC | Email blind copyees | x | | |
| Date-Time Sent | Date sent (mm/dd/yyyy hh:mm:ss format) | x | | |
| Date-Time Received | Date received (mm/dd/yyyy hh:mm:ss format) | x | | |
| Date-Time Created | Creation date (mm/dd/yyyy hh:mm:ss format) | | x | |
| Date-Time Last Modified | Last modification date (mm/dd/yyyy hh:mm:ss format) | | x | |
| File Path | File path of the location where the item was located during the normal course of business. | x | x | |
| All File Paths | File path that would have been provided for each version of the document that was not produced due to de-duplication. | x | x | |
| Filesize | Size or volume of individual file | x | x | |
| HasHiddenContent[2] | Y if hidden content, otherwise N or empty | | x | |
| Physical Location | The actual location where the Document is stored or preserved | | | x |

---

[2] "Hidden Content" for purposes of this field shall include track changes, comments, hidden slides, hidden columns, hidden worksheets, or other hidden text.

| Field | Description | Email | Non- Email ESI | Hard Copy |
|---|---|:---:|:---:|:---:|
| Box Number or unique identifier | The box number associated with archived documents. | | | x |
| Hash Value | Unique electronic signature of email or electronic file used for deduplication. | x | x | |
| Production Volume | Production volume name, including a volume number and a prefix which indicates the Producing Party | x | x | x |
| Confidentiality | Confidentiality designation pursuant to the Protective Order, if any | x | x | x |
| Redacted | Descriptor for documents that have been redacted, yes or y if document contains redactions, otherwise n or blank | x | x | x |
| Redaction Reason | This field should be populated by the basis for the redactions on this document. Multiple entries shall be separated by semicolons | x | x | x |
| Native Link | Path to produced native file used for linking | x | x | x |
| Text Link | Path to produced text file used for database linking | x | x | x |
| Other Regulatory/Related Productions BegBates | Beginning Bates# (including Prefix) used when produced in the other legal matter | x | x | x |
| Other Regulatory/Related Productions EndBates | Ending Bates# (including Prefix) used when produced in the other legal matter | x | x | x |
| Other Legal Matter BegAttach | Beginning Bates number of the first document in an attachment range used when produced in the other legal matter | x | x | x |

| Field | Description | Email | Non- Email ESI | Hard Copy |
|---|---|---|---|---|
| Other Regulatory/Related Productions EndAttach | Ending Bates number of the last document in attachment range used when produced in the other legal matter | x | x | x |
| Other Regulatory/Related Productions Short Caption | The case caption or other legal identifiable name of the other legal matter | x | x | x |

# EXHIBIT 4

Confidential

**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**

---

|  |  |
|---|---|
| SARAH EDMONDSON, *et al.* | * |
|  | * |
|  | * |
| Plaintiffs, | * |
|  | * |
| v. | * |
|  | * |
| Keith Raniere, *et al.* | * |
|  | * |
| Defendants. | * |
|  | * |

1:20 - cv - 00485-EK-CLP

---

**ANSWER TO PLAINTIFFS' FIRST SET OF INTERROGATORIES TO DEFENDANTS**

1. List each telephone number (including "smartphone," "cellular", and "landline") used by You, and the carrier associated with each such number, to communicate anything concerning, referring, or relating to any Plaintiff, NXIVM, or DOS.

   **516.480.1700 - Verizon a few years ago, now Optimum**

2. List each email address You have used to communicate about any Plaintiff, NXIVM, or DOS, including other people's email addresses You used.

   **Danielle@drdanielleroberts.com, danielle@danielleroberts.com, drdanielledo@gmail.com, hello@thedossierproject.com, photonfamentum@protonmail.com, Danielle@exoeso.com (not accessible), I do not recall if I had or the name of my nxvim email if one existed.**

3. List each social media platform, networking website, messaging app, or online forum you have established, used, or maintained that contained or communicated anything concerning, referring, or relating to any Plaintiff, NXIVM, or DOS, and for each, state the (a) the platform or application name; (b) the associated username(s); (c) the date the account was created, and (d) if applicable, the date it was closed.

   **Telegram:**
   **(b) the associated username(s); Danielle Roberts**
   **(c) the date the account was created - application download date is unavailable. I believe it was in 2013, verified by email notification**

   **WhatsApp:**
   **(b) the associated username(s); Danielle Roberts**

Confidential

**(c) the date the account was created - application download date is unavailable. I believe it was in 2013, verified by email notification**

**Instagram:**
**Danielle Roberts @drdanielleroberts: Created August 2016**
**The Dossier Project @thedossierproject: Created June 2020**

**Facebook:**
**Danielle Roberts: Creation date unavailable. Still active.**
**DrDanielleRoberts: Created March 27, 2012**

**Twitter/X:**
**(b) the associated username(s): Dr. Danielle Roberts @DrDanielleDR**
**(c) the date the account was created: September 2020**

**YouTube:**
**Dr. Danielle Roberts @dr.danielleroberts4335**
**created: Joined Dec 9, 2021**

**The Dossier Project @DossierProject**
**Created: Joined Mar 27, 2023**

**Websites:**
**https://www.thedossierproject.love/ Reestablished Summer 2023**
**https://www.drdanielleroberts.com/ Created 2022**

4. List all electronic devices You owned, possessed, or used to communicate anything concerning, referring, or relating to any Plaintiff, NXIVM, or DOS, including, but not limited to, smartphones, cellular phones, lap or desktop computers, tablets, and any other device connected to the internet, and for each device, identify the make, model, operating system, and unique identifiers (e.g., IMEI, MEID, or IMSI), if applicable.

**iPhone: 13 Pro iOS 18.6.2 IMEI 35 385166 071731 4**
**MacBook Pro macOS Monterey Version 12.7.6**

5. State whether You deleted or removed any e-mails, text messages, or other electronic content or communications concerning, referring, or relating to any Plaintiff, NXIVM, or DOS from any of the electronic devices, addresses, platforms, websites, apps, forums, or accounts You identified above in responses to Interrogatories 1-4. If the answer is yes, for each deleted item, describe the content, the date it was deleted, and the reason for its deletion.

**To my recollection I have not deleted any content.**

Confidential

6. List each title, role, and function (whether formal or informal) You had or preformed with respect to NXIVM and DOS and the time period You had each title, role, and function, name everyone You reported to with respect to Your title(s), role(s) and function(s), identify everyone who worked with or for You or reported to You in connection with Your title(s), role(s), and function(s), and describe all monetary and non-monetary benefits You received on account of Your title(s), role(s), and function(s).

**Slave**
a. **everyone You reported to: Allison Mack, Keith Raniere**
b. **identify everyone who worked with - India Oxenberg, Michele Hatchette, Nicole Isbel**
c. **reported to You: none**
d. **all monetary and non-monetary benefits You received: No monetary benefit. I received coaching from Ms. Mack and Mr. Raniere. Support and inspiration from my circle, and networking connections from DOS.**

**Branding Artist**
a. **everyone You reported to: Allison Mack**
b. **worked with: Allison Mack, Professional Branding Artist, Steve Haworth**
c. **all monetary and non-monetary benefits You received: No monetary benefit – the satisfaction of knowing I was doing something to help us women learn how to more meaningfully honor our commitments, build deeper relationships and comradery with each other, and witness the bravery we exhibited to do so.**

**Coach in ESP**
a. **everyone You reported to: Michelle Salzman**
b. **identify everyone who worked with or for You or reported to You: I had 1 or 2 Coachees for a very short period of time. I don't remember their names now.**
c. **all monetary and non-monetary benefits You received: No monetary benefit. I received coaching in entrepreneurship. I learned more about people and the curriculum by guiding others through the it.**

**SOP team leader**
a. **everyone You reported to: Ms. Sally Brink**
b. **or reported to You: Susan Wysocki, Stephanie Fair-Layman, Esther Carlson, Megan Mills-Hoffman, Julia Darmon, Allison Mack**
c. **all monetary and non-monetary benefits You received: No monetary benefit. I received training and experience leading and following (a great leader can do both).**

**SOP team member:**
a. **Reporting to Nicole Clyne and Linda Chung at different times**
b. **Was teammates with Michele Hatchette, Nicole Clyne, Micaela Zahner, to the best of my recollection**

Confidential

      **c.** **No monetary benefit. I received training and experience leading and following (a great leader can do both).**

DEFENDANT DANIELLE ROBERTS reserves the right to supplement and/or amend these responses up to and including the time of trial.

      Dated: October 6, 2025
          New York, NY

I affirm under penalty of perjury that the foregoing statements made by me are true, I am aware that if any of the foregoing statements made by me are willfully false I am subject to punishment.

/s/ Danielle Roberts, Pro Se

# EXHIBIT 5

**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**

| | |
|---|---|
| ———————————————— * | |
| SARAH EDMONDSON, *et al.* * | |
| * | |
| Plaintiffs, * | |
| * | 1:20 - cv - 00485-EK-CLP |
| v. * | |
| * | |
| Keith Raniere, *et al.* * | |
| * | |
| Defendants. * | |
| ———————————————— * | |

August 6, 2025


TO:

Robert A. Swift
William E. Hoese
Zahra R. Dean
Elias Kohn
KOHN, SWIFT & GRAF, P.C.
1600 Market Street, Suite 2500
Philadelphia, PA 19103
(215) 238-1700
rswift@kohnswift.com
whoese@kohnswift.com
zdean@kohnswift.com
ekohn@kohnswift.com


**GENERAL OBJECTIONS**

The following General Objections form a part of, and are hereby incorporated into, the response to each and every Request as set forth below. Nothing in Defendant's Specific Objections and Responses should be construed as a waiver of these General Objections, all of which are expressly preserved.

1. Defendant objects to the Definitions, Instructions, and Requests to the extent they seek to impose burdens or obligations beyond what is required by the Federal Rules of Civil Procedure, the Local Rules of the Eastern District of New York, any applicable Court Orders, or other governing law (collectively, the "Applicable Rules"). Defendant will construe the Definitions and Requests consistent with the Applicable Rules.

2. Defendant objects to these Requests to the extent they attempt or purport to seek Documents and/or information protected by the attorney-client privilege, the work-product doctrine, or any other applicable privilege held by Defendant. Any inadvertent disclosure of such information shall not constitute a waiver of any such privilege or of any ground for objecting to the discovery or admissibility of such materials, their subject matter, or the information obtained therein, nor shall such disclosure constitute a waiver of Defendant's rights to objects to the use of such information during this or any other proceeding.

3. Defendant objects to the Definitions of "You," "Yours," and "Defendant" as overly broad and unduly burdensome to the extent it purports to require these individuals to provide information that is not in their possession, custody, or control, that is not known by Defendant, or that can be more conveniently obtained from another source.

4. Defendant objects to these Requests to the extent that they suggest Defendant are obligated to provide information that is not in the possession, custody, or control of Defendant, that is not known by Defendant, or that can be more conveniently obtained from another source.

5. Defendant objects to these Requests to the extent they are premature by seeking information that has yet to be determined, as discovery in this litigation is ongoing. The requested information will be provided in accordance with the Court's Scheduling Order and all other Applicable Rules.

6. Defendant reserves the right to amend, supplement, or revise their objections and responses as discovery progresses. No statement herein shall be deemed a waiver of any argument, objection, or claim that may later arise in this matter, including at trial.

## RESPONSES TO REQUESTS FOR PRODUCTION OF DOCUMENTS FROM PLAINTIFFS

1. Defendant objects to this Request as overbroad, unduly burdensome, and seeking irrelevant documents not proportional to the needs of the case under Rule 26(b)(1) of the Federal Rules of Civil Procedure ("Rule 26(b)(1)") to the extent it seeks documents without limitation as to subject matter or connection to the allegations in the Third Amended Complaint, specifically the battery charge which is the only relevant charge left against Defendant. Defendant object that this Request is, and no Applicable Rule currently compels Plaintiffs to provide this information in the absence of specific, substantiated relevance. Subject to and without waiving the foregoing objections, Defendant states that she will meet and confer with Plaintiffs regarding the scope of a reasonable search for responsive discovery material in their possession, custody, or control.

2. Please see the documents in my possession, including telegrams and all other proofs responsive to this question at bates stamps numbered 231-236. Defendant reserves the right to supplement this answer at a later time.

3. Defendant objects to this Request as overbroad, unduly burdensome, and seeking irrelevant documents not proportional to the needs of the case under Rule 26(b)(1) of the Federal Rules of Civil Procedure ("Rule 26(b)(1)") to the extent it seeks documents without limitation as to subject matter or connection to the allegations in the Third

Amended Complaint, specifically the battery charge which is the only relevant charge left against Defendant. Defendant object that this Request is, and no Applicable Rule currently compels Plaintiffs to provide this information in the absence of specific, substantiated relevance. Subject to and without waiving the foregoing objections, Defendant states that she will meet and confer with Plaintiffs regarding the scope of a reasonable search for responsive discovery material in their possession, custody, or control.

4. The alleged "tool(s), instrument(s), or device(s)" are not currently in my possession. Defendant reserves the right to supplement this answer at a later time.

5. Please see the video, which will be sent separately via our vendor due to the nature of the video, of Sarah Edmondson getting branded. Defendant reserves the right to supplement this answer at a later time.

6. Please see all Documents regarding elements and Chakras referring to the brand at bates stamp number starting at 87, 91, 166, and 167. Defendant reserves the right to supplement this answer at a later time.

7. Please see all Document regarding elements and Chakras referring to the brand at bates stamp number starting at 87, 91, 166, and 167. Defendant reserves the right to supplement this answer at a later time.

8. Objection, assumes facts not in evidence – "collateral" is undefined and irrelevant to the battery charge. Defendant objects to this Request as overbroad, unduly burdensome, and seeking irrelevant documents not proportional to the needs of the case under Rule 26(b)(1) of the Federal Rules of Civil Procedure ("Rule 26(b)(1)") to the extent it seeks documents without limitation as to subject matter or connection to the allegations in the

Third Amended Complaint, specifically the battery charge which is the only relevant charge left against Defendant. Defendant object that this Request is, and no Applicable Rule currently compels Plaintiffs to provide this information in the absence of specific, substantiated relevance. Subject to and without waiving the foregoing objections, Defendant states that she will meet and confer with Plaintiffs regarding the scope of a reasonable search for responsive discovery material in their possession, custody, or control.

9. Objection, assumes facts not in evidence – "collateral" is undefined and irrelevant to the battery charge. Defendant objects to this Request as overbroad, unduly burdensome, and seeking irrelevant documents not proportional to the needs of the case under Rule 26(b)(1) of the Federal Rules of Civil Procedure ("Rule 26(b)(1)") to the extent it seeks documents  without limitation as to subject matter or connection to the allegations in the Third Amended Complaint, specifically the battery charge which is the only relevant charge left against Defendant. Defendant object that this Request is, and no Applicable Rule currently compels Plaintiffs to provide this information in the absence of specific, substantiated relevance. Subject to and without waiving the foregoing objections, Defendant states that she will meet and confer with Plaintiffs regarding the scope of a reasonable search for responsive discovery material in their possession, custody, or control.

10. Objection, assumes facts not in evidence – "collateral" is undefined and irrelevant to the battery charge. Defendant objects to this Request as overbroad, unduly burdensome, and seeking irrelevant documents not proportional to the needs of the case under Rule 26(b)(1) of the Federal Rules of Civil Procedure ("Rule 26(b)(1)") to the extent it seeks

5

documents without limitation as to subject matter or connection to the allegations in the Third Amended Complaint, specifically the battery charge which is the only relevant charge left against Defendant. Defendant object that this Request is, and no Applicable Rule currently compels Plaintiffs to provide this information in the absence of specific, substantiated relevance. Subject to and without waiving the foregoing objections, Defendant states that she will meet and confer with Plaintiffs regarding the scope of a reasonable search for responsive discovery material in their possession, custody, or control.

11. Objection, assumes facts not in evidence – "collateral" is undefined and irrelevant to the battery charge. Defendant objects to this Request as overbroad, unduly burdensome, and seeking irrelevant documents not proportional to the needs of the case under Rule 26(b)(1) of the Federal Rules of Civil Procedure ("Rule 26(b)(1)") to the extent it seeks documents without limitation as to subject matter or connection to the allegations in the Third Amended Complaint, specifically the battery charge which is the only relevant charge left against Defendant. Defendant object that this Request is, and no Applicable Rule currently compels Plaintiffs to provide this information in the absence of specific, substantiated relevance. Subject to and without waiving the foregoing objections, Defendant states that she will meet and confer with Plaintiffs regarding the scope of a reasonable search for responsive discovery material in their possession, custody, or control.

12. Defendant objects to this Request as overbroad, unduly burdensome, and seeking irrelevant documents not proportional to the needs of the case under Rule 26(b)(1) of the Federal Rules of Civil Procedure ("Rule 26(b)(1)") to the extent it seeks documents

without limitation as to subject matter or connection to the allegations in the Third Amended Complaint, specifically the battery charge which is the only relevant charge left against Defendant. Defendant object that this Request is, and no Applicable Rule currently compels Plaintiffs to provide this information in the absence of specific, substantiated relevance. Subject to and without waiving the foregoing objections, Defendant states that she will meet and confer with Plaintiffs regarding the scope of a reasonable search for responsive discovery material in their possession, custody, or control.

13. Objection as the request is irrelevant to the battery charge. Defendant objects to this Request as overbroad, unduly burdensome, and seeking irrelevant documents not proportional to the needs of the case under Rule 26(b)(1) of the Federal Rules of Civil Procedure ("Rule 26(b)(1)") to the extent it seeks documents  without limitation as to subject matter or connection to the allegations in the Third Amended Complaint, specifically the battery charge which is the only relevant charge left against Defendant. Defendant object that this Request is, and no Applicable Rule currently compels Plaintiffs to provide this information in the absence of specific, substantiated relevance. Subject to and without waiving the foregoing objections, Defendant states that she will meet and confer with Plaintiffs regarding the scope of a reasonable search for responsive discovery material in their possession, custody, or control.

14. Objection as the request is irrelevant to the battery charge. Defendant objects to this Request as overbroad, unduly burdensome, and seeking irrelevant documents not proportional to the needs of the case under Rule 26(b)(1) of the Federal Rules of Civil Procedure ("Rule 26(b)(1)") to the extent it seeks documents  without limitation as to

7

subject matter or connection to the allegations in the Third Amended Complaint, specifically the battery charge which is the only relevant charge left against Defendant. Defendant object that this Request is, and no Applicable Rule currently compels Plaintiffs to provide this information in the absence of specific, substantiated relevance. Subject to and without waiving the foregoing objections, Defendant states that she will meet and confer with Plaintiffs regarding the scope of a reasonable search for responsive discovery material in their possession, custody, or control.

15. Objection as the request is irrelevant to the battery charge. Defendant objects to this Request as overbroad, unduly burdensome, and seeking irrelevant documents not proportional to the needs of the case under Rule 26(b)(1) of the Federal Rules of Civil Procedure ("Rule 26(b)(1)") to the extent it seeks documents  without limitation as to subject matter or connection to the allegations in the Third Amended Complaint, specifically the battery charge which is the only relevant charge left against Defendant. Defendant object that this Request is, and no Applicable Rule currently compels Plaintiffs to provide this information in the absence of specific, substantiated relevance. Subject to and without waiving the foregoing objections, Defendant states that she will meet and confer with Plaintiffs regarding the scope of a reasonable search for responsive discovery material in their possession, custody, or control.

16. Objection as the request is irrelevant to the battery charge. Defendant objects to this Request as overbroad, unduly burdensome, and seeking irrelevant documents not proportional to the needs of the case under Rule 26(b)(1) of the Federal Rules of Civil Procedure ("Rule 26(b)(1)") to the extent it seeks documents  without limitation as to subject matter or connection to the allegations in the Third Amended Complaint,

specifically the battery charge which is the only relevant charge left against Defendant. Defendant object that this Request is, and no Applicable Rule currently compels Plaintiffs to provide this information in the absence of specific, substantiated relevance. Subject to and without waiving the foregoing objections, Defendant states that she will meet and confer with Plaintiffs regarding the scope of a reasonable search for responsive discovery material in their possession, custody, or control.

17. Objection as the request is irrelevant to the battery charge. Defendant objects to this Request as overbroad, unduly burdensome, and seeking irrelevant documents not proportional to the needs of the case under Rule 26(b)(1) of the Federal Rules of Civil Procedure ("Rule 26(b)(1)") to the extent it seeks documents without limitation as to subject matter or connection to the allegations in the Third Amended Complaint, specifically the battery charge which is the only relevant charge left against Defendant. Defendant object that this Request is, and no Applicable Rule currently compels Plaintiffs to provide this information in the absence of specific, substantiated relevance. Subject to and without waiving the foregoing objections, Defendant states that she will meet and confer with Plaintiffs regarding the scope of a reasonable search for responsive discovery material in their possession, custody, or control.

18. Objection as the request is irrelevant to the battery charge. Defendant objects to this Request as overbroad, unduly burdensome, and seeking irrelevant documents not proportional to the needs of the case under Rule 26(b)(1) of the Federal Rules of Civil Procedure ("Rule 26(b)(1)") to the extent it seeks documents without limitation as to subject matter or connection to the allegations in the Third Amended Complaint, specifically the battery charge which is the only relevant charge left against Defendant.

Defendant object that this Request is, and no Applicable Rule currently compels Plaintiffs to provide this information in the absence of specific, substantiated relevance. Subject to and without waiving the foregoing objections, Defendant states that she will meet and confer with Plaintiffs regarding the scope of a reasonable search for responsive discovery material in their possession, custody, or control.

19. Objection as the request is irrelevant to the battery charge. Defendant objects to this Request as overbroad, unduly burdensome, and seeking irrelevant documents not proportional to the needs of the case under Rule 26(b)(1) of the Federal Rules of Civil Procedure ("Rule 26(b)(1)") to the extent it seeks documents without limitation as to subject matter or connection to the allegations in the Third Amended Complaint, specifically the battery charge which is the only relevant charge left against Defendant. Defendant object that this Request is, and no Applicable Rule currently compels Plaintiffs to provide this information in the absence of specific, substantiated relevance. Subject to and without waiving the foregoing objections, Defendant states that she will meet and confer with Plaintiffs regarding the scope of a reasonable search for responsive discovery material in their possession, custody, or control.

20. Objection as "the stripe path" is not defined for these questions. Defendant objects to this Request as overbroad, unduly burdensome, and seeking irrelevant documents not proportional to the needs of the case under Rule 26(b)(1) of the Federal Rules of Civil Procedure ("Rule 26(b)(1)") to the extent it seeks documents without limitation as to subject matter or connection to the allegations in the Third Amended Complaint, specifically the battery charge which is the only relevant charge left against Defendant. Defendant object that this Request is, and no Applicable Rule currently compels

Plaintiffs to provide this information in the absence of specific, substantiated relevance. Subject to and without waiving the foregoing objections, Defendant states that she will meet and confer with Plaintiffs regarding the scope of a reasonable search for responsive discovery material in their possession, custody, or control.

21. Objection as "value exchanges" is not defined for these questions. Defendant objects to this Request as overbroad, unduly burdensome, and seeking irrelevant documents not proportional to the needs of the case under Rule 26(b)(1) of the Federal Rules of Civil Procedure ("Rule 26(b)(1)") to the extent it seeks documents without limitation as to subject matter or connection to the allegations in the Third Amended Complaint, specifically the battery charge which is the only relevant charge left against Defendant. Defendant object that this Request is, and no Applicable Rule currently compels Plaintiffs to provide this information in the absence of specific, substantiated relevance. Subject to and without waiving the foregoing objections, Defendant states that she will meet and confer with Plaintiffs regarding the scope of a reasonable search for responsive discovery material in their possession, custody, or control.

22. Defendant objects to this Request as overbroad, unduly burdensome, and seeking irrelevant documents not proportional to the needs of the case under Rule 26(b)(1) of the Federal Rules of Civil Procedure ("Rule 26(b)(1)") to the extent it seeks documents without limitation as to subject matter or connection to the allegations in the Third Amended Complaint, specifically the battery charge which is the only relevant charge left against Defendant. Defendant object that this Request is, and no Applicable Rule currently compels Plaintiffs to provide this information in the absence of specific, substantiated relevance. Subject to and without waiving the foregoing objections,

Defendant states that she will meet and confer with Plaintiffs regarding the scope of a reasonable search for responsive discovery material in their possession, custody, or control.

23. Defendant objects to this Request as overbroad, unduly burdensome, and seeking irrelevant documents not proportional to the needs of the case under Rule 26(b)(1) of the Federal Rules of Civil Procedure ("Rule 26(b)(1)") to the extent it seeks documents without limitation as to subject matter or connection to the allegations in the Third Amended Complaint, specifically the battery charge which is the only relevant charge left against Defendant. Defendant object that this Request is, and no Applicable Rule currently compels Plaintiffs to provide this information in the absence of specific, substantiated relevance. Subject to and without waiving the foregoing objections, Defendant states that she will meet and confer with Plaintiffs regarding the scope of a reasonable search for responsive discovery material in their possession, custody, or control.

24. Defendant objects to this Request as overbroad, unduly burdensome, and seeking irrelevant documents not proportional to the needs of the case under Rule 26(b)(1) of the Federal Rules of Civil Procedure ("Rule 26(b)(1)") to the extent it seeks documents without limitation as to subject matter or connection to the allegations in the Third Amended Complaint, specifically the battery charge which is the only relevant charge left against Defendant. Defendant object that this Request is, and no Applicable Rule currently compels Plaintiffs to provide this information in the absence of specific, substantiated relevance. Subject to and without waiving the foregoing objections, Defendant states that she will meet and confer with Plaintiffs regarding the scope of a

reasonable search for responsive discovery material in their possession, custody, or control.

25. Defendant objects to this Request as overbroad, unduly burdensome, and seeking irrelevant documents not proportional to the needs of the case under Rule 26(b)(1) of the Federal Rules of Civil Procedure ("Rule 26(b)(1)") to the extent it seeks documents without limitation as to subject matter or connection to the allegations in the Third Amended Complaint, specifically the battery charge which is the only relevant charge left against Defendant. Defendant object that this Request is, and no Applicable Rule currently compels Plaintiffs to provide this information in the absence of specific, substantiated relevance. Subject to and without waiving the foregoing objections, Defendant states that she will meet and confer with Plaintiffs regarding the scope of a reasonable search for responsive discovery material in their possession, custody, or control.

26. Please see all documents about my loss of license at bates stamp number 2, 87, 99, 102, 159, 168, 185, 247, 300, 331, and all attachments from 333 onwards. Defendant reserves the right to supplement this answer at a later time.

27. To my knowledge, there are no such documents in my possession or that I know exist as of this time.

28. See all documents attached and produced bates stamped from 1 through to the end, all were al least briefly reviewed in preparation for these responses.


 /s/ Danielle Roberts____
  Danielle Roberts

**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**

| | |
|---|---|
| SARAH EDMONDSON, *et al.* | * |
| | * |
| | * |
| Plaintiffs, | * |
| | * |
| | *  1:20 - cv - 00485-EK-CLP |
| v. | * |
| | * |
| Keith Raniere, *et al.* | * |
| | * |
| Defendants. | * |
| | * |

July 26, 2025

      TO:

      Robert A. Swift
      William E. Hoese
      Zahra R. Dean
      Elias Kohn
      KOHN, SWIFT & GRAF, P.C.
      1600 Market Street, Suite 2500
      Philadelphia, PA 19103
      (215) 238-1700
      rswift@kohnswift.com
      whoese@kohnswift.com
      zdean@kohnswift.com

      ekohn@kohnswift.com

**GENERAL OBJECTIONS**

The following General Objections form a part of, and are hereby incorporated into, the response to each and every Interrogatory Request as set forth below. Nothing in Defendant's Specific Objections and Responses should be construed as a waiver of these General Objections, all of which are expressly preserved.

15

1. Defendant objects to the Definitions, Instructions, and Requests to the extent they seek to impose burdens or obligations beyond what is required by the Federal Rules of Civil Procedure, the Local Rules of the Eastern District of New York, any applicable Court Orders, or other governing law (collectively, the "Applicable Rules"). Defendant will construe the Definitions and Requests consistent with the Applicable Rules.

2. Defendant objects to these Requests to the extent they attempt or purport to seek Documents and/or information protected by the attorney-client privilege, the work-product doctrine, or any other applicable privilege held by Defendant. Any inadvertent disclosure of such information shall not constitute a waiver of any such privilege or of any ground for objecting to the discovery or admissibility of such materials, their subject matter, or the information obtained therein, nor shall such disclosure constitute a waiver of Defendant's rights to objects to the use of such information during this or any other proceeding.

3. Defendant objects to the Definitions of "You," "Yours," and "Defendant" as overly broad and unduly burdensome to the extent it purports to require these individuals to provide information that is not in their possession, custody, or control, that is not known by Defendant, or that can be more conveniently obtained from another source.

4. Defendant objects to these Requests to the extent that they suggest Defendant are obligated to provide information that is not in the possession, custody, or control of Defendant, that is not known by Defendant, or that can be more conveniently obtained from another source.

5. Defendant objects to these Requests to the extent they are premature by seeking information that has yet to be determined, as discovery in this litigation is ongoing. The requested information will be provided in accordance with the Court's Scheduling Order and all other Applicable Rules.

Defendant reserves the right to amend, supplement, or revise their objections and responses as discovery progresses. No statement herein shall be deemed a waiver of any argument, objection, or claim that may later arise in this matter, including at trial.

## RESPONSES TO FIRST SET OF INTERROGATORIES

1.  Objection as the request is irrelevant to the battery charge. Defendant objects to this Request as overbroad, unduly burdensome, and seeking irrelevant documents not proportional to the needs of the case under Rule 26(b)(1) of the Federal Rules of Civil Procedure ("Rule 26(b)(1)") to the extent it seeks documents  without limitation as to subject matter or connection to the allegations in the Third Amended Complaint, specifically the battery charge which is the only relevant charge left against Defendant. Defendant object that this Request is, and no Applicable Rule currently compels Plaintiffs to provide this information in the absence of specific, substantiated relevance. Subject to and without waiving the foregoing objections, Defendant states that she will meet and confer with Plaintiffs regarding the scope of a reasonable search for responsive discovery material in their possession, custody, or control.

2.  Objection as the request is irrelevant to the battery charge. Defendant objects to this Request as overbroad, unduly burdensome, and seeking irrelevant documents not proportional to the needs of the case under Rule 26(b)(1) of the Federal Rules of Civil Procedure ("Rule 26(b)(1)") to the extent it seeks documents  without limitation as to subject matter or connection to the allegations in the Third Amended Complaint, specifically the battery charge which is the only relevant charge left against Defendant. Defendant object that this Request is, and no Applicable Rule currently compels Plaintiffs to provide this information in the absence of specific, substantiated relevance.

Subject to and without waiving the foregoing objections, Defendant states that she will meet and confer with Plaintiffs regarding the scope of a reasonable search for responsive discovery material in their possession, custody, or control.

3.  Objection as the request is irrelevant to the battery charge. Defendant objects to this Request as overbroad, unduly burdensome, and seeking irrelevant documents not proportional to the needs of the case under Rule 26(b)(1) of the Federal Rules of Civil Procedure ("Rule 26(b)(1)") to the extent it seeks documents  without limitation as to subject matter or connection to the allegations in the Third Amended Complaint, specifically the battery charge which is the only relevant charge left against Defendant. Defendant object that this Request is, and no Applicable Rule currently compels Plaintiffs to provide this information in the absence of specific, substantiated relevance. Subject to and without waiving the foregoing objections, Defendant states that she will meet and confer with Plaintiffs regarding the scope of a reasonable search for responsive discovery material in their possession, custody, or control.

4.  Objection, assumes facts not in evidence – "collateral" is undefined and irrelevant to the battery charge. Defendant objects to this Request as overbroad, unduly burdensome, and seeking irrelevant documents not proportional to the needs of the case under Rule 26(b)(1) of the Federal Rules of Civil Procedure ("Rule 26(b)(1)") to the extent it seeks documents  without limitation as to subject matter or connection to the allegations in the Third Amended Complaint, specifically the battery charge which is the only relevant charge left against Defendant. Defendant object that this Request is, and no Applicable Rule currently compels Plaintiffs to provide this information in the absence of specific, substantiated relevance. Subject to and without waiving the foregoing objections,

Defendant states that she will meet and confer with Plaintiffs regarding the scope of a reasonable search for responsive discovery material in their possession, custody, or control.

5.  Objection, assumes facts not in evidence – "collateral" is undefined and irrelevant to the battery charge. Defendant objects to this Request as overbroad, unduly burdensome, and seeking irrelevant documents not proportional to the needs of the case under Rule 26(b)(1) of the Federal Rules of Civil Procedure ("Rule 26(b)(1)") to the extent it seeks documents without limitation as to subject matter or connection to the allegations in the Third Amended Complaint, specifically the battery charge which is the only relevant charge left against Defendant. Defendant object that this Request is, and no Applicable Rule currently compels Plaintiffs to provide this information in the absence of specific, substantiated relevance. Subject to and without waiving the foregoing objections, Defendant states that she will meet and confer with Plaintiffs regarding the scope of a reasonable search for responsive discovery material in their possession, custody, or control.

6.  Objection as the request is irrelevant to the battery charge. Defendant objects to this Request as overbroad, unduly burdensome, and seeking irrelevant documents not proportional to the needs of the case under Rule 26(b)(1) of the Federal Rules of Civil Procedure ("Rule 26(b)(1)") to the extent it seeks documents without limitation as to subject matter or connection to the allegations in the Third Amended Complaint, specifically the battery charge which is the only relevant charge left against Defendant. Defendant object that this Request is, and no Applicable Rule currently compels Plaintiffs to provide this information in the absence of specific, substantiated relevance.

Subject to and without waiving the foregoing objections, Defendant states that she will meet and confer with Plaintiffs regarding the scope of a reasonable search for responsive discovery material in their possession, custody, or control.

7. I first learned that all DOS members would be receiving a brand when Allison Mack invited me to join DOS in February of 2016. She first let me know there was a women's group that formed to help each other grow. It was for women who were serious about their growth. If I wanted to know more about it I would need to provide collateral. I did give collateral. In our second conversation after I submitted my collateral, Allison shared the 4 components of DOS that I would be committing to if I decided to join: 1. A lifetime vow of obedience, 2. A master : slave relationship, 3. Wearing a piece of jewelry to symbolize the commitment, 4. A brand as part of initiation at some point in the future. I understood the brand was to be a symbol of our commitment and solidarity.

There were no further branding conversations until about 9 months later, in or around Nov/Dec 2016 when Allison asked me if I would be interested in learning the branding and tattooing techniques for the initiation process for the women. She called me while I was in her apartment in Knox Woods. She explained that the women that started the group had their brands done by a male branding artist. They wanted it to be a more intimate and meaningful process for the rest of us. As such, going forward they wanted a woman who was part of DOS to learn how to do it. She was also asking other women and figuring out who might want to learn and then teach this branding process.

Our next conversation was in Allison's car. It was about why she thought I would be a good fit to be able to help and support the other women through this process. I shared some concerns I had about breaching the body//skin and the effects it could have on the

20

body and about the ink from the tattooing process (I was a purist largely when it came to wellness). She shared that the brand is a permanent symbol of our commitment. That many women tend to back pedal or forget their commitment when things get hard or scary, and that the brand was meant to help remind women of their commitment to themselves and each other when things got challenging. She shared that I had a proven track record of sticking to my commitments and seeing them through even when it gets hard or scary (medical school, exo|eso). She thought that I would be a good support for the women for that reason. I also had done art in the past and had good fine motor skills and had some experience with electrocautery.

For these reasons, I considered helping with the process. I understood the depth and scope of the issues that were caused by women breaking their promises and their word; the harms on relationships, our culture and society, but mostly the harms on their personal lives and their personal opinion of themselves. For these reasons I felt the benefits outweighed the risks.

Lastly, Allison shared a little bit about how special and meaningful the first line women wanted this experience to be for the women in DOS, and how it could be crafted to help us surrender, and experience choosing love, and solidarity over pain or fear. How it would help create a group where only women who were truly committed to their goals, each other and love, would participate and how we as women can experience the comradery that men experience by creating this commitment for ourselves. She also spoke about how I had a good relationship with physical pain and that this would be supportive. She shared the symbol itself had a few different meanings including; Greek letters that symbolized the sorority meaning, the 7 chakras, the 5 elements and her and

Keith's initials as a tribute to them for starting this organization. She reiterated that this was all confidential information and all the other women would be informed by their Masters, and that I was not to speak about it otherwise (as per usual with DOS details).

I let her know I was considering it, but I wouldn't do anything on any other woman until I experienced it myself.

We had another one or two brief conversations regarding my choice to do the brands, how long I would do it for before teaching others, and logistics before we decided this was a good fit.

I reserve my right to add to this answer.

8. Objection as the request is irrelevant to the battery charge. Defendant objects to this Request as overbroad, unduly burdensome, and seeking irrelevant documents not proportional to the needs of the case under Rule 26(b)(1) of the Federal Rules of Civil Procedure ("Rule 26(b)(1)") to the extent it seeks documents  without limitation as to subject matter or connection to the allegations in the Third Amended Complaint, specifically the battery charge which is the only relevant charge left against Defendant. Defendant object that this Request is, and no Applicable Rule currently compels Plaintiffs to provide this information in the absence of specific, substantiated relevance. Subject to and without waiving the foregoing objections, Defendant states that she will meet and confer with Plaintiffs regarding the scope of a reasonable search for responsive discovery material in their possession, custody, or control.

9. See response in 7, incorporated here.

10. Objection as the request is irrelevant to the battery charge. Defendant objects to this Request as overbroad, unduly burdensome, and seeking irrelevant documents not

proportional to the needs of the case under Rule 26(b)(1) of the Federal Rules of Civil Procedure ("Rule 26(b)(1)") to the extent it seeks documents without limitation as to subject matter or connection to the allegations in the Third Amended Complaint, specifically the battery charge which is the only relevant charge left against Defendant. Defendant object that this Request is, and no Applicable Rule currently compels Plaintiffs to provide this information in the absence of specific, substantiated relevance. Subject to and without waiving the foregoing objections, Defendant states that she will meet and confer with Plaintiffs regarding the scope of a reasonable search for responsive discovery material in their possession, custody, or control.

11. The DOS women were brought into the room blindfolded and led by their Masters. Once they entered the room, they removed their blindfolds. Often, women were very happy to see me because we knew each other. Typically, they were nervous and excited about the process. Next they removed all their clothing as directed by their Masters. I then explained the process I would guide them through from start to finish and explain a bit about what they could expect during and after the experience. There were never any objections, or expressions to me that any women didn't want to do this, wanted to leave or that this wasn't completely consensual. There weren't even body language cues that I picked up on to indicate unwillingness. I perceived excitement, nervousness, joking and laughing (as per the transcript, audio and video provided). First, each recipient would first find a spot that would work best on her body to place the stencil under their bikini line. I would then apply the stencil, and make adjustments for them as they desired. Once all stencils were placed satisfactorily, the first woman would be ready to begin. The first line women had intentionally crafted a manuscript for the process to turn this into a ritual with

depth and meaning. The Master would start by reading to their Slave and then the Slave read back to their Master in response. There was an introduction and then the woman got on the massage table and was supported by her sisters to secure her body for her own safety so that she wouldn't jump or move inadvertently and cause injury or mess-ups to their brands. There was typically 1 woman at her legs, one at each arm, one with her by her head and one taking video footage. From my understanding this was set up to inspire courage, trust and support. Before each line on the design was completed there was a statement that was read by the Master describing its meaning. I would start each woman with a "light touch" from the cautery for 1 second so that they had an idea of the sensation to come, and could mentally prepare. I would then count to 3 or 5 seconds when I delivered each line depending on the length of the line and the pain tolerance of the member. Some were more pain tolerant than others and I was in tune with and accommodated that. There was only 1 woman that had a pronounced reaction to the pain and took more support and coaching to help her through. There were requests to take a breather here and there, but no requests to stop or abandon the process, even for the woman who had a greater reaction to the experience. There were 7 lines total, which typically took a total of less than two minutes pen to skin time. After the brand was complete each woman was typically emotional, triumphant and verbally expressed their gratitude to their Master, me and their sisters. The brand was cleaned with normal saline and covered with a clear bandage. When everyone was finished in the group (between 3-5 women), I verbally gave basic care instructions and typically gave them some rose ointment as a gift. Each woman was to take a picture each day to document the progression of their healing and maturation process for the manual that would be created

for the future generations of DOS women, so that they would better know what to expect, and for sentimental purposes. They would send those pictures to their Masters and their Masters to me. The women would then reapply their blindfolds and all leave together with their Masters. This was done to keep the home they were in anonymous.

I was not aware of a specific purpose for the filming other than for a record for the women, and their masters - this wasn't collateral from my experience and my own personal branding process was not filed as collateral in my collateral log.

I reserve my right to add to this answer.

12. Who:

    1. Allison's Circle (which I was a part of) – in Allison's home

        a. India Oxenberg

        b. Nicole Isbel

        c. MH

    2. Lauren Salzman – In Allison's home

    3. Lauren's Circle – In Allison's home

        a. AC

        b. Sarah Edmondson

        c. CG

        d. JG

        e. AM

    4. Rosa Laura's Circle – In Allison's home

        a. AD

        b. AR

    c. NH

    d. PA

5. Daniela Padilla's Circle – In Allison's home

    a. CB

    b. MR

    c. LE

6. Jimena's Circle  - In the DOS sorority house

    a. Paloma Pena

    b. M

I reserve my right to add to this list.

How: See answers to #9 as well as:

I bought the electrocautery machine on-line from Medtronic with Allision's credit card. I had training using a cautery in residency, not for creating scars but treating conditions while minimizing scaring. I learned from Steve Hayworth, the leading branding artist in the nation, who was the first to use electrocautery for branding in order to minimize risks of infection, make the art more precise, and reduce healing times significantly. He guided me and shared his process over the phone and email. I learned in person from a branding artist in Brooklyn. I practiced on fruit skin and pig knuckles as instructed by Steve Hayworth before doing it live. I reserve my right to add to this answer.

13. I had no communication with any DOS members before their branding process except my circle of 4 women. We had discussed it several times in person and worked out logistics for me to get my brand in BK and for them to come with me. The discussions were

26

usually us asking Allison regarding any concerns we had. She shared what she learned from Steve Hayworth in learning how to do it and having her own done. She addressed our concerns. There was no talk of collateral.

The other circles I helped with their brands had no communication with me before their brands. See answer to #11 regarding what I spoke to them about in the initiation and "Brands care instructions" for an approximation of what I explained to them in person about their healing process. They were guided to share photos with their Masters for each day after the process for 30 days and to address any signs of infection or issue should they arise with their doctors or urgent care. There were no issues/infections.

I spoke to the women in my circle about their brands, how they liked them, how they were healing and so forth and shared my own experience with them. There were very few other women who messaged me or that I spoke with about their brands after the process. A few sent me a picture so I could see how they were looking or to ask if it looked normal or consistent with what it should look like. Sarah Edmondson messaged me about three months after receiving the brand (and after breaking her vow) and unusually addressed me as Dr. Roberts which she had never done before as I have never acted as her doctor and we had always previously interacted as friendly acquaintances. Days later she filed a complaint against me with the Office of Professional Medical Conduct.

I never discussed anything about collateral with anyone outside of my circle. I spoke to the women in my circle about ideas about what I or they could submit, what the experience was like for us, etc.

I reserve my right to add to this answer.

27

14. Objection as the request is irrelevant to the battery charge. Defendant objects to this Request as overbroad, unduly burdensome, and seeking irrelevant documents not proportional to the needs of the case under Rule 26(b)(1) of the Federal Rules of Civil Procedure ("Rule 26(b)(1)") to the extent it seeks documents without limitation as to subject matter or connection to the allegations in the Third Amended Complaint, specifically the battery charge which is the only relevant charge left against Defendant. Defendant object that this Request is, and no Applicable Rule currently compels Plaintiffs to provide this information in the absence of specific, substantiated relevance. Subject to and without waiving the foregoing objections, Defendant states that she will meet and confer with Plaintiffs regarding the scope of a reasonable search for responsive discovery material in their possession, custody, or control.

15. Objection as the request is irrelevant to the battery charge. Defendant objects to this Request as overbroad, unduly burdensome, and seeking irrelevant documents not proportional to the needs of the case under Rule 26(b)(1) of the Federal Rules of Civil Procedure ("Rule 26(b)(1)") to the extent it seeks documents without limitation as to subject matter or connection to the allegations in the Third Amended Complaint, specifically the battery charge which is the only relevant charge left against Defendant. Defendant object that this Request is, and no Applicable Rule currently compels Plaintiffs to provide this information in the absence of specific, substantiated relevance. Subject to and without waiving the foregoing objections, Defendant states that she will meet and confer with Plaintiffs regarding the scope of a reasonable search for responsive discovery material in their possession, custody, or control.

16. Objection as the request is irrelevant to the battery charge. Defendant objects to this Request as overbroad, unduly burdensome, and seeking irrelevant documents not proportional to the needs of the case under Rule 26(b)(1) of the Federal Rules of Civil Procedure ("Rule 26(b)(1)") to the extent it seeks documents without limitation as to subject matter or connection to the allegations in the Third Amended Complaint, specifically the battery charge which is the only relevant charge left against Defendant. Defendant object that this Request is, and no Applicable Rule currently compels Plaintiffs to provide this information in the absence of specific, substantiated relevance. Subject to and without waiving the foregoing objections, Defendant states that she will meet and confer with Plaintiffs regarding the scope of a reasonable search for responsive discovery material in their possession, custody, or control.

17. Objection, assumes facts not in evidence – "collateral" is undefined and irrelevant to the battery charge. Defendant objects to this Request as overbroad, unduly burdensome, and seeking irrelevant documents not proportional to the needs of the case under Rule 26(b)(1) of the Federal Rules of Civil Procedure ("Rule 26(b)(1)") to the extent it seeks documents without limitation as to subject matter or connection to the allegations in the Third Amended Complaint, specifically the battery charge which is the only relevant charge left against Defendant. Defendant object that this Request is, and no Applicable Rule currently compels Plaintiffs to provide this information in the absence of specific, substantiated relevance. Subject to and without waiving the foregoing objections, Defendant states that she will meet and confer with Plaintiffs regarding the scope of a reasonable search for responsive discovery material in their possession, custody, or control.

18. Objection as the request is irrelevant to the battery charge. Defendant objects to this Request as overbroad, unduly burdensome, and seeking irrelevant documents not proportional to the needs of the case under Rule 26(b)(1) of the Federal Rules of Civil Procedure ("Rule 26(b)(1)") to the extent it seeks documents without limitation as to subject matter or connection to the allegations in the Third Amended Complaint, specifically the battery charge which is the only relevant charge left against Defendant. Defendant object that this Request is, and no Applicable Rule currently compels Plaintiffs to provide this information in the absence of specific, substantiated relevance. Subject to and without waiving the foregoing objections, Defendant states that she will meet and confer with Plaintiffs regarding the scope of a reasonable search for responsive discovery material in their possession, custody, or control.

19. Objection as the request is irrelevant to the battery charge. Defendant objects to this Request as overbroad, unduly burdensome, and seeking irrelevant documents not proportional to the needs of the case under Rule 26(b)(1) of the Federal Rules of Civil Procedure ("Rule 26(b)(1)") to the extent it seeks documents without limitation as to subject matter or connection to the allegations in the Third Amended Complaint, specifically the battery charge which is the only relevant charge left against Defendant. Defendant object that this Request is, and no Applicable Rule currently compels Plaintiffs to provide this information in the absence of specific, substantiated relevance. Subject to and without waiving the foregoing objections, Defendant states that she will meet and confer with Plaintiffs regarding the scope of a reasonable search for responsive discovery material in their possession, custody, or control.

20. Make Justice Blind: https://makejusticeblind.com/ Is a website that was developed out of An important need. Our voices were being silenced in the media and this was a way to illustrate the FBI malfeasance, evidence tampering and corruption that is occurring the Raniere case. It shows hard indisputable evidence (now corroborated by 8 experts including - digital forensic expert, Dr. Rick Kiper, that taught the FBI digital forensic team before he retired, and an independent expert hired by Newsweek). There are also very influential advocates including Judges, Attorney's and the like.

21. The Dossier Project: https://www.thedossierproject.love/. Is a group of women that came together about 5 years ago in May of 2020 as the wreckage from 2017's public campaign started to settle. Most of the community was terrified to talk to each other before that because of FBI threats and investigations. We re-found each other, and began talking. As we did, we started to realize a lot of us had very positive experiences and lies were being told publicly into a well-crafted defamation narrative. We were appalled, shocked, and devastated. We found solace in coming together to support each other and what we experienced to be true. This gave us the strength to speak out and to try to set the record straight since we were being silenced publicly. We created videos and articles detailing our personal accounts and experiences in DOS and laid out evidence contrary to the public narrative. Unfortunately, much of this was withdrawn by Nicki Clyne in March of 2023 when she had a change of heart, decided to leave the Dossier Project, and deny us access to our content. We are currently working to rebuild.


  /s/ Danielle Roberts____
  Danielle Roberts

<u>INDIVIDUAL CERTIFICATION</u>

I certify that the foregoing statements made by me are true.  I am aware that if any of the foregoing statements made by me are willfully false, I am subject to punishment for contempt of Court.

_____(sign and print name)

Print:

Dated: _____September 22_____, 202 5___

**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**

|  |  |
|---|---|
| SARAH EDMONDSON, *et al.* | * |
|  | * |
|  | * |
| Plaintiffs, | * |
|  | * |
| v. | * |
|  | * |
| Keith Raniere, *et al.* | * |
|  | * |
| Defendants. | * |
|  | * |

1:20 - cv - 00485-EK-CLP

TABLE OF CONTENTS FOR DOCUMENTS

Roberts 2 –    IN THE MATTER OF DISCIPLINARY PROCEEDINGS COMPLAINT

Roberts 87 –    Letter enclosing amended complaint

Roberts 87 –    Coach Summy Brand Schedule

Roberts 91 –    Emails about the brand history

Roberts 93 –    Lauren Salzman log

Roberts 95 –    **BASIC NON-DISCLOSURE (NDA) AGREEMENT**

Roberts 99 –    Notice of disciplinary proceedings

Roberts 102 –    Determination and order from disciplinary board

Roberts 159 –    Summary of revocation of license

Roberts 163 –    Text messages with Sarah Edmonson

Roberts 166 –    definitions of key terms

Roberts 167 –    messages with India Oxenberg

Roberts 168 –    "Petitioner's Brief in reply to the Brief For Respondent AG."

Roberts 185 –    Brief for Respondent AG

Roberts 230 –    Text messages with Sarah Edmonson

Roberts 231 – Conversation With Allison Mack

Roberts 237 – Conversation With Kieth Raneire

Roberts 239 – Transcript of Video Conversation with Sarah Edmonson

Roberts 247 – Amended Complaint

Roberts 300 – Determination and order

Roberts 331 – Proof of license

Roberts 332 – Letter to Sarah Edmonson stating issues are not Doctor-Patient related

Roberts 333 – Attachments

Roberts 334 – Attachment 1 – Letter from OPMC to Ms. Edmondson, dated July 11, 2017.

Roberts 336 – Attachment 2 – OPMC Statement of Charges, dated November 17, 2017.

Roberts 407 – Attachment 3 – Email from OPMC Prosecutor Conklin, dated December 1,2017

Roberts 409 – Attachment 4 – OPMC Subpoena for Allison Mack, dated January 18, 2018

Roberts 413 – Attachment 5 – Declaration of Danielle Roberts, dated June 15, 2022

Roberts 419 – Attachment 6 – Letter on behalf of Allison Mack to OPMC, dated February 2, 2018

Roberts 422 – Attachment 7 – OPMC Interview Offer, dated February 5, 2018

Roberts 426 – Attachment 8 – Email from OPMC Prosecutor Conklin, dated June 27, 2019

Roberts 429 –   Attachment 9 – Emails from OPMC Prosecutor Conklin from October 2019

Roberts 436 – Respondent's Memorandum To The Hearing Committee

Roberts 463 – Complaint submitted on July 7, 2017

Roberts 465 – **BRIEF AND SPECIAL APPENDIX FOR DEFENDANT-APPELLANT**

**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**

---

|  |  |  |
|---|---|---|
| SARAH EDMONDSON, *et al.* | * | |
| | * | |
| | * | |
| Plaintiffs, | * | |
| | * | 1:20 - cv - 00485-EK-CLP |
| v. | * | |
| | * | |
| Keith Raniere, *et al.* | * | |
| | * | |
| Defendants. | * | |
| | * | |

---

August 6, 2025

ALL DOCUMENTS RESPONSIVE TO REQUESTS FOR DOCUMENTS

STATE OF WISCONSIN
BEFORE THE MEDICAL EXAMINING BOARD

| | | |
|---|---|---|
| IN THE MATTER OF DISCIPLINARY | : | |
| PROCEEDINGS AGAINST | : | |
| | : | COMPLAINT |
| DANIELLE D. ROBERTS, D.O., | : | |
| RESPONDENT. | : | |

Division of Legal Services and Compliance Case No. 18 MED 161

Colleen L. Meloy, an attorney for the State of Wisconsin, Department of Safety and Professional Services (Department) Division of Legal Services and Compliance (Division) Post Office Box 7190, Madison, Wisconsin 53707-7190, upon information and belief, alleges that:

1.    Danielle D. Roberts, D.O., (Respondent) is licensed in the state of Wisconsin to practice medicine and surgery, having license number 60617-21, first issued on April 25, 2013, and expired on October 31, 2017.

2.    Pursuant to Wis. Stat. § 440.08(3), Respondent has the right to renew her license upon payment of a fee until October 31, 2022.

3.    Respondent's most recent address on file with the Department is 215 Castle Avenue, Westbury, New York 11590.

4.    Respondent is also licensed to practice medicine in New York, having New York medical license number 255075, first granted on October 5, 2009 and registered through August 31, 2023.

5.    On May 2, 2018, Division Case No. 18 MED 161 was opened to investigate allegations that Respondent used a cauterizing iron to deliberately create scar tissue of the initials "K.R." on multiple female members of the sex cult, NXIVM, led by Keith Raniere, as described by various media outlets, including a newspaper article dated April 30, 2018.

6.    On March 5, 2020, the New York State Department of Health, State Board for Professional Medical Conduct (New York Board) filed a Notice of Hearing and Statement of Charges against Respondent (New York Charges). *See New York Charges attached hereto as Exhibit A and incorporated by reference herein.*

7.    The New York Charges alleged the following facts, *intra alia*:

   a.    On March 9, 2017, Respondent used a cauterizing pen as part of a medical procedure to scar the skin by branding female patients A-E, with the initials KR or AM in the pelvis region leaving a permanent scar and deviated from acceptable medical standards as follows:

    i. without using appropriate infection control procedures and sterile technique;

    ii. without the use of local or general anesthesia;

    iii. with the assistance of non-medically trained personnel that physically restrained each patient;

    iv. while both the patient and the non-medically trained personnel were naked contrary to any known medical protocol;

    v. failed to provide appropriate wound care during and after the medical procedure;

    vi. failed to provide appropriate follow-up care to each patient;

    vii. failed to obtain informed consent from each patient; and

    viii. failed to keep appropriate medical records for each patient.

b. Between January 2017 and December 2017, Respondent used a cauterizing pen as part of a medical procedure to scar the skin by branding female patients F-M, with the initials KR or AM in the pelvis region leaving a permanent scar and deviated from acceptable medical standards as set forth in subparagraph a, i-vii.

c. Between June 2016 and August 2016, Respondent failed to report a communicable disease outbreak at a conference held in Silver Bay, New York, which involved approximately 438 individuals, including 76 children.

8. The New York Charges alleged counts one through forty-seven of professional misconduct against Respondent including, *intra alia*:

a. willfully abusing patients (charges 1-6);

b. engaging in conduct in the practice of medicine which evidences moral unfitness to practice medicine (charges 7-12);

c. failing to use scientifically accepted barrier precautions and infection control practices as established by the New York State Department of Health (charges 13-18);

d. practicing the profession fraudulently or beyond its authorized scope (charge 19);

e. practicing the profession with negligence, gross negligence, incompetence and/or gross incompetence (charges 20-33);

f. failing to file a public health report required by law (charge 34);

g. willfully or grossly negligently failing to comply with substantial provisions of federal, state, or local laws, rules, or regulations governing the practice of medicine (charge 35);

h.   performing professional services which have not been authorized by the patient (charges 36-41); and

i.   failing to maintain patient healthcare records (charges 42-47).

9.     A full recitation of the facts alleged and charges set forth in the New York Charges are attached hereto as Exhibit A and incorporated by reference herein.

10.    On April 27, 2020, the New York Board filed an Amended Statement of Charges against Respondent (New York Amended Charges).[1] *See New York Amended Charges attached hereto as Exhibit B and incorporated by reference herein*.

11.    On September 27, 2021, the New York Board issued a Determination and Order which revoked Respondent's license to practice medicine in the State of New York after a determination that the forty-seven specified counts of professional misconduct set forth in the New York Charges were sustained. *See New York Determination and Order attached hereto as Exhibit C and incorporated by reference herein*.

12.    Respondent engaged in unprofessional conduct pursuant to Wis. Admin. Code § Med 10.03(2)(b) by departing from or failing to conform to the standard of minimally competent medical practice which creates an unacceptable risk of harm to a patient or the public whether or not the act or omission resulted in actual harm to any person.

13.    Respondent engaged in unprofessional conduct pursuant to Wis. Admin. Code § Med 10.03(2)(j) by performing an act constituting the practice of medicine and surgery without required informed consent under s. 448.30, Wis. Stats.

14.    Respondent engaged in unprofessional conduct pursuant to Wis. Admin. Code § Med 10.03(3)(c) by having any credential pertaining to the practice of medicine and surgery or any act constituting the practice of medicine and surgery become subject to adverse determination by any agency of this or another state, or by any federal agency or authority.

15.    As a result of the above conduct, Respondent is subject to discipline pursuant to Wis. Stat. § 448.02(3).

The Division of Legal Services and Compliance requests that the Board hear evidence relevant to the matters alleged in this complaint, determine and impose the discipline warranted, and assess the costs against Respondent Danielle D. Roberts, D.O.

Dated the 6th of October, 2021

_____
Colleen L. Meloy, Prosecuting Attorney
State Bar Number 1029855
Department of Safety and Professional Services
Division of Legal Services and Compliance

---

[1] The New York Amended Charges removed patients H-M.

P.O. Box 7190
Madison, WI 53707-7190
(608) 261-8779
Colleen.Meloy@wisconsin.gov

These charges are only allegations which

may be contested by the licensee in an

Administrative hearing.

Exhibit A 001

NEW YORK STATE          DEPARTMENT OF HEALTH
STATE BOARD FOR PROFESSIONAL MEDICAL CONDUCT

| | |
|---|---|
| **IN THE MATTER** | NOTICE |
| **OF** | OF |
| **DANIELLE ROBERTS, D.O.** | HEARING |

TO:    DANIELLE ROBERTS, D.O.

█████████████████████

PLEASE TAKE NOTICE:

A hearing will be held pursuant to the provisions of N.Y. Pub. Health Law §230 and N.Y. State Admin. Proc. Act §§301-307 and 401. The hearing will be conducted before a committee on professional conduct of the State Board for Professional Medical Conduct on May 4, 2020 at 10:00 a.m., at the Offices of the New York State Department of Health, 90 Church State Street, 4th floor, New York, New York 10007, and at such other adjourned dates, times and places as the committee may direct.

At the hearing, evidence will be received concerning the allegations set forth in the Statement of Charges, which is attached. A stenographic record of the hearing will be made and the witnesses at the hearing will be sworn and examined. You shall appear in person at the hearing and may be represented by counsel who shall be an attorney admitted to practice in New York state. You have the right to produce witnesses and evidence on your behalf, to issue or have subpoenas issued on your behalf in order to require the production of witnesses and documents, and you may cross-examine witnesses and examine evidence produced against you. A summary of the Department of Health Hearing Rules is enclosed.

Exhibit A 002

YOU ARE HEREBY ADVISED THAT THE ATTACHED CHARGES WILL BE MADE PUBLIC
FIVE BUSINESS DAYS AFTER THEY ARE SERVED.

Department attorney: Initial here ███████

The hearing will proceed whether or not you appear at the hearing. Please note that requests for adjournments must be made in writing and by telephone to the New York State Department of Health, Division of Legal Affairs, Bureau of Adjudication, Riverview Center,150 Broadway - Suite 510, Albany, NY 12204-2719, ATTENTION: HON. JAMES HORAN, DIRECTOR, BUREAU OF ADJUDICATION, (henceforth "Bureau of Adjudication"), (Telephone: (518-402-0748), upon notice to the attorney for the Department of Health whose name appears below, and at least five days prior to the scheduled hearing date. Adjournment requests are not routinely granted as scheduled dates are considered dates certain. Claims of court engagement will require detailed Affidavits of Actual Engagement. Claims of illness will require medical documentation.

Pursuant to the provisions of N.Y. Pub. Health Law §230(10)(c), you shall file a written answer to each of the charges and allegations in the Statement of Charges not less than ten days prior to the date of the hearing. Any charge or allegation not so answered shall be deemed admitted. You may wish to seek the advice of counsel prior to filing such answer. The answer shall be filed with the Bureau of Adjudication, at the address indicated above, and a copy shall be forwarded to the attorney for the Department of Health whose name appears below. Pursuant to §301(5) of the State Administrative Procedure Act, the Department, upon reasonable notice, will provide at no charge a qualified interpreter of the deaf to interpret the proceedings to, and the testimony of, any deaf person. Pursuant to the

Roberts - 8

Exhibit A 003

terms of N.Y. State Admin. Proc. Act §401 and 10 N.Y.C.R.R. §51.8(b), the Petitioner hereby demands disclosure of the evidence that the Respondent intends to introduce at the hearing, including the names of witnesses, a list of and copies of documentary evidence and a description of physical or other evidence which cannot be photocopied.

At the conclusion of the hearing, the committee shall make findings of fact, conclusions concerning the charges sustained or dismissed, and in the event any of the charges are sustained, a determination of the penalty to be imposed or appropriate action to be taken. Such determination may be reviewed by the Administrative Review Board for Professional Medical Conduct.

> THESE PROCEEDINGS MAY RESULT IN A DETERMINATION THAT YOUR LICENSE TO PRACTICE MEDICINE IN NEW YORK STATE BE REVOKED OR SUSPENDED, AND/OR THAT YOU BE FINED OR SUBJECT TO OTHER SANCTIONS SET OUT IN NEW YORK PUBLIC HEALTH LAW §§230-a. YOU ARE URGED TO OBTAIN AN ATTORNEY TO REPRESENT YOU IN THIS MATTER.

DATE: March 5, 2020

Albany, New York

Timothy A. Mahar, Esq.
Deputy Counsel
Bureau of Professional Medical Conduct

Inquiries should be directed to:
Jeffrey J. Conklin, Esq., Associate Counsel
Bureau of Professional Medical Conduct
Empire State Plaza
Corning Tower, Room 2517
Albany, New York 12237

Exhibit A 004

NEW YORK STATE          DEPARTMENT OF HEALTH
STATE BOARD FOR PROFESSIONAL MEDICAL CONDUCT

| | |
|---|---|
| **IN THE MATTER**<br><br>**OF**<br><br>**DANIELLE ROBERTS, D.O.** | STATEMENT<br><br>OF<br><br>CHARGES |

DANIELLE ROBERTS, D.O., the Respondent, was authorized to practice medicine in New York State on or about October 5, 2009, by the issuance of license number 255075 by the New York State Education Department.

## FACTUAL ALLEGATIONS

A.   On or about March 9, 2017, the Respondent used a cauterizing pen as part of a medical procedure to scar the skin by branding Patient A, a female patient, hereinafter identified in the attached Appendix "A", with the initials KR/AM, and/or KR, in the pelvis region, thereby leaving a permanent scar. Respondent's conduct deviated from accepted standards of care as follows:

1. Respondent performed the medical procedure upon Patient A in an other than appropriately sterile environment, and/or without appropriate infection control, and/or without the use of sterile technique, including the surgical field, surgical procedure room, multiple use of a cautery pen tip and electrical grounding pad, and documented electrical testing and maintenance upkeep of the cautery device.

2. Respondent performed the medical procedure without the use of a local anesthetic or general anesthesia, thereby causing Patient A to suffer pain for no legitimate medical purpose.

1

Exhibit A 005

3. Respondent performed the medical procedure upon Patient A with non-medically trained personnel present, who were not wearing personal protective equipment.

4. Respondent performed the medical procedure upon Patient A with the assistance of non-medically trained personnel who physically restrained said patient.

5. Respondent failed to cease performing the medical procedure despite the fact that Patient A was suffering pain without medical justification.

6. Respondent, during the course of the medical procedure, willfully physically abused Patient A.

7. Respondent performed the medical procedure upon Patient A at the time when said patient was naked and while being held down by other individuals, who were also naked, contrary to any appropriate medical protocol or need.

8. Respondent inappropriately performed the medical procedure upon Patient A while an individual who was also naked utilized a cell phone to video said medical procedure.

9. Respondent failed to provide appropriate wound care for Patient A at the time of the medical procedure, and thereafter.

10. Respondent failed to provide appropriate follow-up medical care and treatment for Patient A's wound, and/or failed to refer Patient A to another medical provider for such post-medical procedure wound care.

11. Respondent inappropriately advised, or caused another individual to advise, Patient A to take photographs of the wound caused by the medical procedure on a daily basis for one month and once a week for another month, and to thereafter send such photographs to an individual who shared all or some of said photographs with the Respondent.

12. Respondent failed to provide appropriate medical care and treatment for Patient A, including obtaining information regarding said patient's medical history and current medications.

2

Exhibit A 006

13. Respondent failed to prepare and/or maintain appropriate medical records for the patient which accurately reflected the evaluation and treatment of Patient A.

14. Respondent fraudulently failed to disclose to Patient A that the initials KR/AM and/or KR said Respondent branded into the pelvis region of Patient A represented the initials of Keith Ranieri and/or Allison Mack.

15. Respondent performed the medical procedure upon Patient A without having obtained the adequate informed consent of Patient A.

B. On or about March 9, 2017, the Respondent used a cauterizing pen as part of a medical procedure to scar the skin by branding Patient B, a female patient, hereinafter identified in the attached Appendix "A", with the initials KR/AM, and/or KR, in the pelvis region, thereby leaving a permanent scar. Respondent's conduct deviated from accepted standards of care as follows:

1. Respondent performed the medical procedure upon Patient B in an other than appropriately sterile environment, and/or without appropriate infection control and/or, without the use of sterile technique, including the surgical field, surgical procedure room, multiple use of a cautery pen tip and electrical ground pad, and documented electrical testing and maintenance upkeep of the cautery device.

2. Respondent, while performing the medical procedure without the use of a local anesthetic or general anesthesia, thereby causing Patient B to suffer pain for no legitimate medical purpose.

3. Respondent performed the medical procedure upon Patient B with non-medically trained personnel present, who were not wearing personal protective equipment.

4. Respondent performed the medical procedure upon Patient B with the assistance of non-medically trained personnel who physically restrained said patient.

3

Exhibit A 007

5.    Respondent failed to cease performing the medical procedure despite the fact that Patient B was suffering pain without medical justification.

6.    Respondent, during the course of the medical procedure, willfully and physically abused Patient B.

7.    Respondent performed the medical procedure upon Patient B at the time when said patient was naked and while being held down by other individuals, who were also naked, contrary to any appropriate medical protocol or need.

8.    Respondent inappropriately performed the medical procedure upon Patient B while an individual who was also naked utilized a cell phone to video said medical procedure.

9.    Respondent failed to provide appropriate wound care for Patient B at the time of the medical procedure, and thereafter.

10.   Respondent failed to provide appropriate follow-up medical care and treatment for Patient B's wound, and/or failed to refer Patient B to another medical provider for such post-medical procedure wound care.

11.   Respondent inappropriately advised, or caused another individual to advise Patient B to take photographs of the wound caused by the medical procedure on a daily basis for one month and once a week for another month, and to thereafter send such photographs to an individual who shared all or some of said photographs with Respondent.

12.   Respondent failed to provide appropriate medical care and treatment for Patient B, including obtaining information regarding said patient's medical history and current medications.

13.   Respondent failed to prepare and/or maintain appropriate medical records for the patient which accurately reflected the evaluation and treatment of Patient B.

14.   Respondent fraudulently failed to disclose to Patient B that the initials KR/AM and/or KR said Respondent branded into the pelvis region of Patient B represented the initials of Keith Ranieri and/or Allison Mack.

4

Exhibit A 008

15.   Respondent performed the medical procedure upon Patient B without having obtained the adequate informed consent of Patient B.

C.   On or about March 9, 2017, the Respondent used a cauterizing pen as part of a medical procedure to scar the skin by branding Patient C, a female patient, hereinafter identified in the attached Appendix "A", with the initials KR/AM, and/or KR, in the pelvis region, thereby leaving a permanent scar. Respondent's conduct deviated from accepted standards of care as follows:

1.   Respondent performed the medical procedure upon Patient C in an other than appropriately sterile environment, and/or without appropriate infection control, and/or without the use of sterile technique, including the surgical field, surgical procedure room, multiple use of a cautery pen tip and electrical grounding pad, and documented electrical testing and maintenance upkeep of the cautery device.

2.   Respondent, while performing the medical procedure without the use of a local anesthetic or general anesthesia, thereby causing Patient C to suffer pain for no legitimate medical purpose.

3.   Respondent performed the medical procedure upon Patient C with non-medically trained personnel present, who were not wearing personal protective equipment.

4.   Respondent performed the medical procedure upon Patient C with the assistance of non-medically trained personnel who physically restrained said patient.

5.   Respondent failed to cease performing the medical procedure despite the fact that Patient C was suffering pain without medical justification.

6.   Respondent, during the course of the medical procedure, willfully physically abused Patient C.

5

Exhibit A 009

7.    Respondent performed the medical procedure upon Patient C at the time when said patient was naked and while being held down by other individuals, who were also naked, contrary to any appropriate medical protocol or need.

8.    Respondent inappropriately performed the medical procedure upon Patient C while an individual who was also naked utilized a cell phone to video said medical procedure.

9.    Respondent failed to provide appropriate wound care for Patient C at the time of the medical procedure, and thereafter.

10.    Respondent failed to provide appropriate follow-up medical care and treatment for Patient C's wound, and/or failed to refer Patient C to another medical provider for such post-medical procedure wound care.

11.    Respondent inappropriately advised, or caused another individual to advise, Patient C to take photographs of the wound caused by the medical procedure on a daily basis for one month and once a week for another month, and to thereafter send such photographs to an individual who shared all or some of said photographs with Respondent.

12.    Respondent failed to provide appropriate medical care and treatment for Patient C, including obtaining information regarding said patient's medical history and current medications.

13.    Respondent failed to prepare and/or maintain appropriate medical records for the patient which accurately reflected the evaluation and treatment of Patient C.

14.    Respondent fraudulently failed to disclose to Patient C that the initials KR/AM and/or KR said Respondent branded into the pelvis region of Patient C represented the initials of Keith Ranieri and/or Allison Mack.

15.    Respondent performed the medical procedure upon Patient C without having obtained the adequate informed consent of Patient C.

6

Exhibit A 010

D.   On or about March 9, 2017, the Respondent used a cauterizing pen as part of a medical procedure to scar the skin by branding Patient D, a female patient, hereinafter identified in the attached Appendix "A", with the initials KR/AM, and/or KR, in the pelvis region, thereby leaving a permanent scar.  Respondent's conduct deviated from accepted standards of care as follows:

1.   Respondent performed the medical procedure upon Patient D in an other than appropriately sterile environment, and/or without appropriate infection control, and/or without the use of sterile technique, including the surgical field, surgical procedure room, multiple use of a cautery pen tip and electrical grounding pad, and documented electrical testing and maintenance upkeep of the cautery device.

2.   Respondent, while performing the medical procedure without the use of a local anesthetic or general anesthesia, thereby causing Patient D to suffer pain for no legitimate medical purpose.

3.   Respondent performed the medical procedure upon Patient D with non-medically trained personnel present, who were not wearing personal protective equipment.

4.   Respondent performed the medical procedure upon Patient D with the assistance of non-medically trained personnel who physically restrained said patient.

5.   Respondent failed to cease performing the medical procedure despite the fact that patient D was suffering pain without medical justification.

6.   Respondent, during the course of the medical procedure, willfully physically abused Patient D.

7.   Respondent performed the medical procedure upon Patient D at the time when said patient was naked and while being held down by other individuals, who were also naked, contrary to any appropriate medical protocol or need.

7

Exhibit A 011

8.   Respondent inappropriately performed the medical procedure upon Patient D while an individual who was also naked utilized a cell phone to video said medical procedure.

9.   Respondent failed to provide appropriate wound care for Patient D at the time of the medical procedure, and thereafter.

10.  Respondent failed to provide appropriate follow-up medical care and treatment for Patient D's wound, and/or failed to refer Patient D to another medical provider for such post-medical procedure wound care.

11.  Respondent inappropriately advised, or caused another individual to advise Patient D to take photographs of the wound caused by the medical procedure on a daily basis for one month and once a week for another month, and to thereafter send such photographs to an individual who shared all or some of said photographs with Respondent.

12.  Respondent failed to provide appropriate medical care and treatment for Patient D, including obtaining information regarding said patient medical history and current medications.

13.  Respondent failed to prepare and/or maintain appropriate medical records for the patient which accurately reflected the evaluation and treatment of Patient D.

14.  Respondent fraudulently failed to disclose to Patient D that the initials KR/AM and/or KR said Respondent branded into the pelvis region of Patient D represented the initials of Keith Ranieri and/or Allison Mack.

15.  Respondent performed the medical procedure upon Patient D without having obtained the adequate informed consent of Patient D.

E.   On or about March 9, 2017, the Respondent used a cauterizing pen as part of a medical procedure to scar the skin by branding Patient E, a female patient, hereinafter identified in the attached Appendix "A", with the initials KR/AM, and/or

8

Exhibit A 012

KR, in the pelvis region, thereby leaving a permanent scar. Respondent's conduct deviated from accepted standards of care as follows:

1.  Respondent performed the medical procedure upon Patient E in an other than appropriately sterile environment, and/or without appropriate infection control, and/or without the use of sterile technique, including the surgical field, surgical procedure room, multiple use of a cautery tip pen and electrical grounding pad, and documented electrical testing and maintenance upkeep of the cautery device.

2.  Respondent performed the medical procedure without the use of a local anesthetic or general anesthesia, thereby causing Patient E to suffer pain for no legitimate medical purpose.

3.  Respondent performed the medical procedure upon Patient E with non-medically trained personnel present, who were not wearing personal protective equipment.

4.  Respondent performed the medical procedure upon Patient E with the assistance of non-medically trained personnel who physically restrained said patient.

5.  Respondent failed to cease performing the medical procedure despite the fact that Patient E was suffering pain without medical justification.

6.  Respondent, during the course of the medical procedure, willfully physically abused Patient E.

7.  Respondent performed the medical procedure upon Patient E at the time when said patient was naked and while being held down by other individuals, who were also naked, contrary to any appropriate medical protocol or need.

8.  Respondent inappropriately performed the medical procedure upon Patient E while an individual who was also naked utilized a cell phone to video said medical procedure.

9.  Respondent failed to provide appropriate wound care for Patient E at the time of the medical procedure, and thereafter.

9

Exhibit A 013

10.   Respondent failed to provide appropriate follow-up medical care and treatment for Patient E's wound, and/or failed to refer Patient E to another medical provider for such post-medical procedure wound care.

11.   Respondent inappropriately advised, or caused another individual to advise, Patient E to take photographs of the wound caused by the medical procedure on a daily basis for one month and once a week for another month, and to thereafter send such photographs to an individual who shared all or some of said photographs with Respondent.

12.   Respondent failed to provide appropriate medical care and treatment for the Patient E, including obtaining information regarding said patient's medical history and current medications.

13.   Respondent failed to prepare and/or maintain appropriate medical records for the patient which accurately reflected the evaluation and treatment of Patient E.

14.   Respondent fraudulently failed to disclose to Patient E that the initials KR/AM and/or KR said Respondent branded into the pelvis region of Patient E represented the initials of Keith Ranieri and/or Allison Mack.

15.   Respondent performed the medical procedure upon Patient E without having obtained the adequate informed consent of Patient E.

F.   During the period from on or about January 2017 through December 2017, the Respondent used a cauterizing pen as part of medical procedures to permanently scar the skin by branding one or more of the following: Patient F through Patient M, inclusive, female patients, hereinafter identified in the attached Appendix "A", with the initials KR/AM, and/or KR, in their pelvis regions.   Respondent's conduct deviated from accepted standards of care as follows:

1.   Respondent performed the medical procedures upon one or more of the following: Patient F through Patient M, inclusive, in an other than appropriately

10

Exhibit A 014

sterile environment, and/or without appropriate infection control, and/or without the use of sterile technique, including the surgical field, surgical procedure room, multiple use of a cautery pen tip and electrical grounding pad, and documented electrical testing and maintenance upkeep of the cautery device.

2.    Respondent performed the medical procedures without the use of a local anesthetic or general anesthesia, thereby causing one or more of the following: Patient F though Patient M, inclusive, to suffer pain for no legitimate medical purpose.

3.    Respondent performed the medical procedures upon one or more of the following: Patient F through Patient M, inclusive, with non-medically trained personnel present, who were not wearing personal protective equipment.

4.    Respondent performing the medical procedures upon one or more of the following: Patient F through Patient M, inclusive, with the assistance of non-medically trained personnel who physically restrained said patients.

5.    Respondent failed to cease performing the medical procedures despite the fact that one or more of the following: Patient F through Patient M, inclusive, were suffering pain without medical justification.

6.    Respondent, during the course of the medical procedures willfully physically abused one or more of the following: Patient F through Patient M, inclusive.

7.    Respondent inappropriately performed the medical procedures upon one or more of the following: Patient F through Patient M, inclusive, while an individual utilized a cell phone to video said medical procedures.

8.    Respondent failed to provide appropriate wound care for one or more of the following: Patient F through Patient M, inclusive, at the time of the medical procedures, and thereafter.

9.    Respondent failed to provide appropriate follow-up medical care and treatment for one or more of the following: Patient F through Patient M,

11

Exhibit A 015

inclusive, and/or failed to refer the patients to other medical providers for such post-medical procedures wound care.

10.    Respondent inappropriately advised, or caused another individual to advise, one or more of the following:  Patient F through Patient M, inclusive, to take photographs of the wounds caused by the medical procedures on a daily basis for one month and once a week for another month, and to thereafter send such photographs to an individual who shared all or some of said photographs with Respondent.

11.    Respondent failed to provide appropriate medical care and treatment for one or more of the following:  Patient F through Patient M, inclusive, including obtaining information regarding said patients' medical histories and current medications.

12.    Respondent failed to prepare and/or maintain appropriate medical records for the patients which accurately reflected the evaluation and treatment of one or more of the following:  Patient F through Patient M, inclusive.

13.    Respondent performed the medical procedures upon one or more of the following:  Patient F through Patient M, inclusive, without having obtained the adequate informed consents of Patient F through Patient M, inclusive.

G.    During the time from on or about June 2016 through August 2016, NXIVM and/or the Executive Success Program (ESP) conducted a conference and/or meeting at the Silver Bay Conference and Family Retreat Center (Conference Center), located in Silver Bay, New York. The Respondent and approximately 438 other individuals attended the conference, including approximately 76 children. During the course of the conference, hundreds of the attendees became severely ill with an undetermined communicable disease. The individuals who became ill suffered inter alia, flu-like symptoms, severe vomiting and diarrhea. The Respondent had knowledge of the fact that many individuals at the conference had become ill. The Respondent knew

12

Exhibit A 016

or should have known that the illness suffered by the attendees at the conference was a communicable disease, outbreak of a communicable disease, and/or an unusual disease or outbreak. Respondent's conduct deviated from accepted standards of care as follows:

1.  Respondent failed to report a disease outbreak or unusual disease to the State Department of Health as required by Title 10 N,Y.C.R.R. Section 2.1(c).

2.  Respondent failed to report the suspected or confirmed case of communicable disease, outbreak of communicable disease, and/or the unusual disease or outbreak to the city, county, or district health officer as required by Title 10 N.Y.C.R.R. Sections 2.10 and 2.1(b) and (c).

3.  Respondent failed to report by telephone, facsimile, or other electronic communication, or in person the illness of the attendees at the conference suspected or confirmed to have been caused due to the consumption of spoiled or poisonous food to the city, county, or district health officer, in violation of Title 10 N.Y.C.R.R. Section 2.15.

4.  Upon being made aware of the fact that attendees at the conference might have been suffering from a communicable disease, the Respondent failed to cause such individuals to be isolated in an appropriate environment, pending official action by the health officer, in violation of Title 10 N.Y.C.R.R. Section 2.27.

13

Exhibit A 017

## SPECIFICATIONS OF CHARGES

### FIRST THROUGH SIXTH SPECIFICATIONS
### WILLFULLY ABUSING A PATIENT

Respondent is charged with committing professional misconduct as defined by New York Education Law §6530(31) by willfully abusing a patient as alleged in the facts of one or more of the following:

1. The facts in paragraphs A and A.2, A and A.4, A and A.5, A and A.6, and/or A and A.8.

2. The facts in paragraphs B and B.2, B and B.4, B and B.5, B and B.6, and/or B and B.8.

3. The facts in paragraphs C and C.2, C and C.4, C and C.5, C and C.6, and/or, C and C.8.

4. The facts in paragraphs D and D.2, D and D.4, D and D.5, D and D.6, and/or, D and D.8.

5. The facts in paragraphs E and E.2, E and E.4, E and E.5, E and E.6, and/or, E and E.8.

6. The facts in paragraphs F and F.2, F and F.4, F and F.5, F and F.6, and/or F and F.8.

14

Exhibit A 018

## SEVENTH THROUGH
## TWELFTH SPECIFICATIONS

### CONDUCT IN THE PRACTICE OF MEDICINE
### WHICH EVIDENCES MORAL UNFITNESS

Respondent is charged with committing professional misconduct as defined by New York Education Law §6530(20) by engaging in conduct in the practice of medicine which evidences moral unfitness to practice medicine as alleged in the facts of one or more of the following:

7. The facts in paragraphs A and A.2, A and A.4, A and A.5, A and A.6, and/or A and A.8.

8. The facts in paragraphs B and B.2, B and B.4, B and B.5, B and B.6, and/or B and B.8.

9. The facts in paragraphs C and C.2, C and C.4, C and C.5, C and C.6, and/or C and C.8.

10. The facts in paragraphs D and D.2, D and D.4, D and D.5, D and D.6, and/or D and D.8.

11. The facts in paragraphs E and E.2, E and E.4, E and E.5, E and E.6, and/or E and E.8.

12. The facts in paragraphs F and F.2, F and F.4, F and F.5, F and F.6, and/or F and F.8.

15

Exhibit A 019

## THIRTEENTH THROUGH EIGHTEENTH SPECIFICATIONS

### FAILING TO USE APPROPRIATE STERILE ENVIRONMENT AND/OR WITHOUT APPROPRIATE INFECTION CONTROL AND/OR WITHOUT THE USE OF STERILE TECHNIQUE

Respondent is charged with committing professional misconduct as defined by New York Education Law §6530(47) by failing to use scientifically accepted barrier precautions and infection control practices as established by the department of health as alleged in the facts of one or more of the following:

13. The facts in paragraphs A and A.1, A and A.3, A and A.4, and/or A and A.7.

14. The facts in paragraphs B and B.1, B and B.3, B and B.4, and/or B and B.7.

15. The facts in paragraphs C and C.1, C and C.3, C and C.4, and/or C and C.7.

16. The facts in paragraphs D and D.1, D and D.3, D and D.4, and/or D and D.7.

17. The facts in paragraphs E and E.1, E and E.3, E and E.4, and/or E and E.7.

18. The facts in paragraphs F and F.1, F and F.3, F and F.4, and/or F and F.7.

## NINTEENTH SPECIFICATION

### PRACTICING THE PROFESSION FRAUDULENTLY OR BEYOND ITS SCOPE

Respondent is charged with committing professional misconduct as defined by New York Education Law §6530(2) by practicing the profession fraudulently or beyond its authorized scope as alleged in the facts of one or more of the following:

19. The facts in paragraphs A and A.2, A and A.3, A and A.8 and/or A and A.14; B and B.2, B and B.3, B and B.8, and/or B and B.14; C and C.2, C and C.3, C and C.8, and/or C and C.14; D and D.2, D and D.3, D and D.8, and/or D and D.14; E

16

Exhibit A 020

and E.2, E and E.3, E and E.8, and/or E and E. 14; F and F.2, F and F.3, and/or F and F.7.

## TWENTIETH THROUGH TWENTY-FIFTH SPECIFICATIONS
## PRACTICING THE PROFESSION WITH GROSS NEGLIGENCE

Respondent is charged with committing professional misconduct as defined by New York Education Law §6530(4) by practicing the profession with gross negligence as alleged in the facts of one or more of the following:

20. The facts in paragraphs A and A.1, A and A.2, A and A.3, A and A.4, A and A.5, A and A.6, A and A.7, A and A.8, A and A.9, A and A.10, A and A.11, A and A.12, A and A.13, A and A.14, and/or A and A.15.

21. The facts in paragraphs B and B.1, B and B.2, B and B.3, B and B.4, B and B.5, B and B.6, B and B.7, B and B.8, B and B.9, B and B.10, B and B.11, B and B.12, B and B.13, B and B.14, and/or B and B.15.

22. The facts in paragraphs C and C.1, C and C.2, C and C.3, C and C.4, C and C.5, C and C.6, C and C.7, C and C.8, C and C.9, C and C.10, C and C.11, C and C.12, C and C.13, C and C.14, and/or C and C.15.

23. The facts in paragraphs D and D.1, D and D.2, D and D.3, D and D.4, D and D.5, D and D.6, D and D.7, D and D.8, D and D.9, D and D.10, D and D.11, D and D.12, D and D.13, D and D.14, and/or D and D.15.

17

Exhibit A 021

24. The facts in paragraphs E and E.1, E and E.2, E and E.3, E and E.4, E and E.5, E and E.6, E and E.7, E and E.8, E and E.9, E and E.10, E and E.11, E and E.12, E and E.13, E and E.14, and/or E and E.15.

25. The facts in paragraphs F and F.1, F and F.2, F and F.3, F and F.4, F and F.5, F and F.6, F and F.7, F and F.8, F and F.9, F and F.10, F and F.11, F and F.12, and/or F and F.13.

## TWENTY-SIXTH SPECIFICATION

### PRACTICING THE PROFESSION WITH NEGLIGENCE ON MORE THAN ONE OCCASION

Respondent is charged with committing professional misconduct as defined by New York Education Law §6530(3) by practicing the profession with negligence on more than one occasion as alleged in the facts of the following:

26. The facts in paragraphs A and A.1, A and A.2, A and A.3, A and A.4, A and A.5, A and A.6, A and A.7, A and A.8, A and A.9, A and A.10, A and A.11, A and A.12, A and A.13, and/or A and A.15; and/or B and B.1, B and B.2, B and B.3, B and B.4, B and B.5, B and B.6, B and B.7, B and B.8, B and B.9, B and B.10, B and B.11, B and B.12, B and B.13, and/or B and B.15; and/or C and C.1, C and C.2, C and C.3, C and C.4, C and C.5, C and C.6, C and C.7, C and C.8, C and C.9, C and C.10, C and C.11, C and C.12, C and C.13, and/or C and C.15; and/or D and D.1, D and D.2, D and D.3, D and D.4, D and D.5, D and D.6, D and D.7, D and D.8, D and D.9, D and D.10, D and D.11, D and D.12, D and D.13, and/or D

18

Exhibit A 022

and D.15; and/or E and E.1, E and E.2, E and E.3, E and E.4, E and E.5, E and E.6, E and E.7, E and E.8, E and E.9, E and E.10, E and E.11, E and E.12, E and E.13, and/or E and E.15; and/or F and F.1, F and F.2, F and F.3, F and F.4, F and F.5, F and F.6, F and F.7, F and F.8, F and F.9, F and F.10, F and F.11, F and F.12, and/or F and F.13; and/or G and G.1, G and G.2, G and G.3, and/or G and G.4.

## TWENTY-SEVENTH THROUGH THIRTY-SECOND SPECIFICATIONS
## PRACTICING THE PROFESSION WITH GROSS INCOMPETENCE

Respondent is charged with committing professional misconduct as defined by New York Education Law §6530(6) by practicing the profession with gross incompetence as alleged in the facts of one or more of the following:

27.  The facts in paragraphs A and A.1, A and A.2, A and A.3, A and A.4, A and A.5, A and A.6, A and A.7, A and A.8, A and A.9, A and A.10, A and A.11, A and A.12, A and A.13, and/or A and A.15.

28.  The facts in paragraphs B and B.1, B and B.2, B and B.3, B and B.4, B and B.5, B and B.6, B and B.7, B and B.8, B and B.9, B and B.10, B and B.11, B and B.12, B and B.13, and/or A and A.15.

29.  The facts in paragraphs C and C.1, C and C.2, C and C.3, C and C.4, C and C.5, C and C.6, C and C.7, C and C.8, C and C.9, C and C.10, C and C.11, C and C.12, C and C.13, and/or C and C.15.

19

Exhibit A 023

30.  The facts in paragraphs D and D.1, D and D.2, D and D.3, D and D.4, D and D.5, D and D.6, D and D.7, D and D.8, D and D.9, D and D.10, D and D.11, D and D.12, D and D.13, and/or D and D.15.

31. The facts in paragraphs E and E.1, E and E.2, E and E.3, E and E.4, E and E.5, E and E.6, E and E.7, E and E.8, E and E.9, E and E.10, E and E.11, E and E.12, E and E.13, and/or E and E.15.

32.  The facts in paragraphs F and F.1, F and F.2, F and F.3, F and F.4, F and F.5, F and F.6, F and F.7, F and F.8, F and F.9, F and F.10, F and F.11, F and F.12, and/or F and F.13.

### THIRTY-THIRD SPECIFICATION

### PRACTICNG THE PROFESSION WITH INCOMPETENCE ON MORE THAN ONE OCCASION

Respondent is charged with committing professional misconduct as defined by New York Education Law §6530(5) by practicing the profession with incompetence on more than one occasion as alleged in the facts of the following:

33. The facts in paragraphs A and A.1, A and A.2, A and A.3, A and A.4, A and A.5, A and A.6, A and A.7, A and A.8, A and A.9, A and A.10, A and A.11, A and A.12, A and A.13, and/or A and A.15; and/or B and B.1, B and B.2, B and B.3, B and B.4, B and B.5, B and B.6, B and B.7, B and B.8, B and B.9, B and B.10, B and B.11, B and B.12, B and B.13, and/or B and B.15; and/or C and C.1, C and C.2, C and C.3, C and C.4, C and C.5, C and C.6, C and C.7, C and C.8, C and C.9,

20

Exhibit A 024

C and C.10, C and C.11, C and C.12, C and C.13, and/or C and C.15; and/or D and D.1, D and D.2, D and D.3, D and D.4, D and D.5, D and D.6, D and D.7, D and D.8, D and D.9, D and D.10, D and D.11, D and D.12, D and D.13, and/or D and D.15; and/or E and E.1, E and E.2, E and E.3, E and E.4, E and E.5, E and E.6, E and E.7, E and E.8, E and E.9, E and E.10, E and E.11, E and E.12, E and E.13, and/or E and E.15; and/or F and F.1, F and F.2, F and F.3, F and F.4, F and F.5, F and F.6, F and F.7, F and F.8, F and F.9, F and F.10, F and F.11, F and F.12, and/or F and F.13; and/or G and G.1, G and G.2, G and G.3, and/or G and G.4.

### THIRTY-FOURTH SPECIFICATION
### WILLFULLY FAILING TO FILE A REPORT REQUIRED BY LAW

Respondent is charged with committing professional misconduct as defined by New York Education Law §6530(21) by willfully failing to file a report required by law or by the Department of Health, or the Education Department as alleged in the facts of one or more of the following:

34. The facts in paragraphs G and G.1, G and G.2, G and G.3 and/or G. and G.4.

21

Exhibit A 025

## THIRTY-FIFTH SPECIFICATION

### WILLFULLY OR GROSSLY FAILING TO COMPLY WITH FEDERAL, STATE, OR LOCAL LAWS RULES OR REGULATIONS GOVERNING THE PRACTICE OF MEDICINE

Respondent is charged with committing professional misconduct as defined by New York Education Law §6530(16) by willfully or grossly negligently failing to comply with substantial provisions of federal, state, or local laws, rules, or regulations governing the practice of medicine as alleged in the facts of one or more of the following:

35. The facts in paragraphs G and G.1, G and G.2, G and G.3 and/or G and G.4.

### THIRTY-SIXTH THROUGH FORTY-FIRST SPECIFICATIONS

### PERFORMING PROFESSIONAL SERVICES WHICH HAVE NOT BEEN AUTHORIZED BY THE PATIENT

Respondent is charged with committing professional misconduct as defined by New York Education Law §6530(26) by performing professional services which have not been authorized by the patient as alleged in the facts of one or more of the following:

36. The facts in paragraphs A and A.14, and/or A and A.15.

37. The facts in paragraphs B and B.14, and/or B and B.15.

38. The facts in paragraphs C and C.14, and/or C and C.15.

39. The facts in paragraphs D and D.14, and/or D and D.15.

40. The facts in paragraphs E and E.14, and/or E and E.15.

41. The facts in paragraphs F and F.14, and/or F and F.15.

22

Exhibit A 026

## FORTY-SECOND THROUGH FORTY-SEVENTH SPECIFICATIONS

### FAILING TO MAINTAIN RECORDS

Respondent is charged with committing professional misconduct as defined by New York Education Law §6530(32) by failing to maintain a record for each patient which accurately reflects the evaluation and treatment of the patient as alleged in the facts of the following:

42. The facts in paragraphs A and A.13.

43. The facts in paragraphs B and B.13.

44. The facts in paragraphs C and C.13.

45. The facts in paragraphs D and D.13.

46. The facts in paragraphs E and E.13.

47. The facts in paragraphs F and F.12.

DATE: March  5  , 2020
         Albany, New York

TIMOTHY J. MAHAR, ESQ.
Deputy Counsel
Bureau of Professional Medical Conduct

23

Exhibit A 027

NEW YORK STATE          DEPARTMENT OF HEALTH
STATE BOARD FOR PROFESSIONAL MEDICAL CONDUCT

| | |
|---|---|
| **IN THE MATTER**<br><br>**OF**<br><br>**DANIELLE ROBERTS, D.O.** | AMENDED<br><br>STATEMENT<br><br>OF CHARGES |

DANIELLE ROBERTS, D.O., the Respondent, was authorized to practice medicine in New York State on or about October 5, 2009, by the issuance of license number 255075 by the New York State Education Department.

### FACTUAL ALLEGATIONS

A.  On or about March 9, 2017, the Respondent used a cauterizing pen as part of a medical procedure to scar the skin by branding Patient A, a female patient, hereinafter identified in the attached Appendix "A", with the initials KR and/or KAR, in the pelvis region, thereby leaving a permanent scar.  Respondent's conduct deviated from accepted standards of care as follows:

1.  Respondent performed the medical procedure upon Patient A in an other than appropriately sterile environment, and/or without appropriate infection control, and/or without the use of sterile technique, including the surgical field, surgical procedure room, multiple use of a cautery pen tip and electrical grounding pad, and documented electrical testing and maintenance upkeep of the cautery device.

2.  Respondent performed the medical procedure without the use of a local anesthetic or general anesthesia, thereby causing Patient A to suffer pain for no legitimate medical purpose.

1


EXHIBIT
1a

Exhibit B   001

3. Respondent performed the medical procedure upon Patient A with non-medically trained personnel present, who were not wearing personal protective equipment.

4. Respondent performed the medical procedure upon Patient A with the assistance of non-medically trained personnel who physically restrained said patient.

5. Respondent failed to cease performing the medical procedure despite the fact that Patient A was suffering pain without medical justification.

6. Respondent, during the course of the medical procedure, willfully physically abused Patient A.

7. Respondent performed the medical procedure upon Patient A at the time when said patient was naked and while being held down by other individuals, who were also naked, contrary to any appropriate medical protocol or need.

8. Respondent inappropriately performed the medical procedure upon Patient A while an individual who was also naked utilized a cell phone to video said medical procedure.

9. Respondent failed to provide appropriate wound care for Patient A at the time of the medical procedure, and thereafter.

10. Respondent failed to provide appropriate follow-up medical care and treatment for Patient A's wound, and/or failed to refer Patient A to another medical provider for such post-medical procedure wound care.

11. Respondent inappropriately advised, or caused another individual to advise, Patient A to take photographs of the wound caused by the medical procedure on a daily basis for one month and once a week for another month, and to thereafter send such photographs to an individual who shared all or some of said photographs with the Respondent.

12. Respondent failed to provide appropriate medical care and treatment for Patient A, including obtaining information regarding said patient's medical history and current medications.

2

13. Respondent failed to prepare and/or maintain appropriate medical records for the patient which accurately reflected the evaluation and treatment of Patient A.

14. Respondent fraudulently failed to disclose to Patient A that the initials KR and/or KAR said Respondent branded into the pelvis region of Patient A represented the initials of Keith Alan Ranieri..

15. Respondent performed the medical procedure upon Patient A without having obtained the adequate informed consent of Patient A.

B. On or about March 9, 2017, the Respondent used a cauterizing pen as part of a medical procedure to scar the skin by branding Patient B, a female patient, hereinafter identified in the attached Appendix "A", with the initials KR and/or KAR, in the pelvis region, thereby leaving a permanent scar. Respondent's conduct deviated from accepted standards of care as follows:

1. Respondent performed the medical procedure upon Patient B in an other than appropriately sterile environment, and/or without appropriate infection control and/or, without the use of sterile technique, including the surgical field, surgical procedure room, multiple use of a cautery pen tip and electrical ground pad, and documented electrical testing and maintenance upkeep of the cautery device.

2. Respondent, while performing the medical procedure without the use of a local anesthetic or general anesthesia, thereby causing Patient B to suffer pain for no legitimate medical purpose.

3. Respondent performed the medical procedure upon Patient B with non-medically trained personnel present, who were not wearing personal protective equipment.

4. Respondent performed the medical procedure upon Patient B with the assistance of non-medically trained personnel who physically restrained said patient.

3

5.    Respondent failed to cease performing the medical procedure despite the fact that Patient B was suffering pain without medical justification.

6.    Respondent, during the course of the medical procedure, willfully and physically abused Patient B.

7.    Respondent performed the medical procedure upon Patient B at the time when said patient was naked and while being held down by other individuals, who were also naked, contrary to any appropriate medical protocol or need.

8.    Respondent inappropriately performed the medical procedure upon Patient B while an individual who was also naked utilized a cell phone to video said medical procedure.

9.    Respondent failed to provide appropriate wound care for Patient B at the time of the medical procedure, and thereafter.

10.    Respondent failed to provide appropriate follow-up medical care and treatment for Patient B's wound, and/or failed to refer Patient B to another medical provider for such post-medical procedure wound care.

11.    Respondent inappropriately advised, or caused another individual to advise Patient B to take photographs of the wound caused by the medical procedure on a daily basis for one month and once a week for another month, and to thereafter send such photographs to an individual who shared all or some of said photographs with Respondent.

12.    Respondent failed to provide appropriate medical care and treatment for Patient B, including obtaining information regarding said patient's medical history and current medications.

13.    Respondent failed to prepare and/or maintain appropriate medical records for the patient which accurately reflected the evaluation and treatment of Patient B.

14.    Respondent fraudulently failed to disclose to Patient B that the initials KR and/or KAR said Respondent branded into the pelvis region of Patient B represented the initials of Keith Alan Ranieri.

4

Exhibit B    004

15.    Respondent performed the medical procedure upon Patient B without having obtained the adequate informed consent of Patient B.

C.    On or about March 9, 2017, the Respondent used a cauterizing pen as part of a medical procedure to scar the skin by branding Patient C, a female patient, hereinafter identified in the attached Appendix "A", with the initials KR and/or KAR, in the pelvis region, thereby leaving a permanent scar.  Respondent's conduct deviated from accepted standards of care as follows:

1.    Respondent performed the medical procedure upon Patient C in an other than appropriately sterile environment, and/or without appropriate infection control, and/or without the use of sterile technique, including the surgical field, surgical procedure room, multiple use of a cautery pen tip and electrical grounding pad, and documented electrical testing and maintenance upkeep of the cautery device.

2.    Respondent, while performing the medical procedure without the use of a local anesthetic or general anesthesia, thereby causing Patient C to suffer pain for no legitimate medical purpose.

3.    Respondent performed the medical procedure upon Patient C with non-medically trained personnel present, who were not wearing personal protective equipment.

4.    Respondent performed the medical procedure upon Patient C with the assistance of non-medically trained personnel who physically restrained said patient.

5.    Respondent failed to cease performing the medical procedure despite the fact that Patient C was suffering pain without medical justification.

6.    Respondent, during the course of the medical procedure, willfully physically abused Patient C.

5

Exhibit B    005

7.  Respondent performed the medical procedure upon Patient C at the time when said patient was naked and while being held down by other individuals, who were also naked, contrary to any appropriate medical protocol or need.

8.  Respondent inappropriately performed the medical procedure upon Patient C while an individual who was also naked utilized a cell phone to video said medical procedure.

9.  Respondent failed to provide appropriate wound care for Patient C at the time of the medical procedure, and thereafter.

10. Respondent failed to provide appropriate follow-up medical care and treatment for Patient C's wound, and/or failed to refer Patient C to another medical provider for such post-medical procedure wound care.

11. Respondent inappropriately advised, or caused another individual to advise, Patient C to take photographs of the wound caused by the medical procedure on a daily basis for one month and once a week for another month, and to thereafter send such photographs to an individual who shared all or some of said photographs with Respondent.

12. Respondent failed to provide appropriate medical care and treatment for Patient C, including obtaining information regarding said patient's medical history and current medications.

13. Respondent failed to prepare and/or maintain appropriate medical records for the patient which accurately reflected the evaluation and treatment of Patient C.

14. Respondent fraudulently failed to disclose to Patient C that the initials KR and/or KAR said Respondent branded into the pelvis region of Patient C represented the initials of Keith Alan Ranieri.

15. Respondent performed the medical procedure upon Patient C without having obtained the adequate informed consent of Patient C.

6

Exhibit B   006

D.    On or about March 9, 2017, the Respondent used a cauterizing pen as part of a medical procedure to scar the skin by branding Patient D, a female patient, hereinafter identified in the attached Appendix "A", with the initials KR and/or KAR, in the pelvis region, thereby leaving a permanent scar.  Respondent's conduct deviated from accepted standards of care as follows:

1.    Respondent performed the medical procedure upon Patient D in an other than appropriately sterile environment, and/or without appropriate infection control, and/or without the use of sterile technique, including the surgical field, surgical procedure room, multiple use of a cautery pen tip and electrical grounding pad, and documented electrical testing and maintenance upkeep of the cautery device.

2.    Respondent, while performing the medical procedure without the use of a local anesthetic or general anesthesia, thereby causing Patient D to suffer pain for no legitimate medical purpose.

3.    Respondent performed the medical procedure upon Patient D with non-medically trained personnel present, who were not wearing personal protective equipment.

4.    Respondent performed the medical procedure upon Patient D with the assistance of non-medically trained personnel who physically restrained said patient.

5.    Respondent failed to cease performing the medical procedure despite the fact that patient D was suffering pain without medical justification.

6.    Respondent, during the course of the medical procedure, willfully physically abused Patient D.

7.    Respondent performed the medical procedure upon Patient D at the time when said patient was naked and while being held down by other individuals, who were also naked, contrary to any appropriate medical protocol or need.

7

8.    Respondent inappropriately performed the medical procedure upon Patient D while an individual who was also naked utilized a cell phone to video said medical procedure.

9.    Respondent failed to provide appropriate wound care for Patient D at the time of the medical procedure, and thereafter.

10.    Respondent failed to provide appropriate follow-up medical care and treatment for Patient D's wound, and/or failed to refer Patient D to another medical provider for such post-medical procedure wound care.

11.    Respondent inappropriately advised, or caused another individual to advise Patient D to take photographs of the wound caused by the medical procedure on a daily basis for one month and once a week for another month, and to thereafter send such photographs to an individual who shared all or some of said photographs with Respondent.

12.    Respondent failed to provide appropriate medical care and treatment for Patient D, including obtaining information regarding said patient medical history and current medications.

13.    Respondent failed to prepare and/or maintain appropriate medical records for the patient which accurately reflected the evaluation and treatment of Patient D.

14.    Respondent fraudulently failed to disclose to Patient D that the initials KR and/or KAR said Respondent branded into the pelvis region of Patient D represented the initials of Keith Alan Ranieri.

15.    Respondent performed the medical procedure upon Patient D without having obtained the adequate informed consent of Patient D.

E.    On or about March 9, 2017, the Respondent used a cauterizing pen as part of a medical procedure to scar the skin by branding Patient E, a female patient, hereinafter identified in the attached Appendix "A", with the initials KR and/or KAR,

8

in the pelvis region, thereby leaving a permanent scar.  Respondent's conduct deviated from accepted standards of care as follows:

1.    Respondent performed the medical procedure upon Patient E in an other than appropriately sterile environment, and/or without appropriate infection control, and/or without the use of sterile technique, including the surgical field, surgical procedure room, multiple use of a cautery tip pen and electrical grounding pad, and documented electrical testing and maintenance upkeep of the cautery device.

2.    Respondent performed the medical procedure without the use of a local anesthetic or general anesthesia, thereby causing Patient E to suffer pain for no legitimate medical purpose.

3.    Respondent performed the medical procedure upon Patient E with non-medically trained personnel present, who were not wearing personal protective equipment.

4.    Respondent performed the medical procedure upon Patient E with the assistance of non-medically trained personnel who physically restrained said patient.

5.    Respondent failed to cease performing the medical procedure despite the fact that Patient E was suffering pain without medical justification.

6.    Respondent, during the course of the medical procedure, willfully physically abused Patient E.

7.    Respondent performed the medical procedure upon Patient E at the time when said patient was naked and while being held down by other individuals, ~~who were also naked~~, contrary to any appropriate medical protocol or need.

8.    Respondent inappropriately performed the medical procedure upon Patient E while an individual who was also naked utilized a cell phone to video said medical procedure.

9.    Respondent failed to provide appropriate wound care for Patient E at the time of the medical procedure, and thereafter.

9

10.    Respondent failed to provide appropriate follow-up medical care and treatment for Patient E's wound, and/or failed to refer Patient E to another medical provider for such post-medical procedure wound care.

11.    Respondent inappropriately advised, or caused another individual to advise, Patient E to take photographs of the wound caused by the medical procedure on a daily basis for one month and once a week for another month, and to thereafter send such photographs to an individual who shared all or some of said photographs with Respondent.

12.    Respondent failed to provide appropriate medical care and treatment for the Patient E, including obtaining information regarding said patient's medical history and current medications.

13.    Respondent failed to prepare and/or maintain appropriate medical records for the patient which accurately reflected the evaluation and treatment of Patient E.

14.    Respondent fraudulently failed to disclose to Patient E that the initials KR and/or KAR said Respondent branded into the pelvis region of Patient E represented the initials of Keith Alan Ranieri.

15.    Respondent performed the medical procedure upon Patient E without having obtained the adequate informed consent of Patient E.

F.    During the period from on or about January 2017 through December 2017, the Respondent used a cauterizing pen as part of medical procedures to permanently scar the skin by branding one or more of the following: Patients F and G, female patients, hereinafter identified in the attached Appendix "A", with the initials KR and/or KAR, in their pelvis regions. Respondent's conduct deviated from accepted standards of care as follows:

1.    Respondent performed the medical procedures upon one or more of the following: Patients F and G in an other than appropriately sterile environment,

10

and/or without appropriate infection control, and/or without the use of sterile technique, including the surgical field, surgical procedure room, multiple use of a cautery pen tip and electrical grounding pad, and documented electrical testing and maintenance upkeep of the cautery device.

2.   Respondent performed the medical procedures without the use of a local anesthetic or general anesthesia, thereby causing one or more of the following: Patients F and G to suffer pain for no legitimate medical purpose.

3.   Respondent performed the medical procedures upon one or more of the following: Patients F and G with non-medically trained personnel present, who were not wearing personal protective equipment.

4.   Respondent performing the medical procedures upon one or more of the following: Patients F and G with the assistance of non-medically trained personnel who physically restrained said patients.

5.   Respondent failed to cease performing the medical procedures despite the fact that one or more of the following: Patients F and G were suffering pain without medical justification.

6.   Respondent, during the course of the medical procedures willfully physically abused one or more of the following: Patients F and G.

7.   Respondent inappropriately performed the medical procedures upon one or more of the following: Patients F and G while an individual utilized a cell phone to video said medical procedures.

8.   Respondent failed to provide appropriate wound care for one or more of the following: Patients F and G at the time of the medical procedures, and thereafter.

9.   Respondent failed to provide appropriate follow-up medical care and treatment for one or more of the following: Patients F and G, and/or failed to refer the patients to other medical providers for such post-medical procedures wound care.

11

Exhibit B   011

10. Respondent inappropriately advised, or caused another individual to advise, one or more of the following:  Patients F and G to take photographs of the wounds caused by the medical procedures on a daily basis for one month and once a week for another month, and to thereafter send such photographs to an individual who shared all or some of said photographs with Respondent.

11. Respondent failed to provide appropriate medical care and treatment for one or more of the following:  Patients F and G, including obtaining information regarding said patients' medical histories and current medications.

12. Respondent failed to prepare and/or maintain appropriate medical records for the patients which accurately reflected the evaluation and treatment of one or more of the following:  Patients F and G.

13. Respondent performed the medical procedures upon one or more of the following:  Patients F and G without having obtained the adequate informed consents of said Patients F and G.

G. During the time from on or about June 2016 through August 2016, NXIVM and/or the Executive Success Program (ESP) conducted a conference and/or meeting at the Silver Bay Conference and Family Retreat Center (Conference Center), located in Silver Bay, New York. The Respondent and approximately 438 other individuals attended the conference, including approximately 76 children. During the course of the conference, hundreds of the attendees became severely ill with an undetermined communicable disease. The individuals who became ill suffered inter alia, flu-like symptoms, severe vomiting and diarrhea. The Respondent had knowledge of the fact that many individuals at the conference had become ill. The Respondent knew or should have known that the illness suffered by the attendees at the conference was a communicable disease, outbreak of a communicable disease, and/or an unusual disease or outbreak.   Respondent's conduct deviated from accepted standards of care as follows:

12

1.  Respondent failed to report a disease outbreak or unusual disease to the State Department of Health as required by Title 10 N.Y.C.R.R. Section 2.1(c).

2.  Respondent failed to report the suspected or confirmed case of communicable disease, outbreak of communicable disease, and/or the unusual disease or outbreak to the city, county, or district health officer as required by Title 10 N.Y.C.R.R. Sections 2.10 and 2.1(b) and (c).

3.  Respondent failed to report by telephone, facsimile, or other electronic communication, or in person the illness of the attendees at the conference suspected or confirmed to have been caused due to the consumption of spoiled or poisonous food to the city, county, or district health officer, in violation of Title 10 N.Y.C.R.R. Section 2.15.

4.  Upon being made aware of the fact that attendees at the conference might have been suffering from a communicable disease, the Respondent failed to cause such individuals to be isolated in an appropriate environment, pending official action by the health officer, in violation of Title 10 N.Y.C.R.R. Section 2.27.

13

Exhibit B   013

## SPECIFICATIONS OF CHARGES

### FIRST THROUGH SIXTH SPECIFICATIONS
### WILLFULLY ABUSING A PATIENT

Respondent is charged with committing professional misconduct as defined by New York Education Law §6530(31) by willfully abusing a patient as alleged in the facts of one or more of the following:

1. The facts in paragraphs A and A.2, A and A.4, A and A.5, A and A.6, and/or A and A.8.

2. The facts in paragraphs B and B.2, B and B.4, B and B.5, B and B.6, and/or B and B.8.

3. The facts in paragraphs C and C.2, C and C.4, C and C.5, C and C.6, and/or, C and C.8.

4. The facts in paragraphs D and D.2, D and D.4, D and D.5, D and D.6, and/or, D and D.8.

5. The facts in paragraphs E and E.2, E and E.4, E and E.5, E and E.6, and/or, E and E.8.

6. The facts in paragraphs F and F.2, F and F.4, F and F.5, F and F.6, and/or F and F.8.

14

Exhibit B   014

## SEVENTH THROUGH
## TWELFTH SPECIFICATIONS

## CONDUCT IN THE PRACTICE OF MEDICINE
## WHICH EVIDENCES MORAL UNFITNESS

Respondent is charged with committing professional misconduct as defined by New York Education Law §6530(20) by engaging in conduct in the practice of medicine which evidences moral unfitness to practice medicine as alleged in the facts of one or more of the following:

7.  The facts in paragraphs A and A.2, A and A.4, A and A.5, A and A.6, and/or A and A.8.

8.  The facts in paragraphs B and B.2, B and B.4, B and B.5, B and B.6, and/or B and B.8.

9.  The facts in paragraphs C and C.2, C and C.4, C and C.5, C and C.6, and/or C and C.8.

10. The facts in paragraphs D and D.2, D and D.4, D and D.5, D and D.6, and/or D and D.8.

11. The facts in paragraphs E and E.2, E and E.4, E and E.5, E and E.6, and/or E and E.8.

12. The facts in paragraphs F and F.2, F and F.4, F and F.5, F and F.6, and/or F and F.8.

15

Roberts - 47

Exhibit B   015

## THIRTEENTH THROUGH EIGHTEENTH SPECIFICATIONS

## FAILING TO USE APPROPRIATE STERILE ENVIRONMENT AND/OR WITHOUT APPROPRIATE INFECTION CONTROL AND/OR WITHOUT THE USE OF STERILE TECHNIQUE

Respondent is charged with committing professional misconduct as defined by New York Education Law §6530(47) by failing to use scientifically accepted barrier precautions and infection control practices as established by the department of health as alleged in the facts of one or more of the following:

13. The facts in paragraphs A and A.1, A and A.3, A and A.4, and/or A and A.7.

14. The facts in paragraphs B and B.1, B and B.3, B and B.4, and/or B and B.7.

15. The facts in paragraphs C and C.1, C and C.3, C and C.4, and/or C and C.7.

16. The facts in paragraphs D and D.1, D and D.3, D and D.4, and/or D and D.7.

17. The facts in paragraphs E and E.1, E and E.3, E and E.4, and/or E and E.7.

18. The facts in paragraphs F and F.1, F and F.3, F and F.4, and/or F and F.7.

## NINTEENTH SPECIFICATION

## PRACTICING THE PROFESSION FRAUDULENTLY OR BEYOND ITS SCOPE

Respondent is charged with committing professional misconduct as defined by New York Education Law §6530(2) by practicing the profession fraudulently or beyond its authorized scope as alleged in the facts of one or more of the following:

19. The facts in paragraphs A and A.2, A and A.3, A and A.8 and/or A and A.14; B and B.2, B and B.3, B and B.8, and/or B and B.14; C and C.2, C and C.3, C and C.8, and/or C and C.14; D and D.2, D and D.3, D and D.8, and/or D and D.14; E

16

Exhibit B    016

and E.2, E and E.3, E and E.8, and/or E and E. 14; F and F.2, F and F.3, and/or F and F.7.

## TWENTIETH THROUGH TWENTY-FIFTH SPECIFICATIONS
## PRACTICING THE PROFESSION WITH GROSS NEGLIGENCE

Respondent is charged with committing professional misconduct as defined by New York Education Law §6530(4) by practicing the profession with gross negligence as alleged in the facts of one or more of the following:

20. The facts in paragraphs A and A.1, A and A.2, A and A.3, A and A.4, A and A.5, A and A.6, A and A.7, A and A.8, A and A.9, A and A.10, A and A.11, A and A.12, A and A.13, A and A.14, and/or A and A.15.

21. The facts in paragraphs B and B.1, B and B.2, B and B.3, B and B.4, B and B.5, B and B.6, B and B.7, B and B.8, B and B.9, B and B.10, B and B.11, B and B.12, B and B.13, B and B.14, and/or B and B.15.

22. The facts in paragraphs C and C.1, C and C.2, C and C.3, C and C.4, C and C.5, C and C.6, C and C.7, C and C.8, C and C.9, C and C.10, C and C.11, C and C.12, C and C.13, C and C.14, and/or C and C.15.

23. The facts in paragraphs D and D.1, D and D.2, D and D.3, D and D.4, D and D.5, D and D.6, D and D.7, D and D.8, D and D.9, D and D.10, D and D.11, D and D.12, D and D.13, D and D.14, and/or D and D.15.

17

Exhibit B    017

24. The facts in paragraphs E and E.1, E and E.2, E and E.3, E and E.4, E and E.5, E and E.6, E and E.7, E and E.8, E and E.9, E and E.10, E and E.11, E and E.12, E and E.13, E and E.14, and/or E and E.15.

25. The facts in paragraphs F and F.1, F and F.2, F and F.3, F and F.4, F and F.5, F and F.6, F and F.7, F and F.8, F and F.9, F and F.10, F and F.11, F and F.12, and/or F and F.13.


## TWENTY-SIXTH SPECIFICATION

## PRACTICING THE PROFESSION WITH NEGLIGENCE ON MORE THAN ONE OCCASION

Respondent is charged with committing professional misconduct as defined by New York Education Law §6530(3) by practicing the profession with negligence on more than one occasion as alleged in the facts of the following:

26. The facts in paragraphs A and A.1, A and A.2, A and A.3, A and A.4, A and A.5, A and A.6, A and A.7, A and A.8, A and A.9, A and A.10, A and A.11, A and A.12, A and A.13, and/or A and A.15; and/or B and B.1, B and B.2, B and B.3, B and B.4, B and B.5, B and B.6, B and B.7, B and B.8, B and B.9, B and B.10, B and B.11, B and B.12, B and B.13, and/or B and B.15; and/or C and C.1, C and C.2, C and C.3, C and C.4, C and C.5, C and C.6, C and C.7, C and C.8, C and C.9, C and C.10, C and C.11, C and C.12, C and C.13, and/or C and C.15; and/or D and D.1, D and D.2, D and D.3, D and D.4, D and D.5, D and D.6, D and D.7, D and D.8, D and D.9, D and D.10, D and D.11, D and D.12, D and D.13, and/or D

18

and D.15; and/or E and E.1, E and E.2, E and E.3, E and E.4, E and E.5, E and E.6, E and E.7, E and E.8, E and E.9, E and E.10, E and E.11, E and E.12, E and E.13, and/or E and E.15; and/or F and F.1, F and F.2, F and F.3, F and F.4, F and F.5, F and F.6, F and F.7, F and F.8, F and F.9, F and F.10, F and F.11, F and F.12, and/or F and F.13; and/or G and G.1, G and G.2, G and G.3, and/or G and G.4.

### TWENTY-SEVENTH THROUGH THIRTY-SECOND SPECIFICATIONS

### PRACTICING THE PROFESSION WITH GROSS INCOMPETENCE

Respondent is charged with committing professional misconduct as defined by New York Education Law §6530(6) by practicing the profession with gross incompetence as alleged in the facts of one or more of the following:

27.    The facts in paragraphs A and A.1, A and A.2, A and A.3, A and A.4, A and A.5, A and A.6, A and A.7, A and A.8, A and A.9, A and A.10, A and A.11, A and A.12, A and A.13, and/or A and A.15.

28.    The facts in paragraphs B and B.1, B and B.2, B and B.3, B and B.4, B and B.5, B and B.6, B and B.7, B and B.8, B and B.9, B and B.10, B and B.11, B and B.12, B and B.13, and/or A and A.15.

29.    The facts in paragraphs C and C.1, C and C.2, C and C.3, C and C.4, C and C.5, C and C.6, C and C.7, C and C.8, C and C.9, C and C.10, C and C.11, C and C.12, C and C.13, and/or C and C.15.

19

Exhibit B   019

30.  The facts in paragraphs D and D.1, D and D.2, D and D.3, D and D.4, D and D.5, D and D.6, D and D.7, D and D.8, D and D.9, D and D.10, D and D.11, D and D.12, D and D.13, and/or D and D.15.

31. The facts in paragraphs E and E.1, E and E.2, E and E.3, E and E.4, E and E.5, E and E.6, E and E.7, E and E.8, E and E.9, E and E.10, E and E.11, E and E.12, E and E.13, and/or E and E.15.

32.  The facts in paragraphs F and F.1, F and F.2, F and F.3, F and F.4, F and F.5, F and F.6, F and F.7, F and F.8, F and F.9, F and F.10, F and F.11, F and F.12, and/or F and F.13.

## THIRTY-THIRD SPECIFICATION

## PRACTICNG THE PROFESSION WITH INCOMPETENCE ON MORE THAN ONE OCCASION

Respondent is charged with committing professional misconduct as defined by New York Education Law §6530(5) by practicing the profession with incompetence on more than one occasion as alleged in the facts of the following:

33. The facts in paragraphs A and A.1, A and A.2, A and A.3, A and A.4, A and A.5, A and A.6, A and A.7, A and A.8, A and A.9, A and A.10, A and A.11, A and A.12, A and A.13, and/or A and A.15; and/or B and B.1, B and B.2, B and B.3, B and B.4, B and B.5, B and B.6, B and B.7, B and B.8, B and B.9, B and B.10, B.11, B and B.12, B and B.13, and/or B and B.15; and/or C and C.1, C and C.2, C and C.3, C and C.4, C and C.5, C and C.6, C and C.7, C and C.8, C and C.9,

20

C and C.10, C and C.11, C and C.12, C and C.13, and/or C and C.15; and/or D and D.1, D and D.2, D and D.3, D and D.4, D and D.5, D and D.6, D and D.7, D and D.8, D and D.9, D and D.10, D and D.11, D and D.12, D and D.13, and/or D and D.15; and/or E and E.1, E and E.2, E and E.3, E and E.4, E and E.5, E and E.6, E and E.7, E and E.8, E and E.9, E and E.10, E and E.11, E and E.12, E and E.13, and/or E and E.15; and/or F and F.1, F and F.2, F and F.3, F and F.4, F and F.5, F and F.6, F and F.7, F and F.8, F and F.9, F and F.10, F and F.11, F and F.12, and/or F and F.13; and/or G and G.1, G and G.2, G and G.3, and/or G and G.4.

## THIRTY-FOURTH SPECIFICATION

## WILLFULLY FAILING TO FILE A REPORT REQUIRED BY LAW

Respondent is charged with committing professional misconduct as defined by New York Education Law §6530(21) by willfully failing to file a report required by law or by the Department of Health, or the Education Department as alleged in the facts of one or more of the following:

34. The facts in paragraphs G and G.1, G and G.2, G and G.3 and/or G. and G.4.

21

Exhibit B   021

## THIRTY-FIFTH SPECIFICATION

### WILLFULLY OR GROSSLY FAILING TO COMPLY WITH FEDERAL, STATE, OR LOCAL LAWS RULES OR REGULATIONS GOVERNING THE PRACTICE OF MEDICINE

Respondent is charged with committing professional misconduct as defined by New York Education Law §6530(16) by willfully or grossly negligently failing to comply with substantial provisions of federal, state, or local laws, rules, or regulations governing the practice of medicine as alleged in the facts of one or more of the following:

35. The facts in paragraphs G and G.1, G and G.2, G and G.3 and/or G and G.4.

### THIRTY-SIXTH THROUGH FORTY-FIRST SPECIFICATIONS

### PERFORMING PROFESSIONAL SERVICES WHICH HAVE NOT BEEN AUTHORIZED BY THE PATIENT

Respondent is charged with committing professional misconduct as defined by New York Education Law §6530(26) by performing professional services which have not been authorized by the patient as alleged in the facts of one or more of the following:

36. The facts in paragraphs A and A.14, and/or A and A.15.

37. The facts in paragraphs B and B.14, and/or B and B.15.

38. The facts in paragraphs C and C.14, and/or C and C.15.

39. The facts in paragraphs D and D.14, and/or D and D.15.

40. The facts in paragraphs E and E.14, and/or E and E.15.

41. The facts in paragraphs F and F.14, and/or F and F.15.

22

Exhibit B    022

## FORTY-SECOND THROUGH FORTY-SEVENTH SPECIFICATIONS

## FAILING TO MAINTAIN RECORDS

Respondent is charged with committing professional misconduct as defined by New York Education Law §6530(32) by failing to maintain a record for each patient which accurately reflects the evaluation and treatment of the patient as alleged in the facts of the following:

42. The facts in paragraphs A and A.13.

43. The facts in paragraphs B and B.13.

44. The facts in paragraphs C and C.13.

45. The facts in paragraphs D and D.13.

46. The facts in paragraphs E and E.13.

47. The facts in paragraphs F and F.12.

DATE: April 27, 2020
       Albany, New York

TIMOTHY J. MAHAR, ESQ.
Deputy Counsel
Bureau of Professional Medical Conduct

23

Exhibit B  023

STATE OF NEW YORK : DEPARTMENT OF HEALTH
STATE BOARD FOR PROFESSIONAL MEDICAL CONDUCT
-------------------------------------------------------------------------------x
                                            :

| | | |
|---|---|---|
| **IN THE MATTER** | : | **DETERMINATION** |
| **OF** | : | **AND** |
| **DANIELLE ROBERTS, D.O.** | : | **ORDER** |

-------------------------------------------------------------------------------x

A Notice of Hearing and Statement of Charges dated March 5, 2020, and Amended Statement of Charges dated April 27, 2020, were duly served pursuant to § 230(10)(d)(i) of the Public Health Law (PHL) upon Danielle Roberts, D.O. (Respondent). (Exhibits 1, 1a; Appendix I.) Steven Lapidus, M.D., Chair, Ramanathan Raju, M.D., and Joan Martinez McNicholas, duly designated members of the State Board for Professional Medical Conduct, served as the Hearing Committee, and Dawn MacKillop-Soller, served as the Administrative Law Judge. PHL § 230(10)(e). The Department of Health, Bureau of Professional Medical Conduct (Department), appeared by Jeffrey J. Conklin, Esq. The Respondent appeared and was represented by Anthony Z. Scher, Esq.

The Hearing Committee voted 3-0 to sustain 45 specifications among ten definitions of misconduct set forth in the Education Law: willfully abusing a patient §6530(31); conduct in the practice of medicine which evidences moral unfitness §6530(20); failing to use appropriate infection control practices §6530(47); practicing the profession of medicine fraudulently §6530(2); practicing the profession with gross negligence §6530(4); practicing the profession with negligence on more than one occasion §6530(3); practicing the profession with gross incompetence §6530(6); practicing the profession with incompetence on more than one occasion §6530(5); performing professional services which have not been authorized by the patient §6530(26); and failing to maintain a record for each patient which accurately reflects the evaluation and treatment of the patient § 6530(32). The Hearing Committee also voted 2-1 to sustain two

Exhibit C  001

additional specifications of misconduct:  willfully failing to file a report required by law §6530(21) and willfully or grossly negligently failing to comply with substantial provisions of federal, state, or local laws, rules, or regulations governing the practice of medicine §6530(16).

The Hearing Committee unanimously determined to impose the penalty of revocation of the Respondent's medical license pursuant to PHL § 230-a(4).

**Hearing Record**

| | |
|---|---|
| Pre-Hearing Conference: | May 28, 2020 |
| Hearing Dates: | June 2, July 1 & 6, August 12 & 14, September 9, October 21, November 3, December 2 & 15, 2020. January 8, February 19, March 2, 2021. |
| Witnesses for Petitioner: | Vasco Bilbao (Transcript, p. 61-189.) Danielle Roberts, D.O. (Transcript, p. 199-440, 514-757.) Ariella Cepelinski (Transcript, p. 443-490.) Michael Menashy (Transcript, p. 492-511.) S.E. (Transcript, p. 769-942.) Robert T. Grant, M.D. (Transcript, p. 1056-1238.) Bruce F. Farber, M.D. (Transcript, p. 955-1045.) |
| Petitioner's Exhibits: | 1, 1a, 2a, 2b, 3, 4, 6, 8d, 9, 14a, 15a, 16, 17, 35, 38, 45, 47-49 |
| Witnesses for Respondent: | Danielle Roberts, D.O. (Transcript, p. 1247-1461, 2106-2150.) David Mayer, M.D. (Transcript, p. 1469-1594.) M.H. (Transcript, p. 1594-1666.) Jane Doe 1 (Transcript, p. 1675-1720.) Jane Doe 2 (Transcript, p. 1726-1755.) Steve Arthur Haworth (Transcript, p. 1758-1840, 2094-2097.) E. Carlson (Transcript, p. 1845-1855.) R. Wolle (Transcript, p. 1856-1867.) Jane Doe 3 (Transcript, p. 1878-1930.) Jane Doe 4 (Transcript, p. 1934-1993.) Jane Doe 5 (Transcript, p. 1996-2092.) |
| Respondent's Exhibit: | A |
| ALJ Exhibit: | I |
| Written Submissions received: | June 2, 2021 |
| Deliberations held: | June 29, July 20, 2021 |

Exhibit C  002

## **Findings of Fact**

The Hearing Committee unanimously makes the following findings of fact:

1.    Respondent Danielle Roberts, D.O., was authorized to practice medicine in New York State on October 5, 2009, by the issuance of license number 255075. (Exhibit 3.)

2.    The Respondent's background includes board certification and completion of a residency in family practice in 2011 followed by working as a physician and medical director between 2011 and 2013 at a large family practice caring for patients of all ages and with various conditions. From 2013 to 2018, she worked as a hospitalist at St. Peter's Hospital in Albany providing medical care to hospital patients from admission to discharge. Her background also includes seven years of locum tenens work at a hospital in Wisconsin and one year at a large integrative medical practice in Manhattan. (Exhibit 38; Transcript, p. 202, 206-207, 1249-1250, 1424-1425.)

3.    In 2013, the Respondent joined NXIVM, a personal development organization founded by Keith Raniere, also known as Vanguard. NXIVM is the parent company to several umbrella organizations, including ESP (Executive Success Programs), SOP (Society of Protectors), Ninth Media, DOS (dominus obsequious sororium, master/slave, master allegiance sisterhood), and Exo/Eso (fitness/exercise program), with multiple center locations in New York, California, Canada, and Mexico. (Exhibit 49; Transcript, p. 65, 184, 186-187, 224, 1255-1256, 1261, 1728.)

4.    In 2016, the Respondent joined DOS, a secret women's group developed by eight "1st line" or original members in collaboration with Keith Raniere. The claimed purpose of DOS was to empower women to build character, strength, and discipline by overcoming fears and pain to experience growth. The Respondent's involvement in DOS was "2nd line member" behind the "1st line" members. (Exhibits 14a, 49; Transcript, p. 234, 246, 252-253, 411-412, 526, 785, 1426, 1938, 2003.)

Exhibit C  003

5.     Membership in DOS required a lifetime commitment or "vow of obedience" between master and slave, the exchange of collateral, a necklace or collar worn 24 hours every day to symbolize obedience and commitment, and a brand placed by an electrocautery device to the pelvic region as part of a branding ceremony. The vow required slaves to strictly follow their masters' orders and keep DOS completely secret. The goal of the branding was to overcome pain and create solidarity. (Exhibit 14a; Transcript, p. 240-243, 255-256, 358-359, 1265, 1268, 1730, 1747-1750, 1888, 1938-1939.)

6.     The brandings of the women, including S.E., A.M., J.G., C.G., A.C., and L.S., occurred only after they committed to join DOS and submitted multiple forms of acceptable collateral. Acceptable collateral included titles to houses and cars, investment and bank accounts, businesses, nude photographs, incriminating letters and/or written confessions detailing sexual deviance, illicit drug use, extramarital affairs, and/or embarrassing family matters. The collateral coerced the women into keeping DOS secret and maintaining their commitment and was subject to public release if the women breached these requirements. (Exhibit 14a; Transcript, p. 243-246, 358-359, 781, 783, 796, 815, 859, 894, 1730, 1747-1748, 1967, 1969, 2054-2055.)

7.     An electrocautery device generates electrical energy that is converted to heat for cutting through skin or solid organs, dissection, separating planes between tissues, hemostasis to stop or seal off bleeding blood vessels or lymphatics during procedures, and for electrocautery branding to place a scar on the body. While an electrocautery device can be used as a scalpel, it is not intended to be used directly on the skin surface because it can cause significantly more skin damage extending beyond the tip or point of contact. (Transcript, p. 1072, 1074, 1224, 1541.)

8.     A smoke evacuator must be used with an electrocautery device to remove dangerous particulate matter such as viruses, infectious diseases, blood cells, and other antigens released from the

Exhibit C  004

device upon contact with skin and tissue and prevent them from being absorbed or inhaled. (Transcript, p. 1074, 1082.)

9.    Electrocautery branding is a form of body modification in which an electrical arch on the electrocautery device vaporizes the skin and leaves behind undamaged skin and tissue but not a 2nd degree burn. (Transcript, p. 1787-1788.)

10.    Prior to performing the branding procedures on the women, including S.E., A.M., J.G., C.G., A.C., and L.S., the Respondent was required, under acceptable standards of medical conduct that apply to physicians, to complete training in the use of an electrocautery device. The training involves: (1) regulating the settings considering skin anatomy for the appropriate amount of energy transmitted through the tip; (2) grounding the device; (3) using personal protection equipment; and (4) safely operating and maintaining the device, including the use of a smoke evacuator. The Respondent never completed such training. (Transcript, p. 1070-1079, 1082-1087, 1125-1126, 1322-1325, 1327-1328.)

11.    Beginning in January of 2017 and continuing through March of 2017, the Respondent used a Medline Valley Lab Surgistat electrocautery device and a stencil to brand "KAR," the initials of Keith Raniere, into the pelvic regions of 17 women, including S.E., A.M., J.G., C.G., A.C., and L.S., most of whom were nude. The brandings were done without anesthesia to intentionally cause them pain. (Exhibits 8D, 45, 47; Transcript, p. 313, 339, 416, 524, 584-585, 635-640, 692, 1331-1332, 1353, 2107-2108.)

12.    The branding procedures occurred in a small room of a house and took between 20 and 45 minutes to complete. They were videotaped with a cell phone while a group of women used their bare hands and/or naked bodies to hold down the woman branded to keep her still and supine on the massage table. (Exhibit 8D; Transcript, p. 308, 313-314, 330, 524, 636, 804, 821, 827, 1333-1334, 1377, 1416, 1421.)

Exhibit C  005

13.    The Respondent's conduct in performing the brandings on S.E., A.M., J.G., C.G., A.C., L.S. and the other women constituted the practice of medicine by a physician. The Respondent relied on her medical training, education, and background when she performed the procedures to alter the skin and physical condition of their pelvic regions. (Transcript, p. 1110, 1115-1116, 1129, 1176.)

14.    The brandings performed by the Respondent while licensed as a physician were medical procedures in which standards of medical practice apply. (Transcript, p. 1097, 1109, 1112, 1129, 1163.)

15.    An electrocautery device must be properly grounded to ensure the safe return of the electrical energy from the person treated with the electrocautery device back to the grounding pad, which is affixed to that person. This process involves ensuring the operator and participants are properly insulated to prevent a burn by wearing gloves to avoid serving as the ground themselves. The women participants were not wearing gloves. (Transcript, p. 342, 638, 696, 1074, 1079-1080, 1082, 1154.)

16.    Physicians using an electrocautery device to perform procedures must adhere to infection control standards applicable to physicians performing invasive procedures on the human body. They must maintain a sterile field and sterile environment by: (1) applying draping around the surgical site and as a barrier to block off unsterile areas; (2) using an antibacterial cleaning solution to clean the room, surfaces, table, and equipment between cases and terminally at the end of the day; and (3) requiring all participants wear personal protection equipment, including sterile gloves, masks, and eye shields. The purpose in these requirements is to prevent infection. The Respondent followed none of these infection control procedures. (Exhibit 8D; Transcript, p. 341-342, 522, 536, 638, 1097-1098, 1100-1105, 1125, 1130, 1160-1161.)

17.    Physicians using electrocautery devices must also adhere to operational standards by performing and documenting routine testing and service of the electrocautery device and confirming sufficient electrical output in the room where the device is used. The purpose in these rules is to prevent a surgical or electrical fire during a procedure. (Transcript, p. 1071, 1097-1098, 1100.)

Exhibit C  006

18.    The Respondent's failures to maintain proper infection control standards and operational procedures while using an electrocautery device that inflicted 2nd degree burns on the women were severe deviations from the standard of care. (Transcript, p. 1124-1125, 1132.)

19.    In using an electrocautery device to perform the brandings without anesthesia, the Respondent caused the women, including S.E., A.M., J.G., C.G., A.C., and L.S., significant physical pain, 2nd degree burns, and abnormal permanent and/or raised keloid and hypertrophic scarring, and placed them at risk for harm, including deeper 3rd and 4th degree burns and psychological trauma like post-traumatic stress disorder (PTSD) or anxiety. (Exhibits 14a, 45, 47; Transcript, p. 579, 1079-1090, 1124-1130, 1133-1146, 1154, 1209, 1377, 1403, 1421.)

20.    In subjecting the women to significant pain from the electrocautery device, the Respondent was required to administer them, or at the very least offer, anesthesia, such as a local anesthetic, to alleviate the pain. The Respondent had no legitimate medical reason, such as an allergy or an emergency, for neither providing the women anesthesia nor presenting them with this treatment option. (Transcript, p. 339, 635, 1073, 1086.)

21.    The Respondent's failure to administer or advise and offer anesthesia to the women was a severe deviation from the standard of care. Physicians are ethically prohibited from causing patients such extreme harm on purpose. (Transcript, p. 1073, 1124-1125, 1131-1132, 1210-1211.)

22.    The Respondent never informed the women she branded that the brand was KAR to represent Keith Raniere's initials or that it would measure approximately two inches by two inches. The brand was intentionally placed upside down and backwards on most of the women to conceal Keith Raniere's initials.  S.E., A.M., J.G., C.G., A.C. and others had falsely been told by their masters that the brand represented "a symbol of the sorority," "a line of the sun and the earth and certain elements," an "abstract symbol," "chakras," and/or "four elements," and that the size would be "little," "small," and/or

Exhibit C  007

"dime sized." Only L.S., as a "1st line" member, knew prior to her branding that the brand represented Keith Raniere's initials. (Exhibit 14a; Transcript, p. 351, 541-542, 787, 797-802, 904, 1355, 1450, 1685-1686, 1739, 1882, 1939, 1941-1942.)

23.    Prior to performing the branding procedures on the women, the Respondent was required to obtain their voluntary, verbal and/or written informed consent that reflected a discussion of the psychological and physical risks, benefits, and alternatives to the procedure, including the option not to proceed; the pain involved and the option of anesthesia; details of the brand symbol; and consideration of the individual's psychological and medical histories, comorbidities, and medications. The purpose of obtaining informed consent is to confirm the women have a complete understanding of the procedure and to avoid complications. The Respondent did not obtain such consent from any of the women. (Transcript, p. 435-437, 538-540, 1098, 1124-1125, 1164-1168, 1178-1182, 1985.)

24.    The Respondent's infliction of the branding procedures on the women without obtaining their voluntary verbal and/or written informed consent was a severe deviation from the standard of care. Informed consent must be voluntary and not in connection with coercion under the threat of disclosure of personal and potentially damaging or destructive collateral. (Transcript, p. 1098, 1124-1125, 1132, 1178-1183.)

25.    Physicians are obligated to provide proper care of 2nd degree burn wounds that includes application of antibacterial ointment and treatment plans that include follow-up physician monitoring. Providing this care is critical to ensure proper wound healing and to prevent infection. The Respondent failed to provide this care. (Transcript, p. 542-545, 624-625, 1164, 1166-1167, 1171, 1349, 2114.)

26.    The Respondent's failure to provide proper treatment and follow-up care of the 2nd degree burn wounds was a severe deviation from the standard of care. (Transcript, p. 1093-1096, 1123-1124, 1128, 1164, 1166-1167, 1171, 1174.)

27.     Following completion of the branding procedures, the Respondent instructed the women to submit photos of their brands to their masters every day for 30 days and then one time per week. The Respondent evaluated and kept the photos but never made them part of a medical record because she never prepared or maintained such records for the women. (Transcript, p. 377, 379, 540, 543, 547-549, 556.)

28.     Physicians performing medical procedures involving the infliction of wounds are required to prepare, maintain, and document medical records that include photographs of the wound and details of the procedure, the equipment used, physical evaluations, diagnosis, treatment plans, and post-procedure instructions. The Respondent severely deviated from the standard of care by failing to prepare and maintain medical records to apprise outside providers of the treatment provided. (Transcript, p. 1173-1174.)

29.     In 2016, the Respondent participated in a ten-day annual NXIVM corporate retreat known as "Vanguard week" at the Silver Bay YMCA Family and Retreat Center, located in Silver Bay, New York. The purpose of the event was to celebrate the birthday of Keith Raniere. The attendees included more than 400 NXIVM members. (Exhibit 17; Transcript, p. 80, 90-93, 451-452, 456, 478, 496, 708, 710.)

30.     During the event and while attending it, the Respondent became aware of a gastrointestinal illness affecting many of the attendees. Among the attendees were children, a woman with end-stage cancer, and a pregnant woman. The symptoms of the illness included diarrhea, nausea, vomiting, dehydration, and fatigue. This illness placed the attendees and the public at risk for harm, including gastrointestinal morbidity and dehydration, which is a particular concern for people with comorbidities like cancer. (Transcript, p. 84-85, 454, 455, 485, 498-499, 505, 714-715.)

31.     This illness constituted a disease outbreak because it involved a large group of people who developed similar symptoms while attending the same event in a confined environment. Physicians are required under Department of Health regulations to report a communicable disease or any disease outbreak

Exhibit C  009

or unusual disease to public health officials. 10 NYCRR 2.10. The Respondent failed to take any steps to comply with these requirements. (Transcript, p. 972, 991.)

32.      The Respondent's failure to report the infectious disease outbreak was a violation of public health regulations and a significant deviation from the standard of care for a physician. (Transcript, p. 991.)

### **Factual Allegations**

By email correspondence dated March 1, 2021, the Petitioner withdrew factual allegations G.3 and G.4. (ALJ I.) The Hearing Committee sustained all the remaining Factual Allegations in the Statement of Charges.

The Hearing Committee <u>sustained</u>, by unanimous vote (3-0):

Factual Allegations A.1, A.2, A.3, A.4, A.5, A.6, A.7, A.8, A.9, A.10, A.11, A.12, A.13, A.14, A.15, B.1, B.2, B.3, B.4, B.5, B.6, B.7, B.8, B.9, B.10, B.11, B.12, B.13, B.14, B.15, C.1, C.2, C.3, C.4, C.5, C.6, C.7, C.8, C.9, C.10, C.11, C.12, C.13, C.14, C.15, D.1, D.2, D.3, D.4, D.5, D.6, D.7, D.8, D.9, D.10, D.11, D.12, D.13, D.14, D.15, E.1, E.2, E.3, E.4, E.5, E.6, E.7, E.8, E.9, E.10, E.11, E.12, E.13, E.14, E.15, F.1, F.2, F.3, F.4, F.5, F.6, F.7, F.8, F.9, F.10, F.11, F.12, F.13.

The Hearing Committee <u>sustained</u>, by majority vote (2-1):

Factual Allegations G.1, G.2.

### **Evaluation of the Respondent's Testimony**

The Respondent testified on her own behalf and as a witness for the Petitioner. Although considered incidental by the Hearing Committee in deciding central issues in this case, the Hearing Committee believes it is worth noting the Respondent's evasiveness, defiance, and inconsistencies on various points. For instance, she refused to disclose: (1) the circumstances of her becoming involved in NXIVM (Transcript, p. 218); (2) the initials of the women she branded (Transcript, p. 315-316); (3) the whereabouts of the branding videos and whether she maintained them (Transcript, p. 328, 331); (4) how it was determined the brandings would be videotaped (Transcript, p. 331); (5) who was present when she branded L.S. (Transcript, p. 333); (6) the roles of the women in the room with L.S. during the branding

Exhibit C  010

(Transcript, p. 336); (7) whether L.S. was clothed during the branding (Transcript, p. 335); (8) what the brand represented (Transcript, p. 351); and (9) whether L.S.'s limbs were held down when she was branded (Transcript, p. 337). Despite being directed to answer these questions when they were asked, the Respondent never did. She also initially refused to disclose whether she was branded with Keith Raniere's initials (Transcript, p. 518-519) but then finally admitted — consistent with the other evidence — that she was branded and that the brand was KAR to represent his initials. (Exhibits 14a and 49; Transcript, p. 1312, 1352-1352, 1388, 1391-1393, 1396.)

Further inconsistencies include her initial testimony that she was unaware of the details of the electrocautery device she used, stating it was "purchased by the friend that invited me" (Transcript, p. 266, 269), and her later testimony that she purchased it, identifying the model and manufacturer. (Transcript, p. 2108.) She also initially testified that DOS was "a completely separate organization" from NXIVM and Keith Raniere was not its "leader" (Transcript, p. 253) and that L.S., a 1st line member, had "no master" (Transcript, p. 381), but then later admitted that Keith Raniere was the "grandmaster" to the 1st line members (Transcript, p. 1387), who were his "slaves." (Transcript, p. 1389.)

The Hearing Committee finds these factors significantly diminished the Respondent's credibility and evaluated her testimony accordingly.

### The Practice of Medicine

The Hearing Committee was not persuaded by the Respondent's arguments that the Board lacks subject matter jurisdiction to bring charges against her because she "was not engaged in the practice of medicine" and that branding "is not a medical procedure." (Respondent's brief, p. 2.) The Hearing Committee finds the Petitioner correctly argues the Respondent "performed medical procedures when she branded the DOS women" and that "the brandings fell within the definition as to what constitutes the

Exhibit C  011

practice of medicine" and agrees with its reliance on Courts having a long-standing history of interpreting Educ. Law §6521 broadly to support these positions. (Petitioner's brief, p. 12-13.)

The practice of the profession of medicine is defined as "diagnosing, treating, operating or prescribing for any human disease, pain, injury, deformity or physical condition." Educ. Law § 6521. Whether conduct constitutes the practice of medicine is a determination to be made by the Hearing Committee based on the facts presented. Addei v. State Board for Professional Medical Conduct, 278 AD2d 551, 552 (3d Dept. 2000); See also Educ. Law §6504.  This determination must be based solely on the facts "and not upon the name of the procedure, its origins or legislative lack of clairvoyance." People v. Amber, 76 Misc. 2d 267, 273 (Sup. Ct. Queens Co. 1973).

The reported decisions relied on by the Petitioner that the Hearing Committee finds convincing on this point include People v. Amber, supra at 273, in which the Court described its interpretation of Educ. Law §6521 as "a statute intended to regulate, limit or control the diagnosis and treatment of ailments must be read broadly to include the gamut of those known, whether or not recognized and even those not yet conjured." (Petitioner's brief, p. 12-13.) See also, People v. Mastromarino, 148 Misc. 454, 455 (Sup. Ct. Kings Co. 1933); People v. Rubin, 103 Misc.2d 227, 234 (N.Y. City Crim. Ct. Queens Co. 1979). The Respondent acknowledges that while branding "arguably involves operating," the operations were not "for a human disease, pain, injury, deformity or physical condition," and so did not fit the statute because the women were "perfectly healthy and normal in all respects" when they received the brands. (Respondent's brief, p. 3-4.)

The Respondent relies on Matter of Gross v. Ambach, 71 NY2d 859, 861 (1988), in which the Court of Appeals determined autopsies constitute the practice of medicine because they are "the ultimate diagnostic procedure" to diagnose the cause and manner of death. (Respondent's brief, p. 3-4.) The Hearing Committee finds the only similarity to be drawn between the two cases is that the statute somehow

Exhibit C  012

does not fit. There because autopsies are not practicing medicine since medicine can only be practiced on "living" patients and here because the women were "normal and healthy" when they were branded. <u>Gross</u>, <u>supra</u> at 861. In any event, the Hearing Committee, like the Court of Appeals in <u>Gross</u>, declines to limit the statue in that regard. *Id.* (Respondent's brief, p. 4.) The Hearing Committee rejects the Respondent's claim that it is "blatantly obvious" that the Respondent's "operating" on the women was not for "a human disease, pain, injury, deformity or physical condition" to meet the criteria under the statute. (Respondent's brief, page 3.) To the contrary, it is glaringly obvious to the Hearing Committee that she was operating on the women to alter the skin, appearance, and physical condition of their pelvic regions regardless of whether they were "normal and healthy." (Transcript, p. 1110-1111, 1116.)

The Petitioner presented as a witness plastic surgeon Robert T. Grant, M.D. While Dr. Grant lacks branding experience, the Hearing Committee noted his expertise and credibility on the main issues in this case were established by his decades of experience as a board-certified specialist in general and plastic surgeries performing cosmetic procedures, such as body piercings and nipple and areola tattooing to complete a breast reconstruction, and as Chief of Plastic Surgery at NewYork-Presbyterian Hospital, program director for the residents training program, and Professor of Surgery at Columbia University. (Exhibit 4; 1060-1066, 1185-1186.)

The Respondent presented as a witness general surgeon David Mayer, M.D. The Hearing Committee noted Dr. Mayer's extensive and diverse background as a practicing healthcare attorney and board-certified surgeon with 40 years of experience, including current privileges at three ambulatory facilities, teaching at three medical colleges, and prior Chair of Surgery at Syosset Hospital, where he performed thousands of surgeries, directed a laparoscopic fellowship program, and trained residents. (Transcript, p. 1469-1471, 1505.) Despite his considerable medical and legal experience, the Hearing

Exhibit C 013

Committee was not persuaded by his professional opinions on the issue of the practice of medicine due to contradictions in his testimony.

For instance, Dr. Mayer insisted the Respondent was a branding technician able to "put aside her white coat" as a physician when she performed the brandings, yet he described himself as "always a physician" who doesn't "stop being a physician…at different times." (Transcript, p. 1569, 1579-1580.) His position that she was acting as a branding technician was also inconsistent with his testimony that "you never forget your training and education" (Transcript, p. 1566-1567.) Another example is his testimony that physicians should not cause extreme pain while also refusing to discuss the "ethics" of the Respondent causing the women such pain and insistence that her osteopathic oath to do no harm and prevent pain did not apply. (Transcript, p. 1528, 1531.) The Hearing Committee considered such inconsistencies, noted his long-standing history of providing expert witness services in hundreds of civil cases to law firms and other private companies, and evaluated his testimony accordingly. (Transcript, p. 1499.)

While the Hearing Committee was not persuaded by Dr. Grant's professional opinion that the Respondent was practicing medicine because she addressed "psychic pain" the women were experiencing, it did agree with his testimony that the brandings are the practice of medicine under Educ. Law §6521 because they were "surgical," involving "violating the epidermis and getting into the deeper layers of skin," and performed to "alter the skin" or physical condition of the women. (Transcript, p. 1110-1111, 1114, 1116.) The Respondent attempted to contrast branding with plastic surgery such as a rhinoplasty on a "successful face model" on the grounds that branding does not treat "a physical condition" the patient seeks to change (brief, p. 12), but the Hearing Committee finds this comparison frustrates her cause. Just as a rhinoplasty to change the appearance of a nose alters the physical condition of the face, the Hearing

Exhibit C  014

Committee finds the Respondent's branding to inflict a permanent and very visible scar alters the skin, appearance, and physical condition of the pelvic region.

Dr. Grant took the position that while brandings and other similar cosmetic procedures such as body piercing and tattooing can be performed by non-physicians, they constitute medical procedures when physicians perform them. (Transcript, p. 1108-1109, 1196-1197.) The Hearing Committee agrees with this view and rejects the Respondent's arguments against it. On the one hand, the Respondent claims that branding "is a form of commercial body art in the same manner as are tattooing and body piercing." (Respondent's brief, p. 8.) To that end, she argues that "aesthetic or ritual branding is outside the jurisdiction of the State Board for Professional Medical Conduct as branding is not regulated at all in New York." (Respondent's brief, p. 9.) On the other hand, the Respondent goes on to distinguish these activities on the basis that tattooing and body piercing require a license to perform, whereas branding does not. PHL §461. In doing so, she overlooks the exception to the tattoo and body piercing licensing requirement for physicians that is expressly stated in the statute. PHL §462. The Hearing Committee believes the Legislature specifically carved out that exception precisely because when a doctor and not a technician performs tattooing or body piercing, it is presumed that appropriate medical standards will apply. Consistent with this was Dr. Grant's testimony that he was unable to "imagine the scenario" involving a licensed physician performing these brandings acting as only a "technician." (Transcript, p. 1218.)

The Respondent's arguments that tattooing and body piercing are regulated — whereas branding is not — were deemed inconsequential to the Hearing Committee. The Committee's view is simple — all these activities are practicing medicine and become medical procedures when performed by a physician. Contrary to Dr. Mayer's testimony that the Respondent could obtain "a separate license as a tattoo artist or body piercer" and "not use" her medical license (Transcript, p. 1549), the Hearing Committee believes that as a physician, the Respondent cannot unilaterally pick and choose when the standards of medical

Exhibit C  015

practice apply. (Transcript, p. 1107-1109, 1200, 1549.) Dr. Grant confirmed this when he testified: "given the privilege of being a physician that comes with responsibilities. You can't decide when you are going to enjoy the privileges, but not have the responsibilities." (Transcript, p. 1112.) The Hearing Committee considers the Respondent's attempt to use a double standard, compartmentalizing her life by ostensibly branding the women as a technician and not a doctor, an irresponsible attempt to cast aside her privileged status as a licensed physician with specialized knowledge.

The Hearing Committee was guided in reaching its determination by reported court decisions relying on various factors and circumstances in recognizing when activities performed by physicians fall within the definition of the practice of medicine. In Y.Y.B. ex rel. Barukh v. Rachminov, the court found that "while a circumcision performed by a physician would be the practice of medicine, a circumcision performed as a religious ritual by a qualified person (a 'mohel' in this case) does not constitute the practice of the profession of medicine within the meaning of the Education Law." Y.Y.B. ex rel. Barukh v. Rachminov, 11 N.Y.S.3d 808, 1059 (Sup. Ct. Queens Co. 2015); See also Zakhartchenko v. Weinberger, 605 N.Y.S.2d 205, 206 (Sup. Ct. Kings Co. 1993.) In relying on this same reasoning, the Court in Zakhartchenko applied negligence principles to a hospital where a circumcision performed by a Rabbi involved the hospital's trained medical staff. Zakhartchenko, supra at 413. The Petitioner also cites Zakhartchenko in its brief (p. 18) to correctly summarize the principle from these cases applicable to this matter: "Therefore, while the acts performed by a non-physician are not subject to the jurisdiction of the Board of Professional Medical Conduct, the brandings/medical procedures performed by Dr. Roberts on 17 DOS women are." The Hearing Committee follows the view of these reported cases that different standards apply when physicians perform procedures.

The Respondent claims that "several possible people were considered" to perform the brandings and that "(c)learly, the intent was not to select a physician but to pick amongst friends" (brief, p. 8), but

Exhibit C  016

the Hearing Committee finds it more likely the Respondent was chosen based on her background, training, and knowledge as a physician. The Respondent acknowledged relying on her medical background in everything she does. (Transcript, p. 263, 423, 430-431, 488, 521, 547, 552-553, 1440-1442, 2134.) The evidence also confirms she was the only physician approached by the 1st line members to perform the brandings, her status as a physician was well-known in the NXIVM community, and she was the one chosen to do them. (Transcript, p. 182-183, 352, 797, 1853, 1950.) Her experience as a physician was obviously relevant to what they were seeking in a person to do the job, which Jane Doe 5 described as someone who was "willing," "calm," not "squeamish," and had "a steady hand" and "attention to detail." (Transcript, p. 2020-2021.) Jane Doe 4 also expressed how she hoped "someone skilled enough" would be chosen for the job and the relief she felt — consistent with S.E.'s testimony — knowing her branding would be done by the Respondent, who she knew was a doctor. (Transcript, p. 796, 1951, 1942-1943, 1975.)

### **Standards of Medical Practice**

The Hearing Committee concluded the Respondent's lack of training in the use of an electrocautery device contributed to her improper technique in performing the branding procedures and exacerbated the harm to these women. The Hearing Committee was skeptical of Dr. Mayer's assertion that the Respondent took "great care to get special training in branding" (Transcript, p. 1476) because the evidence established she was woefully unskilled in performing the procedures. According to Dr. Grant, proper training in the safe and proper use of an electrocautery device includes attending "a series of didactic lectures" and using the device for a period of time "under direct observation of a mentor or preceptor," steps the Respondent never undertook. (Transcript, p. 517, 562-563, 1070-1071, 1327-1328, 1765, 1784.) The Hearing Committee finds her preparations for the brandings, which included undergoing branding herself by branding artist Brian Decker in Brooklyn, practicing on fruit and pigs' knuckles, and a few

Exhibit C  017

communications by email and telephone with Mr. Decker and body modification artist Steve Arthur Haworth, fell short of demonstrating serious and proper training in using an electrocautery device. (Transcript, p. 273-274, 280-284.)

The Respondent presented body modification artist Steve Arthur Haworth as a witness to discuss her branding technique. The Hearing Committee was not convinced by Mr. Haworth's opinion that the Respondent used appropriate technique when she performed the brandings. (Transcript, p. 1779.) Mr. Haworth testified that in his almost 30 years of performing electrocautery brandings, he has never caused a 2nd degree burn. (Transcript, p. 1827.) He described such a burn as "significantly more painful" than a brand (Transcript, p. 1788), with a greater risk of infection. (Transcript, p. 1795.) Mr. Haworth's description of an electrocautery brand as "not a second-degree burn" and "more like a scrape" that heals "very quickly" (Transcript, p. 1763, 1789-1790, 1796) was contrary to all the evidence in this case. The Respondent's brandings resulted in 2nd degree burns, as was established by the brand photos (Exhibits 45 and 47), the branding video (Exhibit 8D), and the testimony of Dr. Mayer (Transcript, p. 1510-1511), Dr. Grant (Transcript, p. 1085), and the Respondent herself. (Transcript, p. 1377, 1420-1421.) The Hearing Committee attributed Mr. Haworth's seeming unawareness that the Respondent's brandings caused 2nd degree burns to his lack of a medical degree and his failure to review the brand wound photos showing the depth of the wounds or the testimony of the physician witnesses. (Exhibits 8D, 45, 47; Transcript, p. 1791-1792.)

The Respondent's poor technique was obvious to the Hearing Committee on S.E.'s branding video, which showed sparks and fire from the electrocautery device as she moved it across the skin to create the brand's "seven lines" and "touchups" (Exhibit 8D; Transcript, p. 366-367) and her multiple starts and stops, which Mr. Haworth commented on as "different" from his technique. (Transcript, p. 1778.) The Hearing Committee also recognized the Respondent's failure to mention the energy settings or the types

18

Exhibit C  018

of tips she used, which suggested her unfamiliarity with how the device works, specifically that the electrical current from the device and the time in which it is applied directly affects the outcome. (Transcript, p. 283, 1224.) She also expressed no awareness of the danger in using an electrocautery device directly on the skin surface to make an incision because it can cause a more significant injury than intended, such as the abnormal scarring and deep 2nd degree burns that occurred in this case and the risk of deeper 3rd and 4th degree burns. (Transcript, p. 1215, 1224, 1510, 1581.) For these reasons, the Hearing Committee believes her lack of training in controlling the electrocautery device to predict the outcome meant she never understood that the time in which she applied the tremendous amount of electrical energy from the device caused the women substantial injuries, pain, and trauma. (Exhibits 14a, 45, 47; Transcript, p. 1085-1087, 1128.)

Dr. Grant described the Respondent's branding of these women as "excruciatingly" and "incredibly painful" for which she never even offered them a choice of anesthesia. (Transcript, p. 1086, 1162-1163.) In response to the pain, the evidence showed A.M. and S.E. cried and J.G. screamed and squealed, flipped off the table, and bit down on a towel. (Exhibit 14a; Transcript, p. 807, 819, 579, 689, 819, 846, 1404.) S.E. described her pain from the branding as "an acute fire in the most sensitive part of my body." (Transcript, p. 827.) L.S. described her experience of the branding as "incredibly painful." (Exhibit 14a.) While the evidence established the women desired pain as part of the branding process (Respondent's brief, p. 18), the Hearing Committee agreed with Dr. Grant that absent a legitimate medical reason, such as an allergy or an emergency, the Respondent was obligated to at least attempt to alleviate such pain, such as by administering a local anesthetic in the area where the cautery was applied. (Transcript, p. 1073, 1124, 1210-1211.)

This was necessary, Dr. Grant explained, because the level of pain the women endured was so intense that it risked causing the woman cauterized even deeper burns from not being able to remain still

Exhibit C  019

during the procedure. Dr. Mayer also acknowledged this risk, as well as the risk of physical injuries to the women participants holding her down as she violently reacts to the electrocautery device. (Transcript, p. 1082-1083, 1087-1090, 1510.) Dr. Grant emphasized it is "unethical" for physicians to intentionally cause patients such harm because doing so violates "our ethical background in training and responsibility." (Transcript, p. 1116, 1228.)

The Respondent's lack of training was also established by her failure to prevent other risks of harm from occurring. She risked burns to the other women participants because they were not properly grounded by wearing gloves for insulation, instead using their bare skin to hold down the woman cauterized. Another risk was that the women could inhale or absorb harmful pathogens, such as viruses and infectious diseases, due to the failure to use a smoke evacuator to remove the debris plume released from the electrocautery device. She also risked burn wound infections by not maintaining a sterile field because she never properly cleaned the room, applied sterile draping, or required the women to wear personal protective equipment such as masks, sterile gloves, and eye protection. (Transcript, p. 1074, 1082, 1097-1098, 1104-1105, 1130.) The Hearing Committee disagreed with Dr. Mayer's opinion that these risks were "low," especially because the Respondent made no effort to mitigate them. (Transcript, p. 334-335, 532, 562, 1584.) Dr. Grant deemed the Respondent's failure to complete these steps serious deviations from the standard of care. (Transcript, p. 1124-1125, 1132.)

The Hearing Committee unanimously voted that the Respondent's conduct constituted professional misconduct as defined in Educ. Law §6530(4), practicing the profession with gross negligence on a particular occasion, professional misconduct as defined in Educ. Law §6530(6), practicing the profession with gross incompetence, and professional misconduct as defined in Educ. Law 6530(5), practicing the profession with incompetence on more than one occasion.

Exhibit C  020

Gross negligence involves a significant deviation from acceptable medical standards that creates the risk of grave consequence to the patient. Such conduct may result in a single act of negligence in egregious proportions or multiple acts of negligence that cumulatively are egregious. Post v. N.Y.S. Dept. of Health, 245 A.D.2d 985, 986 (3d Dept. 1997.) Gross incompetence involves an unmitigated lack of the skill or knowledge necessary to perform an act undertaken by the licensee in the practice of medicine. This conduct may consist of a single act of incompetence of egregious proportions or multiple acts of incompetence that cumulatively amount to egregious conduct. Post, 245 A.D.2d at 986; Minielly v. Commissioner of Health, 222 A.D.2d 750, 752 (3d Dept. 1995). Incompetence includes a lack of the requisite knowledge or skill in the practice of the profession but does not require a showing of an act or omission constituting a breach of the duty of due care. Dhabuwala v. State Bd. For Professional Med. Conduct, 225 AD2d 209, 213 (3d Dept. 1996).

The Respondent deviated from the standard of care and demonstrated a lack of skill and knowledge to practice the profession of medicine. She dangerously operated the electrocautery device to perform the branding procedures without anesthesia or adhering to infection control standards, which subjected the women to extreme pain, deep 2nd degree burn wounds, and abnormal scarring, and risked them further 3rd and 4th degree burn wounds, infection, and other harm.

The Hearing Committee also voted 3-0 that the Respondent's conduct constituted professional misconduct as defined under Education Law §6530(47), failing to use appropriate infection control practices. The Respondent's failure to follow any infection control procedures risked the women burn wound infections and other harmful outcomes, representing to the Hearing Committee her disregard for their health and safety.

Informed consent requires a verbal or written discussion to evaluate risks so the patient can "prudently decide whether or not" to proceed with the procedure. (Transcript, p. 1098, 1178-1180.) It must

Exhibit C  021

include a discussion of the psychological and physical risks, benefits, and alternatives to the procedure, including the option not to proceed, considering medical histories, comorbidities, and medications. (Transcript, p. 1124, 1179-1180.) The Respondent admits she never obtained such consent, which Dr. Grant deemed a serious deviation from the standard of care. (Respondent's brief, p. 8; Transcript, p. 436, 538-540, 1180.)

In failing to take medical histories and perform physical examinations, the Respondent risked missing a diagnosis or condition such as diabetes or connective tissue disorder, or a blood thinner medication like aspirin, that could affect clotting or wound healing. She also risked missing a cardiac condition that could trigger an arrythmia or pre-existing PTSD or anxiety that could become exacerbated by direct exposure to blood and trauma. (Transcript, p. 544-544, 1094-1095, 1171, 1418.) Other risks included burn wound infections and poor healing because she never provided treatment plans that included application of antibiotic ointment and follow-up physician monitoring. (Transcript, p. 377, 547, 556, 1362, 1168, 1171-1172.) In failing to document medical records, including the brand wound photos she collected and kept, she also risked depriving outside providers of important information about the procedures and the reason why they were performed. (Transcript, p. 1175.)

The Respondent, as a physician, was obligated to complete such tasks. The Hearing Committee believes she should have known to do so, especially considering her experience as a hospitalist following protocols that involve reading charts, assessing medications and medical histories to determine comorbidities, and treating patients with various injuries, including burn wounds. (Transcript, p. 206-207, 209, 291.) Although Mr. Haworth testified that his brandings never involve completing these steps, the Hearing Committee noted that he is not a doctor. The medical standards that apply to physicians with specialized medical training and knowledge performing these procedures do not also apply to branding technicians. (Transcript, p. 1770-1771.)

Exhibit C  022

The Hearing Committee unanimously determined that the Respondent's conduct constituted professional misconduct as defined in Educ. Law §6530(32), failing to maintain records for each patient that "accurately reflect the evaluation and treatment of the patient." Physicians are required to maintain such records that include every interaction with the patient and, in cases such as this, photos of the injury. Mucciolo v. Fernandez, 195 A.D.2d 623, 625 (3d Dept. 1993).

Negligence means the "failure to exercise the care that would be exercised by a reasonably prudent licensee under the circumstances." Bogdan v. State Bd. For Professional Med. Conduct, 195 A.D.2d 86, 88 (3d Dept. 1993). The Department is not required to prove harm to a patient. Youssef v. State Bd. For Professional Med. Conduct, 89 A.D.3d 824, 825 (3d Dept. 2004). Negligence can also be sustained when there is a relationship between inadequate medical records and patient treatment. Matter of Patin v. State Bd. For Professional Med. Conduct, 77 A.D.3d 1211, 1214 (3d Dept. 2010). The Hearing Committee sustains the negligence charge on both grounds. The Respondent failed to exercise the required level of care when she failed to take even the most basic steps to protect these women, such as by assessing medical and psychiatric histories, providing follow-up care considering the deeply traumatizing nature of the branding procedures, or assessing cross reactions, such as a medication that could worsen a preexisting psychiatric problem or a heart defect that could create a fatal condition. Her failure to maintain any medical records prevented subsequent providers from understanding the cause of the injuries and the reasons for them, which could adversely impact their future treatment decisions. As a physician, the Respondent was required to consider these matters before performing operations on the women that physically and permanently altered their bodies.

Of particular concern to the Hearing Committee in the circumstances here was that informed consent must be voluntary and not due to coercion (Transcript, p. 1182) and involves providing details of the procedure, all of which were missing in this case. The Respondent concedes she never obtained

Exhibit C  023

"formal written" informed consent but claims the branding video of S.E. shows she gave "verbal" consent, which the Hearing Committee finds misleading at best. (Respondent's brief, p. 8, 17.) The Respondent denies the women were coerced, yet the brandings were performed upon women who had submitted collateral that would result in damaging and embarrassing consequences if released to the public. (Respondent's brief, p. 19; Exhibit 14a; Transcript, p. 388, 390, 424, 426, 530, 783-784, 1182, 1957.) S.E. described the involuntariness of the branding process in the pressure she felt to move forward with the procedure because of the collateral, which she characterized as a "gun" to her head. (Transcript, p. 802.) This is the very definition of coercion.

The collateral included titles to cars and houses, letters about illicit drug use and sexual deviance, and nude photos, some of which showed explicit images of genitalia. (Exhibit 14a; Transcript, p. 802, 857, 1353, 1941-1942, 1686, 1738, 1884.) Even Dr. Mayer acknowledged the women could view the collateral as coercive (Transcript, p. 1537), describing it as "a factor to consider in the voluntariness of their actions." (Transcript, p. 1528.) Dr. Grant confirmed that under these circumstances, there can be no informed consent. (Transcript, p. 1182.) The Hearing Committee was not persuaded by the Respondent's comparison of the branding process to the brandings in the "African American fraternity known as the Omegas" (Respondent's brief, p. 18-19) because while the fraternity members experience painful brands to symbolize their "bond" and "life-long membership in the fraternity," they are not coerced into being branded by having to submit potentially harmful collateral. (Respondent's brief, p. 18-19.)

Particularly troubling to the Hearing Committee was the evidence establishing the women were purposefully not told what symbol would be branded onto their bodies. (Exhibit 14a; Transcript, p. 798, 802, 1182, 1660, 1685, 1884, 1941.) S.E. confirmed this when she testified "(a)t no point did anyone say these are Keith's initials. It was only revealed to me later." (Transcript, p. 798.) The Respondent, however, did know that the symbol was KAR to represent Keith Raniere's initials. (Transcript, p. 1387-1388, 1353,

Exhibit C  024

1355, 1392, 1394.) She claims she did not disclose it to the women because it wasn't her "business" or "responsibility" and doing so would have breached her "lifetime vow of obedience" to DOS. (Transcript, p. 541, 1353-1355.) The Hearing Committee rejects these excuses and finds that regardless of her commitment to DOS, she had a duty as a physician to disclose what she was doing in the same way a plastic surgeon would be required to describe the pigment, shape, and appearance of a nipple for a nipple areola tattooing procedure. (Transcript, p. 1107.) The Hearing Committee agrees with Dr. Grant that the Respondent's failure to disclose the brand symbol to the women deviated from the standard of care. (Transcript, p. 1178, 1182.)

The Hearing Committee unanimously determined that the Respondent's conduct constituted professional misconduct as defined in Educ. Law §6530(2), practicing the profession fraudulently. Fraudulent practice requires "proof of either an intentional misrepresentation or concealment of a known fact" and "intent or knowledge" can be inferred. Patin, *supra* at 1214. The Hearing Committee finds the Respondent's admission that she knew what the brand symbol was and her decision not to disclose it represents an intentional concealment of a known fact. The Respondent violated an important aspect of informed consent by branding the women without making them fully aware of what the brand symbol was or what it represented.

The Hearing Committee unanimously determined that this conduct also constitutes professional misconduct as defined in Educ. Law §6530(20), moral unfitness to practice medicine; professional misconduct as defined in Educ. Law 6530(31), willfully harassing, abusing, or intimidating a patient; and professional misconduct as defined in Educ. Law §6530(26), performing professional services which have not been duly authorized by the patient. Moral unfitness is conduct that "violat[es] the trust the public bestows on the medical profession and/or violate[es] the medical profession's moral standards." Such conduct is suggestive of, or would tend to prove, moral unfitness. Patin, *supra* at 1215 *citing* Matter of

Exhibit C  025

Prado v. Novello, 301 A.D.2d 692, 694 (3d Dept. 2003). The Respondent's medically reckless performance of the brandings caused the women significant harm without apprising them of the brand symbol. Physicians are strictly prohibited from going above and beyond what the patient expects when performing a medical procedure.

## **Vanguard Week**

The Petitioner also charges the Respondent with failing to report a communicable disease, an unusual outbreak, or a disease outbreak involving a gastrointestinal illness during the annual NXIVM retreat at the Silver Bay YMCA, as required under the New York State Sanitary Code. (Petitioner's brief, p. 72-73.) The Respondent admits she did not report the outbreak of the gastrointestinal illness during the event to public health officials but claims she was not required to because she was on vacation and since "garden variety" stomach viruses, which are "unpleasant but not lethal," are not "communicable" or "unusual" to meet the mandatory reporting requirements under the regulation. (Respondent's brief, p. 21-22; Transcript, p. 733, 1294.) Physicians are required to report a "communicable disease" or "(a)ny disease outbreak or unusual disease" to public health officials. 10 NYCRR 2.10(a)-(c). An outbreak is defined as "an increased incidence of disease above its expected or baseline level" 10 NYCRR 2.2(d).

In support of its charges, the Petitioner presented as a witness infectious disease specialist Bruce Frederick Farber, M.D., whose testimony the Respondent failed to refute. The Hearing Committee noted Dr. Farber's impressive background includes 30 years of experience as an infectious disease specialist, including head of infectious disease for Northwell Health and in charge of the infectious disease programs at North Shore University Hospital and LIJ Medical Center. (Exhibit 6; Transcript, p. 959.) The majority of the Hearing Committee agreed with his professional opinion that the Respondent's duty as a physician to report this illness applied to her even if she was on vacation. (Transcript, p. 993, 995.) The Committee decided 2-1 that while the illness fails to meet the criteria under the regulation as "communicable" or

Exhibit C  026

"unknown" — presumably because it was never reported or investigated — it did constitute a "disease outbreak" that the Respondent as a physician was required to report regardless of whether or not she was on vacation. 10 NYCRR 2.1(c); 10 NYCRR 2.2. (Transcript, p. 993, 995, 998-999.) Dr. Farber made clear that her failure to fulfill this duty was a significant deviation from the standard of care. (Transcript, p. 991, 994.)

The evidence established this "obvious" illness affected a large group of people among the more than 400 attendees in a confined location, all of whom had similar symptoms. (Transcript, p. 990-991, 993, 999.) This is the precise definition of a "disease outbreak." 10 NYCRR 2.1(c), 10 NYCRR 2.2(d). The majority of the Hearing Committee agreed with Dr. Farber that the Respondent's failure to report it was especially egregious because it subjected the elderly and other vulnerable individuals, such as those with conditions or diseases like cancer, renal failure, and pregnancy, to potentially dangerous consequences like dehydration requiring hospitalization. (Transcript, p. 974-975.) The majority of the Hearing Committee also agreed with his opinion that based on her hospitalist experience that required her to complete an infection control course covering this subject, the Respondent should have known to report the illness. (Transcript, p. 972-973, 979.) Dr. Farber emphasized the importance in following this rule to "shut down" and properly "clean" the facility to prevent the illness from contaminating others and to determine its etiology. (Transcript, p. 980, 984.)

The Hearing Committee voted 2-1 that the Respondent's failure to report a disease outbreak constituted professional misconduct as defined in Educ. Law § 6530(21), a willful failure to file a report required by law; professional misconduct as defined in Educ. Law § 6530(16), a willful or grossly negligent failure to comply with substantial provisions of state laws governing the practice of medicine; professional misconduct as defined in Educ. Law § 6530(3), practicing the profession with negligence on

27

Exhibit C  027

more than one occasion; and professional misconduct as defined in Educ. Law § 6530(5), practicing the profession with incompetence on more than one occasion.

### Penalty

In considering the full spectrum of penalties under PHL § 230-a, including revocation, suspension, probation, censure and reprimand and the imposition of civil penalties, the Hearing Committee unanimously determined, by vote of 3-0, that the penalty of revocation of the Respondent's medical license is appropriate. The Hearing Committee determined that the Respondent engaged in 12 forms of professional misconduct, all of which it addressed in this hearing decision and sustained. The Respondent says she joined NXIVM with a goal to "enrich (her) skills as a doctor." (Transcript, p. 219.) The evidence shows, however, that she deliberately chose to adhere to her DOS "vows of obedience" instead of providing the women she branded with "all the things that a physician does" because to do so would have resulted in "breaking (her) vow" and "went quite the counter to what the whole purpose was." (Transcript, p. 1442-1443.) In other words, when faced with any conflict between NXIVM and her responsibilities as a physician, she chose NXIVM. For these reasons, the Hearing Committee believes she abdicated her values as a physician and failed her profession, herself, and everyone else involved.

The Hearing Committee recognizes the Respondent's tremendous future potential as a physician who excelled in every undertaking from becoming a skilled gymnast to graduating college with honors and earning dual degrees — osteopathic medicine and a master's in clinical nutrition — and then as an entrepreneur building a family medical practice and developing Exo/Eso, the physical fitness company within NXIVM she co-developed with Keith Raniere. (Transcript, p. 1255-1256.) The Hearing Committee is deeply troubled, however, by her unwillingness to admit regrets. (Transcript, p. 228, 1248-1249, 1252, 1255-1256, 1259, 1412, 1445, 1455-1456.) Instead of holding herself accountable for harming S.E., for example, she accused S.E. of victimizing herself. (Transcript, p. 1412-1413.) The only sadness she

Exhibit C  028

expressed was that the branding "was twisted into something it wasn't" and that "it has been used to scare people." (Transcript, p. 1455-1456.) The Respondent denies being brainwashed, yet she expressed no real remorse, which represented to the Hearing Committee her distorted reality and the very real concern that others remain vulnerable to her future brandings. (Transcript, p. 1453, 1719, 1753.)

The Hearing Committee is hopeful that the Respondent will regard the volume of sustained charges in this hearing decision as an opportunity to reflect on her poor choices and reeducate herself professionally and personally.

Exhibit C  029

## Order

Based upon the foregoing, IT IS HEREBY ORDERED THAT:

1.     The first through forty-seventh specifications of professional misconduct set forth in the Statement of Charges are <u>Sustained</u>.

2.     The Respondent's license to practice medicine in the State of New York is hereby <u>Revoked</u> under PHL § 230-a(4).

3.     This Determination and Order shall be effective upon service on the Respondent in compliance with PHL § 230(10)(h).

DATED:     Albany, New York
           September 27, 2021

Steven Lapidus, M.D., Chairperson

Ramanathan Raju, M.D.
Joan Martinez McNicholas

Exhibit C  030

TO:    Jeffrey J. Conklin, Associate Counsel
       New York State Department of Health
       Division of Legal Affairs
       Corning Tower Building, Room 2517
       Empire State Plaza
       Albany, New York  12237

       Anthony Z. Scher, Esq.
       800 Westchester Avenue
       Suite N-641
       Rye Brook, New York, 10573

Exhibit C  031

Wisconsin Department of Safety and Professional Services
Division of Legal Services and Compliance
4822 Madison Yards Way
PO Box 7190
Madison WI  53707-7190
**RETURN SERVICE REQUESTED**

Phone: 608-266-2112
Web: http://dsps.wi.gov
Email: dsps@wisconsin.gov

**Tony Evers, Governor**
**Dawn B. Crim, Secretary**

November 19, 2021


DIVISION OF HEARING AND APPEALS
ATTN: KRISTIN P. FREDRICK, ALJ
4822 MADISON YARDS WAY, 5TH FLOOR NORTH
MADISON, WI 53705


     Re:  DHA Case No. SPS-21-0080 and DLSC Case No. 18 MED 161 Danielle D. Roberts, D.O.

Dear Administrative Law Judge Frederick,

Enclosed please find for filing in the above matter the Division's Amended Complaint.

The Division hereby amends its Complaint in this matter to plead only a violation of Wis. Admin. Code Med §10.03(3)(c) based solely on the New York Determination and Order.  Pursuant to the scheduling order, the Division will move for summary judgment on the basis that there is no genuine issue of fact or law that the New York Determination and Order constitutes an adverse action by the New York Board against Respondent's license to practice medicine in that state. The Division does not object if Respondent wishes to stand by her original answer in this matter.

By filing this Amended Complaint, the Division does not concede the other violations pled in its original Complaint.  However, the Division believes this matter may be resolved on summary judgment and subsequent discipline by the Board, without the need for additional discovery by either party.  Since all involved share an interest in avoiding unnecessary litigation time and expense, the Division requests that its motion for summary judgment be decided prior to the current witness and exhibit deadlines.  In the alternative, the Division asks that those deadlines be held in abeyance until after the motion is decided, to be reset at that time, as needed.

Sincerely,

Colleen L. Meloy, Attorney
Division of Legal Services and Compliance
Direct Dial: 608-261-8779  Fax:  608-266-2264
colleen.meloy@wisconsin.gov

Enclosure

**Coach summit Brands:**
**16 total**

**Summit schedule:**
Thurs: Albany coaches hosting
Friday: FoF formal night
Sat: Follies

**Need 4 nights:**

**Option 1:**
Day 0: Wed: practice during volley

Day 1: Thursday
      6-9pm – Lola Circle 1: 3 – arriving wed, leaving sunday am.
      9-12pm – Nik – 3; arriving wed night 940, leaving Sunday 4pm

Day 2: Friday (formal night) – ends 9 or 10pm
      8-10pm - India: 2
      10pm-1am – Lola Circle 2: 3

Day 3: Sat (follies) ends 9-10pm
      9-10 – Dani – 1
      10-12am – Ale - 2

Day 4: Sunday
      5-6 – Lauren – 1
      6-8 – Jimena – 2


*Michele and Sylvie's circles are not being branded per Michele.

**Option 2:**
Day 0: Wed: practice during volley

Day 1: Thursday (Can change order of these)
      6-8pm - India: 2
      8-9 – Dani – 1
      9-12pm – Nik – 3; arriving wed night 940, leaving Sunday 4pm

Day 2: Friday (formal night)
      9pm-12 – Lola Circle 1: 3 – arriving wed, leaving sunday am.

Day 3: Sat (follies)

9pm-12am – Lola Circle 2: 3

Day 4: Sunday - Lola:
      6-7 – Lauren – 1
      7-9 – Jimena – 2
      9-11pm – Ale – 2

"Hello Masters;

Congratulations on this important milestone in your circles' growth!

I've noticed a few things that seems to help the process to run smoothly. This may help as you prepare your Circle for this special event.

I've noticed if they try to control the process, controlling when the cautery starts and stops, it takes away from their experience and slows the process down. I've also noticed if they can be fully present, without distractions of phone, meetings etc., they can be more present with the pain and less reactive to it. This may better support them in their process of experiencing a Self beyond the pain of their body and decrease yelling or reactions to the pain.

Bringing a bathing suit bottom or pair of panties that most nearly reflects the cut of their bathing suit also helps us find proper placement quickly.

The process takes about 1 hour per woman from stencil to clean up. Please do your best to come on time so that we finish before the next amazing group of woman come.

I will go over all care of the Brand as a group briefly before we end.  But here are some helpful tips:

1. Each new Brand will be covered with a tegaderm (clear adhesive bandage). This should be kept on overnight.
2. Remove the first tegaderm the next morning. Shower as usual. You may wash with soap and water.
3. Pat dry.  Use may use a little Neosporin, or coconut oil in the "groves" of the brand (just where the skin has been burnt).  Take care not to get it on healthy skin as the new bandage won't stick if you do.
4. Place a new tegaderm over the brand.
5. Wash and change the bandage once a day for a week.  Then you can stop covering the brand and use coconut or sesame oil as needed for cracking or drying.
6. I recommend boy shorts as panties for at least a week or cloths that prevent rubbing against the brand.
7. It may bleed a little the first day or so. This is normal.
8. Enjoy it!

 Gmail

Dr. Danielle Roberts <danielle@drdanielleroberts.com>

---

## Fwd: further explanation

1 message

**Sahajo Haertel** <sahajoh@gmail.com>
To: danielle@drdanielleroberts.com

Mon, Feb 3, 2025 at 7:58 PM

---------- Forwarded message ----------
From: **nicki clyne** <nclyne@gmail.com>
Date: Fri, Aug 27, 2021 at 12:38 PM
Subject: Fwd: further explanation
To: Sahajo Haertel <sahajoh@gmail.com>

The attachments show for me - let me know if this works.

> Begin forwarded message:
>
> **From:** nicki clyne <nclyne@gmail.com>
> **Subject: further explanation**
> **Date:** February 13, 2018 at 12:46:29 AM EST
> **To:** vanessagri@mac.com
>
> Hi Vanessa,
>
> How are you? I'm sorry for the delay, I've been traveling. I'm attaching an explanation of the brand symbol. It started with the Bar Alpha Mu design, and found ways the shapes contained within were also meaningful. At some point we discovered the KR resemblance when flipped and straightened, and we liked that too. I'm attaching drawings for your eyes only just in case the lines weren't clear.
>
> I've also continued to contemplate your questions. Though I'm sure I could talk ad nauseam about any of them, the only one I'm not sure I sufficiently answered was why the opposition may be making the claims they are, the way they are.
>
> I think it's important to note that the most vocal detractors were enthusiastic supporters of NXIVM and its tools for upwards of 13 years. They lived successful, happy, privileged lives. The idea that there was abuse during any of this time—without anyone's knowledge of it—is incredibly hard for me to believe. From what I could see, and I believe this can be verified through independent psychological surveys, they were healthy, productive and psychologically stable; I watched them continuously use NXIVM's tools to achieve their goals and enrich their lives.
>
> The only way I can explain the "trauma" that is being described, or even PTSD, is that something changed or occurred after they left. I think the cognitive dissonance theory helps explain the magnitude and direction of their motivation. (https://en.wikipedia.org/wiki/Cognitive_dissonance) Trauma can happen at any time. In this case, it either happened during their stay, or after they left. I believe, especially considering the above, the trauma was because they left, and their behavior around leaving. This involved lying to, and proactively hurting long-time friends. I have been hurt greatly by Sarah Edmondson's actions. She is a person I thought was a dear friend, the person who brought me into NXIVM, and a person who left and did not even contact me. If I thought one of my friends (even an acquaintance) I had personally enrolled in something might be in a bad situation, I would at least reach out to them to make sure they were ok. This has me questioning her intent. Seeing the benefits she has derived from her version of the circumstance only fortifies my sadness and skepticism.
>
> Without the cognitive dissonance they just would have left and gone on to live happy lives in another direction, as so many people have. To instead focus your energy on destroying the reputations, relationships and livelihoods of people who were once your friends is very confusing behavior from people who once stood for humanitarianism, ethics and personal growth. Not to mention that they are using the situation and media attention for personal gain. So, I find their behavior strange and their motives suspicious; the narrative they are creating is worlds apart from my own experience. I see people take ESP trainings and become better friends, parents, artists, entrepreneurs. I see the people who left choosing to publicly shame those who decide to stay and using the spotlight to boost their own public image. Regardless of anything, I don't agree with using the media to "enact justice." I also would be very curious to know what specifically the trauma is that they experienced, and when it occurred. Speaking for myself, nothing has changed. I still strive to uphold the same values I always have, and I feel more certain than ever of the necessity for a more critically thinking, honorable society. I hope this helps bring some clarity to the situation, or at least another way of understanding the conflict.
>
> Let me know if you have any other questions. I hope this finds you well, and I wish you the best with the rest of the piece!
>
> Sincerely,
> Nicki

---

4 attachments



**B1.jpeg**
24K

Case 1:20-cv-00485-EK-CLP    Document 329    Filed 11/14/25    Page 190 of 758 PageID #: 4929



**B2.jpeg**
31K



**B3.jpeg**
29K


**Symbology Notes.docx**
14K

Danielle Roberts, [28.01.17 18:18]
Lauren Salzman log:

These two were day 1 (12-18 hours after)

Then these two were this morning, day 2

And then lastly, tonight (so now we are almost 48 full hours later)

Day 3

Day 4.

5

Day 6

Day 7

Danielle Roberts:
You can let it air. It may scab and the scabbing may cause uneven healing.
But you can put oil (sesame, coconut, etc.) To keep moist and keep Tegaderm off

Lauren Salzman:
Should I keep it covered with like a non stick gauze or something?

I stopped using the tegaderm after the second day and used polysporine.

No, I used polysporine and the plastic. I'm sorry I thought tegaderm was the salve you gave me.
I used polysporine and the tegaderm.

I used gauze one day but the tape didn't hold as well.

Day 8.

Day 9.

Day 11

Yesterday I wore gauze with no ointment all day (and accidentally left the ointment home). The gauze stuck to the wound and it was very painful most of the day. I had to peel it off a couple times. When I got home I put neosporine and techaderm for the night and it feels better this morning.

It had scabbed on most of the outer sections all around but the middle is where it was still a biz oozy and got all stuck to the gauze.

Day 12

Danielle Roberts:
Day 13

Lauren Salzman:
Day 14

Day 15

Day 16

Day 17

I sent a second one bc you always see it just after the shower when it has been wet for a bit. It is a little dryer than it appears initially.

Danielle Roberts:
Day 18?

# BASIC NON-DISCLOSURE (NDA) AGREEMENT

This Nondisclosure Agreement (the "Agreement") is entered into by and between _____ with its principal offices at 7 Generals Way Clifton Park NY , ("Disclosing Party") and -------------------- ("Receiving Party") for the purpose of preventing the unauthorized disclosure of Confidential Information as defined below. The parties agree to enter into a confidential relationship with respect to the disclosure of certain proprietary and confidential information ("Confidential Information/Design").

1.  **Definition of Confidential Information.** For purposes of this Agreement, "Confidential Information" shall include all information or material that has or could have commercial value or other utility in the business in which Disclosing Party is engaged. If Confidential Information is in written form, the Disclosing Party shall label or stamp the materials with the word "Confidential" or some similar warning. If Confidential Information is transmitted orally, the Disclosing Party shall promptly provide a writing indicating that such oral communication constituted Confidential Information.

2.  **Exclusions from Confidential Information.** Receiving Party's obligations under this Agreement do not extend to information that is: (a) publicly known at the time of disclosure or subsequently becomes publicly known through no fault of the Receiving Party; (b) discovered or created by the Receiving Party before disclosure by Disclosing Party; (c) learned by the Receiving Party through legitimate means other than from the Disclosing Party or Disclosing Party's representatives; or (d) is disclosed by Receiving Party with Disclosing Party's prior written approval.

3.  **Obligations of Receiving Party.** Receiving Party shall hold and maintain the Confidential Information in strictest confidence for the sole and exclusive benefit of the Disclosing Party. Receiving Party shall carefully restrict access to Confidential Information to employees, contractors and third parties as is reasonably required and shall require those persons to sign nondisclosure restrictions at least as protective as those in this Agreement. Receiving Party shall not, without prior written approval of Disclosing Party, use for Receiving Party's own benefit, publish, copy, or otherwise disclose to others, or permit the use by others for their benefit or to the detriment of Disclosing Party, any Confidential Information. Receiving Party shall return to Disclosing Party any and all records, notes, and other written, printed, or tangible materials in its possession pertaining to Confidential Information immediately if Disclosing Party requests it in writing.

Download more templates from FPPT.com

4.   **Time Periods.** The nondisclosure provisions of this Agreement shall survive the termination of 99 Years, this Agreement and Receiving Party's duty to hold Confidential Information in confidence shall remain in effect until the Confidential Information no longer qualifies as a trade secret or until Disclosing Party sends Receiving Party written notice releasing Receiving Party from this Agreement, whichever occurs first.

5.   **Relationships.** Nothing contained in this Agreement shall be deemed to constitute either party a partner, joint venturer or employee of the other party for any purpose.

6.   **Severability.** If a court finds any provision of this Agreement invalid or unenforceable, the remainder of this Agreement shall be interpreted so as best to affect the intent of the parties.

7.   **Integration.** This Agreement expresses the complete understanding of the parties with respect to the subject matter and supersedes all prior proposals, agreements, representations and understandings. This Agreement may not be amended except in a writing signed by both parties.

8.   **Waiver.** The failure to exercise any right provided in this Agreement shall not be a waiver of prior or subsequent rights.

This Agreement and each party's obligations shall be binding on the representatives, assigns and successors of such party. Each party has signed this Agreement through its authorized representative.

_____ (Signature)

 (Printed Name)

Date: Jan/3/2017

_____ (Signature)

 (Printed Name)

Date: Jan/3/2017

Download more templates from FPPT.com

# BASIC NON-DISCLOSURE (NDA) AGREEMENT

This Nondisclosure Agreement (the "Agreement") is entered into by and between Danielle Roberts with its principal offices at 7 Generals Way Clifton Park NY , ("Disclosing Party") and Brian Decker, Pure Body Arts, located at 271 Manhattan Ave.  Brooklyn, NY ("Receiving Party") for the purpose of preventing the unauthorized disclosure of Confidential Information as defined below. The parties agree to enter into a confidential relationship with respect to the disclosure of certain proprietary and confidential information ("Confidential Information/Design").

1.   **Definition of Confidential Information.** For purposes of this Agreement, "Confidential Information" shall include all information or material that has or could have commercial value or other utility in the business in which Disclosing Party is engaged. If Confidential Information is in written form, the Disclosing Party shall label or stamp the materials with the word "Confidential" or some similar warning. If Confidential Information is transmitted orally, the Disclosing Party shall promptly provide a writing indicating that such oral communication constituted Confidential Information.

2.   **Exclusions from Confidential Information.** Receiving Party's obligations under this Agreement do not extend to information that is: (a) publicly known at the time of disclosure or subsequently becomes publicly known through no fault of the Receiving Party; (b) discovered or created by the Receiving Party before disclosure by Disclosing Party; (c) learned by the Receiving Party through legitimate means other than from the Disclosing Party or Disclosing Party's representatives; or (d) is disclosed by Receiving Party with Disclosing Party's prior written approval.

3.   **Obligations of Receiving Party.** Receiving Party shall hold and maintain the Confidential Information in strictest confidence for the sole and exclusive benefit of the Disclosing Party. Receiving Party shall carefully restrict access to Confidential Information to employees, contractors and third parties as is reasonably required and shall require those persons to sign nondisclosure restrictions at least as protective as those in this Agreement. Receiving Party shall not, without prior written approval of Disclosing Party, use for Receiving Party's own benefit, publish, copy, or otherwise disclose to others, or permit the use by others for their benefit or to the detriment of Disclosing Party, any Confidential Information. Receiving Party shall return to Disclosing Party any and all records, notes, and other written, printed, or tangible materials in its possession pertaining to Confidential Information immediately if Disclosing Party requests it in writing.

Download more templates from FPPT.com

4.   **Time Periods.** The nondisclosure provisions of this Agreement shall survive the termination of 99 Years, this Agreement and Receiving Party's duty to hold Confidential Information in confidence shall remain in effect until the Confidential Information no longer qualifies as a trade secret or until Disclosing Party sends Receiving Party written notice releasing Receiving Party from this Agreement, whichever occurs first.

5.   **Relationships.** Nothing contained in this Agreement shall be deemed to constitute either party a partner, joint venturer or employee of the other party for any purpose.

6.   **Severability.** If a court finds any provision of this Agreement invalid or unenforceable, the remainder of this Agreement shall be interpreted so as best to affect the intent of the parties.

7.   **Integration.** This Agreement expresses the complete understanding of the parties with respect to the subject matter and supersedes all prior proposals, agreements, representations and understandings. This Agreement may not be amended except in a writing signed by both parties.

8.   **Waiver.** The failure to exercise any right provided in this Agreement shall not be a waiver of prior or subsequent rights.

This Agreement and each party's obligations shall be binding on the representatives, assigns and successors of such party. Each party has signed this Agreement through its authorized representative.

_____ (Signature)

Danielle Roberts   (Printed Name)

Date: Jan/3/2017

_____ (Signature)

Brian Decker   (Printed Name)

Date: Jan/3/2017

Download more templates from FPPT.com

Roberts - 98

STATE OF WISCONSIN
BEFORE THE MEDICAL EXAMINING BOARD

---

| | |
|---|---|
| IN THE MATTER OF | : |
| DISCIPLINARY PROCEEDINGS AGAINST | : |
| | :    NOTICE OF HEARING |
| DANIELLE D. ROBERTS, D.O., | : |
|     RESPONDENT. | : |

---

Division of Legal Services and Compliance Case No. 18 MED 161

TO:    Danielle D. Roberts, D.O.
        215 Castle Ave.
        Westbury, NY 11590

PLEASE TAKE NOTICE that disciplinary proceedings have been commenced against you before the Wisconsin Medical Examining Board (Board). The Complaint, which is attached to this Notice, states the nature and basis of the proceeding. This proceeding may result in disciplinary action taken against you by the Board. This proceeding is a class 2 proceeding as defined in Wis. Stat. § 227.01(3)(b).

Within 20 days from the date of service of the Complaint, you must file a written Answer to the allegations of the Complaint. You may have an attorney help or represent you. The Answer shall follow the general rules of pleading contained in Wis. Admin. Code § SPS 2.09 and shall be filed as required by Wis. Admin. Code § SPS 2.08(2). If you do not provide a proper Answer within 20 days, you will be found to be in default and a default judgment may be entered against you on the basis of the Complaint and other evidence. In addition, the Board may take disciplinary action against you and impose the costs of the investigation, prosecution and decision of this matter upon you without further notice or hearing.

The original of your Answer should be filed with the Division of Hearings and Appeals, who has been designated to preside over this matter pursuant to Wis. Admin. Code § SPS 2.10, at the address listed below:

        **Division of Hearings and Appeals**
        **4822 Madison Yards Way**
        **Post Office Box 7875**
        **Madison, WI  53707-7875**
        **Telephone (608) 266-7709**

An Administrative Law Judge designated to preside over the matter will be assigned, and you will be notified of the assignment.

You should also file a copy of your Answer with the prosecuting attorney, who is:

Colleen L. Meloy
**Department of Safety and Professional Services**
**Division of Legal Services and Compliance**
**Post Office Box 7190**
**Madison, WI  53707-7190**
**Telephone (608) 261-8779**
**Fax (608) 266-2264**

A prehearing conference or a hearing on the matters contained in the Complaint will be held on a date and time to be determined in the future by the Division of Hearings and Appeals.

The legal authority and procedures under which the hearing is to be held are set forth in Wis. Stat. § 227.44, 448.02(3), and Wis. Admin. Code ch. SPS 2.

If you do not appear for the prehearing or the hearing when it is scheduled, you will be found to be in default, and a default judgment may be entered against you on the basis of the Complaint and other evidence. The Board may then take disciplinary action against you and impose the costs of the investigation, prosecution and decision of this matter upon you without further notice or hearing.

If you choose to be represented by an attorney in this proceeding, the attorney, after he or she has been retained by you, is requested to promptly file a Notice of Appearance with the Division of Hearings and Appeals and the prosecuting attorney.

A copy of the Complaint and of this Notice has been sent to the Division of Hearings and Appeals.  They will be contacting you in the near future to schedule a prehearing conference or hearing regarding this matter.

Dated 6th of October, 2021.

Colleen L. Meloy, Prosecuting Attorney
State Bar Number 1029855
Department of Safety and Professional Services
Division of Legal Services and Compliance
P.O. Box 7190
Madison, WI 53707-7190
(608) 261-8779
Colleen.Meloy@wisconsin.gov

2

cc:    Shelly Wang Bandago by scan
       Mary Kay Avellino by scan
       Donna Fitzgerald by scan
       opmcfinalactions@health.ny.gov by scan
       Mr. Weintraub by scan
       Mr. Conklin by scan
       Mr. Dawson
       SAPA File
       BOA by scan



**KATHY HOCHUL**
Governor

**HOWARD A. ZUCKER, M.D., J.D.**
Commissioner

**KRISTIN M. PROUD**
Acting Executive Deputy Commissioner

September 29, 2021

**CERTIFIED MAIL - RETURN RECEIPT REQUESTED**

Jeffrey J. Conklin, Esq.
NYS Department of Health
Corning Tower Room 2517
Empire State Plaza
Albany, New York 12237

Anthony Z. Scher, Esq.
800 Westchester Avenue
Suite N-641
Rye Brook, New York 10573

**RE: In the Matter of Danielle Roberts, DO**

Dear Parties:

Enclosed please find the Determination and Order (No. 21-206) of the Hearing Committee in the above referenced matter. This Determination and Order shall be deemed effective upon the receipt or seven (7) days after mailing by certified mail as per the provisions of §230, subdivision 10, paragraph (h) of the New York State Public Health Law.

Five days after receipt of this Order, you will be required to deliver to the Board of Professional Medical Conduct your license to practice medicine together with the registration certificate. Delivery shall be by either certified mail or in person to:

Office of Professional Medical Conduct
New York State Department of Health
Office of Professional Medical Conduct
Riverview Center
150 Broadway - Suite 355
Albany, New York 12204

If your license or registration certificate is lost, misplaced or its whereabouts is otherwise unknown, you shall submit an affidavit to that effect. If subsequently you locate the requested items, they must then be delivered to the Office of Professional Medical Conduct in the manner noted above.

As prescribed by the New York State Public Health Law §230, subdivision 10, paragraph (i), (McKinney Supp. 2015) and §230-c subdivisions 1 through 5, (McKinney Supp. 2015), "the determination of a committee on professional medical conduct may be reviewed by the Administrative Review Board for professional medical conduct." Either the licensee or the Department may seek a review of a committee determination.

Request for review of the Committee's determination by the Administrative Review Board stays penalties other than suspension or revocation until final determination by that Board. Summary orders are not stayed by Administrative Review Board reviews.

All notices of review must be served, by certified mail, upon the Administrative Review Board and the adverse party within fourteen (14) days of service and receipt of the enclosed Determination and Order.

The notice of review served on the Administrative Review Board should be forwarded to:

Jean T. Carney, Administrative Law Judge
New York State Department of Health
Bureau of Adjudication
Riverview Center
150 Broadway – Suite 510
Albany, New York 12204

The parties shall have 30 days from the notice of appeal in which to file their briefs to the Administrative Review Board.  Six copies of all papers must also be sent to the attention of Ms. Carney at the above address and one copy to the other party.  The stipulated record in this matter shall consist of the official hearing transcript(s) and all documents in evidence.

Parties will be notified by mail of the Administrative Review Board's Determination and Order.

Sincerely,

James F. Horan
Chief Administrative Law Judge
Bureau of Adjudication

JFH: nm
Enclosure

STATE OF NEW YORK : DEPARTMENT OF HEALTH
STATE BOARD FOR PROFESSIONAL MEDICAL CONDUCT
----------------------------------------------------------------------------x

<table>
<tr><td>IN THE MATTER</td><td>:</td><td>DETERMINATION</td></tr>
<tr><td>OF</td><td>:</td><td>AND</td></tr>
<tr><td>DANIELLE ROBERTS, D.O.</td><td>:</td><td>ORDER</td></tr>
</table>

----------------------------------------------------------------------------x

A Notice of Hearing and Statement of Charges dated March 5, 2020, and Amended Statement of Charges dated April 27, 2020, were duly served pursuant to § 230(10)(d)(i) of the Public Health Law (PHL) upon Danielle Roberts, D.O. (Respondent). (Exhibits 1, 1a; Appendix I.) Steven Lapidus, M.D., Chair, Ramanathan Raju, M.D., and Joan Martinez McNicholas, duly designated members of the State Board for Professional Medical Conduct, served as the Hearing Committee, and Dawn MacKillop-Soller, served as the Administrative Law Judge. PHL § 230(10)(e). The Department of Health, Bureau of Professional Medical Conduct (Department), appeared by Jeffrey J. Conklin, Esq. The Respondent appeared and was represented by Anthony Z. Scher, Esq.

The Hearing Committee voted 3-0 to sustain 45 specifications among ten definitions of misconduct set forth in the Education Law: willfully abusing a patient §6530(31); conduct in the practice of medicine which evidences moral unfitness §6530(20); failing to use appropriate infection control practices §6530(47); practicing the profession of medicine fraudulently §6530(2); practicing the profession with gross negligence §6530(4); practicing the profession with negligence on more than one occasion §6530(3); practicing the profession with gross incompetence §6530(6); practicing the profession with incompetence on more than one occasion §6530(5); performing professional services which have not been authorized by the patient §6530(26); and failing to maintain a record for each patient which accurately reflects the evaluation and treatment of the patient § 6530(32). The Hearing Committee also voted 2-1 to sustain two

additional specifications of misconduct: willfully failing to file a report required by law §6530(21) and willfully or grossly negligently failing to comply with substantial provisions of federal, state, or local laws, rules, or regulations governing the practice of medicine §6530(16).

The Hearing Committee unanimously determined to impose the penalty of revocation of the Respondent's medical license pursuant to PHL § 230-a(4).

### Hearing Record

| | |
|---|---|
| Pre-Hearing Conference: | May 28, 2020 |
| Hearing Dates: | June 2, July 1 & 6, August 12 & 14, September 9, October 21, November 3, December 2 & 15, 2020. January 8, February 19, March 2, 2021. |
| Witnesses for Petitioner: | Vasco Bilbao (Transcript, p. 61-189.) Danielle Roberts, D.O. (Transcript, p. 199-440, 514-757.) Ariella Cepelinski (Transcript, p. 443-490.) Michael Menashy (Transcript, p. 492-511.) S.E. (Transcript, p. 769-942.) Robert T. Grant, M.D. (Transcript, p. 1056-1238.) Bruce F. Farber, M.D. (Transcript, p. 955-1045.) |
| Petitioner's Exhibits: | 1, 1a, 2a, 2b, 3, 4, 6, 8d, 9, 14a, 15a, 16, 17, 35, 38, 45, 47-49 |
| Witnesses for Respondent: | Danielle Roberts, D.O. (Transcript, p. 1247-1461, 2106-2150.) David Mayer, M.D. (Transcript, p. 1469-1594.) M.H. (Transcript, p. 1594-1666.) Jane Doe 1 (Transcript, p. 1675-1720.) Jane Doe 2 (Transcript, p. 1726-1755.) Steve Arthur Haworth (Transcript, p. 1758-1840, 2094-2097.) E. Carlson (Transcript, p. 1845-1855.) R. Wolle (Transcript, p. 1856-1867.) Jane Doe 3 (Transcript, p. 1878-1930.) Jane Doe 4 (Transcript, p. 1934-1993.) Jane Doe 5 (Transcript, p. 1996-2092.) |
| Respondent's Exhibit: | A |
| ALJ Exhibit: | I |
| Written Submissions received: | June 2, 2021 |
| Deliberations held: | June 29, July 20, 2021 |

## **Findings of Fact**

The Hearing Committee unanimously makes the following findings of fact:

1.      Respondent Danielle Roberts, D.O., was authorized to practice medicine in New York State on October 5, 2009, by the issuance of license number 255075. (Exhibit 3.)

2.      The Respondent's background includes board certification and completion of a residency in family practice in 2011 followed by working as a physician and medical director between 2011 and 2013 at a large family practice caring for patients of all ages and with various conditions. From 2013 to 2018, she worked as a hospitalist at St. Peter's Hospital in Albany providing medical care to hospital patients from admission to discharge. Her background also includes seven years of locum tenens work at a hospital in Wisconsin and one year at a large integrative medical practice in Manhattan. (Exhibit 38; Transcript, p. 202, 206-207, 1249-1250, 1424-1425.)

3.      In 2013, the Respondent joined NXIVM, a personal development organization founded by Keith Raniere, also known as Vanguard. NXIVM is the parent company to several umbrella organizations, including ESP (Executive Success Programs), SOP (Society of Protectors), Ninth Media, DOS (dominus obsequious sororium, master/slave, master allegiance sisterhood), and Exo/Eso (fitness/exercise program), with multiple center locations in New York, California, Canada, and Mexico. (Exhibit 49; Transcript, p. 65, 184, 186-187, 224, 1255-1256, 1261, 1728.)

4.      In 2016, the Respondent joined DOS, a secret women's group developed by eight "1st line" or original members in collaboration with Keith Raniere. The claimed purpose of DOS was to empower women to build character, strength, and discipline by overcoming fears and pain to experience growth. The Respondent's involvement in DOS was "2nd line member" behind the "1st line" members. (Exhibits 14a, 49; Transcript, p. 234, 246, 252-253, 411-412, 526, 785, 1426, 1938, 2003.)

5.     Membership in DOS required a lifetime commitment or "vow of obedience" between master and slave, the exchange of collateral, a necklace or collar worn 24 hours every day to symbolize obedience and commitment, and a brand placed by an electrocautery device to the pelvic region as part of a branding ceremony. The vow required slaves to strictly follow their masters' orders and keep DOS completely secret. The goal of the branding was to overcome pain and create solidarity. (Exhibit 14a; Transcript, p. 240-243, 255-256, 358-359, 1265, 1268, 1730, 1747-1750, 1888, 1938-1939.)

6.     The brandings of the women, including S.E., A.M., J.G., C.G., A.C., and L.S., occurred only after they committed to join DOS and submitted multiple forms of acceptable collateral. Acceptable collateral included titles to houses and cars, investment and bank accounts, businesses, nude photographs, incriminating letters and/or written confessions detailing sexual deviance, illicit drug use, extramarital affairs, and/or embarrassing family matters. The collateral coerced the women into keeping DOS secret and maintaining their commitment and was subject to public release if the women breached these requirements. (Exhibit 14a; Transcript, p. 243-246, 358-359, 781, 783, 796, 815, 859, 894, 1730, 1747-1748, 1967, 1969, 2054-2055.)

7.     An electrocautery device generates electrical energy that is converted to heat for cutting through skin or solid organs, dissection, separating planes between tissues, hemostasis to stop or seal off bleeding blood vessels or lymphatics during procedures, and for electrocautery branding to place a scar on the body. While an electrocautery device can be used as a scalpel, it is not intended to be used directly on the skin surface because it can cause significantly more skin damage extending beyond the tip or point of contact. (Transcript, p. 1072, 1074, 1224, 1541.)

8.     A smoke evacuator must be used with an electrocautery device to remove dangerous particulate matter such as viruses, infectious diseases, blood cells, and other antigens released from the

device upon contact with skin and tissue and prevent them from being absorbed or inhaled. (Transcript, p. 1074, 1082.)

9.    Electrocautery branding is a form of body modification in which an electrical arch on the electrocautery device vaporizes the skin and leaves behind undamaged skin and tissue but not a 2nd degree burn. (Transcript, p. 1787-1788.)

10.    Prior to performing the branding procedures on the women, including S.E., A.M., J.G., C.G., A.C., and L.S., the Respondent was required, under acceptable standards of medical conduct that apply to physicians, to complete training in the use of an electrocautery device. The training involves: (1) regulating the settings considering skin anatomy for the appropriate amount of energy transmitted through the tip; (2) grounding the device; (3) using personal protection equipment; and (4) safely operating and maintaining the device, including the use of a smoke evacuator. The Respondent never completed such training. (Transcript, p. 1070-1079, 1082-1087, 1125-1126, 1322-1325, 1327-1328.)

11.    Beginning in January of 2017 and continuing through March of 2017, the Respondent used a Medline Valley Lab Surgistat electrocautery device and a stencil to brand "KAR," the initials of Keith Raniere, into the pelvic regions of 17 women, including S.E., A.M., J.G., C.G., A.C., and L.S., most of whom were nude. The brandings were done without anesthesia to intentionally cause them pain. (Exhibits 8D, 45, 47; Transcript, p. 313, 339, 416, 524, 584-585, 635-640, 692, 1331-1332, 1353, 2107-2108.)

12.    The branding procedures occurred in a small room of a house and took between 20 and 45 minutes to complete. They were videotaped with a cell phone while a group of women used their bare hands and/or naked bodies to hold down the woman branded to keep her still and supine on the massage table. (Exhibit 8D; Transcript, p. 308, 313-314, 330, 524, 636, 804, 821, 827, 1333-1334, 1377, 1416, 1421.)

13.    The Respondent's conduct in performing the brandings on S.E., A.M., J.G., C.G., A.C., L.S. and the other women constituted the practice of medicine by a physician. The Respondent relied on her medical training, education, and background when she performed the procedures to alter the skin and physical condition of their pelvic regions. (Transcript, p. 1110, 1115-1116, 1129, 1176.)

14.    The brandings performed by the Respondent while licensed as a physician were medical procedures in which standards of medical practice apply. (Transcript, p. 1097, 1109, 1112, 1129, 1163.)

15.    An electrocautery device must be properly grounded to ensure the safe return of the electrical energy from the person treated with the electrocautery device back to the grounding pad, which is affixed to that person. This process involves ensuring the operator and participants are properly insulated to prevent a burn by wearing gloves to avoid serving as the ground themselves. The women participants were not wearing gloves. (Transcript, p. 342, 638, 696, 1074, 1079-1080, 1082, 1154.)

16.    Physicians using an electrocautery device to perform procedures must adhere to infection control standards applicable to physicians performing invasive procedures on the human body. They must maintain a sterile field and sterile environment by: (1) applying draping around the surgical site and as a barrier to block off unsterile areas; (2) using an antibacterial cleaning solution to clean the room, surfaces, table, and equipment between cases and terminally at the end of the day; and (3) requiring all participants wear personal protection equipment, including sterile gloves, masks, and eye shields. The purpose in these requirements is to prevent infection. The Respondent followed none of these infection control procedures. (Exhibit 8D; Transcript, p. 341-342, 522, 536, 638, 1097-1098, 1100-1105, 1125, 1130, 1160-1161.)

17.    Physicians using electrocautery devices must also adhere to operational standards by performing and documenting routine testing and service of the electrocautery device and confirming sufficient electrical output in the room where the device is used. The purpose in these rules is to prevent a surgical or electrical fire during a procedure. (Transcript, p. 1071, 1097-1098, 1100.)

18.    The Respondent's failures to maintain proper infection control standards and operational procedures while using an electrocautery device that inflicted 2nd degree burns on the women were severe deviations from the standard of care. (Transcript, p. 1124-1125, 1132.)

19.    In using an electrocautery device to perform the brandings without anesthesia, the Respondent caused the women, including S.E., A.M., J.G., C.G., A.C., and L.S., significant physical pain, 2nd degree burns, and abnormal permanent and/or raised keloid and hypertrophic scarring, and placed them at risk for harm, including deeper 3rd and 4th degree burns and psychological trauma like post-traumatic stress disorder (PTSD) or anxiety. (Exhibits 14a, 45, 47; Transcript, p. 579, 1079-1090, 1124-1130, 1133-1146, 1154, 1209, 1377, 1403, 1421.)

20.    In subjecting the women to significant pain from the electrocautery device, the Respondent was required to administer them, or at the very least offer, anesthesia, such as a local anesthetic, to alleviate the pain. The Respondent had no legitimate medical reason, such as an allergy or an emergency, for neither providing the women anesthesia nor presenting them with this treatment option. (Transcript, p. 339, 635, 1073, 1086.)

21.    The Respondent's failure to administer or advise and offer anesthesia to the women was a severe deviation from the standard of care. Physicians are ethically prohibited from causing patients such extreme harm on purpose. (Transcript, p. 1073, 1124-1125, 1131-1132, 1210-1211.)

22.    The Respondent never informed the women she branded that the brand was KAR to represent Keith Raniere's initials or that it would measure approximately two inches by two inches. The brand was intentionally placed upside down and backwards on most of the women to conceal Keith Raniere's initials. S.E., A.M., J.G., C.G., A.C. and others had falsely been told by their masters that the brand represented "a symbol of the sorority," "a line of the sun and the earth and certain elements," an "abstract symbol," "chakras," and/or "four elements," and that the size would be "little," "small," and/or

"dime sized." Only L.S., as a "1st line" member, knew prior to her branding that the brand represented Keith Raniere's initials. (Exhibit 14a; Transcript, p. 351, 541-542, 787, 797-802, 904, 1355, 1450, 1685-1686, 1739, 1882, 1939, 1941-1942.)

23.    Prior to performing the branding procedures on the women, the Respondent was required to obtain their voluntary, verbal and/or written informed consent that reflected a discussion of the psychological and physical risks, benefits, and alternatives to the procedure, including the option not to proceed; the pain involved and the option of anesthesia; details of the brand symbol; and consideration of the individual's psychological and medical histories, comorbidities, and medications. The purpose of obtaining informed consent is to confirm the women have a complete understanding of the procedure and to avoid complications. The Respondent did not obtain such consent from any of the women. (Transcript, p. 435-437, 538-540, 1098, 1124-1125, 1164-1168, 1178-1182, 1985.)

24.    The Respondent's infliction of the branding procedures on the women without obtaining their voluntary verbal and/or written informed consent was a severe deviation from the standard of care. Informed consent must be voluntary and not in connection with coercion under the threat of disclosure of personal and potentially damaging or destructive collateral. (Transcript, p. 1098, 1124-1125, 1132, 1178-1183.)

25.    Physicians are obligated to provide proper care of 2nd degree burn wounds that includes application of antibacterial ointment and treatment plans that include follow-up physician monitoring. Providing this care is critical to ensure proper wound healing and to prevent infection. The Respondent failed to provide this care. (Transcript, p. 542-545, 624-625, 1164, 1166-1167, 1171, 1349, 2114.)

26.    The Respondent's failure to provide proper treatment and follow-up care of the 2nd degree burn wounds was a severe deviation from the standard of care. (Transcript, p. 1093-1096, 1123-1124, 1128, 1164, 1166-1167, 1171, 1174.)

27.     Following completion of the branding procedures, the Respondent instructed the women to submit photos of their brands to their masters every day for 30 days and then one time per week. The Respondent evaluated and kept the photos but never made them part of a medical record because she never prepared or maintained such records for the women. (Transcript, p. 377, 379, 540, 543, 547-549, 556.)

28.     Physicians performing medical procedures involving the infliction of wounds are required to prepare, maintain, and document medical records that include photographs of the wound and details of the procedure, the equipment used, physical evaluations, diagnosis, treatment plans, and post-procedure instructions. The Respondent severely deviated from the standard of care by failing to prepare and maintain medical records to apprise outside providers of the treatment provided. (Transcript, p. 1173-1174.)

29.     In 2016, the Respondent participated in a ten-day annual NXIVM corporate retreat known as "Vanguard week" at the Silver Bay YMCA Family and Retreat Center, located in Silver Bay, New York. The purpose of the event was to celebrate the birthday of Keith Raniere. The attendees included more than 400 NXIVM members. (Exhibit 17; Transcript, p. 80, 90-93, 451-452, 456, 478, 496, 708, 710.)

30.     During the event and while attending it, the Respondent became aware of a gastrointestinal illness affecting many of the attendees. Among the attendees were children, a woman with end-stage cancer, and a pregnant woman. The symptoms of the illness included diarrhea, nausea, vomiting, dehydration, and fatigue. This illness placed the attendees and the public at risk for harm, including gastrointestinal morbidity and dehydration, which is a particular concern for people with comorbidities like cancer. (Transcript, p. 84-85, 454, 455, 485, 498-499, 505, 714-715.)

31.     This illness constituted a disease outbreak because it involved a large group of people who developed similar symptoms while attending the same event in a confined environment. Physicians are required under Department of Health regulations to report a communicable disease or any disease outbreak

or unusual disease to public health officials. 10 NYCRR 2.10. The Respondent failed to take any steps to comply with these requirements. (Transcript, p. 972, 991.)

32.    The Respondent's failure to report the infectious disease outbreak was a violation of public health regulations and a significant deviation from the standard of care for a physician. (Transcript, p. 991.)

### Factual Allegations

By email correspondence dated March 1, 2021, the Petitioner withdrew factual allegations G.3 and G.4. (ALJ I.) The Hearing Committee sustained all the remaining Factual Allegations in the Statement of Charges.

The Hearing Committee sustained, by unanimous vote (3-0):

Factual Allegations A.1, A.2, A.3, A.4, A.5, A.6, A.7, A.8, A.9, A.10, A.11, A.12, A.13, A.14, A.15, B.1, B.2, B.3, B.4, B.5, B.6, B.7, B.8, B.9, B.10, B.11, B.12, B.13, B.14, B.15, C.1, C.2, C.3, C.4, C.5, C.6, C.7, C.8, C.9, C.10, C.11, C.12, C.13, C.14, C.15, D.1, D.2, D.3, D.4, D.5, D.6, D.7, D.8, D.9, D.10, D.11, D.12, D.13, D.14, D.15, E.1, E.2, E.3, E.4, E.5, E.6, E.7, E.8, E.9, E.10, E.11, E.12, E.13, E.14, E.15, F.1, F.2, F.3, F.4, F.5, F.6, F.7, F.8, F.9, F.10, F.11, F.12, F.13.

The Hearing Committee sustained, by majority vote (2-1):

Factual Allegations G.1, G.2.

### Evaluation of the Respondent's Testimony

The Respondent testified on her own behalf and as a witness for the Petitioner. Although considered incidental by the Hearing Committee in deciding central issues in this case, the Hearing Committee believes it is worth noting the Respondent's evasiveness, defiance, and inconsistencies on various points. For instance, she refused to disclose: (1) the circumstances of her becoming involved in NXIVM (Transcript, p. 218); (2) the initials of the women she branded (Transcript, p. 315-316); (3) the whereabouts of the branding videos and whether she maintained them (Transcript, p. 328, 331); (4) how it was determined the brandings would be videotaped (Transcript, p. 331); (5) who was present when she branded L.S. (Transcript, p. 333); (6) the roles of the women in the room with L.S. during the branding

(Transcript, p. 336); (7) whether L.S. was clothed during the branding (Transcript, p. 335); (8) what the brand represented (Transcript, p. 351); and (9) whether L.S.'s limbs were held down when she was branded (Transcript, p. 337). Despite being directed to answer these questions when they were asked, the Respondent never did. She also initially refused to disclose whether she was branded with Keith Raniere's initials (Transcript, p. 518-519) but then finally admitted — consistent with the other evidence — that she was branded and that the brand was KAR to represent his initials. (Exhibits 14a and 49; Transcript, p. 1312, 1352-1352, 1388, 1391-1393, 1396.)

Further inconsistencies include her initial testimony that she was unaware of the details of the electrocautery device she used, stating it was "purchased by the friend that invited me" (Transcript, p. 266, 269), and her later testimony that she purchased it, identifying the model and manufacturer. (Transcript, p. 2108.) She also initially testified that DOS was "a completely separate organization" from NXIVM and Keith Raniere was not its "leader" (Transcript, p. 253) and that L.S., a 1st line member, had "no master" (Transcript, p. 381), but then later admitted that Keith Raniere was the "grandmaster" to the 1st line members (Transcript, p. 1387), who were his "slaves." (Transcript, p. 1389.)

The Hearing Committee finds these factors significantly diminished the Respondent's credibility and evaluated her testimony accordingly.

## The Practice of Medicine

The Hearing Committee was not persuaded by the Respondent's arguments that the Board lacks subject matter jurisdiction to bring charges against her because she "was not engaged in the practice of medicine" and that branding "is not a medical procedure." (Respondent's brief, p. 2.) The Hearing Committee finds the Petitioner correctly argues the Respondent "performed medical procedures when she branded the DOS women" and that "the brandings fell within the definition as to what constitutes the

practice of medicine" and agrees with its reliance on Courts having a long-standing history of interpreting Educ. Law §6521 broadly to support these positions. (Petitioner's brief, p. 12-13.)

The practice of the profession of medicine is defined as "diagnosing, treating, operating or prescribing for any human disease, pain, injury, deformity or physical condition." Educ. Law § 6521. Whether conduct constitutes the practice of medicine is a determination to be made by the Hearing Committee based on the facts presented. Addei v. State Board for Professional Medical Conduct, 278 AD2d 551, 552 (3d Dept. 2000); See also Educ. Law §6504. This determination must be based solely on the facts "and not upon the name of the procedure, its origins or legislative lack of clairvoyance." People v. Amber, 76 Misc. 2d 267, 273 (Sup. Ct. Queens Co. 1973).

The reported decisions relied on by the Petitioner that the Hearing Committee finds convincing on this point include People v. Amber, supra at 273, in which the Court described its interpretation of Educ. Law §6521 as "a statute intended to regulate, limit or control the diagnosis and treatment of ailments must be read broadly to include the gamut of those known, whether or not recognized and even those not yet conjured." (Petitioner's brief, p. 12-13.) See also, People v. Mastromarino, 148 Misc. 454, 455 (Sup. Ct. Kings Co. 1933); People v. Rubin, 103 Misc.2d 227, 234 (N.Y. City Crim. Ct. Queens Co. 1979). The Respondent acknowledges that while branding "arguably involves operating," the operations were not "for a human disease, pain, injury, deformity or physical condition," and so did not fit the statute because the women were "perfectly healthy and normal in all respects" when they received the brands. (Respondent's brief, p. 3-4.)

The Respondent relies on Matter of Gross v. Ambach, 71 NY2d 859, 861 (1988), in which the Court of Appeals determined autopsies constitute the practice of medicine because they are "the ultimate diagnostic procedure" to diagnose the cause and manner of death. (Respondent's brief, p. 3-4.) The Hearing Committee finds the only similarity to be drawn between the two cases is that the statute somehow

does not fit. There because autopsies are not practicing medicine since medicine can only be practiced on "living" patients and here because the women were "normal and healthy" when they were branded. <u>Gross</u>, *supra* at 861. In any event, the Hearing Committee, like the Court of Appeals in <u>Gross</u>, declines to limit the statue in that regard. *Id.* (Respondent's brief, p. 4.) The Hearing Committee rejects the Respondent's claim that it is "blatantly obvious" that the Respondent's "operating" on the women was not for "a human disease, pain, injury, deformity or physical condition" to meet the criteria under the statute. (Respondent's brief, page 3.) To the contrary, it is glaringly obvious to the Hearing Committee that she was operating on the women to alter the skin, appearance, and physical condition of their pelvic regions regardless of whether they were "normal and healthy." (Transcript, p. 1110-1111, 1116.)

The Petitioner presented as a witness plastic surgeon Robert T. Grant, M.D. While Dr. Grant lacks branding experience, the Hearing Committee noted his expertise and credibility on the main issues in this case were established by his decades of experience as a board-certified specialist in general and plastic surgeries performing cosmetic procedures, such as body piercings and nipple and areola tattooing to complete a breast reconstruction, and as Chief of Plastic Surgery at NewYork-Presbyterian Hospital, program director for the residents training program, and Professor of Surgery at Columbia University. (Exhibit 4; 1060-1066, 1185-1186.)

The Respondent presented as a witness general surgeon David Mayer, M.D. The Hearing Committee noted Dr. Mayer's extensive and diverse background as a practicing healthcare attorney and board-certified surgeon with 40 years of experience, including current privileges at three ambulatory facilities, teaching at three medical colleges, and prior Chair of Surgery at Syosset Hospital, where he performed thousands of surgeries, directed a laparoscopic fellowship program, and trained residents. (Transcript, p. 1469-1471, 1505.) Despite his considerable medical and legal experience, the Hearing

Committee was not persuaded by his professional opinions on the issue of the practice of medicine due to contradictions in his testimony.

For instance, Dr. Mayer insisted the Respondent was a branding technician able to "put aside her white coat" as a physician when she performed the brandings, yet he described himself as "always a physician" who doesn't "stop being a physician...at different times." (Transcript, p. 1569, 1579-1580.) His position that she was acting as a branding technician was also inconsistent with his testimony that "you never forget your training and education" (Transcript, p. 1566-1567.) Another example is his testimony that physicians should not cause extreme pain while also refusing to discuss the "ethics" of the Respondent causing the women such pain and insistence that her osteopathic oath to do no harm and prevent pain did not apply. (Transcript, p. 1528, 1531.) The Hearing Committee considered such inconsistencies, noted his long-standing history of providing expert witness services in hundreds of civil cases to law firms and other private companies, and evaluated his testimony accordingly. (Transcript, p. 1499.)

While the Hearing Committee was not persuaded by Dr. Grant's professional opinion that the Respondent was practicing medicine because she addressed "psychic pain" the women were experiencing, it did agree with his testimony that the brandings are the practice of medicine under Educ. Law §6521 because they were "surgical," involving "violating the epidermis and getting into the deeper layers of skin," and performed to "alter the skin" or physical condition of the women. (Transcript, p. 1110-1111, 1114, 1116.) The Respondent attempted to contrast branding with plastic surgery such as a rhinoplasty on a "successful face model" on the grounds that branding does not treat "a physical condition" the patient seeks to change (brief, p. 12), but the Hearing Committee finds this comparison frustrates her cause. Just as a rhinoplasty to change the appearance of a nose alters the physical condition of the face, the Hearing

Committee finds the Respondent's branding to inflict a permanent and very visible scar alters the skin, appearance, and physical condition of the pelvic region.

Dr. Grant took the position that while brandings and other similar cosmetic procedures such as body piercing and tattooing can be performed by non-physicians, they constitute medical procedures when physicians perform them. (Transcript, p. 1108-1109, 1196-1197.) The Hearing Committee agrees with this view and rejects the Respondent's arguments against it. On the one hand, the Respondent claims that branding "is a form of commercial body art in the same manner as are tattooing and body piercing." (Respondent's brief, p. 8.) To that end, she argues that "aesthetic or ritual branding is outside the jurisdiction of the State Board for Professional Medical Conduct as branding is not regulated at all in New York." (Respondent's brief, p. 9.) On the other hand, the Respondent goes on to <u>distinguish</u> these activities on the basis that tattooing and body piercing require a license to perform, whereas branding does not. PHL §461. In doing so, she overlooks the exception to the tattoo and body piercing licensing requirement for physicians that is expressly stated in the statute. PHL §462. The Hearing Committee believes the Legislature specifically carved out that exception precisely because when a doctor and not a technician performs tattooing or body piercing, it is presumed that appropriate medical standards will apply. Consistent with this was Dr. Grant's testimony that he was unable to "imagine the scenario" involving a licensed physician performing these brandings acting as only a "technician." (Transcript, p. 1218.)

The Respondent's arguments that tattooing and body piercing are regulated — whereas branding is not — were deemed inconsequential to the Hearing Committee. The Committee's view is simple — all these activities are practicing medicine and become medical procedures when performed by a physician. Contrary to Dr. Mayer's testimony that the Respondent could obtain "a separate license as a tattoo artist or body piercer" and "not use" her medical license (Transcript, p. 1549), the Hearing Committee believes that as a physician, the Respondent cannot unilaterally pick and choose when the standards of medical

practice apply. (Transcript, p. 1107-1109, 1200, 1549.) Dr. Grant confirmed this when he testified: "given the privilege of being a physician that comes with responsibilities. You can't decide when you are going to enjoy the privileges, but not have the responsibilities." (Transcript, p. 1112.) The Hearing Committee considers the Respondent's attempt to use a double standard, compartmentalizing her life by ostensibly branding the women as a technician and not a doctor, an irresponsible attempt to cast aside her privileged status as a licensed physician with specialized knowledge.

The Hearing Committee was guided in reaching its determination by reported court decisions relying on various factors and circumstances in recognizing when activities performed by physicians fall within the definition of the practice of medicine. In <u>Y.Y.B. ex rel. Barukh v. Rachminov</u>, the court found that "while a circumcision performed by a physician would be the practice of medicine, a circumcision performed as a religious ritual by a qualified person (a 'mohel' in this case) does not constitute the practice of the profession of medicine within the meaning of the Education Law." <u>Y.Y.B. ex rel. Barukh v. Rachminov</u>, 11 N.Y.S.3d 808, 1059 (Sup. Ct. Queens Co. 2015); *See also* <u>Zakhartchenko v. Weinberger</u>, 605 N.Y.S.2d 205, 206 (Sup. Ct. Kings Co. 1993.) In relying on this same reasoning, the Court in <u>Zakhartchenko</u> applied negligence principles to a hospital where a circumcision performed by a Rabbi involved the hospital's trained medical staff. <u>Zakhartchenko</u>, *supra* at 413. The Petitioner also cites <u>Zakhartchenko</u> in its brief (p. 18) to correctly summarize the principle from these cases applicable to this matter: "Therefore, while the acts performed by a non-physician are not subject to the jurisdiction of the Board of Professional Medical Conduct, the brandings/medical procedures performed by Dr. Roberts on 17 DOS women are." The Hearing Committee follows the view of these reported cases that different standards apply when physicians perform procedures.

The Respondent claims that "several possible people were considered" to perform the brandings and that "(c)learly, the intent was not to select a physician but to pick amongst friends" (brief, p. 8), but

the Hearing Committee finds it more likely the Respondent was chosen based on her background, training, and knowledge as a physician. The Respondent acknowledged relying on her medical background in everything she does. (Transcript, p. 263, 423, 430-431, 488, 521, 547, 552-553, 1440-1442, 2134.) The evidence also confirms she was the only physician approached by the 1st line members to perform the brandings, her status as a physician was well-known in the NXIVM community, and she was the one chosen to do them. (Transcript, p. 182-183, 352, 797, 1853, 1950.) Her experience as a physician was obviously relevant to what they were seeking in a person to do the job, which Jane Doe 5 described as someone who was "willing," "calm," not "squeamish," and had "a steady hand" and "attention to detail." (Transcript, p. 2020-2021.) Jane Doe 4 also expressed how she hoped "someone skilled enough" would be chosen for the job and the relief she felt — consistent with S.E.'s testimony — knowing her branding would be done by the Respondent, who she knew was a doctor. (Transcript, p. 796, 1951, 1942-1943, 1975.)

### **Standards of Medical Practice**

The Hearing Committee concluded the Respondent's lack of training in the use of an electrocautery device contributed to her improper technique in performing the branding procedures and exacerbated the harm to these women. The Hearing Committee was skeptical of Dr. Mayer's assertion that the Respondent took "great care to get special training in branding" (Transcript, p. 1476) because the evidence established she was woefully unskilled in performing the procedures. According to Dr. Grant, proper training in the safe and proper use of an electrocautery device includes attending "a series of didactic lectures" and using the device for a period of time "under direct observation of a mentor or preceptor," steps the Respondent never undertook. (Transcript, p. 517, 562-563, 1070-1071, 1327-1328, 1765, 1784.) The Hearing Committee finds her preparations for the brandings, which included undergoing branding herself by branding artist Brian Decker in Brooklyn, practicing on fruit and pigs' knuckles, and a few

communications by email and telephone with Mr. Decker and body modification artist Steve Arthur Haworth, fell short of demonstrating serious and proper training in using an electrocautery device. (Transcript, p. 273-274, 280-284.)

The Respondent presented body modification artist Steve Arthur Haworth as a witness to discuss her branding technique. The Hearing Committee was not convinced by Mr. Haworth's opinion that the Respondent used appropriate technique when she performed the brandings. (Transcript, p. 1779.) Mr. Haworth testified that in his almost 30 years of performing electrocautery brandings, he has never caused a 2nd degree burn. (Transcript, p. 1827.) He described such a burn as "significantly more painful" than a brand (Transcript, p. 1788), with a greater risk of infection. (Transcript, p. 1795.) Mr. Haworth's description of an electrocautery brand as "not a second-degree burn" and "more like a scrape" that heals "very quickly" (Transcript, p. 1763, 1789-1790, 1796) was contrary to all the evidence in this case. The Respondent's brandings resulted in 2nd degree burns, as was established by the brand photos (Exhibits 45 and 47), the branding video (Exhibit 8D), and the testimony of Dr. Mayer (Transcript, p. 1510-1511), Dr. Grant (Transcript, p. 1085), and the Respondent herself. (Transcript, p. 1377, 1420-1421.) The Hearing Committee attributed Mr. Haworth's seeming unawareness that the Respondent's brandings caused 2nd degree burns to his lack of a medical degree and his failure to review the brand wound photos showing the depth of the wounds or the testimony of the physician witnesses. (Exhibits 8D, 45, 47; Transcript, p. 1791-1792.)

The Respondent's poor technique was obvious to the Hearing Committee on S.E.'s branding video, which showed sparks and fire from the electrocautery device as she moved it across the skin to create the brand's "seven lines" and "touchups" (Exhibit 8D; Transcript, p. 366-367) and her multiple starts and stops, which Mr. Haworth commented on as "different" from his technique. (Transcript, p. 1778.) The Hearing Committee also recognized the Respondent's failure to mention the energy settings or the types

of tips she used, which suggested her unfamiliarity with how the device works, specifically that the electrical current from the device and the time in which it is applied directly affects the outcome. (Transcript, p. 283, 1224.) She also expressed no awareness of the danger in using an electrocautery device directly on the skin surface to make an incision because it can cause a more significant injury than intended, such as the abnormal scarring and deep 2nd degree burns that occurred in this case and the risk of deeper 3rd and 4th degree burns. (Transcript, p. 1215, 1224, 1510, 1581.) For these reasons, the Hearing Committee believes her lack of training in controlling the electrocautery device to predict the outcome meant she never understood that the time in which she applied the tremendous amount of electrical energy from the device caused the women substantial injuries, pain, and trauma. (Exhibits 14a, 45, 47; Transcript, p. 1085-1087, 1128.)

Dr. Grant described the Respondent's branding of these women as "excruciatingly" and "incredibly painful" for which she never even offered them a choice of anesthesia. (Transcript, p. 1086, 1162-1163.) In response to the pain, the evidence showed A.M. and S.E. cried and J.G. screamed and squealed, flipped off the table, and bit down on a towel. (Exhibit 14a; Transcript, p. 807, 819, 579, 689, 819, 846, 1404.) S.E. described her pain from the branding as "an acute fire in the most sensitive part of my body." (Transcript, p. 827.) L.S. described her experience of the branding as "incredibly painful." (Exhibit 14a.) While the evidence established the women desired pain as part of the branding process (Respondent's brief, p. 18), the Hearing Committee agreed with Dr. Grant that absent a legitimate medical reason, such as an allergy or an emergency, the Respondent was obligated to at least attempt to alleviate such pain, such as by administering a local anesthetic in the area where the cautery was applied. (Transcript, p. 1073, 1124, 1210-1211.)

This was necessary, Dr. Grant explained, because the level of pain the women endured was so intense that it risked causing the woman cauterized even deeper burns from not being able to remain still

during the procedure. Dr. Mayer also acknowledged this risk, as well as the risk of physical injuries to the women participants holding her down as she violently reacts to the electrocautery device. (Transcript, p. 1082-1083, 1087-1090, 1510.) Dr. Grant emphasized it is "unethical" for physicians to intentionally cause patients such harm because doing so violates "our ethical background in training and responsibility." (Transcript, p. 1116, 1228.)

The Respondent's lack of training was also established by her failure to prevent other risks of harm from occurring. She risked burns to the other women participants because they were not properly grounded by wearing gloves for insulation, instead using their bare skin to hold down the woman cauterized. Another risk was that the women could inhale or absorb harmful pathogens, such as viruses and infectious diseases, due to the failure to use a smoke evacuator to remove the debris plume released from the electrocautery device. She also risked burn wound infections by not maintaining a sterile field because she never properly cleaned the room, applied sterile draping, or required the women to wear personal protective equipment such as masks, sterile gloves, and eye protection. (Transcript, p. 1074, 1082, 1097-1098, 1104-1105, 1130.) The Hearing Committee disagreed with Dr. Mayer's opinion that these risks were "low," especially because the Respondent made no effort to mitigate them. (Transcript, p. 334-335, 532, 562, 1584.) Dr. Grant deemed the Respondent's failure to complete these steps serious deviations from the standard of care. (Transcript, p. 1124-1125, 1132.)

The Hearing Committee unanimously voted that the Respondent's conduct constituted professional misconduct as defined in Educ. Law §6530(4), practicing the profession with gross negligence on a particular occasion, professional misconduct as defined in Educ. Law §6530(6), practicing the profession with gross incompetence, and professional misconduct as defined in Educ. Law 6530(5), practicing the profession with incompetence on more than one occasion.

Gross negligence involves a significant deviation from acceptable medical standards that creates the risk of grave consequence to the patient. Such conduct may result in a single act of negligence in egregious proportions or multiple acts of negligence that cumulatively are egregious. Post v. N.Y.S. Dept. of Health, 245 A.D.2d 985, 986 (3d Dept. 1997.) Gross incompetence involves an unmitigated lack of the skill or knowledge necessary to perform an act undertaken by the licensee in the practice of medicine. This conduct may consist of a single act of incompetence of egregious proportions or multiple acts of incompetence that cumulatively amount to egregious conduct. Post, 245 A.D.2d at 986; Minielly v. Commissioner of Health, 222 A.D.2d 750, 752 (3d Dept. 1995). Incompetence includes a lack of the requisite knowledge or skill in the practice of the profession but does not require a showing of an act or omission constituting a breach of the duty of due care. Dhabuwala v. State Bd. For Professional Med. Conduct, 225 AD2d 209, 213 (3d Dept. 1996).

The Respondent deviated from the standard of care and demonstrated a lack of skill and knowledge to practice the profession of medicine. She dangerously operated the electrocautery device to perform the branding procedures without anesthesia or adhering to infection control standards, which subjected the women to extreme pain, deep 2nd degree burn wounds, and abnormal scarring, and risked them further 3rd and 4th degree burn wounds, infection, and other harm.

The Hearing Committee also voted 3-0 that the Respondent's conduct constituted professional misconduct as defined under Education Law §6530(47), failing to use appropriate infection control practices. The Respondent's failure to follow any infection control procedures risked the women burn wound infections and other harmful outcomes, representing to the Hearing Committee her disregard for their health and safety.

Informed consent requires a verbal or written discussion to evaluate risks so the patient can "prudently decide whether or not" to proceed with the procedure. (Transcript, p. 1098, 1178-1180.) It must

include a discussion of the psychological and physical risks, benefits, and alternatives to the procedure, including the option not to proceed, considering medical histories, comorbidities, and medications. (Transcript, p. 1124, 1179-1180.) The Respondent admits she never obtained such consent, which Dr. Grant deemed a serious deviation from the standard of care. (Respondent's brief, p. 8; Transcript, p. 436, 538-540, 1180.)

In failing to take medical histories and perform physical examinations, the Respondent risked missing a diagnosis or condition such as diabetes or connective tissue disorder, or a blood thinner medication like aspirin, that could affect clotting or wound healing. She also risked missing a cardiac condition that could trigger an arrythmia or pre-existing PTSD or anxiety that could become exacerbated by direct exposure to blood and trauma. (Transcript, p. 544-544, 1094-1095, 1171, 1418.) Other risks included burn wound infections and poor healing because she never provided treatment plans that included application of antibiotic ointment and follow-up physician monitoring. (Transcript, p. 377, 547, 556, 1362, 1168, 1171-1172.) In failing to document medical records, including the brand wound photos she collected and kept, she also risked depriving outside providers of important information about the procedures and the reason why they were performed. (Transcript, p. 1175.)

The Respondent, as a physician, was obligated to complete such tasks. The Hearing Committee believes she should have known to do so, especially considering her experience as a hospitalist following protocols that involve reading charts, assessing medications and medical histories to determine comorbidities, and treating patients with various injuries, including burn wounds. (Transcript, p. 206-207, 209, 291.) Although Mr. Haworth testified that his brandings never involve completing these steps, the Hearing Committee noted that he is not a doctor. The medical standards that apply to physicians with specialized medical training and knowledge performing these procedures do not also apply to branding technicians. (Transcript, p. 1770-1771.)

The Hearing Committee unanimously determined that the Respondent's conduct constituted professional misconduct as defined in Educ. Law §6530(32), failing to maintain records for each patient that "accurately reflect the evaluation and treatment of the patient." Physicians are required to maintain such records that include every interaction with the patient and, in cases such as this, photos of the injury. Mucciolo v. Fernandez, 195 A.D.2d 623, 625 (3d Dept. 1993).

Negligence means the "failure to exercise the care that would be exercised by a reasonably prudent licensee under the circumstances." Bogdan v. State Bd. For Professional Med. Conduct, 195 A.D.2d 86, 88 (3d Dept. 1993). The Department is not required to prove harm to a patient. Youssef v. State Bd. For Professional Med. Conduct, 89 A.D.3d 824, 825 (3d Dept. 2004). Negligence can also be sustained when there is a relationship between inadequate medical records and patient treatment. Matter of Patin v. State Bd. For Professional Med. Conduct, 77 A.D.3d 1211, 1214 (3d Dept. 2010). The Hearing Committee sustains the negligence charge on both grounds. The Respondent failed to exercise the required level of care when she failed to take even the most basic steps to protect these women, such as by assessing medical and psychiatric histories, providing follow-up care considering the deeply traumatizing nature of the branding procedures, or assessing cross reactions, such as a medication that could worsen a preexisting psychiatric problem or a heart defect that could create a fatal condition. Her failure to maintain any medical records prevented subsequent providers from understanding the cause of the injuries and the reasons for them, which could adversely impact their future treatment decisions. As a physician, the Respondent was required to consider these matters before performing operations on the women that physically and permanently altered their bodies.

Of particular concern to the Hearing Committee in the circumstances here was that informed consent must be voluntary and not due to coercion (Transcript, p. 1182) and involves providing details of the procedure, all of which were missing in this case. The Respondent concedes she never obtained

"formal written" informed consent but claims the branding video of S.E. shows she gave "verbal" consent, which the Hearing Committee finds misleading at best. (Respondent's brief, p. 8, 17.) The Respondent denies the women were coerced, yet the brandings were performed upon women who had submitted collateral that would result in damaging and embarrassing consequences if released to the public. (Respondent's brief, p. 19; Exhibit 14a; Transcript, p. 388, 390, 424, 426, 530, 783-784, 1182, 1957.) S.E. described the involuntariness of the branding process in the pressure she felt to move forward with the procedure because of the collateral, which she characterized as a "gun" to her head. (Transcript, p. 802.) This is the very definition of coercion.

The collateral included titles to cars and houses, letters about illicit drug use and sexual deviance, and nude photos, some of which showed explicit images of genitalia. (Exhibit 14a; Transcript, p. 802, 857, 1353, 1941-1942, 1686, 1738, 1884.) Even Dr. Mayer acknowledged the women could view the collateral as coercive (Transcript, p. 1537), describing it as "a factor to consider in the voluntariness of their actions." (Transcript, p. 1528.) Dr. Grant confirmed that under these circumstances, there can be no informed consent. (Transcript, p. 1182.) The Hearing Committee was not persuaded by the Respondent's comparison of the branding process to the brandings in the "African American fraternity known as the Omegas" (Respondent's brief, p. 18-19) because while the fraternity members experience painful brands to symbolize their "bond" and "life-long membership in the fraternity," they are not coerced into being branded by having to submit potentially harmful collateral. (Respondent's brief, p. 18-19.)

Particularly troubling to the Hearing Committee was the evidence establishing the women were purposefully not told what symbol would be branded onto their bodies. (Exhibit 14a; Transcript, p. 798, 802, 1182, 1660, 1685, 1884, 1941.) S.E. confirmed this when she testified "(a)t no point did anyone say these are Keith's initials. It was only revealed to me later." (Transcript, p. 798.) The Respondent, however, did know that the symbol was KAR to represent Keith Raniere's initials. (Transcript, p. 1387-1388, 1353,

1355, 1392, 1394.) She claims she did not disclose it to the women because it wasn't her "business" or "responsibility" and doing so would have breached her "lifetime vow of obedience" to DOS. (Transcript, p. 541, 1353-1355.) The Hearing Committee rejects these excuses and finds that regardless of her commitment to DOS, she had a duty as a physician to disclose what she was doing in the same way a plastic surgeon would be required to describe the pigment, shape, and appearance of a nipple for a nipple areola tattooing procedure. (Transcript, p. 1107.) The Hearing Committee agrees with Dr. Grant that the Respondent's failure to disclose the brand symbol to the women deviated from the standard of care. (Transcript, p. 1178, 1182.)

The Hearing Committee unanimously determined that the Respondent's conduct constituted professional misconduct as defined in Educ. Law §6530(2), practicing the profession fraudulently. Fraudulent practice requires "proof of either an intentional misrepresentation or concealment of a known fact" and "intent or knowledge" can be inferred. Patin, *supra* at 1214. The Hearing Committee finds the Respondent's admission that she knew what the brand symbol was and her decision not to disclose it represents an intentional concealment of a known fact. The Respondent violated an important aspect of informed consent by branding the women without making them fully aware of what the brand symbol was or what it represented.

The Hearing Committee unanimously determined that this conduct also constitutes professional misconduct as defined in Educ. Law §6530(20), moral unfitness to practice medicine; professional misconduct as defined in Educ. Law 6530(31), willfully harassing, abusing, or intimidating a patient; and professional misconduct as defined in Educ. Law §6530(26), performing professional services which have not been duly authorized by the patient. Moral unfitness is conduct that "violat[es] the trust the public bestows on the medical profession and/or violate[s] the medical profession's moral standards." Such conduct is suggestive of, or would tend to prove, moral unfitness. Patin, *supra* at 1215 *citing* Matter of

Prado v. Novello, 301 A.D.2d 692, 694 (3d Dept. 2003). The Respondent's medically reckless performance of the brandings caused the women significant harm without apprising them of the brand symbol. Physicians are strictly prohibited from going above and beyond what the patient expects when performing a medical procedure.

### **Vanguard Week**

The Petitioner also charges the Respondent with failing to report a communicable disease, an unusual outbreak, or a disease outbreak involving a gastrointestinal illness during the annual NXIVM retreat at the Silver Bay YMCA, as required under the New York State Sanitary Code. (Petitioner's brief, p. 72-73.) The Respondent admits she did not report the outbreak of the gastrointestinal illness during the event to public health officials but claims she was not required to because she was on vacation and since "garden variety" stomach viruses, which are "unpleasant but not lethal," are not "communicable" or "unusual" to meet the mandatory reporting requirements under the regulation. (Respondent's brief, p. 21-22; Transcript, p. 733, 1294.) Physicians are required to report a "communicable disease" or "(a)ny disease outbreak or unusual disease" to public health officials. 10 NYCRR 2.10(a)-(c). An outbreak is defined as "an increased incidence of disease above its expected or baseline level" 10 NYCRR 2.2(d).

In support of its charges, the Petitioner presented as a witness infectious disease specialist Bruce Frederick Farber, M.D., whose testimony the Respondent failed to refute. The Hearing Committee noted Dr. Farber's impressive background includes 30 years of experience as an infectious disease specialist, including head of infectious disease for Northwell Health and in charge of the infectious disease programs at North Shore University Hospital and LIJ Medical Center. (Exhibit 6; Transcript, p. 959.) The majority of the Hearing Committee agreed with his professional opinion that the Respondent's duty as a physician to report this illness applied to her even if she was on vacation. (Transcript, p. 993, 995.) The Committee decided 2-1 that while the illness fails to meet the criteria under the regulation as "communicable" or

"unknown" — presumably because it was never reported or investigated — it did constitute a "disease outbreak" that the Respondent as a physician was required to report regardless of whether or not she was on vacation. 10 NYCRR 2.1(c); 10 NYCRR 2.2. (Transcript, p. 993, 995, 998-999.) Dr. Farber made clear that her failure to fulfill this duty was a significant deviation from the standard of care. (Transcript, p. 991, 994.)

The evidence established this "obvious" illness affected a large group of people among the more than 400 attendees in a confined location, all of whom had similar symptoms. (Transcript, p. 990-991, 993, 999.) This is the precise definition of a "disease outbreak." 10 NYCRR 2.1(c), 10 NYCRR 2.2(d). The majority of the Hearing Committee agreed with Dr. Farber that the Respondent's failure to report it was especially egregious because it subjected the elderly and other vulnerable individuals, such as those with conditions or diseases like cancer, renal failure, and pregnancy, to potentially dangerous consequences like dehydration requiring hospitalization. (Transcript, p. 974-975.) The majority of the Hearing Committee also agreed with his opinion that based on her hospitalist experience that required her to complete an infection control course covering this subject, the Respondent should have known to report the illness. (Transcript, p. 972-973, 979.) Dr. Farber emphasized the importance in following this rule to "shut down" and properly "clean" the facility to prevent the illness from contaminating others and to determine its etiology. (Transcript, p. 980, 984.)

The Hearing Committee voted 2-1 that the Respondent's failure to report a disease outbreak constituted professional misconduct as defined in Educ. Law § 6530(21), a willful failure to file a report required by law; professional misconduct as defined in Educ. Law § 6530(16), a willful or grossly negligent failure to comply with substantial provisions of state laws governing the practice of medicine; professional misconduct as defined in Educ. Law § 6530(3), practicing the profession with negligence on

more than one occasion; and professional misconduct as defined in Educ. Law § 6530(5), practicing the profession with incompetence on more than one occasion.

## Penalty

In considering the full spectrum of penalties under PHL § 230-a, including revocation, suspension, probation, censure and reprimand and the imposition of civil penalties, the Hearing Committee unanimously determined, by vote of 3-0, that the penalty of revocation of the Respondent's medical license is appropriate. The Hearing Committee determined that the Respondent engaged in 12 forms of professional misconduct, all of which it addressed in this hearing decision and sustained. The Respondent says she joined NXIVM with a goal to "enrich (her) skills as a doctor." (Transcript, p. 219.) The evidence shows, however, that she deliberately chose to adhere to her DOS "vows of obedience" instead of providing the women she branded with "all the things that a physician does" because to do so would have resulted in "breaking (her) vow" and "went quite the counter to what the whole purpose was." (Transcript, p. 1442-1443.) In other words, when faced with any conflict between NXIVM and her responsibilities as a physician, she chose NXIVM. For these reasons, the Hearing Committee believes she abdicated her values as a physician and failed her profession, herself, and everyone else involved.

The Hearing Committee recognizes the Respondent's tremendous future potential as a physician who excelled in every undertaking from becoming a skilled gymnast to graduating college with honors and earning dual degrees — osteopathic medicine and a master's in clinical nutrition — and then as an entrepreneur building a family medical practice and developing Exo/Eso, the physical fitness company within NXIVM she co-developed with Keith Raniere. (Transcript, p. 1255-1256.) The Hearing Committee is deeply troubled, however, by her unwillingness to admit regrets. (Transcript, p. 228, 1248-1249, 1252, 1255-1256, 1259, 1412, 1445, 1455-1456.) Instead of holding herself accountable for harming S.E., for example, she accused S.E. of victimizing herself. (Transcript, p. 1412-1413.) The only sadness she

expressed was that the branding "was twisted into something it wasn't" and that "it has been used to scare people." (Transcript, p. 1455-1456.) The Respondent denies being brainwashed, yet she expressed no real remorse, which represented to the Hearing Committee her distorted reality and the very real concern that others remain vulnerable to her future brandings. (Transcript, p. 1453, 1719, 1753.)

The Hearing Committee is hopeful that the Respondent will regard the volume of sustained charges in this hearing decision as an opportunity to reflect on her poor choices and reeducate herself professionally and personally.

## Order

Based upon the foregoing, IT IS HEREBY ORDERED THAT:

1.      The first through forty-seventh specifications of professional misconduct set forth in the Statement of Charges are Sustained.

2.      The Respondent's license to practice medicine in the State of New York is hereby Revoked under PHL § 230-a(4).

3.      This Determination and Order shall be effective upon service on the Respondent in compliance with PHL § 230(10)(h).

DATED:      Albany, New York
            September 27, 2021



_Steven Lapidus, M.D._
Steven Lapidus, M.D., Chairperson

Ramanathan Raju, M.D.
Joan Martinez McNicholas

TO:     Jeffrey J. Conklin, Associate Counsel
        New York State Department of Health
        Division of Legal Affairs
        Corning Tower Building, Room 2517
        Empire State Plaza
        Albany, New York  12237

        Anthony Z. Scher, Esq.
        800 Westchester Avenue
        Suite N-641
        Rye Brook, New York, 10573

APPENDIX I

NEW YORK STATE          DEPARTMENT OF HEALTH
STATE BOARD FOR PROFESSIONAL MEDICAL CONDUCT

| | |
|---|---|
| **IN THE MATTER**<br><br>**OF**<br><br>**DANIELLE ROBERTS, D.O.** | AMENDED<br><br>STATEMENT<br><br>OF CHARGES |

DANIELLE ROBERTS, D.O., the Respondent, was authorized to practice medicine in New York State on or about October 5, 2009, by the issuance of license number 255075 by the New York State Education Department.

## FACTUAL ALLEGATIONS

A.    On or about March 9, 2017, the Respondent used a cauterizing pen as part of a medical procedure to scar the skin by branding Patient A, a female patient, hereinafter identified in the attached Appendix "A", with the initials KR and/or KAR, in the pelvis region, thereby leaving a permanent scar.  Respondent's conduct deviated from accepted standards of care as follows:

   1. Respondent performed the medical procedure upon Patient A in an other than appropriately sterile environment, and/or without appropriate infection control, and/or without the use of sterile technique, including the surgical field, surgical procedure room, multiple use of a cautery pen tip and electrical grounding pad, and documented electrical testing and maintenance upkeep of the cautery device.

   2. Respondent performed the medical procedure without the use of a local anesthetic or general anesthesia, thereby causing Patient A to suffer pain for no legitimate medical purpose.

1



EXHIBIT
la

3. Respondent performed the medical procedure upon Patient A with non-medically trained personnel present, who were not wearing personal protective equipment.

4. Respondent performed the medical procedure upon Patient A with the assistance of non-medically trained personnel who physically restrained said patient.

5. Respondent failed to cease performing the medical procedure despite the fact that Patient A was suffering pain without medical justification.

6. Respondent, during the course of the medical procedure, willfully physically abused Patient A.

7. Respondent performed the medical procedure upon Patient A at the time when said patient was naked and while being held down by other individuals, who were also naked, contrary to any appropriate medical protocol or need.

8. Respondent inappropriately performed the medical procedure upon Patient A while an individual who was also naked utilized a cell phone to video said medical procedure.

9. Respondent failed to provide appropriate wound care for Patient A at the time of the medical procedure, and thereafter.

10. Respondent failed to provide appropriate follow-up medical care and treatment for Patient A's wound, and/or failed to refer Patient A to another medical provider for such post-medical procedure wound care.

11. Respondent inappropriately advised, or caused another individual to advise, Patient A to take photographs of the wound caused by the medical procedure on a daily basis for one month and once a week for another month, and to thereafter send such photographs to an individual who shared all or some of said photographs with the Respondent.

12. Respondent failed to provide appropriate medical care and treatment for Patient A, including obtaining information regarding said patient's medical history and current medications.

2

13. Respondent failed to prepare and/or maintain appropriate medical records for the patient which accurately reflected the evaluation and treatment of Patient A.

14. Respondent fraudulently failed to disclose to Patient A that the initials KR and/or KAR said Respondent branded into the pelvis region of Patient A represented the initials of Keith Alan Ranieri..

15. Respondent performed the medical procedure upon Patient A without having obtained the adequate informed consent of Patient A.

B. On or about March 9, 2017, the Respondent used a cauterizing pen as part of a medical procedure to scar the skin by branding Patient B, a female patient, hereinafter identified in the attached Appendix "A", with the initials KR and/or KAR, in the pelvis region, thereby leaving a permanent scar. Respondent's conduct deviated from accepted standards of care as follows:

1. Respondent performed the medical procedure upon Patient B in an other than appropriately sterile environment, and/or without appropriate infection control and/or, without the use of sterile technique, including the surgical field, surgical procedure room, multiple use of a cautery pen tip and electrical ground pad, and documented electrical testing and maintenance upkeep of the cautery device.

2. Respondent, while performing the medical procedure without the use of a local anesthetic or general anesthesia, thereby causing Patient B to suffer pain for no legitimate medical purpose.

3. Respondent performed the medical procedure upon Patient B with non-medically trained personnel present, who were not wearing personal protective equipment.

4. Respondent performed the medical procedure upon Patient B with the assistance of non-medically trained personnel who physically restrained said patient.

3

5. Respondent failed to cease performing the medical procedure despite the fact that Patient B was suffering pain without medical justification.

6. Respondent, during the course of the medical procedure, willfully and physically abused Patient B.

7. Respondent performed the medical procedure upon Patient B at the time when said patient was naked and while being held down by other individuals, who were also naked, contrary to any appropriate medical protocol or need.

8. Respondent inappropriately performed the medical procedure upon Patient B while an individual who was also naked utilized a cell phone to video said medical procedure.

9. Respondent failed to provide appropriate wound care for Patient B at the time of the medical procedure, and thereafter.

10. Respondent failed to provide appropriate follow-up medical care and treatment for Patient B's wound, and/or failed to refer Patient B to another medical provider for such post-medical procedure wound care.

11. Respondent inappropriately advised, or caused another individual to advise Patient B to take photographs of the wound caused by the medical procedure on a daily basis for one month and once a week for another month, and to thereafter send such photographs to an individual who shared all or some of said photographs with Respondent.

12. Respondent failed to provide appropriate medical care and treatment for Patient B, including obtaining information regarding said patient's medical history and current medications.

13. Respondent failed to prepare and/or maintain appropriate medical records for the patient which accurately reflected the evaluation and treatment of Patient B.

14. Respondent fraudulently failed to disclose to Patient B that the initials KR and/or KAR said Respondent branded into the pelvis region of Patient B represented the initials of Keith Alan Ranieri.

4

15.    Respondent performed the medical procedure upon Patient B without having obtained the adequate informed consent of Patient B.

C.    On or about March 9, 2017, the Respondent used a cauterizing pen as part of a medical procedure to scar the skin by branding Patient C, a female patient, hereinafter identified in the attached Appendix "A", with the initials KR and/or KAR, in the pelvis region, thereby leaving a permanent scar.   Respondent's conduct deviated from accepted standards of care as follows:

1.    Respondent performed the medical procedure upon Patient C in an other than appropriately sterile environment, and/or without appropriate infection control, and/or without the use of sterile technique, including the surgical field, surgical procedure room, multiple use of a cautery pen tip and electrical grounding pad, and documented electrical testing and maintenance upkeep of the cautery device.

2.    Respondent, while performing the medical procedure without the use of a local anesthetic or general anesthesia, thereby causing Patient C to suffer pain for no legitimate medical purpose.

3.    Respondent performed the medical procedure upon Patient C with non-medically trained personnel present, who were not wearing personal protective equipment.

4.    Respondent performed the medical procedure upon Patient C with the assistance of non-medically trained personnel who physically restrained said patient.

5.    Respondent failed to cease performing the medical procedure despite the fact that Patient C was suffering pain without medical justification.

6.    Respondent, during the course of the medical procedure, willfully physically abused Patient C.

5

7.   Respondent performed the medical procedure upon Patient C at the time when said patient was naked and while being held down by other individuals, who were also naked, contrary to any appropriate medical protocol or need.

8.   Respondent inappropriately performed the medical procedure upon Patient C while an individual who was also naked utilized a cell phone to video said medical procedure.

9.   Respondent failed to provide appropriate wound care for Patient C at the time of the medical procedure, and thereafter.

10.   Respondent failed to provide appropriate follow-up medical care and treatment for Patient C's wound, and/or failed to refer Patient C to another medical provider for such post-medical procedure wound care.

11.   Respondent inappropriately advised, or caused another individual to advise, Patient C to take photographs of the wound caused by the medical procedure on a daily basis for one month and once a week for another month, and to thereafter send such photographs to an individual who shared all or some of said photographs with Respondent.

12.   Respondent failed to provide appropriate medical care and treatment for Patient C, including obtaining information regarding said patient's medical history and current medications.

13.   Respondent failed to prepare and/or maintain appropriate medical records for the patient which accurately reflected the evaluation and treatment of Patient C.

14.   Respondent fraudulently failed to disclose to Patient C that the initials KR and/or KAR said Respondent branded into the pelvis region of Patient C represented the initials of Keith Alan Ranieri.

15.   Respondent performed the medical procedure upon Patient C without having obtained the adequate informed consent of Patient C.

6

D.   On or about March 9, 2017, the Respondent used a cauterizing pen as part of a medical procedure to scar the skin by branding Patient D, a female patient, hereinafter identified in the attached Appendix "A", with the initials KR and/or KAR, in the pelvis region, thereby leaving a permanent scar.   Respondent's conduct deviated from accepted standards of care as follows:

1.   Respondent performed the medical procedure upon Patient D in an other than appropriately sterile environment, and/or without appropriate infection control, and/or without the use of sterile technique, including the surgical field, surgical procedure room, multiple use of a cautery pen tip and electrical grounding pad, and documented electrical testing and maintenance upkeep of the cautery device.

2.   Respondent, while performing the medical procedure without the use of a local anesthetic or general anesthesia, thereby causing Patient D to suffer pain for no legitimate medical purpose.

3.   Respondent performed the medical procedure upon Patient D with non-medically trained personnel present, who were not wearing personal protective equipment.

4.   Respondent performed the medical procedure upon Patient D with the assistance of non-medically trained personnel who physically restrained said patient.

5.   Respondent failed to cease performing the medical procedure despite the fact that patient D was suffering pain without medical justification.

6.   Respondent, during the course of the medical procedure, willfully physically abused Patient D.

7.   Respondent performed the medical procedure upon Patient D at the time when said patient was naked and while being held down by other individuals, who were also naked, contrary to any appropriate medical protocol or need.

7

8. Respondent inappropriately performed the medical procedure upon Patient D while an individual who was also naked utilized a cell phone to video said medical procedure.

9. Respondent failed to provide appropriate wound care for Patient D at the time of the medical procedure, and thereafter.

10. Respondent failed to provide appropriate follow-up medical care and treatment for Patient D's wound, and/or failed to refer Patient D to another medical provider for such post-medical procedure wound care.

11. Respondent inappropriately advised, or caused another individual to advise Patient D to take photographs of the wound caused by the medical procedure on a daily basis for one month and once a week for another month, and to thereafter send such photographs to an individual who shared all or some of said photographs with Respondent.

12. Respondent failed to provide appropriate medical care and treatment for Patient D, including obtaining information regarding said patient medical history and current medications.

13. Respondent failed to prepare and/or maintain appropriate medical records for the patient which accurately reflected the evaluation and treatment of Patient D.

14. Respondent fraudulently failed to disclose to Patient D that the initials KR and/or KAR said Respondent branded into the pelvis region of Patient D represented the initials of Keith Alan Ranieri.

15. Respondent performed the medical procedure upon Patient D without having obtained the adequate informed consent of Patient D.

E.   On or about March 9, 2017, the Respondent used a cauterizing pen as part of a medical procedure to scar the skin by branding Patient E, a female patient, hereinafter identified in the attached Appendix "A", with the initials KR and/or KAR,

8

in the pelvis region, thereby leaving a permanent scar.    Respondent's conduct deviated from accepted standards of care as follows:

1.    Respondent performed the medical procedure upon Patient E in an other than appropriately sterile environment, and/or without appropriate infection control, and/or without the use of sterile technique, including the surgical field, surgical procedure room, multiple use of a cautery tip pen and electrical grounding pad, and documented electrical testing and maintenance upkeep of the cautery device.

2.    Respondent performed the medical procedure without the use of a local anesthetic or general anesthesia, thereby causing Patient E to suffer pain for no legitimate medical purpose.

3.    Respondent performed the medical procedure upon Patient E with non-medically trained personnel present, who were not wearing personal protective equipment.

4.    Respondent performed the medical procedure upon Patient E with the assistance of non-medically trained personnel who physically restrained said patient.

5.    Respondent failed to cease performing the medical procedure despite the fact that Patient E was suffering pain without medical justification.

6.    Respondent, during the course of the medical procedure, willfully physically abused Patient E.

7.    Respondent performed the medical procedure upon Patient E at the time when said patient was naked and while being held down by other individuals, ~~who were also naked~~, contrary to any appropriate medical protocol or need.

8.    Respondent inappropriately performed the medical procedure upon Patient E while an individual who was also naked utilized a cell phone to video said medical procedure.

9.    Respondent failed to provide appropriate wound care for Patient E at the time of the medical procedure, and thereafter.

9

10.   Respondent failed to provide appropriate follow-up medical care and treatment for Patient E's wound, and/or failed to refer Patient E to another medical provider for such post-medical procedure wound care.

11.   Respondent inappropriately advised, or caused another individual to advise, Patient E to take photographs of the wound caused by the medical procedure on a daily basis for one month and once a week for another month, and to thereafter send such photographs to an individual who shared all or some of said photographs with Respondent.

12.   Respondent failed to provide appropriate medical care and treatment for the Patient E, including obtaining information regarding said patient's medical history and current medications.

13.   Respondent failed to prepare and/or maintain appropriate medical records for the patient which accurately reflected the evaluation and treatment of Patient E.

14.   Respondent fraudulently failed to disclose to Patient E that the initials KR and/or KAR said Respondent branded into the pelvis region of Patient E represented the initials of Keith Alan Ranieri.

15.   Respondent performed the medical procedure upon Patient E without having obtained the adequate informed consent of Patient E.


F.   During the period from on or about January 2017 through December 2017, the Respondent used a cauterizing pen as part of medical procedures to permanently scar the skin by branding one or more of the following: Patients F and G, female patients, hereinafter identified in the attached Appendix "A", with the initials KR and/or KAR, in their pelvis regions. Respondent's conduct deviated from accepted standards of care as follows:

1.   Respondent performed the medical procedures upon one or more of the following: Patients F and G in an other than appropriately sterile environment,

10

and/or without appropriate infection control, and/or without the use of sterile technique, including the surgical field, surgical procedure room, multiple use of a cautery pen tip and electrical grounding pad, and documented electrical testing and maintenance upkeep of the cautery device.

2.  Respondent performed the medical procedures without the use of a local anesthetic or general anesthesia, thereby causing one or more of the following: Patients F and G to suffer pain for no legitimate medical purpose.

3.  Respondent performed the medical procedures upon one or more of the following: Patients F and G with non-medically trained personnel present, who were not wearing personal protective equipment.

4.  Respondent performing the medical procedures upon one or more of the following: Patients F and G with the assistance of non-medically trained personnel who physically restrained said patients.

5.  Respondent failed to cease performing the medical procedures despite the fact that one or more of the following: Patients F and G were suffering pain without medical justification.

6.  Respondent, during the course of the medical procedures willfully physically abused one or more of the following: Patients F and G.

7.  Respondent inappropriately performed the medical procedures upon one or more of the following: Patients F and G while an individual utilized a cell phone to video said medical procedures.

8.  Respondent failed to provide appropriate wound care for one or more of the following: Patients F and G at the time of the medical procedures, and thereafter.

9.  Respondent failed to provide appropriate follow-up medical care and treatment for one or more of the following: Patients F and G, and/or failed to refer the patients to other medical providers for such post-medical procedures wound care.

11

10. Respondent inappropriately advised, or caused another individual to advise, one or more of the following: Patients F and G to take photographs of the wounds caused by the medical procedures on a daily basis for one month and once a week for another month, and to thereafter send such photographs to an individual who shared all or some of said photographs with Respondent.

11. Respondent failed to provide appropriate medical care and treatment for one or more of the following: Patients F and G, including obtaining information regarding said patients' medical histories and current medications.

12. Respondent failed to prepare and/or maintain appropriate medical records for the patients which accurately reflected the evaluation and treatment of one or more of the following: Patients F and G.

13. Respondent performed the medical procedures upon one or more of the following: Patients F and G without having obtained the adequate informed consents of said Patients F and G.

G. During the time from on or about June 2016 through August 2016, NXIVM and/or the Executive Success Program (ESP) conducted a conference and/or meeting at the Silver Bay Conference and Family Retreat Center (Conference Center), located in Silver Bay, New York. The Respondent and approximately 438 other individuals attended the conference, including approximately 76 children. During the course of the conference, hundreds of the attendees became severely ill with an undetermined communicable disease. The individuals who became ill suffered inter alia, flu-like symptoms, severe vomiting and diarrhea. The Respondent had knowledge of the fact that many individuals at the conference had become ill. The Respondent knew or should have known that the illness suffered by the attendees at the conference was a communicable disease, outbreak of a communicable disease, and/or an unusual disease or outbreak. Respondent's conduct deviated from accepted standards of care as follows:

12

1. Respondent failed to report a disease outbreak or unusual disease to the State Department of Health as required by Title 10 N,Y.C.R.R. Section 2.1(c).

2. Respondent failed to report the suspected or confirmed case of communicable disease, outbreak of communicable disease, and/or the unusual disease or outbreak to the city, county, or district health officer as required by Title 10 N.Y.C.R.R. Sections 2.10 and 2.1(b) and (c).

3. Respondent failed to report by telephone, facsimile, or other electronic communication, or in person the illness of the attendees at the conference suspected or confirmed to have been caused due to the consumption of spoiled or poisonous food to the city, county, or district health officer, in violation of Title 10 N.Y.C.R.R. Section 2.15.

4. Upon being made aware of the fact that attendees at the conference might have been suffering from a communicable disease, the Respondent failed to cause such individuals to be isolated in an appropriate environment, pending official action by the health officer, in violation of Title 10 N.Y.C.R.R. Section 2.27.

13

## SPECIFICATIONS OF CHARGES

### FIRST THROUGH SIXTH SPECIFICATIONS
### WILLFULLY ABUSING A PATIENT

Respondent is charged with committing professional misconduct as defined by New York Education Law §6530(31) by willfully abusing a patient as alleged in the facts of one or more of the following:

1. The facts in paragraphs A and A.2, A and A.4, A and A.5, A and A.6, and/or A and A.8.

2. The facts in paragraphs B and B.2, B and B.4, B and B.5, B and B.6, and/or B and B.8.

3. The facts in paragraphs C and C.2, C and C.4, C and C.5, C and C.6, and/or, C and C.8.

4. The facts in paragraphs D and D.2, D and D.4, D and D.5, D and D.6, and/or, D and D.8.

5. The facts in paragraphs E and E.2, E and E.4, E and E.5, E and E.6, and/or, E and E.8.

6. The facts in paragraphs F and F.2, F and F.4, F and F.5, F and F.6, and/or F and F.8.

14

## SEVENTH THROUGH
## TWELFTH SPECIFICATIONS

## CONDUCT IN THE PRACTICE OF MEDICINE
## WHICH EVIDENCES MORAL UNFITNESS

Respondent is charged with committing professional misconduct as defined by New York Education Law §6530(20) by engaging in conduct in the practice of medicine which evidences moral unfitness to practice medicine as alleged in the facts of one or more of the following:

7.  The facts in paragraphs A and A.2, A and A.4, A and A.5, A and A.6, and/or A and A.8.

8.  The facts in paragraphs B and B.2, B and B.4, B and B.5, B and B.6, and/or B and B.8.

9.  The facts in paragraphs C and C.2, C and C.4, C and C.5, C and C.6, and/or C and C.8.

10. The facts in paragraphs D and D.2, D and D.4, D and D.5, D and D.6, and/or D and D.8.

11. The facts in paragraphs E and E.2, E and E.4, E and E.5, E and E.6, and/or E and E.8.

12. The facts in paragraphs F and F.2, F and F.4, F and F.5, F and F.6, and/or F and F.8.

15

## THIRTEENTH THROUGH EIGHTEENTH SPECIFICATIONS

## FAILING TO USE APPROPRIATE STERILE ENVIRONMENT AND/OR WITHOUT APPROPRIATE INFECTION CONTROL AND/OR WITHOUT THE USE OF STERILE TECHNIQUE

Respondent is charged with committing professional misconduct as defined by New York Education Law §6530(47) by failing to use scientifically accepted barrier precautions and infection control practices as established by the department of health as alleged in the facts of one or more of the following:

13. The facts in paragraphs A and A.1, A and A.3, A and A.4, and/or A and A.7.

14. The facts in paragraphs B and B.1, B and B.3, B and B.4, and/or B and B.7.

15. The facts in paragraphs C and C.1, C and C.3, C and C.4, and/or C and C.7.

16. The facts in paragraphs D and D.1, D and D.3, D and D.4, and/or D and D.7.

17. The facts in paragraphs E and E.1, E and E.3, E and E.4, and/or E and E.7.

18. The facts in paragraphs F and F.1, F and F.3, F and F.4, and/or F and F.7.

## NINTEENTH SPECIFICATION

## PRACTICING THE PROFESSION FRAUDULENTLY OR BEYOND ITS SCOPE

Respondent is charged with committing professional misconduct as defined by New York Education Law §6530(2) by practicing the profession fraudulently or beyond its authorized scope as alleged in the facts of one or more of the following:

19. The facts in paragraphs A and A.2, A and A.3, A and A.8 and/or A and A.14; B and B.2, B and B.3, B and B.8, and/or B and B.14; C and C.2, C and C.3, C and C.8, and/or C and C.14; D and D.2, D and D.3, D and D.8, and/or D and D.14; E

16

and E.2, E and E.3, E and E.8, and/or E and E. 14; F and F.2, F and F.3, and/or F and F.7.

## TWENTIETH THROUGH TWENTY-FIFTH SPECIFICATIONS
## PRACTICING THE PROFESSION WITH GROSS NEGLIGENCE

Respondent is charged with committing professional misconduct as defined by New York Education Law §6530(4) by practicing the profession with gross negligence as alleged in the facts of one or more of the following:

20. The facts in paragraphs A and A.1, A and A.2, A and A.3, A and A.4, A and A.5, A and A.6, A and A.7, A and A.8, A and A.9, A and A.10, A and A.11, A and A.12, A and A.13, A and A.14, and/or A and A.15.

21. The facts in paragraphs B and B.1, B and B.2, B and B.3, B and B.4, B and B.5, B and B.6, B and B.7, B and B.8, B and B.9, B and B.10, B and B.11, B and B.12, B and B.13, B and B.14, and/or B and B.15.

22. The facts in paragraphs C and C.1, C and C.2, C and C.3, C and C.4, C and C.5, C and C.6, C and C.7, C and C.8, C and C.9, C and C.10, C and C.11, C and C.12, C and C.13, C and C.14, and/or C and C.15.

23. The facts in paragraphs D and D.1, D and D.2, D and D.3, D and D.4, D and D.5, D and D.6, D and D.7, D and D.8, D and D.9, D and D.10, D and D.11, D and D.12, D and D.13, D and D.14, and/or D and D.15.

17

24. The facts in paragraphs E and E.1, E and E.2, E and E.3, E and E.4, E and E.5, E and E.6, E and E.7, E and E.8, E and E.9, E and E.10, E and E.11, E and E.12, E and E.13, E and E.14, and/or E and E.15.

25. The facts in paragraphs F and F.1, F and F.2, F and F.3, F and F.4, F and F.5, F and F.6, F and F.7, F and F.8, F and F.9, F and F.10, F and F.11, F and F.12, and/or F and F.13.

### TWENTY-SIXTH SPECIFICATION

### PRACTICING THE PROFESSION WITH NEGLIGENCE ON MORE THAN ONE OCCASION

Respondent is charged with committing professional misconduct as defined by New York Education Law §6530(3) by practicing the profession with negligence on more than one occasion as alleged in the facts of the following:

26. The facts in paragraphs A and A.1, A and A.2, A and A.3, A and A.4, A and A.5, A and A.6, A and A.7, A and A.8, A and A.9, A and A.10, A and A.11, A and A.12, A and A.13, and/or A and A.15; and/or B and B.1, B and B.2, B and B.3, B and B.4, B and B.5, B and B.6, B and B.7, B and B.8, B and B.9, B and B.10, B and B.11, B and B.12, B and B.13, and/or B and B.15; and/or C and C.1, C and C.2, C and C.3, C and C.4, C and C.5, C and C.6, C and C.7, C and C.8, C and C.9, C and C.10, C and C.11, C and C.12, C and C.13, and/or C and C.15; and/or D and D.1, D and D.2, D and D.3, D and D.4, D and D.5, D and D.6, D and D.7, D and D.8, D and D.9, D and D.10, D and D.11, D and D.12, D and D.13, and/or D

18

and D.15; and/or E and E.1, E and E.2, E and E.3, E and E.4, E and E.5, E and E.6, E and E.7, E and E.8, E and E.9, E and E.10, E and E.11, E and E.12, E and E.13, and/or E and E.15; and/or F and F.1, F and F.2, F and F.3, F and F.4, F and F.5, F and F.6, F and F.7, F and F.8, F and F.9, F and F.10, F and F.11, F and F.12, and/or F and F.13; and/or G and G.1, G and G.2, G and G.3, and/or G and G.4.

### TWENTY-SEVENTH THROUGH THIRTY-SECOND SPECIFICATIONS
### PRACTICING THE PROFESSION WITH GROSS INCOMPETENCE

Respondent is charged with committing professional misconduct as defined by New York Education Law §6530(6) by practicing the profession with gross incompetence as alleged in the facts of one or more of the following:

27. The facts in paragraphs A and A.1, A and A.2, A and A.3, A and A.4, A and A.5, A and A.6, A and A.7, A and A.8, A and A.9, A and A.10, A and A.11, A and A.12, A and A.13, and/or A and A.15.

28. The facts in paragraphs B and B.1, B and B.2, B and B.3, B and B.4, B and B.5, B and B.6, B and B.7, B and B.8, B and B.9, B and B.10, B and B.11, B and B.12, B and B.13, and/or A and A.15.

29. The facts in paragraphs C and C.1, C and C.2, C and C.3, C and C.4, C and C.5, C and C.6, C and C.7, C and C.8, C and C.9, C and C.10, C and C.11, C and C.12, C and C.13, and/or C and C.15.

19

30.  The facts in paragraphs D and D.1, D and D.2, D and D.3, D and D.4, D and D.5, D and D.6, D and D.7, D and D.8, D and D.9, D and D.10, D and D.11, D and D.12, D and D.13, and/or D and D.15.

31. The facts in paragraphs E and E.1, E and E.2, E and E.3, E and E.4, E and E.5, E and E.6, E and E.7, E and E.8, E and E.9, E and E.10, E and E.11, E and E.12, E and E.13, and/or E and E.15.

32.  The facts in paragraphs F and F.1, F and F.2, F and F.3, F and F.4, F and F.5, F and F.6, F and F.7, F and F.8, F and F.9, F and F.10, F and F.11, F and F.12, and/or F and F.13.

## THIRTY-THIRD SPECIFICATION

## PRACTICNG THE PROFESSION WITH INCOMPETENCE ON MORE THAN ONE OCCASION

Respondent is charged with committing professional misconduct as defined by New York Education Law §6530(5) by practicing the profession with incompetence on more than one occasion as alleged in the facts of the following:

33. The facts in paragraphs A and A.1, A and A.2, A and A.3, A and A.4, A and A.5, A and A.6, A and A.7, A and A.8, A and A.9, A and A.10, A and A.11, A and A.12, A and A.13, and/or A and A.15; and/or B and B.1, B and B.2, B and B.3, B and B.4, B and B.5, B and B.6, B and B.7, B and B.8, B and B.9, B and B.10, B and B.11, B and B.12, B and B.13, and/or B and B.15; and/or C and C.1, C and C.2, C and C.3, C and C.4, C and C.5, C and C.6, C and C.7, C and C.8, C and C.9,

20

C and C.10, C and C.11, C and C.12, C and C.13, and/or C and C.15; and/or D and D.1, D and D.2, D and D.3, D and D.4, D and D.5, D and D.6, D and D.7, D and D.8, D and D.9, D and D.10, D and D.11, D and D.12, D and D.13, and/or D and D.15; and/or E and E.1, E and E.2, E and E.3, E and E.4, E and E.5, E and E.6, E and E.7, E and E.8, E and E.9, E and E.10, E and E.11, E and E.12, E and E.13, and/or E and E.15; and/or F and F.1, F and F.2, F and F.3, F and F.4, F and F.5, F and F.6, F and F.7, F and F.8, F and F.9, F and F.10, F and F.11, F and F.12, and/or F and F.13; and/or G and G.1, G and G.2, G and G.3, and/or G and G.4.

## THIRTY-FOURTH SPECIFICATION

## WILLFULLY FAILING TO FILE A REPORT REQUIRED BY LAW

Respondent is charged with committing professional misconduct as defined by New York Education Law §6530(21) by willfully failing to file a report required by law or by the Department of Health, or the Education Department as alleged in the facts of one or more of the following:

34. The facts in paragraphs G and G.1, G and G.2, G and G.3 and/or G. and G.4.

21

## THIRTY-FIFTH SPECIFICATION

## WILLFULLY OR GROSSLY FAILING TO COMPLY WITH FEDERAL, STATE, OR LOCAL LAWS RULES OR REGULATIONS GOVERNING THE PRACTICE OF MEDICINE

Respondent is charged with committing professional misconduct as defined by New York Education Law §6530(16) by willfully or grossly negligently failing to comply with substantial provisions of federal, state, or local laws, rules, or regulations governing the practice of medicine as alleged in the facts of one or more of the following:

35. The facts in paragraphs G and G.1, G and G.2, G and G.3 and/or G and G.4.

## THIRTY-SIXTH THROUGH FORTY-FIRST SPECIFICATIONS

## PERFORMING PROFESSIONAL SERVICES WHICH HAVE NOT BEEN AUTHORIZED BY THE PATIENT

Respondent is charged with committing professional misconduct as defined by New York Education Law §6530(26) by performing professional services which have not been authorized by the patient as alleged in the facts of one or more of the following:

36. The facts in paragraphs A and A.14, and/or A and A.15.

37. The facts in paragraphs B and B.14, and/or B and B.15.

38. The facts in paragraphs C and C.14, and/or C and C.15.

39. The facts in paragraphs D and D.14, and/or D and D.15.

40. The facts in paragraphs E and E.14, and/or E and E.15.

41. The facts in paragraphs F and F.14, and/or F and F.15.

22

## FORTY-SECOND THROUGH FORTY-SEVENTH SPECIFICATIONS

## FAILING TO MAINTAIN RECORDS

Respondent is charged with committing professional misconduct as defined by New York Education Law §6530(32) by failing to maintain a record for each patient which accurately reflects the evaluation and treatment of the patient as alleged in the facts of the following:

    42. The facts in paragraphs A and A.13.

    43. The facts in paragraphs B and B.13.

    44. The facts in paragraphs C and C.13.

    45. The facts in paragraphs D and D.13.

    46. The facts in paragraphs E and E.13.

    47. The facts in paragraphs F and F.12.

DATE: April 27, 2020
       Albany, New York

TIMOTHY J. MAHAR, ESQ.
Deputy Counsel
Bureau of Professional Medical Conduct

23

HIGHLLIGHTED PORTION WAS NOT MADE PUBLIC YET
SAVED FOR BEST TIME

The Office of Professional Medical Conduct decided to revoke my license to practice medicine on September 29th, 2021. They released a 58 page 'Determination and Order' (link) to validate their decision.

There have been many articles in the media written about the decision. To date, only one journalist has reached out to me for comment and decided to focus on smut rather than the loss of my license. In the interest of a more important conversation I am making the following statement:

**The lies and fear campaign of one woman:**
In June of 2017 Sarah Edmondson called friends, clients and even the families of friends to say "Something so terrible is happening [I can't say what], but it's so bad you have to get out". She gave no facts and provided no issues, only fear. Eventually, she spread rumors of 'human branding' within the organization, Sarah and others de-enrolled 140+ clients of NXIVM, causing an estimated $1.4 million in damages, according to a then-member of the NXIVM executive board. For this, she was facing possible fraud charges.

July 7th 2017, perhaps to take the heat off of herself, she brought her complaint to the OPMC claiming her consensual receipt of a brand was gross medical misconduct. After her request was denied, the actress turned to her resources in the media.

On October 17, 2017, a New York Times published an article, entitled 'Inside a Secretive Group Where Women Are Branded', she claimed her participation [in the initiation] was non-consensual, that she "thought it [the brand] was going to be a small tattoo", that "for hours muffled screams... filled the room", that she "wept the whole time". She told ABC news "it was worse than childbirth...Imagine a hot laser, dragged across your flesh for 30 minutes without anesthetic." She claimed "she dissociated out of her body (Scared and HBO's 'the Vow'). All of the above are lies, and I have the video to prove it. She knew about the brand before she joined, it was protocol (p. 1718, Trial Transcript). I was invited the same way. She didn't scream once. She breathed deeply for what was less than two mins of pen to skin time. She made fart jokes and bragged about "being a badass...getting a brand after her hallmark audition the day before". She cried (what appeared to be) genuine tears of gratitude at the end as she thanked Ms. Lauren Salzman for inviting her. She emphasized "how important all of this is" and she thanked me and said it looked great. (link to transcript of audio)

Below are excerpts of never-before-released audio from Sarah's branding ceremony [listen to full audio]. They show that Sarah was cheerful, laughed, made jokes, and even expressed gratitude for being invited to DOS:

Sarah: I feel like I might fart though actually… sorry
*(Everyone laughs and someone responds "that's ok")*

Lauren: You're doing great. Fucking awesome!
Sarah: Thank you
Another sorority sister: Warrior Bitches!
Sarah: Thank you for choosing me

*(Lauren kisses Sarah on her cheek)*
Sarah:  … this means a lot
*(Lauren strokes Sarah face)*
Sarah: Thank you… I love you.
Lauren: I love you
*(Lauren kisses Sarah again on the cheek and strokes her own hair and returns her hand to Sarah heart)*

Sarah: … It's so funny, I was auditioning for a fucking hallmark movie yesterday. *(women laughing)* … Bridal Bootcamp *(the title said in a humorous, mocking way)*  … *(she shakes her head from side to side)* fuck…  *(she laughs)*
Another sorority sister: Bridal Bootcamp *(laughs)*
Sarah:  … thank you … warrior bootcamp, bitches!" *(laughter)*

Based on the video, the ceremony was full of meaning and also fun, and a celebration of something Sarah had chosen. Yet the story she told in the New York Times was quite the opposite.

…And yet each media outlet bought her crafted story and supported this grown woman's (39 at the time) sob story without thorough fact checking or even questioning her.

**Political and Media Involvement:**
In 2017 NY Gov. Andrew Cuomo decided to "influence" the medical commissioner to prosecute this matter after the OPMC had rendered a written decision to the contrary. When Sarah Edmondson brought her claims to the OPMC in 2017, they issued a written statement concluding that "[T]he issues you [Ms. Edmondson] describe did not occur within the doctor-patient relationship… The issues you describe are not medical conduct… and no further action will be taken." They also encouraged her to take this matter to the criminal authorities if she felt this act was violent or criminal in nature. When she did, this claim was also denied (link).

Instead of stopping this ridiculous allegation there, the Governor and the OPMC buckled under the pressure of the media. As a result, my license has been under investigation for the past 4 years for actions that have nothing to do with the practice of medicine.

**Not the Practice of Medicine:**
The art of branding is done all over the county by non-medical tattoo artists and fraternity members in tattoo parlors. There are no licenses required to practice branding in the state of NY. Therefore, I was not leaning on my medical license for scope. There was no patient-physician relationship. It was unknown to the women who would be helping them with their brands until they arrived. There were no monies exchanged, or insurances billed. In fact, billing codes for

branding don't even exist. It is not taught in medical school and there are no courses or fellowships that so much as mention it. I was taught by the nation's leading body modification artist – not a doctor. But, perhaps most importantly, it does not meet the medical-legal definition for the practice of medicine as clearly outlined in Section 6251, NY Education Law entitled "Definition of Practice of Medicine":

*"The practice of the profession of medicine is defined as diagnosing, treating, operating or prescribing for any human disease, pain, injury, deformity or physical condition."*

Can someone please tell me what disease, pain, injury, deformity or condition I was treating?

My hard-earned medical license was taken away for actions taken between consenting adults outside the practice of medicine. I have never so much as had one complaint from an actual patient of mine.

**The OPMC:**
Three board members were chosen (by a board that hires/fires them, who are hired/fired by the Medical Commissioner, who is now hired/fired by the Governor [Cuomo]) to evaluate the legitimacy of my case and determine my competence. It is not their job to protect consenting adults from the consequences of their decisions as in the case of Sarah Edmonson. It is, however, their job to distinguish medical practice from personal endeavor. Unless, of course, we want government agencies to dictate to us what we can and can not do in our personal lives, just as our parents did when we were 15.

They were way outside their scope.

The board's lack of judgement, discernment and morality are a matter of great concern for me (and should be for all of us). If boards, political offices and news outlets are run by individuals who have not exercised and refined these skills then we run the risk of accepting oppression and coercion under the guise of security and protection.

**The Consequences:**
Nowhere was it proven that I hurt a single patient, or was grossly neglectful, or gave a patient bad medical treatment, or even misdiagnosed someone. This is the realm where a doctor should be evaluated. Not their belief system, their religion, or their non-medical life. I was stripped of my hard-earned medical license, not because of my failures as a doctor (as I have never, in my entire career, received one malpractice complaint from a single patient or colleague), but because of my personal beliefs and activities outside the practice of medicine. It took merely one former friend (not a patient, not a colleague) complaining, retroactively, about something she not only consented to, but celebrated at the time, to destroy fifteen years of my hard work and ten additional years of dedicated and faithful service.

The ruling in my case ultimately says that physicians must live their lives, both personal and professional, in a way that the OPMC approves of. Frighteningly, it requires a retroactive evaluation by the OPMC to determine that a physician's personal conduct violated their unspecified and undisclosed code. This historic decision grants power to administrative

occupational boards to peer into a physician's personal life and revoke their license(s) for consensual actions taken in "privacy". If this is allowed, even once, by any of us... kiss your civil liberties goodbye.

-

The OPMC released a 58 page justification for their decision. I will address the issues in this justification one by one in coming statements. For now, I'm continuing to evaluate what it means about the rights of all medical practitioners, and all of us as humans, that this was allowed in the United States.

I was stripped of my medical license as a result of a fear campaign incited by one woman willing to lie, the careless and fervent appetite of our culture for gossip, the lack of integrity and rigor of our media to fact check, and the moral weakness of our political leaders and elected court officials.

I will appeal this decision, not just for me, but for all of us.
Please contact me if you'd like to help.

danielle@drdanielleroberts.com
www.drdanielleroberts.com

Danielle Roberts, [06.03.17 22:06]
Ms Edmonson,
We are looking for Ms Obrien. Do you know where she may be?

Sarah Edmonson, [06.03.17 22:06]
She is with me!

Sarah Edmonson, [06.03.17 22:07]
Texting you now.

Danielle Roberts, [06.03.17 22:07]
Thank you!

Sarah Edmonson, [06.03.17 22:07]


Sarah Edmonson, [04.06.17 08:27]
Thanks for your note

Sarah Edmonson, [04.06.17 08:27]
I've been meaning to write

Sarah Edmonson, [04.06.17 08:27]
My brand isn't Healing well

Sarah Edmonson, [04.06.17 08:28]
One line is super thick and painful. And raised. The rest are fine.

Sarah Edmonson, [04.06.17 08:28]
Is that normal?

Sarah Edmonson, [04.06.17 08:28]
What helps? Coconut oil? Vitamin e?

Danielle Roberts, [04.06.17 11:11]
Yes some skin heals that way. You can use coconut oil or lavender

Danielle Roberts, [04.06.17 11:11]
Lets just be mindful of using the b word

Sarah Edmonson, [04.06.17 11:15]
Copy

Danielle Roberts, [04.06.17 13:37]

Sorry for the short answer. We were exploring in groups.
How are you?! Hows your grandpa?!

We miss you?

Danielle Roberts, [04.06.17 13:37]
We miss you.  (Not ?)

Sarah Edmonson, [04.06.17 13:50]
Thanks    He has stomach cancer

Danielle Roberts, [04.06.17 15:54]
Iye. Im so sorry. How is he doing?

Sarah Edmonson, [04.06.17 16:31]
Weak but happy to have his family

Danielle Roberts, [04.06.17 22:07]


Danielle Roberts, [04.06.17 22:07]
How are you doing?

Sarah Edmonson, [04.06.17 22:07]
Rough. U?

Danielle Roberts, [04.06.17 22:09]
A bit of a rollercoaster in coach summit.

You need anything love. I know those situations can wear on you?

Sarah Edmonson, [04.06.17 22:11]
Tell me

Sarah Edmonson, [04.06.17 22:13]
In need some vitamin e oil. Lol

Danielle Roberts, [04.06.17 22:14]
Tell you?

Danielle Roberts, [04.06.17 22:15]
Not sure what you meant by that

Danielle Roberts, [04.06.17 22:15]

Where are you? Im Vancouver?

Sarah Edmonson, [04.06.17 22:26]
U said it was a roller coaster

Danielle Roberts, [04.06.17 22:31]
Ah yes. Building a conscience is painful

Primary meaning:

**Bar** - The horizontal axis represents the path from birth to death, beginning to end, and linear time — life to death, and the dual nature of human existence evidenced by our symmetrical shapes: left and right, male and female, good and evil.

**Alpha** - The letter A (alpha) means the "primary force." In English, the noun is used as a synonym for "beginning." It is derived from the Phoenician and Hebrew letter aleph, an ox or a leader.

**Mu** - According to the Greek Alphabet Code, M (mu) is the "visible nature." From Greek alphabet oracle: *"It is necessary to labor {Mokhtheô}, but the change will be admirable."* (Through toil and distress a change will be made for the better. Hard work will result in a good return.)

Additional meanings:

The design incorporates the Four Elements; a line symbolizing the horizon represents Air, an open triangle symbolizing a mountain, Earth; an angled line symbolizing a wave, Water; and finally, the brand is sealed with Fire. The brand has 7 lines, signifying the 7 Chakras. Triangles represent the desire to rise up as a strong and solid force in harmony and balance with the world around us. Straight lines indicate an unwavering moral code.

In summary:

We started with Alpha because it's the beginning and Mu due to the visible nature of women and progression towards a positive outcome. We added the line to represent the journey, and which also made it 7 lines to reflect the chakras. It's meant to represent our ascension to our ideal selves... committing to grow and uphold our essential nature, to build our capacities to fully express this nature and actualize our individual and shared purposes, in full balance and harmony within ourselves, others and the natural world.

The experience itself harks to traditional rites of passage, where the experience of challenge and pain facilitates an awakening and transition into a state of full responsibility. In addition, the bonding experience that occurs is akin to teams/groups that go through shared hardships or obstacles, creates an experience of deep vulnerability and connection.

**Danielle Roberts**                                                08:35

Here

Have you shared to TBD story with anyone? Particularly the part    08:35
that I choose to ==brand== them because I waned then to have someone
safe to go to? (Speaking with Nik and evaluating a few things)

Nicki                                                               08:35

**India Oxenberg**                                                  08:36

I chose to ==brand== who? Are you referring to me or yourself

**Danielle Roberts**                                                08:37

Me... did you include in your story to your fam that I ==brand==ed you?

**India Oxenberg**

No. I didn't include you in any of the story                        08:42

**Danielle Roberts**                                                08:43

Gotcha! Thanks for the info

Roberts - 167

## PRELIMINARY STATEMENT

Petitioner submits this Brief in reply to the Brief For Respondent. The Brief submitted on behalf of respondent, The New York State Board for Professional Medical Conduct (the "State Board"), constitutes an effort to distract from the fundamental issue in this case – whether the State Board improperly exercised jurisdiction over petitioner. This effort to prejudice the case against petitioner occurred during the administrative hearing and has continued in this Court. Even in the Preliminary Statement contained in respondent's Brief, the organization that petitioner joined is referred to as a "cult." Whether the women who agreed to join DOS and who voluntarily agreed to receive a brand as part of the initiation ceremony were involved in a "cult" is utterly irrelevant to the misconduct charges brought and sustained against petitioner and to her defense that she was not involved in the practice of medicine when she agreed to serve as a branding technician for the initiation ceremony. Respondent's Brief is also prejudicial when it asserts in Point number 3 of its Questions Presented that "investigators initially decided not to pursue petitioner's actions and instead referred a complaint to law enforcement." In fact, as the letter which was not admitted into evidence by the complaint was rejected by the OPMC because the actions by petitioner that were complained of did not occur within a doctor-patient relationship and did not

constitute professional misconduct under Section 6530 of the Education Law (RR 3527-3530). It was suggested to the complainant that she could file a complaint with law enforcement. This was not a statement involving dual jurisdiction, both administrative and criminal, where the Office of Professional Medical Conduct ("OPMC") was exercising discretion by referring the matter to law enforcement. By stating the fact that the actions complained of did not fall within a doctor-patient relationship, OPMC was stating that it lacked jurisdiction because the allegations did not occur in the practice of medicine.

Consistent with OPMC's letter rejecting the allegations set forth in the Complaint, petitioner has asserted in her main Brief that all of the women who received a brand had agreed to receive a brand before learning that petitioner would be serving as the branding technician (RR   ). None of the women, including the complainant who was the only woman who testified against petitioner, had any idea that petitioner or any other physician would be performing the task (RR   ). Despite this, respondent's Brief states the opposite at page 6 thereof, claiming that "the women knew that she was a doctor" thus implying reliance on this knowledge. The evidence, however, was clear and unrefuted by several women who received a brand that they didn't know that a physician would be performing the branding and they did not consider themselves to be patients of petitioner (RR   ).

Respondent's Brief continues its effort to distract from the real issue by referring to the assertions by S.E. that she was misled (by others, not petitioner) about whether she would be receiving a tattoo rather than a brand; that she was misled about the nature of the brand and its alleged meaning; the amount of pain that she would feel when the brand was being applied; the fact that she was not offered anesthesia; or that the table was not disinfected between brandings. While her testimony was largely discredited, it was utterly irrelevant. It served only one purpose during the hearing and is again serving the same purpose in respondent's Brief – to prejudice the hearing committee and now this Court against petitioner. The claims by S.E., which were set forth in her Complaint that was rejected by the OPMC as noted above, are not relevant to whether petitioner was engaged in the practice of medicine and thus subject to the jurisdiction of the State Board. Nor does the testimony of Bilbao and Cepelinski cited in respondent's Brief about alleged pressure brought to convince women to undergo the branding and keep it a secret have anything to do with the fundamental issue (indeed, the only issue) in this case.  (screen for other distractions)

**THE EXPERT TESTIMONY DID NOT ESTABLISH
THAT PETITIONER WAS ENGAGED IN THE
PRACTICE OF MEDICINE WHEN SHE PROVIDED A BRAND
TO SEVERAL WOMEN**

It has been asserted in respondent's Brief that the expert testimony at the hearing below supported the hearing committee's determination that petitioner was engaged in the practice of medicine which justified its assertion of disciplinary jurisdiction. Testifying as an expert on behalf of OPMC was Robert Grant, MD, a plastic surgeon. But Dr. Grant was unable to explain how providing a brand fell within the statutory definition of the practice of medicine. As noted in our main Brief, the practice of medicine is defined in Section 6521 of the Education Law as "diagnosing, treating operating or prescribing for any human disease. Pain, injury, deformity or physical condition," In an effort to fit branding into this definition, Dr. Grant asserted that branding is analogous to cosmetic surgery in that cosmetic surgery is universally considered the practice of medicine and that this is so because cosmetic surgery treats a patient's "psychic pain" (RR    ). [need to address what the reply brief says about grants testimony and the substantiation of the brand beign the practice of medicine "because he says it was" He continued this bizarre analogy by claiming completely without evidence that persons who want to be branded are also experiencing "psychic pain." Apparently, his argument is that since petitioner was treating "pain" she was engaged in the practice of medicine within the statutory definition set forth in Section 6521 of the Education Law. Aside from the obvious facial absurdity and lack of evidence for this position, the fact is that cosmetic surgery is the practice of medicine not because

the surgeon is treating "psychic pain" but rather because the surgeon is treating a physical condition that the patient wants addressed. The condition, for example, could be a nose that is perceived by the patient to be too large, too small or too crooked. But persons who agree to be branded for ceremonial purposes have no physical condition that is being addressed by the branding technician.

Respondent's Brief fails to even mention the underlying basis for Dr. Grant's position undoubtedly because it is too absurd to even defend. perfect

Respondent's Brief also cites the testimony of petitioner's expert as if his testimony supported the hearing committee's determination that petitioner was engaged in the practice of medicine when she provided a brand at the request of several women. Dr. David Mayer testified as an expert on behalf of petitioner. Dr. Mayer is a highly experienced surgeon who has served as a chairman of surgery in the Northwell Health System with supervisory responsibility for over 250 surgeons (including plastic surgeons); he has taught medical students and residents at New York Medical College, Hofstra Medical School and the State University of New York at Stony Brook; and he is also a licensed attorney having graduated *summa cum laude* from the Hofstra University School of Law (RR   ). Contrary to the misleading references in respondent's Brief, Dr. Mayer testified

> In my expert opinion to a reasonable degree
> of medical certainty, [petitioner] was not

> engaged in the practice of medicine when she
> performed the branding procedure. In fact, she
> was acting as a branding technician or a scarification
> artist rather than a physician (RR 1473).

In attempting to respond to petitioner's argument that branding is not the practice of medicine, respondent's Brief cites *People v. Amber, 76 Misc. 2d 267, 273 (Sup. Ct Queens 1973)* which concluded that acupuncture is within the practice of medicine and *People v. Rubin, 113 Misc. 2d 117, 119 (App. Term 2d Dept. 1981)* finding hair implantation to be a medical practice. But both cases actually support petitioner's position that branding is not the practice of medicine as defined by Section 6521 of the Education Law. *People v. Amber, supra,* delved into the history of acupuncture and concluded that it is a form of treatment intended to relieve the patient of pain or other physical trouble and therefore falls within the practice of medicine as defined in the Education Law. Id. At 273. The Court cited the New York Court of Appeals' decision in *People v. Cole, 219 NY 98 (1916)* which, in interpreting the precursor to Education Law Section 6521, concluded that the language of the statute was intended to regulate activities relieve or cure disease or infirmity. *People v. Rubin, supra*, also supports petitioner's position. In that case, the question was whether hair implantation constitutes the practice of medicine within the definition of Section 6521. Therein, the Court referred to the fact that the defendants were treating the condition of

baldness (alopecia – makes it very medical – even has a specific medical word, lol). Since this was a physical condition, its treatment fell within Section 6521.

Respondent's Brief continues its misleading arguments and citations by arguing at page 22 thereof that it was rational for the hearing committee to find that petitioner operated for a physical condition because she caused second degree burns and created permanent scars on her subjects. While there was substantial testimony at the hearing refuting that the "burns" caused by petitioner were real second degree burns in the way that phrase is commonly used medically (RR    ), the fact is that this is irrelevant to the issue just as it is irrelevant that the branding procedure was painful. The undisputed fact is that the women who agreed to be branded and for whom petitioner provided a brand, had no disease when they came to be branded; they had no pain when they came to be branded; they had no injury when they came to be branded; they had no deformity when they came to be branded; and they had no physical condition that they wanted addressed when they came to be branded. Great and emphatic (suggest changing "be branded" in all of these statements to "to receive a brand") Respondent's Brief cites the hearing committee's analogy of branding to rhinoplasty based on the assumption that rhinoplasty changes the appearance of the nose and branding causes a permanent scar on the skin. But this analogy, of course, misperceives the statutory definition of the practice of medicine. A rhinoplasty addresses a pre-existing condition – a

nose that is perceived by the patient to be too large, too small or too crooked. But the women who wanted to receive a brand for ceremonial purposes and as a symbol of their commitment to the organization they wanted to join had no pre-existing physical condition that was being diagnosed, treated, operated on or prescribed for by petitioner. Respondent's Brief argues at page 23 that petitioner's assertion that the women were all healthy is beside the point because cosmetic surgery often seeks to alter or enhance  a normal patient's appearance. To the contrary, that the women who wanted to be branded were all healthy and had no physical condition that they wanted addressed is not beside the point, it is precisely the point. As noted above, cosmetic surgery patients have a physical condition that they want addressed – the same is not true for branding. The fact that the ceremonial or symbolic brand alters the skin by placing a scar on the skin does not render this non-medical activity into the practice of medicine as defined in the Education Law which, in every instance, refers to a pre-existing condition. (excpect for ear piercing – Grant brought this up, and it is mentioned in the reply brief. Does this argument leave us open to the criticism here? Ear Piercing is however taught to plastic surgeons as mentioned by Dr. Grant I believe)

Respondent's Brief next cites *Y.Y.B. v. Rachminov, 48 Misc. 3d 1055 (Sup. Ct. Queens (2015)* which addresses a circumcision by a religious official and argues that this case somehow supports the proposition that the brandings

performed by petitioner fall within the statutory practice of medicine set forth in Education Law Section 6521. A circumcision performed by a physician is clearly the practice of medicine. It is an operative procedure that treats a physical condition that the patient's parents want addressed. (good) The fact that an unlicensed religious official is permitted to perform the procedure does not alter a physician's obligation to perform this medical procedure in accordance with accepted standards of medical practice. This leaves me wide open to their argument that because I;m a physician I need to up hold the standards of medicine while doent this procedure. Thus, *Rachminov* and similar cases do not stand for the proposition that when a physician is performing a private, non-medical procedure, she must nevertheless observe the same standards as if the procedure were a medical procedure. (how – I don't follow here. Because this is a physical condition, yes – but the physicians need to uphold medical standards when doing it perhaps better refuted or bolsetered IF the unlicenced religious official also need to uphold the standards of medical care in this procedure? – supports that it's medical in nature then and even an unlicensed practictioner needs to uphold that standard. Another thought is that there is training for physicians in this realm, training, courses, ICD-9 codes – this is clearly a medical procedure – not the same with branding.)

Respondent's Brief misperceives the argument raised in petitioner's main Brief that branding is not regulated by New York as are tattooing and body piercing. The point is that physicians who perform tattooing and body piercing are exempt from licensure under Article 4A of the Public Health Law. Thus, when performing these procedures (tattooing and body piercing)

, even if for a non-medical purpose (and not part of medical practice) the State Board could reasonably exercise jurisdiction because the medical license would be legally required to exempt the physician from licensure under Article 4A. The same is not true for branding which is not regulated. No license is legally required and thus cannot serve as a predicate for the exercise of disciplinary jurisdiction.

The balance of the arguments raised in respondent's Brief contain similar logical errors. Respondent's Brief argues that petitioner did not meet accepted medical standards and that this renders her conduct within the jurisdiction of the State Board. But a physician is not obligated to meet accepted medical standards when engaged in an activity that does not constitute the practice of medicine. Before the State Board can discipline a physician for deviating from accepted standards of practice, the Board must first determine that the physician was engaged in the practice of medicine such that medical standards apply (perfect). As noted in petitioner's main Brief, the hearing committee's determination that

petitioner was engaged in the practice of medicine was based on the erroneous concept that physicians are always engaged in the practice of medicine because they possess unique training and knowledge not enjoyed by the general public. When engaged in a private, non-medical activity, a physician need only comply with the standards applicable to the activity. (perfect) (because we say so, or because it's true provable by simple logic – doctors can never divorce themselves from their education, you can't unknow something once you know it, but that doesn't mean you play the role of a doctor or uphold the specific standards of medicine in every role you play in life. You don't do medical histories on your aerobics students as an instructor, provide a full physical exam to a waxing client as an esthetician, or obtain informed consent detailing possible risk of anaphylaxis from your clients before serving a meal as a chef? does it need a metaphor or example – aerobics instructor, massage therapist, or does that weaken it?). In the case of branding, petitioner was only obligated to meet branding standards. She did so and there was no evidence to the contrary. OPMC didn't even attempt to prove to the contrary. (nice) OPMC's expert had no experience with branding and conceded that he was unaware of any medical education or training that addresses the subject (RR   ). (use this more if possible – that there is no medical training or courses or ICD-9 codes) But even if OPMC had proven that petitioner violated accepted branding standards, this still would not subject her to jurisdiction of the

State Board which is charged with enforcing the misconduct laws applicable to the practice of medicine. (very good)

Finally, respondent's Brief argues at page 29 that a patient consent to or even insistence upon certain medical treatment does not relieve a physician from the obligation of treating the patient with the usual standards of care. Petitioner agrees. But the women who received a brand were not "patients" and they didn't perceive themselves as patients (   ). There was no "treatment" rendered to them and petitioner did not depart from accepted standards of medical practice based on her "philosophy" or "religion." She served as a branding technician /artist and met standards commonly applicable to branding – there was no requirement that to meet or apply medical standards because she was not engaged in the practice of medicine. All of the cases cited in respondent's Brief concerning moral unfitness in the practice of medicine are inapposite because the conduct addressed in each of the cited cases was part and parcel of medical practice. The opposite is true here. As noted in petitioner's main Brief, the activity engaged in by petitioner (though not immoral in any way), is irrelevant because it ~~did not fall within~~ did not meet the statutory definition of medical practice; the conduct did not involve patients; the conduct did not occur in a hospital or medical facility and no compensation was received or billed for. (ICD10- codes don't even exist for branding).

## RESPONDENT'S BRIEF FAILS TO
## JUSTIFY THE EXCLUSION OF THE

## OPMC LETTER WHICH REJECTED
## THE COMPLAINT OF S.E.

Initially it should be noted that there is nothing in the excluded letter that suggests that an OPMC "investigator" declined to pursue the complaint filed by S.E. (RR   ). The Complaint was rejected by OPMC's Central Intake Unit whose obvious job is to sift through complaints and weed out those that do not fall within OPMC's jurisdiction. (nice) Moreover, the Complaint was not merely "not pursued" by OPMC as alleged in respondent's Brief, It was expressly rejected on the ground that the allegations set forth in the Complaint "did not occur within the doctor-patient relationship…" and "[t]he issues you describe are not medical misconduct as defined in New York State Education Law Section 6530."  (very nice) A review of the allegations in the Complaint reveals that they are identical to the testimony provided at the hearing by S.E. (RR 3529-3530). Contrary to the argument raised in respondent's Brief, petitioner does not argue that the letter is dispositive or that an estoppel should bind the hearing committee. Petitioner argues that the hearing committee should have been permitted to see the letter which is 100 percent consistent with petitioner's defense that the allegations against her did not occur within a doctor-patient relationship and do not constitute misconduct under the Education Law Section 6530. It was prejudicial error to exclude the letter, especially on the ground that it was irrelevant. It couldn't have been more

relevant and had the hearing committee been permitted to see the letter it would likely have effected its decision. (begs the question is why be so prejudicial?)

## PETITIONER WAS NOT OBLIGATED TO REPORT THE OUTBREAK OF A MILD, SELF-LIMITING VIRUS

It is asserted at page 34 of respondent's Brief that the gastrointestinal symptoms suffered by a number of attendees at the corporate retreat known as Vanguard Week falls "squarely within state reporting requirements." This statement is absolutely not true. Indeed, it is stated in respondent's Brief that physicians have a duty to report every case of a "communicable disease," "any unusual disease" and "any unusual disease outbreak." But the regulation in question, 10 NYCRR Section 2.1 *et. seq.* defines "communicable disease" as any disease listed in the regulation. There was agreement at the hearing that the disease outbreak in question was, in all likelihood, a noro virus which is a garden variety stomach virus – unpleasant, but not lethal which usually takes two or three days to recover from (RR   ). There was no dispute that the virus was not on the list of communicable diseases set forth in the regulation (10 NYCRR Section 2.1). Obviously, if this stomach virus was not a communicable disease it could hardly be considered a communicable disease outbreak. Moreover, there was agreement at the hearing below that the virus that broke out was not an "unusual" disease. As such, it could not be considered an unusual disease outbreak. All that is left of the

reporting requirement is an ambiguous reference in Section 2.1c to the reporting of any disease outbreak. But, as noted in petitioner's main Brief, this reporting requirement is limited by 10 NYCRR Section 2.1b which, in turn, refers to 10 NYCRR Section 2.10 which addresses only communicable diseases and unusual diseases. This makes the reporting requirement far less than clear. Further, no one who contracted the disease was hospitalized and each person recovered completely in a few days as is common with a routine stomach virus.

Respondent's Brief mischaracterizes the expert testimony of Dr. Farber who testified on behalf of OPMC. Dr. Farber admitted that the stomach virus in question was a routine, non-lethal, garden variety type virus (RR720). While he thought it should have been reported, he was unable to say how the "failure" to report this routine virus violated 10 NYCRR Section 2. And while he stated his belief that the virus should have been reported, he did not know of even one instance during his long and distinguished career (of 40 years) where a report was made under similar circumstances (RR   ). Clearly, this is not the widely practiced "standard of care" it's purported to be in the hearing or the reply. Furthermore it's clear, there was no intentional or grossly negligent failure by petitioner to comply with the regulation allegedly violated. Indeed, petitioner had no mandatory reporting requirement at all. And Dr. Farber's admission that he had

never heard of anyone making a report under the attendant circumstances leaves the hearing record devoid of evidence to support a negligence finding.

## CONCLUSION

When OPMC's Intake Unit received the allegations against petitioner, it correctly concluded that, even if true, the allegations did not occur in the context of a doctor-patient relationship (and were not the practice of medicine). For reasons that are unclear, but which likely relate to the high visibility and high profile nature of this case, the allegations against petitioner were resurrected and were then kept from the hearing committee by the Health Department's administrative law judge who ruled that this important letter was irrelevant. This, and many other misleading statements and prejudicial actions (just a portion of which were pointed out in this reply) [tie it back to the preliminary statement] severely prejudiced petitioner. The letter, specifically, was directly relevant to the most important issue in the case – whether petitioner was engaged in medical practice when she provided a brand to women who requested that this be done as part of their initiation ceremony. Petitioner engaged in a purely private, non-medical procedure that was clearly outside of medical practice. The determination by the hearing committee constitutes the improper exercise over this private, non-medical activity in which no one was hurt. That the hearing committee may have believed that

petitioner exercised bad judgment in agreeing to act as a branding technician is of no moment. This does not confer jurisdiction where none exists. This is an infringement on the rights of citizens and doctors a like to decide how they would like to live their lives outside of medicine that is meaningful to them. Allowing a determination like this to stand is a dangerous precedent to set for all doctors and state-licensed professionals. The Determination and Order issued by the hearing committee should be vacated and annulled.

To Be Argued By: James M. Hershler
Time Requested: 10 minutes

SUPREME COURT OF THE STATE OF NEW YORK
APPELLATE DIVISION: THIRD DEPARTMENT
-----------------------------------------------------------------------------x
In The Matter of DANIELLE ROBERTS, D.O.,

Petitioner,

For a Judgment and Order Pursuant to Article 78            Case No.:
of the Civil Practice Law and Rules,                          534554

- against -

THE NEW YORK STATE BOARD FOR
PROFESSIONAL MEDICAL CONDUCT,

Respondent.
-----------------------------------------------------------------------------x

## BRIEF FOR RESPONDENT

LETITIA JAMES
Attorney General of the
State of New York
**Attorney for Respondent**
28 Liberty Street
New York, New York 10005
(212) 416-8590

VICTOR PALADINO
Senior Assistant Solicitor General

JAMES M. HERSHLER
Assistant Attorney General
  of Counsel

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ................................................................iii

PRELIMINARY STATEMENT ............................................................ 1

QUESTIONS PRESENTED ................................................................ 2

STATEMENT OF THE CASE ............................................................. 3

A. The Professional Misconduct Charges ............................................. 3

B. The Disciplinary Hearing ............................................................ 4

    1. The Branding Procedures............................................................ 4

        *a.* Petitioner ....................................................................... 4

        *b.* Other NXIVM and DOS Members ............................................ 7

        *c.* Expert Witnesses ................................................................ 10

    2. Vanguard Week ................................................................... 14

C. The Hearing Committee's Determination ........................................ 16

    1. The Committee Determined That Petitioner's
       Brandings Constituted Medical Practice ...................................... 16

    2. The Committee Found That Petitioner's Brandings
       Violated Numerous Medical Standards ........................................ 17

    3. The Vanguard Week Outbreak .................................................. 19

    4. The Penalty........................................................................ 20

i

**Page**

ARGUMENT ......................................................................... 20

THE    COMMITTEE'S    DETERMINATION    THAT
PETITIONER ENGAGED IN NUMEROUS ACTS OF
PROFESSIONAL    MISCONDUCT    IS    RATIONALLY
SUPPORTED BY THE RECORD ................................................. 20

    A.  Petitioner's Branding Procedures Were A Medical Practice
        Within The Committee's Jurisdiction ................................. 20

    B.  Petitioner's Repeated Violations Of Medical Standards
        Constituted Professional Misconduct.................................. 27

    C. The Exclusion Of A Letter By Investigators Initially
        Declining To Pursue A Complaint Against Petitioner
        Did Not Deprive Her Of A Fair Hearing By The
        Committee................................................................... 30

    D. Petitioner Committed Further Misconduct By Failing
        To Report A Large-scale Outbreak Of A Serious Illness ..... 34

CONCLUSION ...................................................................... 38

Roberts - 187

# TABLE OF AUTHORITIES

CASES                                                                    Page(s)

*Matter of Adei v. State Bd. For Professional Med. Conduct*,
 278 A.D.2d 551 (3d Dep't 2000) ........................................................ 21

*Matter of Anghel v. Daines*,
 86 A.D.3d 869 (3d Dep't 2011) ............................................... 24, 27, 37

*Matter of Binenfeld v. New York State Department of Health*,
 226 A.D.2d 935 (3d Dep't 1996) ........................................................ 32

*Matter of Charles A. Field Delivery Service, Inc.*,
 66 N.Y.2d 516 (1985) ...................................................................... 33

*Matter of Conteh v. Daines*,
 52 A.D.3d 994 (3d Dep't 2008) .......................................................... 30

*Matter of Elcor Health Services, Inc. v. Novello*,
 100 N.Y.2d 273 (2003) ...................................................................... 36

*Matter of Gross v. Ambach*,
 71 N.Y.2d 859 (1988) ...................................................................... 25

*Matter of McBarnette v. Sobol*,
 83 N.Y.2d 333 (1994) ...................................................................... 31

*Matter of Pardo v. Novello*,
 2 A.D.3d 991 (3d Dep't 2003) ............................................................ 24

*Matter of Smith v. New York State Dept. of Health*,
 66 A.D.3d 1144 (3d Dep't 2009) ............................................... 29-30, 33

*Matter of Sundaram v. Novello*,
 53 A.D.3d 804 (3d Dept. 2008) ................................................... 30, 32

*Metzler v. New York State Bd. for Professional Medical Conduct*,
 203 A.D.2d 617 (3d Dep't 1994) ........................................................ 29

Roberts - 188

*Patin v. State Bd. for Professional Medical Conduct,*
    77 A.D.3d 1211 (3d Dep't 2010) ........................................... 24, 27, 29, 33

*People v. Amber,*
    76 Misc. 2d 267 (Sup. Ct. Queens 1973)...................................... 21, 25

*People v. Rubin,*
    113 Misc.2d 117 (App. Term 2d Dep't 1981) ..................... 21-22, 25, 28

*Tsirelman v. Daines,*
    61 A.D.3d 1128 (3d Dep't 2009) ................................................21, 32-33

*Y.Y.B. v. Rachminov,*
    48 Misc. 3d 1055 (Sup. Ct. Queens 2015)........................................... 25

## STATE STATUTES

Education Law
    § 6521 ........................................................................... 16, 21-22, 25
    §§ 6530 (2), (3), (4), (5), (6), (20), (26), (31), (32) and (47)..................... 4

Public Health Law
    § 230-c(5) ............................................................................................ 1
    § 230(10)(g)........................................................................................ 31

## STATE REGULATIONS

10 N.Y.C.R.R.
    § 2.1(a).............................................................................................. 35
    § 2.1(b).............................................................................................. 35
    § 2.1(c) ......................................................................................... 19, 35
    § 2.2(d) ......................................................................................... 19, 35
    § 2.10 ................................................................................................ 34

## PRELIMINARY STATEMENT

In this proceeding under Public Health Law § 230-c(5), petitioner Danielle Roberts, a physician, challenges a disciplinary order issued by a Hearing Committee of the New York State Board for Professional Medical Conduct (the "Committee") that revoked petitioner's medical license. Revocation was based on the Committee's finding that petitioner used an electrocautery device to brand seven women on their pelvic areas during their initiation into a cult, causing them to suffer second degree burns and creating permanent scars. The Committee found that petitioner's actions fell within its disciplinary jurisdiction and that she committed professional misconduct by failing to obtain informed consent for the procedures, failing to offer the women anesthesia for the intense pain that they suffered, and otherwise failing to abide by accepted medical standards in performing the medical procedures. It determined that petitioner committed further professional misconduct when, in violation of Health Department regulations, she failed to report a serious disease outbreak at a widely attended event, thereby endangering vulnerable children and elderly participants.

1

The Committee's decision is fully supported by the record and should be confirmed.

## QUESTIONS PRESENTED

1.    Does the record support the Committee's determination that petitioner engaged in the practice of medicine when she used an electrocautery device to brand seven women's pelvic areas, causing them to suffer painful second degree burns and creating permanent scars?

2.    Does the record support the Committee's further determination that petitioner committed professional misconduct by performing the scarring procedures without receiving proper training on the device she used and without taking medical histories, conducting physical examinations, obtaining informed consent, offering anesthesia, using appropriate infection control measures, providing adequate follow-up care or keeping medical records?

3.    Was petitioner deprived of a fair hearing because the administrative law judge did not admit into evidence a letter in which investigators initially decided not to pursue petitioner's actions and instead referred a complainant to law enforcement?

2

4.  Did the Committee correctly determine that petitioner committed further professional misconduct by willfully failing to report to public health authorities a serious disease outbreak occurring at an event that was attended by over 400 persons, including children and other vulnerable individuals?

## STATEMENT OF THE CASE

### A.  The Professional Misconduct Charges

By Amended Statement of Charges, dated April 27, 2020, the New York State Health Department's Bureau of Professional Medical Conduct ("Bureau") charged petitioner with committing professional misconduct when using a cauterizing device to brand seven female patients (A – G) on their pelvic regions, thereby creating permanent scars with the initials "KR" and/or "KAR" (Record [R]43-65).  The Bureau alleged that petitioner deviated from accepted standards of care by, *inter alia*, concealing the brands' meaning and failing to obtain the women's informed consent for their procedures, not taking medical histories or performing physical examinations, failing to offer anesthesia, not using appropriate infection controls or personal protective equipment, failing to provide adequate follow-up care and

3

failing to keep medical records (R43-54). She was charged with, *inter alia*, gross negligence and incompetence, negligence and incompetence on more than one occasion, patient abuse, moral unfitness to practice, fraudulent medical practice, performing services unauthorized by patients and failing to keep medical records, in violation of Education Law §§ 6530 (2), (3), (4), (5), (6), (20), (26), (31), (32) and (47) (R56-65).

The Bureau further charged petitioner with willfully and recklessly failing to report to public health authorities a serious disease outbreak that occurred at an event held in Silver Bay, New York during the summer of 2016 where hundreds of the attendees became severely ill (R54-55, 61, 63-64).

## B.    The Disciplinary Hearing

Petitioner's disciplinary hearing was held on 13 dates from June 2020 to March 2021 during which the three-member Committee heard testimony from 18 witnesses. A summary of the key evidence follows:

### 1.    The Branding Procedures

#### a.    Petitioner

Petitioner testified that she was a member of NXIVM, a personal development organization founded by Keith Raniere, and in 2016 she

4

joined a secret women's society known as DOS ("dominant over submissive") that was organized with Raniere's assistance (R962-963, 974, 980-985, 2271-2272). She testified that new DOS enrollees were required to commit to master-slave relationships with their teachers or mentors, submit "collateral" and get branded in their pelvic areas (R967-974, 985-987, 1040-1042, 1117-1118, 1276-1277).

At the request of DOS, petitioner branded 17 women for their initiations (including the 7 patients alleged in the charges) by using an electrocautery device (R991-994, 1042, 1277). The same symbol was used on all of the women, who had no choice about its content (R1160-1164, 1434). Petitioner did not tell them that the brand represented Keith Raniere's initials because that information was given to her in confidence by the society's leaders (R2197-2200, 2232-2233, 2237-2239).

Petitioner testified that the brandings involved a "very systematic" process in which the women were nude, they were held down and pain was an "integral part" (R1117-1118, 1406-1410, 1158-1160, 1272, 1279, 2261). The procedures were intensely painful, causing one or more of the women to scream and move despite being restrained, and they resulted in second degree burns and hypertropic

5

scars (R1325, 1454-1456, 2222, 2248-2249, 2266, 3065). Petitioner did not tell the women how painful it would be, nor did she offer them anesthesia because that was "completely counterintuitive to what they were trying to accomplish" through the experience (R1274, 1320-1321).

Petitioner received only minimal training on the electrocautery device that she used for the brandings (R1005-1016). She did not take medical histories, there was little protective equipment and medical records were not kept (R1070-1072, 1121, 1272, 1285-1288). Nor did she use sterile techniques or recommend prompt follow-up care or painkillers, terming the brandings a "very low risk, noninvasive procedure" that did not require "treatment of a second-degree burn" (R1185-1186, 1292-1293).

Petitioner did not dispute testimony by respondent's expert on the treatment standards for second degree burns (R2265-2267), but said they did not apply because she performed the brandings "as a technician," not a doctor (R1269-1270, 1407, 1411). However, many of the women knew that she was a doctor (R1080-1081, 1407, 1436-1437, 1521-1522), she reviewed photos of the brands and gave instructions on healing (R1103-1107, 1290-1292, 2209). Petitioner conceded that there

6

is an overlap between the skills of a doctor and a branding technician (R3076-3080) and that she could not ignore her medical knowledge when doing the procedures (R1179, 1269, 1295, 1300, 1305).

Petitioner expressed no regrets about her actions and stated that "I loved what we were doing in DOS. I feel very sad that it was twisted into something that it wasn't [and] used to scare people" (R2300-2301). She denied harming the women that she branded, claiming "[e]verybody is willing of their own free will to victimize themselves" and that "[w]e are all indoctrinated . . . in our society" (R2257, 2298).

### b.   Other NXIVM and DOS Members

S.E. testified that when recruited by DOS, she was told that her experience would be self-empowering and life changing (R1571-1573). But she first had to submit "collateral" including a nude photograph of herself and a letter admitting to sexual deviance, affairs and drug use (R1565-1571). She said the collateral exerted an "incredible amount of pressure" on her, like a "gun to my head" (R1587-1588, 1592, 1680).

S.E. testified that women at her initiation ceremony knew that petitioner was a doctor and she was comforted when realizing that petitioner would do her procedure (R1581-1583). However, she did not

7

know in advance that she would receive a brand, rather than a tattoo, or that it represented Keith Raniere's initials, and she would not have gone through with the procedure if she knew this (R1579-1584, 1690-1692, 1725-1727). She did not learn the brand's meaning until weeks later and felt defrauded by petitioner (R1626-1630, 1649-1650, 1693).

S.E. suffered "extreme pain" during her branding, describing it as an "acute fire in the most sensitive part of my body" (R1613). She could smell her burning flesh (R1614). She saw brandings of other DOS women where one screamed in pain and flipped off the table and another repeatedly asked to stop her procedure (R1593, 1607-1608).

S.E. further testified that petitioner did not offer anesthesia, the table was not disinfected between brandings, the women were all held down and their procedures were filmed (R1589-1593, 1602, 1607, 1635-video). Petitioner then provided instructions on changing bandages, applying Neosporin and submitting photos of the wounds (R 1598-1600). For any subsequent problems, S.E. was told to see petitioner and no one else, including S.E.'s own doctor (R1697-1698). Her brand did not heal well and she needed to apply ointments and creams for years before having plastic surgery to remove it (R1617-1621). S.E.'s branding video

8

was eventually released to the public after she broke her secrecy vow (R231, 1643-45, 2974-2975).

Vasco Bilbao, a former member of NXIVM, testified that S.E. said she had been deceived and was intensely pressured to go through with her branding (R814-818, 823-825, 849-852). Ariella Cepelinski, also a former NXIVM member, interviewed many women including S.E. who described their DOS experiences as "horrible," the ultimate intention appearing to be to "create an army of obedient women" (R1209-1214, 1218-1223, 1226).

Various members of DOS confirmed that Keith Raniere was the "grand master" or "architect" of the organization (R154, 2921-2923, 2960-2961, 2991), and though ostensibly intended for women's empowerment its enrollees had to submit to lifetime master-slave relationships (R194, 2471-2474, 2594, 2645, 2821-2822). The collateral was meant to ensure the group's secrecy and consisted of items such as the deed to a house or car, nude pictures (R163, 170, 177, 2642-2643), compromising letters to family or friends (R2593-2594, 2886, 2888), and other damaging information (R186, 2820-2821).

9

The DOS members confirmed that new enrollees were purposely not told that the brand symbol concealed Keith Raniere's initials (R167, 196, 203, 213, 228, 2490-2491, 2581-2882, 2800-2804, 2859-2861). They also confirmed that petitioner was known to be a doctor (R888-890, 895-896, 2480-2481, 2869-2870), and said that she was chosen to do the brandings as a skilled person with "a steady hand," "attention to detail," and a "very calm, caring demeanor" who was not "squeamish" (R2861-2862, 2894-2895, 2939).

### c.    Expert Witnesses

Respondent's expert, Dr. Robert Grant, board-certified in general and plastic surgery, regularly uses an electrocautery device as a scalpel and to seal bleeding vessels (R1878-1879, 1889-1897). He testified that using the device requires medical training, including operating under supervision (R1889-1890, 1897, 1903), and described necessary precautions such as testing, electrical grounding, sterility, anesthesia, protective equipment and smoke evacuation and general requirements for taking histories, creating plans of care, obtaining informed consent, providing follow up care and keeping medical records (R1892-1893, 1890-1928, 1944-1945, 1948, 1971-1973, 1982-1998).

10

Dr. Grant testified that all of these standards applied to petitioner's brandings because, like other cosmetic surgeries, they were painful, invasive medical procedures that reached and altered the deeper layers of skin (R1929, 1932-1935, 1948, 1994-1995). He further stated that reconstructive surgery is necessary to remove a brand, unlike a tattoo (R2051-2052).

After reviewing testimony by petitioner and other witnesses and video and photographic evidence of the brandings, Dr. Grant concluded that petitioner had not followed medical standards of care (R1888-1889, 1914-1915, 1943-1951, 1979-1993). He testified that her deviations were severe because, *inter alia*, her lack of training, the invasiveness of the procedures and the absence of consent discussions, medical histories, proper follow up care and record keeping presented serious risks to the women (R1943-1944, 1951, 1982, 1992-2000, 2053). He saw no legitimate medical purpose for her use of electrocautery on their skin without offering them anesthesia and said that her procedures caused excruciating pain, deep burns and abnormal scarring (R1892, 1904-1905, 1956-1965, 1981-1982, 2029-2030, 2034, 2043).

11

Dr. Grant further testified that medical standards apply to a doctor even if a layperson can perform the same procedure (R1994-1996, 1927-1928, 1932). He explained that doctors cannot enjoy the privileges that are unique to their profession without bearing the responsibilities (R1930-1932, 2046-2047), and while non-physicians can do minimally invasive procedures like body piercing, medical standards apply to physicians who perform them (R1926-1928).

Testifying for petitioner, Dr. David Mayer said that he received medical training on an electrocautery device and uses it for surgery (R2412). He nevertheless claimed that petitioner was not practicing medicine when branding because she could "put aside her white coat" and act "outside the profession of medicine," and was not addressing an abnormal condition like an "oversized nose" (R2441-2444). He said that her non-compliance with medical standards showed that the brandings were not within the practice of medicine (R2355-2357, 2459-2460).

However, Dr. Mayer tacitly admitted that medical practice can extend beyond treating abnormal conditions, such as performing a breast augmentation (R2444). He further conceded that one does not "stop being a physician . . . at different times" and that petitioner used

12

her medical knowledge when evaluating photos of the brands (R2438, 2451-2452). Nor did he dispute that the DOS women had second degree burns, or deny the medical treatment standards enunciated by Dr. Grant (R2382-2384, 2390). He admitted that anesthesia should be offered for painful procedures in medical practice, and that the women's collateral was possibly coercive (R2400, 2445-2446, 2409). Dr. Mayer said that he was "not here to justify" petitioner's actions because they were outside the practice of medicine (R2403-2405). He believed that her deception about the brand's meaning was "more in line of a criminal battery charge" (R2392-2393).

Steve Haworth, also a witness for petitioner, has done many electrocautery brandings and purportedly invented the technique (R2657, 2659). He said that second degree burns are far more painful and damaging than his brandings, which are "more like a scrape" (R2683-2685, 2723). He gave petitioner information on his methods by email and telephone, but never met her (R2661-2663, 3015). Haworth approved of her technique as shown in the video of S.E.'s branding, but could not explain her infliction of second degree burns and said that her

13

practice differed from his due to more frequent "starting and stopping" common for inexperienced branders (R2674-2675, 2702).

**2.    Vanguard Week**

In August 2016, petitioner attended Vanguard Week, a celebration of the birthday of Keith Raniere, NXIVM's founder (R1477-1483). She taught fitness classes at the event and described it as a "working vacation" (R2122-2124). Petitioner became aware of the outbreak of an illness causing nausea, diarrhea, vomiting and fatigue, and admits that shutting down and disinfecting the facility was a potential response to prevent spread of the illness (R1484-1485, 1490-1491). But she did not report the outbreak, claiming that it was not her duty because she was not there as a physician (R1495-1498, 1503).

However, E. Carlson, who also attended Vanguard Week, testified that petitioner was seen as a "huge resource" by NXIVM for her expertise in physical health and "a doctor in our community that you could go to" (R2747, 2749). Carlson said that petitioner held exercise classes at the event "to improve . . . body mechanics and get healthier" (R2749-2750).

14

Other NXIVM members who attended testified that people came to the ten-day event from all over the world with their families, including pregnant women and young children (R787-789, 893-894, 1199-1200, 1244-1248). The outbreak spread rapidly and many, if not most, of the 400 attendees became ill with intense nausea, diarrhea and vomiting during the event (R879-882, 1201-1208, 1231-1233).

Bruce F. Farber, M.D., board certified in internal medicine and infectious disease (R1762), testified that "any outbreak of infectious disease needs to be reported to the health department," whether or not a doctor is caring for patients (R1782-1784, 1800-1802). The goal is "to end it as soon as possible and prevent further spread," and that "if there is any question, you report it" (R1787, 1841).

Dr. Farber testified that noroviruses commonly cause outbreaks, are "extraordinarily unpleasant" and are dangerous for vulnerable people due to dehydration (R1779-1780). He has reported many such incidents and stated that, because Vanguard Week was a very large outbreak of a serious disease in a confined facility, petitioner should have known that medical standards required her to report it based on her training and experience (R1776-1777, 1784, 1789-1798). He found

15

her lapse to be significant because the facility needed to be closed immediately and decontaminated (R1785, 1795-1799, 1803-1804, 1836).

## C.   The Hearing Committee's Determination

On September 27, 2021, the Committee issued a Determination and Order that sustained the charges against petitioner and revoked her medical license (R 3472-3501).

### 1.   The Committee Determined That Petitioner's Brandings Constituted Medical Practice

The Committee rejected petitioner's claim that she did not engage in medical practice when branding the women (R3482). It observed that Education Law § 6521, which defines the practice of medicine, is interpreted broadly by the courts (R3483). It credited Dr. Grant's testimony that the brandings were "surgical" in nature and found it "glaringly obvious" that petitioner "was operating on the women to alter the skin, appearance, and physical condition of their pelvic regions," within the statute's meaning (R3484).

The Committee further determined that it had jurisdiction over petitioner's conduct notwithstanding the lack of specific branding regulations. It noted that doctors are exempted from tattooing and body piercing regulations because "it is presumed that appropriate

16

medical standards will apply" to their conduct, and that such activities are medical procedures when performed by doctors (R3486).

The Committee was not persuaded by petitioner's claim that she could "compartmentalize" her life, cast aside "her privileged status as a licensed physician with specialized knowledge" and brand the women as a technician (R3487). It found her testimony evasive and contradictory, diminishing her credibility (R3481-3482) (*e.g.* R1044-1046, 1049, 1059-1066, 1079). It noted that she admittedly relied on her medical background "in everything she does" and that her status as a doctor was well known in the NXIVM community (R3488).

### 2. The Committee Found That Petitioner's Brandings Violated Numerous Medical Standards

The Committee determined that petitioner violated many professional standards when performing the branding procedures. It found that she lacked "serious and proper training in using an electrocautery device," noting testimony by her witness that he never causes second degree burns whereas visual evidence and witness testimony showed that she caused intensely painful second degree burns (R3489). The Committee found that her "poor technique was obvious" from the video of S.E.'s branding, "which showed sparks and

17

fire from the electrocautery device as she moved it across the skin" (R3489).  It concluded that she lacked an understanding of how the device worked, the dangers in using it directly on the skin and the substantial pain and trauma that she caused (R3490).

The Committee credited Dr. Grant's opinion that "it is unethical for physicians to intentionally cause patients such harm" and that petitioner's severe deviations from medical standards "risked causing the women cauterized even deeper burns from not being able to remain still during the procedure," wound infections and psychological trauma (R3490-3492).  It concluded that her failure to take medical histories, perform physical examinations and keep medical records created additional dangers, and that she should have known to discuss the risks, benefits and alternatives to the branding procedure with the women in order to obtain their informed consent (R3493-3494).

The Committee was particularly concerned about the coercive material submitted by the women and petitioner's failure to inform them of the brand's meaning (R3494-3495).  It found that her "medically reckless" procedures violated the strict prohibition against doctors "going above and beyond what the patient expects," constituting fraud,

18

performing unauthorized services, moral unfitness to practice and patient abuse (R3496-3497).

### 3.    The Vanguard Week Outbreak

The Committee held that petitioner committed further misconduct by her willful and negligent failure to comply with state requirements to report to public health authorities the widespread disease outbreak that occurred during Vanguard Week (R3498).

The Committee found that the definition of a "disease outbreak" which must be reported under 10 NYCRR §§ 2.1(c) and 2.2(d) was met because numerous attendees at the event, held in a confined location, suffered similar gastrointestinal symptoms (R3498).  It credited Dr. Farber's testimony that petitioner should have known it was her duty to report the outbreak from her medical training and experience, even if on vacation (R3497-3498).  It considered her failure to be "especially egregious" because of the potentially dangerous consequences for sick, elderly and other vulnerable people and the need to close the facility to prevent further spread of the disease (R3498).

19

## 4.    The Penalty

The Committee found that petitioner's many acts of professional misconduct in this case showed that she abdicated her responsibilities as a physician (R3499).  It was deeply concerned by her lack of remorse and observed that "instead of holding herself accountable for harming" S.E., who was severely traumatized by the branding, she accused S.E. of "victimizing herself" (R3499).  The Committee determined that license revocation was necessary because petitioner's "distorted reality" presented the risk that others would be vulnerable to similar misconduct if she were to continue practicing (R3500).

This proceeding ensued.

## ARGUMENT

### THE COMMITTEE'S DETERMINATION THAT PETITIONER ENGAGED IN NUMEROUS ACTS OF PROFESSIONAL MISCONDUCT IS RATIONALLY SUPPORTED BY THE RECORD

### A.    Petitioner's Branding Procedures Were A Medical Practice Within The Committee's Jurisdiction.

There is no merit to petitioner's argument that her brandings were a non-medical practice that was beyond the Committee's disciplinary authority.  Quite the contrary, the record amply supports

20

the Committee's finding that her performance of these procedures was subject to numerous medical standards.

Judicial review of the Committee's determination "is limited to whether it is supported by substantial evidence." *Tsirelman v. Daines*, 61 A.D.3d 1128, 1129 (3d Dep't 2009). Of particular relevance here, the question of "[w]hether the alleged misconduct actually occurred within the practice of medicine is a factual determination to be made by the [Hearing] Committee which will not be disturbed if it has a rational basis." *Matter of Adei v. State Bd. For Professional Med. Conduct*, 278 A.D.2d 551, 552 (3d Dep't 2000).

Education Law § 6521 defines the practice of medicine as "diagnosing, treating, operating or prescribing for any human disease, pain, injury, deformity or physical condition." As the Committee observed, this law has been broadly interpreted by courts and the determination of whether conduct falls within it must be based on the facts presented "and not upon the name of the procedure, its origins or legislative lack of clairvoyance." (R3483) (quoting *People v. Amber*, 76 Misc. 2d 267, 273 (Sup. Ct. Queens 1973) (finding acupuncture within the practice of medicine); *see also People v. Rubin*, 113 Misc.2d 117, 119

21

(App. Term 2d Dep't 1981) (finding hair implantation to be a medical practice).

The evidence in this case showed that petitioner's branding procedures were excruciatingly painful and resulted in permanent and abnormal scars that would require sophisticated plastic surgery to repair (R129-151, 564-599, 1593, 1607-1608, 1613, 2051-2052). The Committee rationally credited Dr. Grant's expert testimony that petitioner's invasive procedures, which caused second degree burns and reached the deeper layers of skin, constituted "operating" within the meaning of medical practice (R3484-3485). *Cf. Rubin*, 113 Misc.2d at 119 (hair implantation is the practice of medicine because, *inter alia*, it involves "violation of the scalp by a foreign object" and "potential or actual complications resulting from such procedure").

Petitioner even concedes that her electrocautery procedures "arguably" could be considered "operating" within Educ. L. § 6521, but nonetheless claims there is no evidence that she addressed a "physical condition" (Br. at 10). However, it was rational for the committee to find that petitioner "operat[ed]" "for" a "physical condition" when she caused second degree burns and created permanent scars on her

22

subjects. The Committee found that "just as rhinoplasty to change the appearance of a nose alters the physical condition of the face [the petitioner's] branding to inflict a permanent and very visible scar alters the skin, appearance, and physical condition of the pelvic region" (R3485-3486). Her claim that the women were healthy (Br. at 10) is beside the point - - cosmetic plastic surgery is often performed to alter or enhance a normal patient's appearance (R1926-1927, 2444).

Petitioner's further claim that she could simply cast aside her physician's role when branding the women (Br. at 14-15) is likewise difficult to reconcile with the painful, violative nature of the procedures. The Committee was not required to accept this excuse, especially when she lacked credibility and admittedly relied on her medical background "in everything that she does" (R3488). Record evidence showed that petitioner's status as a doctor was well known, she was chosen to perform the brandings for her specialized skills and DOS enrollees were relieved knowing that it was her doing their procedures (R3488). Indeed, her expert conceded that doctors cannot simply forget their training, while declining to defend her ethics (R2438, 2451).

The Committee rationally credited Dr. Grant's testimony that a doctor can never simply cast aside professional responsibilities and deem herself to be a mere "technician" when performing a medical procedure (R3487).  It agreed with his firm statement that "given the privilege of being a physician comes with responsibilities.  You can't decide when you are going to enjoy the privileges, but not have the responsibilities" (R3487).   Moreover, to the extent his testimony conflicted with the views of petitioner's expert, the Committee carefully explained why it found Dr. Grant more convincing (R3484-3486). Making these credibility determinations and weighing the evidence are the Committee's sole province. *Matter of Anghel v. Daines*, 86 A.D.3d 869, 872 (3d Dep't 2011); *Patin v. State Bd. for Professional Medical Conduct*, 77 A.D.3d 1211, 1214 (3d Dep't 2010) (rejecting doctor's excuses for not taking patient histories or performing physical examinations after finding him "evasive on questioning"); *Cf. Matter of Pardo v. Novello*, 2 A.D.3d 991, 992 (3d Dep't 2003) (finding ample basis for misconduct findings despite expert witness's "guarded testimony" supporting physician's "marginal or outright lacking" conduct).

Petitioner fails to address, much less distinguish, the cases relied on by the Committee which hold that while a procedure such as circumcision is not a medical practice when done by a religious official, it is when performed by a physician (R3487). *See, e.g. Y.Y.B. v. Rachminov*, 48 Misc. 3d 1055, 1059 (Sup. Ct. Queens 2015). Nor can she reasonably deny the Committee's common sense rationale, based on those cases, that while a layperson may perform a given procedure, when doctors undertake such treatment they are bound by the established standards of their profession (R3486).

Equally unavailing is petitioner's reliance on the lack of branding regulations in New York (Br. at 16-17). The State is not required to enact specific rules for every single procedure that a doctor may perform in governing the vast field of medical practice. *Cf. Matter of Gross v. Ambach*, 71 N.Y.2d 859, 861 (1988) (finding autopsies constitute medical practice despite the lack of an explicit statutory reference); *People v. Amber*, 76 Misc. 2d at 273 (Legislature was not required to envision accupuncture when enacting Educ. L. 6521); *Rubin*, 113 Misc.2d at 119 (*accord*). As the Committee aptly reasoned, it is presumed that accepted standards will apply to a given medical

25

procedure performed by a physician even in the absence of specific regulations (R3486).

Similarly, the fact that laypersons can purchase electrocautery devices and do brandings does not obviate a physician's duty of care (Br. at 3). Anyone can also buy and use tweezers, bandages, a stethoscope, a blood pressure kit, over the counter pills, etc. However, when removing splinters, dressing wounds, checking heart rates, taking blood pressures and recommending medications, physicians are held to higher standards by virtue of their training and license to practice medicine.

As a final matter, petitioner asserts that the Committee's decision implies that doctors will not be able to hold exercise classes or chaperone elementary school students without performing EKG tests, doing physical examinations and taking medical histories (Br. at 18). But she cites no authority that accepted practice standards reasonably contemplate those extreme measures. Nor would routine, non-medical activities be comparable to the type of invasive, traumatizing procedures seen in this case that "physically and permanently altered [women's] bodies" (R3494).

26

## B.    Petitioner's Repeated Violations Of Medical Standards Constituted Professional Misconduct.

In its exhaustive determination, the Committee cited abundant evidence that petitioner violated numerous medical standards of care applicable to her branding procedures and that her misconduct reached egregious levels due to the risks involved.

The Committee relied on voluminous testimony by Dr. Grant, petitioner and her own expert witness, the accounts of various NXIVM and DOS members, scar photos and a video recording of a branding by petitioner.    This evidence demonstrated petitioner's severe medical lapses, including negligent and incompetent use of the electrocautery device, failing to take medical histories and perform physical examinations, failing to obtain informed consent, ignoring infection controls, neglecting adequate follow up care and keeping no medical records (R3474-3481, 3488-3497).    While petitioner disputes the evidence, the "assessment and resolution of conflicting evidence and witness credibility are within the exclusive province of the Hearing Committee." *Patin*, 77 A.D.3d at 1214-15 (confirming findings of negligence, incompetence and fraud based on, *inter alia*, a physician's own admissions and lack of credibility) (citations omitted); *Anghel*, 86

27

A.D.3d at 872, 875 (deferring to hearing committee's resolution of conflicting expert testimony).

Rather than defending her practices, petitioner largely rests on her contention that they were simply outside the Committee's jurisdiction for lack of a "nexus" to the practice of medicine (Br. at 14). But her case is not comparable to situations where doctors committed acts that were extraneous to the practice of medicine, such as making unwarranted sexual advances to co-workers (Br. at 12-13). Here, petitioner's misconduct arose directly from her use of an electrical surgical instrument to cause second degree burns and create permanent, abnormal scars. *Cf. Rubin*, 113 Misc.2d at 119. Petitioner's claim that her very failure to abide by accepted standards of care when performing the brandings proves that her acts were unregulated (Br. at 6, 15) cannot be right. Her position, if accepted, would incentivize other doctors to forgo medical standards in order to avoid disciplinary review, an unacceptable result.

Equally flawed is petitioner's claim that the "usual indicia of medical practice" were absent because "branding was simply part of a ritual" for which critical items such as medical histories, physical

28

examinations and anesthesia for pain were irrelevant (Br. at 14-15). To the contrary, this Court has held that "[t]here are no different standards for licensed physicians based on their philosophy, religion or personal approach to their calling," and that "[i]t is well settled that a patient's consent to or even insistence upon a certain treatment does not relieve a physician from the obligation of treating a patient with the usual standard of care." *Metzler v. New York State Bd. for Professional Medical Conduct*, 203 A.D.2d 617, 619 (3d Dep't 1994) (confirming license revocation for homeopathic physician who did not recognize the necessity for physical examinations and laboratory testing).

Ample evidence in the record supported the Committee's determination that petitioner's many deviations from practice standards reached egregious levels. It found that she chose her allegiance to the NXIVM and DOS organizations over her profound responsibilities as a physician (R3499), to the point of concealing the meaning of the symbols that she painfully emblazoned on the women in this case. Her conduct showed a "deliberate deceit which violates the trust the public bestows on the medical profession." *Patin*, 77 A.D.3d at 1215. *Cf. Matter of Smith v. New York State Dept. of Health*, 66 A.D.3d

1144, 1148 (3d Dep't 2009) (confirming misconduct findings against plastic surgeon who conducted false evaluation for a breast augmentation); *Matter of Conteh v. Daines*, 52 A.D.3d 994, 996 (3d Dep't 2008) (confirming fraud and moral unfitness charges against doctor for prescribing controlled substances without sound medical reasons).

### C.    The Exclusion Of A Letter By Investigators Initially Declining To Pursue A Complaint Against Petitioner Did Not Deprive Her Of A Fair Hearing By The Committee.

Petitioner further claims that the Committee's determination should be annulled because the administrative law judge excluded from evidence a letter in which the Office of Professional Medical Conduct (OPMC) initially declined to pursue S.E.'s complaint (Br. at 20-22). This contention too is meritless.

It is well-established that the petitioners in these proceedings are "not entitled to the same due process rights afforded to criminal defendants" and that the Committee "is not bound by traditional rules of evidence." *Smith*, 66 A.D.3d at 1147.    Thus, in order to warrant annulment, "an erroneous evidentiary ruling must infect the entire proceeding with unfairness." *Matter of Sundaram v. Novello*, 53 A.D.3d 804, 806 (3d Dept. 2008) (citations omitted).    That is hardly the case

30

here since the letter in question was irrelevant and its exclusion did not deprive petitioner of a fair hearing on the charges.

The essential point overlooked by petitioner is that while the OPMC conducts investigations, it does not decide disciplinary cases. She fails to suggest how the OPMC's opinion regarding a misconduct complaint constituted evidence when the Committee has sole authority to make findings of fact and conclusions of law in professional misconduct cases. *See* PHL 230(10)(g). The excluded letter did not contain any *factual* material relevant to the charges of professional misconduct, but rather stated an investigator's legal conclusion that was not binding on the Committee. Moreover, while the OPMC initially directed the complainant to law enforcement authorities (R3527), it ultimately brought a misconduct investigation against petitioner after she was not criminally charged.

This case is unlike *Matter of McBarnette v. Sobol*, 83 N.Y.2d 333 (1994) (Br. at 21), where a physician wanted to introduce a complaint made against him to cross-examine the patient. Here, the petitioner had no similar purpose but instead wanted the OPMC's letter in evidence so that the Committee could "see what allegations had been

31

rejected" (Br. at 22). However, that would have invited pointless speculation since the OPMC does not rule on misconduct charges, and the disciplinary case the Bureau brought against petitioner years later involved many more women that she branded, photographic and video evidence of her procedures and lengthy testimony by both sides. The essential point is that petitioner had ample opportunity to defend the case at her hearing, including presenting testimony by her expert on whether she had engaged in medical practice. *Cf. Sundaram*, 53 A.D.3d at 807 (exclusion of medical texts at physician misconduct hearing was non-prejudicial because both sides presented experts on the relevant issues); *Tsirelman*, 61 A.D.3d at 1131 (rejecting evidentiary claim where the excluded records were redundant and irrelevant).

Petitioner's argument boils down to an estoppel theory that would bind the respondent to a preliminary decision made by its investigators. But estoppel is generally unavailable to prevent an agency from enforcing its administrative duties. *Matter of Binenfeld v. New York State Department of Health*, 226 A.D.2d 935, 936 (3d Dep't 1996) ("[i]n all but rare cases, estoppel cannot be invoked against a governmental agency to prevent it from discharging its statutory duties"). Nor is this

32

a situation where administrative *stare decisis* would apply, because the Committee made no prior determination that could be binding on it. *Cf. Matter of Charles A. Field Delivery Service, Inc.*, 66 N.Y.2d 516, 517 (1985) ("A decision of an administrative agency which neither adheres to its own prior precedent nor indicates its reason for reaching a different result on essentially the same facts is arbitrary and capricious").

The exclusion of OPMC's letter hardly tainted the entire proceeding or deprived petitioner of the opportunity to fully defend the charges. Consequently, she does not approach the high threshold for setting aside a disciplinary determination based on evidentiary error. *Tsirelman*, 61 A.D.3d at 1130 (petitioner must show that an evidentiary error "infected the entire proceeding with unfairness"); *Smith*, 66 A.D.3d at 1147 (finding no merit to physician's claim that he was substantially prejudiced by reference in the prosecutor's opening statement to a charge that was later withdrawn).

33

**D.    Petitioner Committed Further Misconduct By Failing To Report A Large-scale Outbreak Of A Serious Illness.**

Petitioner also challenges the Committee's determination that she committed further misconduct by failing to report to public authorities the widespread disease outbreak at Vanguard Week.  Her argument, however, relies on an unduly restrictive interpretation of state reporting requirements, while ignoring unrebutted evidence by respondent's expert that she violated medical standards by failing to report the outbreak of a highly infectious and potentially dangerous illness (Br. at 22-27).

The evidence in this case showed that many of the over 400 Vanguard Week attendees became acutely ill with similar gastrointestinal symptoms in a short period of time, falling squarely within state reporting requirements (R3498).  In relevant part, these regulations provide that "it shall be the duty of every physician to report" to local public health authorities every case of a "communicable disease," any "outbreak of communicable disease," "any unusual disease" and any "unusual disease outbreak" (10 N.Y.C.R.R. § 2.10).  They further require that all such reports be immediately forwarded to

34

the State Department of Health (10 N.Y.C.R.R. § 2.1 (b)), and that any "disease outbreak" or "unusual disease" shall *also* be reported to the State Department of Health. 10 N.Y.C.R.R. § 2.1(c).

Contrary to petitioner's analysis (Br. at 25), these regulations are not limited to the communicable diseases listed in 10 N.Y.C.R.R. § 2.1(a) or "unusual diseases." Petitioner misreads the requirement that doctors must also report "any disease outbreak" to the Department of Health (Br. at 25). *See* 10 N.Y.C.R.R. §§ 2.1(c). Because section 2.1(b) already requires "communicable" and "unusual" disease reports to be forwarded immediately to the State Health Department, section 2.1(c)'s requirement that "any disease outbreak" be reported is meaningless if limited to those illnesses.

Further, the Committee's straightforward view of this regulation (R3497-3498) does not extend to routine or seasonal colds, strep throats and the like, as petitioner contends (Br. at 25). The regulations define an "outbreak" as "an increased incidence of a disease above its expected or baseline level," providing indicative factors such as the "size and type of population exposed" and "time and place of occurrence," precluding an unnecessarily wide reach. *See* 10 N.Y.C.R.R. § 2.2(d).

35

Petitioner's reading of the regulatory scheme, on the other hand, would eliminate the reporting requirement precisely when it is critical, namely, when a large event attended by people from various locations, including children and other vulnerable individuals, is struck by a rapidly spreading disease (R787-788, 893-894, 1199-1200, 1794-1795). Even if her narrow view of a doctor's reporting duties made sense, the Committee's rational interpretation of its own agency's regulation should be deferred to "in the absence of weighty reasons." *Matter of Elcor Health Services, Inc. v. Novello*, 100 N.Y.2d 273, 280 (2003) ("That the Department's interpretation might not be the most natural reading of the regulation, or that the regulation could be interpreted in another way, does not make the interpretation irrational").

For similar reasons, petitioner's claim that the Committee's determination lacked evidentiary support (Br. at 26-27) is meritless. Contrary to her contentions, Dr. Farber did not view the Vanguard Week outbreak as a "routine," "garden variety" illness limited to a small community function, but testified that it was "very unusual" and "one of the largest" disease outbreaks he has seen in New York (R1795, 1820, 1836). He has reported many outbreaks of norovirus, the likely

36

infectious agent, and gave unrefuted testimony that medical standards required a doctor to report it to the Health Department so that the facility would be closed to prevent further spread of the highly contagious disease (R1784-1789, 1796-1798). He firmly stated that physicians have this duty whether or not they are taking care of patients, "morally, ethically and legally" (R1776-1777, 1783-1784).

The Committee was not compelled to accept petitioner's excuses for failing to comply with a critical infection control requirement. The evidence showed that she knew about the outbreak, that her status as a physician was well known in the NXIVM sphere, and that she even engaged in health-related activities at the Vanguard Week event (R1484-1485, 2747-2750). Moreover, the fast-spreading illness was a potentially serious health threat for attendees and anyone else infected who had co-morbidities (R1779-1780). Consequently, there was ample support for the Committee's determination that petitioner's failure to report the outbreak was egregious and constituted professional misconduct (R3498-3499). *Cf. Anghel*, 86 A.D.3d at 872 (finding substantial evidence that physician willfully failed to comply with laws

37

regulating medical practice after inferring his knowledge of laboratory

certification requirements from the record facts).

## CONCLUSION

The Committee's determination should be confirmed and the

petition should be dismissed.

Dated:  New York, New York
       November 22, 2022

                             LETITIA JAMES
                             Attorney General of the
                             State of New York
                             **Attorney for Respondent**
                             By:
                             James M. Hershler
                             Assistant Attorney General
                             28 Liberty Street
                             New York, New York 10005
                             (212) 416-8590

VICTOR PALADINO
Senior Assistant Solicitor General

JAMES M. HERSHLER
Assistant Attorney General
    of Counsel

38

## CERTIFICATE OF COMPLIANCE
## PURSUANT TO 22 NYCRR § 1250.8(j)

The foregoing brief was prepared on a computer. A proportionally spaced typeface was used, as follows:

Name of typeface: Century Schoolbook
Point size: 14
Line spacing: Double

The total number of words in the brief, inclusive of point headings and footnotes and exclusive of signature blocks and pages including the table of contents, table of citations, proof of service, certificate of compliance, or any authorized addendum containing statutes, rules, regulations, etc., is 7325.

## <u>AFFIRMATION OF SERVICE</u>

James M. Hershler, an attorney duly admitted to practice before the Courts of this State, declares and affirms under the penalties of perjury that the following is true and correct:

On November 22, 2022, I served the following document:

- BRIEF FOR RESPONDENT

upon counsel for the petitioner in this proceeding:

Anthony Z. Scher, Esq.
800 Westchester Avenue
Suite N-641
Rye Brook, New York 10573

by depositing a true copy of the same enclosed in a postage prepaid Fedex Overnight Mailing envelope directed to said attorney at the above address in an official Fedex depository located in New York, NY.  Additionally, I emailed a copy of said document to petitioner's counsel on this date to woodscher@aol.com .

Dated: New York, NY
       November 22, 2022

_____
James M. Hershler



3:07 PM



**Sarah Edmonson**
seen today at 2:58 PM

Please delete this here    11:14 PM ✓✓

It looks great though.  Any concerns?
11:15 PM ✓✓

Ops sorry!!    11:24 PM

Just wasn't sure about the white
11:25 PM

JUNE 29, 2017

Hey Danielle. Sally passed on what
you said about me. Would you like to
speak to me directly?    11:52 AM

JULY 3, 2017

I guess not. So much for honour.
10:46 AM

TODAY

Hi Dr Roberts! So, my scar is really
not healing well. Any medical tips?
2:45 AM

Type a message



Allison Mack:
Hey love!

Hows it looking for branding??

Danielle Roberts:
Still waiting for the machine.... 😔

I was just thing about this last night. I'm going to track it today

I want to practice a bit Bellmore I touch another human 😱

*I want to practice a bit before I touch another human



Hi M...

How are you?

I have a big fear coming up around the branding... I'd lie to EM it with Dani ASAP...

Does she know about that?

I'd love to talk to you about it too. It has to do with my attachment to having a man female relationship in the future... I think the same thing that came up during our friendship breakfast.

I have an EM with Crystal today. I'm excited to work that.

Let me know if you can talk soon. Xoxo I'm sad I missed our time together

Allison Mack:

Yes you can speak to dani amiga. She knows.

Roberts - 232

And yes we can talk. Whats your scheudle?

OK good news...
so I have the machine!

Bad news...

There's no workable attachments for the branding instruments...

These don't fit...

There is a number on the side.. I will call and trouble shoot.. I'm going to need to find the hand held part of the tool and order it...

Then I'll be able to practice 😅

Update...
The machine that Steve recommended and I ordered apparently is ancient.  It didn't come with the pencils and needle tips I need to start... I found some leads as to where I can order them and left messages...

Medtronic (a manufacturuer) closed after Thursday. I was hoping to get the parts from the rep but no such luck. She doesn't have them.
They are closed until Jan 2nd.

I have the product numbers and will do some more searching. I'm so sorry for the delay.

I hope your having a beautiful Christmas Eve ❤️🎄🌨️🌲



Allison Mack:
So whe

Danielle Roberts, [01.01.17 23:06]
n will branding happen?

Danielle Roberts:
I'll let you know an estimate shortly

If I can't find another store to order parts from then the earliest I'll be able to order them from Medtronic is January 2nd. That's when they reopen. If that's the case I'll overnight them and practice in the next few days. It's possible we could do it before coach Summit at the latest after pennies Memorial.

If I can find another company then I'll have them ship the parts right away and we can do it next week

**Danielle Roberts:**
Hmmm. I didn't know about it

I'll talk to them...and coordinate the branding equipment I may be able to have it sent by tomorrow

**Allison Mack:**
Beautiful. The plan for nyc just happened

Wouod be good fornyou to be there

**Danielle Roberts:**
Coordinating now

**Allison Mack:**
Ok love

**Danielle Roberts:**
I'll let you know by this evening...😚

**Allison Mack:**
We may be able to brand in nyc??

**Danielle Roberts:**
I have no practice yet... I'd want to make sure I have a few grapefruits and maybe a flank steak under my belt before I touch my sisters.. 🐵

But I'll try

**Allison Mack:**
Hahaha... we could do Saturday... or Sunday?? If you get the parts by tomorrow??

Roberts - 235

==Branding== update?

Danielle Roberts:
Driving in the snow in... Write you soon

M*



==Branding==: I sent the reciept. It will be shipped today that was the soonest I could get it. I will be here likely tues... I will practice and likely do the day before  coach summit starts

Roberts - 236



**Danielle**                                                          9:10:18 AM

Someone has also called another hospital to tell them I am
having inappropriate relationships with my patients.



**Danielle**                                                          10:48:58 AM

From Barry Meier NYT this morning:

"Dear Dr. Roberts. As I believe you are aware I have reached out
to you numerous times in connection with an article in The New
York Times about Nxivm and  branding. I anticipate that this
article with refer to a complaint filed with the NYS Dept of
Health that alleges you performed branding. As I stated be fore
I am eager for your comment. This article is likely to appear
shortly. Kindly contact me by 5PM today Tuesday October 17.
Thank you."


It was texted wjile I was driving and my autoreply texted back.



"[Auto-Reply]  I'm driving right now – I'll get back to you later."

It was the times union that called St. Peter's hospital with a      10:57:55 AM
"patient" of mine that has a brand on their "vagina"

**Keith Raneire**                                                     12:17:45 PM

**Keith Raneire**                                                             12:17:45 PM

KR

I am so sorry about all this honey... I'll be back late tonight... If
someone was branded on their vagina it was not you... but even
if it were I guess women just can't make those decisions for
themselves...



**Danielle**                                                                 12:26:14 PM

Yeah... vagina... hip area same thing

**Keith Raneire**                                                            12:27:28 PM

KR

Up to the collar bone I think... it's been a long time since I
studied anatomy, I'm rusty

**Danielle**                                                                 12:28:52 PM

Ha yeah! I think you go up to the collar bone through the
vagina

SE recites the initial statement expressing she wants to be branded.  There is a secret dialog exchange and then SE gets on the table. For the rest of the transcript, every time it says "dialog exchange," assume it's a secret of the sisterhood.

The women position themselves around her and voices can be heard.

Woman A, as she positions herself to hold SE's leg says, "so tell me how this feels…"
SE states, "I need more…"

Woman A "on the other leg?"

SE, moving her arms to indicate that they are movable "… on my elbow"
Woman B moves to support the elbows, gains visual agreement on what is needed – removes support to wait for the process to begin.

Woman A "is this ok, the way I'm sitting now?"
SE: "yeah"

SE, closing her eyes, starts doing deep yoga breathing (she had told us it was yoga breathing)
There's a bunch of talking… Woman D (the individual who will be applying the brand) is getting the equipment ready, etc. SE continues to breathe deeply.

Woman B, "do you have to do personality studies in the morning?" (we were to start jness the next morning and we were assessing what time we needed to arrive)
It's not quite clear what is said, but SE smiles in response

Woman A "… again and again and again…" (joking about how many times we have filled out the paperwork for the study)  Everyone laughs

SE: "I am apt to show off my body" (joking about a question on the paperwork) Everyone laughs and SE has a big smile on her face

Woman C (who is sitting above SE holding her hands) leans down and says something unclear to SE.  SE responds, "sure"
SE says something unclear back to Woman C, Woman C responds "Ok, you tell me when."

SE: "I feel like I might fart though actually… sorry" Everyone laughs and someone responds "that's ok"

Someone jokes, "you won't be able to smell it over the smell of burning skin"

SE: "are we doing a new needle?"
Woman D responds: "Yes"
SE: "What happened?"

A few of the women respond "dropped it"
SE: "Oh… thank you"
Woman E exclaims: "drop that shit like Drake… drop it like it's hot!"
Woman A laughs
SE starts rapping though it's hard to make out the words clearly

Woman D is ready to start.  She stands and says "ready?"
All the women get into position to help offer moral support and physical support so there are no involuntary movements that could disturb the line work.
SE takes a deep breath.
Woman D: "We'll just do a touch first so you know what it feels like."

Woman D: "ready, touch." It's brief, you can hear the sound of the tool touching the skin.
SE's face can be seen.  Her facial expression does not change with the test.

Following the test, SE inhales and exhales, yoga breathing.
Woman D: "Ok… we'll do a three count at first… ready? Here we go… one, two, three, nice job."
(as she counts she is moving the branding tool, which looks like a pen across the stencil, about a 1/3 of the way across the top line of the design.)

Woman B: "You're doing so good Sarah"

SE can be heard breathing deeply in and out

Woman D: "k, three count again… inhale, and… here we go… one, two, three" (she finished the rest of the line)

Woman B: "fucking awesome!"
SE: sighs gently as she exhales

Woman D: "two little touch ups, ok? … Ready, here we go" does one touch up "one more… umm, one, maybe two more, ready, here we go…"
SE: hums as she exhales in a yoga breath
Woman D: "Ready? Here we go."
SE: hums in exhale
Woman D: "one more. Ready?"
SE: hums again in exhale

Camera moves to her face. She takes a deep breath in and out. At this point there is emotion.

Woman B: "That was awesome!"
Woman A: "One shot baby!"
SE:  "We did it!" there is a positive/soft tone in her voice – she takes a deep breath in and sighs as she lets it out.

Woman E: "Fucking warrior!"

The women are talking about how much time has elapsed since the start.  SE's process was moving quicker than the two before her.  It's been about 2 minutes, but the actual branding was approximately less than 10 seconds.

Woman E: "Gonna break some records!"
Woman C says something that's unclear but I think it was about SE's breathing
Someone else says something like  "always helpful"
SE affirms: "and birth" (referencing that she had used the same breathing process during her labor for child birth) 4:26:730

Dialog exchange that's part of the ceremony – the women have all stepped back to give themselves and SE a break.  In the dialog exchange, SE asks that one of the lines be repeated and it is.

When the dialog is done we resume positions.
SE mentions "I need someone to hold here" again referring to her elbows… it wasn't really needed and woman B rests her hand on SE's heart.

SE is holding woman C's hands.  There is a reassuring squeeze of the hands between them.

SE: "which line is next?"

Woman D: "I'm gonna show you where we're at"
SE: "ok"

Woman B: "the inside one, inside triangle"

Woman D: "Ok, so just a touch… ready, touch… ok, good… ready, breathe in… ready, one, two, three…"

Woman B: "that was awesome!"
SE deep inhale and yoga exhale with a sigh

Woman B: "more than half way"
Woman D: "ready? Here we go… one, two, three"
Woman B: "done"

Woman D: "gonna go over that one a little bit… ready? Here we go… one… one more little touch, ready?"
SE nods that she is ready, deep inhale and exhale
Woman D: "here we go… k, hold on one sec… I'm gonna leave it, I'm gonna compare it to the other side… no electricity… (she goes over the line just with the needle, this can't be felt)… ok"

Someone says "nice job" 6:17:623
Dialog exchange

SE becomes emotional
Woman B: "You're doing great.  Fucking awesome!"
SE: "Thank you"
Woman E whispers: "Warrior Bitches!"
SE: "Thank you for choosing me"

Woman B kisses SE on her cheek
SE: says something that's not audible and then, "this means a lot…"
Woman B strokes SE's face
SE: "thank you… I love you."
Woman B: "I love you" kisses her again on the cheek and strokes her hair, returns her hand to SE's heart
SE: "k… (a moment elapses) … it's so funny, I was auditioning for a fucking hallmark movie yesterday." Everyone laughs "… Bridal Bootcamp… (the title said in a humorous mocking way) SE shakes her head from side to side and says "… fuck…" and laughs

Woman C repeats the title and laughs
SE is making jokes, but it's hard to hear what she says "… (something) on my fucking life… oh, yeah, so good, thank you… warrior bootcamp, bitches!"
Woman C is laughing

Woman D: "ok, here we go…"
SE closes her eyes and breathes deeply in and out
Woman D: "ok, just a touch at first… ready, touch.  I'm gonna go right up that line… ready, here we go, one, two, three…"
SE takes several deep breaths in and out
Woman D: "ready?  Here we go… one, two, three…"
SE exhales loudly… then says "sorry" (I think it was to woman C for squeezing her hands tightly)

Woman B brushes SE's chest lightly to help her clear the state

Woman D: "ready? Here we go… one, two…"
SE winces
Woman D: "just some touch ups"
SE takes a deep breath in and out
Woman D: "Ok, ready? Here we go… one, two, three"

SE: calmly "That was the worst one"
Woman D: "one more touch up"
SE breathes in and out

Woman D does a few quick touches
SE: "touch ups are always the worst"
Woman B: agreeing "they *are* the worst"
Woman D: "no electricity"
Woman B: "looks good!"
Someone else: "looks great!"
Someone else says: "three quarters done"
Woman B: "Even more because you have all the big lines done"

SE emotes: "this is so important…"
Woman B kisses her head and puts her hand on SE's heart, sits next to her
9:54:691

Dialog exchange

Woman D: "ok, small touch first… ready, touch…"
SE: yoga breath out with hum
Woman D: "ready, here we go… one, two, three"
Woman B: "that's the whole line"
SE: exhales with sound
Woman D: "little touch.  Ready, here we go…" two touches "no electricity…"
SE: deep breathing
Woman D: "that's good"
Woman B: "awesome"
SE: "ok"

Women talking, it's unclear what's being said, something about tiny lines
Woman B: "you have three lines left"
SE: "ok… little ones?
Woman B: "Yeah, one the same as the one you just did and then two little little"
11:00

Dialog exchange

SE is smiling during this and nodding her head in agreement
SE: "I got your back!"
Woman B: "I got yours" and they laugh
SE: "you got my whole body right now" continuing to laugh

Woman D: "ok, Sarah, touch…"
SE inhales
Woman D: "ready? Here we go…" one touch
SE inhales and exhales
Woman D: "ok, here we go…" touch for like two counts

Woman D: taking a second to adjust to position of her hand "sorry just trying to figure out where to anchor…"
SE: "my hip bones are bony"
Woman C: "your what?"
SE: "my hip bones are bony"
Woman B: "funny angle"
SE: "yeah… (imitating her husband) want me to flex, does that help?" laughs and everyone laughs.. making more flexing faces like her husband does
Woman B: in a low voice but continuing the joke "I'm stronger…" (something SE's husband shouts when he leaves the gym)
SE: in a soft humorous voice "Troy (her son) goes, I gotta go to the gym and get stronger and muscles like daddy!"
Woman B: "aww…"
Laughing…
Someone says "that's sweet…"

Woman D: "ok, ready?"
SE: "mmm hmm"
Woman D: "here we go… ready? Here we go, one, two, three"
SE yoga breathing, exhaling with a low rumble
Woman D: "ok, gonna go over that one…"
SE deep exhale
Woman D: "ready, here we go, one, two, three"
SE: "that was way worse, is it done?"
Woman D: "two touch ups"
SE: "ok"
Woman D: "here we go… one more touch up… ready, here we go… just elec, uh, just <u>no</u> electricity."
Woman B: "Looks really good.  Just have two dinky ones."
SE: laughing "dinky… I love the word dinky!"
13:19:336

Dialog exchange

Woman D: "touch first… k, ready? Here we go, one, two…. I'm gonna go over that one one more time.  Ready, here we go, one, two"
SE breathing as woman D goes over it with no electricity
Woman D: "little touch… here we go" (quick touch) "no electricity… ok"

Woman B: "last line…"
14:32:749

Dialog exchange

Woman B: "last one…"
SE: big smile to woman B, "how am I doing?"
Woman B: "Awesome! Fucking inspiring!"
SE is beaming

Woman D: "ok, ready?  Ok, here we go…"
Woman B: "that was awesome!"
Woman D: "hang in there, just little touch ups now"
SE exhales
Woman D: "ready, here we go… ok, I'm just gonna open this side a little bit.  It's gonna be the one towards the inside, ok?"
Woman B: preparing SE "this ones gonna hurt" and something else inaudible
Woman D: "ready? Here we go…"
SE winces
Woman D: "Nice… Almost there…"
SE: breathes in and out, calmly says "just finish it…"
Woman D: "ok, I think we're good."
SE puts her hands in namaste, first to her forehead and then to her heart
Releases a bit of emotion
15:31:244

Woman B sits next to SE and stokes her hair and the side of her face during the last dialog exchange

When it is complete SE laughs and emotes
Woman B kisses her on the cheek twice and they embrace for some time
Woman B: still in the embrace "you did awesome!"
SE: emoting "this is such an honor thank you…"
Woman B kisses her again twice
SE: "thank you for helping me push!"
Woman B kisses her again: "You did so good.  I'm so proud of you!"
SE: "thank you." (she says something else that's hard to hear… something "to control it" she may have been referring to her emotional release at the end, it's not clear)
Woman B: "That was really, really awesome! You did fucking awesome!"

Video ends

STATE OF WISCONSIN
BEFORE THE MEDICAL EXAMINING BOARD

---

IN THE MATTER OF DISCIPLINARY          :
PROCEEDINGS AGAINST                     :
                                        :          AMENDED COMPLAINT
DANIELLE D. ROBERTS, D.O.,              :
    RESPONDENT.                      :

---

Division of Legal Services and Compliance Case No. 18 MED 161

Colleen L. Meloy, an attorney for the State of Wisconsin, Department of Safety and Professional Services (Department) Division of Legal Services and Compliance (Division) Post Office Box 7190, Madison, Wisconsin 53707-7190, upon information and belief, alleges that:

1.      Danielle D. Roberts, D.O., (Respondent) is licensed in the state of Wisconsin to practice medicine and surgery, having license number 60617-21, first issued on April 25, 2013, and expired on October 31, 2017.

2.      Pursuant to Wis. Stat. § 440.08(3), Respondent has the right to seek renewal of her license upon payment of a fee until October 31, 2022.

3.      Respondent's most recent address on file with the Department is 215 Castle Avenue, Westbury, New York 11590.[1]

4.      Respondent is also licensed to practice medicine in New York, having New York medical license number 255075, first granted on October 5, 2009 and which was revoked on September 27, 2021.

5.      On May 2, 2018, Division Case No. 18 MED 161 was opened to investigate allegations that Respondent used a cauterizing iron to deliberately create scar tissue of the initials "K.R." on multiple female members of the sex cult, NXIVM, led by Keith Raniere, as described by various media outlets, including a newspaper article dated April 30, 2018.

6.      On March 5, 2020, the New York State Department of Health, State Board for Professional Medical Conduct (New York Board) filed a Notice of Hearing and Statement of Charges against Respondent (New York Charges). *See New York Charges attached hereto as Exhibit A and incorporated by reference herein.*

7.      The New York Charges alleged the following facts, *intra alia*:

---

[1] In Respondent's Answer to the Complaint, she stated that her current mailing address is 4120 S. Lake Dr., Unit 463, St. Francis, WI 53235.

a. On March 9, 2017, Respondent used a cauterizing pen as part of a medical procedure to scar the skin by branding female patients A-E, with the initials KR or AM in the pelvis region leaving a permanent scar and deviated from acceptable medical standards as follows:

  i. without using appropriate infection control procedures and sterile technique;
  ii. without the use of local or general anesthesia;
  iii. with the assistance of non-medically trained personnel that physically restrained each patient;
  iv. while both the patient and the non-medically trained personnel were naked contrary to any known medical protocol;
  v. failed to provide appropriate wound care during and after the medical procedure;
  vi. failed to provide appropriate follow-up care to each patient;
  vii. failed to obtain informed consent from each patient; and
  viii. failed to keep appropriate medical records for each patient.

b. Between January 2017 and December 2017, Respondent used a cauterizing pen as part of a medical procedure to scar the skin by branding female patients F-M, with the initials KR or AM in the pelvis region leaving a permanent scar and deviated from acceptable medical standards as set forth in subparagraph a, i-vii.

c. Between June 2016 and August 2016, Respondent failed to report a communicable disease outbreak at a conference held in Silver Bay, New York, which involved approximately 438 individuals, including 76 children.

8.     The New York Charges alleged counts one through forty-seven of professional misconduct against Respondent including, *intra alia*:

a. willfully abusing patients (charges 1-6);

b. engaging in conduct in the practice of medicine which evidences moral unfitness to practice medicine (charges 7-12);

c. failing to use scientifically accepted barrier precautions and infection control practices as established by the New York State Department of Health (charges 13-18);

d. practicing the profession fraudulently or beyond its authorized scope (charge 19);

e. practicing the profession with negligence, gross negligence, incompetence and/or gross incompetence (charges 20-33);

f. failing to file a public health report required by law (charge 34);

g.  willfully or grossly negligently failing to comply with substantial provisions of federal, state, or local laws, rules, or regulations governing the practice of medicine (charge 35);

h.  performing professional services which have not been authorized by the patient (charges 36-41); and

i.  failing to maintain patient healthcare records (charges 42-47).

9.      A full recitation of the facts alleged and charges set forth in the New York Charges are attached hereto as Exhibit A and incorporated by reference herein.

10.     On April 27, 2020, the New York Board filed an Amended Statement of Charges against Respondent (New York Amended Charges).[2]  *See New York Amended Charges attached hereto as Exhibit B and incorporated by reference herein*.

11.     On September 27, 2021, the New York Board issued a Determination and Order which revoked Respondent's license to practice medicine in the State of New York after a determination that the forty-seven specified counts of professional misconduct set forth in the New York Charges were sustained.  *See New York Determination and Order attached hereto as Exhibit C and incorporated by reference herein*.

12.     Respondent engaged in unprofessional conduct pursuant to Wis. Admin. Code § Med 10.03(3)(c) by having any credential pertaining to the practice of medicine and surgery or any act constituting the practice of medicine and surgery become subject to adverse determination by any agency of this or another state, or by any federal agency or authority.

13.     As a result of the above conduct, Respondent is subject to discipline pursuant to Wis. Stat. § 448.02(3).

The Division of Legal Services and Compliance requests that the Board hear evidence relevant to the matters alleged in this complaint, determine and impose the discipline warranted, and assess the costs against Respondent Danielle D. Roberts, D.O.

Dated this 19th of November, 2021

Colleen L. Meloy, Prosecuting Attorney
State Bar Number 1029855
Department of Safety and Professional Services
Division of Legal Services and Compliance
P.O. Box 7190
Madison, WI 53707-7190
(608) 261-8779
Colleen.Meloy@wisconsin.gov

---

[2] The New York Amended Charges removed patients H-M.

These charges are only allegations which

may be contested by the licensee in an

Administrative hearing.

Exhibit A 001

NEW YORK STATE          DEPARTMENT OF HEALTH
STATE BOARD FOR PROFESSIONAL MEDICAL CONDUCT

|  |  |
|---|---|
| IN THE MATTER<br>OF<br>**DANIELLE ROBERTS, D.O.** | NOTICE<br><br>OF<br><br>HEARING |

TO:    DANIELLE ROBERTS, D.O.

███████████████████

PLEASE TAKE NOTICE:

A hearing will be held pursuant to the provisions of N.Y. Pub. Health Law §230 and N.Y. State Admin. Proc. Act §§301-307 and 401. The hearing will be conducted before a committee on professional conduct of the State Board for Professional Medical Conduct on May 4, 2020 at 10:00 a.m., at the Offices of the New York State Department of Health, 90 Church State Street, 4th floor, New York, New York 10007, and at such other adjourned dates, times and places as the committee may direct.

At the hearing, evidence will be received concerning the allegations set forth in the Statement of Charges, which is attached. A stenographic record of the hearing will be made and the witnesses at the hearing will be sworn and examined. You shall appear in person at the hearing and may be represented by counsel who shall be an attorney admitted to practice in New York state. You have the right to produce witnesses and evidence on your behalf, to issue or have subpoenas issued on your behalf in order to require the production of witnesses and documents, and you may cross-examine witnesses and examine evidence produced against you. A summary of the Department of Health Hearing Rules is enclosed.

Exhibit A 002

YOU ARE HEREBY ADVISED THAT THE ATTACHED CHARGES WILL BE MADE PUBLIC

FIVE BUSINESS DAYS AFTER THEY ARE SERVED.

Department attorney: Initial here ████████

      The hearing will proceed whether or not you appear at the hearing. Please note that requests for adjournments must be made in writing and by telephone to the New York State Department of Health, Division of Legal Affairs, Bureau of Adjudication, Riverview Center,150 Broadway - Suite 510, Albany, NY 12204-2719, ATTENTION: HON. JAMES HORAN, DIRECTOR, BUREAU OF ADJUDICATION, (henceforth "Bureau of Adjudication"), (Telephone: (518-402-0748), upon notice to the attorney for the Department of Health whose name appears below, and at least five days prior to the scheduled hearing date. Adjournment requests are not routinely granted as scheduled dates are considered dates certain. Claims of court engagement will require detailed Affidavits of Actual Engagement. Claims of illness will require medical documentation.

      Pursuant to the provisions of N.Y. Pub. Health Law §230(10)(c), you shall file a written answer to each of the charges and allegations in the Statement of Charges not less than ten days prior to the date of the hearing. Any charge or allegation not so answered shall be deemed admitted. You may wish to seek the advice of counsel prior to filing such answer. The answer shall be filed with the Bureau of Adjudication, at the address indicated above, and a copy shall be forwarded to the attorney for the Department of Health whose name appears below. Pursuant to §301(5) of the State Administrative Procedure Act, the Department, upon reasonable notice, will provide at no charge a qualified interpreter of the deaf to interpret the proceedings to, and the testimony of, any deaf person. Pursuant to the

Exhibit A 003

terms of N.Y. State Admin. Proc. Act §401 and 10 N.Y.C.R.R. §51.8(b), the Petitioner hereby demands disclosure of the evidence that the Respondent intends to introduce at the hearing, including the names of witnesses, a list of and copies of documentary evidence and a description of physical or other evidence which cannot be photocopied.

At the conclusion of the hearing, the committee shall make findings of fact, conclusions concerning the charges sustained or dismissed, and in the event any of the charges are sustained, a determination of the penalty to be imposed or appropriate action to be taken. Such determination may be reviewed by the Administrative Review Board for Professional Medical Conduct.

THESE PROCEEDINGS MAY RESULT IN A DETERMINATION THAT YOUR LICENSE TO PRACTICE MEDICINE IN NEW YORK STATE BE REVOKED OR SUSPENDED, AND/OR THAT YOU BE FINED OR SUBJECT TO OTHER SANCTIONS SET OUT IN NEW YORK PUBLIC HEALTH LAW §§230-a. YOU ARE URGED TO OBTAIN AN ATTORNEY TO REPRESENT YOU IN THIS MATTER.

DATE: March 5, 2020

Albany, New York

Timothy A. Mahar, Esq.
Deputy Counsel
Bureau of Professional Medical Conduct

Inquiries should be directed to:
Jeffrey J. Conklin, Esq., Associate Counsel
Bureau of Professional Medical Conduct
Empire State Plaza
Corning Tower, Room 2517
Albany, New York 12237

Exhibit A 004

NEW YORK STATE          DEPARTMENT OF HEALTH
STATE BOARD FOR PROFESSIONAL MEDICAL CONDUCT

| | |
|---|---|
| **IN THE MATTER**<br><br>**OF**<br><br>**DANIELLE ROBERTS, D.O.** | STATEMENT<br><br>OF<br><br>CHARGES |

DANIELLE ROBERTS, D.O., the Respondent, was authorized to practice medicine in New York State on or about October 5, 2009, by the issuance of license number 255075 by the New York State Education Department.

## FACTUAL ALLEGATIONS

A.    On or about March 9, 2017, the Respondent used a cauterizing pen as part of a medical procedure to scar the skin by branding Patient A, a female patient, hereinafter identified in the attached Appendix "A", with the initials KR/AM, and/or KR, in the pelvis region, thereby leaving a permanent scar.  Respondent's conduct deviated from accepted standards of care as follows:

1. Respondent performed the medical procedure upon Patient A in an other than appropriately sterile environment, and/or without appropriate infection control, and/or without the use of sterile technique, including the surgical field, surgical procedure room, multiple use of a cautery pen tip and electrical grounding pad, and documented electrical testing and maintenance upkeep of the cautery device.

2. Respondent performed the medical procedure without the use of a local anesthetic or general anesthesia, thereby causing Patient A to suffer pain for no legitimate medical purpose.

1

Exhibit A 005

3. Respondent performed the medical procedure upon Patient A with non-medically trained personnel present, who were not wearing personal protective equipment.

4. Respondent performed the medical procedure upon Patient A with the assistance of non-medically trained personnel who physically restrained said patient.

5. Respondent failed to cease performing the medical procedure despite the fact that Patient A was suffering pain without medical justification.

6. Respondent, during the course of the medical procedure, willfully physically abused Patient A.

7. Respondent performed the medical procedure upon Patient A at the time when said patient was naked and while being held down by other individuals, who were also naked, contrary to any appropriate medical protocol or need.

8. Respondent inappropriately performed the medical procedure upon Patient A while an individual who was also naked utilized a cell phone to video said medical procedure.

9. Respondent failed to provide appropriate wound care for Patient A at the time of the medical procedure, and thereafter.

10. Respondent failed to provide appropriate follow-up medical care and treatment for Patient A's wound, and/or failed to refer Patient A to another medical provider for such post-medical procedure wound care.

11. Respondent inappropriately advised, or caused another individual to advise, Patient A to take photographs of the wound caused by the medical procedure on a daily basis for one month and once a week for another month, and to thereafter send such photographs to an individual who shared all or some of said photographs with the Respondent.

12. Respondent failed to provide appropriate medical care and treatment for Patient A, including obtaining information regarding said patient's medical history and current medications.

2

Exhibit A 006

13. Respondent failed to prepare and/or maintain appropriate medical records for the patient which accurately reflected the evaluation and treatment of Patient A.

14. Respondent fraudulently failed to disclose to Patient A that the initials KR/AM and/or KR said Respondent branded into the pelvis region of Patient A represented the initials of Keith Ranieri and/or Allison Mack.

15. Respondent performed the medical procedure upon Patient A without having obtained the adequate informed consent of Patient A.

B. On or about March 9, 2017, the Respondent used a cauterizing pen as part of a medical procedure to scar the skin by branding Patient B, a female patient, hereinafter identified in the attached Appendix "A", with the initials KR/AM, and/or KR, in the pelvis region, thereby leaving a permanent scar. Respondent's conduct deviated from accepted standards of care as follows:

1. Respondent performed the medical procedure upon Patient B in an other than appropriately sterile environment, and/or without appropriate infection control and/or, without the use of sterile technique, including the surgical field, surgical procedure room, multiple use of a cautery pen tip and electrical ground pad, and documented electrical testing and maintenance upkeep of the cautery device.

2. Respondent, while performing the medical procedure without the use of a local anesthetic or general anesthesia, thereby causing Patient B to suffer pain for no legitimate medical purpose.

3. Respondent performed the medical procedure upon Patient B with non-medically trained personnel present, who were not wearing personal protective equipment.

4. Respondent performed the medical procedure upon Patient B with the assistance of non-medically trained personnel who physically restrained said patient.

3

Exhibit A 007

5.    Respondent failed to cease performing the medical procedure despite the fact that Patient B was suffering pain without medical justification.

6.    Respondent, during the course of the medical procedure, willfully and physically abused Patient B.

7.    Respondent performed the medical procedure upon Patient B at the time when said patient was naked and while being held down by other individuals, who were also naked, contrary to any appropriate medical protocol or need.

8.    Respondent inappropriately performed the medical procedure upon Patient B while an individual who was also naked utilized a cell phone to video said medical procedure.

9.    Respondent failed to provide appropriate wound care for Patient B at the time of the medical procedure, and thereafter.

10.    Respondent failed to provide appropriate follow-up medical care and treatment for Patient B's wound, and/or failed to refer Patient B to another medical provider for such post-medical procedure wound care.

11.    Respondent inappropriately advised, or caused another individual to advise Patient B to take photographs of the wound caused by the medical procedure on a daily basis for one month and once a week for another month, and to thereafter send such photographs to an individual who shared all or some of said photographs with Respondent.

12.    Respondent failed to provide appropriate medical care and treatment for Patient B, including obtaining information regarding said patient's medical history and current medications.

13.    Respondent failed to prepare and/or maintain appropriate medical records for the patient which accurately reflected the evaluation and treatment of Patient B.

14.    Respondent fraudulently failed to disclose to Patient B that the initials KR/AM and/or KR said Respondent branded into the pelvis region of Patient B represented the initials of Keith Ranieri and/or Allison Mack.

4

15.     Respondent performed the medical procedure upon Patient B without having obtained the adequate informed consent of Patient B.

C.     On or about March 9, 2017, the Respondent used a cauterizing pen as part of a medical procedure to scar the skin by branding Patient C, a female patient, hereinafter identified in the attached Appendix "A", with the initials KR/AM, and/or KR, in the pelvis region, thereby leaving a permanent scar.  Respondent's conduct deviated from accepted standards of care as follows:

1.     Respondent performed the medical procedure upon Patient C in an other than appropriately sterile environment, and/or without appropriate infection control, and/or without the use of sterile technique, including the surgical field, surgical procedure room, multiple use of a cautery pen tip and electrical grounding pad, and documented electrical testing and maintenance upkeep of the cautery device.

2.     Respondent, while performing the medical procedure without the use of a local anesthetic or general anesthesia, thereby causing Patient C to suffer pain for no legitimate medical purpose.

3.     Respondent performed the medical procedure upon Patient C with non-medically trained personnel present, who were not wearing personal protective equipment.

4.     Respondent performed the medical procedure upon Patient C with the assistance of non-medically trained personnel who physically restrained said patient.

5.     Respondent failed to cease performing the medical procedure despite the fact that Patient C was suffering pain without medical justification.

6.     Respondent, during the course of the medical procedure, willfully physically abused Patient C.

5

Exhibit A 009

7. Respondent performed the medical procedure upon Patient C at the time when said patient was naked and while being held down by other individuals, who were also naked, contrary to any appropriate medical protocol or need.

8. Respondent inappropriately performed the medical procedure upon Patient C while an individual who was also naked utilized a cell phone to video said medical procedure.

9. Respondent failed to provide appropriate wound care for Patient C at the time of the medical procedure, and thereafter.

10. Respondent failed to provide appropriate follow-up medical care and treatment for Patient C's wound, and/or failed to refer Patient C to another medical provider for such post-medical procedure wound care.

11. Respondent inappropriately advised, or caused another individual to advise, Patient C to take photographs of the wound caused by the medical procedure on a daily basis for one month and once a week for another month, and to thereafter send such photographs to an individual who shared all or some of said photographs with Respondent.

12. Respondent failed to provide appropriate medical care and treatment for Patient C, including obtaining information regarding said patient's medical history and current medications.

13. Respondent failed to prepare and/or maintain appropriate medical records for the patient which accurately reflected the evaluation and treatment of Patient C.

14. Respondent fraudulently failed to disclose to Patient C that the initials KR/AM and/or KR said Respondent branded into the pelvis region of Patient C represented the initials of Keith Ranieri and/or Allison Mack.

15. Respondent performed the medical procedure upon Patient C without having obtained the adequate informed consent of Patient C.

6

Exhibit A 010

D.  On or about March 9, 2017, the Respondent used a cauterizing pen as part of a medical procedure to scar the skin by branding Patient D, a female patient, hereinafter identified in the attached Appendix "A", with the initials KR/AM, and/or KR, in the pelvis region, thereby leaving a permanent scar.  Respondent's conduct deviated from accepted standards of care as follows:

1.  Respondent performed the medical procedure upon Patient D in an other than appropriately sterile environment, and/or without appropriate infection control, and/or without the use of sterile technique, including the surgical field, surgical procedure room, multiple use of a cautery pen tip and electrical grounding pad, and documented electrical testing and maintenance upkeep of the cautery device.

2.  Respondent, while performing the medical procedure without the use of a local anesthetic or general anesthesia, thereby causing Patient D to suffer pain for no legitimate medical purpose.

3.  Respondent performed the medical procedure upon Patient D with non-medically trained personnel present, who were not wearing personal protective equipment.

4.  Respondent performed the medical procedure upon Patient D with the assistance of non-medically trained personnel who physically restrained said patient.

5.  Respondent failed to cease performing the medical procedure despite the fact that patient D was suffering pain without medical justification.

6.  Respondent, during the course of the medical procedure, willfully physically abused Patient D.

7.  Respondent performed the medical procedure upon Patient D at the time when said patient was naked and while being held down by other individuals, who were also naked, contrary to any appropriate medical protocol or need.

7

Exhibit A 011

8.  Respondent inappropriately performed the medical procedure upon Patient D while an individual who was also naked utilized a cell phone to video said medical procedure.

9.  Respondent failed to provide appropriate wound care for Patient D at the time of the medical procedure, and thereafter.

10. Respondent failed to provide appropriate follow-up medical care and treatment for Patient D's wound, and/or failed to refer Patient D to another medical provider for such post-medical procedure wound care.

11. Respondent inappropriately advised, or caused another individual to advise Patient D to take photographs of the wound caused by the medical procedure on a daily basis for one month and once a week for another month, and to thereafter send such photographs to an individual who shared all or some of said photographs with Respondent.

12. Respondent failed to provide appropriate medical care and treatment for Patient D, including obtaining information regarding said patient medical history and current medications.

13. Respondent failed to prepare and/or maintain appropriate medical records for the patient which accurately reflected the evaluation and treatment of Patient D.

14. Respondent fraudulently failed to disclose to Patient D that the initials KR/AM and/or KR said Respondent branded into the pelvis region of Patient D represented the initials of Keith Ranieri and/or Allison Mack.

15. Respondent performed the medical procedure upon Patient D without having obtained the adequate informed consent of Patient D.

E.  On or about March 9, 2017, the Respondent used a cauterizing pen as part of a medical procedure to scar the skin by branding Patient E, a female patient, hereinafter identified in the attached Appendix "A", with the initials KR/AM, and/or

8

Exhibit A 012

KR, in the pelvis region, thereby leaving a permanent scar.  Respondent's conduct deviated from accepted standards of care as follows:

1.  Respondent performed the medical procedure upon Patient E in an other than appropriately sterile environment, and/or without appropriate infection control, and/or without the use of sterile technique, including the surgical field, surgical procedure room, multiple use of a cautery tip pen and electrical grounding pad, and documented electrical testing and maintenance upkeep of the cautery device.

2.  Respondent performed the medical procedure without the use of a local anesthetic or general anesthesia, thereby causing Patient E to suffer pain for no legitimate medical purpose.

3.  Respondent performed the medical procedure upon Patient E with non-medically trained personnel present, who were not wearing personal protective equipment.

4.  Respondent performed the medical procedure upon Patient E with the assistance of non-medically trained personnel who physically restrained said patient.

5.  Respondent failed to cease performing the medical procedure despite the fact that Patient E was suffering pain without medical justification.

6.  Respondent, during the course of the medical procedure, willfully physically abused Patient E.

7.  Respondent performed the medical procedure upon Patient E at the time when said patient was naked and while being held down by other individuals, who were also naked, contrary to any appropriate medical protocol or need.

8.  Respondent inappropriately performed the medical procedure upon Patient E while an individual who was also naked utilized a cell phone to video said medical procedure.

9.  Respondent failed to provide appropriate wound care for Patient E at the time of the medical procedure, and thereafter.

9

Exhibit A 013

10.  Respondent failed to provide appropriate follow-up medical care and treatment for Patient E's wound, and/or failed to refer Patient E to another medical provider for such post-medical procedure wound care.

11.  Respondent inappropriately advised, or caused another individual to advise, Patient E to take photographs of the wound caused by the medical procedure on a daily basis for one month and once a week for another month, and to thereafter send such photographs to an individual who shared all or some of said photographs with Respondent.

12.  Respondent failed to provide appropriate medical care and treatment for the Patient E, including obtaining information regarding said patient's medical history and current medications.

13.  Respondent failed to prepare and/or maintain appropriate medical records for the patient which accurately reflected the evaluation and treatment of Patient E.

14.  Respondent fraudulently failed to disclose to Patient E that the initials KR/AM and/or KR said Respondent branded into the pelvis region of Patient E represented the initials of Keith Ranieri and/or Allison Mack.

15.  Respondent performed the medical procedure upon Patient E without having obtained the adequate informed consent of Patient E.

F.  During the period from on or about January 2017 through December 2017, the Respondent used a cauterizing pen as part of medical procedures to permanently scar the skin by branding one or more of the following: Patient F through Patient M, inclusive, female patients, hereinafter identified in the attached Appendix "A", with the initials KR/AM, and/or KR, in their pelvis regions.  Respondent's conduct deviated from accepted standards of care as follows:

1.  Respondent performed the medical procedures upon one or more of the following: Patient F through Patient M, inclusive, in an other than appropriately

10

sterile environment, and/or without appropriate infection control, and/or without the use of sterile technique, including the surgical field, surgical procedure room, multiple use of a cautery pen tip and electrical grounding pad, and documented electrical testing and maintenance upkeep of the cautery device.

2.    Respondent performed the medical procedures without the use of a local anesthetic or general anesthesia, thereby causing one or more of the following:  Patient F though Patient M, inclusive, to suffer pain for no legitimate medical purpose.

3.    Respondent performed the medical procedures upon one or more of the following:  Patient F through Patient M, inclusive, with non-medically trained personnel present, who were not wearing personal protective equipment.

4.    Respondent performing the medical procedures upon one or more of the following:  Patient F through Patient M, inclusive, with the assistance of non-medically trained personnel who physically restrained said patients.

5.    Respondent failed to cease performing the medical procedures despite the fact that one or more of the following:  Patient F through Patient M, inclusive, were suffering pain without medical justification.

6.    Respondent, during the course of the medical procedures willfully physically abused one or more of the following:  Patient F through Patient M, inclusive.

7.    Respondent inappropriately performed the medical procedures upon one or more of the following:  Patient F through Patient M, inclusive, while an individual utilized a cell phone to video said medical procedures.

8.    Respondent failed to provide appropriate wound care for one or more of the following:  Patient F through Patient M, inclusive, at the time of the medical procedures, and thereafter.

9.    Respondent failed to provide appropriate follow-up medical care and treatment for one or more of the following:  Patient F through Patient M,

11

Exhibit A 015

inclusive, and/or failed to refer the patients to other medical providers for such post-medical procedures wound care.

10.  Respondent inappropriately advised, or caused another individual to advise, one or more of the following:  Patient F through Patient M, inclusive, to take photographs of the wounds caused by the medical procedures on a daily basis for one month and once a week for another month, and to thereafter send such photographs to an individual who shared all or some of said photographs with Respondent.

11.  Respondent failed to provide appropriate medical care and treatment for one or more of the following:  Patient F through Patient M, inclusive, including obtaining information regarding said patients' medical histories and current medications.

12.  Respondent failed to prepare and/or maintain appropriate medical records for the patients which accurately reflected the evaluation and treatment of one or more of the following:  Patient F through Patient M, inclusive.

13.  Respondent performed the medical procedures upon one or more of the following:  Patient F through Patient M, inclusive, without having obtained the adequate informed consents of Patient F through Patient M, inclusive.

G.  During the time from on or about June 2016 through August 2016, NXIVM and/or the Executive Success Program (ESP) conducted a conference and/or meeting at the Silver Bay Conference and Family Retreat Center (Conference Center), located in Silver Bay, New York. The Respondent and approximately 438 other individuals attended the conference, including approximately 76 children. During the course of the conference, hundreds of the attendees became severely ill with an undetermined communicable disease. The individuals who became ill suffered inter alia, flu-like symptoms, severe vomiting and diarrhea. The Respondent had knowledge of the fact that many individuals at the conference had become ill. The Respondent knew

12

Exhibit A 016

or should have known that the illness suffered by the attendees at the conference was a communicable disease, outbreak of a communicable disease, and/or an unusual disease or outbreak.   Respondent's conduct deviated from accepted standards of care as follows:

1.  Respondent failed to report a disease outbreak or unusual disease to the State Department of Health as required by Title 10 N,Y.C.R.R. Section 2.1(c).

2.  Respondent failed to report the suspected or confirmed case of communicable disease, outbreak of communicable disease, and/or the unusual disease or outbreak to the city, county, or district health officer as required by Title 10 N.Y.C.R.R. Sections 2.10 and 2.1(b) and (c).

3.  Respondent failed to report by telephone, facsimile, or other electronic communication, or in person the illness of the attendees at the conference suspected or confirmed to have been caused due to the consumption of spoiled or poisonous food to the city, county, or district health officer, in violation of Title 10 N.Y.C.R.R. Section 2.15.

4.  Upon being made aware of the fact that attendees at the conference might have been suffering from a communicable disease, the Respondent failed to cause such individuals to be isolated in an appropriate environment, pending official action by the health officer, in violation of Title 10 N.Y.C.R.R. Section 2.27.

13

Exhibit A 017

## SPECIFICATIONS OF CHARGES

### FIRST THROUGH SIXTH SPECIFICATIONS
### WILLFULLY ABUSING A PATIENT

Respondent is charged with committing professional misconduct as defined by New York Education Law §6530(31) by willfully abusing a patient as alleged in the facts of one or more of the following:

1. The facts in paragraphs A and A.2, A and A.4, A and A.5, A and A.6, and/or A and A.8.

2. The facts in paragraphs B and B.2, B and B.4, B and B.5, B and B.6, and/or B and B.8.

3. The facts in paragraphs C and C.2, C and C.4, C and C.5, C and C.6, and/or, C and C.8.

4. The facts in paragraphs D and D.2, D and D.4, D and D.5, D and D.6, and/or, D and D.8.

5. The facts in paragraphs E and E.2, E and E.4, E and E.5, E and E.6, and/or, E and E.8.

6. The facts in paragraphs F and F.2, F and F.4, F and F.5, F and F.6, and/or F and F.8.

14

Exhibit A 018

## SEVENTH THROUGH
## TWELFTH SPECIFICATIONS

### CONDUCT IN THE PRACTICE OF MEDICINE
### WHICH EVIDENCES MORAL UNFITNESS

Respondent is charged with committing professional misconduct as defined by New York Education Law §6530(20) by engaging in conduct in the practice of medicine which evidences moral unfitness to practice medicine as alleged in the facts of one or more of the following:

7.  The facts in paragraphs A and A.2, A and A.4, A and A.5, A and A.6, and/or A and A.8.

8.  The facts in paragraphs B and B.2, B and B.4, B and B.5, B and B.6, and/or B and B.8.

9.  The facts in paragraphs C and C.2, C and C.4, C and C.5, C and C.6, and/or C and C.8.

10. The facts in paragraphs D and D.2, D and D.4, D and D.5, D and D.6, and/or D and D.8.

11. The facts in paragraphs E and E.2, E and E.4, E and E.5, E and E.6, and/or E and E.8.

12. The facts in paragraphs F and F.2, F and F.4, F and F.5, F and F.6, and/or F and F.8.

15

Exhibit A 019

## THIRTEENTH THROUGH EIGHTEENTH SPECIFICATIONS

### FAILING TO USE APPROPRIATE STERILE ENVIRONMENT AND/OR WITHOUT APPROPRIATE INFECTION CONTROL AND/OR WITHOUT THE USE OF STERILE TECHNIQUE

Respondent is charged with committing professional misconduct as defined by New York Education Law §6530(47) by failing to use scientifically accepted barrier precautions and infection control practices as established by the department of health as alleged in the facts of one or more of the following:

13. The facts in paragraphs A and A.1, A and A.3, A and A.4, and/or A and A.7.

14. The facts in paragraphs B and B.1, B and B.3, B and B.4, and/or B and B.7.

15. The facts in paragraphs C and C.1, C and C.3, C and C.4, and/or C and C.7.

16. The facts in paragraphs D and D.1, D and D.3, D and D.4, and/or D and D.7.

17. The facts in paragraphs E and E.1, E and E.3, E and E.4, and/or E and E.7.

18. The facts in paragraphs F and F.1, F and F.3, F and F.4, and/or F and F.7.


## NINTEENTH SPECIFICATION

### PRACTICING THE PROFESSION FRAUDULENTLY OR BEYOND ITS SCOPE

Respondent is charged with committing professional misconduct as defined by New York Education Law §6530(2) by practicing the profession fraudulently or beyond its authorized scope as alleged in the facts of one or more of the following:

19. The facts in paragraphs A and A.2, A and A.3, A and A.8 and/or A and A.14; B and B.2, B and B.3, B and B.8, and/or B and B.14; C and C.2, C and C.3, C and C.8, and/or C and C.14; D and D.2, D and D.3, D and D.8, and/or D and D.14; E

16

Exhibit A 020

and E.2, E and E.3, E and E.8, and/or E and E. 14; F and F.2, F and F.3, and/or F and F.7.

## TWENTIETH THROUGH TWENTY-FIFTH SPECIFICATIONS
## PRACTICING THE PROFESSION WITH GROSS NEGLIGENCE

Respondent is charged with committing professional misconduct as defined by New York Education Law §6530(4) by practicing the profession with gross negligence as alleged in the facts of one or more of the following:

20. The facts in paragraphs A and A.1, A and A.2, A and A.3, A and A.4, A and A.5, A and A.6, A and A.7, A and A.8, A and A.9, A and A.10, A and A.11, A and A.12, A and A.13, A and A.14, and/or A and A.15.

21. The facts in paragraphs B and B.1, B and B.2, B and B.3, B and B.4, B and B.5, B and B.6, B and B.7, B and B.8, B and B.9, B and B.10, B and B.11, B and B.12, B and B.13, B and B.14, and/or B and B.15.

22. The facts in paragraphs C and C.1, C and C.2, C and C.3, C and C.4, C and C.5, C and C.6, C and C.7, C and C.8, C and C.9, C and C.10, C and C.11, C and C.12, C and C.13, C and C.14, and/or C and C.15.

23. The facts in paragraphs D and D.1, D and D.2, D and D.3, D and D.4, D and D.5, D and D.6, D and D.7, D and D.8, D and D.9, D and D.10, D and D.11, D and D.12, D and D.13, D and D.14, and/or D and D.15.

17

Exhibit A 021

24. The facts in paragraphs E and E.1, E and E.2, E and E.3, E and E.4, E and E.5, E and E.6, E and E.7, E and E.8, E and E.9, E and E.10, E and E.11, E and E.12, E and E.13, E and E.14, and/or E and E.15.

25. The facts in paragraphs F and F.1, F and F.2, F and F.3, F and F.4, F and F.5, F and F.6, F and F.7, F and F.8, F and F.9, F and F.10, F and F.11, F and F.12, and/or F and F.13.

### TWENTY-SIXTH SPECIFICATION

### PRACTICING THE PROFESSION WITH NEGLIGENCE ON MORE THAN ONE OCCASION

Respondent is charged with committing professional misconduct as defined by New York Education Law §6530(3) by practicing the profession with negligence on more than one occasion as alleged in the facts of the following:

26. The facts in paragraphs A and A.1, A and A.2, A and A.3, A and A.4, A and A.5, A and A.6, A and A.7, A and A.8, A and A.9, A and A.10, A and A.11, A and A.12, A and A.13, and/or A and A.15; and/or B and B.1, B and B.2, B and B.3, B and B.4, B and B.5, B and B.6, B and B.7, B and B.8, B and B.9, B and B.10, B and B.11, B and B.12, B and B.13, and/or B and B.15; and/or C and C.1, C and C.2, C and C.3, C and C.4, C and C.5, C and C.6, C and C.7, C and C.8, C and C.9, C and C.10, C and C.11, C and C.12, C and C.13, and/or C and C.15; and/or D and D.1, D and D.2, D and D.3, D and D.4, D and D.5, D and D.6, D and D.7, D and D.8, D and D.9, D and D.10, D and D.11, D and D.12, D and D.13, and/or D

18

Exhibit A 022

and D.15; and/or E and E.1, E and E.2, E and E.3, E and E.4, E and E.5, E and E.6, E and E.7, E and E.8, E and E.9, E and E.10, E and E.11, E and E.12, E and E.13, and/or E and E.15; and/or F and F.1, F and F.2, F and F.3, F and F.4, F and F.5, F and F.6, F and F.7, F and F.8, F and F.9, F and F.10, F and F.11, F and F.12, and/or F and F.13; and/or G and G.1, G and G.2, G and G.3, and/or G and G.4.

## TWENTY-SEVENTH THROUGH THIRTY-SECOND SPECIFICATIONS
## PRACTICING THE PROFESSION WITH GROSS INCOMPETENCE

Respondent is charged with committing professional misconduct as defined by New York Education Law §6530(6) by practicing the profession with gross incompetence as alleged in the facts of one or more of the following:

27.   The facts in paragraphs A and A.1, A and A.2, A and A.3, A and A.4, A and A.5, A and A.6, A and A.7, A and A.8, A and A.9, A and A.10, A and A.11, A and A.12, A and A.13, and/or A and A.15.

28.   The facts in paragraphs B and B.1, B and B.2, B and B.3, B and B.4, B and B.5, B and B.6, B and B.7, B and B.8, B and B.9, B and B.10, B and B.11, B and B.12, B and B.13, and/or A and A.15.

29.   The facts in paragraphs C and C.1, C and C.2, C and C.3, C and C.4, C and C.5, C and C.6, C and C.7, C and C.8, C and C.9, C and C.10, C and C.11, C and C.12, C and C.13, and/or C and C.15.

19

Roberts - 272

Exhibit A 023

30.    The facts in paragraphs D and D.1, D and D.2, D and D.3, D and D.4, D and D.5, D and D.6, D and D.7, D and D.8, D and D.9, D and D.10, D and D.11, D and D.12, D and D.13, and/or D and D.15.

31. The facts in paragraphs E and E.1, E and E.2, E and E.3, E and E.4, E and E.5, E and E.6, E and E.7, E and E.8, E and E.9, E and E.10, E and E.11, E and E.12, E and E.13, and/or E and E.15.

32.    The facts in paragraphs F and F.1, F and F.2, F and F.3, F and F.4, F and F.5, F and F.6, F and F.7, F and F.8, F and F.9, F and F.10, F and F.11, F and F.12, and/or F and F.13.

**THIRTY-THIRD SPECIFICATION**

**PRACTICNG THE PROFESSION WITH INCOMPETENCE
ON MORE THAN ONE OCCASION**

Respondent is charged with committing professional misconduct as defined by New York Education Law §6530(5) by practicing the profession with incompetence on more than one occasion as alleged in the facts of the following:

33. The facts in paragraphs A and A.1, A and A.2, A and A.3, A and A.4, A and A.5, A and A.6, A and A.7, A and A.8, A and A.9, A and A.10, A and A.11, A and A.12, A and A.13, and/or A and A.15; and/or B and B.1, B and B.2, B and B.3, B and B.4, B and B.5, B and B.6, B and B.7, B and B.8, B and B.9, B and B.10, B.11, B and B.12, B and B.13, and/or B and B.15; and/or C and C.1, C and C.2, C and C.3, C and C.4, C and C.5, C and C.6, C and C.7, C and C.8, C and C.9,

20

C and C.10, C and C.11, C and C.12, C and C.13, and/or C and C.15; and/or D and D.1, D and D.2, D and D.3, D and D.4, D and D.5, D and D.6, D and D.7, D and D.8, D and D.9, D and D.10, D and D.11, D and D.12, D and D.13, and/or D and D.15; and/or E and E.1, E and E.2, E and E.3, E and E.4, E and E.5, E and E.6, E and E.7, E and E.8, E and E.9, E and E.10, E and E.11, E and E.12, E and E.13, and/or E and E.15; and/or F and F.1, F and F.2, F and F.3, F and F.4, F and F.5, F and F.6, F and F.7, F and F.8, F and F.9, F and F.10, F and F.11, F and F.12, and/or F and F.13; and/or G and G.1, G and G.2, G and G.3, and/or G and G.4.

### THIRTY-FOURTH SPECIFICATION

### WILLFULLY FAILING TO FILE A REPORT REQUIRED BY LAW

Respondent is charged with committing professional misconduct as defined by New York Education Law §6530(21) by willfully failing to file a report required by law or by the Department of Health, or the Education Department as alleged in the facts of one or more of the following:

34. The facts in paragraphs G and G.1, G and G.2, G and G.3 and/or G. and G.4.

21

Exhibit A 025

## THIRTY-FIFTH SPECIFICATION

### WILLFULLY OR GROSSLY FAILING TO COMPLY WITH FEDERAL, STATE, OR LOCAL LAWS RULES OR REGULATIONS GOVERNING THE PRACTICE OF MEDICINE

Respondent is charged with committing professional misconduct as defined by New York Education Law §6530(16) by willfully or grossly negligently failing to comply with substantial provisions of federal, state, or local laws, rules, or regulations governing the practice of medicine as alleged in the facts of one or more of the following:

35. The facts in paragraphs G and G.1, G and G.2, G and G.3 and/or G and G.4.

## THIRTY-SIXTH THROUGH FORTY-FIRST SPECIFICATIONS

### PERFORMING PROFESSIONAL SERVICES WHICH HAVE NOT BEEN AUTHORIZED BY THE PATIENT

Respondent is charged with committing professional misconduct as defined by New York Education Law §6530(26) by performing professional services which have not been authorized by the patient as alleged in the facts of one or more of the following:

36. The facts in paragraphs A and A.14, and/or A and A.15.

37. The facts in paragraphs B and B.14, and/or B and B.15.

38. The facts in paragraphs C and C.14, and/or C and C.15.

39. The facts in paragraphs D and D.14, and/or D and D.15.

40. The facts in paragraphs E and E.14, and/or E and E.15.

41. The facts in paragraphs F and F.14, and/or F and F.15.

22

Exhibit A 026

## FORTY-SECOND THROUGH FORTY-SEVENTH SPECIFICATIONS

### FAILING TO MAINTAIN RECORDS

Respondent is charged with committing professional misconduct as defined by New York Education Law §6530(32) by failing to maintain a record for each patient which accurately reflects the evaluation and treatment of the patient as alleged in the facts of the following:

42. The facts in paragraphs A and A.13.

43. The facts in paragraphs B and B.13.

44. The facts in paragraphs C and C.13.

45. The facts in paragraphs D and D.13.

46. The facts in paragraphs E and E.13.

47. The facts in paragraphs F and F.12.

DATE: March 5 , 2020
Albany, New York

TIMOTHY J. MAHAR, ESQ.
Deputy Counsel
Bureau of Professional Medical Conduct

23

Exhibit A 027

NEW YORK STATE          DEPARTMENT OF HEALTH
STATE BOARD FOR PROFESSIONAL MEDICAL CONDUCT

| | |
|---|---|
| **IN THE MATTER** | AMENDED |
| **OF** | STATEMENT |
| **DANIELLE ROBERTS, D.O.** | OF CHARGES |

DANIELLE ROBERTS, D.O., the Respondent, was authorized to practice medicine in New York State on or about October 5, 2009, by the issuance of license number 255075 by the New York State Education Department.

## FACTUAL ALLEGATIONS

A.    On or about March 9, 2017, the Respondent used a cauterizing pen as part of a medical procedure to scar the skin by branding Patient A, a female patient, hereinafter identified in the attached Appendix "A", with the initials KR and/or KAR, in the pelvis region, thereby leaving a permanent scar.  Respondent's conduct deviated from accepted standards of care as follows:

1.  Respondent performed the medical procedure upon Patient A in an other than appropriately sterile environment, and/or without appropriate infection control, and/or without the use of sterile technique, including the surgical field, surgical procedure room, multiple use of a cautery pen tip and electrical grounding pad, and documented electrical testing and maintenance upkeep of the cautery device.

2.  Respondent performed the medical procedure without the use of a local anesthetic or general anesthesia, thereby causing Patient A to suffer pain for no legitimate medical purpose.

1



EXHIBIT

1a

Exhibit B   001

3.  Respondent performed the medical procedure upon Patient A with non-medically trained personnel present, who were not wearing personal protective equipment.

4.  Respondent performed the medical procedure upon Patient A with the assistance of non-medically trained personnel who physically restrained said patient.

5.  Respondent failed to cease performing the medical procedure despite the fact that Patient A was suffering pain without medical justification.

6.  Respondent, during the course of the medical procedure, willfully physically abused Patient A.

7.  Respondent performed the medical procedure upon Patient A at the time when said patient was naked and while being held down by other individuals, who were also naked, contrary to any appropriate medical protocol or need.

8.  Respondent inappropriately performed the medical procedure upon Patient A while an individual who was also naked utilized a cell phone to video said medical procedure.

9.  Respondent failed to provide appropriate wound care for Patient A at the time of the medical procedure, and thereafter.

10. Respondent failed to provide appropriate follow-up medical care and treatment for Patient A's wound, and/or failed to refer Patient A to another medical provider for such post-medical procedure wound care.

11. Respondent inappropriately advised, or caused another individual to advise, Patient A to take photographs of the wound caused by the medical procedure on a daily basis for one month and once a week for another month, and to thereafter send such photographs to an individual who shared all or some of said photographs with the Respondent.

12. Respondent failed to provide appropriate medical care and treatment for Patient A, including obtaining information regarding said patient's medical history and current medications.

2

Exhibit B   002

13. Respondent failed to prepare and/or maintain appropriate medical records for the patient which accurately reflected the evaluation and treatment of Patient A.

14. Respondent fraudulently failed to disclose to Patient A that the initials KR and/or KAR said Respondent branded into the pelvis region of Patient A represented the initials of Keith Alan Ranieri..

15. Respondent performed the medical procedure upon Patient A without having obtained the adequate informed consent of Patient A.

B. On or about March 9, 2017, the Respondent used a cauterizing pen as part of a medical procedure to scar the skin by branding Patient B, a female patient, hereinafter identified in the attached Appendix "A", with the initials KR and/or KAR, in the pelvis region, thereby leaving a permanent scar. Respondent's conduct deviated from accepted standards of care as follows:

1. Respondent performed the medical procedure upon Patient B in an other than appropriately sterile environment, and/or without appropriate infection control and/or, without the use of sterile technique, including the surgical field, surgical procedure room, multiple use of a cautery pen tip and electrical ground pad, and documented electrical testing and maintenance upkeep of the cautery device.

2. Respondent, while performing the medical procedure without the use of a local anesthetic or general anesthesia, thereby causing Patient B to suffer pain for no legitimate medical purpose.

3. Respondent performed the medical procedure upon Patient B with non-medically trained personnel present, who were not wearing personal protective equipment.

4. Respondent performed the medical procedure upon Patient B with the assistance of non-medically trained personnel who physically restrained said patient.

3

5.    Respondent failed to cease performing the medical procedure despite the fact that Patient B was suffering pain without medical justification.

6.    Respondent, during the course of the medical procedure, willfully and physically abused Patient B.

7.    Respondent performed the medical procedure upon Patient B at the time when said patient was naked and while being held down by other individuals, who were also naked, contrary to any appropriate medical protocol or need.

8.    Respondent inappropriately performed the medical procedure upon Patient B while an individual who was also naked utilized a cell phone to video said medical procedure.

9.    Respondent failed to provide appropriate wound care for Patient B at the time of the medical procedure, and thereafter.

10.    Respondent failed to provide appropriate follow-up medical care and treatment for Patient B's wound, and/or failed to refer Patient B to another medical provider for such post-medical procedure wound care.

11.    Respondent inappropriately advised, or caused another individual to advise Patient B to take photographs of the wound caused by the medical procedure on a daily basis for one month and once a week for another month, and to thereafter send such photographs to an individual who shared all or some of said photographs with Respondent.

12.    Respondent failed to provide appropriate medical care and treatment for Patient B, including obtaining information regarding said patient's medical history and current medications.

13.    Respondent failed to prepare and/or maintain appropriate medical records for the patient which accurately reflected the evaluation and treatment of Patient B.

14.    Respondent fraudulently failed to disclose to Patient B that the initials KR and/or KAR said Respondent branded into the pelvis region of Patient B represented the initials of Keith Alan Ranieri.

4

15.   Respondent performed the medical procedure upon Patient B without having obtained the adequate informed consent of Patient B.


C.   On or about March 9, 2017, the Respondent used a cauterizing pen as part of a medical procedure to scar the skin by branding Patient C, a female patient, hereinafter identified in the attached Appendix "A", with the initials KR and/or KAR, in the pelvis region, thereby leaving a permanent scar.   Respondent's conduct deviated from accepted standards of care as follows:

1.   Respondent performed the medical procedure upon Patient C in an other than appropriately sterile environment, and/or without appropriate infection control, and/or without the use of sterile technique, including the surgical field, surgical procedure room, multiple use of a cautery pen tip and electrical grounding pad, and documented electrical testing and maintenance upkeep of the cautery device.

2.   Respondent, while performing the medical procedure without the use of a local anesthetic or general anesthesia, thereby causing Patient C to suffer pain for no legitimate medical purpose.

3.   Respondent performed the medical procedure upon Patient C with non-medically trained personnel present, who were not wearing personal protective equipment.

4.   Respondent performed the medical procedure upon Patient C with the assistance of non-medically trained personnel who physically restrained said patient.

5.   Respondent failed to cease performing the medical procedure despite the fact that Patient C was suffering pain without medical justification.

6.   Respondent, during the course of the medical procedure, willfully physically abused Patient C.

5

Exhibit B   005

7. Respondent performed the medical procedure upon Patient C at the time when said patient was naked and while being held down by other individuals, who were also naked, contrary to any appropriate medical protocol or need.

8. Respondent inappropriately performed the medical procedure upon Patient C while an individual who was also naked utilized a cell phone to video said medical procedure.

9. Respondent failed to provide appropriate wound care for Patient C at the time of the medical procedure, and thereafter.

10. Respondent failed to provide appropriate follow-up medical care and treatment for Patient C's wound, and/or failed to refer Patient C to another medical provider for such post-medical procedure wound care.

11. Respondent inappropriately advised, or caused another individual to advise, Patient C to take photographs of the wound caused by the medical procedure on a daily basis for one month and once a week for another month, and to thereafter send such photographs to an individual who shared all or some of said photographs with Respondent.

12. Respondent failed to provide appropriate medical care and treatment for Patient C, including obtaining information regarding said patient's medical history and current medications.

13. Respondent failed to prepare and/or maintain appropriate medical records for the patient which accurately reflected the evaluation and treatment of Patient C.

14. Respondent fraudulently failed to disclose to Patient C that the initials KR and/or KAR said Respondent branded into the pelvis region of Patient C represented the initials of Keith Alan Ranieri.

15. Respondent performed the medical procedure upon Patient C without having obtained the adequate informed consent of Patient C.

6

Exhibit B    006

D.    On or about March 9, 2017, the Respondent used a cauterizing pen as part of a medical procedure to scar the skin by branding Patient D, a female patient, hereinafter identified in the attached Appendix "A", with the initials KR and/or KAR, in the pelvis region, thereby leaving a permanent scar.  Respondent's conduct deviated from accepted standards of care as follows:

1.    Respondent performed the medical procedure upon Patient D in an other than appropriately sterile environment, and/or without appropriate infection control, and/or without the use of sterile technique, including the surgical field, surgical procedure room, multiple use of a cautery pen tip and electrical grounding pad, and documented electrical testing and maintenance upkeep of the cautery device.

2.    Respondent, while performing the medical procedure without the use of a local anesthetic or general anesthesia, thereby causing Patient D to suffer pain for no legitimate medical purpose.

3.    Respondent performed the medical procedure upon Patient D with non-medically trained personnel present, who were not wearing personal protective equipment.

4.    Respondent performed the medical procedure upon Patient D with the assistance of non-medically trained personnel who physically restrained said patient.

5.    Respondent failed to cease performing the medical procedure despite the fact that patient D was suffering pain without medical justification.

6.    Respondent, during the course of the medical procedure, willfully physically abused Patient D.

7.    Respondent performed the medical procedure upon Patient D at the time when said patient was naked and while being held down by other individuals, who were also naked, contrary to any appropriate medical protocol or need.

7

Exhibit B    007

8.    Respondent inappropriately performed the medical procedure upon Patient D while an individual who was also naked utilized a cell phone to video said medical procedure.

9.    Respondent failed to provide appropriate wound care for Patient D at the time of the medical procedure, and thereafter.

10.   Respondent failed to provide appropriate follow-up medical care and treatment for Patient D's wound, and/or failed to refer Patient D to another medical provider for such post-medical procedure wound care.

11.   Respondent inappropriately advised, or caused another individual to advise Patient D to take photographs of the wound caused by the medical procedure on a daily basis for one month and once a week for another month, and to thereafter send such photographs to an individual who shared all or some of said photographs with Respondent.

12.   Respondent failed to provide appropriate medical care and treatment for Patient D, including obtaining information regarding said patient medical history and current medications.

13.   Respondent failed to prepare and/or maintain appropriate medical records for the patient which accurately reflected the evaluation and treatment of Patient D.

14.   Respondent fraudulently failed to disclose to Patient D that the initials KR and/or KAR said Respondent branded into the pelvis region of Patient D represented the initials of Keith Alan Ranieri.

15.   Respondent performed the medical procedure upon Patient D without having obtained the adequate informed consent of Patient D.

E.    On or about March 9, 2017, the Respondent used a cauterizing pen as part of a medical procedure to scar the skin by branding Patient E, a female patient, hereinafter identified in the attached Appendix "A", with the initials KR and/or KAR,

8

Roberts - 284

in the pelvis region, thereby leaving a permanent scar.  Respondent's conduct deviated from accepted standards of care as follows:

1.  Respondent performed the medical procedure upon Patient E in an other than appropriately sterile environment, and/or without appropriate infection control, and/or without the use of sterile technique, including the surgical field, surgical procedure room, multiple use of a cautery tip pen and electrical grounding pad, and documented electrical testing and maintenance upkeep of the cautery device.

2.  Respondent performed the medical procedure without the use of a local anesthetic or general anesthesia, thereby causing Patient E to suffer pain for no legitimate medical purpose.

3.  Respondent performed the medical procedure upon Patient E with non-medically trained personnel present, who were not wearing personal protective equipment.

4.  Respondent performed the medical procedure upon Patient E with the assistance of non-medically trained personnel who physically restrained said patient.

5.  Respondent failed to cease performing the medical procedure despite the fact that Patient E was suffering pain without medical justification.

6.  Respondent, during the course of the medical procedure, willfully physically abused Patient E.

7.  Respondent performed the medical procedure upon Patient E at the time when said patient was naked and while being held down by other individuals, ~~who were also naked~~, contrary to any appropriate medical protocol or need.

8.  Respondent inappropriately performed the medical procedure upon Patient E while an individual who was also naked utilized a cell phone to video said medical procedure.

9.  Respondent failed to provide appropriate wound care for Patient E at the time of the medical procedure, and thereafter.

9

10. Respondent failed to provide appropriate follow-up medical care and treatment for Patient E's wound, and/or failed to refer Patient E to another medical provider for such post-medical procedure wound care.

11. Respondent inappropriately advised, or caused another individual to advise, Patient E to take photographs of the wound caused by the medical procedure on a daily basis for one month and once a week for another month, and to thereafter send such photographs to an individual who shared all or some of said photographs with Respondent.

12. Respondent failed to provide appropriate medical care and treatment for the Patient E, including obtaining information regarding said patient's medical history and current medications.

13. Respondent failed to prepare and/or maintain appropriate medical records for the patient which accurately reflected the evaluation and treatment of Patient E.

14. Respondent fraudulently failed to disclose to Patient E that the initials KR and/or KAR said Respondent branded into the pelvis region of Patient E represented the initials of Keith Alan Ranieri.

15. Respondent performed the medical procedure upon Patient E without having obtained the adequate informed consent of Patient E.

F. During the period from on or about January 2017 through December 2017, the Respondent used a cauterizing pen as part of medical procedures to permanently scar the skin by branding one or more of the following: Patients F and G, female patients, hereinafter identified in the attached Appendix "A", with the initials KR and/or KAR, in their pelvis regions. Respondent's conduct deviated from accepted standards of care as follows:

1. Respondent performed the medical procedures upon one or more of the following: Patients F and G in an other than appropriately sterile environment,

10

and/or without appropriate infection control, and/or without the use of sterile technique, including the surgical field, surgical procedure room, multiple use of a cautery pen tip and electrical grounding pad, and documented electrical testing and maintenance upkeep of the cautery device.

2.    Respondent performed the medical procedures without the use of a local anesthetic or general anesthesia, thereby causing one or more of the following:  Patients F and G to suffer pain for no legitimate medical purpose.

3.    Respondent performed the medical procedures upon one or more of the following: Patients F and G with non-medically trained personnel present, who were not wearing personal protective equipment.

4.    Respondent performing the medical procedures upon one or more of the following:  Patients F and G with the assistance of non-medically trained personnel who physically restrained said patients.

5.    Respondent failed to cease performing the medical procedures despite the fact that one or more of the following:  Patients F and G were suffering pain without medical justification.

6.    Respondent, during the course of the medical procedures willfully physically abused one or more of the following:  Patients F and G.

7.    Respondent inappropriately performed the medical procedures upon one or more of the following: Patients F and G while an individual utilized a cell phone to video said medical procedures.

8.    Respondent failed to provide appropriate wound care for one or more of the following:  Patients F and G at the time of the medical procedures, and thereafter.

9.    Respondent failed to provide appropriate follow-up medical care and treatment for one or more of the following: Patients F and G, and/or failed to refer the patients to other medical providers for such post-medical procedures wound care.

11

10.    Respondent inappropriately advised, or caused another individual to advise, one or more of the following: Patients F and G to take photographs of the wounds caused by the medical procedures on a daily basis for one month and once a week for another month, and to thereafter send such photographs to an individual who shared all or some of said photographs with Respondent.

11.    Respondent failed to provide appropriate medical care and treatment for one or more of the following: Patients F and G, including obtaining information regarding said patients' medical histories and current medications.

12.    Respondent failed to prepare and/or maintain appropriate medical records for the patients which accurately reflected the evaluation and treatment of one or more of the following: Patients F and G.

13.    Respondent performed the medical procedures upon one or more of the following: Patients F and G without having obtained the adequate informed consents of said Patients F and G.

G.    During the time from on or about June 2016 through August 2016, NXIVM and/or the Executive Success Program (ESP) conducted a conference and/or meeting at the Silver Bay Conference and Family Retreat Center (Conference Center), located in Silver Bay, New York. The Respondent and approximately 438 other individuals attended the conference, including approximately 76 children. During the course of the conference, hundreds of the attendees became severely ill with an undetermined communicable disease. The individuals who became ill suffered inter alia, flu-like symptoms, severe vomiting and diarrhea. The Respondent had knowledge of the fact that many individuals at the conference had become ill. The Respondent knew or should have known that the illness suffered by the attendees at the conference was a communicable disease, outbreak of a communicable disease, and/or an unusual disease or outbreak. Respondent's conduct deviated from accepted standards of care as follows:

12

Roberts - 288

Exhibit B   012

1. Respondent failed to report a disease outbreak or unusual disease to the State Department of Health as required by Title 10 N,Y.C.R.R. Section 2.1(c).

2. Respondent failed to report the suspected or confirmed case of communicable disease, outbreak of communicable disease, and/or the unusual disease or outbreak to the city, county, or district health officer as required by Title 10 N.Y.C.R.R. Sections 2.10 and 2.1(b) and (c).

3. Respondent failed to report by telephone, facsimile, or other electronic communication, or in person the illness of the attendees at the conference suspected or confirmed to have been caused due to the consumption of spoiled or poisonous food to the city, county, or district health officer, in violation of Title 10 N.Y.C.R.R. Section 2.15.

4. Upon being made aware of the fact that attendees at the conference might have been suffering from a communicable disease, the Respondent failed to cause such individuals to be isolated in an appropriate environment, pending official action by the health officer, in violation of Title 10 N.Y.C.R.R. Section 2.27.

13

## SPECIFICATIONS OF CHARGES

### FIRST THROUGH SIXTH SPECIFICATIONS
### WILLFULLY ABUSING A PATIENT

Respondent is charged with committing professional misconduct as defined by New York Education Law §6530(31) by willfully abusing a patient as alleged in the facts of one or more of the following:

1. The facts in paragraphs A and A.2, A and A.4, A and A.5, A and A.6, and/or A and A.8.

2. The facts in paragraphs B and B.2, B and B.4, B and B.5, B and B.6, and/or B and B.8.

3. The facts in paragraphs C and C.2, C and C.4, C and C.5, C and C.6, and/or, C and C.8.

4. The facts in paragraphs D and D.2, D and D.4, D and D.5, D and D.6, and/or, D and D.8.

5. The facts in paragraphs E and E.2, E and E.4, E and E.5, E and E.6, and/or, E and E.8.

6. The facts in paragraphs F and F.2, F and F.4, F and F.5, F and F.6, and/or F and F.8.

14

Exhibit B  014

## SEVENTH THROUGH
## TWELFTH SPECIFICATIONS

## CONDUCT IN THE PRACTICE OF MEDICINE
## WHICH EVIDENCES MORAL UNFITNESS

Respondent is charged with committing professional misconduct as defined by New York Education Law §6530(20) by engaging in conduct in the practice of medicine which evidences moral unfitness to practice medicine as alleged in the facts of one or more of the following:

7.  The facts in paragraphs A and A.2, A and A.4, A and A.5, A and A.6, and/or A and A.8.

8.  The facts in paragraphs B and B.2, B and B.4, B and B.5, B and B.6, and/or B and B.8.

9.  The facts in paragraphs C and C.2, C and C.4, C and C.5, C and C.6, and/or C and C.8.

10. The facts in paragraphs D and D.2, D and D.4, D and D.5, D and D.6, and/or D and D.8.

11. The facts in paragraphs E and E.2, E and E.4, E and E.5, E and E.6, and/or E and E.8.

12. The facts in paragraphs F and F.2, F and F.4, F and F.5, F and F.6, and/or F and F.8.

15

Exhibit B    015

## THIRTEENTH THROUGH EIGHTEENTH SPECIFICATIONS

## FAILING TO USE APPROPRIATE STERILE ENVIRONMENT AND/OR WITHOUT APPROPRIATE INFECTION CONTROL AND/OR WITHOUT THE USE OF STERILE TECHNIQUE

Respondent is charged with committing professional misconduct as defined by New York Education Law §6530(47) by failing to use scientifically accepted barrier precautions and infection control practices as established by the department of health as alleged in the facts of one or more of the following:

13. The facts in paragraphs A and A.1, A and A.3, A and A.4, and/or A and A.7.

14. The facts in paragraphs B and B.1, B and B.3, B and B.4, and/or B and B.7.

15. The facts in paragraphs C and C.1, C and C.3, C and C.4, and/or C and C.7.

16. The facts in paragraphs D and D.1, D and D.3, D and D.4, and/or D and D.7.

17. The facts in paragraphs E and E.1, E and E.3, E and E.4, and/or E and E.7.

18. The facts in paragraphs F and F.1, F and F.3, F and F.4, and/or F and F.7.

## NINTEENTH SPECIFICATION

## PRACTICING THE PROFESSION FRAUDULENTLY OR BEYOND ITS SCOPE

Respondent is charged with committing professional misconduct as defined by New York Education Law §6530(2) by practicing the profession fraudulently or beyond its authorized scope as alleged in the facts of one or more of the following:

19. The facts in paragraphs A and A.2, A and A.3, A and A.8 and/or A and A.14; B and B.2, B and B.3, B and B.8, and/or B and B.14; C and C.2, C and C.3, C and C.8, and/or C and C.14; D and D.2, D and D.3, D and D.8, and/or D and D.14; E

16

Exhibit B  016

and E.2, E and E.3, E and E.8, and/or E and E. 14; F and F.2, F and F.3, and/or F and F.7.

## TWENTIETH THROUGH TWENTY-FIFTH SPECIFICATIONS
## PRACTICING THE PROFESSION WITH GROSS NEGLIGENCE

Respondent is charged with committing professional misconduct as defined by New York Education Law §6530(4) by practicing the profession with gross negligence as alleged in the facts of one or more of the following:

20. The facts in paragraphs A and A.1, A and A.2, A and A.3, A and A.4, A and A.5, A and A.6, A and A.7, A and A.8, A and A.9, A and A.10, A and A.11, A and A.12, A and A.13, A and A.14, and/or A and A.15.

21. The facts in paragraphs B and B.1, B and B.2, B and B.3, B and B.4, B and B.5, B and B.6, B and B.7, B and B.8, B and B.9, B and B.10, B and B.11, B and B.12, B and B.13, B and B.14, and/or B and B.15.

22. The facts in paragraphs C and C.1, C and C.2, C and C.3, C and C.4, C and C.5, C and C.6, C and C.7, C and C.8, C and C.9, C and C.10, C and C.11, C and C.12, C and C.13, C and C.14, and/or C and C.15.

23. The facts in paragraphs D and D.1, D and D.2, D and D.3, D and D.4, D and D.5, D and D.6, D and D.7, D and D.8, D and D.9, D and D.10, D and D.11, D and D.12, D and D.13, D and D.14, and/or D and D.15.

17

Exhibit B   017

24. The facts in paragraphs E and E.1, E and E.2, E and E.3, E and E.4, E and E.5, E and E.6, E and E.7, E and E.8, E and E.9, E and E.10, E and E.11, E and E.12, E and E.13, E and E.14, and/or E and E.15.

25. The facts in paragraphs F and F.1, F and F.2, F and F.3, F and F.4, F and F.5, F and F.6, F and F.7, F and F.8, F and F.9, F and F.10, F and F.11, F and F.12, and/or F and F.13.

## TWENTY-SIXTH SPECIFICATION

## PRACTICING THE PROFESSION WITH NEGLIGENCE ON MORE THAN ONE OCCASION

Respondent is charged with committing professional misconduct as defined by New York Education Law §6530(3) by practicing the profession with negligence on more than one occasion as alleged in the facts of the following:

26. The facts in paragraphs A and A.1, A and A.2, A and A.3, A and A.4, A and A.5, A and A.6, A and A.7, A and A.8, A and A.9, A and A.10, A and A.11, A and A.12, A and A.13, and/or A and A.15; and/or B and B.1, B and B.2, B and B.3, B and B.4, B and B.5, B and B.6, B and B.7, B and B.8, B and B.9, B and B.10, B and B.11, B and B.12, B and B.13, and/or B and B.15; and/or C and C.1, C and C.2, C and C.3, C and C.4, C and C.5, C and C.6, C and C.7, C and C.8, C and C.9, C and C.10, C and C.11, C and C.12, C and C.13, and/or C and C.15; and/or D and D.1, D and D.2, D and D.3, D and D.4, D and D.5, D and D.6, D and D.7, D and D.8, D and D.9, D and D.10, D and D.11, D and D.12, D and D.13, and/or D

18

Exhibit B   018

and D.15; and/or E and E.1, E and E.2, E and E.3, E and E.4, E and E.5, E and E.6, E and E.7, E and E.8, E and E.9, E and E.10, E and E.11, E and E.12, E and E.13, and/or E and E.15; and/or F and F.1, F and F.2, F and F.3, F and F.4, F and F.5, F and F.6, F and F.7, F and F.8, F and F.9, F and F.10, F and F.11, F and F.12, and/or F and F.13; and/or G and G.1, G and G.2, G and G.3, and/or G and G.4.

### TWENTY-SEVENTH THROUGH THIRTY-SECOND SPECIFICATIONS

### PRACTICING THE PROFESSION WITH GROSS INCOMPETENCE

Respondent is charged with committing professional misconduct as defined by New York Education Law §6530(6) by practicing the profession with gross incompetence as alleged in the facts of one or more of the following:

27. The facts in paragraphs A and A.1, A and A.2, A and A.3, A and A.4, A and A.5, A and A.6, A and A.7, A and A.8, A and A.9, A and A.10, A and A.11, A and A.12, A and A.13, and/or A and A.15.

28. The facts in paragraphs B and B.1, B and B.2, B and B.3, B and B.4, B and B.5, B and B.6, B and B.7, B and B.8, B and B.9, B and B.10, B and B.11, B and B.12, B and B.13, and/or A and A.15.

29. The facts in paragraphs C and C.1, C and C.2, C and C.3, C and C.4, C and C.5, C and C.6, C and C.7, C and C.8, C and C.9, C and C.10, C and C.11, C and C.12, C and C.13, and/or C and C.15.

19

Exhibit B   019

30.   The facts in paragraphs D and D.1, D and D.2, D and D.3, D and D.4, D and D.5, D and D.6, D and D.7, D and D.8, D and D.9, D and D.10, D and D.11, D and D.12, D and D.13, and/or D and D.15.

31. The facts in paragraphs E and E.1, E and E.2, E and E.3, E and E.4, E and E.5, E and E.6, E and E.7, E and E.8, E and E.9, E and E.10, E and E.11, E and E.12, E and E.13, and/or E and E.15.

32.   The facts in paragraphs F and F.1, F and F.2, F and F.3, F and F.4, F and F.5, F and F.6, F and F.7, F and F.8, F and F.9, F and F.10, F and F.11, F and F.12, and/or F and F.13.


## THIRTY-THIRD SPECIFICATION

## PRACTICNG THE PROFESSION WITH INCOMPETENCE ON MORE THAN ONE OCCASION

Respondent is charged with committing professional misconduct as defined by New York Education Law §6530(5) by practicing the profession with incompetence on more than one occasion as alleged in the facts of the following:

33. The facts in paragraphs A and A.1, A and A.2, A and A.3, A and A.4, A and A.5, A and A.6, A and A.7, A and A.8, A and A.9, A and A.10, A and A.11, A and A.12, A and A.13, and/or A and A.15; and/or B and B.1, B and B.2, B and B.3, B and B.4, B and B.5, B and B.6, B and B.7, B and B.8, B and B.9, B and B.10, B and B.11, B and B.12, B and B.13, and/or B and B.15; and/or C and C.1, C and C.2, C and C.3, C and C.4, C and C.5, C and C.6, C and C.7, C and C.8, C and C.9,

20

Exhibit B   020

C and C.10, C and C.11, C and C.12, C and C.13, and/or C and C.15; and/or D and D.1, D and D.2, D and D.3, D and D.4, D and D.5, D and D.6, D and D.7, D and D.8, D and D.9, D and D.10, D and D.11, D and D.12, D and D.13, and/or D and D.15; and/or E and E.1, E and E.2, E and E.3, E and E.4, E and E.5, E and E.6, E and E.7, E and E.8, E and E.9, E and E.10, E and E.11, E and E.12, E and E.13, and/or E and E.15; and/or F and F.1, F and F.2, F and F.3, F and F.4, F and F.5, F and F.6, F and F.7, F and F.8, F and F.9, F and F.10, F and F.11, F and F.12, and/or F and F.13; and/or G and G.1, G and G.2, G and G.3, and/or G and G.4.

## THIRTY-FOURTH SPECIFICATION

## WILLFULLY FAILING TO FILE A REPORT REQUIRED BY LAW

Respondent is charged with committing professional misconduct as defined by New York Education Law §6530(21) by willfully failing to file a report required by law or by the Department of Health, or the Education Department as alleged in the facts of one or more of the following:

34. The facts in paragraphs G and G.1, G and G.2, G and G.3 and/or G. and G.4.

21

Exhibit B 021

### THIRTY-FIFTH SPECIFICATION

### WILLFULLY OR GROSSLY FAILING TO COMPLY WITH FEDERAL, STATE, OR LOCAL LAWS RULES OR REGULATIONS GOVERNING THE PRACTICE OF MEDICINE

Respondent is charged with committing professional misconduct as defined by New York Education Law §6530(16) by willfully or grossly negligently failing to comply with substantial provisions of federal, state, or local laws, rules, or regulations governing the practice of medicine as alleged in the facts of one or more of the following:

35. The facts in paragraphs G and G.1, G and G.2, G and G.3 and/or G and G.4.

### THIRTY-SIXTH THROUGH FORTY-FIRST SPECIFICATIONS

### PERFORMING PROFESSIONAL SERVICES WHICH HAVE NOT BEEN AUTHORIZED BY THE PATIENT

Respondent is charged with committing professional misconduct as defined by New York Education Law §6530(26) by performing professional services which have not been authorized by the patient as alleged in the facts of one or more of the following:

36. The facts in paragraphs A and A.14, and/or A and A.15.

37. The facts in paragraphs B and B.14, and/or B and B.15.

38. The facts in paragraphs C and C.14, and/or C and C.15.

39. The facts in paragraphs D and D.14, and/or D and D.15.

40. The facts in paragraphs E and E.14, and/or E and E.15.

41. The facts in paragraphs F and F.14, and/or F and F.15.

22

Exhibit B    022

## FORTY-SECOND THROUGH FORTY-SEVENTH SPECIFICATIONS

## FAILING TO MAINTAIN RECORDS

Respondent is charged with committing professional misconduct as defined by New York Education Law §6530(32) by failing to maintain a record for each patient which accurately reflects the evaluation and treatment of the patient as alleged in the facts of the following:

42. The facts in paragraphs A and A.13.

43. The facts in paragraphs B and B.13.

44. The facts in paragraphs C and C.13.

45. The facts in paragraphs D and D.13.

46. The facts in paragraphs E and E.13.

47. The facts in paragraphs F and F.12.

DATE: April 27, 2020
      Albany, New York

TIMOTHY J. MAHAR, ESQ.
Deputy Counsel
Bureau of Professional Medical Conduct

23

Exhibit B  023

STATE OF NEW YORK : DEPARTMENT OF HEALTH
STATE BOARD FOR PROFESSIONAL MEDICAL CONDUCT
--------------------------------------------------------------------------------x
                                                  :

|                              |   |                  |
|------------------------------|---|------------------|
| **IN THE MATTER**            | : | **DETERMINATION** |
| **OF**                       | : | **AND**          |
| **DANIELLE ROBERTS, D.O.**   | : | **ORDER**        |

--------------------------------------------------------------------------------x

A Notice of Hearing and Statement of Charges dated March 5, 2020, and Amended Statement of Charges dated April 27, 2020, were duly served pursuant to § 230(10)(d)(i) of the Public Health Law (PHL) upon Danielle Roberts, D.O. (Respondent). (Exhibits 1, 1a; Appendix I.) Steven Lapidus, M.D., Chair, Ramanathan Raju, M.D., and Joan Martinez McNicholas, duly designated members of the State Board for Professional Medical Conduct, served as the Hearing Committee, and Dawn MacKillop-Soller, served as the Administrative Law Judge. PHL § 230(10)(e). The Department of Health, Bureau of Professional Medical Conduct (Department), appeared by Jeffrey J. Conklin, Esq. The Respondent appeared and was represented by Anthony Z. Scher, Esq.

The Hearing Committee voted 3-0 to sustain 45 specifications among ten definitions of misconduct set forth in the Education Law: willfully abusing a patient §6530(31); conduct in the practice of medicine which evidences moral unfitness §6530(20); failing to use appropriate infection control practices §6530(47); practicing the profession of medicine fraudulently §6530(2); practicing the profession with gross negligence §6530(4); practicing the profession with negligence on more than one occasion §6530(3); practicing the profession with gross incompetence §6530(6); practicing the profession with incompetence on more than one occasion §6530(5); performing professional services which have not been authorized by the patient §6530(26); and failing to maintain a record for each patient which accurately reflects the evaluation and treatment of the patient § 6530(32). The Hearing Committee also voted 2-1 to sustain two

Exhibit C  001

additional specifications of misconduct: willfully failing to file a report required by law §6530(21) and willfully or grossly negligently failing to comply with substantial provisions of federal, state, or local laws, rules, or regulations governing the practice of medicine §6530(16).

The Hearing Committee unanimously determined to impose the penalty of revocation of the Respondent's medical license pursuant to PHL § 230-a(4).

## **Hearing Record**

| | |
|---|---|
| Pre-Hearing Conference: | May 28, 2020 |
| Hearing Dates: | June 2, July 1 & 6, August 12 & 14, September 9, October 21, November 3, December 2 & 15, 2020. January 8, February 19, March 2, 2021. |
| Witnesses for Petitioner: | Vasco Bilbao (Transcript, p. 61-189.) Danielle Roberts, D.O. (Transcript, p. 199-440, 514-757.) Ariella Cepelinski (Transcript, p. 443-490.) Michael Menashy (Transcript, p. 492-511.) S.E. (Transcript, p. 769-942.) Robert T. Grant, M.D. (Transcript, p. 1056-1238.) Bruce F. Farber, M.D. (Transcript, p. 955-1045.) |
| Petitioner's Exhibits: | 1, 1a, 2a, 2b, 3, 4, 6, 8d, 9, 14a, 15a, 16, 17, 35, 38, 45, 47-49 |
| Witnesses for Respondent: | Danielle Roberts, D.O. (Transcript, p. 1247-1461, 2106-2150.) David Mayer, M.D. (Transcript, p. 1469-1594.) M.H. (Transcript, p. 1594-1666.) Jane Doe 1 (Transcript, p. 1675-1720.) Jane Doe 2 (Transcript, p. 1726-1755.) Steve Arthur Haworth (Transcript, p. 1758-1840, 2094-2097.) E. Carlson (Transcript, p. 1845-1855.) R. Wolle (Transcript, p. 1856-1867.) Jane Doe 3 (Transcript, p. 1878-1930.) Jane Doe 4 (Transcript, p. 1934-1993.) Jane Doe 5 (Transcript, p. 1996-2092.) |
| Respondent's Exhibit: | A |
| ALJ Exhibit: | I |
| Written Submissions received: | June 2, 2021 |
| Deliberations held: | June 29, July 20, 2021 |

## **Findings of Fact**

The Hearing Committee unanimously makes the following findings of fact:

1.      Respondent Danielle Roberts, D.O., was authorized to practice medicine in New York State on October 5, 2009, by the issuance of license number 255075. (Exhibit 3.)

2.      The Respondent's background includes board certification and completion of a residency in family practice in 2011 followed by working as a physician and medical director between 2011 and 2013 at a large family practice caring for patients of all ages and with various conditions. From 2013 to 2018, she worked as a hospitalist at St. Peter's Hospital in Albany providing medical care to hospital patients from admission to discharge. Her background also includes seven years of locum tenens work at a hospital in Wisconsin and one year at a large integrative medical practice in Manhattan. (Exhibit 38; Transcript, p. 202, 206-207, 1249-1250, 1424-1425.)

3.      In 2013, the Respondent joined NXIVM, a personal development organization founded by Keith Raniere, also known as Vanguard. NXIVM is the parent company to several umbrella organizations, including ESP (Executive Success Programs), SOP (Society of Protectors), Ninth Media, DOS (dominus obsequious sororium, master/slave, master allegiance sisterhood), and Exo/Eso (fitness/exercise program), with multiple center locations in New York, California, Canada, and Mexico. (Exhibit 49; Transcript, p. 65, 184, 186-187, 224, 1255-1256, 1261, 1728.)

4.      In 2016, the Respondent joined DOS, a secret women's group developed by eight "1st line" or original members in collaboration with Keith Raniere. The claimed purpose of DOS was to empower women to build character, strength, and discipline by overcoming fears and pain to experience growth. The Respondent's involvement in DOS was "2nd line member" behind the "1st line" members. (Exhibits 14a, 49; Transcript, p. 234, 246, 252-253, 411-412, 526, 785, 1426, 1938, 2003.)

Exhibit C  003

5.    Membership in DOS required a lifetime commitment or "vow of obedience" between master and slave, the exchange of collateral, a necklace or collar worn 24 hours every day to symbolize obedience and commitment, and a brand placed by an electrocautery device to the pelvic region as part of a branding ceremony. The vow required slaves to strictly follow their masters' orders and keep DOS completely secret. The goal of the branding was to overcome pain and create solidarity. (Exhibit 14a; Transcript, p. 240-243, 255-256, 358-359, 1265, 1268, 1730, 1747-1750, 1888, 1938-1939.)

6.    The brandings of the women, including S.E., A.M., J.G., C.G., A.C., and L.S., occurred only after they committed to join DOS and submitted multiple forms of acceptable collateral. Acceptable collateral included titles to houses and cars, investment and bank accounts, businesses, nude photographs, incriminating letters and/or written confessions detailing sexual deviance, illicit drug use, extramarital affairs, and/or embarrassing family matters. The collateral coerced the women into keeping DOS secret and maintaining their commitment and was subject to public release if the women breached these requirements. (Exhibit 14a; Transcript, p. 243-246, 358-359, 781, 783, 796, 815, 859, 894, 1730, 1747-1748, 1967, 1969, 2054-2055.)

7.    An electrocautery device generates electrical energy that is converted to heat for cutting through skin or solid organs, dissection, separating planes between tissues, hemostasis to stop or seal off bleeding blood vessels or lymphatics during procedures, and for electrocautery branding to place a scar on the body. While an electrocautery device can be used as a scalpel, it is not intended to be used directly on the skin surface because it can cause significantly more skin damage extending beyond the tip or point of contact. (Transcript, p. 1072, 1074, 1224, 1541.)

8.    A smoke evacuator must be used with an electrocautery device to remove dangerous particulate matter such as viruses, infectious diseases, blood cells, and other antigens released from the

Exhibit C  004

device upon contact with skin and tissue and prevent them from being absorbed or inhaled. (Transcript, p. 1074, 1082.)

9.    Electrocautery branding is a form of body modification in which an electrical arch on the electrocautery device vaporizes the skin and leaves behind undamaged skin and tissue but not a 2nd degree burn. (Transcript, p. 1787-1788.)

10.    Prior to performing the branding procedures on the women, including S.E., A.M., J.G., C.G., A.C., and L.S., the Respondent was required, under acceptable standards of medical conduct that apply to physicians, to complete training in the use of an electrocautery device. The training involves: (1) regulating the settings considering skin anatomy for the appropriate amount of energy transmitted through the tip; (2) grounding the device; (3) using personal protection equipment; and (4) safely operating and maintaining the device, including the use of a smoke evacuator. The Respondent never completed such training. (Transcript, p. 1070-1079, 1082-1087, 1125-1126, 1322-1325, 1327-1328.)

11.    Beginning in January of 2017 and continuing through March of 2017, the Respondent used a Medline Valley Lab Surgistat electrocautery device and a stencil to brand "KAR," the initials of Keith Raniere, into the pelvic regions of 17 women, including S.E., A.M., J.G., C.G., A.C., and L.S., most of whom were nude. The brandings were done without anesthesia to intentionally cause them pain. (Exhibits 8D, 45, 47; Transcript, p. 313, 339, 416, 524, 584-585, 635-640, 692, 1331-1332, 1353, 2107-2108.)

12.    The branding procedures occurred in a small room of a house and took between 20 and 45 minutes to complete. They were videotaped with a cell phone while a group of women used their bare hands and/or naked bodies to hold down the woman branded to keep her still and supine on the massage table. (Exhibit 8D; Transcript, p. 308, 313-314, 330, 524, 636, 804, 821, 827, 1333-1334, 1377, 1416, 1421.)

Exhibit C  005

13.    The Respondent's conduct in performing the brandings on S.E., A.M., J.G., C.G., A.C., L.S. and the other women constituted the practice of medicine by a physician. The Respondent relied on her medical training, education, and background when she performed the procedures to alter the skin and physical condition of their pelvic regions. (Transcript, p. 1110, 1115-1116, 1129, 1176.)

14.    The brandings performed by the Respondent while licensed as a physician were medical procedures in which standards of medical practice apply. (Transcript, p. 1097, 1109, 1112, 1129, 1163.)

15.    An electrocautery device must be properly grounded to ensure the safe return of the electrical energy from the person treated with the electrocautery device back to the grounding pad, which is affixed to that person. This process involves ensuring the operator and participants are properly insulated to prevent a burn by wearing gloves to avoid serving as the ground themselves. The women participants were not wearing gloves. (Transcript, p. 342, 638, 696, 1074, 1079-1080, 1082, 1154.)

16.    Physicians using an electrocautery device to perform procedures must adhere to infection control standards applicable to physicians performing invasive procedures on the human body. They must maintain a sterile field and sterile environment by: (1) applying draping around the surgical site and as a barrier to block off unsterile areas; (2) using an antibacterial cleaning solution to clean the room, surfaces, table, and equipment between cases and terminally at the end of the day; and (3) requiring all participants wear personal protection equipment, including sterile gloves, masks, and eye shields. The purpose in these requirements is to prevent infection. The Respondent followed none of these infection control procedures. (Exhibit 8D; Transcript, p. 341-342, 522, 536, 638, 1097-1098, 1100-1105, 1125, 1130, 1160-1161.)

17.    Physicians using electrocautery devices must also adhere to operational standards by performing and documenting routine testing and service of the electrocautery device and confirming sufficient electrical output in the room where the device is used. The purpose in these rules is to prevent a surgical or electrical fire during a procedure. (Transcript, p. 1071, 1097-1098, 1100.)

Exhibit C  006

18.    The Respondent's failures to maintain proper infection control standards and operational procedures while using an electrocautery device that inflicted 2nd degree burns on the women were severe deviations from the standard of care. (Transcript, p. 1124-1125, 1132.)

19.    In using an electrocautery device to perform the brandings without anesthesia, the Respondent caused the women, including S.E., A.M., J.G., C.G., A.C., and L.S., significant physical pain, 2nd degree burns, and abnormal permanent and/or raised keloid and hypertrophic scarring, and placed them at risk for harm, including deeper 3rd and 4th degree burns and psychological trauma like post-traumatic stress disorder (PTSD) or anxiety. (Exhibits 14a, 45, 47; Transcript, p. 579, 1079-1090, 1124-1130, 1133-1146, 1154, 1209, 1377, 1403, 1421.)

20.    In subjecting the women to significant pain from the electrocautery device, the Respondent was required to administer them, or at the very least offer, anesthesia, such as a local anesthetic, to alleviate the pain. The Respondent had no legitimate medical reason, such as an allergy or an emergency, for neither providing the women anesthesia nor presenting them with this treatment option. (Transcript, p. 339, 635, 1073, 1086.)

21.    The Respondent's failure to administer or advise and offer anesthesia to the women was a severe deviation from the standard of care. Physicians are ethically prohibited from causing patients such extreme harm on purpose. (Transcript, p. 1073, 1124-1125, 1131-1132, 1210-1211.)

22.    The Respondent never informed the women she branded that the brand was KAR to represent Keith Raniere's initials or that it would measure approximately two inches by two inches. The brand was intentionally placed upside down and backwards on most of the women to conceal Keith Raniere's initials. S.E., A.M., J.G., C.G., A.C. and others had falsely been told by their masters that the brand represented "a symbol of the sorority," "a line of the sun and the earth and certain elements," an "abstract symbol," "chakras," and/or "four elements," and that the size would be "little," "small," and/or

Exhibit C  007

"dime sized." Only L.S., as a "1st line" member, knew prior to her branding that the brand represented Keith Raniere's initials. (Exhibit 14a; Transcript, p. 351, 541-542, 787, 797-802, 904, 1355, 1450, 1685-1686, 1739, 1882, 1939, 1941-1942.)

23.    Prior to performing the branding procedures on the women, the Respondent was required to obtain their voluntary, verbal and/or written informed consent that reflected a discussion of the psychological and physical risks, benefits, and alternatives to the procedure, including the option not to proceed; the pain involved and the option of anesthesia; details of the brand symbol; and consideration of the individual's psychological and medical histories, comorbidities, and medications. The purpose of obtaining informed consent is to confirm the women have a complete understanding of the procedure and to avoid complications. The Respondent did not obtain such consent from any of the women. (Transcript, p. 435-437, 538-540, 1098, 1124-1125, 1164-1168, 1178-1182, 1985.)

24.    The Respondent's infliction of the branding procedures on the women without obtaining their voluntary verbal and/or written informed consent was a severe deviation from the standard of care. Informed consent must be voluntary and not in connection with coercion under the threat of disclosure of personal and potentially damaging or destructive collateral. (Transcript, p. 1098, 1124-1125, 1132, 1178-1183.)

25.    Physicians are obligated to provide proper care of 2nd degree burn wounds that includes application of antibacterial ointment and treatment plans that include follow-up physician monitoring. Providing this care is critical to ensure proper wound healing and to prevent infection. The Respondent failed to provide this care. (Transcript, p. 542-545, 624-625, 1164, 1166-1167, 1171, 1349, 2114.)

26.    The Respondent's failure to provide proper treatment and follow-up care of the 2nd degree burn wounds was a severe deviation from the standard of care. (Transcript, p. 1093-1096, 1123-1124, 1128, 1164, 1166-1167, 1171, 1174.)

Exhibit C  008

27.     Following completion of the branding procedures, the Respondent instructed the women to submit photos of their brands to their masters every day for 30 days and then one time per week. The Respondent evaluated and kept the photos but never made them part of a medical record because she never prepared or maintained such records for the women. (Transcript, p. 377, 379, 540, 543, 547-549, 556.)

28.     Physicians performing medical procedures involving the infliction of wounds are required to prepare, maintain, and document medical records that include photographs of the wound and details of the procedure, the equipment used, physical evaluations, diagnosis, treatment plans, and post-procedure instructions. The Respondent severely deviated from the standard of care by failing to prepare and maintain medical records to apprise outside providers of the treatment provided. (Transcript, p. 1173-1174.)

29.     In 2016, the Respondent participated in a ten-day annual NXIVM corporate retreat known as "Vanguard week" at the Silver Bay YMCA Family and Retreat Center, located in Silver Bay, New York. The purpose of the event was to celebrate the birthday of Keith Raniere. The attendees included more than 400 NXIVM members. (Exhibit 17; Transcript, p. 80, 90-93, 451-452, 456, 478, 496, 708, 710.)

30.     During the event and while attending it, the Respondent became aware of a gastrointestinal illness affecting many of the attendees. Among the attendees were children, a woman with end-stage cancer, and a pregnant woman. The symptoms of the illness included diarrhea, nausea, vomiting, dehydration, and fatigue. This illness placed the attendees and the public at risk for harm, including gastrointestinal morbidity and dehydration, which is a particular concern for people with comorbidities like cancer. (Transcript, p. 84-85, 454, 455, 485, 498-499, 505, 714-715.)

31.     This illness constituted a disease outbreak because it involved a large group of people who developed similar symptoms while attending the same event in a confined environment. Physicians are required under Department of Health regulations to report a communicable disease or any disease outbreak

or unusual disease to public health officials. 10 NYCRR 2.10. The Respondent failed to take any steps to comply with these requirements. (Transcript, p. 972, 991.)

32.    The Respondent's failure to report the infectious disease outbreak was a violation of public health regulations and a significant deviation from the standard of care for a physician. (Transcript, p. 991.)

## Factual Allegations

By email correspondence dated March 1, 2021, the Petitioner withdrew factual allegations G.3 and G.4. (ALJ I.) The Hearing Committee sustained all the remaining Factual Allegations in the Statement of Charges.

The Hearing Committee <u>sustained</u>, by unanimous vote (3-0):

Factual Allegations A.1, A.2, A.3, A.4, A.5, A.6, A.7, A.8, A.9, A.10, A.11, A.12, A.13, A.14, A.15, B.1, B.2, B.3, B.4, B.5, B.6, B.7, B.8, B.9, B.10, B.11, B.12, B.13, B.14, B.15, C.1, C.2, C.3, C.4, C.5, C.6, C.7, C.8, C.9, C.10, C.11, C.12, C.13, C.14, C.15, D.1, D.2, D.3, D.4, D.5, D.6, D.7, D.8, D.9, D.10, D.11, D.12, D.13, D.14, D.15, E.1, E.2, E.3, E.4, E.5, E.6, E.7, E.8, E.9, E.10, E.11, E.12, E.13, E.14, E.15, F.1, F.2, F.3, F.4, F.5, F.6, F.7, F.8, F.9, F.10, F.11, F.12, F.13.

The Hearing Committee <u>sustained</u>, by majority vote (2-1):

Factual Allegations G.1, G.2.

## Evaluation of the Respondent's Testimony

The Respondent testified on her own behalf and as a witness for the Petitioner. Although considered incidental by the Hearing Committee in deciding central issues in this case, the Hearing Committee believes it is worth noting the Respondent's evasiveness, defiance, and inconsistencies on various points. For instance, she refused to disclose: (1) the circumstances of her becoming involved in NXIVM (Transcript, p. 218); (2) the initials of the women she branded (Transcript, p. 315-316); (3) the whereabouts of the branding videos and whether she maintained them (Transcript, p. 328, 331); (4) how it was determined the brandings would be videotaped (Transcript, p. 331); (5) who was present when she branded L.S. (Transcript, p. 333); (6) the roles of the women in the room with L.S. during the branding

Exhibit C  010

(Transcript, p. 336); (7) whether L.S. was clothed during the branding (Transcript, p. 335); (8) what the brand represented (Transcript, p. 351); and (9) whether L.S.'s limbs were held down when she was branded (Transcript, p. 337). Despite being directed to answer these questions when they were asked, the Respondent never did. She also initially refused to disclose whether she was branded with Keith Raniere's initials (Transcript, p. 518-519) but then finally admitted — consistent with the other evidence — that she was branded and that the brand was KAR to represent his initials. (Exhibits 14a and 49; Transcript, p. 1312, 1352-1352, 1388, 1391-1393, 1396.)

Further inconsistencies include her initial testimony that she was unaware of the details of the electrocautery device she used, stating it was "purchased by the friend that invited me" (Transcript, p. 266, 269), and her later testimony that she purchased it, identifying the model and manufacturer. (Transcript, p. 2108.) She also initially testified that DOS was "a completely separate organization" from NXIVM and Keith Raniere was not its "leader" (Transcript, p. 253) and that L.S., a 1st line member, had "no master" (Transcript, p. 381), but then later admitted that Keith Raniere was the "grandmaster" to the 1st line members (Transcript, p. 1387), who were his "slaves." (Transcript, p. 1389.)

The Hearing Committee finds these factors significantly diminished the Respondent's credibility and evaluated her testimony accordingly.

### The Practice of Medicine

The Hearing Committee was not persuaded by the Respondent's arguments that the Board lacks subject matter jurisdiction to bring charges against her because she "was not engaged in the practice of medicine" and that branding "is not a medical procedure." (Respondent's brief, p. 2.) The Hearing Committee finds the Petitioner correctly argues the Respondent "performed medical procedures when she branded the DOS women" and that "the brandings fell within the definition as to what constitutes the

Exhibit C  011

practice of medicine" and agrees with its reliance on Courts having a long-standing history of interpreting Educ. Law §6521 broadly to support these positions. (Petitioner's brief, p. 12-13.)

The practice of the profession of medicine is defined as "diagnosing, treating, operating or prescribing for any human disease, pain, injury, deformity or physical condition." Educ. Law § 6521. Whether conduct constitutes the practice of medicine is a determination to be made by the Hearing Committee based on the facts presented. Addei v. State Board for Professional Medical Conduct, 278 AD2d 551, 552 (3d Dept. 2000); *See also* Educ. Law §6504. This determination must be based solely on the facts "and not upon the name of the procedure, its origins or legislative lack of clairvoyance." People v. Amber, 76 Misc. 2d 267, 273 (Sup. Ct. Queens Co. 1973).

The reported decisions relied on by the Petitioner that the Hearing Committee finds convincing on this point include People v. Amber, *supra* at 273, in which the Court described its interpretation of Educ. Law §6521 as "a statute intended to regulate, limit or control the diagnosis and treatment of ailments must be read broadly to include the gamut of those known, whether or not recognized and even those not yet conjured." (Petitioner's brief, p. 12-13.) *See also*, People v. Mastromarino, 148 Misc. 454, 455 (Sup. Ct. Kings Co. 1933); People v. Rubin, 103 Misc.2d 227, 234 (N.Y. City Crim. Ct. Queens Co. 1979). The Respondent acknowledges that while branding "arguably involves operating," the operations were not "for a human disease, pain, injury, deformity or physical condition," and so did not fit the statute because the women were "perfectly healthy and normal in all respects" when they received the brands. (Respondent's brief, p. 3-4.)

The Respondent relies on Matter of Gross v. Ambach, 71 NY2d 859, 861 (1988), in which the Court of Appeals determined autopsies constitute the practice of medicine because they are "the ultimate diagnostic procedure" to diagnose the cause and manner of death. (Respondent's brief, p. 3-4.) The Hearing Committee finds the only similarity to be drawn between the two cases is that the statute somehow

Exhibit C  012

does not fit. There because autopsies are not practicing medicine since medicine can only be practiced on "living" patients and here because the women were "normal and healthy" when they were branded. <u>Gross</u>, <u>supra</u> at 861. In any event, the Hearing Committee, like the Court of Appeals in <u>Gross</u>, declines to limit the statue in that regard. *Id.* (Respondent's brief, p. 4.) The Hearing Committee rejects the Respondent's claim that it is "blatantly obvious" that the Respondent's "operating" on the women was not for "a human disease, pain, injury, deformity or physical condition" to meet the criteria under the statute. (Respondent's brief, page 3.) To the contrary, it is glaringly obvious to the Hearing Committee that she was operating on the women to alter the skin, appearance, and physical condition of their pelvic regions regardless of whether they were "normal and healthy." (Transcript, p. 1110-1111, 1116.)

The Petitioner presented as a witness plastic surgeon Robert T. Grant, M.D. While Dr. Grant lacks branding experience, the Hearing Committee noted his expertise and credibility on the main issues in this case were established by his decades of experience as a board-certified specialist in general and plastic surgeries performing cosmetic procedures, such as body piercings and nipple and areola tattooing to complete a breast reconstruction, and as Chief of Plastic Surgery at NewYork-Presbyterian Hospital, program director for the residents training program, and Professor of Surgery at Columbia University. (Exhibit 4; 1060-1066, 1185-1186.)

The Respondent presented as a witness general surgeon David Mayer, M.D. The Hearing Committee noted Dr. Mayer's extensive and diverse background as a practicing healthcare attorney and board-certified surgeon with 40 years of experience, including current privileges at three ambulatory facilities, teaching at three medical colleges, and prior Chair of Surgery at Syosset Hospital, where he performed thousands of surgeries, directed a laparoscopic fellowship program, and trained residents. (Transcript, p. 1469-1471, 1505.) Despite his considerable medical and legal experience, the Hearing

Committee was not persuaded by his professional opinions on the issue of the practice of medicine due to contradictions in his testimony.

For instance, Dr. Mayer insisted the Respondent was a branding technician able to "put aside her white coat" as a physician when she performed the brandings, yet he described himself as "always a physician" who doesn't "stop being a physician…at different times." (Transcript, p. 1569, 1579-1580.) His position that she was acting as a branding technician was also inconsistent with his testimony that "you never forget your training and education" (Transcript, p. 1566-1567.) Another example is his testimony that physicians should not cause extreme pain while also refusing to discuss the "ethics" of the Respondent causing the women such pain and insistence that her osteopathic oath to do no harm and prevent pain did not apply. (Transcript, p. 1528, 1531.) The Hearing Committee considered such inconsistencies, noted his long-standing history of providing expert witness services in hundreds of civil cases to law firms and other private companies, and evaluated his testimony accordingly. (Transcript, p. 1499.)

While the Hearing Committee was not persuaded by Dr. Grant's professional opinion that the Respondent was practicing medicine because she addressed "psychic pain" the women were experiencing, it did agree with his testimony that the brandings are the practice of medicine under Educ. Law §6521 because they were "surgical," involving "violating the epidermis and getting into the deeper layers of skin," and performed to "alter the skin" or physical condition of the women. (Transcript, p. 1110-1111, 1114, 1116.) The Respondent attempted to contrast branding with plastic surgery such as a rhinoplasty on a "successful face model" on the grounds that branding does not treat "a physical condition" the patient seeks to change (brief, p. 12), but the Hearing Committee finds this comparison frustrates her cause. Just as a rhinoplasty to change the appearance of a nose alters the physical condition of the face, the Hearing

Exhibit C  014

Committee finds the Respondent's branding to inflict a permanent and very visible scar alters the skin, appearance, and physical condition of the pelvic region.

Dr. Grant took the position that while brandings and other similar cosmetic procedures such as body piercing and tattooing can be performed by non-physicians, they constitute medical procedures when physicians perform them. (Transcript, p. 1108-1109, 1196-1197.) The Hearing Committee agrees with this view and rejects the Respondent's arguments against it. On the one hand, the Respondent claims that branding "is a form of commercial body art in the same manner as are tattooing and body piercing." (Respondent's brief, p. 8.) To that end, she argues that "aesthetic or ritual branding is outside the jurisdiction of the State Board for Professional Medical Conduct as branding is not regulated at all in New York." (Respondent's brief, p. 9.) On the other hand, the Respondent goes on to distinguish these activities on the basis that tattooing and body piercing require a license to perform, whereas branding does not. PHL §461. In doing so, she overlooks the exception to the tattoo and body piercing licensing requirement for physicians that is expressly stated in the statute. PHL §462. The Hearing Committee believes the Legislature specifically carved out that exception precisely because when a doctor and not a technician performs tattooing or body piercing, it is presumed that appropriate medical standards will apply. Consistent with this was Dr. Grant's testimony that he was unable to "imagine the scenario" involving a licensed physician performing these brandings acting as only a "technician." (Transcript, p. 1218.)

The Respondent's arguments that tattooing and body piercing are regulated — whereas branding is not — were deemed inconsequential to the Hearing Committee. The Committee's view is simple — all these activities are practicing medicine and become medical procedures when performed by a physician. Contrary to Dr. Mayer's testimony that the Respondent could obtain "a separate license as a tattoo artist or body piercer" and "not use" her medical license (Transcript, p. 1549), the Hearing Committee believes that as a physician, the Respondent cannot unilaterally pick and choose when the standards of medical

Exhibit C  015

practice apply. (Transcript, p. 1107-1109, 1200, 1549.) Dr. Grant confirmed this when he testified: "given the privilege of being a physician that comes with responsibilities. You can't decide when you are going to enjoy the privileges, but not have the responsibilities." (Transcript, p. 1112.) The Hearing Committee considers the Respondent's attempt to use a double standard, compartmentalizing her life by ostensibly branding the women as a technician and not a doctor, an irresponsible attempt to cast aside her privileged status as a licensed physician with specialized knowledge.

The Hearing Committee was guided in reaching its determination by reported court decisions relying on various factors and circumstances in recognizing when activities performed by physicians fall within the definition of the practice of medicine. In <u>Y.Y.B. ex rel. Barukh v. Rachminov</u>, the court found that "while a circumcision performed by a physician would be the practice of medicine, a circumcision performed as a religious ritual by a qualified person (a 'mohel' in this case) does not constitute the practice of the profession of medicine within the meaning of the Education Law." <u>Y.Y.B. ex rel. Barukh v. Rachminov</u>, 11 N.Y.S.3d 808, 1059 (Sup. Ct. Queens Co. 2015); *See also* <u>Zakhartchenko v. Weinberger</u>, 605 N.Y.S.2d 205, 206 (Sup. Ct. Kings Co. 1993.) In relying on this same reasoning, the Court in <u>Zakhartchenko</u> applied negligence principles to a hospital where a circumcision performed by a Rabbi involved the hospital's trained medical staff. <u>Zakhartchenko</u>, *supra* at 413. The Petitioner also cites <u>Zakhartchenko</u> in its brief (p. 18) to correctly summarize the principle from these cases applicable to this matter: "Therefore, while the acts performed by a non-physician are not subject to the jurisdiction of the Board of Professional Medical Conduct, the brandings/medical procedures performed by Dr. Roberts on 17 DOS women are." The Hearing Committee follows the view of these reported cases that different standards apply when physicians perform procedures.

The Respondent claims that "several possible people were considered" to perform the brandings and that "(c)learly, the intent was not to select a physician but to pick amongst friends" (brief, p. 8), but

Exhibit C  016

the Hearing Committee finds it more likely the Respondent was chosen based on her background, training, and knowledge as a physician. The Respondent acknowledged relying on her medical background in everything she does. (Transcript, p. 263, 423, 430-431, 488, 521, 547, 552-553, 1440-1442, 2134.) The evidence also confirms she was the only physician approached by the 1st line members to perform the brandings, her status as a physician was well-known in the NXIVM community, and she was the one chosen to do them. (Transcript, p. 182-183, 352, 797, 1853, 1950.) Her experience as a physician was obviously relevant to what they were seeking in a person to do the job, which Jane Doe 5 described as someone who was "willing," "calm," not "squeamish," and had "a steady hand" and "attention to detail." (Transcript, p. 2020-2021.) Jane Doe 4 also expressed how she hoped "someone skilled enough" would be chosen for the job and the relief she felt — consistent with S.E.'s testimony — knowing her branding would be done by the Respondent, who she knew was a doctor. (Transcript, p. 796, 1951, 1942-1943, 1975.)

### Standards of Medical Practice

The Hearing Committee concluded the Respondent's lack of training in the use of an electrocautery device contributed to her improper technique in performing the branding procedures and exacerbated the harm to these women. The Hearing Committee was skeptical of Dr. Mayer's assertion that the Respondent took "great care to get special training in branding" (Transcript, p. 1476) because the evidence established she was woefully unskilled in performing the procedures. According to Dr. Grant, proper training in the safe and proper use of an electrocautery device includes attending "a series of didactic lectures" and using the device for a period of time "under direct observation of a mentor or preceptor," steps the Respondent never undertook. (Transcript, p. 517, 562-563, 1070-1071, 1327-1328, 1765, 1784.) The Hearing Committee finds her preparations for the brandings, which included undergoing branding herself by branding artist Brian Decker in Brooklyn, practicing on fruit and pigs' knuckles, and a few

Exhibit C  017

communications by email and telephone with Mr. Decker and body modification artist Steve Arthur Haworth, fell short of demonstrating serious and proper training in using an electrocautery device. (Transcript, p. 273-274, 280-284.)

The Respondent presented body modification artist Steve Arthur Haworth as a witness to discuss her branding technique. The Hearing Committee was not convinced by Mr. Haworth's opinion that the Respondent used appropriate technique when she performed the brandings. (Transcript, p. 1779.) Mr. Haworth testified that in his almost 30 years of performing electrocautery brandings, he has never caused a 2nd degree burn. (Transcript, p. 1827.)  He described such a burn as "significantly more painful" than a brand (Transcript, p. 1788), with a greater risk of infection. (Transcript, p. 1795.) Mr. Haworth's description of an electrocautery brand as "not a second-degree burn" and "more like a scrape" that heals "very quickly" (Transcript, p. 1763, 1789-1790, 1796) was contrary to all the evidence in this case. The Respondent's brandings resulted in 2nd degree burns, as was established by the brand photos (Exhibits 45 and 47), the branding video (Exhibit 8D), and the testimony of Dr. Mayer (Transcript, p. 1510-1511), Dr. Grant (Transcript, p. 1085), and the Respondent herself. (Transcript, p. 1377, 1420-1421.) The Hearing Committee attributed Mr. Haworth's seeming unawareness that the Respondent's brandings caused 2nd degree burns to his lack of a medical degree and his failure to review the brand wound photos showing the depth of the wounds or the testimony of the physician witnesses. (Exhibits 8D, 45, 47; Transcript, p. 1791-1792.)

The Respondent's poor technique was obvious to the Hearing Committee on S.E.'s branding video, which showed sparks and fire from the electrocautery device as she moved it across the skin to create the brand's "seven lines" and "touchups" (Exhibit 8D; Transcript, p. 366-367) and her multiple starts and stops, which Mr. Haworth commented on as "different" from his technique. (Transcript, p. 1778.) The Hearing Committee also recognized the Respondent's failure to mention the energy settings or the types

18

Exhibit C  018

of tips she used, which suggested her unfamiliarity with how the device works, specifically that the electrical current from the device and the time in which it is applied directly affects the outcome. (Transcript, p. 283, 1224.) She also expressed no awareness of the danger in using an electrocautery device directly on the skin surface to make an incision because it can cause a more significant injury than intended, such as the abnormal scarring and deep 2nd degree burns that occurred in this case and the risk of deeper 3rd and 4th degree burns. (Transcript, p. 1215, 1224, 1510, 1581.) For these reasons, the Hearing Committee believes her lack of training in controlling the electrocautery device to predict the outcome meant she never understood that the time in which she applied the tremendous amount of electrical energy from the device caused the women substantial injuries, pain, and trauma. (Exhibits 14a, 45, 47; Transcript, p. 1085-1087, 1128.)

Dr. Grant described the Respondent's branding of these women as "excruciatingly" and "incredibly painful" for which she never even offered them a choice of anesthesia. (Transcript, p. 1086, 1162-1163.) In response to the pain, the evidence showed A.M. and S.E. cried and J.G. screamed and squealed, flipped off the table, and bit down on a towel. (Exhibit 14a; Transcript, p. 807, 819, 579, 689, 819, 846, 1404.) S.E. described her pain from the branding as "an acute fire in the most sensitive part of my body." (Transcript, p. 827.) L.S. described her experience of the branding as "incredibly painful." (Exhibit 14a.) While the evidence established the women desired pain as part of the branding process (Respondent's brief, p. 18), the Hearing Committee agreed with Dr. Grant that absent a legitimate medical reason, such as an allergy or an emergency, the Respondent was obligated to at least attempt to alleviate such pain, such as by administering a local anesthetic in the area where the cautery was applied. (Transcript, p. 1073, 1124, 1210-1211.)

This was necessary, Dr. Grant explained, because the level of pain the women endured was so intense that it risked causing the woman cauterized even deeper burns from not being able to remain still

Exhibit C  019

during the procedure. Dr. Mayer also acknowledged this risk, as well as the risk of physical injuries to the women participants holding her down as she violently reacts to the electrocautery device. (Transcript, p. 1082-1083, 1087-1090, 1510.) Dr. Grant emphasized it is "unethical" for physicians to intentionally cause patients such harm because doing so violates "our ethical background in training and responsibility." (Transcript, p. 1116, 1228.)

The Respondent's lack of training was also established by her failure to prevent other risks of harm from occurring. She risked burns to the other women participants because they were not properly grounded by wearing gloves for insulation, instead using their bare skin to hold down the woman cauterized. Another risk was that the women could inhale or absorb harmful pathogens, such as viruses and infectious diseases, due to the failure to use a smoke evacuator to remove the debris plume released from the electrocautery device. She also risked burn wound infections by not maintaining a sterile field because she never properly cleaned the room, applied sterile draping, or required the women to wear personal protective equipment such as masks, sterile gloves, and eye protection. (Transcript, p. 1074, 1082, 1097-1098, 1104-1105, 1130.) The Hearing Committee disagreed with Dr. Mayer's opinion that these risks were "low," especially because the Respondent made no effort to mitigate them. (Transcript, p. 334-335, 532, 562, 1584.) Dr. Grant deemed the Respondent's failure to complete these steps serious deviations from the standard of care. (Transcript, p. 1124-1125, 1132.)

The Hearing Committee unanimously voted that the Respondent's conduct constituted professional misconduct as defined in Educ. Law §6530(4), practicing the profession with gross negligence on a particular occasion, professional misconduct as defined in Educ. Law §6530(6), practicing the profession with gross incompetence, and professional misconduct as defined in Educ. Law 6530(5), practicing the profession with incompetence on more than one occasion.

Exhibit C  020

Gross negligence involves a significant deviation from acceptable medical standards that creates the risk of grave consequence to the patient. Such conduct may result in a single act of negligence in egregious proportions or multiple acts of negligence that cumulatively are egregious. Post v. N.Y.S. Dept. of Health, 245 A.D.2d 985, 986 (3d Dept. 1997.) Gross incompetence involves an unmitigated lack of the skill or knowledge necessary to perform an act undertaken by the licensee in the practice of medicine. This conduct may consist of a single act of incompetence of egregious proportions or multiple acts of incompetence that cumulatively amount to egregious conduct. Post, 245 A.D.2d at 986; Minielly v. Commissioner of Health, 222 A.D.2d 750, 752 (3d Dept. 1995). Incompetence includes a lack of the requisite knowledge or skill in the practice of the profession but does not require a showing of an act or omission constituting a breach of the duty of due care. Dhabuwala v. State Bd. For Professional Med. Conduct, 225 AD2d 209, 213 (3d Dept. 1996).

The Respondent deviated from the standard of care and demonstrated a lack of skill and knowledge to practice the profession of medicine. She dangerously operated the electrocautery device to perform the branding procedures without anesthesia or adhering to infection control standards, which subjected the women to extreme pain, deep 2nd degree burn wounds, and abnormal scarring, and risked them further 3rd and 4th degree burn wounds, infection, and other harm.

The Hearing Committee also voted 3-0 that the Respondent's conduct constituted professional misconduct as defined under Education Law §6530(47), failing to use appropriate infection control practices. The Respondent's failure to follow any infection control procedures risked the women burn wound infections and other harmful outcomes, representing to the Hearing Committee her disregard for their health and safety.

Informed consent requires a verbal or written discussion to evaluate risks so the patient can "prudently decide whether or not" to proceed with the procedure. (Transcript, p. 1098, 1178-1180.) It must

Exhibit C  021

include a discussion of the psychological and physical risks, benefits, and alternatives to the procedure, including the option not to proceed, considering medical histories, comorbidities, and medications. (Transcript, p. 1124, 1179-1180.) The Respondent admits she never obtained such consent, which Dr. Grant deemed a serious deviation from the standard of care. (Respondent's brief, p. 8; Transcript, p. 436, 538-540, 1180.)

In failing to take medical histories and perform physical examinations, the Respondent risked missing a diagnosis or condition such as diabetes or connective tissue disorder, or a blood thinner medication like aspirin, that could affect clotting or wound healing. She also risked missing a cardiac condition that could trigger an arrythmia or pre-existing PTSD or anxiety that could become exacerbated by direct exposure to blood and trauma. (Transcript, p. 544-544, 1094-1095, 1171, 1418.) Other risks included burn wound infections and poor healing because she never provided treatment plans that included application of antibiotic ointment and follow-up physician monitoring. (Transcript, p. 377, 547, 556, 1362, 1168, 1171-1172.) In failing to document medical records, including the brand wound photos she collected and kept, she also risked depriving outside providers of important information about the procedures and the reason why they were performed. (Transcript, p. 1175.)

The Respondent, as a physician, was obligated to complete such tasks. The Hearing Committee believes she should have known to do so, especially considering her experience as a hospitalist following protocols that involve reading charts, assessing medications and medical histories to determine comorbidities, and treating patients with various injuries, including burn wounds. (Transcript, p. 206-207, 209, 291.) Although Mr. Haworth testified that his brandings never involve completing these steps, the Hearing Committee noted that he is not a doctor. The medical standards that apply to physicians with specialized medical training and knowledge performing these procedures do not also apply to branding technicians. (Transcript, p. 1770-1771.)

22

Exhibit C  022

The Hearing Committee unanimously determined that the Respondent's conduct constituted professional misconduct as defined in Educ. Law §6530(32), failing to maintain records for each patient that "accurately reflect the evaluation and treatment of the patient." Physicians are required to maintain such records that include every interaction with the patient and, in cases such as this, photos of the injury. Mucciolo v. Fernandez, 195 A.D.2d 623, 625 (3d Dept. 1993).

Negligence means the "failure to exercise the care that would be exercised by a reasonably prudent licensee under the circumstances." Bogdan v. State Bd. For Professional Med. Conduct, 195 A.D.2d 86, 88 (3d Dept. 1993). The Department is not required to prove harm to a patient. Youssef v. State Bd. For Professional Med. Conduct, 89 A.D.3d 824, 825 (3d Dept. 2004). Negligence can also be sustained when there is a relationship between inadequate medical records and patient treatment. Matter of Patin v. State Bd. For Professional Med. Conduct, 77 A.D.3d 1211, 1214 (3d Dept. 2010). The Hearing Committee sustains the negligence charge on both grounds. The Respondent failed to exercise the required level of care when she failed to take even the most basic steps to protect these women, such as by assessing medical and psychiatric histories, providing follow-up care considering the deeply traumatizing nature of the branding procedures, or assessing cross reactions, such as a medication that could worsen a preexisting psychiatric problem or a heart defect that could create a fatal condition. Her failure to maintain any medical records prevented subsequent providers from understanding the cause of the injuries and the reasons for them, which could adversely impact their future treatment decisions. As a physician, the Respondent was required to consider these matters before performing operations on the women that physically and permanently altered their bodies.

Of particular concern to the Hearing Committee in the circumstances here was that informed consent must be voluntary and not due to coercion (Transcript, p. 1182) and involves providing details of the procedure, all of which were missing in this case. The Respondent concedes she never obtained

Exhibit C  023

"formal written" informed consent but claims the branding video of S.E. shows she gave "verbal" consent, which the Hearing Committee finds misleading at best. (Respondent's brief, p. 8, 17.) The Respondent denies the women were coerced, yet the brandings were performed upon women who had submitted collateral that would result in damaging and embarrassing consequences if released to the public. (Respondent's brief, p. 19; Exhibit 14a; Transcript, p. 388, 390, 424, 426, 530, 783-784, 1182, 1957.) S.E. described the involuntariness of the branding process in the pressure she felt to move forward with the procedure because of the collateral, which she characterized as a "gun" to her head. (Transcript, p. 802.) This is the very definition of coercion.

The collateral included titles to cars and houses, letters about illicit drug use and sexual deviance, and nude photos, some of which showed explicit images of genitalia. (Exhibit 14a; Transcript, p. 802, 857, 1353, 1941-1942, 1686, 1738, 1884.) Even Dr. Mayer acknowledged the women could view the collateral as coercive (Transcript, p. 1537), describing it as "a factor to consider in the voluntariness of their actions." (Transcript, p. 1528.) Dr. Grant confirmed that under these circumstances, there can be no informed consent. (Transcript, p. 1182.) The Hearing Committee was not persuaded by the Respondent's comparison of the branding process to the brandings in the "African American fraternity known as the Omegas" (Respondent's brief, p. 18-19) because while the fraternity members experience painful brands to symbolize their "bond" and "life-long membership in the fraternity," they are not coerced into being branded by having to submit potentially harmful collateral. (Respondent's brief, p. 18-19.)

Particularly troubling to the Hearing Committee was the evidence establishing the women were purposefully not told what symbol would be branded onto their bodies. (Exhibit 14a; Transcript, p. 798, 802, 1182, 1660, 1685, 1884, 1941.) S.E. confirmed this when she testified "(a)t no point did anyone say these are Keith's initials. It was only revealed to me later." (Transcript, p. 798.) The Respondent, however, did know that the symbol was KAR to represent Keith Raniere's initials. (Transcript, p. 1387-1388, 1353,

Exhibit C  024

1355, 1392, 1394.) She claims she did not disclose it to the women because it wasn't her "business" or "responsibility" and doing so would have breached her "lifetime vow of obedience" to DOS. (Transcript, p. 541, 1353-1355.) The Hearing Committee rejects these excuses and finds that regardless of her commitment to DOS, she had a duty as a physician to disclose what she was doing in the same way a plastic surgeon would be required to describe the pigment, shape, and appearance of a nipple for a nipple areola tattooing procedure. (Transcript, p. 1107.) The Hearing Committee agrees with Dr. Grant that the Respondent's failure to disclose the brand symbol to the women deviated from the standard of care. (Transcript, p. 1178, 1182.)

The Hearing Committee unanimously determined that the Respondent's conduct constituted professional misconduct as defined in Educ. Law §6530(2), practicing the profession fraudulently. Fraudulent practice requires "proof of either an intentional misrepresentation or concealment of a known fact" and "intent or knowledge" can be inferred. Patin, *supra* at 1214. The Hearing Committee finds the Respondent's admission that she knew what the brand symbol was and her decision not to disclose it represents an intentional concealment of a known fact. The Respondent violated an important aspect of informed consent by branding the women without making them fully aware of what the brand symbol was or what it represented.

The Hearing Committee unanimously determined that this conduct also constitutes professional misconduct as defined in Educ. Law §6530(20), moral unfitness to practice medicine; professional misconduct as defined in Educ. Law 6530(31), willfully harassing, abusing, or intimidating a patient; and professional misconduct as defined in Educ. Law §6530(26), performing professional services which have not been duly authorized by the patient. Moral unfitness is conduct that "violat[es] the trust the public bestows on the medical profession and/or violate[s] the medical profession's moral standards." Such conduct is suggestive of, or would tend to prove, moral unfitness. Patin, *supra* at 1215 *citing* Matter of

Exhibit C  025

Prado v. Novello, 301 A.D.2d 692, 694 (3d Dept. 2003). The Respondent's medically reckless performance of the brandings caused the women significant harm without apprising them of the brand symbol. Physicians are strictly prohibited from going above and beyond what the patient expects when performing a medical procedure.

### Vanguard Week

The Petitioner also charges the Respondent with failing to report a communicable disease, an unusual outbreak, or a disease outbreak involving a gastrointestinal illness during the annual NXIVM retreat at the Silver Bay YMCA, as required under the New York State Sanitary Code. (Petitioner's brief, p. 72-73.) The Respondent admits she did not report the outbreak of the gastrointestinal illness during the event to public health officials but claims she was not required to because she was on vacation and since "garden variety" stomach viruses, which are "unpleasant but not lethal," are not "communicable" or "unusual" to meet the mandatory reporting requirements under the regulation. (Respondent's brief, p. 21-22; Transcript, p. 733, 1294.) Physicians are required to report a "communicable disease" or "(a)ny disease outbreak or unusual disease" to public health officials. 10 NYCRR 2.10(a)-(c). An outbreak is defined as "an increased incidence of disease above its expected or baseline level" 10 NYCRR 2.2(d).

In support of its charges, the Petitioner presented as a witness infectious disease specialist Bruce Frederick Farber, M.D., whose testimony the Respondent failed to refute. The Hearing Committee noted Dr. Farber's impressive background includes 30 years of experience as an infectious disease specialist, including head of infectious disease for Northwell Health and in charge of the infectious disease programs at North Shore University Hospital and LIJ Medical Center. (Exhibit 6; Transcript, p. 959.) The majority of the Hearing Committee agreed with his professional opinion that the Respondent's duty as a physician to report this illness applied to her even if she was on vacation. (Transcript, p. 993, 995.) The Committee decided 2-1 that while the illness fails to meet the criteria under the regulation as "communicable" or

Exhibit C  026

"unknown" — presumably because it was never reported or investigated — it did constitute a "disease outbreak" that the Respondent as a physician was required to report regardless of whether or not she was on vacation. 10 NYCRR 2.1(c); 10 NYCRR 2.2. (Transcript, p. 993, 995, 998-999.) Dr. Farber made clear that her failure to fulfill this duty was a significant deviation from the standard of care. (Transcript, p. 991, 994.)

The evidence established this "obvious" illness affected a large group of people among the more than 400 attendees in a confined location, all of whom had similar symptoms. (Transcript, p. 990-991, 993, 999.) This is the precise definition of a "disease outbreak." 10 NYCRR 2.1(c), 10 NYCRR 2.2(d). The majority of the Hearing Committee agreed with Dr. Farber that the Respondent's failure to report it was especially egregious because it subjected the elderly and other vulnerable individuals, such as those with conditions or diseases like cancer, renal failure, and pregnancy, to potentially dangerous consequences like dehydration requiring hospitalization. (Transcript, p. 974-975.) The majority of the Hearing Committee also agreed with his opinion that based on her hospitalist experience that required her to complete an infection control course covering this subject, the Respondent should have known to report the illness. (Transcript, p. 972-973, 979.) Dr. Farber emphasized the importance in following this rule to "shut down" and properly "clean" the facility to prevent the illness from contaminating others and to determine its etiology. (Transcript, p. 980, 984.)

The Hearing Committee voted 2-1 that the Respondent's failure to report a disease outbreak constituted professional misconduct as defined in Educ. Law § 6530(21), a willful failure to file a report required by law; professional misconduct as defined in Educ. Law § 6530(16), a willful or grossly negligent failure to comply with substantial provisions of state laws governing the practice of medicine; professional misconduct as defined in Educ. Law § 6530(3), practicing the profession with negligence on

more than one occasion; and professional misconduct as defined in Educ. Law § 6530(5), practicing the profession with incompetence on more than one occasion.

### Penalty

In considering the full spectrum of penalties under PHL § 230-a, including revocation, suspension, probation, censure and reprimand and the imposition of civil penalties, the Hearing Committee unanimously determined, by vote of 3-0, that the penalty of revocation of the Respondent's medical license is appropriate. The Hearing Committee determined that the Respondent engaged in 12 forms of professional misconduct, all of which it addressed in this hearing decision and sustained. The Respondent says she joined NXIVM with a goal to "enrich (her) skills as a doctor." (Transcript, p. 219.) The evidence shows, however, that she deliberately chose to adhere to her DOS "vows of obedience" instead of providing the women she branded with "all the things that a physician does" because to do so would have resulted in "breaking (her) vow" and "went quite the counter to what the whole purpose was." (Transcript, p. 1442-1443.) In other words, when faced with any conflict between NXIVM and her responsibilities as a physician, she chose NXIVM. For these reasons, the Hearing Committee believes she abdicated her values as a physician and failed her profession, herself, and everyone else involved.

The Hearing Committee recognizes the Respondent's tremendous future potential as a physician who excelled in every undertaking from becoming a skilled gymnast to graduating college with honors and earning dual degrees — osteopathic medicine and a master's in clinical nutrition — and then as an entrepreneur building a family medical practice and developing Exo/Eso, the physical fitness company within NXIVM she co-developed with Keith Raniere. (Transcript, p. 1255-1256.) The Hearing Committee is deeply troubled, however, by her unwillingness to admit regrets. (Transcript, p. 228, 1248-1249, 1252, 1255-1256, 1259, 1412, 1445, 1455-1456.) Instead of holding herself accountable for harming S.E., for example, she accused S.E. of victimizing herself. (Transcript, p. 1412-1413.) The only sadness she

Exhibit C  028

expressed was that the branding "was twisted into something it wasn't" and that "it has been used to scare people." (Transcript, p. 1455-1456.) The Respondent denies being brainwashed, yet she expressed no real remorse, which represented to the Hearing Committee her distorted reality and the very real concern that others remain vulnerable to her future brandings. (Transcript, p. 1453, 1719, 1753.)

The Hearing Committee is hopeful that the Respondent will regard the volume of sustained charges in this hearing decision as an opportunity to reflect on her poor choices and reeducate herself professionally and personally.

Exhibit C  029

## Order

Based upon the foregoing, IT IS HEREBY ORDERED THAT:

1.       The first through forty-seventh specifications of professional misconduct set forth in the Statement of Charges are <u>Sustained</u>.

2.       The Respondent's license to practice medicine in the State of New York is hereby <u>Revoked</u> under PHL § 230-a(4).

3.       This Determination and Order shall be effective upon service on the Respondent in compliance with PHL § 230(10)(h).

DATED:       Albany, New York
             September 27, 2021

                              ███████████████████████

                              Steven Lapidus, M.D., Chairperson

                              Ramanathan Raju, M.D.
                              Joan Martinez McNicholas

Exhibit C  030

TO:     Jeffrey J. Conklin, Associate Counsel
        New York State Department of Health
        Division of Legal Affairs
        Corning Tower Building, Room 2517
        Empire State Plaza
        Albany, New York  12237

        Anthony Z. Scher, Esq.
        800 Westchester Avenue
        Suite N-641
        Rye Brook, New York, 10573

Exhibit C  031



Congratulations! Below are your electronic wallet cards to use as proof of your license. You can also print your license at any time by visiting www.colorado.gov/dora/DPO_Print_License and following the instructions listed.

If you would like a more durable wallet card option, you can order one for a fee by visiting www.nasbastore.org and selecting the "Colorado License Cards" link on the left hand side of the page. If you prefer, you can also contact NASBA by phone at 1-888-925-5237 or by email at nasbastore@nasba.org.

Should you have questions about your credential, or need other information please contact our Customer Service Team at 303-894-7800 or dora_registrations@state.co.us.

| **Colorado Department of Regulatory Agencies** **Division of Professions and Occupations** | **Colorado Department of Regulatory Agencies** **Division of Professions and Occupations** |
|---|---|
| Colorado Medical Board | Colorado Medical Board |
| **Danielle D Roberts** | **Danielle D Roberts** |
| Physician               Doctor of Osteopathic Medicine | Physician               Doctor of Osteopathic Medicine |
| DR.0059333                              09/19/2017 | DR.0059333                              09/19/2017 |
| **Number**                              **Issue Date** | **Number**                              **Issue Date** |
| Active                                  04/30/2019 | Active                                  04/30/2019 |
| **Credential Status**                   **Expire Date** | **Credential Status**                   **Expire Date** |
| Verify this credential at: www.colorado.gov/dora/dpo | Verify this credential at: www.colorado.gov/dora/dpo |
| Division Director Ronne Hines   Credential Holder Signature | Division Director Ronne Hines   Credential Holder Signature |





**NEW YORK** STATE OF OPPORTUNITY. | **Department of Health**

ANDREW M. CUOMO
Governor

HOWARD A. ZUCKER, M.D., J.D.
Commissioner

SALLY DRESLIN, M.S., R.N.
Executive Deputy Commissioner

July 11, 2017

OPMC # 17-07-4422

Dear Ms. Edmondson:

In accordance with New York State Public Health Law Section 230, the Office of Professional Medical Conduct (OPMC) has reviewed your July 7, 2017 correspondence regarding Danielle Roberts, DO. This office is responsible for investigating allegations of professional misconduct by physicians, physician assistants and special assistants. We assessed the allegations you raised and the physician's actions in the context of New York State Education Law Section 6530 that defines the parameters of medical misconduct.

The issues you describe did not occur within the doctor-patient relationship and should be reported to law enforcement in the area where the incident occurred. The issues you describe are not medical misconduct as defined in New York State Education Law Section 6530. The information that you have supplied will be retained in our confidential files and no further action will be taken.

If you have further questions regarding the processing of your complaint, or this letter, you may contact this office at 1-800-663-6114. Thank you for bringing this matter to our attention.

Sincerely,

R. Soulier

R. Soulier
Central Intake Unit
Office of Professional Medical Conduct

Empire State Plaza, Corning Tower, Albany, NY 12237 | health.ny.gov

1/1

# ATTACHMENTS

# Attachment 1

Letter from OPMC to Ms. Edmondson, dated July 11, 2017.



**NEW YORK STATE OF OPPORTUNITY.**

**Department of Health**

| ANDREW M. CUOMO | HOWARD A. ZUCKER, M.D., J.D. | SALLY DRESLIN, M.S., R.N. |
|---|---|---|
| Governor | Commissioner | Executive Deputy Commissioner |

July 11, 2017

OPMC # 17-07-4422

Dear Ms. Edmondson:

In accordance with New York State Public Health Law Section 230, the Office of Professional Medical Conduct (OPMC) has reviewed your July 7, 2017 correspondence regarding Danielle Roberts, DO. This office is responsible for investigating allegations of professional misconduct by physicians, physician assistants and special assistants. We assessed the allegations you raised and the physician's actions in the context of New York State Education Law Section 6530 that defines the parameters of medical misconduct.

The issues you describe did not occur within the doctor-patient relationship and should be reported to law enforcement in the area where the incident occurred. The issues you describe are not medical misconduct as defined in New York State Education Law Section 6530. The information that you have supplied will be retained in our confidential files and no further action will be taken.

If you have further questions regarding the processing of your complaint, or this letter, you may contact this office at 1-800-663-6114. Thank you for bringing this matter to our attention.

Sincerely,

R. Soulier

R. Soulier
Central Intake Unit
Office of Professional Medical Conduct

# Attachment 2

OPMC Statement of Charges, dated November 17, 2017.

NEW YORK STATE          DEPARTMENT OF HEALTH
STATE BOARD FOR PROFESSIONAL MEDICAL CONDUCT

| | |
|---|---|
| **IN THE MATTER**<br><br>**OF**<br><br>**DANIELLE ROBERTS, D.O.** | STATEMENT<br><br>OF<br><br>CHARGES |

DANIELLE ROBERTS, D.O., the Respondent, was authorized to practice medicine in New York State on or about October 5, 2009, by the issuance of license number 255075 by the New York State Education Department.


## FACTUAL ALLEGATIONS

A.    On or about March, 2017, the Respondent intentionally used a cauterizing iron as part of a branding procedure and/or rite to permanently alter and/or disfigure the skin by branding Patient A, a female patient, hereinafter identified in the attached Appendix "A", with the initials KR/AM in the pelvis region, thereby leaving a permanent scar.

  1.    Respondent performed the branding procedure and/or rite in an other than appropriately sterile environment and/or without appropriate infection control.

  2.    Respondent, while performing the branding procedure and/or rite, caused the patient to suffer excruciating pain for no known medical purpose.

  3.    The patient requested on multiple occasions that Respondent cease performing the branding procedure and/or rite, which said Respondent failed to do.

1

4.   Respondent failed to cease performing the branding procedure and/or rite despite the fact that the patient screamed on multiple occasions because of the excruciating pain she was experiencing.

5.   Respondent, during the course of the branding procedure and/or rite, tortured and physically abused the patient.

6.   Respondent performed the branding procedure and/or rite upon the patient at the time the patient was naked and while being held down by three other individuals, who were also naked, contrary to any appropriate medical protocol or need.

7.   Respondent knowingly performed a branding procedure and/or rite upon the patient when Respondent knew, or should have known, that the patient believed that she was only having a tattoo applied to her pelvic region.

8.   Respondent inappropriately performed the branding procedure and/or rite upon the patient while an individual who was also naked utilized a cell phone to video said branding procedure and/or rite without the consent of the patient.

9.   Respondent failed to provide appropriate wound care for the patient at the time of the branding procedure and/or rite and thereafter.

10.   Respondent failed to refer the patient to a specialist after the branding procedure and/or rite to provide appropriate wound care.

11.   Respondent inappropriately advised the patient to take photos of the wound caused by the branding procedure and/or rite on a daily basis for one month and once a week for another month, and to thereafter send such photographs to an individual known as "Lauren Salzman".

12.   Respondent failed to provide appropriate medical care and treatment for the patient.

13.   Respondent failed to prepare and/or maintain appropriate medical records for the patient which accurately reflected the evaluation and treatment of the patient.

2

B.    On or about March, 2017, the Respondent intentionally used a cauterizing iron as part of a branding procedure and/or rite to permanently alter and/or disfigure the skin by branding Patient B, a female patient, hereinafter identified in the attached Appendix "A", with the initials KR/AM in the pelvis region, thereby leaving a permanent scar.

1.    Respondent performed the branding procedure and/or rite in an other than appropriately sterile environment and/or without appropriate infection control.

2.    Respondent, while performing the branding procedure and/or rite, caused the patient to suffer excruciating pain for no known medical purpose.

3.    The patient requested on multiple occasions that Respondent cease performing the branding procedure and/or rite, which said Respondent failed to do.

4.    Respondent failed to cease performing the branding procedure and/or rite despite the fact that the patient screamed on multiple occasions because of the excruciating pain she was experiencing.

5.    Respondent, during the course of the branding procedure and/or rite, tortured and physically abused the patient.

6.    Respondent performed the branding procedure and/or rite upon the patient at the time the patient was naked and while being held down by three other individuals, who were also naked, contrary to any appropriate medical protocol or need.

7.    Respondent knowingly performed a branding procedure and/or rite upon the patient when Respondent knew, or should have known, that the patient believed that she was only having a tattoo applied to her pelvic region.

8.    Respondent inappropriately performed the branding procedure and/or rite upon the patient while an individual who was also naked utilized a cell phone to video said branding procedure and/or rite without the consent of the patient.

9.    Respondent failed to provide appropriate wound care for the patient at the time of the branding procedure and/or rite and thereafter.

3

10. Respondent failed to refer the patient to a specialist after the branding procedure and/or rite to provide appropriate wound care.

11. Respondent inappropriately advised the patient to take photos of the wound caused by the branding procedure and/or rite on a daily basis for one month and once a week for another month, and to thereafter send such photographs to an individual known as "Lauren Salzman".

12. Respondent failed to provide appropriate medical care and treatment for the patient.

13. Respondent failed to prepare and/or maintain appropriate medical records for the patient which accurately reflected the evaluation and treatment of the patient.

C. On or about March, 2017, the Respondent intentionally used a cauterizing iron as part of a branding procedure and/or rite to permanently alter and/or disfigure the skin by branding Patient C, a female patient, hereinafter identified in the attached Appendix "A", with the initials KR/AM in the pelvis region, thereby leaving a permanent scar.

1. Respondent performed the branding procedure and/or rite in an other than appropriately sterile environment and/or without appropriate infection control.

2. Respondent, while performing the branding procedure and/or rite, caused the patient to suffer excruciating pain for no known medical purpose.

3. The patient requested on multiple occasions that Respondent cease performing the branding procedure and/or rite, which said Respondent failed to do.

4. Respondent failed to cease performing the branding procedure and/or rite despite the fact that the patient screamed on multiple occasions because of the excruciating pain she was experiencing.

4

5.   Respondent, during the course of the branding procedure and/or rite, tortured and physically abused the patient.

6.   Respondent performed the branding procedure and/or rite upon the patient at the time the patient was naked and while being held down by three other individuals, who were also naked, contrary to any appropriate medical protocol or need.

7.   Respondent knowingly performed a branding procedure and/or rite upon the patient when Respondent knew, or should have known, that the patient believed that she was only having a tattoo applied to her pelvic region.

8.   Respondent inappropriately performed the branding procedure and/or rite upon the patient while an individual who was also naked utilized a cell phone to video said branding procedure and/or rite without the consent of the patient.

9.   Respondent failed to provide appropriate wound care for the patient at the time of the branding procedure and/or rite and thereafter.

10.  Respondent failed to refer the patient to a specialist after the branding procedure and/or rite to provide appropriate wound care.

11.  Respondent inappropriately advised the patient to take photos of the wound caused by the branding procedure and/or rite on a daily basis for one month and once a week for another month, and to thereafter send such photographs to an individual known as "Lauren Salzman".

12.  Respondent failed to provide appropriate medical care and treatment for the patient.

13.  Respondent failed to prepare and/or maintain appropriate medical records for the patient which accurately reflected the evaluation and treatment of the patient.

5

D.    On or about March, 2017, the Respondent intentionally used a cauterizing iron as part of a branding procedure and/or rite to permanently alter and/or disfigure the skin by branding Patient D, a female patient, hereinafter identified in the attached Appendix "A", with the initials KR/AM in the pelvis region, thereby leaving a permanent scar.

1.    Respondent performed the branding procedure and/or rite in an other than appropriately sterile environment and/or without appropriate infection control.

2.    Respondent, while performing the branding procedure and/or rite, caused the patient to suffer excruciating pain for no known medical purpose.

3.    The patient requested on multiple occasions that Respondent cease performing the branding procedure and/or rite, which said Respondent failed to do.

4.    Respondent failed to cease performing the branding procedure and/or rite despite the fact that the patient screamed on multiple occasions because of the excruciating pain she was experiencing.

5.    Respondent, during the course of the branding procedure and/or rite, tortured and physically abused the patient.

6.    Respondent performed the branding procedure and/or rite upon the patient at the time the patient was naked and while being held down by three other individuals, who were also naked, contrary to any appropriate medical protocol or need.

7.    Respondent knowingly performed a branding procedure and/or rite upon the patient when Respondent knew, or should have known, that the patient believed that she was only having a tattoo applied to her pelvic region.

8.    Respondent inappropriately performed the branding procedure and/or rite upon the patient while an individual who was also naked utilized a cell phone to video said branding procedure and/or rite without the consent of the patient.

9.    Respondent failed to provide appropriate wound care for the patient at the time of the branding procedure and/or rite and thereafter.

6

10.      Respondent failed to refer the patient to a specialist after the branding procedure and/or rite to provide appropriate wound care.

11.      Respondent inappropriately advised the patient to take photos of the wound caused by the branding procedure and/or rite on a daily basis for one month and once a week for another month, and to thereafter send such photographs to an individual known as "Lauren Salzman".

12.      Respondent failed to provide appropriate medical care and treatment for the patient.

13.      Respondent failed to prepare and/or maintain appropriate medical records for the patient which accurately reflected the evaluation and treatment of the patient.

E.      On or about March, 2017, the Respondent intentionally used a cauterizing iron as part of a branding procedure and/or rite to permanently alter and/or disfigure the skin by branding Patient E, a female patient, hereinafter identified in the attached Appendix "A", with the initials KR/AM in the pelvis region, thereby leaving a permanent scar.

1.      Respondent performed the branding procedure and/or rite in an other than appropriately sterile environment and/or without appropriate infection control.

2.      Respondent, while performing the branding procedure and/or rite, caused the patient to suffer excruciating pain for no known medical purpose.

3.      The patient requested on multiple occasions that Respondent cease performing the branding procedure and/or rite, which said Respondent failed to do.

4.      Respondent failed to cease performing the branding procedure and/or rite despite the fact that the patient screamed on multiple occasions because of the excruciating pain she was experiencing.

7

5.  Respondent, during the course of the branding procedure and/or rite, tortured and physically abused the patient.

6.  Respondent performed the branding procedure and/or rite upon the patient at the time the patient was naked and while being held down by three other individuals, who were also naked, contrary to any appropriate medical protocol or need.

7.  Respondent knowingly performed a branding procedure and/or rite upon the patient when Respondent knew, or should have known, that the patient believed that she was only having a tattoo applied to her pelvic region.

8.  Respondent inappropriately performed the branding procedure and/or rite upon the patient while an individual who was also naked utilized a cell phone to video said branding procedure and/or rite without the consent of the patient.

9.  Respondent failed to provide appropriate wound care for the patient at the time of the branding procedure and/or rite and thereafter.

10. Respondent failed to refer the patient to a specialist after the branding procedure and/or rite to provide appropriate wound care.

11. Respondent inappropriately advised the patient to take photos of the wound caused by the branding procedure and/or rite on a daily basis for one month and once a week for another month, and to thereafter send such photographs to an individual known as "Lauren Salzman".

12. Respondent failed to provide appropriate medical care and treatment for the patient.

13. Respondent failed to prepare and/or maintain appropriate medical records for the patient which accurately reflected the evaluation and treatment of the patient.

8

F.    On or about March, 2017, the Respondent intentionally used a cauterizing iron as part of a branding procedure and/or rite to permanently alter and/or disfigure the skin by branding Patient F, a female patient, hereinafter identified in the attached Appendix "A", with the initials KR/AM in the pelvis region, thereby leaving a permanent scar.

1.    Respondent performed the branding procedure and/or rite in an other than appropriately sterile environment and/or without appropriate infection control.

2.    Respondent, while performing the branding procedure and/or rite, caused the patient to suffer excruciating pain for no known medical purpose.

3.    The patient requested on multiple occasions that Respondent cease performing the branding procedure and/or rite, which said Respondent failed to do.

4.    Respondent failed to cease performing the branding procedure and/or rite despite the fact that the patient screamed on multiple occasions because of the excruciating pain she was experiencing.

5.    Respondent, during the course of the branding procedure and/or rite, tortured and physically abused the patient.

6.    Respondent performed the branding procedure and/or rite upon the patient at the time the patient was naked and while being held down by three other individuals, who were also naked, contrary to any appropriate medical protocol or need.

7.    Respondent knowingly performed a branding procedure and/or rite upon the patient when Respondent knew, or should have known, that the patient believed that she was only having a tattoo applied to her pelvic region.

8.    Respondent inappropriately performed the branding procedure and/or rite upon the patient while an individual who was also naked utilized a cell phone to video said branding procedure and/or rite without the consent of the patient.

9.    Respondent failed to provide appropriate wound care for the patient at the time of the branding procedure and/or rite and thereafter.

9

Roberts - 345

10.      Respondent failed to refer the patient to a specialist after the branding procedure and/or rite to provide appropriate wound care.

11.      Respondent inappropriately advised the patient to take photos of the wound caused by the branding procedure and/or rite on a daily basis for one month and once a week for another month, and to thereafter send such photographs to an individual known as "Lauren Salzman".

12.      Respondent failed to provide appropriate medical care and treatment for the patient.

13.      Respondent failed to prepare and/or maintain appropriate medical records for the patient which accurately reflected the evaluation and treatment of the patient.

G.      On or about March, 2017, the Respondent intentionally used a cauterizing iron as part of a branding procedure and/or rite to permanently alter and/or disfigure the skin by branding Patient G, a female patient, hereinafter identified in the attached Appendix "A", with the initials KR/AM in the pelvis region, thereby leaving a permanent scar.

1.      Respondent performed the branding procedure and/or rite in an other than appropriately sterile environment and/or without appropriate infection control.

2.      Respondent, while performing the branding procedure and/or rite, caused the patient to suffer excruciating pain for no known medical purpose.

3.      The patient requested on multiple occasions that Respondent cease performing the branding procedure and/or rite, which said Respondent failed to do.

4.      Respondent failed to cease performing the branding procedure and/or rite despite the fact that the patient screamed on multiple occasions because of the excruciating pain she was experiencing.

10

5.      Respondent, during the course of the branding procedure and/or rite, tortured and physically abused the patient.

6.      Respondent performed the branding procedure and/or rite upon the patient at the time the patient was naked and while being held down by three other individuals, who were also naked, contrary to any appropriate medical protocol or need.

7.      Respondent knowingly performed a branding procedure and/or rite upon the patient when Respondent knew, or should have known, that the patient believed that she was only having a tattoo applied to her pelvic region.

8.      Respondent inappropriately performed the branding procedure and/or rite upon the patient while an individual who was also naked utilized a cell phone to video said branding procedure and/or rite without the consent of the patient.

9.      Respondent failed to provide appropriate wound care for the patient at the time of the branding procedure and/or rite and thereafter.

10.      Respondent failed to refer the patient to a specialist after the branding procedure and/or rite to provide appropriate wound care.

11.      Respondent inappropriately advised the patient to take photos of the wound caused by the branding procedure and/or rite on a daily basis for one month and once a week for another month, and to thereafter send such photographs to an individual known as "Lauren Salzman".

12.      Respondent failed to provide appropriate medical care and treatment for the patient.

13.      Respondent failed to prepare and/or maintain appropriate medical records for the patient which accurately reflected the evaluation and treatment of the patient.

11

H.    On or about March, 2017, the Respondent intentionally used a cauterizing iron as part of a branding procedure and/or rite to permanently alter and/or disfigure the skin by branding Patient H, a female patient, hereinafter identified in the attached Appendix "A", with the initials KR/AM in the pelvis region, thereby leaving a permanent scar.

    1.    Respondent performed the branding procedure and/or rite in an other than appropriately sterile environment and/or without appropriate infection control.

    2.    Respondent, while performing the branding procedure and/or rite, caused the patient to suffer excruciating pain for no known medical purpose.

    3.    The patient requested on multiple occasions that Respondent cease performing the branding procedure and/or rite, which said Respondent failed to do.

    4.    Respondent failed to cease performing the branding procedure and/or rite despite the fact that the patient screamed on multiple occasions because of the excruciating pain she was experiencing.

    5.    Respondent, during the course of the branding procedure and/or rite, tortured and physically abused the patient.

    6.    Respondent performed the branding procedure and/or rite upon the patient at the time the patient was naked and while being held down by three other individuals, who were also naked, contrary to any appropriate medical protocol or need.

    7.    Respondent knowingly performed a branding procedure and/or rite upon the patient when Respondent knew, or should have known, that the patient believed that she was only having a tattoo applied to her pelvic region.

    8.    Respondent inappropriately performed the branding procedure and/or rite upon the patient while an individual who was also naked utilized a cell phone to video said branding procedure and/or rite without the consent of the patient.

    9.    Respondent failed to provide appropriate wound care for the patient at the time of the branding procedure and/or rite and thereafter.

12

10. Respondent failed to refer the patient to a specialist after the branding procedure and/or rite to provide appropriate wound care.

11. Respondent inappropriately advised the patient to take photos of the wound caused by the branding procedure and/or rite on a daily basis for one month and once a week for another month, and to thereafter send such photographs to an individual known as "Lauren Salzman".

12. Respondent failed to provide appropriate medical care and treatment for the patient.

13. Respondent failed to prepare and/or maintain appropriate medical records for the patient which accurately reflected the evaluation and treatment of the patient.

I.    On or about March, 2017, the Respondent intentionally used a cauterizing iron as part of a branding procedure and/or rite to permanently alter and/or disfigure the skin by branding Patient I, a female patient, hereinafter identified in the attached Appendix "A", with the initials KR/AM in the pelvis region, thereby leaving a permanent scar.

1. Respondent performed the branding procedure and/or rite in an other than appropriately sterile environment and/or without appropriate infection control.

2. Respondent, while performing the branding procedure and/or rite, caused the patient to suffer excruciating pain for no known medical purpose.

3. The patient requested on multiple occasions that Respondent cease performing the branding procedure and/or rite, which said Respondent failed to do.

4. Respondent failed to cease performing the branding procedure and/or rite despite the fact that the patient screamed on multiple occasions because of the excruciating pain she was experiencing.

13

5.      Respondent, during the course of the branding procedure and/or rite, tortured and physically abused the patient.

6.      Respondent performed the branding procedure and/or rite upon the patient at the time the patient was naked and while being held down by three other individuals, who were also naked, contrary to any appropriate medical protocol or need.

7.      Respondent knowingly performed a branding procedure and/or rite upon the patient when Respondent knew, or should have known, that the patient believed that she was only having a tattoo applied to her pelvic region.

8.      Respondent inappropriately performed the branding procedure and/or rite upon the patient while an individual who was also naked utilized a cell phone to video said branding procedure and/or rite without the consent of the patient.

9.      Respondent failed to provide appropriate wound care for the patient at the time of the branding procedure and/or rite and thereafter.

10.      Respondent failed to refer the patient to a specialist after the branding procedure and/or rite to provide appropriate wound care.

11.      Respondent inappropriately advised the patient to take photos of the wound caused by the branding procedure and/or rite on a daily basis for one month and once a week for another month, and to thereafter send such photographs to an individual known as "Lauren Salzman".

12.      Respondent failed to provide appropriate medical care and treatment for the patient.

13.      Respondent failed to prepare and/or maintain appropriate medical records for the patient which accurately reflected the evaluation and treatment of the patient.

14

J.   On or about March, 2017, the Respondent intentionally used a cauterizing iron as part of a branding procedure and/or rite to permanently alter and/or disfigure the skin by branding Patient J, a female patient, hereinafter identified in the attached Appendix "A", with the initials KR/AM in the pelvis region, thereby leaving a permanent scar.

1.   Respondent performed the branding procedure and/or rite in an other than appropriately sterile environment and/or without appropriate infection control.

2.   Respondent, while performing the branding procedure and/or rite, caused the patient to suffer excruciating pain for no known medical purpose.

3.   The patient requested on multiple occasions that Respondent cease performing the branding procedure and/or rite, which said Respondent failed to do.

4.   Respondent failed to cease performing the branding procedure and/or rite despite the fact that the patient screamed on multiple occasions because of the excruciating pain she was experiencing.

5.   Respondent, during the course of the branding procedure and/or rite, tortured and physically abused the patient.

6.   Respondent performed the branding procedure and/or rite upon the patient at the time the patient was naked and while being held down by three other individuals, who were also naked, contrary to any appropriate medical protocol or need.

7.   Respondent knowingly performed a branding procedure and/or rite upon the patient when Respondent knew, or should have known, that the patient believed that she was only having a tattoo applied to her pelvic region.

8.   Respondent inappropriately performed the branding procedure and/or rite upon the patient while an individual who was also naked utilized a cell phone to video said branding procedure and/or rite without the consent of the patient.

9.   Respondent failed to provide appropriate wound care for the patient at the time of the branding procedure and/or rite and thereafter.

15

10.  Respondent failed to refer the patient to a specialist after the branding procedure and/or rite to provide appropriate wound care.

11.  Respondent inappropriately advised the patient to take photos of the wound caused by the branding procedure and/or rite on a daily basis for one month and once a week for another month, and to thereafter send such photographs to an individual known as "Lauren Salzman".

12.  Respondent failed to provide appropriate medical care and treatment for the patient.

13.  Respondent failed to prepare and/or maintain appropriate medical records for the patient which accurately reflected the evaluation and treatment of the patient.

K.  On or about March, 2017, the Respondent intentionally used a cauterizing iron as part of a branding procedure and/or rite to permanently alter and/or disfigure the skin by branding Patient K, a female patient, hereinafter identified in the attached Appendix "A", with the initials KR/AM in the pelvis region, thereby leaving a permanent scar.

1.  Respondent performed the branding procedure and/or rite in an other than appropriately sterile environment and/or without appropriate infection control.

2.  Respondent, while performing the branding procedure and/or rite, caused the patient to suffer excruciating pain for no known medical purpose.

3.  The patient requested on multiple occasions that Respondent cease performing the branding procedure and/or rite, which said Respondent failed to do.

4.  Respondent failed to cease performing the branding procedure and/or rite despite the fact that the patient screamed on multiple occasions because of the excruciating pain she was experiencing.

16

5.    Respondent, during the course of the branding procedure and/or rite, tortured and physically abused the patient.

6.    Respondent performed the branding procedure and/or rite upon the patient at the time the patient was naked and while being held down by three other individuals, who were also naked, contrary to any appropriate medical protocol or need.

7.    Respondent knowingly performed a branding procedure and/or rite upon the patient when Respondent knew, or should have known, that the patient believed that she was only having a tattoo applied to her pelvic region.

8.    Respondent inappropriately performed the branding procedure and/or rite upon the patient while an individual who was also naked utilized a cell phone to video said branding procedure and/or rite without the consent of the patient.

9.    Respondent failed to provide appropriate wound care for the patient at the time of the branding procedure and/or rite and thereafter.

10.    Respondent failed to refer the patient to a specialist after the branding procedure and/or rite to provide appropriate wound care.

11.    Respondent inappropriately advised the patient to take photos of the wound caused by the branding procedure and/or rite on a daily basis for one month and once a week for another month, and to thereafter send such photographs to an individual known as "Lauren Salzman".

12.    Respondent failed to provide appropriate medical care and treatment for the patient.

13.    Respondent failed to prepare and/or maintain appropriate medical records for the patient which accurately reflected the evaluation and treatment of the patient.

17

L.  On or about March, 2017, the Respondent intentionally used a cauterizing iron as part of a branding procedure and/or rite to permanently alter and/or disfigure the skin by branding Patient L, a female patient, hereinafter identified in the attached Appendix "A", with the initials KR/AM in the pelvis region, thereby leaving a permanent scar.

1.  Respondent performed the branding procedure and/or rite in an other than appropriately sterile environment and/or without appropriate infection control.

2.  Respondent, while performing the branding procedure and/or rite, caused the patient to suffer excruciating pain for no known medical purpose.

3.  The patient requested on multiple occasions that Respondent cease performing the branding procedure and/or rite, which said Respondent failed to do.

4.  Respondent failed to cease performing the branding procedure and/or rite despite the fact that the patient screamed on multiple occasions because of the excruciating pain she was experiencing.

5.  Respondent, during the course of the branding procedure and/or rite, tortured and physically abused the patient.

6.  Respondent performed the branding procedure and/or rite upon the patient at the time the patient was naked and while being held down by three other individuals, who were also naked, contrary to any appropriate medical protocol or need.

7.  Respondent knowingly performed a branding procedure and/or rite upon the patient when Respondent knew, or should have known, that the patient believed that she was only having a tattoo applied to her pelvic region.

8.  Respondent inappropriately performed the branding procedure and/or rite upon the patient while an individual who was also naked utilized a cell phone to video said branding procedure and/or rite without the consent of the patient.

9.  Respondent failed to provide appropriate wound care for the patient at the time of the branding procedure and/or rite and thereafter.

18

10. Respondent failed to refer the patient to a specialist after the branding procedure and/or rite to provide appropriate wound care.

11. Respondent inappropriately advised the patient to take photos of the wound caused by the branding procedure and/or rite on a daily basis for one month and once a week for another month, and to thereafter send such photographs to an individual known as "Lauren Salzman".

12. Respondent failed to provide appropriate medical care and treatment for the patient.

13. Respondent failed to prepare and/or maintain appropriate medical records for the patient which accurately reflected the evaluation and treatment of the patient.

M. On or about March, 2017, the Respondent intentionally used a cauterizing iron as part of a branding procedure and/or rite to permanently alter and/or disfigure the skin by branding Patient M, a female patient, hereinafter identified in the attached Appendix "A", with the initials KR/AM in the pelvis region, thereby leaving a permanent scar.

1. Respondent performed the branding procedure and/or rite in an other than appropriately sterile environment and/or without appropriate infection control.

2. Respondent, while performing the branding procedure and/or rite, caused the patient to suffer excruciating pain for no known medical purpose.

3. The patient requested on multiple occasions that Respondent cease performing the branding procedure and/or rite, which said Respondent failed to do.

4. Respondent failed to cease performing the branding procedure and/or rite despite the fact that the patient screamed on multiple occasions because of the excruciating pain she was experiencing.

19

5.  Respondent, during the course of the branding procedure and/or rite, tortured and physically abused the patient.

6.  Respondent performed the branding procedure and/or rite upon the patient at the time the patient was naked and while being held down by three other individuals, who were also naked, contrary to any appropriate medical protocol or need.

7.  Respondent knowingly performed a branding procedure and/or rite upon the patient when Respondent knew, or should have known, that the patient believed that she was only having a tattoo applied to her pelvic region.

8.  Respondent inappropriately performed the branding procedure and/or rite upon the patient while an individual who was also naked utilized a cell phone to video said branding procedure and/or rite without the consent of the patient.

9.  Respondent failed to provide appropriate wound care for the patient at the time of the branding procedure and/or rite and thereafter.

10. Respondent failed to refer the patient to a specialist after the branding procedure and/or rite to provide appropriate wound care.

11. Respondent inappropriately advised the patient to take photos of the wound caused by the branding procedure and/or rite on a daily basis for one month and once a week for another month, and to thereafter send such photographs to an individual known as "Lauren Salzman".

12. Respondent failed to provide appropriate medical care and treatment for the patient.

13. Respondent failed to prepare and/or maintain appropriate medical records for the patient which accurately reflected the evaluation and treatment of the patient.

20

N.  On or about March, 2017, the Respondent intentionally used a cauterizing iron as part of a branding procedure and/or rite to permanently alter and/or disfigure the skin by branding Patient N, a female patient, hereinafter identified in the attached Appendix "A", with the initials KR/AM in the pelvis region, thereby leaving a permanent scar.

1.  Respondent performed the branding procedure and/or rite in an other than appropriately sterile environment and/or without appropriate infection control.

2.  Respondent, while performing the branding procedure and/or rite, caused the patient to suffer excruciating pain for no known medical purpose.

3.  The patient requested on multiple occasions that Respondent cease performing the branding procedure and/or rite, which said Respondent failed to do.

4.  Respondent failed to cease performing the branding procedure and/or rite despite the fact that the patient screamed on multiple occasions because of the excruciating pain she was experiencing.

5.  Respondent, during the course of the branding procedure and/or rite, tortured and physically abused the patient.

6.  Respondent performed the branding procedure and/or rite upon the patient at the time the patient was naked and while being held down by three other individuals, who were also naked, contrary to any appropriate medical protocol or need.

7.  Respondent knowingly performed a branding procedure and/or rite upon the patient when Respondent knew, or should have known, that the patient believed that she was only having a tattoo applied to her pelvic region.

8.  Respondent inappropriately performed the branding procedure and/or rite upon the patient while an individual who was also naked utilized a cell phone to video said branding procedure and/or rite without the consent of the patient.

9.  Respondent failed to provide appropriate wound care for the patient at the time of the branding procedure and/or rite and thereafter.

21

10. Respondent failed to refer the patient to a specialist after the branding procedure and/or rite to provide appropriate wound care.

11. Respondent inappropriately advised the patient to take photos of the wound caused by the branding procedure and/or rite on a daily basis for one month and once a week for another month, and to thereafter send such photographs to an individual known as "Lauren Salzman".

12. Respondent failed to provide appropriate medical care and treatment for the patient.

13. Respondent failed to prepare and/or maintain appropriate medical records for the patient which accurately reflected the evaluation and treatment of the patient.

O. On or about March, 2017, the Respondent intentionally used a cauterizing iron as part of a branding procedure and/or rite to permanently alter and/or disfigure the skin by branding Patient O, a female patient, hereinafter identified in the attached Appendix "A", with the initials KR/AM in the pelvis region, thereby leaving a permanent scar.

1. Respondent performed the branding procedure and/or rite in an other than appropriately sterile environment and/or without appropriate infection control.

2. Respondent, while performing the branding procedure and/or rite, caused the patient to suffer excruciating pain for no known medical purpose.

3. The patient requested on multiple occasions that Respondent cease performing the branding procedure and/or rite, which said Respondent failed to do.

4. Respondent failed to cease performing the branding procedure and/or rite despite the fact that the patient screamed on multiple occasions because of the excruciating pain she was experiencing.

22

5.    Respondent, during the course of the branding procedure and/or rite, tortured and physically abused the patient.

6.    Respondent performed the branding procedure and/or rite upon the patient at the time the patient was naked and while being held down by three other individuals, who were also naked, contrary to any appropriate medical protocol or need.

7.    Respondent knowingly performed a branding procedure and/or rite upon the patient when Respondent knew, or should have known, that the patient believed that she was only having a tattoo applied to her pelvic region.

8.    Respondent inappropriately performed the branding procedure and/or rite upon the patient while an individual who was also naked utilized a cell phone to video said branding procedure and/or rite without the consent of the patient.

9.    Respondent failed to provide appropriate wound care for the patient at the time of the branding procedure and/or rite and thereafter.

10.    Respondent failed to refer the patient to a specialist after the branding procedure and/or rite to provide appropriate wound care.

11.    Respondent inappropriately advised the patient to take photos of the wound caused by the branding procedure and/or rite on a daily basis for one month and once a week for another month, and to thereafter send such photographs to an individual known as "Lauren Salzman".

12.    Respondent failed to provide appropriate medical care and treatment for the patient.

13.    Respondent failed to prepare and/or maintain appropriate medical records for the patient which accurately reflected the evaluation and treatment of the patient.

23

P.   On or about March, 2017, the Respondent intentionally used a cauterizing iron as part of a branding procedure and/or rite to permanently alter and/or disfigure the skin by branding Patient P, a female patient, hereinafter identified in the attached Appendix "A", with the initials KR/AM in the pelvis region, thereby leaving a permanent scar.

1.   Respondent performed the branding procedure and/or rite in an other than appropriately sterile environment and/or without appropriate infection control.

2.   Respondent, while performing the branding procedure and/or rite, caused the patient to suffer excruciating pain for no known medical purpose.

3.   The patient requested on multiple occasions that Respondent cease performing the branding procedure and/or rite, which said Respondent failed to do.

4.   Respondent failed to cease performing the branding procedure and/or rite despite the fact that the patient screamed on multiple occasions because of the excruciating pain she was experiencing.

5.   Respondent, during the course of the branding procedure and/or rite, tortured and physically abused the patient.

6.   Respondent performed the branding procedure and/or rite upon the patient at the time the patient was naked and while being held down by three other individuals, who were also naked, contrary to any appropriate medical protocol or need.

7.   Respondent knowingly performed a branding procedure and/or rite upon the patient when Respondent knew, or should have known, that the patient believed that she was only having a tattoo applied to her pelvic region.

8.   Respondent inappropriately performed the branding procedure and/or rite upon the patient while an individual who was also naked utilized a cell phone to video said branding procedure and/or rite without the consent of the patient.

9.   Respondent failed to provide appropriate wound care for the patient at the time of the branding procedure and/or rite and thereafter.

24

10.    Respondent failed to refer the patient to a specialist after the branding procedure and/or rite to provide appropriate wound care.

11.    Respondent inappropriately advised the patient to take photos of the wound caused by the branding procedure and/or rite on a daily basis for one month and once a week for another month, and to thereafter send such photographs to an individual known as "Lauren Salzman".

12.    Respondent failed to provide appropriate medical care and treatment for the patient.

13.    Respondent failed to prepare and/or maintain appropriate medical records for the patient which accurately reflected the evaluation and treatment of the patient.

Q.    On or about March, 2017, the Respondent intentionally used a cauterizing iron as part of a branding procedure and/or rite to permanently alter and/or disfigure the skin by branding Patient Q, a female patient, hereinafter identified in the attached Appendix "A", with the initials KR/AM in the pelvis region, thereby leaving a permanent scar.

1.    Respondent performed the branding procedure and/or rite in an other than appropriately sterile environment and/or without appropriate infection control.

2.    Respondent, while performing the branding procedure and/or rite, caused the patient to suffer excruciating pain for no known medical purpose.

3.    The patient requested on multiple occasions that Respondent cease performing the branding procedure and/or rite, which said Respondent failed to do.

4.    Respondent failed to cease performing the branding procedure and/or rite despite the fact that the patient screamed on multiple occasions because of the excruciating pain she was experiencing.

25

5.    Respondent, during the course of the branding procedure and/or rite, tortured and physically abused the patient.

6.    Respondent performed the branding procedure and/or rite upon the patient at the time the patient was naked and while being held down by three other individuals, who were also naked, contrary to any appropriate medical protocol or need.

7.    Respondent knowingly performed a branding procedure and/or rite upon the patient when Respondent knew, or should have known, that the patient believed that she was only having a tattoo applied to her pelvic region.

8.    Respondent inappropriately performed the branding procedure and/or rite upon the patient while an individual who was also naked utilized a cell phone to video said branding procedure and/or rite without the consent of the patient.

9.    Respondent failed to provide appropriate wound care for the patient at the time of the branding procedure and/or rite and thereafter.

10.    Respondent failed to refer the patient to a specialist after the branding procedure and/or rite to provide appropriate wound care.

11.    Respondent inappropriately advised the patient to take photos of the wound caused by the branding procedure and/or rite on a daily basis for one month and once a week for another month, and to thereafter send such photographs to an individual known as "Lauren Salzman".

12.    Respondent failed to provide appropriate medical care and treatment for the patient.

13.    Respondent failed to prepare and/or maintain appropriate medical records for the patient which accurately reflected the evaluation and treatment of the patient.

26

R.    On or about March, 2017, the Respondent intentionally used a cauterizing iron as part of a branding procedure and/or rite to permanently alter and/or disfigure the skin by branding Patient R, a female patient, hereinafter identified in the attached Appendix "A", with the initials KR/AM in the pelvis region, thereby leaving a permanent scar.

1.    Respondent performed the branding procedure and/or rite in an other than appropriately sterile environment and/or without appropriate infection control.

2.    Respondent, while performing the branding procedure and/or rite, caused the patient to suffer excruciating pain for no known medical purpose.

3.    The patient requested on multiple occasions that Respondent cease performing the branding procedure and/or rite, which said Respondent failed to do.

4.    Respondent failed to cease performing the branding procedure and/or rite despite the fact that the patient screamed on multiple occasions because of the excruciating pain she was experiencing.

5.    Respondent, during the course of the branding procedure and/or rite, tortured and physically abused the patient.

6.    Respondent performed the branding procedure and/or rite upon the patient at the time the patient was naked and while being held down by three other individuals, who were also naked, contrary to any appropriate medical protocol or need.

7.    Respondent knowingly performed a branding procedure and/or rite upon the patient when Respondent knew, or should have known, that the patient believed that she was only having a tattoo applied to her pelvic region.

8.    Respondent inappropriately performed the branding procedure and/or rite upon the patient while an individual who was also naked utilized a cell phone to video said branding procedure and/or rite without the consent of the patient.

9.    Respondent failed to provide appropriate wound care for the patient at the time of the branding procedure and/or rite and thereafter.

27

10. Respondent failed to refer the patient to a specialist after the branding procedure and/or rite to provide appropriate wound care.

11. Respondent inappropriately advised the patient to take photos of the wound caused by the branding procedure and/or rite on a daily basis for one month and once a week for another month, and to thereafter send such photographs to an individual known as "Lauren Salzman".

12. Respondent failed to provide appropriate medical care and treatment for the patient.

13. Respondent failed to prepare and/or maintain appropriate medical records for the patient which accurately reflected the evaluation and treatment of the patient.

S. On or about March, 2017, the Respondent intentionally used a cauterizing iron as part of a branding procedure and/or rite to permanently alter and/or disfigure the skin by branding Patient S, a female patient, hereinafter identified in the attached Appendix "A", with the initials KR/AM in the pelvis region, thereby leaving a permanent scar.

1. Respondent performed the branding procedure and/or rite in an other than appropriately sterile environment and/or without appropriate infection control.

2. Respondent, while performing the branding procedure and/or rite, caused the patient to suffer excruciating pain for no known medical purpose.

3. The patient requested on multiple occasions that Respondent cease performing the branding procedure and/or rite, which said Respondent failed to do.

4. Respondent failed to cease performing the branding procedure and/or rite despite the fact that the patient screamed on multiple occasions because of the excruciating pain she was experiencing.

28

5.    Respondent, during the course of the branding procedure and/or rite, tortured and physically abused the patient.

6.    Respondent performed the branding procedure and/or rite upon the patient at the time the patient was naked and while being held down by three other individuals, who were also naked, contrary to any appropriate medical protocol or need.

7.    Respondent knowingly performed a branding procedure and/or rite upon the patient when Respondent knew, or should have known, that the patient believed that she was only having a tattoo applied to her pelvic region.

8.    Respondent inappropriately performed the branding procedure and/or rite upon the patient while an individual who was also naked utilized a cell phone to video said branding procedure and/or rite without the consent of the patient.

9.    Respondent failed to provide appropriate wound care for the patient at the time of the branding procedure and/or rite and thereafter.

10.    Respondent failed to refer the patient to a specialist after the branding procedure and/or rite to provide appropriate wound care.

11.    Respondent inappropriately advised the patient to take photos of the wound caused by the branding procedure and/or rite on a daily basis for one month and once a week for another month, and to thereafter send such photographs to an individual known as "Lauren Salzman".

12.    Respondent failed to provide appropriate medical care and treatment for the patient.

13.    Respondent failed to prepare and/or maintain appropriate medical records for the patient which accurately reflected the evaluation and treatment of the patient.

29

T.  On or about March, 2017, the Respondent intentionally used a cauterizing iron as part of a branding procedure and/or rite to permanently alter and/or disfigure the skin by branding Patient T, a female patient, hereinafter identified in the attached Appendix "A", with the initials KR/AM in the pelvis region, thereby leaving a permanent scar.

1.  Respondent performed the branding procedure and/or rite in an other than appropriately sterile environment and/or without appropriate infection control.

2.  Respondent, while performing the branding procedure and/or rite, caused the patient to suffer excruciating pain for no known medical purpose.

3.  The patient requested on multiple occasions that Respondent cease performing the branding procedure and/or rite, which said Respondent failed to do.

4.  Respondent failed to cease performing the branding procedure and/or rite despite the fact that the patient screamed on multiple occasions because of the excruciating pain she was experiencing.

5.  Respondent, during the course of the branding procedure and/or rite, tortured and physically abused the patient.

6.  Respondent performed the branding procedure and/or rite upon the patient at the time the patient was naked and while being held down by three other individuals, who were also naked, contrary to any appropriate medical protocol or need.

7.  Respondent knowingly performed a branding procedure and/or rite upon the patient when Respondent knew, or should have known, that the patient believed that she was only having a tattoo applied to her pelvic region.

8.  Respondent inappropriately performed the branding procedure and/or rite upon the patient while an individual who was also naked utilized a cell phone to video said branding procedure and/or rite without the consent of the patient.

9.  Respondent failed to provide appropriate wound care for the patient at the time of the branding procedure and/or rite and thereafter.

30

10. Respondent failed to refer the patient to a specialist after the branding procedure and/or rite to provide appropriate wound care.

11. Respondent inappropriately advised the patient to take photos of the wound caused by the branding procedure and/or rite on a daily basis for one month and once a week for another month, and to thereafter send such photographs to an individual known as "Lauren Salzman".

12. Respondent failed to provide appropriate medical care and treatment for the patient.

13. Respondent failed to prepare and/or maintain appropriate medical records for the patient which accurately reflected the evaluation and treatment of the patient.

U. On or about March, 2017, the Respondent intentionally used a cauterizing iron as part of a branding procedure and/or rite to permanently alter and/or disfigure the skin by branding Patient U, a female patient, hereinafter identified in the attached Appendix "A", with the initials KR/AM in the pelvis region, thereby leaving a permanent scar.

1. Respondent performed the branding procedure and/or rite in an other than appropriately sterile environment and/or without appropriate infection control.

2. Respondent, while performing the branding procedure and/or rite, caused the patient to suffer excruciating pain for no known medical purpose.

3. The patient requested on multiple occasions that Respondent cease performing the branding procedure and/or rite, which said Respondent failed to do.

4. Respondent failed to cease performing the branding procedure and/or rite despite the fact that the patient screamed on multiple occasions because of the excruciating pain she was experiencing.

31

5.      Respondent, during the course of the branding procedure and/or rite, tortured and physically abused the patient.

6.      Respondent performed the branding procedure and/or rite upon the patient at the time the patient was naked and while being held down by three other individuals, who were also naked, contrary to any appropriate medical protocol or need.

7.      Respondent knowingly performed a branding procedure and/or rite upon the patient when Respondent knew, or should have known, that the patient believed that she was only having a tattoo applied to her pelvic region.

8.      Respondent inappropriately performed the branding procedure and/or rite upon the patient while an individual who was also naked utilized a cell phone to video said branding procedure and/or rite without the consent of the patient.

9.      Respondent failed to provide appropriate wound care for the patient at the time of the branding procedure and/or rite and thereafter.

10.     Respondent failed to refer the patient to a specialist after the branding procedure and/or rite to provide appropriate wound care.

11.     Respondent inappropriately advised the patient to take photos of the wound caused by the branding procedure and/or rite on a daily basis for one month and once a week for another month, and to thereafter send such photographs to an individual known as "Lauren Salzman".

12.     Respondent failed to provide appropriate medical care and treatment for the patient.

13.     Respondent failed to prepare and/or maintain appropriate medical records for the patient which accurately reflected the evaluation and treatment of the patient.

32

V.    On or about March, 2017, the Respondent intentionally used a cauterizing iron as part of a branding procedure and/or rite to permanently alter and/or disfigure the skin by branding Patient V, a female patient, hereinafter identified in the attached Appendix "A", with the initials KR/AM in the pelvis region, thereby leaving a permanent scar.

1.    Respondent performed the branding procedure and/or rite in an other than appropriately sterile environment and/or without appropriate infection control.

2.    Respondent, while performing the branding procedure and/or rite, caused the patient to suffer excruciating pain for no known medical purpose.

3.    The patient requested on multiple occasions that Respondent cease performing the branding procedure and/or rite, which said Respondent failed to do.

4.    Respondent failed to cease performing the branding procedure and/or rite despite the fact that the patient screamed on multiple occasions because of the excruciating pain she was experiencing.

5.    Respondent, during the course of the branding procedure and/or rite, tortured and physically abused the patient.

6.    Respondent performed the branding procedure and/or rite upon the patient at the time the patient was naked and while being held down by three other individuals, who were also naked, contrary to any appropriate medical protocol or need.

7.    Respondent knowingly performed a branding procedure and/or rite upon the patient when Respondent knew, or should have known, that the patient believed that she was only having a tattoo applied to her pelvic region.

8.    Respondent inappropriately performed the branding procedure and/or rite upon the patient while an individual who was also naked utilized a cell phone to video said branding procedure and/or rite without the consent of the patient.

9.    Respondent failed to provide appropriate wound care for the patient at the time of the branding procedure and/or rite and thereafter.

33

10.   Respondent failed to refer the patient to a specialist after the branding procedure and/or rite to provide appropriate wound care.

11.   Respondent inappropriately advised the patient to take photos of the wound caused by the branding procedure and/or rite on a daily basis for one month and once a week for another month, and to thereafter send such photographs to an individual known as "Lauren Salzman".

12.   Respondent failed to provide appropriate medical care and treatment for the patient.

13.   Respondent failed to prepare and/or maintain appropriate medical records for the patient which accurately reflected the evaluation and treatment of the patient.

W.   On or about March, 2017, the Respondent intentionally used a cauterizing iron as part of a branding procedure and/or rite to permanently alter and/or disfigure the skin by branding Patient W, a female patient, hereinafter identified in the attached Appendix "A", with the initials KR/AM in the pelvis region, thereby leaving a permanent scar.

1.   Respondent performed the branding procedure and/or rite in an other than appropriately sterile environment and/or without appropriate infection control.

2.   Respondent, while performing the branding procedure and/or rite, caused the patient to suffer excruciating pain for no known medical purpose.

3.   The patient requested on multiple occasions that Respondent cease performing the branding procedure and/or rite, which said Respondent failed to do.

4.   Respondent failed to cease performing the branding procedure and/or rite despite the fact that the patient screamed on multiple occasions because of the excruciating pain she was experiencing.

34

5.    Respondent, during the course of the branding procedure and/or rite, tortured and physically abused the patient.

6.    Respondent performed the branding procedure and/or rite upon the patient at the time the patient was naked and while being held down by three other individuals, who were also naked, contrary to any appropriate medical protocol or need.

7.    Respondent knowingly performed a branding procedure and/or rite upon the patient when Respondent knew, or should have known, that the patient believed that she was only having a tattoo applied to her pelvic region.

8.    Respondent inappropriately performed the branding procedure and/or rite upon the patient while an individual who was also naked utilized a cell phone to video said branding procedure and/or rite without the consent of the patient.

9.    Respondent failed to provide appropriate wound care for the patient at the time of the branding procedure and/or rite and thereafter.

10.   Respondent failed to refer the patient to a specialist after the branding procedure and/or rite to provide appropriate wound care.

11.   Respondent inappropriately advised the patient to take photos of the wound caused by the branding procedure and/or rite on a daily basis for one month and once a week for another month, and to thereafter send such photographs to an individual known as "Lauren Salzman".

12.   Respondent failed to provide appropriate medical care and treatment for the patient.

13.   Respondent failed to prepare and/or maintain appropriate medical records for the patient which accurately reflected the evaluation and treatment of the patient.

35

X.    In on or about 2014, the Respondent provided medical care and treatment to Patient X, as identified in the Appendix. The Respondent's medical care of Patient X deviated from accepted standards of care as follows:

1. Respondent failed to prepare and/or maintain appropriate records which accurately reflected the evaluation and treatment of Patient X.

Y.    In on or about 2016, the Respondent provided medical care and treatment to Patient Y, as identified in the Appendix. The Respondent's medical care of Patient Y deviated from accepted standards of care as follows:

1. Respondent failed to prepare and/or maintain appropriate records which accurately reflected the evaluation and treatment of Patient Y.

Z.    During the time from on or about June 2016 through August 2016, NXIVM and/or the Executive Success Program (ESP) conducted a conference and/or meeting at the Silver Bay Conference and Family Retreat Center (Conference Center), located in Silver Bay, New York. The Respondent and approximately 300 to 400 other individuals attended the conference, including 50 to 60 children. During the course of the conference, hundreds of the attendees became severely ill with an undetermined communicable disease. The individuals who became ill suffered inter alia, flu-like symptoms, severe vomiting and diarrhea. The Respondent had knowledge of the fact that many individuals at the conference had become ill. The Respondent knew or should have known that the illness suffered by the attendees at the conference was a communicable disease, outbreak of a communicable disease, and/or an unusual disease or outbreak.

1. Respondent failed to report the suspected or confirmed case of communicable disease, outbreak of communicable disease, and/or the unusual disease or

36

outbreak to the city, county, or district health officer as required by Title 10 N.Y.C.R.R. Section 2.10.

2.  Respondent failed to report by telephone, facsimile, or other electronic communication, or in person the illness of the attendees at the conference suspected or confirmed to have been caused due to the consumption of spoiled or poisonous food to the city, county, or district health officer, in violation of Title 10 N.Y.C.R.R. Section 2.15.

3.  Upon being made aware of the fact that attendees at the conference might have been suffering from a communicable disease, the Respondent failed to cause such individuals to be isolated in an appropriate environment, pending official action by the health officer, in violation of Title 10 N.Y.C.R.R. Section 2.27.

37

## SPECIFICATIONS OF CHARGES

## FIRST THROUGH TWENTY-THIRD SPECIFICATIONS
## WILLFULLY ABUSING A PATIENT

Respondent is charged with committing professional misconduct as defined by New York Education Law §6530(31) by willfully abusing a patient as alleged in the facts of:

1. The facts in paragraphs A and A.1, A and A.2, A and A.3, A and A.4, A and A.5, A and A.6, A and A.7, A and A.8, A and A.9, A and A.10, A and A.11, A and A.12, and/or A and A.13.

2. The facts in paragraphs B and B.1, B and B.2, B and B.3, B and B.4, B and B.5, B and B.6, B and B.7, B and B.8, B and B.9, B and B.10, B and B.11, B and B.12, and/or B and B.13.

3. The facts in paragraphs C and C.1, C and C.2, C and C.3, C and C.4, C and C.5, C and C.6, C and C.7, C and C.8, C and C.9, C and C.10, C and C.11, C and C.12, and/or C and C.13.

4. The facts in paragraphs D and D.1, D and D.2, D and D.3, D and D.4, D and D.5, D and D.6, D and D.7, D and D.8, D and D.9, D and D.10, D and D.11, D and D.12, and/or D and D.13.

5. The facts in paragraphs E and E.1, E and E.2, E and E.3, E and E.4, E and E.5, E and E.6, E and E.7, E and E.8, E and E.9, E and E.10, E and E.11, E and E.12, and/or E and E.13.

38

6. The facts in paragraphs F and F.1, F and F.2, F and F.3, F and F.4, F and F.5, F and F.6, F and F.7, F and F.8, F and F.9, F and F.10, F and F.11, F and F.12, and/or F and F.13.

7. The facts in paragraphs G and G.1, G and G.2, G and G.3, G and G.4, G and G.5, G and G.6, G and G.7, G and G.8. G and G.9, G and G.10, G and G.11, G and G.12, and/or G and G.13.

8. The facts in paragraphs H and H.1, H and H.2, H and H.3, H and H.4, H and H.5, H and H.6, H and H.7, H and H.8, H and H.9, H and H.10, H and H.11, H and H.12, and/or H and H.13.

9. The facts in paragraphs I and I.1, I and I.2, I and I.3, I and I.4, I and I.5, I and I.6, I and I.7, I and I.8, I and I.9, I and I.10, I and I.11, I and I.12, and/or I and I.13.

10. The facts in paragraphs J and J.1, J and J.2, J and J.3, J and J.4, J and J.5, J and J.6, J and J.7, J and J.8, J and J.9, J and J.10, J and J.11, J and J.12, and/or J and J.13.

11. The facts in paragraphs K and K.1, K and K.2, K and K.3, K and K.4, K and K.5, K and K.6, K and K.7, K and K.8, K and K.9, K and K.10, K and K.11, K and K.12, and/or K and K.13.

12. The facts in paragraphs L and L.1, L and L.2, L and L.3, L and L.4, L and L.5, L and L.6, L and L.7, L and L.8, L and L.9, L and L.10, L and L.11, L and L.12, and/or L and L.13.

39

13. The facts in paragraphs M and M.1, M and M.2, M and M.3, M and M.4, M and M.5, M and M.6, M and M.7, M and M.8, M and M.9, M and M.10, M and M.11, M and M.12, and/or M and M.13.

14. The facts in paragraphs N and N.1, N and N.2, N and N.3, N and N.4, N and N.5, N and N.6, N and N.7, N and N.8, N and N.9, N and N.10, N and N.11, N and N.11, N and N.12, and/or N and N.13.

15. The facts in paragraphs O and O.1, O and O.2, O and O.3, O and O.4, O and O.5, O and O.6, O and O.7, O and O.8, O and O.9, O and O.10, O and O.11, O and O.12, and/or O and O.13.

16. The facts in paragraphs P and P.1, P and P.2, P and P.3, P and P.4, P and P.5, P and P.6, P and P.7, P and P.8, P and P.9, P and P.10, P and P.11, P and P.12, and/or P and P.13.

17. The facts in paragraphs Q and Q.1, Q and Q.2, Q and Q.3, Q and Q.4, Q and Q.5, Q and Q.6, Q and Q.7, Q and Q.8, Q and Q.9, Q and Q.10, Q and Q.11, Q and Q.12, and/or Q and Q.13.

18. The facts in paragraphs R and R.1, R and R.2, R and R.3, R and R.4, R and R.5, R and R. 6, R and R.7, R and R.8, R and R.9, R and R.10, R and R.11, R and R.12, and/or R and R.13.

19. The facts in paragraphs S and S.1, S and S.2, S and S.3, S and S.4, S and S.5, S and S.6, S and S.7, S and S.8, S and S.9, S and S.10, S and S.11, S and S.12, and/or S and S.13.

40

20. The facts in paragraphs T and T.1, T and T.2, T and T.3, T and T.4, T and T.5, T and T.6, T and T.7, T and T.8, T and T.9, T and T.10, T and T.11, T and T.12, and/or T and T.13.

21. The facts in paragraphs U and U.1, U and U.2, U and U.3, U and U.4, U and U.5, U and U.6, U and U.7, U and U.8, U and U.9, U and U.10, U and U.11, U and U.12, and/or U and U.13.

22. The facts in paragraphs V and V.1, V and V.2, V and V.3, V and V.4, V and V.5, V and V.6, V and V.7, V and V.8, V and V.9, V and V.10, V and V.11, V and V.12, and/or V and V.13.

23. The facts in paragraphs W and W.1, W and W.2, W and W.3, W and W.4, W and W.5, W and W. 6, W and W.7, W and W.8, W and W.9, W and W.10, W and W.11, W and W.12, and/or W and W.13.

### TWENTY-FOURTH THROUGH FORTY-SIXTH SPECIFICATIONS

### CONDUCT IN THE PRACTICE OF MEDICINE WHICH EVIDENCES MORAL UNFITNESS

Respondent is charged with committing professional misconduct as defined by New York Education Law §6530(20)

24. The facts in paragraphs A and A.1, A and A.2, A and A.3, A and A.4, A and A.5, A and A.6, A and A.7, A and A.8, A and A.9, A and A.10, A and A.11, A and A.12, and/or A and A.13.

41

25. The facts in paragraphs B and B.1, B and B.2, B and B.3, B and B.4, B and B.5, B and B.6, B and B.7, B and B.8, B and B.9, B and B.10, B and B.11, B and B.12, and/or B and B.13.

26. The facts in paragraphs C and C.1, C and C.2, C and C.3, C and C.4, C and C.5, C and C.6, C and C.7, C and C.8, C and C.9, C and C.10, C and C.11, C and C.12, and/or C and C.13.

27. The facts in paragraphs D and D.1, D and D.2, D and D.3, D and D.4, D and D.5, D and D.6, D and D.7, D and D.8, D and D.9, D and D.10, D and D.11, D and D.12, and/or D and D.13.

28. The facts in paragraphs E and E.1, E and E.2, E and E.3, E and E.4, E and E.5, E and E.6, E and E.7, E and E.8, E and E.9, E and E.10, E and E.11, E and E.12, and/or E and E.13.

29. The facts in paragraphs F and F.1, F and F.2, F and F.3, F and F.4, F and F.5, F and F.6, F and F.7, F and F.8, F and F.9, F and F.10, F and F.11, F and F.12, and/or F and F.13.

30. The facts in paragraphs G and G.1, G and G.2, G and G.3, G and G.4, G and G.5, G and G.6, G and G.7, G and G.8. G and G.9, G and G.10, G and G.11, G and G.12, and/or G and G.13.

31. The facts in paragraphs H and H.1, H and H.2, H and H.3, H and H.4, H and H.5, H and H.6, H and H.7, H and H.8, H and H.9, H and H.10, H and H.11, H and H.12, and/or H and H.13.

42

32. The facts in paragraphs I and I.1, I and I.2, I and I.3, I and I.4, I and I.5, I and I.6, I and I.7, I and I.8, I and I.9, I and I.10, I and I.11, I and I.12, and/or I and I.13.

33. The facts in paragraphs J and J.1, J and J.2, J and J.3, J and J.4, J and J.5, J and J.6, J and J.7, J and J.8, J and J.9, J and J.10, J and J.11, J and J.12, and/or J and J.13.

34. The facts in paragraphs K and K.1, K and K.2, K and K.3, K and K.4, K and K.5, K and K.6, K and K.7, K and K.8, K and K.9, K and K.10, K and K.11, K and K.12, and/or K and K.13.

35. The facts in paragraphs L and L.1, L and L.2, L and L.3, L and L.4, L and L.5, L and L.6, L and L.7, L and L.8, L and L.9, L and L.10, L and L.11, L and L.12, and/or L and L.13.

36. The facts in paragraphs M and M.1, M and M.2, M and M.3, M and M.4, M and M.5, M and M.6, M and M.7, M and M.8, M and M.9, M and M.10, M and M.11, M and M.12, and/or M and M.13.

37. The facts in paragraphs N and N.1, N and N.2, N and N.3, N and N.4, N and N.5, N and N.6, N and N.7, N and N.8, N and N.9, N and N.10, N and N.11, N and N.11, N and N.12, and/or N and N.13.

38. The facts in paragraphs O and O.1, O and O.2, O and O.3, O and O.4, O and O.5, O and O.6, O and O.7, O and O.8, O and O.9, O and O.10, O and O.11, O and O.12, and/or O and O.13.

43

39. The facts in paragraphs P and P.1, P and P.2, P and P.3, P and P.4, P and P.5, P and P.6, P and P.7, P and P.8, P and P.9, P and P.10, P and P.11, P and P.12, and/or P and P.13.

40. The facts in paragraphs Q and Q.1, Q and Q.2, Q and Q.3, Q and Q.4, Q and Q.5, Q and Q.6, Q and Q.7, Q and Q.8, Q and Q.9, Q and Q.10, Q and Q.11, Q and Q.12, and/or Q and Q.13.

41. The facts in paragraphs R and R.1, R and R.2, R and R.3, R and R.4, R and R.5, R and R. 6, R and R.7, R and R.8, R and R.9, R and R.10, R and R.11, R and R.12, and/or R and R.13.

42. The facts in paragraphs S and S.1, S and S.2, S and S.3, S and S.4, S and S.5, S and S.6, S and S.7, S and S.8, S and S.9, S and S.10, S and S.11, S and S.12, and/or S and S.13.

43. The facts in paragraphs T and T.1, T and T.2, T and T.3, T and T.4, T and T.5, T and T.6, T and T.7, T and T.8, T and T.9, T and T.10, T and T.11, T and T.12, and/or T and T.13.

44. The facts in paragraphs U and U.1, U and U.2, U and U.3, U and U.4, U and U.5, U and U.6, U and U.7, U and U.8, U and U.9, U and U.10, U and U.11, U and U.12, and/or U and U.13.

45. The facts in paragraphs V and V.1, V and V.2, V and V.3, V and V.4, V and V.5, V and V.6, V and V.7, V and V.8, V and V.9, V and V.10, V and V.11, V and V.12, and/or V and V.13.

44

46. The facts in paragraphs W and W.1, W and W.2, W and W.3, W and W.4, W and W.5, W and W. 6, W and W.7, W and W.8, W and W.9, W and W.10, W and W.11, W and W.12, and/or W and W.13.

## FORTY-SEVENTH THROUGH SIXTY-NINTH SPECIFICATIONS

## FAILING TO USE SCIENTIFICALLY ACCEPTED
## INFECTION CONTROL PRACTICES

Respondent is charged with committing professional misconduct as defined by New York Education Law §6530(47)

47. The facts in paragraphs A and A.1, A and A.8, A and A.9, A and A.10, and/or A and A.11.

48. The facts in paragraphs B and B.1, B and B.8, B and B.9, B and B.10, and/or B and B.11.

49. The facts in paragraphs C and C.1, C and C.8, C and C.9, C and C.10, and/or C and C.11.

50. The facts in paragraphs D and D.1, D and D.8, D and D.9, D and D.10, and/or D and D.11.

51. The facts in paragraphs E and E.1, E and E.8, E and E.9, E and E.10, and/or E and E.11.

52. The facts in paragraphs F and F.1, F and F.8, F and F.9, F and F.10, and/or F and F.11.

45

53. The facts in paragraphs G and G.1, G and G.8, G and G.9, G and G.10, and/or G and G.11.

54. The facts in paragraphs H and H.1, H and H.8, H and H.9, H and H.10, and/or H and H.11.

55. The facts in paragraphs I and I.1, I and I.8, I and I.9, I and I.10, and/or I and I.11.

56. The facts in paragraphs J and J.1, J and J.8, I and J.9, J and J.10, and/or J and J.11.

57. The facts in paragraphs K and K.1, K and K.8, K and K.9, K and K.10, and/or K and K.11.

58. The facts in paragraphs L and L.1, L and L.8, L and L.9, L and L.10, and/or L and L.11.

59. The facts in paragraphs M and M.1, M and M.8, M and M.9, M and M.10, and/or M and M.11.

60. The facts in paragraphs N and N.1, N and N.8, N and N.9, N and N.10, and/or N and N.11.

61. The facts in paragraphs O and O.1, O and O.8, O and O.9, O and O.10, and/or O and O.11.

62. The facts in paragraphs P and P.1, P and P.8, P and P.9, P and P.10, and/or P and P.11.

63. The facts in paragraphs Q and Q.1, Q and Q.8, Q and Q.9, Q and Q.10, and/or Q and Q.11.

46

64. The facts in paragraphs R and R.1, R and R.8, R and R.9, R and R.10, and/or R and R. 11.

65. The facts in paragraphs S and S.1, S and S.8, S and S.9, S and S.10, and/or S and S.11.

66. The facts in paragraphs T and T.1, T and T.8, T and T.9, T and T.10, and/or T and T.11.

67. The facts in paragraphs U and U.1, U and U.8, U and U.9, U and U.10, and/or U and U.11.

68. The facts in paragraphs V and V.1, V and V.8, V and V.9, V and V.10, and/or V and V.11.

69. The facts in paragraphs W and W.1, W and W.8, W and W.9, W and W.10, and/or W and W.11.

## SEVENTIETH THROUGH NINETY-SECOND SPECIFICATIONS

## PRACTICING THE PROFESSION FRAUDULENTLY OR BEYOND ITS SCOPE

Respondent is charged with committing professional misconduct as defined by New York Education Law §6530(2)

70. The facts in paragraphs A and A.2, A and A.3, A and A.4, and/or A and A.7.

71. The facts in paragraphs B and B.2, B and B.3, B and B.4, and/or B and B.7.

72. The facts in paragraphs C and C.2, C and C.3, C and C.4, and/or C and C.7.

73. The facts in paragraphs D and D.2, D and D.3, D and D.4, and/or D and D.7.

47

74. The facts in paragraphs E and E.2, E and E.3, E and E.4, and/or E and E.7.

75. The facts in paragraphs F and F.2, F and F.3, F and F.4, and/or F and F.7.

76. The facts in paragraphs G and G.2, G and G.3, G and G.4, and/or G and G.7.

77. The facts in paragraphs H and H.2, H and H.3, H and H.4, and/or H and H.7.

78. The facts in paragraphs I and I.2, I and I.3, I and I.4, and/or I and I.7.

79. The facts in paragraphs J and J.2, J and J.3, J and J.4, and/or J and J.7.

80. The facts in paragraphs K and K.2, K and K.3, K and K.4, and/or K and K.7.

81. The facts in paragraphs L and L.2, L and L.3, L and L.4, and/or L and L.7.

82. The facts in paragraphs M and M.2, M and M.3, M and M.4, and/or M and M.7.

83. The facts in paragraphs N and N.2, N and N.3, N and N.4, and/or N and N.7.

84. The facts in paragraphs O and O.2, O and O.3, O and O.4, and/or O and O.7.

85. The facts in paragraphs P and P.2, P and P.3, P and P.4, and/or P and P.7.

86. The facts in paragraphs Q and Q.2, Q and Q.3, Q and Q.4, and/or Q and Q.7.

87. The facts in paragraphs R and R.2, R and R.3, R and R.4, and/or R and R.7.

88. The facts in paragraphs S and S.2, S and S.3, S and S.4, and/or S and S.7.

89. The facts in paragraphs T and T.2, T and T.3, T and T.4, and/or T and T.7.

90. The facts in paragraphs U and U.2, U and U.3, U and U.4, and/or U and U.7.

91. The facts in paragraphs V and V.2, V and V.3, V and V.4, and/or V and V.7.

92. The facts in paragraphs W and W.2, W and W.3, W and W.4, and/or W and W.7.

48

## NINETY-THIRD THROUGH ONE HUNDRED FIFTEENTH SPECIFICATIONS

## PRACTICING THE PROFESSION WITH GROSS NEGLIGENCE

Respondent is charged with committing professional misconduct as defined by New York Education Law §6530(4)

93. The facts in paragraphs A and A.1, A and A.2, A and A.3, A and A.4, A and A.5, A and A.6, A and A.7, A and A.8, A and A.9, A and A.10, A and A.11, A and A.12, and/or A and A.13.

94. The facts in paragraphs B and B.1, B and B.2, B and B.3, B and B.4, B and B.5, B and B.6, B and B.7, B and B.8, B and B.9, B and B.10, B and B.11, B and B.12, and/or B and B.13.

95. The facts in paragraphs C and C.1, C and C.2, C and C.3, C and C.4, C and C.5, C and C.6, C and C.7, C and C.8, C and C.9, C and C.10, C and C.11, C and C.12, and/or C and C.13.

96. The facts in paragraphs D and D.1, D and D.2, D and D.3, D and D.4, D and D.5, D and D.6, D and D.7, D and D.8, D and D.9, D and D.10, D and D.11, D and D.12, and/or D and D.13.

97. The facts in paragraphs E and E.1, E and E.2, E and E.3, E and E.4, E and E.5, E and E.6, E and E.7, E and E.8, E and E.9, E and E.10, E and E.11, E and E.12, and/or E and E.13.

98. The facts in paragraphs F and F.1, F and F.2, F and F.3, F and F.4, F and F.5, F and F.6, F and F.7, F and F.8, F and F.9, F and F.10, F and F.11, F and F.12, and/or F and F.13.

49

99. The facts in paragraphs G and G.1, G and G.2, G and G.3, G and G.4, G and G.5, G and G.6, G and G.7, G and G.8. G and G.9, G and G.10, G and G.11, G and G.12, and/or G and G.13.

100. The facts in paragraphs H and H.1, H and H.2, H and H.3, H and H.4, H and H.5, H and H.6, H and H.7, H and H.8, H and H.9, H and H.10, H and H.11, H and H.12, and/or H and H.13.

101. The facts in paragraphs I and I.1, I and I.2, I and I.3, I and I.4, I and I.5, I and I.6, I and I.7, I and I.8, I and I.9, I and I.10, I and I.11, I and I.12, and/or I and I.13.

102. The facts in paragraphs J and J.1, J and J.2, J and J.3, J and J.4, J and J.5, J and J.6, J and J.7, J and J.8, J and J.9, J and J.10, J and J.11, J and J.12, and/or J and J.13.

103. The facts in paragraphs K and K.1, K and K.2, K and K.3, K and K.4, K and K.5, K and K.6, K and K.7, K and K.8, K and K.9, K and K.10, K and K.11, K and K.12, and/or K and K.13.

104. The facts in paragraphs L and L.1, L and L.2, L and L.3, L and L.4, L and L.5, L and L.6, L and L.7, L and L.8, L and L.9, L and L.10, L and L.11, L and L.12, and/or L and L.13.

105. The facts in paragraphs M and M.1, M and M.2, M and M.3, M and M.4, M and M.5, M and M.6, M and M.7, M and M.8, M and M.9, M and M.10, M and M.11, M and M.12, and/or M and M.13.

50

106. The facts in paragraphs N and N.1, N and N.2, N and N.3, N and N.4, N and N.5, N and N.6, N and N.7, N and N.8, N and N.9, N and N.10, N and N.11, N and N.11, N and N.12, and/or N and N.13.

107. The facts in paragraphs O and O.1, O and O.2, O and O.3, O and O.4, O and O.5, O and O.6, O and O.7, O and O.8, O and O.9, O and O.10, O and O.11, O and O.12, and/or O and O.13.

108. The facts in paragraphs P and P.1, P and P.2, P and P.3, P and P.4, P and P.5, P and P.6, P and P.7, P and P.8, P and P.9, P and P.10, P and P.11, P and P.12, and/or P and P.13.

109. The facts in paragraphs Q and Q.1, Q and Q.2, Q and Q.3, Q and Q.4, Q and Q.5, Q and Q.6, Q and Q.7, Q and Q.8, Q and Q.9, Q and Q.10, Q and Q.11, Q and Q.12, and/or Q and Q.13.

110. The facts in paragraphs R and R.1, R and R.2, R and R.3, R and R.4, R and R.5, R and R. 6, R and R.7, R and R.8, R and R.9, R and R.10, R and R.11, R and R.12, and/or R and R.13.

111. The facts in paragraphs S and S.1, S and S.2, S and S.3, S and S.4, S and S.5, S and S.6, S and S.7, S and S.8, S and S.9, S and S.10, S and S.11, S and S.12, and/or S and S.13.

112. The facts in paragraphs T and T.1, T and T.2, T and T.3, T and T.4, T and T.5, T and T.6, T and T.7, T and T.8, T and T.9, T and T.10, T and T.11, T and T.12, and/or T and T.13.

51

113. The facts in paragraphs U and U.1, U and U.2, U and U.3, U and U.4, U and U.5, U and U.6, U and U.7, U and U.8, U and U.9, U and U.10, U and U.11, U and U.12, and/or U and U.13.

114. The facts in paragraphs V and V.1, V and V.2, V and V.3, V and V.4, V and V.5, V and V.6, V and V.7, V and V.8, V and V.9, V and V.10, V and V.11, V and V.12, and/or V and V.13.

115. The facts in paragraphs W and W.1, W and W.2, W and W.3, W and W.4, W and W.5, W and W. 6, W and W.7, W and W.8, W and W.9, W and W.10, W and W.11, W and W.12, and/or W and W.13.

## ONE HUNDRED SIXTEENTH THROUGH ONE HUNDRED THIRTY-NINTH

## SPECIFICATIONS

## PRACTICING THE PROFESSION WITH NEGLIGENCE
## ON MORE THAN ONE OCCASION

Respondent is charged with committing professional misconduct as defined by New York Education Law §6530(3)

116. The facts in paragraphs A and A.1, A and A.2, A and A.3, A and A.4, A and A.5, A and A.6, A and A.7, A and A.8, A and A.9, A and A.10, A and A.11, A and A.12, and/or A and A.13.

117. The facts in paragraphs B and B.1, B and B.2, B and B.3, B and B.4, B and B.5, B and B.6, B and B.7, B and B.8, B and B.9, B and B.10, B and B.11, B.12, and/or B and B.13.

52

118. The facts in paragraphs C and C.1, C and C.2, C and C.3, C and C.4, C and C.5, C and C.6, C and C.7, C and C.8, C and C.9, C and C.10, C and C.11, C and C.12, and/or C and C.13.

119. The facts in paragraphs D and D.1, D and D.2, D and D.3, D and D.4, D and D.5, D and D.6, D and D.7, D and D.8, D and D.9, D and D.10, D and D.11, D and D.12, and/or D and D.13.

120. The facts in paragraphs E and E.1, E and E.2, E and E.3, E and E.4, E and E.5, E and E.6, E and E.7, E and E.8, E and E.9, E and E.10, E and E.11, E and E.12, and/or E and E.13.

121. The facts in paragraphs F and F.1, F and F.2, F and F.3, F and F.4, F and F.5, F and F.6, F and F.7, F and F.8, F and F.9, F and F.10, F and F.11, F and F.12, and/or F and F.13.

122. The facts in paragraphs G and G.1, G and G.2, G and G.3, G and G.4, G and G.5, G and G.6, G and G.7, G and G.8. G and G.9, G and G.10, G and G.11, G and G.12, and/or G and G.13.

123. The facts in paragraphs H and H.1, H and H.2, H and H.3, H and H.4, H and H.5, H and H.6, H and H.7, H and H.8, H and H.9, H and H.10, H and H.11, H and H.12, and/or H and H.13.

124. The facts in paragraphs I and I.1, I and I.2, I and I.3, I and I.4, I and I.5, I and I.6, I and I.7, I and I.8, I and I.9, I and I.10, I and I.11, I and I.12, and/or I and I.13.

53

125. The facts in paragraphs J and J.1, J and J.2, J and J.3, J and J.4, J and J.5, J and J.6, J and J.7, J and J.8, J and J.9, J and J.10, J and J.11, J and J.12, and/or J and J.13.

126. The facts in paragraphs K and K.1, K and K.2, K and K.3, K and K.4, K and K.5, K and K.6, K and K.7, K and K.8, K and K.9, K and K.10, K and K.11, K and K.12, and/or K and K.13.

127. The facts in paragraphs L and L.1, L and L.2, L and L.3, L and L.4, L and L.5, L and L.6, L and L.7, L and L.8, L and L.9, L and L.10, L and L.11, L and L.12, and/or L and L.13.

128. The facts in paragraphs M and M.1, M and M.2, M and M.3, M and M.4, M and M.5, M and M.6, M and M.7, M and M.8, M and M.9, M and M.10, M and M.11, M and M.12, and/or M and M.13.

129. The facts in paragraphs N and N.1, N and N.2, N and N.3, N and N.4, N and N.5, N and N.6, N and N.7, N and N.8, N and N.9, N and N.10, N and N.11, N and N.11, N and N.12, and/or N and N.13.

130. The facts in paragraphs O and O.1, O and O.2, O and O.3, O and O.4, O and O.5, O and O.6, O and O.7, O and O.8, O and O.9, O and O.10, O and O.11, O and O.12, and/or O and O.13.

131. The facts in paragraphs P and P.1, P and P.2, P and P.3, P and P.4, P and P.5, P and P.6, P and P.7, P and P.8, P and P.9, P and P.10, P and P.11, P and P.12, and/or P and P.13.

54

132. The facts in paragraphs Q and Q.1, Q and Q.2, Q and Q.3, Q and Q.4, Q and Q.5, Q and Q.6, Q and Q.7, Q and Q.8, Q and Q.9, Q and Q.10, Q and Q.11, Q and Q.12, and/or Q and Q.13.

133. The facts in paragraphs R and R.1, R and R.2, R and R.3, R and R.4, R and R.5, R and R. 6, R and R.7, R and R.8, R and R.9, R and R.10, R and R.11, R and R.12, and/or R and R.13.

134. The facts in paragraphs S and S.1, S and S.2, S and S.3, S and S.4, S and S.5, S and S.6, S and S.7, S and S.8, S and S.9, S and S.10, S and S.11, S and S.12, and/or S and S.13.

135. The facts in paragraphs T and T.1, T and T.2, T and T.3, T and T.4, T and T.5, T and T.6, T and T.7, T and T.8, T and T.9, T and T.10, T and T.11, T and T.12, and/or T and T.13.

136. The facts in paragraphs U and U.1, U and U.2, U and U.3, U and U.4, U and U.5, U and U.6, U and U.7, U and U.8, U and U.9, U and U.10, U and U.11, U and U.12, and/or U and U.13.

137. The facts in paragraphs V and V.1, V and V.2, V and V.3, V and V.4, V and V.5, V and V.6, V and V.7, V and V.8, V and V.9, V and V.10, V and V.11, V and V.12, and/or V and V.13.

138. The facts in paragraphs W and W.1, W and W.2, W and W.3, W and W.4, W and W.5, W and W. 6, W and W.7, W and W.8, W and W.9, W and W.10, W and W.11, W and W.12, and/or W and W.13.

139. The facts in paragraphs X and X.1 and/or Y and Y.1.

55

## ONE HUNDRED FORTIETH THROUGH ONE HUNDRED SIXTIETH SPECIFICATIONS

### PRACTICING THE PROFESSION WITH GROSS INCOMPETENCE

Respondent is charged with committing professional misconduct as defined by New York Education Law §6530(6)

140.  The facts in paragraphs A and A.1, A and A.2, A and A.3, A and A.4, A and A.5, A and A.6, A and A.7, A and A.8, A and A.9, A and A.10, A and A.11, A and A.12, and/or A and A.13.

141.  The facts in paragraphs B and B.1, B and B.2, B and B.3, B and B.4, B and B.5, B and B.6, B and B.7, B and B.8, B and B.9, B and B.10, B and B.11, B and B.12, and/or B and B.13.

142.  The facts in paragraphs C and C.1, C and C.2, C and C.3, C and C.4, C and C.5, C and C.6, C and C.7, C and C.8, C and C.9, C and C.10, C and C.11, C and C.12, and/or C and C.13.

143.  The facts in paragraphs D and D.1, D and D.2, D and D.3, D and D.4, D and D.5, D and D.6, D and D.7, D and D.8, D and D.9, D and D.10, D and D.11, D and D.12, and/or D and D.13.

144.  The facts in paragraphs E and E.1, E and E.2, E and E.3, E and E.4, E and E.5, E and E.6, E and E.7, E and E.8, E and E.9, E and E.10, E and E.11, E and E.12, and/or E and E.13.

145.  The facts in paragraphs F and F.1, F and F.2, F and F.3, F and F.4, F and F.5, F and F.6, F and F.7, F and F.8, F and F.9, F and F.10, F and F.11, F and F.12, and/or F and F.13.

56

146. The facts in paragraphs G and G.1, G and G.2, G and G.3, G and G.4, G and G.5, G and G.6, G and G.7, G and G.8. G and G.9, G and G.10, G and G.11, G and G.12, and/or G and G.13.

147. The facts in paragraphs H and H.1, H and H.2, H and H.3, H and H.4, H and H.5, H and H.6, H and H.7, H and H.8, H and H.9, H and H.10, H and H.11, H and H.12, and/or H and H.13.

148. The facts in paragraphs I and I.1, I and I.2, I and I.3, I and I.4, I and I.5, I and I.6, I and I.7, I and I.8, I and I.9, I and I.10, I and I.11, I and I.12, and/or I and I.13.

149. The facts in paragraphs J and J.1, J and J.2, J and J.3, J and J.4, J and J.5, J and J.6, J and J.7, J and J.8, J and J.9, J and J.10, J and J.11, J and J.12, and/or J and J.13.

150. The facts in paragraphs K and K.1, K and K.2, K and K.3, K and K.4, K and K.5, K and K.6, K and K.7, K and K.8, K and K.9, K and K.10, K and K.11, K and K.12, and/or K and K.13.

151. The facts in paragraphs L and L.1, L and L.2, L and L.3, L and L.4, L and L.5, L and L.6, L and L.7, L and L.8, L and L.9, L and L.10, L and L.11, L and L.12, and/or L and L.13.

152. The facts in paragraphs M and M.1, M and M.2, M and M.3, M and M.4, M and M.5, M and M.6, M and M.7, M and M.8, M and M.9, M and M.10, M and M.11, M and M.12, and/or M and M.13.

57

153. The facts in paragraphs N and N.1, N and N.2, N and N.3, N and N.4, N and N.5, N and N.6, N and N.7, N and N.8, N and N.9, N and N.10, N and N.11, N and N.11, N and N.12, and/or N and N.13.

154. The facts in paragraphs O and O.1, O and O.2, O and O.3, O and O.4, O and O.5, O and O.6, O and O.7, O and O.8, O and O.9, O and O.10, O and O.11, O and O.12, and/or O and O.13.

155. The facts in paragraphs P and P.1, P and P.2, P and P.3, P and P.4, P and P.5, P and P.6, P and P.7, P and P.8, P and P.9, P and P.10, P and P.11, P and P.12, and/or P and P.13.

156. The facts in paragraphs Q and Q.1, Q and Q.2, Q and Q.3, Q and Q.4, Q and Q.5, Q and Q.6, Q and Q.7, Q and Q.8, Q and Q.9, Q and Q.10, Q and Q.11, Q and Q.12, and/or Q and Q.13.

157. The facts in paragraphs R and R.1, R and R.2, R and R.3, R and R.4, R and R.5, R and R. 6, R and R.7, R and R.8, R and R.9, R and R.10, R and R.11, R and R.12, and/or R and R.13.

158. The facts in paragraphs S and S.1, S and S.2, S and S.3, S and S.4, S and S.5, S and S.6, S and S.7, S and S.8, S and S.9, S and S.10, S and S.11, S and S.12, and/or S and S.13.

159. The facts in paragraphs T and T.1, T and T.2, T and T.3, T and T.4, T and T.5, T and T.6, T and T.7, T and T.8, T and T.9, T and T.10, T and T.11, T and T.12, and/or T and T.13.

58

160. The facts in paragraphs U and U.1, U and U.2, U and U.3, U and U.4, U and U.5, U and U.6, U and U.7, U and U.8, U and U.9, U and U.10, U and U.11, U and U.12, and/or U and U.13.

161. The facts in paragraphs V and V.1, V and V.2, V and V.3, V and V.4, V and V.5, V and V.6, V and V.7, V and V.8, V and V.9, V and V.10, V and V.11, V and V.12, and/or V and V.13.

162. The facts in paragraphs W and W.1, W and W.2, W and W.3, W and W.4, W and W.5, W and W. 6, W and W.7, W and W.8, W and W.9, W and W.10, W and W.11, W and W.12, and/or W and W.13.


## ONE HUNDRED SIXTY-THIRD THROUGH

## ONE HUNDRED EIGHTY-SIXTH SPECIFICATIONS

## PRACTICNG THE PROFESSION WITH INCOMPETENCE
## ON MORE THAN ONE OCCASION

Respondent is charged with committing professional misconduct as defined by New York Education Law §6530(5)

163. The facts in paragraphs A and A.1, A and A.2, A and A.3, A and A.4, A and A.5, A and A.6, A and A.7, A and A.8, A and A.9, A and A.10, A and A.11, A and A.12, and/or A and A.13.

164. The facts in paragraphs B and B.1, B and B.2, B and B.3, B and B.4, B and B.5, B and B.6, B and B.7, B and B.8, B and B.9, B and B.10, B and B.11, B.12, and/or B and B.13.

59

165. The facts in paragraphs C and C.1, C and C.2, C and C.3, C and C.4, C and C.5, C and C.6, C and C.7, C and C.8, C and C.9, C and C.10, C and C.11, C and C.12, and/or C and C.13.

166. The facts in paragraphs D and D.1, D and D.2, D and D.3, D and D.4, D and D.5, D and D.6, D and D.7, D and D.8, D and D.9, D and D.10, D and D.11, D and D.12, and/or D and D.13.

167. The facts in paragraphs E and E.1, E and E.2, E and E.3, E and E.4, E and E.5, E and E.6, E and E.7, E and E.8, E and E.9, E and E.10, E and E.11, E and E.12, and/or E and E.13.

168. The facts in paragraphs F and F.1, F and F.2, F and F.3, F and F.4, F and F.5, F and F.6, F and F.7, F and F.8, F and F.9, F and F.10, F and F.11, F and F.12, and/or F and F.13.

169. The facts in paragraphs G and G.1, G and G.2, G and G.3, G and G.4, G and G.5, G and G.6, G and G.7, G and G.8. G and G.9, G and G.10, G and G.11, G and G.12, and/or G and G.13.

170. The facts in paragraphs H and H.1, H and H.2, H and H.3, H and H.4, H and H.5, H and H.6, H and H.7, H and H.8, H and H.9, H and H.10, H and H.11, H and H.12, and/or H and H.13.

171. The facts in paragraphs I and I.1, I and I.2, I and I.3, I and I.4, I and I.5, I and I.6, I and I.7, I and I.8, I and I.9, I and I.10, I and I.11, I and I.12, and/or I and I.13.

60

172. The facts in paragraphs J and J.1, J and J.2, J and J.3, J and J.4, J and J.5, J and J.6, J and J.7, J and J.8, J and J.9, J and J.10, J and J.11, J and J.12, and/or J and J.13.

173. The facts in paragraphs K and K.1, K and K.2, K and K.3, K and K.4, K and K.5, K and K.6, K and K.7, K and K.8, K and K.9, K and K.10, K and K.11, K and K.12, and/or K and K.13.

174. The facts in paragraphs L and L.1, L and L.2, L and L.3, L and L.4, L and L.5, L and L.6, L and L.7, L and L.8, L and L.9, L and L.10, L and L.11, L and L.12, and/or L and L.13.

175. The facts in paragraphs M and M.1, M and M.2, M and M.3, M and M.4, M and M.5, M and M.6, M and M.7, M and M.8, M and M.9, M and M.10, M and M.11, M and M.12, and/or M and M.13.

176. The facts in paragraphs N and N.1, N and N.2, N and N.3, N and N.4, N and N.5, N and N.6, N and N.7, N and N.8, N and N.9, N and N.10, N and N.11, N and N.11, N and N.12, and/or N and N.13.

177. The facts in paragraphs O and O.1, O and O.2, O and O.3, O and O.4, O and O.5, O and O.6, O and O.7, O and O.8, O and O.9, O and O.10, O and O.11, O and O.12, and/or O and O.13.

178. The facts in paragraphs P and P.1, P and P.2, P and P.3, P and P.4, P and P.5, P and P.6, P and P.7, P and P.8, P and P.9, P and P.10, P and P.11, P and P.12, and/or P and P.13.

61

179. The facts in paragraphs Q and Q.1, Q and Q.2, Q and Q.3, Q and Q.4, Q and Q.5, Q and Q.6, Q and Q.7, Q and Q.8, Q and Q.9, Q and Q.10, Q and Q.11, Q and Q.12, and/or Q and Q.13.

180. The facts in paragraphs R and R.1, R and R.2, R and R.3, R and R.4, R and R.5, R and R. 6, R and R.7, R and R.8, R and R.9, R and R.10, R and R.11, R and R.12, and/or R and R.13.

181. The facts in paragraphs S and S.1, S and S.2, S and S.3, S and S.4, S and S.5, S and S.6, S and S.7, S and S.8, S and S.9, S and S.10, S and S.11, S and S.12, and/or S and S.13.

182. The facts in paragraphs T and T.1, T and T.2, T and T.3, T and T.4, T and T.5, T and T.6, T and T.7, T and T.8, T and T.9, T and T.10, T and T.11, T and T.12, and/or T and T.13.

183. The facts in paragraphs U and U.1, U and U.2, U and U.3, U and U.4, U and U.5, U and U.6, U and U.7, U and U.8, U and U.9, U and U.10, U and U.11, U and U.12, and/or U and U.13.

184. The facts in paragraphs V and V.1, V and V.2, V and V.3, V and V.4, V and V.5, V and V.6, V and V.7, V and V.8, V and V.9, V and V.10, V and V.11, V and V.12, and/or V and V.13.

185. The facts in paragraphs W and W.1, W and W.2, W and W.3, W and W.4, W and W.5, W and W. 6, W and W.7, W and W.8, W and W.9, W and W.10, W and W.11, W and W.12, and/or W and W.13.

186. The facts in paragraphs X and X.1, and/or Y and Y.1.

62

## ONE HUNDRED EIGHTY-SEVENTH THROUGH
## TWO HUNDRED NINTH SPECIFICATIONS

## EXERCISING UNDUE INFLUENCE ON A PATIENT

Respondent is charged with committing professional misconduct as defined by New York Education Law §6530(17)

187.   The facts in paragraphs A and A.5, A and A.6, and/or A and A.7.

188.   The facts in paragraphs B and B.5, B and B. 6, and/or B and B.7.

189.   The facts in paragraphs C and C.5, C and C.6, and/or C and C.7.

190.   The facts in paragraphs D and D.5, D and D.6, and/or D and D.7.

191.   The facts in paragraphs E and E.5, E and E.6, and/or E and E.7.

192.   The facts in paragraphs F and F.5, F and F.6, and/or F and F.7.

193.   The facts in paragraphs G and G.5, G and G.6, and/or G and G.7.

194.   The facts in paragraphs H and H.5, H and H.6, and/or H and H.7.

195.   The facts in paragraphs I and I.5, I and I.6, and/or I and I.7.

196.   The facts in paragraphs J and J.5, J and J.6, and/or J and J.7.

197.   The facts in paragraphs K and K.5, K and K.6, and/or K and K.7.

198.   The facts in paragraphs L and L.5, L and L.6, and/or L and L.7.

199.   The facts in paragraphs M and M.5, M and M.6, and/or M and M.7.

200.   The facts in paragraphs N and N.5, N and N.6, and/or N and N.7.

201.   The facts in paragraphs O and O.5, O and O.6, and/or O and O.7.

202.   The facts in paragraphs P and P.5, P and P.6, and/or P and P.7.

63

203.   The facts in paragraphs Q and Q.5, Q and Q.6, and/or Q and Q.7.

204.   The facts in paragraphs R and R.5, R and R.6, and/or R and R.7.

205.   The facts in paragraphs S and S.5, S and S.6, and/or S and S.7.

206.   The facts in paragraphs T and T.5, T and T.6, and/or T and T.7.

207.   The facts in paragraphs U and U.5, U and U.6, and/or U and U.7.

208.   The facts in paragraphs V and V.5, V and V.6, and/or V and V.7.

209.   The facts in paragraphs W and W.5, W and W.6, and/or W and W.7.

## TWO HUNDRED TENTH SPECIFICATION

## WILLFULLY FAILING TO FILE A REPORT REQUIRED BY LAW

Respondent is charged with committing professional misconduct as defined by New York Education Law §6530(21)

210.   The facts in paragraphs Z and Z.1, and/or Z and Z.2.

64

## TWO HUNDRED ELEVENTH SPECIFICATION

### WILLFULLY OR GROSSLY FAILING TO COMPLY WITH FEDERAL, STATE, OR LOCAL LAWS RULES OR REGULATIONS GOVERNING THE PRACTICE OF MEDICINE

Respondent is charged with committing professional misconduct as defined by New York Education Law §6530(16)

211.    The facts in paragraphs Z and Z.1, Z and Z.2, and/or Z and Z.3.

## TWO HUNDRED TWELFTH THROUGH TWO HUNDRED THIRTY-FOURTH SPECIFICATIONS

### PERFORMING PROFESSIONAL SERVICES WHICH HAVE NOT BEEN AUTHORIZED BY THE PATIENT

Respondent is charged with committing professional misconduct as defined by New York Education Law §6530(26)

212.    The facts in paragraphs A and A.3, and/or A and A.7.

213.    The facts in paragraphs B and B.3, and/or B and B.7.

214.    The facts in paragraphs C and C.3, and/or C and C.7.

215.    The facts in paragraphs D and D.3, and/or D and D.7.

216.    The facts in paragraphs E and E.3, and/or E and E.7.

217.    The facts in paragraphs F and F.3, and/or F and F.7.

218.    The facts in paragraphs G and G.3, and/or G and G.7.

219.    The facts in paragraphs H and H.3, and/or H and H.7.

220.    The facts in paragraphs I and I.3, and/or I and I.7.

221.    The facts in paragraphs J and J.3, and/or J and J.7.

65

222.    The facts in paragraphs K and K.3, and/or K and K.7.

223.    The facts in paragraphs L and L.3, and/or L and L.7.

224.    The facts in paragraphs M and M.3, and/or M and M.7.

225.    The facts in paragraphs N and N.3, and/or N and N.7.

226.    The facts in paragraphs O and O.3, and/or O and O.7.

227.    The facts in paragraphs P and P.3, and/or P and P.7.

228.    The facts in paragraphs Q and Q.3, and/or Q and Q.7

229.    The facts in paragraphs R and R.3, and/or R and R.7.

230.    The facts in paragraphs S and S.3, and/or S and S.7.

231.    The facts in paragraphs T and T.3, and/or T and T.7.

232.    The facts in paragraphs U and U.3, and/or U and U.7.

233.    The facts in paragraphs V and V.3, and/or V and V.7.

234.    The facts in paragraphs W and W.3, and/or W and W.7.


## TWO HUNDRED THIRTY-FIFTH THROUGH TWO HUNDRED FIFTY-EIGHTH SPECIFICATIONS

### FAILING TO MAINTAIN RECORDS

Respondent is charged with committing professional misconduct as defined by New York Education Law §6530(32)

235.    The facts in paragraphs A and A.13.

236.    The facts in paragraphs B and B.13.

66

237. The facts in paragraphs C and C.13.

238. The facts in paragraphs D and D.13.

239. The facts in paragraphs E and E.13.

240. The facts in paragraphs F and F.13.

241. The facts in paragraphs G and G.13.

242. The facts in paragraphs H and H.13.

243. The facts in paragraphs I and I.13.

244. The facts in paragraphs J and J.13.

245. The facts in paragraphs K and K.13.

246. The facts in paragraphs L and L.13.

247. The facts in paragraphs M and M.13.

248. The facts in paragraphs N and N.13.

249. The facts in paragraphs O and O.13.

250. The facts in paragraphs P and P.13.

251. The facts in paragraphs Q and Q.13.

252. The facts in paragraphs R and R.13.

253. The facts in paragraphs S and S.13.

254. The facts in paragraphs T and T.13.

255. The facts in paragraphs U and U.13.

256. The facts in paragraphs V and V.13.

257. The facts in paragraphs W and W.13.

258. The facts in paragraphs X and X.1, and/or Y and Y.1.

67

DATE: November      , 2017
        Albany, New York

_____
MICHAEL A. HISER, ESQ.
Deputy Counsel
Bureau of Professional Medical Conduct

68

# APPENDIX "A"

| Patient A | Sarah Edmondson; |
|-----------|------------------|
| Patient B | Amanda Canning; |
| Patient C | Lauren Salzman; |
| Patient D | Livia Cohen; |
| Patient E | Allison Mack; |
| Patient F | Alicia Novak; |
| Patient G | Melissa Demmers; |
| Patient H | Maggie Dou; |
| Patient I | India Oxenberg; |
| Patient J | Soukaina Mehdaoui; |
| Patient K | Michelle Salzman; |
| Patient L | Audrey McIntyre; |
| Patient M | Nicki Klein; |
| Patient N | Sylvie Lloyd; |
| Patient O | Pam Aristikitis; |
| Patient P | Nancy Salzman; |
| Patient Q | Ana-Lea Holland; |
| Patient R | Sahjo Haertel; |
| Patient S | Rosa Laura Junco; |
| Patient T | Jimena Garza; |

69

| | |
|---|---|
| Patient U | Corolla Garza; |
| Patient V | Nicole Isbal; |
| Patient W | Angelica Hinjos; |
| Patient X | Barbara Jeske; and |
| Patient Y | Pam Cafritz |

70

# Attachment 3

Email from OPMC Prosecutor Conklin, dated December 1,2017

**From:** Conklin, Jeffrey J (HEALTH) [mailto:jeffrey.conklin@health.ny.gov]
**Sent:** Friday, December 01, 2017 12:31 PM
**To:** Michael Kelton <MKelton@Abramslaw.com>
**Subject:** ████████████ and Danielle Roberts, M.D.


Michael: Our investigation has continued, which has resulted in new evidence and confirmation of the charges of professional misconduct against ████████ and Dr. Roberts. With the possibility of separate criminal investigations ongoing, please let me know whether your clients have reconsidered the offers of the voluntary Surrenders with the modest Statements of Charges. If they are willing to voluntarily surrender their licenses, we will seek authority for you to speak to individuals involved with the parallel criminal investigations.

   If you are inclined to discuss these matters, you can call me at (518) 473-4219 (direct line) or (518) 275-1178 (cell). I also have access to my work e-mail at all times.


Jeffrey J. Conklin

Associate Counsel

Bureau of Professional Medical Conduct

Division of Legal Affairs

New York State Department of Health

Room 2516, Corning Tower

Empire State Plaza

Albany, New York 12237

(518) 473-4219

Jeffrey.conklin@health.ny.gov

# Attachment 4

OPMC Subpoena for Allison Mack, dated January 18, 2018

NEW YORK STATE                    DEPARTMENT OF HEALTH

<table>
<tr><td>IN THE MATTER<br>OF<br>AL-17-07-4422A</td><td>SUBPOENA<br>AD<br>TESTIFICANDUM<br>AND<br>DUCES TECUM</td></tr>
</table>

THE PEOPLE OF THE STATE OF NEW YORK

TO:    Allison Mack
       127 Grenadier Court
       Clifton Park, New York 12065-6583

PURSUANT TO THE AUTHORITY OF N.Y. Pub. Health Law § 230(10)(a), the State Board for Professional Medical Conduct (the Board) is conducting an investigation of possible professional misconduct within the meaning of N.Y. Educ. Law §§ 6530 and 6531 by an individual licensed to practice medicine in the State of New York.

The Board is required to conduct this investigation by N.Y. Pub. Health Law § 230(10)(a).

PURSUANT TO N.Y. Pub. Health Law § 230(11)(a), all complaints of possible professional misconduct received by the Board must remain and are kept confidential.

PURSUANT TO THE AUTHORITY OF N.Y. Pub. Health Law §§ 230(10)(k) and (l), on November 1, 2017, a committee on professional conduct (the Committee) reviewed the complaint and investigatory materials in connection with the above-captioned matter. The committee determined that the complaint is authentic and that there is sufficient substance to warrant investigation into the professional conduct of the physician named therein. The Committee, having concluded that the preliminary investigation justifies the issuance of subpoenas in furtherance of the investigation, specifically authorized the issuance of subpoenas in this matter. The instant subpoena requires the production of documents necessary to the proper investigation of the possible professional misconduct.

1

YOU ARE HEREBY COMMANDED to appear and be examined before the designee(s) of the Director of the Office of Professional Medical Conduct, pursuing an investigation on the authority of the State Board for Professional Medical Conduct, New York State Department of Health, pursuant to Pub. Health Law §§230(10)(a)(i), Empire State Plaza, Corning Tower, Room 2512, Albany, New York 12237, on February 14, 2018, at 10:00 a.m., or at such other adjourned date, time or place as may be directed.

Failure to comply with this Subpoena Ad Testificandum may subject you to such penalties as are provided by the laws of the State of New York.

YOU ARE HEREBY FURTHER COMMANDED to produce before the Office of Professional Medical Conduct at New York State Department of Health, Empire State Plaza, Corning Tower, Room 2512, Albany, New York 12237, on or before the 14th day of February, or at such other adjourned dates, times and places as may be scheduled, the following documents now in your possession or under your control:

1)    Any and all records, written communications (whether by text messaging or other text or messenger apps, e-mails, social media posts, or correspondence) photographs, movies, videos, and cellphone videos regarding marks (symbols, initials or other letters) made by use of a cauterizing pen (or other medical device) upon you by Danielle Roberts, D.O.

2)    Any and all records, written communications (whether by text messaging or other text or messenger apps, e-mails, social media posts, or correspondence) photographs, movies, videos, and cellphone videos regarding the disinfectants, bandages, masks and gloves utilized at the times marks (symbols, initials or other letters) were made by use of a cauterizing pen (or other medical device) upon you by Danielle Roberts, D.O.

2

3)        Any and all records, written communications (whether by text messaging or other text or messenger apps, e-mails, social media posts, or correspondence) photographs, movies, videos, and cellphone videos regarding the instructions for wound care given to you at the time marks (symbols, initials, or other letters) were made by use of a cauterizing pen (or other medical device) upon you by Danielle Roberts, D.O., including, but not limited to, the type of bandages to be applied, the frequency when bandages should be changed, the application of Neosporin, ointments, coconut oil, and/or lavender to the wounds, and the frequency of said applications, and taking photographs of the wounds, and the frequency of said photographs.

OR

4)        Legible photocopies of the material described in paragraphs (1), (2) and (3), above, certified to be true and complete copies thereof.

AND UPON YOUR FAILURE to produce as required above, you may be held subject to such penalties as are provided by the laws of the State of New York.

WITNESS,     Robert Catalano, M.D., Executive Secretary
             State Board for Professional Medical Conduct

DATED:       January 18, 2018
             Albany, New York

                              Robert Catalano, M.D., Executive Secretary
                              State Board for Professional Medical Conduct

                              By: _____
                                   JEFFREY J. CONKLIN, ESQ.
                                   Associate Counsel/ BPMC

Inquiries to:

Jeffrey J. Conklin, Esq.
Associate Counsel
Bureau of Professional Medical Conduct
(518) 473-4219

3

# Attachment 5

Declaration of Danielle Roberts, dated June 15, 2022

## Declaration of Danielle Roberts

1. My name is Danielle Roberts, DO, MS.
2. I currently reside in St. Francis, Wisconsin.
3. I graduated from Binghamton University Cum Laude in 2003 with a degree in Psychobiology. I completed a dual degree as a Doctor of Osteopathic Medicine with a Masters in Clinical Nutrition in 2008. I completed my Family Practice Residency in 2011. Since, I have served our communities as a hospitalist in 4 different hospitals from 2012-2017, as a Medical Director of an Integrative Medical Practice from 2011-2013, and as an entrepreneur creating and developing 4 different movement and wellness systems and certifications for prevention from 2013-2018, one of which was implemented in 3 countries.
4. I was a second-line member of DOS and was invited by Allison Mack.
5. I served as the primary branding artist for those who got a brand.
6. I have key information I could have offered to the defense counsel in Keith Raniere's case to dispel much of the testimony that was given at trial about how DOS worked, its procedures and practices, the branding process, and my experiences in DOS with Allison Mack, and India and Nicole who were in my circle.
7. I could have given direct testimony that would have challenged Nicole's narrative in general, and specifically about her spending a few hours transcribing videos with me, for Pamela Cafritz's memorial service, which the Government argued was "forced labor."
8. As a second-line member of DOS, I directly experienced the processes and protocols being developed and implemented by the first line.
9. My testimony would have attested to the rigorous and thoughtful enrollment process each woman would have undergone who decided to join, and the conditions surrounding the collateral.
10. This would have clearly illustrated that the collateral was used as a tool to back our promises to ourselves, like surety, not as a tool of fear, force, or blackmail as was alleged by the Government and by Nicole.
11. I believe much of my testimony would have helped to dispel, if not completely dismantle, the Government's theory of sex trafficking and forced labor. I was similarly situated to Nicole, both of us being in the same circle of DOS.
12. In addition, I have been a close friend and business partner of Mr. Raniere.
13. I had known him for approximately six years at the time of the trial.
14. I had worked very closely with him for four years building our company exo|eso, and I worked very closely with him and his closest chosen family in caring for Ms. Pamela Cafritz in her two-year struggle with metastatic renal cancer before she passed away in 2016.
15. I cared for Ms. Cafritz in their home and, at the end, around the clock.

16. As such a close friend, I could have offered essential and reliable testimony as to the consistency of Mr. Raniere's character and conduct.

17. I believe my testimony would have strongly contradicted the handful of Government witnesses' narrative of Mr. Raniere's alleged sinister intent.

18. Instead of being afforded an uninfluenced right to testify under oath as to the nature and purpose of DOS and my experience, I was threatened and intimidated into silence by the actions of U.S. Governmental agencies, including the EDNY, which I will describe below, and significant media pressure.

19. In and around Oct. 2017, the time when Mr. Raniere and five others were being indicted, the New York Times published an article that criticized NYS Governor, Andrew Cuomo, for choosing not to investigate my medical license.

20. In the summer of 2017, the Office of Professional Medical Conduct (OPMC), part of the NYS Health Department, had already issued a written decision, in response to a complaint from Ms. Sarah Edmondson, stating that my actions as a branding artist for DOS was NOT the practice of medicine.

21. Two days after the New York Times article, the OPMC, in contravention of their prior decision, launched an investigation into my private and professional life.

22. This decision (to act outside of their jurisdiction) cost me my contract as a hospitalist at Columbia St. Mary's Hospital (which I had served loyally for 5 years) and every other job I tried to pursue over the next 2 years in the medical field. This was the beginning of dismantling my reputation, credibility, and financial stability.

23. The OPMC threatened me with a salacious, highly exaggerated statement of charges to subpoena information from me, and other women (not related to the practice of medicine and quite possibly to try to collect further information in relation to Mr. Raniere's criminal case).

24. These initial allegations are very different from the allegations the Health Dept. finally published against me about three years later. The Health Dept. continually found ways to try to intimidate me to surrender my license, including highlighting their right to use any information I may state as testimony to defend my medical license and livelihood, as grounds for criminal charges. Clearly discouraging me from testifying in any way in relation to the federal case.

25. OPMC prosecutor, Jeffery Conklin indicated that any testimony I gave in my medical hearing could be used to support a criminal indictment, thus inextricably linking the federal case and my medical hearing. Therefore, any evidence uncovered or testimony given by me (or others) in my hearing could have been used in the federal case to challenge the prosecutors narrative.

26. The women that were subpoenaed through my case, also pleaded the 5th amendment for fear of prosecutorial retaliation, reputational damage, and financial consequence.

27. Seeing I was not amendable to surrendering my license (and that I would likely testify at my own hearing), my hearing was held in abeyance for approximately 2 years, until September 2019, when the federal trial was complete (June 2019) and convictions made.

28. It is precatory that the OPMC present a case to the state board no more than 90 days after an initial interview is offered to a physician/defendant. It was 2 years before the OPMC moved my hearing forward. In order to justify their delay, and divergence from their standard, they offered another "initial" interview so that the hearing would be within the "90 day window". This was a severe deviation from the standard, during which I was unable to work, and timed exactly with the progression of the criminal trial.

29. The consequences of these unjustified tactics and actions led to the loss of my livelihood.

30. I had to sell my home and most of my possessions and eventually had to change careers to support myself and pay legal fees.

31. In addition to the significant intimidation and financial duress I was placed under, the Federal Government invaded and threatened our community, followed us in our cars, sat outside our homes in their vehicles, and raided Ms. Salzman's home just a few blocks from my home.

32. As a gesture of cooperation, NXIVM had closed their offices and I was sufficiently intimidated that I closed my company, exo|eso™ as well.

33. I sought legal representation and was represented by attorney Michael Kelton, Esq. of Abrams Fensterman, LLP for my matters with the OPMC and attorney Daniel Stein, Esq. of Mayer Brown, LLP for any matters pertaining to possible criminal charges. In April 2018, the prosecutor's in Mr. Raniere's case informed Mr. Stein that they wanted to speak with me.

34. Mr. Stein offered that I comply, if they offered me protection from prosecution.

35. Then-Assistant US Attorney Moira Kim Penza, the lead prosecutor, granted limited immunity. The limited protections of the proffer agreement stated that the proffer agreement did not constitute a cooperation agreement. Should there be any criminal exposure for me discovered in the course of the interview, that my participation in the proffer and continued cooperation would be helpful in resolving such issues.

36. However, Ms. Penza stated that she was not making any promises to resolve any matter in any particular fashion.

37. It became clear to me that if I was of help to the prosecution, it would be beneficial to me.

38. There were many moments over the course of the two, full eight-hour-long proffer sessions that Ms. Penza seemed very fixed in her viewpoints about NXIVM and DOS; especially pertaining to my experience and perspectives regarding the collateral I voluntarily gave in exchange for mentorship (however unconventional), and the incorporation of Mr. Raniere's initials into the meanings of the brand.

39. When I shared my viewpoints, based on my personal experiences, she often seemed to get visibly upset and perseverated on those specific points and others that offered a different motivation other than coercion.

40. I recall one instance in particular where, for around fifteen minutes, she argued with me about my experience of collateral. I explained that collateral was a tool I chose to use to build self-trust and self-reliance, to back my promises and that it was not, nor was it intended to be, a tool of coercion or extortion. My attorney eventually needed to step in to point out her behavior and redirect her.

41. She displayed the same behavior when discussing the intent and meaning behind what I was told the incorporation of Mr. Raniere's initials meant in the symbol that was created by the 1st line members. She again was insistent the meaning was related to control, possession, and coercion, when that was not my opinion at all.

42. By the end of the interview on May 11, 2018, it became clear to me that Ms. Penza had solely two possible viewpoints: 1) I was a co-conspirator of a massive criminal enterprise, or 2) I was a victim of the situation that had been brainwashed and couldn't think for myself.

43. It did not seem to me that she was open to the possibility, which I believe to be the truth, that this group of people, including Keith Raniere, was innocent and well-intended, even if some mistakes were made.

44. Consistent with my observation, at the end of the first interview she offered me victim support services so that I could be properly treated for the abuse that she decreed that I had undergone, even though I did not, and do not feel, I was abused nor can I measure objectively any destruction of my life or life's work by the practices I engaged in in DOS. In fact, I experienced quite the opposite and I conveyed that in my proffer interviews.

45. Ms. Penza's comments to me at the end of the first interview indicated to me that she had dismissed my testimony, my positive experience, and rendered me incompetent in her mind in order to maintain her theory of the case and the foundation she needed to "win."

46. At the end of the second interview, she threatened to subpoena me to testify in the trial against Mr. Raniere. I made it clear I was not interested in helping her.

47. I also knew that if I were to testify in support of the defense, Mr. Raniere, she may change her mind about me, if it served her, and I could then become a co-conspirator in her assessment, open to indictment, even though I had done nothing wrong or criminal.

48. Based on my initial direct experiences with Ms. Penza, she seemed disinterested in the truth and unwilling to examine any contrary perspective to one of abuse and coercion.

49. I was effectively intimidated from giving crucial testimony to the case.

50. Ms. Penza did not choose to call me to testify.

51. The actions of Ms. Penza were the straw that broke the camel's back and successfully intimidated me from testifying in the criminal proceedings.

52. I declare under penalty of perjury of the laws of the United States of America that the foregoing is true and correct, and of my own personal knowledge, except as to those matters stated upon information and belief. As to those matters, I believe them to be true.

Executed on June 15, 2022 at St. Francis, Wisconsin.

_Danielle Roberts_

Danielle Roberts



Jaclene Elyse Dobbins-Baptiste

NOTARY PUBLIC
STATE OF NEVADA

Appt. No. 21-1883-01

Expires December 12, 2025

Notarized online using audio-video communication

State of Nevada

County of Clark

Signed and sworn to (or affirmed) before me

on 06/14/2022 by Danielle Roberts.

_Jaclene Elyse Dobbins-Baptiste_

# Attachment 6

Letter on behalf of Allison Mack to OPMC, dated February 2, 2018

# ABRAMS A F FENSTERMAN

Abrams, Fensterman, Fensterman, Eisman, Formato, Ferrara, Wolf & Carone, LLP

Attorneys at Law
www.abramslaw.com

1 MetroTech Center
Suite 1701
Brooklyn, New York 11201
Phone: (718) 215-5300
Fax: (718) 215-5304
Fax Not For Legal Service

FIRM OFFICES
___
Lake Success
New York
Rochester

February 2, 2018

**VIA EMAIL AND FIRST-CLASS MAIL**
Jeffrey Conklin, Esq.
New York State Department of Health
Office of Professional Medical Conduct
Riverview Center
150 Broadway, Suite 355
Albany, New York 12204-2719

Re: OPMC # AL-17-07-4422A

Dear Mr. Conklin:

As you know, this office has been retained by Allison Mack in connection with the Administrative Subpoena ad Testificandum and Duces Tecum ("the Administrative Subpoena") issue to her by BPMC.

Ms. Mack is neither a licensee of the state of New York, nor a holder of a limited permit, medical resident, physician, physician assistant's or specialist's assistant subject to the jurisdiction of the Department of Health. As such the Department of Health has no jurisdiction over Ms. Mack, nor any legal authority to compel her to respond to the Administrative Subpoena. *See* N.Y. Public Health Law §230 generally, and §230(7)(a).

It is Ms. Mack's position that, inasmuch as she is not subject to the jurisdiction of the Department of Health, the Administrative Subpoena provides no legal compulsion to require her to provide the materials and testimony requested therein. As such, she will not comply with the Administrative Subpoena.

Further, it is Ms. Mack's position that the Administrative Subpoena is based upon nothing more than an unsubstantiated fishing expedition infringing upon her constitutionally protected personal affiliations and lifestyle choices, and does not satisfy the threshold requirement of a good faith basis by which to compel her response.

In responding to the Administrative Subpoena in the manner set forth herein, Ms. Mack

neither admits nor denies that she has any of the requested items or materials in her possession or under her control, or that she possesses any relevant and material information in connection with BPMC's purported investigation.

Ms. Mack recognizes that BPMC may seek legal redress in the appropriate forum. Should such action be taken, demand is made on behalf of Ms. Mack, that the undersigned be given reasonable advance notice of such action and an opportunity to be heard in connection therewith.

Very truly yours,

Michael S. Kelton

cc: Allison Mack

# Attachment 7

OPMC Interview Offer, dated February 5, 2018

**NEW YORK STATE OF OPPORTUNITY.**

# Department
# of Health

**ANDREW M. CUOMO**
Governor

**HOWARD A. ZUCKER, M.D., J.D.**
Commissioner

**SALLY DRESLIN, M.S., R.N.**
Executive Deputy Commissioner

February 5, 2018

**CERTIFIED MAIL - RETURN RECEIPT REQUESTED**

**PERSONAL AND CONFIDENTIAL**

Danielle Roberts, DO
c/o Michael S. Kelton
Abrams Fensterman
1 MetroTech Center Suite 1701
Brooklyn, New York 11201

RE: OPMC# AL-17-07-4422A

Dear Dr. Roberts:

The Office of Professional Medical Conduct (OPMC) within the New York State Department of Health is authorized to investigate instances or complaints of suspected professional misconduct. OPMC is currently investigating your medical conduct.

Public Health Law Section 230(10)(a)(iii) provides that in all matters referred to an investigation committee of the Board for Professional Medical Conduct, the licensee shall have an opportunity to be interviewed by OPMC in order to provide an explanation of the issues under investigation and to submit written comments or expert opinions to OPMC. You may have legal counsel present during this interview. A copy of the report of interview from OPMC will be provided to you within 30 days of the conclusion of your interview. You may have a stenographer present to transcribe the interview (at your own expense). You must provide a copy of the transcribed interview to this office within 30 days of the conclusion of the interview. After review of the transcript, if there are no inconsistencies, a Memorandum of Investigation will be provided to you within 15 days. Please see the enclosed Information for Licensees as well as information regarding infection control practices.

The matters under investigation are listed below. The questions that will be presented to you during the interview will, for the most part, address these matters. However, the discussion may, if appropriate, cover other areas relevant to the evaluation, diagnosis, treatment, and follow-up provided to the specified individuals during the specified timeframes, as well as other professional conduct, including, but not limited to, medical procedures performed on the individuals, and the circumstances before, during and after such medical procedures.

The issues under investigation are:

- Whether you used a cauterizing pen, or other medical device, to burn letters, initials, symbols or other marks upon the bodies of Sarah Edmondson, Audrey

McIntyre, India Oxenberg, Pamela Arstikaitis, Rosa Laura Junco, Allison Mack, Lauren Salzman, Sylvie Lloyd, Sahajo Haertel, and Nicole Clyne, and/or other individuals, during the period of 2009 to the present.

- Whether before, during and after the times when you used a cauterizing pen or other medical device to burn letters, initials, symbols or other marks upon the bodies of the above referenced individuals, you performed such procedures in an appropriate sterile environment, administered anesthesia, used proper equipment, and took necessary infection control steps.

- Whether you permitted multiple women in a state of nakedness to hold down the limbs of the above referenced individuals (who were also naked) in an unsterile environment, without administering anesthesia, without using proper equipment and taking necessary infection control steps while using a cauterizing pen or other medical device to burn letters, initials, symbols or other marks upon the bodies of such individuals.

- Whether you provided medical care and treatment to the above referenced individuals, and/or advised such individuals as to wound care.

- Whether you maintained medical records for each of the above referenced individuals.

- Whether videos were taken of the above referenced individuals at the time you used a cauterizing pen, or other medical device, to burn letters, initials, symbols, and/or other marks upon their bodies.

- The circumstances under which you used a cauterizing pen, or other medical device, to burn letters, initials, symbols, and/or other marks upon the bodies of the above referenced individuals.

- Whether you failed to report a virus outbreak during a retreat held at the Silver Bay YMCA in August and September 2016 to public authorities.

- Whether your physician profile, which was last updated on January 13, 2010, is presently current and compliant with law.

Please note that New York State Public Health Law (NYSPHL) Section 2995 mandates that physicians actively registered to practice medicine in New York State complete a Physician Profile Survey which they are required to update within six months prior to the expiration of each biennial registration period, as a condition of registration renewal. Your profile has **not** been updated as required. You must update your physician profile prior to this interview. The updates can be made on line through your Health Commerce System (HCS) account or by requesting a survey via telephone at 1-888-338-6998. Failure to update your profile as required may result in disciplinary action.

You may provide written comment and/or expert opinion that is directly relevant to the issues identified in this letter or during the interview. In addition, you are directed to provide the following identifying information, which may be provided in the form of a curriculum vitae: full name, date of birth, place of birth, residence address/phone number, office address/phone number, all states where currently or previously licensed, medical school/year graduated, residency location(s)/dates, internship location(s)/dates, current practice type and specialty, current hospital/health maintenance organization affiliations, and past hospital affiliations. Please also provide a list of all professional corporations/businesses in which you are an owner or partner, and a list of all private corporations by which you are employed.

Please telephone me at 518-408-5431 no later than February 26, 2018 to either schedule this interview or decline this opportunity for an interview. This interview must be scheduled no

sooner than 20 days from receipt of this letter, (unless you wish to waive this 20 day period), and no later than March 12, 2018.  A declination must be followed up in writing to me at **New York State Department of Health, Office of Professional Medical Conduct, Riverview Center, 150 Broadway, Suite 355, Menands, New York 12204**.  Failure to contact this office to schedule an interview or failure to show for the interview on the scheduled date will be considered a declination of your opportunity for an interview.  If you or your attorney wish to discuss this matter further, please contact me at your earliest convenience.  Thank you.

Sincerely,

Jason Warn
Supervising Medical Conduct Investigator
Office of Professional Medical Conduct

Enclosures

# Attachment 8

Email from OPMC Prosecutor Conklin, dated June 27, 2019



**From:** Conklin, Jeffrey J (HEALTH) <jeffrey.conklin@health.ny.gov>
**Sent:** Thursday, June 27, 2019 9:06 AM
**To:** Michael Kelton ██████████████████
**Subject:** Matter of Roberts


Michael: As you may recall, we discussed negotiated resolutions of the Porter and Roberts matters back in 2017. With regard to Dr. Porter, the penalty included, among other parameters,  a two year suspension dated from October of 2017. Had that offer been accepted, Dr. Porter would be in a position to resume his medical career in 4 months. Of course, we do  not have an Order and Decision in the case.

   Before completing our investigation and initiating a hearing in the Roberts case, this e-mail is to inquire whether Dr. Roberts is inclined to consider a resolution short of a permanent surrender. I do not have the authority to accept any such offer, but would

discuss the same with my superiors. If Dr. Roberts does not intend to conduct negotiations under any circumstances, please advise.

I hope you are enjoying the summer.

Jeffrey J. Conklin

Associate Counsel

Bureau of Professional Medical Conduct

Division of Legal Affairs

New York State Department of Health

Room 2516, Corning Tower

Empire State Plaza

Albany, New York 12237

(518) 473-4219

Jeffrey.conklin@health.ny.gov



# Attachment 9

Emails from OPMC Prosecutor Conklin from October 2019

**From:** Conklin, Jeffrey J (HEALTH) <jeffrey.conklin@health.ny.gov>
**Sent:** Thursday, October 10, 2019 3:03 PM
**To:** Michael Kelton <MKelton@Abramslaw.com>
**Subject:** Matter of Roberts

Michael: This e-mail is to follow-up on our recent communications regarding the Roberts matter. If at any time in the future your firm is no longer representing Dr. Roberts, please advise. As you know, Dr. Roberts sent a letter which indicated that she would be unable to afford the services of an attorney.

The investigation by OPMC continues. At the time this case is submitted to an Investigation Committee, and if it is voted to hearing, I will advise you immediately. If that occurs, of course, Dr. Roberts will be offered an opportunity to be interviewed.

I would ask that you bring to the attention of Dr. Roberts Public Health Law Section 230 (9-a). Pursuant to this provision, "At any time, if the board or professional medical conduct or the office of professional medical conduct determines that there is a reasonable belief that an act or omission that constitutes a crime under the law of the state of New York, or any other state, or the United States has been committed by the licensee, the board for professional medical conduct shall notify the appropriate law enforcement official or authority."

Thank you.


Jeffrey J. Conklin

Associate Counsel

Bureau of Professional Medical Conduct

Division of Legal Affairs

Roberts - 430

Michael: Over the course of time, I have advised you of the offer of a license surrender, with a modest Statement of Charges (alleging negligence on more than one occasion regarding the use of a medical device - cautery pen).

I have met with 2 expert witnesses, who are expected to be called as witnesses at the professional misconduct hearing. Additionally, I am in receipt of devastating evidence against Dr. Roberts (through investigation, interviews of witnesses, and evidence from the AUSA involved in the criminal prosecution of Keith Ranieri and other NXIVM semembers.

Based upon the foregoing, the Statement of Charges will include many more Specifications than the draft previously forwarded to you.

If Dr. Roberts had accepted the settlement offer from October of 2017, she would be able to practice medicine at this time. Again, I am reiterating the opportunity for Dr. Roberts to surrender her license, with the less serious allegations. In 3 years, Dr. Roberts can reapply for restoration of her medical license. If this case is voted to hearing, and the testimony and other evidence goes as expected, the Department will seek revocation of Dr. Roberts' license. Additionally, by reason of the egregious nature of her professional misconduct, we will request the imposition of the maximum monetary fines. In the event a Hearing Committee sustains the charges of professional misconduct and revokes Dr. Roberts' medical license, the chances of restoration in the future would be greatly diminished.

I urge Dr. Roberts in the strongest possible terms to accept the offer to resolve this matter.

Please forward this e-mail to Dr. Roberts. Thank you.

Roberts - 431

Sent from my iPhone

**Timeline & Records of New York State OPMC's Prosecution of Danielle Roberts**

In July 2017, Sarah Edmondson ("Edmondson"), a former member DOS[1], filed a complaint with the Office of Professional Medical Conduct ("OPMC") after receiving a brand from Danielle Roberts ("Danielle"). Danielle, a physician, was a DOS member. The brand was done with an electrocautery pen, similar to tattooing as they both involve the use of heat to alter tissue.

The OPMC dismissed the complaint, stating that the cauterization, branding, "did not occur within the doctor-patient relationship" and "[is] not medical misconduct [by Danielle]" but "should be reported to law enforcement."[2]

Notably, Lauren Salzman, a cooperating witness for the government, who recruited Edmondson into DOS, testified in the trial of Keith Raniere that prospective DOS members were informed beforehand that joining would involve receiving a brand.[3]

On October 17, 2017, a *New York Times* article[4] revealed DOS' existence, while focusing on Edmondson's claims about forcibly receiving a brand—claims that are demonstrably false.[5]

The article criticized the OPMC for not taking action and cited a text message where a state police investigator told Edmondson and 2 other women that their criminal complaint would not be pursued because the "actions had been **consensual**."

Two days later, the *New York Times* followed up, quoting Richard Azzopardi, spokesperson for then Governor Andrew Cuomo, "[o]fficials in New York State plan to review why regulators and others did not act."[6]

Shortly after the *New York Times* articles, the OPMC reversed its dismissal. On or about November 17, 2017, Danielle received an unsigned, undated 70-page Statement of Charges from the Bureau of Professional Medical Conduct ("BPMC") by its Deputy Counsel .[7]

---

[1] In 2015, Keith Raniere co-founded a private women's self-empowerment group, a non-collegiate sorority, called DOS.

[2] *See* Attachment 1, Letter from OPMC to Ms. Edmondson, dated July 11, 2017.

[3] *See* Trial T. (5/20/19) at 1602:9-1603:17.

[4] *See* Barry Meier, Inside a Secretive Group Where Women Are Branded, *N.Y. Times*, October 17, 2017, https://www.nytimes.com/2017/10/17/nyregion/nxivm-women-branded-albany.html.

[5] *See* Dr. Danielle Roberts' Statement in Response to the Revocation of Her Medical License, https://www.drdanielleroberts.com/sovereignty/dr-danielle-roberts-statement-in-response-to-the-revocation-of-her-medical-license; *see* also Trial T. (5/20/19) at 1749:1-15 (Lauren Salzman describing the conditions of Ms. Edmondson's branding ceremony).

[6] *See* Complaints About Branding Inside Secretive Group Are Under Review, *N.Y. Times* (Oct. 19, 2017), https://www.nytimes.com/2017/10/19/nyregion/complaints-by-ex-nxivm-members.html.

[7] *See* Attachment 2, OPMC Statement of Charges.

1

The Statement of Charges alleged medical misconduct toward 25 individuals, including 2 who had passed away from natural causes long before these allegations were compiled. It also contained other demonstrably false claims, including:

- It claims Danielle gave a brand to Nancy Salzman, the 60+ year-old president of NXIVM, who, in fact, never received a brand.
- The statement accuses Danielle of giving brands to 12 specific women, none of whom received a brand.
- It claims Edmondson repeatedly "requested on multiple occasions that [Danielle] cease performing the branding procedure."[8] Video evidence from Edmondson's own branding session, which she consented to be filmed, shows no such requests to stop.[9]
- It claims "Edmondson believed that she was only having a tattoo applied to her pelvic region."[10] However, evidence confirms that Edmondson was fully aware and informed she would receive a brand, not a tattoo. She had been told about the brand in advance of joining DOS and even filmed the process of other DOS members receiving a brand before receiving her own.[11]

On December 1, 2017, Associate Counsel Jeffrey J. Conklin ("Associate Counsel Conklin") reminded Danielle, through counsel, about "the possibility of separate criminal investigations ongoing" and inquired as to whether Roberts would voluntarily surrender her license.[12]

On January 18, 2018, Associate Counsel Conklin subpoenaed 7 women[13], including DOS members India Oxenberg ("Oxenberg") and Allison Mack ("Mack"), (*I took out alleging bc the subpoena doesn't spell it out directly*) inferring they were victims of medical misconduct by Roberts. Mack was charged by the EDNY months later, and Oxenberg was designated as an "unindicted co-conspirator."

---

[8] *Id.* at 1 ¶ A(3).

[9] *See* GX 441_SE Video_v1, presented in In re Danielle Roberts, D.O., N.Y. Dep't of Health, State Bd. for Prof'l Med. Conduct.

[10] *See* OPMC Statement of Charges at 2 at ¶ A(7).

[11] *See* Trial T. (5/20/19) at 1747:11-20 (Lauren Salzman stating, "I think it was Sarah [Edmondson]" who filmed the first branding ceremony, prior to Edmondson's own).

[12] *See* Attachment 3, Email from Associate Counsel Conklin, dated December 1, 2017

[13] *See*, e.g., Attachment 4, BPMC Subpoena for Allison Mack

Danielle herself was a potential key defense witness. She was positioned within DOS under Mack and alongside the EDNY's primary alleged victim at that time. Roberts' experience and evidence directly contradicts the government's narrative of coercion, central to their case.[14]

The subpoenas "commanded" the women to appear at the OPMC office on February 14, 2018, and to bring emails, texts, photos, videos, and any other evidence relating to the cauterizing pen. These women contested the subpoenas[15]. Some had not received a brand at all, others received a brand from a tattoo artist, not Danielle, and all who received a brand had consented.

On February 5, 2018, Associate Counsel Conklin invited Roberts to provide information at an OPMC interview.[16] Danielle declined this "offer."

Under NY State Public Health Law Section 230(10)(iii), the Bureau of Professional Medical Conduct had **90 days** from the date of the interview offer to bring charges against Danielle, but failed to do so.

From March 2018 to June 2019, as the Eastern District pursued its criminal case against Keith Raniere, Allison Mack, and others, there was no further action from BPMC.

However, a week after Raniere's guilty verdict on June 27, 2019 and **507 days** after the February 2018 offer letter, Associate Counsel Conklin contacted Roberts' lawyer again, suggesting that Danielle might want to "consider a resolution short of a permanent surrender."[17]

By this time, approximately 450 days had passed since the interview offer, yet Associate Counsel Conklin had still not brought any charges, despite the legal requirement to do so within 90 days. During this time, Danielle was unable to secure medical employment after being terminated from her prior job or get malpractice insurance in New York due to the pending investigation.

Subsequently, Associate Counsel Conklin pressed Danielle to surrender her license, threatening her with license revocation, "the imposition of maximum monetary fines", the potential for "separate criminal investigations", and the possibility of "notifying appropriate law enforcement official or authority."[18]

---

[14] *See* Attachment 5, Declaration of Danielle Roberts, dated June 15, 2022, which was included in a Rule 33 motion for a new trial, dated June 21, 2022, in *US v. Keith Raniere* (EDNY), 18-cr-204, Doc. 1178.

[15] *See*, e.g., Attachment 6, Letter on behalf of Allison Mack to OPMC, dated February 2, 2018

[16] *See* Attachment 7, OPMC Interview Offer, dated February 5, 2018.

[17] *See* Attachment 8, Email from OPMC Prosecutor Conklin, dated June 27, 2019.

[18] *See* Attachment 9, Emails from OPMC Prosecutor Conklin from October 2019

On September 30, 2021, after a trial, the the New York Department of Health revoked Danielle's license. 2 years later, in 2023, the NYS Supreme Court denied her appeal, and the NYS Court of Appeals declined to review the case.

This timeline of actions can only demonstrate how the OPMC, influenced by media pressure in concert with New York State and DOJ influence, was improperly weaponized to support the federal prosecution of Mr. Raniere.

**NEW YORK STATE              DEPARTMENT OF HEALTH**

**STATE BOARD FOR PROFESSIONAL MEDICAL CONDUCT**

-------------------------------------------------------------------------------X

*IN THE MATTER*

*OF*

*DANIELLE ROBERTS, D.O.*

-------------------------------------------------------------------------------X

# RESPONDENT'S MEMORANDUM TO THE
# HEARING COMMITTEE

## Preliminary Statement

Respondent, Danielle Roberts, D.O., submits this Memorandum to the Hearing Committee in support of her position that the charges against her constitute an improper attempt by the Office of Professional Medical Conduct ("OPMC") to exercise jurisdiction over the purely private, non-medical conduct of a physician in violation of the New York Education Law and the New York Public Health Law.  This effort is not only dangerous for physicians but also is a gross misuse of resources as it places the State Board for Professional Medical Conduct in a position where it is being called upon to utilize its limited resources to pursue a purely political attack on perfectly legal and private activities. Moreover, the Courts have made it clear that the State Board, like all administrative agencies, is a creature of statute and, as such, has only the jurisdiction granted to it by the Legislature. *New York State Association of Nurse Anesthetists v. Novello, 189 Misc. 2d 564 (Sup. Ct. Albany Co. 2001) aff'd 301 AD2d 895 rev. on other grounds*

1

*2 NY 3d 2007 (2004).* The jurisdiction granted to the Board does not extend to the regulation of physicians in their private lives and to activities not considered the practice of medicine.   As we show below, the evidence adduced at the hearing demonstrates that branding is not a medical procedure and that Dr. Roberts was not engaged in the practice of medicine when she gave a brand to several women who sought out and consented to this activity for their own reasons.

## STATEMENT OF THE CASE

In an Amended Statement of Charges, OPMC asserted that Dr. Roberts committed professional misconduct by giving a brand to a number of women identified in the charges. (Exhibit 1) (Citations herein are to exhibits in evidence and to pages in the transcript.)  The women are referred to in the charges as "Patients A-G".  We decline to refer to the women who received a brand as "patients" because the evidence was quite clear, indeed overwhelming, that none of the women were patients of Dr. Roberts and did not see Dr. Roberts in her capacity as a physician.

OPMC was quite aware of this fundamental defect and fatal flaw in the legal validity of its charges. That is why the branding procedure is delineated as a "medical procedure" 55 times in the Amended Statement of Charges. Apparently, OPMC hopes that if you repeat a falsehood often enough, people (such as a Hearing Committee) will begin to believe it, a tactic sometimes employed by politicians.  A review of the relevant provision of the New York Education Law, however, makes it indisputable that the branding performed by Dr. Roberts was not a medical procedure.  Section 6521 of the Education Law is entitled "Definition of Practice of Medicine"

2

and provides that "The practice of the profession of medicine is defined as diagnosing, treating, operating or prescribing for any human disease, pain, injury, deformity or physical condition." There can be no doubt that this provision is applicable. A number of years ago, OPMC charged Elliot Gross, MD, with professional misconduct relating to several autopsies that he performed in the course of his position and professional duties as the Chief Medical Examiner for New York City.  During the administrative proceeding before the State Board for Professional Medical Conduct a motion was made to dismiss the charges as lacking in jurisdiction.  The argument in favor of dismissal was that forensic autopsies, which involve cadavers rather than live patients, do not fall within Section 6521 of the Education Law and thus are not the practice of medicine. This legal issue ultimately worked its way to the courts and the Appellate Division held that the State Board did have jurisdiction to hear and decide the charges against Dr. Gross but the Court's reasoning is especially pertinent to Dr. Roberts' case.  The Court recognized the applicability of Education Law Section 6521 but noted that an autopsy is the "ultimate diagnosis" and, as such, falls within the statutory definition of medical practice. *Matter of Gross v. Ambach, 126 A.D. 2d 21 (Third Dept. 1987) aff'd 71 N.Y.2d 859 (1988)*.  Thus, it is clear that Section 6521 must be considered in the determination as to whether branding is a medical procedure that is within the practice of medicine as defined by the New York Education Law. Accordingly, an analysis of Section 6521 and the pertinent facts is in order. Section 6521 contains a two-pronged test.  First, the activity must involve "diagnosing, treating, operating or prescribing."  While branding does not involve diagnosing, treating or prescribing, it arguably involves "operating."  But this is only the first prong of the test.  The "operating" must be for a human disease, pain, injury, deformity or physical condition.  It should be blatantly obvious that none of these criteria are implicated.

3

The women who received a brand were perfectly normal and healthy in all respects and OPMC presented no evidence to the contrary. No evidence was offered by OPMC that the women who received a brand had any "disease, pain, injury, deformity or physical condition." Since this second prong of Section 6521 was not met or satisfied, it is evident that branding is not a medical procedure and does not fall within the statutory definition of the practice of medicine.  The fact that branding may have some risks associated with it is utterly irrelevant. Many procedures and activities people choose to engage in on a regular basis carry associated risks (electrolysis, massage, fitness and yoga classes) but they are not considered medical practice just because a physician may administer or lead them.

To further illuminate the distinction between activities and contexts that carry risk with them but are outside the context of medical practice and the jurisdiction of the State Board, consider: there are many processes and activities people do every day that have risks associated but are not considered the practice of medicine – some even arguably closer to "treating a condition" than giving a brand could ever be. Take teaching an aerobics class; because the instructor is a physician would she be required to take a medical history on every person that gets on a spin bike in her aerobics class? Of course not; that would not be appropriate for the activity being engaged in. There are other responsibilities and standards that have been created for aerobics instructors to uphold that are appropriate for this activity and those who choose to participate have a responsibility to check with their physician or determine on their own whether they are fit for this activity. Though this activity could possibly treat a condition (diabetes, heart disease, musculoskeletal imbalances), it is not considered the practice of medicine and a physician who leads the activity would not be expected to treat it like a medical practice just

4

because he or she has a medical license. The physician would be expected to adhere to the standards associated with the activity – not the more rigorous standards of medical practice.

Branding is no exception. It is an unregulated activity which people choose to engage in at their local tattoo shop, fraternity, sorority or home. The branding technician/artist and the participant have responsibilities to keep each other safe during the process, and there are accepted standards and practices that apply – but these are not medical standards; they are branding standards. That the branding technician/artist is a physician does not alter the applicable standards.

The fact that branding is not a medical procedure under the applicable law and relevant facts, does not, however, automatically preclude the Board's jurisdiction. If this activity was performed in the course of Dr. Roberts' medical practice or it otherwise implicated her medical license, the Board could still reasonably exercise jurisdiction. For example, if a gynecologist performing a pelvic examination sexually touches a patient purely for his sexual gratification, everyone would agree that this conduct (the improper touching) would not be considered a medical practice or procedure. But everyone would also agree that the conduct represents "conduct in the practice of the profession which evidences moral unfitness to practice medicine" in violation of Section 6530 (20) of the Education Law. Thus, for the State Board's jurisdiction to be properly invoked, the conduct must fall within the definition of the practice of medicine (under Education Law Section 6521) or, at least, the conduct must have occurred in the environment and context of medical practice. The same analysis applies to all of OPMC's charges against Dr. Roberts relating to the branding process.

Dr. Roberts was charged with practicing the profession of medicine with gross negligence and gross incompetence and practicing the profession of medicine with negligence

5

and incompetence on more than one occasion based on the facts and circumstances surrounding the branding process. To establish these charges, OPMC was required to prove that not only was Dr. Roberts grossly negligent, grossly incompetent, and negligent and/or incompetent but also that her conduct occurred in the practice of medicine. She was also charged with engaging in conduct in the practice of medicine which evidences moral unfitness to practice medicine. The law is well-settled that the issue of whether conduct occurs in the practice of medicine is a factual determination to be made by a hearing committee based on all of the pertinent facts. With that in mind, we set forth below how the evidence adduced at the hearing demonstrates that Danielle was engaged in conduct that was clearly outside the practice of medicine and in no way implicated her medical license. Throughout this Memorandum, respondent is sometimes referred to as "Danielle" where the context indicates that she was not performing a medical procedure, was not engaged in the practice of medicine and was not regarded by others as their physician.

First and foremost is the fact that the women receiving a brand did not perceive that Danielle was functioning as a physician when she gave them a brand. Several women who received a brand from Danielle testified on her behalf. Each testified that she did not consider Danielle to be her physician. (1887, 1943, 1950-1951). Similarly, Dr. Roberts testified that she perceived herself to be acting as a branding technician rather than a physician and she did not consider the women to whom she gave brands to be her patients (750, 1337).

The women who received brands and who testified on behalf of Dr. Roberts were Jane Doe 3, Jane Doe 4 and Jane Doe 5. They testified that when they agreed to join DOS they were told that receiving a brand would be part of their initiation ceremony (1881-1882, 1939, 2013-2015). Not one of them testified that they were advised that they would be getting a tattoo rather than a brand. (1882, 1939, 2014-2015). Each of these women testified that when they agreed to

6

receive a brand they had no idea that a physician would be doing the branding and they were not relying on or contemplating that a physician would be doing the branding (1883, 1939-1940, 1943).  The only person who gave slightly different testimony was prosecution witness S.E. According to S.E., she was told that a small tattoo would be required and that she didn't know it would be a brand until much later on - the night the branding took place (793). S.E. further testified that she didn't want to receive a brand but she felt comforted by the fact that it would be done by a physician (796).  It seems unlikely that all of the other women who received a brand knew from the outset that a brand would be required and only S.E. was told that it would be a small tattoo.  It was apparent from her testimony that S.E. became angry at DOS and everyone involved with DOS including Danielle and was trying her best to incriminate Dr. Roberts. SE is the woman seen receiving a brand on the video in evidence (Exhibit 8C). She was confronted on cross-examination with information that she provided to an OPMC investigator which clearly is inconsistent with what can be plainly seen on the video (884-895). In an apparent effort to "reconcile" her prior statements with the video, S.E. claimed that the OPMC investigator got everything she told him wrong (884-895).  A far more likely explanation is that when S.E. realized that what she told the investigator was inconsistent with the video, she had to assert that the investigator's summary was inaccurate.  But even if S.E.'s testimony was truthful it still would not establish that a physician/patient relationship existed between her and Danielle on the day she received her brand.  It takes more than S.E. stating that she was "comforted" that a physician would be doing the branding to establish a physician/patient relationship.  Numerous other factors demonstrate that the branding did not take place in the context of a physician/patient relationship and that Danielle was acting as a branding technician/artist in a private capacity that was not part of medical practice. We set forth below some of these factors.

7

The branding was performed in a private home rather than in a hospital, medical facility or physician's office (1336-1337, 1886). The branding was not paid for (1338, 1886). No medications were prescribed. No scripts at all were written (1352). None of the formalities normally associated with medical practice were observed. No formal written informed consent was obtained (although verbal consent was documented as can be seen from the video in evidence). No history was taken and no physical examination was performed. No medical records were maintained. No insurance information was obtained. Insurance billing codes for branding don't exist.  The women who received a brand did not know who would be performing the branding (1943).  The women of DOS who received a brand initially (before Danielle became involved) received their brands from a branding artist (1315, 1323, 2019).  When they decided that future branding should be done in a more intimate setting, they considered several possible people to perform the task (2019-2021).  Only one of the candidates was a physician – Danielle. Clearly, the intent was not to select a physician but to pick amongst friends (1314).

Danielle agreed to the request that she perform the branding, but only after she received a brand herself and only after she satisfied herself that she could perform this task safely and competently (1322, 1327-1331).  It was necessary for her to research the subject and talk to branding artists because branding is not taught in medical school; there are no residencies in branding (1327-1331, 1784) and there was no way to learn about branding through traditional medical avenues.  Branding is not a medical practice or procedure; it is a form of commercial body art in the same manner as are tattooing and body piercing.  Thus, Danielle's knowledge about branding was not derived from her medical education, training or experience (1784).

.

8

A number of states regulate branding under the rubric of commercial body art.  For example, Arkansas, Idaho, Louisiana and Michigan, among many others, regulate branding as a form of commercial body art.  It is noteworthy that some of the states that regulate branding distinguish between branding performed for aesthetic or ritual purposes and branding performed incidental to medical practice.  See, for example, Michigan Body Art Facilities Act 210 PA 375 Section 3.1.9 which specifically distinguishes branding for aesthetic purposes from branding which the State Board determines to be medical in nature. It is only medical branding that falls within the jurisdiction of the medical board.  In New York, it is even more clear that aesthetic or ritual branding is outside the jurisdiction of the State Board for Professional Medical Conduct as branding is not regulated at all in New York.  Pursuant to Article 4-A of the New York Public Health Law, tattooing and body piercing (but not branding) are regulated activities that require a license issued by the Department of Health.  The only exemption is for physicians. Thus, a physician who performs tattooing or body piercing who does not possess a license issued pursuant to Article 4A necessarily relies upon his or her medical license for the legal authority to perform that activity.  But this is not true for branding.  Therefore, when a physician performs branding his or her medical license is not implicated because the physician does not need to rely upon a statutory exemption (as would be true for tattooing and body piercing) because branding is not regulated at all.

OPMC attempted to argue that Dr. Roberts was engaged in medical practice when she performed the branding because she used an electrocautery which is a "medical" device sometimes used by physicians in the course of medical practice (1070-1071).  But anyone can legally purchase an electrocautery – no medical license is required for such a purchase (1329,

9

1768). This is unlike an X-ray machine. Such machines can only be purchased by a hospital, medical facility or appropriately licensed person.

Moreover, an electrocautery was purchased by Danielle solely for the purpose of performing the branding that she was asked to do. Steve Haworth testified as a fact/expert witness on behalf of Dr. Roberts. He explained that he was the first person to utilize an electrocautery for the purpose of branding to replace strike branding with hot metal which was commonly used before he brought the electrocautery into vogue (1760-1761). Danielle purchased the same device used by Mr. Haworth (2124). It should thus be clear that Danielle's use of an electrocautery in no way implicated her medical license, medical education, medical training or medical experience and the device was only used for this single, non-medical purpose, i.e. branding.

OPMC's other arguments that Dr. Roberts was engaged in medical practice when she performed the branding (and thus subject to the jurisdiction of the State Board) are equally unavailing. OPMC pointed out that Dr. Roberts utilized bandages; she kept the brands clean; she wore gloves and the "patients" were placed on an "examining" table. All of these and other similar points are common to any branding procedure and in no way transform branding into an aspect of medical practice. OPMC also attempted to prove that Dr. Roberts was engaged in medical practice by offering the expert testimony of Dr. Robert Grant. But the expert testimony provided by Dr. Grant was not persuasive.

Dr. Grant conceded that there are no medical programs that involve branding. (1185). He further admitted that he has no experience whatsoever with branding (1185-11186). The primary argument advanced by Dr. Grant was utterly without merit. He attempted to argue that branding is analogous to cosmetic surgery. It was Dr. Grant's position that cosmetic surgery is universally

10

recognized as the practice of medicine. From this basic truism, he next argued that cosmetic surgery falls within the definition of the practice of medicine set forth in Section 6521 of the Education Law. He reasoned that cosmetic surgeons treat "psychic pain" that the patient has from having a part of their body that displeases them and results in a type of emotional pain that he labeled "psychic pain" (1191-1192). Since Section 6521 includes the treatment of pain as part of the definition of the practice of medicine, he argued that cosmetic surgery is therefore the practice of medicine. From this, Dr. Grant argued that branding is also medical practice because it too treats a type of psychic pain. He did not make clear, however, the basis for his position that persons receiving a brand are experiencing "psychic pain." In any event, his argument is so preposterous and without merit that ordinarily we would not even dignify it with a response. But the stakes in this case are too high to leave this absurd argument unchallenged.

Dr. Grant cited no authority whatsoever for his claim that all cosmetic surgery patients, are experiencing what he referred to as "psychic pain." Moreover, if he really believed that all of his cosmetic surgery patients are being treated for psychic pain, then it would be incumbent on him to arrange for every patient to undergo a psychiatric evaluation before having cosmetic surgery. He provided no such testimony and we seriously doubt that all of his cosmetic surgery patients are required to undergo a psychiatric evaluation before he operates on them. Furthermore, a simple hypothetical should suffice to show the lack of merit to Dr. Grant's argument.

Hypothesize a successful face model who is extremely happy with her appearance. She nevertheless is advised by her agent that she can earn substantially more money for each photo shoot if she has cosmetic surgery on her nose making it slightly smaller; she agrees to this for the financial reward despite being perfectly content with her appearance and having absolutely no "psychic pain" whatsoever with the way she looks. According to Dr. Grant's argument, the

11

cosmetic surgeon who performs the requested procedure would not be practicing medicine since in our hypothetical situation there is no psychic pain being treated.  But common-sense dictates that this hypothetical rhinoplasty is clearly the practice of medicine.  The reason that it is the practice of medicine is the same reason that all cosmetic surgery is considered the practice of medicine.  Cosmetic surgeons operate on or treat a "physical condition" that the patient wants to have addressed.  The physical condition could be a nose that the patient wants changed or wrinkles that he or she wants removed or a plethora of other physical conditions.  Since treating or operating on a "physical condition" falls within Section 6521, cosmetic surgery constitutes the practice of medicine.  While we do not doubt that in some instances patients undergoing cosmetic surgery will obtain some emotional or psychic benefit, this does not mean that this constitutes the basis for deeming cosmetic surgery as the practice of medicine.

Indeed, Dr. Grant's argument is so lacking in a rational basis, that one can only conclude that he was not acting as a non-partisan expert, but rather was creating an argument in an attempt to achieve a desired result – in other words, the end justifies the means.  It is also the case that while Dr. Grant is a highly experienced and respected plastic surgeon, neither his testimony nor his *curriculum vitae* demonstrates any legal training or background.  This is especially important in this case which did not present clinical issues in plastic surgery but rather involved a somewhat complex application of the facts to the applicable law.  The credentials of defense expert David Mayer, M.D., were, however, particularly pertinent to the expert testimony that he provided.

Dr. Mayer graduated from Cornell Medical College (1st in his class).  He performed a five-year residency in general surgery at New York Hospital-Weil Cornell Medical Center which he completed in 1978 (1469-1470).  He has been certified by the American Board of Surgery

12

since 1979 (1470).  Following his residency, Dr. Mayer practiced as a busy general and vascular surgeon in the Northwell Health System.  He served as Chairman of Surgery at Syosset Hospital where he had supervisory responsibility for 250 surgeons including various specialties such as general surgery, plastic surgery, orthopedic surgery, etc., as well as running an advanced laparoscopic, minimally invasive fellowship program (1471).  He teaches medical students and residents at New York Medical College, Hofstra Medical School and the State University of New York at Stonybrook (1470-1474).  Dr. Mayer has published extensively – over 50 peer reviewed articles and three book chapters in the field of surgery (1971-1972).  He has also lectured widely in the United States and internationally (1472).  In addition, Dr. Mayer is a licensed attorney having graduated *summa cum laude* from the Hofstra University School of Law in 2010, and he has an expertise in Health Law (1472).  Clearly, he brings to his testimony a rather unique dual perspective.

In preparation for his testimony, Dr. Mayer reviewed the relevant hearing transcripts including the testimony of Dr. Grant, Dr. Roberts and S.E. (1972).  He also reviewed the video of Danielle performing the branding of S.E., as well as the relevant provision of the New York Education Law (1473).  As he testified:

> In my expert opinion and testimony to a reasonable degree of medical certainty, Dr. Roberts was not engaged in the practice of medicine when she performed the branding procedure.  In fact, she was acting as a branding tech or a scarification artist rather than a physician or osteopathic physician. (1473)

Dr. Mayer explained that his opinion was based on his training and experience both as a physician and attorney and on the application of the pertinent facts to the applicable law (1474).  He emphasized the fact that the women who received brands had no prior knowledge that a

13

physician would be doing the branding and that therefore the confidential relationship of trust that is crucial to the doctor/patient relationship didn't exist (1475-1476). He disagreed with Dr. Grant's analysis and Dr. Grant's analogy of branding to cosmetic surgery. He explained that cosmetic surgeons treat a patient's perceived physical condition – not "psychic pain" as asserted by Dr. Grant (1480-1481).

OPMC was well aware of the weakness of its argument as to branding being a medical procedure. In an effort to circumvent this fatal flaw in the charges, OPMC attempted to argue that even if the branding itself is not the practice of medicine, the "follow-up" care or alleged lack of such care by Dr. Roberts constituted the practice of medicine, thus subjecting her to the jurisdiction of the State Board. But this argument fails as well.

Although there is always a theoretical risk of harm following the creation of the brand/scar, Danielle did not provide medical follow-up care. The risks from the branding process are exceedingly small and the women were told to follow-up with their own physician if any medical issues arose (418-419, 436-437, 1352, 1370). OPMC argued through the testimony of its expert, Dr. Grant, that Dr. Roberts acted irresponsibly and negligently because she created a second degree burn with the electrocautery which required medical attention which she did not provide. But branding expert, Steve Haworth, explained that the electrocautery doesn't cause a true second degree burn because it only vaporizes the layers of skin it directly touches and leaves intact the surrounding cells and blood supply, thus being categorized as a second degree burn only because it removes two layers of skin (1787-1789). However, the wound it creates carries significantly less infection risk and heals much more quickly than typical second degree burns caused by scalding water or by strike branding with a hot iron (1787-1789); – which medical professionals typically encounter and are trained to manage. The exaggeration of the "risks"

14

associated with electrocautery branding was compounded by OPMC's placing in evidence (over objection) of numerous photos of the branding scar in the healing process (Exhibit 47). The photos of the brands offered by OPMC were significantly enlarged, backlighted and reddened to create the impression that the scar that was created was extensive and constituted a significant risk to the women who received the brands (1357-1358).

The only post-branding instructions that Danielle gave related to the aesthetics of the brand (668, 1349-1350, 1979). Obviously, she advised the women to keep the scar clean with a clear plastic bandage (534-535, 1349-1350), but this was no more than any branding technician/artist does. Dr. Mayer pointed out that there are many personal services such as tattooing, piercing, waxing, facials, electrolysis, perms and eyelash extensions where it is well-settled that they are not the practice of medicine. He explained that it is routine for those providing such services to give aftercare instructions that are considered general care rather than medical in nature (1483). He testified that the fact that Dr. Roberts provided routine instructions for aesthetic purposes was not an indicia of medical practice (1483). The women who received the brand all understood that they should follow-up with their primary care doctor or go to an emergency room should any complications develop (1352, 1370, 1893). This was understood because they were all aware that Danielle was not functioning as their physician (1943, 1959). The only exception to this was the testimony of prosecution witness S.E. But it was obvious that S.E. provided false, biased testimony. This can be seen from her earlier text messages to Dr. Roberts where she referred to Dr. Roberts as "Danielle." (669). Later, when she was trying to incriminate Danielle, her texts sought "medical" advice and referred to Danielle as "Dr. Roberts." (Exhibit 35; 669).

It should be noted that we are not making the argument that merely because unlicensed persons can legally perform a task that it cannot be the practice of medicine. This is a "straw

15

man" argument raised by OPMC in its oral closing. By way of illustration, the definition of the licensed profession of public accountancy does not include the preparation of tax returns. See, Education Law Section 7401. This permits companies such as H&R Block to prepare tax returns without employing CPAs. Yet it is common knowledge that many people elect to use a CPA for the preparation of their tax returns. When a CPA incorporates the preparation of tax returns into his or her accounting practice and clients go to the CPA for that purpose, it is clear that the CPA is subject to the jurisdiction of the State Board for Public Accountancy if he or she were to act fraudulently, negligently or immorally. It would not be a valid jurisdictional defense that anyone, including unlicensed persons, can legally prepare a tax return. But that is very different from the situation involved in this case. In the former case, the preparation of tax returns is incorporated into the CPA's accounting practice and the clients who seek out that service do so precisely because they want a CPA to take responsibility for their tax returns. It would thus be incorrect to assert that a CPA who acts unprofessionally with respect to the preparation of tax returns can do so with impunity because he or she is not engaged in the practice of his or her profession. And we make no such argument here. We do not argue that because anyone can perform branding that, therefore, Danielle was not engaged in the practice of medicine.

Danielle was not engaged in the practice of medicine for the reasons referred to above. She did not incorporate branding into her general practice of medicine and the women did not come to her because she was a physician and they all had agreed to the branding before even knowing that DOS had recruited her to perform the branding. Thus, OPMC's strawman argument fails.

OPMC's remaining arguments (and charges) also have no merit. OPMC alleged that Dr. Roberts committed professional misconduct because she "failed to meet the accepted standards

16

of medical practice related to the "medical procedure" that she performed.  Thus, OPMC alleged

that Dr. Roberts practiced medicine negligently and incompetently because she did not take a

medical history and did not perform a physical examination prior to giving the women the brands

that they requested; she did not obtain a formal written consent and she did not offer the women

anesthesia to mitigate or eliminate the pain associated with the branding.   Finally, OPMC

alleged that Dr. Roberts failed to maintain a medical record reflecting her evaluation and

treatment of the women who received the brands.  Paradoxically, that Danielle didn't do these

things is actually consistent with her not being engaged in the practice of medicine.  As Dr.

Mayer testified "the things that she didn't do are understandably disturbing to OPMC when

OPMC reviews a case. But, in this case, they support the proposition that she did not engage in

the practice of medicine, and therefore, wouldn't need to do the indicia of medical practices and

documentations that medical practice would normally require." (1483-1484).  Although Dr.

Grant testified that Dr. Roberts deviated from the accepted standards of practice by not

performing a history and physical and by not obtaining informed consent, etc., he admitted on

cross-examination that his testimony was premised on the idea that Dr. Roberts was engaging in

medical practice when she performed the branding and that this triggered the standards of

medical practice that she was obligated to comply with (1198-1199).  Inconsistently and even

bizarrely, Dr. Grant insisted that these medical standards would still apply even if the Hearing

Committee were to conclude that branding is not a medical procedure; that the women who were

branded were not patients of Dr. Roberts; and that Dr. Roberts was not engaged in the practice of

medicine (1199).

Of particular concern to OPMC was the fact that Dr. Roberts had no "medical

justification" for not offering anesthesia to the women who received the brands to eliminate or

17

mitigate the pain associated with the branding. But this concern misperceives the purpose of the branding and the concept of the shared experience that was intended to create a bond among the women that they had all persevered through a difficult and painful experience (411-412, 748, 1325-1326, 2023-2025). Even prosecution witness S.E. conceded this. Several witnesses testified that receiving anesthesia during the branding process would have defeated one of the primary purposes of the branding (411-412, 1325-1326, 1888, 1947-1948, 2023-2025).

There was testimony during the hearing about the African American fraternity known as the Omegas and that many prominent African-Americans including former basketball player, Michael Jordan, are members of this prestigious college fraternity (415, 663, 748, 753). Many of the Omegas choose to be branded with the Greek letters symbolizing their life-long membership in the fraternity. The brand is accomplished by the use of a hot iron on the exposed flesh. Presumably, this is quite painful. Imagine if it were ascertained that one of the Omegas so branded was given anesthesia to eliminate the pain. That fraternity brother would not have the respect of those who endured the branding and accepted the pain as a symbol of their commitment. Instead of being a bonding experience, it would be divisive. The branding experience involving the DOS women was similar. It was intended to be a shared bonding experience, not a shared medical experience. The idea was not merely to obtain the final result of having a brand but also to persevere through the difficult branding process (411-412, 748, 1325-1326, 2023-2025). The way the women saw themselves can be gleaned from Shakespeare's *Henry V*, Act 4 Scene 3. Before the vastly outnumbered English fight the French at Agincourt in 1415, King Henry addresses his troops:

18

> We few, we happy few, we band of brothers;
> For he to-day that sheds his blood with me shall be my brother;
> Be he ne'er so vile, this day shall gentle his conditions:
> And gentlemen in England now a-bed shall think themselves accursed
> They were not here, and hold their manhoods cheap whiles any speaks
> That fought with us Saint Crispin's day.

This is the bond that the branded DOS women desired to emulate. They viewed their membership in a secret society as empowering and a show of strength and commitment. They wanted to be a "band of sisters." That bond would be defeated if they were offered anesthesia and some accepted. By regarding the branding as a medical procedure and part of medical practice, Dr. Grant not only failed to correctly interpret Section 6521 of the Education Law, he also failed to understand the initiation bonding ritual that the DOS women wanted and accepted.

OPMC also spent a substantial amount of time delving into the "collateral" provided by the women who were branded. OPMC argued that this constituted coercion and that accordingly, the women were not able to and did not give true consent to the branding. This is blatantly untrue, (as Danielle herself went through the very same process all the women who chose to join DOS went through) and many women testified to the absurdity of this assertion. Moreover, OPMC again fails to understand the illogic of its position. Consent in this forum is only an issue if Danielle was performing a medical procedure and/or was engaged in the practice of medicine. Since it has been shown by clear and convincing evidence that branding is not a medical procedure and that Danielle was not engaged in the practice of medicine, there is no issue of consent that can legally be heard in the misconduct forum.  Certainly, whether the DOS women who were branded gave their consent or were coerced is extremely important.  This issue, however, would have been adjudicated elsewhere if true.  But the fact is there was no coercion as Danielle and several other witnesses testified (530, 1265-1266, 1397, 1925-1929). If there was

19

coercion, it might constitute immoral conduct, but it would not be "conduct in the practice of medicine which evidences moral unfitness to practice medicine." – the requirement of Section 6530 (20) of the Education Law. The Hearing Committee should take note of the fact that New York only regulates the moral conduct of physicians when they are engaged in the practice of their profession. This is not true for all States. Some States regulate and sanction any conduct by a physician perceived to be immoral. New York has chosen not to follow those States. Indeed, almost all of New York Education Law Section 6530, where misconduct is defined, is limited to acts committed in the course of practicing the profession. The only exceptions are for criminal convictions and drug and alcohol dependency. See, Education Law Sections 6530 (8) and 6530 (9).

By referring to and citing this fact, we do not mean to imply that Danielle engaged in immoral behavior in any way. Rather, this is a response to OPMC's effort to taint Dr. Roberts by improper allegations of guilt by association. That is why counsel for OPMC repeatedly referred to NXIVM, Keith Raniere and DOS. He claimed that this was for the purpose of context. In reality, OPMC's purpose was an attempt to tarnish Dr. Roberts in the eyes of the Hearing Committee based on her purely private, non-medical conduct. As we have shown, Danielle's conduct was, at all times, moral and compassionate. But regardless, it is only her conduct while practicing her profession that is within the purview and jurisdiction of the State Board.

It is critical for the Hearing Committee to understand that Dr. Roberts is a highly moral person and did not engage in immoral conduct in the practice of medicine or outside the practice of medicine. Witnesses testified to her exemplary character. She was described as "exceptionally honest," "caring, compassionate" and "loyal, faithful and full of integrity" (1852, 1863, 1866). We urge the Hearing Committee to review the video in evidence (Exhibit 8C). It can readily be

20

seen that Danielle was supportive and compassionate.  The women were laughing and joking as they shared the experience. There was absolutely nothing resembling coercion or immorality. The Hearing Committee should also consider Dr. Roberts' demeanor as she was testifying. By carefully declining to answer specific questions that did not pertain to the charges but only sought information about her private life, she stood for the right of physicians to have private lives outside of their agreed upon professional commitments, and revealed where those rights were being violated to serve a political agenda. She upheld the honorable foundation and principles the Board was founded on. She stood to safeguard the privacy of non-relevant parties and the sanctity of the commitments she gave when she joined DOS. She did this even when declining to answer might have placed her in legal peril depending on the rulings made by ALJ MacKillop-Soller. This was courageous and benefits us all.

**The Charges Relating to "Vanguard" Week**

Dr. Roberts was also charged with practicing the profession of medicine with negligence and incompetence because she didn't report the outbreak of a norovirus while on vacation at a corporate retreat in Upstate New York. And she was charged with willfully failing to file a report required by law (Education Law Section 6530 (21)) and willfully (or grossly negligently) failing to comply with a substantial provision of Health Department regulation 10 NYCRR Section 2.1 et. seq. – a regulation mandating that physicians report certain infectious disease situations to the Department of Health. See, Education Law Sectio 6530 (16). We address first the alleged reporting requirement of 10 NYCRR Section 2.1.

Section 2.1 does not require the filing of a report as asserted by OPMC. This regulation, which most physicians are not familiar with, is concerned primarily with "communicable"

21

diseases. But it is clear from Section 2.1 that the term "communicable disease" is not used in its usual sense and is limited to those diseases specified in Section 2.1. The evidence adduced at the hearing showed that the disease entity that occurred during "Vanguard" week attended by Dr. Roberts and others in 2016 was a norovirus or something very similar thereto (1000). Noroviruses are not included on the list of communicable diseases in Section 2.1 (1300). As such, there was no mandatory reporting requirement. OPMC correctly points out that Section 2.1 also requires the reporting of "unusual" diseases. The evidence was clear, however, that the disease that occurred during Vanguard week 2016 was not "unusual" (1015-1016, 1302). In fact, OPMC's expert conceded that it was a very common, self-limiting disease that was unpleasant but not lethal (1001-1002). It was a garden variety stomach virus, sometimes referred to informally as a stomach bug or 24-hour virus (720). Clearly, this virus was not reportable as an "unusual" disease. *A priori* it was not reportable as an unusual disease outbreak.  Next, OPMC asserted that the norovirus had to be reported as a disease outbreak under Section 2.1(c). This subsection states that "any disease outbreak or unusual disease shall also be reported to the State Department of Health as provided in subdivision (b) of the section." But subdivision (b) refers, in turn, to Section 2.10. Title 10 NYCRR Section 2.10 states:

> It shall be the duty of every physician to report
> to the city, county or district health officer, within
> whose jurisdiction such patient resides, the full name,
> age and address of every person with a suspected
> or confirmed case of a communicable disease, any
> outbreak of communicable disease, any unusual disease
> or unusual disease outbreak and as otherwise authorized
> in section 2.1 of this Part, together with the name of the
> disease if known, and any additional information requested
> by the health officer….

22

Two things are clear from the above quoted language – first, Section 2.10 refers to reporting about "patients," not persons who are known to the physician only as fellow vacationers. This makes Section 2.1 inapplicable to what occurred during Vanguard week. Second, Section 2.10 refers to "communicable diseases, outbreaks of communicable diseases, unusual diseases and unusual disease outbreaks – none of which occurred during Vanguard week if the definitions contained in Section 2.1 are applied as they must be. Apparently, OPMC is attempting to hang its hat on the language in Section 2.10 that refers to "as otherwise authorized in section 2.1 of this Part." But a review of Section 2.1 reveals that there are no other reports mandated or authorized. As can be seen from the foregoing, Dr. Roberts did not violate 10 NYCRR Section 2.1 et. seq. As can also be seen, this regulation is difficult to parse and requires jumping from subdivision to subdivision and the application of technical definitions. This is a challenging task even for lawyers trained in statutory and regulatory interpretation. Even if the Hearing Committee were to disagree with the analysis and interpretation set forth above, the evidence in this case did not demonstrate a "willful" failure to file a report required by law and, just as clearly, the evidence did not establish that Dr. Roberts "willfully or grossly negligently" failed to comply with Title 10 NYCRR Section 2.1 et. seq.

Nor is there any merit to OPMC's charges that, irrespective of Section 2.1 of Title 10, Dr. Roberts practiced the profession of medicine negligently and incompetently by not notifying the Department of Health about the norovirus that occurred during Vanguard week. In an effort to prove that Dr. Roberts departed from accepted standards of practice by not reporting the cases of norovirus (or similar disease) that occurred, OPMC offered the testimony of Dr. Bruce Farber. While we do not question Dr. Farber's credentials as an infectious disease expert, his testimony fell well short of establishing a departure by Dr. Roberts from accepted standards of practice. In

23

fact, Dr. Farber's testimony established the opposite – that there was no departure from accepted standards by Dr. Roberts.

Dr. Farber testified on direct examination that the disease entity that occurred during Vanguard week was probably a norovirus (1000). On cross-examination, he acknowledged that a norovirus is not an unusual virus and that it is a self-limiting virus which, in most cases, resolves in two or three days (1001-1002). He also admitted that the symptoms, while unpleasant, are rarely lethal (1002). Dr. Farber testified that every New York physician is required to take an infection control course every four years and that he co-authored one such course (1004-1005). Implied in this testimony is that his course and courses like it inform physicians of their reporting obligations and define standard practice in this area. But Dr. Farber admitted that the course he co-authored says nothing about a physician's reporting obligations while on vacation. Curiously, OPMC did not offer in evidence the documents pertaining to the infection control course co-authored by Dr. Farber (1005). The Hearing Committee can be confident that if the infection control course co-authored by Dr. Farber contained any language supporting OPMC's position, the course documents would have been offered in evidence. OPMC, did, however, offer the documents pertaining to an infection control course given at St. Peter's Hospital (1005). That course and the documents related thereto do not refer to any obligation to report a disease such as a norovirus, especially while on vacation and where the disease does not relate to any of a physician's own patients. Moreover, Dr. Farber was unable to identify any textbook that refers to a physician's reporting obligations while on vacation. Nor could he identify any teaching that takes place during a physician's post-graduate training years or scholarly literature that refers to and defines a physician's obligations under such circumstances (1006-1008). His "explanation" was that he hadn't done a literature search in preparation for his testimony (1009). His position

24

that standard accepted practice requires the reporting of an outbreak of a relatively benign disease such as a norovirus in non-patients while on vacation was completely undermined through questioning by Dr. Raju of the Hearing Committee. Dr. Raju asked Dr. Farber whether in his 40 years of practice he had ever heard of a family practice physician attending a community event reporting an incident such as occurred at Vanguard week (1043-1044). Dr. Farber candidly admitted that he could not recall a single such instance (1044). Given this testimony, it should be clear that there was no valid expert testimony supporting OPMC's negligence and incompetence charges.

## CONCLUSION

This case was brought improperly from the outset. OPMC's "case" against Dr. Roberts constitutes a misuse of government resources to prosecute the purely private behavior of a physician. New York's misconduct definitions, which are found in Section 6530 of the Education Law, limit actionable misconduct to conduct that occurs in the practice of medicine. Thus, the Education Law refers to "practicing the profession" with negligence or incompetence (Sections 6530 (2) and (5)) and "conduct in the practice of medicine" which evidences moral unfitness to practice medicine (Section 6530 (20)). One can't help but think that OPMC prosecuted Dr. Roberts because of her connection to an organization that was and is politically unpopular – in other words, guilt by association. This is contrary to everything this country stands for.  This case also represents an abuse of the State Board. We believe that members of the Board did not volunteer their time to police the private behavior of their colleagues resulting in no harm. Furthermore, allowing or legitimizing charges like the ones brought against Dr.

25

Roberts, would condone the government's peering into the private lives of physicians – a scary proposition indeed.

Dr. Roberts has had her career destroyed despite the fact that not a single allegation has been made by an actual patient or colleague against her clinical abilities or integrity as a physician. In fact, during her testimony, she declined to identify the non-medical field in which she is now working for fear that OPMC would further destroy her ability to make a living. Despite tremendous social, legal and financial obstacles, Dr. Roberts has continued to stand for our rights, find other ways to make a living for herself and those she cares for, start new businesses that will help keep people healthy in the face of COVID, and even pursue ways to volunteer her skills during this critical time that we face. She is an unrelenting force for good. The Hearing Committee can and should end this ordeal and allow Dr. Roberts to return to what she earned with years of study and work and what she loves most, the practice of medicine.

Respectfully submitted

Anthony Z. Scher, Esq.

Rye Brook, NY
May 31, 2021

Attorney for Respondent
800 Westchester Avenue
Suite N-641
Rye Brook, NY 10573
(914) 328-5600

`

26

27

Jul 02, 2017 2:49 PM   Page 48   From: 8040089832   To: 15114020145

## COMPLAINT

I WAS INVITED TO BE A PART OF WHAT I THOUGHT WAS A SORORITY, AN INTERNATIONAL WOMEN'S GROUP. THE FIRST STEP WAS GIVING NUDE PHOTOS AS "COLLATERAL," AKA BLACKMAIL, TO ENSURE SECRECY. THE SECOND STEP WAS HAZING: GETTING A SMALL TATTOO, THAT I WAS TOLD WOULD BE 1 INCH BY 1 INCH. ON THE NIGHT OF MARCH 9, I WAS BLINDFOLDED IN CLIFTON PARK AND TAKEN TO AN UNKNOWN ADDRESS IN KNOX WOODS WITH FOUR OF MY OTHER "SISTERS" - OTHER RECRUITS IN THIS SORORITY. WE WERE TOLD TO REMOVE OUR BLINDFOLDS, GET UNDRESSED HEAD TO TOE, AND WERE HELD DOWN BY FIVE WOMEN WHILE DOCTOR ROBERTS PERFORMED WHAT I THOUGHT WAS GOING TO BE A TATTOO. THE WOUND ENDED UP BEING A 2 INCH BY 2 INCH THIRD DEGREE BURN, MADE WITH A CAUTERIZING IRON ON THE PUBIC AREA, AN INCH LEFT OF MY VAGINA. THE ENTIRE PROCEDURE TOOK 30 MINUTES AND WAS FILMED, TO BE USED AS MORE COLLATERAL FOR BLACKMAIL.

I WAS INITIALLY TOLD THAT THE MARK WAS A LATIN SYMBOL FOR THE ELEMENTS, SIMILAR TO THE GREEK LETTERS IN A SORORITY. A FEW WEEKS LATER, I FOUND OUT THIS WAS ALL A LIE. THIS WAS NOT A WOMEN'S GROUP, BUT A CULT STARTED BY KEITH RANIERE OF NXIVM, AND THE BRAND WAS ACTUALLY HIS INITIALS, "KR," COMBINED WITH THE INITIALS OF ANOTHER WOMAN, ALLISON MACK ("AM"), WHO STARTED THIS WITH HIM. A PHOTO OF THE BURN IS ATTACHED.

I THINK IT'S IMPORTANT THIS GETS ADDRESSED RIGHT AWAY. DR. ROBERTS IS PERFORMING THIS "SECRET RITUAL" TO UP TO SIX WOMEN AT A TIME UNDER FALSE PRETENSES. THEY ARE BEING LIED TO, AND THIS HAS TO STOP.

THE ENTIRE ORDEAL HAS BEEN VERY TRAUMATIC FOR ME, AND MY DOCTOR HAS DIAGNOSED ME WITH POST-TRAUMATIC STRESS DISORDER WITH INSTRUCTIONS TO SEE A PSYCHOLOGIST.

I HAVE ATTACHED A COPY OF DR. ROBERTS'S MEDICAL LICENSE, AVAILABLE TO VIEW ONLINE.

PUBLIC LINKS TO MORE INFORMATION:
https://frankreport.com/2017/06/05/part-1-branded-slaves-and-master-raniere-sources-human-branding-part-of-raniere-inspired-womens-group
https://frankreport.com/2017/06/07/part-2branded-slaves-and-master-raniere-more-details-of-secretive-master-slave-branding-group-revealed
More information about the activity can be found on this site.

http://www.vanityfair.com/culture/2010/11/pronfman-201011

Roberts - 463

③

# 3530

Jul 07, 2017 01:49 PM  Page 5/6, From 0049089832  To: 15184020145

https://www.forbes.com/forbes/2003/1013/088.html

FINALLY, I WOULD LIKE TO REMAIN ANONYMOUS, AS THE ORGANIZATION IS INCREDIBLY LETIGIOUS AND DESTRUCTIVE, AND THREATENS TO FRAME AND/OR SUE ANYONE WHO WILL SPEAK OF THIS IN PUBLIC:

JULY 7, 2017



# 24-778-CR(L)

## 24-1285-CR(CON), 24-1317-CR(CON)

IN THE

# United States Court of Appeals

### FOR THE SECOND CIRCUIT

▶▶ ◀◀

UNITED STATES OF AMERICA,

*Appellee,*

*v.*

ALLISON MACK, CLARE BRONFMAN, KATHY RUSSELL,
LAUREN SALZMAN, NANCY SALZMAN, AKA PERFECT,

*Defendants,*

KEITH RANIERE, AKA VANGUARD,

*Defendant-Appellant.*

On Appeal from the United States District Court
for the Eastern District of New York

## BRIEF AND SPECIAL APPENDIX
## FOR DEFENDANT-APPELLANT

DEBORAH J. BLUM, ESQ.
*Attorney for Defendant-Appellant*
225 Broadway, Suite 715
New York, New York 10007
646-535-2586

 (212) 719-0990
appeals@phpny.com

# TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES.......................................................................................vi

PRELIMINARY STATEMENT ...............................................................................1

STATEMENT OF JURISDICTION .........................................................................4

ISSUES PRESENTED FOR REVIEW .....................................................................5

STANDARD OF REVIEW........................................................................................9

STATEMENT OF CASE..........................................................................................10

    1.   Before Trial..................................................................................................10

    2.   At Trial........................................................................................................12

    3.   Post-Trial Discoveries of Digital Evidence Falsification ..........................16

    4.   Government's Consolidated Opposition.....................................................18

    5.   Defense's Reply to the Rule 33 .................................................................19

    6.   The Court's Denials....................................................................................20

SUMMARY OF THE ARGUMENT .......................................................................20

    I.   Denial of the Rule 33 ..................................................................................20

    II.  Denial of the Motions to Compel ...............................................................22

    III. Denial of Recusal.......................................................................................23

Roberts - 466

ARGUMENT ...................................................................................24

I.   WHETHER THE DISTRICT COURT ABUSED ITS
     DISCRETION IN DENYING THE RULE 33 BY
     SUBSTANTIALLY RELYING UPON AND CREDITING
     NEW GOVERNMENT EVIDENCE, CREATED POST-
     TRIAL, FROM INDIVIDUALS WHO WERE NEVER
     SUBJECT TO CROSS-EXAMINATION, VIOLATING
     MR. RANIERE'S SIXTH AMENDMENT RIGHT OF
     CONFRONTATION ..................................................................24

     A.  Applicable Law ..................................................................24

     B.  Analysis ...........................................................................25

II.  THE DISTRICT COURT ABUSED ITS DISCRETION IN
     CREDITING LOVEALL'S REPORT TO DENY THE
     RULE 33..................................................................................28

     A.  Loveall's Report Was Based Upon Secret Evidence,
         Violating Mr. Raniere's Fifth Amendment Right to Due
         Process ..............................................................................28

         1.  Applicable Law ..........................................................28

         2.  Analysis .....................................................................29

     B.  Loveall's Report Failed to Meet the Admissibility
         Standards of FRE 702 and *Daubert* ...................................30

         1.  Applicable Law ..........................................................30

         2.  Analysis .....................................................................31

     C.  Loveall's Report Failed to Meet the Statutory
         Requirements of 28 U.S.C. § 1746.......................................31

         1.  Applicable Law ..........................................................31

         2.  Analysis .....................................................................32

Roberts - 467

D. Loveall's Report Failed to Refute the 7 Digital Forensics Experts' Findings ................................................32

E. Loveall's Report Contained Indisputable Errors.............................35

III. THE DISTRICT COURT ABUSED ITS DISCRETION IN FINDING THAT "AMPLE TRIAL EVIDENCE" IN CONJUNCTION WITH THE LOVEALL REPORT AND CAMILA'S DECLARATION, OUTWEIGHED THE MATERIALITY OF THE 7 DIGITAL FORENSICS EXPERTS' FINDINGS............................................................36

IV. THE DISTRICT COURT ABUSED ITS DISCRETION IN IGNORING THAT THE SECOND FORENSIC IMAGE MEETS THE STANDARD FOR BOTH A *BRADY/GIGLIO* VIOLATION <u>AND</u> "NEWLY DISCOVERED EVIDENCE".................................................38

A. The Court Abused Its Discretion By Not Applying the *Brady* Rule 33 Standard ......................................................38

B. Applicable Law ..............................................................38

C. Analysis ........................................................................40

V. THE DISTRICT COURT ABUSED ITS DISCRETION IN FAILING TO FIND THAT THE SECRET FBI PHOTOGRAPH TECHNICIAN MEETS THE STANDARD FOR BOTH A *BRADY/GIGLIO* VIOLATION <u>AND</u> "NEWLY DISCOVERED EVIDENCE" ..............................................44

VI. THE DISTRICT COURT ABUSED ITS DISCRETION IN FAILING TO FIND THAT THE PROOF OF GOVERNMENT INVOLVEMENT IN FALSIFYING MATERIAL EVIDENCE CATEGORICALLY CONSTITUTES "NEWLY DISCOVERED EVIDENCE" AND A *BRADY/GIGLIO* VIOLATION ................................................47

VII.   THE EVIDENCE OF SYSTEMATIC AND
       INTENTIONAL GOVERNMENT MALFEASANCE
       MEETS THE STANDARD FOR DISMISSAL AND
       ALSO CAUSED STRUCTURAL ERROR ...........................................48

       A.   Applicable Law ...................................................................48

            1.   Standard for Dismissal ...............................................48

            2.   Standard for Structural Error .......................................49

       B.   Analysis ..............................................................................50

VIII.  THE DISTRICT COURT ABUSED ITS DISCRETION IN
       DENYING THE MOTIONS TO COMPEL ...........................................52

       A.   Applicable Law ...................................................................52

       B.   Analysis ..............................................................................52

IX.    THE DISTRICT COURT ABUSED ITS DISCRETION IN
       DENYING THE MOTION FOR JUDICIAL RECUSAL ....................54

       A.   Applicable Law ...................................................................54

       B.   Analysis ..............................................................................55

            1.   The Court Abused Its Discretion in Misapplying
                 *Liteky* to Comments Made During the Trial...............................55

            2.   The Court's Termination of Cross-Examination
                 Demonstrates the Appearance of "Deep-Seated
                 Favoritism" Towards the Government and "Deep-
                 Seated Antagonism" Towards Mr. Raniere.................................56

            3.   The Court's Comments and Actions at the
                 Restitution Hearing Further Demonstrate the
                 Appearance of "Deep-Seated Antagonism"
                 Towards Mr. Raniere, Requiring Recusal .................................60

Roberts - 469

CONCLUSION ....................................................................................................62

    REASONS TO GRANT, VACATE, AND REMAND....................................62

PRINTING SPECIFICATIONS STATEMENT ......................................................63

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Alcorta v. State of Texas*,
  355 U.S. 28 (1957) ............................................................................................40

*Amorgianos v. National R.R. Passenger Corp.*
  303 F.3d 256 (2d Cir. 2002) .............................................................................30

*Anderson v. United States*,
  417 U.S. 211 (1974) ..........................................................................................21

*Arizona v. Fulminante*,
  499 U.S. 279 (1991) ....................................................................................49, 51

*Banks v. Dretke*
  540 U.S. 668 (2004) ..............................................................................39, 43, 45

*Bonds v. Cox*,
  20 F.3d 697 (6th Cir. 1995) ...............................................................................32

*Boucher v. U.S. Suzuki Motor Corp.*,
  73 F.3d 18 (2d Cir. 1996) ..................................................................................30

*Brady v. United States*,
  397 U.S. 742 (1970) ...................................................................................*passim*

*Bullcoming v. New Mexico*,
  564 U.S. 647 (2011) ..............................................................................3, 25, 27

*Crawford v. Washington*,
  541 U.S. 36 (2004) ............................................................................................24

*Daubert v. Merrell Dow Pharmaceuticals, Inc.*,
  509 U.S. 579 (1993) ...................................................................................*passim*

*Dilonez v. Fox Linen Serv. Inc.*,
  35 F. Supp. 3d 247 (E.D.N.Y. 2014)..................................................................31

Roberts - 471

*Flovac, Inc. v. Airvac, Inc.*,
  817 F.3d 849 (1st Cir. 2016) .................................................................. 32

*Giglio v. United States*,
  405 US 150 (1972) ...................................................................... *passim*

*Harris v. Nelson*,
  394 U.S. 286 (1969) .............................................................................. 22

*In re Drexel Burnham Lambert Inc.*,
  861 F.2d 1307 (2d Cir. 1988) .............................................................. 55

*In re United States v. Coppa (In re United States)*,
  267 F.3d 132 (2d Cir. 2001) ................................................................ 43

*ISC Holding AG v. Nobel Biocare Fin. AG*,
  688 F.3d 98 (2d Cir. 2012) .................................................................. 55

*Kyles v. Whitley*,
  514 U.S. 419 (1995) ........................................................................ 39, 40

*Leka v. Portuondo*,
  257 F.3d 89 (2d Cir. 2001) .................................................................. 39

*Liteky* v. *United States*,
  510 U.S. 540 (1994) ..................................................................... 8, 23, 54, 55

*Melendez-Diaz v. Massachusetts*,
  557 U.S. 305 (2009) ............................................................................ 24

*Mendez v. MCSS Rest. Corp.*,
  564 F. Supp. 3d 195 (E.D.N.Y. 2021) .................................................. 31

*Napue v. Illinois*,
  360 US 264 (1959) .............................................................................. 48

*Paucar v. Garland*
  84 F.4th 71 (2d Cir. 2023) .................................................................... 9

*Perkins v. Teele*,
  No. 3:15-CV-01137 (JCH), 2018 U.S. Dist. LEXIS 122117,
  2018 WL 3541864 (D. Conn. July 23, 2018) ...................................... 32

Roberts - 472

*Poventud v. City of New York,*
   750 F.3d 121 (2d Cir. 2014) ...................................................................40

*Reynolds v. Sealift, Inc.,*
   311 Fed.Appx. 422 (2d Cir. 2009) .......................................................31

*Rose v. Clark,*
   478 U.S. 570 (1986) .......................................................................49, 51

*Smith v. Arizona,*
   144 S. Ct. ............................................................................3, 21, 25, 27

*Smith v. Arizona,*
   602 U.S. ___ ..........................................................................................25

*Strickler v. Greene,*
   527 U.S. 263 (1999) ..............................................................................39

*U.S. v. Abuhamra,*
   389 F.3d 309 (2d Cir. 2004) ....................................................28, 29, 30

*U.S. v. Autuori*
   212 F.3d 105 (2d Cir. 2000) .................................................................27

*United States v. Agurs,*
   427 U.S. 97 (1976) .....................................................39, 42, 46, 48

*United States v. Alston,*
   899 F.3d 135 (2d Cir. 2018) .................................................................47

*United States v. Amico,*
   486 F.3d 764 (2d Cir. 2007) ....................................................54, 55, 58

*United States v. Armstrong,*
   517 U.S. 456 (1996) ..............................................................................48

*United States v. Bagley,*
   473 U.S. 667 (1985) ..............................................................................38

*United States v. Boles,*
   914 F.3d 95 (2d Cir. 2019) ......................................................................9

*United States* v. *Carlton*,
    534 F.3d 97 (2d Cir. 2008).........................................................55, 59, 62

*United States v. Chemical Foundation*,
    272 U.S. 1 (1926) ...............................................................................48

*United States v. Christi*,
    682 F.3d 138 (1st Cir. 2012) ..............................................................49

*United States v. Davis*,
    836 F. App'x 754 (11th Cir. 2020) .....................................................53

*United States v. Fields*
    592 F.2d 638 (2d Cir. 1978)..........................................................49, 52

*United States v. Forbes*,
    790 F.3d 403 (2d Cir. 2015).........................................................38, 43

*United States v. Halloran*,
    821 F.3d 321 (2d Cir. 2016)...............................................................40

*United States v. Hicks*,
    2024 U.S. Dist. LEXIS 7877 (W.D.N.Y 1.16.24).............................32

*United States v. Jackson*,
    345 F.3d 59 (2d Cir. 2003)..................................................................39

*United States v. Johnson*,
    2024 U.S. App. LEXIS 22691 (2d Cir. 2024)..............................25, 49

*United States v. Keith Raniere, et. al*,
    1:18-cr-00204 (EDNY) ......................................................................10

*United States v. Madori*,
    419 F.3d 159 (2d Cir. 2005)................................................................10

*United States v. Mangano*,
    2022 U.S. Dist. LEXIS 3048 (EDNY Jan. 6, 2022)......................48, 52

*United States v. Middlemiss*,
    217 F.3d 112 (2d Cir. 2000)................................................................25

*United States v. Morell,*
    524 F.2d 550 (2d Cir. 1975) ................................................................42

*United States v. Purcell,*
    967 F. 3d 159 (2d Cir. 2020) ................................................................9

*United States v. Sanchez,*
    813 F. Supp. 241 (S.D.N.Y. 1993) ......................................................42

*United States v. Sessa,*
    711 F.3d 316 (2d Cir. 2013), *cert, denied,* —— U.S. ——,
    134 S.Ct. 353 (2013) ............................................................................9

*United States v. Thomas,*
    981 F.Supp. 2d 229 (SDNY 10.30.13) ................................................40

*United States v. Wallach,*
    935 F.2d 445 (2d Cir. 1991) ................................................................48

*United States v. Walters,*
    910 F.3d 11 (2d Cir. 2018) ..................................................................10

*United States v. Wedd,*
    993 F.3d 104 (2d Cir. 2021) ..................................................................9

*United States v. Williams,*
    2017 U.S. Dist. LEXIS 135235 (S.D.N.Y. 2017) ...............................52

*United States v. Wolfson,*
    413 F.2d 804 (2d Cir. 1969) ..........................................................22, 52

*Williams v. Keisler,*
    No. 07 CV 503 (ARR), 2007 U.S. Dist. LEXIS 117028
    (E.D.N.Y. Oct. 30, 2007) ....................................................................31

*Zervos v. Verizon N.Y., Inc.,*
    252 F.3d 163 (2d Cir.2001) ...................................................................9

**Statutes**

18 U.S.C. § 3231 ......................................................................................4

18 U.S. § 3500 ...................................................................................*passim*

28 U.S.C. § 445(a) .................................................................4, 24, 54, 59

28 U.S.C. § 455 ................................................................................8, 62

28 U.S.C. § 1291 ....................................................................................4

28 U.S.C. § 1746 ..........................................................................*passim*

**Rules**

Federal Rules of Criminal Procedure Rule 16....................................*passim*

Federal Rules of Civil Procedure Rule 33.........................................*passim*

Federal Rules of Evidence 702.........................................................*passim*

Federal Rules of Evidence 702(b) ..........................................................30

**Constitutional Provisions**

Fifth Amendment to the U.S. Constitution...........................................5, 28

Sixth Amendment to the U.S. Constitution .......................................3, 5, 24

**Other Authorities**

Dang, Quynh, *Secure Hash Standard (SHS)*, FIPS PUB 180-4, Nat'l
    Inst. of Standards & Tech. (2015) .....................................................53

New York Post .......................................................................................61

Noah Goldberg (@Noah__Goldberg**)**, *X (formerly Twitter)*
    (May 6, 2022, 10:14 AM)).
    https://x.com/Noah__Goldberg/status/1522580665899925509...................61, 62

Vanity Fair............................................................................................61

## PRELIMINARY STATEMENT

Defendant-Appellant's (hereinafter referred to as "Mr. Raniere") Rule 33 is

based upon the post-trial findings of seven (7) independent digital forensics

experts, **including four (4) former FBI examiners**, who discovered that material

evidence was extensively falsified, with government involvement in the fraudulent

conduct:

> "[A] camera card ... and a hard drive were deliberately and
> extensively manipulated… 168 photos, including the alleged
> contraband, were planted on the hard drive... Given admitted
> government misconduct, including violating evidence protocols,
> providing evidence to unidentified and unauthorized personnel, and
> altering the original camera card, **the involvement of government
> personnel in this evidentiary fraud is inescapable – an
> unprecedented finding in our combined 150+ years of forensic
> experience.**" (A1698 ¶¶ 1-2, A1700 ¶ 8, A1703 ¶ 16) (emphasis
> added).

The camera's memory card and hard drive were the core evidence of the alleged

child pornography and sexual exploitation predicate acts, which the government

said was "at the heart of our racketeering conspiracy." (A217:14-16).

Mr. Raniere met the Rule 33 threshold for *Brady* violations and "newly

discovered evidence". The government actively concealed:

(1) the existence and use of a second forensic image[1] of the memory card,
secretly created during trial, which was never disclosed, despite repeated
requests and the prosecution's assurances of full compliance with their
statutory disclosure requirements;

---

[1] A forensic image is an exact replica of the contents of the device. (A310:7-A311:3).

(2) the intentional mishandling of the unpreserved memory card by a secret FBI photograph technician, in violation of FBI and DOJ regulations, deliberately omitted from the chain of custody, and only revealed **4 years after trial**; and

(3) falsification of the digital evidence and government involvement in this fraudulent conduct.

Some of this fraudulent conduct took place during the trial, after the government sought and obtained a prohibition against "presenting evidence or arguments concerning … alleged government misconduct in … this prosecution." (A272).

There is a high likelihood that Judge Garaufis created new precedent by crediting new government evidence and having it serve as two-thirds (⅔) of his basis for denial of the Rule 33. The evidence relied upon by the government was created post-trial solely to oppose the Rule 33 and related Motions to Compel and consisted of a report from the government's post-conviction forensic expert, FBI Senior Computer Scientist David Loveall II, and a declaration from Camila, the alleged subject of the purported underage photos. Neither testified nor were subject to cross-examination of confrontation **at any time**. The Court's reliance on this new government evidence, without a hearing, violated the fundamental constitutional protections afforded to defendants in our justice system.

Relying on Camila's hearsay declaration, which is partly contradicted by her unsworn statement at Mr. Raniere's sentencing, without her being subject to

cross examination, violates Mr. Raniere's Sixth Amendment Right of
Confrontation.

Another clear abuse of the Court's discretion is its reliance on Loveall's
forensic report due to its many fatal flaws. It was based on material evidence that
the government and Court have refused to disclose to the defense, rendering his
report a product of 'secret evidence'. Not only was Loveall never subjected to
cross-examination in any capacity, but his report relied on the analysis of another
FBI examiner who did not testify at all, violating the Confrontation protections
established by *Smith v. Arizona* and *Bullcoming v. New Mexico*. Loveall's rebuttals
did not cite to data, violating the requirements of Federal Rule of Evidence 702 and
*Daubert*, and was undated, violating the requirements of 28 U.S.C. §1746.

Allowing these decisions to stand will permit the government to create new
evidence and theory whole-cloth in post-conviction litigation and deprive a
defendant of their rights under the Confrontation Clause and other constitutional
protections.

Judge Garaufis's decision makes the unacceptable acceptable by allowing
systematic, intentional government malfeasance relating to the digital evidence,
involving at least eight (8) identified FBI/DOJ personnel.

Respectfully, Judge Garaufis was not the right justice to preside over these
determinations. The Court erred in failing to recuse itself pursuant to 28 U.S.C. §

455(a), despite clear evidence of the appearance of "deep-seated antagonism"

against Mr. Raniere and "deep-seated favoritism" towards the prosecution.

## STATEMENT OF JURISDICTION

This is a consolidated appeal from three (3) final Orders that dispose of Mr.

Raniere's current claims. The District Court had subject matter jurisdiction over

these actions pursuant to 18 U.S.C. § 3231 and Rule 33 of the Federal Rules of

Criminal Procedure. This Court has jurisdiction over this consolidated appeal

pursuant to 28 U.S.C. § 1291.

Mr. Raniere filed a timely Notice of Appeal (Doc. 1240) dated March 21,

2024 with respect to the March 7, 2024 Order (SPA12-19) denying (1) the Motion

for Reconsideration (A1692-1696) of the Court's November 6, 2023 Memorandum

and Order (A1680-1691) denying his first Motion to Compel Production of

Evidence, and (2) a separate Motion to Compel Production of Evidence, dated

December 21, 2023 (A1747-1759).

Mr. Raniere filed a timely Notice of Appeal (A1842) dated May 7, 2024 in

respect to the April 29, 2024 Order (SPA20-30) denying the Rule 33, supplemental

Rule 33 focusing on the *Brady* violations, and *pro se* Rule 33 (A767-808; A1197-

1210; A1211-1231).

Mr. Raniere filed a timely Notice of Appeal (A1843) dated May 10, 2024 in

respect to the April 26, 2023 Order (SPA1-11) denying the Motion for Judicial

Disqualification pursuant to 28 U.S.C. § 445(a) (A1159-1191).

On June 13, 2024, the Second Circuit consolidated these appeals. (2nd

Circuit, *US v. Raniere*, 24-1285, DktEntry 32.1)

The original deadline for the consolidated appeals was August 21, 2024.

(*Id*.) However, on consent, the Second Circuit granted two motions for extension

of time and set a new deadline of October 28, 2024. (2nd Circuit, *US v. Raniere*,

24-1285, DktEntry 35.1, DktEntry 37.1).

### ISSUES PRESENTED FOR REVIEW

1. Whether the District Court's substantial reliance on and crediting of new

   government evidence, created post-trial, from Camila and FBI Senior

   Computer Scientist David Loveall II, who never testified and were never

   subject to cross-examination, to deny the Rule 33, without a hearing,

   violated Mr. Raniere's Sixth Amendment right to confront witnesses?

2. Whether the District Court's crediting of Loveall's forensic report

   (hereinafter referred to as "Loveall Report") in denying the Rule 33:

   a. Violated Mr. Raniere's Fifth Amendment right to Due Process by

      allowing Loveall to rely on secret evidence, including an undisclosed

second forensic copy of the camera's memory card, which was never

made available to the defense, despite repeated requests and the

prosecution's assurances of full compliance with their statutory

disclosure requirements?

b. Abused its discretion, due to the Loveall Report's failure to meet the

admissibility standards of FRE 702 and *Daubert*?

c. Abused its discretion, due to the Loveall Report lacking a date, in

violation of the requirements of 28 U.S.C. § 1746?

d. Abused its discretion, due to the Loveall Report's failure to address at

least 12 key defense findings, its agreement with one of the defense's

key findings, its decision not to contest another, and its blatant errors?

3. Whether the District Court abused its discretion in finding that "ample [non-

digital] trial evidence", in conjunction with the post-trial Loveall Report and

post-trial Camila declaration, outweighed the materiality of the 7 digital

forensic experts' findings, to deny the Rule 33?

4. Whether the District Court abused its discretion in ignoring that the non-

disclosure and concealment of the **second** forensic image of the memory

card constitutes both a *Brady/Giglio* violation and "newly discovered

evidence" under Rule 33?

5. Whether the District Court abused its discretion in ignoring that an FBI

   photograph technician conducted an unauthorized access of the unpreserved

   memory card, deliberately omitted from the chain of custody, and revealed

   by the government after trial in their Consolidated Opposition, constitutes

   both a *Brady/Giglio* violation and "newly discovered evidence" under Rule

   33?

6. Whether the District Court abused its discretion in ignoring that the 7 digital

   forensics experts' discovery of proof of government involvement in

   falsifying material evidence categorically constitutes "newly discovered

   evidence" under Rule 33 and a *Brady/Giglio* violation?

7. Whether the evidence of systematic and intentional government malfeasance

   meets the standard for dismissal of the indictment, or, separately, a reversal

   of the conviction due to structural error?

8. Whether the District Court abused its discretion in denying Mr. Raniere's

   Motions to Compel exculpatory evidence, for use in his Rule 33 Reply?

9. Whether the District Court abused its discretion in denying the Motion for
   Recusal, pursuant to 28 U.S.C. § 455, by:

   a. Erroneously applying the standard set forth in *Liteky* for post-trial
      judicial comments to comments made during trial?

   b. Failing to acknowledge that its comments both in the presence and
      absence of the jury evinced a "deep-seated antagonism" against Mr.
      Raniere?

   c. Failing to acknowledge that its reason for terminating cross-
      examination of a key government cooperating witness was to prevent
      the jury from hearing testimony favorable to the defense?

   d. Failing to acknowledge that its post-trial comments during a
      restitution hearing evinced "deep-seated antagonism" towards Mr.
      Raniere?

All should be answered in the affirmative.

## STANDARD OF REVIEW

The Second Circuit reviews a District Court's denial of a Rule 33, a Motion to Compel, and a Motion for Judicial Disqualification for abuse of discretion. *See United States v. Sessa,* 711 F.3d 316, 321 (2d Cir. 2013), *cert, denied,* —— U.S. —— ——, 134 S.Ct. 353 (2013); *United States v. Boles*, 914 F.3d 95, 109 (2d Cir. 2019); *United States v. Wedd*, 993 F.3d 104, 114 (2d Cir. 2021).

"A district court 'abuses' or 'exceeds' the discretion accorded to it when (1) its decision rests on an error of law (such as application of the wrong legal principle) or a clearly erroneous factual finding, or (2) its decision—though not necessarily the product of a legal error or a clearly erroneous factual finding— cannot be located within the range of permissible decisions." *Zervos v. Verizon N.Y., Inc.,* 252 F.3d 163, 169 (2d Cir.2001) (footnotes omitted).

Issues 1, 2(a), 3, 4, 5, 6, 7, 8, and 9(a) are presented for *de novo* review. Issues 2(b) - (d) and 9(b) - (d) are presented for abuse of discretion review.

As to an error of law, the Second Circuit "review[s] constitutional claims and questions of law *de novo*." *Paucar v. Garland* 84 F.4th 71, 80 (2d Cir. 2023).

This Court reviews challenges to the sufficiency of the evidence underlying criminal convictions *de novo*. *United States v. Purcell*, 967 F. 3d 159, 185 (2d Cir. 2020).

Materiality in the context of an alleged *Brady* violation presents a mixed
question of law and fact and is reviewed *de novo* by this Court. See *United States
v. Madori*, 419 F.3d 159, 169 (2d Cir. 2005) (citations omitted).

This Court reviews the denial of a motion to dismiss an indictment on
grounds of government misconduct *de novo*. *See United States v. Walters,* 910
F.3d 11, 22 (2d Cir. 2018).

## STATEMENT OF CASE

This is a consolidated appeal from post-conviction Memorandum & Orders
by The Hon. Judge Nicholas G. Garaufis, USDJ (hereinafter referred to as "Judge
Garaufis" and "the Court") in *United States v. Keith Raniere, et. al*, 1:18-cr-00204,
(EDNY) in which he denied without a hearing Mr. Raniere's First and Second
Motion to Compel Production of Evidence and Motion for Reconsideration
(hereinafter jointly referred to as "Motions to Compel") (SPA12-19), Final Rule 33
Motion for a New Trial and its Supplement (hereinafter referred to as "Rule 33")
(SPA20-30), and Motion for Recusal (SPA1-11).

### 1. Before Trial

On February 21, 2019, nine (9) weeks before the trial was set to begin, FBI
agents made an 'accidental' discovery on a seized Western Digital hard drive
(hereinafter referred to as the "hard drive") of alleged child pornography involving
a single subject, Camila. (SPA22). The files were outside the date range authorized

by the search warrant. This accidental discovery transformed a case about adult conduct into one centering on child exploitation. It led to a second superseding indictment on March 13, 2019, adding two (2) predicate acts of sexual exploitation, for alleged production of the photos, and one predicate act of possession of the photos on the hard drive (hereinafter referred to as "child predicate acts"). (A192-193). The prosecution stated that these charges were "at the heart of our racketeering conspiracy." (A217:14-16).

Pre-trial, the defense requested inspection of all digital evidence which supported these predicate acts (A243:10-15, A265 ¶ 4, A419:5-9). The hard drive was the only piece of digital evidence the prosecution disclosed it would rely on to support the child predicate acts. (Doc. 362, A220-230; A232-264). On April 4, 2019, the prosecution pressed the defense to declare it would be ready for trial. The defense stated that it would be ready, noting that the prosecution had been "accommodating and responsive", as they had made *the hard drive* available to the defense for its expert to analyze (A243:6-A244:2).

However, on April 24, 2019, during the third day of jury selection, the prosecution disclosed a forensic report about a different piece of digital evidence, *a camera's memory card*, by CART Examiner Stephen Flatley (hereinafter referred to as "Flatley"). (A776, 1089). This was the first indication of the government's reliance on the camera's memory card.

## 2. At Trial

On May 4, 2019, three (3) days prior to opening statements, the Court issued its ruling on the motions *in limine*, ordering, "Raniere is prohibited from presenting evidence or arguments concerning… **alleged government misconduct** in … this prosecution". (A272). (emphasis added).

At trial, the child pornography and sexual exploitation predicate acts centered on the digital evidence: a Canon camera (hereinafter referred to as the "camera"), its memory card, and the hard drive, all seized from 8 Hale Drive, a townhouse Mr. Raniere used. (A774). The government's theory at trial was that Mr. Raniere took illicit photographs of a singular underage subject on two (2) dates in 2005[2] with the camera, which stored photographs on its memory card, and the photographs were backed up to the hard drive, where the FBI reported discovering them. (A525:9-A529:24).

Camila, the subject of the alleged underage photographs, did not testify at trial. The photographs were not obviously contraband but were argued to be such,

---

[2] The prosecution had an ever-shifting number of alleged illicit photographs. Before trial, it was "approximately 15" photos. (A226). During trial, it was "18 or so images". (A391:7-9). After trial, it was "at least nine". (A1573).

based upon allegedly being taken in 2005, when she would have been fifteen (15), using the camera[3]. (A528:22-A529:24; A530:17-23).[4]

The 2005 timing was derived from information in the photographs, called EXIF metadata, which is generated by a camera on capture. (A346:18-A347:20). FBI Senior Forensic Examiner Brian Booth (hereinafter referred to as "Booth"), who analyzed the hard drive, testified that EXIF metadata is difficult to modify and "purposely designed" to be that way. Booth affirmed it is the "best evidence" of when the photographs were taken and that the EXIF metadata dates indicated the photos were taken in 2005. (A349:12-4; A359:3-11; A404:7-11). In summation, lead prosecutor AUSA Moira Kim Penza (hereinafter referred to as "AUSA Penza") reiterated this by stating:

> [T]he photographs were taken in 2005 because that's what the data shows... Booth testified that **the most reliable metadata that the FBI could obtain from the images on the Western digital hard drive, said that they were taken... on November 2, 2005 ... [and] November 24, 2005.**[5]

---

[3] That specific camera was necessary to establish an element of production. Neither of the witnesses who were photographed, **as adults**, by Mr. Raniere identified the camera as the one used to photograph them. Camila did not identify that camera in her post-trial declaration.

[4] Camila's sister Daniela testified that Camila underwent an appendectomy in 2007, and was asked, "[I]f you saw an image of Camila where there is no scar on her abdomen, would you know how old she was?" to which Daniela answered, "She would be 16 years or younger." (A295:11-20; A298:24-A299:3) According to the testimony of Special Agent Michael Weniger, no appendectomy scar was visible in the photographs. (A516:6-A517:8). There are photographs of Camila as an adult where sometimes the scar is not visible, as presented in Mr. Raniere's *pro se* Rule 33. (A1335 ¶ 6).

[5] It should be noted that Camila, in her post-trial declaration, claimed that there was only <u>one</u> (1) single photo session in 2005, "no more than 2-3 months after September 18, 2005." (A1592 ¶ 8).

(A529:16-24) (emphasis added).

The defense discovered post-trial that Flatley, who did not testify in this case, testified in a prior case that **metadata creation dates are unreliable and easily altered**. (A1512-1520, 1826).

Five (5) weeks into the six (6) week trial and prior to testimony about the digital evidence, Flatley, who examined the camera and memory card, was suddenly sent to Ghana. Flatley created a forensic image of the memory card before trial, and Booth was substituted as a trial witness to testify about the forensic analysis of the camera and its memory card. (A510:1-16). At trial, the prosecution introduced a "Replacement" report from Booth regarding the memory card. Booth's report, disclosed two (2) days before the close of testimony, showed that the memory card contained photo files that corroborated the 2005 dates of the purported contraband and linked the photographs to the camera tied to Mr. Raniere. (A1006-1007, A1029-1033; A530:17-A531:1).

The prosecution elicited testimony supporting that the camera, containing the memory card, was properly handled in accordance with FBI protocol. Special Agent Christopher Mills (hereinafter referred to as "Mills") testified that FBI protocol, which requires the involvement of the Computer Analysis Response Team (hereinafter referred to as "CART") to review original digital evidence, was

adhered to with the handling of the camera. (A304:8-18)[6]. Four (4) years after trial, the prosecution's footnote revealed that the protocol was **not** followed for the camera and its memory card, as it was accessed outside of CART. (A1579 at n.6).

Booth, a CART member, explained that CART's role is to "protect and process" digital evidence; this involves creating a "forensic image," which is an extraction of the device's data. (A308:2-8; A310:3-A311:2). Booth testified that CART protocol allows for **only one (1) forensic image per device** and that all evidence review and analysis is conducted based on that image. (A311:21-A312:19. The prosecution did not disclose that Booth's "Replacement" report was derived from **a second forensic image**, which he created, a violation of FBI protocol, the existence of which was discovered by the defense post-trial. (A1006-1007, 1038-1039).

During cross-examination of Booth regarding his examination of the camera and memory card, Assistant U.S. Attorney Tanya Hajjar (hereinafter referred to as "AUSA Hajjar") requested a sidebar and represented that Booth did not create any forensic images. (A414:3-A416:4). During it, AUSA Hajjar admitted that they had not disclosed the CART examination notes. In response, the defense reiterated its

---

[6] Three (3) days after Mills' testimony, and the day before the close of testimony, Booth confirmed that an access without a write blocker occurred prior to delivery to CART.

request for all Rule 16 and 3500 materials. (A417:17-24; A417:25-4895:3; A418:16-22).

### 3. Post-Trial Discoveries of Digital Evidence Falsification

Mr. Raniere, in weighing his right to exercise his post-conviction challenges, retained Dr. James Richard Kiper, Ph.D. (hereinafter referred to as "Dr. Kiper"), a retired FBI Special Agent, Forensic Examiner, and "a trainer of forensic examiners, and a trainer of other trainers of forensic examiners," to analyze the digital evidence. (A1003). Based on his specialized knowledge of FBI procedure, Dr. Kiper deduced from details in Booth's report and notes that Booth's report was based on a **second** forensic image of the memory card, which Booth had created on June 11, 2019, violating the very protocol Booth testified to. Dr. Kiper also noted that creating a second forensic image is **strictly prohibited by the FBI**. (A1038).

Dr. Kiper uncovered that Booth's report contained thirty-seven (37) photo files not listed in Flatley's report and that the metadata of several of these photo files had been intentionally manipulated. (A1004-1005). He concluded that there was a "high likelihood" that **all 37 photo files were planted on the memory card in FBI custody**, between the creation of the first and second forensic images. (A1036-1037).

Notably, Dr. Kiper, during his 20 years in the FBI, "never observed or claimed that an FBI employee tampered with evidence, digital or otherwise." (A1003).

Dr. Kiper determined that the alleged contraband, as well as the other photos on the hard drive, had been manually planted there, and that timestamps and folder names had been intentionally manipulated, "happen[ing] to align with the government's narrative." (*Id.*). All of Dr. Kiper's technical findings and conclusions of digital evidence falsification were independently verified and agreed with by six (6) additional forensic experts, including three (3) fellow former FBI CART examiners. (A1074-1087, A1097-1104, A1371-1556).

On March 16, 2022, prior to filing the Rule 33, Mr. Raniere, through counsel, requested the second forensic image from the prosecution. (A1143-1154). On March 18, 2022, AUSA Hajjar responded that the prosecution had "fully complied" with its obligations under *Brady*, Rule 16, and 3500. (*Id.*) Prior to trial, the prosecution made multiple representations about their compliance. (A1749-1752; A1780-1782).

On May 3, 2022, Mr. Raniere filed the Rule 33. (A767-808). Thereafter, with the Court's permission, Mr. Raniere filed a supplemental Rule 33, which focused on *Brady* violations. (A1197-1210). On June 21, 2022, Mr. Raniere filed a

*pro se* Rule 33. (A1211-1231). On April 14, 2023, Mr. Raniere filed a Motion to

Compel, seeking access to the second forensic image. (A1358-1556).

### 4. Government's Consolidated Opposition

The government submitted a Consolidated Opposition to Mr. Raniere's Rule

33 and Motion to Compel, denying that evidence manipulation occurred. (A1568-

1589).

To support its contentions, the prosecution submitted a forensic report from

Loveall, who was not involved in the investigation or prosecution of Mr. Raniere.

(A1618-1625). Loveall was given access to the second forensic image, and his

report, which was undated in violation of 28 U.S.C. 1746, was created solely for

the purpose of opposing the Rule 33 (A1618, A1621-1622 ¶ 9).

In his report, Loveall included rebuttals to five (5) of the seven (7) technical

findings by Dr. Kiper. (A1619 ¶ 5, A1619-1620 ¶ 6, A1620-1621 ¶ 7, A1621 ¶ 8,

A1621-A1622 ¶ 9, A1622 ¶¶ 11-12, A1622-1623 ¶ 13, A1623 ¶¶ 14-15, A1623-

1624 ¶17, A1624-1625 ¶18). Of the remaining two (2) findings, he chose not to

contest one (1) finding (A1623 ¶ 16), and agreed with the other, that the memory

card was accessed on September 19, 2018[7] without a 'write blocker,' a tool meant

---

[7] The defense was aware of this improper September 19, 2018 access at trial. (A492:6-A496:12).
Dr. Kiper included this fact as one of several findings which supported his conclusion of
intentional evidence manipulation. (A1007-1008).

to prevent alterations to the digital evidence. (A1622 ¶ 10). The Loveall Report only addressed a subset of Dr. Kiper's findings and did not address the 6 other digital forensics experts' reports.

Over 4 years after trial, the prosecution disclosed for the first time, in two parts,[8] that an unidentified FBI "photograph technician" was the individual who improperly accessed the camera's memory card on September 19, 2018, which was before it was delivered to CART for processing, violating FBI protocol. (A1579 at n.6). No such person was listed on the chain of custody or previously disclosed. (A1233-A1235).

The prosecution also included a post-trial declaration from Camila. (A1591-1593). In it, Camila asserted that she was 15 in the photos and that they were taken by Mr. Raniere. (*Id*). Prior to the creation of this declaration, Camila was awarded $507,997.45 in restitution. (A1821).

### 5. Defense's Reply to the Rule 33

In its Reply, the defense included a joint report from the 7 digital forensics experts which provided refutations for each of Loveall's rebuttals, identified errors in his report, and included additional findings of data falsification on the memory

---

[8] In their Consolidated Opposition, the prosecution disclosed the existence of the "photograph technician." (A1579 at n.6). Five (5) months later, in their Opposition to the Second Motion to Compel, the prosecution identified the same individual as an **FBI** photograph technician. (Doc. 1231 at 1).

card, such as the planting of photo files and manual editing of timestamps, which were uncovered during the process of responding to Loveall. (A1698-1727). This report was also included in the Motion for Reconsideration. (A1694).

### 6. The Court's Denials

First, the Court denied the Motion for Recusal. (SPA1-11). The Court then denied, without a hearing, the Motion to Compel, its subsequent Motion for Reconsideration, and a Second Motion to Compel seeking information about the newly disclosed FBI photograph technician. (A1680-1691, SPA12-19). It credited the Loveall Report's rebuttals as more "plausible" than Dr. Kiper's findings, relied on Camila's post-trial declaration, and pointed to the so-called 'ample trial evidence' supporting the jury verdict. Thereafter, in denying the Rule 33 without a hearing, the Court reiterated this reasoning and found no newly discovered evidence or *Brady* violations. (A1840).

## SUMMARY OF THE ARGUMENT

### I.   Denial of the Rule 33

The Court's finding that "Mr. Raniere seeks to have a new trial to challenge evidence … that he had the opportunity to challenge, and did in fact challenge during his trial" is patently wrong. (SPA27-28). Mr. Raniere is not seeking a second bite at the apple. There are clear *Brady/Giglio* violations and "newly discovered evidence" which the Court abused its discretion in not crediting: 1) the

second forensic image of the memory card, 2) the secret FBI photograph

technician, and 3) the 7 digital forensics experts' proof of government involvement

in the falsification of the digital evidence used to introduce and support the child

predicate acts. Each of these were actively concealed by the government.

The Court's conclusion that the defense's evidence would not "likely lead to

an acquittal" is flawed. It failed to apply the *Brady* standard for Rule 33 review, a

less strict standard, despite the defense identifying *Brady* violations.

The Court erroneously credited new government evidence, created post-trial,

serving as its primary basis for the Rule 33 denial. Put simply, Judge Garaufis'

reliance upon Camila's declaration and the Loveall Report violates the

Confrontation Clause. Neither testified before the jury and were never subject to

cross examination yet the Court credited their testimonial statements as proof of

the truth of the matters they asserted. *See Smith v. Arizona*, 144 S. Ct. 1785, 1792

(2024) (quoting *Anderson v. United States*, 417 U.S. 211, 219 (1974)). The Loveall

Report does not comply with *Daubert*, FRE 702, and 28 U.S.C. § 1746.

The government should not be permitted to claim that there is no "newly

discovered evidence" when they indisputably created new evidence post-trial and

disclosed previously concealed information to the defense for the first time, and

then used it to oppose Mr. Raniere's Rule 33 and Motions to Compel.

Finally, the Court fails to recognize that the 7 digital forensics experts'
conclusion that the hard drive and camera's memory card were falsified is fatal to
the child predicate acts, independent of any so-called other 'ample trial evidence.'
The Court's refusal to order a hearing, despite the unanimous determination by **4
former members of the FBI digital forensics unit** regarding unprecedented
government malfeasance, and the Court's reliance on new unscrutinized evidence
created post-trial by the prosecution shocks the conscience.

## II.  Denial of the Motions to Compel

A District Court has broad discretion to fashion discovery mechanisms
suitable to the case before it. According to the Supreme Court, "where specific
allegations before the court show reason to believe that the petitioner may... be
able to demonstrate that he is" entitled to a new trial, "it is the duty of the court to
provide the necessary facilities and procedures for an adequate inquiry." *Harris v.
Nelson,* 394 U.S. 286, 299 (1969); *see also United States v. Wolfson*, 413 F.2d 804,
808 (2d Cir. 1969) (in dictum, suggesting that *Harris* applies to Rule 33 motions).

The Court erroneously concluded there was no "reasonable probability" that
testing the requested evidence, including the 2 forensic images of the memory
card, would prove Mr. Raniere's innocence. However, this conclusion is based on
the same three (3) flawed factors: 1) the Loveall Report, 2) Camila's post-trial
declaration, and 3) 'ample trial evidence.' Permitting the defense to test the

forensic images would further prove digital falsification. It would also confirm

whether 37 specific photo files are present only on the second forensic image,

which Dr. Kiper concluded a high likelihood of. If true, this would prove they were

planted on the memory card in FBI custody during the months between the

creation of the 2 forensic images. This finding would entitle Mr. Raniere to a new

trial, if not a dismissal.

Finally, the Court failed to recognize that Loveall used both the concealed

second forensic image and the first forensic image[9] to make new, material claims

opposing the Rule 33. The defense needed access to both forensic images to

competently respond to these claims. In a circular way, the Court used the Loveall

Report to deny the defense access to evidence needed to challenge it, and then

relied on that report to deny the Rule 33.

## III.    Denial of Recusal

The District Court abused its discretion in denying Mr. Raniere's motion for

recusal by misapplying the standard in *Liteky v. United States*. The Court

incorrectly relied on *Liteky* to justify its denial; as *Liteky* stands for the proposition

that recusal is not warranted where "upon completion of the evidence, [a Judge is]

exceedingly ill disposed towards the defendant". However, the comments in

question occurred early in the trial, during ongoing evidence, before a

---

[9] The first forensic image was first known to the defense on the third day of jury selection.

determination of guilt. Judge Garaufis's comments revealed that the Court's

termination of cross-examination of a key government witness was based upon

preconceived notions of Mr. Raniere's guilt and an effort to protect the

government's case; demonstrating "deep-seated favoritism" towards the

prosecution. Further, the Court's exchange with defense counsel during the

restitution hearing highlighted its "deep-seated antagonism" incompatible with

judicial impartiality. These incidents show bias, warranting recusal pursuant to 28

U.S.C. § 455(a) to ensure a fair evaluation of Mr. Raniere's post-conviction

motions.

## ARGUMENT

I.    **Whether the District Court Abused Its Discretion in Denying the Rule 33 by Substantially Relying Upon and Crediting New Government Evidence, Created Post-Trial, from Individuals Who Were Never Subject to Cross-Examination, Violating Mr. Raniere's Sixth Amendment Right of Confrontation**

### A. Applicable Law

Under *Crawford v. Washington,* 541 U.S. 36 (2004), a witness's testimony

against a defendant is inadmissible unless the witness appears at trial or, if the

witness is unavailable, the defendant had a prior opportunity for cross-

examination. This principle was further extended in *Melendez-Diaz v.*

*Massachusetts*, 557 U.S. 305 (2009), where the Court held that affidavits reporting

the results of forensic analysis are testimonial, requiring the analyst who prepared

the report to testify in person. *See also Bullcoming v. New Mexico*, 564 U.S. 647 (2011.

    In *Smith v. Arizona*, 602 U.S. ___; 144 S. Ct. 1785, 1791 (2024), The Supreme Court held that "a prosecutor cannot introduce an absent laboratory analyst's testimonial out-of-court statements to prove the results of forensic testing", thereby implicating the Confrontation Clause. *See also United States v. Johnson*, 2024 U.S. App. LEXIS 22691, at \*34 (2d Cir. 2024).

    Pursuant to this Court's precedent, a district court faced with a Rule 33 motion must be careful to consider any reliable **trial evidence**[10] as a whole, rather than on a piecemeal basis. *See, e.g.*, *United States v. Middlemiss*, 217 F.3d 112, 117 (2d Cir. 2000) (emphasis added). An analysis of trial evidence is a required aspect of the analysis, not post-trial evidence created by the government, which forms ⅔ of Judge Garaufis' basis for his denial of the Rule 33 and related Motions to Compel. (SPA15, SPA29).

    **B. Analysis**

    Defendants have fewer rights in post-conviction proceedings, given the existence of evidence previously subjected to an adversarial process. **Here, Mr.**

---

[10] If this Court finds a structural error occurred, or that an evidentiary hearing is necessary to make this determination, as discussed in Section VII**,** the trial evidence cannot be considered "reliable."

**Raniere's case is unique because the Court relied on, and credited, new government evidence, created post-trial.** Since the government's newly created evidence was never subject to an adversarial process, nor presented for the jury's scrutiny, the Court should not have made a credibility determination.

The Court credited the post-trial declaration of Camila, despite its hearsay, for the truth of her assertion that she was 15 years old in the photographs. Yet while the Court acknowledged that Camila never testified at trial[11] (SPA24), it went on to fully credit the declaration as one-third (⅓) of its reasons for denial. Moreover, in assessing the declaration's credibility, the Court failed to discuss the fact that Camila had previously been awarded $507,997.45 in restitution, a material factor potentially impacting her motives. (A1821).

The Court also failed to consider critical inconsistencies in her declaration, raised in the Rule 33 Reply. (A1821-1822). In it, Camila claims there was only a single photo session in 2005 and claims certainty of the timing because "it was the only time he took photographs of me like that." (A1592 ¶ 8, A1593 ¶ 10). Yet, this is contradicted by her statement at sentencing, when she alleged multiple photo sessions at age 15. (Sentencing Hearing T. (10/27/20) at 21: 7-13). The

---

[11] Neil Glazer, a civil attorney who represented Daniela, Camila's sister, and other testifying government fact witnesses, wrote in a pre-trial email, "Cami has been interviewed… the fact is they don't need her testimony to prosecute and convict Raniere... Moira [AUSA Penza] told me, and this is a quote, '**we have all the evidence we need.**'" (A1330) (emphasis added).

government's theory, presented at trial and based on the EXIF dates, claimed **2** photo sessions on precise dates in 2005, further casting doubt on the veracity of Camila's declaration.

The Court relied on the Loveall Report for the truth of whether digital evidence falsification occurred. The Loveall Report relied on Flatley's analysis, specifically the settings[12] he used to generate his report, to make material assertions. (A1621-1622 ¶ 9). Neither Flatley nor Loveall testified in the case, and Loveall had no involvement in the prosecution of Mr. Raniere. (A1618 ¶ 2). **This set of circumstances is the exact harm sought to be prevented** under *Bullcoming v. New Mexico*, and *Smith v. Arizona*, which require that the analyst responsible for the original analysis testify in court.

If this had occurred during trial, not taking testimony from Camila, Loveall, or Flatley would be a clear violation of the Confrontation Clause. By crediting the truthfulness of this new government evidence, the Court usurped the jury's role in assessing witness credibility. As noted in *U.S. v. Autuori*, 212 F.3d 105, 120 (2d Cir. 2000): "the court may weigh the evidence and credibility of witnesses... At the same time, the court may not wholly usurp the jury's role. It is only where exceptional circumstances can be demonstrated that the trial judge may intrude

---

[12] The defense was not provided these settings; they are not a part of Flatley's report.

upon the jury function of credibility assessment." No such exceptional
circumstances exist here.

Respectfully, the Confrontation Clause protections must apply here given
that the government introduced unconfronted post-trial evidence from new
witnesses, effectively presenting a different case than at trial and bolstering it. The
Court used this new **post-trial** government evidence to justify why the defense's
newly discovered evidence would not have changed the **trial** outcome. This logical
fallacy created by the Court's erroneous Rule 33 analysis is precisely why this
Court must intervene.

## II. The District Court Abused Its Discretion in Crediting Loveall to Deny the Rule 33

### A. Loveall's Report Was Based Upon Secret Evidence, Violating Mr. Raniere's Fifth Amendment Due Process Rights

#### 1. Applicable Law

The practice of the government utilizing undisclosed evidence is a violation
of due process. In *U.S. v. Abuhamra*, this Court held that the district court's
reliance on *ex parte* information provided by the government, during a post-
conviction bail hearing, which was not disclosed to the defense, violated due
process. *U.S. v. Abuhamra*, 389 F.3d 309, 322 (2d Cir. 2004). The *Abuhamra*
Court also opined:

> "Although a defendant who has been found guilty at trial retains
> only a modest conditional expectation of continued liberty…

neither the defendant nor the public would be well served by having determinations that so immediately affect even this reduced interest routinely made in closed proceedings or on secret evidence." *Id. at* 324.

### 2. Analysis

Loveall used both images in his analysis and made material assertions about them. (A1621-1622 ¶ 9). The government has refused defense access to these same materials.[13] To verify or challenge Loveall's critical claim that the 2 forensic images are "identical"[14] and thus 37 photo files were not planted in FBI custody, the defense must have access to both forensic images. Additionally, Loveall relied on Flatley's report settings, which are not listed in his report, to assert that the 37 photo files on the second forensic image do not appear in Flatley's report of the first forensic image due to different settings.

The only time the Court addressed Mr. Raniere's reliance on *Abuhamra* was in denying the Second Motion to Compel, opining "*Abuhamra* is thus inapplicable to this case where the court did not rely on arguments presented *ex parte* or *in camera* and does not concern access to information relevant to a party's bail application." (SPA16). However, the Court relied on secret evidence to adjudicate the Rule 33, violating due process. The Rule 33 and *Abuhamra* both deal with

---

[13] The defense was aware of the **first** forensic image at trial.

[14] The literal interpretation of Loveall's assertion is that the forensic image of the **camera** is identical to the forensic image of the **memory card**, which is false and impossible, as discussed in Section II(E)

secret evidence within a post-conviction proceeding. Yet in the Rule 33, the liberty interest impacted is greater, as is the level of secrecy. *Abuhamra* dealt with a defendant's post-conviction bail hearing while awaiting sentencing, whereas a Rule 33 entails the possibility of a new trial. While *Abuhamra* dealt with *ex parte* evidence, the Rule 33 deals with secret evidence.

This Court must avoid a ruling that makes it acceptable for district courts to rely on secret government evidence to deny a Rule 33.

### B. Loveall's Report Failed to Meet the Admissibility Standards of FRE 702 and *Daubert*

#### 1. Applicable Law

Under *Daubert*, the judge must ensure that an expert's testimony rests on a reliable foundation and is relevant. *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 580 (1993). It is an abuse of discretion to admit expert testimony based on speculative assumptions. *Boucher v. U.S. Suzuki Motor Corp.*, 73 F.3d 18, 22 (2d Cir. 1996). "[W]hen an expert opinion is based on data, a methodology, or studies that are simply inadequate to support the conclusions reached, *Daubert* and Rule 702 mandate [its] exclusion". *Amorgianos v. National R.R. Passenger Corp.* 303 F.3d 256, 266 (2d Cir. 2002). Expert testimony must be "based on sufficient facts or data." FRE 702(b).

## 2. Analysis

Loveall's rebuttals of Dr. Kiper's technical findings are speculative and outright lack data. (A1619 ¶ 5, A1619-1620 ¶ 6, A1620-1621 ¶ 7, A1621 ¶ 8, A1621-A1622 ¶ 9, A1622 ¶¶ 11-12, A1622-1623 ¶ 13, A1623 ¶¶ 14-15, A1623-1624 ¶17, A1624-1625 ¶18, A1699 ¶ 4(d); A1824). Loveall's conclusions rest on conjecture, unverified assertions and are unsupported by sufficient facts or data. As such, the Loveall Report fails to meet the reliability and evidentiary requirements set forth in *Daubert* and FRE 702. This Court must avoid a ruling that violates this Supreme Court precedent and the FRE.

### C. Loveall's Report Failed to Meet the Statutory Requirements of 28 U.S.C. § 1746

#### 1. Applicable Law

Under 28 U.S.C. § 1746, an unsworn declaration must be "dated" to be valid. Failure to date an unsworn declaration is "technical noncompliance." *Dilonez v. Fox Linen Serv. Inc.*, 35 F. Supp. 3d 247, 253 (E.D.N.Y. 2014). This Court has upheld exclusion of undated affidavits. *See Reynolds v. Sealift, Inc.*, 311 Fed.Appx. 422, 425 (2d Cir. 2009). The District Courts of the Second Circuit, including The Eastern District of New York:

> "have routinely exercised their discretion against admitting
> undated, unsworn declarations into evidence. See, e.g., *Mendez v.*
> *MCSS Rest. Corp.*, 564 F. Supp. 3d 195, 209 (E.D.N.Y. 2021)
> (declining to accept plaintiff's undated, unsworn declaration);
> *Williams v. Keisler*, … 2007 U.S. Dist. LEXIS 117028 at *4

(E.D.N.Y. Oct. 30, 2007) ("The document is not actually an
affidavit, since it is unsworn, and is not admissible as an unsworn
declaration because it is undated."); *Perkins v. Teele*, … 2018 U.S.
Dist. LEXIS 122117 … at *2 n.3 (D. Conn. July 23, 2018)
(disregarding an undated, unsworn declaration)". *United States v.
Hicks*, 2024 U.S. Dist. LEXIS 7877, at *10 - 12 (W.D.N.Y
1.16.24).

Other Circuits have also deemed undated declarations inadmissible. *See,
e.g., Flovac, Inc. v. Airvac, Inc.*, 817 F.3d 849, 854 n.2 (1st Cir. 2016); *Bonds v.
Cox*, 20 F.3d 697, 702 (6th Cir. 1995).

### 2. Analysis

The Loveall Report is undated, making it inadmissible, technically non-
compliant, and invalid. (A1618, A1825). The Court abused its discretion in
crediting and relying upon it.

### D. Loveall's Report Failed to Refute the 7 Digital Forensics Experts' Findings

The Court's claim that "Loveall's explanations… thoroughly refute Kiper's
key findings" is incorrect. (SPA29, citing to A1682-1683). Of Dr. Kiper's 7
technical findings, Loveall only provided speculative rebuttals to five (5) of them;
the 7 digital forensics experts refuted these 5 in their joint response. (A1619 ¶ 5,
A1619-1620 ¶ 6, A1620-1621 ¶ 7, A1621 ¶ 8, A1621-A1622 ¶ 9, A1622 ¶¶ 11-12,
A1622-1623 ¶ 13, A1623 ¶¶ 14-15, A1623-1624 ¶17, A1624-1625 ¶18, A1699 -
A1703). The prosecution and Loveall had the opportunity to contest at least **12**
other significant defense findings and failed to do so. In their Opposition to the

Rule 33, they opposed only Dr. Kiper's findings, in part, and none of the other

experts' findings. In their Opposition to the Motion for Reconsideration, they

failed to contest the 7 digital forensic experts' joint report. Thus, and as

summarized below, the Loveall Report was hardly a "thorough refutation":

| Defense Finding | Loveall / Government's Response |
|---|---|
| Mills committed perjury by testifying that the camera was handled in compliance with FBI protocol. (A1206). | **Uncontested.** |
| Booth committed perjury regarding the reliability of EXIF metadata and that receiving unsealed evidence is not extraordinary. (A1037-1039). | **Uncontested.** |
| SAs Lever and Maegan Rees each reviewed the unpreserved camera and memory card, for a total of 24 days, before it had been sent to CART, violating FBI procedure. (A1035-1036). | **Uncontested.** |
| The USAO was provided the original, unpreserved memory card, which is prohibited by FBI protocol. (A1383). | **Uncontested.** |
| An unauthorized forensic exam was done on the unpreserved memory card on 9/19/18, 5 months before it was delivered to CART. (A1383). | **Uncontested.** |
| Booth created a second forensic image of the memory card, in violation of FBI procedure. (A1006-1007, A1038-1039). | **Uncontested.** |

| | |
|---|---|
| Booth's receipt of the memory card from Mills in an unsealed bag violated FBI procedure. (A1034). | **Uncontested.** |
| Photos 81-100 on the memory card were planted by a computer with manually edited creation dates, falsely supporting the 2005 timeframe. (A1703 ¶ 15(a), A1707-1709). | **Uncontested.** This was submitted in the Motion for Reconsideration and the government did not address it in their Opposition.[15] |
| Photos 224-243 on the memory card were planted by a computer with manually edited creation dates, falsely supporting the 2005 timeframe. (A1703 ¶ 15(b), A1709-1711). | **Uncontested.** This was submitted in the Motion for Reconsideration and the government did not address it in their Opposition.[16] |
| A computer was used to manually edit the last accessed dates of Photos 21-42, falsely supporting the 2005 timeframe. (A1703 ¶ 15(c), A1711-1713). | **Uncontested.** This was submitted in the Motion for Reconsideration and the government did not address it in their Opposition.[17] |
| A computer was used to manually edit the last accessed dates of Photos 193-199, falsely supporting the 2005 timeframe. (A1703 ¶ 15(d), Bates 17-18). | **Uncontested.** This was submitted in the Motion for Reconsideration and the government did not address it in their Opposition.[18] |
| Folder names on the hard drive were intentionally manipulated, falsely supporting the 2005 timeframe. (A1009-1010, 1378-1379). | **Loveall responded but did not contest.** (A1623 ¶ 16). |
| The 168 photos, including the alleged contraband, were **manually planted on the hard drive** and disguised to appear as if they were automatically backed up by a computer in 2009. (A1011-1012, | Rebutted defense's finding without proof and their rebuttal is demonstrably false. (A1623-1624 ¶ 17, A1624-1624 ¶18, A1700 ¶ 8). |

---

[15] This defense finding was also included in the Reply to the Rule 33, not in the original findings Loveall reviewed.

[16] *See* footnote 14.

[17] *See* footnote 14.

[18] *See* footnote 14.

| A1379, A1448-1451). | |
|---|---|
| Photos 93-97 on the memory card had their metadata intentionally manipulated. (A1004-1005, A1437-1439). | Rebutted defense's finding without proof and their rebuttal is demonstrably false. (A1619 ¶ 5, A1619-1620 ¶ 6, A1620-1621 ¶ 7, A1621 ¶ 8, A1702 ¶ 14). |
| 37 photo files, with "high likelihood", were planted on the memory card in FBI custody, between 4/11/19 and 6/11/19. (A1036-1037). | Rebutted defense's finding without proof and is unverifiable by the defense without access to the forensic images. (A1621-1622 ¶ 9, A1702 at n.1). |
| Timestamps of at least 12 photos on the hard drive were intentionally manipulated to falsely support the 2005 timeframe. (A1008-1009; A1378-1379). | Rebutted defense's finding without proof and their rebuttal is demonstrably false. (A1622 ¶¶ 11-12, A1622-A1623 ¶ 13, A1623 ¶¶ 14-15, A1701 ¶¶ 9-10). |
| Memory card altered on 9/19/18 in FBI custody. (A1007-1008). | **Agreed.** (A1622 ¶ 10). |

The Court's denial renders the above uncontested findings of government misconduct and data falsification as acceptable.

### E. Loveall's Report Contained Indisputable Errors

The Court ignored false assertions made by Loveall that undermine the credibility of his report. For example, Loveall wrote:

> "The fact that additional files appeared in one report [of the memory card] is a result of the use of different settings. I have examined the disk images [forensic copies] created of 1B15 and 1B15a and determined that they are identical." (A1621-1622 ¶ 9).

To a layperson, this statement appears as though Loveall is confirming that the 2 forensic images of the memory card are "identical." However, he is actually stating

that a forensic image of the *camera* (1B15) is identical to a forensic image of the *memory card* (1B15a). This is technically impossible and false, as they are 2 distinct devices. (A1699 ¶ 4(b), A1702 ¶ 12).

Additionally, in opposing Dr. Kiper's finding that the photos were planted on the hard drive, Loveall wrote, "I procured a Dell Dimension 8300-20090330, the same [computer] model identified in the folder name, to test Kiper's claim." (A1623-1624 ¶ 17). "Dell Dimension 8300-20090330" is not a computer model. (A1699 ¶ 4(a), A1825). The Court failed to address these blatant falsehoods in the Loveall Report, which were pointed out in the defense submissions, before concluding that Loveall's explanation "offers a far more plausible and convincing explanation" of the discrepancies in the digital data. (SPA29).

## III. The District Court Abused Its Discretion in Finding that "Ample Trial Evidence" in Conjunction with the Loveall Report and Camila's Declaration, Outweighed the Materiality of the 7 Digital Forensics Experts' Findings.

Judge Garaufis cited three (3) incorrect reasons (SPA29) to deny the Rule 33. ⅔ of them, Loveall Report's and Camila's declaration[19], should not have been credited, *supra*. The third, "ample evidence [non-digital evidence] presented at

---

[19] Camila's declaration does not negate the 7 digital forensics experts' findings showing data falsification and government malfeasance.

trial," including "the photos themselves", cannot be credited as a reason for a

denial given that:

- The "photos themselves" are not proof of guilt, contrary to the Court's opinion (A1681); they are not obviously contraband. It is their alleged 2005 dating, derived from EXIF metadata[20] that makes them appear illegal.

- The government's other so-called "ample" trial evidence was debunked point by point by Mr. Raniere (A1743-1745). For example, the Court cites "communications from Mr. Raniere referencing the photos [from 2005]." However, the referenced text exchange (A1587) is from 2014, when Camila was 24, and simply mentions pictures "from way back" without reference to any specific time frame, age or other incriminating information. The Court's determination that these messages refer to the photos in question is baseless. (A626).

- **Falsification of the hard drive and camera's memory card is a standalone issue that, if credited, is fatal to the child pornography and sexual exploitation predicate acts, regardless of other trial evidence. The devices formed the basis of these acts and should not have been admitted. The Court failed to recognize this.** Further, government involvement in falsification of evidence is a due process violation requiring relief, independent of the question of guilt or innocence.

---

[20] To this end, the Court incorrectly concluded, "Booth acknowledged before the jury that the metadata was not reliable as to when the photos were taken." In this comment, the Court cites to Booth's testimony about one type of metadata, **file creation dates**, being unreliable, but ignored his testimony that **EXIF metadata** was reliable. (A501:13-A502:17). EXIF data is what the government used to establish the alleged 2005 timeframe.

IV.   **The District Court Abused Its Discretion in Ignoring that the Second Forensic Image Meets the Standard for Both a *Brady/Giglio* Violation and "Newly Discovered Evidence".**

   A. **The Court Abused Its Discretion by Not Applying the *Brady* Rule 33 Standard**

The Court committed an error of law by applying the wrong standard to

review the Rule 33, which is presented to this Court for *de novo* review. It used the

*Forbes* standard, which Judge Garaufis enunciated in his denial:

> "Relief under Rule 33 based on newly discovered evidence may be
> granted only upon a showing that '(1) the evidence was newly
> discovered after trial; (2) facts are alleged from which the court can
> infer due diligence on the part of the movant to obtain the evidence;
> (3) the evidence is material; (4) the evidence is not merely
> cumulative or impeaching; and (5) the evidence would likely result
> in an acquittal.' *United States v. Forbes,* 790 F.3d 403, 406-07 (2d
> Cir. 2015)." (SPA25).

The *Forbes* standard requires that newly discovered evidence "would likely

result in an acquittal." However, Mr. Raniere claims *Brady* violations, requiring a

less strict standard of review: "a reasonable probability that, had the evidence been

disclosed to the defense, the result of the proceeding would have been different."

*United States v. Bagley*, 473 U.S. 667, 682 (1985) (A1817-1818).

   B. **Applicable Law**

There are three (3) components of a *Brady* violation: "[1] The evidence at

issue must be favorable to the accused, either because it is exculpatory, or because

it is impeaching; [2] that evidence must have been suppressed by the State, either

willfully or inadvertently; and [3] prejudice must have ensued." *United States v. Jackson*, 345 F.3d 59, 71 (2d Cir. 2003) (alterations in original) (quoting *Strickler v. Greene*, 527 U.S. 263, 281-82 (1999)).

As to prong one, the "prosecutor has a duty to learn of any favorable evidence known to the others acting on the government's behalf in the case, including [law enforcement]." *Kyles v. Whitley*, 514 U.S. 419, 437 (1995). (Petitioner's conviction was reversed and remanded for a new trial ordered due to the prosecution's failure to disclose material evidence favorable to the accused).

As to prong two, *Brady* material that is not "disclos[ed] in sufficient time to afford the defense an opportunity for use" may be deemed suppressed within the meaning of the *Brady* doctrine. *Leka v. Portuondo,* 257 F.3d 89, 103 (2d Cir. 2001). In *Banks,* The Supreme Court opined:

> "Our decisions lend no support to the notion that defendants must scavenge for hints of undisclosed *Brady* material when the prosecution represents that all such material has been disclosed. … A rule thus declaring "prosecutor may hide, defendant must seek," is not tenable in a system constitutionally bound to accord defendants due process." *Banks v. Dretke*, 540 U.S. 668, 694-96 (2004).

The Supreme Court in *Agurs*, held that "[w]hen the prosecutor receives a specific and relevant request, the failure to make any response is seldom, if ever, excusable." *United States v. Agurs*, 427 U.S. 97, 106 (1976). The deliberate suppression by the government of evidence favorable to a defendant would

constitute a denial of due process. *Alcorta v. State of Texas*, 355 U.S. 28, 78 (1957).

As to prong three, whether prejudice ensued, the materiality analysis "turns on the cumulative effect of all . . . evidence suppressed by the government." *Kyles*, 514 U.S. at 421. As reiterated in *United States v. Thomas*, 981 F.Supp. 2d 229, 242 (SDNY 10.30.13):

> "*Brady* does not require a "strong" or "overwhelming" probability of a **different outcome**, only a "**reasonable probability**" that the Government's suppression affected the outcome of the case ... The question is not whether the defendant would more likely than not have received a different verdict with the evidence, but whether in its absence he received a fair trial, understood as a trial resulting in a verdict worthy of confidence. *Kyles*, 514 U.S. at 434 (internal citations omitted)."

The "remedy for a *Brady* violation is vacatur of the judgment of conviction and a new trial in which the defendant now has the *Brady* material available to her." *United States v. Halloran*, 821 F.3d 321, 342 n.14 (2d Cir. 2016) (quoting *Poventud v. City of New York*, 750 F.3d 121, 133 (2d Cir. 2014) (en banc)).

### C. Analysis

The Court erroneously opined:

> "[Mr. Raniere's] **defense was also aware of [the memory card] during trial** ... [yet uses it] to argue that the evidence now in focus is both "newly discovered" and the "key evidence" that would prove his innocence. But the Defendant provides no persuasive argument that he could not have discovered this evidence with diligence." (SPA28) (emphasis added).

**The Court fundamentally misconstrues the issue**. The defense's argument is not about the memory card itself but the data extracted from it — specifically, the *second* forensic image. At trial, the defense was aware of the first forensic image only. The defense had no knowledge that Booth created a second forensic image and that his testimony and analysis was based on it.

Dr. Kiper's post-trial analysis revealed that Booth created this second forensic image **3 days before the close of testimony**. (A1006). At trial, the government actively concealed the existence of this second forensic image. On direct examination, AUSA Hajjar elicited testimony from Booth describing the FBI protocol of only creating 1 forensic image of the original digital evidence. (A311:21-A312:19). Booth omitted that he violated this protocol by creating a second image. Further, during cross-examination of Booth, regarding the notes of his examination of the camera and memory card, AUSA Hajjar requested a sidebar. During it, **she told the Court that Booth did not create any forensic images**, stating, "[Booth] testified yesterday he received the forensic image from Ms. Donnelly … **he never said I was the one who imaged the devices.**" (A414:3-A416:4) (emphasis added).

In fact, Booth deceptively concealed that he created a second forensic image, as further highlighted in his Administrative Note entry on June 7, 2019, in the CART Examination Notes. In it, he states, "Request was made by SA Lever of

item 1B15 [the camera, containing the memory card] to be processed in lieu of ITS/SFE Steven Flatleys availability as he would be overseas during trial. This exam would be utilized in trial. **SSA Trenton Schmatz concurred and authorized to process the item.**" (emphasis added). (A930). However, Booth omits that his "processing" would entail creating a second forensic image, which he knew was prohibited and that Schmatz could not authorize; re-imaging can only be authorized by the Assistant Director of the FBI Operational Technology Division. (A1038-1039).

Despite repeated defense requests under Rule 16 and 3500 for all digital evidence, including during that sidebar and before trial (A416:9-11; A417:25-A418:7; A418:16-22; A419:5-9), the prosecution never disclosed the existence of the second forensic image. This failure to comply with the defense's request, given the prosecution's statutory disclosure requirement, "is seldom, if ever, excusable." *Agurs*, 427 U.S. at 106.

For *Brady* purposes, the prosecution is imputed with knowledge of the second forensic image, as it was created by Booth, a testifying witness and "arm of the prosecution." *United States v. Morell*, 524 F.2d 550, 555 (2d Cir. 1975); see also *United States v. Sanchez*, 813 F. Supp. 241, 247 (S.D.N.Y. 2.10.93). The Court must avoid a ruling that allows the prosecution to "hide" material evidence that the prosecution is obligated to disclose, such as the second forensic image,

which they secretly used at trial, and then shift the burden to the defense to "seek" it. *See Banks*, 540 U.S. at 694-96, As such, the second forensic image of the camera's memory card is "suppressed" under *Brady*.

There is a "reasonable probability that the government's suppression" of the second forensic image "affected the outcome of the case," establishing a *Brady/Giglio* violation. *In re United States v. Coppa (In re United States),* 267 F.3d 132, 134 (2d Cir. 2001). Had the second forensic image been disclosed, it would have had a material impact on the outcome of the case. Defense counsel would have had it analyzed by a forensic expert. This should have revealed that the camera's memory card had been extensively falsified and led to an application for suppression of the camera and its memory card. Without them, the prosecution is unable to link the production of the photos to Mr. Raniere, a required element of the sexual exploitation acts. (A530:17-A531:1).

For Rule 33 purposes, the second forensic image constitutes "newly discovered evidence". Before and during trial, defense counsel diligently sought all relevant scientific evidence relating to these charges, "from which the court can infer due diligence." *Forbes,* 790 F.3d at 406-07. Given the government's intentional concealment of the second forensic image, there was no way for the defense, through due diligence, to have discovered it. Given the fatal impact of the

newly discovered evidence, an acquittal on the child predicate acts would have

been likely, meeting the threshold for Rule 33 relief.

## V. The District Court Abused Its Discretion in Failing to Find that the Secret FBI Photograph Technician Meets the Standard for Both a *Brady/Giglio* Violation <u>and</u> "Newly Discovered Evidence".

The Court failed to acknowledge the prosecution's disclosure in their

Consolidated Opposition:

> "This [September 19, 2018] access [without a write blocker] was not
> the result of law enforcement "tampering,"... [H]aving no reason to
> believe that the metadata of the contents of the Canon EOS 20D
> camera card had any evidentiary value, law enforcement agents
> directed that a photograph technician copy the photographs from the
> camera card in order to provide the photographs more expeditiously to
> defense counsel." (A1579 at n.6)

This disclosure, **made in a footnote 4 years after trial,** is clearly "newly

discovered evidence," as was argued by the defense in its Rule 33 Reply. (A1810,

1814, 1816).

It revealed intentional government misconduct with respect to the camera

and memory card and its unauthorized access on September 19, 2018[21] as analyzed

in a joint report from the 4 former FBI examiners, submitted in the Reply to the

Second Motion to Compel (A1771-A1776):

- The prosecution directed this operation, as they disclosed in the footnote that its purpose was for discovery production, "to provide the photographs … to defense counsel", which is under the prosecution's purview, and their

---

[21] At trial, the defense was solely aware of the fact that the memory card was accessed without a write blocker on September 19, 2018.

paralegal was involved in creating the report from the technician's access (A1383).

- The prosecution, in directing this operation, intentionally circumvented CART, which is prohibited, whether or not the evidence is believed to have value. (A1774 ¶ 14)

- The prosecution knowingly concealed it until 4 years after trial.

- The FBI technician and Lever, who provided the access, **deliberately concealed** this operation from the chain of custody. (A1773 ¶ 11; Chain of Custody at A1233-A1235).

- The FBI technician knowingly violated protocol by accessing the original, unpreserved memory card and used "an unknown forensic tool" on it, constituting "an unauthorized forensic examination" and altered the memory card (A1773 ¶ 11, A1774 ¶ 17).

- The intentional misconduct by Lever and the FBI technician could have led to termination, lacked a legitimate explanation, and is **unprecedented in their combined 55 years of FBI service**. (A1773 ¶ 11, A1774 ¶ 14, A1776 ¶ 21).

This Court must avoid a ruling that makes such secret manipulation of

evidence acceptable.

The onus is not on the defense to "scavenge" for an unauthorized operation

that was intentionally concealed from the chain of custody, and for which no *Brady*

notice was ever provided. *See Banks,* 540 U.S. at 694-96. During cross-

examination, the prosecution's disclosure requirement was prompted when the

defense questioned Booth about the improper access without a write blocker

(A496:19-25), as the defense repeatedly requested all materials relating to the

45

digital evidence. The prosecution's failure to respond to a specific request and prompt, such as this one, is "seldom, if ever, excusable." *Agurs*, 427 U.S. at 106.

The prosecution's knowing concealment of the FBI technician's involvement demonstrates that this information was clearly suppressed under *Brady*. Their footnote disclosure, on July 21, 2023, is particularly egregious because the prosecution previously made an affirmative representation of full compliance with *Brady*, Rule 16, and 3500 on March 18, 2022. (A1154).

The secret FBI photograph technician also constitutes "newly discovered evidence" under Rule 33, as no amount of due diligence on the part of the defense could have exposed an individual not listed on the chain of custody. To date, the prosecution and Court have denied the defense access to the FBI technician's identity and records relating to their access. (A1762-1763, SPA15-19).

The week before and after the prosecution directed this operation, six (6) months after seizure and before the camera and its memory card were sent to CART, AUSAs Penza and Hajjar repeatedly and falsely assured the Court that all devices had been processed by CART **"[w]ithin days"** of seizure. (See, e.g., A88 ¶ 1; A112:25-A113:12; Doc. 143 at 1¶ 2 (9/24/18)).

This prosecution's lack of required *Brady/Giglio* notice, regarding the secret FBI photograph technician, deprived the defense from impeaching Mills and

Booth[22] about this concealed and intentional malfeasance, and using it to seek

suppression of the camera and memory card.[23]

## VI. The District Court Abused Its Discretion in Failing to Find that the Proof of Government Involvement in Falsifying Material Evidence Categorically Constitutes "Newly Discovered Evidence" and a *Brady/Giglio* Violation.

In its denial of the Rule 33, the Court ignored that the 7 digital forensics

experts' discovery of government involvement in facilitating and concealing the

falsification of key evidence is **categorically** newly discovered and suppressed

under *Brady*. They concluded that "**the involvement of government personnel in**

**this evidentiary fraud is inescapable**". (A1703 ¶ 16) (emphasis added). The

government "may not knowingly use false evidence, including false testimony, to

obtain a tainted conviction." *United States v. Alston*, 899 F.3d 135, 145 (2d Cir.

2018) (citations omitted).

Our legal system operates on a presumption of good faith by the

government. "The presumption of regularity supports the official acts of public

officers and, in the absence of clear evidence to the contrary, courts presume that

---

[22] The Court's opinion that "Mr. Raniere's counsel cross-examined … Booth extensively about the photographic evidence, the … hard drive, the camera card, … the related metadata, and the chain of custody of the digital evidence" (SPA23-24) is undermined by the fact that the defense was deprived of the ability to do a complete cross-examination, as the secret FBI photograph technician and the second forensic image were concealed and "suppressed".

[23] To seek suppression, defense counsel would need to challenge the Court's prohibition on presenting evidence or argument concerning government misconduct. (A272).

they have properly discharged their official duties." *United States v. Chemical Foundation*, 272 U.S. 1, 14-15 (1926); *see also United States v. Armstrong*, 517 U.S. 456, 464 (1996).

This Court must avoid a ruling that undermines this presumption of regularity. Therefore, it must find the 7 digital forensic experts' findings of fraudulent government conduct, uncovered after trial, to be both "suppressed" under *Brady* and constitute "newly discovered evidence" under Rule 33, and/or order a hearing.

Additionally, the uncontested, material perjury by Mills and Booth about the integrity and authenticity of the digital evidence, as listed in the table in Section II(D), independently warrant reversal of the conviction. *See Giglio v. United States*, 405 US 150, 153 (1972); *Napue v. Illinois*, 360 US 264, 269 (1959); *United States v. Wallach*, 935 F.2d 445 (2d Cir. 1991); *Agurs*, 427 U.S. at 103.

## VII.  The Evidence of Systematic and Intentional Government Malfeasance Meets the Standard for Dismissal and Also Caused Structural Error

### A. Applicable Law

#### 1. Standard for Dismissal

Dismissal is generally appropriate only when the prosecution engages in "'egregious and deliberate' misconduct or act[s] flagrantly, willfully, and in bad faith.'" *United States v. Mangano*, 2022 U.S. Dist. LEXIS 3048, at *7 (E.D.N.Y. Jan. 6, 2022) (citations omitted).

"It is only in the rare case, where it is impossible to restore a criminal
defendant to the position that he would have occupied vis-a-vis the prosecutor, that
the indictment may be dismissed… We have approved this extreme sanction only
when the pattern of misconduct is widespread or continuous." *United States v.
Fields* 592 F.2d 638, 648 (2d Cir. 1978) (citations omitted).

### 2. Standard for Structural Error

In *Arizona v. Fulminante*, The Supreme Court recognized that there are
"structural defects in the constitution of the trial mechanism … [which] defy
analysis by harmless error standards." *Arizona v. Fulminante*, 499 U.S. 279, 280
(1991). Such structural defects require automatic reversal without any need to
demonstrate prejudice. *Johnson*, 2024 U.S. App. LEXIS at *18. In addition to
being per se reversible, these structural types of errors need not be preserved by
objection and thus may be raised for the first time on appeal. See *United States v.
Christi*, 682 F.3d 138 (1st Cir. 2012).

Structural errors share in common that they undermine a criminal trial such
that it "cannot reliably serve its function as a vehicle for determination of guilt or
innocence." *Rose v. Clark*, 478 U.S. 570, 577-78 (1986). As such, as a result of
structural error, the question of guilt or innocence cannot be determined.

## B. Analysis

While the class of structural errors is extremely limited, the systematic and
pervasive **intentional** government malfeasance in Mr. Raniere's case qualifies.[24]
This misconduct involved at least eight (8) identified FBI and DOJ personnel and
spanned multiple departments, involving CART, non-CART FBI employees, and
the prosecutors, who knew or should have known. A subset of these findings is
summarized below:

### CART:

- Booth committed perjury about the reliability of EXIF metadata and that
  unsealed evidence is not extraordinary in FBI evidence handling. (A1037-
  1039).

- Booth knowingly violated FBI protocol by creating a second forensic image,
  and intentionally concealed it. (A1006-1007, A1038-1039).

- Schmatz knowingly violated FBI protocol by approving Booth's creation of
  the second forensic image, as he lacked the authority to approve this action.
  (*Id.*).

### Non-CART FBI employees:

- Rees, Lever and an FBI photograph technician knowingly violated FBI
  protocol by reviewing the unpreserved camera and memory card. (A1035-
  1036, A1773 ¶ 11).

- Lever and the FBI photograph technician knowingly violated FBI protocol
  by concealing the technician's access from the chain of custody. (A1773 ¶
  11; Chain of Custody at A1233-A1235).

- Mills committed perjury about proper CART handling of the camera, despite

---

[24] Mr. Raniere preserved this argument in his Rule 33 Reply. (A1823; *Id.* at n.1).

signing the chain of custody prior to his testimony; the chain of custody
showed unauthorized non-CART handling of the camera. (A1206, A1235).

**Prosecution:**

- AUSAs Hajjar and Penza intentionally circumvented CART for the
  unpreserved camera and memory card and concealed the FBI photograph
  technician's access until 4+ years after trial. (A1774 ¶ 14; A1579 at n.6).

- AUSAs Hajjar and Penza made false assertions to the Court about proper
  CART handling of all digital evidence and full compliance of their statutory
  disclosure obligations. (A1749-1752; A1780-1782).

- AUSA Hajjar should have known she was eliciting Mills' false testimony
  about the proper CART handling of the camera, as the prosecution had
  directed the unauthorized handling of the camera outside of CART.

- AUSA Hajjar misrepresented that Booth did "not create any forensic
  images", which she should have known was false. (A414:3-A416:4)

The above subset of findings demonstrates widespread and coordinated

malfeasance that affected the integrity of evidence handling, evidence processing,

evidence disclosure, witness handling, and the presentation of the case at trial. Its

impact is not isolatable and constitutes a structural error, which fundamentally

undermined the trial's "framework" (*Arizona,* 499 U.S.at 310) such that the trial

could not "reliably serve its function as a vehicle for determination of guilt or

innocence." *Rose*, 478 U.S. at 577-78.

Respectfully, this Court must find this to be a structural error or remand the

case for an evidentiary hearing to fully develop the record, to avoid a ruling that

makes the above, largely uncontested government malfeasance to be within

tolerance.

The above also demonstrates "widespread", "continuous", and "egregious

and deliberate" misconduct by the government such that dismissal is warranted.

*Mangano*, 2022 U.S. Dist. LEXIS at \*7; *Fields* 592 F.2d at 648.

### VIII.  The District Court Abused Its Discretion in Denying the Motions to Compel

#### A. Applicable Law

In opining on a defendant's post-trial motion for discovery, this Court has

held:

> "In some instances when possible exculpatory evidence not known
> by a defendant to exist at the time of trial is later shown to have
> then been in the Government's hands and the information necessary
> to develop fully the exculpatory nature of the evidence must be
> obtained from government sources it might be improper for a
> district judge to deny a motion for discovery when coupled with a
> timely motion for a new trial." *United States v. Wolfson*, 413 F.2d
> 804, 808 (2d Cir. 1969).

"In certain circumstances, some discovery may be appropriate as part of the

post-trial factual development." *United States v. Williams*, 2017 U.S. Dist.

LEXIS 135235, at \*5 (S.D.N.Y. 2017).

#### B. Analysis

Its denial of the Motions to Compel (SPA12-19), the Court made multiple

factual and legal errors warranting reversal and the requested disclosure:

- The Court abused its discretion in not finding that the second forensic image was "suppressed" under *Brady* and "newly discovered evidence" under Rule 33. (A1689-1690).

- The Court abused its discretion in concluding that testing the 2 forensic images would not raise a "reasonable probability" of Mr. Raniere's innocence, instead erroneously relying on unconfronted newly created government evidence and so-called "ample" trial evidence. (A1689).

- The District Court made a clear error in concluding that digital evidence is "wholly different from DNA evidence, which has been shown capable of conclusively demonstrating a petitioner's innocence." (A1685). For instance, comparing the 2 forensic images' "hash values" is more accurate than DNA testing[25] and could, with virtually 100% accuracy, verify or disprove Loveall's claim about the 37 photo files not being planted while in FBI custody.

- The District Court misapplied the standard of fundamental fairness when it dismissed the defense's request as a "fishing expedition" and cited to *United States v. Davis*, 836 F. App'x 754, 758 (11th Cir. 2020) and its holding that

---

[25] The National Institute of Standards and Technology describes SHA-256, a hash algorithm, which creates hash values, as offering exceptionally strong "collision resistance," meaning it is "computationally infeasible" for two different files to produce the same hash value. The chance of such a collision is approximately **1 in $2^{256}$**, which is infinitesimal. See Quynh Dang, *Secure Hash Standard (SHS)*, FIPS PUB 180-4, Nat'l Inst. of Standards & Tech. (2015).

"[a] blanket assertion of fabricated evidence not substantiated by any credible source is not enough to warrant a new trial or even an evidentiary hearing." However, the defense did not make a "blank assertion"; it made precise scientific assertions about the planting of specific photos and manipulation of specific timestamps. These assertions were unanimously substantiated by highly credible sources, the 7 digital forensics experts, including 4 former FBI examiners.

## IX. The District Court Abused Its Discretion in Denying the Motion for Judicial Recusal

### A. Applicable Law

In evaluating the appropriateness of recusal, courts consider the statutory requirement that a Judge "shall disqualify himself in any proceeding in which his impartiality might reasonably be questioned." 28 U.S.C. § 455(a). This provision is to "be evaluated on an objective basis, so that what matters is not the reality of bias or prejudice but its appearance." *Liteky* v. *United States,* 510 U.S. 540, 548 (1994) 3; *United States v. Amico,* 486 F.3d 764, 775 (2d Cir. 2007) ("[T]his test deals exclusively with appearances. Its purpose is the protection of the public's confidence in the impartiality of the judiciary.").

To constitute a basis for recusal due to bias stemming from judicial sources, "opinions formed by the judge on the basis of facts introduced or events occurring in the course of the current [or] prior proceedings" would have to demonstrate "a

deep-seated favoritism or antagonism that would make fair judgment impossible."

*Liteky*, 510 U.S. at 555.

The operative question is whether "an objective, disinterested observer fully

informed of the underlying facts, [would] entertain significant doubt that justice

would be done absent recusal." *United States* v. *Carlton,* 534 F.3d 97, 100 (2d Cir.

2008) (alterations in original); *ISC Holding AG v. Nobel Biocare Fin. AG,* 688

F.3d 98, 107 (2d Cir. 2012); *see also In re Drexel Burnham Lambert Inc.,* 861 F.2d

1307, 1313 (2d Cir. 1988); *Amico,* 486 F.3d at 775.

### B. Analysis

#### 1. The Court Abused Its Discretion in Misapplying *Liteky* to Comments Made During the Trial

In denying recusal, Judge Garaufis cited primarily to *Liteky* to justify his

position:

> "Alleged bias may not warrant recusal where 'upon completion of
> the evidence, [a Judge is] exceedingly ill disposed towards the
> defendant, who has been shown to be a thoroughly reprehensible
> person' throughout the trial. *Liteky*, 510 U.S. at 550-51." (SPA4).

The Court's citation to *Liteky* ignores that it refers to a judge's conduct

"upon **completion** of the evidence." The Court repeats this error in opining:

> Even if the court's comments at time [after the termination of
> Lauren Salzman's cross-examination] evinced … some sort of
> distaste for the defendant, no reasonable observer would, **after
> witnessing the trial …** earnestly believe that the distaste was the
> result of some sort of extrajudicial bias or deep-seated antagonism.
> (SPA8) (emphasis added).

Here, the Court's comments relating to his termination of the cross-examination of Lauren Salzman (hereinafter referred to as "Ms. Salzman") took place during the first half of the trial, ten (10) days into the twenty-three (23) days of testimony, prior to any determination of guilt.

### 2. The Court's Termination of Cross-Examination Demonstrates the Appearance of "Deep-Seated Favoritism" Towards the Government and "Deep-Seated Antagonism" Towards Mr. Raniere

During cross-examination of Ms. Salzman, defense counsel asked a critical question, "What was your intention when you were in DOS?" (A284:7). The case involved charges that related to alleged activities involving DOS. The crux of the government's theory regarding DOS was that the actions of Mr. Raniere and some of his co-defendants, including Ms. Salzman, were **intended to harm**, a necessary element of these charges.[26] Ms. Salzman was critical to their case, as she was the sole testifying cooperating witness and a founding member of DOS. Ms. Salzman then gave an answer that tended to invalidate her extortion plea, showing a lack of required intent to harm:

> "My intention was to prove to Keith that I was not so far below the ethical standard that he holds that I was -- I don't even know how far below I am. I was trying to prove my self-worth, and salvage

---

[26] The indictment alleged that the actions of Mr. Raniere involved "instilling in them [DOS members] fear" and the threats of actions "calculated to harm." (A198 ¶ 34).

this string of a hope of what I thought my relationship might someday be, and I put it above everything else; I put it above my friends, and I put it above other people, helping them in their best interest. That's what I did when I was in DOS." (A284:9-16).

In the presence of the jury, the Court abruptly terminated cross-examination. The Court then twice offered the prosecution to reexamine the witness, which they declined. (A284:23-A285:4). The Court later conceded that defense counsel was not harassing the witness. (A288:2-10).

The Court's decision that the defense could not continue questioning but the prosecution could itself shows the appearance of "deep-seated favoritism" towards the prosecution. After dismissing the jury, the Court gave its first justification for terminating cross-examination:

> **I am not going to have someone have a nervous breakdown** on the witness stand in front of -- excuse me, this is not DOS. This is not the allegations… I think it's absolutely necessary that there be a certain level of consideration for someone's condition. And that's really what this was… **I had a crisis here. And not in my courtroom.** (A286:24-A287:8). (emphasis added).

In its denial of the Motion for Recusal, the Court reiterated that its rationale was "to avoid needless harassment and attend to the witness's wellbeing." (SPA7).

However, if the Court thought that Ms. Salzman was having a "nervous breakdown", it could have done any number of things, including: offering her a recess, giving the defense a limiting instruction, or dismissing her entirely without asking for redirect. The Court took the only option that is antithetical to its stated

concern; immediately inviting the prosecution to subject Ms. Salzman to more

questioning, asking **not once but twice** if the government wanted to question her

on redirect. This refutes that it intervened out of concern for the witness's well-

being.

The Court also provided a second justification, accusing the defense of

asking an improper question:

> I have to sentence this defendant and **what you did was, basically,
> ask her to make legal judgments** about whether what she did in
> pleading guilty was farcical that she took somebody else's advice,
> some lawyer, so she could get out from under a trial… **When I tried
> to cut off the line of questioning**, you just went right back to the line
> of questioning. (A288:11-A289:3) (emphasis added).

However, this justification is disproven by the fact that the Court allowed defense

counsel's question, over the prosecution's objection. (A284:4-8).

By process of elimination, this reveals that the Court's termination of cross-

examination was not due any impropriety with the question, nor the witness'

emotional state, but **the content of her answer**.

The Court's decision to intervene reveals its intent was to prevent the jury

from hearing testimony that was favorable to the defense; not an "ordinary effort at

courtroom administration" as it claimed. (Doc. 1194 at 7). A judge should not be

partial to the government's case. The Court's intervention, in front of the jury,

demonstrates "[a]n appearance of partiality … that made it inappropriate for him to

continue to preside." *Amico*, 486 F.3d at 767.

The Court also demonstrated "deep-seated antagonism" towards Mr. Raniere by its comment, "I am not going to have someone have a nervous breakdown on the witness stand in front of -- excuse me, **this is not DOS.**" (A286:24-A287:1) (emphasis added). "[T]his is not DOS" indicated a pre-judgment that Mr. Raniere's role in DOS was intended to harm. This was a central question being litigated in the trial. The Court taking a critical action during the trial based on a predetermination of the defendant's guilt, before any jury verdict, is textbook bias and evidences "significant doubt that justice would be done absent recusal." *Carlton,* 534 F.3d at 100.

The Court's final justification is equivalent to an admission of bias:

> "I may not get everything right up here, but I will tell you, **as a human being, it was the right decision**. Alright? And **before I'm a judge, I'm a human being.**" (A289:4-6) (emphasis added).

What distinguishes the role of a judge from humans generally is their required impartiality. Yet the Court's comment logically equates to: **this is something that a human generally would do, but that a judge would not**. The Court's decision to vacate this role clearly demonstrates that his "impartiality might reasonably be questioned," meeting the statutory standard of 28 U.S.C. § 455(a).

The Court acknowledged that its termination of cross-examination potentially implicated appellate ruling, stating, "So, you have your record, and if

there is a conviction, you can appeal my decision to the Second Circuit, okay?"

(A287:9-11).

> ### 3. The Court's Comments and Actions at the Restitution Hearing Further Demonstrate the Appearance of "Deep-Seated Antagonism" Towards Mr. Raniere, Requiring Recusal

The Court's "deep-seated antagonism" towards Mr. Raniere was also

expressed through direct statements made to defense counsel[27] during the

restitution hearing. In answering the Court, Mr. Raniere stated that he was not

aware of who the restitution victims were. (A549:3-8). A contentious exchange

between the Court and defense counsel then ensued about whether the proceeding

would be delayed to allow Mr. Raniere to confer with counsel. This led to the

Court bringing up that counsel had requested a one-hour postponement of the

hearing to attend the funeral and shiva of counsel's mentor, who had just passed

away due to pancreatic cancer. This culminated in the following exchange:

> Mr. Fernich: There is absolutely nothing dilatory about my request.
>
> The Court: Excuse me.
>
> Mr. Fernich: I wanted the day off to go to Joel Winograd's funeral, who died of pancreatic cancer on Sunday morning.
>
> The Court: **Give him this to go cry on. He's not a member of your family, sir.**
> …

---

[27] Mr. Raniere retained separate defense counsel to handle the restitution hearing.

The Court: **Be seated or I'll have you arrested.**

(A576:23-A578:12) (emphasis added).

This colloquy made its way to *Vanity Fair*, as cited to in the Motion

for Recusal. It provided additional context surrounding this exchange:

> "According to the *New York Post* ... during the hearing, [after the above exchange] Garaufis and Fernich **spent half an hour staring at each other in silence** as the rest of the courtroom looked on... When Fernich said during the hearing that Garaufis lacked "human decency," the judge, according to the tabloid, **grabbed a box of tissues,** told a court clerk, "Give him this to go cry," and threatened to have Fernich arrested unless he sat down. (A1177 at n.5). (emphasis added).

Mocking a person's grief over the death of their mentor, is one most would find

inappropriate to express. It is expected that a Senior District Court Judge would not

say such a thought aloud. There is no way to determine that the bias inherent in this

comment was against defense counsel, and not Mr. Raniere, who would be

impacted negatively regardless.

In response to the Motion for Recusal being filed, Noah Goldberg, a

journalist and "an objective, disinterested observer" present at the restitution

hearing, tweeted: "Keith Raniere's lawyer asked for the judge in the case to recuse

himself for being biased, citing **one of the most bizarre moments in court I've**

**ever seen** in which a lawyer was told by the judge to go cry about a funeral for a

colleague who had just died of pancreatic cancer." (Noah Goldberg

(@Noah__Goldberg)**,** *X (formerly Twitter)* (May 6, 2022, 10:14 AM)). (emphasis

added). https://x.com/Noah__Goldberg/status/1522580665899925509). *See also*

*Carlton,* 534 F.3d at 100.

## CONCLUSION

## REASONS TO GRANT, VACATE, AND REMAND

For the foregoing reasons, Defendant-Appellant, Mr. Raniere, respectfully

submits that: 1) the Order denying the motion for a new trial, the Rule 33, should

be reversed and the case remanded for either a new trial or an evidentiary hearing;

2) the Order denying the Motions to Compel should be reversed and remanded,

ordering the production of the 2 forensics images to the defense; and 3) the Order

denying the Motion for Recusal under 28 U.S.C. § 455 should be reversed and

remanded.

Dated:      New York, New York
            October 28, 2024

                            Respectfully submitted,

                            \s\ Deborah J. Blum
                       By:  Deborah J. Blum
                            DEBORAH J. BLUM, ESQ.
                            Attorney for Defendant-Appellant
                            225 Broadway, Suite 715
                            New York, New York 10007
                            646-535-2586

## CERTIFICATE OF COMPLIANCE WITH FRAP 32(A)

1.  This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because this brief contains 13,962 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii).

2.  This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using Microsoft Word in Times New Roman, 14 point font.


Dated:      New York, New York
            October 28, 2024

                             Respectfully submitted,

                             _Deborah J Blum_
                             _____

                             By:    Deborah J. Blum
                                    DEBORAH J. BLUM, ESQ.
                                    Attorney for Defendant-Appellant
                                    225 Broadway, Suite 715
                                    New York, New York 10007
                                    646-535-2586

# SPECIAL APPENDIX

## Table of Contents

**Page**

Memorandum and Order of the Honorable Nicholas G. Garaufis,
    dated April 26, 2023 (Docket No. 1194)......................................  SPA1

Memorandum and Order of the Honorable Nicholas G. Garaufis,
    dated March 6, 2024 (Docket No. 1238)  .................................  SPA12

Memorandum and Order of the Honorable Nicholas G. Garaufis,
    dated April 29, 2024 (Docket No. 1256)  ..................................  SPA20

Case: 24-778, 10/29/2024, DktEntry: 48.1, Page 78 of 107
Case 1:20-cv-00485-EK-CLP    Document 329    Filed 11/14/23    Page 640 of 758 PageID
#: 15319
Case 1:18-cr-00204-NGG-VMS    Document 1194    Filed 04/26/23    Page 1 of 11 PageID
#: 22199

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

UNITED STATES,

       -against-

KEITH RANIERE, et al.,

               Defendant.

**MEMORANDUM & ORDER**
**18-CR-204 (NGG) (VMS)**

NICHOLAS G. GARAUFIS, United States District Judge.

Pending before the court is a Motion for Recusal and Judicial Dis-
qualification of this court, filed by Defendant Raniere on May 6,
2022. (Mot. for Recusal (Dkts. 1170-71).) Defendant Raniere
seeks recusal pursuant to both 28 U.S.C. § 455(a) and 28 U.S.C.
§ 455(b)(1). For the reasons set forth below, this motion for
recusal is DENIED.

**I.  BACKGROUND**

**A.  Factual History**

The court assumes familiarity with the underlying facts of the
case, *United States v. Raniere*, et al., and summarizes briefly be-
low only those facts relevant to the instant motion.

In May and June 2019, this court held a several week jury trial
regarding the criminal charges brought against Defendant Keith
Raniere. That trial included testimony from a plethora of wit-
nesses. (*See generally* Dkts. 634, 636, 638, 654, 658, 660, 661,
662, 670, 672, 674, 676, 678, 680, 687, 695, 697, 699, 704, 706,
711, 713, 723.) One such witness, Lauren Salzman, played an
important role at trial as a cooperating witness. (*See generally*
Dkts. 670, 672.) An exchange between the court and an attorney
for the defense that took place during the cross-examination of
Ms. Salzman, on the 10th out of 23 days of testimony, is among
the incidents in dispute on this motion. (Mem. In Support (the
"Mot.") (Dkt. 1171) at 2-7); (May 22, 2019 Trial Tr. (Dkt. 958)

1

Case: 24-778, 10/29/2024, DktEntry: 48.1, Page 79 of 107
Case 1:20-cv-00485-EK-CLP    Document 329-2   Filed 11/14/23    Page 641 of 758 PageID
#: 5336
SPA2

Case 1:18-cr-00204-NGG-VMS    Document 1194    Filed 04/26/23    Page 2 of 11 PageID
#: 22200

at 2265-70.) After the trial was completed, the court undertook typical post-trial duties such as presiding over restitution hearings and sentencing the various defendants who had pleaded guilty or been convicted at trial. Two such hearings are at issue in this motion. First, on July 20, 2021, a hearing was held for the purposes of determining the amount of restitution owed by Defendant Raniere. (Mot. at 7-16; Restitution Hearing Tr. (Dkt. 1193).) Second, on September 30, 2020, a hearing was held for the purposes of sentencing Defendant Clare Bronfman. (Mot. at 17-18; Bronfman Sent. Tr. (Dkt. 964).)

### B. Procedural History

Defendant Raniere filed the instant Recusal Motion on May 6, 2022. (Mot.) On May 9, 2022, the Court acknowledged receipt of the motion and stated that it would defer consideration of the motion until the Second Circuit resolved the appeal of the judgment of conviction, which was at the time *sub judice* after oral argument. (May 9, 2022 Text Order.) On January 3, 2023, two mandates issued from the Second Circuit, affirming the district court's judgments in full. (Dkts. 1183-84.)[1] Shortly thereafter, Defendant filed with the Second Circuit a petition for a writ of mandamus, seeking relief consistent with this Motion. (*See* Dkt. 1185.) On March 20, 2023, a mandate issued from the Second Circuit, denying that petition on the basis that "Petitioner has not demonstrated that he lacks an adequate, alternative means of obtaining relief, that his right to the writ is clear and indisputable, and that granting the writ is appropriate under the circumstances." (*Id.*) The court now considers the Motion.

---

[1] On April 17, 2023, the Supreme Court denied Defendant Raniere's petition for a writ of certiorari. *See* Order List, Supreme Court of the United States at 3 (Apr. 17, 2023), https://www.supremecourt.gov/orders/courtorders/041723zor_4gdj.pdf.

Roberts - 543

Case: 24-778, 10/29/2024, DktEntry: 48.1, Page 80 of 107
Case 1:20-cv-00485-EK-CLP    Document 329-3    Filed 11/14/23    Page 642 of 758 PageID
#: 15882
Case 1:18-cr-00204-NGG-VMS    Document 1194    Filed 04/26/23    Page 3 of 11 PageID
#: 22201

## II. LEGAL STANDARD

Defendant Raniere moves for recusal under both 28 U.S.C. § 455(a) and 28 U.S.C. § 455(b)(1). These two statutory provisions are governed by similar but distinct legal standards.

### 1. 28 U.S.C. § 455(a)

In evaluating the appropriateness of recusal under § 455(a), courts consider the statutory requirement that a Judge "shall disqualify himself in any proceeding in which his impartiality might reasonably be questioned." 28 U.S.C. § 455(a).[2] This provision is to "be evaluated on an objective basis, so that what matters is not the reality of bias or prejudice but its appearance." *Liteky v. United States*, 510 U.S. 540, 548 (1994)[3]; *see also Amico*, 486 F.3d at 775 ("[T]his test deals exclusively with appearances. Its purpose is the protection of the public's confidence in the impartiality of the judiciary."). The operative question is whether "an objective, disinterested observer fully informed of the underlying facts, [would] entertain significant doubt that justice would be done absent recusal." *United States v. Carlton*, 534 F.3d 97, 100 (2d Cir. 2008) (alterations in original); *ISC Holding*, 688 F.3d at 107; *see also In re Drexel Burnham Lambert Inc.*, 861 F.2d 1307, 1313 (2d Cir. 1988); *Amico*, 486 F.3d at 775.

---

[2] *See, e.g., ISC Holding AG v. Nobel Biocare Fin. AG*, 688 F.3d 98, 107 (2d Cir. 2012) ("Recusal here is governed by 28 U.S.C. § 455(a), which states that '[a]ny . . . judge . . . of the United States shall disqualify himself in any proceeding in which his impartiality might reasonably be questioned.'") (alterations in original); *see also SEC v. Razmilovic*, 728 F.3d 71 (2d Cir. 2013), *as amended* 738 F.3d 14, 29 (2d Cir. 2013); *In re Int'l Bus. Machs. Corp.*, 45 F.3d 641, 643 (2d Cir. 1995); *United States v. Amico*, 486 F.3d 764, 775 (2d Cir. 2007); *United States v. Giordano*, 442 F.3d 30, 48 (2d Cir. 2006); *United States v. Basciano*, No. 03-CR-929 (NGG), 2008 WL 794945, at *10 (E.D.N.Y. Mar. 24, 2008).

[3] When quoting cases, and unless otherwise noted, all citations and quotation marks are omitted, and all alterations are adopted.

3

Case 1:20-cv-00485-EK-CLP Case: 24-778, 10/29/2024, DktEntry: 48.1, Page 81 of 107 Document 329 Filed 11/14/23 Page 643 of 758 PageID
SPA4
#: 5882

Case 1:18-cr-00204-NGG-VMS Document 1194 Filed 04/26/23 Page 4 of 11 PageID
#: 22202

The *Liteky* court explained that the goal of a recusal analysis is to identify not just whether the judge in question holds a "favorable or unfavorable disposition or opinion," but whether such views are "wrongful or inappropriate." *Liteky*, 510 U.S. at 550. Moreover, the level of bias necessary to warrant recusal under §455(a) is higher if it is derived from a judicial—rather than extrajudicial—source. *Liteky*, 510 U.S. at 555 (stating that § 455(a) analyses rely on a highly "significant (and often determinative) extrajudicial source factor")

Alleged bias may not warrant recusal where "upon completion of the evidence, [a Judge is] exceedingly ill disposed towards the defendant, who has been shown to be a thoroughly reprehensible person" throughout the trial. *Liteky*, 510 U.S. at 550-51. This would likely not constitute recusable bias because the judge's "knowledge and the opinion it produced were properly and necessarily acquired in the course of the proceedings." *Id.* To constitute a basis for recusal due to bias stemming from judicial sources, "opinions formed by the judge on the basis of facts introduced or events occurring in the course of the current [or] prior proceedings" would have to demonstrate "a deep-seated favoritism or antagonism that would make fair judgment impossible." *Id.* at 555; *see also ISC Holding*, 688 F.3d at 107; *Razmilovic*, 738 F.3d at 29; *Basciano*, 2008 WL 794945, at *10. Even "a judge's comments during a proceeding that are 'critical or disapproving of, or even hostile to, counsel, the parties, or their cases, ordinarily do not support a bias or partiality challenge.'" *Carlton*, 534 F.3d at 100 (citing *Liteky*, 510 U.S. at 555); *see also Razmilovic*, 738 F.3d at 29.

By contrast, the "requirement of deep-seated antagonism does not apply" where "opinions are . . . 'derive[d] from a source outside judicial proceedings.'" *ISC Holding*, 688 F.3d at 107 (quoting *Liteky*, 510 U.S. at 551, 554) (differentiating bias derived from judicial versus extrajudicial sources).

4

Case: 24-778, 10/29/2024, DktEntry: 48.1, Page 82 of 107
Case 1:20-cv-00485-EK-CLP   Document 329   Filed 11/14/23   Page 644 of 758 PageID
#: 5882

Case 1:18-cr-00204-NGG-VMS   Document 1194   Filed 04/26/23   Page 5 of 11 PageID
#: 22203

### 2. 28 U.S.C. § 455(b)(1)

§ 455(b)(1) requires a judge to recuse himself "where he has a personal bias or prejudice concerning a party[.]" 28 U.S.C. § 455(b)(1). *See, e.g., United States v. Osinowo*, No. 95-CR-1334, 1996 WL 20514, at *1 (2d Cir. 1996). Courts have emphasized that while motions brought under § 455(a) are evaluated pursuant to an objective standard, § 455(b)(1) "mandates recusal only where the court harbors *actual* prejudice or bias against a particular defendant." *Id.* (citing *Liteky*, 510 U.S. at 553) (emphasis added); *see also Pri-har v. United States*, 83 F. Supp. 2d 393, 397 (S.D.N.Y. 2000). As in a § 455(a) analysis, § 455(b)(1) typically requires an "extrajudicial" source factor. *Liteky*, 510 U.S. at 553 ("§ 455(b)(1)...contains the 'extrajudicial source' limitation[.]"); *see also Curley v. St. John's Univ.*, 7 F. Supp. 2d 359, 362 (S.D.N.Y. 1998); *Pri-har*, 83 F.Supp. at 397 (applying the logic of *Liteky* to § 455(b)(1) claims).

### 3. Recusal for the Purposes of Ruling on a Rule 33 Motion

Although much of the controlling case law cited was developed in the context of a party seeking a judge's recusal prior to the commencement of litigation or trial, the standards for recusal under § 455(a) and/or (b)(1) remain the same where the party moving for recusal has also moved (or is simultaneously moving) for a new trial under Fed. R. Crim. P. 33. *See United States v. Scaretta*, No. 97-CR-1089, 1997 WL 829256, at *4 (2d Cir. 1997); *Osinowo*, 1996 WL 20514, at *1; *United States v. Robinson*, No. 16-CR-545 (SJF) (AYS), 2021 WL 62076, at *25 (E.D.N.Y. Jan. 6, 2021); *Pri-har*, 83 F. Supp. at 394; *United States*

5

Case: 24-778, 10/29/2024, DktEntry: 48.1, Page 83 of 107
Case 1:20-cv-00485-EK-CLP    Document 329    Filed 11/14/23    Page 645 of 758 PageID #: 5880

Case 1:18-cr-00204-NGG-VMS    Document 1194    Filed 04/26/23    Page 6 of 11 PageID #: 22204

*v. Agunbiade*, No. 90-CR-610(S)-02 (JRB), 1995 WL 351058, at *1 (E.D.N.Y. May 10, 1995).[4]

## III. LEGAL ANALYSIS

The court will now assess the Defendant's various arguments for recusal in turn. None of the cited-to examples of supposed bias reach the standards set forth by 28 U.S.C. §§ 455(a) or 455(b)(1).

### A. Trial conduct

First, the Defendant argues that "the Court's comments and personal opinions expressed about Mr. Raniere, his Defense team, and his co-defendants, displayed a deep-seated, unequivocal hostility and personal bias against Mr. Raniere and his Defense team, making disqualification for all future proceedings, in this case, warranted and, indeed, mandatory." (Mot. at 21.)

With regard to the allegedly biased conduct during Ms. Salzman's testimony at trial, the Defendant exhibits a foundational misunderstanding of what constitutes personal, extra-judicial bias, rather than honestly held viewpoints gained throughout presiding over a trial. Here, there is no indication whatsoever that this

---

[4] In addition to filing a motion for a new trial pursuant to Rule 33, Defendant Raniere took the unusual step of filing a petition for a writ of mandamus at the Court of Appeals prior to decision on the Rule 33 motion. While such a step is typically not taken until *after* the district court decides the underlying recusal motion, the court is aware of two other cases in which parties attempted to do so prior to a district court ruling on the recusal. *Qualls v. United States*, No. 07-CR-14 (DLI), 2018 WL 1513625, at *1 (E.D.N.Y. Mar. 27, 2018); *Buhannic v. TradingScreen Inc.*, No. 19-CIV-10650 (ER), 2020 WL 4058949, at *4 (S.D.N.Y. July 20, 2020). In both instances, the appellate court denied the petition for a writ of mandamus, and the district court proceeded to evaluate the recusal motions under the same legal standards it would have used had no writ of mandamus been sought. *Qualls*, 2018 WL 1513625, at *1; *Buhannic*, 2020 WL 4058949, at *4.

court harbored any animosity or "personal bias" toward Defendant Raniere prior to the trial, during which many unsavory facts about Mr. Raniere were proven beyond a reasonable doubt.

The Defendant also fails to recognize the wide discretion granted to judges in the administration of a trial. "A judge's ordinary efforts at courtroom administration—even a stern and short-tempered judge's ordinary efforts at courtroom administration—remain immune." *Liteky*, 510 U.S. at 556; *see also Farr v. Greiner*, No. 01-CV-6921 (NG), 2007 WL 1094160, at *15 (E.D.N.Y. Apr. 10, 2007) (quoting *Gilliam v. Foster*, 75 F.3d 881, 900 (4th Cir.1996)) ("Generally, a trial judge possesses wide latitude to maintain control over the courtroom to ensure the integrity of the proceedings."). In particular, "[t]rial judges retain wide latitude to impose reasonable limits on cross-examination based on concerns about, among other things, harassment, prejudice, confusion of issues, the witness's safety, or interrogation that is repetitive or only marginally relevant." *Cordero v. Rivera*, 677 F. Supp. 2d 684, 699 (S.D.N.Y. 2009) (quoting *Delaware v. Fensterer*, 474 U.S. 15, 20 (1985)). Here, the court's choice to curtail cross-examination of a witness to avoid needless harassment and attend to the witness's wellbeing was well within the bounds of a trial judge's discretion. The court's behavior in furtherance of this legitimate goal, therefore, did not meet the extremely high standard for bias stemming from a judicial source—that of evincing "deep-seated . . . antagonism."[5] *Liteky*, 510 U.S. at 555. Thus, the court is not required to recuse itself under 455(b)(1)'s actual bias rule.

The standard under 455(a) is one of whether "an objective, disinterested observer fully informed of the underlying facts, [would] entertain significant doubt that justice would be done

---

[5] Moreover, the comparison to a World War-I era case in which a federal judge exhibited blatant xenophobia is an analogy that is, at best, inapt.

7

Case: 24-778, 10/29/2024, DktEntry: 48.1, Page 85 of 107
Case 1:20-cv-00485-EK-CLP    Document 329-8   Filed 11/14/23    Page 647 of 758 PageID
#: 15380

Case 1:18-cr-00204-NGG-VMS    Document 1194    Filed 04/26/23    Page 8 of 11 PageID
#: 22206

absent recusal." *Carlton*, 534 F.3d at 100. Even if the court's com-
ments at time evinced not just frustration and impatience, but
some sort of distaste for the defendant, no reasonable observer
would, after witnessing the trial over which the court was then
presiding, earnestly believe that the distaste was the result of
some sort of extrajudicial bias or deep-seated antagonism. This
threshold has therefore also not been met.[6]

### B.  Restitution Hearing Conduct

Second, the Defendant asserts that "Judge Garaufis displayed an
unacceptable bias toward Mr. Raniere's Defense team by letting
his frustration with the Defense's request for a delay" of the Res-
titution Hearing interfere with his duty to preside over the trial
impartially. (Mot. at 24.) Here too, there is no evidence that the
court harbored any bias with an extra-judicial source against Mr.
Raniere. The restitution hearing in question happened *after* the
trial took place. Moreover, any conduct evincing bias was alleg-
edly aimed toward an attorney hired by Defendant Raniere after
the conclusion of trial, and there is no evidence that any disa-
greement between the court and that counsel reflected a broader
issue between the court and the defendant. Thus, the court ex-
hibited no bias stemming from *either* an extrajudicial or judicial
source toward the Defendant at this time, let alone the "deep
seated . . . antagonism" required to mandate recusal under 28
U.S.C. 455(a). *Liteky*, 510 U.S. at 555. Finally, the fact that the
allegedly biased conduct was directed only toward one of a series
of lawyers representing the defendant, and never toward the de-
fendant himself, weighs strongly against any finding that the

---

[6] The Defendant also raises the question of whether less extreme measures
would have been possible. It is altogether possible that less extreme
measures were available. However, that is not the standard to which this
court must be held in considering a recusal motion.

8

district court "harbors actual prejudice or bias against a defendant," *Osinowo*, 100 F.3d at 2. This incident therefore also does not require recusal under 28 U.S.C. 455(b)(1).

### C. Sentencing Hearing Conduct

Third and finally, the Defendant argues that this court's choice to "tripl[e] the sentence of Ms. Bronfman, a first-time offender, because she refused to 'renounce' Mr. Raniere and the NXIVM organization," presents further evidence of this court's bias toward Defendant Raniere. (Mot. at 26.)

In determining the appropriate sentence for Defendant Bronfman, the court considered the required sentencing factors. 18 U.S.C. § 3553(a). These factors include the need for a sentence that reflects the seriousness of the offense, the need for a sentence that promotes respect for the law, and the goal of providing a just punishment. (*See* Bronfman Sent. Tr. at ECF 121); *see also* 18 U.S.C. § 3553(a)(2)(A). The court made no findings as to whether Defendant Bronfman had any real time knowledge of the extent of Defendant Raniere's criminal behavior. As part of its analysis of the sentencing factors, however, the court did take into consideration Defendant Bronfman's continued support for Defendant Raniere *after* learning the full extent of his criminal conduct. (*See* Bronfman Sent. Tr. at ECF 123 ("It does, however, concern me that she continues to stand by Raniere and believe in his work, even as he stands convicted of heinous conduct."); *see also* Mandate of USCA as to 20-5320-cr (Dkt. 118) ("Summary Order") at ECF 38 ("a full reading of the District Court's lengthy statement (which covers thirty pages of the transcript) shows that it was primarily concerned with Bronfman's actions *after* she found out about DOS in June 2017, including gher reinvigorated support of Raniere").) In doing so, the court displayed fidelity to its obligation to carefully weigh the sentencing factors and other relevant information, and therefore displayed no bias—extra-judicial or otherwise.

9

Case: 24-778, 10/29/2024, DktEntry: 48.1, Page 87 of 107
Case 1:20-cv-00485-EK-CLP   Document 329   Filed 11/14/23   Page 649 of 758 PageID
#: 5330
Case 1:18-cr-00204-NGG-VMS   Document 1194   Filed 04/26/23   Page 10 of 11 PageID
#: 22208

The court carefully articulated the ways in which Defendant Bronfman's actions in devotion to Defendant Raniere without regard to the seriousness of his crimes had reflected a sincere lack of respect of the law. The court also endeavored to consider how the sentence compared to sentences of other similarly situated defendants. But, as the court took great pains to describe, the circumstances of Ms. Bronfman's offenses, and in particular the relationship between her and Mr. Raniere, provided important context when considering the seriousness of her offenses, and set her conduct far apart from other otherwise similarly situated defendants. (Bronfman Sent. Tr. at ECF 124 ("[T]he context of Ms. Bronfman's criminal conduct places her in [an] all together different category from other defendants convicted of the same offenses; and, therefore, her circumstances defy easy comparison.").) Indeed, the court made clear that "the offenses of conviction . . . were more serious here than those crimes might ordinarily be under other circumstances." (Bronfman Sent. Tr. at ECF 121.) The Second Circuit, affirming this court in full, agreed wholeheartedly with this assessment, pointing out that her "conduct—before and after her indictment—readily distinguishe[d] her" from her co-defendants, and reiterating this court's assertion that the context for her criminal conduct set her far apart from other defendants convicted of the same offenses. (Summary Order at ECF 38.) In sentencing Ms. Bronfman accordingly, the court appropriately exercised its wide discretion in matters of sentencing. (*See id.*) ("[T]he District Court acted well within its discretion in arriving at its conclusion.")

To have considered Ms. Bronfman's relationship with Mr. Raniere in the process of doing so does not indicate impermissible bias—either of the objective sort required for recusal under 455(a) or of the actual sort required for recusal under 455(b)(1). 28 U.S.C. § 455(a)-(b)(1). Indeed, "[t]he Second Circuit has repeatedly held that a sentencing court is entitled to rely on

10

Case: 24-778, 10/29/2024, DktEntry: 48.1, Page 88 of 107
Case 1:20-cv-00485-EK-CLP    Document 329    Filed 11/14/23    Page 650 of 758 PageID
#: 5389

Case 1:18-cr-00204-NGG-VMS    Document 1194    Filed 04/26/23    Page 11 of 11 PageID
#: 22209

information gleaned from a trial in which the person to be sen-
tenced was neither a defendant nor represented by counsel."
(Bronfman Sent. Tr. at ECF 100.) To the extent the court
properly gleaned such information about that relationship from
the lengthy trial and the surrounding proceedings, and weighed
that evidence at sentencing, it was proper to do so.

## IV. CONCLUSION

For the foregoing reasons, Defendant Raniere's motion seeking
for this court to recuse itself prior to consideration of Rule 33
motions in this action is DENIED.

SO ORDERED.

Dated:    Brooklyn, New York
          April 2⁶, 2023

                                    s/Nicholas G. Garaufis

                                    NICHOLAS G. GARAUFIS
                                    United States District Judge

11

Case: 24-778, 10/29/2024, DktEntry: 48.1, Page 89 of 107
Case 1:20-cv-00485-EK-CLP    Document 328    Filed 11/14/23    Page 651 of 758 PageID #: 5390
Case 1:18-cr-00204-NGG-VMS    Document 1238    Filed 03/07/24    Page 1 of 8 PageID #: 22806

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA,

            -against-

KEITH RANIERE,

              Defendant.

**MEMORANDUM & ORDER**
**18-CR-204 (NGG)**

NICHOLAS G. GARAUFIS, United States District Judge.

Before the court are two motions filed by Defendant Keith Raniere: (1) his motion for reconsideration of the court's November 6, 2023, Memorandum and Order denying his motion to compel production of evidence, (*see* Mot. for Recons. (Dkt. 1225)), and (2) a separate motion to compel production of evidence. (*See* Post-Conviction Mot. to Compel dated December 21, 2023 ("Second MTC") (Dkt. 1230).) For the reasons set forth below, both motions are DENIED.

The court further sets April 22, 2024, as the final deadline for Defendant's submission of his Reply in support of his pending Rule 33 motion.

## I.  BACKGROUND

The court assumes familiarity with the background of this case. In brief, Mr. Raniere was convicted on June 19, 2019 on seven counts, including racketeering, racketeering conspiracy, wire fraud conspiracy, forced labor conspiracy, sex trafficking conspiracy, and two counts of sex trafficking. (*See* Jury Verdict (Dkt. 735).) On October 27, 2020, he was then sentenced to 120 years in the custody of the Federal Bureau of Prisons. (*See* October 27, 2020 Minute Entry (Dkt. 968).) Since his conviction, Mr. Raniere has filed three motions for a new trial pursuant to Fed. R. Crim.

1

P. 33. (*See, e.g.*, First Rule 33 Mot. (Dkt. 851); Second Rule 33
Mot. (Dkt. 956); Third Rule 33 Mot. (Dkts. 1169, 1176).) The
court denied the first two of the these. (Mem. and Order dated
July 17, 2020 (Dkt. 902) (denying first Rule 33 motion); Mem.
and Order dated October 23, 2020 (Dkt. 963) (denying second
Rule 33 motion).) His third remains pending.

Since filing his latest Rule 33 motion, Mr. Raniere has made two
requests to the court to compel the Government to produce in-
formation relating to his child exploitation and child
pornography predicate acts. (*See* Post-Conviction Mot. to Compel
dated April 14, 2023 ("First MTC"); Second MTC.) On November
6, 2023, this court denied Mr. Raniere's first motion to compel
the production of evidence. (*See* Mem. and Order dated Novem-
ber 6, 2023 (Dkt. 1224) (denying First MTC).) Mr. Raniere then
moved for reconsideration of this denial two weeks later. (Mot.
for Recons; *see also* Opp. to Mot. for Recons. (Dkt. 1229).) He
then filed his second, separate request for the court to compel
production of evidence on December 21, 2023. (Second MTC;
*see also* Opp. to Second MTC (Dkt. 1231); Reply (Dkt. 1233);
Supp. Reply (Dkt. 1235).)

The court considers the motion for reconsideration and the latest
motion to compel in turn.

## II.  MOTION FOR RECONSIDERATION

The standard courts apply when considering motions for recon-
sideration "is strict, and reconsideration will generally be
denied unless the moving party can point to controlling deci-
sions or data that the court overlooked—matters, in other
words, that might reasonably be expected to alter the conclu-
sion reached by the court." *Shrader v. CSX Transp., Inc.*, 70 F.3d
255, 257 (2d Cir. 1995). A motion for reconsideration "is not a
vehicle for relitigating old issues, presenting the case under new
theories, securing a rehearing on the merits, or otherwise taking

2

Case: 24-778, 10/29/2024, DktEntry: 48.1, Page 91 of 107
Case 1:20-cv-00485-EK-CLP    Document 329    Filed 11/14/23    Page 653 of 758 PageID
SPA14
SPA592

Case 1:18-cr-00204-NGG-VMS    Document 1238    Filed 03/07/24    Page 3 of 8 PageID #:
22808

a second bite at the apple[.]" *Analytical Surveys, Inc. v. Tonga Partners, L.P.*, 684 F.3d 36, 52 (2d Cir. 2012). Courts in this Circuit have thus generally held that parties seeking reconsideration may not advance new facts not previously presented to the Court. *See In re Facebook, Inc., IPO Secs. & Derivative Litig.*, 43 F. Supp. 3d 369, 373 (S.D.N.Y. 2014) (noting that a "party seeking reconsideration" may not "advance new facts, issues, or arguments not previously presented to the Court.") (quoting *Schonberger v. Serchuk*, 742 F. Supp. 108, 119 (S.D.N.Y. 1990)); *United States v. Morillo-Vidal*, No. 10-CR-222 (RWS), 2011 WL 4072173, at *2 (S.D.N.Y. Sept. 13, 2011); *see also* Local Civil Rule 6.3 ("No affidavits shall be filed by any party unless directed by the Court.")

Mr. Raniere does not cite to any controlling law that the court overlooked. (*See generally* Mot. for Recons.) He asserts that the court overlooked two items that Defendant argues are "critical"—(1) that it was fundamentally unfair for the court to consider the Loveall Declaration and (2) that the Loveall Declaration was incorrect. (Mot. for Recons. at 1-2); *see also* Loveall Decl. (Dkt. 1213-3).) But neither of these arguments were overlooked or alter the conclusion reached by the court. The court, in denying the motion to compel evidence, found that Mr. Raniere did not have "(1) *Brady* rights to this information; (2) post-conviction due process rights to this information; and (3) the right to this information under principles of 'elemental fairness.'" (Mem. and Order dated November 6, 2023 at 5.) The Loveall Report was considered by the court in the latter "elemental fairness" analysis alongside the "ample evidence at trial" when finding that "even assuming" a standard premised on "elemental fairness" applied, Mr. Raniere could not meet this standard. (*Id.* at 8-10.) Specifically, the court found that:

> Mr. Loveall's report, refuting Kiper's key findings, offers a far
> more plausible and convincing explanation of any anomalies

3

Case: 24-778, 10/29/2024, DktEntry: 48.1, Page 92 of 107
Case 1:20-cv-00485-EK-CLP    Document 321    Filed 11/14/23    Page 654 of 758 PageID
SPA 15
#: 5393
Case 1:18-cr-00204-NGG-VMS    Document 1238    Filed 03/07/24    Page 4 of 8 PageID #:
22809

> in the photos' metadata. Mr. Loveall's report is further sup-
> ported by the ample evidence presented at trial and Camila's
> declaration that she is certain of the circumstances and tim-
> ing of the photos. In sum, the evidence presented at trial, the
> Government's expert report, and Camila's declaration sub-
> stantially outweigh the arguments raised in the Report and
> Mr. Raniere's motion. Mr. Raniere therefore does not raise a
> reasonable probability that testing the evidence would
> demonstrate he did not commit the offense. (*Id.* at 10.)

Mr. Raniere's arguments in the present motion questioning the
veracity of the report are better characterized as attempts to re-
litigate old issues. *See Analytical Surveys, Inc.*, 684 F.3d at 52. The
court therefore DENIES Defendant's motion for reconsideration.

### III. SECOND POST-CONVICTION MOTION TO COMPEL

This Second MTC has much in common with the first. Mr. Rani-
ere again requests information that he argues will demonstrate
that the Government fabricated evidence relating to his convic-
tion of racketeering acts of child pornography and child
exploitation. (*See generally* Second MTC.)[1] And he again argues
that withholding this information violates his due process rights
and principles of "elemental fairness." (*Id.* at 9-12).

The court thus incorporates its discussion concerning the rele-
vant standards to Mr. Raniere's request to compel production of

---

[1] In his First MTC, "Mr. Raniere request[ed] (1) two forensic copies of the
camera card and corresponding FTK log files; (2) a file listing of the Hard
drive that contained the images of child pornography (the "Western Digital
hard drive"); and (3) CART examination notes." (Memorandum and Order
dated November 6, 2023 at 3 n.1.) In his Second MTC, Mr. Raniere re-
quests: "all information pertaining to the unknown photograph technician
who, prior to trial, and without authorization, changed and forensically
manipulated an unpreserved, essential piece of evidence – the camera
card." (Second MTC at 1; *see also* Second MTC, Ex. A (Requested Infor-
mation Relating to the Photograph Technician) (Dkt. 1230-1).)

4

Case: 24-778, 10/29/2024, DktEntry: 48.1, Page 93 of 107
Case 1:20-cv-00485-EK-CLP    Document 329    Filed 11/14/23    Page 655 of 758 PageID
SP 5346

Case 1:18-cr-00204-NGG-VMS    Document 1238    Filed 03/07/24    Page 5 of 8 PageID #:
22810

evidence from its November 6, 2023 order. (*See* Mem. & Order dated November 6, 2023 at 5-11.) In considering Defendant's present request under these standards, the court finds that Mr. Raniere does not have post-conviction due process right to the requested information and DENIES his motion.

Mr. Raniere again does not cite any law showing he has a right to the information requested. He primarily relies on *U.S. v. Abuhamra* 389 F.3d 309, 322. (2d Cir. 2004), for the contention that the Government must hand over this information. (*See* Second MTC at 9-10). In *Abuhamra*, the Second Circuit found that the respondent's right to a fair hearing was violated when the district court relied on information presented *ex parte* and *in camera* when denying respondent's bail application. *Id.* at 332-33. *Abuhamra* is thus inapplicable to this case where the court did not rely on arguments presented *ex parte* or *in camera* and does not concern access to information relevant to a party's bail application. This motion instead concerns a request for information relevant to Mr. Raniere's post-conviction motion for a new trial. His rights to this information therefore "must be analyzed in light of the fact that he has already been found guilty at a fair trial, and has only a limited interest in postconviction relief." *Dist. Attorney's Off. for Third Jud. Dist. v. Osborne,* 557 U.S. 52, 69 (2009).

And Mr. Raniere again does not demonstrate that "elemental fairness" should lead the court to compel the Government to grant him access to this information. Mr. Raniere's counsel had an opportunity to review and test the veracity of the photographic evidence prior to trial. (*See* Mem. and Order dated November 6, 2023 at 10-11.) The evidence requested would thus not support his Rule 33 motion because he cannot show that "'the evidence could not with due diligence have been discovered before or during trial.'" (*Id.* (quoting *United States v. Forbes,* 790 F.3d 403, 408-09 (2d Cir. 2015)). And Mr. Raniere is unable to

5

Case: 24-778, 10/29/2024, DktEntry: 48.1, Page 94 of 107
Case 1:20-cv-00485-EK-CLP    Document 329    Filed 11/14/23    Page 656 of 758 PageID
#: 5395

Case 1:18-cr-00204-NGG-VMS    Document 1238    Filed 03/07/24    Page 6 of 8 PageID #:
22811

show that the evidence raises a reasonable probability as to his
innocence in light of the substantial evidence supporting the rel-
evant charges in addition to the photos, including:

> messages from [the victim] where she referenced her sexual
> relationship with Raniere beginning in 2005 when she was
> fifteen years old; communications from Mr. Raniere refer-
> encing the photos; testimony from [the victim's] sister that
> she was aware of the relationship prior to Fall 2006; a folder
> containing nude pictures of the other women with whom Mr.
> Raniere had a sexual relationship and in which the pictures
> of [the victim] were found; testimony that Mr. Raniere
> sought to take similar pictures of other women; [the victim's]
> medical records, which included statements indicating she
> was in a sexual relationship with the same partner since she
> was underage; and testimony from [the victim's] sister iden-
> tifying her as the person in a sanitized version of the photos.
> (Id. at 2.)

The Government provided additional information rebutting the
claims of fabrication including: a declaration from the victim ver-
ifying the photos and the Loveall report discussed above. (*Id.* at
4, 9-10.) Considered together, Mr. Raniere is unable to demon-
strate a reasonable probability that he did not commit the
offense.

The court therefore finds that "Mr. Raniere provides no legal sup-
port for his request, and even if applying his desired standard of
'fundamental fairness,' Mr. Raniere fails to show that access to
this evidence violates fundamental fairness." (*Id.* at 11.)

## IV. RULE 33 MOTION

Mr. Raniere was convicted in June 2019 and his third Rule 33
motion for a new trial has been outstanding since May 2022. (*See*
Third Rule 33 Mot.) The court has not ruled on this motion pri-
marily due to his filing of separate motions that the court

6

Case: 24-778, 10/29/2024, DktEntry: 48.1, Page 95 of 107
Case 1:20-cv-00485-EK-CLP    Document 329    Filed 11/14/23    Page 657 of 758 PageID
SPA18
#: 5396
Case 1:18-cr-00204-NGG-VMS    Document 1238    Filed 03/07/24    Page 7 of 8 PageID #:
22812

considered and decided. (*See e.g.*, Not. of Mot. for Recusal (Dkt. 1170); First MTC; Second MTC.) The court also granted multiple requests to extend the deadline for Mr. Raniere to file a reply in support of his third Rule 33 motion due to logistical challenges presented by Mr. Raniere's incarceration. (*See* Def. Mots. for Extension of Time to Reply (Dkts. 1217, 1220, 1221, 1222, 1226).)

This court granted the most recent extension of time to file a reply on November 28, 2023, at which time the court noted that it would update the deadline for the Reply when ruling on Mr. Raniere's motion for reconsideration. (See Min. Entry dated November 28, 2023.) The court now sets the deadline for April 22, 2024, approximately 45 days following the release of this order. The court will not grant an additional request for an extension beyond this date. Mr. Raniere has had ample time to consider and respond to the Government's response to Mr. Raniere's third Rule 33 motion and now has an additional 45 days to do so. Any potential prejudice in not granting an additional extension is outweighed by an interest in the finality of his conviction.

7

Case: 24-778, 10/29/2024, DktEntry: 48.1, Page 96 of 107

Case 1:20-cv-00485-EK-CLP    Document 329    Filed 11/14/23    Page 658 of 758 PageID
#: 5597

SPA19

Case 1:18-cr-00204-NGG-VMS    Document 1238    Filed 03/07/24    Page 8 of 8 PageID #:
22813

## V.   CONCLUSION

For the reasons discussed herein, the court DENIES Mr. Raniere's motion for reconsideration and second post-conviction motion to compel. The court further sets a final deadline of April 22, 2024, for Mr. Raniere to file his reply in support of his pending third Rule 33 motion for a new trial.

SO ORDERED.

Dated:    Brooklyn, New York
          March 6, 2024

                                        s/Nicholas G. Garaufis

                                        NICHOLAS G. GARAUFIS
                                        United States District Judge

8

Case: 24-778, 10/29/2024, DktEntry: 48.1, Page 97 of 107
Case 1:20-cv-00485-EK-CLP    Document 328    Filed 11/14/23    Page 659 of 758 PageID
#: 5330

Case 1:18-cr-00204-NGG-VMS    Document 1256    Filed 04/29/24    Page 1 of 11 PageID
#: 23125

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
UNITED STATES OF AMERICA,

                                 **MEMORANDUM & ORDER**
                                 **18-CR-204 (NGG)**

        -against-

KEITH RANIERE,

                   Defendant.

NICHOLAS G. GARAUFIS, United States District Judge.

On June 19, 2019, Defendant Keith Raniere was convicted of
racketeering, racketeering conspiracy, wire fraud conspiracy,
forced labor conspiracy, sex trafficking conspiracy, and two
counts of sex trafficking. (*See* Jury Verdict (Dkt. 735); Judgment
(Dkt. 969) at 1-2.) Now before the court is Mr. Raniere's third
motion for a new trial premised on what he argues is newly dis-
covered evidence relating to two of the eleven predicate acts
supporting his racketeering conviction. (*See* Not. of Mot. (Dkt.
1168); Mem. of Law in Support of Mot. for Rule 33 Relief
("Mot.") (Dkt. 1169); Suppl. to Mot. (Dkt. 1176); *see also* Mem.
and Order dated July 17, 2020 (Dkt. 902) ("First Rule 33 M&O")
(denying Defendant's first Rule 33 motion); Mem. and Order
dated October 23, 2020 (Dkt. 963) ("Second Rule 33 M&O")
(denying Defendant's second Rule 33 motion).)[1]

---

[1] In addition to this third Rule 33 motion, Mr. Raniere filed a *pro se* fourth
new trial motion on June 21, 2022. (*See* Pro Se Mot. (Dkt. 1178).) This
motion raises the same issues previously considered by this court when
denying Mr. Raniere's first two motions for a new trial relating to allega-
tions of Government intimidation or perjury by key witnesses, which this
court has previously rejected as bases to grant a new trial, as well as issues
raised in the present motion which the court considers herein. Mr. Rani-
ere's *pro se* motion is therefore also DENIED. (*See generally* First Rule 33

1

For the reasons discussed herein, Mr. Raniere's motion for a new trial is DENIED.[2]

## I.   BACKGROUND

The court assumes familiarity with this case's background, which the court reviews only as relevant to the present motion.[3]

As the leader of NXIVM, Mr. Raniere engaged in criminal activities that led a jury to find him guilty of racketeering, racketeering conspiracy, forced labor conspiracy, wire fraud conspiracy, sex trafficking conspiracy, and two counts of sex trafficking. (*See* Judgment at 1-2; *see also* Sentencing Mem. (Dkt. 966) at 9-18 (describing underlying criminal activity).) Mr. Raniere's racketeering charge was predicated on eleven acts, including child exploitation and possession of child pornography. (*See* Jury Verdict at 2-3.) The jury found that the Government proved each of these eleven predicate acts beyond a reasonable doubt. (*Id.*)

The child pornography and child exploitation predicate acts are the focus of this motion. These acts were added in the second superseding indictment returned by the grand jury in March 2019. (*See* Second Superseding Indictment (Dkt. 430) ¶¶ 21-23);

___

M&O (discussing purported perjury); Second Rule 33 M&O (discussing purported Government intimidation).)

[2] On April 19, 2024, Mr. Raniere filed a habeas petition which discusses some of the same underlying facts reviewed in his Rule 33 motion, but in the context of constitutional ineffective assistance of counsel claims. (*See* Habeas Petition (Dkt. 1252) at 27-42.) Because the habeas petition considers separate claims, the court finds that it is proper to consider the outstanding Rule 33 motion and the habeas petition separately. This order thus RESERVES DECISION on the outstanding habeas petition pending additional briefing from the parties.

[3] Much of the underlying facts relevant to this motion were recently reviewed when denying Mr. Raniere's request to compel evidence. (*See* Mem. and Order dated Nov. 6, 2023 (Dkt. 1224) at 1-3.)

2

Case: 24-778, 10/29/2024, DktEntry: 48.1, Page 99 of 107
Case 1:20-cv-00485-EK-CLP    Document 328    Filed 11/14/23    Page 661 of 758 PageID
SPA 422
#: 5402

Case 1:18-cr-00204-NGG-VMS    Document 1256    Filed 04/29/24    Page 3 of 11 PageID
#: 23127

*see also, generally,* Superseding Indictment (Dkt. 50).) Specifi-
cally, they were added after the Government discovered
pornographic images depicting a minor in February 2019, while
reviewing a previously seized hard drive (the "Western Digital
hard drive"). (Gov Mem. of Law in Opposition to Rule 33 Mot.
("Opp.") (Dkt. 1213) at 4-5; *see also* Letter from Government
dated February 21, 2019 (Dkt. 362) (noting discovery of child
pornography images on the Western Digital hard drive).) The de-
fense moved to dismiss or sever the newly added predicate acts
(Defense Letter dated March 17, 2019 (Dkt. 436)), which this
court denied. (Mem. and Order dated April 29, 2019 (Dkt. 600)
at 31-32.)

The defense initially raised concerns about their ability to analyze
the evidence relating to the newly added predicate acts prior to
the start of the trial, which was then scheduled for April 29, 2019.
(*See, e.g.*, Defense Letter dated March 17, 2019 at 2; March 18,
2019 Status Conference Tr. (Dkt. 467) at 20:11-24 (noting that
jury selection was to begin on April 8, 2019, with the trial to
begin on April 29, 2019).) However, in a filing dated March 22,
2019, Mr. Raniere represented that he was ready for trial "even
though the government has superseded the indictment" and he
"request[ed] that the Court keep the dates for the current trial
schedule." (Defense Mem. dated March 22, 2019 (Dkt. 456-1) at
2-4.) Given the conflicting statements from Mr. Raniere's defense
team, the Government sought to ensure that he was ready to pro-
ceed, after noting numerous times that it would consent to the
trial's adjournment if necessary to allow his defense team time to
conduct a forensic examination of the photographs and the pho-
tographs' metadata. (*See, e.g.*, Gov. Mem. of Law dated March
29, 2019 (Dkt. 485) at 6-10.)

The issue of a potential delay in the trial was then discussed at a
status conference held on April 4, 2019, where the Government
raised the defense's prior statements that Raniere may not be

3

Case: 24-778, 10/29/2024, DktEntry: 48.1, Page 100 of 107

Case 1:20-cv-00485-EK-CLP    Document 228    Filed 11/14/25    Page 662 of 758 PageID
SPA23
#: 5461

Case 1:18-cr-00204-NGG-VMS    Document 1256    Filed 04/29/24    Page 4 of 11 PageID
#: 23128

ready for trial following the recent filing of the Second Superseding Indictment. (April 4, 2019 Status Conference Tr. (Dkt. 510) at 11:14-17.) The court therefore asked Mr. Raniere's defense counsel whether they could make an "affirmative statement that based on what's in the second superseding indictment . . . that [Mr. Raniere] will still be ready to go to trial." (*Id.* at 14:20-25.) Mr. Raniere's counsel responded saying that he will "be ready to go to trial." (*Id.* at 15:1-5.) Mr. Raniere's counsel also noted that the Government had been "very responsive" and accommodating in allowing the defense's forensic expert to visit the FBI to examine the relevant evidence. (*Id.* at 12:10-13:2, 15:1-5.) The trial then began on May 7, 2019. (*See* Dkt. 631.)

At trial, the Government introduced the photographs of the victim and metadata to prove the child pornography and child exploitation predicate acts. (Opp. at 19.) Further evidence proving that the pictures were from 2005 when the victim was fifteen years old included messages from the victim where she referenced her sexual relationship with Raniere beginning in 2005; communications from Mr. Raniere referencing the photos; testimony from the victim's sister that she was aware of the relationship prior to Fall 2006; a folder containing nude pictures of the other women with whom Mr. Raniere had a sexual relationship and in which the pictures of the victim were found; testimony that Mr. Raniere sought to take similar pictures of other women; the victim's medical records, which included statements indicating she was in a sexual relationship with the same partner since she was underage; and testimony from the victim's sister identifying the victim as the person in a sanitized version of the photos. (*Id.* at 19-20 (citing trial exhibits and the trial transcript).)

Mr. Raniere's counsel cross-examined FBI Senior Forensic Examiner Booth extensively about the photographic evidence, the

4

Case: 24-778, 10/29/2024, DktEntry: 48.1, Page 101 of 107

Case 1:20-cv-00485-EK-CLP    Document 328    Filed 11/14/25    Page 663 of 758 PageID

SPA124

#: 5424

Case 1:18-cr-00204-NGG-VMS    Document 1256    Filed 04/29/24    Page 5 of 11 PageID
#: 23129

Western Digital hard drive, the camera card ("CF card"), the re-
lated metadata, and the chain of custody of the digital evidence.
(June 13, 2019 Trial Tr. (Dkt. 979) at 4898:1-4947:4, 4962:8-
4975:4, 4986:19-4988:21.) During his testimony, Booth
acknowledged before the jury that the metadata was not reliable
as to when the photos were taken (*id.* at 4940:13-15), that
metadata could be changed or altered (*id.* at 4987:21-4988:12),
and that he was unaware of who accessed the camera card on
September 19, 2018 while it was in the FBI's possession. (*Id.* at
4973:19-25.)

The victim depicted in these photographs did not testify at trial,
but she submitted a sworn declaration in response to this motion.
(*See* Camila Decl. (Dkt. 1213-1).) In the declaration, the victim
affirms that she reviewed each of the photographs at issue and
that she is certain both that she is the subject of each photo and
that she was 15 years old when the photos were taken. (*Id.* ¶¶ 5,
8.) She also affirms that Mr. Raniere began sexually abusing her
in 2005, when she was 15 years old. (Camila Decl. ¶ 5; *see also*
Camila Impact Statement (Dkt. 965-1) at 1.)

Following his conviction in June 2019, Mr. Raniere has filed mul-
tiple motions for a new trial pursuant to Fed. R. Crim. P. 33. (*See*
Mot.; First Rule 33 M&O; Second Rule 33 M&O.) His first two
were denied in July and October 2020. (First Rule 33 M&O; Sec-
ond Rule 33 M&O.) The present motion was filed in May 2022.
(*See* Mot.) The Government responded to this motion in July
2023 and Mr. Raniere filed his Reply on April 17, 2024.[4]

---

[4] The delay in briefing of the present motion largely resulted from stays
while the court considered separate motions filed by the Defendant or his
appeals of separate motions. The court also granted numerous requests by
the defense for extension of time to submit Mr. Raniere's Reply. (*See* Mem.
and Order dated March 6, 2024 (Dkt. 1238) at 6-7 (reviewing the delay in
briefing the present motion).)

5

## II. LEGAL STANDARD

Rule 33 endows district courts with the authority to order a new trial "if the interest of justice so requires." Fed. R. Crim. Pro. 33. District court have "broad discretion to grant a new trial," but should grant such motions "sparingly and in the most extraordinary circumstances, and only in order to avert a perceived miscarriage of justice." *United States v. Gramins*, 939 F.3d 429, 444 (2d Cir. 2019).[5] In considering Rule 33 motions, the focus is "whether letting a guilty verdict stand would be a *manifest injustice*." *Id.*

Relief under Rule 33 based on newly discovered evidence may be granted only upon a showing that "(1) the evidence was newly discovered after trial; (2) facts are alleged from which the court can infer due diligence on the part of the movant to obtain the evidence; (3) the evidence is material; (4) the evidence is not merely cumulative or impeaching; and (5) the evidence would likely result in an acquittal." *United States v. Forbes*, 790 F.3d 403, 406-07 (2d Cir. 2015). The Second Circuit has "long held that to constitute newly discovered evidence, not only must the defendant show that the evidence was discovered after trial, but he must also demonstrate that the evidence could not with due diligence have been discovered before or during trial." *Id.* at 408-09. The court in conducting this analysis considers the balance between "protecting the finality of judgments and the interests of justice [] inherent in the Rule 33 analysis." *Id.* at 408.

## III. DISCUSSION

Mr. Raniere fails to demonstrate that justice requires a new trial, and the court therefore denies his motion.

---

[5] When quoting case law, except as otherwise noted, all citations and internal quotation marks are omitted, and all alterations are adopted.

Roberts - 566

Case: 24-778, 10/29/2024, DktEntry: 48.1, Page 103 of 107
Case 1:20-cv-00485-EK-CLP    Document 326    Filed 11/14/25    Page 665 of 758 PageID
SPA26

Case 1:18-cr-00204-NGG-VMS    Document 1256    Filed 04/29/24    Page 7 of 11 PageID
#: 23131

The basis for the Defendant's motion are allegations that the Government manipulated and fabricated "all the key evidence" used to prove the child pornography and child exploitation predicate acts. (Mot. at 3.) In his Reply, Mr. Raniere clarifies that he does not allege that the photos themselves were falsified, but instead only that the "files, timestamps, folders and metadata" associated with the pictures were fabricated. (Reply (Dkt. 1253) at 16-17.) This purported clarification is surprising because in the very first sentence of Mr. Raniere's memorandum in support of the present motion filed in May 2022, he states that "the government manufactured child pornography and planted it on a computer hard drive to tie it to him." (Mot. at 3.) And subsequent filings did not contradict this statement but instead reinforced it through broad statements such as: "the child pornography evidence was fabricated." (First Post-Conviction Mot. to Compel (Dkt. 1192) at 3-4.) His Reply therefore directly contradicts his prior representations about the photographic evidence at issue. Nevertheless, in light of his Reply's purported clarification, the court considers the digital evidence's "files, timestamps, folders, and metadata." (Reply at 17.)

The Defendant argues that the FBI falsified metadata on the digital camera card ("CF card") and Western Digital hard drive to fit the Government's narrative that the photographs were taken in 2005 when the victim was fifteen years old. (*See, e.g.*, Mot. at 12-13.) He further alleges that he did not have time to thoroughly examine the metadata evidence (Reply at 2), and that the Government covered up this manipulation by soliciting false testimony during trial. (Mot. at 19-20.)

These allegations of data manipulation do not constitute newly discovered evidence under Rule 33, which requires the defendant to show that "the evidence was discovered after trial . . . [and]

7

Case: 24-778, 10/29/2024, DktEntry: 48.1, Page 104 of 107
Case 1:20-cv-00485-EK-CLP    Document 32    Filed 11/14/25    Page 666 of 758 PageID
SPA127
#: 5405

Case 1:18-cr-00204-NGG-VMS    Document 1256    Filed 04/29/24    Page 8 of 11 PageID
#: 23132

that the evidence could not with due diligence have been discov-
ered before or during trial." *Forbes*, 790 F.3d at 409. They are
also contrary to the record.

In the leadup to trial and during trial, Mr. Raniere was made
aware of the metadata evidence soon after the Government dis-
covered the photographs on the Western Digital hard drive. (*See*
Letter from Government dated February 21, 2019.) His defense
then had an opportunity to test and challenge this evidence prior
to trial, including by hiring a forensic expert who visited the FBI
to review this evidence. His defense then had an opportunity to
cross-examine the FBI Agent called by the Government to discuss
the photos and their metadata. In this cross-examination, the
Agent testified to the metadata and its ability to be altered. (June
13, 2019 Trial Tr. at 4987:21-4988:20.) The jury considered this
evidence alongside other evidence presented at trial and con-
victed Mr. Raniere of these charges.

Raniere argues that even if his defense team was aware of the
evidence, a new trial is warranted because there was not suffi-
cient time for his experts to analyze the metadata. (Reply at 10.)
But this post-trial argument is in conflict with Mr. Raniere's trial
counsel clearly stating multiple times after the photographs were
discovered and the new charges were added to his Second Su-
perseding Indictment that he was ready for trial. (*Cf.* April 4,
2019 Status Conference Tr. at 15:1-5; Defense Mem. dated
March 22, 2019 at 2-4.) The Government offered to adjourn the
trial date on consent specifically to allow the defense to have
more time to examine the evidence connected to his child por-
nography and exploitation charges, which he rejected. (*See* Gov.
Mem. of Law dated March 29, 2019 at 6-10; April 4, 2019 Status
Conference Tr. at 15:1-5.)

Mr. Raniere ultimately seeks to have a new trial to challenge ev-
idence that he previously stated he was ready to challenge, that

8

Case: 24-778, 10/29/2024, DktEntry: 48.1, Page 105 of 107

Case 1:20-cv-00485-EK-CLP    Document 326    Filed 11/14/25    Page 667 of 758 PageID
SPA28
#: 5468

Case 1:18-cr-00204-NGG-VMS    Document 1256    Filed 04/29/24    Page 9 of 11 PageID
#: 23133

he had the opportunity to challenge, and that he did in fact challenge during his trial. The jury found him guilty of the predicate acts at issue so he now attempts to manufacture "new evidence" he argues would lead to his acquittal to receive a second bite at the apple. These are not extraordinary circumstances where a new trial is necessary to prevent a manifest injustice.

Mr. Raniere separately argues that it was "impossible" to discover certain evidence relating to the metadata, specifically, the camera card and details of the chain of custody of the metadata. (Reply at 9-10.) In doing so, he seeks to distinguish the metadata evidence his defense indisputably had the opportunity to review and challenge—*i.e.*, the evidence found on the Western Digital hard drive—from other evidence connected to the metadata. (*Id.*) His argument is that if given the opportunity to examine this other source of the metadata, it would reveal the "tampering" on which his motion relies. (*Id.*) This argument fails. Mr. Raniere seeks to circumvent his defense's ability to inspect and challenge the photographs' metadata by distinguishing the evidence his defense reviewed from other pieces of evidence such as the CF card—which, to be clear, his defense was also aware of during trial (*see, e.g.*, June 13, 2019 Trial Tr. 4901:1-25, 4902:11-25, 4906:10-4907:4)—to argue that the evidence now in focus is both "newly discovered" and the "key evidence" that would prove his innocence. But the Defendant provides no persuasive argument that he could not have discovered this evidence with diligence, *see Forbes*, 790 F.3d at 409, or that the evidence now in focus demonstrates manipulation or falsification of metadata that would support an acquittal. Ultimately, as with his prior unsuccessful motion for a new trial, Mr. Raniere "does not point to a single case in which a court has recognized the kind of evidence he cites as the basis for his motion as 'newly discovered evidence' under Rule 33." (Second Rule 33 M&O at 7.)

Case: 24-778, 10/29/2024, DktEntry: 48.1, Page 106 of 107
Case 1:20-cv-00485-EK-CLP   Document 228   Filed 11/14/25   Page 668 of 758 PageID
SPA29
#: 5429
Case 1:18-cr-00204-NGG-VMS   Document 1256   Filed 04/29/24   Page 10 of 11 PageID
#: 23134

The motion also fails because Mr. Raniere cannot demonstrate that the purported newly discovered evidence would result in acquittal or otherwise demonstrate that a new trial is necessary to prevent a manifest injustice. *Forbes*, 790 F.3d at 411. Mr. Raniere's primary support for his argument that the metadata was falsified are proffered expert reports submitted alongside his motion. (Reply at 3-4; *see also* Kiper Report (Dkt. 1169-1) at ECF 195-264); *see also* Dkt. 1178-2.) In response to these reports, the Government submitted a Declaration by David Loveall II, a Senior Computer Scientist with the FBI. (Loveall Decl. (Dkt. 1213-3).) This court previously considered the Defendant's and Government's reports when denying Mr. Raniere's motions to compel evidence. (*See* Mem. and Order dated Nov. 6, 2023 (Dkt. 1224) at 3-4, 9-10; Mem. and Order dated March 6, 2024 (Dkt. 1238) at 3-4.) In doing so, the court found that the Loveall Declaration "offers a far more plausible and convincing explanation of any anomalies in the photos' metadata" than the reports submitted by the Defendant, especially when considered alongside the "ample evidence presented at trial," *see supra*, and the victim's affidavit affirming that she was fifteen in the photographs. (Mem. and Order dated Nov. 6, 2023 at 9-10; Mem. and Order dated March 6, 2024 at 3-4.).) Mr. Raniere disagrees with the court's prior findings in his Reply. (Reply at 18-21.) But he provides no reason for the court to reconsider its prior determination that the evidence presented at trial, the Loveall report, and the affidavit submitted by the victim verifying her identity and age in the photos provide a far more plausible explanation for the discrepancy in the metadata than the Defendant. The court is confident that the evidence demonstrates Mr. Raniere's guilt as to these charges.

In sum, the court finds that the evidence is not newly discovered under Rule 33 and that, even if it was considered newly discovered, it would not "likely result in an acquittal." *Forbes*, 790 F.3d at 407. Justice does not require a new trial and the court denies

10

Case: 24-778, 10/29/2024, DktEntry: 48.1, Page 107 of 107
Case 1:20-cv-00485-EK-CLP    Document 329    Filed 11/14/25    Page 669 of 758 PageID
**SPA30**
Case 1:18-cr-00204-NGG-VMS    Document 1256    Filed 04/29/24    Page 11 of 11 PageID
#: 23135

Mr. Raniere's Rule 33 motion.[6] *See United States v. Snyder*, 740 F. App'x 727, 728 (2d Cir. 2018) (summary order) ("A district court ordinarily should not grant a new trial unless it is convinced that the jury has reached a seriously erroneous result or that the verdict is a miscarriage of justice.").

## IV. CONCLUSION

For the foregoing reasons, Defendant's Motion for a New Trial is DENIED and his request for an evidentiary hearing is DENIED as moot.

SO ORDERED.

Dated:    Brooklyn, New York
          April 27, 2024

                                        s/Nicholas G. Garaufis
                                        NICHOLAS G. GARAUFIS
                                        United States District Judge

---

[6] The court further finds that an evidentiary hearing is not necessary to decide the present motion. *See United States v. Ghavami*, 23 F. Supp. 3d 148, 157 (S.D.N.Y. 2014) ("Whether to hold an evidentiary hearing before deciding a motion for a new trial rests within the district court's discretion."); *see also United States v. Helmsley*, 985 F.2d 1202, 1209-10 (2d Cir. 1993) (district court may properly decline to hold hearing where "the moving papers themselves disclosed the inadequacies of the defendant['s] case").

11

EXHIBIT 6

## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF NEW YORK

---

| | |
|---|---|
| SARAH EDMONDSON, *et al.*　　　　* | |
| 　　　　　　　　　　　　　　　* | |
| 　　　　　　　　　　　　　　　* | |
| 　　　Plaintiffs,　　　　　* | |
| 　　　　　　　　　　　　　　　*　　1:20 - cv - 00485-EK-CLP | |
| 　　v.　　　　　　　　　　* | |
| 　　　　　　　　　　　　　　　* | |
| Keith Raniere, *et al.*　　　　* | |
| 　　　　　　　　　　　　　　　* | |
| 　　　Defendants.　　　　* | |
| 　　　　　　　　　　　　　　　* | |

---

October 21st, 2025

TO:

Robert A. Swift
William E. Hoese
Zahra R. Dean
Elias Kohn
KOHN, SWIFT & GRAF, P.C.
1600 Market Street, Suite 2500
Philadelphia, PA 19103
(215) 238-1700
rswift@kohnswift.com
whoese@kohnswift.com
zdean@kohnswift.com
ekohn@kohnswift.com

## ANSWER TO PLAINTIFFS' SECOND REQEUST FOR PRODCUTION OF DOCUMENTS

The following General Objections form a part of, and are hereby incorporated into, the response to each and every Request as set forth below. Nothing in Defendant's Specific Objections and Responses should be construed as a waiver of these General Objections, all of

which are expressly preserved. I also incorporate my previous General Objections from all previous responses to discovery requests.

I have fully reviewed this First set of requests (now with search terms) for production of documents. I have included everything that I have in my possession, access and control in the prior response to discovery, there are no changes. I have provided all documents that are related to the one last allegation remaining against me, Battery. The search terms have not cured any of my objections. The majority of questions are addressed to matters that were part of the dismissed allegations and therefore are part of a fishing expedition to try to loop me back into something I'm not involved in or gain information regarding other Defendants you are pursuing. Keep in mind there are only 4 relevant plaintiffs for the discovery pertaining to me: Sarah Edmondson, India Oxenberg, Nicole Isbell, and Paloma Pena. These requests and search terms attempt to probe far beyond that. See previous objections and answers to this document. Regarding the suggestion to meeting and confer in my previous responses or the Plaintiffs', please note that the recent specification of terms submitted in this request with search terms has not resolved the issues related to specificity and does not overcome my previous objections of these overbroad requests.

After meeting and conferring to attempt to resolve this issue at the request of the judge we found during our conference that the meeting was largely futile because the basis for my objections were not resolved and the search terms did not cure the objection.

**ANSWERS**

1. Objection: There is only 1 allegation left against me, Battery. This interrogatory has nothing to do with the claim against me. I have provided all the documents related to Battery, in my possession, access or control. Term 001: There are only 4 relevant plaintiffs for these search terms:  Sarah Edmondson, India Oxenberg, Nicole Isbell, and Paloma Pena. Battery is concerned with the alleged claims of these people only. This request is overbroad and not calculated to finding information related to the allegation against me. Instead, these questions are addressed to matters that were part of the dismissed allegations and therefore are part of a fishing expedition. Without waving the objection see document Roberts Discovery Response 1 092225 number 1. Defendant reserves the right to supplement this answer at a later time.


*Please be advised, my previous answers to Request 2 and 3 were submitted out of order. They were flipped. The answer to 2 was for 3 and the answer for 3 was for 2. My apologies for any confusion.


2. This request is overbroad and not calculated to finding information related to the allegation against me. How I became a member of DOS has nothing to do with the remaining allegation or it's elements. Instead, these questions are addressed to matters that were part of the dismissed allegations and therefore are part of a fishing expedition. Term-002 doesn't cure the issue. Without waiving the objection I refer you to Roberts Discovery Response 1 092225 answer ***number 3.*** Defendant reserves the right to supplement this answer at a later time.

3.  I refer you to Roberts Discovery Response 1 092225 answer **number 2.** On the basis of these terms I have provided you previously all of what I possess. Term 003 adds nothing additional. Defendant reserves the right to supplement this answer at a later time.

4.  I object to these terms because it is asking me to produce an instrument that I don't have. I do not have the physical tool as I stated in my prior answer. I refer you to Roberts Discovery Response 1 092225 answer number 4. Defendant reserves the right to supplement this answer at a later time.

5.  Objection: This request as those above and below are simply you taking a second bite of the apple, though permitted by The Court to do so, because these were answered and done so properly. On the basis of these terms I have provided you previously all of what I possess. Term 003 adds nothing additional. I refer you to Roberts Discovery Response 1 092225 answer number 5. Defendant reserves the right to supplement this answer at a later time.

6.  Objection: This request as those above and below are simply you taking a second bite of the apple, though permitted by The Court to do so, because these were answered and done so properly. On the basis of these terms I have provided you previously all of what I possess. Term 003 adds nothing additional. I refer you to Roberts Discovery Response 1 092225 answer number 6. Defendant reserves the right to supplement this answer at a later time.

7.  Objection: This request as those above and below are simply you taking a second bite of the apple, though permitted by The Court to do so, because these were answered and done so properly. On the basis of these terms I have provided you previously all of what I possess. Term 003 adds nothing additional. Without waiving the objection I refer you to Roberts Discovery Response 1 092225 answer number 7. Defendant reserves the right to supplement this answer at a later time.

8.  Objection: This request is overbroad and not calculated to finding information related to the allegation against me. Collateral is not defined. Instead, these questions are addressed to matters that were part of the dismissed allegations and therefore are part of a fishing expedition. Term-008 doesn't cure the issues. Without waiving the objection I refer you to Roberts Discovery Response 1 092225 answer number 8. Defendant reserves the right to supplement this answer at a later time.

9.  Objection: Collateral has nothing to do with the allegation. This request is overbroad and not calculated to finding information related to the allegation against me. Term-008 doesn't cure it. There was never any collateral collected related to branding or for the branding process. It was voluntarily shared and held to uphold the agreement to keep the sorority a secret and remain a member of the organization for the timeframe committed to. I have provided all collateral documents related to the allegation. Without waiving the objection I refer you to Roberts Discovery Response 1 092225 answer number.

Defendant reserves the right to supplement this answer if upon additional investigation and search they are found.

10. Objection: Release of collateral has nothing to do with the allegation. This request is overbroad and not calculated to finding information related to the allegation against me. Term-008 doesn't cure it. There was never any collateral release or threat of release related to branding or the branding process. I have provided all collateral documents related to the allegation. Without waiving the objection I refer you to Roberts Discovery Response 1 092225 answer number 10. Defendant reserves the right to supplement this answer at a later time.

11. I repeat the same objection that I stated above (Term-008 doesn't cure it) and further state that I have never held, nor been asked for return or to destroy the alleged undefined collateral, nor have documents related to returning or destroying of the alleged undefined collateral. Without waiving the objection I refer you to Roberts Discovery Response 1 092225 answer number 11. For the same reason stated above as stated in #9, and #10 above I repeat I have provided all documents in my possession with respect to the issue of Battery by the persons and with the persons that have allegationd me. I have no others. Defendant reserves the right to supplement this answer if upon additional investigation and search they are found.

12. Objection: This request is overbroad and not calculated to finding information related to the allegation against me. Instead, these questions are addressed to matters that were part

of the dismissed allegations and therefore are part of a fishing expedition. There is only 1 allegation left against me, Battery. This interrogatory has nothing to do with the claim against me. I have provided all the documents related to Battery, in my possession, access or control. Term 009: There are only 4 relevant plaintiffs for these search terms: Sarah Edmondson, India Oxenberg, Nicole Isbell, and Paloma Pena. Battery is concerned with the alleged claims of these people only. Without waving the objection see document Roberts Discovery Response 1 092225 number 12. Defendant reserves the right to supplement this answer if upon additional investigation and search they are found.

13. Objection: Nothing in this interrogatory pertains to the allegations of Battery against me. This is a fishing expedition to try to gain information. There is only 1 allegation left against me, Battery. This interrogatory has nothing to do with the claim against me. Term-10 doesn't cure this. I have provided all the documents related to Battery, in my possession, access or control. exo|eso has nothing to do with DOS, or the Battery Allegation. exo|eso is not a party to the suit and has no connection to DOS or the branding process. It is also not under the NXVIM umbrella. All documents regarding the company's registration are public documents. The Plaintiffs can obtain them by a thorough search in the public domain. Without waving the objection see document Roberts Discovery Response 1 092225 number 13. Defendant reserves the right to supplement this answer if upon additional investigation and search they are found.

14. Objection: Nothing in this interrogatory pertains to the allegations of Battery against me. For the same reasons in #13, I have provided all the documents related to Battery, in my

possession, access or control. Without waving the objection see document Roberts Discovery Response 1 092225 number 14. Defendant reserves the right to supplement this answer if upon additional investigation and search they are found.

15. Objection: Nothing in this interrogatory pertains to the allegations of Battery against me. For the same reasons in #13 and #14 above, I have provided all the documents related to Battery, in my possession, access or control. Without waving the objection see document Roberts Discovery Response 1 092225 number 15. Defendant reserves the right to supplement this answer if upon additional investigation and search they are found.

16. Objection: This is vague and calculated to confuse, and conflate the individual companies and their objectives. Without waving the objection see document Roberts Discovery Response 1 092225 number 16. Repeat answer above to #13, and #14. I also object to mixing of DOS and these companies - DOS which is a party and the others which are not - as a mechanism to have questions that should be directed to DOS as valid requests apply to the others. This is again a fishing expedition. With respect to recruiting, suggesting, persuading or advising persons to be part of DOS this also has nothing to do with the branding process, the Battery allegation against me, or it's elements. Defendant reserves the right to supplement this answer if upon additional investigation and search they are found.

17. Objection: This request vague and calculated to confuse, and conflate the individual companies and their objectives. Without waving the objection, on the basis of these terms

I have provided you previously all of what I possess in regards to Battery. See document Roberts Discovery Response 1 092225 number 17. See answers #13 and #16. Defendant reserves the right to supplement this answer if upon additional investigation and search they are found.

18. Objection: This request vague and calculated to confuse, and conflate the individual companies and their objectives.  Without waving the objection, on the basis of these terms I have provided you previously all of what I possess in regards to Battery. See document Roberts Discovery Response 1 092225 number 18. See answers #13 and #16. Defendant reserves the right to supplement this answer if upon additional investigation and search they are found.

19. Objection: This request is overbroad and not calculated to finding information related to the allegation against me. This is vague and calculated to confuse, and conflate the individual companies and their objectives. It assumes compensation. It assumes that in order to be a member of NXIVM you were compensated, it goes beyond the Battery allegation and it's elements, and by asking NXVIM related questions it is overbroad, unduly burden come and confusing. It tries to conflate parties and non-parties, objective and compensation, in a fishing expedition. It is quite frankly offensive – but so is this entire suit. Term-011 doesn't cure any of this, in fact it just makes it worse. Without waving the objection, on the basis of these terms I have provided you previously all of what I possess in regards to Battery. See document Roberts Discovery Response 1

092225 number 19. Defendant reserves the right to supplement this answer if upon additional investigation and search they are found.

20. Objection: This request is overbroad and not calculated to finding information related to the allegation against me. Instead, these questions are addressed to matters that were part of the dismissed allegations and therefore are part of a fishing expedition. Term-012 doesn't cure this. Without waving the objection, on the basis of these terms I have provided you previously all of what I possess in regards to Battery. See document Roberts Discovery Response 1 092225 number 20. Defendant reserves the right to supplement this answer if upon additional investigation and search they are found.

21. Objection: This request is overbroad and not calculated to finding information related to the allegation against me. Instead, these questions are addressed to matters that were part of the dismissed allegations and therefore are part of a fishing expedition. Term-013 doesn't cure this. Without waving the objection, on the basis of these terms I have provided you previously all of what I possess in regards to Battery. See document Roberts Discovery Response 1 092225 number 21. Defendant reserves the right to supplement this answer if upon additional investigation and search they are found.

22. Objection: This request is overbroad and not calculated to finding information related to the allegation against me. Instead, these questions are addressed to matters that were part of the dismissed allegations and therefore are part of a fishing expedition. Term-014 doesn't cure this. Without waving the objection, on the basis of these terms I have provided you previously all of what I possess in regards to Battery. See document

Roberts Discovery Response 1 092225 number 22. Defendant reserves the right to supplement this answer at a later time.

23. Objection: This request is overbroad and not calculated to finding information related to the allegation against me. Instead, these questions are addressed to matters that were part of the dismissed allegations and therefore are part of a fishing expedition to gain information. Term-015 doesn't cure this. I am not a Co-defendant in any other matter. Term-015 also refers to people some of whom I have never met, nor have any recollection of any conversation or communication exchange with. Without waving the objection, on the basis of these terms I have provided you previously all of what I possess in regards to Battery. See document Roberts Discovery Response 1 092225 number 23. Defendant reserves the right to supplement this answer at a later time.

24. Objection: This request is overbroad and not calculated to finding information related to the allegation against me. Instead, these questions are addressed to matters that were part of the dismissed allegations and therefore are part of a fishing expedition to gain information. Term-016 doesn't cure this. The nature of the communication itself refers to retention of counsel which is a matter of attorney client privilege. Without waving the objection, see document Roberts Discovery Response 1 092225 number 24. Defendant reserves the right to supplement this answer at a later time.

25. Objection: This request is overbroad and not calculated to finding information related to the allegation against me. Instead, these questions are addressed to matters that were part

of the dismissed allegations and therefore are part of a fishing expedition. Term-017 doesn't cure this. On the basis of these terms I have provided you previously all of what I possess in regards to Battery. Without waving the objection, see document Roberts Discovery Response 1 092225 number 25. Defendant reserves the right to supplement this answer at a later time.

26. Objection: This request as those above and below are simply you taking a second bite of the apple, though permitted by The Court to do so, because these were answered and done so properly. I complied and provided the documents requested here because these were documents of an administrative matter and are public documents. However I object to using this document in any civil proceeding  because this  request is seeking documents unrelated to my final allegation. Term-018 makes the fishing expedition worse. The decision of the medical board was politically motivated, and wrongful. It concluded wrongly that branding is the practice of medicine to try to create a basis to revoke my license, as there was no other basis, and they were uncomfortable with my participation in a  high profile organization and needed a way to somehow control or punish me because they didn't understand my participation. There was no criminal allegation or criminal basis for Battery upon which their decision was based. There was no proof of non-consensual touching and the conclusions are therefore unrelated to the allegation at hand. They merely show the effects of fear mongering in the media and political pressure upon administrative board members. On the basis of these terms I have provided you previously all of what I possess. Without waving the objection, I refer you to Roberts Discovery Response 1 092225 answer number 26. Defendant reserves the right to supplement this answer at a later time.

27. Response is unchanged from my precious response. See Discovery Response 1 092225 answer number 27. Defendant reserves the right to supplement this answer at a later time.

28. Response is unchanged from my precious response. See Discovery Response 1 092225 answer number 28. Defendant reserves the right to supplement this answer at a later time.

<u>INDIVIDUAL CERTIFICATION</u>

I certify that the foregoing statements made by me are true. I am aware that if any of the foregoing statements made by me are willfully false, I am subject to punishment for contempt of Court.

_____(sign and print name)

Print:   Danielle Roberts

Dated: _____November 11_____, 202 _25_

# EXHIBIT 7

**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**

---

| | |
|---|---|
| SARAH EDMONDSON, *et al.* | * |
| | * |
| | * |
| Plaintiffs, | * |
| | * |
| v. | * |
| | * |
| Keith Raniere, *et al.* | * |
| | * |
| Defendants. | * |
| | * |

1:20 - cv - 00485-EK-CLP

---

July 8, 2025


TO:

Robert A. Swift
William E. Hoese
Zahra R. Dean
Elias Kohn
KOHN, SWIFT & GRAF, P.C.
1600 Market Street, Suite 2500
Philadelphia, PA 19103
(215) 238-1700
rswift@kohnswift.com
whoese@kohnswift.com
zdean@kohnswift.com

ekohn@kohnswift.com


**SECOND SET OF  REQUESTS FOR PRODUCTION OF DOCUMENTS  TO PLAINTIFFS[1]**

Defendant Danielle Roberts requests pursuant to Federal Rules of Civil Procedure 26 and

34 and Local Civil Rules 26.2, 26.3 and 26.4 of the United States District Court for the Eastern

Districts of New York, that Plaintiffs, in the above captioned action produce the following

---

[1] This does not toll or stop your requirement to properly answer my prior discovery. These are additional questions to those previously sent. You have not properly responded to **any** prior discovery, and if that continues, I will file a motion to compel that discovery, and if it comes to it, this discovery as well.

Documents to Defendant via email ONLY at danielle@drdanielleroberts.com, within thirty (30) days following the receipt of service of these Requests for Production of Documents ("Requests").

**<u>DEFINITIONS</u>**

1.      The Uniform Definitions in Discovery Requests set forth in Local Civil Rule 26.3 and the rules of construction set forth therein and in the Federal Rules of Civil Procedure are all incorporated herein by reference as if separately set forth in each and every Request.

2.      The "Action" refers to the particular action in which these Requests have been served, i.e., the action within which the party responding to these Requests has been named as a Defendant.

3.      "And" and "or" mean and/or and should be construed accordingly.

4. "Communication" means the transmission of information, in the form of facts, ideas, inquiries, or otherwise.

5. "Document" has the broadest possible meaning, including paper Documents and electronic files and data, including without limitation communications in any form including emails, text messages, messages using any other messaging app, calendars, phone logs, notes and recordings of meetings and phone calls.

6. "You," or "Your" means the specific Plaintiff identified in the question, or any Plaintiff who is answering these documents.

7. "Defendants" means all currently and formerly named Defendants in this Action.

8. "DOS" means the organization within NXIVM generally referred to as "DOS", also sometimes referred to as "the Vow".

9. "DOS member" means any individual associated with NXIVM who was recruited to join DOS (also known as "The Vow").

10. "DOS Plaintiffs" means Plaintiffs Sarah Edmonson, Jessica Joan Salazar, India Oxenberg, Soukiana Mehdaoui, Rachel Widjaja, Nicole Isbell, Valerie Heckel, Allison Warnyca, Paloma Pena, Erika Weissenborn, Kristin Taravella, Veronica Jaspeado, Charlotte Giroux (the

"DOS Plaintiffs") and Camila Fernandez.

11. "Identify" when referring to a Document means, unless otherwise specified, to give, to the extent known, the (a) type of Document; (b) general subject matter; (c) date of the Document; and (d) author(s), addressee(s), and recipient(s).

12. "Individual Defendant" means any non-entity who was ever named as a Defendant in the Action, whether or not the person is named as a Defendant in the Third Amended Complaint.

13. "NXIVM" means NXIVM, Executive Success Programs ("ESP") and affiliated companies, including: Ethical Science Foundation ("ESF"), Ethical Humanitarian Foundation, Rainbow Cultural Garden ("RCG"), Jness, Society of Protectors ("SOP"), and NXIVM's VIP Program.

15. "Person" or "persons" means any natural person or any business, legal or governmental entity, or association.

16. "Plaintiffs" means Sarah Edmondson, Jessica Joan Salazar, Soukiana Mehdaoui, Nicole Isbell, Daniela Fernandes, Camila Fernandes, India Oxenberg, Bonnie Piesse, Tabitha Chapman, Ashley Mclean, Mark Vicente, Anthony Ames, Veronica Jaspeado, Paloma Pena, Charlotte Giroux, Rachel Behl/Widjaja, Valerie Heckel, Adrienne Stiles, Jennifer Sinclair/Kobelt, Margot Leviton, Isabella Constantino, Caryssa Cottrell, Deanne Brunelle, Karla Diaz Cano, Pamela Cooley, Rosalyn Cua, Brieanna Fiander, Shayna Holmes, Polly Green, Andrea Hammond, Yan Huang, Sara Lim, Ariella Menashy, Maja Miljkovic, Michelle Neal, Susan Pratt, Alison Rood, Katie Shaw Kristin, Hannah Vanderheyden, Juliana Vicente, Susan Patricia Vieta, Susan Wysocki, Stephanie Fair-Layman, Gabrielle Gendron, Sarah Wall, Scott Starr, Philip Akka, Alejandro Balassa, Madeline Carrier, Rod Christiansen, Owen Giroux, Jeffrey Golfman, Ashley Harvey, Rees Alan Haynes, Nils Macquarrie, Anthony Madani, Chad Williams, Christopher Black, Robert Gray, Ken Kozak, Allison Warnycam, Erika Weissenborn, Elham Menhaji, Kayla Grosse and Lindsay MacInnis.

17. "Referring to" means concerning, relating to, describing, evidencing, or constituting and is used synonymously with those terms.

3

## **INSTRUCTIONS**

1.      The Documents to be produced in response to these Requests are all responsive Documents within Your possession, custody or control, including Documents that You have the practical ability to obtain, including but not limited to, Documents that are within the possession, custody or control of any of Your agents, attorneys, administrators, executors, family members and any and all such other persons and entities that represent You or are subject to Your control.

2.      Electronically Stored Information ("ESI") shall be produced pursuant to the Joint Stipulated Order Regarding Discovery of Electronically Stored Information or any other ESI order entered on the Court's docket or as agreed to by the parties.

3.      With respect to each Document withheld on a claim of privilege, provide a statement setting forth the information required by Local Civil Rule 26.2.

4.      Each Request shall be construed as required under Local Civil Rule 26.4.

5.      If any Documents within the scope of the Requests have been lost, destroyed, transferred to others not subject to Your control, or otherwise disposed of, or if any Documents responsive to the Requests exist but are not available, furnish a list identifying each such Document and setting forth the following information with respect to each such Document: its date, author(s), sender(s), addressee(s), and recipient(s), and the subject matter of the Document. In each instance, explain the circumstances surrounding each disposition or why such Document is unavailable, including the person(s) responsible for authorizing the disposition and the date of disposition.

6.      Please produce the Documents either as they are kept in the usual course of business or organize and label them to correspond to the categories in these Requests.

7.      If You have no Documents responsive to a particular Request, so state.

8.      Unless otherwise indicated, the time period covered by these Requests encompasses, for the individual responding, the period from when they first became involved in the matters specific to this complaint to the present.

4

**DOCUMENTS TO BE PRODUCED**:

1.  Please present all evidence that defendant was personally directly or indirectly responsible for the delay in you bringing the specific charge of battery against her.

2.  Please present all evidence as to the reason you waited until you did for when you filed the battery charge against defendant, if any such evidence exists.
    Please present all documentation that backs up your answer.

3.  Did you believe that filing the battery charge against her when you did was within the one year statute of limitations? If so why?
    Please present all documentation that backs up your answer.

4.  If you knew it was beyond the statute of limitations, why did you file it anyway?
    Please present all documentation that backs up your answer.

5.  Were you aware that defendant had not been charged criminally with anything?
    Please present all documentation that backs up your answer.

6.  Is it your contention that the statute of limitations in regards to the battery charge was somehow tolled?
    Please present all documentation that backs up your answer.

7.  Once the attempts to file charges in July 2017 for battery that allegedly took place on the date of 3/9/2017 with the police department were dropped, please tell me why you failed to file civil charges before the statute of limitations passed.
    Please present all documentation that backs up your answer.

8.  In regards to the Battery claim that you have filed against me, Communications between medical board and authorities, phone records, produce all documents, including police reports, emails and texts, written letters, journal entry, podcast or video recordings,

5

Facebook pages, signal, whats app, telegram, protonmail, all email addresses, group

chats, recorded voice conversations (HBO), voice notes, zoom recordings, snapchat,

tiktok, photos, videos recorded communications or anything else (from now on known as

Proofs) that allege supports your claim for battery and specifically:

    a.  Proofs regarding the alleged intentional touching or application of force;

    b.  Proofs regarding the alleged touching that shows that it was either harmful or

        offensive to a reasonable person in the plaintiff's circumstances; and

    c.  Proofs regarding the Lack of consent to the touching.

9. In regards to the Battery claim that you have filed against me, produce all Proofs as far

back as you have available when you first contemplated bring the battery charge against

me.

10. If any such Proofs were deleted, please give a detailed list of those deleted Proofs, and

why they were deleted. Further, please state what actions taken, if any were done to

recover those Proofs in light of the ongoing litigation.

11. For any such Proofs where a Phone was used, please state the Phone company you used

for such Proofs.

12. In regards to consent for the alleged battery, please produce all Proofs showing:

    a.  You did not consent to get a brand;
    b.  You needed to know the meaning prior to getting the brand;
    c.  Any "Master slave communications";
    d.  All communication that showed you either enjoyed their experience and wanted
        to share it or communications showing you did not enjoy it;
    e.  If applicable, the date you found out the brand was KR's initials and how you
        found out;
    f.  People you tried to enroll, conversations with those people and specifically who
        you tried to enroll after you found out the brand was KR's initials;
    g.  All Proofs in your possession showing the activities and conversations that show
        the lifestyle that was occurring in ESP and DOS was one you wanted and wanted
        to share it with others;

h.  All Proofs that show you trusted the system – things that show how "weird" their lifestyle was and how you liked doing it – all the things that you were doing, and this was just one of them;

i.  Proofs that show you knew DOS was about complete obedience and either objected at any time, or enjoyed it;

j.  Proofs that you had Informed consent and that you were informed of what the life was;

k.  Proofs of when you learned that you were, in fact, a "victim" of this lifestyle, and who, or how you learned it;

l.  Proofs you agreed to an alternative lifestyle and liked and enjoyed that until it became inconvenient and proofs as to how you were inconvenienced or damages by the lifestyle;

m.  Any proofs that the alleged act of the battery was part of the practice of medicine or a medical procedure;

n.  Any proofs that you have or made for tributes or "thank yous" or anything you created that shows your appreciation of Keith;

o.  Produce your "Vow" and "creedos" from DOS; and

p.  Any Communications between you and any other members of DOS.

13. In regards to harm for the alleged battery, please produce all Proofs showing:

a.  Proofs that you sought medical advice after the alleged battery occurred;

b.  Proofs of you Enrolling of others after the alleged battery occurred;

c.  Proofs of any threats you received if you didn't comply with anything while participating in the lifestyle;

d.  Proofs of Any Collaterals or alleged Blackmail that were released against you or anyone else;

e.  Any communications you have between yourself and Lauren Salzman;

f.  Any communications you have between yourself and Alex Betancourt;

g.  Any communications you have between yourself and anyone who is or was a party in this matter related to this matter;

h.  Any Proofs related to any videos of any alleged battery of any of the alleged parties;

i.  Any therapy records in your possession where you spoke about the alleged battery and it's alleged psychological damage;

j.  Any Medical records for bodily harm that you can produce after the alleged battery;

k.  Communications of progress on any assignments with a master/instructor/teacher and slave/instructed/student and reports on successes/failures with those assignments;

l.  Proofs of any receipts from plastic surgery procedure to counter the alleged battery and have it removed that you got restitution for  and what specifically the money was used for;

14. Any proofs or letters stating anyone explained the risks of the alleged battery;

15. Any proofs anyone told you to see their doctor for follow up if needed;

16. Any proofs you left during part of the alleged battery, and what you left to do and that you came back afterwards to have it completed?

_/s/ Danielle Roberts____
Danielle Roberts

<u>CERTIFICATION</u>

I hereby certify that the copies of the reports annexed hereto rendered by proposed expert witnesses are exact copies of the entire report or reports rendered by them; that the existence of other reports of said experts, either written or oral, are unknown to me, and if such become later known or available, I shall serve them promptly on the propounding party.

By:_____(sign and print name)
Print:

Dated:_____, 202____

<u>INDIVIDUAL CERTIFICATION</u>

I certify that the foregoing statements made by me are true.  I am aware that if any of the foregoing statements made by me are willfully false, I am subject to punishment for contempt of Court.

_____(sign and print name)
Print:

Dated: _____, 202____

# EXHIBIT 8

*Edmondson v. Raniere*: Pls.' Preliminary Proposed Search Strings: Def. Danielle Roberts' 1st and 2d Sets of Demands for Production

Plaintiffs' proposal herein represents an initial proposal subject to good-faith modification following negotiation and continuing evaluation of burden.

## I.    First Set of Demands for Production

**Request No. 1:**

(battery OR assault* OR touch* OR burn* OR injur* OR harm* OR scar* OR cauteriz* OR procedure)
AND (Danielle OR Roberts OR DOS OR slave OR master OR collateral OR ceremony OR initiat*)

**Request No. 5:**

(consent OR consensual* OR agree* OR permission OR aware* OR force* OR coerc* OR pressure* OR threat* OR intimidat* OR object* OR resist* OR fear OR pain OR hurt OR enjoy* OR fun* OR experience* OR regret* OR share* OR brand* OR trauma)

AND (brand* OR KR OR Raniere OR Keith OR initial* OR meaning OR symbol OR medical OR medicine OR procedure OR doctor OR physician OR practice OR enroll* OR invit* OR encourage* OR introduce*)

AND (DOS OR slave OR master OR collateral OR Danielle OR Roberts OR doctor OR ceremony OR initiat*)

**Request No. 6:**

(medical OR doctor OR physician OR nurse OR clinic OR hospital OR ER OR treatment OR exam OR injury OR wound* OR scar* OR burn* OR pain OR infection OR inflame* OR blister* OR prescribe* OR surgery OR surgical OR plastic OR reconstruct* OR removal OR procedure OR therapy OR therapist OR counseling OR psychologist OR trauma OR PTSD OR mental health OR emotional OR distress OR restitution OR refund OR payment OR receipt* OR bill* OR invoice* OR record* OR note* OR diagnosis OR prescription OR medication OR video* OR recording OR film OR clip OR footage OR evidence)

AND (brand* OR burn* OR cauteriz* OR scar* OR injur* OR battery OR harm OR wound* OR damage OR mark* OR procedure OR DOS OR slave OR master OR collateral OR Danielle OR Roberts OR Raniere OR Keith OR ceremony OR initiat*)

**Request No. 8:**

(risk* OR warn* OR disclose* OR explain* OR inform* OR aware* OR consent OR permission OR medical OR safety OR procedure OR cauteriz* OR infection OR pain OR scar OR burn OR injury OR harm OR side effect* OR complication* OR healing OR aftercare OR treatment)

AND (brand* OR procedure OR initiat* OR ceremony OR DOS OR slave OR master OR collateral OR Danielle OR Roberts OR Raniere OR Keith)

*Edmondson v. Raniere*: Pls.' Preliminary Proposed Search Strings: Def. Danielle Roberts' 1st and 2d Sets of Demands for Production

**Request No. 9:**

(doctor OR physician OR medical OR clinic OR nurse OR hospital OR treatment OR "follow up" OR followup OR checkup OR appointment OR visit OR care OR wound* OR heal* OR infection OR burn OR scar OR pain OR aftercare)

AND

(told OR advise* OR recommend* OR suggest* OR instruct* OR direct* OR encourage*)

AND

(brand* OR procedure OR cauteriz* OR initiat* OR ceremony OR DOS OR slave OR master OR collateral OR Danielle OR Roberts OR Raniere OR Keith)

**Request No. 10:**

(left OR leav* OR exit* OR walk* OR step* OR went OR return* OR rejoin* OR pause* OR stop* OR interrupt* OR resume* OR complete* OR finish* OR stop* OR complet*)

/30 (brand* OR procedure OR cauteriz* OR burn* OR initiat* OR ceremony OR battery OR DOS OR slave OR master OR collateral OR Danielle OR Roberts OR Raniere OR Keith)

**Request No. 21:**

Search strings inapplicable: Plaintiffs and Counsel are working on completing HIPAA consent forms to have therapy records produced.

**Request No. 22:**

Search strings inapplicable: Plaintiffs and Counsel are working on completing HIPAA consent forms to have therapy records produced.

**Request No. 30:**

(leave* OR left OR resign* OR quit OR stop* OR depart* OR exit* OR report* OR complaint* OR contact* OR email* OR letter OR call* OR speak* OR communicat* OR file* OR submit* OR notify OR statement OR claim OR grievance OR allegation OR negative OR deny* OR dismiss* OR reject* OR decline* OR no action OR response OR reply)

AND

(OPMC OR "Office of Professional Medical Conduct" OR "medical board" OR "board of medicine" OR licensing OR disciplinary OR complaint OR investigation OR authority OR police OR law enforcement OR detective OR officer OR prosecutor OR DA OR FBI)

AND

*Edmondson v. Raniere*: Pls.' Preliminary Proposed Search Strings: Def. Danielle Roberts' 1st and 2d Sets of Demands for Production

(ESP OR NXIVM OR DOS OR Danielle OR Roberts OR doctor OR physician OR branding OR brand* OR procedure OR initiat* OR ceremony OR collateral)

**Request No. 31:**

(NYTimes OR "New York Times" OR Times OR Barry OR Meier OR Parlato OR Frank OR reporter OR journalist OR media OR press OR article OR interview OR story OR publication OR documentary OR HBO OR producer OR filmmaker OR team OR publicist OR PR)

AND

(Vow OR NXIVM OR ESP OR DOS OR Danielle OR Roberts OR doctor OR physician OR branding OR brand* OR procedure OR initiat* OR ceremony OR collateral)

**Request No. 36:**

(NYTimes OR "New York Times" OR Times OR "Albany Times" OR media OR press OR reporter OR journalist OR publication OR outlet OR newspaper OR magazine OR article OR interview OR story OR documentary OR producer OR director OR filmmaker OR film OR HBO OR Vow OR Rob OR Gavin OR Parlato OR Frank OR publicist OR team)

AND

(NXIVM OR ESP OR DOS OR Danielle OR Roberts OR doctor OR physician OR branding OR brand* OR procedure OR initiat* OR ceremony OR collateral OR Raniere OR Keith)

**Request No. 47:**

[Plaintiffs' email addresses]

Plaintiffs will further respond by directing Defendant's attention to their individual responses and objections to Keith Raniere's and Clare Bronfman's First Set of Interrogatories, which identify Plaintiffs' messaging and social media accounts and identities used to communicate publicly about NXIVM.

**Request No. 54:**

(content: (Televisa OR Noticieros OR (Mexic* /5 (media OR outlet OR news)) OR journalist OR reporter OR producer OR press OR article OR video OR leak* OR publish* OR release* OR broadcast OR air* OR footage OR clip OR segment OR record*)

AND

(Sarah OR Edmondson OR brand* OR branding OR burn* OR cauteriz* OR procedure OR ceremony OR initiat* OR DOS OR slave OR NXIVM OR master OR collateral)

AND

(Alex OR Betancourt OR Lauren OR Salzman OR Danielle OR Roberts OR Raniere OR Keith OR NXIVM OR ESP))

AND

(date:[2017-01-01 TO 2025-12-31])

**Request No. 59:**

(custodian: S. Edmondson) AND

((To: L_Salzman Contacts) OR (from: L_Salzman Contacts) OR (contributor: L_Salzman Contacts))

AND (contents: (brand* OR burn* OR cauteriz* OR procedure OR initiat* OR ceremony OR DOS OR slave OR master OR collateral)

AND (initial* OR KR OR Keith OR Raniere OR meaning OR symbol OR logo OR design OR mark*))

AND

(date:[2017-01-01 TO 2018-12-31])

II.   **Second Set of Demands for Production**

**Request No. 2:**

(wait* OR delay* OR later OR time* OR timing OR decide* OR chose OR choice OR reason* OR why OR because OR after OR years later OR recently OR finally OR when OR report* OR complaint* OR file* OR claim* OR allegation* OR charge* OR lawsuit OR case OR statement OR explanation OR disclos* OR reveal*)

AND

(battery OR brand* OR burn* OR cauteriz* OR scar* OR procedure OR initiat* OR ceremony OR DOS OR slave OR master OR collateral OR Danielle OR Roberts OR Raniere OR Keith OR NXIVM OR ESP)

# EXHIBIT 9

**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**

| | |
|---|---|
| SARAH EDMONDSON, *et al.* | * |
| | * |
| | * |
| Plaintiffs, | * |
| | *     1:20 - cv - 00485-EK-CLP |
| v. | * |
| | * |
| Keith Raniere, *et al.* | * |
| | * |
| Defendants. | * |
| | * |

October 5, 2025

TO: Robert A. Swift

William E. Hoese
Zahra R. Dean
Elias Kohn
KOHN, SWIFT & GRAF, P.C.
1600 Market Street, Suite 2500
Philadelphia, PA 19103
(215) 238-1700
rswift@kohnswift.com
whoese@kohnswift.com
zdean@kohnswift.com
ekohn@kohnswift.com

**Second Set of Requests to Produce Documents**

Defendant Danielle Roberts requests pursuant to Federal Rules of Civil Procedure 26 and 34 and Local Civil Rules 26.2, 26.3 and 26.4 of the United States District Court for the Eastern Districts of New York, that Plaintiffs, in the above captioned action produce the following Documents to Defendant via email ONLY at danielle@drdanielleroberts.com, within thirty (30) days following the receipt of service of these Requests for Production of Documents ("Requests").

**PREFACE**

These Requests are specifically tailored to the claims of Battery and the disputed application of equitable tolling to the statue of limitations. The defined terms and search strings are intended to meet Plaintiffs' obligation under FRCP 26(g) to conduct a reasonable search and are proportional to the needs of the case, as they focus directly on the narrow, surviving claim.

**DEFINITIONS**

1. The Uniform Definitions in Discovery Requests set forth in Local Civil Rule 26.3 and the rules of construction set forth therein and in the Federal Rules of Civil Procedure are all incorporated herein by reference as if separately set forth in each and every Request.

2. The "Action" refers to the particular action in which these Requests have been served, i.e., the action within which the party responding to these Requests has been named as a Defendant – in particular here, the one remaining action, Battery.

3. "And" and "or" mean and/or and should be construed accordingly.

4. "Communication" means the transmission of information, in the form of facts, ideas, inquiries, or otherwise.

5. "Document" has the broadest possible meaning, including paper Documents and electronic files and data, including without limitation communications in any form including written letters, journal entries, emails, text messages, messages using any other messaging app (signal, WhatsApp, telegram, proton mail, snap chat, tiktok, X, etc.) calendars, phone logs, notes and recordings of meetings, phone calls, voice notes, video recordings and footage.

    5a. By "Documents" this notice to produce is not seeking documents that are subject to attorney client privilege or any other applicable privilege. If such privilege is raised the answer to this document production should identify the document for which the privilege is raised, the specific reason for the raising of the privilege and for each such objection provide a list identifying the document with the corresponding privilege raised.

5b. The span of time for answer of this document production is the time in which the Plaintiff came in contact with the DOS, started to formulate their desire to join, actually joined, and all events including when this action was filed and has proceeded to present, unless otherwise specified. If there is any uncertainty use January 1, 2015 to present.

6. "You," or "Your" means the specific Plaintiff identified in the question, or any Plaintiff who is answering these documents.

7. "Defendant" means Danielle Roberts.

8. "DOS" means the organization generally referred to as "DOS," Dominus Obsequious Sororium, also sometimes referred to as "the Vow".

9. "DOS member" means any individual who was recruited to join DOS (also known as "The Vow"), and joined.

10. "DOS Plaintiffs" means Plaintiffs Sarah Edmonson, Jessica Joan Salazar, India Oxenberg, Soukiana Mehdaoui, Rachel Widjaja, Nicole Isbell, Valerie Heckel, Allison Warnyca, Paloma Pena, Erika Weissenborn, Kristin Taravella, Veronica Jaspeado, Charlotte Giroux (the "DOS Plaintiffs") and Camila Fernandez.

11. "Battery Plaintiffs" means Plaintiffs Sarah Edmonson, India Oxenberg, Nicole Isbell, and Paloma Pena.

12. "Identify" when referring to a Document means, unless otherwise specified, to give, to the extent known, the (a) type of Document; (b) general subject matter; (c) date of the Document; and (d) author(s), addressee(s), and recipient(s).

13. "Individual Defendant" means any non-entity who was ever named as a Defendant in the Action, whether or not the person is named as a Defendant in the Third Amended Complaint.

14. "NXIVM" means NXIVM, Executive Success Programs ("ESP") and affiliated companies, including: Ethical Science Foundation ("ESF"), Ethical Humanitarian Foundation, Rainbow Cultural Garden ("RCG"), Jness, Society of Protectors ("SOP"), and NXIVM's VIP Program.

15. "Person" or "persons" means any natural person or any business, legal or governmental entity, or association.

16. "Plaintiffs" means Sarah Edmondson, Jessica Joan Salazar, Soukiana Mehdaoui, Nicole Isbell, Daniela Fernandes, Camila Fernandes, India Oxenberg, Bonnie Piesse, Tabitha Chapman, Ashley Mclean, Mark Vicente, Anthony Ames, Veronica Jaspeado, Paloma Pena, Charlotte Giroux, Rachel Behl/Widjaja, Valerie Heckel, Adrienne Stiles, Jennifer Sinclair/Kobelt, Margot Leviton, Isabella Constantino, Caryssa Cottrell, Deanne Brunelle, Karla Diaz Cano, Pamela Cooley, Rosalyn Cua, Brieanna Fiander, Shayna Holmes, Polly Green, Andrea Hammond, Yan Huang, Sara Lim, Ariella Menashy, Maja Miljkovic, Michelle Neal, Susan Pratt, Alison Rood, Katie Shaw Kristin, Hannah Vanderheyden, Juliana Vicente, Susan Patricia Vieta, Susan Wysocki, Stephanie Fair-Layman, Gabrielle Gendron, Sarah Wall, Scott Starr, Philip Akka, Alejandro Balassa, Madeline Carrier, Rod Christiansen, Owen Giroux, Jeffrey Golfman, Ashley Harvey, Rees Alan Haynes, Nils Macquarrie, Anthony Madani, Chad Williams, Christopher Black, Robert Gray, Ken Kozak, Allison Warnyca, Erika Weissenborn, Elham Menhaji, Kayla Grosse and Lindsay MacInnis.

17. "Referring to" means concerning, relating to, describing, evidencing, or constituting and is used synonymously with those terms.

**INSTRUCTIONS**

1. The Documents to be produced in response to these Requests are all responsive Documents within Your possession, custody or control, including Documents that You have the practical ability to obtain, including but not limited to, Documents that are within the possession, custody or control of any of Your agents, attorneys, administrators, executors, family members, friends or colleagues – ie: HBO and it's associates or the like, and any and all such other persons and entities that represent You or are subject to Your control.  This includes, but is not limited to, Documents held on personal devices, cloud storage accounts (e.g., iCloud, Google Drive, Dropbox), and social media or messaging platforms (e.g., Facebook, WhatsApp, Signal).

2. With respect to messaging apps and text messages documents to be produced in response to these requests are the conversations in full between January 1, 2015 and present that contain any of the search terms provided.

3. Electronically Stored Information ("ESI") shall be produced pursuant to the Joint Stipulated Order Regarding Discovery of Electronically Stored Information or any other ESI order entered on the Court's docket or as agreed to by the parties.

4. With respect to each Document withheld on a claim of privilege, provide a statement setting forth the information required by Local Civil Rule 26.2.

5. Each Request shall be construed as required under Local Civil Rule 26.4.

6. If any Documents within the scope of the Requests have been lost, destroyed, transferred to others not subject to Your control, or otherwise disposed of, or if any Documents responsive to the Requests exist but are not available, furnish a list identifying each such Document and setting forth the following information with respect to each such Document: its date, author(s), sender(s), addressee(s), and recipient(s), and the subject matter of the Document. In each instance, explain the circumstances surrounding each disposition or why such Document is unavailable, including the person(s) responsible for authorizing the disposition and the date of disposition.

7. Please produce the Documents either as they are kept in the usual course of business or organize and label them to correspond to the categories in these Requests.

8. If You have no Documents responsive to a particular Request, so state.

9. Unless otherwise indicated, the time period covered by these Requests encompasses, for the individual responding, the period from when they first became involved in the matters specific to this complaint, specifically the Alleged Battery, to the present.

**DOCUMENTS TO BE PRODUCED:** If not specified these document requests are directed at the 4 Plaintiff's involved in the only surviving action, Battery.

| 1 | Any and all documents and communications that support your tolling claim that the defendant was directly or indirectly responsible for Battery Plaintiffs failure to file within the timeframe of the statute of limitations between when the alleged Battery occurred and the time the complaint was filed by the Battery Plaintiffs. | Term-001 | (wait* OR delay* OR later OR time* OR timing OR expir* OR decide* OR chose OR choice OR reason* OR why OR because OR after OR years later OR change OR flip OR remorse OR recently OR finally OR when OR report* OR complaint* OR file* OR claim* OR allegation* OR action* OR charge* OR lawsuit OR civil OR suit OR case OR statement OR explanation OR disclose* OR reveal* OR Police OR Report OR Tort OR Civil OR Abuse OR Intervene OR Filing OR statute of limit*OR toll*<br><br>AND<br><br>(Battery OR process OR brand* OR burn* OR cauterize* OR Battery OR scar* OR initiat* OR ceremony OR process OR DOS OR Sorority OR slave OR master OR collateral OR Danielle OR Roberts OR Raniere OR Keith OR NXIVM OR ESP OR Sarah OR Edmonson OR India OR Oxenberg OR Nicole OR Nik OR Isbell OR Paloma OR Pena) |
| 2 | Any and all documents and communications that support your arguments of tolling the statute of limitation for your filing of the Battery action against the Defendant by the Battery Plaintiffs involved. | Term-001 | |
| 3 | Any and all documents and communications that support the Plaintiffs beliefs that the action was brought within the timeframe before the expiration of the appropriate statute of limitation. | Term-001 | |
| 4 | Produce documents that support factually your claim that the complaint | Term-001 | |

| | was filed within the statute of limitation period and support any extension of the period. | | |
|---|---|---|---|
| 5 | Any and all documents and communications that the Battery Plaintiffs knew or did not know that the Defendant had not been charged criminally in any way from the time of the alleged Battery until the civil claim was filed. | Term-002 | (Criminal OR Defendant OR Civil OR Federal OR Dismissed OR Witness OR charg* OR Dismissed OR Indict OR Subject OR action OR Battery OR brand OR RICO OR sex trafficking OR forced labor OR conspiracy OR cooperate OR Frank OR Report OR Parlato OR NY Times OR Danielle OR Roberts OR Raniere OR Keith OR NXIVM OR ESP OR Sarah OR Edmonson OR India OR Oxenberg OR Nicole OR Nik OR Isbell OR Paloma OR Pena Lauren OR Salzman OR Allison OR Mack OR Jimena OR Garza OR Keith OR Raniere OR Master OR Slave OR M) |
| 6 | Produce documents that support in any manner your contention raised in the Defendants motion for dismissal that the statute of limitation was tolled. | Term-001 | |
| 7 | Produce every document in your possession, access or control that shows the date of the last act of alleged Battery committed against the Battery Plaintiffs. | Term-003 | (Battery OR brand* OR burn* OR cauterize* OR scar* OR process OR initiate* OR ceremony OR DOS OR slave OR master OR collateral OR Danielle OR Roberts OR Raniere OR Keith OR NXIVM OR ESP OR Sarah OR Edmonson OR India OR Oxenberg OR Nicole OR Nik OR Isbell OR Paloma OR Pena Lauren OR Salzman OR Allison OR Mack OR Jimena OR Garza OR Keith OR Raniere OR Master OR Slave OR M) |
| 8 | Produce documents showing attempts to file charges in July 2017 for Battery that allegedly took place on the date of 3/9/2017 with the police department, who filed and the results of this filing. | Term-004 | (Battery OR brand* OR burn* OR cauterize* OR scar* OR process OR initiate* OR ceremony OR DOS OR slave OR master OR collateral OR |

| | | | |
|---|---|---|---|
| | | | Danielle OR Roberts OR Raniere OR Keith OR NXIVM OR ESP OR Sarah OR Edmonson OR India OR Oxenberg OR Nicole OR Nik OR Isbell OR Paloma OR Pena OR Lauren OR Salzman OR when OR report* OR complaint* OR file* OR claim* OR allegation* OR charge* OR lawsuit OR case OR statement OR explanation OR disclose* OR reveal* OR Police OR Abuse OR Intervene OR Filing OR statute of limitation(s)) |
| 9 (1st set No. 1) | Produce all documents related to the Battery action that the Battery Plaintiffs have filed against me. Documents that support your claim for Battery and specifically:<br><br>a. Documents regarding the alleged intentional touching or application of force by the Defendant;<br>b. Documents regarding the alleged touching that shows that it was harmful or offensive to a reasonable person in the Plaintiff's circumstances; and<br>c. Documents showing the lack of consent to the Defendant for the touching. | Term-005 | (Battery OR assault* OR touch* OR burn* OR injur* OR harm* OR scar* OR cauteriz* OR force, OR releas*, OR blackmail, OR said no, OR objected, OR resisted, OR consent  OR coerce OR refused OR offensive OR agree OR Yes or NO OR join* OR participat* OR planned OR intentional OR lack OR collateral ORDanielle OR Roberts OR DOS OR slave OR master OR collateral OR ceremony OR initiate* OR Sarah OR Edmonson OR India OR Oxenberg OR Nicole OR Nik OR Isbell OR Paloma OR Pena OR Lauren OR Salzman OR Allison OR Mack OR Jimena OR Garza OR Keith OR Raniere OR Master OR Slave OR M) |
| 10 | If any document were deleted, please give a detailed list of which documents, and why they were deleted or destroyed. Provide documents showing what actions were taken by Plaintiffs to recover those documents in light of the ongoing litigation. | Term-006 | (lose* OR lost OR destroy* OR delet* OR discard* OR alter* OR mutilat* OR shred* OR "get rid of" OR remove OR erase OR wipe*)<br><br>AND (document* OR file* OR record* OR email* OR |

| | | | |
|---|---|---|---|
| | | | message* OR note* OR data OR evidence)<br><br>AND (DOS OR "Dominus Obsequious Sororium" OR Dominus OR "The Sorority" OR "The Vow" OR DOS w/2 member* OR Master OR Slave OR M OR Danielle OR Roberts OR DOS OR consent OR yes OR No OR Sarah OR Edmonson OR India OR Oxenberg OR Nicole OR Nik OR Isbell OR Paloma OR Pena Lauren OR Salzman OR Allison OR Mack OR Jimena OR Garza or Keith OR Raniere Lauren OR Salzman OR Allison OR Mack OR Jimena OR Garza or Keith OR Raniere OR Anthony Ames OR Anthony OR Nippy OR husband Or Michele OR Hatchette OR Sister* OR Circle OR Squad OR Love* OR Audrey OR McIntyre OR Amanda OR Canning OR Carola OR Garza OR Charmel OR Bowden OR Margarita Or Garcia OR Lucia OR Todd OR Ana OR Isabel OR Guinea OR Gonzalez OR Marla Gonzalez)) |
| 11 | For any such documents requested where a phone was used to create the document, provide the document that shows which phone company you used. | | NA – to be completed as other searches are conducted |
| 12a (1st set No. 5) | All documents and communications showing that the Battery Plaintiffs did not consent (or objected) to the Defendant to receive the brand before the time of the alleged Battery. | Term-007 | (consent OR consensual* OR agree* OR permission OR aware* OR force* OR coerc* OR pressure* OR threat* OR intimidat* OR object* OR resist* OR pain OR hurt OR laugh OR enjoy* OR fun* OR experience* OR regret* OR share* OR brand* OR trauma OR Yes OR No OR grateful OR happy OR important OR blackmail OR Invite OR give |

| | | | OR Pledge Or Vow OR Commit OR Agree OR want OR thank you OR appreciate OR Love OR dislike OR Protest OR participat* OR showed up OR came OR desired OR left OR leave OR protest OR stop OR encourage OR help OR comfort OR slave OR master OR Danielle OR Roberts OR Sarah OR Edmonson OR India OR Oxenberg OR Nicole OR Nik OR Isbell OR Paloma OR Pena OR Lauren OR Salzman OR Allison OR Mack OR Jimena OR Garza or Keith OR Raniere OR Anthony Ames OR Anthony OR Nippy OR husband Or Michele OR Hatchette OR Sister* OR Circle OR Squad OR Love* OR Audrey OR McIntyre OR Amanda OR Canning OR Carola OR Garza OR Charmel OR Bowden OR Margarita Or Garcia OR Lucia OR Todd OR Ana OR Isabel OR Guinea OR Gonzalez OR Marla Gonzalez) |
|---|---|---|---|
| 12b | Any and all documents and communications on which you (Battery Plaintiffs) base your allegation that the branding was not consensual before the alleged Battery took place. | Term-007 | |
| 12c | Any and all documents and communications that expressed that you (Battery Plaintiffs) consented and/or participated and/or enjoyed the branding and wanted to, or did share the experience and/or were positively impacted by it. | Term-007 | |
| 12d | Any and all documents and communications in which you (Battery Plaintiffs) objected to be branded, expressed your dislike of it, and/or protested the process. | Term 007 | |
| 12e | Any and all documents and communications that show the date you | Term-008 | (Meaning OR Brand OR Symbol OR KR OR Keith OR Raniere |

| | | | |
|---|---|---|---|
| | (Battery Plaintiffs) learned the brand included KR's initials and how you learned. Include documents that show date you learned the other meanings and how you learned them. | | OR Elements OR DOS OR Dominus Obsequious Sororium" OR Chakras OR Bar OR Alpha OR Mu OR Air OR Earth Or Water Or Fire OR Pod OR Dropbox OR Circle OR Sisters OR Log OR Submit OR Give OR Gave OR lie OR deceiv* OR tantrum OR possession OR tribute OR Sarah OR Edmonson OR India OR Oxenberg OR Nicole OR Nik OR Isbell OR Paloma OR Pena OR Lauren OR Salzman Or Allison OR Mack OR First Line OR Jimena OR Garza OR Master OR Up OR Upline OR M Lauren OR Salzman OR Allison OR Mack OR Anthony OR Ames OR Nippy OR husband Or Michele OR Hatchette OR Sister* OR Circle OR Squad OR Love* OR Audrey OR McIntyre OR Amanda OR Canning OR Carola OR Garza OR Charmel OR Bowden OR Margarita Or Garcia OR Lucia OR Todd OR Ana OR Isabel OR Guinea OR Gonzalez OR Marla Gonzalez OR Erika OR Weissenborn OR Kristen OR Zirben OR Danai OR Johnson OR Jessica OR Joan OR Valerie OR Heckle OR Haney OR Rachel OR Widjaja) |
| 12f | Any and all documents and communications showing the name of the people you invited or enrolled [after you received your brand], and [after you learned that the brands meaning included KR's initials.] Include communications with those people, their name, address and the dates. | Term-008 Term-009 | (*Plus – be sure to search the names of each additional woman invited after that time period) |
| 12g | Any and all documents and communications containing the activities/companies you (co)developed/participated in, and | Term 009 | (Lifestyle OR Unique Or Alternative OR consent OR consensual* OR agree* OR participate OR permission OR |

| | created or contributed to building, and conversations that you had about the lifestyle that was offered and evolving into DOS. Documents illustrating your participation in this lifestyle and your desire and actions you took to share it with others. Include documents showing how long you were a participating member in ESP, SOP, Jness, DOS and who you invited to and enrolled in each. Include communications with those people, their name, address and the dates. [year 2000 – present] | | aware* OR force* OR coerc* OR pressure* OR threat* OR intimidat* OR object* OR resist* OR Submit OR Give OR Gave OR lie OR deceiv* OR tantrum OR possession OR tribute OR consequence OR pain* OR hurt OR laugh OR enjoy* OR fun* OR experience* OR regret* OR share* OR brand* OR trauma OR Yes OR No OR grateful OR happy OR important OR blackmail OR Invite OR give OR Pledge Or Vow OR Commit OR Agree OR want OR thank you OR appreciate OR Love OR dislike OR Protest OR enroll* OR invit* OR Secret OR Swore OR Swear OR join* OR enroll OR invite* OR recruit OR build OR Create OR Develop OR CoCreate OR activity OR practices OR growth OR Goals OR progress OR minut* OR Meeting* OR desire OR pursue OR earned OR willing*) <br><br> AND <br><br> (Jness OR SOP OR DOS OR ESP OR Delegates OR points system OR Vancouver OR Center OR Owner OR vulnerability OR practice OR Source OR Field OR Trainer OR Green OR Sash OR Coach OR Stripe OR Path OR Proctor OR Master OR Slave OR Friend) |
|---|---|---|---|
| 12h | Any and all documents and communications illustrating you trusted the lifestyle, adopted it because you wanted to, that you liked doing it, benefitted from it and that the branding was just one of the practices of this | Term-009 | |

|  |  |  |  |
|---|---|---|---|
|  | lifestyle you choose to adopt. [year 2000 – present] |  |  |
| 12i | Any and all documents and communications you knew or didn't know DOS was about complete obedience and either objected at any time, or agreed and participated. | Term-010 | (Obedience OR Permission OR DOS OR Invitation OR Process OR Invit* OR Yes OR No OR agre* OR gave OR collateral OR join* OR participate OR enroll OR wanted OR obedience OR Brand* OR skin * OR Necklace OR disclosure OR need to know basis OR jewelry Or Collar Or Consent OR tattoo OR small OR Lifetime OR Master OR Slave OR Participate OR Swear OR Promis* OR Object* Or No OR resist* OR declin* Or left OR Rejected OR escap* OR Releas* OR Allision Or Mack Or Lauren Or Salzman OR Jimena OR Garza OR Vow OR Pledge OR Creedo OR Commitment OR Strong OR "bad ass" OR badass OR character) |
| 12j | Any and all documents and communications showing that you were informed or not of what the DOS lifestyle was; including but not limited to; a lifetime Vow of Obedience, an initiation brand, a collar or piece of jewelry, a Master/Slave relationship | Term-010 |  |
| 12k | Any and all documents and communications showing that you knew of another woman that refused to get the brand and the consequences of her decision. | Term-008 Term-010 | (OR Ana OR Gabby OR AnaGabriela OR Montemayor) |
| 12o | Your "Vow" "Pledges" "Promises" and "Creedos" from DOS; you created or contributed to creating while in DOS. Including drafts. | Term-010 |  |
| 12p | Any and all documents and communications between you and any other members of DOS during the period in which you were deciding to become a member. | Term -008 Term-009, | OR (consider* OR decid* OR "thinking about" OR serious* OR ponder* OR "walk around with" OR "walking around with" OR invit* OR life*) |

| | | Term-010 | |
|---|---|---|---|
| 13a (1st set No. 6) | In regards to harm for the alleged Battery, please produce all documents showing: That you sought medical advice after the alleged Battery occurred; Produce any and all medical records for bodily harm that you claim was produced by the alleged Battery. | Term-011 | (medical OR doctor OR physician OR nurse OR clinic OR hospital OR ER OR treatment OR exam OR injury OR wound* OR scar* OR groin OR burn* OR pain OR infection OR inflame* OR blister* OR prescribe* OR surgery OR surgical OR plastic OR reconstruct* OR removal OR procedure OR therapy OR therapist OR counseling OR psych* OR trauma OR PTSD OR mental health OR emotional OR distress OR restitution OR refund OR payment OR receipt* OR bill* OR invoice* OR record* OR note* OR diagnosis OR prescription OR medication OR video* OR recording OR film OR clip OR footage OR evidence)<br><br>AND (brand* OR burn* OR cauteriz* OR scar* OR injur* OR Battery OR harm OR wound* OR damage OR mark* OR process OR DOS OR slave OR master OR collateral OR Danielle OR Roberts OR Raniere OR Keith OR ceremony OR initiat*) |
| 13c | Any and all documents and communications illustrating any threats you received if you didn't comply with anything while participating in the lifestyle of DOS, and/or threats related to the brand. | | (Term-001 OR Term-007)<br><br>OR<br><br>(threat* OR intimidat* OR "blackmail" OR "get rid of" OR releas* OR consequenc* OR repercussion* OR punish* OR expose* OR demand* OR breach* OR repair*) |
| 13d | All documents and communications showing any Collaterals or alleged | Term-012 | (collateral OR blackmail OR release* OR send* OR receiv* |

| | Blackmail that were released against you or anyone else; | | OR give* OR use* OR leak* OR expos* OR "fear for") |
|---|---|---|---|
| 13g | Any documents and communications you have between yourself and anyone who is or was a party or involved in this case/matter related to Battery or the branding experience between when you received the brand to present. | Term 001, Term-010 | |
| 13h | Any documents and communications related to any videos of the initiation process and any alleged Battery of any of the alleged parties to the Battery. Include any videos. | Term 001, Term-010 | Term-001 OR Term-010<br><br>OR<br><br>(video* OR record* OR film* OR tape* OR footage OR clip* OR photo* OR picture*) AND (Term-001 OR Term-010) |
| 13i | Any and all documents and communications where you stated and/or spoke about the alleged Battery and the alleged psychological damage. | Term - 011 Term-013 Term-008 | (Frank OR Parlato OR Janja OR Lalich OR Catherine * OR "India's mom" OR deprogram* OR ex-cult OR ex cult OR cult OR psych* OR trauma* OR PTSD OR "mental health" OR distress OR anguish OR fear OR emotional OR distraught OR<br><br>AND (Brand* OR Battery OR Names OR Symbol OR Mark OR Tattoo) |
| 13j | Any and all therapy records in your possession where you spoke about the alleged Battery and it's alleged psychological damage | n/a | |
| 13k | Any and all Medical records for bodily harm that you can produce after the alleged Battery; | n/a | |
| 13l | Any and all documents and communications of progress on your favorite assignment with a master/instructor/teacher and slave/instructed/student and reports on successes/failures with those assignments while you were in DOS; | Term-014 Term-008 | (assignment* OR task* OR goal OR progress* OR success* OR fail* OR report* OR update* OR "favorite" OR "going well" OR achieve*OR excited OR evolve OR break through OR Grow*) |

| 13m | Any receipts from a plastic surgery procedure to remove the brand. Include receipts for the surgery to equate to the restitution your received from the court to the procedure. | n/a | |
|---|---|---|---|
| 14 | Any and all documents and communications that show that you went to see your own independent doctor for follow up after the branding. | Term 001, Term-010<br><br>Term-014 | (Term-001 OR Term-010)<br><br>AND<br><br>(doctor OR "Dr" OR physician OR clinic OR "medical attention" OR "see a doctor" OR appointment OR after OR follow-up OR "next day" OR "week after") |
| 15 | Any and all documents and communications that show that during the time the branding was made on the specific date of the branding you consulted with any third party about the branding and returned to the branding and objected to it. Provide also documentation of the consultation and time that was used for consultation during the time you attended the branding ceremony | Term-015 | (Term-001 OR Term-010 OR Term-008)<br><br>AND (consult* OR talk* OR speak* OR call* OR text* OR message* OR "step away" OR "take a break" OR pause OR breast OR feed OR Troy Or Care for)<br><br>AND (object* OR "said no" OR unsure OR uncertain OR "not sure" OR "change my mind" OR "don't want to" |
| 16<br>(1st set No. 10) | Any and all documents and communications you left during part of the alleged Battery, and what you left to do and that you came back afterwards to have it completed | Term-015 | OR<br><br>(left OR leav* OR exit* OR walk* OR step* OR went OR return* OR rejoin* OR pause* OR stop* OR interrupt* OR resume* OR complete* OR finish* OR stop* OR complet*) |

Your search strings for requests No. 21 – No. 59 for my First Set of Requests unedited from your suggestions.

Request No. 21:

Search strings inapplicable: Plaintiffs and Counsel are working on completing HIPAA consent forms to have therapy records produced.

Request No. 22:

Search strings inapplicable: Plaintiffs and Counsel are working on completing HIPAA consent forms to have therapy records produced.

Request No. 54:

(content: (Televisa OR Noticieros OR (Mexic* (media OR outlet OR news)) OR journalist OR reporter OR producer OR press OR article OR video OR leak* OR publish* OR release* OR broadcast OR air* OR footage OR clip OR segment OR record*)

AND

(Sarah OR Edmondson OR brand* OR branding OR burn* OR cauteriz* OR ceremony OR initiat* OR DOS OR slave OR NXIVM OR master OR collateral)

AND

(Alex OR Betancourt OR Lauren OR Salzman OR Danielle OR Roberts OR Raniere OR Keith OR NXIVM OR ESP))

AND (date:[2017-01-01 TO 2025-12-31])

Request No. 59:

(custodian: S. Edmondson) AND

((To: L_Salzman Contacts) OR (from: L_Salzman Contacts) OR (contributor: L_Salzman Contacts))

AND (contents: (brand* OR burn* OR cauteriz* OR initiat* OR ceremony OR DOS OR slave OR master OR collateral)

AND (initial* OR KR OR Keith OR Raniere OR meaning OR symbol OR logo OR design OR mark*))

AND (date:[2017-01-01 TO 2018-12-31])


  /s/ Danielle Roberts____
Danielle Roberts

<u>CERTIFICATION</u>

I hereby certify that the copies of the reports annexed hereto rendered by proposed expert witnesses are exact copies of the entire report or reports rendered by them; that the existence of other reports of said experts, either written or oral, are unknown to me, and if such become later known or available, I shall serve them promptly on the propounding party.

By:_____(sign and print name)

Print:

Dated:_____, 202____

<u>INDIVIDUAL CERTIFICATION</u>

I certify that the foregoing statements made by me are true.  I am aware that if any of the foregoing statements made by me are willfully false, I am subject to punishment for contempt of Court.

By: _____(sign and print name)

Print:

Dated: _____, 202____

**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**

| | |
|---|---|
| SARAH EDMONDSON, *et al.* | * |
| | * |
| | * |
| Plaintiffs, | * |
| | * |
| v. | * |
| | * |
| Keith Raniere, *et al.* | * |
| | * |
| Defendants. | * |
| | * |

1:20 - cv - 00485-EK-CLP

October 5, 2025

TO: Robert A. Swift

William E. Hoese
Zahra R. Dean
Elias Kohn
KOHN, SWIFT & GRAF, P.C.
1600 Market Street, Suite 2500
Philadelphia, PA 19103
(215) 238-1700
rswift@kohnswift.com
whoese@kohnswift.com
zdean@kohnswift.com
ekohn@kohnswift.com

## Amended Request to Plaintiffs to Answer Interrogatories

Defendant Danielle Roberts requests pursuant to Federal Rules of Civil Procedure 26 and 34 and Local Civil Rules 26.2, 26.3 and 26.4 of the United States District Court for the Eastern Districts of New York, that Plaintiffs, in the above captioned action produce the following Documents to Defendant via email ONLY at danielle@drdanielleroberts.com, within thirty (30) days following the receipt of service of these Requests for Production of Documents ("Requests").

**PREFACE**

These Requests are specifically tailored to the claims of Battery and the disputed application of equitable tolling to the statue of limitations. The defined terms and search strings are intended to meet Plaintiffs' obligation under FRCP 26(g) to conduct a reasonable search and are proportional to the needs of the case, as they focus directly on the narrow, surviving claim.

**DEFINITIONS**

1. The Uniform Definitions in Discovery Requests set forth in Local Civil Rule 26.3 and the rules of construction set forth therein and in the Federal Rules of Civil Procedure are all incorporated herein by reference as if separately set forth in each and every Request.

2. The "Action" refers to the particular action in which these Requests have been served, i.e., the action within which the party responding to these Requests has been named as a Defendant – in particular here, the one remaining action, Battery.

3. "And" and "or" mean and/or and should be construed accordingly.

4. "Communication" means the transmission of information, in the form of facts, ideas, inquiries, or otherwise.

5. "Document" has the broadest possible meaning, including paper Documents and electronic files and data, including without limitation communications in any form including written letters, journal entries, emails, text messages, messages using any other messaging app (signal, WhatsApp, telegram, proton mail, snap chat, tiktok, X, etc.) calendars, phone logs, notes and recordings of meetings, phone calls, voice notes, video recordings and footage.

>    5a. By "Documents" this notice to produce is not seeking documents that are subject to attorney client privilege or any other applicable privilege. If such privilege is raised the answer to this document production should identify the document for which the privilege is raised, the specific reason for the raising of the privilege and for each such objection provide a list identifying the document with the corresponding privilege raised.

5b. The span of time for answer of this document production is the time in which the Plaintiff came in contact with the DOS, started to formulate their desire to join, actually joined, and all events including when this action was filed and has proceeded to present, unless otherwise specified. If there is any uncertainty use January 1, 2015 to present.

6. "You," or "Your" means the specific Plaintiff identified in the question, or any Plaintiff who is answering these documents.

7. "Defendant" means Danielle Roberts.

8. "DOS" means the organization generally referred to as "DOS," Dominus Obsequious Sororium, also sometimes referred to as "the Vow".

9. "DOS member" means any individual who was recruited to join DOS (also known as "The Vow"), and joined.

10. "DOS Plaintiffs" means Plaintiffs Sarah Edmonson, Jessica Joan Salazar, India Oxenberg, Soukiana Mehdaoui, Rachel Widjaja, Nicole Isbell, Valerie Heckel, Allison Warnyca, Paloma Pena, Erika Weissenborn, Kristin Taravella, Veronica Jaspeado, Charlotte Giroux (the "DOS Plaintiffs") and Camila Fernandez.

11. "Battery Plaintiffs" means Plaintiffs Sarah Edmonson, India Oxenberg, Nicole Isbell, and Paloma Pena.

12. "Identify" when referring to a Document means, unless otherwise specified, to give, to the extent known, the (a) type of Document; (b) general subject matter; (c) date of the Document; and (d) author(s), addressee(s), and recipient(s).

13. "Individual Defendant" means any non-entity who was ever named as a Defendant in the Action, whether or not the person is named as a Defendant in the Third Amended Complaint.

14. "NXIVM" means NXIVM, Executive Success Programs ("ESP") and affiliated companies, including: Ethical Science Foundation ("ESF"), Ethical Humanitarian Foundation, Rainbow Cultural Garden ("RCG"), Jness, Society of Protectors ("SOP"), and NXIVM's VIP Program.

15. "Person" or "persons" means any natural person or any business, legal or governmental entity, or association.

16. "Plaintiffs" means Sarah Edmondson, Jessica Joan Salazar, Soukiana Mehdaoui, Nicole Isbell, Daniela Fernandes, Camila Fernandes, India Oxenberg, Bonnie Piesse, Tabitha Chapman, Ashley Mclean, Mark Vicente, Anthony Ames, Veronica Jaspeado, Paloma Pena, Charlotte Giroux, Rachel Behl/Widjaja, Valerie Heckel, Adrienne Stiles, Jennifer Sinclair/Kobelt, Margot Leviton, Isabella Constantino, Caryssa Cottrell, Deanne Brunelle, Karla Diaz Cano, Pamela Cooley, Rosalyn Cua, Brieanna Fiander, Shayna Holmes, Polly Green, Andrea Hammond, Yan Huang, Sara Lim, Ariella Menashy, Maja Miljkovic, Michelle Neal, Susan Pratt, Alison Rood, Katie Shaw Kristin, Hannah Vanderheyden, Juliana Vicente, Susan Patricia Vieta, Susan Wysocki, Stephanie Fair-Layman, Gabrielle Gendron, Sarah Wall, Scott Starr, Philip Akka, Alejandro Balassa, Madeline Carrier, Rod Christiansen, Owen Giroux, Jeffrey Golfman, Ashley Harvey, Rees Alan Haynes, Nils Macquarrie, Anthony Madani, Chad Williams, Christopher Black, Robert Gray, Ken Kozak, Allison Warnyca, Erika Weissenborn, Elham Menhaji, Kayla Grosse and Lindsay MacInnis.

17. "Referring to" means concerning, relating to, describing, evidencing, or constituting and is used synonymously with those terms.

**INSTRUCTIONS**

1. The Documents to be produced in response to these Requests are all responsive Documents within Your possession, custody or control, including Documents that You have the practical ability to obtain, including but not limited to, Documents that are within the possession, custody or control of any of Your agents, attorneys, administrators, executors, family members, friends or colleagues – ie: HBO and it's associates or the like, and any and all such other persons and entities that represent You or are subject to Your control.  This includes, but is not limited to, Documents held on personal devices, cloud storage accounts (e.g., iCloud, Google Drive, Dropbox), and social media or messaging platforms (e.g., Facebook, WhatsApp, Signal).

2. Electronically Stored Information ("ESI") shall be produced pursuant to the Joint Stipulated Order Regarding Discovery of Electronically Stored Information or any other ESI order entered on the Court's docket or as agreed to by the parties.

3. With respect to each Document withheld on a claim of privilege, provide a statement setting forth the information required by Local Civil Rule 26.2.

4. Each Request shall be construed as required under Local Civil Rule 26.4.

5. If any Documents within the scope of the Requests have been lost, destroyed, transferred to others not subject to Your control, or otherwise disposed of, or if any Documents responsive to the Requests exist but are not available, furnish a list identifying each such Document and setting forth the following information with respect to each such Document: its date, author(s), sender(s), addressee(s), and recipient(s), and the subject matter of the Document. In each instance, explain the circumstances surrounding each disposition or why such Document is unavailable, including the person(s) responsible for authorizing the disposition and the date of disposition.

6. Please produce the Documents either as they are kept in the usual course of business or organize and label them to correspond to the categories in these Requests.

7. If You have no Documents responsive to a particular Request, so state.

8. Unless otherwise indicated, the time period covered by these Requests encompasses, for the individual responding, the period from when they first became involved in the matters specific to this complaint, specifically the Alleged Battery, to the present.

**INTERROGATORIES TO BE ANSWERED**

This interrogatory request is directed to the 4 Plaintiff's that remain with an allegation against me; Sarah Edmondson, India Oxenberg, Nicole Isbell, and Paloma Pena.

1. State the name and address of each Plaintiff left with an allegation against me.
2. State the name and address of the person answering this interrogatory.

3. Give in detail your version of the event and facts in which you base the allegation and each of its elements lainin the complaint against the Defendant. Provide any documentation you used or referenced in formulating this answer.

4. State all of the facts and events on which you allege and claim that the Defendant was personally directly or indirectly responsible for any delay in the Plaintiffs bringing the specific charge of battery against the Defendant within the statute of limitations for this allegation. Provide any documentation you used or referenced in formulating this answer.

5. State in detail the facts that you allege were the reason why you waited until the date of filing to bring the charges against the defendant, and your beliefs as to why the date of filing is within the statute of limitations. Provide any documentation you used or referenced in formulating this answer.

6. State the name and address of every person that has knowledge about the facts of this allegation of Battery, and for each give the nature of their knowledge and state the relationship they have to these Battery Plaintiffs. Provide any documentation you used or referenced in formulating this answer.

7. State if you have ever been convicted of a crime and if yes, state the nature of the crime, the docket number of the case if any, the attorney that defended you and the court in which any decision on the case was made. Provide any documentation you used or referenced in formulating this answer.

8. State chronologically every court action for which you have been involved; be it civil, criminal, or administrative in the last 10 years. And for each, give the docket number, court name, and the subject matter of the litigation as well as the name and address for the attorney that represented you if any. Provide any documentation you used or referenced in formulating this answer.

9. List the name and address of each and every expert witness that you have consulted in any way in respect to the subject matter of this charge, and state: a. if there has been a report provided to you or your representative, the content of the report, and any finding or recommendations made by those experts. Provide copies of all documents in your possession, action or control coming from those experts. Provide any documentation you used or referenced in formulating this answer.

10. State the name and address, profession, field of expertise, of any expert consulted or retained in contemplation of the present litigation (including Neil Glazer) and for each provide, the CV, list of publications, list of court cases in which they have participated, and state if they were the expert for the Plaintiff or Defense. In addition, provide a list of all the cases in which this expert participated, and the address and name of the attorneys in those cases. Provide any documentation you used or referenced in formulating this answer.

11. State the name and address of each and every expert designated to be the expert in this case for purpose of trial in the following areas of the case; a. liability, b. causation, c. damages – and provide copies of each report accompanied by their CV, list of cases in which they have participated, which distinction for which plaintiff or defendant they were the expert. Provide any documentation you used or referenced in formulating this answer.

12. For each one of the experts named above, provide any history of the status of their license, disciplining, and status of their expertise. Provide any documentation you used or referenced in formulating this answer.

13. State when you learned for the first time that joining DOS required receiving a brand. Provide any documentation you used or referenced in formulating this answer.

14. Did you inquire about the condition and circumstance of the branding? State the date you made the inquiry and provide a copy of the inquiry. If it was oral, to whom it was made, the date, and a summary of what was discussed. Provide any documentation you used or referenced in formulating this answer.

15. State if you've chosen or received (before the branding, in which this action is based) any tattoo, print, marking, or design in the flesh or skin, and give the circumstances for receiving it, where it was received, by whom (what artist), and provide their name and address. Provide any documentation you used or referenced in formulating this answer.

16. State the date, time and the person(s) to whom you gave consent for the branding both at the time of invitation and initiation. Give the name and address of the person(s) to whom you gave the consent. Provide any documentation you used or referenced in formulating this answer.

17. State why you chose to give collateral to enter this organization. Provide any documentation you used or referenced in formulating this answer.

18. State your understanding of the meaning of the brand before you received it, whom shared that explanation, and when. Provide name and address of the person who explained it. If you were not informed, did you request this information before receiving the brand, from whom and when? When did you learn KR's initials were an additional meaning and from whom? How you found it, the date, and if there was any communication/documents produced as a result of the communications? What was your understanding of why the initials were incorporated? If you assumed possession instead of tribute, how come? Who and what influenced you? Provide name and address of all involved. Provide any documentation you used or referenced in formulating this answer.

19. State the date you found out Keith was involved in DOS. How you learned of his involvement, from whom. Please include conversations you had with Keith regarding your involvement in DOS before you received your brand, including activities you engaged in with him, goals or plans you were working on. India and Nicole you were taking picture weekly with me and knew they were being sent to Keith before your initiation process ever ensured, correct? Provide any documentation you used or referenced in formulating this answer.

20. Sarah Edmondson please describe the process you adhered to as a green in order to use Keith Raniere's tools in any of your businesses or endeavors. Provide any documentation you used or referenced in formulating this answer. Please include any contracts you utilized in reference to this. Were you aware of, from your experience with SOP and ESP that Penance, Collateral, and Disciplines are tools Keith Raniere worked with to help himself and others build character? Provide any documentation you used or referenced in formulating this answer.

21. State all of the facts and circumstances of the reason why from the time of the branding you did not file a battery charge against the defendant within the 1 year of the statute of limitation. Provide any documentation you used or referenced in formulating this answer.

22. Explain why after filing a complaint for criminal battery on Tuesday July 11th, 2017 you did not file your civil complaint at the same time. Why did it take until January 28th, 2020 – 2.5 years later? Provide any documentation you used or referenced in formulating this answer.

23. State why when you have already filed criminal charges 2.5 years before the present civil charges, that you choose to file the present civil charges beyond the 1 year statute of limitation. Provide any documentation you used or referenced in formulating this answer.

24. If it is your contention that the statute of limitation in regards the battery charges was somehow tolled, state the factual basis for this contention and provide the name, and address of the person and/or documents that support that contention. Provide any documentation you used or referenced in formulating this answer.

25. State in detail all communication and the contents of the communications made by you or any other person related to this charge of which you have knowledge be it; a. police officers, b. medical board, or c. authorities, and state the nature of the communication/documents. For each communication state the content, the witness's that you mentioned, and any response from the people with which you communicated. Provide any documentation you used or referenced in formulating this answer.

26. Please state in detail the facts in which you base your allegation of intentional touching, and application of force against plaintiff providing dates, the name and address of any person present, and any document or video illustrating this. Provide any documentation you used or referenced in formulating this answer.

27. State how the touching was either harmful or offensive, as related to you as a person that joined an organization, DOS, in which the branding was foreseeable and consented to. Provide any documentation you used or referenced in formulating this answer.

28. State in detail the facts on which you base that the touching was without of your consent (and/or the consent each of the other Plaintiffs present in each particular case). Give the name of the person present when you refused to give the consent or identify with name, date and addressee of the person in which any document in which you refused to give consent was stated. Provide any documentation you used or referenced in formulating this answer.

29. State when was the first time that you decided to file any battery claim (be it criminal or civil) against me or another for your receiving the brand. Provide any documentation you used or referenced in formulating this answer.

30. State if you communicated to anyone prior to filing, or attempting to file the criminal battery charges, your intent to file. Give the communication be it oral or any defined by

documents to whom, the name and address and the method by which you made that communication. Provide any documentation you used or referenced in formulating this answer.

31. Did you or any of each of the Plaintiffs express to anyone in DOS that you needed to have the meaning of the brand in order to consent to receiving it. State the name and address of the person you told, the time which you fought/opposed the meaning, the manner in which you made the inquiry. Provide any documentation you used or referenced in formulating this answer.

32. State the name and address of all the people you attempted to enroll into DOS after; a. you received your brand, and b. you found out the brand contained KR's initials. Provide the conversation details. Provide the details of name and address for all involved. Provide any documentation you used or referenced in formulating this answer.

33. State chronologically and in detail when you joined ESP, SOP, JNESS, and DOS. State the activities and conversations in which the lifestyle that was occurring in these organizations was discussed, illustrated/modeled, and how you participated or led. State how long you participated in each. State if and when you shared them with others and with whom. Provide any documentation you used or referenced in formulating this answer [year 2000 – present].

34. State if you knew by joining DOS you were required to have complete obedience to your Master. If you ever objected at any time, state when, to whom, and in what manner did you object. What happened? How was the objection addressed or handled? What were the conversations like and were there any consequences? If so, what were they? Provide any documentation you used or referenced in formulating this answer.

35. Did you ever refuse an assignment or fail on an assignment? What were the consequences and who took them on? How was it handled or addressed? Was your collateral ever threatened in relation to these refusals or failures? Provide any documentation you used or referenced in formulating this answer.

36. Do you know of any other woman that reufused/did not get the brand and the consequences of her decision? Please provide the names and addresses of any you are aware of. Describe the consequences if any.

37. Were you informed of the requirements and lifestyle of DOS? State by whom (name and address), how and date(s). Despite this information, state if you joined knowingly. Provide any documentation you used or referenced in formulating this answer.

38. Did you ever refuse or object to getting the brand? If yes, provide to whom (name and address) and in what manner you exercised this refusal. If so, was your collateral threatened in relation to this refusal? If yes, provide to whom (name and address), when, witnesses or anyone your shared this information with. Was your collateral ever released? If so, who was the person that released the collateral, what was the content of the alleged collateral, and when it happened. Provide any documentation you used or referenced in formulating this answer.

39. State if you sought medical advices or treatment after the alleged battery occurred and state with whom, when, address of those persons or institutions. State the means and content of the communications. Provide any documentation you used or referenced in formulating this answer.

40. Did you enroll any others into DOS after the alleged battery occurred? If yes, provide name, addresses, and any documents related to your communications with them. Provide any documentation you used or referenced in formulating this answer.

41. State in detail if you were subject to any threats if you didn't comply with anything while participating in the DOS lifestyle. For each give the name, address, date and provide any communications you had with the person that made the threats. Provide any documentation you used or referenced in formulating this answer.

42. State the date, content of any communication related to the subject matters of the litigation, specifically branding, battery, or release of collateral or any video content of your branding process (or anyone else's) between you and Lauren Salzman or you and Alex Betancourt. Provide any documentation you used or referenced in formulating this answer.

43. State the name and address of any medical practitioner, therapist, psychiatrist or psychologist that you have consulted, sought, or received counselling and/or treatment from for any matter related to this case.  For each state the specific matter/focus of your consultation or treatment. List the times and dates in which you had communication with them. Provide any documentation you used or referenced in formulating this answer.

44. Identify who was your master/instructor/teacher in DOS and give chronologically the dates of assignments given, your progress of any assignment given by them, and the content of your communications with them. Provide any documentation you used or referenced in formulating this answer.

45. Did you lead slaves/students of your own in DOS? If so, who? Provide the assignments you gave to any Slave/instructed/student, their progress and the content of the communications regarding the assignment and progress. Provide any documentation you used or referenced in formulating this answer.

46. Did you ever threaten release of their collateral for any failures on their assignments or refusal to complete them? Provide any documentation you used or referenced in formulating this answer.

47. Were your slaves/students informed of the brand when you invited them? Did they object or refuse? Did you threaten or release collateral? Provide any documentation you used or referenced in formulating this answer.

48. State specifically if you had a plastic surgery procedure to remove the mark made by the alleged battery. If so, provide the name and address of the physician and institution of where it was preformed and when. Provide any documentation you used or referenced in formulating this answer.

49. State if you used the money that you received in restitution from the federal criminal litigation for removing the brand and state how you specifically use the money, to whom it was paid, when it was paid. Pro Provide any documentation you used or referenced in formulating this answer.

50. State if before or during the performance of the branding if at any point you were late or delayed your circle in arriving or left to conduct other matters, what those matters were, with whom, and why you returned to complete your branding process after the conclusion of those matters. Provide any documentation you used or referenced in formulating this answer.


 /s/ Danielle Roberts
 Danielle Roberts

## CERTIFICATION

I hereby certify that the copies of the reports annexed hereto rendered by proposed expert witnesses are exact copies of the entire report or reports rendered by them; that the existence of other reports of said experts, either written or oral, are unknown to me, and if such become later known or available, I shall serve them promptly on the propounding party.


By:_____(sign and print name)

Print:

Dated:_____, 202____


## INDIVIDUAL CERTIFICATION

I certify that the foregoing statements made by me are true.  I am aware that if any of the foregoing statements made by me are willfully false, I am subject to punishment for contempt of Court.

By: _____(sign and print name)

Print:

Dated: _____, 202____

# EXHIBIT 10



<div align="right">Dr. Danielle Roberts &lt;danielle@drdanielleroberts.com&gt;</div>

---

## Notice of Failure to Respond To Discovery

**Emma Bruder** &lt;ebruder@dicellolevitt.com&gt;                                              Thu, Oct 30, 2025 at 6:13 PM
To: "Dr. Danielle Roberts" &lt;danielle@drdanielleroberts.com&gt;, "Zahra R. Dean" &lt;zdean@kohnswift.com&gt;
Cc: "Robert A. Swift" &lt;rswift@kohnswift.com&gt;, "William E. Hoese" &lt;whoese@kohnswift.com&gt;, Greg Gutzler &lt;ggutzler@dicellolevitt.com&gt;, Adam Prom &lt;aprom@dicellolevitt.com&gt;,
"Manuel John Dominguez (jdominguez@cohenmilstein.com)" &lt;jdominguez@cohenmilstein.com&gt;, "Agnieszka M. Fryszman" &lt;afryszman@cohenmilstein.com&gt;, Brendan
Schneiderman &lt;bschneiderman@cohenmilstein.com&gt;, Mary Brown &lt;mabrown@cohenmilstein.com&gt;, "Henry, Robin" &lt;robin.henry@friedfrank.com&gt;, "Aufhauser, Anne"
&lt;anne.aufhauser@friedfrank.com&gt;, Aaron Goldsmith &lt;aarongoldsmithlaw@gmail.com&gt;

Ms. Roberts,

Thank you for meeting with us yesterday morning. I'm writing to recap the key action items we discussed to ensure we're aligned on next steps.

Roberts' RFPs to Plaintiffs: Plaintiffs agreed to draft proposed search strings to collect and produce documents responsive to your requests for production for which we agreed to meet and confer on search terms. Please see those attached. You will review those search strings and let us know if you have any proposed edits or comments.

Plaintiffs' RFPs to Roberts: You will review the search strings we sent on October 13 and let us know if you have any proposed edits or comments.

You will also provide a letter to Plaintiffs and the Court explaining: (a) your position as to why you are unable to hire a vendor to collect and produce documents with full metadata compliant with the ESI Protocol; (b) how you have been conducting searches thus far to respond to Plaintiffs' RFPs; and (c) how you propose to re-produce documents and produce additional documents going forward in a manner that is as compliant as reasonably possible with the ESI Protocol.

Best,

Emma



Emma Bruder

**DICELLO LEVITT**

646.933.1000

This transmission may contain privileged and confidential information meant for the intended recipient only. If you have received this email in error, please notify the sender and permanently delete this email and any attachments.

[Quoted text hidden]


📄 **2025.10.30 - Pls' Prop. Search Strings Responsive to Roberts' 1st and 2d Set of RFPs.pdf**
344K

 Gmail

<div align="right">Dr. Danielle Roberts &lt;danielle@drdanielleroberts.com&gt;</div>

---

## Notice of Failure to Respond To Discovery

---

**Dr. Danielle Roberts** <danielle@drdanielleroberts.com>                                             Mon, Nov 3, 2025 at 10:30 PM
To: Emma Bruder <ebruder@dicellolevitt.com>
Cc: "Zahra R. Dean" <zdean@kohnswift.com>, "Robert A. Swift" <rswift@kohnswift.com>, "William E. Hoese" <whoese@kohnswift.com>, Greg Gutzler
<ggutzler@dicellolevitt.com>, Adam Prom <aprom@dicellolevitt.com>, "Manuel John Dominguez (jdominguez@cohenmilstein.com)" <jdominguez@cohenmilstein.com>, "Agnieszka
M. Fryszman" <afryszman@cohenmilstein.com>, Brendan Schneiderman <bschneiderman@cohenmilstein.com>, Mary Brown <mabrown@cohenmilstein.com>, "Henry, Robin"
<robin.henry@friedfrank.com>, "Aufhauser, Anne" <anne.aufhauser@friedfrank.com>, Aaron Goldsmith <aarongoldsmithlaw@gmail.com>

Thank you, Emma.
I will get back to you as soon as possible.

**Danielle Roberts, DO, MS**

[Quoted text hidden]

Case 1:20-cv-00485-EK-CLP    Document 329    Filed 11/14/25    Page 734 of 758 PageID #: 5473



Dr. Danielle Roberts <danielle@drdanielleroberts.com>

---

## Notice of Failure to Respond To Discovery

**Dr. Danielle Roberts** <danielle@drdanielleroberts.com>    Tue, Nov 11, 2025 at 9:43 PM
To: Emma Bruder <ebruder@dicellolevitt.com>
Cc: "Zahra R. Dean" <zdean@kohnswift.com>, "Robert A. Swift" <rswift@kohnswift.com>, "William F. Hoese" <whoese@kohnswift.com>, Greg Gutzler <ggutzler@dicellolevitt.com>, Adam Prom <aprom@dicellolevitt.com>, "Manuel John Dominguez (jdominguez@cohenmilstein.com)" <jdominguez@cohenmilstein.com>, "Agnieszka M. Fryszman" <afryszman@cohenmilstein.com>, Brendan Schneiderman <bschneiderman@cohenmilstein.com>, Mary Brown <mabrown@cohenmilstein.com>, "Henry, Robin" <robin.henry@friedfrank.com>, "Aufhauser, Anne" <anne.aufhauser@friedfrank.com>, Aaron Goldsmith <aarongoldsmithlaw@gmail.com>

Counsel,

In our meet and confer you have maintained your previous objections and suggested search strings for ESI compliance. Thank you for taking the time to suggest these search strings for me.

Regarding search string suggestions: I have attached my suggestions. I have narrowed our focus to requests solely related to the only remaining allegation of cause of action against me, Battery, and therefore amended my Second Set of Requests to you.

My first set of requests I submitted before I understood the nature of discovery and that it is pointed only at the 1 remaining allegation of Battery against me, Battery. My initial understanding of discovery was that I would need to ask ALL possible questions necessary or I would lose the opportunity to bring them later. I have hence come to understand the pointed nature of the discovery at hand, and as such had focused my requests in my Second Set of requests. I suggest we focus there in an effort to respect all of our time. Thank you.

Regarding your position to maintain your objections to my second set of requests that are specific to the issues and allegations you have brought, please directly respond to my requests – either you can produce documents and answers requested or not. If you cannot please say so. I will be submitting examples of your evasiveness to the judge for her review.

Specifically, the majority of your objections to my second set of requests illustrate a clear effort to avoid answering requests that are directly related to issues you yourself have raised. They are dragging out the proceedings in reference to me and the 1 remaining allegation of Battery against me. Your process is creating an undue and disproportionate burden on me as a Pro Se litigant that does not have the same time, education, capacity, resources or funding that you have.

For example: *Your Response to My Second set of Requests, Request No. 1:*
You were the one that brought the tolling issue to The Court in response to my motion to dismiss. My request No. 1 in my Second Set of document requests to you is clear, pointed and it is obvious what I am requesting in relation to the tolling issue you have brought. I am asking for the evidence (*documents) of tolling. You either have it or not.
My Request: Please present all evidence that the defendant was personally directly or indirectly responsible for the delay in you bringing the specific allegation of Battery of battery against her.
You object to this Request as vague and ambiguous with respect to the terms, "evidence" and "delay," which are not defined and render the Request unworkable as drafted.

a. You had acknowledged in my *Request 1 Response No. 1* that you would interpret my incorrect use of "proofs" as "documents" the term that has been defined in the discovery instructions. My use of "evidence" is a similar misuse. It is clear you understand what I am trying to convey as a layperson, but yet use the semantics to avoid answering the request.

b. Additionally, the definition of "delay" is clear. Directly from Webster's dictionary it is defined: as a verb, to stop, detain, or hinder for a time, or to cause to be slower or to occur more slowly than normal – Again, you are the ones that brought the tolling issue to The Court's attention. It is obvious that I am seeking any documents that illustrate I caused a delay in the Plaintiffs bringing the Battery allegation of Battery in relationship to the defined statute of limitations you are arguing.
You further object "to the extent it seeks "all evidence" without reasonable limitations as to time, subject matter, or connection to the battery claim asserted in the Third Amended Complaint."

a. We've covered the semantics of "all evidence" directly above.

b. It's also clear where I request to produce "all documents" that I am requesting all documents as defined in the instructions as "all documents within your possession, access or control." This is customary.

Additionally, there are clear and reasonable limitations as obviously defined by the subject matter you raised you raised to The Court:

b. The "time" is clear as defined by the tolling of the statute of limitations you brought in relation to the battery allegation of Battery you also brought.
c.  "Subject matter" is equally clear and couldn't be more specific – is it directly stated in reference to the Battery allegation of Battery and it's elements that you have brought.
d.  I'm not even sure what you mean "or connection to the battery claim" – my request specifically refers to battery claim.

Ex 2: *Your Response to My Second set of Requests, Request No. 3:*
My Request: Did you believe that filing the battery allegation of Battery against her when you did was within the one year statute of limitations? If so, why? Please present all documentation that backs up your answer.

You object to this Request "on the ground that it is, in substance, an interrogatory improperly styled as a request for production. The Request seeks narrative information regarding Plaintiffs' beliefs, reasoning, and legal interpretations, rather than requesting specific documents for production as contemplated by Rule 34."

Similar to how you handled my incorrect use of the word "proofs" above - It is clear you understand what I am trying to convey as a layperson, but yet use the semantics to avoid answering the request.

I have attached an amended version of my Second Set of Requests with the proposed search strings based on your objections and suggestions. In addition, I have separated my document request and interrogatories as you have objected to in my first set of requests. These are Common sense requests. Please respond to these directly. If there is anything else for us to meet and confer about please let me know expeditiously.

Further delay is an abuse of process and extortion of a pro se litigants lack of time, resources, education and capacity. You have been put on notice. I will be alerting the Judge of these abuses in my letter to the Court, and requesting a final and straight forward response in 30 days.

We also have agreed that I would provide a letter to Plaintiffs and the Court explaining: (a) why I am unable to hire a vendor to collect and produce documents with full metadata compliant with the ESI Protocol; (b) how I have been conducting searches thus far to respond to Plaintiffs' RFPs; and (c) how I propose to re-produce documents and produce additional documents going forward in a manner that is as compliant as reasonably possible with the ESI Protocol.

I will submit this letter to the court forthwith.

Lastly, I have submitted a subpoena request to the court. The contents of my request are attached here.

Looking forward to expeditiously resolving these items with you,


**Danielle Roberts, DO, MS**


On Thu, Oct 30, 2025 at 6:14 PM Emma Bruder <ebruder@dicellolevitt.com> wrote:
[Quoted text hidden]

---

**6 attachments**

📄 **Amended Request to Plaintiffs to Answer Interrog FINAL 11_10_25.pdf**
274K

📄 **Letter request to clerk for subpoena.pdf**
65K

📄 **New York State Police _ FOIL Records Access Center.pdf**
202K

📄 **AO 088b Subpoena Form.pdf**
415K

📄 **Edmondson_Incident_Report_Redacted.pdf**
727K

📄 **Amended Second Set of Requests to Produce Documents 11_10_25.pdf**
227K



---

## Notice of Failure to Respond To Discovery

**Dr. Danielle Roberts** <danielle@drdanielleroberts.com>                                                        Tue, Nov 11, 2025 at 10:09 PM
To: Emma Bruder <ebruder@dicellolevitt.com>
Cc: "Zahra R. Dean" <zdean@kohnswift.com>, "Robert A. Swift" <rswift@kohnswift.com>, "William E. Hoese" <whoese@kohnswift.com>, Greg Gutzler <ggutzler@dicellolevitt.com>, Adam Prom <aprom@dicellolevitt.com>, "Manuel John Dominguez (jdominguez@cohenmilstein.com)" <jdominguez@cohenmilstein.com>, "Agnieszka M. Fryszman" <afryszman@cohenmilstein.com>, Brendan Schneiderman <bschneiderman@cohenmilstein.com>, Mary Brown <mabrown@cohenmilstein.com>, "Henry, Robin" <robin.henry@friedfrank.com>, "Aufhauser, Anne" <anne.aufhauser@friedfrank.com>, Aaron Goldsmith <aarongoldsmithlaw@gmail.com>

My apologies - There was a mistake in the previous version of the amended requests for documents and the amended interrogatories. Please refer to these finalized versions. These are dated 11.11.25 for distinction.

**Danielle Roberts, DO, MS**

[Quoted text hidden]

---

**2 attachments**

 **Amended Request to Plaintiffs to Answer Interrog FINAL  11_11_25.pdf**
274K

 **Amended Second Set of Requests to Produce Documents 11_11_25 FINAL.pdf**
228K

# EXHIBIT 11

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------x

SARAH EDMONDSON, et al.,

                    Plaintiffs,               **MEMORANDUM & ORDER**
                                              20-CV-485 (EK)(CLP)


          -against-

KEITH RANIERE, et al.,

                    Defendants.

------------------------------------x
ERIC KOMITEE, United States District Judge:

          Before the Court is defendant Danielle Roberts' motion

to dismiss the state-law battery claim against her in this civil

action.  Roberts, who is proceeding *pro se*, argues that the

claim is time-barred.  The plaintiffs respond that the battery

claim is timely or, at the very least, subject to equitable

tolling.  They also claim that Roberts' motion is procedurally

improper.  For the reasons discussed below, the motion is denied

without prejudice to renew at a later stage.

## I.  Background

          The Court assumes the parties' familiarity with the

factual and procedural background of this case.  Some additional

detail appears in the Court's September 2024 order of partial

dismissal.  *See generally* Mem. & Order Dismissing Compl. in

Part, ECF No. 240.

As relevant here, the plaintiffs filed their third amended complaint in June 2023.  ECF No. 215.  Roberts moved to dismiss the battery claim under Rule 12(b)(6).  ECF No. 231.  After the Court rejected Roberts' motion, *see* ECF No. 240 at 102, Roberts filed an answer in November 2024.  *See* ECF No. 244.  One week later, Roberts filed another motion to dismiss the same claim, this time asserting a statute-of-limitations defense.  ECF No. 246.  That motion is now before the Court.

## II.  Legal Standard

When a plaintiff is proceeding without counsel, a court must review her filings "liberally and interpret them to raise the strongest arguments that they suggest."  *Pabon v. Wright*, 459 F.3d 241, 248 (2d Cir. 2006).[1]  At the same time, this lenient standard does not "exempt a [pro se] party from compliance with relevant rules of procedural and substantive law."  *Traguth v. Zuck*, 710 F.2d 90, 95 (2d Cir. 1983).

A complaint must contain "sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face."  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).  The complaint must allege facts that "raise a right to relief above the speculative level."  *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007).  It cannot simply offer "labels and

---

[1] Unless otherwise noted, when quoting judicial decisions this order accepts all alterations and omits all citations, footnotes, and internal quotation marks.

conclusions" or a "formulaic recitation of the elements of a cause of action."  *Id.*

## III. Discussion

### A. The Motion's Alleged Procedural Flaws Do Not Bar Consideration of the Merits.

The plaintiffs argue that Roberts' motion is procedurally improper on two grounds.  But even if the plaintiffs are correct, neither procedural flaw precludes the Court from reaching the merits.

#### 1. <u>Untimeliness under Rule 12(b)</u>

First, the plaintiffs argue that the motion is untimely because Roberts filed it one week after answering the third amended complaint.  *See* ECF No. 244 (answer); ECF No. 246 (motion to dismiss).

A motion to dismiss must be made "before pleading if a responsive pleading is allowed."  Fed. R. Civ. P. 12(b); *see also Jennings Oil Co., Inc. v. Mobil Oil Corp.*, 80 F.R.D. 124, 127 n.4 (S.D.N.Y. 1978) (under a "strict interpretation" of Rule 12(b), post-answer motions to dismiss are untimely).  That said, federal courts will generally rule on a post-answer motion to dismiss if the answer "expressly preserve[d]" the defense or objection advanced by the motion.  *Telesca v. Long Island Hous. P'ship, Inc.*, 443 F. Supp. 2d 397, 405 (E.D.N.Y. 2006); *see also* 5C Charles Alan Wright & Arthur R. Miller, *Federal Practice and*

*Procedure* § 1361 (3d ed.) (making the same point and collecting authorities). Here, Roberts' answer preserved the statute-of-limitations defense. ECF No. 244 at 60 ("The complaint should be dismissed because of expiration of the statute of limitations."). So, the asserted untimeliness does not necessarily bar consideration of the merits.

   2. <u>The Bar on Successive Motions Under Rule 12(g)(2)</u>

   The plaintiffs also argue that the motion violates Rule 12(g)(2). That rule states that "a party that makes a motion under [Rule 12] must not make another motion under [Rule 12] raising a defense or objection that was available to the party but omitted from its earlier motion." Fed. R. Civ. P. 12(g)(2). Basically, Rule 12(g)(2) reflects a "consolidation principle." *Federal Practice and Procedure* § 1385. If a defendant wishes to advance defenses or objections under Rule 12, she generally must do so in a single motion. *Id.*

   Roberts did not raise a statute-of-limitations defense in her first motion to dismiss the third amended complaint. *See generally* ECF No. 231. And the defense was available to her at the time.[2] So, her successive motion for failure to state a

_____

   [2] Indeed, "a statute of limitations defense may be decided on a Rule 12(b)(6) motion if the defense appears on the face of the complaint." *Ellul v. Congregation of Christian Bros.*, 774 F.3d 791, 798 n.12 (2d Cir. 2014). So, by moving to dismiss based on the statute of limitations, Roberts implicitly assumes that the defense was initially available, i.e., that it appeared on the face of the third amended complaint.

claim at least arguably violates Rule 12(g)(2).  Wright & Miller
§ 1385; *see also Polidora v. Dagostino & Assocs.*, No. 19-CV-
1290, 2021 WL 4482273, at *1 n.1 (S.D.N.Y. Sept. 29, 2021) (Rule
12(g)(2) "bars successive [Rule] 12(b)(6) motions containing
arguments that could have been raised in earlier motions").

Roberts replies that there is an exception to Rule
12(g).  She claims that under Rule 12(h)(2), a motion to dismiss
for failure to state a claim is not subject to Rule 12(g)(2),
meaning that a party may file as many successive Rule 12(b)(6)
motions as she wants.  This view is not entirely without merit.
While the Second Circuit has not resolved this question, other
circuits have split on whether Rule 12 permits successive
motions for failure to state a claim.[3]  The district courts in
this circuit are also divided.[4]

---

[3] *Compare Doe v. Columbia-Brazoria Indep. Sch. Dist.*, 855 F.3d 681, 686
(5th Cir. 2017) (successive Rule 12(b)(6) motions permissible)*, and Ennenga
v. Starns*, 677 F.3d 766, 773 (7th Cir. 2012) (same), *with In re Apple iPhone
Antitrust Lit.*, 846 F.3d 313, 318 (9th Cir. 2017), *aff'd sub nom. Apple Inc.
v. Pepper*, 587 U.S. 273 (argument not raised in the initial Rule 12(b)(6)
motion may be raised in a post-answer Rule 12(c) motion, but not in a second
Rule 12(b) motion), *and Leyse v. Bank of Am. Nat. Ass'n*, 804 F.3d 316, 320-22
(3d Cir. 2015) (same).

[4] *Compare Ballast v. Workforce7, Inc.*, No. 20-CV-3812, 2024 WL 307966,
at *5 (S.D.N.Y. Jan. 25, 2024) ("[S]uccessive Rule 12(b)(6) motions are not
procedurally improper."), *and In re Parmalat Sec. Litig.*, 497 F. Supp. 2d
526, 530 (S.D.N.Y. 2007) ("The plain language of [Rule 12] thus contemplates
that successive motions to dismiss for failure to state a claim may be
filed."), *with Easton Rae, LLC v. Violet Grey, Inc.*, No. 21-CV-6234, 2023 WL
2691459, at *3 (S.D.N.Y. Mar. 29, 2023) ("Rule 12(g)(2) is understood to bar
successive 12(b)(6) motions containing arguments that could have been raised
in earlier motions."), *and Polidora*, 2021 WL 4482273, at *1 n.1 (same).

The Court need not take a position on this issue. Even if Roberts' motion were dismissed as procedurally improper under Rule 12(g), she could easily re-raise the same argument in a motion for judgment on the pleadings under Rule 12(c). *See* Fed. R. Civ. P. 12(h)(2)(B) (defendant may argue that plaintiff failed to state a claim in a Rule 12(c) motion, even if the defendant failed to make the same argument in a Rule 12(b) motion). So, addressing the merits now will spare the parties (and the Court) another round of likely repetitive briefing. *See, e.g.*, *Ballast v. Workforce7, Inc.*, No. 20-CV-3812, 2024 WL 307966, at *5 (S.D.N.Y. Jan. 25, 2024) (considering the merits of a successive Rule 12(b)(6) motion where the defendants "undoubtedly could re-raise the identical arguments as a [Rule] 12(c) motion"); *Federal Practice and Procedure* § 1385 n.12 (collecting similar cases).

## B. Dismissal on Timeliness Grounds is Inappropriate

The parties agree that, under New York law, the battery claim is subject to a one-year statute of limitations. N.Y. C.P.L.R. § 215(3). And they agree that the plaintiffs filed this claim more than a year after the alleged battery occurred. *See* Original Compl. ¶¶ 779-87, 899-901, ECF No. 1.

The plaintiffs assert that the battery claim is nevertheless timely under Section 215(8)(a) of the New York Civil Practice Law. That provision reads as follows:

> Whenever it is shown that a criminal action against the same defendant has been commenced with respect to the event or occurrence from which a claim governed by [the one-year statute of limitations] arises, the plaintiff shall have at least one year from the termination of the criminal action . . . in which to commence the civil action, notwithstanding that the time in which to commence such an action has already expired or has less than a year remaining.

N.Y. C.P.L.R. § 215(8)(a). According to the plaintiffs, Section 215(8) tolled the statute of limitations on the battery claim until one year after the end of the criminal proceeding against Raniere. *See United States v. Raniere*, No. 18-CR-204 (E.D.N.Y. 2018). That proceeding terminated upon the "imposition of sentence," N.Y. Crim. Proc. Law § 1.20(16), which occurred on October 30, 2020. *See* Judgment, *United States v. Raniere*, No. 18-CR-204 (E.D.N.Y. Oct. 30, 2020), ECF No. 969. So, if Section 215(8) applies, then the battery claim — which was initially filed in January 2020 — was timely. *See generally* Original Compl.

Roberts replies that Section 215(8) does not apply by virtue of its plain text. That provision, she argues, only applies to civil actions brought against the "same defendant" who is subject to a pending criminal proceeding. N.Y. C.P.L.R. § 215(8)(a). And Roberts herself was not charged in the criminal proceeding cited by the plaintiffs.

Both sides cite supporting authority.  Indeed, the New York appellate courts are divided on whether Section 215(8) applies to defendants like Roberts — civil defendants whose co-defendants were the subject of a prior and related criminal proceeding.  *Compare Alford v. St. Nicholas Holding Corp.*, 218 A.D.2d 622, 631 (1st Dep't 1995) (Section 215(8) can apply to co-defendants), *with Villanueva v. Comparetto*, 180 A.D.2d 627, 629 (2d Dep't 1992) (Section 215(8) only applies when the civil and criminal defendants are the "same defendant"), *and Jordan v. Britton*, 128 A.D.2d 315, 320-21 (4th Dep't 1987) (same).

The Court need not pick a side in this divide, either.[5] Even if the battery claim is untimely, dismissal is inappropriate at the pleading stage, because the plaintiffs have also invoked equitable tolling.  Under New York law, a court may equitably estop a defendant from asserting a statute-of-limitations defense if "the defendant's affirmative wrongdoing . . . produced the long delay between the accrual of the cause of action and the institution of the legal proceeding."  *Zumpano v. Quinn*, 849 N.E.2d 926, 929 (N.Y. 2006)

---

[5] Nor should it aspire to do so.  "Federal courts asked to rule on an unsettled question of state law should do so only where an answer to the question is necessary for a decision."  *Merritt v. United States*, 592 F. Supp. 3d 340, 354 (D. Vt. 2022); *accord United Mine Workers of Am. v. Gibbs*, 383 U.S. 715, 726 (1966) ("Needless decisions of state law should be avoided both as a matter of comity and to promote justice between the parties, by procuring for them a surer-footed reading of the applicable law.").

8

(quoting *General Stencils v. Chiappa*, 219 N.E.2d 169, 171 (N.Y. 1966)).

Equitable tolling "often raises fact-specific issues premature for resolution on a Rule 12(b)(6) motion, before a plaintiff can develop a factual record." *Clark v. Hanley*, 89 F.4th 78, 94 (2d Cir. 2023). Thus, courts generally do not resolve equitable tolling arguments at the pleading stage. *Lama v. Malik*, 58 F. Supp. 3d 226, 235 (E.D.N.Y. 2014) (collecting cases). While the plaintiffs argue that certain allegations in the third amended complaint could plausibly support an equitable tolling argument, *see, e.g.*, Third Am. Compl. ¶¶ 122-24, 129, there is ultimately an "inadequate factual record to determine whether equitable tolling is warranted here." *Lama*, 58 F. Supp. 3d at 235. Accordingly, Roberts' motion to dismiss on timeliness grounds is denied without prejudice to renew at summary judgment or at trial. *Id.*

## IV. Conclusion

For the foregoing reasons, Roberts' motion to dismiss the battery claim is denied without prejudice.


SO ORDERED.


/s/ Eric Komitee
ERIC KOMITEE
United States District Judge

9

```
Dated:    June 25, 2025
          Brooklyn, New York
```

# EXHIBIT 12

Danielle Roberts
244 York St. Apt 2
Jersey City, NJ 07302
(516)480-1700
Danielle@drdanielleroberts.com

11.7.25

Pro Se Office
United States District Court
Eastern District of New York
225 Cadman Plaza East
Brooklyn, New York 11201

      RE: Request for So-Ordered Subpoena to New York State Police
      Edmondson, et al. v. Raniere, et al., 1:20-cv-00485-EK-CLP

Dear Pro Se Office:

I am a pro se litigant and a named party in the above-referenced civil action pending before this Court. I respectfully request the Court's assistance in issuing a "so-ordered" subpoena, pursuant to CPLR §2307, to the New York State Police to obtain information and records that were previously withheld or redacted from my earlier Freedom of Information Law (FOIL) request (see attached AO 088b Subpoena Form). The redacted information is critical to a central matter in this case and cannot be obtained from any other source. It illustrates an attempt to file of a battery charge against me back in 2017. This would provide clear timeline for the statute of limitations for this allegation upon with dismissal of this charge hinges currently and is essential for my ability to defend myself in this matter.

Specifically, I seek an order permitting the issuance of a subpoena commanding the Superintendent of the New York State Police to produce an unredacted copy of the NY State Police Incident Report for Incident No. 7677164, occurring on or about July 11, 2017 at NYS Capitol, Albany NY 12224, including any attachments incorporated into the incident report (e.g., narrative supplements, officer notes, associated photographs, audio recordings, and CAD/event logs). If any portion is withheld/redacted, please identify the legal basis for each redaction/withholding. Production by email is requested.

I have attached a proposed subpoena (form AO 88B) along with this letter, which identifies the specific records sought, and a copy of the FOIL response identifying the redactions. I understand the subpoena must be "so-ordered" by the Court to comply with New York State Police requirements.

Thank you for your consideration of this request. Please let me know if additional information or documentation is required.

              Respectfully submitted,

              /s/ Danielle Roberts, DO, MS
              Danielle Roberts

AO 88B  (Rev. 02/14) Subpoena to Produce Documents, Information, or Objects or to Permit Inspection of Premises in a Civil Action

# UNITED STATES DISTRICT COURT
for the

_____ District of _____

|  |  |
|---|---|
| _____ | ) |
| *Plaintiff* | ) |
| v. | )    Civil Action No. |
| _____ | ) |
| *Defendant* | ) |

## SUBPOENA TO PRODUCE DOCUMENTS, INFORMATION, OR OBJECTS
## OR TO PERMIT INSPECTION OF PREMISES IN A CIVIL ACTION

To: _____

*(Name of person to whom this subpoena is directed)*

❏ *Production:* **YOU ARE COMMANDED** to produce at the time, date, and place set forth below the following documents, electronically stored information, or objects, and to permit inspection, copying, testing, or sampling of the material: **Unredacted copy of the NY State Police Incident Report for Incident No. 7677164, occurring on or about July 11, 2017 at NYS Capitol, Albany NY 12224, including any attachments incorporated into the incident report (e.g., narrative supplements, officer notes, associated photographs, audio recordings, and CAD/event logs). If any portion is withheld/redacted, please identify the legal basis for each redaction/withholding. Production by email is requested.**

| Place: | Date and Time: |
|---|---|
|  |  |

❏ *Inspection of Premises:* **YOU ARE COMMANDED** to permit entry onto the designated premises, land, or other property possessed or controlled by you at the time, date, and location set forth below, so that the requesting party may inspect, measure, survey, photograph, test, or sample the property or any designated object or operation on it.

| Place: | Date and Time: |
|---|---|
|  |  |

The following provisions of Fed. R. Civ. P. 45 are attached – Rule 45(c), relating to the place of compliance; Rule 45(d), relating to your protection as a person subject to a subpoena; and Rule 45(e) and (g), relating to your duty to respond to this subpoena and the potential consequences of not doing so.

Date: _____

|  |  |  |
|---|---|---|
| *CLERK OF COURT* |  |  |
|  | OR |  |
| _____ | | _____ |
| *Signature of Clerk or Deputy Clerk* | | *Attorney's signature* |

The name, address, e-mail address, and telephone number of the attorney representing *(name of party)* _____

_____ , who issues or requests this subpoena, are:

### Notice to the person who issues or requests this subpoena
If this subpoena commands the production of documents, electronically stored information, or tangible things or the inspection of premises before trial, a notice and a copy of the subpoena must be served on each party in this case before it is served on the person to whom it is directed. Fed. R. Civ. P. 45(a)(4).

AO 88B  (Rev.  02/14) Subpoena to Produce Documents, Information, or Objects or to Permit Inspection of Premises in a Civil Action (Page 2)

Civil Action No.

## PROOF OF SERVICE
### *(This section should not be filed with the court unless required by Fed. R. Civ. P. 45.)*

I received this subpoena for *(name of individual and title, if any)* _____

on *(date)* _____ .

❒  I served the subpoena by delivering a copy to the named person as follows: _____

_____

_____ on *(date)* _____ ; or

❒  I returned the subpoena unexecuted because: _____

_____ .

Unless the subpoena was issued on behalf of the United States, or one of its officers or agents, I have also tendered to the witness the fees for one day's attendance, and the mileage allowed by law, in the amount of

$ _____ .

My fees are $ _____ for travel and $ _____ for services, for a total of $ _____ .

I declare under penalty of perjury that this information is true.

Date: _____

_____
*Server's signature*

_____
*Printed name and title*

_____
*Server's address*

Additional information regarding attempted service, etc.:

AO 88B  (Rev.  02/14) Subpoena to Produce Documents, Information, or Objects or to Permit Inspection of Premises in a Civil Action(Page 3)

## Federal Rule of Civil Procedure 45 (c), (d), (e), and (g) (Effective 12/1/13)

**(c) Place of Compliance.**

  **(1)** *For a Trial, Hearing, or Deposition.* A subpoena may command a person to attend a trial, hearing, or deposition only as follows:
   **(A)** within 100 miles of where the person resides, is employed, or regularly transacts business in person; or
   **(B)** within the state where the person resides, is employed, or regularly transacts business in person, if the person
    **(i)** is a party or a party's officer; or
    **(ii)** is commanded to attend a trial and would not incur substantial expense.

  **(2)** *For Other Discovery.* A subpoena may command:
   **(A)** production of documents, electronically stored information, or tangible things at a place within 100 miles of where the person resides, is employed, or regularly transacts business in person; and
   **(B)** inspection of premises at the premises to be inspected.

**(d) Protecting a Person Subject to a Subpoena; Enforcement.**

  **(1)** *Avoiding Undue Burden or Expense; Sanctions.* A party or attorney responsible for issuing and serving a subpoena must take reasonable steps to avoid imposing undue burden or expense on a person subject to the subpoena. The court for the district where compliance is required must enforce this duty and impose an appropriate sanction—which may include lost earnings and reasonable attorney's fees—on a party or attorney who fails to comply.

  **(2)** *Command to Produce Materials or Permit Inspection.*
   **(A)** *Appearance Not Required.* A person commanded to produce documents, electronically stored information, or tangible things, or to permit the inspection of premises, need not appear in person at the place of production or inspection unless also commanded to appear for a deposition, hearing, or trial.
   **(B)** *Objections.* A person commanded to produce documents or tangible things or to permit inspection may serve on the party or attorney designated in the subpoena a written objection to inspecting, copying, testing, or sampling any or all of the materials or to inspecting the premises—or to producing electronically stored information in the form or forms requested. The objection must be served before the earlier of the time specified for compliance or 14 days after the subpoena is served. If an objection is made, the following rules apply:
    **(i)** At any time, on notice to the commanded person, the serving party may move the court for the district where compliance is required for an order compelling production or inspection.
    **(ii)** These acts may be required only as directed in the order, and the order must protect a person who is neither a party nor a party's officer from significant expense resulting from compliance.

  **(3)** *Quashing or Modifying a Subpoena.*
   **(A)** *When Required.* On timely motion, the court for the district where compliance is required must quash or modify a subpoena that:
    **(i)** fails to allow a reasonable time to comply;
    **(ii)** requires a person to comply beyond the geographical limits specified in Rule 45(c);
    **(iii)** requires disclosure of privileged or other protected matter, if no exception or waiver applies; or
    **(iv)** subjects a person to undue burden.
   **(B)** *When Permitted.* To protect a person subject to or affected by a subpoena, the court for the district where compliance is required may, on motion, quash or modify the subpoena if it requires:
    **(i)** disclosing a trade secret or other confidential research, development, or commercial information; or

    **(ii)** disclosing an unretained expert's opinion or information that does not describe specific occurrences in dispute and results from the expert's study that was not requested by a party.
   **(C)** *Specifying Conditions as an Alternative.* In the circumstances described in Rule 45(d)(3)(B), the court may, instead of quashing or modifying a subpoena, order appearance or production under specified conditions if the serving party:
    **(i)** shows a substantial need for the testimony or material that cannot be otherwise met without undue hardship; and
    **(ii)** ensures that the subpoenaed person will be reasonably compensated.

**(e) Duties in Responding to a Subpoena.**

  **(1)** *Producing Documents or Electronically Stored Information.* These procedures apply to producing documents or electronically stored information:
   **(A)** *Documents.* A person responding to a subpoena to produce documents must produce them as they are kept in the ordinary course of business or must organize and label them to correspond to the categories in the demand.
   **(B)** *Form for Producing Electronically Stored Information Not Specified.* If a subpoena does not specify a form for producing electronically stored information, the person responding must produce it in a form or forms in which it is ordinarily maintained or in a reasonably usable form or forms.
   **(C)** *Electronically Stored Information Produced in Only One Form.* The person responding need not produce the same electronically stored information in more than one form.
   **(D)** *Inaccessible Electronically Stored Information.* The person responding need not provide discovery of electronically stored information from sources that the person identifies as not reasonably accessible because of undue burden or cost. On motion to compel discovery or for a protective order, the person responding must show that the information is not reasonably accessible because of undue burden or cost. If that showing is made, the court may nonetheless order discovery from such sources if the requesting party shows good cause, considering the limitations of Rule 26(b)(2)(C). The court may specify conditions for the discovery.

  **(2)** *Claiming Privilege or Protection.*
   **(A)** *Information Withheld.* A person withholding subpoenaed information under a claim that it is privileged or subject to protection as trial-preparation material must:
    **(i)** expressly make the claim; and
    **(ii)** describe the nature of the withheld documents, communications, or tangible things in a manner that, without revealing information itself privileged or protected, will enable the parties to assess the claim.
   **(B)** *Information Produced.* If information produced in response to a subpoena is subject to a claim of privilege or of protection as trial-preparation material, the person making the claim may notify any party that received the information of the claim and the basis for it. After being notified, a party must promptly return, sequester, or destroy the specified information and any copies it has; must not use or disclose the information until the claim is resolved; must take reasonable steps to retrieve the information if the party disclosed it before being notified; and may promptly present the information under seal to the court for the district where compliance is required for a determination of the claim. The person who produced the information must preserve the information until the claim is resolved.

**(g) Contempt.**
The court for the district where compliance is required—and also, after a motion is transferred, the issuing court—may hold in contempt a person who, having been served, fails without adequate excuse to obey the subpoena or an order related to it.

For access to subpoena materials, see Fed. R. Civ. P. 45(a) Committee Note (2013).



## New York State Police | FOIL Records Access Center

| View File(s) | View Message(s) |

**Request Type:**
FOIL Records Request

**Primary Requester E-Mail:**
danielle@drdanielleroberts.com

**Reference No:**
R006830-121624

**Status:**
Requester Update

**Balance Due:**
$0.00

**Payments:**
$0.00

### Main Menu

🏠 Home
🔍 FAQs
📝 Submit a FOIL Request
🔧 Submit an Appeal
👤 My Records Center
➡ Logout

### FAQs

See All FAQs 🔍

Does is cost anything to make a FOIL Request?

What is my right to appeal a FOIL determination?

How do I contact Customer Support?

Subject Matter List

What is the Freedom of Information Law?

UPLOAD DATE

⬇ DOWNLOAD ALL

| Files: | 02/21/2025 | Edmondson_Incident_Report_Redacted.pdf |

The Freedom of Information Law (Public Officers Law, Article 6) (FOIL) grants members of the public access to the records of government in accordance with its provisions. For more information about FOIL and the Personal Privacy Protection Law (Public Officers Law, Article 6-A), please visit the **New York State Committee on Open Government's website.**

**Type of Requestor:**
Attorney/Paralegal

**Your Relationship to the Incident:**
Representative of Involved Party

**Client or Party You Represent:**
Danielle Roberts

**Incident #:**                         **Incident Location:**
                                           Albany

**Incident Date:**                      **Incident Time:**
3/9/2017                                      7pm

**Name(s) of Involved Individuals:**
Roberts, Danielle, D, 09/30/1981 Edmondson, Sarah, 06/22/1977 Salzman, Lauren. 06/26/1977
Please include Last Name, First Name, Middle Initial, Date of Birth (mm/dd/yyyy)

**Briefly Provide Other Descriptive Information on Record(s) Sought:**
This would be a police report filed by Sarah Edmondson on our around July 7th, 2017 claiming that Danielle Roberts battered her by giving her a brand on March 9th, 2017. Lauren Salzman was Sarah's "Master" and invited her to the secret society, known as DOS. Sarah may have filed this report against NXIVM instead of Dr. Danielle Roberts also.

**By submitting this request, you acknowledge the following:**



I understand there may be fees associated with receiving copies of records as per Public Officers Law § 66a and 87. I further understand that fees are calculated after the records have been located and that I must pay any fees due prior to the receipt of records.

I understand that Public Officers Law 89 (3) (a) requires the agency to acknowledge my request within five (5) business days from the date my request is received. Within the five (5) day response time the agency may ask for clarification, grant or deny a request, or provide a date by which the agency will answer a request.

I understand that the Public Officers Law § 89(2)(b) limits access to records when such records are requested for solicitation or fund-raising purposes. "Solicitation or fund-raising purposes" means any business activity intended to generate direct financial benefit or business growth. I certify that any lists of individuals obtained through this public records request will not be used for solicitation or fund-raising purposes.

**Preferred Method to Receive Records:**
Electronic via Records Center

| New Message | Return to List |
|---|---|

## Messages 10

⎙ Print Messages (PDF)

∨ ✉ On 2/25/2025 7:37:05 AM, NY State Police Records Access Center wrote:

**Subject:** New Message :: R006830-121624
**Body:**
RE: FOIL Records Request of December 16, 2024, Reference # R006830-121624
Dear Danielle Roberts,
The New York State Police received a FOIL request from you on December 16, 2024.
You already have access through the GovQA portal. In your account there should be a tab that shows "My Records". This is where you will find your records.
For more information on the FOIL Appeals process, please visit this FAQ.
Sincerely,
New York State Police
1220 Washington Avenue, Bldg. 22
Albany, NY 12226-2252

> ↩ On 2/24/2025 3:35:33 PM, Danielle Roberts wrote:

> ✉ On 2/21/2025 8:57:47 AM, NY State Police Records Access Center wrote:

> ↩ On 2/7/2025 9:25:35 AM, Danielle Roberts wrote:

> ✉ On 2/7/2025 8:57:04 AM, NY State Police Records Access Center wrote:

> ↩ On 2/6/2025 5:41:14 PM, Danielle Roberts wrote:

> ✉ On 2/4/2025 11:11:20 AM, NY State Police Records Access Center wrote:

> ✉ On 12/19/2024 11:26:03 AM, NY State Police Records Access Center wrote:

> ✉ On 12/16/2024 3:47:47 PM, NY State Police Records Access Center wrote:

> ✉ On 12/16/2024 3:47:46 PM, Danielle Roberts wrote:



| 1. Agency | | 2. Div/Precinct | New York State | 3. ORI | 5. Case No. | 6. Incident No. |
|---|---|---|---|---|---|---|
| G2 TROOP G - ZONE 2 | | G223 | **INCIDENT REPORT** | NY1450100 | | 7677164 |

| 7,8,9. Date Reported (Day, Date, Time) | 10,11,12. Occurred On/From (Day, Date, Time) | 13,14,15. Occurred To (Day, Date, Time) |
|---|---|---|
| TUESDAY 07/11/2017 08:00 | TUESDAY 07/11/2017 08:00 | |

| 16. Incident Type | 17. Business Name |
|---|---|
| HARASSMENT-HARASSMENT | NYS ATTORNEYS GENERALS OFFICE |

**19. Incident Address (Street Name, Bldg. No., Apt. No.)**
NYS CAPITOL

**20. City/State/Zip**
ALBANY NEW YORK 12224

| 21. Location Code (TSLED) | 23. No. of Victims | 24. No. of Suspects | 26. Victim also Complainant? |
|---|---|---|---|
| HALFMOON TOWN 4659 | 1 | 1 | YES |

**Location Type**
SINGLE FAMILY HOME

| 22.OFF. No. | LAW SECTION SUB | CL | CAT | DEG | ATT | NAME OF OFFENSE | CTS |
|---|---|---|---|---|---|---|---|
| 1. | PL 120.17 | | V | 2 | C | HAZING 2ND | 1 |

### ASSOCIATED PERSONS

| 25. TYPE | Name (Last, First, Middle, Title) | DOB | Street Name Bldg., Apt.No., City, State, Zip | Res Phone Bus Phone |
|---|---|---|---|---|
| LAW ENFORCEMENT OFFICER | KARAM, ANTOINE, J | | NY STATE ATTORNEY GENERAL'S OFFICE ALBANY NY 12224 | ███ |
| ██████████████████████████ | | | | |

### VICTIM

███████████████████████████████████████████████████████████████

### NARRATIVE

| Date of Action | Date Written | Officer Name & Rank |
|---|---|---|
| 07/11/2017 | 07/12/2017 | STUDENT, MICHAEL (SR INV) |

**Narrative**

BCI CASE ADOPTION:

On July 11, 2017, member adopted a said case based on information received from the NYS Attorney Generals Office.

| Date of Action | Date Written | Officer Name & Rank |
|---|---|---|
| 08/23/2017 | 08/23/2017 | STUDENT, MICHAEL (SR INV) |

**Narrative**

On June 14, 2017, I received a email from the NYS Attorney General's Office and from an Investigator Antoine Karam. Inv. Karam advised that his office received a complaint of a possible unlawful imprisonment / kidnapping of a adult female ████ The complaint was submitted through a forum named: Questions & Comments to Attorney General Eric T. Schneiderman. The complainant, █████████████████████████████████████████████ Email Address: ██████████████████████████████████████████ provided the following.

Comments:
Our daughter called from Albany where she has been involved with Keith Raniere and his group for the past 18 months. She is abruptly leaving and tells us she must get away from this group. We are very concerned for her wellbeing and safety. Can you advise us? Our daughters name is █████████████████

On same date, I called the contact number and spoke with ████████████ They advised that they spoke to their daughter ████ and she is currently in ██████████████████ and not in any danger. She is not being held against her will. ███ ████████████████████ They are going back to ██

#7  01/17/18

████████████ to pack her things. They have been instructed to call for a civil standby if they feel the need. ████ ████ advised that she has a lot of personal belongings and believes it will take two days to remove all her property. I advised her that we cannot standby for two days while she packs and she understood. I again instructed her to call 911 if she felt threatened and also provided NYSP contact numbers along with my contact information for when they go to the house.

I notified BCI Captain Richard Obrien. No case was adopted being that it was just a phone call to ████████████ and she advised that she was in no danger.

On June 19, 2017. I was advised by telephone that ████████████████████ took a couple days and moved her belonging out of the ████████████ house and it was without incident.

On July 07, 2017. Inv. Karam received another call from ████████ advising that ████ and an additional female named ████████ were interested in speaking to the Police regarding suspicious activities going on at NXIVM. Inv. Karam referred ████ to the NYSP.

On July 11, 2017. I adopted SJS# 7677164. I telephonically interviewed ████████████████ She wouldn't provide a location where she resided because she was afraid NXIVM would find her. She advised that she began with NXIVM about three years ago. She signed up for a five day Executive Success Program (ESP). She advised that the program helped her with her profession and she took numerous other courses. There came a point when ████████████ asked her if she would be interested in joining a secret group of professional women. She called the group DOS which stood for a Latin term for obedience. ████████████ advised that she was curious and inquired what she needed to do. ████████ advised her that first she need to accept a vow of obedience and become a slave to a master. She explained it as devoting yourself to a higher principals. She described the slave to master thing as being ready to do anything for their assigned master. She described it as within ten minutes you need to respond to the master upon her request. She then said that she would than require collateral. collateral was a number of things which if you broke the vow to the society they would make public to embarrass you. She described the forms of collateral as:
1.    A letter describing some very personal thing. describing infidelity, describing family secrets, or just something very personal that if outed would highly embarrass her.
2.    Naked Photos
3.    Sex video
4.    Sign another person on to your bank accounts.
5.    Branding.

After all this there would be a monthly collateral to keep the vow of secrecy. This came in many forms, video's of being paddled by you master or another member. It could be another letter describing family issues or just straight up lies about someone that if it got out would be extremely embarrassing. Ultimately each girl would attend a branding ceremony. Where they would subject themselves to being branded. She described the branding as they would strip down and lay on a table at ████████████ ████████████ Then Danielle Roberts would actually do the branding as other members of DOS would hold her down. The brand was always the same "KR". The initials of Keith Raniere, the head of NXIVM.

Over the course of the day I telephonically interviewed ████████████████ at 10:00 am, ████████ ████████ at 1:00 pm and ████████████████████ at 3:00 pm. All three advised that they did not want their names in any report for fear of reprisal from NXIVM. I had to promise them before they would talk. ████████ ████████ All three advised that they would not give a deposition as to their experiences. All three gave the same consistent story regarding their experiences and training. All three raved about NXIVM's ESP (Executive Success Program) and how it benefited them professionally. Everything changed after they joined DOS. ████████ stated that they allowed themselves to be branded so they could be in DOS. I inquired further about them allowing themselves to be branded and asked if they consented to being branded and they both said yes. ████████ advised that she ultimately ████████████████ ████████████████████ The following are some of the comments ████████████ ████████ made.

████████████ advised that she began taking the Executive Success Program in January of 2016. She stated that she was introduced to Keith Raniere by ████████ and she immediately noticed she was getting alot of attention from Mr. Raniere. In February of 2016 ████████ started courting her for the DOS program. One of the first things she was advised that you are already a slave to your fears, now you need to surrender to the group. She advised that she was put on a diet. she later believed that this was a directive from Mr. Raniere because he appeared interested in her. She ultimately gave collateral in the same forms as ████ ████████████ advised that any violation of the rules would result in the release of the collateral. She advised that Mr. Raniere wanted to work with her on a one to one basis. he provided her his personal cell number. Mr. Raniere confided in her and he told her he trusted her. He stated that ████████ Mr. Raniere was very controlling and asked her to set a goal of losing 15 pounds from 135 to 120. The when

12/27/2017    9:38:38

she met the goal of 120 lbs he asked her to go to 110. It came down to her sending pictures of the food she was about to eat. Mr. Raniere had to approve it before she could eat. At one point she was on a 500 calorie diet a day. When she reached 99 lbs she started to have fainting spells. She immediately stopped the diet. She advised that she shared her experiences with other members of the DOS program and several of them left the program. She decided to confront Mr. Raniere regarding hearing girls were being branded with his initials. He admitted that it was taking place. He advised that he was the head of DOS and the program was setup to chold women to their word. He said t help women grow. After confronting Mr. Raniere she decided to leave entirely from the DOS and NXIVM program. She asked for her collateral back and was never given anything back. I asked her if any of the collateral had been made public and she said no. I asked her if she had any money from her accounts taken. She stated that she paid for the ESP training sessions but nothing else. She stated that she has paid approximately $30,000.00 for training sessions. She believed that the branding of DOS candidates was taking place at ███████ house. The person doing the branding was a Danielle Roberts.

████████████████ advised that she that she resides in ██████ She advised that she has been a member of NXIVM for 12 years. She joined DOS in ████████████ Prior to joining DOS she was a ████████ She stated that she ████████████████████ She advised that she was paid very well by NXIVM. She dvise that she was approached by Keith Raniere to join DOS. ████████ became her master. █████ was the ████████████████ She advised that ████████████ She trusted her. ████ explained that the DOS program was like the Mason's but for women. She completed all of her responsibilities including her Collateral. She advised that she consented to be branded and was branded in the same way described above. One of her reponsibilities was to recruit 6 people into the DOS program. She was in the process of recruiting and being a master to her recruits. She advised that the turning point came when she was being pressured ████████████████ about the branding of Keith Raniere's initials ████████

Additionally, she reports that during a branding ceremony and while holding another female down she realized how wrong this was. Not too long after the ceremony she left the entire program. Upon leaving she requested her Collateral back but has never received any of it. She advised since leaving NXIVM she believes 80.000 past ESP trainee's have requested their money back.

I contacted the Saratoga County District Attorney's office and spoke to Assistant District Attorney's Michele Schettino and Jennifer Buckley. I advised them of the information that the three females had disclosed. I was advised that because they consented to the branding that no crime was committed.

I also contacted the Albany Office of the FBI and spoke to Special Agent David Fallon. I advised him of the case and inquired if his department would be interested in this case. He reiterated that based on the females consenting to the branding he advised his agency would not entertain a case.

On August 8, 2017, I remained in communication with the three females through my division cellphone in the form of text messages. I notified all three females of the above finding by the Saratoga County District attorney and the the FBI.

| Date of Action | Date Written | Officer Name & Rank |
|---|---|---|
| 10/18/2017 | 10/18/2017 | STUDENT, MICHAEL (SR INV) |
| Narrative | | |

CASE UPDATE:

On October 18, 2017, I updated the case narrative and provided Capt. Richard Obrien with a synopsis of the case.

| Date of Action | Date Written | Officer Name & Rank |
|---|---|---|
| 10/23/2017 | 10/23/2017 | STUDENT, MICHAEL (SR INV) |
| Narrative | | |

CLOSING ENTRY:

On October 23, 2017, when this case was opened, I was requested by all three victims to keep their names out of the reports searchable areas. I honored said request after advising Troop G BCI command. The victims names were never entered in the person's tab. Recently, several news articles have publicly identified two of the victims. I have not been in communication with any of the three victims since August 8, 2017 when I advised them of the determination of the Saratoga County District Attorneys Office and the FBI. I conferred with BCI Captain Richard Obrien and based on the above, I am closing this case by investigation, FINAL.

No Enclosures.

SJS#7677164 - Hazing in the second degree - Closed by investigation - no evidence - FINAL.

## ADMINISTRATIVE

| 74. Inquiries | 75. NYSPIN Message No. | 76. Complainant Signature | | |
|---|---|---|---|---|
| 77. Reporting Officer Signature (Include Rank) SR INV MICHAEL STUDENT | | 78. ID No. 1807 | 79. Supervisor Signature (Include Rank) SR INV MICHAEL STUDENT | 80. ID No. 1807 |
| 81. Status CLOSED BY INVESTIGATION | 82. Status Date 10/23/2017 | 83. Notified/TOT | | |

Solvability Total    0