**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**

| | |
|---|---|
| SARAH EDMONDSON, et al., : | |
| Plaintiffs, : | |
| : | |
| v. : | CIVIL ACTION NO. 20-CV-485 |
| KEITH RANIERE, et al., : | |
| Defendants. : | |

**REVISED CUMMULATIVE SCHEDULE A**

**PRELIMINARY STATEMENT**

1.      The Court directed Plaintiffs to file a revised Schedule A to the Third Amended Complaint ("TAC") by November 26, 2024 that specified how each Plaintiff asserting a RICO claim suffered injury to their business or property by relying on fraudulent statements. Memorandum and Order, September 27, 2024 at 54–55, 102–03.[1] (Doc. 240) Plaintiffs filed a revised Schedule A on November 26, 2024. (Doc. 249) The revised Schedule A set forth the facts that are alleged below in the Revised Schedule A column. At the conference with the Court on February 7, 2025 and in its February 11, 2025 Minute Entry, the Court instructed Plaintiffs to file

---

[1] The Order held that certain representations supporting Plaintiffs' RICO claims are not actionable under the mail and wire fraud statutes. Order at 55; see also id. at 39–41. The Order further instructed Plaintiffs to "take note" of that ruling when revising Schedule A. Id. at 55. Plaintiffs thus do not reallege here any fraudulent representations that they understand the Court to have ruled were non-actionable in the Order, see id. at 39–41, and reserve their appellate rights as to that ruling.

a revised cumulative Schedule A by February 21, 2025 to identify the paragraphs in the main body of the TAC connected to allegations in the revised Schedule A. Plaintiffs repeat the following allegations that were included in revised Schedule A to provide further context regarding their revisions to Schedule A.

2.      Keith Raniere and Nancy Salzman developed NXIVM's curriculum and materials, which were repeatedly updated and republished during Clare and Sara Bronfman's tenure in the Inner Circle.[2]

3.      Clare and Sara Bronfman, who held positions of substantial authority in NXIVM's Inner Circle, knew of the contents of NXIVM's curriculum and materials, and expressly or tacitly approved of the representations made therein.

4.      Along with Raniere, Clare and Sara Bronfman intended to use NXIVM's curriculum and materials as part of a multi-level marketing scheme to amass a following of enrollees who would pay money and expend labor on behalf of NXIVM and the Inner Circle.

5.      The multi-level marketing scheme involved the combined use of written materials that were created by Raniere and the oral dissemination of false and misleading statements to accomplish the goals of Raniere, Clare and Sara Bronfman, and other members of the Inner Circle.

6.      For example, certain written materials distributed to enrollees reflected a chart (the "Courses Chart"), which showed the courses that enrollees would need to take to complete a subprogram called "Ethos," and which they would need to pay for with

_____

[2] Capitalized terms are defined in the TAC, which is incorporated herein by reference.

money or labor, to attain a higher status in NXIVM and become qualified to earn compensation. One clear implication of the Courses Chart was that the set of Ethos courses was limited, that each course had a name, and that the program culminated in the attainment of "Level 3 Certification," which was the completion of Ethos. The Courses Chart shows the name of each of the fifty courses that enrollees needed to take to reach the Level 3 Certification, which was necessary to become a Coach.

7.    The Courses Chart was false and misleading because new courses were added to the regime to extend the program, and the money and labor Plaintiffs would have to expend on it, and because enrollees were required to repeatedly re-take courses. Examples of similar false and misleading representations as it relates to specific Plaintiffs are alleged below.

8.    Other written NXIVM materials included false or misleading statements. For example, one document promulgated to enrollees represented that "[w]e consider our coaches to be the highest-paid people in our organization" and that through the "ESP Coaching Program" enrollees would be "qualified to begin earning an income in an entirely new career." Those statements were false and misleading because even after enrollees attained the rank of Coach they were told, as alleged with greater specificity below, that they were not qualified to earn income based on labor that they would perform at that rank. Rather, they were told that they would need to become Proctors to earn income. In fact, very few individuals were ever made Proctors, and whether individuals were made Proctor was not based primarily on the successful completion of the NXIVM curriculum.

9.    NXIVM's multi-level marketing scheme also relied on false and misleading oral statements. The oral statements were devised by Raniere and intended by him, and upon information and belief, Clare and Sara Bronfman to be disseminated by NXIVM enrollees to others to effectuate the multi-level marketing scheme.

10.     For example, at one critical meeting, Raniere met with enrollees, including Plaintiffs Sarah Edmondson and Mark Vicente, to instruct them on how to disseminate statements that, unbeknownst to Edmondson and Vicente, were false or misleading and designed to persuade more people to enroll in NXIVM programs. Clare and Sara Bronfman attended that session. Other false and misleading statements were, as alleged below, disseminated directly by members of the Inner Circle, including Clare and Sara Bronfman.

11.     The written and oral statements described herein formed part of the NXIVM Inner Circle's scheme to defraud Plaintiffs of their money and labor.

12.     One or more of the following paragraphs (24-25, 37-44, 210-211, and 217) of the TAC apply to most if not all of the Plaintiffs.  Instead of repeating them verbatim for each Plaintiff in this Cumulative Revised Schedule A, they will be referred to by paragraph number in the section setting forth that Plaintiff's revised Schedule A allegations and the applicable TAC paragraphs.

13.     In 1998, Raniere and his collaborator, Nancy Salzman, formed NXIVM, which was operated and managed by Defendant ESP. NXIVM was another pyramid operation designed to induce enrollees (so-called Nxians) to recruit others and form downstream sales organizations within NXIVM. Enrollees were told they would benefit financially from selling curricula and other NXIVM products and recruiting others to do the same, and that, through sales and recruiting, they would climb a hierarchy known as "The Stripe Path." NXIVM's leaders and enrollees wore colored, striped sashes to indicate their rank and recruitment achievements.

14.     Raniere based NXIVM's curricula on his so-called "Rational Inquiry" method, a synthesis of psychotherapy and the teachings, methods, and practices of the human potential movement. Rational Inquiry was used to modify thinking and behavior that,

according to NXIVM doctrine, was maladaptive. Although Raniere touted Rational Inquiry as a cure for psychiatric and physical illnesses, he and the other Individual Defendants knew that it was not. Rational Inquiry's purpose was to defraud Nxians out of substantial sums of money and increase their vulnerability to emotional, psychological, and sexual abuse.

15.    The NXIVM multi-level marketing scheme and curriculum were designed to corrode the emotional health and well-being of new members and defraud them of money, so that they would become susceptible to physical, psychological, and sexual abuse. NXVIM operated by pressuring members to purchase expensive courses, recruit new members, and perform uncompensated "coaching" services for junior members to unlock ever-increasing "goal levels" within NXIVM. The goal levels corresponded to increased status, responsibility, and privilege within the NXIVM system, including the potential to earn commissions on the sale of curricula once the enrollee became a "Proctor."

16.    Defendants Raniere, Clare Bronfman, Sara Bronfman, Mack, Russell, and Clyne knew of the content of NXIVM materials because they were in the Inner Circle, and because each had firsthand experience with the NXIVM curricula. Sara and Clare Bronfman and Russell were NXIVM Coaches and Proctors, and Mack and Clyne were Coaches. Moreover, both Clare and Sara Bronfman, as leaders and chief financiers of NXIVM, had knowledge of and influence and control over the content of NXIVM's doctrines, curricula, sales materials, and practices.

17.    NXIVM doctrine taught Nxians to recruit prospective students using a script developed by Raniere and the Inner Circle and included in NXIVM's Field Trainer Manuals.

18.    Although NXIVM's curricula were designed to create the appearance of progress, Raniere, with Clare and Sara Bronfman's tacit or express approval, continuously added new modules and courses and required enrollees to retake courses they had already taken to generate more revenue. In fact, no enrollee ever did, or could, complete the NXIVM program. Chances of making money from capturing new recruits were slim (a feature of illegal pyramid operations) and of the more than sixteen-thousand individuals who took NXIVM's courses, fewer than one percent ever earned any income from NXIVM's businesses. Instead, Raniere, NXIVM's Inner Circle, and the entities they controlled enjoyed most of the earnings.

19.    All enrollees were strongly encouraged from the outset to attain the rank of "Coach," which was a pre-condition to becoming a "Proctor," and could be achieved only by committing to become a Proctor. Under NXIVM doctrine, Apprentice Coaches were required to undergo a screening process, perform six hours per week of uncompensated labor including attend each training twice and facilitate subsequent trainings, and recruit three new students within 6 months. Coaches were required to perform ten hours per week of uncompensated labor including facilitating trainings, "coaching" members and working on committees for 9–24 months without pay until they were finally awarded the rank of Proctor. NXIVM's "ESP Coaching Responsibilities and Privileged & Internship Agreement" stated "Our Coaching Program is an internship, at the end of which you are qualified to begin earning an income in an entirely new career—in an entirely new field!"

20.    In fact recruiting (which generated revenue) rather than completing the process set forth above, actually drove an enrollee's advancement in the NXIVM system.

21.     To drive recruiting, NXIVM's leadership published, promoted, and sold a systematized, training program premised on curricula containing NXIVM doctrine.

22.     Those doctrines, curricula, and sales materials and practices included fraudulent representations to entice new recruits and thereby generate more revenue.

23.     *Mail/Wire Fraud (Raniere-and Curriculum-Related Fraud):* Clare Bronfman committed directly, aided and abetted the commission of, and conspired to commit multiple acts of mail and wire fraud in violation of 18 U.S.C. §§ 1341, 1343.

24.     Around 2005, Clare Bronfman became a leader of the Enterprise, overseeing and directing its operation. From that time until the Enterprise dissolved, NXIVM materials continuously made several false and materially misleading assertions of fact, including that: (i) Defendant Raniere was the "world's smartest man" with an IQ of 240; (ii) he was an ascetic who eschewed possessions and wealth; (iii) he was a practitioner of celibacy; (iv) he had donated his IP right to ESP as a charitable act; (v) Rational Inquiry was based in science and derived results that were empirically measurable; (vi) Rational Inquiry was patent-pending; (vii) completion of certain NXIVM courses was needed for promotion in the NXIVM community; (viii) promotion in the NXIVM community depended on completing NXIVM courses; and (ix) NXIVM's curriculum could be completed by the taking of courses. Clare Bronfman is responsible for the assertions made in NXIVM materials given her leadership in, and control over, the Enterprise, including its materials.  [Plaintiffs recognize that the Court's September 27, 2024 Order found that (i), (ii), (iii), and (vi) were not actionable misrepresentations.]

25.    *Mail/Wire Fraud (Raniere- and Curriculum-related Fraud):* Sara Bronfman committed directly, aided and abetted the commission of, and conspired to commit multiple acts of mail and wire fraud in violation of 18 U.S.C. §§ 1341, 1343, alleged *supra* ¶¶ 37-57. Given her leadership role in the Enterprise, which she assumed in 2005, she is responsible for the false assertions of fact alleged above, and she had fraudulent intent when those statements were disseminated as part of NXIVM's curriculum to defraud Plaintiffs in the manner alleged above, *supra* ¶¶ 37-57.

| No | Client Name | Revised Schedule A | TAC |
|---|---|---|---|
| 1. | Sarah Edmondson | Edmondson paid for Levels 1-5 of NXIVM EM Practitioner training ("EMP training") in reliance on the representations by Nancy Salzman, Lauren Salzman, and Daniella Padilla (a NXIVM Proctor), that, on completing that training, she would be authorized to offer EM sessions to clients for a fee and pursue a career as a Head Trainer. This representation was false, because after she paid for and attended the EMP training, Nancy Salzman, Lauren Salzman, and Padilla announced that all EMP students, no matter what level they had achieved, had to begin again at Level 1 because of newly announced changes to the curriculum, so Edmondson was not certified as an EMP, could not offer EM sessions to clients for a fee, and was unable to become a Head Trainer. | Para. 24-25<br><br>Para. 37-44.<br><br>53. Plaintiffs (with the exception of Camila, Daniela, and Adrian) relied on Raniere, Clare and Sara Bronfman's false statements when they purchased NXIVM curricula and performed uncompensated labor for Raniere and the Inner Circle, such as facilitating intensives, coaching enrollees and attending committee meetings. Plaintiffs would not have purchased such curricula and performed such labor but for these false statements.[3]<br><br>57. Similarly, the Inner Circle pressured enrollees to become indebted to NXIVM and |

[3] In an effort to shorten the Revised Cumulative Schedule A, when the paragraph is first cited Plaintiffs include the entire text but thereafter will refer to the paragraph by only the paragraph number.

| No | Client Name | Revised Schedule A | TAC |
|---|---|---|---|
| | | Edmondson worked without compensation to enroll students in reliance on the representation by Clare Bronfman that, as a Field Trainer, Edmondson would be entitled to a commission of 20% of the training fees for every student she enrolled. The representation was false because after Edmondson enrolled students as a Field Trainer she received between 0% and 10% of her enrollees' training fees as commissions. | its leadership. This indebtedness was later used to exploit them. When enrollees were unable to purchase more classes, the Inner Circle would encourage them to "pay for" the courses with uncompensated labor. Desperate to escape debt and fearful of disobeying, enrollees, including many Plaintiffs, performed uncompensated labor for NXIVM's leaders, including Clare Bronfman, and were credited a small hourly rate toward the cost of the courses. For example, Plaintiffs Valerie, Charlotte, Anthony Ames, Alejandro Balassa, Rachel Behl, Tabitha Chapman, Isabella Constantino, Pam Cooley, Sarah Edmondson, Adrian, Brieanna Ingram, Ashley Harvey, Nicole, Margot Leviton, Lindsay MacInnis, Nils MacQuarrie, Anthony Madani, Jennifer Kobelt, Ariella Menashy, Elham Menhaji, Maja Milijkovic, Michelle Neal, India Oxenberg, Bonnie Piesse, Adrienne Stiles, Kristin, Mark Vicente, Jane Doe 8, and Chad Williams, became trapped in a cycle of indebtedness because of (i) false representations by the Inner Circle that more courses were needed to progress through the program; (ii) the high cost of the courses; (iii) the threat that if they did not purchase and take more courses they would be shunned from the community. In this way, Nxians were deceived about the nature of NXIVM's curricula and the possibility of completing NXIVM's never-ending program and trapped in a circle of indebtedness and labor. |

| No | Client Name | Revised Schedule A | TAC |
|---|---|---|---|
| | | | Para. 210-211. |

<div style="margin-left: 55%;">

Para. 217.

"RICO" Injury
231. All Plaintiffs have been injured in their business or property by reason of the Count I Defendants' violation of 18 U.S.C. § 1962(c). Each Plaintiff was fraudulently induced to purchase curriculum or perform uncompensated labor and was thereby deprived of money or property because of the "Raniere- and Curriculum-Related" mail and wire fraud scheme perpetrated by Raniere, Clare Bronfman, and Sara Bronfman.

234. Plaintiffs Edmondson, Salazar, Medhaoui, and Camila suffered injury to their property, namely expenses associated from responding threatening letters and false allegations, that was caused by Clare Bronfman's witness/victim tampering violations.

