Danielle Roberts, DO, MS
Email:Danielle@drdanielleroberts.com
Direct Line: 516.480.1700
April 13, 2026

The Honorable Eric R. Komitee
United States District Judge
Eastern District of New York
225 Cadman Plaza East
Brooklyn, New York 11201
Courtroom: 6G North

Re: *Edmondson et al. v. Raniere et al.*, 1:20-cv-00485-EK-CLP

Dear Honorable Judge Komitee:

I respectfully submit this letter in opposition to Plaintiffs' motion to dismiss my counterclaims and, alternatively, request leave to file an amended counterclaim pursuant to **Fed. R. Civ. P. 15(a)(2).** The Court should deny Plaintiffs' motion and/or grant the cross motion for leave to amend because (1) the existing counterclaims plead factual allegations sufficient to survive a **Rule 12(b)(6)** motion under the *Twombly/Iqbal* standard (*Bell Atl. Corp. v. Twombly*, 550 U.S. 544 (2007); *Ashcroft v. Iqbal*, 556 U.S. 662 (2009); (2) pro se status counsels liberal treatment and an opportunity to amend; (3) Plaintiffs' media statements are not protected by absolute litigation privilege when repeated extra-judicially; and (4) Plaintiffs' motion is premature while discovery remains incomplete. **Rule 56(d)** protections apply here *(Hellstrom v. U.S. Dep't of Veterans Affairs*, 46 F.4th 60 (2d Cir. 2022)).

This opposition is accompanied by a certification that illustrates the factual basis for the counterclaims, and is submitted only for the purposes of illustration of the allegations that will be included in the amended counterclaim should, the Court grant me leave to amend.

<u>**STATEMENT OF FACTS**</u>

**LEGAL STANDARDS**

1. **Rule 12(b)(6)** / *Twombly and Iqbal*. A complaint survives a **Rule 12(b)(6)** motion if it contains factual allegations that, taken as true, state a claim that is plausible on its face. *Twombly*, 550 U.S. at 556–57; *Iqbal*, 556 U.S. at 678–79. The plausibility standard requires factual content that permits the court to draw a reasonable inference of liability, not mere labels or conclusions.

2. **Rule 15(a).** Leave to amend should be freely given "when justice so requires." Denial is appropriate only for reasons such as undue delay, bad faith, repeated failure to cure deficiencies, undue prejudice, or futility. *Cuoco v. Moritsugu*, 222 F.3d 99, 112 (2d Cir. 2000); *Grullon v. City of New Haven*, 720 F.3d 133 (2d Cir. 2013) (pro se litigants liberally afforded opportunity to amend).

3. **Absolute Litigation Privilege and Its Limits.** Statements made in judicial pleadings are absolutely privileged, but extrajudicial repetitions (press plans, interviews, social-media campaigns) are not necessarily protected. New York courts have recognized that extrajudicial dissemination of allegations may be actionable where malice or bad faith is alleged. See *Gottwald v. Sebert*, 40 N.Y.3d 240 (2023) (distinguishing in-pleading statements from extrajudicial press statements); *3P-733, LLC v. Davis*, 2020 NY Slip Op 06043 (1st Dep't 2020). These authorities support the proposition that defamation counterclaims based on media statements can survive where the complaint pleads extrajudicial publication and malice.

4.  **Rule 56(d) / Premature Dispositive Motions.** Summary judgment or dismissal should not be granted where the non-movant has not had a full opportunity for discovery. Courts routinely defer or deny dispositive motions under **Rule 56(d)** when additional discovery is necessary to oppose the motion. *Hellstrom v. U.S. Dep't of Veterans Affairs*, 46 F.4th 60 (2d Cir. 2022) (reaffirming that summary judgment is improper where discovery is incomplete); see also **Rule 56(d)** practice guidance.

## ARGUMENT:

**I. The Existing Counterclaims Contain Factual Allegations**

**A. Plaintiffs argue that the counterclaims are conclusory.** That is incorrect. The counterclaims incorporate factual denials and affirmative factual assertions from Defendant's answers, and the certification submitted herewith. Under *Twombly/Iqbal*, Supra, courts accept factual allegations as true and draw reasonable inferences for the non-movant. For example, paragraph 303 and 304 of the TAC states; "303. The Count V Plaintiffs did not and could not consent to the contact under the circumstances alleged herein, and, even if they had, consent is not conclusive as to whether contact constitutes battery because under New York Law it is only one factor to consider in determining whether the contact was offensive. 304. Plaintiffs suffered lasting physical and emotional injuries as a result of Defendant's commission of battery upon their persons." The answer to the combined allegation was; "303. The Defendant denies lack of consent. All interactions were consensual at the time of the branding processes. 304. The Defendant denies any physical or emotional injuries as a result of the branding process. The scar was the desired result that Plaintiffs had wanted and had asked for. Defendant is not responsible for any changes in opinion about their brand that the Plaintiffs may have developed after Defendant branded them at their request." Similarly in Doc 244, Defendants Answer to the TAC,

paragraph 124 states, "To the Defendant's knowledge and experience all persons who received brands gave voluntary, informed consent to receiving a brand. To Defendant's knowledge and experience, the collateral had no relationship to a participant's decisions about whether or not to obey a command or get the brand as has been already adjudicated. Defendant witnessed many of these Plaintiffs disobey "commands" with no fear of their collateral being released. In addition, there are women that chose NOT to get the brand and their collateral was NOT released. Defendant has insufficient information on Raniere's intention to or directions to retaliate, or the actual release of Edmonson's branding experience to the media and leave the Plaintiffs to their proof of this." As the Court can see, those incorporated factual statements identify the time, manner, and circumstances of the branding procedures and deny lack of consent and the existence of injury. Under *Twombly/Iqbal*, Supra, the Court must accept well-pleaded factual allegations as true and draw reasonable inferences in the non-movant's favor. The incorporated factual material and the certification submitted with this opposition supply the factual content necessary to render the counterclaims plausible. It is also important to note that the counterclaims incorporate factual denials and affirmative factual assertions from Defendant's answers to successive complaints. So, the factual assertions in the Defendants Answers to the TAC are incorporated in the counterclaims in the Defendants answer to the FAC.

**B. Defamation and Malice.** The proposed amended counterclaim will allege that Plaintiffs made repeated extrajudicial statements to national media and in press campaigns that were false, inconsistent with contemporaneous records, and made with actual malice or reckless disregard for the truth. New York law requires proof of falsity and, for limited public figures, actual malice; the proposed amendment will plead facts showing Plaintiffs' inconsistent statements, contemporaneous admissions, and public campaign to amplify allegations—facts

that, if proven, support a plausible claim. *Gottwald v. Sebert,* Supra, confirms that extrajudicial media statements are not absolutely privileged and support defamation claims where malice is alleged.

## II. Pro Se Status and Liberal Amendment Standard

As your Honor is aware I am a Pro Se defendant. Denying leave to amend would unfairly prejudice a pro se litigant who has diligently sought discovery and who has been previously directed by the Court to seek leave to amend under **Rule 15(a)(2).** Here, leave to amend is necessary due to the fact that the period of time to amend, as a matter of course, has elapsed (see **FRCP 15(a)(1)(B)**). The Second Circuit's pro se jurisprudence counsels' liberal amendment where amendment is not futile. *Grullon v. City of New Haven*, 720 F.3d 133 (2d Cir. 2013), *Cuoco v. Moritsugu*, 222 F.3d 99, 112 (2d Cir. 2000). *Nakahata v. New York-Presbyterian Healthcare Sys.*, 723 F.3d 192, 198 (2d Circ.2013). Nothing in Plaintiffs' motion establishes futility. The Court previously directed Defendant to seek leave to amend under **Rule 15(a)(2);** In the interest of justice, this submission is that motion. Denying leave now—before the Court has considered the proposed amended pleading and the supporting exhibits—would be premature and inconsistent with the liberal amendment policy.

## III. Plaintiffs Overstate the Scope of Absolute Privilege

Plaintiffs rely on absolute privilege for all statements that echo allegations in the complaint. But New York law distinguishes between statements made in judicial filings (absolutely privileged) and extrajudicial publications (not privileged). *Gottwald,* Supra*,* and related decisions confirm that extrajudicial press statements, interviews, and social-media

campaigns are not shielded by absolute privilege where malice is alleged. The proposed amended counterclaim will plead extrajudicial publications and malice with specificity.

## IV. The Proposed Amended Counterclaim States Plausible Claims and Would Not Be Futile

The proposed amended counterclaim will add factual allegations and documentary exhibits (FOIL records, media transcripts, incident reports, and contemporaneous communications) that, if credited, would establish falsity, publication, and malice for defamation; and would support malicious prosecution and IIED claims (see the attached certificate for illustration). Because the proposed amendment supplies factual content beyond mere legal conclusions, amendment is not futile. See *Nakahata v. New York-Presbyterian*, 723 F.3d 192 (2d Cir. 2013) (vacating dismissal where plaintiffs were not given opportunity to replead).

The attached certification and exhibits illustrate the factual basis for defamation, malicious prosecution, and intentional infliction of emotional distress. These materials demonstrate:

1. **Plaintiffs repeatedly made false statements to national media outlets**, including claims of non-consent and severe physical injury, which are contradicted by contemporaneous evidence and their own prior statement(s) to the NYS Attorney General's office.

2. **These statements were made outside judicial proceedings**, and therefore are not protected by absolute litigation privilege. See *3P-733, LLC v. Davis,* 2020 NY Slip Op 06043; *Metropolitan Opera Ass'n v. Local 100*, 2019 NY Slip Op 30834(U); *Gottwald v. Sebert*, 40 N.Y.3d 240 (2023). Defendant's attached certification goes beyond the mere statement in the pleadings and illustrates allegations of malice and bad faith on the part of the Plaintiffs that lie *publicly* to these outlets. Malice and bad faith defeat any privilege.

3. **The civil RICO, trafficking, and forced labor claims Plaintiffs filed against me were dismissed**, supporting the elements of malicious prosecution.

Under *Twombly*/*Iqbal*, Supra, these allegations are more than sufficient to state plausible claims.

## IV. Extrinsic Materials May Be Considered

Courts may consider public records and documents integral to a pleading without converting a motion to dismiss into summary judgment. *Halebian v. Berv*, 644 F.3d 122, 130 n.7 (2d Cir. 2011); *Lovelace v. Software Spectrum*, 78 F.3d 1015 (5th Cir. 1996), *Bishop v. Air Line Pilots Ass'n*, 900 F.3d 388, 399 n.28 (7th Circ. 2018), *Miller v Redwood Toxicology Lab.*, 688 F.3d 928, 931& n.3(8th Circ. 2012). The exhibits submitted illustrate the factual basis for amendment and do not contradict the pleadings.

All of the above makes possible and clearly certain that the allegations in an amended counterclaim, that is made possible by the leave to amend, will assert the existence of plausible factual allegations (See *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007) and *Ashcroft v. Iqbal*, 556 U.S. 662 (2009). And as to plausibility the Court must indulge reasonable inference in favor of the counterclaim Plaintiff (*Collins v. Morgan Stanley Dean Witter*, 224 F.3d 496, 498 (5th Cir. 2000); *Cassanova v. Ulibarri*, 595 F.3d 1120, 1125-26 (10th Cir. 2010). Leave to amend should ordinarily be granted before dismissal with prejudice unless the amendment would be futile; *Toone V. Wells Fargo Bank*, 716 F.3d 516, 524 (10th Cir. 2013).

