**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**

SARAH EDMONDSON; JESSICA JOAN SALAZAR; SOUKIANA MEHDAOUI; NICOLE; DANIELA; CAMILA; INDIA OXENBERG; BONNIE PIESSE; TABITHA CHAPMAN; ASHLEY MCLEAN; MARK VICENTE; ANTHONY AMES; VERONICA JASPEADO; PALOMA PENA; CHARLOTTE; RACHEL; VALERIE; ADRIENNE STILES; LINDSAY MACINNIS; JENNIFER KOBELT; DEANNE BRUNELLE; KARLA DIAZ CANO; PAMELA COOLEY; BRIEANNA FIANDER; SHAYNA HOLMES; POLLY GREEN; ANDREA HAMMOND; YAN HUANG; SARA LIM; ARIELLA MENASHY; ELHAM MENHAJI; MAJA MILJKOVIC; MICHELLE NEAL; ALISON ROOD; KATIE SHAW; KRISTIN; HANNAH VANDERHEYDEN; SUSAN PATRICIA VIETA; STEPHANIE FAIR-LAYMAN; SARAH WALL; SCOTT STARR; PHILIP AKKA; ALEJANDRO BALASSA; MADELINE CARRIER; ROD CHRISTIANSEN; OWEN GIROUX; JEFFREY GOLFMAN; ASHLEY HARVEY; ANTHONY MADANI; CHAD WILLIAMS; CHRISTOPHER BLACK; ROBERT GRAY; KEN KOZAK; ADRIAN; JANE DOE 8; and JANE DOE 9,

Plaintiffs,

v.

KEITH RANIERE; CLARE BRONFMAN; SARA BRONFMAN; DR. DANIELLE ROBERTS; NXIVM CORPORATION; EXECUTIVE SUCCESS PROGRAMS, INC.; ETHICAL SCIENCE FOUNDATION; and FIRST PRINCIPLES, INC,

Defendants.

CIVIL ACTION NO. 20-CV-485

# TABLE OF CONTENTS


FIFTH AMENDED COMPLAINT ........ 1

SUMMARY OF THE ACTION ........ 1

PARTIES AND FORMER PARTIES ........ 4

JURISDICTION AND VENUE ........ 7

STATEMENT OF FACTS ........ 8

*Defendant Raniere forms NXIVM—a pseudo-psychotherapy-based pyramid scheme.* ........ 8

*Defendants Sara and Clare Bronfman join NXIVM, rise to leadership positions in the organization, and fuel it with millions of dollars.* ........ 10

*NXIVM's leaders operate the enterprise and use fraudulent representations to generate revenue; amass recruits; and target and prime enrollees for physical, psychological, and sexual abuse.* ........ 13

*NXIVM lures to the United States, then exploits, foreign nationals.* ........ 19

*NXIVM conducts unauthorized human experiments using Clare and Sara Bronfman's ESF and with the actual knowledge of Clare and Sara Bronfman.* ........ 30

*NXIVM creates identity-based subgroups to target, prime, isolate, and abuse victims* ........ 32

*Raniere and Clare Bronfman create more subgroups to groom women for sexual abuse by Raniere.* ........ 34

*Defendant Raniere's abuse of Camila leads her to attempt suicide.* ........ 37

*Raniere creates and secretly operates DOS, a sex trafficking pipeline, which sexually abuses and brands women who had been groomed by NXIVM.* ........ 38

*Raniere and Mack Agree DOS members will be branded. Defendant Roberts brands DOS victims and is stripped of her license for it.* ........ 43

*Former Defendant Mack recruits, extorts, and abuses her DOS slaves.* ........ 47

*Plaintiff Nicole* ........ 47

*Plaintiff India Oxenberg* ........ 50

*Plaintiff Soukiana Mehdaoui* ........ 51

*Plaintiff Jessica Joan Salazar* ........ 52

*Plaintiff Rachel* ........ 53

*Plaintiff Valerie* ........ 54

*Former Defendant Clyne recruits, extorts, and abuses her "slaves."* ........ 55

*Plaintiffs Edmondson, Paloma Pena, Jane Doe 9, Kristin, and Charlotte are recruited into DOS, extorted, and abused.* ........ 56

*Clare Bronfman facilitated some DOS victims' abuse.* ........ 58

*As DOS unravels, Defendant Clare Bronfman leads an attack on defectors and critics to protect Raniere and NXIVM, and Sara Bronfman engages in witness tampering.* ........ 60

*NXIVM's abusive tactics in the wake of DOS revelations were part of a broader pattern of retaliatory and abusive actions that included misusing the legal system.* ........ 63

*Despite Clare Bronfman's and NXIVM's attempt to cover up DOS and Raniere's crimes, the Department of Justice successfully prosecutes several NXIVM leaders.* ........ 66

COUNT I - RACKETEER INFLUENCED AND CORRUPT ORGANIZATIONS ACT (RICO) - 18 U.S.C. §§ 1962(c) and 1964(c) ........ 68

*Against Defendants Raniere, Clare Bronfman, Sara Bronfman, former Defendant Mack, former Defendant Clyne, former Defendant Russell, and the Entity Defendants on behalf of all Plaintiffs* ........ 68

RICO "Person" ........ 68

RICO "Enterprise" ........ 68

Interstate or Foreign Commerce ........ 69

Pattern of Racketeering Activity ........ 69

Defendant Raniere's Predicate Acts ........ 69

Defendant Clare Bronfman's Predicate Acts ........ 70

Defendant Sara Bronfman's Predicate Acts ........ 72

Former Defendant Mack's Predicate Acts ........ 73

Former Defendant Clyne's Predicate Acts ........ 74

Former Defendant Russell's Predicate Acts ........ 75

"RICO" Injury ........ 76

COUNT II - RACKETEER INFLUENCED AND CORRUPT ORGANIZATIONS ACT (RICO) CONSPIRACY - 18 U.S.C. §1962(d) and 1964(c) ........ 77

*Against Defendants Raniere, Clare Bronfman, Sara Bronfman, former Defendant Mack,former Defendant Clyne, former Defendant Russell, Roberts, and former Defendant Porter on behalf of all Plaintiffs* ........ 77

COUNT III - CLAIMS UNDER 18 U.S.C. § 1595 ........ 81

(A) SEX TRAFFICKING—18 U.S.C. § 1591 and ATTEMPTED SEX TRAFFICKING – 18 U.S.C. § 1594(a) ........ 82

*Against Defendant Raniere on behalf of Plaintiffs Edmonson, Salazar, Oxenberg, Mehdaoui, Rachel, Nicole, Valerie, Jane Doe 8, Paloma Pena, Jane Doe 9,*

*Kristin, Jaspeado, Charlotte (the "DOS Plaintiffs"); Lindsay MacInnis, Adrienne Stiles, Bonnie Piesse (the "Exo/Eso Plaintiffs"); and Camila and Daniela* .................... 82

*Against Defendant Clare Bronfman on behalf of the Exo/Eso Plaintiffs and the DOS Plaintiffs* .................................................................................................... 85

*Former Defendant Clyne on behalf of Jane Doe 8 and the DOS Plaintiffs*...................... 86

*Against former Defendant Mack on behalf of Plaintiffs Nicole, Oxenberg, Mehdaoui, Salazar, Rachel, and Valerie and the DOS Plaintiffs*..................................... 87

*Former Defendant Russell on behalf of Camila* ............................................................ 88

(B) CONSPIRACY TO COMMIT SEX TRAFFICKING – 18 U.S.C. § 1594(c) ....................... 89

*Against Defendants Raniere, Clare Bronfman, former Defendant Mack, former Defendant Clyne, former Defendant Russell on behalf of the DOS Plaintiffs, the exo/eso Plaintiffs, Daniela, and Camila* ........................................................................... 89

(C) FORCED LABOR—18 U.S.C. § 1589 and HUMAN TRAFFICKING - 18 U.S.C. § 1590 and ATTEMPTED FORCED LABOR AND HUMAN TRAFFICKING - 18 U.S.C. § 1594(a) . 89

*Against Defendant Raniere on behalf of the DOS Plaintiffs, Exo/Eso Plaintiffs, Daniela, Camila, and Adrian*............................................................................................ 90

*Against Defendant Sara Bronfman on behalf of Plaintiff Camila* ................................... 92

*Against Defendant Clare Bronfman on behalf of the Exo/Eso Plaintiffs, the DOS Plaintiffs, Adrian, Camila, and Daniela* .................................................................. 93

*Former Defendant Clyne on behalf of Jane Doe 8 and the DOS Plaintiffs.*..................... 94

*Against Defendant Mack on behalf of Plaintiffs Nicole, Oxenberg, Mehdaoui, Jessica Joan Salazar, Rachel, and Valerie and all DOS Plaintiffs*................................... 94

*Against former Defendant Russell on behalf of the DOS Plaintiffs and Camila*.............. 95

(D) CONSPIRACY TO COMMIT FORCED LABOR and CONSPIRACY TO COMMIT HUMAN TRAFFICKING - 18 U.S.C. § 1594(b) ............................................................... 96

*Against Defendants Raniere, Clare Bronfman, Sara Bronfman, former Defendant Mack, former Defendant Clyne, former Defendant Porter on behalf of the DOS Plaintiffs, the Exo/Eso Plaintiffs, Adrian, Camila, and Daniela* ..................................... 96

(E) UNLAWFUL CONDUCT WITH RESPECT TO DOCUMENTS IN FURTHERANCE OF TRAFFICKING OR FORCED LABOR 18 U.S.C. § 1592 .................................................. 96

*Against Defendants Raniere and Clare Bronfman on behalf of Plaintiff Daniela*............ 96

(F) CONSPIRACY TO ENGAGE IN UNLAWFUL CONDUCT WITH RESPECT TO DOCUMENTS IN FURTHERANCE OF TRAFFICKING OR FORCED LABOR - 18 U.S.C. § 1594(b)...................................................................................................................... 97

*Against Defendants Raniere and Clare Bronfman on behalf of Plaintiff Daniela*............ 97

STATE LAW CLAIMS COUNT IV - BATTERY ..................................................................... 97

*Against Defendant Danielle Roberts on behalf of Plaintiffs Sarah Edmondson, Nicole, Paloma Pena, and India Oxenberg* ........ 97

COUNT V - AIDING AND ABETTING, ACTING IN CONCERT, AND CONSPIRING WITH RESPECT TO BATTERY ........ 98

*Against Defendants Raniere, former Defendant Mack and former Defendant Clyne, on behalf of Plaintiffs Sarah Edmondson, Nicole, Paloma Pena, India Oxenberg and Camila* ........ 98

COUNT VI - GROSS NEGLIGENCE and RECKLESSNESS ........ 98

*Against Defendant Raniere on behalf of Plaintiffs Margot Leviton, Isabella Constantino and Caryssa Cottrell* ........ 98

COUNT VII - NEW YORK CHILD VICTIMS ACT CLAIM (N.Y. C.P.L.R. § 214-g) ........ 99

*Against Defendant Raniere on behalf of Camila* ........ 99

COUNT VIII - N.Y. C.P.L.R. § 213-c (action by victim of sexual offenses) ........ 100

*Against Defendant Raniere on behalf of Camila* ........ 100

COUNT IX - BATTERY; INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS; CLAIMS PURSUANT TO NEW YORK CHILD VICTIMS ACT (N.Y. C.P.L.R. § 214-g) ........ 100

*Against Defendant Raniere on behalf of Camila* ........ 100

COUNT X - BATTERY; INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS; CLAIMS PURSUANT TO N.Y. C.P.L.R. § 213-c (action by victim of sexual offenses)

*Against Defendant Raniere on behalf of Camila* ........ 101

PRAYER FOR RELIEF ........ 102

DEMAND FOR JURY TRIAL ........ 103

**FIFTH AMENDED COMPLAINT**

Plaintiffs file this fifth amended complaint[1] against Keith Raniere; Clare Bronfman; Sara Bronfman; former Defendant Allison Mack; former Defendant Nicki Clyne; former Defendant Kathy Russell; former Defendant Brandon Porter; and Danielle Roberts (the "Individual Defendants"), as well as NXIVM Corporation; Executive Success Programs, Inc.; Ethical Science Foundation; and First Principles, Inc. (the "Entity Defendants"), collectively referred to as "Defendants."

Defendants conspired to operate, and in fact operated, a sprawling, criminal organization that qualifies as an "enterprise" under the Racketeer Influenced and Corrupt Organizations ("RICO") Act and a "venture" under Title 18, Chapter 77 (the "TVPRA"). The organization's central purpose was to enrich its leadership, including the Individual Defendants, with money, uncompensated labor, sex, and social status and power in the NXIVM organization. To accomplish those ends, each Individual Defendant committed tortious, and, in many cases, criminal acts that injured Plaintiffs physically, financially, and psychologically.

**SUMMARY OF THE ACTION**

1. In 1998, Keith Raniere formed the NXIVM organization in Albany, New York.

2. NXIVM was an umbrella comprised of several pyramid-structured organizations, some of which were legal entities, including the NXIVM Corporation; Executive Success Programs ("ESP"), Inc.; Jness, LLC ("Jness"); Society of Protectors, LLC ("SOP"); Ethical Science Foundation ("ESF"); First Principles, Inc.; and Rainbow Cultural Garden ("RCG"), and

[1] By filing Fourth and Fifth Amended Complaints per the Court's Orders, Plaintiffs stand on all their claims for purposes of appeal and specifically retain all their appellate rights.

some of which were not legal entities, including Ultima, exo/eso, and DOS (also known as "The Vow" and "The Sorority").

3. NXIVM's leadership included current Defendants Raniere, Clare Bronfman, and Sara Bronfman, as well as former Defendants Nancy Salzman, Lauren Salzman, Allison Mack, Nicky Clyne, and Kathy Russell. These individuals were referred to as Raniere's "Inner Circle," and they all knew each other personally and were intimately involved in all aspects of the NXIVM enterprise.

4. NXIVM's principal revenue-generating activity was operating a multi-level marketing ("MLM"), or "pyramid," scheme based on the sale of "self-help" curricula created by Defendant Raniere and former Defendant Nancy Salzman.

5. NXIVM and the Individual Defendants comprised and operated a criminal enterprise and venture, which, among other things, harbored foreign nationals to exploit their labor, performed unauthorized experiments on human beings (including those already suffering from serious illness) without their informed consent, and sexually abused women through extortion and other crimes. NXIVM's leadership used its, Clare Bronfman's, and Sara Bronfman's extraordinary wealth to silence critics and witnesses and potential critics and witnesses through (among other things) intimidation, threats, extortion, vexatious litigation, and the initiation of false criminal allegations to protect the enterprise.

6. NXIVM began to collapse in 2017, after Raniere, former Defendant Mack, former Defendant Clyne, Roberts, and leaders of a NXIVM subgroup, "DOS," defrauded, extorted, sexually abused, and branded DOS recruits (so-called "slaves") with Raniere's initials. Those events led to several defections from NXIVM, which were reported by *The New York Times*.[2]

---

[2] Barry Meier, "Inside a secretive group where women are branded," *The New York Times* (Oct. 17, 2017), *https://www.nytimes.com/2017/10/17/nyregion/nxivm-women-branded-albany.html.*

7. Soon after, the United States Department of Justice launched an investigation of the enterprise that culminated in a grand jury indicting Defendants Raniere, and Clare Bronfman, and former Defendants Mack and Russell (among others) with a multitude of criminal offenses, including racketeering, racketeering conspiracy, sexual exploitation of a child, child pornography, identity theft, conspiracy to alter records for use in an official proceeding, conspiracy to commit identify theft, money laundering, trafficking foreign nationals for labor and services, document servitude, extortion, visa fraud, forced labor, wire fraud conspiracy, and sex trafficking.[3]

8. Defendants Raniere, and Clare Bronfman, and former Defendants Mack, Russell were later convicted in this District of myriad offenses, many of which constitute racketeering acts under RICO. The head of the enterprise, Raniere, was convicted on all counts against him—including racketeering, racketeering conspiracy, and human trafficking—after a six-week jury trial, and sentenced to 120-years' imprisonment.[4] Clare Bronfman was sentenced to 81-months' imprisonment after she pled guilty to (1) conspiring to conceal, harbor, and shield from detection one or more aliens for financial gain, in violation of 8 U.S.C. § 1324(a)(1)(A)(v)(I), and (2) unlawfully transferring and using a means of identification of another person with the intent to commit, and in connection with, attempted tax evasion, in violation of 18 U.S.C. §§ 1028(a)(7), 1028(b)(1)(D), and 1028(c)(3)(A).[5] Both sentences have been affirmed by the United States Court of Appeals for the Second Circuit.[6] Former Defendant Mack pled guilty to racketeering and racketeering conspiracy, predicated on forced labor, extortion, sex trafficking, and wire

[3] For concision, Plaintiffs incorporate by reference herein, and request that the Court judicially notice, all public filings on the dockets of *United States v. Raniere et al*, 1:18-cr-00204-NGG-VMS (E.D.N.Y.) (hereafter, "District Court Docket") and *United States v. Raniere et al*, 20-3789 (2d Cir.) (hereafter, "Appellate Court Docket"), and all unsealed transcripts and exhibits from those proceedings.
[4] District Court Docket, ECF 966 at 19.
[5] District Court Docket, ECF 936 at 27.
[6] Appellate Court Docket, ECF 215 at 13-14.

fraud, for her role in using deceit to obtain damaging information about DOS victims and using the threat of that information's disclosure to coerce DOS victims into providing labor for, and performing sex acts with, Raniere.[7] Former Defendant Kathy Russell pled guilty to visa fraud for her role in NXIVM's immigration fraud scheme.[8]

**PARTIES AND FORMER PARTIES**

9. Defendant Keith Raniere, also known by several aliases, including "Vanguard," "Grandmaster," and "Master," is a citizen of New York. He is serving a 120-year prison sentence in Tucson, Arizona. Raniere was the *de facto* head of NXIVM.

10. Defendant Clare Bronfman is a citizen of New York. She is serving an 81-month sentence in Philadelphia, Pennsylvania. She was found by the grand jury to be part of Raniere's Inner Circle and a leader of NXIVM.[9] As discussed below, she was a member of the Inner Circle, had several top positions, and performed critically important roles for the enterprise. She is the daughter of billionaire Edgar Bronfman Sr. and a wealthy heiress to the Seagram's fortune. According to her own representations to this Court (J. Garaufis) during the related criminal proceeding, she provided more than $100 million to NXIVM, which included paying attorneys to send threatening letters to DOS victims.[10] This Court found that she "consistently leveraged her wealth and social status as a means of intimidating, controlling, and punishing individuals whom Raniere perceived as his adversaries, particularly NXIVM's detractors and critics."[11] She is Defendant Sara Bronfman's sister.

[7] District Court Docket, ECF 1053 at 4.
[8] District Court Docket, ECF 1131 at 3.
[9] District Court Docket, ECF 430 at 2.
[10] District Court Docket, ECF 936 at 13.
[11] *Id.*at 13.

11. Defendant Sara Bronfman is a citizen and former resident of New York. Her current whereabouts are unknown to Plaintiffs. On information and belief, she has left the country. She was part of Raniere's Inner Circle and a leader of NXIVM, who, as discussed below, held several titles and performed several important roles for the enterprise. She is an heiress who used her wealth and social status to promote NXIVM and recruit new members. Like Clare Bronfman, she provided millions of dollars to finance Defendants' campaign to silence critics and witnesses. She also financed NXIVM's operations, including by acquiring three commercial properties to serve as NXIVM's headquarters, center of operations, and administrative offices, from which the Individual Defendants committed tortious and criminal acts.

12. Former Defendant Allison Mack is a citizen and resident of California who resided in New York at all times relevant to this Complaint. She is serving a 3-year sentence for crimes she committed as a leader of DOS. She was a member of Raniere's Inner Circle and helped Raniere create and run DOS. She was a DOS "First Line Master;" the slaves she extorted included Plaintiffs Jessica Joan Salazar, India Oxenberg, Soukiana Mehdaoui, Rachel, Nicole, and Valerie.[12] This Court found that Mack, a prominent actress, used her "status as a well-known public figure to gain credibility and influence with NXIVM and DOS recruits" and "abused [that] power to persuade and pressure women to join DOS."[13]

13. Former Defendant Nicki Clyne is a resident of Florida who resided in New York at all times relevant to this Complaint. She worked directly with Raniere to create and operate DOS. She was a DOS "First Line Master" and wielded substantial power over Plaintiff Jane Doe

[12] Plaintiffs refer to themselves in this Complaint by their full names, by their first names only, or as Jane Does, in compliance with this Court's orders. *See Edmondson et al v. Raniere et al*, 20-CV-485 (E.D.N.Y.), ECF 141 at 5, 10; 152.
[13] District Court Docket, ECF 1053 at 4.

8 and her other slaves. She was a member of Raniere's Inner Circle, who continued to recruit for DOS until March 27, 2023.

14. Former Defendant Kathy Russell resides in New York. She was NXIVM's bookkeeper for at least twelve years.[14] A member of the Inner Circle, she worked directly with Raniere and other NXIVM leaders. She was responsible for harboring Plaintiff Camila, and evidence adduced at trial established that under the alias Kathleen O'Sullivan she leased and made cash rental payments for the apartment where Camila was hidden. Former Defendant Russell also transported, and concealed Plaintiff Daniela from immigration authorities by driving her across the Canadian border and presenting a false sheriff's identification that she had procured for Daniela to immigration authorities to successfully bring Daniela into the United States.

15. Former Defendant Brandon Porter is a physician formerly licensed to practice medicine in New York. On information and belief, he resides in Iowa. At all times relevant to this Complaint, he was licensed to practice medicine in New York and regularly engaged in the practice of medicine here. Porter was paid by, and an agent of, ESF. At the direction of Raniere, Clare Bronfman, and Nancy Salzman, Porter "treated" NXIVM recruits, including Plaintiffs suffering from Tourette's and OCD, with NXIVM's psychotherapy techniques, and he conducted the "Human Fright Experiment" on recruits without voluntary informed consent, authorization, or appropriate professional oversight.

16. Defendant Danielle Roberts is a physician formerly licensed to practice medicine in New York. She was regularly engaged in the practice of medicine in New York at all times relevant to this Complaint. She maintains a professional address in Plainview, New York and

[14] District Court Docket, ECF 1131 at 3.

resides in New York. A member of DOS, she was specially commissioned by Raniere to use a cauterizing iron to brand numerous DOS members in their pubic regions without informed consent or anesthesia. Roberts continues to support Raniere and publicly promote DOS.