Schedule A
Financial harm including, by paying for NXIVM curriculum and EMP training; and attorney's fees for representation and PR costs in connection with a complaint filed with the Vancouver police department by Clare Bronfman; uncompensated labor, including facilitating intensives, coaching students,

</div>

| No | Client Name | Revised Schedule A | TAC |
|----|-------------|--------------------|----|
| | | | administrative work and recruiting new students for NXIVM without compensation in reliance on the promise that if she met the hours per week and recruiting requirements she would earn the equivalent of a salary from commissions and income from companies under the NXIVM umbrella; unpaid work for DOS as a slave; lost employment opportunities;. Emotional harm including pain and suffering for trauma associated with the public dissemination of collateral, being branded, and being threatened with criminal prosecution. |
| 2. | Jessica Joan Salazar | Salazar incurred expenses moving to Albany, and worked without compensation to develop a business plan for a t-shirt company, in reliance on the representation by Raniere that she would be a co-owner of the business with him and have a share of the profits. This representation was false because after she relocated to Albany, Raniere did not start the business with her, and he never intended to do so, but rather made that representation so Salazar would move to Albany and become a part of the NXIVM community. | Para 53.<br><br>*Plaintiff Jessica Joan Salazar*<br>142. Another DOS "slave," directed and extorted by Defendants Raniere and Mack, recruited Jessica Joan Salazar ("Salazar") into DOS. Salazar had moved to Albany based on Defendant Raniere's promises that she would operate a t-shirt business with him and make a living working for The Source. Clare Bronfman owned the t-shirt company and its equipment. Upon information and belief, Clare Bronfman knew Defendant Raniere used the t-shirt company and its equipment to entice recruits whom he would later financially and sexually abuse.<br><br>Para. 231. |

| No | Client Name | Revised Schedule A | TAC |
|---|---|---|---|
| | | | Schedule A<br>Financial harm including, by paying for NXIVM curriculum, relocating to Albany, uncompensated labor, including for the t-shirt business, as instructor for The Source costs of relocating when she went into hiding as a result of the threatening letter she received from Clare Bronfman's attorneys; and lost employment opportunities as a result of moving to Albany. Emotional harm including pain and suffering for trauma associated with the possible public dissemination of collateral, and being threatened with criminal prosecution. |
| 3. | Soukaina Mehdaoui | Mehdaoui moved to Albany (and paid for flights, moving expenses, and train travel to and from New York City) in reliance on the representation by Allison Mack that she would be employed by The Source as a cinematographer and director and eventually help run its production company. This representation was false because after she relocated to Albany she did not receive employment as the cinematographer and director for The Source.<br><br>Mehdaoui paid for and attended trainings in Albany, including SOP and SOP2 (whose costs she was told were necessary to advance in the organization and develop trust with key stakeholders and that would prepare her for the | Para. 53.<br><br>*NXIVM creates identity-based subgroups to target, prime, isolate, and abuse victims*<br>87. Around 2006, NXIVM leadership began creating specialized programs based on existing curricula to supplement the traditional NXIVM program and target potential victims for forced labor or sex trafficking, or both. The creation of these companies was accompanied by the formation of legal entities. These programs and entities were part of the NXIVM Enterprise.<br><br>88. "Jness" was a program for women, headed by Defendant Raniere, and a precursor to DOS. It was radically misogynistic, teaching that |

| No | Client Name | Revised Schedule A | TAC |
|----|-------------|--------------------|-----|
|    |             | responsibilities the role would entail) in reliance on the representation by Mack that on completing the training she would have the opportunity to create films with Mack and lead video production for other NXIVM programs under Mark Vicente. This representation was false because after she completed the training, she was not employed to lead video production for other NXIVM programs under Mark Vicente.<br><br>Mehdaoui also spent money on JNESS in Mexico City, and worked throughout the training by taking photos and videos in exchange for only a minimal discount on her training costs, in reliance on the promise by Mack that on completing the training, she would be authorized to lead media strategy for a new social media & branding agency ("Ubique") supporting NXIVM organizations. This representation was false because after she completed the training, she was not authorized to lead media strategy for a new social media & branding agency. | women were inferior, dishonest, untrustworthy, and genetically and evolutionarily predisposed to subservience. It also taught that women were entitled to neither equal pay nor equal rights, and that by nature women desire one sexual partner whereas men require multiple sexual partners. This program was used by Raniere and NXIVM's leadership to groom women for sexual relationships and abuse by Raniere. Indeed, Jness's curricula evolved to justify Raniere's predatory acts. For example, after Raniere forcibly raped Plaintiff Camila twice, once at a residence on Hale Drive and once at nearby apartment on Victory Way, NXIVM's leadership supplemented Jness's curricula to teach that (i) men rape women as a natural way of territory- marking when women attempt to leave men, and (ii) women can climax only when being raped. Raniere required Camila to attend sessions teaching these lessons.<br><br>89. "Society of Protectors" was another subgroup created by Raniere, designed to promote men and masculinity. The group was framed as NXIVM's military arm, and its recruits were subjected to penances, discipline, and so-called readiness drills (in which recruits were required to quickly perform a commanded act to demonstrate loyalty and heighten their "fight or flight state"). |

| No | Client Name | Revised Schedule A | TAC |
|----|-------------|--------------------|-----|
| | | | 102. Another of the Ultima Companies was the Knife of Aristotle ("The Knife"), founded in 2014 as a purported news outlet. The key officers of The Knife included Defendants Mack and Clyne.<br><br>103. Raniere's stated purpose for creating The Knife was the scientific analysis of news media. In reality, it was NXIVM's propaganda arm, which Raniere used to isolate his followers from outside influences including bad press about NXIVM. Raniere did not compensate Plaintiffs Soukiana Mehdaoui, Veronica Jaspeado, Isabella Constantino, Ashley McLean, Maja Miljkovic and Mark Vicente for their work for the Knife.<br><br>Para. 231.<br><br>Schedule A<br>Physical harm including injuries caused by sexual activity with Raniere. Financial harm including, by paying for NXIVM curriculum; uncompensated labor including writing, producing, directing and editing video content; sexual labor; unpaid work for DOS as a slave; costs of relocating to Albany; costs of relocating when she went into hiding as a result of the threatening letter she received from Clare Bronfman's attorneys; and lost employment opportunities. Emotional harm including pain and suffering for trauma |

| No | Client Name | Revised Schedule A | TAC |
|---|---|---|---|
| | | | associated with the possible public dissemination of collateral and being threatened with litigation. |
| 4. | Nicole | Nicole spent thousands of dollars on The Source curriculum, travel, and accommodations in Albany for the duration of the training, in reliance on the representations by Allison Mack and Mark Hildreth (a Proctor in ESP and founder of The Source) that on completing the curriculum, she would be paid to teach others the material, which was false because after she completed the curriculum, she was not paid to teach others the materials. Rather, Mack told her that before she could teach the curriculum, she needed to complete the material a second time and pay thousands of dollars more. Then, once she completed the material a second time, she taught the curriculum in multiple training sessions but was not paid for that labor. Mack then told her that she would be compensated through a teaching commission only if she recruited others to pay $6,000 for the program. | Para. 53.<br><br>Para. 57.<br><br>92. Around 2014, NXIVM created more subgroups. Raniere and Clare Bronfman established the so-called "Ultima" companies, which were designed to groom and obtain sexual partners for Raniere.<br><br>93. Exo/eso: Raniere invited Adrienne Stiles to be a member of NXIVM's Ultima committee tasked with developing curriculum for programs including exo/eso, The Knife, Ethicist, and The Source. One of those Ultima companies was exo/eso, a sex trafficking operation designed to procure women for sex with Raniere. Raniere and Clare Bronfman personally oversaw all aspects of the development and operation of exo/eso.<br><br>100. Another entity formed as part of the Ultima group under the NXIVM umbrella was "The Source," NXIVM's program for actors and other public speakers led by Mack. The Source was linked to exo/eso, whose physical training curricula was an integral part of The |

| No | Client Name | Revised Schedule A | TAC |
|----|-------------|--------------------|-----|
| | | | Source's curriculum. Clare Bronfman used the overlapping entities to mislead recruits about their entitlement to compensation and exploit them. For example, Clare Bronfman told exo/eso recruits they were entitled to no money because their labors generated revenue for The Source and not exo/eso, and that they had no claim to The Source's revenues. <br><br> 101. The Source did not compensate Plaintiff Nicole for her work for The Source, including teaching two-hour long classes three times a week. <br><br> 127. Nicole joined NXIVM because she learned that Defendants Clare Bronfman and Mack, among others, were members. Nicole paid or went into debt to Mack for thousands of dollars in reliance on Mack's false promise that she would make a living by working on The Source because she would get 50% of The Source's revenue for teaching acting classes. Mack knew that statement was false because she taught classes for The Source and knew it was not possible to earn a living from the company's meager revenues. Mack recruited and enticed Nicole into DOS at a time when Mack knew she was suffering from a mental illness and particularly vulnerable. Mack told her that DOS would help her with her personal problems, and that DOS was a women-only organization with no connection to NXIVM. |

| No | Client Name | Revised Schedule A | TAC |
|---|---|---|---|
| | | | Mack knew these statements were false when she made them because evidence (including the audio recording referenced above) demonstrates that Mack knew that Raniere had created and was the *de facto* leader of DOS. Mack did not tell Nicole that she would be required to provide additional collateral; that she would be subservient to Mack at all times; and that she would be forbidden from sexual relationships with men except Raniere.<br><br>Para. 231.<br><br>Schedule A<br>Physical harm including injuries caused by sexual activity with Raniere and being branded. Financial harm including, by paying for NXIVM curriculum, uncompensated labor including as instructor for The Source and sexual labor, unpaid work for DOS as a slave, and lost employment opportunities. Emotional harm including pain and suffering for trauma associated with the possible public dissemination of collateral, being branded and being threatened with litigation. |
| 5. | Daniela | Daniela traveled from Mexico to Albany in reliance on the representations by Lauren Salzman, and Raniere that she would be employed as a computer programmer. Those representations were false because when Daniela arrived in Albany, Raniere and ESP | 54. Daniela, Camila, and Adrian also relied on false statements (as set forth below) when they exchanged their labor for NXIVM curricula.<br><br>232. In addition, Plaintiffs Lindsay MacInnis, Camila, Adrian, Daniela, and Maja Miljkovic |

| No | Client Name | Revised Schedule A | TAC |
|---|---|---|---|
|  |  | did not sponsor her for a visa and did not employ her as a programmer. In order to support herself, Daniela accepted jobs doing data entry, administrative work, and housekeeping but was not compensated for this work.<br><br>Daniela also forewent an education at an Ivy League university in reliance on the representation by Karen Unterreiner, and Keith Raniere that ESP and Raniere would provide her with education superior to an Ivy League university level education. | also suffered injury to their property, namely uncompensated labor and legal expenses, that was caused by Raniere, Clare Bronfman, and Sara Bronfman's violations of 8 U.S.C. § 1324. *See* Schedule A.<br><br>235. As alleged below, the exo/eso Plaintiffs, DOS Plaintiffs, as well as Adrian, Camila, and Daniela also suffered injury to their property, namely uncompensated labor, that was caused by the Count I Defendants' forced labor violations.<br><br>Schedule A<br>Physical harm including injuries caused by sexual activity with Raniere. Financial harm including, expenses for return travel from Mexico to Albany, uncompensated labor including IT, administrative work, preparing extensive reports for Raniere, conducting research for Raniere, developing key loggers, writing letters to Raniere and sexual labor, and lost education and employment opportunities while she worked for Raniere and when she returned to Mexico and was unable to seek employment due to not having her identification. Emotional harm including from terminating unwanted pregnancies and being isolated and shunned by her family and threatened with deportation. |

| No | Client Name | Revised Schedule A | TAC |
|---|---|---|---|
| 6. | Camila | Camila worked full time to develop and implement the programs and activities for children enrolled in RCG without compensation over a span of 10 years in reliance on representations by Raniere. First, Raniere told her that the education and experience she obtained in working for RCG would be transferable to businesses outside the NXIVM umbrella, which was false because the training was only applicable to the NXIVM system. Second, Raniere told her that when RCG was formed as a legal entity she would be an owner of the company, have decision-making powers and be paid for the work she had performed from the company's revenues. But when Raniere formed RCG as a company, he did not make Camila an owner or pay her for her work from the company's revenues and she had no authority in the company. Third, Raniere told her that RCG would be a legitimate company, and the curriculum would provide children with an education superior to other alternatives. This was false because RCG was never licensed as a school for children. In reliance on Raniere's false representations, Camila not only worked for the company without compensation, but she also forewent other compensable childcare work because Raniere told her that her work with RCG precluded her from working with children in any capacity outside RCG. | Para. 54.<br><br>59. A major part of this immigration fraud scheme was RCG, which was formed in 2006, as NXIVM's purported school and daycare for children. Clare and Sara Bronfman, operated and financed RCG. The stated purpose of RCG was to provide children with several rotating foreign babysitters for the majority of the children's waking hours to improve child development and teach the children several languages. RCG was a front for a trafficking operation. RCG recruited foreign nationals, placed and kept them in positions of servitude, and obtained free labor from them. Although RCG operated for over a decade, it was never licensed as a daycare provider in any state, and NXIVM leadership closed at least one RCG center (the Miami center) after authorities inquired about its lack of credentials. Moreover, RCG did not require any of its babysitters, so-called Multi-Cultural Development Specialists ("MDS"), to have any background or experience in teaching or child development; nor were they trained or assessed for proficiency in either English or any other language, suggesting that Sara and Clare Bronfman had no intention that these "specialists" would teach the children foreign languages. |

| No | Client Name | Revised Schedule A | TAC |
|----|-------------|--------------------|-----|
|    |             |                    | 72. Plaintiff Camila, Adrian's younger sister, was another foreign national victimized by the immigration scheme. Camila lived in the NXIVM community in Clifton Park and would dutifully return to Mexico to satisfy the requirements of her visa. But Raniere informed Camila that she no longer needed to return to Mexico to renew her visa because Clare Bronfman's immigration lawyers had a better way for her to remain in the U.S. Camila followed that advice and overstayed her visa, losing her lawful immigration status. She repeatedly asked members of the Inner Circle about her status, but they did nothing but string her along, assuring her that Clare Bronfman was handling it. At that point, Camila lived in fear of being discovered by U.S. authorities, and NXIVM's leadership exploited that fear. On several occasions, Nancy Salzman told Camila that she could not be paid for her work including her hours worked at RCG. Camila was financially harmed because she was uncompensated or undercompensated for her work for RCG and she was not able to seek other employment because of her immigration status. Clare knew of Camila's immigration status: she had orchestrated immigration fraud for NXIVM, including as to Adrian, Camila's brother; members of the Inner Circle and the legal team were aware of Camila's immigration status; and Clare was personally familiar with Camila, who worked for RCG. |

| No | Client Name | Revised Schedule A | TAC |
|---|---|---|---|
| | | | 73. Around 2010, Raniere instructed Camila to go into hiding, and in 2011 she was hidden from all other members of the NXIVM community in an apartment. From 2011 until Camila's escape from NXIVM in 2018, NXIVM's bookkeeper, Defendant Russell, renewed the lease under the alias Kathleen O'Sullivan, and made annual rental payments for the apartment from a paper bag of cash at a Starbucks with funds provided by Clare Bronfman. By then, Camila was rarely paid for her work. When she complained about her circumstances, Raniere threatened her with eviction from the apartment and deportation.<br><br>Para. 231.<br><br>Para. 232.<br><br>Schedule A<br>Physical harm including injuries caused by sexual activity with Raniere and being branded. Financial harm including, uncompensated labor including providing childcare and sexual labor, and lost education and employment opportunities because Raniere directed her to drop out of school and work for RCG; and lost opportunities because she was falsely promised gainful employment in RCG in Mexico and then forced to go into hiding for fear of being prosecuted in the U.S. Emotional |

| No | Client Name | Revised Schedule A | TAC |
|----|-------------|--------------------|-----|
| | | | harm including, psychological injuries from being raped when she was a minor and when she was an adult, incidental to the pornographic photos of her taken by Raniere when she was a minor, trauma associated with the possible public dissemination of collateral, being isolated and shunned by her family, being threatened with deportation and criminal prosecution, and being branded. |
| 7. | India Oxenberg | Oxenberg spent money on, and performed labor staffing intensives for NXIVM, administrative work for Pamela Cafritz and Clare Bronfman, and data entry for Clare Bronfman and Brandon Porter, on exchange for numerous NXIVM programs (16-day intensive, annual Ethos membership for several years, Level 2 training, and coaching retreats) in reliance on the representations by Sarah Edmondson, Mark Vicente, and others that the NXIVM program was equivalent to a graduate degree or "practical MBA." Those representations reasonably implied to Oxenberg that the curriculum could be completed, that it included valuable professional training, and that one could graduate from the program. Those representations were false and misleading. NXIVM's program was not equivalent to a graduate degree or "practical MBA" because it could not be completed, it did not include professional training, and individuals could not | Para. 24-25.<br><br>Para. 37-44.<br><br>Para. 53.<br><br>Para. 57.<br><br>Para. 59.<br><br>138. Oxenberg suffers from PTSD from her experience in DOS. She was also financially harmed because she performed hours of uncompensated labor for Mack and spent money on travel and accommodation expenses for NXIVM courses after being recruited into DOS.<br><br>Para. 210-211.<br><br>Para. 217. |