**V. Plaintiffs' Motion Is Premature Under Rule 56(d) Because Discovery Remains Incomplete**

Plaintiffs seek dismissal while discovery is ongoing and while Defendant has outstanding subpoenas and FOIL materials that bear directly on Plaintiffs' extrajudicial statements and prior admissions. **Rule 56(d)** protects a non-movant who lacks facts essential to oppose a dispositive motion; courts routinely deny or defer summary judgment where discovery is incomplete. *Hellstrom* and other Second Circuit authorities require that the non-movant be given a full opportunity to conduct discovery before a dispositive ruling. Granting Plaintiffs' motion now would effectively resolve disputed factual issues before Defendant has had a fair chance to obtain and present evidence. Courts also reject attempts to curtail discovery where the opposing party has acted diligently. *Parker v. Columbia Pictures*, 204 F.3d 326 (2d Cir. 2000).

Granting the Plaintiffs this motion would be equivalent to granting them a summary judgement motion before discovery is finalized which would violate **FRCP 56(d)** and is inconsistent with these authorities. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 250 n.5 (1986). *Celotex Corp. v. Catrett,* 477 U.S. 317, 322 (1986)

The court should also take into consideration that the Plaintiffs, in a requiring a series of amendments of this complaint, taxed the time and resources of a Pro Se litigant and lay person and opened the door to filing of answers without sufficient time for researching and asking for leave to amend the counterclaim. In the interest of Justice and for the foregoing reasons I respectfully request that the Court:

**VI. Request for Relief:**

1. **Deny Plaintiffs' motion to dismiss the counterclaims**; and/or

2. **Grant leave to file the proposed amended counterclaim** under Fed. R. Civ. P. 15(a)(2) and,

3. **Defer any dispositive ruling until the close of discovery** or, at minimum, permit Rule 56(d) discovery necessary to oppose any future dispositive motion.

*Given the complexity of the issues and my pro se status, I also request oral argument if the Court is to make a dispositive decision.

Dated: This 13th Day of April, 2026

Pro Se Defendant-Counterclaimant
Respectfully submitted,

/s/ Danielle Roberts
Danielle Roberts
235 Pavonia Ave,
Jersey City, NJ 07302
516.480.1700

**DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**

|  |  |
|---|---|
| _____ | * |
| | * |
| SARAH EDMONDSON, *et al.* | * |
| | * |
| Plaintiffs, | * |
| | *     1:20 - cv - 00485-EK-CLP |
| v. | * |
| | * |
| Keith Raniere, *et al.* | * |
| | * |
| Defendants. | * |
| _____ | * |

CERTIFICATION OF SERVICE

I certify that I have served all of the documents in opposition to the motion of

plaintiffs to dismiss the counterclaim and in support of the motion of the

defendant for leave to file an amended counterclaim.

Dated: This 13th Day of April, 2026

Defendant *Pro Se*
Respectfully submitted,

/s/ Danielle
Roberts Danielle
Roberts 235
Pavonia Ave,
Jersey City, NJ
07302 516.480.1700

**DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**

|  |  |  |
|---|---|---|
| SARAH EDMONDSON, *et al.* | * * * | |
| Plaintiffs, | * * | |
| v. | * * | 1:20 - cv - 00485-EK-CLP |
| Keith Raniere, *et al.* | * * | **CERTIFICATION** |
| Defendants. | * * * | |

## CERTIFICATION IN SUPPORT OF DEFENDANT ROBERTS OPPOSTION TO PLAINTIFES MOTION TO DISMISS THE COUNTERCLAIMS IN HER ANSWER TO THE FOURTH AMENDED COMPLAINT AND IN SUPPORT OF HER CROSS MOTION FOR LEAVE TO AMMEND THE COUNTERCLAIM

I, Danielle Roberts, Defendant, hereby certify as follows:

1.  I am the Defendant in the opposed captioned case, Pro Se. I am fully familiar with the facts stated herein.

2.  I make this certification in support of my opposition to the Plaintiffs pending motion for dismissal of my counterclaims, and in support of my letter motion which opposes the Plaintiff's motion and supports my cross motion for leave to amend the counterclaim.

3.  **Exhibit 1**: attached hereto is a copy of the order by which the Court denied my application for opposing the prior motion to dismiss, but allowed that I file a motion for leave to amend the counterclaim.

4. **Exhibit 2: [Complaint 1 by Edmondson] July 7, 2017**, Edmondson brought claims of medical misconduct to the Office of Professional Medical Conduct (OPMC). They issued a written response **July, 11th 2017,** concluding that "The issues you [Ms. Edmondson] describe did not occur within the doctor-patient relationship and should be reported to law enforcement in the area where the incident occurred. The issues you describe are not medical conduct… and no further action will be taken**.**" The same day this was issued to her, **July 11th, 2017**, the incident report below was filed (**EXHIBIT 4**).

5. **Exhibit 3**: attached hereto is a copy of the NY State FOIL request documents sent by me to the NY State Attorney General's Office to obtain an incident report whereby the Plaintiffs admit they consented to receive a brand.

6. **Exhibit 4**: **[Complaint 2 by Edmondson],** Plaintiffs (including Edmondson) brought claims of Hazing in the second degree (§ 120.17) to law enforcement. Attached hereto is a copy of the Incident report from **July 11, 2017** obtained from the NY State Attorney General's Office through the above FOIL request which contains consent admissions by the Plaintiff(s). These criminal allegations are defamatory, because when they went to the police they clearly state they CONSENTED. This was also filed as "Hazing in the second degree" (which creates a substantial risk of injury, but *no actual injury occurs)*. This makes it painfully clear that at the time of first reporting this incident, they were aware, and claimed there WAS NO INJURY. However, this, now second, complaint Edmonson attempted to bring to authorities, failed and authorities informed them on **August 8th, 2017** that there was no crime and took no action.

7. It is my belief, that as Edmondson hit these closed doors with The OPMC (**EXHIBIT 2**), The NYS Attorney Generals Office, The Saratoga County District Attorney's Office, and the Albany Office of the FBI **(EXHIBIT 4)** – it became clear to her the storyline and lies

she needed to create in order to overcome these road blocks: 1. Frame this as a doctor: patient relationship, 2. Make it non-consensual and coercive, and 3. Make it harmful and damaging, and that is what she did. With the help of others (Piesse, Vincente, Ames, Parlato, C. Oxenberg and later, I. Oxenberg, Isbel, and more) the actresses launched a salacious national fear campaign in order to "force" authorities to listen, that has ultimately destroyed my career, reputation and much more.

8. **Exhibit 5**: Additional Factual Examples of Defamation:

Sarah Edmondson:

a. It took a few months to gain attention from a major media outlet (from August 8th to October 17th), but on **October 17, 2017**, a New York Times published an article, entitled '[Inside a Secretive Group Where Women Are Branded]' **Exhibit 5a1** , Edmondson claimed her participation [in the initiation] was non-consensual, that she "thought it [the brand] was going to be a small tattoo," that "for hours muffled screams... filled the room", that she "wept the whole time." I have the video of the primary Plaintiff's branding process and it illustrates clear as day these statements are false. Lauren Salzman also testified under oath that she had invited Edmonson using the standard DOS invitation process which clearly discloses receiving a brand as part of initiation should she except the invitation (**Exhibit 5a2,** v. aniere transcript p.1 1 ). Additionally, the brands disclosure in the invitation process is documented in the Incident Report above by "the victims" testimony **(Exhibit 4).** Malice and Defamation.

b. This same article confirms our timeline of facts above and Ms. Edmonson's participation in the Incident Report on July 7th 2107. It also admonishes legal

officials for not taking on the case.

*"Several former members have asked state authorities to investigate the group's practices, but officials have declined to pursue action.*

*In July, Ms. Edmondson filed a complaint with the New York State Department of Health against Danielle Roberts, a licensed osteopath and follower of Mr. Raniere, who performed the branding, according to Ms. Edmondson and another woman. In a letter, the agency said it would not look into Dr. Roberts because she was not acting as Ms. Edmondson's doctor when the branding is said to have happened.*

*Separately, a state police investigator told Ms. Edmondson and two other women that officials would not pursue their criminal complaint against Nxivm because their actions had been consensual, a text message shows.*

*State medical regulators also declined to act on a complaint filed against another Nxivm-affiliated physician, Brandon Porter. Dr. Porter, as part of an "experiment," showed women graphically violent film clips while a brain-wave machine and video camera recorded their reactions, according to two women who took part."*

c. By **October 19, 2017**—just two days later, and at the height of the #MeToo movement —the authorities began responding to Plaintiffs' fear campaign. In The New York Times article titled Complaints About Branding Inside Secretive Group Are Under Review, dated October 19, 2017, officials stated that "New York State plan[ned] to review why regulators and others did not act after women involved with a secretive group reported they had been branded with a cauterizing device or traumatized during an "experiment," said a spokesman for Gov. Andrew M. Cuomo." **(Exhibit 5c).**

d. Days later I received a call from my attorney that the OPMC was filing charges, and "is under marching orders to move forward quickly" (email from my attorney at the time, Michael Kelton, to me November 1, 2017). **(Exhibit 5d)**

e. **November 1, 2017** - When interviewed about her complaint to the medical board

Edmondson states, in her *sworn statement* to Jason Warn **Exhibit 5e1** , that she "asked me to stop several times during the branding." In the hearing, when cross-examined after watching the video I submitted to the medical board of her branding process Edmondson states "[Jason Warn] got it wrong, she was telling me when to start and stop" (Dept. of Health HEARING, VOL. 5, 08-14-20, p. 891-896 **Exhibit 5e2)**. There is nothing about telling me to stop, or weeping in the video footage of her branding process, but she tells this to a 3rd party under sworn oath to create a narrative to persuade the medical board members to revoke my license. Malice and Defamation.

f. She also states in the sworn statement that she reviewed, that LS threatens her with her collateral if she doesn't get the brand. However, when questioned she back pedals and denies this – stating "it was a tepid thread throughout the entire event that our collateral was on the line. It wasn't a direct statement. I'm going to release your collateral if you don't get branded." Another very misleading statement to defame me and bias the Board to revoke my license. There is no sign of this in the live footage which I will supply if permitted to amend.

g. **Nov 2, 2017**, in Vice, *Why I Joined a Secret Society That Branded Me,* Edmondson states, "With the first cut of her flesh—they burned her flesh—we were crying, we were shaking, we were holding each other. It was horrific. It was like a bad horror movie" **(Exhibit 5g).** That's not what is illustrated in the video I will supply if permitted to amend (See transcript of video **Exhibit 5k**). She uses salacious statements like these to spin a narrative to defame me, and get officials to take action on events that were previously deemed consensual, between friends, that did not cause harm.

https://www.vice.com/en/article/why-i-joined-a-secret-society-that-branded-me/

h. Edmondson told ABC news, **December 16, 2017** "it was worse than childbirth... Imagine a hot laser, dragged across your flesh for 30 minutes without anesthetic" https://abcnews.com/video/51826785/. The video of Edmondson's branding process illustrates these statements are false, specifically pen to skin time was less than 2 minutes. Malice and Defamation.

i. Edmondson wrote in her published book, *Scared*, that "Danielle was alleged to be one of the many women in Keith's private harem…" **(Exhibit 5i)**. I wasn't aware of a harem and if there was one, I wasn't a part of it. Malice and Defamation.

j. Edmondson claimed "she dissociated out of her body, NYT (above) and HBO's 'The Vow'. I have the video of Edmondson's branding process and it illustrates these statements are false. She was present; breathing, and joking through the process. Malice and Defamation **(Exhibit 5k)**.

k. All of the above are lies. She knew about the brand before she joined, it was protocol (U.S. v. Raniere, trial transcript, p. 1718). I was invited the same way. She didn't scream once. She breathed deeply for what was less than two minutes of pen to skin time. She made fart jokes and bragged about "being a badass... getting a brand after her hallmark audition the day before". She cried (what appeared to be) genuine tears of gratitude at the end as she thanked Ms. Lauren Salzman for inviting her. She emphasized "how important all of this is" and she thanked me and said it looked great (Transcript from Edmondson's Branding Video **EXHIBIT 5k**).