17. Each of the Entity Defendants—NXIVM Corporation; Executive Success Programs, Inc.; Ethical Science Foundation; and First Principles, Inc.—is a legal entity whose purpose was to further the criminal organization's unlawful schemes by moving and concealing funds. Raniere and the Inner Circle operated and controlled the Entity Defendants, which did not abide by corporate formalities, and were at all times Raniere's alter egos.

18. For clarity and concision, Plaintiffs' names, residencies, and injuries are set forth in Schedule A, which is incorporated herein by reference.

## JURISDICTION AND VENUE

19. The Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 because Plaintiffs' claims arise under the laws of the United States, including 18 U.S.C. §§ 1595, 1964. The Court has supplemental jurisdiction over Plaintiffs' state law claims pursuant to 28 U.S.C. § 1337.

20. Venue is proper in this District pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to the claims occurred in this District, including the recruitment of residents of this District to take NXIVM courses and join NXIVM-affiliated groups, and that some of the Plaintiffs and Defendants reside in this District. Defendants also knowingly and purposely availed themselves of and made use of airports within this District as part of the course of conduct at issue in this action, including the transport of foreign nationals to the Albany area, where certain Defendants conspired to, attempted to, and

committed racketeering acts, forced labor, human trafficking, document servitude, and sex trafficking.

21. Venue is also proper in this District pursuant to 28 U.S.C. § 1391(b)(3), insofar as Defendants Raniere, and Clare Bronfman former Defendants Mack and Russell are presently subject to the personal jurisdiction of this Court with respect to the matters that are the subject of this Complaint.

22. Venue is also proper in this District pursuant to 18 U.S.C. § 1965(a) and (b). Defendant Roberts resides in this District, and the ends of justice require that parties residing in other districts be brought before this Court.

## STATEMENT OF FACTS

***Defendant Raniere forms NXIVM—a pseudo-psychotherapy-based pyramid scheme.***

23. Before forming NXIVM, Raniere operated a multi-level marketing scheme through a company named Consumers Buyline, Inc. ("CBI"). In the mid-1990's CBI was investigated as an unlawful pyramid scheme by 25 Attorneys General. It was shuttered by the New York Attorney General on September 3, 1996, and Raniere consented to an order that barred him from participating in a chain distribution scheme in New York and required him to pay a $40,000 penalty.[15]

24. In 1998, Raniere and his collaborator, Nancy Salzman, formed NXIVM, which was operated and managed by Defendant ESP. NXIVM was another pyramid operation designed to induce enrollees (so-called Nxians) to recruit others and form downstream sales organizations within NXIVM. Enrollees were told they would benefit financially from selling curricula and other NXIVM products and recruiting others to do the same, and that, through sales and

[15] Consent Order and Judgement, *People of the State of New York v. Consumers' Buyline, Inc. et al.,* No. 2336-93 (Sup. Ct. Albany, N.Y.).

recruiting, they would climb a hierarchy known as "The Stripe Path." NXIVM's leaders and enrollees wore colored, striped sashes to indicate their rank and recruitment achievements.

25. Raniere based NXIVM's curricula on his so-called "Rational Inquiry" method, a synthesis of psychotherapy and the teachings, methods, and practices of the human potential movement. Rational Inquiry was used to modify thinking and behavior that, according to NXIVM doctrine, was maladaptive. Although Raniere touted Rational Inquiry as a cure for psychiatric and physical illnesses, he and the other Individual Defendants knew that it was not. Rational Inquiry's purpose was to defraud Nxians out of substantial sums of money and increase their vulnerability to emotional, psychological, and sexual abuse.

26. The sale of Rational Inquiry-based curricula was NXIVM's principal revenue-generating activity. NXIVM continued selling this curriculum until the Department of Justice prosecuted NXIVM's leadership, and the U.S. government took ownership of certain NXIVM copyrights.

27. NXIVM was based in Albany, New York, and its curricula taught that recruits needed to completely immerse themselves in the NXIVM system and move to Albany. Raniere's purpose in promulgating this "complete immersion" doctrine was to cultivate a hidden, insular community where members had little contact with the outside world, so he could exercise control over, and eventually financially exploit and sexually abuse, recruits. While NXIVM operated, hundreds of recruits and Raniere's Inner Circle, traveled to and lived in Albany.

***Defendants Sara and Clare Bronfman join NXIVM, rise to leadership positions in the organization, and fuel it with millions of dollars.***

28. In 2001, Sara Bronfman, joined NXIVM.

29. In 2004, she persuaded her sister, Clare Bronfman, to attend a NXIVM course in Monterrey, Mexico. That year, Sara and Clare relocated to New York to dedicate themselves to NXIVM.

30. The sisters rose to prominence within the organization and began funneling massive amounts of money into NXIVM. They had privileged positions, were given authority and control over NXIVM and its organizations and enjoyed numerous high-ranking ownership, leadership, and management positions within NXIVM. For example, Sara Bronfman was a member of NXIVM's Executive Board, Senior Executive of ESP, Co-Founder of Defendant ESF; head of Defendant RCG, NXIVM's childcare program that was a vehicle through which she, Raniere, Clare Bronfman, and others exploited foreign labor; and Founder of NXIVM's so-called VIP Programs, which recruited powerful individuals with financial, social and political capital to appear at NXIVM events. On her personal blog (*www.sarabronfman.com*), Sara Bronfman explained that she was "one of the company's [NXIVM's] top-ranked international trainers" who "overs[aw]" the company's activities "within its thirty-three-country network," that she was a "success" at "teaching and run[ning] a VIP training program," that she "opened ESPs activities in Great Britain," "ha[d] been responsible for the organization's European endeavors," and helped "launch ESP Centers in both New York City and Belfast, Northern Ireland," in addition to "creat[ing] the World Ethical Foundations Consortium" with Clare Bronfman and their "mentor" and the organization's "conceptual founder," Keith Raniere.

31. Clare Bronfman was also a member of NXIVM's Executive Board, and her other positions included Vice President of Operations and Board Member of Defendant ESP; and

Trustee, Co-founder, and Chief Operating Officer of Defendant ESF. Testimony adduced at Raniere's trial established that Clare Bronfman directed and ran virtually every aspect of the NXIVM operation, including overseeing its financial, legal, administrative, and accounting operations.[16] Shortly after Sara and Clare Bronfman joined NXIVM and rose to prominence within it, they were in frequent contact with Raniere, who Clare Bronfman has publicly described as her "best friend."

32. Clare and Sara Bronfman provided Raniere and his entities with over $100 million. The money was used to establish an immigration fraud network, silence detractors through litigation, and provide loans to Raniere and his entities.[17] Much of this money flowed through Defendant ESF, a non-profit founded, financed, and operated by Sara and Clare Bronfman. As set forth below, ESF funded RCG, the entity at the center of NXIVM's immigration fraud schemes and human experimentation. Clare and Sara Bronfman were also Trustees of the "Ethical Humanitarian Foundation," a non-profit founded by Raniere.

33. Sara Bronfman also promoted and elevated Raniere and NXIVM as exemplars of humanitarianism and ethical living, spending at least $1 million to induce the Dalai Lama to speak at a NXIVM event. That event was subsequently used to falsely promote Raniere and NXIVM as having been endorsed by the Dalai Lama when in fact it was a paid speaking engagement and did not endorse NXIVM or Raniere.

34. Clare Bronfman developed a "close relationship" with Raniere[18] and marshalled her power, rank, and wealth to, among other things, (1) "intimidate and silence NXIVM's critics," including those who were not "prominent and powerful" by emailing photographs of

---

[16] Vicente, Tr. 592-597.
[17] District Court Docket, ECF 936 at 16.
[18] *Id*. at 7.

women who, after having been victimized by Raniere, became vocal critics of him, to a Mexican attorney to facilitate the women's identification; (2) pressure Plaintiff Oxenberg to sue her mother who was publicly critical of NXIVM; (3) "aggressive[ly] ... use the legal system to silence NXIVM's critics;" (4) "use[] her incredible wealth and attempt[] to use her social status and connections" to "support NXIVM's work" and "intimidate[], threaten[], and exact[] revenge upon individuals who dared challenge its dogma;" and (5) contributed to the culture that led to NXIVM leadership's "darkest and most horrific" crimes.[19]

35. Clare Bronfman also committed crimes as NXIVM's financier. For example, she pled guilty to fraudulent use of identification, as part of a scheme to keep money out of Raniere's name.[20] Clare Bronfman arranged for the regular payment of a deceased woman's credit card that was being used by Raniere, even though Clare Bronfman knew at the time the woman (Pamela Cafritz, another member of the Inner Circle) was deceased.[21] Over $100,000 was charged to Cafritz's credit card after her death and over $700,000 was disbursed from Cafritz's bank account, including some payments that went to former Defendant Russell. Judge Garaufis accepted Clare Bronfman's guilty plea, and found "by a preponderance of the evidence, that the facts underlying the offense [were] consistent with a pattern of facts . . . suggesting that Raniere attempted to minimize money that was in his name," and that Clare Bronfman's "conduct in committing this offense helped to facilitate those efforts on Raniere's part."[22]

36. Sara and Clare Bronfman were Defendant Raniere's primary backers and funders and his most trusted advisors and confidants. They were tied to nearly every aspect of the

[19] *Id.* at 13-14.
[20] *Id.* at 3.
[21] *Id.* at 12.
[22] *Id.* at 12.

NXIVM operation and worked closely with Defendant Raniere and other Inner Circle members to perpetuate and cover up NXIVM's crimes.

***NXIVM's leaders operate the enterprise and use fraudulent representations to generate revenue; amass recruits; and target and prime enrollees for physical, psychological, and sexual abuse.***

37. The NXIVM multi-level marketing scheme and curriculum were designed to corrode the emotional health and well-being of new members and defraud them of money, so that they would become susceptible to physical, psychological, and sexual abuse. NXVIM operated by pressuring members to purchase expensive courses, recruit new members, and perform uncompensated "coaching" services for junior members to unlock ever-increasing "goal levels" within NXIVM. The goal levels corresponded to increased status, responsibility, and privilege within the NXIVM system, including the potential to earn commissions on the sale of curricula once the enrollee became a "Proctor."

38. Defendants Raniere, Clare Bronfman, and Sara Bronfman, and former Defendants Mack, Russell, and Clyne knew of the content of NXIVM materials because they were in the Inner Circle, and because each had firsthand experience with the NXIVM curricula. Sara and Clare Bronfman and former Defendant Russell were NXIVM Coaches and Proctors, and former Defendant Mack and former Defendant Clyne were Coaches. Moreover, both Clare and Sara Bronfman, as leaders and chief financiers of NXIVM, had knowledge of and influence and control over the content of NXIVM's doctrines, curricula, sales materials, and practices.

39. NXIVM doctrine taught Nxians to recruit prospective students using a script developed by Raniere and the Inner Circle and included in NXIVM's Field Trainer Manuals.

40. Although NXIVM's curricula were designed to create the appearance of progress, Raniere, with Clare and Sara Bronfman's tacit or express approval, continuously added new

modules and courses and required enrollees to retake courses they had already taken to generate more revenue. In fact, no enrollee ever did, or could, complete the NXIVM program. Chances of making money from capturing new recruits were slim (a feature of illegal pyramid operations) and of the more than sixteen-thousand individuals who took NXIVM's courses, fewer than one percent ever earned any income from NXIVM's businesses. Instead, Raniere, NXIVM's Inner Circle, and the entities they controlled enjoyed most of the earnings.

41. All enrollees were strongly encouraged from the outset to attain the rank of "Coach," which was a pre-condition to becoming a "Proctor," and could be achieved only by committing to become a Proctor. Under NXIVM doctrine, Apprentice Coaches were required to undergo a screening process, perform six hours per week of uncompensated labor including attend each training twice and facilitate subsequent trainings, and recruit three new students within 6 months. Coaches were required to perform ten hours per week of uncompensated labor including facilitating trainings, "coaching" members and working on committees for 9–24 months without pay until they were finally awarded the rank of Proctor. NXIVM's "ESP Coaching Responsibilities and Privileged & Internship Agreement" stated "Our Coaching Program is an internship, at the end of which you are qualified to begin earning an income in an entirely new career—in an entirely new field!"

42. In fact recruiting (which generated revenue) rather than completing the process set forth above, actually drove an enrollee's advancement in the NXIVM system.

43. To drive recruiting, NXIVM's leadership published, promoted, and sold a systematized, training program premised on curricula containing NXIVM doctrine.

44. Those doctrines, curricula, and sales materials and practices included fraudulent representations to entice new recruits and thereby generate more revenue.

45. For example, to entice recruits, NXIVM publications represented that Raniere was the "world's smartest man" with an IQ of 240, an ascetic who had eschewed possessions and wealth, and a celibate. Raniere's website has also long asserted (as recently as January 2018) that: he "could construct full sentences and questions" by "the age of one"; he could "read by the age of two"; he "taught himself how to play piano at the concert level" by twelve; he "master[ed] many other musical instruments"; at thirteen, he was proficient in third-year college mathematics and was a professional computer programmer"; and that he "taught himself high school mathematics in nineteen hours at the age of twelve."

46. Each of those statements was false. On information and belief, Raniere does not have an IQ of 240 and has never scored 240 on a commonly-used, generally accepted, or legitimate IQ test; he was in fact using NXIVM to fund his lifestyle and accumulate personal wealth (which NXIVM materials asserted that he had disclaimed); and he did not practice celibacy but rather engaged in sexual conduct frequently and committed sex crimes for which he would later be convicted. Each of those statements was also knowingly false to Raniere and the Inner Circle. For instance, while such assertions were being published to NXIVM recruits, Sara and Clare Bronfman knew that Raniere neither practiced celibacy nor forsaken accumulating personal wealth, as evidenced by their roles in covering up Raniere's crimes and as Raniere's financiers. This was also evidenced by Clare Bronfman's payment of credit card bills incurred by Raniere on then-deceased Pamela Cafritz's credit card (a crime for which Clare Bronfman was later convicted).

47. NXIVM recruits were also drawn into the NXIVM program because they believed Raniere had successfully operated a similar company (CBI) in the past. This was because Clare Bronfman, Sara Bronfman, and Keith Raniere made false representations about

CBI and Raniere's business acumen. For example, the Ethical Humanitarian website (a foundation of which Clare and Sara Bronfman were Trustees[23]) published false statements on its website from at least April 7, 2010 to May 4, 2018, including that Raniere's former business, CBI, was "responsible for an estimated one billion dollars in product and services sales in its second full year of business," that Raniere "was worth $50 million only two years later," that Raniere turned CBI "into a corporation of nearly 400,000 [people]" two years after it was formed, and that Raniere became a millionaire at age thirty.

48. Raniere, Clare Bronfman, and Sara Bronfman knew these representations were materially false and misleading when they were made because before CBI was investigated by regulators, the business began to fail, its debt ballooned, customers complained, and Raniere did not appear to have a substantial amount of money.[24] Raniere only paid $9,000 of the $40,000 he owed the New York Attorney General, and Raniere admitted he could not pay the balance of that debt. When the representations were made, Raniere, Clare Bronfman, and Sara Bronfman also knew that CBI had been investigated by 25 attorney generals and shuttered in the wake of a consent order. The statements made on the Ethical Humanitarian website about CBI were calculated to mislead people into believing that Raniere was a highly successful entrepreneur, which he was not. Another example is that CBI purported to be a corporation of nearly 400,000 people, implying that CBI had 400,000 employees, which was untrue.

49. The NXIVM curricula also claimed that Defendant Raniere had donated his intellectual property rights in the ESP curricula to Defendant First Principles in an effort to

---

[23] On information and belief, Raniere, Sara Bronfman, and Clare Bronfman operated and controlled the Ethical Humanitarian website, which featured profiles of only those three individuals, and which was affiliated with and could be entered through Sara Bronfman's personal blog.
[24] FORBES, "Cult of Personality," (Oct. 13, 2003), *https://www.forbes.com/forbes/2003/1013/088.html?sh=55e96651853b.*

demonstrate that Raniere would not gain financially from the sale of curricula. That representation was false and materially misleading because Raniere owned an equity interest in First Principles and in fact enjoyed revenues from the curricula sold.[25] That ownership was concealed from enrollees, but—upon information and belief, including Clare Bronfman's close relationship with Raniere and her financial, administrative, and accounting oversight of NXIVM's operations—was known to Sara and Clare Bronfman, as well as other NXIVM leaders. That Raniere's ownership interest in First Principles was concealed from NXIVM's enrollees evinces that Raniere and NXIVM leadership knew that fact was inconsistent with the representation that Raniere had donated his rights to the ESP curriculum.

50. To portray NXIVM as legitimate and to generate sales, Raniere also claimed that Rational Inquiry was based in science, and used methods and derived results that were empirically measurable.

51. Evidence adduced at trial established that Clare Bronfman spent over $40,000 per month on NXIVM's patent costs.

52. Plaintiffs (with the exception of Camila, Daniela, and Adrian) relied on Raniere, Clare and Sara Bronfman's false statements when they purchased NXIVM curricula and performed uncompensated labor for Raniere and the Inner Circle, such as facilitating intensives, coaching enrollees and attending committee meetings. Plaintiffs would not have purchased such curricula and performed such labor but for these false statements.

53. Adrian also relied on false statements (as set forth below) when he exchanged his labor for NXIVM curricula.

[25] District Court Docket, ECF 794 at 4.

54. In addition to using the pyramid scheme to collect revenue, the Inner Circle also used the pyramid scheme to target and prime NXIVM's victims for abuse. For example, NXIVM's curriculum deliberately elicited highly personal information from participants to intentionally filter out mental health professionals and others likely to identify NXIVM's methods as pseudo-psychotherapy performed by unlicensed and untrained individuals. NXIVM used confidentiality agreements to prevent enrollees from disclosing NXIVM's concepts.

55. NXIVM also employed techniques, including a personnel ranking system with titles, special handshakes, and deferential practices (e.g., bowing), to foster subservience to authority and strict hierarchy. A key teaching was that Nxians with higher ranks were more accomplished and worthy than lower ranked Nxians. The program used teachings of self-blame, shame, and humiliation to prime its enrollees (including all Plaintiffs) for future abuse and encourage them to purchase more curriculum to fix their supposed failures. For example, during "counseling" sessions, higher ranking Nxians used the curriculum to shame and humiliate lower ranking Nxians into obeying their commands. Other key teachings included that complaining and questioning were forms of attention seeking; that neither the NXIVM curriculum nor its leaders should be criticized; and that it was immoral to criticize people in their absence.

56. Similarly, the Inner Circle pressured enrollees to become indebted to NXIVM and its leadership. This indebtedness was later used to exploit them. When enrollees were unable to purchase more classes, the Inner Circle would encourage them to "pay for" the courses with uncompensated labor. Desperate to escape debt and fearful of disobeying, enrollees, including many Plaintiffs, performed uncompensated labor for NXIVM's leaders, including Clare Bronfman, and were credited a small hourly rate toward the cost of the courses. For example, Plaintiffs Valerie, Charlotte, Anthony Ames, Alejandro Balassa, Rachel Behl, Tabitha Chapman,

Pam Cooley, Sarah Edmondson, Adrian, Brieanna Ingram, Ashley Harvey, Nicole, Lindsay MacInnis, Anthony Madani, Jennifer Kobelt, Ariella Menashy, Elham Menhaji, Maja Milijkovic, Michelle Neal, India Oxenberg, Bonnie Piesse, Adrienne Stiles, Kristin, Mark Vicente, Jane Doe 8, and Chad Williams, became trapped in a cycle of indebtedness because of (i) false representations by the Inner Circle that more courses were needed to progress through the program; (ii) the high cost of the courses; (iii) the threat that if they did not purchase and take more courses they would be shunned from the community. In this way, Nxians were deceived about the nature of NXIVM's curricula and the possibility of completing NXIVM's never-ending program and trapped in a circle of indebtedness and labor.

***NXIVM lures to the United States, then exploits, foreign nationals.***

57. In addition to generating revenue and uncompensated or under-compensated labor from the pyramid scheme, Raniere and the Inner Circle devised an immigration fraud scheme to recruit foreign nationals to provide NXIVM with uncompensated or under-compensated labor, and to sexually gratify Raniere.

58. A major part of this immigration fraud scheme was RCG, which was formed in 2006, as NXIVM's purported school and daycare for children. Clare and Sara Bronfman, operated and financed RCG. The stated purpose of RCG was to provide children with several rotating foreign babysitters for the majority of the children's waking hours to improve child development and teach the children several languages. RCG was a front for a trafficking operation. RCG recruited foreign nationals, placed and kept them in positions of servitude, and obtained free labor from them. Although RCG operated for over a decade, it was never licensed as a daycare provider in any state, and NXIVM leadership closed at least one RCG center (the Miami center) after authorities inquired about its lack of credentials. Moreover, RCG did not

require any of its babysitters, so-called Multi-Cultural Development Specialists ("MDS"), to have any background or experience in teaching or child development; nor were they trained or assessed for proficiency in either English or any other language, suggesting that Sara and Clare Bronfman had no intention that these "specialists" would teach the children foreign languages.

59. In fact, as set forth below, these "specialists" were simply foreign recruits enticed to come to the U.S. under false pretenses who performed uncompensated or under-compensated labor. The screening process through which they were selected consisted of Raniere reviewing photos of the young women that were provided to him by Loretta Garza ("Garza").

60. Garza was a Mexican national who entered the U.S. on a visa to work for Defendant ESF but in fact worked for RCG. Although she was the titular head of RCG, she worked for the organization at the direction of Raniere and Sara Bronfman, who directed Garza to maintain multiple sets of books to hide the existence of foreign nationals and mask RCG's finances. Garza was herself in the country without lawful status because of former Defendant Kathy Russell's criminal visa fraud, to which former Defendant Russell pled guilty. In her guilty plea, former Defendant Russell admitted that she "knowingly and intentionally presented a document to the United States Consulate in Mexico that contained false statements" in support of Ms. Garza's visa, including "materially false statements regarding [Ms.] Garza's job description and salary."[26]

61. Sara Bronfman later founded and operated RCG locations abroad, including in London, and (under a different name) in France. The center in France was shuttered by French authorities.

[26] District Court Docket, ECF 756 at 25-26.