| No | Client Name | Revised Schedule A | TAC |
|---|---|---|---|
| | | graduate from it. NXIVM's leaders added new courses to the program, specifically so that it could not be completed, to extract money and labor from Oxenberg.<br><br>Oxenberg also performed work hiring and training MDS and recruiting families to enroll their children in RCG without compensation for two years in reliance on the representation by Michel Chernitzsky that when RCG was formed as a legal entity she would be an owner of the company, and be paid from the company's revenues for the work she had performed. But when Raniere formed RCG as a company, he did not make Oxenberg an owner or pay her for her work from the company's revenues. | Para. 231.<br><br>233. Plaintiffs Nicole, India, Medhaoui, Salazar, Rachel, Valerie, and Jane Doe 8, as well as Plaintiffs Edmondson, Pena, Jane Doe 9, Kristin, and Charlotte suffered injury to their property, namely uncompensated labor, that was caused by Raniere, Mack, and Clare Bronfman's state law extortion and by Defendant Raniere and Mack's DOS-related mail and wire fraud.<br><br>Schedule A<br>Physical harm including injuries caused by sexual activity with Raniere and being branded. Financial harm including, by paying for NXIVM curriculum, uncompensated labor including facilitating intensives, coaching students, administrative work and recruiting new students for NXIVM without compensation in reliance on the promise that if she met the hours per week and recruiting requirements she would earn the equivalent of a salary from commissions and income from companies under the NXIVM umbrella and sexual labor, unpaid work for DOS as a slave, and lost employment opportunities. Emotional harm including pain and suffering for trauma associated with the possible public dissemination of collateral and being branded. |

| No | Client Name | Revised Schedule A | TAC |
|---|---|---|---|
| 8. | Bonnie Piesse | Piesse paid for Ethos, 16 day intensive, Mobius, Jness, Ethicist, Vweek, Coach Summits, and flights in reliance on the false representations by Lauren Salzman, Clare Bronfman, Sara Bronfman and Raniere who told her personally, or spoke at NXIVM events, and promised that if she paid for and attended the training, worked as a shadow coach without pay and attend coaching retreats to advance up NXIVM's stripe path, she would become a Proctor and make money from the students she enrolled and coached, and be paid to teach the training. Raniere personally asked Piesse what her monthly expenses were and assured her that once she became a Proctor her compensation would be much higher than her expenses. But after she paid for and attended the training and coaching retreats and became a Proctor, she was not paid the promised commissions for the students she enrolled and she was not compensated for teaching the training.<br><br>Piesse also attended EMP training because Siobhan Hoteling and Sarah Edmondson told her that as an EM Practitioner she would be able to offer EMs to NXIVM's students for a fee and make money. | Para. 24-25.<br><br>Para. 37-44<br><br>Para. 53.<br><br>Para. 57.<br><br>95. Raniere and Clare Bronfman selected six women who fit Raniere's criteria: young, attractive, thin, and willing to devote time to NXIVM. Among those individuals were Plaintiffs Adrienne Stiles ("Stiles"), Lindsay MacInnis ("MacInnis"), and Bonnie Piese ("Piese"). Raniere and Clare Bronfman told these Plaintiffs that they would own and operate exo/eso and divide the profits generated by the company between themselves, to incentivize them to join exo/eso and develop training programs that the company would sell. However, ownership of exo/eso was not transferred to them, and they never received a share of the profits. Further, Raniere and Clare's approval was required for all business plans and opportunities, and they rejected anything proposed by Stiles, MacInnis, and Piese.<br><br>Para. 210-211.<br><br>Para. 217. |

| No | Client Name | Revised Schedule A | TAC |
|---|---|---|---|
| | | | Para. 231.<br><br>Schedule A<br>Financial harm including, by paying for NXIVM curriculum and uncompensated labor, including creating the curriculum for exo/eso and facilitating trainings, administrative work and recruiting new students for exo/eso without compensation in reliance on the promise that she would earn a percentage of revenue from exo/eso; and lost employment opportunities including from quitting her job to work for exo/eso full time. Emotional harm including pain and suffering for the medical conditions incidental to her work for exo/eso. |
| 9. | Tabitha Chapman | Chapman spent money on NXIVM curriculum such as intensives and Ethos courses in reliance on the representations by Nancy Salzman, Keith Raniere, Karen Unterreiner, and others that the curriculum could be completed. Those representations were false because NXIVM's leaders continuously added new courses to the program, specifically so that it could not be completed, to extract money and labor from Chapman.<br>Chapman also suffered financial injury in reliance on false statements made about progression through the curriculum. For example, she paid for and took NXIVM curriculum based on the representation by Nancy Salzman and others that, on becoming a | Para. 24-25.<br><br>Para. 37-44.<br><br>Para. 53.<br><br>Para. 57.<br><br>Para. 210-211.<br><br>Para. 217.<br><br>Para. 231.<br><br>Schedule A |

| No | Client Name | Revised Schedule A | TAC |
|---|---|---|---|
| | | Coach, she would be promoted up the stripe path. Once made a Coach, she paid and worked for the 16 day and Level 2a, Level 2b and worked without pay coaching intensives, mentoring students, and organizing events, in reliance on the representation by Lauren Salzman, Nancy Salzman, Allison Mack, Nicki Clyne and others that on completing the training she would be promoted to Proctor and would be paid to teach the training. Those representations were false because she was not promoted to Proctor or authorized to teach the trainings, including because promotions were based on arbitrary decisions by a student's coach (the student was required to draft a statement about their "life issue" and how they would overcome it, that would be either accepted or rejected by their coach). After she completed those courses, she was forced to retake the courses (and pay for them again) if she wanted to move up the stripe path and earn money from teaching courses and taking EMs. Chapman eventually took the courses a second time. | Financial harm including, by paying tuition and membership fees for NXIVM courses, programs and groups |
| 10. | Ashley Mclean | McLean spent money on the Ethos annual membership, and the Knife in reliance on the representations by Allison Mack that the curriculum could be completed, that she would graduate from the curriculum, and that the curriculum would include professional training that was transferrable to other businesses | Para. 24-25.<br><br>Para. 37-44.<br>.<br>Para. 53. |

| No | Client Name | Revised Schedule A | TAC |
|---|---|---|---|
|  |  | (outside the NXIVM umbrella). These representations were false because NXIVM's program did not include professional training, and individuals could not graduate from it. NXIVM's leaders continuously added new courses to the program, specifically so that it could not be completed, to extract money from Mclean.<br><br>McLean was also deceived about the career path that the Knife, a company owned by Clare Bronfman, could provide in the media/publishing industry. She paid for the Knife training, flights to Albany, and rent while she lived in Albany in reliance on the representation by Mack and Nicki Clyne that if she moved to Albany and completed the training offered by the Knife, she would receive professional training to work in the media/publishing industry and be paid for her work doing data analysis for the Knife. This representation was false because after she moved to Albany and completed the training, she did not receive any professional training and she was not paid for her work. After she provided work as a data analyst, Nicki Clyne and Jens Erickson also told McLean that she needed to continue to be a member of the Knife and pay fees for membership as a condition of being eligible to be paid for | 92. Around 2014, NXIVM created more subgroups. Raniere and Clare Bronfman established the so-called "Ultima" companies, which were designed to groom and obtain sexual partners for Raniere.<br><br>93. Exo/eso: Raniere invited Adrienne Stiles to be a member of NXIVM's Ultima committee tasked with developing curriculum for programs including exo/eso, The Knife, Ethicist, and The Source. One of those Ultima companies was exo/eso, a sex trafficking operation designed to procure women for sex with Raniere. Raniere and Clare Bronfman personally oversaw all aspects of the development and operation of exo/eso.<br><br>102. Another of the Ultima Companies was the Knife of Aristotle ("The Knife"), founded in 2014 as a purported news outlet. The key officers of The Knife included Defendants Mack and Clyne.<br><br>103. Raniere's stated purpose for creating The Knife was the scientific analysis of news media. In reality, it was NXIVM's propaganda arm, which Raniere used to isolate his followers from outside influences including bad press about NXIVM. Raniere did not compensate Plaintiffs Soukiana Mehdaoui, Veronica Jaspeado, Isabella Constantino, |

| No | Client Name | Revised Schedule A | TAC |
|---|---|---|---|
| | | | Ashley McLean, Maja Miljkovic and Mark Vicente for their work for the Knife.<br><br>Para. 210-211.<br><br>Para. 217.<br><br>Para. 231.<br><br>Schedule A<br>Financial harm including, by paying tuition and membership fees for NXIVM courses, programs and groups, travel and boarding expenses for courses and programs and uncompensated labor including operating cameras, event planning, editing and news reporting. |
| 11. | Mark Vicente | Mark Vicente paid for a flight and relocation costs to move to Albany and took NXIVM curriculum in reliance on representations by Nancy Salzman and Sara Bronfman (made on a private jet owned by Clare and Sara Bronfman) that if he relocated to Albany and took the curriculum, NXIVM would finance the films that he wanted to produce and help him get the films made. Those representations were false because after Vicente relocated to Albany and completed the curriculum, Sara Bronfman told him that she would finance only the production of films approved by Raniere. | Para. 24-25.<br><br>Para. 37-44.<br><br>Para. 53.<br><br>Para. 57.<br><br>Para. 92-93.<br><br>Para. 102-103.<br><br>Para. 210-211. |

| No | Client Name | Revised Schedule A | TAC |
|----|-------------|-------------------|-----|
|    |             | Vicente also paid for EMP training levels 1-5, because he was told by Lauren and Nancy Salzman that this would enhance his ability to work with NXIVM students and increase his income; specifically, they told Vicente that once he reached Level 5 he would be able to charge an hourly fee for providing EMs. Those representations were false. Once Vicente reached Level 5, the goalposts were moved: all EMP students, no matter what level they had achieved, had to begin again at Level 1 because of supposed changes in the curriculum. | Para. 217.<br><br>Para. 231.<br><br>Schedule A<br>Financial harm including, by paying for NXIVM curriculum and EMP training, uncompensated labor, including facilitating intensives, coaching students, administrative work and recruiting new students for NXIVM without compensation in reliance on the promise that if he met the hours per week and recruiting requirements, he would earn the equivalent of a salary from commissions and income from companies under the NXIVM umbrella and lost employment opportunities. |
| 12. | Anthony Ames | Mark Vicente, at Raniere's direction, invited Ames to shoot a film and encouraged him to move from California to New York to work on the film. Clare Bronfman and Nancy Salzman personally assured him that he would be compensated for that work. When he arrived in New York, Vicente and Nancy Salzman informed him that to participate in the film he would need to take NXIVM-related courses and training that cost money. Ames paid for some of the courses with cash and worked to facilitate other training sessions for NXIVM without pay in exchange for other courses. By the time Lauren and Nancy Salzman informed him that he would need to pay to take courses | Para. 24-25.<br><br>Para. 37-44.<br><br>Para. 53.<br><br>Para. 57.<br><br>Para. 210-211.<br><br>Para. 217.<br><br>Para. 231.<br><br>Schedule A |

| No | Client Name | Revised Schedule A | TAC |
|---|---|---|---|
| | | to shoot the film, he had already uprooted his life by moving to New York and had incurred costs doing so.<br><br>Lauren Salzman told Ames that if he became an EM Practitioner he would be able to earn money by offering EMs to paying clients. Ames relied on that representation when he paid to take EM Levels 1–3. But after he completed those levels, Lauren Salzman told him that he had to retake the training to requalify, which would cost more money. Ames would not have taken the initial Level 3 courses if he had known that he would just be told to pay more money to take the course again.<br><br>Lauren Salzman told Ames that to become a Head Trainer he would meet the recruiting requirements. In reliance on that representation, Ames paid for training to become a Coach and Proctor and worked on recruitment. But after he completed the courses and recruited the new members, he was not promoted to Head Trainer and Lauren Salzman told him that he had to take additional training, which would cost more money. Ames would not have taken the training if he had known that he would just be told to pay more money to take additional training. | Financial harm including, by paying tuition and membership fees for NXIVM courses and training; uncompensated labor, including facilitating intensives, coaching students, administrative work and recruiting new students for NXIVM without compensation in reliance on the promise that if he met the hours per week and recruiting requirements, he would earn the equivalent of a salary from commissions and income from companies under the NXIVM umbrella; and lost employment opportunities. |

| No | Client Name | Revised Schedule A | TAC |
|---|---|---|---|
| 13. | Veronica Jaspeado | Jaspeado paid for Anatomy of Mind and Body, Mobius and Characterization (3 times); Human Pain Ethicist 1-2 (twice); and Breaches of ethics, Ascension, Family Values, JNESS 1-8, SOP 1-2, Ethicist III, Reverence, The World Ethical Foundation Consortium, coach summits, V-week (nine times); EMP training; and flights to Albany and accommodations. She also taught Ethos classes twice a week, worked on committees, provided one on one coaching sessions to students, and assisted Proctors during training, for around 7 years without compensation, in reliance on representations by Keith Raniere, Clare Bronfman, Nancy Salman, Lauren Salzman, Emiliano Salinas, Alex Bettancourt, and Barbara Jeske (Proctor) that if she completed the training and unpaid work she would be promoted to Proctor and be authorized to open a NXIVM center in Mexico and make money. She also worked as a Coach in Universidad Iberoamericana de México without compensation in reliance on the representation by Nancy Salzman that this work would enable her promotion to Proctor. Those representations were false because after she paid for and completed the courses and performed the work, she was not promoted to Proctor.<br><br>Jaspeado paid for the Knife of Aristotle training (twice) in reliance on representations | Para. 2.<br><br>Para. 24-25.<br><br>Para. 37-44.<br><br>Para. 53.<br><br>Para. 92-93.<br><br>99. All of exo/eso's recruits worked under false pretenses. Clare Bronfman and Raniere never intended exo/eso to be a viable company and used it solely to procure women for Raniere. This is evidenced by the facts that Clare Bronfman and Raniere starved exo/eso of resources, made no resources available for promoting and marketing the company (even though resources could have been made available), and attempted to collect on fake debts owed by exo/eso to other NXIVM entities and Clare Bronfman. To maintain the appearance that exo/eso was a viable company, Raniere and Clare Bronfman created an event where wealthy NXIVM supporters traveled to Clare Bronfman's private island in Fiji for a weeklong exo/eso course. But the trip had no other business purpose or substance.<br><br>Para. 100-103.<br><br>Para. 210-211. |

| No | Client Name | Revised Schedule A | TAC |
|----|-------------|--------------------|----|
|    |             | by Rosa Laura Junco, Nicki Clyne and Jens Gould that on completing the training she would be paid to analyze articles. These representations were false because although she worked for The Knife analyzing articles for two years she was not compensated.<br><br>Jaspeado paid for The Source training (twice) and Trainers in Training for The Source in reliance on the promise by Allison Mack that on completing the training she would be paid to teach the training and coach students. This representation was false because although she taught the training and coached students she was not compensated.<br><br>Clare Bronfman personally attempted to persuade Jaspeado to attend a NXIVM training in Fiji that cost $20,000. Clare Bronfman told Jaspeado in writing that Clare saw the training "as an investment in a business . . . for people who want to support or open this in their area and make a lot of money!" And Clare Bronfman reiterated later that it was "a training for people who we believe will want to be involved in the Company and help grow and make a lot of money!" Jaspeado did not take the training in Fiji because she could not afford it. But in part based on Clare Bronfman's representations to her about her likelihood of making money in NXIVM, Jaspeado spent | Para. 217.<br><br>Para. 231.<br><br>Schedule A<br>Physical harm including injuries caused by sexual activity with Raniere. Financial harm including, by paying for NXIVM curriculum, uncompensated labor including facilitating intensives, coaching students, administrative work and recruiting new students for NXIVM without compensation in reliance on the promise that if she met the hours per week and recruiting requirements she would earn the equivalent of a salary from commissions and income from companies under the NXIVM umbrella; sexual labor, unpaid work for DOS as a slave, and lost employment opportunities. Emotional harm including pain and suffering for trauma associated with the possible public dissemination of collateral, and being branded. |