**l.** Mrs. Edmondson appeared to take Mr. Vicente's advice about using "parents" to "get to the kids," as well as telling this DOS member that she "could be in big trouble," then offering access to a "pro bono lawyer," possibly referencing Mr. Glazer. This shows four things: 1. It explains her enrollment of Catherine Oxenberg in her "cause" as a "mother saving her child [India]" in order to develop this defamatory narrative against me that will really move the public and legal officials, as well as, 2. Her willingness to try to scare others to join her cause, 3. Their monetary motivation for the defamation and malicious prosecution, and 4. their willingness to lie as illustrated by the perjury committed by Nicole (and Daniela), and suborned by Neil Glazer (**EXHIBIT 5l** - Major Witness Perjury and Civil Suit Collusion Excerpt).  Additionally, Sarah, Bonnie, Catherine, Daniela, Glazer and Vicente were working together to create this narrative, media campaign and opportunity for secondary gain through legal and public means. Once India was embarrassed and thoroughly scared and intimidated by her mother about her potential indictment in a Federal RICO matter (that resulted from the narrative her mother, a well-known actress, helped spin), she joined the defamatory efforts to protect herself and reap the rewards. In *The Vow,* Catherine talking to her mother, *"I got a call from Bonnie* [Vicente's wife], *who was involved in NXIVM, and she said that she was extremely worried about India, that she had been one of her closest friends. And she said, 'You need to save her.' I was like 'well, I always assumed that India would wake up one day on her own, and I wanted to respect her and not criticize her life choices.' And she (Bonnie) said, '...I don't know if you know what's really going on... there's a secret organization within NXIVM. It is a supposed sisterhood.... they have to*

*provide blackmail... and they're branding girls"* - as the screen shows images of India as a child (The Vow, season 1, episode 4). These are fear tactics and lies.

India Oxenberg:

m. **May 6th 2017** (about **5 Months** after receiving her brand), in a private interview between India Oxenberg and Nicki Clyne on, NC asks "I want you to tell me what you know about the branding." IO; "Branding, I know is a ceremony you do with your circles." (08:22 - 08:29) My understanding of branding is that it's a ritual so that you can experience your body going through like great adversity, but your love for what you're doing being greater than that and then also it's a bonding experience....*and I actually thought for me it was extraordinary...I felt super proud"* (10:07 - 11:24).

n. [Months after receiving the brand in a conversation with her mother] Catherine Oxenberg states: "And I just asked her point blank, 'Are you branded?' And she didn't lie. She did admit to being branded and that she thought it was wonderful. *She says, 'Mom, I never felt so happy and purposeful in my life..."* clip from Seduced India .2.m4v 2:07 - 2:22 and The Vow episode 5 00:13.354 - 00:19.168).

o. Months after that and after being threatened with indictment, India acts in the docuseries, Seduced: Inside The NXIVM Cult (Cecilia Peck dir., 2020) (Starz), where India says "it was torture" and participates in these civil proceedings claiming Battery.

p. In the same Docuseries, India states, "None of us really had any idea what this was going to be like, so Allison brought out these videos. I remember watching it and thinking, 'wow, that looks awful' but *I made no connection to the fact that that was going to happen to ME."* (Seduced: Inside The NXIVM Cult, S01E01). But in actuality, India was proactively planning, and participating in my branding process

and quite literally holding my hand, weeks before she received hers. I have the video of my own branding process Jan 5th, 2026 illustrating this, which I can also provide if allowed to amend. She was excited to get hers, and after expressed she was "glad she could be my first one." Oxenberg also states in her interrogatory answer "On or around the second week of January, Mack told Plaintiff that to further indicate her devotion to Mack and DOS, Defendant Danielle Roberts was going to brand Plaintiff during a ceremony. Prior to this, Mack had been referring to the mark as a tattoo." However, I have multiple private texts between the Plaintiff and I starting at the end of December 2016 where she is helping to participate in and move along the plans for me to receive my brand (and clearly refers to it as a brand) **(Exhibit 5p)**. Again, this was a process India proactively helped plan and intimately participated in weeks before she ever received her brand. These examples clearly illustrate defamation, and lying for secondary gain in this suit - hence malice.

q. And, there are numerous others not included here so as to not to burden the Court with all of these documents because it will make this application extensive and burdensome..

r. All of the quoted material is presented here as illustration, not as statement of facts, compliant with the **FRCP 12(b)(6) Rule**.

s.  defamation was outrageous because they were smearing me nationally which caused me to lose my job of 7 years at the time with Columbia St. Mary's hospital, cost me my Medical license in NY, CO and WI and my 15 year budding career as a doctor, forced me to close the doors to my three-year-old company, exo|eso, which was growing and establishing in 3 countries when the defamation started, destroyed my reputation and as a result numerous future career and relational opportunities, and severely damaged my relationships (including my most intimate and foundational ones with my Mother and Father) which required significant time and effort to repair. There are many other damages which I will itemize should I have the chance to amend my counterclaims.

t.  The factual basis for malicious prosecution is met by the Civil proceeding we are currently engaged in. Count I RICO, Count II RICO Conspiracy, Counts III A - Sex trafficking and attempted sex trafficking, B – Conspiracy to sex trafficking, C – Human trafficking and forced labor or attempted human trafficking and forced labor, and D – Conspiracy to human trafficking and forced labor, were brought by the Plaintiffs in 2021 in relationship to me, and have all been dismissed. The repeated lies that intentionally spun this salacious narrative, which was projected nationally in the media for the purpose of secondary gains including, but not limited to; saving marriages, monetary benefit, public sympathy and favor, reputational gain, career opportunity, and vengeance by way of destroying my career and reputation clearly substantiate malice.

9. **EXHIBIT 6:** Additionally illustrating malicious prosecution, Nicole committed perjury by denying intending to be part of a class action suit in the U.S. v. Raniere Federal Criminal Proceedings. Nicole was a major witness that committed perjury to conceal her Civil Suit motivation **(Doc 1. See page 2 and trial transcript Page 4276-4277. Doc 2)**. Facts and common sense indicate they were lying when they made this claim, as described in a motion for a new trial submitted by the criminal defense. According to the motion, Daniela and Nicole had the same lawyer in the criminal case as several of the other major witnesses: Vicente, Sylvie and Jaye. This is significant for three reasons: The major witnesses all shared the same lawyer. This is unusual, as they all likely had somewhat different interests. Their lawyer was not a criminal lawyer but, in fact, a civil, class-action lawyer: Neil Glazer, who also represented many of the non-testifying witnesses in the criminal case. After the trial, Neil Glazer filed this class-action lawsuit, also in the EDNY, against Roberts; Daniela, Nicole, Vicente and Jaye are all Plaintiffs. This suggests an ulterior motive, other than truth or justice, and that many of the Plaintiffs are instead working together, creating lies for secondary gain, and have been for years. This further supports the malice of this current prosecution.

10. As a result of all of these things (and many others), I experienced severe emotional distress; marked by witnessed panic attacks, intense fear states, loss of memory, focus and cognitive impairment (rendering simple tasks, like reading, disabling), social withdrawal, loss of confidence, paranoia, and other symptoms which required years of therapies - presently ongoing. I didn't use a conventional licensed psychologist because early on many believed I was in a cult and wanted to "deprogram me." When I found a licensed therapist I trusted, who seemed to listen to me, she informed me our records

could be subpoenaed for FBI investigation (whom I was afraid of at the time for their demonstrated capacity for corruption). As such, I found other ways to help myself, including yoga, somatic therapy, biofeedback, dance, weekly coaching and emotional practices, rational inquiry, NLP, EMDR, pastoral counsel, and others. A Thriving Coach with a PhD in Educational Psychology helped me regain my reading ability, so that I could become more embodied and tend to litigation. These sessions were recorded on zoom, and illustrate marked loss of focus, frequent pauses, emotional interruptions (available for the future amended claim if permitted). I also have journal logs that show my mental capacity and its evolution over the past 9 years. Later on, in 2025, I saw a licensed Better Health therapist for 3 months, but didn't find much benefit and instead continued my other therapies. Each of my therapists can testify to my condition before and after.

11. All of the above and more are illustrations of defamation, malicious prosecution, and emotional distress.

12. In light of the above, the Plaintiffs in the discovery material, provided documents that show that the basis of the denials in my Answer, as well as the counterclaims, are based on operative facts. Second, the defamation that will be alleged illustrates the *public* dissemination of lies (knowingly by Plaintiffs), which makes the absolute litigation privilege inapplicable.

13. Needless to say, I am Pro Se (secondary to the financial strain this defamation and malicious prosecution have caused), and as a layperson carry the workload of the proceedings, plus learning the rules of Court and precedents applicable for the first time (while try to maintain a full-time job and therapy). Additionally, I am at a

disadvantage to Plaintiffs' attorneys in the response since I don't have prior experience in matters of this kind. I ask the courts forbearance because the Plaintiffs filed a Fourth Amended Complaint (which I answered), before I could make a motion for leave to amend. They are now moving for the dismissal of my counterclaims for which there was no previous order granted. Rather, there was an order directing that I file a motion for leave to amend. As such, I am following that directive now, and filing this request for leave to amend.

14. For all of the above reasons, it is my belief that many of the Plaintiffs have colluded together to spin this narrative that has forced politicians, officials, the medical board, and potentially now this court to try me in the court of public opinion. Additionally, the massive FBI cover up for their inexplicable corruption and malfeasance that is connected to my name via this narrative has kept me, and many of the facts around this narrative silenced and wrongfully persecuted. The Plaintiffs have continued to embellish and deepen their lies, both publicly and in their recently submitted interrogatories, in order to save face, and avoid criminal and civil litigation. In an attempt to protect their previous lies, they had no choice, but to tie me to this massive money grab (suing billionaires that weren't involved in DOS), and filing these serious [FEDERAL RICO], but frivolous charges (four of which have been previously dismissed) including Battery (with *full knowledge that there was consent and no harm at the time of the incident*). This clearly shows their malice and recklessness. In the interest of justice, the subpoena requests I have made to the Court, and this request for leave to amend are essential. To this point I have not been able to shine a light on the actions that have cost me so much. Unless these truths are allowed to see the light of justice, my wrongful prosecution will only embolden these individuals to continue hurting people, victimizing themselves for gain, and setting a precedent for millions of others that have publicly watched their example.