62. Clare Bronfman was also integral to RCG. She disbursed funds from ESF to RCG to ensure funds were available to support visa applications for MDS workers. As the United States explained in a Court filing, "ESF was a favorable vehicle for sponsoring the H1-B visa applications because ESF, as a nonprofit, was not subject to the annual H1-B visa caps applicable to for-profit organizations."[27] Those visas were fraudulently obtained because the MDS workers were not student or non-profit workers, but laborers for RCG. Some of the funds that Clare Bronfman funneled to RCG were reported on RCG's books as tuition payments for children, even though the funds were used for visas for foreign workers. Indeed, in the criminal proceedings, the government amassed evidence that "ESF was little more than a vehicle to employs MDSs."[28]

63. NXIVM's scheme to exploit foreign nationals was designed to obtain low-cost labor and avoid taxation through under-the-table dealings. This was accomplished by ensconcing foreign nationals in the NXIVM community, isolating them from their families, manipulating them, and making them susceptible to psychological, emotional, and sexual abuse.

64. As part of that scheme, Clare Bronfman and other members of NXIVM's leadership intentionally compromised foreign nationals' immigration statuses to increase their susceptibility to abuse. Indeed, Clare Bronfman pled guilty to harboring aliens for financial gain, and Judge Garaufis found it was "clear" that "[Clare] Bronfman made promises to immigrants that she did not keep, exacted labor that she did not pay for, and took advantage of [those immigrants'] financial straits and immigration statues in a manner that exacerbated both their

[27] District Court Docket, ECF 922 at 8.
[28] *Id.* at 10.

financial and emotional vulnerabilities and made them more reliant on her and the NXIVM community, sometimes with very harmful consequences."[29]

65. For example, the government's investigation found that Clare Bronfman personally devised and effectuated a scheme attempting to fraudulently procure an investor visa.[30] Sylvie, a British national, entered the United States on a tourist visa specifically to work for and train for show horse jumping with Clare Bronfman. Under her visa, Sylvie was forbidden from working in the U.S., but Clare Bronfman paid Sylvie to work and take NXIVM classes. After Sylvie returned to England, Clare Bronfman encouraged her to apply for an investor's visa, even though Sylvie was 20 years old and in no financial position to invest in a commercial enterprise as required to obtain an investor's visa. To solve that problem, Clare Bronfman devised a scheme by which she would "pretend to buy" a horse from Sylvie by wiring funds into Sylvie's bank account. Sylvie would then "invest" this money in Ethletics, LLC, a NXIVM-affiliated entity. Clare Bronfman also authorized payments from Etheltics, LLC to "pay" Sylvie. Eventually this investor visa scheme was abandoned after the government requested additional documents. Nevertheless, Sylvie eventually returned to the U.S. and worked for Clare Bronfman for ten years, at which point she was recruited into DOS, extorted, and sexually abused by Raniere as set forth below.[31]

66. Additionally, Clare Bronfman promised B,[32] a foreign national, a full scholarship to attend school in the U.S. Her student visa was sponsored by ESF, the non-profit created and funded by Sara and Clare Bronfman. After B arrived in the U.S. with her child, Garza and Clare Bronfman told B that she would have to work as an MDS for RCG to receive the tuition money

[29] District Court Docket, ECF 936 at 11.
[30] District Court Docket, ECF 922 at 11.
[31] *Id.* at 11.
[32] B is not a plaintiff. Plaintiffs refer to her by first initial only to protect her privacy.

they had promised her. This scheme violated the terms of B's visa, which forbade her from working. The arrangement troubled B, who discussed the issue with Clare Bronfman and Garza, who then informed B that she no longer had a job at RCG and was ineligible for the promised scholarship. B was afraid that if she left the community, members of the Inner Circle would retaliate against her, report her to authorities, and cause her arrest and deportation. B expressed this concern to Clare Bronfman, who offered her an alternative: B (and her child) could live in a house owned by Clare Bronfman, where B could work for Clare as a "personal assistant." Due to B's tenuous financial circumstances and immigration status, conditions designed by Clare Bronfman and the Inner Circle, B agreed to work for Clare Bronfman and was paid by Clare Bronfman less than a living wage. By housing B and her child and paying B in cash, Clare intended to keep B and her child invisible to authorities. Given B's knowledge of Clare Bronfman's propensity for revenge, which Judge Garaufis discussed at Clare's sentencing,[33] B could not escape Clare Bronfman's house until the government indicted and arrested Clare.

67. Plaintiff Adrian was another foreign national who lived and worked in the NXIVM community. He was rarely compensated for the work he performed at Clare Bronfman's request, including manual labor he performed in her barn. After Adrian complained that he was unable to support himself and planned to leave NXIVM and return to Mexico, Raniere told Adrian that Adrian could build a company with Raniere. Clare Bronfman and Cafritz purchased equipment to print t-shirts, and promised Adrian a substantial share of net revenues of a t-shirt company. Adrian relied on these representations and worked tirelessly to build and operate the t-shirt company, investing his own money. The business, located in a property owned by a member of the Inner Circle, sold thousands of t-shirts, generating substantial revenues and profits, but

[33] District Court Docket, ECF 936 at 14.

Raniere and Clare Bronfman refused to compensate Adrian or reimburse his investment. Their explanation was that Adrian was like a CEO who would receive no compensation until investors were paid, even though there were no investors, and the company had no debt. At that time, Clare Bronfman and Raniere knew Adrian did not have the immigration status necessary to operate the company, and that he would be unable to demand compensation or seek other employment for fear of retaliation and deportation or arrest.

68. In fact, Clare Bronfman and Raniere did not just know and take advantage of Adrian's immigration status, they took concrete actions to place and keep Adrian in this vulnerable state. When Adrian informed them that he was returning to Mexico, to wait the requisite period, and apply to renew his visa, Raniere, Clare Bronfman, and others pressured him to stay in the country illegally and persuaded him not to leave the U.S. because their lawyers could resolve the immigration issue. Adrian relied on those assurances and remained in the U.S., losing his lawful immigration status.

69. After the Albany Times Union published a series of articles about NXIVM, Clare Bronfman and other members of NXIVM leadership told Adrian to go into hiding so that he would not be discovered by reporters or immigration authorities because it would reflect poorly on Raniere and the NXIVM community if he were caught. For the next eight months, Adrian was concealed in the home of a Nxian, where he worked for accommodations and was not paid or permitted to do other work.

70. Clare Bronfman even established an elaborate scheme (which she assured Adrian was lawful) to prevent Adrian from becoming too desperate to leave. She arranged for a Mexican business owner to establish a U.S. subsidiary (Sagitta, LLC) in Clifton Park, New York, which sponsored Adrian's work visa. Clare Bronfman represented she would transfer funds from a

NXIVM entity owned by Clare Bronfman (Moving Pixels, Inc.) to Sagitta, LLC's U.S. bank account, which would then compensate Adrian, including for his work operating the video cameras for NXIVM's "My Tourette's" production. Moving Pixels sent the funds to Sagitta on the pretext that Sagitta had provided services to NXIVM. In fact, Sagitta "existed solely as a vehicle for obtaining Adrian's visa."[34] As part of this scheme, Adrian was provided with false Sagitta LLC documents. Clare Bronfman assured Adrian that this scheme was lawful.

71. Camila lived in the NXIVM community in Clifton Park and would dutifully return to Mexico to satisfy the requirements of her visa. But Raniere informed Camila that she no longer needed to return to Mexico to renew her visa because Clare Bronfman's immigration lawyers had a better way for her to remain in the U.S. Camila followed that advice and overstayed her visa, losing her lawful immigration status. She repeatedly asked members of the Inner Circle about her status, but they did nothing but string her along, assuring her that Clare Bronfman was handling it. At that point, Camila lived in fear of being discovered by U.S. authorities, and NXIVM's leadership exploited that fear. On several occasions, Nancy Salzman told Camila that she could not be paid for her work including her hours worked at RCG. Camila was financially harmed because she was uncompensated or undercompensated for her work for RCG and she was not able to seek other employment because of her immigration status. Clare knew of Camila's immigration status: she had orchestrated immigration fraud for NXIVM, including as to Adrian, Camila's brother; members of the Inner Circle and the legal team were aware of Camila's immigration status; and Clare was personally familiar with Camila, who worked for RCG.

[34] District Court Docket, ECF 922 at 12.

72. Around 2010, Raniere instructed Camila to go into hiding, and in 2011 she was hidden from all other members of the NXIVM community in an apartment. From 2011 until Camila's escape from NXIVM in 2018, NXIVM's bookkeeper, former Defendant Russell, renewed the lease under the alias Kathleen O'Sullivan, and made annual rental payments for the apartment from a paper bag of cash at a Starbucks with funds provided by Clare Bronfman.[35] By then, Camila was rarely paid for her work. When she complained about her circumstances, Raniere threatened her with eviction from the apartment and deportation.

73. Daniela lived for years in the NXIVM community without lawful immigration status. On one occasion, Defendants Raniere and former Defendant Russell arranged for Daniela to fly from Mexico to Canada, so that she could be driven across the U.S.-Canada border to Albany. Their purpose in this plan was to avoid immigration scrutiny at the U.S. - Mexico border, which they perceived as stricter than that at the U.S.-Canada border. Once Daniela was in Canada, former Defendant Russell met her and drove her across the U.S.-Canada border, presenting immigration officials with fabricated identification papers that presented them as law enforcement officers. former Defendant Russell also purchased items in Canada for the specific purpose of telling the immigration officials a cover story that she went to Canada to shop.

74. Later, Daniela performed uncompensated labor for the Inner Circle, including cataloguing NXIVM materials and Raniere's publications. Eventually Daniela asked Raniere for help from Clare Bronfman's attorneys regarding her immigration status; she was ignored. Soon thereafter, Raniere confined her to a room and confiscated her passport and other documents that proved her identity and country of origin. Based on the circumstances and her familiarity with NXIVM's leadership, she understood that if she left the room, she faced the risk of arrest or

[35] Jelonek, Tr. 3330-3338.

deportation because she lacked lawful immigration status and papers proving her identity and country of origin. Moreover, Raniere expressly threatened her with deportation if she escaped. Her confinement caused her severe psychological harm, including suicidal ideation and clinical depression. Eventually Raniere instructed a co-conspirator to drive her to the Texas-Mexico border, which she crossed with almost no money and no documentation. Daniela was financially harmed because she was uncompensated or undercompensated for her work for Raniere and the Inner Circle and she was not able to seek other employment because of her immigration status.

75. Several other foreign nationals were injured by the fraudulent immigration scheme, which was furthered by use of the mails and wires. For example, Raniere and Clare Bronfman lured Plaintiff Lindsay MacInnis to the U.S., assuring her that she would receive gainful employment in the NXIVM community. Clare Bronfman sent letters to immigration authorities on NXIVM's behalf representing that Lindsay (and others) would work for NXIVM as "business consultants" and be given a salary satisfying the requirements for a visa. In her letter in support of Lindsay's visa application, Clare Bronfman represented that Lindsay would work closely with Raniere and earn a livable wage by providing services outlined in the letter. But when Lindsay arrived, she realized those representations were false. Though she worked for Raniere and Clare Bronfman a part of "exo/eso" (discussed below) and as Clare Bronfman's "personal assistant" she was not paid what she had been promised or a salary sufficient to satisfy the requirements of her visa. For periods of time she was paid nothing. When Lindsay complained, Clare responded by claiming Lindsay was to blame, that she needed to take more curriculum, and that she owed debts to NXIVM. Lindsay was forced to comply with Clare Bronfman's demands because of her immigration status, which had been intentionally compromised by Clare Bronfman. When Clare Bronfman represented to immigration authorities

that Lindsay would be a "business consultant" who would receive a salary exceeding the amount required for her visa, Clare Bronfman knew those representations were false because her plan from the outset was to compromise Lindsay's immigration status to coerce her into providing uncompensated labor for NXIVM's subgroup "exo/eso," as set forth below.

76. On at least one occasion, after Lindsay confronted Clare Bronfman and Clare paid her some money, Clare informed Lindsay that the payment was merely a loan, which Lindsay had to work off until the funds were repaid. Eventually Lindsay fled to Canada, and Clare Bronfman and Raniere continued demanding that she repay funds to which she had been entitled as a condition of her visa. They also threatened her with legal action for working outside the NXIVM community, a purported violation of a non-compete clause Lindsay had supposedly signed with NXIVM. The purpose of these harassing communications were to cause Lindsay to return to the NXIVM community and provide free labor to NXIVM. Clare Bronfman's threats of legal action against Lindsay were a common tactic that Clare Bronfman and other NXIVM leaders used to retrieve or silence defectors.

77. The NXIVM immigration scheme extended to fraudulent marriages. For example, Raniere and Clare Bronfman pressured Plaintiff Maja Miljkovic ("Maja") to seduce a member of the NXIVM community and marry him to procure a green card.

78. Maja entered the U.S. on a visitor visa. Raniere and Clare Bronfman told her that she would create and own a NXIVM company from which she would earn income. Maja was recruited to develop "the Knife" (discussed below) with others including former Defendant Clyne. Maja was never compensated for her work. Instead, to cover her living expenses and because Maja was unable to work anywhere else because of her visa status, Clare paid Maja to work as a waitress at a cafe owned by Clare Bronfman. Maja spent most of her meager pay on

rent, which she paid back to Clare Bronfman, her landlord. When Maja told Raniere she was resigning from the Knife, leaving the NXIVM community, and returning to Canada, he pressured her to marry a U.S. citizen so she could remain in the US. He told her that many people in the NXIVM community had entered into sham marriages for this purpose. When Maja rejected this suggestion, Clare asked Maja to provide her resume to Clare so Clare could facilitate a visa for Maja to stay in the U.S. Maja knew that Clare had obtained visas for other members of the community, but Clare did not obtain a visa for Maja. Raniere and Clare then pressured Maja to marry Marc Elliot so Maja could remain in the U.S. and Maja agreed. But she could not bring herself to obtain a visa based on a fraudulent marriage and filed for a divorce shortly thereafter, incurring legal fees for the divorce.

79. Clare Bronfman knew the immigration fraud scheme she operated and funded was illegal. As the government explained in its submission to the Court at Clare's sentencing, the evidence demonstrates that Clare Bronfman knowingly made false statements to immigration authorities.[36] For example, even though she knew that one foreign national would continue to work at RCG, she instructed her inferior in an email to make no mention of RCG in visa letters: "Yes, the letter – not supposed to have RCG on there[.]"[37] Indeed, Clare caused a letter to be sent to immigration authorities that represented she was offering that foreign national a scholarship funded by ESF because the foreign national was an "Ethical Science Scholar" "relationship to me [Clare Bronfman]"—even though Clare never intended for the foreign national to receive a scholarship for "tuition and books" and, in fact, no such scholarship existed.[38]

[36] District Court Docket, ECF 922 at 9-10.
[37] *Id.* at 10.
[38] *Id.* at 9-10.

***NXIVM conducts unauthorized human experiments using Clare and Sara Bronfman's ESF and with the actual knowledge of Clare and Sara Bronfman.***

80. As alleged above, NXIVM curricula and coaching were rooted in psychotherapy that could supposedly cure maladies.

81. But Clare and Sara Bronfman took NXIVM's purported ability to treat ailments to another, more dangerous, level. Around 2010, Clare and Sara Bronfman used ESF, the entity they had co-founded, funded, and operated, to pay for a series of unauthorized medical experiments on Nxians. They funded the experiments to bolster Raniere's reputation and the credibility of the NXIVM program and demonstrate that its teachings could cure physical and psychiatric diseases. For example, Clare Bronfman sponsored multiple individuals (including Plaintiffs Isabella Constantino and Caryssa Cottrell[39]) to come to Albany so they could be experimented on under the guise of curing their Tourette's Syndrome. She did this on the condition that they agreed to be subjects in a film, released in 2018, "My Tourette's," that was made at Clare Bronfman's direction by a production company that she operated. Like the experiments, the film's purpose was to advertise NXIVM.

82. ESF employed former Defendant Porter to conduct the human experiments. His medical license would later be revoked by the State of New York for his involvement in the experiments. Before or during these experiments, at least one person advised Defendants Raniere and Clare Bronfman that performing medical research on human subjects required strict compliance with scientific protocols. Defendants Raniere and Clare Bronfman (along with Nancy Salzman and former Defendant Porter) ignored this direction and proceeded with the

---

[39] The Court ordered that "References to plaintiffs … Leviton, Constantino, Cottrell … should be deleted". However, "other claims against defendant Raniere, and the overall enterprise – should be retained for the time being." ECF 341 at 1 and 2. Plaintiffs' position is that ¶¶79-84 should not be removed because Plaintiffs Leviton, Constantino and Cottrell's claims for gross negligence and aiding and abetting remain against Raniere, who answered the TAC, they are factual allegations regarding the wider fraud claims, and to maintain appellate rights.

experiments, which were never authorized by any independent body or researcher. As the treating physician, Porter had a duty to his patients, Plaintiffs Margot Leviton, Isabella Constantino, and Carysa Cottrell. Defendants Raniere, Clare Bronfman, and former Defendant Porter intentionally failed to ensure that their treatment met the standard of care that a reasonable doctor would provide in similar circumstances, remained willfully blind to that fact, or were reckless as to it.

83. These untested, unauthorized, and inherently risky psychotherapy and unscientific so-called studies for the treatments of OCD and Tourette's Syndrome, which lacked scientific basis and informed consent, harmed their subjects, including Plaintiffs Margot Leviton, Isabella Constantino, and Carysa Cottrell. As a result of these experiments, Plaintiffs Margot Leviton, Isabella Constantino, and Carysa Cottrell were harmed. For example, Nancy Salzman told Plaintiff Margot Leviton that Defendants' system could cure her OCD. Raniere approved this treatment, after which Margot was subjected to nightly 4-hour long "EM" questioning sessions by Porter, who had instructed her to cease taking prescribed medications. Nancy Salzman then verbally abused Margot, who suffered severe physical and psychological problems, including suicidal thoughts. Former Defendant Porter told her that her symptoms were due to her failure to commit to Defendants' system. Fearing she would take her own life, Margot fled to Canada, hid, and delayed seeking medical treatment because she feared Defendants would retaliate. That fear was reasonable because Margot knew Defendants had (as discussed below) previously retaliated against two former members of the NXIVM community residing in Canada by making false statements to Canadian law enforcement authorities.

84. On August 16, 2019, after a yearlong investigation into former Defendant Porter, the New York Department of Health and State Board for Professional Medical Conduct

concluded that none of the NXIVM studies he was involved with (some of which included showing subjects videos of dismemberment and murder) followed established scientific or medical protocols; none was peer reviewed or published; none had secured the voluntary, informed consent of the subjects; and none was overseen by an official oversight body, which is legally required for human experimentation. The Board also found that Porter was morally unfit to practice medicine and revoked his license to practice in New York.

85. As evidenced by Clare Bronfman's leadership in NXIVM, her control of funds flowing in and out of ESF, her decisions to fund various NXIVM projects through ESF, her recruiting subjects for the experiments, her production of "My Tourette's," and the fact that former Defendant Porter was at all times a paid agent of ESF when he performed the experiments, Clare Bronfman actually or constructively knew, or recklessly disregarded the fact, that she was funding unauthorized, illegal Tourette's and OCD experiments that fell below the standard of care that a reasonable doctor would provide.

***NXIVM creates identity-based subgroups to target, prime, isolate, and abuse victims***

86. Around 2006, NXIVM leadership began creating specialized programs based on existing curricula to supplement the traditional NXIVM program and target potential victims for forced labor or sex trafficking, or both. The creation of these companies was accompanied by the formation of legal entities. These programs and entities were part of the NXIVM Enterprise.[40]

87. **"Jness"** was a program for women, headed by Defendant Raniere, and a precursor to DOS. It was radically misogynistic, teaching that women were inferior, dishonest, untrustworthy, and genetically and evolutionarily predisposed to subservience. It also taught that women were entitled to neither equal pay nor equal rights, and that by nature women desire one

[40] Salzman, Tr. 1649.

sexual partner whereas men require multiple sexual partners. This program was used by Raniere and NXIVM's leadership to groom women for sexual relationships and abuse by Raniere. Indeed, Jness's curricula evolved to justify Raniere's predatory acts. For example, after Raniere forcibly raped Plaintiff Camila twice, once at a residence on Hale Drive and once at nearby apartment on Victory Way, NXIVM's leadership supplemented Jness's curricula to teach that (i) men rape women as a natural way of territory-marking when women attempt to leave men, and (ii) women can climax only when being raped. Raniere required Camila to attend sessions teaching these lessons.

88. **"Society of Protectors"** was another subgroup created by Raniere, designed to promote men and masculinity. The group was framed as NXIVM's military arm, and its recruits were subjected to penances, discipline, and so-called readiness drills (in which recruits were required to quickly perform a commanded act to demonstrate loyalty and heighten their "fight or flight state").

89. **"One Asian"** was created by Raniere and other NXIVM leaders working at his direction. It was intended to recruit women of East Asian heritage for sexual acts with Raniere. Raniere and the other NXIVM leaders recruited several women, because (unbeknownst to them) they satisfied Raniere's criteria for potentially suitable sexual partners. The group succeeded in recruiting over 100 women, including Plaintiff Sara Lim. One recruit was frequently summoned to Albany for late-night meetings with Raniere, who pressured her to move to Albany so they could form a romantic relationship. Raniere attempted to kiss her on the mouth and touched her hands during what were supposedly business meetings. She would frequently stay in former Defendant Mack's home, and former Defendant Mack pressured her to engage in sexual activity with Raniere.

90. **<u>"TEN C"</u>** was designed to procure young women from nearby college sororities for Raniere and was led by Raniere and former Defendants Mack and Clyne. Former Defendants Mack and Clyne solicited female college students to join NXIVM's sisterhood, offering them jobs at the t-shirt company owned by Raniere and Clare Bronfman. The group's name was derived from a nickname Raniere used to refer to himself in private: "TEN C," which stood for "The Emperor Has No Clothes." Former Defendants Mack and Clyne would, as discussed below, later form DOS with Raniere.

***Raniere and Clare Bronfman create more subgroups to groom women for sexual abuse by Raniere.***

91. Around 2014, NXIVM created more subgroups. Raniere and Clare Bronfman established the so-called "Ultima" companies, which were designed to groom and obtain sexual partners for Raniere.

92. **<u>Exo/eso:</u>** Raniere invited Adrienne Stiles to be a member of NXIVM's Ultima committee tasked with developing curriculum for programs including exo/eso, The Knife, Ethicist, and The Source. One of those Ultima companies was exo/eso, a sex trafficking operation designed to procure women for sex with Raniere. Raniere and Clare Bronfman personally oversaw all aspects of the development and operation of exo/eso.