| No | Client Name | Revised Schedule A | TAC |
|---|---|---|---|
| | | money to go to Albany for six months to take training. | |
| 14. | Paloma Pena | Pena spent money on courses, coach summits, EMs, flights, and hotels in reliance on the representations by Edgar Boone and Jimena Garza (heads of the NXIVM center in Monterrey, Mexico) that if she attended training and coach summits, and worked without compensation, she would become a Coach and Proctor and be certified to get paid to teach the NXIVM curriculum. Those representations were false because after she paid for and completed the training and performed the required work, Boone and Garza told her she could not be promoted to Proctor unless she took additional training, provided additional work assisting coaches without compensation, and enrolled new members. | Para. 24-25.<br><br>Para. 37-44.<br><br>Para. 53.<br><br>Para. 210-211.<br><br>Para. 217.<br><br>Para. 231.<br><br>Schedule A<br>Physical injuries because of being branded. Financial harm including, by paying for NXIVM curriculum, uncompensated labor including facilitating intensives, coaching students, administrative work and recruiting new students for NXIVM without compensation in reliance on the promise that if she met the hours per week and recruiting requirements she would earn the equivalent of a salary from commissions and income from companies under the NXIVM umbrella; unpaid work for DOS as a slave, and lost employment opportunities. Emotional harm including pain and suffering for trauma associated with the |

| No | Client Name | Revised Schedule A | TAC |
|---|---|---|---|
| | | | possible public dissemination of collateral, and being branded. |
| 15. | Charlotte | Charlotte paid for Ethos classes to complete the training to be promoted to Coach in reliance on the false representations by Sarah Edmondson, Keith Raniere, Nancy Salzman, Lucas Roberts, Wendy Rosen-Brooks, Di Goodman, and Charmel Bowden (Proctors) that, on becoming a Coach, she would be promoted up the stripe path. Once made a Coach, she paid for Origins training, V-Weeks and Coach Summits in Albany, worked without pay coaching intensives, mentoring students, and organizing events, and incurred travel expenses for mandatory trips to New York and other locations over the next 7 years in reliance on the representation by Sarah Edmondson, Keith Raniere, Clare Bronfman, Nancy Salzman, Lauren Salzman, Lucas Roberts, Leah Mottishaw, Wendy Rosen-Brooks, Crystal Rosen-Brooks, Di Goodman, Shawn Goodman, and Charmel Bowden (Proctors) that taking the training and performing the work was "a practical MBA" and that on completing the training she would be promoted to Proctor and would be paid to teach the training. Those representations were false because the program was not equivalent to a "practical MBA" and she was not promoted to Proctor or authorized to teach the trainings, including because promotions were based on | Para. 24-25.<br><br>Para. 37-44.<br><br>Para. 53.<br><br>Para. 57.<br><br>Para. 210-211.<br><br>Para. 217.<br><br>Para. 231.<br><br>Para. 233.<br><br>Schedule A<br>Financial harm including, by paying for NXIVM courses, programs and groups and EMs; uncompensated labor including facilitating intensives, coaching students, administrative work and recruiting new students for NXIVM without compensation in reliance on the promise that if she met the hours per week and recruiting requirements she would earn the equivalent of a salary from commissions and income from companies under the NXIVM umbrella, unpaid work for DOS as a slave, termination by her employer |

| No | Client Name | Revised Schedule A | TAC |
|---|---|---|---|
| | | arbitrary decisions by a student's coach (the student was required to draft a statement about their "life issue" and how they would overcome it, that would be either accepted or | as a result of her involvement in DOS and lost employment opportunities. Emotional harm including pain and suffering for trauma associated with the possible public dissemination of collateral. |
| 16. | Rachel | Rachel spent money on the 5 day, the 16 day, Mobius, flights, and accommodations, in reliance on the representations by India Oxenberg, Bonnie Piesse, Mark Vicente, and Michel Chernitzky that NXIVM had a specific technology that would allow her to overcome emotional distress, particularly anxiety, and that NXIVM owned and operated a particular form of science-based psychoanalysis that would succeed at curing emotional distress where psychology had failed. These representations were false because NXIVM had no such technology.<br><br>Rachel spent money Level 1 training (multiple times) Mobius, and Ethos and flights, and accommodations, in reliance on the representations by India Oxenberg, Michele Chernitzky, Brian Elliot and Mark Elliot that, on becoming a Coach, she would be promoted up the stripe path. Once made a Coach, she paid for Mobius and performed administrative and housekeeping work without compensation for ESP in reliance on the representations by India Oxenberg, Michele Chernitzky, Brian Elliot and Mark Elliot that that on completing | Para. 24-25.<br><br>Para. 37-44.<br><br>Para. 53.<br><br>Para. 57.<br><br>146. Mack also required Rachel to participate in 24/7 readiness drills, send a private message to her master each morning and night, and provide services to, and uncompensated labor for, her master. The District Court found Rachel was a victim of a forced labor conspiracy offense.<br><br>Para. 210-211.<br><br>Para. 217.<br><br>Para. 231.<br><br>Para. 233.<br><br>Schedule A |

| No | Client Name | Revised Schedule A | TAC |
|---|---|---|---|
| | | the training and performing this work, she would be promoted to Proctor and would be paid to teach the training. Those representations were false and she was not promoted to Proctor or authorized to teach the trainings, including because promotions were based on arbitrary decisions by a student's coach (the student was required to draft a statement about their "life issue" and how they would overcome it, that would be either accepted or rejected by their coach). Instead Brian Elliot told her that she needed to pay for and take additional training, which would cost more money. In reliance on those representations, Rachel not only worked for the company without compensation, she resigned from her employment promoting skincare products because they told her that working as a Salesperson for ESP precluded her from working as a Salesperson for any other entity. | Financial harm including, by paying for NXIVM curriculum, uncompensated labor including facilitating intensives, coaching students, administrative work and recruiting new students for NXIVM without compensation in reliance on the promise that if she met the hours per week and recruiting requirements she would earn the equivalent of a salary from commissions and income from companies under the NXIVM umbrella, unpaid work for DOS as a slave, and lost employment opportunities. Emotional harm including pain and suffering for trauma associated with the possible public dissemination of collateral. |
| 17. | Valerie | Valerie performed administrative work for Delegates (a NXIVM company) in reliance on the promise by Mack that she would be compensated on an hourly basis, which was false because she was never compensated for any work that she performed for Delegates. | Para. 53. Para. 57. 148. Mack threatened to release Valerie's collateral and forced Valerie to participate in readiness drills, punishing her physically and psychologically if she failed to respond within 60 seconds. Mack demanded that Valerie keep a daily journal, provide acts of service for the slave who was her direct master, and perform |

| No | Client Name | Revised Schedule A | TAC |
|---|---|---|---|
|  |  |  | data entry work. The District Court found Valerie was a victim of a forced labor conspiracy offense based on the abuse she suffered in DOS.<br><br>149. Plaintiff Valerie suffered emotional distress from her experience in DOS. She was also financially harmed because she performed hours of uncompensated labor for Mack.<br><br>Para. 231.<br><br>Para. 233.<br><br>Schedule A<br>Financial harm including, by paying for NXIVM curriculum; travel and boarding expenses for courses and programs; uncompensated labor including administrative work and recruiting new students for NXIVM without compensation including unpaid work for DOS as a slave, and lost employment opportunities. Emotional harm including pain and suffering for trauma associated with the possible public dissemination of collateral. |
| 18. | Adrienne Stiles | Stiles paid for monthly SOP and Jness memberships, and Ethos performed graphic design work, office administration, and prepared transcriptions without compensation in exchange for the 5 day intensive, 10 day | Para. 24-25.<br><br>Para. 37-44.<br><br>Para. 53. |

| No | Client Name | Revised Schedule A | TAC |
|----|-------------|--------------------|----|
| | | intensive, and Jness Track, in reliance on the representations by Clare Bronfman, Lauren Salzman and Jim DelNegro, that the curriculum could be completed, that she would graduate from the curriculum, and that the curriculum was akin to a graduate program or "practical MBA" that would include professional training. Lauren Salzman and Jim DelNegro also told her that the curriculum included entrepreneurship and leadership training, that would be transferable to businesses outside the NXIVM umbrella. Those representations were false and misleading. NXIVM's program was not equivalent to a graduate degree or "practical MBA" because it could not be completed, it did not include professional training, and individuals could not graduate from it. NXIVM's leaders continuously added new courses to the program, specifically so that it could not be completed, to extract money and labor from Stiles and others. Clare Bronfman and Keith Raniere told Stiles that she would need to complete Jness Tracks (eight intensives), SOP training, and Mobius so she paid or worked without compensation for this curriculum.<br><br>Stiles worked up for up to 18 hours a day over two years to develop and run exo/eso, in reliance on the representation by Raniere that if she did so, then she would receive an ownership interest in exo/eso and be entitled to | Para. 57.<br><br>Para. 88-89.<br><br>Para. 92-95.<br><br>98. Stiles worked for exo/eso. She reported directly to Clare Bronfman, and her job responsibilities (including teaching exo/eso classes) were so demanding that she quit her fulltime job. But as with Piese, Clare Bronfman refused to pay Stiles for her first year of work. Thereafter, Clare Bronfman paid her a menial wage for a brief period then abruptly stopped. Stiles suffered physical injuries from her work at eso/exo, could not afford health insurance and treatment, and was forced into debt. Stiles was financially devastated by exo/eso and began working as a personal assistant to Clare Bronfman to scrape by.<br><br>Para. 210-211.<br><br>Para. 217.<br><br>Para. 231.<br><br>Schedule A<br>Financial harm including, by paying for NXIVM curriculum and uncompensated labor, |

| No | Client Name | Revised Schedule A | TAC |
|---|---|---|---|
| | | a percentage of the revenue the company made from fees it charged students for teacher training. That representation was false because when Raniere formed the company he named Pam Cafritz as the owner and Stiles received no ownership interest and only partial compensation. Stiles also paid for Ethicist, whose costs Clare Bronfman told her were necessary to advance in the organization and that would prepare her for the responsibilities the role would entail. | including creating the curriculum for exo/eso and facilitating trainings, administrative work and recruiting new students for exo/eso without compensation in reliance on the promise that she would earn a percentage of revenue from exo/eso; and lost employment opportunities including from quitting her job to work for exo/eso full time. Emotional harm including pain and suffering for the medical conditions incidental to her work for exo/eso. |
| 19. | Lindsay MacInnis | Raniere invited MacInnis to be a member of NXIVM's Ultima committee tasked with developing the curriculum for programs including exo/eso, and The Source. MacInnis paid for SOP, Ethicist and Jness training (whose costs she was told were necessary to advance in the organization and develop trust with key stakeholders and that would prepare her for the responsibilities the role would entail) and worked for up to 18 hours a day for a year to develop the training for exo/eso, in reliance on the promise by Keith Raniere that she would receive a commission based on every student who enrolled in and be entitled to a percentage of the income the company made from fees exo/eso charged students for teacher training. This representation was false because when Raniere formed the company, he named Clare Bronfman as the owner and MacInnis had no ownership interest. | Para. 24-25.<br><br>Para. 37-44.<br><br>Para. 53.<br><br>Para. 57.<br><br>76. Several other foreign nationals were injured by the fraudulent immigration scheme, which was furthered by use of the mails and wires. For example, Raniere and Clare Bronfman lured Plaintiff Lindsay MacInnis to the U.S., assuring her that she would receive gainful employment in the NXIVM community. Clare Bronfman sent letters to immigration authorities on NXIVM's behalf representing that Lindsay (and others) would work for NXIVM as "business consultants" and be given a salary satisfying the |

| No | Client Name | Revised Schedule A | TAC |
|----|-------------|--------------------|----|
| | | | requirements for a visa. In her letter in support of Lindsay's visa application, Clare Bronfman represented that Lindsay would work closely with Raniere and earn a livable wage by providing services outlined in the letter. But when Lindsay arrived, she realized those representations were false. Though she worked for Raniere and Clare Bronfman a part of "exo/eso" (discussed below) and as Clare Bronfman's "personal assistant" she was not paid what she had been promised or a salary sufficient to satisfy the requirements of her visa. For periods of time she was paid nothing. When Lindsay complained, Clare responded by claiming Lindsay was to blame, that she needed to take more curriculum, and that she owed debts to NXIVM. Lindsay was forced to comply with Clare Bronfman's demands because of her immigration status, which had been intentionally compromised by Clare Bronfman. When Clare Bronfman represented to immigration authorities that Lindsay would be a "business consultant" who would receive a salary exceeding the amount required for her visa, Clare Bronfman knew those representations were false because her plan from the outset was to compromise Lindsay's immigration status to coerce her into providing uncompensated labor for NXIVM's subgroup "exo/eso," as set forth below.<br><br>Para. 88-89. |

| No | Client Name | Revised Schedule A | TAC |
|----|-------------|--------------------|-----|
|    |             |                    | Para. 92-95.<br><br>96. MacInnis participated in exo/eso only because of her compromised immigration status, orchestrated by Clare Bronfman and Raniere. As part of her participation in exo/eso, she performed uncompensated labor, namely participating in meetings with Raniere, creating the training for exo/eso, and teaching exo/exo classes, while Clare Bronfman subjected her to emotional and verbal abuse.<br><br>Para. 210-211.<br><br>Para. 217.<br><br>Para. 231.<br><br>232. In addition, Plaintiffs Lindsay MacInnis, Camila, Adrian, Daniela, and Maja Miljkovic also suffered injury to their property, namely uncompensated labor and legal expenses, that was caused by Raniere, Clare Bronfman, and Sara Bronfman's violations of 8 U.S.C. § 1324. See Schedule A.<br><br>Schedule A<br>Financial harm including, by paying for NXIVM curriculum and uncompensated labor, including creating the curriculum for exo/eso and facilitating trainings, administrative work |

| No | Client Name | Revised Schedule A | TAC |
|---|---|---|---|
| | | | and recruiting new students for exo/eso without compensation in reliance on the promise that she would earn a percentage of revenue from exo/eso; and lost employment opportunities including from quitting her job to work for exo/eso full time. Emotional harm including pain and suffering for the medical conditions incidental to her work for exo/eso. |
| 20. | Jennifer Kobelt | Kobelt spent money on the coaching training and Jness in reliance on the representations by Raniere, Nancy Salzman, Lauren Salzman, Karen Unterriner and Wendy Rosenbrooks (Proctors) that if she completed the training to become a Proctor and met specified recruiting requirements, then she would be promoted to Proctor and authorized to earn money through teaching. But after she completed the courses and recruited the new members, she was not promoted to Proctor or authorized to earn money through teaching and Sarah Edmondson, Wendy Rosenbrooks and Allison Mack told her that she had to take additional training, which would cost more money. Kobelt also spent money on The Source in reliance on the representations by Allison Mack that if she took The Source training and The Source teacher training then she would be paid to teach The Source. That representation was false because after Kobelt paid for and completed the training, she was not authorized to receive payment for teaching The Source. | Para. 24-25.<br><br>Para. 37-44<br><br>Para. 53.<br><br>Para. 57.<br><br>Para. 88.<br><br>Para. 100.<br><br>Para. 210-211.<br><br>Para. 217.<br><br>Para. 231.<br><br>Schedule A<br>Financial harm including, by paying for NXIVM curriculum and uncompensated labor, including participating in the fright studies and lost employment opportunities. Emotional |

| No | Client Name | Revised Schedule A | TAC |
|---|---|---|---|
| | | | harm including pain and suffering incidental to participating in NXIVM's human experimentation "studies" and being threatened with criminal prosecution. |
| 21. | Margot J. Leviton | Leviton suffered financial injury, including payment to travel to Albany and money for lodging in Albany, when she moved from Vancouver to Albany in reliance on representations made to her by Nancy Salzman that NXIVM had a treatment for OCD that would obviate the need for her to continue taking the medication she was on and eliminate her obsessive-compulsive disorder tendencies.  Those representations were false because NXIVM's leadership, including Nancy Salzman, knew they possessed no such treatment for OCD and made that representation for the purpose of having Leviton to rely on it, so that she would serve as a test subject in NXIVM's experiments, which were designed to cast NXIVM and its leadership in a favorable light. | 15. Defendant Brandon Porter is a physician formerly licensed to practice medicine in New York. On information and belief, he resides in Iowa. At all times relevant to this Complaint, he was licensed to practice medicine in New York and regularly engaged in the practice of medicine here. Porter was paid by, and an agent of, ESF. At the direction of Raniere, Clare Bronfman, and Nancy Salzman, Porter "treated" NXIVM recruits, including Plaintiffs suffering from Tourette's and OCD, with NXIVM's psychotherapy techniques, and he conducted the "Human Fright Experiment" on recruits without voluntary informed consent, authorization, or appropriate professional oversight.