15. We are here requesting the Court deny the motion to dismiss, and grant us leave to amend or alternatively that it simply grants us leave to amend the counterclaim if dismissal is granted. If the Court is to make a decision the Defendant asks for Oral Arguments.

I certify that the foregoing statements made by me are true. I am aware that if any statements above are willfully false, that I am subject to punishment.

Dated: This 13th Day of April, 2026

Defendant *Pro Se*
Respectfully submitted,

/s/ Danielle Roberts
Danielle Roberts
235 Pavonia Ave,
Jersey City, NJ 07302
516.480.1700

# EXHIBIT 1

ORDER: Defendant Roberts requests until January 31 to (1) file her opposition to the motion to dismiss her counterclaim complaint, and (2) file an amended counterclaim complaint. The first request, which does not comport with Section I.C.1 of the Court's Individual Rules, is denied. Defendant Roberts is directed to file her opposition forthwith. As to the second request, time has elapsed for Defendant Roberts to amend her counterclaim complaint as a matter of right. Fed. R. Civ. P. 15(a)(1). So, there is no outstanding deadline for amendments that the Court can extend. If (or when) Defendant Roberts wishes to file an amended counterclaim complaint, she may seek leave (permission) to do so pursuant to Federal Rule of Civil Procedure 15(a)(2). Ordered by Judge Eric R. Komitee on 1/18/2025. (CAM) (Entered: 01/18/2025)

# EXHIBIT 2



**NEW YORK STATE OF OPPORTUNITY.** | **Department of Health**

**ANDREW M. CUOMO**
Governor

**HOWARD A. ZUCKER, M.D., J.D.**
Commissioner

**SALLY DRESLIN, M.S., R.N.**
Executive Deputy Commissioner

July 11, 2017

OPMC # 17-07-4422

Dear Ms. Edmondson:

In accordance with New York State Public Health Law Section 230, the Office of Professional Medical Conduct (OPMC) has reviewed your July 7, 2017 correspondence regarding Danielle Roberts, DO. This office is responsible for investigating allegations of professional misconduct by physicians, physician assistants and special assistants. We assessed the allegations you raised and the physician's actions in the context of New York State Education Law Section 6530 that defines the parameters of medical misconduct.

The issues you describe did not occur within the doctor-patient relationship and should be reported to law enforcement in the area where the incident occurred. The issues you describe are not medical misconduct as defined in New York State Education Law Section 6530. The information that you have supplied will be retained in our confidential files and no further action will be taken.

If you have further questions regarding the processing of your complaint, or this letter, you may contact this office at 1-800-663-6114. Thank you for bringing this matter to our attention.

Sincerely,

*R. Soulier*

R. Soulier
Central Intake Unit
Office of Professional Medical Conduct

# EXHIBIT 3



## New York State Police | FOIL Records Access Center

### Main Menu

🏠 Home

🔍 FAQs

✏️ Submit a FOIL Request

🔧 Submit an Appeal

👤 My Records Center

↪ Logout

### FAQs

See All FAQs 🔍

Does is cost anything to make a FOIL Request?

What is my right to appeal a FOIL determination?

How do I contact Customer Support?

Subject Matter List

What is the Freedom of Information Law?

|  View File(s)  |  View Message(s)  |

**Request Type:**
FOIL Records Request

**Primary Requester E-Mail:**
danielle@drdanielleroberts.com

**Reference No:**
R006830-121624

**Status:**
Requester Update

**Balance Due:**
$0.00

**Payments:**
$0.00



| | UPLOAD DATE | ⬇ DOWNLOAD ALL |
|---|---|---|
| Files: | 02/21/2025 | Edmondson_Incident_Report_Redacted.pdf |

**The Freedom of Information Law (Public Officers Law, Article 6) (FOIL) grants members of the public access to the records of government in accordance with its provisions. For more information about FOIL and the Personal Privacy Protection Law (Public Officers Law, Article 6-A), please visit the New York State Committee on Open Government's website.**

**Type of Requestor:**
Attorney/Paralegal

**Your Relationship to the Incident:**
Representative of Involved Party

**Client or Party You Represent:**
Danielle Roberts

**Incident #:**

**Incident Location:**
Albany

**Incident Date:**
3/9/2017

**Incident Time:**
7pm

**Name(s) of Involved Individuals:**
Roberts, Danielle, D, 09/30/1981 Edmondson, Sarah, 06/22/1977 Salzman, Lauren. 06/26/1977
Please include Last Name, First Name, Middle Initial, Date of Birth (mm/dd/yyyy)

**Briefly Provide Other Descriptive Information on Record(s) Sought:**
This would be a police report filed by Sarah Edmondson on our around July 7th, 2017 claiming that Danielle Roberts battered her by giving her a brand on March 9th, 2017. Lauren Salzman was Sarah's "Master" and invited her to the secret society, known as DOS. Sarah may have filed this report against NXIVM instead of Dr. Danielle Roberts also.

**By submitting this request, you acknowledge the following:**



I understand there may be fees associated with receiving copies of records based on Public Officers Law § 66a and 87. I further understand that fees are calculated after the records have been located and that I must pay any fees due prior to the receipt of records.

I understand that Public Officers Law 89 (3) (a) requires the agency to acknowledge my request within five (5) business days from the date my request is received. Within the five (5) day response time the agency may ask for clarification, grant or deny a request, or provide a date by which the agency will answer a request.

I understand that the Public Officers Law § 89(2)(b) limits access to records when such records are requested for solicitation or fund-raising purposes. "Solicitation or fund-raising purposes" means any business activity intended to generate direct financial benefit or business growth. I certify that any lists of individuals obtained through this public records request will not be used for solicitation or fund-raising purposes.

**Preferred Method to Receive Records:**
Electronic via Records Center

| New Message | Return to List |
|---|---|

Messages 10                         🖶 Print Messages (PDF)



∨ ✉ On 2/25/2025 7:37:05 AM, NY State Police Records Access Center wrote:

**Subject:** New Message :: R006830-121624
**Body:**
RE: FOIL Records Request of December 16, 2024, Reference # R006830-121624
Dear Danielle Roberts,
The New York State Police received a FOIL request from you on December 16, 2024.
You already have access through the GovQA portal. In your account there should be a tab that shows "My Records". This is where you will find your records.
For more information on the FOIL Appeals process, please visit this FAQ.
Sincerely,
New York State Police
1220 Washington Avenue, Bldg. 22
Albany, NY 12226-2252

﹥ ↩ On 2/24/2025 3:35:33 PM, Danielle Roberts wrote:

﹥ ✉ On 2/21/2025 8:57:47 AM, NY State Police Records Access Center wrote:

﹥ ↩ On 2/7/2025 9:25:35 AM, Danielle Roberts wrote:

﹥ ✉ On 2/7/2025 8:57:04 AM, NY State Police Records Access Center wrote:

﹥ ↩ On 2/6/2025 5:41:14 PM, Danielle Roberts wrote:

﹥ ✉ On 2/4/2025 11:11:20 AM, NY State Police Records Access Center wrote:

﹥ ✉ On 12/19/2024 11:26:03 AM, NY State Police Records Access Center wrote:

﹥ ✉ On 12/16/2024 3:47:47 PM, NY State Police Records Access Center wrote:

﹥ ✉ On 12/16/2024 3:47:46 PM, Danielle Roberts wrote:



Powered by
GovQA

# EXHIBIT 4

| 1. Agency | 2. Div/Precinct | New York State | | 3. ORI | 5. Case No. | 6. Incident No. |
|---|---|---|---|---|---|---|
| G2 TROOP G - ZONE 2 | G223 | **INCIDENT REPORT** | | NY1450100 | | 7677164 |

| 7,8,9. Date Reported (Day, Date, Time) | 10,11,12. Occurred On/From (Day, Date, Time) | 13,14,15. Occurred To (Day, Date, Time) |
|---|---|---|
| TUESDAY 07/11/2017 08:00 | TUESDAY 07/11/2017 08:00 | |

| 16. Incident Type | 17. Business Name |
|---|---|
| HARASSMENT-HARASSMENT | NYS ATTORNEYS GENERALS OFFICE |

**19. Incident Address (Street Name, Bldg. No., Apt. No.)**
NYS CAPITOL

**20. City/State/Zip**
ALBANY NEW YORK 12224

| 21. Location Code (TSLED) | 23. No. of Victims | 24. No. of Suspects | 26. Victim also Complainant? |
|---|---|---|---|
| HALFMOON TOWN 4659 | 1 | 1 | YES |

**Location Type**
SINGLE FAMILY HOME

| 22.OFF. No. | LAW | SECTION | SUB | CL | CAT | DEG | ATT | NAME OF OFFENSE | CTS |
|---|---|---|---|---|---|---|---|---|---|
| 1. | PL | 120.17 | | | V | 2 | C | HAZING 2ND | 1 |

## ASSOCIATED PERSONS

| 25. TYPE | Name (Last, First, Middle, Title) | DOB | Street Name Bldg., Apt.No., City, State, Zip | Res Phone Bus Phone |
|---|---|---|---|---|
| LAW ENFORCEMENT OFFICER | KARAM, ANTOINE, J | | NY STATE ATTORNEY GENERAL'S OFFICE ALBANY NY 12224 | ▮ |

▮

## VICTIM

▮

## NARRATIVE

| Date of Action | Date Written | Officer Name & Rank |
|---|---|---|
| 07/11/2017 | 07/12/2017 | STUDENT, MICHAEL (SR INV) |

**Narrative**

BCI CASE ADOPTION:

On July 11, 2017, member adopted a said case based on information received from the NYS Attorney Generals Office.

| Date of Action | Date Written | Officer Name & Rank |
|---|---|---|
| 08/23/2017 | 08/23/2017 | STUDENT, MICHAEL (SR INV) |

**Narrative**

On June 14, 2017, I received a email from the NYS Attorney General's Office and from an Investigator Antoine Karam. Inv. Karam advised that his office received a complaint of a possible unlawful imprisonment / kidnapping of a adult female ▮ ▮ The complaint was submitted through a forum named: Questions & Comments to Attorney General Eric T. Schneiderman. The complainant, ▮ ▮ Email Address: ▮ provided the following.