93. Exo/eso was NXIVM's bodywork program marketed to athletes, fitness enthusiasts, and yoga practitioners. The purpose of exo/eso—concealed from participants but known to Raniere, Clare Bronfman, and the rest of the Inner Circle—was to recruit, select, and groom desirable female candidates to engage in sexual conduct for Raniere's gratification. Recruits were required to meet with Raniere at his command, including between midnight and 3 a.m., which resulted in perpetual sleep deprivation.

94. Raniere and Clare Bronfman selected six women who fit Raniere's criteria: young, attractive, thin, and willing to devote time to NXIVM. Among those individuals were Plaintiffs Adrienne Stiles ("Stiles"), Lindsay MacInnis ("MacInnis"), and Bonnie Piesse ("Piesse"). Raniere and Clare Bronfman told these Plaintiffs that they would own and operate exo/eso and divide the profits generated by the company between themselves, to incentivize them to join exo/eso and develop training programs that the company would sell. However, ownership of exo/eso was not transferred to them, and they never received a share of the profits. Further, Raniere and Clare's approval was required for all business plans and opportunities, and they rejected anything proposed by Stiles, MacInnis, and Piesse.

95. MacInnis participated in exo/eso only because of her compromised immigration status, orchestrated by Clare Bronfman and Raniere. As part of her participation in exo/eso, she performed uncompensated labor, namely participating in meetings with Raniere, creating the training for exo/eso, and teaching exo/exo classes, while Clare Bronfman subjected her to emotional and verbal abuse.

96. Clare Bronfman also falsely promised Piesse that she would receive a share of the company's profits to exploit Piesse into developing exo/eso curricula and two other Ultima projects. Piesse was on call every hour of the day, punished by Clare Bronfman when she was unavailable, and not paid for her first nine months of work for Ultima. Soon after her ninth month of work, Clare Bronfman began paying her a menial wage then abruptly stopped, telling her that she had not rightfully earned the payments, and that she needed to pay tribute to Raniere. Paying tribute to Raniere was NXIVM doctrine.

97. Stiles worked for exo/eso. She reported directly to Clare Bronfman, and her job responsibilities (including teaching exo/eso classes) were so demanding that she quit her full-

time job. But as with Piesse, Clare Bronfman refused to pay Stiles for her first year of work. Thereafter, Clare Bronfman paid her a menial wage for a brief period then abruptly stopped. Stiles suffered physical injuries from her work at eso/exo, could not afford health insurance and treatment, and was forced into debt. Stiles was financially devastated by exo/eso and began working as a personal assistant to Clare Bronfman to scrape by.

98. All of exo/eso's recruits worked under false pretenses. Clare Bronfman and Raniere never intended exo/eso to be a viable company and used it solely to procure women for Raniere. This is evidenced by the facts that Clare Bronfman and Raniere starved exo/eso of resources, made no resources available for promoting and marketing the company (even though resources could have been made available), and attempted to collect on fake debts owed by exo/eso to other NXIVM entities and Clare Bronfman. To maintain the appearance that exo/eso was a viable company, Raniere and Clare Bronfman created an event where wealthy NXIVM supporters traveled to Clare Bronfman's private island in Fiji for a weeklong exo/eso course. But the trip had no other business purpose or substance.

99. Another entity formed as part of the Ultima group under the NXIVM umbrella was "The Source," NXIVM's program for actors and other public speakers led by Mack. The Source was linked to exo/eso, whose physical training curricula was an integral part of The Source's curriculum. Clare Bronfman used the overlapping entities to mislead recruits about their entitlement to compensation and exploit them. For example, Clare Bronfman told exo/eso recruits they were entitled to no money because their labors generated revenue for The Source and not exo/eso, and that they had no claim to The Source's revenues.

100. The Source did not compensate Plaintiff Nicole for her work for The Source, including teaching two-hour long classes three times a week.

101. Another of the Ultima Companies was the Knife of Aristotle ("The Knife"), founded in 2014 as a purported news outlet. The key officers of The Knife included former Defendants Mack and Clyne.

102. Raniere's stated purpose for creating The Knife was the scientific analysis of news media. In reality, it was NXIVM's propaganda arm, which Raniere used to isolate his followers from outside influences including bad press about NXIVM. Raniere did not compensate Plaintiffs Soukiana Mehdaoui, Veronica Jaspeado, Ashley McLean, Maja Miljkovic and Mark Vicente for their work for the Knife.

***Defendant Raniere's abuse of Camila leads her to attempt suicide.***

103. In April 2015, unable to withstand Raniere and his Inner Circle's psychological abuse, Camila attempted suicide by slashing her wrists. Raniere found her, scolded her, and forbade her from going to a hospital, claiming her suicide attempt placed him in jeopardy. Raniere demanded that Camila give him and NXIVM's Inner Circle a written "vow" of obedience and "collateral" (that is, sensitive or humiliating information to be used as blackmail). In this regard, Camila was an early victim of the same techniques of abuse and control employed by DOS leadership (as discussed below).

104. The reason that Camila attempted suicide was because Raniere sexually abused her. When she was fifteen, he demanded that she have sexual intercourse with him and perform oral sex on him, and he took lewd, pornographic photographs of her. He was 45 years old at the time, and simultaneously engaged in sexual relationships with her sisters. As a minor, Camila was also put to work as a maid for members of the Inner Circle. This abuse was made possible because of Camila's immigration status (discussed above).

105. The District Court found that "Raniere exerted control over this child in every way imaginable" and that his abuse was "cruel to the point of inhumane."[41]

***Raniere creates and secretly operates DOS, a sex trafficking pipeline, which sexually abuses and brands women who had been groomed by NXIVM.***

106. Around 2016, Raniere created an organization within NXIVM called DOS, an acronym for a Latin phrase concocted by Raniere—*dominus obsequious sororium*—which translates roughly to "lord over the obedient female companions." It was also referred to as "The Vow." He, and former Defendants Mack and Clyne formed DOS, which was a successor to the NXIVM entities that had been grooming women for Raniere's sexual abuse, including Jness, Society of Protectors Complete, and exo/eso. Although touted as a women's empowerment group by former Defendants Mack, Clyne, and others, DOS was a sex trafficking pipeline operated and furthered by Raniere, members of the Inner Circle (including Sara and Clare Bronfman), and DOS First Line Masters (including former Defendants Clyne and Mack) to provide Raniere with sexual prey and "slaves" who would perform uncompensated labor. Lauren Salzman pled guilty to receiving property including damaging information from women based on materially false representations and subsequently extorting more property from the women in 2017 with former Defendants Mack and Clyne.

107. DOS was based on the NXIVM teaching, grounded in NXIVM doctrine and employed in multiple NXIVM subgroups, that members should "collateralize" their commitments and undertake unpleasant tasks or punishments if they failed to honor them. In SOP, for example, a member would authorize NXIVM leadership to charge his credit card if he committed to enrolling five new members but failed. In DOS, women were told they had to provide collateral as the price of learning more about DOS, and if they joined DOS (based on

[41] District Court Docket, ECF 966 at 12-13.

misrepresentation and material omissions discussed below) they were required to provide more "collateral" so Raniere and the DOS "masters" could maintain power over [the "slaves"] and have leverage to direct them to do [what Raniere and the other masters] wanted." Collateral was deeply embarrassing, humiliating, or harmful material that would destroy their lives or the lives of their family members, friends and colleagues if it were made public, for example nude photographs or false written statements alleging that the author was abused by family members. DOS recruits were bound by their collateral and blackmailed; high-ranking DOS members (called First-Line Masters) such as former Defendants Mack and Clyne threatened to release their collateral if they told anyone about DOS, disobeyed commands from their masters or failed to abide by their "commitment." DOS similarly borrowed from the teachings of NXIVM subgroups, Jness and Society of Protectors Complete, which instilled in its recruits that women were inferior and meant to be punished. And as with SOP, DOS recruits were required to perform so-called readiness drills (e.g., responding to text messages within moments at all hours of the day) or else endure physical punishment by their First Line Masters.

108. The purpose of DOS, as evidenced by its name, was to control and subjugate women for Raniere's sexual gratification. Like NXIVM itself, DOS was structured as a pyramid with Raniere at the top as "grandmaster." Below Raniere were several women known as "First-Line Masters," who organized and operated DOS with Raniere. Below the First-Line Masters were "slaves" who were forced to provide free labor to their assigned First Line Master. "Slaves" were obligated to recruit more "slaves" whom they could then "master" and obtain free labor from. Like NXIVM, DOS was thus a pyramid scheme, which capitalized on "slave" labor, operated to accumulate a pool of sexual partners for Raniere, and generated uncompensated labor and personal benefits for the masters.

109. Former Defendants Mack and Clyne were "First-Line Masters" who each reported directly to Raniere and recruited "slaves" who performed free labor for them.

110. DOS slaves did not willingly and knowingly join the organization that DOS turned out to be. Raniere and First-Line Masters, in the words of the Court when sentencing former Defendant Mack, "misrepresented and obscured fundamental facts about [DOS] and the conditions of membership" to coerce the slaves' participation. For example, Raniere instructed First-Line Masters to tell recruits that they were joining a sorority; that it was woman-only and woman-centered; that Raniere was not involved; and to avoid referencing the master/slave structure. First Line Masters followed those instructions. When recruits requested more information about DOS, First-Line Masters demanded collateral in exchange for information about the organization. The purpose of this initial collateral-gathering was to trap recruits in a cycle of providing additional sensitive collateral and becoming ensnared in DOS because the collateral extracted "would damage them or loved ones if released."

111. "Adequate" collateral included sexually explicit or embarrassing photographs and videos; written or videotaped confessions about the recruit or people close to her; legal title to valuable assets, including real and personal property; and bank account and credit card information. When DOS masters deemed collateral insufficiently scandalous, they demanded more sensitive collateral and refused to return the "insufficient" collateral, even if the DOS slave requested its return. As discussed below, when slaves learned the truth about DOS and requested that their masters return or destroy their collateral, these requests were sent to Clare Bronfman, who ignored these pleas for the return of collateral.

112. DOS Masters knew that the representations about DOS that they made to recruit slaves were false and misleading. In this regard, DOS was executed through wire fraud and a

conspiracy to commit wire fraud. Mack, who pled guilty to racketeering conspiracy with wire fraud as a predicate, testified at her guilty plea hearing that she "knowingly and intentionally worked with others and devised a scheme to make materially false representations and admissions regarding DOS in order to obtain property from DOS members. Specifically, I concealed Keith Raniere's role as the head of DOS and characterized DOS as a women's only organization, knowing that Keith Raniere was the head of the organization."[42] Mack conceded at her sentencing that the scheme's execution involved the use of interstate wires; that is because DOS masters often communicated with, and obtained collateral from, their slaves through text messages and emails.[43]

113. Expert testimony adduced by the government in the criminal proceedings described how coercive control (physical abuse, sexual violence, psychological aggression, stalking and surveillance behaviors, economic abuse, shaming, humiliation, and isolation) is used to entrap women in abusive relationships and prevent their efforts to leave the situation. The expert also testified that age and power differential in an organization can strengthen coercive control if the perpetrator is powerful in the community, and that compliance can be enforced through intimidation and fear of a credible threat, even in the absence of an express threat. Women selected for DOS depended on NXIVM for their income, had taken misogynistic curriculum, were subjected to restrictive diets and sleep deprivation, and isolated from their families and friends.

114. After obtaining initial collateral, First Line Masters demanded that recruits supply more collateral. DOS recruits understood, based on the express teachings of the First-Line Masters regarding collateralization, that if they refused, the collateral they had already provided

---

[42] Mack Guilty Plea, Tr. 25.
[43] *Id.* Tr. 10.

would be released. When DOS slaves were reluctant to accept the system or obey, DOS masters employed techniques from NXIVM's core curricula, including NXIVM's version of psychotherapy, to shame and coerce them into submission. Once recruits were trapped by their collateral, their masters forced the recruits to perform labor for the masters and (secretly) Raniere, including but not limited to transcribing video and audio recordings.

115. The criminal proceedings determined that the DOS scheme was, among other things, criminal extortion, and former Defendant Mack pled guilty to racketeering conspiracy, predicated on extortion, as well as forced labor for her role in the scheme. As to certain slaves, Mack also "stipulat[ed] to the conduct underlying the sex trafficking of [a DOS slave]."[44] Similarly, a jury also found that Raniere committed the predicate act of extortion and forced labor conspiracy. Mack testified at her guilty plea hearing that she obtained labor and services from DOS slaves by "mak[ing] them believe that if they did not perform the requested acts . . . they could suffer serious harm," that is, "the specter of the release of their collateral."[45]

116. Through this extortion, DOS slaves were required to perform uncompensated labor. For example, masters forced DOS slaves under threat of the release of their collateral to review and edit NXIVM course materials and transcribe numerous video presentations featuring Raniere and other members of the Inner Circle. All slaves were also subjected to sleep deprivation, forced to perform tasks of physical endurance, and routinely humiliated, under the threat of the release of their collateral.

117. As part of this extortive scheme to which Mack pled guilty, masters also demanded that DOS slaves perform tasks that were sexual in nature. For example, masters forced recruits including Plaintiffs Jessica Joan Salazar, Nicole, Soukiana Mehdaoui and India

---

[44] District Court Docket, ECF 1053 at 1; see also Mack Guilty Plea, Tr. 8.
[45] Mack Guilty Plea, Tr. 24.

Oxenberg to seduce or sexually gratify Raniere. Masters also demanded that these Plaintiffs restrict their diets, sometimes to 500 calories a day, so they would lose weight in accordance with Raniere's sexual preferences. DOS masters penalized slaves for breaking their diets or otherwise failing to comply with the masters' demands by punishing them with additional fasting or paddling. Judge Garaufis found that Mack, on multiple occasions, "directed [her] slaves to engage in sexual contact with Mr. Raniere" by using the "leverage" she obtained through the collateral trap, coercing the slaves to engage in sex acts with Raniere that "they did not want to engage in and would not have engaged in voluntarily."[46] In his words, Mack "willingly enslaved, destabilized, and manipulated" DOS slaves "to satisfy Raniere's sexual interests."[47]

***Raniere and Mack Agree DOS members will be branded. Defendant Roberts brands DOS victims and is stripped of her license for it.***

118. To exert control over the bodies of his slaves, Raniere executed a plan to brand DOS slaves with his initials in their pubic regions. He specially commissioned Roberts to burn his initials onto some DOS slaves' skin with a cauterizing instrument without informed consent or anesthesia, while the victims were held down. Plaintiffs Sarah Edmondson, Nicole, Paloma Pena, and India Oxenberg were forced to participate in this process. As Judge Garaufis explained, there is an "audio recording" that was a "crucial piece of evidence at trial" proving that Raniere "devise[d]" the branding ritual.[48] That evidence makes plain that Raniere and Mack collaborated on the process and a script that those receiving the brand would recite. Branding was used as collateral, which is why Defendant Raniere and former Defendant Mack agreed that those receiving the brand should be videotaped and held in a physically "vulnerable position" on a table— "[l]aying on the back, legs slightly or legs spread straight like, like feet, feet being held

[46] District Court Docket, ECF 1053 at 5.
[47] *Id.* at 5
[48] *Id.* at 7.

to the side of the table, hands probably above the head being held, almost like being tied down, like sacrificial….”[49]

119. In 2018, the State of New York’s Health Department’s Office of Professional Medical Conduct (“OPMC”) investigated Roberts for branding DOS victims. In 2021, the Hearing Committee revoked Roberts’ license.

120. The OPMC found the brandings performed by Roberts while licensed as a physician were medical procedures in which standards of medical practice applied, Roberts “relied on her medical training, education, and background when she performed the procedures,” and her conduct in branding Plaintiffs Sarah Edmondson “constituted the practice of medicine by a physician.”[50] Roberts was “required, under acceptable standards of medical conduct that apply to physicians, to complete training in the use of an electrocautery device,” but she never completed such training.[51] The OPMC found that Roberts’ failure to follow infection protocols or operational standards that physicians using electrocautery devices must adhere to; failure to administer or offer anesthesia; failure to provide proper treatment and follow up care of the burn wounds and failure to prepare and maintain medical records to apprise outside providers of the treatment provided were severe deviations from the standard of care.[52] In addition to causing the women Roberts branded significant physical pain and 2nd degree burns, Roberts placed them at risk for harm including 3rd and 4th degree burns and psychological trauma like PTSD or anxiety.[53]

---

[49] District Court Docket, ECF 1045 at 5-6.
[50] New York State Department of Health, “Determination and Order,” Re: In the Matter of Danielle Roberts, D.O., (September 29, 2021), p.6.
[51] *Id.* at 5.
[52] *Id.* at 6-9.
[53] *Id.* at 7.

121. The OPMC also found that Roberts' "infliction of the branding procedures on the women without obtaining their informed consent" was a severe deviation from the standard of care. Informed consent must include a discussion of the psychological and physical risks, benefits, and alternatives to the procedure, including the option not to proceed, considering medical histories, comorbidities, and medications. Roberts admitted that she never obtained such consent.[54] Further, Roberts intentionally concealed a known fact, and "never informed the women she branded that the brand was KAR to represent Raniere's initials or that it would measure two inches by two inches."[55] Roberts admitted to the OPMC that she purchased the electrocautery device, that she knew that the brand was KAR to represent Raniere's initials, and that Raniere was the grandmaster to the First Line Masters who were his slaves. [56] The OPMC also held that that "informed consent must be voluntary and not in connection with coercion under the threat of disclosure of personal and potentially damaging or destructive collateral" and characterized Roberts conduct as "medically reckless." As a member of DOS, Roberts knew that DOS members were not told that they would be branded when they were recruited into DOS, that they were not told that the brand was Raniere's initials, and that all DOS members had provided collateral and therefore could not consent to the branding.

122. Unbeknownst to DOS members at the time (because they were lied to about what the brand represented) the brand was a stylized representation of Raniere's initials ("KAR"), burned onto DOS members' bodies in private recorded ceremonies. The videos of the brandings were then supplied to Raniere and used as further collateral. Images of the brand as burned onto DOS slaves is reproduced below:

---

[54] *Id.* at 21-22.
[55] *Id.*at 7.
[56] *Id*. at 11.



123. No DOS slave gave voluntary, informed consent being branded. No slave could have consented under the circumstances because each slave was branded under threat of the release of their collateral or punishment. The fear that collateral would be released was reasonable, as evidenced by the fact that at least one DOS slave's collateral (Plaintiff Edmondson's) was released at Raniere's direction in retaliation for her speaking out against NXIVM and DOS. Former Defendant Mack and other Inner Circle members had edited the video to make it appear as though Edmondson had consented to the branding. Moreover, the DOS slaves feared the retaliatory tactics of the Inner Circle, particularly Clare Bronfman, because of Clare Bronfman's history of retributive actions (discussed below).

124. Masters also did not tell DOS slaves they would be branded before the branding ceremony. Sarah Edmondson's master told her she would be participating in a ceremony where she would receive a small tattoo. The same was true of each of the other Plaintiffs who were branded.

125. Raniere, the First-Line Masters, and Roberts knew that any medical procedure, let alone an excruciatingly painful medical procedure like being burned with a cautery pen, required voluntary, informed consent. They likewise knew such consent did not exist. That knowledge is evidenced by, among other things, the facts that: (i) each DOS master lied to each DOS slave to be branded that the brand represented the elements of nature (which the DOS masters knew was

false) and that it was a small tattoo; (ii) Raniere and the First-Line Masters created the brand as a mirrored and rotated version of Raniere's initials in an effort to mask its true nature; and (iii) masters instructed DOS slaves at their branding to recite the phrase: "Master, please brand me, it would be an honor," to create the appearance of consent.

***Former Defendant Mack recruits, extorts, and abuses her DOS slaves.***

***Plaintiff Nicole***

126. Nicole joined NXIVM because she learned that Defendants Clare Bronfman and former Defendant Mack, among others, were members. Nicole paid or went into debt to Mack for thousands of dollars in reliance on Mack's false promise that she would make a living by working on The Source because she would get 50% of The Source's revenue for teaching acting classes. Mack knew that statement was false because she taught classes for The Source and knew it was not possible to earn a living from the company's meager revenues. Mack recruited and enticed Nicole into DOS at a time when Mack knew she was suffering from a mental illness and particularly vulnerable. Mack told her that DOS would help her with her personal problems, and that DOS was a women-only organization with no connection to NXIVM. Mack knew these statements were false when she made them because evidence (including the audio recording referenced above) demonstrates that Mack knew that Raniere had created and was the de facto leader of DOS. Mack did not tell Nicole that she would be required to provide additional collateral; that she would be subservient to Mack at all times; and that she would be forbidden from sexual relationships with men except Raniere.

127. After gaining Nicole's trust, Mack directed Nicole to provide a deed to her house or title to her car as collateral. Nicole owned neither a house nor car, so Mack demanded a sexually explicit video, which Nicole provided to her. Mack also directed Nicole to provide

letters falsely alleging that Nicole had been sexually abused by a family member and other damaging statements about family members and colleagues. Mack required Nicole to sign the letters and provide them to Mack in envelopes addressed to her family members' and colleagues' employers. Nicole would not have provided the explicit video but for Mack's assurance to her that no one would ever see the collateral—a statement that Mack knew was false and materially misleading when she made it, because (i) the collateral was sent to Raniere and (ii) because Mack knew that she would use the threat of other people seeing the collateral to coerce Nicole to perform labor and sex acts against her volition.

128. Only after Nicole provided the collateral did Mack inform Nicole that she would be branded with "a small brand like a tattoo," another false statement because the brand was neither small nor a tattoo (it was performed with an electrocautery device not a tattoo pen). Nicole eventually told Mack she wished to leave DOS. Mack told her leaving was not an option, and that Mack's master would release her collateral should Nicole leave DOS or fail to obey her. Mack then forced Nicole to provide additional collateral on a monthly basis, including nude photos depicting close-ups of her genitals, credit card authorizations, and title to her grandmother's wedding ring. Nicole provided the additional collateral because she feared that her previously submitted collateral would be released if she did not comply. Defendant Mack also demanded that Nicole (and others in her "pod" of slaves, including Plaintiffs India Oxenberg and Soukiana Mehdaoui) pose for nude photographs together, which were sent to Raniere without their consent or knowledge.