25. Raniere based NXIVM's curricula on his so-called "Rational Inquiry" method, a synthesis of psychotherapy and the teachings, methods, and practices of the human potential movement. Rational Inquiry was used to modify thinking and behavior that, according to NXIVM doctrine, was maladaptive. Although Raniere touted Rational Inquiry as a cure for psychiatric and physical illnesses, he and the other Individual Defendants knew that |

| No | Client Name | Revised Schedule A | TAC |
|----|-------------|--------------------|----|
|    |             |                    | it was not. Rational Inquiry's purpose was to defraud Nxians out of substantial sums of money and increase their vulnerability to emotional, psychological, and sexual abuse.<br><br>Para. 53.<br><br>Para. 57.<br><br>84. These untested, unauthorized, and inherently risky psychotherapy and unscientific so-called studies for the treatments of OCD and Tourette's Syndrome, which lacked scientific basis and informed consent, harmed their subjects, including Plaintiffs Margot Leviton, Isabella Constantino, and Carysa Cottrell. As a result of these experiments, Plaintiffs Margot Leviton, Isabella Constantino, and Carysa Cottrell were harmed. For example, Nancy Salzman told Plaintiff Margot Leviton that Defendants' system could cure her OCD. Raniere approved this treatment, after which Margot was subjected to nightly 4-hour long "EM" questioning sessions by Porter, who had instructed her to cease taking prescribed medications. Nancy Salzman then verbally abused Margot, who suffered severe physical and psychological problems, including suicidal thoughts. Porter told her that her symptoms were due to her failure to commit to Defendants' system. Fearing she would take her own life, Margot fled to |

| No | Client Name | Revised Schedule A | TAC |
|---|---|---|---|
| | | | Canada, hid, and delayed seeking medical treatment because she feared Defendants would retaliate. That fear was reasonable because Margot knew Defendants had (as discussed below) previously retaliated against two former members of the NXIVM community residing in Canada by making false statements to Canadian law enforcement authorities.<br><br>Para. 231.<br><br>Schedule A<br>Financial harm including, by paying for NXIVM curriculum and uncompensated labor, including participating in the fright studies and lost employment opportunities. Emotional harm including pain and suffering incidental to participating in NXIVM's human experimentation "studies". |
| 22. | Isabella Constantino | Constantino spent money on transport and accommodations and worked for NXIVM's Girl's School without pay in reliance on the representation by Rosa Laura Junco that she would have the opportunity to work with Keith Raniere and be paid for this work. This representation was false because after traveling to Clifton Park almost every weekend for the three and a half months, working on assignments and participating in telephonic meetings, Constantino was not compensated. | Para. 25.<br><br>Para. 53.<br><br>Para. 57.<br><br>82. But Clare and Sara Bronfman took NXIVM's purported ability to treat ailments to another, more dangerous, level. Around 2010, Clare and Sara Bronfman used ESF, the entity they had co-founded, funded, and operated, to |

| No | Client Name | Revised Schedule A | TAC |
|---|---|---|---|
| | | Instead, Junco told her that if she wanted to be compensated, she would need to move to Albany to help grow the program.<br><br>Constantino participated as a subject in the Tourette's study (she participated in screening interviews, on-camera interviews before and after each day of the 16 day training, took the 16 day curriculum and participated in EMs with Nancy Salzman) without compensation in reliance on representations by Nancy Salzman that NXIVM had a treatment for Tourette's that would obviate the need for her to continue taking the medication she was on and eliminate her tics. Those representations were false because NXIVM's leadership, including Nancy Salzman, knew they possessed no such treatment for Tourette's and made that representation for the purpose of having Constantino rely on it, so that she would serve as a test subject in NXIVM's experiments, which were designed to cast NXIVM and its leadership in a favorable light. | pay for a series of unauthorized medical experiments on Nxians. They funded the experiments to bolster Raniere's reputation and the credibility of the NXIVM program and demonstrate that its teachings could cure physical and psychiatric diseases. For example, Clare Bronfman sponsored multiple individuals (including Plaintiffs Isabella Constantino and Caryssa Cottrell) to come to Albany so they could be experimented on under the guise of curing their Tourette's Syndrome. She did this on the condition that they agreed to be subjects in a film, released in 2018, "My Tourette's," that was made at Clare Bronfman's direction by a production company that she operated. Like the experiments, the film's purpose was to advertise NXIVM.<br><br>Para. 84.<br><br>Para. 103.<br><br>Para. 231.<br><br>Schedule A<br>Financial harm including, by paying for NXIVM curriculum and uncompensated labor, including participating in the fright studies and lost employment opportunities. Emotional harm including pain and suffering incidental to participating in NXIVM's human experimentation "studies". |

| No | Client Name | Revised Schedule A | TAC |
|---|---|---|---|
| | | | |
| 23. | Carysa Cottrell | Cottrell participated as a subject in the Tourette's study (she participated in screening interviews, on-camera interviews before and after each day of the 16 day training, took the 16 day curriculum and participated in EMs with Nancy Salzman) without compensation in reliance on representations by Nancy Salzman that NXIVM had a treatment for Tourette's that would obviate the need for her to continue taking the medication she was on and eliminate her tics. Those representations were false because NXIVM's leadership, including Nancy Salzman, knew they possessed no such treatment for Tourette's and made that representation for the purpose of having Cottrell rely on it, so that she would serve as a test subject in NXIVM's experiments, which were designed to cast NXIVM and its leadership in a favorable light. | Para. 25.<br><br>Para. 53.<br><br>82. But Clare and Sara Bronfman took NXIVM's purported ability to treat ailments to another, more dangerous, level. Around 2010, Clare and Sara Bronfman used ESF, the entity they had co-founded, funded, and operated, to pay for a series of unauthorized medical experiments on Nxians. They funded the experiments to bolster Raniere's reputation and the credibility of the NXIVM program and demonstrate that its teachings could cure physical and psychiatric diseases. For example, Clare Bronfman sponsored multiple individuals (including Plaintiffs Isabella Constantino and Caryssa Cottrell) to come to Albany so they could be experimented on under the guise of curing their Tourette's Syndrome. She did this on the condition that they agreed to be subjects in a film, released in 2018, "My Tourette's," that was made at Clare Bronfman's direction by a production company that she operated. Like the experiments, the film's purpose was to advertise NXIVM.<br><br>Para. 231.<br><br>Schedule A |

| No | Client Name | Revised Schedule A | TAC |
|---|---|---|---|
| | | | Financial harm including, by paying for NXIVM curriculum and uncompensated labor, including participating in the fright studies and lost employment opportunities. Emotional harm including pain and suffering incidental to participating in NXIVM's human experimentation "studies". |
| 24. | Deanne Brunelle | Brunelle spent money on a 5-day program and Ethos membership in reliance on the representations by Lucas Roberts (a coach in ESP) that the Rational Inquiry program could be completed and that if she completed certain training courses then she would become a Coach and eventually Proctor. Those representations were false because after she completed the training, Lucas Roberts told her that she could not be promoted to Coach unless she enrolled new members. | Para. 24-25<br><br>Para. 37-44.<br><br>Para. 53.<br><br>Para. 210-211.<br><br>Para. 217.<br><br>Para. 231.<br><br>Schedule A<br>Financial harm including, by paying tuition and membership fees for NXIVM courses, programs and groups. |
| 25. | Karla Diaz Cano | Cano paid for the 16-day, Ethos, flights and accommodations in reliance on the representation by Michel Chernitzky, Marc Elliott, Cedric, Edgar Boone, India Oxenberg, Nancy Salzman that on becoming a Coach, she would be promoted up the stripe path. On becoming a Coach, she paid for Jness and | Para. 2. NXIVM was an umbrella comprised of several pyramid-structured organizations, some of which were legal entities, including the NXIVM Corporation; Executive Success Programs ("ESP"), Inc.; Jness, LLC ("Jness"); Society of Protectors, LLC ("SOP"); Ethical Science Foundation ("ESF"); First Principles, |

| No | Client Name | Revised Schedule A | TAC |
|----|-------------|--------------------|-----|
| | | Level 2 curriculum (Mobius, Human Pain), Jness and SOP. But after she completed the training and was promoted to Coach she was invited to DOS and, after providing collateral, decided to abandon the coaching path.<br><br>Cano also paid for exo/eso training and incurred relocation costs moving to Albany because she relied on the representation by Danielle Roberts, Keith Raniere (in a forum), Eduardo Asunsolo, and others that if she moved to Albany and took exo/eso training, then she would be provided with materials and be authorized to start her own center. But after she completed the training, she was not provided with materials to start her own center or authorized to do so. Rather, Danielle Roberts told her that she needed to continue to work for exo/eso without pay. | Inc.; and Rainbow Cultural Garden ("RCG"), and some of which were not legal entities, including Ultima, exo/eso, and DOS (also known as "The Vow" and "The Sorority").<br><br>Para. 24-25.<br><br>Para. 37-44.<br><br>Para. 53.<br><br>Para. 92-94.<br><br>Para. 210-211.<br><br>Para. 217.<br><br>Para. 231.<br><br>Schedule A<br>Financial harm including, by paying tuition and membership fees for NXIVM courses, programs and groups, EMs, and travel and boarding expenses for courses and programs, and uncompensated labor including coaching intensives, coaching students and attending meetings. |
| 26. | Pamela Cooley | Cooley paid for EM training Levels 1-4 and spent money on travel and accommodations in Tacoma and Albany based on the representations by Clare Bronfman, Nancy | Para. 24-25.<br><br>Para. 37-44. |

| No | Client Name | Revised Schedule A | TAC |
|---|---|---|---|
| | | Salzman, and Lauren Salzman that upon completion of the training, she would be certified as an EM Practitioner and authorized to earn money by offering EMs to clients. These representations were false because after she completed the training, Lauren Salzman, Karen Unterreiner, Nancy Salzman and Keith Raniere told her that she had to retake the training to requalify, which would cost more money.<br><br>Cooley paid for Ethicist 1-3, flights and accommodations from Vancouver to Albany in reliance on the representations by Clare Bronfman, Lauren Salzman, Nancy Salzman, Karen Unterreiner, Pam Cafritz, Barbara Jeske, Alex Betancourt, Allison Mack, Esther Chiapponne, Emiliano Salinas that on completing the curriculum she would be certified as an "Ethicist" a highly paid position as a "consultant" in ESP companies and companies outside the ESP umbrella. This representation was false because on completing the training, ESP did not employ her as an Ethicist. | Para. 53.<br><br>Para. 57.<br><br>Para. 210-211.<br><br>Para. 217.<br><br>Para. 231.<br><br>Schedule A<br>Financial harm including, by paying tuition and membership fees for NXIVM courses, programs and groups, EMs, and travel and boarding expenses for courses and programs, and uncompensated labor including coaching intensives, coaching students and attending meetings and event planning. |
| 27. | Brieanna Fiander | Fiander paid for training and worked without compensation as a Coach in reliance on the representations by Wendy Rosenbrooks and Diane Goodman that the training was akin to a graduate program or "practical MBA" that would include professional training. Those | Para. 53.<br><br>Para. 231.<br><br>Schedule A<br>Financial harm including, by paying tuition and membership fees for NXIVM courses, |

| No | Client Name | Revised Schedule A | TAC |
|---|---|---|---|
| | | representations were false because she did not receive any professional training. | programs and groups, EMs, and travel and boarding expenses for courses and programs and uncompensated labor coaching intensives, coaching students and attending meetings. |
| 28. | Shayna Holmes | Holmes spent money on an Ethos membership, Jness training, V week, and flights and accommodations to attend V week, in reliance on the representations by Wendy Rosenbrooks and Lucas Roberts (Proctors) that curriculum could be completed, that she would graduate from the curriculum, that the curriculum was akin to a graduate program or "practical MBA" and that it would include professional business development training that would lead to more income in her business. These statements were false because NXIVM continued to add modules to the courses and the courses did not provide any professional business development training.<br><br>Holmes also paid money for training based on the representations by Lucas Roberts that if she completed the training to become a Proctor she would be promoted to Proctor and paid to teach the NXIVM curriculum. That representation was false because promotions were not based on any metrics and were based on arbitrary decisions by a student's coach (the student was required to draft a statement about their "life issue" and how they would overcome it that | Para. 24-25.<br><br>Para. 37-44.<br><br>Para. 53.<br><br>Para. 210-211.<br><br>Para. 217.<br><br>Para. 231.<br><br>Schedule A<br>Financial harm including, by paying tuition and membership fees for NXIVM courses, programs and groups, EMs, travel and boarding expenses for courses and programs and uncompensated labor including coaching intensives, coaching students and attending meetings. |

| No | Client Name | Revised Schedule A | TAC |
|---|---|---|---|
| | | would be either accepted or rejected by their coach).<br><br>Holmes relied on claims made by Nancy Salzman curriculum was based on a scientific technology that could produce measurable results and would succeed at curing emotional distress where psychology had failed. That representation was false because NXIVM had no such technology. | |
| 29 | Polly Green | Green spent money on an Ethos membership for two years for herself and her partner in reliance on the representations by Sarah Edmondson that NXIVM had a specific technology that would allow her to overcome emotional distress, particularly her social anxiety, and that NXIVM owned and operated a particular form of science-based psychoanalysis that would succeed at curing emotional distress where psychology had failed. That representation was false because NXIVM had no such technology. | Para. 25.<br><br>Para. 53.<br><br>Para. 231.<br><br>Schedule A<br>Financial harm including, by paying tuition and membership fees for NXIVM courses, programs and groups. |
| 30. | Andrea Hammond | Hammond spent money on a monthly SOP membership for five years in reliance on the representations by SOP leaders and Natalia Gaviria that if she paid for this membership, she would receive SOP-specific curriculum, but after paying money she never got any SOP-specific curriculum. | Para. 53.<br><br>Para. 89.<br><br>Para. 231.<br><br>Schedule A |

| No | Client Name | Revised Schedule A | TAC |
|---|---|---|---|
| | | | Financial harm including, by paying tuition and membership fees for NXIVM courses, programs and groups EMs, travel and boarding expenses for courses and programs. |
| 31. | Yan Huang | Yan Huang spent money on the 5-day intensive, One Asian curriculum, flights, and hotels in reliance on the representations by Alice Chen that the curriculum could be completed and that she would graduate from the curriculum. These representations were false because NXIVM's program could not be completed, and individuals could not graduate from it. NXIVM's leaders continuously added new courses to the program, specifically so that it could not be completed, to extract money and labor from Huang and others. | Para. 53.<br><br>Para. 231.<br><br>Schedule A<br>Financial harm including, by paying tuition and membership fees for NXIVM courses, programs and groups, travel and boarding expenses for courses and programs and uncompensated labor including sales. |
| 32. | Sara Lim | Lim paid for and attended the Ethos training three times in reliance on the false representations by Sarah Edmondson, Rebecca Davis, Diane Goodman, that the curriculum could be completed, that she would graduate from the curriculum, and that the curriculum was akin to a graduate program or "practical MBA" that would include professional training. Vancouver coaches also told her that the curriculum included entrepreneurship and leadership training, that would be transferable to businesses outside the NXIVM umbrella which was false because the training was only applicable to the NXIVM coaching system. | Para. 24-25.<br><br>Para. 37-44.<br><br>Para. 53.<br><br>Para. 90.<br><br>Para. 210-211.<br><br>Para. 217.<br><br>Para. 231. |