Comments:
Our daughter called from Albany where she has been involved with Keith Raniere and his group for the past 18 months. She is abruptly leaving and tells us she must get away from this group. We are very concerned for her wellbeing and safety. Can you advise us? Our daughters name is ▮

On same date, I called the contact number and spoke with ▮ They advised that they spoke to their daughter ▮ and she is currently in ▮ and not in any danger. She is not being held against her will. ▮ ▮ They are going back to ▮

01/17/18

12-27-2017    9:38:38

██████████████████████████ to pack her things. They have been instructed to call for a civil standby if they feel the need. ██████ advised that she has a lot of personal belongings and believes it will take two days to remove all her property. I advised her that we cannot standby for two days while she packs and she understood. I again instructed her to call 911 if she felt threatened and also provided NYSP contact numbers along with my contact information for when they go to the house.

I notified BCI Captain Richard Obrien. No case was adopted being that it was just a phone call to ██████████████ and she advised that she was in no danger.

On June 19, 2017, I was advised by telephone that ████████████████████████ took a couple days and moved her belonging out of the ██████████████ house and it was without incident.

On July 07, 2017, Inv. Karam received another call from ████████ advising that ██████ and an additional female named ████████ were interested in speaking to the Police regarding suspicious activities going on at NXIVM. Inv. Karam referred ████████ to the NYSP.

On July 11, 2017, I adopted SJS# 7677164. I telephonically interviewed █████████████████████████████ She wouldn't provide a location where she resided because she was afraid NXIVM would find her. She advised that she began with NXIVM about three years ago. She signed up for a five day Executive Success Program (ESP). She advised that the program helped her with her profession and she took numerous other courses. There came a point when ████████████ asked her if she would be interested in joining a secret group of professional women. She called the group DOS which stood for a Latin term for obedience. ████████████ advised that she was curious and inquired what she needed to do. ████████ advised her that first she need to accept a vow of obedience and become a slave to a master. She explained it as devoting yourself to a higher principals. She described the slave to master thing as being ready to do anything for their assigned master. She described it as within ten minutes you need to respond to the master upon her request. She then said that she would then require collateral. collateral was a number of things which if you broke the vow to the society they would make public to embarrass you. She described the forms of collateral as:
1. A letter describing some very personal thing, describing infidelity, describing family secrets, or just something very personal that if outed would highly embarrass her.
2. Naked Photos
3. Sex video
4. Sign another person on to your bank accounts.
5. ==Branding==

After all this there would be a monthly collateral to keep the vow of secrecy. This came in many forms, video's of being paddled by you master or another member. It could be another letter describing family issues or just straight up lies about someone that if it got out would be extremely embarrassing . Ultimately each girl would attend a branding ceremony. Where they would subject themselves to being branded. She described the branding as they would strip down and lay on a table at ████████████████ ████████████████████████ Then Danielle Roberts would actually do the branding as other members of DOS would hold her down. The brand was always the same "KR". The initials of Keith Raniere, the head of NXIVM.

Over the course of the day I telephonically interviewed ████████████████████████ at 10:00 am. ████████████ ████████ at 1:00 pm and ████████████████████████ at 3:00 pm. All three advised that they did not want their names in any report for fear of reprisal from NXIVM. I had to promise them before they would talk. ████████████ ████████████ All three advised that they would not give a deposition as to their experiences. All three gave the same consistent story regarding their experiences and training . All three raved about NXIVM's ESP (Executive Success Program) and how it benefited them professionally. Everything changed after they joined DOS. ████████████ stated that they ==allowed themselves to be branded so they could be in DOS. I inquired further about them allowing themselves to be branded and asked if they consented to being branded and they both said yes.== ████████ advised that she ultimately ████████████ ████████████████████████████████ The following are some of the comments ██████████ ████████ made.

████████████████████████ advised that she began taking the Executive Success Program in January of 2016. She stated that she was introduced to Keith Raniere by ████████ and she immediately noticed she was getting alot of attention from Mr. Raniere. In February of 2016 ████████ started courting her for the DOS program. One of the first things she was advised that you are already a slave to your fears, now you need to surrender to the group. She advised that she was put on a diet. she later believed that this was a directive from Mr. Raniere because he appeared interested in her. She ultimately gave collateral in the same forms as ██████ ██████████ advised that any violation of the rules would result in the release of the collateral. She advised that Mr. Raniere wanted to work with her on a one to one basis. he provided her his personal cell number. Mr. Raniere confided in her and he told her he trusted her. He stated that ████████████████████ ████████████████████ Mr. Raniere was very controlling and asked her to set a goal of losing 15 pounds from 135 to 120. The when

she met the goal of 120 lbs he asked her to go to 110. It came down to her sending pictures of the food she was about to eat. mr. Raniere had to approve it before she could eat. At one point she was on a 500 calorie diet a day. When she reached 99 lbs she started to have fainting spells. She immediately stopped the diet. She advised that she shared her experiences with other members of the DOS program and several of them left the program. She decided to confront Mr. Raniere regarding hearing girls were being branded with his initials. He admitted that it was taking place. He advised that he was the head of DOS and the program was setup to chold women to their word. He said t help women grow. After confronting Mr. Raniere she decided to leave entirely from the DOS and NXIVM program. She asked for her collateral back and was never given anything back. I asked her if any of the collateral had been made public and she said no. I asked her if she had any money from her accounts taken. She stated that she paid for the ESP training sessions but nothing else. She stated that she has paid approximately $30,000.00 for training sessions. She believed that the branding of DOS candidates was taking place at ████████ house. The person doing the branding was a Danielle Roberts.

████████████████████ advised that she that she resides in ████ She advised that she has been a member of NXIVM for 12 years. She joined DOS in ████████ Prior to joining DOS she was a ████████████ ████████ She stated that she ████████████████ She advised that she was paid very well by NXIVM. She dvise that she was approached by Keith Raniere to join DOS. ████████ became her master. ████ was the ████████████████████████ She advised that ████████████ ████████████████████ She trusted her. ████ explained that the DOS program was like the Mason's but for women. She completed all of her responsibilities including her Collateral. She advised that she consented to be branded and was branded in the same way described above. One of her reponsibilities was to recruit 6 people into the DOS program. She was in the process of recruiting and being a master to her recruits. She advised that the turning point came when she was being pressured ████████████████████ about the branding of Keith Raniere's initials ████████

Additionally, she reports that during a branding ceremony and while holding another female down she realized how wrong this was. Not too long after the ceremony she left the entire program. Upon leaving she requested her Collateral back but has never received any of it. She advised since leaving NXIVM she believes 80.000 past ESP trainee's have requested their money back.

I contacted the Saratoga County District Attorney's office and spoke to Assistant District Attorney's Michele Schettino and Jennifer Buckley. I advised them of the information that the three females had disclosed. I was advised that because they consented to the branding that no crime was committed.

I also contacted the Albany Office of the FBI and spoke to Special Agent David Fallon. I advised him of the case and inquired if his department would be interested in this case. He reiterated that based on the females consenting to the branding he advised his agency would not entertain a case.

On August 8, 2017, I remained in communication with the three females through my division cellphone in the form of text messages. I notified all three females of the above finding by the Saratoga County District attorney and the the FBI.

| Date of Action | Date Written | Officer Name & Rank |
|---|---|---|
| 10/18/2017 | 10/18/2017 | STUDENT, MICHAEL (SR INV) |
| Narrative | | |

CASE UPDATE:

On October 18, 2017, I updated the case narrative and provided Capt. Richard Obrien with a synopsis of the case.

| Date of Action | Date Written | Officer Name & Rank |
|---|---|---|
| 10/23/2017 | 10/23/2017 | STUDENT, MICHAEL (SR INV) |
| Narrative | | |

CLOSING ENTRY:

On October 23, 2017, when this case was opened, I was requested by all three victims to keep their names out of the reports searchable areas. I honored said request after advising Troop G BCI command. The victims names were never entered in the person's tab. Recently, several news articles have publicly identified two of the victims. I have not been in communication with any of the three victims since August 8, 2017 when I advised them of the determination of the Saratoga County District Attorneys Office and the FBI. I conferred with BCI Captain Richard Obrien and based on the above, I am closing this case by investigation, FINAL.

No Enclosures.

SJS#7677164 - Hazing in the second degree - Closed by investigation - no evidence - FINAL.

## ADMINISTRATIVE

| 74. Inquiries | 75. NYSPIN Message No. | 76. Complainant Signature | |
|---|---|---|---|
| 77. Reporting Officer Signature (Include Rank)<br>SR INV MICHAEL STUDENT | 78. ID No.<br>1807 | 79. Supervisor Signature (Include Rank)<br>SR INV MICHAEL STUDENT<br>S/I *Michael W Student* | 80. ID No.<br>1807 |
| 81. Status<br>CLOSED BY INVESTIGATION | 82. Status Date<br>10-23-2017 | 83. Notified/TOT | |

Solvability Total    0

# EXHIBIT 5a1

**N.Y. / REGION**

# Inside a Secretive Group Where Women Are Branded

查看简体中文版
查看繁體中文版
**Leer en español**

By BARRY MEIER    OCT. 17, 2017

ALBANY — Last March, five women gathered in a home near here to enter a secret sisterhood they were told was created to empower women.

To gain admission, they were required to give their recruiter — or "master," as she was called — naked photographs or other compromising material and were warned that such "collateral" might be publicly released if the group's existence were disclosed.

The women, in their 30s and 40s, belonged to a self-help organization called Nxivm, which is based in Albany and has chapters across the country, Canada and Mexico.

Sarah Edmondson, one of the participants, said she had been told she would get a small tattoo as part of the initiation. But she was not prepared for what came next.

Each woman was told to undress and lie on a massage table, while three others restrained her legs and shoulders. According to one of them, their "master," a top

9
ARTICLES REMAINING

✳    **SEE MY OPTIONS**    Subscriber login

A female doctor proceeded to use a cauterizing device to sear a two-inch-square symbol below each woman's hip, a procedure that took 20 to 30 minutes. For hours, muffled screams and the smell of burning tissue filled the room.

"I wept the whole time," Ms. Edmondson recalled. "I disassociated out of my body."

Since the late 1990s, an estimated 16,000 people have enrolled in courses offered by Nxivm (pronounced Nex-e-um), which it says are designed to bring about greater self-fulfillment by eliminating psychological and emotional barriers. Most participants take some workshops, like the group's "Executive Success Programs," and resume their lives. But other people have become drawn more deeply into Nxivm, giving up careers, friends and families to become followers of its leader, Keith Raniere, who is known within the group as "Vanguard."

Both Nxivm and Mr. Raniere, 57, have long attracted controversy. Former members have depicted him as a man who manipulated his adherents, had sex with them and urged women to follow near-starvation diets to achieve the type of physique he found appealing.

Now, as talk about the secret sisterhood and branding has circulated within Nxivm, scores of members are leaving. Interviews with a dozen of them portray a group spinning more deeply into disturbing practices. Many members said they feared that confessions about indiscretions would be used to blackmail them.

Mark Vicente, a filmmaker and former top Nxivm official, said that after hearing about the secret society, he confronted Mr. Raniere.

"I said, 'Whatever you are doing, you are heading for a blowup,'" Mr. Vicente said.

Several former members have asked state authorities to investigate the group's practices, but officials have declined to pursue action.

In July, Ms. Edmondson filed a complaint with the New York State Department of Health against Danielle Roberts, a licensed osteopath and follower of Mr. Raniere, who performed the branding, according to Ms. Edmondson and another woman. In

a letter, the agency said it would not look into Dr. Roberts because she was not acting as Ms. Edmondson's doctor when the branding is said to have happened.