129. Mack also forced Nicole to perform hours of uncompensated labor, including completing lengthy surveys, transcribing tapes, teaching, acting, editing, event planning, and performing personal services. Nicole complied because she feared that if she did not Mack

would release her collateral. Mack also threatened to and did punish other slaves in Nicole's circle when Nicole disobeyed commands from Mack, and they would be forced to take cold showers or further reduce their calorie intake.

130. On May 31, 2016, at Raniere's request, Mack directed Nicole to meet Raniere. Forced to obey Mack because she was afraid her collateral would be released, Nicole complied. Raniere blindfolded Nicole and took her to an unknown location. There, he forced her to undress and tied her to a table. Then another person, whose identity was unknown to Nicole, performed oral sex on her. Mack forced Nicole to have additional sexual encounters with Raniere under threat of the release of her collateral. In exchange for obeying Mack and Raniere's every command, including directions to perform sex acts, Raniere gave Nicole $10,000 in cash and permitted her to use some of the money to pay for one month's rent, some EMs and travel, and directed Nicole to keep a log of what she spent the money on. Nicole obeyed Raniere's commands that she miss work for NXIVM events and travel to Albany. Raniere also told Nicole that he had had private investigators follow the mother of his child, and that he had paddled other DOS slaves. Nicole feared that she would be subject to this same surveillance and physical abuse, in addition to the release of her collateral, if she disobeyed him.

131. After other slaves defected from DOS, Mack told Nicole that her collateral would not be released if she left DOS so long as she continued to keep DOS's existence secret. Nicole emailed Mack requesting that Mack return and destroy her collateral. Mack sent the email to Clare Bronfman and Raniere. Neither Defendant returned nor destroyed the collateral. The District Court found that Nicole was a victim of forced labor conspiracy and sex trafficking conspiracy offenses based on the abuse she suffered in DOS.[57]

[57] District Court Docket, ECF 1073 at 5.

132. Nicole suffers from PTSD from her experience in DOS. She was also financially harmed because she performed hours of uncompensated labor for Mack and The Source and spent money on travel after being recruited into DOS.

***Plaintiff India Oxenberg***

133. Former Defendant Mack also recruited India Oxenberg ("Oxenberg") into DOS. Mack required Oxenberg to provide collateral, including compromising information about her family's finances, nude photos, and videos. Mack told Oxenberg that DOS was a women's only group that had nothing to do with ESP. Mack did not tell Oxenberg that she would have to provide additional collateral; be accountable to Mack; or have sex with Raniere. Only after Oxenberg provided collateral did Mack reveal that their relationship was "master" and "slave." Mack and former Defendant Clyne demanded that Oxenberg continue providing collateral that would destroy her life or the lives of her family and friends if it were made public. Oxenberg complied because she feared that, if she did not, her previously provided collateral would be released.

134. Mack forced Oxenberg to perform hours of uncompensated labor, including event planning, recruiting other women to DOS, transcribing audio recordings, preparing and delivering meals, and purchasing services or gifts ("acts of care") without compensation. She was also required to partake in readiness drills. Mack controlled Oxenberg, requiring her to obtain her permission to travel, meet with people, and eat, and to report her whereabouts hourly. She forced Oxenberg to subsist on a restricted calorie diet for over a year, causing Oxenberg to develop medical conditions including a hormonal imbalance. Oxenberg complied with these demands because she feared release of her collateral.

135. Mack also directed Oxenberg to submit to Raniere's predation under threat of punishment and the release of her collateral. Oxenberg complied, and Raniere had sexual intercourse with her without her consent on numerous occasions. Raniere later paid Mack, for "delivering" Oxenberg to him. According to an email Raniere sent Mack, Mack also forced Oxenberg, to "complete [an] assignment" involving "tak[ing] all her clothes off, while [Raniere was] clothed, pos[ing] in the most revealing way, and hav[ing Raniere] take a picture of her." The District Court found Oxenberg was a victim of forced labor conspiracy and sex trafficking conspiracy based on the abuse she suffered in DOS.[58]

136. After obtaining several rounds of collateral from Oxenberg, Mack forced her to submit to branding on videotape. Mack falsely told her the brand represented the elements, was small and discreet, about the size of a quarter (ultimately, the brand was over twice that large), and like a tattoo. Oxenberg did not know until after she received the brand that it was Raniere's initials.

137. Oxenberg suffers from PTSD from her experience in DOS. She was also financially harmed because she performed hours of uncompensated labor for Mack and spent money on travel and accommodation expenses for Nxivm courses after being recruited into DOS.

***Plaintiff Soukiana Mehdaoui***

138. A DOS "slave" acting at the direction, and under the extortion, of Defendants Raniere and Mack recruited Soukiana Mehdaoui ("Mehdaoui") into DOS. This person became her "master" and directed Mehdaoui to provide collateral, including damaging information about herself. After Mehdaoui supplied collateral, the master required Mehdaoui to perform unpaid

[58] *Id*. at 7.

work for her, Mack, and other masters, including committee work and media management, writing and editing, event planning, app development, graphic design, enrollment work, video and documentary production, photography and editing, blog development, business administration, asset management, coaching, video production, performing, and personal care and service work. The master also controlled Mehdaoui, prohibiting her from having sexual relationships with men besides Raniere and restricting her calorie intake.

139. Mack also made demands of Mehdaoui, including that Mehdaoui move to Albany, live in Mack's residence, and supply collateral several times. Mack demanded that Mehdaoui have sex with Raniere, and Mehdaoui complied because she feared that otherwise she would be punished, and her collateral would be released. When Mehdaoui told her direct "master" that she intended to leave Albany, her master threatened to release the collateral. The District Court found Mehdaoui was a victim of forced labor conspiracy and sex trafficking conspiracy offenses in connection with her experience in DOS.[59]

140. Plaintiff Mehdaoui suffered emotional distress from her experience in DOS. She was also financially harmed because she performed hours of uncompensated labor for Mack.

***Plaintiff Jessica Joan Salazar***

141. Another DOS "slave," directed and extorted by Defendants Raniere and Mack, recruited Jessica Joan Salazar ("Salazar") into DOS. Salazar had moved to Albany based on Defendant Raniere's promises that she would operate a t-shirt business with him and make a living working for The Source. Clare Bronfman owned the t-shirt company and its equipment. Upon information and belief, Clare Bronfman knew Defendant Raniere used the t-shirt company and its equipment to entice recruits whom he would later financially and sexually abuse.

[59] District Court Docket, ECF 1073 at 8.

142. Salazar's DOS "collateral" included a sex tape and a video describing childhood abuse. Her direct master (the slave extorted by Mack) required her to provide "collateral" monthly and perform uncompensated services for Mack, including cleaning Mack's house and doing Mack's laundry and grocery shopping. The slave also forced Salazar to transcribe videos without compensation. Additionally, Mack gave Salazar a "special assignment" to "seduce" Raniere and "have him take a naked picture" of her. Mack meant for Salazar to have sex with Raniere and that is how Salazar understood the assignment. Salazar refused and decided to escape DOS at great personal risk. Salazar informed Mack and requested her collateral back. Mack refused. The District Court found Salazar was a victim of a sex trafficking offense, and a sex trafficking and forced labor conspiracies based on the abuse she suffered in DOS.[60]

143. Plaintiff Salazar suffered emotional distress from her experience in DOS. She was also financially harmed because she performed hours of uncompensated labor for Mack.

***Plaintiff Rachel***

144. Mack and a DOS "slave" extorted by Mack recruited Rachel into DOS. Mack told Rachel that DOS was a special program and directed her to provide damaging collateral to learn more. After Rachel provided a sex tape as collateral, Mack told her that she had entered into a master-slave relationship, and that another slave would be her personal coach. Mack demanded that Rachel provide additional collateral, which—if released—would impact her finances, relationships, career, and reputation. Mack and the extorted slave who was Rachel's master "assigned" Rachel to seduce (that is, have sex with) Raniere.

145. Mack also required Rachel to participate in 24/7 readiness drills, send a private message to her master each morning and night, and provide services to, and uncompensated

[60] *Id.* at 5-6.

labor for, her master. The District Court found Rachel was a victim of a forced labor conspiracy offense.[61]

146. Plaintiff Rachel suffered emotional distress from her experience in DOS. She was also financially harmed because she performed hours of uncompensated labor for Mack.

***Plaintiff Valerie***

147. Former Defendant Mack and a DOS "slave" extorted by Mack recruited Valerie into DOS. Former Defendant Mack and the extorted slave told Valerie that DOS was a women's-only empowerment group, and that to gain entry she would need to submit three forms of collateral: something financial, something damaging to her family, and something damaging to her reputation. Valerie signed over an investment, and provided a letter disparaging a family member and a video in which she appeared to be snorting cocaine. After Valerie provided the collateral, former Defendant Mack told her that she had entered a master-slave relationship, and that if she failed to obey her master or grandmaster (Raniere) she would be punished. Mack also told her that she was required to get a small tattoo, referring to the brand. After Valerie provided the initial collateral, the DOS slave extorted by Mack directed Valerie to provide naked photos and videos as additional collateral monthly.

148. Former Defendant Mack threatened to release Valerie's collateral and forced Valerie to participate in readiness drills, punishing her physically and psychologically if she failed to respond within 60 seconds. Former Defendant Mack demanded that Valerie keep a daily journal, provide acts of service for the slave who was her direct master, and perform data entry work. The District Court found Valerie was a victim of a forced labor conspiracy offense based on the abuse she suffered in DOS.[62]

---

[61] *Id.* at 12.
[62] *Id.* at 9.

149. Plaintiff Valerie suffered emotional distress from her experience in DOS. She was also financially harmed because she performed hours of uncompensated labor for Mack.

***Former Defendant Clyne recruits, extorts, and abuses her "slaves."***

150. Like Mack, former Defendant Clyne, a member of the Inner Circle and a DOS First Line Master, used collateral to extort and exploit several slaves. Former Defendant Clyne lured Jane Doe 8 to DOS by describing it as a woman's group, separate from ESP. Former Defendant Clyne knew these statements were false when she made them. Former Defendant Clyne demanded that Jane Doe 8 supply nude photographs of herself as a warranty that she would keep DOS a secret and assured her that no one else would see the images—a statement former Defendant Clyne knew was false and materially misleading when she made it because she knew the images were provided to Raniere for his sexual gratification. Former Defendant Clyne and Raniere had a master slave and sexual relationship, so former Defendant Clyne knew or should have known that when she recruited Jane Do 8 into DOS that she was procuring Jane Doe 8 for commercial sex acts with Raniere.

151. After Jane Doe 8 provided collateral, former Defendant Clyne revealed to Jane Doe 8 that she had entered a "master-slave" relationship for life, that Jane Doe 8 needed to enroll slaves under her, and that she needed to supply additional collateral monthly. Former Defendant Clyne demanded that Jane Doe 8 give her the email addresses of her co-workers and sign letters falsely accusing an actor of sexual assault in envelopes addressed to casting directors. She threatened Jane Doe 8 with the release of her collateral if she disobeyed. Former Defendant Clyne directed Jane Doe 8 to be branded at an upcoming NXIVM event and described the brand as a small mark like a tattoo, even though she knew what the brand truly was. Eventually, Jane

Doe 8 asked former Defendant Clyne to release her from The Vow and return her collateral. Former Defendant Clyne refused.

152. Former Defendant Clyne also forced Jane Doe 8 to perform labor and services for her, including menial tasks and 24/7 readiness drills, as well as reporting to former Defendant Clyne on the goings-on at the Vancouver NXIVM Center. Former Defendant Clyne coerced Jane Doe 8 into resigning from her high paying job so that she could work for ESP. When ESP shut down, Jane Doe 8 had no job and no income from ESP. She was diagnosed with PTSD and remained out of work for months. The District Court found that Jane Doe 8 was a victim of a forced labor conspiracy offense.[63]

153. Former Defendant Clyne was also the main repository of DOS collateral, and, on information and belief, still possesses significant amounts of this highly damaging material.

154. Jane Doe 8 suffered emotional distress from her experience in DOS. She was also financially harmed because she performed hours of uncompensated labor for former Defendant Clyne.

***Plaintiffs Edmondson, Paloma Pena, Jane Doe 9, Kristin, and Charlotte are recruited into DOS, extorted, and abused.***

155. DOS masters also recruited Sarah Edmondson ("Edmondson"), Paloma Pena ("Pena"), Jane Doe 9, and Kristin into DOS using the same deceptive and extortive means described above. A DOS master persuaded Edmondson to provide collateral to the master to learn more about DOS (based on the same false representations alleged above). The master demanded that Edmondson regularly submit additional collateral and perform readiness drills and labor for her. The DOS master similarly demanded that Pena provide property or financially valuable material as collateral. Pena had none, so the DOS master directed her to provide a false

[63] *Id.* at 11.

video confessing to an affair and forced her to sign a contract that the DOS master neither gave her nor permitted her to read. After obtaining the collateral, the DOS master coerced Pena into partaking in readiness drills, and forced her to provide additional collateral, including nude photographs, telling her that failing to obey would result in the release of her collateral and punishments for other DOS women.

156. Another DOS master similarly recruited Jane Doe 9 to join DOS and provide collateral, including videos that depicted Jane Doe 9 nude, making false statements about her business, and confessing to a fake affair by falsely telling Jane Doe 9 that DOS was a women's only group unrelated to NXIVM.

157. Likewise, a DOS master recruited Kristin by telling her that DOS was a women's group, and that Raniere was not involved in it. The DOS master directed Kristin to provide collateral, namely a letter falsely accusing her father of sexual abuse and letters that would destroy her relationships with her sister and parents.

158. A DOS master lured Charlotte into DOS based on the same false representations alleged above. She then directed Charlotte to provide collateral in the form of a humiliating video to learn more about it. The master subsequently demanded that Charlotte provide additional collateral, which would damage, humiliate, and shame Charlotte and those close to her if released. The master also demanded that Charlotte perform labor for her and participate in 24/7 readiness drills. Eventually, Charlotte requested the return of her collateral from former Defendant Mack and Defendant Raniere. They ignored her. Because Charlotte feared the release of her collateral and NXIVM's infamous abusive litigation tactics, Charlotte left the NXIVM community at great personal risk and kept silent about her experience.

159. The District Court found Edmondson, Pena, Jane Doe 9, Kristin and Charlotte were victims of a forced labor conspiracy based on the abuse they suffered in DOS.

160. Edmondson, Pena, Jane Doe 9, Kristin and Charlotte suffered emotional distress from their experiences in DOS. They were financially harmed because they performed hours of uncompensated labor for DOS Masters.

***Clare Bronfman facilitated some DOS victims' abuse.***

161. Sylvie, who was subject to Clare Bronfman's immigration fraud scheme described above, and who thereafter worked for Clare Bronfman for approximately a decade, was sexually abused in DOS. Trial testimony showed that Clare Bronfman and Raniere instructed Sylvie not to have sex with her husband.[64] Then Sylvie was approached by a First- Line DOS Master who invited Sylvie to a secret project that supposedly had nothing to do with NXIVM, directing Sylvie to provide "collateral" to learn more about the program. After Sylvie provided the collateral, a false confession addressed to her parents that she was a prostitute and a naked photograph, the First-Line Master directed Sylvie to seduce Raniere and send him naked photographs of herself every day. Sylvie did not wish to seduce or engage in sexual activity with Raniere because she found him "creepy." Sylvie's master then directed Sylvie to meet Raniere at a house. There, Raniere undressed Sylvie, performed oral sex on her, and took close up photographs of her vagina, all without her consent. Sylvie was disgusted and traumatized by the encounter and submitted to it only because she feared her collateral would be released if she did not obey Raniere. Evidence of this was admitted at Raniere's trial.[65]

162. Clare Bronfman likewise funneled Veronica Jaspeado ("Veronica") to DOS by encouraging her to join exo/eso. Although Clare's attempts were unsuccessful, Veronica was later

[64] District Court Docket, ECF 922 at 21.
[65] *Id.* at 21.

recruited into DOS by a First Line DOS Master who created and ran DOS along with Raniere and other First-Line Masters. Veronica's master demanded that Veronica provide property or financial assets as collateral to learn more about the program. Veronica had neither and instead provided multiple rounds of humiliating collateral, including nude videos and photographs.

163. Veronica then complied with her masters' demands to perform hours of uncompensated labor, including personal care and service work for the benefit of her master and Raniere, because she feared the release of her collateral. When she expressed discomfort with absolute obedience to her master and Raniere, her master threatened to release her collateral. Eventually, Veronica asked Raniere to release her from DOS. He refused. She requested the return of her collateral, and her master threatened to release her collateral. Fearing the release of her collateral and NXIVM's abusive litigation tactics, Veronica severed her ties to the NXIVM community at great personal risk and kept silent about her experience.

164. The District Court found Veronica was a victim of a forced labor conspiracy offense.[66]

165. Veronica suffered emotional distress from her experiences in DOS. She was financially harmed because she performed hours of uncompensated labor for her DOS Master and Raniere.

166. Based on Clare Bronfman's leadership of exo/eso, her interactions with Veronica, her proximity to Raniere, her defense of DOS, and attacks on DOS victims after DOS was made public (discussed below), it is reasonable to infer that when Clare attempted to recruit Veronica into exo/eso she intended for Veronica to engage in sex acts with Raniere and knew that she and

[66] District Court Docket, ECF 1073 at 10.

members of the Inner Circle would use extortive means to procure uncompensated labor and commercial sex acts from her.

***As DOS unravels, Defendant Clare Bronfman leads an attack on defectors and critics to protect Raniere and NXIVM, and Sara Bronfman engages in witness tampering.***

167. In or around June 2017, DOS began to unravel. Plaintiff Edmondson learned that the brand was not the symbol of natural elements but Raniere's initials. Her husband, Plaintiff Anthony Ames, a member of NXIVM immediately confronted Edmondson's master in an unsuccessful attempt to extract an admission about the nature of DOS. Soon after, Plaintiff Edmondson defected, fleeing Albany at great personal risk.

168. Many DOS defectors, including Plaintiffs Nicole, Charlotte, and Kristin, wrote letters to Defendant Clare Bronfman, former Defendant Mack, and other NXIVM leaders pleading for their collateral to be returned or destroyed. As Judge Garaufis discussed at Clare Bronfman's sentencing, Lauren Salzman (a DOS First-Line Master) testified that she personally passed such pleas to Defendant Clare Bronfman because "Clare was heading up our legal initiatives."[67] One of the letters stated: "I am requesting the immediate return and/or destruction of the 'collateral' I provided to you, as well as the nude photographs and videos of me that were produced within DOS at your direction. . . [M]y participation in DOS, and all material provided or created during that time, was based on false information."[68] Judge Garaufis found that Clare Bronfman was provided that letter by Lauren Salzman and "in receipt" of it.[69] But neither Clare Bronfman nor any other NXIVM leader returned or destroyed any collateral. Clare Bronfman did not attempt to contact the letters' authors, instead she and Raniere executed a plan to protect

[67] District Court Docket, ECF 936 at 17.
[68] *Id.*at 17
[69] *Id.*at 17

NXIVM and Raniere by threatening DOS defectors with legal action if they failed to stay silent about DOS.

169. Judge Garaufis found that rather than aid DOS's victims by making any effort to return or destroy their collateral, Clare Bronfman "doubled down on her support for Raniere,"[70] after news of DOS emerged, and led a multi-front war against NXIVM's critics with the purpose of thwarting public and governmental investigations of DOS. The government also learned that Clare Bronfman "retained a private investigator and public relations firm to rehabilitate DOS' public image and distance it from NXIVM."[71]

170. Clare Bronfman also attempted to pressure several witnesses (including Plaintiff Oxenberg) to be represented during the criminal proceedings by counsel of Clare's choice. Clare told these witnesses that she would pay for their counsel, if they retained counsel from a list of attorneys handpicked by Clare, who advised clients to refuse to answer any questions by investigators in any proceedings. Moreover, Clare pressured several defectors to disclose the identities of all persons to whom they had disclosed anything relating to NXIVM and the content of those disclosures.

171. Clare Bronfman also retained two attorneys to file false charges against DOS defectors in Mexico. Those attorneys sent letters—written by Raniere and Clare Bronfman and transposed on law firm letterhead—to victim-witnesses, threatening them with legal action and arrest on criminal charges if they did not remain silent about DOS and NXIVM. Judge Garaufis discussed these letters at length at Clare Bronfman's sentencing. Metadata recovered by the

---

[70] *Id.* at 17.
[71] District Court Docket, ECF 922 at 24.

government established that at least one of the threatening, extortive letters sent to a DOS victim came from a document created by Clare Bronfman.[72]

172. Judge Garaufis found that, in September 2017, Clare Bronfman "work[ed] hand-in-hand with Raniere to intimidate and silence victims of Raniere's brutal campaign of sexual abuse and exploitation."[73]

173. Among the recipients of these threatening letters were Plaintiffs Salazar and Medhaoui, both of whom went into hiding upon receipt of the letters.

174. As Judge Garaufis also found, after the public revelations, Clare Bronfman attempted to hide DOS's crimes by falsely characterizing it as a "sorority" that "truly benefitted the lives of its members, and d[id] so freely." Clare Bronfman knew this statement was false and misleading when she made it because at the time, she knew the truth about DOS.[74]

175. The District Court also found that, in response to the forthcoming New York Times exposé, Clare Bronfman continued the cover-up by pursuing false criminal charges against Plaintiffs Edmondson and Kobelt in Vancouver. The Vancouver authorities concluded there was no evidence supporting Clare Bronfman's complaint to the Vancouver authorities that Plaintiffs Edmondson or Kobelt had committed illegal activities.[75]

176. The Court also found that that Clare Bronfman "travelled to Mexico to live with Raniere, during which time Raniere invited First Line DOS members to participate in a "recommitment ceremony," and that she funded Raniere's legal defense after the facts of DOS came to light.[76]

---

[72] In briefing before this Court, the government set forth its findings as to the letters and reproduced a significant portion of them. See District Court Docket, ECF 922 at 24.
[73] District Court Docket, ECF 936 at 19.
[74] *Id.*at 21.
[75] Vancouver Police Department, "Response to Records Access Request," (July 26, 2018).
[76] District Court Docket, ECF 936 at 21.

177. The District Court found that, at minimum, Clare Bronfman was willfully blind to DOS's activities at the time of the branding.[77]

178. Sara Bronfman also took concrete actions to help Raniere evade justice and responsibility for his crimes. In the days before Raniere's criminal trial on May 7, 2019, Sara Bronfman and her husband attempted to obstruct or interfere with the trial by attempting to bribe Adrian, a critical government witness, to leave the United States and remain outside the country during Raniere's trial. Specifically, Sara Bronfman offered Adrian a substantial sum of money under the false pretense that he would work on multiple video production projects in France during Raniere's trial. Sara Bronfman told him that the offer required him to leave for France immediately and stay for at least a month. When Sara Bronfman made this offer to Adrian she knew he was a key witness for the government and her intention in making the proposition was to render him unavailable at the Raniere trial.