| No | Client Name | Revised Schedule A | TAC |
|---|---|---|---|
| | | Lim also spent money on EMs in reliance on the representations by Nancy Salzman and Vancouver coaches that NXIVM had a specific technology that would allow her to overcome emotional distress, particularly anxiety, and that NXIVM owned and operated a particular form of science-based psychoanalysis that would succeed at curing emotional distress where psychology had failed. That representation was false because NXIVM had no such technology.<br><br>Lim spent money on exo/eso teacher training and relocation costs reliance on the representation by Peter Christie, Danielle Roberts, and other exo|eso leaders that on completing the training she would be authorized to own an exo|eso center and teach the training certification program to paying trainees. This representation was false because after she completed the training, she was not authorized to open a center and teach the training certification program for payment. Danielle Roberts told her that the development of the curriculum for the training was not complete, and that she needed certified trainers to stay in Albany and continue to work to develop the curriculum. Lim worked to develop and teach the curriculum without pay. | Schedule A<br>Financial harm including, by paying tuition and membership fees for courses, programs and groups, travel and boarding expenses for courses and programs and uncompensated labor including coaching intensives, coaching students and attending meetings, news reporting and fitness training. |

| No | Client Name | Revised Schedule A | TAC |
|---|---|---|---|
| 33. | Ariella Menashy | Menashy paid for EMP Levels 1 and 2 and worked by doing practice EMs in reliance on the representation by Nancy Salzman, Rosa Laura Junco and Wendy Rosen-Brooks that on completion of EMP Levels 1 and 2 she would be certified as an EM practitioner and be authorized to make money by offering EMs to paying clients. That representation was false because after she completed EMP Levels 1 and 2 Nancy Salzman and Wendy Rosen-Brooks told her that in order to be certified as an EMP, she would need to take Levels 3 and 4. Menashy paid for EMP Levels 3 and 4 but after she completed them Nancy Salzman told her that she would have to redo all four levels again to be certified.<br><br>Menashy also worked without compensation to open a RCG center in Vancouver in reliance on the false representations by Loreta Garza that she would be compensated for this work. This representation was false because after she completed the work to start a center and signed up a paying client, Loreta Garza told her that she was not authorized to operate a center. | Para. 2.<br><br>Para. 53.<br><br>Para. 57.<br><br>59. A major part of this immigration fraud scheme was RCG, which was formed in 2006, as NXIVM's purported school and daycare for children. Clare and Sara Bronfman, operated and financed RCG. The stated purpose of RCG was to provide children with several rotating foreign babysitters for the majority of the children's waking hours to improve child development and teach the children several languages. RCG was a front for a trafficking operation. RCG recruited foreign nationals, placed and kept them in positions of servitude, and obtained free labor from them. Although RCG operated for over a decade, it was never licensed as a daycare provider in any state, and NXIVM leadership closed at least one RCG center (the Miami center) after authorities inquired about its lack of credentials. Moreover, RCG did not require any of its babysitters, so-called Multi-Cultural Development Specialists ("MDS"), to have any background or experience in teaching or child development; nor were they trained or assessed for proficiency in either English or any other language, suggesting that Sara and Clare Bronfman had no intention that these |

| No | Client Name | Revised Schedule A | TAC |
|----|-------------|--------------------|-----|
|    |             |                    | "specialists" would teach the children foreign languages.<br><br>62. Sara Bronfman later founded and operated RCG locations abroad, including in London, and (under a different name) in France. The center in France was shuttered by French authorities.<br><br>63. Clare Bronfman was also integral to RCG. She disbursed funds from ESF to RCG to ensure funds were available to support visa applications for MDS workers. As the United States explained in a Court filing, "ESF was a favorable vehicle for sponsoring the H1-B visa applications because ESF, as a nonprofit, was not subject to the annual H1-B visa caps applicable to for-profit organizations." Those visas were fraudulently obtained because the MDS workers were not student or non-profit workers, but laborers for RCG. Some of the funds that Clare Bronfman funneled to RCG were reported on RCG's books as tuition payments for children, even though the funds were used for visas for foreign workers. Indeed, in the criminal proceedings, the government amassed evidence that "ESF was little more than a vehicle to employs MDSs."<br><br>200. The Enterprise engaged in, and conducted activities which affected, interstate and foreign commerce, including operating NXIVM and |

| No | Client Name | Revised Schedule A | TAC |
|---|---|---|---|
|  |  |  | RCG centers in several states across the country, Canada, and Mexico, as well as enticing American recruits and foreigners to travel across state and international borders to New York. |
|  |  |  | Para. 211. |
|  |  |  | Para. 231. |
|  |  |  | Schedule A<br>Financial harm including, by paying tuition and membership fees for NXIVM courses, programs and groups, travel and boarding expenses for courses and programs and uncompensated labor including operating cameras, event planning, editing and news reporting. |
| 34. | Elham Menhaji | Menhaji paid for Ethos, to complete the training to be promoted to Coach in reliance on the representation by Cedric Fuat (her Coach) that, on becoming a Coach, she would be promoted up the stripe path. Once made a Coach, she paid for the 16-day intensive, Ethos (twice), and level 2 curriculum (Origins, Human Pain and Mobius) recruited new members and worked without compensation as a shadow Coach in reliance on the representation by Fuat that on completing the training she would be promoted to Proctor and would be paid to teach the training. Those | Para. 24-25.<br><br>Para. 37-44.<br><br>Para. 53.<br><br>Para. 57.<br><br>Para. 210-211.<br><br>Para. 217.<br><br>Para. 231. |

| No | Client Name | Revised Schedule A | TAC |
|----|-------------|---------------------|-----|
|  |  | representations were false [because] she was not promoted to Proctor or authorized to teach the trainings, including because promotions were based on arbitrary decisions by a student's coach (the student was required to draft a statement about their "life issue" and how they would overcome it, that would be either accepted or rejected by their coach). | Schedule A<br>Financial harm including, by paying tuition and membership fees for NXIVM courses, programs and groups, travel and boarding expenses for courses and programs, and uncompensated labor including coaching intensives, coaching students and administrative work. |
| 35. | Maja Miljkovic | Maja Milijkovic paid for the 11 day intensive, Ethos membership, level 2 intensives, a flight, relocation costs to move to Albany, and accommodations, and worked to develop the training for the Ultima companies The Source and The Knife in reliance on the representations by Raniere that if she relocated to Albany and completed the training, she would be authorized to teach The Source and The Knife and be paid. Raniere also promised that he would make her a co-owner and she would receive a share of the revenue from those entities. This representation was false because after she completed the training, she was not paid for teaching the training and Raniere did not make her a co-owner of The Source and The Knife or pay her any share of the revenues of those entities. | Para. 24-25.<br><br>Para. 37-44.<br><br>Para. 53.<br><br>Para. 57.<br><br>79. …Raniere and Clare Bronfman told her that she would create and own a NXIVM company from which she would earn income. Maja was recruited to develop "the Knife" (discussed below) with others including Defendant Clyne. Maja was never compensated for her work. Instead, to cover her living expenses and because Maja was unable to work anywhere else because of her visa status, Clare paid Maja to work as a waitress at a cafe owned by Clare Bronfman. Maja spent most of her meager pay on rent, which she paid back to Clare Bronfman, her landlord. |

| No | Client Name | Revised Schedule A | TAC |
|---|---|---|---|
| | | | Para. 102<br><br>103…Raniere did not compensate Plaintiffs Soukiana Mehdaoui, Veronica Jaspeado, Isabella Constantino, Ashley McLean, Maja Miljkovic and Mark Vicente for their work for the Knife.<br><br>Para. 210-211.<br><br>Para. 217.<br><br>Para. 231.<br><br>Para. 232.<br><br>Schedule A<br>Financial harm including, by paying tuition and membership fees for NXIVM courses, programs and groups; paying for the cost of her divorce following the sham marriage; and uncompensated labor including coaching intensives, coaching students, operating video cameras and editing video, and news reporting. |
| 36. | Michelle Neal | Michelle Neal paid for Ethos classes to complete the training to be promoted to Coach in reliance on the representations by Raniere, Nancy Salzman, Lauren Salzman, Wendy Rosenbrooks and Lucas | Para. 24-25.<br><br>Para. 37-44.<br>.<br>Para. 53. |

| No | Client Name | Revised Schedule A | TAC |
|---|---|---|---|
| | | Roberts that, on becoming a Coach, she would be promoted up the stripe path. Once made a Coach, she paid for Jness and V-Weeks and Coach Summits in Albany and worked without pay coaching intensives, mentoring students, and organizing events, alongside incurring travel expenses in reliance on the representation by Raniere, Nancy Salzman, Lauren Salzman, Wendy Rosenbrooks and Lucas Roberts that on completing the training she would be promoted to Proctor and would be paid to teach the training. Those representations were false because she was not promoted to Proctor or authorized to teach the trainings, including because promotions were based on arbitrary decisions by a student's coach (the student was required to draft a statement about their "life issue" and how they would overcome it, that would be either accepted or rejected by their coach) | Para. 57.<br><br>Para. 210-211.<br><br>Para. 217.<br><br>Para. 231.<br><br>Schedule A<br>Financial harm including, by paying tuition and membership fees for NXIVM courses, programs and groups, EMs, travel and boarding expenses for courses and programs and uncompensated labor including coaching intensives, coaching students and attending meetings and administrative work, web development and news reporting. |
| 37. | Alison Rood | Rood paid for training to become a coach and performed unpaid work without compensation running Ethos training participating in a committee and editing a newsletter in reliance on the representation by Mark Vicente, Michel Chernitzky, and Mark Hildreth that on completing the training and performing this work she was be promoted to Coach and she could take the training to become a Proctor and earn an income by teaching the NXVIM curriculum to students. This representation was | Para. 24-25.<br><br>Para. 37-44.<br><br>Para. 53.<br><br>Para. 210-211.<br><br>Para. 217.<br><br>Para. 231. |

| No | Client Name | Revised Schedule A | TAC |
|---|---|---|---|
| | | false because after she completed the training, she was not promoted to coach and she was told that in addition to enrolling students, one of those students would also need to enroll someone. | Schedule A<br>Financial harm including, by paying tuition and membership fees for NXIVM courses, programs and groups, travel and boarding expenses for courses and programs and uncompensated labor including coaching intensives, coaching students and attending meetings and administrative work. |
| 38. | Katie Shaw | Shaw spent money on Level 1 and 2 intensives, Ethos curriculum, Jness intensive and groups, EM's, flights and accommodation on the representations by Mark Vicente and Sarah Edmondson that NXIVM would teach her business skills. That representation was false because NXIVM had no curriculum on business.<br>Shaw also suffered this injury in reliance on the representations Mark Vicente and Sarah Edmondson that NXIVM had a specific technology that would allow her to overcome emotional distress, and that NXIVM owned and operated a particular form of sciencebased psychoanalysis that would succeed at curing emotional distress where psychology had failed. That representation was false because NXIVM had no such technology. | Para. 25.<br><br>Para. 37-44.<br><br>47. NXIVM recruits were also drawn into the NXIVM program because they believed Raniere had successfully operated a similar company (CBI) in the past. This was because Clare Bronfman, Sara Bronfman, and Keith Raniere made false representations about CBI and Raniere's business acumen. For example, the Ethical Humanitarian website (a foundation of which Clare and Sara Bronfman were Trustees22) published false statements on its website from at least April 7, 2010 to May 4, 2018, including that Raniere's former business, CBI, was "responsible for an estimated one billion dollars in product and services sales in its second full year of business," that Raniere "was worth $50 million only two years later," that Raniere turned CBI "into a corporation of nearly 400,000 [people]" two years after it was |

| No | Client Name | Revised Schedule A | TAC |
|---|---|---|---|
| | | | formed, and that Raniere became a millionaire at age thirty.<br><br>48. Raniere, Clare Bronfman, and Sara Bronfman knew these representations were materially false and misleading when they were made because before CBI was investigated by regulators, the business began to fail, its debt ballooned, customers complained, and Raniere did not appear to have a substantial amount of money.23 Raniere only paid $9,000 of the $40,000 he owed the New York Attorney General, and Raniere admitted he could not pay the balance of that debt. When the representations were made, Raniere, Clare Bronfman, and Sara Bronfman also knew that CBI had been investigated by 25 attorney generals and shuttered in the wake of a consent order. The statements made on the Ethical Humanitarian website about CBI were calculated to mislead people into believing that Raniere was a highly successful entrepreneur, which he was not. Another example is that CBI purported to be a corporation of nearly 400,000 people, implying that CBI had 400,000 employees, which was untrue.<br><br>Para. 53.<br><br>Para. 211.<br><br>Para. 231. |

| No | Client Name | Revised Schedule A | TAC |
|---|---|---|---|
| | | | Schedule A<br>Financial harm including, by paying tuition and membership fees for NXIVM courses, programs and groups, travel and boarding expenses for courses and programs. |
| 39. | Kristin | Kristin spent money on the 16 day, the 5 day (twice), and flights and accommodations in Los Angeles and Vancouver in reliance on the false representations by Wendy Rosenbrooks, Mark Elliott and Brian Elliott that NXIVM had a specific technology that would allow her to overcome emotional distress, particularly anxiety, and that NXIVM owned and operated a particular form of science-based psychoanalysis that would succeed at curing emotional distress where psychology had failed. These representations were false because NXIVM had no such technology.<br><br>Kristin paid for the 5 day intensive (twice) to complete the training to be promoted to Coach in reliance on the false representations by Mark Elliott, Brian Elliott and Christopher Pearson-Smith (her Coach) that, on becoming a Coach, she would be promoted up the stripe path. Once made a Coach, she paid for an Ethos membership for two years, a level 2 intensive and flights and worked without pay | Para. 24-25.<br><br>Para. 37-44.<br><br>Para. 53.<br><br>Para 57.<br><br>Para. 210-211.<br><br>Para. 217.<br><br>Para. 231.<br><br>Para. 233.<br>.<br>Schedule A<br>Financial harm including, by paying for NXIVM curriculum, uncompensated labor including facilitating intensives, coaching students, administrative work and recruiting new students for NXIVM without compensation in reliance on the promise that if she met the hours per week and recruiting |

| No | Client Name | Revised Schedule A | TAC |
|---|---|---|---|
| | | coaching three 5-day intensives, mentoring students, and organizing events, in reliance on the representation by Mark Elliott, Brian Elliott and Christopher Pearson-Smith that on completing the training and this work, she would be promoted to Proctor and would be paid to teach the training. Those representations were false because on completing the training and work she was not promoted to Proctor or authorized to teach the trainings, including because promotions were based on arbitrary decisions by a student's coach (the student was required to draft a statement about their "life issue" and how they would overcome it, that would be either accepted or rejected by their coach). | requirements she would earn the equivalent of a salary from commissions and income from companies under the NXIVM umbrella; unpaid work for DOS as a slave, and lost employment opportunities. Emotional harm including pain and suffering for trauma associated with the possible public dissemination of collateral. |
| 40. | Susan Patricia Vieta | Susan Patricia Vieta spent money on courses, intensives, the Ethos program, and a trip to V-Week including flights, event activities, and other travel expenses in reliance on the false representations by Sarah Edmondson and Mark Vicente that NXIVM had a specific technology that would allow her to overcome emotional distress particularly anxiety, and that NXIVM owned and operated a particular form of science-based psychoanalysis that would succeed at curing emotional distress where psychology had failed. This representation was false because NXIVM had no such technology | Para. 25.<br><br>Para. 53.<br><br>Para. 211.<br><br>Para. 231.<br><br>Schedule A<br>Financial harm including, by paying tuition and membership fees for NXIVM courses, programs and groups, and travel and boarding expenses for courses and programs. |