Separately, a state police investigator told Ms. Edmondson and two other women that officials would not pursue their criminal complaint against Nxivm because their actions had been consensual, a text message shows.

State medical regulators also declined to act on a complaint filed against another Nxivm-affilated physician, Brandon Porter. Dr. Porter, as part of an "experiment," showed women graphically violent film clips while a brain-wave machine and video camera recorded their reactions, according to two women who took part.

The women said they were not warned that some of the clips were violent, including footage of four women being murdered and dismembered.

"Please look into this ASAP," a former Nxivm member, Jennifer Kobelt, stated in her complaint. "This man needs to be stopped."

In September, regulators told Ms. Kobelt they concluded that the allegations against Dr. Porter did not meet the agency's definition of "medical misconduct," their letter shows.

Mr. Raniere and other top Nxivm officials, including Lauren Salzman, did not respond to repeated emails, letters or text messages seeking comment. Dr. Roberts and Dr. Porter also did not respond to inquiries.

Former members said that, inside Nxivm, they are being portrayed as defectors who want to destroy the group.

It is not clear how many women were branded or which Nxivm officials were aware of the practice.

A copy of a text message Mr. Raniere sent to a female follower indicates that he knew women were being branded and that the symbol's design incorporated his initials.

# EXHIBIT 5a2

Q    And where did you initially approach Sarah about enrollment into DOS?

A    I approached her in Vancouver.  I was staying in her home there.

Q    Why were you in Vancouver at that time?

A    I was teaching intensive in her center.

Q    About how soon after your enrollment into DOS were you recruiting Sarah?

A    Five days.

Q    Was Sarah married?

A    Yes.

Q    And can you describe to the jury what the process was for recruiting her?

A    Sure.  It was -- it was the same process that Rosa Laura did with me, that I approached her and told her that I was doing something I was very excited about.  I wanted to share it with her.  And that this might sound weird, but I needed a guarantee from her that she wasn't going to speak about this to anybody else, and I introduced the concept of collateral, which she provided me.  And then when she provided it, I went through the four aspects of it, lifetime vow of obedience to me; master/slave concept; collar, which was the necklace; and branding, and she decided she wanted to go forward and provided more collateral.

# EXHIBIT 5c

**The New York Times** | https://nyti.ms/2l0DXNp

**N.Y. / REGION**

# Complaints About Branding Inside Secretive Group Are Under Review

By BARRY MEIER    OCT. 19, 2017

Officials in New York State plan to review why regulators and others did not act after women involved with a secretive group reported they had been branded with a cauterizing device or traumatized during an "experiment," said a spokesman for Gov. Andrew M. Cuomo.

The review will also examine whether state officials should now pursue those complaints, said that spokesman, Richard Azzopardi. The women were former members of an Albany-based group called Nxivm that offers self-improvement courses.

In a related development, a Nxivm-affiliated physician resigned Wednesday from the staff of St. Peter's Hospital in Albany, hospital officials said.

The doctor, Brandon Porter, is accused of having run a study in which women were shown video clips while their brain waves were recorded and facial expressions videotaped. Participants were not warned beforehand that some of the clips were extremely violent, including scenes of women being killed and dismembered, according to a complaint filed with the New York State Department of Health.

Medical regulators also did not act on a complaint filed against another licensed physician, Danielle Roberts, who reportedly used a surgical device to burn a brand below the hip of women during their initiation into a secret sorority within Nxivm.

Some women said they reported the branding to state police officials. Police officials declined to pursue the complaint, saying the women's actions had been consensual, a text message showed.

The developments came after the publication on Tuesday of an article in The New York Times about Nxivm and the practices of the secret sorority. The article cited a text message indicating that Nxivm's leader, Keith Raniere, who is known as "Vanguard," was aware that some female members were being branded and that the symbol used contained his initials as a "tribute" to him.

Late Wednesday, Nxivm released a statement through an affiliate, stating that an unnamed media outlet had "unfoundedly, and incorrectly," linked NXIVM corporation, and its related companies, with a social group."

The statement asserted that the article "might be a criminal product of criminal minds," and said NXIVM "will explore any and all legal remedies."

"NXIVM was not able to participate in this story because it painfully held true to the due process of our free world justice system," the statement said.

During a three-month period, officials of Nxivm did not respond to repeated requests by The Times for interviews and responses. Neither Dr. Porter nor Dr. Roberts responded to repeated inquiries.

Mr. Azzopardi said in his statement: "The allegations in this article are disturbing. Counsel's Office will be reviewing this matter to determine if applicable laws, regulations and procedures were followed by the agencies cited in this report and that review will determine if further action is warranted."

In a letter, the State Department of Health declined to take action on a

© 2017 The New York Times Company

*Correction: October 19, 2017*

An earlier version of this article misstated the hospital where Dr. Brandon Porter worked. It is St. Peter's Hospital in Albany, not St. Francis.

The New York State Commissioner of Health, Dr. Howard Zucker, did not respond to two emails sent to him on Wednesday.

A spokesman for St. Peter's Hospital said Dr. Porter resigned from his part-time position after officials there met with him to discuss the allegations cited in The Times article.

In September, medical regulators informed her that they were declining to act on her complaint because Dr. Porter's supposed actions did not meet the agency's definition of "medical misconduct," their letter shows.

In of one them, Mexican cartel members are seen killing four women. "Please look into this ASAP," Ms. Kobelt wrote. "This man needs to be stopped."

There, he showed her a series of video clips, three of which were so violent that the images "have haunted me for almost a year now," she stated in her complaint.

Last year, Ms. Kobelt said, Dr. Porter drove her to a former restaurant called Apropos in Clifton Park, N.Y., a town not far from Albany that is now used by Nxivm as a meeting center.

In a separate complaint filed in August, Jennifer Kobelt, 28, described Dr. Porter as the physician who treated Mr. Raniere's followers when they got ill and the "main scientist" who conducted tests involving the group.

complaint filed in July against Dr. Roberts because she had not been acting as a doctor treating a patient when she reportedly performed branding.

# EXHIBIT 5d

**Michael Kelton** <MKelton@abramslaw.com>                    Wed, Nov 1, 2017, 3:41 PM

to me ▾

Hi Danielle:

Jeff Conklin returned my call today ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓ He is under marching orders to move forward quickly. How would you like me to respond?

### *Michael Kelton, Esq.*

**ABRAMS, FENSTERMAN, FENSTERMAN, EISMAN, FORMATO, FERRARA, WOLF & CARONE, LLP**

| *Partner-Director* |  | **Brooklyn Office** |
|---|---|---|
| **Tel: 718-215-5300** | | **1 Metrotech Center** |
| **Fax: 718-215-5304** | | **Suite 1701** |
| **Email: MKelton@Abramslaw.com** | | **Brooklyn, New York 11201** |

| **Long Island** | **Manhattan** | **Brooklyn** | **Rochester** |
|---|---|---|---|
| **(516) 328-2300** | **(212) 279-9200** | **(718) 215-5300** | **(585) 218-9999** |

**WWW.ABRAMSLAW.COM**

# EXHIBIT 5e1

## NEW YORK STATE DEPARTMENT OF HEALTH
## OFFICE OF PROFESSIONAL MEDICAL CONDUCT

### REPORT OF INTERVIEW

| | |
|---|---|
| SUBJECT: | DANIELLE ROBERTS, DO |
| FILE#: | AL-17-07-4422A |
| INTERVIEW OF: | SARAH EDMONDSON |
| DATE OF INTERVIEW: | November 1, 2017 |
| INTERVIEW BY: | JASON WARN |
| | Supervising Medical Conduct Investigator |

On 11/1/17, Supervising Medical Conduct Investigator JASON WARN and Associate Counsel JEFFREY CONKLIN conducted a preliminary telephone interview of SARAH EDMONDSON concerning her experience with DANIELLE ROBERTS, DO. WARN explained the authority of the Office of Professional Medical Conduct (OPMC) and the purpose of the interview.

EDMONDSON stated that she was part of the organization NXIVM / Executive Success Program, Inc. (ESP). EDMONDSON stated that she was invited to be part of a social group related to ESP. EDMONDSON stated that the social / women's group was essentially a subset of ESP. EDMONDSON stated that as part of the social group, she was told that she would receive a small tattoo. EDMONDSON stated that instead of a tattoo, she was branded with a cauterizing iron without anesthesia. EDMONDSON stated that the branding process took about 25 minutes. EDMONDSON stated that the branding was done by ROBERTS.

When asked if she ever told ROBERTS to stop branding her, EDMONDSON stated that she did. EDMONDSON stated that she said "stop" on several occasions during the branding process. At one point after EDMONDSON said stop, LAUREN SALZMAN (A member of ESP) threatened her with exposure of collateral EDMONDSON had given to be part of the society.

When asked if ROBERTS responded to EDMONDSON's request to stop the procedure, EDMONDSON stated that ROBERTS paused before continuing with the branding.

EDMONDSON stated that she was convinced that she should undergo the branding. EDMONDSON stated that she did not consent to what was ultimately put on her body, the initials of KEITH RANIERE, the leader of ESP.

EDMONDSON stated that he brand was in her pubic area.

EDMONDSON stated that four other women were branding on the same night she received her brand. EDMONDSON identified the other women as ▨▨▨▨▨▨▨▨▨▨▨▨

The information contained herein is the property of the New York State Department of Health, is confidential, and is not to be released except as provided by law

**EXHIBIT**

tabbies

**10**

EXHIBIT 5e2

8-14-2020                S.E.

changed the setting, which apparently was on a default.  That was where we had the problem the other day.

JUDGE MACKILLOP-SOLLER: Mr. Scher, do you need this document up any longer?

MR. SCHER:  Well, I think I may need it a little while longer because I think "Ms. E." wants to refer to it in her testimony.  That is my understanding.  If she doesn't need it, then I am happy to let it go.

JUDGE MACKILLOP-SOLLER:  Let's leave it on while you are in this line of inquiry.  Go ahead, Mr. Scher.

EXAMINATION BY
MR. SCHER:

Q.    "Ms. E.," are you able to see the part of the document that refers to the fact that you told or asked Dr. Roberts during the branding procedure to stop on several occasions; do you see that?

A.    I see his summary, yes.

Q.    Is that what you told him?

8-14-2020                    S.E.

A.    No.

Q.    So you think he got it wrong?  He misunderstood you?

A.    Correct.  He got it wrong.  I told him that women said that to stop and start, which was true.  You can see by the other videos.  You didn't see the other videos, you only saw mine.

Q.    In the statement though that he took down, it said that you told Dr. Roberts to stop on several occasions --

A.    Correct.

MR. SCHER:  Let me finish.

Q.    And you're saying now that is not what you told the investigator?

A.    Correct.  I told the investigator that women told them to stop and start.  I may have told him that I told her to stop, which I did, I believe, at one point, as I said wait, you know, and then continue.

Q.    You also, according to this -- when you spoke with the investigator, you also told him that at one point "L.S." threatened you with exposure of your

8-14-2020                    S.E.

collateral if you didn't continue; is that right?