179. Sara Bronfman was also in Albany, assisting with the DOS cover-up, in the wake of *The New York Times* article about DOS branding, as evidenced by the fact that around that time she gave an interview about NXIVM to *The New York Times Magazine* from Albany. Sara Bronfman had not cut ties to the organization while DOS was ongoing, and it is reasonable to infer that she knew about the sex trafficking and extortion when it occurred.

***NXIVM's abusive tactics in the wake of DOS revelations were part of a broader pattern of retaliatory and abusive actions that included misusing the legal system.***

180. Clare Bronfman's abuse of the legal process as DOS unraveled was part of a broader pattern of retaliatory, abusive, and vexatious litigation initiated by her and NXIVM leadership against the organization's critics and dissidents. Bronfman's tactics were common knowledge within DOS and NXIVM community and created a culture of fear within the NXIVM

---

[77] *Id.* at 22–23.

community and helped DOS leadership to extract free labor and sex acts from DOS slaves. Trial testimony established that "[t]he decision makers in Legal were Clare Bronfman and Raniere."[78]

181. For example, one abusive tactic Clare Bronfman employed as the director of NXIVM's legal team was to intervene and interfere with bankruptcy proceedings of members who had depleted their life savings and had become perceived enemies of NXIVM. For example, at Clare Bronfman's direction, NXIVM intervened in the bankruptcy of NXIVM defector Kim Woolhouse. The bankruptcy court found that Woolhouse's only "sin" was attempting to leave NXIVM and that NXIVM's conduct in subjecting Woolhouse to "protracted litigation from two large law firms and a phalanx of attorney was in a word, deplorable." *In re Dones*, 2011 WL 5079585, at *18 (Bkrtcy. W.D. Wash. 2011) (finding that NXIVM labeled Woolhouse "a 'suppressive,' a term that NXIVM applies to former associates who leave the company or whom NXIVM perceives to be its enemies" and concluding that "[d]espite multiple depositions and extensive discovery, [NXIVM was] never able to prove that Woolhouse did anything wrong.").

182. Similarly, at Clare Bronfman's direction, NXIVM brought two adversary proceedings in Barbara Bouchey's bankruptcy. Barbara Bouchey was a former NXIVM leader, and Clare Bronfman attempted to have her prosecuted in New York for extortion and sought regulatory enforcement proceedings against her for alleged financial crimes that did not occur. At Clare Bronfman's direction, NXIVM hired a private investigator to investigate Bouchey. That investigator was later charged by New York authorities for witness intimidation in the Bouchey case.

183. In 2003, NXIVM launched a legal crusade against cult deprogrammer Rick Ross ("Ross") and the Ross Institute for publishing highly critical articles about NXIVM and excerpts

[78] Vicente, Tr. 592.

from NXIVM's course materials. For the next fourteen years, the Defendants engaged in relentless retaliatory litigation, bringing parallel proceedings in multiple courts to destroy both Ross and the Ross Institute. In one instance, Defendants employed a private investigator to obtain Ross's confidential banking and telephone records, which one court observed could only have been obtained in "improper and probably illegal manner." *NXIVM Corp. v. O'Hara*, 241, F.R.D. 109, 116 n.29 (N.D.N.Y. 2007). During discovery in the Ross litigation, Raniere, Clare Bronfman and Nancy Salzman directed others in NXIVM to conceal evidence by altering videotaped recordings of NXIVM classes, in which Nancy Salzman made false statements about the ability of Rational Inquiry to cure physical and mental illness, because Raniere knew this was damaging to NXIVM's litigation position.

184. In *Raniere v. Microsoft Corp.,* Nos. 15-0540 & 15-2298, 2016 WL 4626584 (N.D. Tex. Sept. 2, 2016), Raniere sued Microsoft Corporation for infringement of a patent that he did not own (the "GTI patent"). Raniere was unable to document his ownership of the patent, and the court dismissed the case and sanctioned Raniere for his "clear history of delay and contumacious conduct" and for acting in "bad faith to vexatiously multiply these proceedings and avoid early dismissal." *Id*. at *5. The District Court characterized Raniere's conduct in the litigation as "deplorable," found he "made false and misleading representations to Defendants and the Court," gave "wholly incredible and untruthful" testimony, "engaged in a pattern of obfuscation, offering inconsistent theories and arguments and promising to produce evidence that never materialized," and "made false and misleading representations to Defendants and the Court that resulted in, among other things, prejudice to Defendants in the form of significant legal fees incurred in defending the action." *Id*. at **4-5. The sanctions were affirmed on appeal. *Raniere v. Microsoft Corp.,* 887 F. 3d 1298 (Fed. Cir. 2018).

185. Clare Bronfman and other NXIVM leaders, including former Defendant Russell, also retaliated against NXIVM dissidents through means other than frivolous litigation. As Judge Garaufis found at former Defendant Russell's sentencing, former Defendant Russell "assisted in a scheme to hack a perceived enemy of NXIVM by distracting him as keylogging software was installed on his computer."[79] Keylogging software records keystrokes input into a device and covertly sends a record of those keystrokes to a third party.

186. And evidence adduced at trial demonstrated that after *Forbes* quoted Edgar Bronfman (Clare and Sara's father) as calling NXIVM a "cult," Raniere perceived Edgar Bronfman as an enemy and Clare Bronfman thereafter installed keylogging software on her father's computer without permission, so that NXIVM members were able to access Edgar Bronfman's email account for years.[80]

187. Relatedly, Clare Bronfman hired several private firms to investigate perceived enemies of Raniere and NXIVM.

***Despite Clare Bronfman's and NXIVM's attempt to cover up DOS and Raniere's crimes, the Department of Justice successfully prosecutes several NXIVM leaders.***

188. After *The New York Times* published its exposé on DOS in October 2017, NXIVM fell under greater scrutiny from the Department of Justice and the United States Attorney's Office for the Eastern District of New York.

189. A grand jury in this District concluded, among other things, that there was probable cause to believe:

i. Defendants Raniere and Mack violated federal law by sex trafficking, conspiring to commit sex trafficking, and conspiring to commit forced labor violations;

---

[79] District Court Docket, ECF 1131 at 3.
[80] District Court Docket, ECF 922 at 16.

ii. A RICO enterprise led by Raniere and NXIVM's leadership—including Defendants Clare Bronfman, former Defendants Mack and Russell—operated in the Eastern District of New York and elsewhere;

iii. Clare Bronfman was a "high-ranking member of NXIVM";

iv. As part of their criminal scheme, Defendants Raniere, Clare Bronfman, and former Defendants Mack and Russell collectively violated numerous federal laws, such as racketeering conspiracy, racketeering, and several RICO racketeering acts including conspiracy to commit identity theft, sexual exploitation of a child, possession of child pornography, conspiracy to alter records for use in an official proceeding, money laundering, trafficking and document servitude, state law extortion, visa fraud, sex trafficking, forced labor, and wire fraud conspiracy;

v. Clare Bronfman committed more than two RICO predicates as part of the scheme, namely conspiracy to commit identity theft three times against three individuals, money laundering, and visa fraud;

vi. Allison Mack committed more than two RICO predicates as part of the scheme, namely state law extortion, sex trafficking, sex trafficking conspiracy, forced labor, forced labor conspiracy, and wire fraud conspiracy.

190. Former Defendant Mack pled guilty to racketeering, racketeering conspiracy, and the racketeering acts of state law extortion and forced labor, conceding the existence of a RICO enterprise. As part of her guilty plea, she testified that she: joined in the DOS scheme to extort recruits using collateral to obtain labor from them; concealed Raniere's role in the scheme; and falsely characterized DOS as a women's only organization even though she knew Raniere sat at its head.

191. Defendant Clare Bronfman pled guilty to conspiring to conceal and harbor illegal aliens for financial gain (a RICO predicate) and the fraudulent use of identification.

192. After a six-week trial, a jury in this District convicted Raniere of racketeering conspiracy, racketeering, forced labor conspiracy, wire fraud conspiracy, sex trafficking conspiracy, sex trafficking, attempted sex trafficking, as well as myriad predicate acts—all taken

in his capacity as head of NXIVM and its affiliates. The jury thus found that a RICO enterprise run by Raniere existed and operated in this District.

## COUNT I

## RACKETEER INFLUENCED AND CORRUPT ORGANIZATIONS ACT (RICO) - 18 U.S.C. §§ 1962(c) and 1964(c)

***Against Defendants Raniere, Clare Bronfman, Sara Bronfman, former Defendant Mack, former Defendant Clyne, former Defendant Russell, and the Entity Defendants on behalf of all Plaintiffs***

193. Plaintiffs reallege and incorporate the foregoing paragraphs of this Complaint.

### *RICO "Person"*

194. Each Defendant named in this Count ("Count I Defendant") is a "person" capable of being held liable under 18 U.S.C. § 1962(c) because each such Defendant is an individual or entity capable of holding a legal or beneficial interest in property, 18 U.S.C. § 1961(3). All Plaintiffs are "person[s]" capable of bringing this claim under 18 U.S.C. § 1964(c) because all Plaintiffs are individuals capable of holding a legal or beneficial interest in property, 18 U.S.C. § 1961(3).

### *RICO "Enterprise"*

195. Each Count I Defendant was employed by or associated with the NXIVM racketeering enterprise (the "Enterprise") within the meaning of 18 U.S.C. § 1961(4). Each Count I Defendant conducted or participated directly or indirectly in the Enterprise's affairs through a pattern of racketeering activity as set forth above.

196. Specifically, each Count I Defendant (i) shared a common purpose, including to enrich Raniere and themselves with money and social power by expanding and strengthening the NXIVM community to, among other things, sell curriculum, cultivate a pool of foreign laborers to support the Enterprise, and groom women for sexual conduct with and for Raniere; and (ii)

maintained interpersonal relationships with one another. Additionally, the Enterprise (iii) possessed an ascertainable structure that was pyramidic, and (iv) operated with sufficient longevity, namely several years, for the Count I Defendants to pursue their common purpose. That the organization described herein qualifies as a RICO enterprise has been established by the related criminal proceedings, in which the United States government secured numerous indictments, convictions by jury, and convictions by plea establishing the existence of a RICO enterprise.

**Interstate or Foreign Commerce**

197. The Enterprise engaged in, and conducted activities which affected, interstate and foreign commerce, including operating NXIVM and RCG centers in several states across the country, Canada, and Mexico, as well as enticing American recruits and foreigners to travel across state and international borders to New York.

**Pattern of Racketeering Activity**

198. Each Count I Defendant committed two or more predicate acts that formed a pattern because the acts were committed over a substantial period of time for the same or similar purposes against many of the same victims. Those acts were also related to one another and to the Enterprise as a whole because they were committed by the Count I Defendants against members of the NXIVM community to further their and the Enterprise's joint purposes.

**Defendant Raniere's Predicate Acts**

199. A grand jury found probable cause to believe, and a petit jury found beyond a reasonable doubt, that Defendant Raniere participated in the affairs of the Enterprise by committing at least eleven predicate acts. For concision, Plaintiffs do not articulate each of Defendant Raniere's predicate acts and instead rely on the public record and documents

incorporated herein. Because the Entity Defendants at all times disregarded corporate formalities and acted as Raniere's alter ego, they are responsible for predicate acts committed by Raniere.

**Defendant Clare Bronfman's Predicate Acts**

200. A grand jury found probable cause to believe Defendant Clare Bronfman participated in the affairs of the Enterprise by committing at least five predicate acts, and she pled guilty to committing one predicate act.

201. ***Immigration Fraud:*** Clare Bronfman committed directly, aided and abetted the commission of, and conspired with Defendants Raniere, and former Defendant Russell to commit multiple violations of 8 U.S.C. § 1324 for financial gain.

202. For example, for financial gain Clare Bronfman encouraged or induced Sylvie, B, and Plaintiff Lindsay MacInnis to come to, enter, or reside in the U.S. knowing or in reckless disregard of the fact that such coming to, entry, or residence would violate the law, 8 U.S.C. § 1324(a)(1)(A)(iv). Clare Bronfman violated 8 U.S.C. § 1324(a)(1)(A)(iii) as to those same persons because her sponsorship of visas, assisting them with obtaining employment, and her use of corporate entities to further those aims constitutes "harboring" within the meaning of that subsection. *See, e.g., Nichols v. Mahoney*, 608 F. Supp. 2d 526, 538 (S.D.N.Y. Apr. 2, 2009).

203. She violated 18 U.S.C. § 1324 as to Plaintiff Maja Miljkovich, including encouraging her to enter a sham marriage to remain in the United States in violation of immigration law.

204. ***Witness/Victim Tampering*:** Clare Bronfman committed directly, aided and abetted the commission of, and conspired with Defendant Raniere to commit multiple violations of 18 U.S.C. § 1512. For example, she attempted to and did intimidate, threaten, corruptly persuade, and engage in misleading conduct toward multiple persons, including Plaintiffs

Salazar, Medhaoui, Edmondson, Camila, with intent to (i) hinder, delay, or prevent their communication to law enforcement of the commission or possible commission of federal offenses; (ii) cause those persons to withhold testimony, records, or documents from an official proceeding; and (iii) influence, delay, or prevent those persons from testifying in an official proceeding. 18 U.S.C. § 1512(b)(1)–(3).

205. ***Forced Labor, Sex Trafficking, and Human Trafficking*: ** Clare Bronfman committed several forced labor, sex trafficking, and human trafficking violations that are predicate acts under 18 U.S.C. § 1961(1). Those allegations are articulated below, *infra* ¶¶ 250-252, and incorporated herein by reference.

206. ***Mail/Wire Fraud (Raniere-and Curriculum-Related Fraud)*:** Clare Bronfman committed directly, aided and abetted the commission of, and conspired to commit multiple acts of mail and wire fraud in violation of 18 U.S.C. §§ 1341, 1343.

207. Around 2005, Clare Bronfman became a leader of the Enterprise, overseeing and directing its operation. From that time until the Enterprise dissolved, NXIVM materials continuously made several false and materially misleading assertions of fact, including that: (i) Defendant Raniere was the "world's smartest man" with an IQ of 240; (ii) he was an ascetic who eschewed possessions and wealth; (iii) he was a practitioner of celibacy; (iv) he had donated his IP right to ESP as a charitable act; (v) Rational Inquiry was based in science and derived results that were empirically measurable; (vi) completion of certain NXIVM courses was needed for promotion in the NXIVM community; (vii) promotion in the NXIVM community depended on completing NXIVM courses; and (viii) NXIVM's curriculum could be completed by the taking of courses. Clare Bronfman is responsible for the assertions made in NXIVM materials given her leadership in, and control over, the Enterprise, including its materials.

208. Clare Bronfman (among others) had the fraudulent intent when those statements were made in NXIVM curriculum to execute a scheme to defraud all Plaintiffs of money and property, namely, to induce Plaintiffs to purchase NXIVM curriculum they would not otherwise have purchased. There was a reasonable foreseeability that interstate mail and wires would be used as part of the scheme and in fact the use of interstate mail and wire was, at minimum, incident to an essential part of the scheme.

209. ***State Law Extortion*****:** Defendants Raniere and former Defendant Mack violated New York Penal Law Sections 155.30(6), 155.05(2)(e)(v), 155.05(2)(e)(ix), and 20.00 when, as part of DOS, they obtained property through extortion. Defendant Clare Bronfman aided and abetted or conspired with Raniere and Mack to commit those crimes, as evidenced by all the facts and circumstances, including her longtime leadership roles in NXIVM and closeness to Defendant Raniere, her interactions with foreigners and NXIVM recruits, namely Sylvie and Plaintiff Veronica Jaspeado who were recruited into DOS, and her attempts to cover-up the DOS conduct, including by sending by wire communications threatening letters she drafted to attorneys she had hired to send to people trying to escape DOS after it came to light in order to intimidate them from disclosing what Raniere and other DOS masters had done to them.

**Defendant Sara Bronfman's Predicate Acts**

210. ***Witness/Victim Tampering*****:** Defendant Sara Bronfman violated 8 U.S.C. § 1512(b)(1)–(3) by attempting to, in the days leading up to Defendant Raniere's trial, induce Adrian to leave the U.S. and remain in France during Defendant Raniere's trial, in exchange for substantial sums of money that Adrian would receive under the pretense of being employed as part of a video production project.

211. ***Mail/Wire Fraud (Raniere- and Curriculum-related Fraud)*****:** Sara Bronfman committed directly, aided and abetted the commission of, and conspired to commit multiple acts of mail and wire fraud in violation of 18 U.S.C. §§ 1341, 1343, alleged supra ¶¶ 37-56. Given her leadership role in the Enterprise, which she assumed in 2005, she is responsible for the false assertions of fact alleged above, and she had fraudulent intent when those statements were disseminated as part of NXIVM's curriculum to defraud Plaintiffs in the manner alleged above, *supra* ¶¶ 37-56.

212. ***Forced Labor, Sex Trafficking, and Human Trafficking*****:** Sara Bronfman committed several forced labor and human trafficking violations that are predicate acts under 18 U.S.C. § 1961(1). Those allegations are articulated below, *infra* ¶¶ 269-270, and incorporated herein by reference.

**Former Defendant Mack's Predicate Acts**

213. Former Defendant Mack pled guilty to racketeering, testifying that she committed the predicate acts of state law extortion and forced labor as part of a pattern of racketeering activity in operation of the Enterprise.

214. ***State Law Extortion*****:** As alleged herein, Mack obtained property through the extortion of Plaintiffs Nicole, India, Medhaoui, Salazar, Rachel, and Valerie, in violation of New York Penal Law Sections 155.30(6), 155.05(2)(e)(v), 155.05(2)(e)(ix), and 20.00. With Raniere, Mack also aided and abetted and conspired to extort several other Plaintiffs, including Edmondson, Pena, Jane Doe 9, Kristin, Charlotte, Sylvie, and Veronica Jaspeado.

215. ***Forced Labor, Sex Trafficking, and Human Trafficking*****:** Mack committed several forced labor, sex trafficking, and human trafficking violations that are predicate acts

under 18 U.S.C. § 1961(1). Those allegations are articulated below, *infra* ¶¶ 255-256, and incorporated herein by reference.

216. ***Mail/Wire Fraud (DOS-related Fraud)*****:** Mack also committed directly, aided and abetted the commission of, and conspired to commit multiple acts of mail and wire fraud in violation of 18 U.S.C. §§ 1341, 1343, related to Mack's leadership of DOS.

217. According to Mack's testimony, she "knowingly and intentionally worked with others and devised a scheme to make materially false representations and admissions regarding DOS in order to obtain property from DOS members," including concealing Raniere's role in DOS and characterizing it as a women's only organization.

218. She had the fraudulent intent when making those statements to execute a scheme to defraud all Plaintiffs of property, and there was a reasonable foreseeability that interstate mail and wires would be used as part of the scheme and in fact the use of interstate mail and wire was, at minimum, incident to an essential part of the scheme.

**Former Defendant Clyne's Predicate Acts**

219. ***State Law Extortion*****:** As alleged herein, Defendant former Defendant Clyne committed multiple acts of extortion based on the same collateral scheme employed by former Defendant Mack, in violation of New York Penal Law Sections 155.30(6), 155.05(2)(e)(v), 155.05(2)(e)(ix), and 20.00.

220. ***Forced Labor, Sex Trafficking, and Human Trafficking*****:** Former Defendant Clyne committed several forced labor, sex trafficking, and human trafficking violations that are predicate acts under 18 U.S.C. § 1961(1). Those allegations are articulated below, *infra* ¶¶ 253-254, and incorporated herein by reference.

221. ***Mail/Wire Fraud (DOS-related Fraud)*:** As alleged herein, former Defendant Clyne committed multiple acts of mail and wire fraud based on the same false-representation scheme employed by former Defendant Mack.

**Former Defendant Russell's Predicate Acts**

222. ***Visa Fraud*:** former Defendant Russell pled guilty to visa fraud, in violation of 18 U.S.C. § 1546(a), which is a RICO predicate, in connection with her intentional submission of documents she knew were false to the U.S. Consulate as part of her involvement in the Enterprise's immigration fraud.[81]

223. ***Immigration Fraud*:** former Defendant Russell also aided and abetted and conspired with Clare Bronfman and others to commit the immigration fraud described *supra* ¶ 60, as evidenced by the facts and circumstances, including her making all cash payments under an alias for the apartment in which Camila was concealed by NXIVM's leadership as described herein. Former Defendant Russell also committed immigration fraud for financial gain by encouraging, transporting, and concealing Daniela from immigration authorities by arranging for her to fly to Canada, driving her across the border, and presenting a false sheriffs identification that she had procured for Daniela to immigration authorities to successfully bring Daniela into the United States, where she performed uncompensated labor that benefitted the Inner Circle.

224. ***Forced Labor, Sex Trafficking, and Human Trafficking*:** former Defendant Russell committed several forced labor, sex trafficking, and human trafficking violations that are predicate acts under 18 U.S.C. § 1961(1). Those allegations are articulated below, *infra* ¶ 257, and incorporated herein by reference.

---

[81] District Court Docket, ECF 756 at 25; District Court Docket, ECF 1131 at 3.

**"RICO" Injury**

225. All Plaintiffs have been injured in their business or property by reason of the Count I Defendants' violation of 18 U.S.C. § 1962(c). Each Plaintiff was fraudulently induced to purchase curriculum or perform uncompensated labor and was thereby deprived of money or property because of the "Raniere-and Curriculum-Related" mail and wire fraud scheme perpetrated by Raniere, Clare Bronfman, and Sara Bronfman.

226. In addition, Plaintiffs Lindsay MacInnis, Adrian, and Maja Miljkovic also suffered injury to their property, namely uncompensated labor and legal expenses, that was caused by Raniere, Clare Bronfman, and Sara Bronfman's violations of 8 U.S.C. § 1324. *See* Schedule A.

227. Plaintiffs Nicole, India, Medhaoui, Salazar, Rachel, Valerie, and Jane Doe 8, as well as Plaintiffs Edmondson, Pena, Jane Doe 9, Kristin, and Charlotte suffered injury to their property, namely uncompensated labor, that was caused by Raniere, Mack, and Clare Bronfman's state law extortion and by Defendant Raniere and former Defendant Mack's DOS-related mail and wire fraud.