| No | Client Name | Revised Schedule A | TAC |
|---|---|---|---|
| 41. | Stephanie Fair-Layman | Fair-Layman worked without compensation selling NXIVM trainings in reliance on the representation by Sarah and Mark Vicente that if she enrolled new members who paid for NXIVM training, she would get a percentage of all training fees that they subsequently paid as a commission. This representation was false because after she enrolled new members and they paid for curriculum, she did not receive a percentage of those fees as a commission.<br><br>Fair-Layman spent money on SOP weekends, and an ongoing monthly membership in reliance on the false representations by Damon Brink that if she paid money, she would receive curriculum, but instead of receiving the curriculum after paying money she was told that she would get the curriculum only if several people participated in "readiness drills." She was in SOP for over two years, but she never got any curriculum.<br><br>Fair-Layman also spent money on the 16 day and Ethos in reliance on the representations by Nancy Salzman and others that, if she completed the training to become a Proctor and met the recruiting requirements, she could get paid to teach the NXIVM curriculum. These representations were false because after she completed the courses and satisfied the recruitment requirement, she was not promoted to Proctor | Para. 24-25<br><br>Para. 37-44.<br><br>Para. 53.<br><br>Para. 89.<br><br>Para. 92.<br><br>Para. 93.<br><br>Para. 210-211.<br><br>Para. 217.<br><br>Para. 231.<br><br>Schedule A<br>Financial harm including, by paying tuition and membership fees for NXIVM courses, programs and groups, EMs, and travel and boarding expenses for courses and programs and uncompensated labor coaching intensives, coaching students and attending meetings |

| No | Client Name | Revised Schedule A | TAC |
|---|---|---|---|
| | | and Michel Chernitzski, Edgar Boone and Mark Vicente told her that she had to take additional training, which would cost more money. Cedric Fuat and Nancy Salzman told Fair Layman that it was possible to complete the training and enrollment requirements and be promoted to Proctor in six months to a year. But despite completing the training and recruiting requirements, she was not promoted to Proctor. Instead, she was told to take additional curriculum which would cost more money. Additionally promotions were not based on any metrics and were based on arbitrary decisions by a student's coach (the student was required to pass an examination, but the Coaches administering the exam refused to tell her why she had not passed or permit her to re-take the test).<br><br>Fair-Layman paid for Ethicist 1, flights and accommodations from New York City to Albany in reliance on the representations by Nancy Salzman that on completing the curriculum she would be certified as an "Ethicist" a highly paid position as a "consultant" in ESP companies and companies outside the ESP umbrella. This representation was false because on completing the training, ESP did not employ her as an Ethicist. | |
| 42. | Sarah Wall | Wall spent money on taking the 5 day course multiple times, V week, completing the Ethos | Para. 24-25. |

| No | Client Name | Revised Schedule A | TAC |
|---|---|---|---|
| | | curriculum twice, and flights, accommodations and childcare expenses, in reliance on the false representations by Lauren Salzman, Nancy Salzman and Allison Mack that the curriculum could be completed, that she would graduate from the curriculum, and that the curriculum was akin to a graduate program or "practical MBA" that would include professional training transferable to businesses outside the NXIVM umbrella. These representations were false because NXIVM continued to add new modules to the curriculum, and the training was only applicable to the NXIVM coaching system Wall spent money on EMs in reliance on the false representations by Nancy Salzman and Wendy Rosenbrooks (Proctor) that NXIVM had a specific technology that would allow her to overcome emotional distress, particularly anxiety, and that NXIVM owned and operated a particular form of science-based psychoanalysis that would succeed at curing emotional distress where psychology had failed. These representations were false because NXIVM did not have any such technology. | Para. 37-44.<br><br>Para. 53.<br><br>Para. 210-211.<br><br>Para. 217.<br><br>Para. 231.<br><br>Schedule A<br>Financial harm including, by paying tuition and membership fees for NXIVM courses, programs and groups travel and boarding expenses for courses and programs and uncompensated labor including coaching intensives, coaching students and attending meetings |
| 43. | Scott Starr | Starr paid tuition for two of his children to attend Rainbow Cultural Garden in reliance on the representations by Clare Bronfman, Sara Bronfman, and Loreta Garza that RCG provided a language immersion curriculum. These representations were false because the | Para. 2.<br><br>Para. 24-25.<br><br>Para. 37-44. |

| No | Client Name | Revised Schedule A | TAC |
|----|-------------|--------------------|-----|
| | | MDS who cared for the children were not assessed for proficiency in either English or any other language and did not have any background or experience in teaching or child development.<br><br>Starr also spent money to relocate his family to Albany in reliance on the representations by Esther Carlson and Jim DelNegro that, if he completed the training to become a Proctor and met the recruiting requirements, he could get paid to teach the NXIVM curriculum. These representations were false because after he completed the courses and satisfied the recruitment requirement, he was not promoted to Proctor and he was told that he had to take additional training, which would cost more money. Jim DelNegro told Starr that it was possible to complete the training and enrollment requirements and be promoted to Proctor in six months to a year. But despite completing the training and recruiting requirements, he was not promoted to Coach until three years later. Instead, promotions were not based on any metrics and were based on arbitrary decisions by a student's coach (the student was required to draft a statement about their "life issue" and how they would overcome it, that would be either accepted or rejected by their coach). | Para. 53.<br><br>Para. 87.<br><br>Para. 89.<br><br>Para. 93.<br><br>Para. 102.<br><br>Para. 210-211.<br><br>Para. 217.<br><br>Para. 231.<br><br>Schedule A<br>Financial harm including, by paying for NXIVM curriculum and training, uncompensated labor, including facilitating intensives, coaching students, administrative work and recruiting new students for NXIVM without compensation in reliance on the promise that if he met the hours per week and recruiting requirements, he would earn the equivalent of a salary from commissions and income from companies under the NXIVM umbrella, lost employment opportunities, and also defrauded by paying for his child to receive an<br>education at RCG. |

| No | Client Name | Revised Schedule A | TAC |
|----|-------------|--------------------|----|
|    |             | Starr worked for over 480 hours organizing the triathlon race and awards ceremony at V-Week for three years without compensation in reliance on the representation by Clare Bronfman that he would receive a discount on the price of attendance at V-Week. This representation was false because after performing the work, he did not receive any discounts on V-Week attendance.<br><br>Starr spent money on SOP weekends, courses and events in reliance on the false representations by Jim DelNegro that if he paid money, he would receive courses, but instead of receiving the courses after paying money he was told that he would get the curriculum only if several people participated in "readiness drills." He was in SOP for over two years, but he never got any curriculum. Jim DelNegro told Starr that he would be compensated for holding SOP events, so he organized and conducted SOP events in Austin and Atlanta and paid for flights, hotels and the venues where the events were held. That representation was false because he was not compensated. Only after the events were held was he told that he did not meet the minimum number of enrollees required to be compensated.<br><br>Starr paid for the Knife training, in reliance on the representations by Clare Bronfman and | |

| No | Client Name | Revised Schedule A | TAC |
|---|---|---|---|
| | | Nicki Clyne that if he completed the training offered by the Knife, he would receive professional training to work in the media/publishing industry and be paid for his work doing data analysis for the Knife. These representations were false because he did not receive any professional training, and he was not paid for his work. After he completed the training, he was also told that he needed to continue to be a member of the Knife and pay fees for membership as a condition of being eligible to be paid for his work. | |
| 44. | Philip Akka | Akka spent money on the 16-day intensive, three Jness intensives, the 2A intensive, Mobius intensive, Human Pain intensive, an Ultima course and three V-Weeks, involving multiple train journeys to Albany and accommodation expenses on different occasions, in reliance on representations by Nancy Salzman, Lauren Salzman, Edgar Boone, Esther Chiappone, and Jim Del Negro (Proctors) that NXIVM had a specific technology that would allow him to overcome emotional distress, particularly his social anxiety and childhood trauma, and that NXIVM owned and operated a particular form of science-based psychoanalysis that would succeed at curing emotional distress where psychology had failed. These representations were false because NXIVM had no such technology. | Para. 2.<br><br>Para. 24-25.<br><br>Para. 53.<br><br>Para. 87.<br><br>Para. 89.<br><br>Para. 231.<br><br>Schedule A<br>Financial harm including, by paying tuition and membership fees for NXIVM courses, programs and groups, and travel and boarding expenses for courses and programs. |

| No | Client Name | Revised Schedule A | TAC |
|----|-------------|--------------------|-----|
|    |             | Akka paid for a year membership of Ethos curriculum because Nancy Salzman and Edgar Boone told him that Ethos was akin to a "practical MBA" that would include professional training transferable to businesses outside the NXIVM umbrella. These representations were false because the Ethos training did not include professional training that was transferable to other businesses or valuable outside NXIVM, and was only applicable to the NXIVM coaching system. | |
|    |             | Akka spent money on SOP weekends and a monthly SOP membership in reliance on the representations by Jim DelNegro (one of the founders of SOP) that if he paid money he would receive curriculum, but instead of receiving the courses after paying money he was told that he would get the curriculum only if several people participated in "readiness drills." He was in SOP for almost two years but he never received any curriculum. | |
|    |             | Akka also paid for several SOP weekends and SOP Complete curriculum in reliance on the representation by Damon Brink (one of the founders of SOP) that SOP training was an opportunity to learn how to make hundreds of thousands of dollars per year from "the | |

| No | Client Name | Revised Schedule A | TAC |
|---|---|---|---|
| | | original founder" Keith Raniere who had "created over one hundred millionaires" and charged businesses $10,000/hour for consulting. This representation was false because Raniere never provided any entrepreneurship training in SOP. | |
| 45. | Alejandro Balassa | Balassa paid for the 15 day, Ethos, flights and accommodations, to be promoted to Coach in reliance on the representations by Nancy Salzman, other Proctors, on becoming a Coach, he would be promoted up the stripe path. Once made a Coach, he paid for Level 2 (Mobius, Human Pain, Origins, Family Values) SOP, and Jness training and worked as a coach during trainings, in reliance on the representations by Nancy Salzman, Emiliano Salinas and Alex Betancourt that on completing the training she would be promoted to Proctor and would be paid to teach the training, and would be able to earn money as a center owner, field trainer and EMP. Those representations were false because he was not promoted to Proctor or authorized to teach the trainings, open a center, including because promotions were based on arbitrary decisions by a student's coach (the student was required to draft a statement about their "life issue" and how they would overcome it, that would be either accepted or rejected by their Coach and Proctor). | Para. 24-25.<br><br>Para. 37-44<br><br>Para. 53.<br><br>Para. 57.<br><br>Para. 210-2011.<br><br>Para. 217.<br><br>Para. 231.<br><br>Schedule A:<br>Financial harm including, by paying tuition and membership fees for NXIVM courses, programs and groups, EMs, and travel and boarding expenses for courses and programs, and uncompensated labor including coaching intensives, coaching students and attending meetings, operating cameras and editing film. |

| No | Client Name | Revised Schedule A | TAC |
|---|---|---|---|
| 46. | Madeleine Carrier | Carrier spent money on SOP curriculum and weekends in reliance on the false representations by Lucas Roberts and Sarah Edmondson that she would get curriculum and have a leadership role in the organization. These representations were false because after she satisfied the enrollment requirements, she was not promoted to a leadership position. Lucas Roberts and Sarah Edmondson told her that she would get the curriculum only if several people participated in "readiness drills and she did not receive any curriculum. | Para. 2.<br><br>Para. 24-25.<br><br>Para. 37-44.<br><br>Para 53.<br><br>Para. 87.<br><br>Para. 89.<br><br>Para. 93.<br><br>Para. 100.<br><br>Para. 210-211.<br><br>Para. 217.<br><br>Para. 231.<br><br>Schedule A<br>Financial harm including, by paying tuition and membership fees for NXIVM courses, programs and groups |
| 47. | Rod Christiansen | Christiansen spent money on an Ethos membership, 5 day, V-week, travel, and accommodations to be promoted to Coach in reliance on the false representations by Nancy Salzman, Lauren Salzman, Charmel Bowden | Para. 24-25.<br><br>Para. 37-44.<br><br>Para. 53. |

| No | Client Name | Revised Schedule A | TAC |
|---|---|---|---|
| | | and Wendy Rosenbrooks that, on becoming a Coach, he would be promoted up the stripe path. Once made a Coach, he paid for annual Ethos training and worked as a Coach during trainings, in reliance on the representation by Nancy Salzman, Lauren Salzman, Charmel Bowden and Wendy Rosenbrooks that on completing the training he would be promoted to Proctor and would be paid to teach the training. Those representations were false because on completing the training and work he was not promoted to Proctor or authorized to teach the trainings, including because promotions were based on arbitrary decisions by a student's coach (the student was required to draft a statement about their "life issue" and how they would overcome it, that would be either accepted or rejected by their Coach and Proctor). | Para. 210-211.<br><br>Para. 217.<br><br>Para. 231.<br><br>Schedule A<br>Financial harm including, by paying tuition and membership fees for NXIVM courses, programs and groups and EMs, and uncompensated labor including coaching intensives, coaching students and attending meetings. |
| 48. | Owen Giroux | Giroux spent money on SOP weekend and ongoing monthly membership training in reliance on the representations by Nancy Salman and Raniere that if he paid money for the monthly membership he would receive SOP curriculum. These representations were false because instead of receiving the SOP curriculum after paying money Salzman and Raniere told him that he would get the additional curriculum only if several people participated in "readiness drills." He was in NXIVM for almost 2 years but never got any | Para. 2.<br><br>Para. 24-25.<br><br>Para. 37-44.<br><br>Para 53.<br><br>Para. 87.<br><br>Para. 89. |

| No | Client Name | Revised Schedule A | TAC |
|---|---|---|---|
| | | SOP additional curriculum. | Para. 210-211.<br><br>Para. 217.<br><br>Para. 231.<br><br>Schedule A<br>Financial harm including, by paying tuition and membership fees for NXIVM courses, programs and groups. |
| 49. | Jeffrey Golfman | Golfman spent money on the 16-day intensive, Jness Track, V week, flights, and hotels in reliance on the representations by Sarah Edmondson, Alex Bettancourt, Wendy Rosenbrooks, and Lauren Salzman that the curriculum could be completed and that he would graduate from the curriculum.  These representations were false because NXIVM continued to add new modules to the curriculum and it could not be completed.<br><br>Golfman also spent money on a monthly SOP membership  in reliance on the representations by Damon Brink and Jim DelNegro (who were SOP leaders) that if he paid money he would receive additional curriculum, but instead of receiving any additional curriculum after paying money Brink and  DelNegro told him that he would get the curriculum only if several people participated in "readiness drills." He was in SOP for 2 years but he never got any additional curriculum. | Para. 2.<br><br>Para. 24-25<br><br>Para. 37-44.<br><br>Para 53.<br><br>Para. 87.<br><br>Para. 89.<br><br>Para. 210-211.<br><br>Para. 217.<br><br>Para. 231.<br><br>Schedule A<br>Financial harm including, by paying tuition and membership fees for NXIVM courses, programs and groups, EMs, and travel and |

| No | Client Name | Revised Schedule A | TAC |
|---|---|---|---|
| | | Golfman also spent money organizing an event in reliance on the representation by Brink, DelNegro and Emiliano Salinas that he would be compensated with commissions and profit shares for holding SOP events. This representation was false because after the events were held, he was not compensated. Only after the events were held was he told that he did not meet the minimum number of enrollees required to be compensated. | boarding expenses for courses and programs and uncompensated labor including coaching intensives, coaching students and attending meetings. |
| 50. | Ashley Harvey | Harvey spent money on Ethos, multiple 5-day, 10-day and 16-day training programs, multiple flights to New York and accommodations on different occasions in reliance on false representations by Lucas Roberts, his employer at the time, Wendy Rosen-Brooks and Charmel Bowden that the curriculum was equivalent to a "practical MBA," and that the skills he obtained would be transferable to any entrepreneurial pursuit. These representations were false because the training did not provide any professional training and the curriculum had no application outside the NXIVM umbrella.<br><br>Harvey also suffered this injury in reliance on the representations that NXIVM had a specific technology that would allow him to overcome emotional distress, and that NXIVM owned and operated a particular form of science-based | Para. 2.<br><br>Para. 25.<br><br>Para 53.<br><br>Para. 87.<br><br>Para. 89.<br><br>Para. 231.<br><br>Schedule A<br>Financial harm including, by paying tuition and membership fees for NXIVM courses, programs and groups, EMs, travel and boarding expenses for courses and programs and uncompensated labor |