A. I did not tell him that. I said that the threat of collateral being exposed was a part of the whole process.

Q. Well, if you can, in the same paragraph where it says, "At one point, after "E." said stop, "L.S." threatened her with exposure of collateral"?

A. Again --

Q. The investigator got that wrong too, right?

A. This is a summary of his understanding of what I'm trying to explain to him. It's not accurate.

Q. After the summary was done, you were sent a copy of it; weren't you?

A. I was sent a copy to look at recently, which I told Jeffrey Conklin what the problems were. This problem and the other problem that I didn't -- I think there was another part where it says I didn't recognize it was branding until weeks after, to which point, I corrected, "I didn't

8-14-2020                S.E.
recognize it was Keith's initials until weeks after."

Q.    The part we had just gone over, did you correct that mistake that the investigator made?

A.    There was no back and forth to even say that.  That was -- I'm doing it right now.

Q.    Now, I'm saying when you spoke with Mr. Conklin about it; did you correct the mistake?

A.    Yes.

Q.    So he was aware, according to you, that, in fact, "L.S." did not threaten you with collateral exposure after you said, stop, right?

A.    What we corrected is that it wasn't as explicit.  It was a tepid thread throughout the entire event that our collateral was on the line.  It wasn't a direct statement.  I'm going to release your collateral if you don't get branded.

Q.    But according to the statement though, it was after you said stop that so-

8-14-2020                    S.E.
called --

          A.    That's not accurate.

                MR. SCHER:  Let me finish, would
you?

                JUDGE MACKILLOP-SOLLER:
Mr. Scher, let's move on with the
cross-examination.

                MR. SCHER:  I'm trying to.  She
keeps interrupting me.

                JUDGE MACKILLOP-SOLLER:  Well,
she is trying to answer the question, so go
ahead.

                MR. SCHER:  I would ask you to
instruct that she wait until I finish my
question before she starts her answer.

                JUDGE MACKILLOP-SOLLER:
"Ms. E.," you understand the instructions?

                THE WITNESS:  Yes.

                JUDGE MACKILLOP-SOLLER:  Go
ahead, Mr. Scher.

                MR. SCHER:  Thank you.
EXAMINATION BY
MR. SCHER:

          Q.    According to the investigator, it

8-14-2020                S.E.

was after you told Dr. Roberts to stop that the threat occurred, whether that was tacit or expressed. That's when the threat occurred; is that right?

A. Incorrect.

Q. Okay. If the investigator wrote that, that is something else he got wrong?

A. Correct. I gave him a lot of information. I could see how he would be confused.

Q. Was there any point whatsoever during the branding procedure that you said, you yelled or said quietly or in any other way said stop this?

A. No, as you can see in the video, I was one that kept quiet.

Q. Yes. That's what I was about to ask you. It doesn't look like you said stop at any point?

A. No. I think I said, "Wait, slow down," or at moments to catch my breath.

Q. Right, but slow down and wait is very different from stop; isn't it?

A. I told the investigator that the

EXHIBIT 5g

it, it was just your issue. It was really hard to speak up and go hey guys, this isn't right, why are we doing this?

And then **Dr. [Danielle] Roberts** came in, who I also knew from Nxivm. We took turns holding each other down—three would be on them and the fourth would be filming. This is all on camera somewhere. The first woman lay on the table and then me and the other women were sitting on her holding her legs down. With the first cut of her flesh—they burned her flesh—we were crying, we were shaking, we were holding each other. It was horrific. It was like a bad horror movie. We even had these surgical masks on because the smell of flesh was so strong and burning. I felt petrified, I felt, every part of my body was like: get out of here. Run.

# EXHIBIT 5i

Danielle was alleged to be one of the many women in Keith's private harem, and had accepted the role of branding us for DOS. I'll discover that this entire branding ceremony was constructed to serve as the ultimate "trauma bonding" to connect us five women with one another for life. (This sadistic type of conditioning is classic Keith Raniere methodology.) I'll learn how they were bringing me in to recruit young women whom they would coerce to have sex with Keith.

This mark is not only a physical injury. Soon, a therapist will help me to understand that it is what's known as a "moral injury," a permanent trauma to my conscience as I discover the true part I've played in the sinister reality they've been building for years. I feel like a soldier who returns from war to learn he'd killed children over a fight for oil, orchestrated by a machine bigger than him. I joined NXIVM to be part of a positive movement in the world, to do good.

*Am I bad?*

*What have I done?*

# EXHIBIT 5k

Below are excerpts of never-before-released audio from Sarah's branding ceremony. They show that Sarah was cheerful, laughed, made jokes, and even expressed gratitude for being invited to DOS:

Sarah: I feel like I might fart though actually… sorry
*(Everyone laughs and someone responds "that's ok")*

Lauren: You're doing great. Fucking awesome!
Sarah: Thank you
Another sorority sister: Warrior Bitches!
Sarah: Thank you for choosing me

*(Lauren kisses Sarah on her cheek)*
Sarah:  … this means a lot
*(Lauren strokes Sarah face)*
Sarah: Thank you… I love you.
Lauren: I love you
*(Lauren kisses Sarah again on the cheek and strokes her own hair and returns her hand to Sarah heart)*

Sarah: … It's so funny, I was auditioning for a fucking hallmark movie yesterday. *(women laughing)* … Bridal Bootcamp *(the title said in a humorous, mocking way)* … *(she shakes her head from side to side)* fuck…  *(she laughs)*
Another sorority sister: Bridal Bootcamp *(laughs)*
Sarah:  … thank you … warrior bootcamp, bitches!" *(laughter)*

Based on the video, the ceremony was full of meaning and also fun, and a celebration of something Sarah had chosen. Yet the story she told in the New York Times was quite the opposite.

# EXHIBIT 51

The collusion continued past June 5, 2017 after the story "broke" online and in the media. In multiple episodes of The Vow, where Mr. Vicente, Bonnie Piesse, Sarah Edmondson, Anthony Ames and Catherine Oxenberg are shown recruiting and coaching people to take action against Raniere. Note that collusion, also called a conspiracy, can occur when parties use legal means (contributing a personal letter to a criminal investigation) to achieve illegal acts (defamation and/or strengthening the future class-action lawsuit). The leaders of this collusion actively and intentionally recruited people to their cause.

> "The parents are the way to get to the kids." - Mark Vicente (The Vow, Episode 4, 00:01:57)

> "Everyone's [here at the party] texting, tweeting, sending [the New York Times article about DOS] to the people who are still in ... making sure the right person sends it so we don't trigger their pride." - Sarah Edmondson (The Vow, Episode 6, 00:06:01)

> "If all of us write letters basically saying that there was criminal activity...it's important that you share... that you were brought in under certain pretexts." - Catherine Oxenburg (The Vow, Episode 7, 00:15:30)

> "The idea was to get 100 letters." - Sarah Edmondson (The Vow, Episode 7, 00:16:07)

There is other evidence of coordination. For instance, on March 10, 2018, Mr. Vicente sent an email to a number of people in which he stated that he had spoken with 20 women who were Raniere's lovers and slaves and that "these 20 women are all talking to each other and comparing notes."

Q    But you believe you had spoken to over -- as of the time you wrote this email on March the 10th, 2018, you had spoken to over 20 women who were Keith Raniere's lovers and slaves or slaves, right?

A    That's what I believed.

Q    And do you remember writing that these 20 women are all talking to each other and comparing notes?

A    Yes.

Source: 05-16-2019 - USA v Raniere - 18CR204(NGG) -  pg. 1254

In another instance, Ms. Edmondson appeared to take Mr. Vicente's advice about using "parents" to "get to the kids," as well as telling this DOS member that she "could be in big trouble," then offering access to a "pro bono lawyer," possibly referencing Mr. Glazer.



# EXHIBIT 5p

**Danielle Roberts** 09:20
Hi India... what did 3RM mean on the thread?

**India Oxenberg** 09:20
My persons person 😈🙀😊

**Danielle Roberts** 09:20
Jess has someone?!?

**India Oxenberg**

Yes. 09:25

I'm a GM 09:25

**Danielle Roberts** 09:27

Congrats honey. How's it going? 09:28

**India Oxenberg** 09:28
Thank you!! Intense

1 January 2017

**India Oxenberg** 19:23
Hey lady. Any update on the NYC trip?

**Danielle Roberts** 20:17
Thought we were doing it here...at Ms.
Or do you mean for mine?

**India Oxenberg** 20:18
Yours

**Danielle Roberts** 20:21
Not yet... awaiting response to see if it can be earlier. Right now it's wed or thurs

**India Oxenberg**     20:18
Yours

**Danielle Roberts**     20:21
Not yet... awaiting response to see if it can be earlier. Right now it's wed or thurs

**India Oxenberg**     20:21
Ohh okay got it. Fingers crossed for earlier

**Danielle Roberts**     20:24
Si

3 January 2017

**India Oxenberg**     13:02
Hey any update?

On the branding for you     13:02

**Danielle Roberts**     13:09
Not yet. Waiting on design from M

**India Oxenberg**     14:53
okay

**India Oxenberg**     20:31
Hey Im fixing the NDA whats the guys name

and where is his company     20:31

**Danielle Roberts**     20:32
*██████████ Body Arts*

*██████████ Ave. Brooklyn, NY*

**India Oxenberg**     20:32
Thank you

Sent     20:46

**Danielle Roberts**     20:48
Copy

4 January 2017

# EXHIBIT 6.1

# The prosecution suborned perjury – that is, the prosecution allowed witnesses to tell untruths while under oath on the stand.

## Suborned perjury example

**The prosecution suborned the perjury of major witnesses.** Multiple witnesses perjured themselves by claiming that they had no intent to bring a civil lawsuit against Keith Raniere and others. Even worse, the government clearly knew their witnesses intended to file a civil suit and worked to prevent the jury from learning this information. If witnesses in a criminal trial are positioned to gain from a civil lawsuit, the jury should be informed. In the case of Raniere's trial, the prosecution repeatedly objected to the defense's cross-examination of two witnesses which sought to reveal this critical information to the jury.

**When questioned about a potential civil suit, the witnesses were unambiguous in their testimony.** During the trial, Mark Vicente said he had retained attorney Neil Glazer for "potential civil matters" against Raniere.

| | |
|---|---|
| LESKO: | Do you have another attorney that's representing you? |
| VICENTE: | Ah, yes. Neil Glazer. N-E-I-L. |
| LESKO: | And it's -- why don't you spell the last name. |
| VICENTE: | G-L-A-Z-E-R. |
| LESKO: | And who is Neil Glazer? |
| VICENTE: | Neil Glazer is civil attorney with a firm in Philadelphia. |
| LESKO: | And is this civil attorney representing you in civil matters relating to Mr. Raniere? |
| VICENTE: | In potential civil matters, correct. |

Source: Defense Motion filed March 9, 2020 - pg. 7 (Document 853)

In contrast, witnesses Daniela and Nicole testified that they had no intention of bringing a civil lawsuit against Raniere, despite the fact that they also retained Mr. Glazer as their attorney, which in itself is unusual in a criminal trial.