228. Plaintiffs Edmondson, Salazar, Medhaoui, and Camila suffered injury to their property, namely expenses associated from responding threatening letters and false allegations, that was caused by Clare Bronfman's witness/victim tampering violations.

229. As alleged below, the exo/eso Plaintiffs, DOS Plaintiffs also suffered injury to their property, namely uncompensated labor, that was caused by the Count I Defendants' forced labor violations.

## COUNT II

## RACKETEER INFLUENCED AND CORRUPT ORGANIZATIONS ACT (RICO) CONSPIRACY - 18 U.S.C. §1962(d) and 1964(c)

***Against Defendants Raniere, Clare Bronfman, Sara Bronfman, former Defendant Mack, former Defendant Clyne, former Defendant Russell, and former Defendant Porter on behalf of all Plaintiffs***

230. Plaintiffs reallege and incorporate the foregoing paragraphs of this Complaint.

231. The Count II Defendants agreed and conspired to violate 18 U.S.C. § 1962(c). Each agreed to form and associate themselves with the Enterprise; each knew about, and agreed to further or facilitate, the criminal endeavor, which involved, or by agreement was intended to involve, two or more predicate acts; and each agreed with one or more co-conspirators to participate in the conspiracy to pursue the Enterprise's unlawful objectives or pursue its objectives by unlawful means. That agreement can be inferred from the circumstances, including the Count II Defendants' positions in NXIVM, their actions, and the interdependence of activities and persons involved.

232. Although individuals may be held liable under 18 U.S.C. § 1962(d) even if they did not personally (i) commit RICO predicate violations, (ii) perform overt acts in furtherance of the conspiracy, (iii) agree to commit the predicate acts that are elements of the underlying RICO offense, (iv) take some part in directing the Enterprise, or (v) know of each criminal act committed by their co-conspirators, so long as they know of the general contours of the conspiracy, each Count II Defendant in fact committed multiple overt acts in furtherance of the conspiracy. Those actions and the circumstances evince each Count II Defendant's agreement to participate in the conspiracy as well as their knowledge and facilitation of the criminal endeavor.

233. <u>Defendant Raniere's Acts Evincing His Knowing Agreement to Facilitate the Enterprise</u>: Raniere was convicted of RICO conspiracy, and his acts in furtherance of the

conspiracy are innumerable. For concision, Plaintiffs rely on the public record and documents incorporated herein.

234. Defendant Clare Bronfman's Acts Evincing Her Knowing Agreement to Facilitate the Enterprise: Clare Bronfman's actions evincing her knowledge of the conspiracy and agreement with co-conspirators to facilitate it include: accumulating a suite of positions in the Enterprise that allowed her *de facto* power to operate and control various important aspects of the Enterprise (such as its legal arm); financing the Enterprise with over $100 million; fraudulently using a then-deceased Pamela Cafritz's credit card and bank account to keep money out of Raniere's name (a crime to which she pled guilty); operating and financing ESF and RCG to commit immigration fraud described herein; personally arranging for fraudulent visas and exploiting foreign laborers as described herein; instructing her subordinates to fraudulently omit RCG from letters submitted to the government; encouraging a sham marriage to facilitate the violation of immigration law; funding unauthorized human experimentation and exploiting its subjects in related video content (namely, the "My Tourette's" film) to further the Enterprise's bogus claims that its methods and treatments were scientifically legitimate; operating the subgroup exo/eso to recruit and groom candidates for sex acts with Raniere and refusing to compensate those recruits for labor they performed; overseeing and directing the Enterprise's legal operations before and after the revelation of DOS; ignoring requests of DOS victims to return their collateral; pressuring witnesses and victims to retain counsel that she would pay for so that she and NXIVM could control them; retaining Mexican attorneys to send letters that she and Raniere drafted threatening witnesses and victims if they did not remain silent about DOS; "working hand-in-hand with Raniere to intimidate and silence victims of Raniere's brutal campaign of sexual abuse and exploitation," according to this Court; "falsely characterize[ing]"

DOS, in this Court's words, in a public statement with knowledge that her characterizations were false; traveling to Mexico with Raniere for the DOS recommitment ceremony even after she indisputably knew information about DOS, collateral, and its victims; pressuring Camila not to speak with law enforcement; operating NXIVM's legal arm in a "deplorable" manner, according to another federal court, before the creation of DOS to create a culture of fear and silence around the Enterprise; installing keylogging software on her father, Edgar Bronfman's computer, without authorization at Raniere's behest after Mr. Bronfman became a perceived critic of the Enterprise; giving her co-conspirators access to his email for years; and hiring firms to investigate other perceived enemies of the Enterprise.

235. Defendant Sara Bronfman's Acts Evincing Her Knowing Agreement to Facilitate the Enterprise: Sara Bronfman's actions evincing her knowledge of the conspiracy and agreement with co-conspirators to facilitate it include: accumulating positions in the Enterprise that were accompanied by *de facto* power to operate and control various aspects of the Enterprise; financing the Enterprise with substantial sums of money, including its legal campaigns; purchasing multiple properties used as NXIVM's headquarters, center of operations, and administrative offices; operating and financing RCG and ESF; directing Ms. Garza to employ misleading accounting practices to hide the existence of foreign nationals and mask RCG's finances; using ESF to fund unauthorized human experiments designed to further the Enterprise's bogus claims that its methods and treatments were scientifically legitimate; and encouraging Adrian to travel to France during Raniere's trial so he could not provide testimony helpful to the government's case, in exchange for money.

236. Former Defendant Mack's Acts Evincing Her Knowing Agreement to Facilitate the Enterprise: former Defendant Mack's actions evincing her knowledge of the conspiracy and

agreement with co-conspirators to facilitate it include: leading the Enterprise's subgroups, including "TEN C" and "The Source"; encouraging a "One Asian" recruit to engage in sex acts with Raniere; devising the DOS branding with Raniere, including the plan to place the DOS victims in a vulnerable position during the branding; using false and misleading statements of facts to encourage DOS victims, including multiple Plaintiffs, to join DOS; overseeing DOS as a First- Line Master; extracting collateral from DOS victims, including multiple Plaintiffs, to extort them into performing labor and sex acts with Raniere; and editing collateral that was eventually released.

237. Former Defendant Clyne's Acts Evincing Her Knowing Agreement to Facilitate the Enterprise: Former Defendant Clyne's actions evincing her knowledge of the conspiracy and agreement with co-conspirators to facilitate it include: leading "TEN C"; overseeing DOS as a First-Line Master; using false and misleading statements of facts to encourage DOS victims, including multiple Plaintiffs, to join DOS; overseeing DOS as a First-Line Master; extracting collateral from DOS victims, including Plaintiff Jane Doe 8, to extort them into performing labor and sex acts with Raniere; and serving the Enterprise as the custodian of collateral through the present.

238. Former Defendant Russell's Acts Evincing Her Knowing Agreement to Facilitate the Enterprise: former Defendant Russell's actions evincing her knowledge of the conspiracy and agreement with co-conspirators to facilitate it include: transporting Daniela across the U.S.-Canada border by the presentation of fraudulent law enforcement documents; accepting payments from then- deceased Pamela Cafritz's bank account as part of Clare Bronfman's fraudulent use of identification aimed at keeping money out of Raniere's name; visa fraud (to which she pled guilty); making cash payments under an alias to assist in the harboring of Camila;

and assisting in the hacking of a perceived NXIVM critic's computer through the installation of keylogging software.

239. Defendant Roberts' actions include branding DOS victims' pubic regions without their informed consent; continuing to promote DOS well-after the details of DOS-related crimes came to light.

240. Injury: All Plaintiffs seek to recover for injuries from each Defendant to the fullest extent permitted by law. Each RICO predicate alleged in this Complaint and each RICO injury sustained by each Plaintiff was reasonably foreseeable to each Count II Defendant and a natural consequence of the conspiracy.

## COUNT III

## CLAIMS UNDER 18 U.S.C. § 1595

241. Plaintiffs reallege and incorporate by reference paragraphs 1 through 192 of this Complaint.

242. **Venture:** NXIVM was not only a RICO enterprise, but also a trafficking "Venture" designed to groom and procure women for Defendant Raniere's sexual predation and to provide free labor and services to members of the Venture. The Venture was led by Defendant Raniere. All Individual Defendants participated in the Venture.[82]

[82] A trafficking "venture" is "any group of two or more individuals associated in fact, whether or not a legal entity." 18 U.S.C. §1591(e)(6). Hereinafter, "Venture" or "Venture Defendants" refer to Defendant Raniere, former Defendant Porter, and members of the NXIVM Inner Circle (including Defendants Clare Bronfman and Sara Bronfman and former Defendants Russell, Mack, and Clyne), and DOS First Line Masters (including former Defendants Mack and Clyne). Defendants in the Venture, aside from Raniere, are also referred to as Raniere's "agents" or "co-conspirators."

### (A) SEX TRAFFICKING—18 U.S.C. § 1591 and ATTEMPTED SEX TRAFFICKING – 18 U.S.C. § 1594(a)

243. As set forth below, members of the Venture perpetrated sex trafficking offenses against the Plaintiffs or knowingly benefitted financially or by receiving things of value from participation in the Venture, which they knew or should have known was engaged in sex trafficking. 18 U.S.C. § 1595(a).

244. 18 U.S.C. § 1594(a) holds those who complete the offense of sex trafficking liable for attempted sex trafficking. Defendants Raniere, Clare Bronfman, former Defendant Mack, former Defendant Clyne and former Defendant Russell attempted to perpetrate sex trafficking offenses in furtherance of the NXIVM Venture and succeeded, as set forth below.

***Against Defendant Raniere on behalf of Plaintiffs Edmonson, Salazar, Oxenberg, Mehdaoui, Rachel, Nicole, Valerie, Jane Doe 8, Paloma Pena, Jane Doe 9, Kristin, Jaspeado, Charlotte (the "DOS Plaintiffs"); Lindsay MacInnis, Adrienne Stiles, Bonnie Piesse (the "Exo/Eso Plaintiffs"); and Camila and Daniela***

245. Defendant Raniere perpetrated sex trafficking offenses against the DOS Plaintiffs, the exo/eso Plaintiffs, Camila, and Daniela. He knowingly recruited and enticed these Plaintiffs (directly and through agents), knowing or in reckless disregard of the fact that threats of force, fraud, coercion, or any combination of these means, would be used to cause these Plaintiffs to engage in commercial sex acts with him. That some sex acts were never completed is immaterial.

246. **The DOS Plaintiffs:** Defendant Raniere recruited or directed the recruitment of the DOS Plaintiffs himself and through his First Line Masters (including former Defendants Mack and Clyne), knowing or in reckless disregard that he and his First Line Masters (former Defendants Mack and Clyne) would coerce these Plaintiffs into providing personally damaging collateral, and threaten explicitly or impliedly to release that collateral to cause the DOS Plaintiffs to engage in commercial sex acts with him or others. The sex acts were "commercial"

because they were committed or intended to be committed in circumstances where things of value were given to or received by any person. Namely, First Line Masters, at the direction of Raniere, promised DOS Plaintiffs membership in a sorority or sisterhood and advancement within the NXIVM organization should they submit to First Line Masters' and Defendant Raniere's demands, including those which, unbeknownst to the DOS Plaintiffs, were expressly or impliedly of a sexual nature. Defendant Raniere also received things of value in connection with the completed or almost completed sex acts, including satisfaction of his perverse sexual interests, complete control over DOS members and First Line Masters, free labor, and enhanced power, prestige, and authority within the NXIVM organization.

247. **The exo/eso Plaintiffs:** Defendant Raniere enticed and recruited the exo/eso Plaintiffs through his close friend, co-conspirator, confidant, and funder, Defendant Clare Bronfman, knowing or in reckless disregard that she would use fraud (false promises of a job, salary, and career advancement) and coercion (the threat of harm, including psychological abuse, threat of deportation) to groom or procure these Plaintiffs and cause them to engage in commercial sex acts with him. The sex acts were "commercial" because they were committed or intended to be committed in circumstances where things of value were given to or received by any person. 18 U.S.C. § 1591(e)(3). Namely, Defendant Clare Bronfman and Defendant Raniere promised the exo/eso Plaintiffs a job, salary, and career advancement should they submit to Defendant Clare Bronfman and Defendant Raniere's demands, including those which, unbeknownst to the Exo/Eso Plaintiffs, were expressly or impliedly of a sexual nature. Defendant Raniere also received things of value in connection with the completed or almost completed sex acts, including satisfaction of his perverse sexual interests, free labor from the exo/eso Plaintiffs, and enhanced power, prestige, and authority within the NXIVM organization.

248. **<u>Daniela</u>:** Defendant Raniere recruited, harbored, and maintained Plaintiff Daniela or directed the recruitment, harboring, or maintenance of her through his agents and co-conspirators (members of the Inner Circle), knowing or in reckless disregard that he and certain members of the Inner Circle would use fraud (false promises of a job, education, and legal immigration status) and coercion (the threat of harm, including psychological and verbal abuse and the threat of deportation) to cause Daniela to engage in commercial sex acts with him. The sex acts were "commercial" because they were committed or intended to be committed in circumstances where things of value were given to or received by any person. 18 U.S.C. § 1591(e)(3). Namely, Defendant Raniere, himself or through his agents, promised Daniela a job, salary, education, and legal immigration status, should she submit to Defendant Raniere's demands, including those which, unbeknownst to Daniela, were expressly or impliedly of a sexual nature. Defendant Raniere also received things of value in connection with the completed or almost completed sex acts, including satisfaction of his perverse sexual interests, free labor, control over Daniela, and enhanced power, prestige, and authority within the NXIVM organization.

249. **<u>Camila</u>:** Defendant Raniere also recruited, harbored, or maintained Plaintiff Camila or directed the recruitment, harboring, or maintenance of Camila through his agents and co-conspirators (members of the Inner Circle, including former Defendant Kathy Russell), knowing or in reckless disregard that he and certain members of the Inner Circle would use fraud (false promises of a job, education, and legal immigration status), force (rape), and coercion (the threat of harm, including psychological and verbal abuse and the threat of deportation) to cause her to engage in commercial sex acts with him, and that she had not yet attained the age of 18 years. The sex acts were "commercial" because they were committed or intended to be

committed in circumstances where things of value were given to or received by any person. 18 U.S.C. § 1591(e)(3). Namely, Defendant Raniere, himself or through his agents, promised Camila a job, salary, education, and legal immigration status, should she submit to Defendant Raniere's demands, including those which, unbeknownst to Camila, were expressly or impliedly of a sexual in nature. Defendant Raniere also received things of value in connection with the completed or almost completed sex acts, including satisfaction of his perverse sexual interests, free labor, control over Camila, and enhanced power, prestige, and authority within the NXIVM organization.

***Against Defendant Clare Bronfman on behalf of the Exo/Eso Plaintiffs and the DOS Plaintiffs***

250. **The exo/eso Plaintiffs:** Defendant Clare Bronfman is also liable for sex trafficking the exo/eso Plaintiffs because she knowingly benefited by receiving things of value, including enhanced status, power, prestige, and free labor from the exo/eso Plaintiffs, from participation in the Venture, which she knew or should have known was engaged in sex trafficking offenses against these Plaintiffs. She knew or should have known the Venture was engaged in sex trafficking offenses against the exo/eso Plaintiffs because she helped Defendant Raniere design the exo/eso program and recruited these women for Defendant Raniere's sexual predation.

251. **The DOS Plaintiffs:** Defendant Clare Bronfman is liable for sex trafficking the DOS Plaintiffs because she knowingly benefited by receiving things of value, including enhanced status, power, and prestige within NXIVM, from participation in the Venture, which she knew or should have known was sex trafficking the DOS Plaintiffs. First, she knew or should have known that DOS First Line Masters (including former Defendants Mack and Clyne) and Defendant Raniere sex trafficked the DOS Plaintiffs because of the facts alleged herein,

including that she was a member of the Inner Circle (which included former Defendants Mack and Clyne). That she launched false campaigns against DOS defectors, who came to her for the release of their collateral and told a reporter that there was a video of Plaintiff Edmonson's branding, further demonstrates that she knew or should have known about the sex trafficking offenses within DOS when they occurred.

252. **Camila and Daniela:** Defendant Clare Bronfman is liable for sex trafficking Camila and Daniela because she knowingly benefited by receiving things of value, including enhanced status, power, and prestige within NXIVM, from participation in the Venture, which she knew or should have known sex trafficked Camila and Daniela. She knew or should have known that Defendant Raniere and the Venture were sex trafficking Camila and Daniela when the trafficking occurred, as evidenced by facts including her leadership roles and power within NXIVM, her familiarity with Raniere and NXIVM's operations and Camila and Daniela, and that she paid an attorney to direct Camila not to cooperate with an FBI investigation into NXIVM.

***Former Defendant Clyne on behalf of Jane Doe 8 and the DOS Plaintiffs***

253. **Jane Doe 8:** Former Defendant Clyne perpetrated sex trafficking offenses against Jane Doe 8. Former Defendant Clyne recruited Jane Doe 8 to DOS knowing or in reckless disregard of the fact that she would coerce Jane Doe 8 into providing collateral (nude photographs, among other things) and threaten the release of that collateral to cause Jane Doe 8 to engage in a commercial sex act with Defendant Raniere. The sex act was "commercial" because it was committed or intended to be committed in circumstances where things of value were given to or received by any person. 18 U.S.C. § 1591(e)(3). Namely, former Defendant Clyne promised Jane Doe 8 membership in a sorority or sisterhood and advancement within the

NXIVM organization, should she submit to former Defendant Clyne and Defendant Raniere's demands, including those which, unbeknownst to Jane Doe 8, were expressly or impliedly of a sexual nature. Former Defendant Clyne also received things of value in connection with the completed or almost completed sex act, including control over Jane Doe 8, free labor from her "slave," and enhanced power, prestige, and authority within the NXIVM organization.

254. **The DOS Plaintiffs:** Alternatively, former Defendant Clyne is liable for sex trafficking all DOS Plaintiffs because she knowingly benefited by receiving things of value, including enhanced status, power, and prestige within NXIVM, and free labor and services from her DOS "slaves," from participation in the Venture, which she knew or should have known was engaged in sex trafficking offenses. She knew or should have known that DOS First Line Masters and Defendant Raniere were engaged in sex trafficking because she was a First Line Master and a member of the Inner Circle who directed these offenses herself.

***Against former Defendant Mack on behalf of Plaintiffs Nicole, Oxenberg, Mehdaoui, Salazar, Rachel, and Valerie and the DOS Plaintiffs***

255. **Plaintiffs Nicole, Oxenberg, Mehdaoui, Salazar, Rachel, and Valerie:** Former Defendant Mack perpetrated sex trafficking offenses against Plaintiffs Nicole, Oxenberg, Mehdaoui, Salazar, Rachel, and Valerie whom she recruited into DOS, knowing or in reckless disregard of the fact that she would coerce them into providing collateral (nude photographs, among other things) and threaten the release of that collateral to cause them to engage in commercial sex acts with Defendant Raniere. The sex acts were "commercial" because they were committed or intended to be committed in circumstances where things of value were given to or received by any person. 18 U.S.C. § 1591(e)(3). Namely, former Defendant Mack promised Plaintiffs Nicole, Oxenberg, Mehdaoui, Salazar, Rachel, and Valerie membership in a sorority or sisterhood and advancement within the NXIVM organization, should they submit to former

Defendant Mack's and Defendant Raniere's demands, including those which, unbeknownst to these Plaintiffs, were expressly or impliedly of a sexual nature. Former Defendant Mack also received things of value in connection with the completed or almost completed sex acts, including control over her "slaves," free labor from them, and enhanced power, prestige, and authority within the NXIVM organization.

256. **The DOS Plaintiffs:** Alternatively, former Defendant Mack is liable for sex trafficking the DOS Plaintiffs because she knowingly benefited by receiving things of value, including enhanced status, power, and prestige within NXIVM, and labor and services from her DOS "slaves," from participation in the Venture, which she knew or should have known was engaged in sex trafficking offenses. She knew or should have known that DOS First Line Masters and Defendant Raniere were engaged in sex trafficking because she helped Raniere create and run DOS, was a First Line Master, and a member of Raniere's Inner Circle.

***Former Defendant Russell on behalf of Camila***

257. Former Defendant Russell perpetrated sex trafficking offenses against Camila, whom she harbored by providing and paying for her housing,[83] knowing or in reckless disregard that coercion (the threat of serious harm, including psychological and verbal abuse and the threat of deportation) would be used to cause her to engage in commercial sex acts with Defendant Raniere. The sex acts were "commercial" because they were committed or intended to be committed in circumstances where things of value were given to or received by any person. 18 U.S.C. § 1591(e)(3). Namely, Raniere and his agents falsely promised Camila a job, salary, education, and legal immigration status, should she submit to Defendant Raniere's demands, including those which, unbeknownst to Camila, were expressly or impliedly of a sexual nature.

[83] *See Mouloki v. Epee*, 262 F. Supp. 3d 684, 698 (N.D. Ill. 2017).

Former Defendant Russell also received things of value in connection with the completed or almost completed sex acts, including control, enhanced power, prestige, and authority within the NXIVM organization.

### (B) CONSPIRACY TO COMMIT SEX TRAFFICKING – 18 U.S.C. § 1594(c)

***Against Defendants Raniere, Clare Bronfman, former Defendant Mack, former Defendant Clyne, former Defendant Russell on behalf of the DOS Plaintiffs, the exo/eso Plaintiffs, Daniela, and Camila***

258. Members of the NXIVM Venture conspired to commit sex trafficking offenses. Former Defendants Mack and Clyne conspired with Defendant Raniere to create and run DOS, a sex trafficking pipeline for Defendant Raniere. Former Defendant Clyne conspired with Defendant Raniere and other DOS First Line Masters to control Jane Doe 8 and further the DOS trafficking pipeline. Likewise, former Defendant Mack conspired to traffic "slaves." Defendant Roberts branded DOS victims at the instruction of Defendant Raniere. Defendant Clare Bronfman created exo/eso with Raniere to obtain women for Defendant Raniere in furtherance of the Venture. Defendant Raniere, in concert with his agents, conspired to traffic, and did in fact traffic, Daniela and Camila for the purpose of engaging in commercial sexual activity with them. Former Defendant Russell harbored Camila for the purpose of causing her to engage in commercial sex acts with Defendant Raniere. These actions by these specific Venture Defendants evidence their larger agreement to procure and groom the DOS Plaintiffs, the exo/eso Plaintiffs, Daniela, and Camila for commercial sex acts with Defendant Raniere.