| No | Client Name | Revised Schedule A | TAC |
|---|---|---|---|
| | | psychoanalysis that would succeed at curing emotional distress where psychology had failed. These representations were false because NXIVM had no such technology.<br><br>Harvey also paid for SOP weekend programs and an intensive in reliance on the representation by Brink that SOP training was an opportunity to learn how to make hundreds of thousands of dollars per year from "the founder" Raniere who had "created over one thousand millionaires" and charged businesses $100,000/hour for consulting. This representation was false, including because Raniere never provided any entrepreneurship training in SOP and upon information and belief could not take responsibility for creating over one thousand millionaires. | including coaching intensives, coaching students, administrative work, cleaning and food preparation. |
| 51. | Anthony Madani | Madani spent money on 16-day intensive training, in reliance on the representations by Nancy Salzman that the NXIVM program was equivalent to a graduate degree or "practical MBA." Those representations reasonably implied to Madani that the curriculum included valuable professional, sales, and/or leadership training. Those representations were false and misleading. NXIVM's program was not equivalent to a graduate degree or "practical MBA" because it did not include professional, sales and/or leadership training. | Para. 2.<br><br>Para. 24-25.<br><br>Para. 37-44.<br><br>Para 53.<br><br>Para 57.<br><br>Para. 87.<br><br>Para. 89. |

| No | Client Name | Revised Schedule A | TAC |
|---|---|---|---|
| | | Madani also worked without compensation recruiting for NXIVM in reliance on the representation by Nancy Salzman that when he became a Coach he would get access to a series of valuable coaching videos that was a new line of curriculum.  He was even showed a diagram reflecting that there were multiple videos that would be unlocked when he became a Coach.  That representation was false because after he became a Coach he was never given access to the multiple videos he was promised and eventually given access to only one video on one day.<br><br>Madani spent money on SOP weekend 1 and performed administrative work in reliance on the representations by DelNegro that if he paid for the weekend and performed this work he would unlock further weekends and courses (more advanced programming in SOP). This representation was false because after he paid for the program and performed the work DelNegro told him that he would get the curriculum only if several people participated in "readiness drills."  Madani was in SOP for years but he never received the further weekends and courses that he was promised. DelNegro also told him that he would be compensated for holding SOP events so he organized and conducted 15 SOP events. This representation was false because he was not compensated for holding the events. Only after | Para. 210-11.<br><br>Para. 217.<br><br>Para. 231.<br><br><br>Schedule A<br>Financial harm including, by paying tuition and membership fees for NXIVM courses, programs and groups, EMs, travel and boarding expenses for courses and programs and uncompensated labor including coaching intensives, coaching students and attending meetings and administrative work, cleaning, operating video cameras and editing film. |

| No | Client Name | Revised Schedule A | TAC |
|---|---|---|---|
| | | the events were held did DelNegro tell him that he did not meet the minimum number of enrollees required to be compensated. | |
| 52. | Chad Williams | Williams spent money on an Ethos membership to be promoted to Coach in reliance on the representation by Wendy Rosenbrooks, Charmel Bowden (Proctors) Sarah Edmondson and Mark Vicente that on completing the training he would be promoted to Proctor and be authorized to get paid to teach the NXIVM curriculum.  Once made a Coach, he paid for an Ethos membership in reliance by Wendy Rosenbrooks, Charmel Bowden (Proctors) Sarah Edmondson and Mark Vicente that on that it was possible to complete the training and enrollment requirements within a few months at each level and be promoted to Proctor and be paid to teach the training. Those representations were false because he was not promoted to Proctor or authorized to teach the trainings, including because promotions were based on arbitrary decisions by a student's coach (the student was required to draft a statement about their "life issue" and how they would overcome it, that would be either accepted or rejected by their Coach and Proctor).

Williams spent money to rent the venues where the events were held, and worked without pay | Para. 2.

Para. 24-25.

Para. 37-44.
Para 53.

Para 57.

Para. 87.

Para. 89.

Para. 93-94.

Para. 210-211.

Para. 217.

Para. 231.

Schedule A
Financial harm including, by paying tuition and membership fees for NXIVM courses, programs and groups, travel and boarding expenses for courses and programs and uncompensated labor including coaching |

| No | Client Name | Revised Schedule A | TAC |
|---|---|---|---|
| | | to organize and conduct SOP intensive weekends and on-going membership meetings/events in Vancouver in reliance on the false representations by Raniere and DelNegro (SOP leadership) that he would be compensated for holding SOP events. This representation was false because he was not compensated. Only after the events were held did Raniere and DelNegro tell him that he did not meet the minimum number of enrollees required to be compensated.<br><br>Williams spent money on travel, accommodations and paid for an 8-week exo/eso training program in Albany in reliance on the representations by Raniere and Clare Bronfman that on completing the training he would be authorized to own an exo/so center and teach the training certification program to paying trainees. This representation was false because after he completed the training he was not authorized to open a center and teach the training certification program for payment. Danielle Roberts told him that the curriculum for the training had not been completed and he needed to stay in Albany and continue to work to develop the curriculum. Williams worked to develop and teach the curriculum without pay. | intensives, coaching students and attending meetings and administrative work. |
| 53. | Christopher Black | Black spent money on multiple 5-day courses and EMs in reliance on the false representations by Lauren Salzman that | Para. 25.<br><br>Para. 53. |

| No | Client Name | Revised Schedule A | TAC |
|---|---|---|---|
| | | NXIVM had a specific technology that would allow him to overcome emotional distress, particularly anxiety, and that NXIVM owned and operated a particular form of science-based psychoanalysis that would succeed at curing emotional distress where psychology had failed. These representations were false because NXIVM had no such technology.<br><br>He also spent money on Entrepreneurs Goal Lab in reliance on the representations by Sarah Edmondson that the program was unique and different from the rational inquiry curriculum. This was false because the rational Inquiry and Goals Lab curriculum were identical. | Para. 57.<br><br>Para. 231.<br><br>Schedule A<br>Financial harm including, by paying tuition and membership fees for NXIVM courses, programs and groups and EMs, and uncompensated labor including coaching intensives, coaching students and attending meetings. |
| 54. | Robert Gray | Gray paid for a 10-day intensive and Ethos to be promoted to Coach in reliance on the false representations by Sarah Edmondson, Wendy Rosen-Brooks, and Mark Vicente that, on becoming a Coach, he would be promoted up the Stripe Path. Once made a Coach, he paid for training, and worked without compensation coaching several students each week, assisting Coaches and Proctors, and meeting with a committee each week in reliance on the representation by Megan Mumford and Sarah Edmondson that on completing the training he would be promoted to Proctor and would be paid to teach the training. Gray also spent money on travel to Albany, and accommodations there during the summer in | Para. 24-25.<br><br>Para. 37-44.<br><br>Para. 53.<br><br>Para. 210-211.<br><br>Para. 217.<br><br>Para. 231.<br><br>Schedule A<br>Financial harm including, by paying tuition and membership fees for NXIVM courses, programs and groups, EMs, and travel and |

| No | Client Name | Revised Schedule A | TAC |
|----|-------------|--------------------|----|
| | | reliance on the representation by Sarah Edmondson, Wendy Rosen-Brooks, and Mark Vicente that he would ascend the stripe path more quickly if he spent more time in Albany. Those representations were false because he was not promoted to Proctor or authorized to teach the trainings, including because promotions were based on arbitrary decisions by a student's coach (the student was required to draft a statement about their "life issue" and how they would overcome it, that would be either accepted or rejected by their Coach and Proctor). Sarah Edmondson, Wendy Rosen-Brooks, and Mark Vicente told him that he needed to take additional training which would cost more money. Gray paid for and attended level 2 training (four intensives) but was still not promoted to Proctor.<br><br>Gray paid for and attended V week and coach summits in reliance on the representation by Megan Mumford, Mark Vicente, Karen Unterreiner, Clare Bronfman, Lauren Salzman and Alex Bettancourt that he would receive coaching curriculum at the coach summits. This representation was false because he did not receive any curriculum. Instead Mark Vicente, Karen Unterreiner, Clare Bronfman, Lauren Salzman and Alex Bettancourt told him to write letters to NXIVM members who did not attend V week berating them for their absence at V week. | boarding expenses for courses and programs and uncompensated labor including coaching intensives, coaching students and attending meetings. |

| No | Client Name | Revised Schedule A | TAC |
|---|---|---|---|
| | | | |
| 55. | Ken Kozak | Kozak paid for Level 2 curriculum in reliance on the representations by Nancy Salzman, and Lauren Salzman that if he completed this training and worked without compensation, he would become a Coach and, on taking additional training, be promoted to Proctor and be certified to get paid to teach the NXIVM curriculum.  Those representations were false because after he paid for and completed the training and performed the required work, Nancy Salzman told him that he could not be promoted to Coach unless he enrolled new members.<br><br>Kozak also spent money on a monthly SOP membership for two years in reliance on the representations by Mark Vicente, Damon Brink, Anthony Ames that if he paid for the membership he would receive weekly and monthly SOP workshops, but after paying money he no weekly or monthly workshops were held. | Para. 2.<br><br>Para. 24-25.<br><br>Para. 37-44.<br><br>Para. 53.<br><br>Para. 87.<br><br>Para. 89.<br><br>Para. 210-211.<br><br>Para. 217.<br><br>Para. 231.<br><br>Schedule A<br>Financial harm including, by paying tuition and membership fees for NXIVM courses, programs and groups and uncompensated labor including audio/video filming and editing, audio and video technician work, legal research/support, website development, graphic design, computer support, contract service- transportation, administrative work, transcription and demolition work/garbage removal. |
| 56. | Jane Doe 8 | Doe 8 paid for training to be promoted to | Para. 2. |

| No | Client Name | Revised Schedule A | TAC |
|----|-------------|--------------------|-----|
| | | Coach in reliance on representations by Nancy Salman and Lauren Salzman that, on becoming a Coach, she would be promoted up the stripe path. Once made a Coach, she paid for the Ethos monthly membership and performed work assisting coaches without compensation and recruited new members in reliance on the representations by Nancy and Lauren Salzman that on completing the training she would be promoted to Proctor and would be paid to teach the training. Those representations were false because on completing the training she was not promoted to Proctor or authorized to teach the trainings, including because promotions were based on arbitrary decisions by a student's coach (the student was required to draft a statement about their "life issue" and how they would overcome it, that would be either accepted or rejected by their coach).  Proctors told her that she had to take additional training, which would cost more money.

Jane Doe 8 also paid for and attended Level 1 of EM Practitioner training (twice) in reliance on the representations by Nancy and Lauren Salzman, that, on completing the training, she would be able to offer EM sessions to clients for a fee. This representation was false because, after she paid for and attended the EMP training, Nancy and Lauren Salzman announced that all EMP students, no matter what level they had achieved, had to begin | Para. 24-25.

Para. 37-44.

Para. 53.

Para 57.

Para. 210-211.

Para. 217.

Para. 231.

Para. 233.

Schedule A
Financial harm including, by paying for NXIVM curriculum, uncompensated labor including facilitating intensives, coaching students, administrative work and recruiting new students for NXIVM without compensation in reliance on the promise that if she met the hours per week and recruiting requirements she would earn the equivalent of a salary from commissions and income from companies under the NXIVM umbrella, unpaid work for DOS as a slave, and lost employment opportunities. Emotional harm including pain and suffering for trauma associated with the possible public dissemination of collateral. |

| No | Client Name | Revised Schedule A | TAC |
|----|-------------|--------------------|-----|
| | | again at Level 1 because of alleged changes in the curriculum, so Doe 8 was not certified as an EMP. | |
| 57. | Jane Doe 9 | Jane Doe 9 spent money on the 16 day, and Ethos (5 year membership) in reliance on the representations by Sarah Edmondson that the curriculum could be completed, that she would graduate from the curriculum, that the curriculum was akin to a graduate program or "practical MBA" that would include professional training. She was told by Edmondson that the curriculum included entrepreneurship and leadership training, that would be transferable to businesses outside the NXIVM umbrella. This representation was false because the training was only applicable to the NXIVM coaching system.<br><br>She also spent money on EMs in reliance on the false representations by Wendy Rosen-Brooks (Proctor) that NXIVM had a specific technology that would allow her to overcome emotional distress, particularly anxiety, and that NXIVM owned and operated a particular form of science-based psychoanalysis that would succeed at curing emotional distress where psychology had failed. These representations were false because NXIVM did not have any such technology.<br><br>Doe 9 paid for the 16 day to complete the | Para. 2.<br><br>Para. 24-25.<br><br>Para. 37-44.<br><br>Para. 53.<br><br>Para. 87-89.<br><br>Para. 93-94.<br><br>Para. 210-211.<br><br>Para. 217.<br><br>Para. 231.<br><br>Para. 233.<br><br>Schedule A<br>Financial harm including, by paying for NXIVM curriculum, uncompensated labor including facilitating intensives, coaching students, administrative work and recruiting new students for NXIVM without compensation in reliance on the promise that if she met the hours per week and recruiting |

| No | Client Name | Revised Schedule A | TAC |
|---|---|---|---|
| | | training to be promoted to Coach in reliance on the false representations by Sarah Edmondson that, on becoming a Coach, she would be promoted up the stripe path. Once made a Coach, she paid for Ethos (five years) and Jness monthly membership, worked without pay coaching intensives, mentoring students, and organizing events, and enrolled students in programs in reliance on the representation by Sarah Edmondson that on completing the training she would be promoted to Proctor and would be paid to teach the training. Those representations were false because on completing the training and performing the work, she was not promoted to Proctor or authorized to teach the trainings, including because promotions were based on arbitrary decisions by a student's coach (the student was required to draft a statement about their "life issue" and how they would overcome it, that would be either accepted or rejected by their coach). Sarah Edmondson told her that she had to take additional training to be promoted to Proctor, which would cost more money.<br><br>Jane Doe 9 spent money on SOP (weeklong course + ongoing membership for three years) in reliance on the false representations by Del Negro that if she paid money she would receive additional curriculum. But after ongoing monthly payment, SOP admin told her that she would get the curriculum only if | requirements she would earn the equivalent of a salary from commissions and income from companies under the NXIVM umbrella, unpaid work for DOS as a slave, and lost employment opportunities. Emotional harm including pain and suffering for trauma associated with the possible public dissemination of collateral. |

| No | Client Name | Revised Schedule A | TAC |
|----|-------------|--------------------|-----|
|    |             | several people participated in "readiness drills." She was in SOP for three years but she never got any additional curriculum.<br><br>Jane Doe 9 spent money on the 16 day, and Ethos (5 year membership) in reliance on the representations by Sarah Edmondson that the curriculum could be completed, that she would graduate from the curriculum, that the curriculum was akin to a graduate program or "practical MBA" that would include professional training. She was told by Edmondson that the curriculum included entrepreneurship and leadership training, that would be transferable to businesses outside the NXIVM umbrella. This representation was false because the training was only applicable to the NXIVM coaching system.<br><br>She also spent money on EMs in reliance on the false representations by Wendy Rosen-Brooks (Proctor) that NXIVM had a specific technology that would allow her to overcome emotional distress, particularly anxiety, and that NXIVM owned and operated a particular form of science-based psychoanalysis that would succeed at curing emotional distress where psychology had failed. These representations were false because NXIVM did not have any such technology.<br><br>Jane Doe 9 spent money on relocating to |     |

| No | Client Name | Revised Schedule A | TAC |
|----|-------------|--------------------|-----|
| | | Albany in reliance on the representation by Danielle Roberts that if she moved to Albany and took the training to become a teacher in exo/eso, exo/eso she would be authorized to teach exo/eso to paying students.  This representation was false because after she completed the training, Roberts told her that the training was not ready yet so she would need to continue to develop the training. | |