> AGNIFILO: So as you sit here today, you have no intention of bringing a civil lawsuit?
>
> DANIELA: That's right.

Source: Defense Motion filed March 9, 2020 - pg. 11 (Document 853)

> AGNIFILO: Are you intending to bring a civil suit?
>
> NICOLE: No.
>
> AGNIFILO: No?
>
> NICOLE: No.
>
> AGNIFILO: You have no intentions of bringing a civil suit?
>
> NICOLE: Like me, personally?
>
> AGNIFILO: You and other people.
>
> NICOLE: Not me, personally.
>
> AGNIFILO: Do you intend to be part of a class-action lawsuit?
>
> NICOLE: No.

Source: Defense Motion filed March 9, 2020 - pg. 13 (Document 853)

On January 28, 2020, Mr. Glazer filed a class-action lawsuit against Raniere and others, on behalf of 80 plaintiffs including Mr. Vicente, Daniela, Nicole and Jay (another government witness). Please note the women were not named in the class-action suit but their identities are clear, as described in the defense's motion filed on March 9, 2020.

These witnesses stood to gain from Raniere's guilty verdict and the jury ought to have known the witnesses had this vested interest. Of course, this fact would have undermined the strength of the government's case, which rested entirely on these

witnesses' corroborative testimony on several of the most serious charges including sex trafficking and forced labor.

Note that ordinarily, witness perjury alone is sufficient to warrant a new trial, let alone if the prosecution has clear knowledge of the perjury and takes steps to protect the lie, or in this case, lies.

These events were described in the March 9, 2020 [motion](#). The Court denied.

---

# Witness collusion

Separate from witness perjury is the apparent witness collusion. It should have been obvious to the prosecution and anyone involved in the *criminal* case against Raniere, that Mr. Glazer, a *civil* attorney, was <u>simultaneously</u> preparing a *civil* case against Raniere on behalf of multiple witnesses.

The pertinent points: On November 11, 2017, Mr. Glazer began bringing individuals to the US Attorney's office and continued to do so for two years. He would ultimately attend at least 33 government proffer sessions with at least 16 different witnesses and potential witnesses, who were interviewed by the government. (A proffer session is where someone offers or presents evidence for a trial.)

It is completely improbable that the prosecution could have overlooked Mr. Glazer's substantial involvement in these pre-trial proceedings. In fact, Mr. Glazer expressly stated in an August 21, 2018 letter to the court that he represented "numerous individuals who were victims of and/or witnesses concerning crimes charged in the Superseding Indictment." It is equally improbable that the prosecution could have overlooked the likelihood that Mr. Glazer was preparing a civil suit on behalf of multiple witnesses. Even in the extremely unlikely event that the government was unaware of the pending suit, the defense explicitly put the government on notice in a [motion](#) filed on April 27, 2019 (Document 595), writing that "many of these [purported victims] are contemplating a class-action case and have retained counsel in doing so…" This motion was made before the trial began, so the prosecutors undeniably knew about this suit when the defense was questioning the witnesses.

**Witnesses colluded by working together in multiple ways.** First, they referred each other to Mr. Glazer, as shown in Nicole's testimony, where she says that the witness Jay had given her Mr. Glazer's contact information.

```
Q    Okay.  And do you remember the name Neil Glazer?
A    Yeah, that's my lawyer.  But I don't think I got it from
Katherine.
Q    Do you remember Katherine sending you Neil Glazer's name
and contact information?
A    I do.  Sorry, I thought it was Jay that had sent that.
But maybe, I -- I did get Neil's information.
```

Source: 06-10-2019 - USA v Keith Raniere  18-CR-00204[NGG] - REDACTED - NO AWI pg. 4268

Second, and long before the trial, there was a premeditated, coordinated and secret effort to defame Raniere. This collusion was led at least in-part by Mr. Vicente. In order to protect his plan, Mr. Vicente invited people to join his efforts only after they signed a non-disclosure agreement. One of the people Mr. Vicente spoke to is Eduardo Asunsolo:

> On May 26 of 2017, Mark Vicente called me and told me there would be negative stories about Keith Raniere that were to come out in the Frank Report and other media outlets in the next few months. Previously, I had signed an NDA at his request in order to get information about why he had left ESP. He had told me that he was leaving to make movies, but that there was another version, and that I could get access to this version if I signed this contract. The contract was peculiar in that you keep not only the content of the call private, but also the existence of the contract itself. The call sounded scripted, and my understanding was that Mark was going to engage in a defamation campaign against Keith, and I also had the impression he was going to try to steal Keith's curriculum, for he mentioned Keith's curriculum wasn't really his and it needed to be "freed." Mark talked about spies, his life being in danger (with no apparent threat or any information about who, how or why that would be the case), and how he considered jumping off of a building. Mark said on the stand and on The Vow, that around that period of time that he recorded all of his calls, so he must be in possession of the audio of this call.
> - *Eduardo Asunsolo*

The collusion continued past June 5, 2017 after the story "broke" online and in the media. In multiple episodes of The Vow, where Mr. Vicente, Bonnie Piesse, Sarah Edmondson, Anthony Ames and Catherine Oxenberg are shown recruiting and coaching people to take action against Raniere. Note that collusion, also called a conspiracy, can occur when parties use legal means (contributing a personal letter to a criminal investigation) to achieve illegal acts (defamation and/or strengthening the future class-action lawsuit). The leaders of this collusion actively and intentionally recruited people to their cause.

> "The parents are the way to get to the kids." - Mark Vicente (The Vow, Episode 4, 00:01:57)

> "Everyone's [here at the party] texting, tweeting, sending [the New York Times article about DOS] to the people who are still in ... making sure the right person sends it so we don't trigger their pride." - Sarah Edmondson (The Vow, Episode 6, 00:06:01)

> "If all of us write letters basically saying that there was criminal activity...it's important that you share... that you were brought in under certain pretexts." - Catherine Oxenburg (The Vow, Episode 7, 00:15:30)

> "The idea was to get 100 letters." - Sarah Edmondson (The Vow, Episode 7, 00:16:07)

There is other evidence of coordination. For instance, on March 10, 2018, Mr. Vicente sent an email to a number of people in which he stated that he had spoken with 20 women who were Raniere's lovers and slaves and that "these 20 women are all talking to each other and comparing notes."

Q    But you believe you had spoken to over -- as of the time you wrote this email on March the 10th, 2018, you had spoken to over 20 women who were Keith Raniere's lovers and slaves or slaves, right?

A    That's what I believed.

Q    And do you remember writing that these 20 women are all talking to each other and comparing notes?

A    Yes.

Source: 05-16-2019 - USA v Raniere - 18CR204(NGG) - pg. 1254

In another instance, Ms. Edmondson appeared to take Mr. Vicente's advice about using "parents" to "get to the kids," as well as telling this DOS member that she "could be in big trouble," then offering access to a "pro bono lawyer," possibly referencing Mr. Glazer.



# Summary

There was an organized group of people who had a shared monetary interest in seeing Raniere found guilty. Some of these people **colluded** to bring a class-action lawsuit against Raniere, while simultaneously testifying against him in his criminal trial where they lied to keep their monetary motivations a secret from judge and jury. Specifically, Daniela and Nicole testified that they had no intention of bringing a civil lawsuit against Raniere and others for monetary damages, when they did. **This is perjury.** The government clearly knew, or should have known, that these witnesses committed perjury. Instead, the government stymied the defense's efforts to reveal the witnesses' plans for a civil suit. Therefore, **the prosecution suborned perjury** in regards to Daniela and Nicole's denial of their intent to bring a civil suit. A larger group of former NXIVM students, led at least in part by witness Mr. Vicente, **conspired** to harm Raniere by **defamation**, ultimately strengthening the class-action suit.

# EXHIBIT 6.2

counsel received in § 3500 material and at trial, Glazer represented at least sixteen witnesses interviewed by the government.[5]

1. Mark Vicente (Named Plaintiff in the lawsuit)
2. Toni Natalie (Named Plaintiff in the lawsuit)
3. Sarah[6] (Named Plaintiff in the lawsuit)
4. Daniela (Jane Doe 1)
5. Nicole (Jane Doe 4)
6. Jay (Jane Doe 2)
7. Audrey (Jane Doe 5)
8. Jennifer Kobelt (Jane Doe 19)

9. Adrienne (Jane Doe 16)
10. Sallie Brink (Jane Doe 51)
11. Hector (John Doe 8)
12. Carly (Jane Doe 10)
13. Crystal
14. Rebecca
15. Kristin Keeffe
16. James ███████[7]

# Nicole, Agnifilo Page 4268

Q     Okay.  And do you remember the name Neil Glazer?

A     Yeah, that's my lawyer.  But I don't think I got it from Katherine.

Q     Do you remember Katherine sending you Neil Glazer's name and contact information?

A     I do.  Sorry, I thought it was Jay that had sent that. But maybe, I -- I did get Neil's information.

# Nicole, Agnifilo Page 4270

Q    And did he pressure you to be involved in a lawsuit?

A    In like a civil lawsuit?

Q    Yes.

A    No.

Q    Do you remember telling that to the FBI?

## Nicole, Agnifilo, Page 4276

Q    And your lawyer, Mr. Glazer is here today, right?  He is the gentleman, my colleague here to my left, right?

A    Yes.

Q    Are you intending to bring a civil suit?

A    No.

Q    No?

A    No.

Q    You have no intentions of bringing a civil suit?

A    Like me, personally?

Q    You and other people.

A    Not me, personally.

Q    Do you intend to be part of a class-action lawsuit?

A    No.

## Nicole, Agnifilo, Page 4277

Q    Have you discussed with anybody else the prospect of bringing a class-action lawsuit against NXIVM?

A    No.

Q    You haven't discussed with Jay, for instance?

A    No.  No.

## Daniela, Agnifilo Page 3275:

Q    You have a lawyer named Neil Glazer, correct?

A    Yes.

Q    Because you are going to bring a civil lawsuit, aren't you?

A    No.

Q    You have no intention of bringing a civil lawsuit against Keith Raniere or NXIVM or anyone else?

A    That's not something that I have done or decided, no.

Q    I know you haven't done it but you plan on doing it, don't you?

A    No.

## Daniela, Agnifilo, Page 3276

**DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**

_____ *

SARAH EDMONDSON, *et al.*                *
                                                            *
            Plaintiffs,                            *
                                                            *          1:20 - cv - 00485-EK-CLP
                                                            *
v.                                                         *
                                                            *
Keith Raniere, *et al.*                         *
                                                            *
            Defendants.                          *
_____ *

**ORDER**

THIS MATTER having been brought to the attention of the Court by the Defendant

Counterclaimant, Danielle D. Roberts and the Court having examined all submissions and for

good cause

**IT IS ORDERED THIS** _____ of April 2026 that:

The motion to dismiss the Counterclaims is:

            _____ Granted

            _____ Denied

**AND IT IS FURTHER ORDERED** that the Defendant Counterclaimant is GRANTED leave to

file an amended counterclaim within _____ days of the present order

**AND IT IS FURTHER ORDERED** that there will be no dispositive motions until discovery for

the claim of Battery against Danielle Roberts is completed.

_____

Eric R. Komitee U.SD.J