### (C) FORCED LABOR—18 U.S.C. § 1589 and HUMAN TRAFFICKING - 18 U.S.C. § 1590 and ATTEMPTED FORCED LABOR AND HUMAN TRAFFICKING - 18 U.S.C. § 1594(a)

259. Members of the Venture forcibly obtained the uncompensated labor of the DOS Plaintiffs, the exo/eso Plaintiffs, Camila, Daniela, and Adrian for personal gain. That labor

benefitted the Venture's members and had the intended effect of increasing their status in the NXIVM organization.

260. The U.S. Court of Appeals for the Second Circuit concluded that the DOS Plaintiffs performed unconsented to "labor or services" under 18 U.S.C. § 1589.[84] The labor performed by the DOS Plaintiffs that is the subject of this Count is the same labor discussed in the Second Circuit's ruling.

261. By committing forced labor offenses under 18 U.S.C. § 1589, the Venture Defendants also committed human trafficking offenses under 18 U.S.C. § 1590.

262. Under 18 U.S.C. § 1594(a), those who complete the offense of labor trafficking are liable for attempted labor trafficking. The Venture Defendants attempted human and labor trafficking offenses in furtherance of the Venture and successfully perpetrated those offenses as set forth below.

***Against Defendant Raniere on behalf of the DOS Plaintiffs, Exo/Eso Plaintiffs, Daniela, Camila, and Adrian***

263. Defendant Raniere perpetrated forced labor and human trafficking offenses against the DOS Plaintiffs, Exo/Eso Plaintiffs, Adrian, Daniela, and Camila. He knowingly provided or obtained the labor or services of these Plaintiffs by himself of through his agents by threats of force or physical restraint; by means of serious harm or threats of serious harm; by means of the abuse or threatened abuse of law or legal process; or by means of a scheme, plan, or pattern intended to cause them to believe that if they did not perform the labor or services, they would suffer serious harm or restraint.

264. **The DOS Plaintiffs:** Defendant Raniere recruited or directed the recruitment of the DOS Plaintiffs himself and through his First Line Masters (including former Defendants

---

[84] *See* Appellate Docket ECF 215 at 4.

Mack and Clyne. He knowingly provided and obtained the DOS Plaintiffs' uncompensated labor or services (including acts of service, menial labor, chores, and commercial sex acts), through threats of serious harm (the release of humiliating and damaging collateral) or by means of a scheme, plan, or pattern intended to cause them to believe that if they did not perform the labor or services, they would suffer serious harm or restraint (the continued submission of collateral and the threat of its release). The release of collateral qualifies as "serious harm" under 18 U.S.C. § 1589 because the release of collateral was intended to cause psychological, financial, or reputation harm that is sufficiently serious under the circumstances to compel a similarly situated reasonable person to perform labor or services to avoid incurring that harm. *See* 18 U.S.C. § 1589(c)(2).

265. **The exo/eso Plaintiffs:** Defendant Raniere recruited or directed the recruitment of the exo/eso Plaintiffs through his close friend, co-conspirator, confidant, and funder, Defendant Clare Bronfman. He provided and obtained these Plaintiffs' uncompensated labor and services (the establishment of a pretend wellness company, administrative and menial work) by means of serious harm (sleep-deprivation, psychological and verbal abuse) and in some cases by means of the abuse or threatened abuse of law or legal process (deportation or immigration proceedings).

266. **Daniela, Camila, and Adrian:** Defendant Raniere obtained the uncompensated labor and services (letter-writing, administrative work, menial work, and commercial sex acts) of Plaintiff Daniela by means of serious harm (physical confinement to a room, psychological and verbal abuse) and by means of the abuse or threatened abuse of law or legal process (deportation). He did this by means of a scheme, pattern, or plan, which caused Daniela to believe she would be deported to Mexico should she fail to obey his and his Inner Circle's every command.

267. Defendant Raniere obtained the uncompensated labor and services (babysitting, administrative work, research, menial work, and commercial sex acts) of Plaintiff Camila by means of serious harm (psychological abuse and rape) and by means of the abuse or threatened abuse of law or legal process (deportation). He did this by means of a scheme, pattern, or plan, which caused Camila to believe she would be deported to Mexico should she fail to obey his and his Inner Circle's every command.

268. Defendant Raniere obtained the uncompensated labor and services (the setting up of a t-shirt company) of Plaintiff Adrian by means of the abuse or threatened abuse of law or legal process (deportation). He did this by means of a scheme, pattern, or plan, which caused Adrian to believe he would be deported to Mexico should he fail to obey his and his Inner Circle's every command.

***Against Defendant Sara Bronfman on behalf of Plaintiff Camila***

269. Defendant Sara Bronfman perpetrated labor trafficking offenses against Camila. She provided and obtained Plaintiff Camila's uncompensated labor and services (babysitting and teaching in RCG, which Defendant Sara Bronfman created and funded) by means of a scheme, pattern, or plan, which caused Plaintiff Camila to believe she would be deported should she fail to continue providing her uncompensated labor and services.

270. Alternatively, Defendant Sara Bronfman is liable for labor trafficking Camila because she knowingly benefited financially or by receiving things of value, including free labor, enhanced status, power, and prestige within NXIVM, from participation in the Venture, which she knew or should have known labor trafficked Camila. She knew or should have known about the Venture's forced labor offenses because she was the creator and funder of RCG, where

Camila worked, and a member of the Inner Circle, in close and constant contact with Defendant Raniere and other members of the Inner Circle.

***Against Defendant Clare Bronfman on behalf of the Exo/Eso Plaintiffs, the DOS Plaintiffs, Adrian, Camila, and Daniela***

271. **The DOS Plaintiffs:** Defendant Clare Bronfman is liable for labor trafficking the DOS Plaintiffs because she knowingly benefited by receiving things of value, including enhanced status, power, and prestige within NXIVM, from participation in the Venture, which she knew or should have known was engaged in labor trafficking offenses. She knew or should have known DOS First Line Masters and Defendant Raniere were forcing the DOS Plaintiffs to perform menial tasks, acts of care, and commercial sex acts because she was a member of the Inner Circle who was in close and constant contact with other members of the Inner Circle, including former Defendants Mack and Clyne and Defendant Raniere. That she knew or should have known about the forced labor violations is evidenced by the fact that she launched legal campaigns against DOS defectors who came to her for the return of their collateral.

272. Defendant Clare Bronfman is liable for labor trafficking Camila and Daniela because she knowingly benefited by receiving things of value, including enhanced status, power, and prestige within NXIVM, from participation in the Venture, which she knew or should have known labor trafficked Camila and Daniela. She knew or should have known the Inner Circle and Defendant Raniere were forcing Plaintiffs Daniela and Camila to perform menial tasks, administrative work, and commercial sex acts, because she was a member of the Inner Circle who conspired to commit forced labor offenses and because she was in close and constant contact with other members of the Inner Circle and Raniere. She was also the head of NXIVM's legal department, and it was common knowledge that those who disobeyed her or Raniere (including Camila and Daniela) suffered her abusive legal tactics and/or threats of deportation.

***Former Defendant Clyne on behalf of Jane Doe 8 and the DOS Plaintiffs.***

273. **Jane Doe 8:** former Defendant Clyne perpetrated labor trafficking offenses against Jane Doe 8. She knowingly provided and obtained the uncompensated labor or services of her "slave," Jane Doe 8 (including acts of care, menial tasks, chores, and commercial sex acts for Raniere), through threats of serious harm (the threatened release of humiliating and damaging collateral) or by means of a scheme, plan, or pattern intended to cause Jane Doe 8 to believe that if she did not perform the labor or services, she would suffer serious harm or restraint (the continued submission of collateral and the threat of its release, as well as psychological or physical punishment).

274. **DOS Plaintiffs:** Additionally, former Defendant Clyne is liable for the labor trafficking of all DOS Plaintiffs because she knowingly benefited by receiving things of value, including enhanced status, power, and prestige within NXIVM, and free labor and services from her DOS "slave," from participation in the Venture, which she knew or should have known was engaged in labor trafficking offenses. She knew or should have known that DOS First Line Masters and Defendant Raniere were forcing DOS Plaintiffs to perform menial tasks, acts of care, and commercial sex acts because she was a First Line Master who did this to Jane Doe 8 herself and because she was a member of the Inner Circle.

***Against former Defendant Mack on behalf of Plaintiffs Nicole, Oxenberg, Mehdaoui, Jessica Joan Salazar, Rachel, and Valerie and all DOS Plaintiffs***

275. **Plaintiffs Nicole, Oxenberg, Mehdaoui, Jessica Joan Salazar, Rachel, and Valerie:** Former Defendant Mack perpetrated labor trafficking offenses against Plaintiffs Nicole, Oxenberg, Mehdaoui, Jessica Joan Salazar, Rachel, and Valerie. She knowingly obtained or provided the labor or services of her "slaves," including acts of care, menial tasks, chores, and commercial sex acts for Raniere. Former Defendant Mack accomplished this through threats of

serious harm (the threatened release of humiliating and damaging collateral) or by means of a scheme, plan, or pattern intended to cause these Plaintiffs to believe that if they did not perform the labor or services, they would suffer serious harm or restraint (the continued submission of collateral and the threat of its release, as well as psychological or physical punishments).

276. **DOS Plaintiffs:** Additionally, Former Defendant Mack is liable for labor trafficking all DOS Plaintiffs because she knowingly benefited by receiving things of value, including enhanced status, power, and prestige within NXIVM, and free labor and services from her DOS "slaves," from participation in the Venture, which she knew or should have known was engaged in labor trafficking offenses. She knew or should have known DOS First Line Masters and Defendant Raniere were forcing the DOS Plaintiffs to perform menial tasks, acts of service, and commercial sex acts because she was a First Line Master who did this to Plaintiffs Nicole, Oxenberg, Mehdaoui, Jessica Joan Salazar, Rachel, and Valerie herself, and because she was a member of the Inner Circle.

***Against former Defendant Russell on behalf of the DOS Plaintiffs and Camila***

277. Former Defendant Russell is liable for labor trafficking Camila and the DOS Plaintiffs because she knowingly benefited financially and by receiving things of value, including payment, enhanced status, power, and prestige from participation in the Venture, which she knew or should have known labor trafficked Camila. She knew or should have known that members of the Inner Circle and Defendant Raniere were forcing Plaintiff Camila to perform menial tasks, commercial sex acts, administrative work, and babysitting because she "harbored" Camila. *See* 18 U.S.C. § 1591; *see also Mouloki v. Epee*, 262 F. Supp. 3d 684, 698 (N.D. Ill. 2017). She was in regular contact with Camila, Raniere, and members of the Inner Circle, and for

this reason also knowingly benefitted by receiving things of value from participation in the Venture, which she knew or should have known labor trafficked the DOS Plaintiffs.

**(D) CONSPIRACY TO COMMIT FORCED LABOR and CONSPIRACY TO COMMIT HUMAN TRAFFICKING - 18 U.S.C. § 1594(b)**

***Against Defendants Raniere, Clare Bronfman, Sara Bronfman, former Defendant Mack, former Defendant Clyne, former Defendant Porter on behalf of the DOS Plaintiffs, the Exo/Eso Plaintiffs, Adrian, Camila, and Daniela***

278. The Venture operated as a collective to extract uncompensated labor from Plaintiffs. The Venture Defendants agreed and conspired to commit and succeeded in committing forced labor offenses as set forth above. Each Venture Defendant obtained the forced labor of one or more of these Plaintiffs (as set forth above), and their agreement to perpetuate the forced labor crimes of the Venture is evidenced by the facts alleged herein, including that the forced labor and human trafficking were committed as part of a single, cohesive scheme against similarly situated Plaintiffs (NXIVM recruits); that each of the DOS masters used the same methods to commit their violations; that there was a united attempt to cover up the Venture's forced labor crimes; and that all of the violations were committed at Raniere and his Inner Circle's direction.

**(E) UNLAWFUL CONDUCT WITH RESPECT TO DOCUMENTS IN FURTHERANCE OF TRAFFICKING OR FORCED LABOR 18 U.S.C. § 1592**

***Against Defendants Raniere and Clare Bronfman on behalf of Plaintiff Daniela***

279. Defendant Raniere and his agents, members of the Inner Circle, including Clare Bronfman, knowingly confiscated Daniela's government identification documents and/or immigration papers in the course and with the intention of committing sex trafficking, human trafficking, and forced labor offenses against her. Specifically, Defendant Raniere ordered the confiscation of Plaintiff Daniela's documents and ordered her confinement to a room for two

years. He did this with the intention and purpose of forcing her to perform labor, including secretarial work like writing letters.

**(F) CONSPIRACY TO ENGAGE IN UNLAWFUL CONDUCT WITH RESPECT TO DOCUMENTS IN FURTHERANCE OF TRAFFICKING OR FORCED LABOR - 18 U.S.C. § 1594(b)**

***Against Defendants Raniere and Clare Bronfman on behalf of Plaintiff Daniela***

280. As set forth above, members of the Inner Circle, including Clare Bronfman, at the direction of Raniere agreed and conspired to hold Plaintiff Daniela captive in a room and confiscate her identification papers. They succeeded in doing so. Defendant Clare Bronfman's knowledge and participation in this conspiracy is evidenced by the facts alleged herein, including her leadership role in NXIVM's immigration fraud schemes.

**STATE LAW**

**CLAIMS COUNT IV**

**BATTERY**

***Against Defendant Danielle Roberts on behalf of Plaintiffs Sarah Edmondson, Nicole, Paloma Pena, and India Oxenberg***

281. Plaintiffs reallege and incorporate paragraphs 1 through 192 of this Complaint.

282. When Defendant Danielle Roberts branded Sarah Edmondson, Nicole, Paloma Pena and India Oxenberg with Defendant Raniere's initials as part of the DOS ritual, Roberts (i) intentionally, (ii) made contact with Sarah Edmondson's, Nicole's, Paloma Pena's, and India Oxenberg's bodies; (iii) that was harmful, offensive, and wrongful under the all the circumstances.

283. The Count IV Plaintiffs did not and could not consent to the contact under the circumstances alleged herein, and, even if they had, consent is not conclusive as to whether

contact constitutes battery because under New York Law it is only one factor to consider in determining whether the contact was offensive.

284. Plaintiffs suffered lasting physical and emotional injuries as a result of Defendant's commission of battery upon their persons.

**COUNT V**

**AIDING AND ABETTING, ACTING IN CONCERT, AND CONSPIRING WITH RESPECT TO BATTERY**

***Against Defendants Raniere, former Defendant Mack and former Defendant Clyne, on behalf of Plaintiffs Sarah Edmondson, Nicole, Paloma Pena, India Oxenberg and Camila***

285. Plaintiffs reallege and incorporate paragraphs 1 through 192 of this Complaint.

286. Defendants Raniere, and former Defendants Mack and Clyne aided and abetted, and acted in concert with, Defendant Roberts as to the battery alleged above by either devising the ceremony, requesting that it be done, participating in it or assisting in it with knowledge and intent that the Plaintiffs were going to unknowingly be branded with Defendant Raniere's initials.

287. Plaintiffs suffered lasting physical and emotional injuries as a result of the commission of battery upon their persons that Defendants acted in concert with respect to and which they aided and abetted.

**COUNT VI**

**GROSS NEGLIGENCE and RECKLESSNESS**

***Against Defendant Raniere on behalf of Plaintiffs Margot Leviton, Isabella Constantino and Caryssa Cottrell***

288. Plaintiffs reallege and incorporate paragraphs 1 through 192 of this Complaint.

289. Raniere assumed a duty of care to Margot Leviton, Isabella Constantino and Caryssa Cottrell when he directed Porter to perform treatment and experimentation on Margot

Leviton, Isabella Constantino and Caryssa Cottrell and directed Clare Bronfman and Sara Bronfman to use ESF to finance the human experiments. Raniere breached this duty of care by causing Margot Leviton, Isabella Constantino and Caryssa Cottrell to suffer (i) post-traumatic stress disorder, (ii) physical pain, (iii) mental anguish, (iv) additional medical bills, and (v) lost work and lost earning capacity.

290. As a direct and proximate result of the Count VI Defendants' gross negligence, Margot Leviton, Isabella Constantino, and Caryssa Cottrell sustained significant injuries.

**COUNT VII**

**NEW YORK CHILD VICTIMS ACT CLAIM (N.Y. C.P.L.R. § 214-g)**

***Against Defendant Raniere on behalf of Camila***

291. Plaintiffs reallege and incorporate paragraphs 1 through 192 of this Complaint.

292. Defendant Raniere repeatedly engaged in conduct against Camila while she was a child under eighteen years of age that constituted sexual offenses as defined under article one hundred thirty of New York state penal law, including: (i) 130.25, rape in the third degree; (ii) 130.40, criminal sexual act in the third degree; (iii) 130.55, sexual abuse in the third degree; and (iv) 130.20, sexual misconduct.

293. Defendant Raniere engaged in conduct against Camila when she was a child under seventeen years old in violation of New York penal law section 263.05, use of a child in a sexual performance.

294. Raniere was convicted for, among other things, sexual offenses against Camila in violation of 18 U.S.C. section 2251(a), sexual exploitation of a minor, and 18 U.S.C. section 2252(a)(4)(B), knowingly possessing visual depictions of a minor engaging in sexually explicit conduct (possession of child pornography). The elements of these federal offenses of conviction

are identical or substantially similar to the elements constituting the New York state criminal offense of use of a child in a sexual performance.

295. Raniere's sexual offenses committed against Camila as alleged herein caused and continues to cause Camila to suffer physical, psychological, and emotional injuries or conditions.

**COUNT VIII**

**N.Y. C.P.L.R. § 213-c (action by victim of sexual offenses)**

***Against Defendant Raniere on behalf of Camila***

296. Plaintiffs reallege and incorporate paragraphs 1 through 192 of this Complaint.

297. On one or more occasions, Defendant Raniere engaged in sexual intercourse with Camila by forcible compulsion, in violation of New York penal code section 130.35, rape in the first degree. On one or more occasions, Defendant Raniere engaged in sexual intercourse with Camila without her consent, in violation of New York penal code section 130.25(3), rape in the third degree.

298. Raniere's acts of raping Camila have caused her to suffer physical, psychological, and emotional injuries or conditions.

**COUNT IX**

**BATTERY; INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS; CLAIMS PURSUANT TO NEW YORK CHILD VICTIMS ACT (N.Y. C.P.L.R. § 214-g)**

***Against Defendant Raniere on behalf of Camila***

299. Plaintiffs reallege and incorporate by reference paragraphs 1 through 192 of this Complaint.

300. Defendant Raniere repeatedly engaged in conduct against Camila while she was a child under eighteen years of age that constituted sexual offenses as defined under article one hundred thirty of New York state penal law, including: (i) 130.25, rape in the third degree; (ii)

130.40, criminal sexual act in the third degree; (iii) 130.55, sexual abuse in the third degree; and (iv) 130.20, sexual misconduct. Defendant Raniere engaged in conduct against Camila when she was a child under seventeen years old in violation of New York penal law section 263.05, use of a child in a sexual performance.

301. Raniere was convicted for, among other things, sexual offenses against Camila in violation of 18 U.S.C. section 2251(a), sexual exploitation of a minor, and 18 U.S.C. section 2252(a)(4)(B), knowingly possessing visual depictions of a minor engaging in sexually explicit conduct. The elements of these federal offenses of conviction are identical or substantially similar to the elements constituting the New York state criminal offense of use of a child in a sexual performance.

302. Raniere's intentional bodily contact with Camila was offensive in nature and constituted battery. Raniere's intentional or reckless, extreme, and outrageous conduct was intended to cause and did cause Camila to suffer severe emotional distress.

303. Raniere's sexual offenses committed against Camila caused and continue to cause Camila to suffer physical, psychological, and emotional injuries or conditions.

## COUNT X

## BATTERY; INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS; CLAIMS PURSUANT TO N.Y. C.P.L.R. § 213-c (action by victim of sexual offenses)

***Against Defendant Raniere on behalf of Camila***

304. Plaintiffs reallege and incorporate paragraphs 1 through 192 of this Complaint.

305. On one or more occasions, Defendant Raniere engaged in sexual intercourse with Camila by forcible compulsion, in violation of New York penal code section 130.35, rape in the first degree.

306. On one or more occasions, Defendant Raniere engaged in sexual intercourse with Camila without her consent, in violation of New York penal code section 130.25(3), rape in the third degree.

307. Raniere's intentional bodily contact with Camila was offensive in nature and constituted acts of battery.

308. Raniere's intentional or reckless, extreme, and outrageous conduct was intended to cause and did cause Camila to suffer severe emotional distress.

309. Raniere's sexual offenses committed against Camila as alleged herein caused and continue to cause Camila to suffer physical, psychological, and emotional injuries or conditions.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs pray that the Court find the Defendants liable on all Counts of the Complaint applicable to them; that judgment be entered on Plaintiffs' behalf; and that Plaintiffs receive recovery for their losses to the fullest extent permitted by law, including compensatory, punitive, and statutorily-provided for damages and attorneys' fees, for amounts to be determined.

**DEMAND FOR JURY TRIAL**

Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiffs demand a trial by jury of all issues so triable.

Dated: October 7, 2026

*<u>/s/ Greg G. Gutzler</u>*
Greg G. Gutzler
Emma Bruder
DICELLO LEVITT LLP
485 Lexington Avenue, 10th Floor
New York, NY 10017
(646) 933-1000
ggutzler@dicellolevitt.com
ebruder@dicellolevitt.com

Adam M. Prom
DICELLO LEVITT LLP
10 North Dearborn Street, 6th Floor
Chicago, IL 60602
(312) 214-7900
aprom@dicellolevitt.com

Agnieszka M. Fryszman
COHEN MILSTEIN SELLERS
& TOLL PLLC
1100 New York Ave. NW, Suite 800
Washington, DC 20005
(202) 408-4600
afryszman@cohenmilstein.com

Manuel John Dominguez
COHEN MILSTEIN SELLERS
& TOLL PLLC
11780 U.S. Highway One, Suite N500
Palm Beach Gardens, FL 33408
(561) 515-1400
jdominguez@cohenmilstein.com

Robert A. Swift
Zahra R. Dean
KOHN, SWIFT & GRAF, P.C.
1600 Market Street, Suite 2500
Philadelphia, PA 19103

(215) 238-1700

*Attorneys for Plaintiffs*